## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| SUK JOON RYU, a/k/a James S. Ryu, | : : : | |
| Plaintiff, | : : | **JURY TRIAL DEMANDED** |
| v. | : : : | |
| BANK OF HOPE, | : : : | CASE NO. _____ |
| Defendant. | : : | |

## <u>COMPLAINT</u>

**STEVE HARVEY LAW LLC**
Stephen G. Harvey
David V. Dzara
Michael E. Gehring*
1880 John F. Kennedy Blvd.
Suite 1715
Philadelphia, PA 19103
(215) 438-6600
steve@steveharveylaw.com
david@steveharveylaw.com
mike@steveharveylaw.com

*Attorneys for Plaintiff*
*Suk Joon Ryu, a/k/a James S. Ryu*
*\* Pro hac vice motion to be filed*

Dated:  October 15, 2019

# <u>TABLE OF CONTENTS</u>

**Page**

INTRODUCTION ............................................................................................... 1

THE PARTIES ................................................................................................. 10

JURISDICTION AND VENUE ........................................................................ 10

FACTUAL ALLEGATIONS ............................................................................ 11

    A.    General Background of Plaintiff James Ryu, Defendant
           Bank of Hope, and Convicted Embezzler Karen Chon ........................ 11

    B.    The Bank's Simultaneous Discovery of (1) Ryu's Role in
           Setting Up a Competing Bank and (2) Chon's Embezzlement
           of $1.5 Million from BankAsiana ......................................................... 13

    C.    Chon's Meetings with the FBI in February 2014 and Her
           Statements That (1) Ryu Was Not Involved in Her Scheme
           and (2) She Lied About His Role Because Bank Auditors
           Suggested He was Involved ................................................................... 15

    D.    The Unwarranted Seizure of Ryu's Money, and Ryu's Efforts
           to Assist the Bank with Its Investigation ............................................. 16

    E.    Chon's Meeting with Pai at Which She Failed to Cooperate............... 19

    F.    The Bank's Internal Investigation Report, Which Concluded
           That Chon Had Perpetrated the Scheme on Her Own, With
           No Evidence of Ryu's Participation ...................................................... 23

    G.    The Bank's Failure to Investigate or Even Consider Other
           Obvious Possibilities About What Chon Did With the
           $1.5 Million She Admits She Stole and Has Not Returned
           Because She Claims She Does Not Have It ......................................... 26

    H.    The Filing of the Embezzlement Action and the Bank's
           Adoption of Chon's False Accusation Against Ryu .............................. 28

    I.    Chon's First Day of Deposition, Where She Contradicted
           Her Prior Statement.............................................................................. 33

    J.    Chon's Guilty Plea and Sentencing, Where She First Claimed
           That Ryu "Forced" Her to Embezzle..................................................... 35

K.      Pai's Review of the FBI Memos and Chon's Sentencing
        Transcript, Which Showed That Chon Had Lied Repeatedly,
        and Pai's Refusal to Consider the Possibility That Chon
        Had Lied ........................................................................................ 37

L.      Chon's Second and Third Days of Deposition, at Which
        She Feigned Lack of Memory and Failed to Answer Any
        Questions Except to Repeat Her Contention That Ryu
        "Forced" Her to Embezzle ............................................................. 39

M.      The Advancement Action, by Which Ryu Forced the Bank to
        Honor Its Contractual Obligation to Pay His Defense Costs ............. 41

N.      The Bank's Dismissal of Its Claims Against Ryu With Prejudice ....... 42

O.      The Bank's Harassing, Vindictive, and Spiteful Behavior
        Toward Ryu .................................................................................... 43

P.      The Harm to Ryu Caused by the Bank's Claims Against Him
        Based on Chon's Lies ...................................................................... 45

        1.      Harm to Reputation .............................................................. 48

        2.      Financial Harm ...................................................................... 48

        3.      Emotional Stress and Pain Including Physical
                Manifestation ........................................................................ 50

COUNT I – MALICIOUS USE OF PROCESS ........................................... 51

COUNT II – BREACH OF CONTRACT ................................................... 53

PRAYER FOR RELIEF .......................................................................... 54

DEMAND FOR JURY TRIAL .................................................................. 55

**INTRODUCTION**

1.     Miye Chon, a/k/a Karen Chon ("Chon"), is currently serving a lengthy prison sentence for embezzling approximately $1.5 million from Defendant Bank of Hope (the "Bank"), her former employer. She pleaded guilty to the embezzlement after being investigated and charged by federal authorities. No one except Chon was ever criminally charged for participating in her embezzlement.

2.     When Chon was caught in her embezzlement scheme, she confessed that she had been stealing money from the Bank for the last few years.

3.     The following day, she changed her story for the first of many, many times. At the specific suggestion of a Bank employee, she claimed that Plaintiff Suk Joon Ryu, a/k/a James S. Ryu ("Ryu"), a former executive of the Bank's predecessor and former Bank employee, was involved in the embezzlement and that she had, in fact, simply handed the cash that she stole to him, for no apparent reason or benefit to herself.

4.     The Bank was eager to credit, or to pretend to credit, this story of Ryu's involvement. The Bank had an undeniable motive to harm Ryu, as it learned at the same time that Ryu, who had left the employ of the Bank, was in the process of starting a new competing Korean American bank in the same region of northern New Jersey. The Bank had just paid millions to enter this market with the October 2013 purchase of BankAsiana, which Ryu had helped to found and ultimately to sell to the Bank. The Bank, angry with Ryu for working with a future potential competitor, and frustrated with itself for failing to request and pay for a

noncompete agreement, was happy to exact its revenge against Ryu by ostensibly buying into Chon's story of Ryu's involvement, and claiming that Ryu was involved in the embezzlement.

5.     Blaming Ryu also allowed the Bank to deflect from its negligence in failing to investigate millions of dollars in suspicious transactions in the same time frame as the embezzlement (2010-13) that Chon made in accounts for herself and her husband's businesses. To this day, the Bank has not investigated these transactions or made any attempt to determine what happened to the money Chon admits she stole, and *none* of it has yet been recovered or even located. This goes beyond gross incompetence and amounts to intentional disregard of the facts.

6.     There were several large problems with Chon's tale and the Bank's ostensible reliance on it. First, there was not, and there never has been, a single piece of evidence—not a scrap—to corroborate Chon's claim that Ryu was involved in, and profited from, her embezzlement. Chon herself acknowledged to the Bank that she had no evidence to support her claim against Ryu, and *the Bank's own internal investigation reported no evidence of Ryu's involvement, even though the Bank had specifically tasked the investigation to look for evidence of Ryu's involvement.* In this age of data, and the use of surveillance video, and every other method that banks possess to document bank activity and discover fraud and theft, the Bank has never been able to point to *anything* other than Chon's fantastical and inconsistent story to prove that Ryu was in any way involved in Chon's embezzlement of Bank funds.

7.     Second, Chon had obvious motives to lie including to protect her husband and to conceal the money she stole so she could access it later. The Bank made no effort to investigate these possibilities and, as noted, acted suspiciously uninterested in locating or recovering any stolen funds.

8.     Third, there were significant inconsistencies and obvious lies in what Chon told the Bank, apart from the failure to mention him the day she first confessed. For example, Chon at first told Bank employees that she had started to steal when Ryu asked her to procure a $10,000 "loan" for him and then kept demanding similar cash payments, but later she told the Bank's general counsel that she stole the first $100,000 to $200,000 on her own and then somehow Ryu "caught" her and forced her to steal for him. The Bank recognized that there were inconsistencies in Chon's story, but made no effort to investigate them, and decided not to interview key witnesses.

9.     Fourth, after initially acting as if she were cooperating with the Bank, Chon hired a lawyer and refused to cooperate. In contrast, Ryu met with the Bank and its counsel, answered all questions, and offered to make himself available as much as needed, without the assistance of any lawyer.

10.     Fifth, the Bank knew that Chon had worked for another predecessor of the Bank and had left her employment under suspicion of embezzlement. In other words, the Bank ostensibly accepted the word of a person who admitted embezzling all of the money at issue and who was suspected of embezzlement on a prior occasion.

11.     With all of these problems with Chon's accusation against Ryu, and with a motive to harm Ryu, the Bank claimed that it believed Chon's story that she embezzled vast sums of money from the Bank, exposing herself to serious criminal liability, to mainly benefit Ryu, a person she barely knew, and that explained why she could not account for any of the money she stole. Acting in purported reliance on Chon's spurious claim, on March 19, 2014, the Bank filed a lawsuit against Ryu, who had a stellar record and had never been charged with any wrongs in his almost twenty years of work in Korean American banking, accusing him of embezzlement, with predictably devastating results to him, including to his reputation, his ability to find work and provide for his family, and his emotional state, as well as great harm to his wife and children. The baseless lawsuit brought by the Bank has, in a word, destroyed Ryu.

12.     Ryu therefore brings this action under the New Jersey law of malicious use of process to recover against the Bank for the harm caused to him by the baseless lawsuit that it brought against him in this Court, *Bank of Hope v. Miye Chon, et al.*, No. 2:14-cv-01770 (the "Embezzlement Action"). When the Bank brought the lawsuit in March 2014, it knew or should have known that the core allegation—that Ryu knowingly had participated with confessed embezzler Karen Chon in stealing approximately $1.5 million from the Bank—was false.

13.     As noted, prior to suing Ryu, the Bank's investigation of Chon's crime did *not* conclude that Ryu was involved in the embezzlement, and Chon's accusations against Ryu were uncorroborated, contradictory, and highly suspicious

if not transparently false. The Bank therefore knew that it had no reasonable basis to credit Chon's story of Ryu's involvement. At the very least, the Bank had a clear duty to investigate Chon's story and the many transactions involving millions of dollars that she had conducted during the same years as the embezzlement, including at a minimum, for example, interviewing her husband, which it did not even *try* to do, before taking the drastic and devastating step of suing Ryu and thereby publicly accusing him of embezzlement. Instead, it precipitously filed the Embezzlement Action, when it should have taken time to investigate and corroborate, and at the very least complete its own internal investigation, before filing. There was no valid or even arguable need for the Bank to bring the claim against Ryu so quickly before completing and pursuing readily available avenues of investigation, especially in light of the inherent untrustworthiness of Chon's accusations.

14.     The Bank's precipitous action suggests that it had no interest in finding out the truth regarding Ryu's alleged involvement in Chon's embezzlement. Rather, the evidence strongly suggests that the Bank either desired to harm Ryu or at least recklessly disregarded the risk of harm to Ryu, and *chose* not to complete its own investigation, and continue to investigate if necessary, and thereby confirm his non-involvement, because it wanted to sue him and cause him lasting harm. Indeed, the Bank not only sued Ryu, it first seized $54,000 in his personal account at the Bank. It claimed it needed to take hold of Ryu's personal account to see if the money came from Chon, but that also was untrue because the Bank had access to the

5

accounts and could easily see that the money in Ryu's account did not come from Chon.

15.     As bad as it was for the Bank to bring the baseless lawsuit in the first place, and to seize Ryu's funds, the Bank compounded the harm exponentially by continuing the lawsuit well past the time that it was undeniable that Chon was lying. Chon's mendacity was apparent from well before the lawsuit was filed, but at the latest at her first deposition in June 2016, when she contradicted what she had previously told the Bank, including the amount of her first alleged payment to Ryu, the total amount she kept, and the fact that she spent money for her own debts and personal expenses as well as her husband's business.

16.     Ryu's counsel had only a brief chance to question Chon at that deposition, and sought to depose her on another day, but Chon refused. She evaded court orders requiring her to sit for a further deposition for almost two more years, before she pleaded guilty to embezzlement, and went to prison. Ryu's counsel got a court order requiring her to appear for her deposition in prison in March 2018.

17.     Between Chon's depositions in 2016 and 2018, Ryu's counsel forced Chon to produce documents that the government had provided to her in preparation for her criminal trial. Among these documents was the Federal Bureau of Investigation ("FBI") memo showing that *Chon initially told the FBI in February 2014 that Ryu had no role in her crime and that she had lied about this to the Bank at the suggestion of Bank employees.* The Bank reviewed those memos in December 2016 and yet continued its claim against Ryu based exclusively on Chon's ever-

changing, unbelievable, and uncorroborated story of Ryu's involvement in her embezzlement which the FBI clearly did not credit.

18.     At the 2018 deposition in prison, Chon dropped any pretense of telling the truth. She refused to answer any questions and instead testified over 300 times that she could not remember anything other than that "James Ryu forced me to do it." She gave this same answer—lack of memory of anything except that Ryu forced her to do it—when asked questions about anything having to do with the Bank, banking, her job, or any of the numerous transactions totaling hundreds of thousands of dollars in her personal checking account during 2010 to 2013, the same years of her confessed embezzlement. These are among the accounts and transactions the Bank should have looked at in 2014, before it brought the lawsuit. It is utterly unreasonable that the Bank, with all its lawyers hired to work on the lawsuit, did nothing to investigate this obvious explanation for the money Chon stole, but instead merely accepted (or pretended to accept) without more her accusation that she gave most of the money to Ryu and continued to rely on this falsehood, even after she refused to answer any questions and hid behind an obviously untrue claim of total memory loss, and even after the Bank later learned that she had several times undeniably lied about the facts of the embezzlement.

19.     After Chon's 2018 deposition, the most hardened of heart would have given up reliance on Chon's obviously untruthful story about Ryu's participation in the embezzlement. But not the Bank. It persisted for another year and only gave up its claim in April 2019 after Ryu sued the Bank's corporate parent in federal court

in New York to force it to honor its clear contractual duty to pay Ryu's defense costs. It was not until after the federal court in New York ordered the Bank's corporate parent to pay several times, and it faced sanctions for not complying with court orders, did the Bank finally pay Ryu's legal bills. At that point, the Bank, knowing that it would be paying Ryu's lawyers to defend him against the Bank's baseless lawsuit, finally decided to give up its false claims against Ryu in the Embezzlement Action.

20.     Ever spiteful, the Bank could not resist, in one last parting shot, to claim in its motion to terminate with prejudice its claims against Ryu that he was involved in the embezzlement: "Bank of Hope maintains that its claims against Ryu have merit . . . ." This confirms the malicious nature of the Bank's motives throughout the case. It was a gratuitous statement, and clearly intended to inflict further harm on Ryu.

21.     Several months after the Bank dropped its claims against Ryu, the Bank and Ryu entered into a confidential settlement of Ryu's counterclaim against the Bank for wrongfully seizing his $54,000 of funds on deposit. Ryu agreed to settle that counterclaim on several conditions, including that it would have no effect on his rights in this action and that the settlement funds would be paid in ten days' time. This was very important to Ryu, because he needed the money to save his house from sheriff's sale and he had literally run out of money to pay for everyday living expenses for himself and his wife and children. Knowing that Ryu was desperate and that it had obligated itself to make payment within ten days' time,

the Bank knowingly and intentionally breached the agreement and failed to pay within ten days or, indeed, for an additional nine days (a long time for four people to be hungry), and only because the court ordered it to make that settlement payment. This is part of a shameful pattern of the Bank disregarding clear court orders and agreements all for the purpose of making life as hard as possible for Ryu.

22.     The harm to Ryu and his family is done, and it continues. Ryu has been crushed financially. His efforts to work with the competing bank were stopped cold, as the investors would not accept Ryu as a senior executive at the new bank because of the charges levelled against him by the Bank. Since then, with limited exceptions, he has been unable to find work or earn an income.

23.     Without any income, Ryu spent all his savings and what he can borrow to support his family. At the time he agreed to settle the counterclaim, he had literally $99 to his name. The counterclaim settlement allowed him to rescue his home from sheriff's sale and pay some debt, with some money left over to live off for a year or two, at most. He is disgraced not just before the Korean American community, but also before the entire world as an accused embezzler, a thief who was sued in federal court. He has been forced to watch the toll that over five years of that false lawsuit has taken on him and his family. The emotional strain on him has been prolonged and intense. It has caused him acute physical and mental stress and harm. He seeks substantial damages to compensate him for the harm caused plus punitive damages to the maximum amount allowed by law. Most of all, he wants back his good name.

## THE PARTIES

24.     Plaintiff Ryu is an individual residing at 630 Rita Drive, River Vale, New Jersey 07675.

25.     Defendant Bank of Hope is a commercial bank chartered under the laws of the State of California, with its principal place of business located at 3200 Wilshire Boulevard, Suite 1400, Los Angeles, California 90010. It is registered to do business in New Jersey and has branches here.

26.     The Bank is a Korean American bank, which means that most of its customer base, employees, and leadership is Korean American and it markets its banking products and services primarily but not exclusively to Korean Americans.

27.     It is the result of a series of corporations and mergers of earlier Korean American banks, including Liberty Bank of New York, BankAsiana, BBCN Bank, Wilshire Bank, Center Bank, and Nara Bank. It is the wholly-owned subsidiary of Hope Bancorp, Inc., a publicly traded company. It is also the successor to Wilshire Bank, the entity that initially filed the Embezzlement Action against Ryu.

## JURISDICTION AND VENUE

28.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(1) because there is diversity of citizenship and the amount in controversy exceeds the sum of $75,000.00, exclusive of interest and costs.

29.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in this District.

## FACTUAL ALLEGATIONS

**A.   General Background of Plaintiff James Ryu, Defendant Bank of Hope, and Convicted Embezzler Karen Chon**

30.    On October 1, 2013, the Bank, through a predecessor (Wilshire Bank), acquired by merger all the assets of a smaller Korean American bank in New Jersey by the name of BankAsiana (the "Merger").

31.    Prior to the Merger, Ryu was BankAsiana's senior vice president and chief operating officer as well as one of its founders.

32.    Prior to the Merger, Chon was BankAsiana's assistant vice president and operations officer.

33.    Ryu had a long and very successful career in the field of Korean American banking that began as an employee of Wilshire Bank in California from approximately 1989 to 1990.

34.    Ryu took a leave of absence from banking to pursue a successful career as, among other things, a music producer and performing artist in Korea from approximately 1991 to 1998.

35.    In 1998, Ryu returned to banking by taking employment in California with another Korean American bank, called Center Bank, which later became part of the Bank. Ryu received substantial experience and training as a banker at Center Bank from 1998 to 2006, where he was in charge of human resources management, federal and state regulatory relations, investors relations, public and media relations, risk management, and policies and procedures administration, among other things, as the senior vice president and special assistant to the

11

president, and senior administrator. His record and reputation for honesty and professionalism at Center Bank was impeccable.

36.     In 2006, Ryu moved to New Jersey to start a Korean American bank for a group of investors and to handle the bank regulatory aspect of the operations as well as to handle general management duties as the number two executive at the bank as the chief operating officer with his senior colleague H.S. Hur as president and chief executive officer. This became BankAsiana.

37.     After founding BankAsiana (where, again, his record and reputation were spotless), Hur and Ryu successfully managed and ran it until October 2013 when it was sold to the Bank.

38.     Following the sale of BankAsiana, Ryu intended to continue his career as a banker by doing what he did at BankAsiana with a new banking venture.

39.     Ryu began working with a group of investors who planned to inject new capital in and revitalize a financially troubled New Jersey chartered bank named New Millennium Bank.

40.     Ryu was hired to complete the change-in-control and other regulatory applications with the Federal Deposit Insurance Corporation and New Jersey Department of Banking and Insurance.

41.     Ryu was slated to become the new bank's chief operating officer following approval of the regulatory applications.

42.     Ryu had a legal right to work with New Millennium Bank. There were no legal restrictions preventing him from working with another bank.

**B.      The Bank's Simultaneous Discovery of (1) Ryu's Role in Setting Up a Competing Bank and (2) Chon's Embezzlement of $1.5 Million from BankAsiana**

43.      In or around January 15, 2014, the Bank discovered that H.S. Hur was engaged in creating New Millennium Bank as a Korean American bank to compete with the Bank in northern New Jersey.

44.      The Bank right away suspected Ryu of being involved with H.S. Hur in the creation of New Millennium Bank because it had terminated his employment with the Bank following the Merger and knew that Ryu had a history of working with Hur to found BankAsiana.

45.      The Bank also knew that it had not paid Ryu for a noncompete agreement and that he was free to compete with the Bank.

46.      One week after it got word of a new competitor led by Hur and Ryu, the Bank learned of Chon's embezzlement when a Bank employee discovered irregularities in the vault cash account at the Fort Lee branch, where Chon had worked, and contacted Chon for an explanation. Chon attended a meeting with two Bank employees on January 22, 2014. At this meeting, she confessed to the Bank employees that she had embezzled money from BankAsiana for years by debiting CD accounts and crediting a vault cash account. Chon stated that she transferred funds from one CD account to another to cover the shortage in the CD accounts she had debited. Chon also stated that she funneled some of the stolen money into her husband's business accounts he had at BankAsiana, and that she had forged his

13

signature on checks for the business accounts. Chon said *nothing* about Ryu being involved.

47.     The following day, January 23, 2014, Chon attended another meeting with the same two Bank employees plus Alicia Lee, the Bank's first vice president and operations administrative manager, who had flown to New Jersey from Los Angeles overnight to interview Chon. Chon again confessed to embezzling money from BankAsiana.

48.     At this meeting, in response to a suggestion from the Bank employees, Chon first claimed that Ryu was also involved in her embezzlement. Chon stated that Ryu initially contacted Chon and asked her for a personal loan to which Chon responded no. According to Chon, Ryu then asked Chon if there was any way that she could facilitate a $10,000 "loan" to him, which she understood to be a request to steal from the Bank. As a result, Chon stole $10,000 from the Bank in cash and delivered it to Ryu, Chon told the Bank. Chon also stated that after the initial $10,000, she provided cash to Ryu whenever he asked for it. She stated that sometimes she delivered the stolen cash to Ryu, and other times he came to the Fort Lee Branch to pick it up. Chon stated that Ryu contacted her by BankAsiana company phone, not home or cell phone, when he wanted her to give him cash. Chon also stated that money she embezzled went to her husband's business use, and she admitted to forging her husband's signature to issue checks from her husband's BankAsiana business account.

49.     Two days later, on January 25, 2014, the Bank searched its records and discovered checks made out to Ryu that he had deposited in his checking account at the Bank in December 2013 and January 2014. The checks showed that they were payment for salary and expenses for Ryu's work on New Millennium Bank.

50.     Less than a week later, on January 29, 2014, an article about New Millennium Bank, which mentioned Ryu's role as chief operating officer, appeared in an industry report. The following day, the Bank's chief financial officer circulated a copy of the report to the Bank's board of directors as well as the Bank employees who were participants in the investigation of the embezzlement. The cover email specifically called out Ryu's involvement in New Millennium Bank.

**C.     Chon's Meetings with the FBI in February 2014 and Her Statements That (1) Ryu Was Not Involved in Her Scheme and (2) She Lied About His Role Because Bank Auditors Suggested He was Involved**

51.     Chon's confession of her embezzlement led to an investigation by the United States Department of Justice ("DOJ") and FBI (the "DOJ/FBI Investigation").

52.     Two FBI agents interviewed Chon outside of her residence on February 7, 2014. Notably, this interview took place *after* Chon had told the Bank that Ryu was involved in the embezzlement.

53.     The FBI drafted a memo of the February 7 interview of Chon, which reported that "CHON immediately admitted that she had acted alone.*"* She said that "no one else at BANKASIANA knew that she was stealing money from the

bank while she was doing it."  She also said that ""JAMES RYU was not involved in the scheme to steal money from the CD accounts." Further, she said that she had "lied about JAMES RYU's involvement because the bank auditors suggested to CHON that RYU was involved. The auditors seemed to suspect RYU from the beginning. They did not believe that CHON accomplished the scheme by herself. CHON agreed with the auditors that JAMES RYU was involved."

54.     The FBI interviewed Chon a second time on February 11, 2014. During this interview, Chon changed her story yet again. This time she said that approximately three years before, she found out that Ryu needed money, and around this same time she started taking money out of CD accounts at the Bank. She said it was her idea to take money out of the CD accounts, and that the first time Ryu asked her to steal for him was around the same time he asked her for a personal loan. She said she told Ryu about her scheme, and she claimed Ryu told her to get him some money and he would pay it back, but he never gave her any money back. She claims that she funneled $600,000 to $700,000 to Ryu.

**D.    The Unwarranted Seizure of Ryu's Money, and Ryu's Efforts to Assist the Bank with Its Investigation**

55.     In mid-January 2014, Ryu began having problems with his debit card and accessing funds in his checking account. The balance of the account at that time was approximately $54,000. Ryu called several Bank employees to resolve the debit card issue, but the issue was not resolved.

56.     Ryu later discovered that the debit card issue was a result of the Bank's freezing of his checking account ostensibly in response to Chon's false accusation that he conspired with her to embezzle money.

57.     In early February 2014, Ryu learned that some of the New Millennium Bank investors had heard a rumor about Chon's lies that Ryu was involved in her embezzlement.

58.     Ryu also learned that the Bank made a claim with its insurance carrier to recover the losses incurred by Chon's embezzlement.

59.     Ryu was perplexed as to why the Bank had not reached out to him to discuss Chon's lies as part of their investigation, so he called Lisa Pai ("Pai"), who was executive vice president and chief legal and human resources officer of the Bank, on or about February 10, 2014. Ryu knew Pai through dealings in connection with the sale of BankAsiana to the Bank in 2013.

60.     During their conversation, Pai confirmed that the Bank was investigating Ryu for possible embezzlement due to Chon's statement. Ryu vehemently denied any involvement in the embezzlement and said that Chon had lied.

61.     Pai also confirmed that the Bank froze Ryu's checking account while they were investigating him.

62.     Pai then demanded Ryu preserve all files on his two BankAsiana computers and return them. Ryu responded that BankAsiana permitted him to take

and keep the computers, but he would preserve all files and return the computers to show his cooperation and that he had nothing to hide.

63.     Pai stated that she would be in the New Jersey area within the week and asked Ryu if he would be willing to meet with her and the Bank's outside counsel, Michael M. Yi. Ryu agreed.

64.     Ryu met with Pai and Yi at a hotel in Fort Lee, New Jersey, on or about February 13, 2014. He provided the computers to Pai at the meeting.

65.     Ryu told them that Chon had lied about his involvement in the embezzlement.

66.     Ryu informed Pai and Yi that he met with Chon right before their meeting and that he recorded his conversation with her. Ryu told them that Chon said she would tell the Bank that she lied about his involvement in the embezzlement.

67.     Ryu again asked about the Bank's seizure of his checking account. Pai and Yi confirmed that the bank froze the account during their investigation of Chon's accusation of Ryu's involvement in the embezzlement.

68.     Pai and Yi asked Ryu about his relationship with Chon. Ryu explained that there was no personal relationship between him and Chon, and that he did not hire, supervise, or promote her. He further explained that he did not communicate with her regularly, and that his only meetings with her were monthly lunches with her and other employees to discuss branch operations.

69.     Pai and Yi extensively questioned Ryu about New Millennium Bank and recent transactions in his checking account.

70.     Ryu confirmed that he began working with New Millennium Bank in October 2013, and that recent deposits were payments for his work for New Millennium Bank.

71.     Ryu asked for the basis of Pai and Yi's questions regarding New Millennium Bank and payments he received for his work, and what relationship they thought they had with Chon's embezzlement. Yi responded that they wanted to determine whether Ryu was involved in the embezzlement because he needed money to invest in New Millennium Bank. Ryu explained that he was not an investor.

72.     Pai and Yi then asked Ryu about two failed retail businesses Ryu was involved with in 2010. Again, Ryu questioned the relationship between these businesses in 2010 and Chon's embezzlement but answered their questions fully. Pai and Yi provided no explanation.

73.     Ryu answered all their questions for several hours and volunteered to make himself available to answer any additional questions, but the Bank never requested another meeting or asked other questions of him prior to filing the Embezzlement Action against him.

**E.     Chon's Meeting with Pai at Which She Failed to Cooperate**

74.     Chon met with Pai at a hotel in Fort Lee, New Jersey, on February 14, 2014. The meeting lasted less than an hour. Pai wanted to meet with Chon longer,

19

but the meeting was cut short because Chon claimed that she had babysitting problems and could not stay. The Bank's outside counsel Michael M. Yi was supposed to attend the meeting as well, but Chon arrived early and left before Yi arrived.

75.     At the meeting, Chon told Pai that she stole approximately $1.2 million, used approximately $500,000 to pay her husband's business debts and gave the remaining approximately $700,000 in cash to Ryu with no way to trace it and no proof that she had given any of it to him. She told Pai that she had begun embezzling without Ryu's knowledge and that she thought she was merely borrowing temporarily from the accounts of her husband's business partners and her husband's sister, and that she had taken somewhere in the range of $100,000 to $200,000 when Ryu caught her. Chon did not say and Pai did not ask how Ryu supposedly caught her. Pai claimed that she credited as "plausible" Chon's claim that she thought she was just borrowing money and intended to give it back, even though Pai knew that Chon had been suspected of embezzlement on a prior occasion and had denied it even after being caught with $4,000 in cash in her purse. This version by Chon of how she began the Embezzlement directly contradicted what she had previously told Bank employees (*i.e.*, that she started stealing when Ryu asked for a $10,000 "loan").

76.     Pai asked Chon about unexplained transactions in Chon's accounts at the Bank, during the same time as the embezzlement, in the following amounts: $100,500; $100,000; $70,000; $60,000; $50,000; $30,000; and $27,000. Chon told Pai

that these transactions were related to a "gae" or "kye," a type of rotating credit association used in Korean communities and through which, according to Pai, "a lot of people get defrauded." Pai testified that she believed Chon that all of these large transactions were related to a gae and were unrelated to the embezzlement, without any need to investigate further. Chon also told Pai that she had lied to her husband about the source of funds used to pay his business debts, and claimed that it came from a gae/kye.

77.     There were significant inconsistencies and obvious untruths in what Chon told the Bank on the only occasions she spoke to it about the embezzlement, which were at the meetings on January 22 and 23 and the meeting with Pai on February 14, including, most notably, how much she stole, how much she gave to Ryu, and how she came to embezzle and allegedly give the money to Ryu.

78.     The Bank recognized that there were inconsistencies, but purportedly decided to credit Chon's story nonetheless, because, according to Pai's testimony, she decided that the inconsistencies were the product of Chon's nervousness about going to prison after she had just recently given birth. Pai even said that she believed Chon's claim that she had been authorized by one accountholder to take money out of her account without even needing to check with the accountholder.

79.     The Bank decided not to conduct formal interviews of the employees who had spoken to Chon on January 22 and 23. Pai spoke to these employees alone but made no notes of what they said. The Bank also decided not to conduct any interviews of the employees who had worked in the branch with Chon, Chon's

husband, or any of the people with whom Chon had entered into large dollar transactions.

80.     The Bank decided that it did not need to interview any of these witnesses, because the FBI was conducting an investigation, and the Bank wanted to defer to the FBI, even though the Bank thereafter never communicated with the FBI about the progress of the FBI's investigation and/or findings.

81.     Pai was aware of Chon's prior embezzlement from Liberty Bank and considered it when deciding whether to ostensibly credit Chon over Ryu, but later testified that the prior embezzlement was a small amount compared to Chon's BankAsiana embezzlement and therefore Chon must have needed "help" to embezzle an amount of the magnitude stolen from BankAsiana. This contradicts the version of Chon's story that Pai claims she accepted, *i.e.*, that Chon started, conceived, and carried out the embezzlement scheme on her own, and that Ryu then caught Chon and forced her to steal more, not that she at any point needed his "help" to steal the money.

82.     Chon never again met with the Bank after her meeting with Pai, but instead retained a lawyer and refused to cooperate. Despite the numerous problems and inconsistencies in Chon's story, Pai testified that she believed it all at the time, and as late as August 2017, that she still believed all of Chon's testimony. This is a fabrication by the Bank designed to hide the lack of evidentiary basis for suing Ryu based on Chon's uncorroborated and fantastical story that she gave all the money to Ryu.

### F.   The Bank's Internal Investigation Report, Which Concluded That Chon Had Perpetrated the Scheme on Her Own, With No Evidence of Ryu's Participation

83.     Following Chon's admission of the embezzlement on January 22, 2019, the Bank began an internal investigation that was reported internally in two separate memoranda, one dated February 25, 2014, and the other dated March 28, 2014 (shortly *after* the Bank had already sued Ryu). Pai specifically tasked the investigation with trying to find a link between Ryu and the embezzlement.

84.     *Other than Chon's accusation, the two memoranda reported no evidence of Ryu's involvement in the crime and concluded that Chon was the perpetrator*. The first memorandum said that "[i]n conclusion, the embezzlement was a well-conceived plan to defraud the Bank, regardless of whether [Ryu] was involved." The second memorandum, completed about a month later after additional investigation, said that "[i]n conclusion, the embezzlement was a well-conceived plan to defraud the Bank *performed by the Operations Officer [Chon]*." (Emphasis added).

85.     These memoranda also reported that in 2006, Chon had worked for a predecessor of the Bank in New York City. They reported that "Karen left the Bank through maternity leave under a cloud of suspicion since she and/or her employees had several cash shortages, of which $10,000 was the largest." They also reported that bank employees in 2006 "searched her purse and found $4,000 in cash," but "[s]he was not terminated and arrested for the cash shortage due to lack of sufficient evidence."

86.     These memoranda also reported several unexplained financial items that the Bank apparently never fully investigated, including that Chon had possibly used embezzled funds in 2012 and 2013 to pay off a $160,000 business loan that her husband had with BankAsiana, and that she was a principal of a Japanese restaurant in Brooklyn.

87.     These memoranda also reported more previous illegality by Chon, *i.e.*, that Chon had stolen money from the account of her husband's business partner, that her husband had signed checks on his business partner's account even though he was not a signer on that account, and that the total amount of checks possibly signed by Chon's husband on his business partner's account exceeded $250,000. The memorandum also reported that Chon had made unauthorized transactions and/or forged her husband's signature on hundreds of other transactions in her husband's business partner's account totaling over $450,000.

88.     In addition to knowing about these fraudulent and dishonest transactions involving (or at least possibly involving) Chon's husband, the Bank knew about at least another $1 million in transactions during the years 2010-2013 involving Chon and unknown people other Ryu that were reported in these memoranda, including:

    a.     checks drawn on BankAsiana accounts or other banks for $27,000, $30,000, $50,000, $59,600, and $100,000 that were deposited into an account owned by Chon at JPMorgan Chase;

      b.     a check for $100,500 Chon wrote on her JPMorgan Chase account to an unknown person who had an account at BankAsiana;

      c.     "large dollar wire activity; large dollar check deposits; and large dollar checks" in an account held jointly by the same unknown person and an unknown entity, including a loan paydown for $40,000 that was posted by Chon for $40,000 and checks from Chon for $30,000, $200,000, $50,000, $160,000, and $160,000; and

      d.     a check for $100,000 drawn on the BankAsiana account of the same unknown entity, was signed by Chon even though she was not a signer on that account, and deposited at JPMorgan Chase.

89.    These memoranda also reported that the activity reported in prior paragraph may be activity performed by a "gae" or "kye," and that "the Gae's involvement in this embezzlement cannot be ruled out."

90.    The March 28, 2014 memorandum is nearly conclusive on Ryu's non-involvement in Chon's embezzlement. While again reporting Chon's accusation of Ryu's involvement in the embezzlement, the remainder of the memorandum does not point to a single other piece of evidence to support those accusations. Indeed, the memorandum noticeably retreats from the suggestion in the earlier memorandum, based only on Chon's unsupported accusation, that Ryu *might* be involved. The February 25, 2014 memorandum was, at best, inconclusive regarding Ryu's involvement, stating: "In conclusion, the embezzlement was a well-conceived plan to defraud the Bank, regardless of whether James [Ryu] was involved." The

second memorandum, dated approximately one week after the Embezzlement

Action was filed, in contrast, states: "In conclusion, the embezzlement was a well-

conceived plan to defraud the Bank *performed by the Operations Officer [Chon.]*"

(Emphasis added). Thus, the reference to Ryu's potential involvement was removed,

and the crime attributed to *only* the "Operations Officer[]", *i.e.*, Chon.

91.     The remainder of the "conclusion" paragraph goes into great detail

about the withdrawals "she" (Chon) made; Chon's methods: "She chose her

customers carefully, mostly elderly, hoping they would not notice or were decreased

. . . ."; and the losses to the bank. *There is no mention of Ryu's involvement in Chon's*

*embezzlement.*

92.     In short, the Bank's own albeit incomplete internal investigation,

conducted before and shortly after the Embezzlement Action was filed, found no

evidence of Ryu's involvement, and instead concluded that the embezzlement plan

was "conceived" and "performed" *by Chon alone.*

**G.     The Bank's Failure to Investigate or Even Consider Other Obvious**
**Possibilities About What Chon Did With the $1.5 Million She Admits**
**She Stole and Has Not Returned Because She Claims She Does Not**
**Have It**

93.     When confronted in January 2014 with a massive embezzlement, any

reasonable banker or other person investigating the crime would have been

particularly interested, and indeed, obligated, to find out what happened to the

money, so that it could be recovered. Chon told the Bank that she used some of it for

her husband's businesses but gave most of it to Ryu.

94.     The Bank uncritically accepted (or pretended to accept) this explanation, even though Chon, who refused to cooperate with the Bank, had an obvious motive to protect her husband. Further, records available to the Bank revealed unexplained transactions totaling well over $1.5 million involving Chon, her husband, and people other than Ryu.

95.     Chon's husband had seven different bank accounts with BankAsiana during the years of Chon's embezzlement (2010-2013). The records for these accounts were available to the Bank at all times. They show that during these years approximately $2.3 million passed through these accounts. The Bank's auditors reported to the Bank that Chon controlled these accounts. Quite obviously, Chon could have laundered the embezzled $1.5 million through these accounts she controlled. The Bank did nothing to investigate this possibility, which suggests deliberate indifference to the true facts.

96.     In addition, the Bank failed to investigate numerous other transactions and unexplained financial items described in paragraphs 86-88 above. The transactions in paragraph 88 alone add up to over $1 million.

97.     Despite knowledge of these numerous suspicious transactions involving people other than Ryu, which could easily account for all of the embezzled funds, the Bank did nothing to investigate Chon's husband or the other people identified in its reports as being involved with these transactions.

98.     The Bank deliberately chose not to interview Chon's husband or his business partner because Chon had told Pai, at the brief meeting between Chon and

Pai, that "her husband didn't know about it, and she didn't want me to -- she was very afraid of her husband finding out." Incredibly, the Bank acquiesced in Chon's suggestion that it not interview her husband.

99.    Pai admitted that the Bank took no steps to talk to Chon's husband or his business partner before filing the lawsuit against Ryu based on its ostensible acceptance of Chon's incredible story that she gave most of the money to Ryu, even though Chon admitted she could not prove it.

## H.   The Filing of the Embezzlement Action and the Bank's Adoption of Chon's False Accusation Against Ryu

100.    On March 19, 2014, the Bank started the Embezzlement Action by filing a complaint in court (the "Original Complaint"). The Bank at this point, already had in its initial investigation report not concluded that Ryu was involved in the embezzlement; rather, it had concluded that Chon, in a "well-conceived plan to defraud the Bank," embezzled from the Bank, and had made no conclusion regarding, and set forth no evidence supporting, Ryu's involvement.  The report set forth no independent evidence that Ryu was involved. If the Bank, despite this report and other clear evidence that Chon acted alone, had any genuine lingering suspicion of Ryu's alleged involvement, it could and should have awaited the outcome of its own investigation before filing the Original Complaint. It had no valid, important reason for filing the Original Complaint when it did. It could have waited while it completed its investigation and further investigated if necessary.

101.    Instead, the Bank filed the Original Complaint without awaiting its own March 28, 2014 internal investigation report, which again, and even more

28

strongly, concluded that Chon alone conceived and executed her plan to embezzle from the Bank and that Ryu was not involved. The only conclusion that can be drawn from this timing is that the Bank, at best, was deliberately indifferent to the actual facts as to whether Ryu was involved in the embezzlement and, at worst, filed its Original Complaint prior to conducting a thorough investigation because it knew that further investigation would only more strongly exonerate Ryu, and the Bank had reasons independent of Ryu's guilt or innocence for wanting to sue Ryu.

102.   The Bank asserted thirteen counts against Ryu concerning the embezzlement and ten counts related to the computers; thirteen counts against Chon concerning the embezzlement; one count each against Chon's husband and his businesses concerning the embezzlement; and seven counts against Hur concerning the embezzlement and eleven counts concerning his alleged taking of a computer and Hur's work with New Millennium Bank allegedly while he was still advisor to the Bank after the Merger.

103.   On July 11, 2016, the Bank filed an amended complaint ("Amended Complaint") against Chon, Ryu, Chon's husband, and her husband's businesses. Despite the Bank's clear knowledge that its claims against Ryu were baseless, the Amended Complaint continued to accuse Ryu of embezzlement.

104.   The material allegations regarding the embezzlement and Ryu's alleged role in the Amended Complaint were the same as the Original Complaint. The Bank also consolidated many of the claims against Ryu and dropped several counts.

105.    The Bank admitted in discovery in the Embezzlement Action that it had no evidence in support of its embezzlement-related claims against Ryu other than Chon's statements, which were incredible and untruthful, and contradicted the Bank's own internal findings that Ryu was not involved.

106.    Specifically, in response to an interrogatory that asked for the factual basis for the Bank's allegation in paragraph 20 of the Original Complaint that Ryu conspired with Chon and aided and abetted her in the embezzlement, the Bank answered as follows: "Miye Chon's statements to Irene Lee, Bo-Young Lee, Alicia Lee and Lisa Pai provided the factual basis for its allegation in Paragraph 20 of the Complaint." Thus, the Bank was clear that the *entire* basis for its claims against Ryu was ostensibly Chon's inherently unbelievable and uncorroborated statements implicating Ryu.

107.    Pai testified as the Bank's corporate representative, and when questioned about this interrogatory response, she confirmed that the Bank had no other direct evidence supporting Chon's claim that Ryu was involved in the embezzlement other than Chon's accusation. This also included the Bank's review of the computers Ryu had returned to the Bank; the Bank found no evidence on them implicating Ryu.

108.    Thus, at the moment that the Bank filed a lawsuit accusing Ryu of the criminal act of embezzlement, it knew, among other things, the following:

    a.    Chon had committed embezzlement and fraud, and had likely done it before, and also had committed other financial crimes, involving fraud and

dishonesty, and was therefore a transparently dishonest person who was unworthy of belief without strong corroborating evidence;

b.     When Chon was first confronted with her crime, she did not say that Ryu was involved;

c.     When Chon implicated Ryu in her subsequent meeting with the Bank, bank auditors, not Chon, first raised the idea that Ryu was involved in the embezzlement, and Chon thereafter latched onto the Bank's suggestion of Ryu's involvement.

d.     Chon's multiple statements to the Bank were inherently contradictory, and thus suspect on their face;

e.     Chon told the Bank that she conspired with Ryu by means that would leave no evidence and could not be proven;

f.     Ryu had voluntarily met with Bank officials, denied his involvement in Chon's embezzlement, explained that the source of deposits in his checking account was compensation for his work with New Millennium Bank; and volunteered to continue meeting with the Bank and answering questions;

g.     At Chon's February 14, 2014 meeting with Bank officials, she left early and thereafter retained a lawyer and refused to cooperate with the Bank;

h.     The Bank had no evidence at all connecting Ryu with Chon's embezzlement except for Chon's statements to that effect, which were unworthy of belief and for which there was no corroborating evidence;

i.    The Bank did nothing to investigate where the embezzled money went, and existing records available to the Bank showed that the money could readily have been laundered through accounts controlled by Chon, her husband, and people other than Ryu;

j.    There was no evidence that the missing money had gone into any of Ryu's accounts; and

k.    Chon had obvious motives to lie that were never even considered by the Bank much less explored, most notably the motive to protect her husband or the members of the gae/kye with whom she was collaborating with and/or to hide the money she stole so she could access it later.

109.   Also at the moment that the Bank filed the lawsuit against Ryu, it knew that there was *zero* evidence linking him to Chon's embezzlement except for Chon's statements; and further knew or should have known that Chon's accusations against Ryu were entirely unworthy of belief, and that further investigation was required before filing a lawsuit against Ryu.

110.   The Bank lacked probable cause to initiate the lawsuit against Ryu because the Bank's claims against Ryu were based entirely on the accusations of Chon, and the Bank knew or should have known at the time it initiated suit that there were strong indications that Chon's accusations were unworthy of belief and untrue.

111.   There was no reason, either practical or legal, that the Bank could not have pursued further investigation prior to suing Ryu and publicly accusing him of

embezzlement based solely on the highly suspect statements of a known liar and thief.

112.    The Bank indeed knew that it was awaiting an updated investigation report when it filed the lawsuit, and knew that it was filing the lawsuit without that report. When the report was eventually issued on March 28, 2014—eight days after the lawsuit was filed—the report, consistent with the Bank's earlier report, found no involvement by Ryu in Chon's embezzlement, and no evidence corroborating Chon's accusation, and concluded that the embezzlement was conceived and carried out by Chon alone. Yet, even in the face of that internal conclusion that Ryu was not involved, the Bank did not withdraw its Complaint, and continued to litigate it for years.

113.    In subsequent discovery in the lawsuit, the Bank never produced any evidence other than Chon's statements and testimony that Ryu had any involvement in Chon's embezzlement. Yet the Bank persisted in its baseless litigation against Ryu.

## I.    Chon's First Day of Deposition, Where She Contradicted Her Prior Statement

114.    Chon was first deposed in the Embezzlement Action on June 23, 2016.

115.    Chon testified that she first started stealing from accounts of people she knew well: her husband's sister and her husband's business associate.

116.    Chon testified that she began her embezzlement without the knowledge of Ryu.

117.    Chon testified that Ryu approached her after a monthly meeting at BankAsiana's Palisades Park branch and said that he had discovered her embezzlement activities (although she did not say how he had supposedly discovered it), and he asked her to lend him $30,000. (This contradicted what Chon told the Bank on January 23, 2014.)

118.    When asked by the Bank's counsel how Ryu allegedly discovered her embezzlement, Chon testified that "he probably found out because other people knew about it." Despite this statement that multiple people—not just Ryu—knew about her embezzlement, the Bank's counsel asked not one follow up question in response, such as who these people were, and how they discovered her embezzlement. No lawyer could be so lacking in curiosity. The Bank's counsel did not ask because he feared learning facts that would disprove the Bank's claims against Ryu. This episode exemplifies the Bank's "see no evil" approach towards Chon throughout the entire Embezzlement Action.

119.    Chon said she thought about his request for $30,000 for a couple of days and then decided to give him that amount.

120.    Chon testified that after the first $30,000, Ryu asked for loans on ten occasions between 2010 and 2013, and she gave him a total of $700,000 to $800,000 in cash on those ten occasions.

121.    Chon testified that she either delivered the cash to him (all in $100 bills) in an envelope at Ryu's office at the Palisades Park headquarters or he picked up the cash at the Fort Lee branch where she worked.

122.    Chon testified that she thought she was just loaning the money to Ryu, and that he would give it back to her so she could put it back. She said she raised this with him, but he never gave her any of the money back.

123.    She testified that Ryu said he would compensate her for loaning him a large sum of money that she had stolen, which she interpreted to mean that perhaps he would help her to get promoted at BankAsiana.

124.    Chon admitted that there are no records or witnesses to corroborate her claim that she gave Ryu $700,000; rather, she testified that she kept track of how much she gave Ryu in her head.

125.    Chon testified that she kept $200,000 to $300,000, and used it to pay her personal debts, her husband's business debts, and her family's living expenses, but also testified that she kept $500,000.

## J.    Chon's Guilty Plea and Sentencing, Where She First Claimed That Ryu "Forced" Her to Embezzle

126.    On March 21, 2016, Chon pleaded guilty to bank fraud, embezzlement of $1,431,195.22, and aggravated identity theft. She also agreed to pay back the amount she embezzled.

127.    On October 24, 2016, Chon was sentenced to 81 months in federal prison.

128.    During the sentencing hearing, Chon's counsel stated on her behalf the following:

> [T]he circumstances was that she did engage, she admitted to the loss of the $1.35 million. But, that she did not profit from the $1.35 million to that extent.

> She readily admits that its approximate from, anywhere from 600 to 650,000. The remainder was to Mr. Ryu, her supervisor, who is the subject of a civil litigation as a co-defendant along with her husband.

129.    Chon's counsel further stated the following:

   a.    "She was pressured into taking the funds for Mr. Ryu. And that's not to say that she didn't do it, but, she was pressured."

   b.    "Now, when she began to take these funds out, her immediate supervisor Mr. Ryu found out what was going on, confronted her and said I need the same funds and began to pressure her to remove funds on his behalf. And she did so because there's, we can explain the 650,000. She is able to explain that amount. But, she can't explain the balance."[1]

130.    Chon made the following statement at the sentencing hearing:

> Due to businesses that continue to fail, I was, so I was going through severe economic hardship. Whenever I was having difficulty due to stress and depression, I ended up getting involved in this instance because of my supervisor James Ryu.[2]

---

[1]    This statement, like other statements by Chon and her counsel, was untrue. Chon has never explained what she did with $650,000 or any other amount. The government in the criminal matter against Chon asserted that approximately $538,000 was transferred to accounts for Chon's husband or his businesses that were controlled by Chon, and the Bank supposedly confirmed this amount. But the Bank never verified where the money flowed after it was transferred into accounts controlled by Chon, and Chon never provided any information on this subject because (a) she was never asked and (b) she refused to cooperate with the Bank after her brief meeting with Lisa Pai.

[2]    This statement is also untrue. Among other things, Chon testified at her deposition that she started the embezzlement scheme on her own *without the assistance of Ryu.*

At first I thought it was going to end at first ten thousand dollars. But, the amount continued to grow to the point where I couldn't handle anymore at the bank. And for a long period of time there was no way I could have done this amount, I mean such huge amount of money alone.

It's because there was someone else behind me who was watching over me this was possible. However, I have no proof regarding this matter, nor do I have a witness who could testify for me.

131.    The Assistant United States Attorney at the hearing responded that Chon had never told the FBI or United States Attorney's Office that Ryu pressured her to embezzle. He never heard her make that claim until her sentencing and he confirmed that she had lied to both the Bank and the FBI.

132.    Chon pleaded guilty to embezzlement and is in prison for that offense. Ryu was never even charged by the FBI in connection with Chon's embezzlement and, as is clear from the above, the Bank was on notice that the federal authorities had no evidence or belief that Ryu was involved in the embezzlement.

**K.    Pai's Review of the FBI Memos and Chon's Sentencing Transcript, Which Showed That Chon Had Lied Repeatedly, and Pai's Refusal to Consider the Possibility That Chon Had Lied**

133.    At a corporate designee deposition on August 18, 2017, Pai read the memos summarizing the FBI interviews of Chon on February 7 and 11, 2014, and testified that she was not previously aware of these memos, even though the Bank had copies of the memos since December 2016.

134.    Specifically, Pai testified that she was not aware Chon told the FBI on February 7, 2014, that: she had acted alone in the embezzlement without the assistance of Ryu; she had lied to the Bank auditors about Ryu's involvement in the

embezzlement; she lied because the bank auditors suggested to her that Ryu was involved; and Ryu did not threaten her.

135.   Pai agreed that Chon had clearly lied to the FBI with respect to the statements she made on February 7, but immediately claimed that Chon must have done so at the instruction of Ryu. Pai testified that she believes that Chon "was instructed by James to tell the F.B.I. that she -- to basically retract what she had told the bank about his involvement . . . ." Pai had no evidence to support this statement, but instead made it up to further the Bank's strategy of studiously avoiding facts that disproved its claims against Ryu.

136.   At her deposition, Pai also reviewed for the first time another FBI memo from February 2014 that reported that Bank employee Irene Lee had concluded Chon was lying because of inconsistencies she perceived in Chon's story told on January 22 and 23, 2014, Pai testified that Lee had possibly provided this information to her in January or February 2014, but the information did not cause her to consider that the Bank's allegation against Ryu might be misplaced.

137.   Pai also reviewed the transcript of Chon's sentencing, and the statement of the Assistant United States Attorney assigned to the case, who told Federal District Judge Walls that prior to her sentencing Chon had previously contradicted herself on Ryu's alleged participation with her in the crime but had never before stated that Ryu "forced" her to commit the crime, and that she had lied to the FBI as well as to the Bank. Pai testified that this information did not cause

her to disbelieve any part of what Chon had told her. Pai emphasized that she believed and still believes all of what Chon told her.

138.   For the Bank's general counsel and corporate designee to claim to be so unwilling to consider the possibility that Chon had lied to the Bank about Ryu's involvement when presented with FBI reports and a sentencing transcript showing that Chon had lied multiple times confirms the Bank's disregard for the need to have probable cause in the form of reasonable evidentiary grounds for making or continuing its allegation of embezzlement against Ryu.

**L.   Chon's Second and Third Days of Deposition, at Which She Feigned Lack of Memory and Failed to Answer Any Questions Except to Repeat Her Contention That Ryu "Forced" Her to Embezzle**

139.   Chon's deposition was continued on March 14 and March 15, 2018.

140.   During her deposition on March 14, Chon claimed that all should could recall was that Ryu "forced" her to embezzle and that she gave him some money.

141.   Other than that, Chon claimed that she could not recall anything about the embezzlement, including when Ryu allegedly forced her, how he forced her, their communications, how many times she allegedly gave him money, where she got the money from that she allegedly gave to him, or anything else related to the subject.

142.   Chon responded "I don't recall" 130 times during the less than two-hour deposition on March 14, including, but not limited to, on the following issues:

a.   how she embezzled funds from BankAsiana or whether she ever stole money from BankAsiana;

   b.  the accountholders from which she embezzled money;

   c.  making any statements to the FBI, including her statements to the FBI on February 4, 2014, provided in the FBI interview memo), and her statements to the FBI on February 11, 2014, provided in the FBI interview memo;

   d.  how much money she embezzled;

   e.  if she kept any of the money for herself that she embezzled, if she used any money to pay her husband's business debts, or where any of the money is today; and

   f.  that she pleaded guilty to the criminal charges related to her embezzlement.

143. During her deposition on March 15, Chon responded "I don't recall" 186 times during the approximately two-hour deposition, including, but not limited to, on the following issues:

   a.  anything that she said at her deposition on June 23, 2016;

   b.  any of her financial information she provided in the net worth statement and monthly cash flow statement she submitted to federal probation office prior to her sentencing other than a life insurance policy she listed;

   c.  any of the deposits she made into her JPMorgan Chase Bank account during the embezzlement time-period; and

   d.  any of the withdrawals she made from her JPMorgan Chase Bank account during the embezzlement time-period other than payments made to the school where her daughter attended kindergarten.

**M.   The Advancement Action, by Which Ryu Forced the Bank to Honor Its Contractual Obligation to Pay His Defense Costs**

144.   In late 2017, Ryu discovered that he had in his possession a copy of the 2013 Agreement and Plan of Merger between BankAsiana and Wilshire Bank ("Merger Agreement").

145.   Upon review, Ryu discovered that Section 6.7 of the Merger Agreement gave him a right to advancement of his legal fees and other expenses incurred responding to the FBI/DOJ investigation and defending the Embezzlement Action. It also provided for advancement of the attorney's fees and costs incurred enforcing his rights under Section 6.7.

146.   On January 10, 2018, Ryu made a demand for advancement to the Bank through its corporate parent, Hope Bancorp, Inc., under Section 6.7 for his past and future legal fees and expenses incurred as a result of the FBI/DOJ investigation and the Embezzlement Action. Hope Bancorp denied the demand on February 2, 2018.

147.   On February 12, 2018, Ryu filed an action in federal court in New York City (the "Advancement Action"), seeking a declaration that Hope Bancorp had a legal obligation to pay his legal fees and costs incurred in the FBI/DOJ investigation, the Embezzlement Action, and the Advancement Action.

148.   Ryu won the right to advancement of most of his attorneys' fees and expenses by orders of the federal district court in New York on April 26, 2018, and September 27, 2018.

149.    Hope Bancorp tried to avoid paying Ryu's fees and expenses by seeking a stay of the September 27 Order, but the district court denied the motion for a stay pending appeal in large part, on January 22, 2019, and on January 30, 2019, the court of appeals denied Hope Bancorp's motion for a stay pending appeal.

150.    At that point, Hope Bancorp was forced to begin advancing Ryu's attorneys' fees and costs, in part, and it withdrew its appeal to the court of appeals of the September 27 Order, and began paying the rest of Ryu's fees and costs that were the subject of the September 27 Order.

151.    Throughout the Advancement Action, the Bank purposefully delayed making required payments to Ryu, which necessitated three separate motions for civil contempt sanctions, one of which is still pending. The Bank through its counsel persisted in taking unreasonable positions, in violation of agreements and Court orders, all for the purpose of wearing down Ryu and harming him.

## N.    The Bank's Dismissal of Its Claims Against Ryu With Prejudice

152.    The Bank continued to litigate its claims against Ryu in the Embezzlement Action for more than five years.

153.    On March 22, 2019, after over five years of baseless litigation, the Bank filed a motion to dismiss with prejudice all of its claims against Ryu in the Embezzlement Action. The Bank continued to assert that Ryu was involved in Chon's embezzlement in its dismissal papers: "Bank of Hope maintains that its claims against Ryu have merit . . . ."

**O.    The Bank's Harassing, Vindictive, and Spiteful Behavior Toward Ryu**

154.    From the very outset of the events set forth in this Complaint, the Bank has engaged in behavior toward Ryu that clearly evinces a hostility towards, and desire to harm, Ryu, in a manner that goes well beyond ordinary litigation practices.

155.    This attitude towards Ryu commenced with the Bank's discovery, approximately one week before Chon's embezzlement came to light, that Ryu, a former executive of the Bank's predecessor and Bank employee, was planning on opening a new bank that would directly compete with the Bank in the Korean American community and beyond.

156.    The discovery of Chon's embezzlement provided the Bank with both an opportunity to exact revenge on Ryu for competing with the Bank, and to cover its own clear negligence in failing to uncover Chon's crimes for a period of years. Accusing Ryu of participating in Chon's embezzlement allowed the Bank to tell the story that Chon's embezzlement would have been caught earlier if not for Ryu's alleged help. Ryu was a perfect "fall guy," and suing him provided, from the Bank's perspective, the added benefit of punishing and ruining someone perceived as disloyal and a future competitor.

157.    With that attitude in mind, the Bank over the ensuing years went out of its way to cause additional harm to Ryu on numerous occasions, over and above suing him falsely for embezzlement.

158.    As noted, the Bank initially, before even filing the lawsuit, wrongfully and with no legal basis, seized $54,000 in Ryu's bank account, thereby severely damaging at the outset Ryu's ability to defend the lawsuit.

159.    During the litigation, Ryu had written letters to the Bank's upper management and institutional shareholders detailing the wrongs perpetrated against him, in an effort to force an earlier settlement of the Bank's baseless claims. The Bank obtained a gag order prohibiting such communications, in direct violation of Ryu's right to free speech, and in a clear attempt to forestall any pressure on the Bank to settle the litigation. Ryu was forced to fight this ruling on appeal, opposed by the Bank, and eventually prevailed before the United States Court of Appeals for the Third Circuit.

160.    When the Bank finally dropped its baseless claims against Ryu, it gratuitously, against all of the evidence, and for the purpose of inflicting further harm on Ryu and his reputation, stated that "Bank of Hope maintains that its claims against Ryu have merit . . . ."

161.    The Bank also deliberately failed to timely pay money due to Ryu under a partial settlement agreement with the Bank as to Ryu's counterclaim Count III (regarding the Bank's seizure of $54,000 of Ryu's money in January 2014) asserted in the Embezzlement Action. The Bank refused to timely pay the money despite knowing Ryu's then-desperate need for the money, in a clear attempt to cause him additional harm.

44

162.    Ryu's counsel told the Bank's counsel at a hearing on July 24, 2019, that Ryu was desperate for funds, with literally $99 left to his name, and thereby had decided to settle his counterclaim and also to not seek to enforce his right to a greater amount to which the parties had previously agreed. During a discussion in chambers on July 24, 2019, Ryu's counsel asked for the payment to be made sooner in a day or two, but the Bank refused. Ryu reluctantly agreed to ten days, and the Bank's counsel agreed to try and deliver the money in less than ten days.

163.    Then the Bank manufactured a dispute about the settlement terms as an excuse to not make payment within ten days. The Bank insisted on Ryu's agreement to several terms that had never been discussed, while it willfully disregarded its obligation to make timely payment, another express condition of the settlement agreement.

164.    The Bank made the payment nine days late only when ordered to do so. Nine days may not seem like a lot of time, until one realizes this is nine days with no money for food and living expenses for Ryu, his spouse, and his two teenage children. It was frankly outrageous as well as horribly unkind that the Bank would play such a game with the basic needs of a family, and clearly evidences the Bank's longstanding and continuing desire to harm and punish Ryu.

**P.    The Harm to Ryu Caused by the Bank's Claims Against Him Based on Chon's Lies**

165.    Ryu is Korean American.

166.    Bank of Hope is a Korean American bank.

167.    Korean American banks focus primarily on Korean American businesses and people as clients.

168.    Other than his time as a music producer and artist in Korea, since graduating from college when he was 22, Ryu had worked in the field of Korean American banking for the most part, including nearly ten years at predecessors of the Bank.

169.    On or around February 17, 2014, Ryu met with the New Millennium Bank investors regarding Chon's allegation against him and the Bank's ongoing investigation of Chon's embezzlement.

170.    Ryu told the investors that the allegations were false and that he had recorded his February 13 meeting with Chon where she agreed to tell the Bank that she lied about Ryu's involvement.

171.    The investors agreed to move forward with the revitalization plan for New Millennium Bank and keep Ryu in his current role on the project.

172.    On or about March 25, 2014, the New Millennium Bank investors terminated Ryu's involvement with the bank because of the filing of the Embezzlement Action against Ryu and several news publications that followed including USA Today.

173.    By its lawsuit accusing Ryu of participating with Chon in embezzling $1.5 million from BankAsiana, combined with its continuing insistence after dropping the lawsuit that Ryu was involved in the embezzlement as Chon had claimed, the Bank has (a) prevented Ryu from working in Korean American

banking or anywhere else since March 2014, and (b) likely ruined any chance of him ever working again, except perhaps at certain menial jobs for which a reputation for honesty are not required, if there are such jobs.

174.    This is because of the nature of the accusation (embezzlement), the importance of the forum (federal court), the region of the country (the nation's largest financial and news market), and the prominence of the Bank, which is the largest Korean American bank in the United States. On its website, the Bank calls itself "the representative bank and the pride of the Korean American community."

175.    The Bank's lawsuit against Ryu would have caused serious and lasting harm to Ryu even if it was an obscure bank in a rural area with no ties to the Korean American community.

176.    The Bank's prominence in the Korean American community has made the harm all the more painful and lasting. For this same reason, Ryu cannot escape the shame of the false accusation unless and until the legal system holds the Bank liable for the harm it caused to Ryu by its egregious violation of norms in civil society that also amounts to a legal violation.

177.    Ryu has been unable to secure work since the filing of the Embezzlement Action, with the limited exception of two short engagements as a consultant by New Millennium Bank in 2016 and 2018, that he secured through his former BankAsiana colleague Hur, and very limited work as a translator in 2018.

178.   The Bank's actions have caused serious harm to Ryu. It has harmed his reputation, it has harmed him financially, and it has caused him great emotional stress and pain manifesting physically.

**1.     Harm to Reputation**

179.   Prior to the filing of the Embezzlement Action, Ryu had a reputation for business integrity. It took Ryu many years of hard work and dedication to develop this reputation.

180.   The allegations of the Embezzlement Action were reported in several publications including USA Today, and the publications are still available online.

181.   The Bank's false allegations against Ryu in the Embezzlement Action suggested to people in the Korean American and broader communities that Ryu was an untrustworthy person who stole money.

182.   As a result of the Bank's false statements in the lawsuit, Ryu's reputation has been substantially and permanently damaged.

**2.     Financial Harm**

183.   Ryu has suffered serious financial harm as a result of the Bank's actions.

184.   But for the Bank's actions, Ryu would have achieved significant professional and financial success in the future as a founder, the second highest ranking officer and executive at New Millennium Bank.

185.   As a direct result of the Bank's actions, Ryu was completely unable to work from February 2014 to June 2016, when New Millennium Bank hired him as a

consultant because it had personal knowledge of Ryu's honesty and recognized the falsity of the allegations against Ryu in the Embezzlement Action.

186.    That employment was temporary. Ryu continues to be unemployed and unemployable because of the Bank's actions.

187.    This inability to work and earn income has caused Ryu severe financial strain. He was forced to cease making payments on the mortgage for his home and to apply for and receive food stamps to feed his family. The family home has been subject to foreclosure proceedings, and Ryu has been forced to incur debt for attorneys' fees to defend his interest in the foreclosure case.

188.    Ryu almost ran out of money to support his family, including two minor children, and his personal and family financial situation is still precarious.

189.    Additionally, in May or June 2014, Ryu liquidated his entire 401(k) retirement plan, and in June 2015, Ryu surrendered his life insurance policy. Ryu suffered financial harm as a result of both, and both actions were necessary for Ryu and his family to have money to survive.

190.    Ryu came very close to losing his home to sheriff's sale and is now forced to sell it and seek cheaper housing for himself and family. He sold off most of his possessions to support his family.

191.    In addition to the harm caused to date, the Bank's conduct will cause continuing financial harm to Ryu, as he will not be able to earn nearly the same income that he would have been able to earn in the prime of his career but for the

Bank's conduct. As a result of the Bank's conduct, Ryu's short- and long-term earning capacity has been substantially impaired.

### 3.   Emotional Stress and Pain Including Physical Manifestation

192.   The year 2014 was harrowing for Ryu, as he watched his reputation and professional career go down the drain and he and his family suffered financially and emotionally as a result of the Bank's conduct.

193.   This caused Ryu to become depressed and experience great emotional stress and pain, which was exacerbated by Ryu's realization that people in the Korean American and broader communities viewed him as a thief and embezzler.

194.   In 2014, Ryu watched his wife's father die knowing that in his father-in-law's eyes he (Ryu) was disgraced as an embezzler. Ryu was also disgraced in the eyes of his own mother, who learned of his loss of job and the embezzlement accusation before she developed acute kidney damage and irreversible dementia in 2015. Ryu will always regret that his mother's last memories were of him not as a successful banker, but as an accused embezzler. Ryu's mother passed away in 2017.

195.   The emotional stress on Ryu has continued right at all time, virtually every hour of every day, from the filing of the Embezzlement Action, through its conclusion, and continuing to the present.

196.   The emotional stress caused by the Bank's lawsuit against him has manifested physically, including significant damage on Ryu's heart developed in 2015 and diagnosed by physicians, including heart palpitations and murmur, as well as anxiety, insomnia, hypertension, and shortness of breath.

## COUNT I

## MALICIOUS USE OF PROCESS

197.    Ryu hereby incorporates each paragraph of this Complaint as if fully set forth herein.

198.    Malicious use of process requires the plaintiff to prove five elements: (1) a civil action was instituted by this defendant against this plaintiff; (2) there was an absence of probable cause to prosecute; (3) the action was motivated by malice; (4) the action was terminated favorably to the plaintiff; and (5) the plaintiff has suffered a special grievance caused by the institution of the underlying claim. *LoBiondo v. Schwartz*, 970 A.2d 1007, 1022-23 (N.J. 2009).

199.    The Bank wrongfully procured, instituted, prosecuted, and/or continued the embezzlement-related claims against Ryu in the Embezzlement Action from on or about March 19, 2014 until April 10, 2019.

200.    The Bank took part in the procurement, institution, prosecution, and continuation of the embezzlement-related claims against Ryu in the Embezzlement Action as it was the plaintiff in that action.

201.    The Bank lacked probable cause to procure, initiate, prosecute, and/or continue the embezzlement-related claims against Ryu in the Embezzlement Action because:

a.    there was no basis for it to reasonably believe that there was a good or sound chance of establishing the claims to the satisfaction of the court or the jury;

b.      there was no presence of reasonable ground for belief that the claims exist supported by circumstances sufficient to warrant an ordinarily prudent person in the belief that they exist;

c.      there was no basis for it to reasonably believe that the claims were or may have been valid under existing or developing law;

d.      the procurement, initiation, prosecution, and/or continuation of the Embezzlement Action was intended to harass or maliciously injure Ryu.

202.    The Bank procured, instituted, prosecuted, and/or continued the embezzlement-related claims against Ryu in the Embezzlement Action with malice as it intentionally committed these wrongful acts without just cause or excuse. The Bank's conduct was in utter disregard of what it knew to be its duty to the injury of Ryu.

203.    The Bank's malice can also be inferred because it lacked probable cause or reasonable belief in probable cause.

204.    The Bank's embezzlement-related claims against Ryu in the Embezzlement Action terminated in his favor because Bank of Hope voluntarily withdrew them with prejudice.

205.    Ryu suffered a special grievance as a result of the Bank's seizure of his $54,000 on deposit as well as the procurement, institution, prosecution, and/or continuation of the embezzlement-related claims in the Embezzlement Action, as he lost his ability to work as a banker and consequently millions of dollars he would have earned, as well as spending five years defending against the claims. The

embezzlement related claims have effectively put Ryu "out of business" for over five years and counting resulting in a complete loss of his total income during that time period and continuing into the future.

206.    The conduct of the Bank was a direct and proximate cause, as well as a substantial factor, in bringing about serious emotional and physical injuries, damages, and harm to Ryu.

207.    As a result of the above conduct, the Bank is liable to Ryu for the attorneys' fees and costs incurred in the Embezzlement Action, harm to his reputation as a result of the Embezzlement Action, physical harm and emotional distress caused by the lawsuit, and punitive damages.

## COUNT II

## BREACH OF CONTRACT

208.    Ryu hereby incorporates each paragraph of this Complaint as if fully set forth herein.

209.    The settlement agreement which resolved Ryu's counterclaim Count III (regarding the Bank's seizure of $54,000 of Ryu's money in January 2014) asserted in the Embezzlement Action was a valid and binding contract between Ryu and the Bank as of July 24, 2019.

210.    Ryu duly performed all of his obligations under the settlement agreement.

211.    Under the settlement agreement, the Bank was required to make the settlement payment within ten days of July 24, 2019 (*i.e.*, August 3, 2019).

212.    The Bank did not make the settlement payment until August 12, 2019, nine days late.

213.    The Bank's failure to timely pay the settlement funds to Ryu constitutes a material breach of the settlement agreement.

214.    The Bank's failure to timely pay caused Ryu a great deal of emotional harm and anguish, especially as during this time his home was on the brink of foreclosure, and he reasonably believed that the delay could have resulted in his losing his home.

215.    The Bank's conduct in breaching the settlement agreement was willful, wanton, reckless, outrageous, malicious, unprivileged, and intended to cause deliberate harm to Ryu, and the harm to Ryu was foreseeable when the agreement was made.

## <u>PRAYER FOR RELIEF</u>

WHEREFORE, Plaintiff Suk Joon Ryu respectfully prays for judgment against Defendant Bank of Hope as follows:

a.    Damages for economic harm, harm to reputation, physical harm, and emotional distress;

b.    Payment of unpaid attorneys' fees and expenses incurred in the Embezzlement Action;

c.    Punitive damages; and

d.    Further relief as this Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff demands a jury trial for all claims so triable.

Respectfully submitted,

STEVE HARVEY LAW LLC

Dated: October 15, 2019      By:   /s/ Stephen G. Harvey
         Stephen G. Harvey
         David V. Dzara
         Michael E. Gehring*
         1880 John F. Kennedy Blvd.
         Suite 1715
         Philadelphia, PA 19103
         (215) 438-6600
         steve@steveharveylaw.com
         david@steveharveylaw.com
         mike@steveharveylaw.com

*Attorneys for Plaintiff*
*Suk Joon Ryu, a/k/a James S. Ryu*
*\* Pro hac vice motion to be filed*