Eric W. Moran, Esq.
Theodora McCormick, Esq.
Lauren B. Cooper, Esq.
**EPSTEIN BECKER & GREEN, P.C.**
875 Third Avenue
New York, New York 10022
(212) 351-4500 (phone)
(212) 878-8600 (fax)

150 College Road West, Suite 301
Princeton, New Jersey 08540
(609) 455-1540 (phone)
(609) 228-5318 (fax)

*Attorneys for Defendant*
*Bank of Hope*

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| SUK JOON RYU, a/k/a James S. Ryu, <br><br> Plaintiff, <br><br> v. <br><br> BANK OF HOPE, <br><br> Defendant. | Civil Action No.: 2:19-18998 (KM) (JBC) <br><br> *Document Electronically Filed* <br><br> **CERTIFICATION OF ERIC W. MORAN, ESQ.** <br><br> ▄▄▄▄▄▄▄▄▄▄▄▄▄ |

I, Eric W. Moran, Esquire, hereby certify as follows:

1.      I am an attorney-at-law of the State of New Jersey and a Member of

the Firm of Epstein Becker & Green, P.C., attorneys for Defendant Bank of Hope

in this matter. I make this Certification in support of Defendant's Motion to

Motion to Dismiss Count I of the Complaint.

2.      I have firsthand knowledge of the facts set forth in this Certification.

3.      Attached hereto as **Exhibit 1** is a true and correct copy of Bank of

Hope's March 2014 Internal Investigation Report.

4.      Attached hereto as **Exhibit 2** is a true and correct copy of Bank of

Hope's Complaint filed on or about March 19, 2014 in *Wilshire Bank v. Chon, et al.*, Civil Action No. 2:14-1770 (KM) (JAD) (the "Embezzlement Action").

5.      Attached hereto as **Exhibit 3** is a true and correct copy of the relevant

portions of Miye Chon a/k/a Karen Chon's June 23, 2016 deposition in the

Embezzlement Action.

6.      Attached hereto as **Exhibit 4** is a true and correct copy of the relevant

portions of Miye Chon a/k/a Karen Chon's March 14, 2018 deposition in the

Embezzlement Action.

7.      Attached hereto as **Exhibit 5** is a true and correct copy of the

February 10, 2014 report issued by the Federal Bureau of Investigation.

8.      Attached hereto as **Exhibit 6** is a true and correct copy of the March

20, 2014 report issued by the Federal Bureau of Investigation.

9.      Attached hereto as **Exhibit 7** is a true and correct copy of Plaintiff Suk Joon Ryu's Memorandum of Law in support of his Motion for Summary Judgment in the Embezzlement Action.

10.      Attached hereto as **Exhibit 8** is a true and correct copy of the Hon. Jose Linares, former Chief Judge of the United States District Court for the District of New Jersey, denying Plaintiff Suk Joon Ryu's Motion for Summary Judgment in the Embezzlement Action.

11.      Attached hereto as **Exhibit 9** is a true and correct copy of Bank of Hope's Memorandum of Law in support of its Motion for Voluntary Dismissal of the Embezzlement Action.

12.      Attached hereto as **Exhibit 10** is a true and correct copy of the Order entered by the Hon. Jose Linares granting the Bank of Hope's Motion for Voluntary Dismissal of the Embezzlement Action.

I hereby certify that the foregoing statements made by me are true. I am aware that if any of the statements made by me are knowingly false, I may be subject to punishment.


                                                        s/ Eric W. Moran
Dated: December 11, 2019                    Eric W. Moran, Esq.

# EXHIBIT 1

(ENTIRE EXHIBIT UNDER SEAL)

# EXHIBIT 2

Jane Chuang (JC 9132)
Lee Anav Chung White & Kim LLP
156 Fifth Avenue, Suite 303
New York, New York 10010
*Telephone:* (212) 271-0664
*Facsimile:* (212) 271-0665

*Attorneys for Plaintiff*
*Wilshire Bank*

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY
------------------------------------------------------------X

WILSHIRE BANK,

                          Plaintiff,

            v.

MIYE CHON, a/k/a Karen Chon, SUK JOON
RYU, a/k/a James S. Ryu, HONG SIK HUR, TAE
JONG KIM, BERGENFIELD BAGEL & CAFE
INC., d/b/a Cafe Clair, MAYWOOD BAGEL
INC., UB'S PIZZA & BAGEL INC., UB'S
BAGEL & CAFE INC., and UBK BAGELS
CORP., d/b/a Franklin Bagels & Cafe,

                          Defendants.

------------------------------------------------------------X

**ECF CASE**

**COMPLAINT**

*JURY TRIAL DEMANDED*

        Plaintiff Wilshire Bank (formerly known as Wilshire State Bank), the successor-by-

merger to BankAsiana ("Wilshire Bank"), by its undersigned attorneys, as and for its Complaint

against defendants Miye Chon, Suk Joon Ryu, Hong Sik Hur, Tae Jong Kim, Bergenfield Bagel

& Cafe Inc., Maywood Bagel Inc., UB's Pizza & Bagel Inc., UB's Bagel & Cafe Inc., and UBK

Bagels Corp., alleges as follows:

                          <u>**NATURE OF THE ACTION**</u>

        1.      Wilshire Bank, as the successor-by-merger to BankAsiana, brings this action to

recover all of the losses and damages resulting from the Embezzlement (defined below),

perpetrated by BankAsiana's former Assistant Vice President and Operations Officer and its former Senior Vice President and Chief Operating Officer, from in or about 2010 to 2013, which totals over $1.57 million. Wilshire Bank also brings this action to recover damages resulting from the breach of fiduciary duties and gross negligence of BankAsiana's former President and Chief Executive Officer.

## THE PARTIES

2.      Plaintiff Wilshire Bank is a commercial bank chartered under the laws of the State of California, with its principal office located at 3200 Wilshire Boulevard, Los Angeles, California 90010.

3.      Defendant Miye Chon, also known as Karen Chon ("Chon"), is an individual who, upon information and belief, resides at 11 3rd Street, Englewood Cliffs, New Jersey 07632.

4.      Defendant Suk Joon Ryu, also known as James S. Ryu ("Ryu"), is an individual who, upon information and belief, resides at 630 Rita Drive, River Vale, New Jersey 07675.

5.      Defendant Hong Sik Hur ("Hur") is an individual who, upon information and belief, resides at 770 Anderson Avenue, #3P, Cliffside Park, New Jersey 07010.

6.      Defendant Tae Jong Kim ("Kim") is an individual who, upon information and belief, resides at 11 3rd Street, Englewood Cliffs, New Jersey 07632.

7.      Upon information and belief, defendant Bergenfield Bagel & Cafe Inc., doing business as Cafe Clair, is a corporation organized and existing under the laws of the State of New Jersey, with offices at 11 3rd Street, Englewood Cliffs, New Jersey 07632.

8.      Upon information and belief, defendant Maywood Bagel Inc. is a corporation organized and existing under the laws of the State of New Jersey, with offices at 239 East Brinkerhoff Avenue, 2nd Floor, Palisades Park, New Jersey 07650.

9.      Upon information and belief, defendant UB's Pizza & Bagel Inc. is a corporation organized and existing under the laws of the State of New Jersey, with offices at 54-06 Bergenline Avenue, West New York, New Jersey 07093.

10.     Upon information and belief, defendant UB's Bagel & Cafe Inc. is a corporation organized and existing under the laws of the State of New Jersey, with offices at 615 South Avenue West, Westfield, New Jersey 07090.

11.     Upon information and belief, defendant UBK Bagels Corp., doing business as Franklin Bagels & Cafe, is a corporation organized and existing under the laws of the State of New York, with offices at 192 New Hyde Park Road, Franklin Square, New York 11010.

## JURISDICTION AND VENUE

12.     This Court has original subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(1).  Plaintiff Wilshire Bank is a citizen of the State of California.  Upon information and belief, all defendants are each a citizen of the State of New Jersey, except defendant UBK Bagels Corp., which is a citizen of the State of New York.  Thus, there is complete diversity between plaintiff and defendants.  The matter in controversy exceeds the sum or value of $75,000.00 excluding interest and costs.

13.     This Court has personal jurisdiction over defendants pursuant to Rule 4:4-4(a) of the Rules Governing Civil Practice in the Superior Court of New Jersey.

14.     Venue is proper within this district pursuant to 28 U.S.C. § 1391(a)(2), in that a substantial part of the events giving rise to plaintiff Wilshire Bank's claims occurred in the State of New Jersey.

## BACKGROUND

**Wilshire Bank's Acquisition of BankAsiana**

15.     In October, 2013, Wilshire Bank, then known as Wilshire State Bank, acquired—by way of a merger (the "Merger")—all of the assets of BankAsiana, a commercial bank founded in 2006 and chartered under the laws of the State of New Jersey.  The Merger was completed on or about October 1, 2013.

16.     Prior to the Merger, defendant Chon was BankAsiana's Assistant Vice President and Operations Officer.

17.     Prior to the Merger, defendant Ryu was BankAsiana's Senior Vice President and Chief Operating Officer.

18.     Prior to the Merger, defendant Hur was BankAsiana's President and Chief Executive Officer.  Hur was also a member of BankAsiana's board of directors.

**Post-Merger Discovery of Chon and Ryu's Embezzlement
Perpetrated During Their Employment with BankAsiana**

19.     In January, 2014—approximately three months following the Merger—Wilshire Bank received an inquiry from a customer, who had maintained certificate of deposit ("CD") accounts since prior to the Merger, concerning certain inaccuracies in the 1099-INT forms he had received.  In response to that inquiry, Wilshire Bank commenced an internal investigation and examined BankAsiana's records relating to its customers' CD accounts prior to the Merger.

20.     As a result of that investigation, Wilshire Bank has discovered that—*for well over three years, from in or about 2010 to October, 2013*—Chon (then BankAsiana's Assistant Vice President and Operations Officer) and Ryu (then BankAsiana's Senior Vice President and Chief Operating Officer) conspired together and engaged in a fraudulent scheme, known and referred to as "lapping," to embezzle from BankAsiana (the "Embezzlement").  In pursuance of such

4

conspiracy, Chon, aided and abetted by Ryu, periodically removed sums of cash from the bank's cash vault and, to conceal such theft, falsified the bank's records by: (a) recording fictitious "withdrawals" in corresponding sums from certain of the bank's customers' CD accounts; and (b) thereafter recording fictitious "transfers" of funds from other customers' CD accounts to those accounts shortly prior to maturity.

21.     Upon information and belief, through such fraudulent scheme, Chon and Ryu embezzled a total of not less than $1,575,754.00 from BankAsiana during that period, by falsifying the bank's records relating to seven CD accounts.

22.     As a result of the Embezzlement, Wilshire Bank, as the successor-in-interest to BankAsiana, has sustained losses totaling not less than $1,575,754.00.

23.     Upon information and belief, from 2010 to 2013, in pursuance of the conspiracy, Chon diverted portions of the proceeds of the Embezzlement to Ryu for his own use and benefit.

24.     Upon information and belief, from 2010 to 2013, in pursuance of the conspiracy, Chon kept portions of the proceeds of the Embezzlement for her own use and benefit, and also diverted portions of the proceeds of the Embezzlement to her husband, defendant Kim, for their own use and benefit.

25.     Upon information and belief, from 2010 to 2013, Chon also diverted portions of the proceeds of the Embezzlement to her husband's corporations, named herein as defendants Bergenfield Bagel & Cafe Inc., Maywood Bagel Inc., UB's Pizza & Bagel Inc., UB's Bagel & Cafe Inc., and UBK Bagels Corp. for their own use and benefit.

**Hur's Breach of His Fiduciary Duties**

26.     Following the Merger, Wilshire Bank, as the successor-in-interest to BankAsiana, continued to employ Hur pursuant to the terms of the Employment Agreement, by and between

BankAsiana and Hur, dated as of May 13, 2013 (the "Employment Agreement"). (A copy of the Employment Agreement is annexed hereto as Exhibit 1.)

27.     Hur was employed by Wilshire Bank as Marketing Advisor to the Director of the Eastern Region from on or about October 2, 2013 to February 3, 2014.

28.     During that period, Hur failed to devote his time and energies to the business and affairs of Wilshire Bank. Upon information and belief, Hur instead devoted his time and energies to a scheme—planned with Ryu beginning in or about September, 2013—to purchase with other investors a controlling stake in New Millennium Bank, a commercial bank in New Jersey, and thereafter directly compete against Wilshire Bank as New Millennium Bank's president and chief executive officer and a member of its board of directors.

29.     In furtherance of that scheme, in January, 2014—while still employed by Wilshire Bank—Hur, as a member of the investment group, committed to invest approximately $11,200,000.00 in New Millennium Bank (the "Subscription Funds"), and deposited a portion of the Subscription Funds into a designated escrow account. (A copy of Hur's check, in the amount of $330,000.00, made payable to the escrow account, is annexed hereto as Exhibit 2.)

30.     In furtherance of that scheme, Hur—while still employed by Wilshire Bank—also hired Ryu as New Millennium Bank's senior vice president and chief operating officer, and arranged for Ryu to be compensated as such from portions of the investment funds held in escrow by Hur's attorneys. (Copies of the checks issued to Ryu for "salary" and "expenses," dated December 13, 2013, December 17, 2013, and January 6, 2014, are annexed hereto, collectively, as Exhibit 3).

**Hur's Conversion of Wilshire Bank's Property**

31.     Upon information and belief, on or about October 24, 2013, Hur removed a Dell Inspiron 560 workstation, Tag #5L1VWR1, that had been assigned to him (the "Dell Inspiron"), from Wilshire Bank's premises without any permission or authority of Wilshire Bank.

32.     Upon information and belief, the Dell Inspiron contained Wilshire Bank's confidential and proprietary information and trade secrets.  Upon information and belief, Hur used the Dell Inspiron for his own use and benefit, and used Wilshire Bank's confidential and proprietary information and trade secrets to directly compete against Wilshire Bank as New Millennium Bank's president, chief executive officer and director.

33.     Wilshire Bank terminated Hur's employment for cause, effective as of February 3, 2014, pursuant to the Notice of Termination of Employment Agreement and Demand for Cure, dated January 23, 2014 (the "Notice of Termination").  (A copy of the Notice of Termination is annexed hereto as Exhibit 4.)

34.     Despite the termination of his employment, upon information and belief, Hur continued to use for his own benefit Wilshire Bank's company car, an Audi A8, Vehicle Identification Number WAULV44E17N023857 (the "Company Car").  Upon information and belief, Hur also continued to use the Dell Inspiron for his own benefit.

35.     In a letter dated February 5, 2014 (a copy of which is annexed hereto as Exhibit 5), Wilshire Bank, through its counsel, demanded that Hur return the Company Car and the Dell Inspiron, and to immediately cease and desist from any and all use of Wilshire Bank's confidential and proprietary information and trade secrets.

36.     Despite such demand, Hur continued to use the Company Car, and did not return it until February 18, 2014.  Despite such demand, Hur also continued to use the Dell Inspiron,

7

and did not return it until February 10, 2014.

**Ryu's Conversion of Wilshire Bank's Property**

37.     Following the Merger, Ryu's employment was terminated pursuant to a

Severance and Release Agreement, dated October 4, 2013 (the "Severance and Release

Agreement").  (A copy of the Severance and Release Agreement is annexed hereto as Exhibit 6.)

38.     Upon information and belief, on or about September 28, 2013, three days before

the Merger, Ryu removed from BankAsiana's premises a Dell XPS 8500 workstation,

Tag #JZ6H4V1 (the "Dell XPS"), and a Sony Vaio Z2160 (the "Sony Vaio") that had been

assigned to him, without any permission or authority of BankAsiana or Wilshire Bank.

39.     Upon information and belief, the Dell XPS 8500 and the Sony Vaio contained

Wilshire Bank's confidential and proprietary information and trade secrets.  Upon information

and belief, Ryu used the Dell XPS and the Sony Vaio for his own benefit, and used Wilshire

Bank's confidential and proprietary information and trade secrets to directly compete against

Wilshire Bank as New Millennium Bank's senior vice president and chief operating officer.

40.     In a letter dated February 7, 2014 (a copy of which is annexed hereto as

Exhibit 7), Wilshire Bank, through its counsel, demanded that Ryu return the Dell XPS and the

Sony Vaio, and to immediately cease and desist from any and all use of Wilshire Bank's

confidential and proprietary information and trade secrets.  Despite such demand, Ryu continued

to use the Dell XPS and the Sony Vaio, and did not return them until February 12, 2014.

**FIRST CLAIM FOR RELIEF**
**AGAINST DEFENDANT CHON**
**(Conversion)**

41.     Wilshire Bank repeats and re-alleges the allegations in paragraphs 1 through 40 of

the Complaint with the same force and effect as if fully set forth herein.

8

42.     Defendant Chon—aided and abetted by Ryu—removed sums of cash from BankAsiana's cash vault, without any permission or authority, and to conceal such theft, falsified the bank's records relating to the bank's customer's CD account, account number ending in 094, and converted such sums to her own use and benefit.

43.     As a result of the foregoing, Wilshire Bank has been damaged in an amount to be determined at trial.

**SECOND CLAIM FOR RELIEF**
**AGAINST DEFENDANT CHON**
**(Conversion)**

44.     Wilshire Bank repeats and re-alleges the allegations in paragraphs 1 through 43 of the Complaint with the same force and effect as if fully set forth herein.

45.     Defendant Chon—aided and abetted by Ryu—removed sums of cash from BankAsiana's cash vault, without any permission or authority, and to conceal such theft, falsified the bank's records relating to the bank's customer's CD account, account number ending in 248, and converted such sums to her own use and benefit.

46.     As a result of the foregoing, Wilshire Bank has been damaged in an amount to be determined at trial.

**THIRD CLAIM FOR RELIEF**
**AGAINST DEFENDANT CHON**
**(Conversion)**

47.     Wilshire Bank repeats and re-alleges the allegations in paragraphs 1 through 46 of the Complaint with the same force and effect as if fully set forth herein.

48.     Defendant Chon—aided and abetted by Ryu—removed sums of cash from BankAsiana's cash vault, without any permission or authority, and to conceal such theft, falsified

the bank's records relating to the bank's customer's CD account, account number ending in 228, and converted such sums to her own use and benefit.

49.      As a result of the foregoing, Wilshire Bank has been damaged in an amount to be determined at trial.

**FOURTH CLAIM FOR RELIEF**
**AGAINST DEFENDANT CHON**
**(Conversion)**

50.      Wilshire Bank repeats and re-alleges the allegations in paragraphs 1 through 49 of the Complaint with the same force and effect as if fully set forth herein.

51.      Defendant Chon—aided and abetted by Ryu—removed sums of cash from BankAsiana's cash vault, without any permission or authority, and to conceal such theft, falsified the bank's records relating to the bank's customer's CD account, account number ending in 721, and converted such sums to her own use and benefit.

52.      As a result of the foregoing, Wilshire Bank has been damaged in an amount to be determined at trial.

**FIFTH CLAIM FOR RELIEF**
**AGAINST DEFENDANT CHON**
**(Conversion)**

53.      Wilshire Bank repeats and re-alleges the allegations in paragraphs 1 through 52 of the Complaint with the same force and effect as if fully set forth herein.

54.      Defendant Chon—aided and abetted by Ryu—removed sums of cash from BankAsiana's cash vault, without any permission or authority, and to conceal such theft, falsified the bank's records relating to the bank's customer's CD account, account number ending in 414, and converted such sums to her own use and benefit.

55.     As a result of the foregoing, Wilshire Bank has been damaged in an amount to be determined at trial.

## SIXTH CLAIM FOR RELIEF
## AGAINST DEFENDANT CHON
### (Conversion)

56.     Wilshire Bank repeats and re-alleges the allegations in paragraphs 1 through 55 of the Complaint with the same force and effect as if fully set forth herein.

57.     Defendant Chon—aided and abetted by Ryu—removed sums of cash from BankAsiana's cash vault, without any permission or authority, and to conceal such theft, falsified the bank's records relating to the bank's customer's CD account, account number ending in 215, and converted such sums to her own use and benefit.

58.     As a result of the foregoing, Wilshire Bank has been damaged in an amount to be determined at trial.

## SEVENTH CLAIM FOR RELIEF
## AGAINST DEFENDANT CHON
### (Conversion)

59.     Wilshire Bank repeats and re-alleges the allegations in paragraphs 1 through 58 of the Complaint with the same force and effect as if fully set forth herein.

60.     Defendant Chon—aided and abetted by Ryu—removed sums of cash from BankAsiana's cash vault, without any permission or authority, and to conceal such theft, falsified the bank's records relating to the bank's customer's CD account, account number ending in 960, and converted such sums to her own use and benefit.

61.     As a result of the foregoing, Wilshire Bank has been damaged in an amount to be determined at trial.

11

## EIGHTH CLAIM FOR RELIEF
## AGAINST DEFENDANT CHON
### (Fraud)

62.      Wilshire Bank repeats and re-alleges the allegations in paragraphs 1 through 61 of

the Complaint with the same force and effect as if fully set forth herein.

63.      In pursuance of the conspiracy, Chon falsified BankAsiana's records as described

above, in order to conceal the theft of the sums of cash from the bank's cash vault.

64.      Chon knew and intended that BankAsiana would rely on such records in its

operation.

65.      Upon information and belief, prior to Wilshire Bank's discovery of the

Embezzlement in January, 2014, BankAsiana had no knowledge that such records had been

falsified.

66.      Upon information and belief, BankAsiana justifiably relied on the records

maintained by Chon as its Assistant Vice President and Operations Officer.

67.      As a result of Chon's fraudulent concealment, Wilshire Bank has been damaged

in an amount to be determined at trial, but not less than $1,575,754.00, plus interest as permitted

by law.

## NINTH CLAIM FOR RELIEF
## AGAINST DEFENDANT CHON
### (Civil Conspiracy to Defraud)

68.      Wilshire Bank repeats and re-alleges the allegations in paragraphs 1 through 67 of

the Complaint with the same force and effect as if fully set forth herein.

69.      Chon and Ryu conspired together and maliciously and willfully entered into a

scheme to perpetrate the Embezzlement.

70.      In pursuance of such conspiracy, Chon and Ryu engaged in acts as described

above, and all of such acts were participated in and done by one or both of them in accordance with the plan of the conspiracy.

71.     As a result of the foregoing, Wilshire Bank has been damaged in an amount to be determined at trial, but not less than $1,575,754.00, plus interest as permitted by law.

### TENTH CLAIM FOR RELIEF
### AGAINST DEFENDANT CHON
### (Breach of Fiduciary Duties)

72.     Wilshire Bank repeats and re-alleges the allegations in paragraphs 1 through 71 of the Complaint with the same force and effect as if fully set forth herein.

73.     Defendant Chon's employment as BankAsiana's Assistant Vice President and Operations Officer imposed on her fiduciary duties and obligations.

74.     Defendant Chon breached her fiduciary duties and obligations by converting the proceeds of the Embezzlement for her own use and benefit.

75.     As a result of the foregoing, Wilshire Bank has been damaged in an amount to be determined at trial.

### ELEVENTH CLAIM FOR RELIEF
### AGAINST DEFENDANT CHON
### (Breach of Fiduciary Duty)

76.     Wilshire Bank repeats and re-alleges the allegations in paragraphs 1 through 75 of the Complaint with the same force and effect as if fully set forth herein.

77.     Defendant Chon's employment as BankAsiana's Assistant Vice President and Operations Officer imposed on her fiduciary duties and obligations.

78.     Defendant Chon breached her fiduciary duties and obligations by falsifying BankAsiana's records as described above, in order to conceal the theft of the sums of cash from the bank's cash vault.

79.     As a result of the foregoing, Wilshire Bank has been damaged in an amount to be determined at trial.

## TWELFTH CLAIM FOR RELIEF
## AGAINST DEFENDANT CHON
### (Breach of Fiduciary Duty)

80.     Wilshire Bank repeats and re-alleges the allegations in paragraphs 1 through 79 of the Complaint with the same force and effect as if fully set forth herein.

81.     Defendant Chon's employment as BankAsiana's Assistant Vice President and Operations Officer imposed on her fiduciary duties and obligations.

82.     Defendant Chon breached her fiduciary duties and obligations by conspiring with Ryu to maliciously and willfully enter into a scheme to perpetrate the Embezzlement, and in pursuance of such conspiracy, engaging in acts as described above, in accordance with the plan of the conspiracy.

83.     As a result of the foregoing, Wilshire Bank has been damaged in an amount to be determined at trial.

## THIRTEENTH CLAIM FOR RELIEF
## AGAINST DEFENDANT CHON
### (Unjust Enrichment)

84.     Wilshire Bank repeats and re-alleges the allegations in paragraphs 1 through 83 of the Complaint with the same force and effect as if fully set forth herein.

85.     Defendant Chon has been unjustly enriched in an amount to be determined at trial.

## FOURTEENTH CLAIM FOR RELIEF
## AGAINST DEFENDANT RYU
### (Conversion)

86.     Wilshire Bank repeats and re-alleges the allegations in paragraphs 1 through 85 of the Complaint with the same force and effect as if fully set forth herein.

87.     Defendant Ryu caused the removal of the sums of cash from BankAsiana's cash vault, without any permission or authority, and the falsification of the bank's records relating to the bank's customer's CD account, account ending in number 094, and converted such funds to his own use and benefit.

88.     As a result of the foregoing, Wilshire Bank has been damaged in an amount to be determined at trial.

**FIFTEENTH CLAIM FOR RELIEF**
**AGAINST DEFENDANT RYU**
**(Conversion)**

89.     Wilshire Bank repeats and re-alleges the allegations in paragraphs 1 through 88 of the Complaint with the same force and effect as if fully set forth herein.

90.     Defendant Ryu caused the removal of the sums of cash from BankAsiana's cash vault, without any permission or authority, and the falsification of the bank's records relating to the bank's customer's CD account, account number ending in 248, and converted such funds to his own use and benefit.

91.     As a result of the foregoing, Wilshire Bank has been damaged in an amount to be determined at trial.

**SIXTEENTH CLAIM FOR RELIEF**
**AGAINST DEFENDANT RYU**
**(Conversion)**

92.     Wilshire Bank repeats and re-alleges the allegations in paragraphs 1 through 91 of the Complaint with the same force and effect as if fully set forth herein.

93.     Defendant Ryu caused the removal of the sums of cash from BankAsiana's cash vault, without any permission or authority, and the falsification of the bank's records relating to

the bank's customer's CD account, account number ending in 228, and converted such funds to his own use and benefit.

94.     As a result of the foregoing, Wilshire Bank has been damaged in an amount to be determined at trial.

**SEVENTEENTH CLAIM FOR RELIEF**
**AGAINST DEFENDANT RYU**
**(Conversion)**

95.     Wilshire Bank repeats and re-alleges the allegations in paragraphs 1 through 94 of the Complaint with the same force and effect as if fully set forth herein.

96.     Defendant Ryu caused the removal of the sums of cash from BankAsiana's cash vault, without any permission or authority, and the falsification of the bank's records relating to the bank's customer's CD account, account number ending in 721, and converted such funds to his own use and benefit.

97.     As a result of the foregoing, Wilshire Bank has been damaged in an amount to be determined at trial.

**EIGHTEENTH CLAIM FOR RELIEF**
**AGAINST DEFENDANT RYU**
**(Conversion)**

98.     Wilshire Bank repeats and re-alleges the allegations in paragraphs 1 through 97 of the Complaint with the same force and effect as if fully set forth herein.

99.     Defendant Ryu caused the removal of the sums of cash from BankAsiana's cash vault, without any permission or authority, and the falsification of the bank's records relating to the bank's customer's CD account, account number ending in 414, and converted such funds to his own use and benefit.

100.    As a result of the foregoing, Wilshire Bank has been damaged in an amount to be determined at trial.

### NINETEENTH CLAIM FOR RELIEF
### AGAINST DEFENDANT RYU
**(Conversion)**

101.    Wilshire Bank repeats and re-alleges the allegations in paragraphs 1 through 100 of the Complaint with the same force and effect as if fully set forth herein.

102.    Defendant Ryu caused the removal of the sums of cash from BankAsiana's cash vault, without any permission or authority, and the falsification of the bank's records relating to the bank's customer's CD account, account number ending in 215, and converted such funds to his own use and benefit.

103.    As a result of the foregoing, Wilshire Bank has been damaged in an amount to be determined at trial.

### TWENTIETH CLAIM FOR RELIEF
### AGAINST DEFENDANT RYU
**(Conversion)**

104.    Wilshire Bank repeats and re-alleges the allegations in paragraphs 1 through 103 of the Complaint with the same force and effect as if fully set forth herein.

105.    Defendant Ryu caused the removal of the sums of cash from BankAsiana's cash vault, without any permission or authority, and the falsification of the bank's records relating to the bank's customer's CD account, account number ending in 960, and converted such funds to his own use and benefit.

106.    As a result of the foregoing, Wilshire Bank has been damaged in an amount to be determined at trial.

17

**TWENTY-FIRST CLAIM FOR RELIEF**
**AGAINST DEFENDANT RYU**
**(Fraud)**

107.    Wilshire Bank repeats and re-alleges the allegations in paragraphs 1 through 106 of the Complaint with the same force and effect as if fully set forth herein.

108.    In pursuance of the conspiracy, Ryu caused Chon to falsify BankAsiana's records as described above, in order to conceal the theft of the sums of cash from the bank's cash vault.

109.    Ryu knew and intended that BankAsiana would rely on such records in its operation.

110.    Upon information and belief, prior to Wilshire Bank's discovery of the Embezzlement in January, 2014, BankAsiana had no knowledge that such records had been falsified.

111.    Upon information and belief, BankAsiana justifiably relied on the records maintained by Chon as its Assistant Vice President and Operations Officer.

112.    As a result of the foregoing, Wilshire Bank has been damaged in an amount to be determined at trial, but not less than $1,575,754.00, plus interest as permitted by law.

**TWENTY-SECOND CLAIM FOR RELIEF**
**AGAINST DEFENDANT RYU**
**(Civil Conspiracy to Defraud)**

113.    Wilshire Bank repeats and re-alleges the allegations in paragraphs 1 through 112 of the Complaint with the same force and effect as if fully set forth herein.

114.    Ryu and Chon conspired together and maliciously and willfully entered into a scheme to perpetrate the Embezzlement.

115.    In pursuance of such conspiracy, Chon and Ryu engaged in acts as described above, and all of such acts were participated in and done by one or both of them in accordance

with the plan of the conspiracy.

116.     As a result of the foregoing, Wilshire Bank has been damaged in an amount to be determined at trial, but not less than $1,575,754.00, plus interest as permitted by law.

## TWENTY-THIRD CLAIM FOR RELIEF
## AGAINST DEFENDANT RYU
### (Breach of Fiduciary Duties)

117.     Wilshire Bank repeats and re-alleges the allegations in paragraphs 1 through 116 of the Complaint with the same force and effect as if fully set forth herein.

118.     Defendant Ryu's employment as BankAsiana's Senior Vice President and Chief Operating Officer imposed on him fiduciary duties and obligations.

119.     Defendant Ryu breached his fiduciary duties and obligations by converting the proceeds of the Embezzlement for his own use and benefit.

120.     As a result of the foregoing, Wilshire Bank has been damaged in an amount to be determined at trial.

## TWENTY-FOURTH CLAIM FOR RELIEF
## AGAINST DEFENDANT RYU
### (Breach of Fiduciary Duty)

121.     Wilshire Bank repeats and re-alleges the allegations in paragraphs 1 through 120 of the Complaint with the same force and effect as if fully set forth herein.

122.     Defendant Ryu's employment as BankAsiana's Senior Vice President and Chief Operations Officer imposed on him fiduciary duties and obligations.

123.     Defendant Ryu breached his fiduciary duties and obligations by causing Chon to falsify BankAsiana's records as described above, in order to conceal the theft of the sums of cash from the bank's vault.

124.     As a result of the foregoing, Wilshire Bank has been damaged in an amount to be determined at trial.

### TWENTY-FIFTH CLAIM FOR RELIEF
### AGAINST DEFENDANT RYU
**(Breach of Fiduciary Duty)**

125.     Wilshire Bank repeats and re-alleges the allegations in paragraphs 1 through 124 of the Complaint with the same force and effect as if fully set forth herein.

126.     Defendant Ryu's employment as BankAsiana's Senior Vice President and Chief Operations Officer imposed on him fiduciary duties and obligations.

127.     Defendant Ryu breached his fiduciary duties and obligations by conspiring with Chon to maliciously and willfully enter into a scheme to perpetrate the Embezzlement and, in pursuance of such conspiracy, engaging in acts as described above, in accordance with the plan of the conspiracy.

128.     As a result of the foregoing, Wilshire Bank has been damaged in an amount to be determined at trial.

### TWENTY-SIXTH CLAIM FOR RELIEF
### AGAINST DEFENDANT RYU
**(Conversion)**

129.     Wilshire Bank repeats and re-alleges the allegations in paragraphs 1 through 128 of the Complaint with the same force and effect as if fully set forth herein.

130.     Defendant Ryu removed from BankAsiana's premises the Dell XPS that had been assigned to him, without any permission or authority of BankAsiana or Wilshire Bank, and converted the Dell XPS to his own use and benefit.

131.     As a result of the foregoing, Wilshire Bank has been damaged in an amount to be determined at trial.

### TWENTY-SEVENTH CLAIM FOR RELIEF
### AGAINST DEFENDANT RYU
### (Conversion)

132.     Wilshire Bank repeats and re-alleges the allegations in paragraphs 1 through 131 of the Complaint with the same force and effect as if fully set forth herein.

133.     Defendant Ryu removed from BankAsiana's premises the Sony Vaio that had been assigned to him, without any permission or authority of BankAsiana or Wilshire Bank, and converted the Sony Vaio to his own use and benefit.

134.     As a result of the foregoing, Wilshire Bank has been damaged in an amount to be determined at trial.

### TWENTY-EIGHTH CLAIM FOR RELIEF
### AGAINST DEFENDANT RYU
### (Misappropriation of Trade Secrets – N.J.S.A. 56:15-1 *et seq.*)

135.     Wilshire Bank repeats and re-alleges the allegations in paragraphs 1 through 134 of the Complaint with the same force and effect as if fully set forth herein.

136.     Upon information and belief, the Dell XPS and/or Sony Vaio contained Wilshire Bank's trade secrets.  Defendant Ryu acquired Wilshire Bank's trade secrets by converting the Dell XPS and/or Sony Vaio to his own use and benefit as set forth above.

137.     Upon information and belief, following such conversion, defendant Ryu used and/or disclosed Wilshire Bank's trade secrets without any permission or authority of Wilshire Bank.

138.     As a result of the foregoing, Wilshire Bank has been damaged in an amount to be determined at trial.

## TWENTY-NINTH CLAIM FOR RELIEF
## AGAINST DEFENDANT RYU
### (Misappropriation of Confidential Information)

139.    Wilshire Bank repeats and re-alleges the allegations in paragraphs 1 through 138 of the Complaint with the same force and effect as if fully set forth herein.

140.    Upon information and belief, the Dell XPS and/or Sony Vaio contained Wilshire Bank's confidential and proprietary information.  Defendant Ryu acquired Wilshire Bank's confidential and proprietary information by converting the Dell XPS and/or Sony Vaio to his own use and benefit as set forth above.

141.    Upon information and belief, following such conversion, defendant Ryu used and/or disclosed Wilshire Bank's confidential and proprietary information without any permission or authority of Wilshire Bank.

142.    As a result of the foregoing, Wilshire Bank has been damaged in an amount to be determined at trial.

## THIRTIETH CLAIM FOR RELIEF
## AGAINST DEFENDANT RYU
### (Breach of Fiduciary Duties)

143.    Wilshire Bank repeats and re-alleges the allegations in paragraphs 1 through 142 of the Complaint with the same force and effect as if fully set forth herein.

144.    Defendant Ryu's employment as BankAsiana's Senior Vice President and Chief Operating Officer imposed on him fiduciary duties and obligations.

145.    Defendant Ryu breached his fiduciary duties and obligations by converting the Dell XPS for his own use and benefit.

146.    As a result of the foregoing, Wilshire Bank has been damaged in an amount to be determined at trial.

22

### THIRTY-FIRST CLAIM FOR RELIEF
### AGAINST DEFENDANT RYU
#### (Breach of Fiduciary Duties)

147.     Wilshire Bank repeats and re-alleges the allegations in paragraphs 1 through 146 of the Complaint with the same force and effect as if fully set forth herein.

148.     Defendant Ryu's employment as BankAsiana's Senior Vice President and Chief Operating Officer imposed on him fiduciary duties and obligations.

149.     Defendant Ryu breached his fiduciary duties and obligations by converting the Sony Vaio for his own use and benefit.

150.     As a result of the foregoing, Wilshire Bank has been damaged in an amount to be determined at trial.

### THIRTY-SECOND CLAIM FOR RELIEF
### AGAINST DEFENDANT RYU
#### (Breach of Fiduciary Duty)

151.     Wilshire Bank repeats and re-alleges the allegations in paragraphs 1 through 150 of the Complaint with the same force and effect as if fully set forth herein.

152.     Defendant Ryu's employment as BankAsiana's Senior Vice President and Chief Operating Officer imposed on him fiduciary duties and obligations.

153.     Defendant Ryu breached his fiduciary duties and obligations by using and/or disclosing Wilshire Bank's trade secrets without any permission or authority of Wilshire Bank.

154.     As a result of the foregoing, Wilshire Bank has been damaged in an amount to be determined at trial.

## THIRTY-THIRD CLAIM FOR RELIEF
## AGAINST DEFENDANT RYU
### (Breach of Fiduciary Duty)

155.     Wilshire Bank repeats and re-alleges the allegations in paragraphs 1 through 154 of the Complaint with the same force and effect as if fully set forth herein.

156.     Defendant Ryu's employment as BankAsiana's Senior Vice President and Chief Operating Officer imposed on him fiduciary duties and obligations.

157.     Defendant Ryu breached his fiduciary duties and obligations by using and/or disclosing Wilshire Bank's confidential and proprietary information without any permission or authority of Wilshire Bank.

158.     As a result of the foregoing, Wilshire Bank has been damaged in an amount to be determined at trial.

## THIRTY-FOURTH CLAIM FOR RELIEF
## AGAINST DEFENDANT RYU
### (Unjust Enrichment)

159.     Wilshire Bank repeats and re-alleges the allegations in paragraphs 1 through 158 of the Complaint with the same force and effect as if fully set forth herein.

160.     As a result of Ryu's breach of his fiduciary duties and obligations as set forth above (¶¶ 117-120) defendant Ryu has been unjustly enriched in an amount to be determined at trial, but not less than $1,575,754.00, plus interest as permitted by law.

## THIRTY-FIFTH CLAIM FOR RELIEF
## AGAINST DEFENDANT RYU
### (Unjust Enrichment)

161.     Wilshire Bank repeats and re-alleges the allegations in paragraphs 1 through 160 of the Complaint with the same force and effect as if fully set forth herein.

162.    As a result of Ryu's breach of fiduciary duties and obligations as set forth above (¶¶ 143-146), defendant Ryu has been unjustly enriched in an amount to be determined at trial.

### THIRTY-SIXTH CLAIM FOR RELIEF
### AGAINST DEFENDANT RYU
**(Unjust Enrichment)**

163.    Wilshire Bank repeats and re-alleges the allegations in paragraphs 1 through 162 of the Complaint with the same force and effect as if fully set forth herein.

164.    As a result of Ryu's breach of fiduciary duties and obligations as set forth above (¶¶ 147-150), defendant Ryu has been unjustly enriched in an amount to be determined at trial.

### THIRTY-SEVENTH CLAIM FOR RELIEF
### AGAINST DEFENDANT HUR
**(Breach of Fiduciary Duties)**

165.    Wilshire Bank repeats and re-alleges the allegations in paragraphs 1 through 164 of the Complaint with the same force and effect as if fully set forth herein.

166.    Defendant Hur's employment as BankAsiana's President and Chief Executive Officer imposed on him fiduciary duties and obligations.

167.    Defendant Hur breached his fiduciary duties and obligations by failing to ensure that the bank's transactions were conducted by its employees in a safe and sound manner.

168.    As a result of the foregoing, Wilshire Bank has been damaged in an amount to be determined at trial, but not less than $1,575,754.00, plus interest as permitted by law.

### THIRTY-EIGHTH CLAIM FOR RELIEF
### AGAINST DEFENDANT HUR
**(Breach of Fiduciary Duties)**

169.    Wilshire Bank repeats and re-alleges the allegations in paragraphs 1 through 168 of the Complaint with the same force and effect as if fully set forth herein.

170.     Defendant Hur's employment as BankAsiana's President and Chief Executive Officer imposed on him fiduciary duties and obligations.

171.     Defendant Hur breached his fiduciary duties and obligations by failing to supervise Chon and Ryu during their employment with BankAsiana.

172.     As a result of the foregoing, Wilshire Bank has been damaged in an amount to be determined at trial, but not less than $1,575,754.00, plus interest as permitted by law.

**THIRTY-NINTH CLAIM FOR RELIEF**
**AGAINST DEFENDANT HUR**
**(Breach of Fiduciary Duties)**

173.     Wilshire Bank repeats and re-alleges the allegations in paragraphs 1 through 172 of the Complaint with the same force and effect as if fully set forth herein.

174.     Defendant Hur's position as a member of BankAsiana's board of directors imposed on him fiduciary duties and obligations.

175.     Defendant Hur breached his fiduciary duties and obligations by failing to ensure that the bank's transactions were conducted by its employees in a safe and sound manner.

176.     As a result of the foregoing, Wilshire Bank has been damaged in an amount to be determined at trial, but not less than $1,575,754.00, plus interest as permitted by law.

**FORTIETH CLAIM FOR RELIEF**
**AGAINST DEFENDANT HUR**
**(Breach of Fiduciary Duties)**

177.     Wilshire Bank repeats and re-alleges the allegations in paragraphs 1 through 176 of the Complaint with the same force and effect as if fully set forth herein.

178.     Defendant Hur's employment as Wilshire Bank's Marketing Advisor to the Director of the Eastern Region imposed on him fiduciary duties and obligations.

26

179.     Defendant Hur breached his fiduciary duties and obligations by failing to devote his time and energies to the business and affairs of Wilshire Bank.

180.     As a result of the foregoing, Wilshire Bank has been damaged in an amount to be determined at trial.

**FORTY-FIRST CLAIM FOR RELIEF**
**AGAINST DEFENDANT HUR**
**(Gross Negligence)**

181.     Wilshire Bank repeats and re-alleges the allegations in paragraphs 1 through 180 of the Complaint with the same force and effect as if fully set forth herein.

182.     Hur owed a duty of care to BankAsiana to carry out his responsibilities as its President and Chief Executive Officer, by exercising the degree of care, skill and diligence that an ordinarily prudent person in a like position would use under the same or similar circumstances.

183.     Hur failed to exercise slight care or diligence in ensuring that the bank's transactions were conducted by its employees in a safe and sound manner.

184.     As a result of the foregoing, Wilshire Bank has been damaged in an amount to be determined at trial, but not less than $1,575,754.00, plus interest as permitted by law.

**FORTY-SECOND CLAIM FOR RELIEF**
**AGAINST DEFENDANT HUR**
**(Gross Negligence)**

185.     Wilshire Bank repeats and re-alleges the allegations in paragraphs 1 through 184 of the Complaint with the same force and effect as if fully set forth herein.

186.     Hur owed a duty of care to BankAsiana to carry out his responsibilities as its President and Chief Executive Officer, by exercising the degree of care, skill and diligence that an ordinarily prudent person in a like position would use under the same or similar

27

circumstances.

187.     Hur failed to exercise slight care or diligence in supervising Ryu and Chon during their employment with BankAsiana.

188.     As a result of the foregoing, Wilshire Bank has been damaged in an amount to be determined at trial, but not less than $1,575,754.00, plus interest as permitted by law.

## FORTY-THIRD CLAIM FOR RELIEF
## AGAINST DEFENDANT HUR
### (Gross Negligence)

189.     Wilshire Bank repeats and re-alleges the allegations in paragraphs 1 through 188 of the Complaint with the same force and effect as if fully set forth herein.

190.     Hur owed a duty of care to BankAsiana to carry out his responsibilities as a member of its board of directors, by exercising the degree of care, skill and diligence that an ordinarily prudent person in a like position would use under the same or similar circumstances.

191.     Hur failed to exercise slight care or diligence in ensuring that the bank's transactions were conducted by its employees in a safe and sound manner.

192.     As a result of the foregoing, Wilshire Bank has been damaged in an amount to be determined at trial, but not less than $1,575,754.00, plus interest as permitted by law.

## FORTY-FOURTH CLAIM FOR RELIEF
## AGAINST DEFENDANT HUR
### (Conversion)

193.     Wilshire Bank repeats and re-alleges the allegations in paragraphs 1 through 192 of the Complaint with the same force and effect as if fully set forth herein.

194.     Wilshire Bank repeats and re-alleges the allegations in paragraphs 1 through 40 of the Complaint with the same force and effect as if fully set forth herein.

28

195.     Defendant Hur removed from Wilshire Bank's premises the Dell Inspiron that had been assigned to him, without any permission or authority of Wilshire Bank, and converted the Dell Inspiron to his own use and benefit.

196.     As a result of the foregoing, Wilshire Bank has been damaged in an amount to be determined at trial.

### FORTY-FIFTH CLAIM FOR RELIEF
### AGAINST DEFENDANT HUR
#### (Conversion)

197.     Wilshire Bank repeats and re-alleges the allegations in paragraphs 1 through 196 of the Complaint with the same force and effect as if fully set forth herein.

198.     Defendant Hur removed the Company Car from Wilshire Bank's premises without any permission or authority of Wilshire Bank, and converted the Company Car to his own use and benefit.

199.     As a result of the foregoing, Wilshire Bank has been damaged in an amount to be determined at trial.

### FORTY-SIXTH CLAIM FOR RELIEF
### AGAINST DEFENDANT HUR
#### (Breach of Fiduciary Duties)

200.     Wilshire Bank repeats and re-alleges the allegations in paragraphs 1 through 199 of the Complaint with the same force and effect as if fully set forth herein.

201.     Defendant Hur's employment as Wilshire Bank's Marketing Advisor to the Director of the Eastern Region imposed on him fiduciary duties and obligations.

202.     Defendant Hur breached his fiduciary duties and obligations by converting the Dell Inspiron to his own use and benefit.

203.     As a result of the foregoing, Wilshire Bank has been damaged in an amount to be determined at trial.

## FORTY-SEVENTH CLAIM FOR RELIEF
## AGAINST DEFENDANT HUR
### (Breach of Fiduciary Duties)

204.     Wilshire Bank repeats and re-alleges the allegations in paragraphs 1 through 203 of the Complaint with the same force and effect as if fully set forth herein.

205.     Defendant Hur's employment as Wilshire Bank's Marketing Advisor to the Director of the Eastern Region imposed on him fiduciary duties and obligations.

206.     Defendant Hur breached his fiduciary duties and obligations by converting the Company Car to his own use and benefit.

207.     As a result of the foregoing, Wilshire Bank has been damaged in an amount to be determined at trial.

## FORTY-EIGHTH CLAIM FOR RELIEF
## AGAINST DEFENDANT HUR
### (Misappropriation of Trade Secrets – N.J.S.A. 56:15-1 *et seq.*)

208.     Wilshire Bank repeats and re-alleges the allegations in paragraphs 1 through 207 of the Complaint with the same force and effect as if fully set forth herein.

209.     Upon information and belief, the Dell Inspiron contained Wilshire Bank's trade secrets.  Defendant Hur acquired Wilshire Bank's trade secrets by converting the Dell Inspiron to his own use and benefit as set forth above.

210.     Upon information and belief, following such conversion, defendant Hur used and/or disclosed Wilshire Bank's trade secrets without any permission or authority of Wilshire Bank.

211.     As a result of the foregoing, Wilshire Bank has been damaged in an amount to be

determined at trial.

## FORTY-NINTH CLAIM FOR RELIEF
## <u>AGAINST DEFENDANT HUR</u>
### (Misappropriation of Confidential Information)

212.    Wilshire Bank repeats and re-alleges the allegations in paragraphs 1 through 211 of the Complaint with the same force and effect as if fully set forth herein.

213.    Upon information and belief, the Dell Inspiron contained Wilshire Bank's confidential and proprietary information.  Defendant Hur acquired Wilshire Bank's confidential and proprietary information by converting the Dell Inspiron to his own use and benefit as set forth above.

214.    Upon information and belief, following such conversion, defendant Hur used and/or disclosed Wilshire Bank's confidential and proprietary information without any permission or authority of Wilshire Bank.

215.    As a result of the foregoing, Wilshire Bank has been damaged in an amount to be determined at trial.

## FIFTIETH CLAIM FOR RELIEF
## <u>AGAINST DEFENDANT HUR</u>
### (Breach of Fiduciary Duties)

216.    Wilshire Bank repeats and re-alleges the allegations in paragraphs 1 through 215 of the Complaint with the same force and effect as if fully set forth herein.

217.    Defendant Hur's employment as Wilshire Bank's Marketing Advisor to the Director of the Eastern Region imposed on him fiduciary duties and obligations.

218.    Defendant Hur breached his fiduciary duties and obligations by using and/or disclosing Wilshire Bank's trade secrets without any permission or authority of Wilshire Bank.

219.    As a result of the foregoing, Wilshire Bank has been damaged in an amount to be determined at trial.

## FIFTY-FIRST CLAIM FOR RELIEF
## AGAINST DEFENDANT HUR
### (Breach of Fiduciary Duties)

220.    Wilshire Bank repeats and re-alleges the allegations in paragraphs 1 through 219 of the Complaint with the same force and effect as if fully set forth herein.

221.    Defendant Hur's employment as Wilshire Bank's Marketing Advisor to the Director of the Eastern Region imposed on him fiduciary duties and obligations.

222.    Defendant Hur breached his fiduciary duties and obligations by using and/or disclosing Wilshire Bank's confidential and proprietary information without any permission or authority of Wilshire Bank.

223.    As a result of the foregoing, Wilshire Bank has been damaged in an amount to be determined at trial.

## FIFTY-SECOND CLAIM FOR RELIEF
## AGAINST DEFENDANT HUR
### (Unjust Enrichment)

224.    Wilshire Bank repeats and re-alleges the allegations in paragraphs 1 through 223 of the Complaint with the same force and effect as if fully set forth herein.

225.    As a result of Hur's breach of his fiduciary duties and obligations as set forth above (¶¶ 177-180), defendant Hur has been unjustly enriched in an amount not less than the total compensation and benefits paid by Wilshire Bank to him since he first engaged in such conduct.

### FIFTY-THIRD CLAIM FOR RELIEF
### AGAINST DEFENDANT HUR
#### (Unjust Enrichment)

226.     Wilshire Bank repeats and re-alleges the allegations in paragraphs 1 through 225 of the Complaint with the same force and effect as if fully set forth herein.

227.     As a result of Hur's breach of his fiduciary duties and obligations as set forth above (¶¶ 200-203), defendant Hur has been unjustly enriched in an amount to be determined at trial.

### FIFTY-FOURTH CLAIM FOR RELIEF
### AGAINST DEFENDANT HUR
#### (Unjust Enrichment)

228.     Wilshire Bank repeats and re-alleges the allegations in paragraphs 1 through 227 of the Complaint with the same force and effect as if fully set forth herein.

229.     As a result of Hur's breach of his fiduciary duties and obligations as set forth above (¶¶ 204-207), defendant Hur has been unjustly enriched in an amount to be determined at trial.

### FIFTY-FIFTH CLAIM FOR RELIEF
### AGAINST DEFENDANT KIM
#### (Unjust Enrichment)

230.     Wilshire Bank repeats and re-alleges the allegations in paragraphs 1 through 229 of the Complaint with the same force and effect as if fully set forth herein.

231.     Defendant Kim has been unjustly enriched in an amount to be determined at trial.

### FIFTY-SIXTH CLAIM FOR RELIEF
### AGAINST DEFENDANT BERGENFIELD BAGEL & CAFE INC.
#### (Unjust Enrichment)

232.     Wilshire Bank repeats and re-alleges the allegations in paragraphs 1 through 231 of the Complaint with the same force and effect as if fully set forth herein.

233.     Defendant Bergenfield Bagel & Cafe Inc. has been unjustly enriched in an amount to be determined at trial.

## FIFTY-SEVENTH CLAIM FOR RELIEF
## AGAINST DEFENDANT MAYWOOD BAGEL INC.
### (Unjust Enrichment)

234.     Wilshire Bank repeats and re-alleges the allegations in paragraphs 1 through 233 of the Complaint with the same force and effect as if fully set forth herein.

235.     Defendant Maywood Bagel Inc. has been unjustly enriched in an amount to be determined at trial.

## FIFTY-EIGHTH CLAIM FOR RELIEF
## AGAINST DEFENDANT UB'S PIZZA & BAGEL INC.
### (Unjust Enrichment)

236.     Wilshire Bank repeats and re-alleges the allegations in paragraphs 1 through 235 of the Complaint with the same force and effect as if fully set forth herein.

237.     Defendant UB'S Pizza & Bagel Inc. has been unjustly enriched in an amount to be determined at trial.

## FIFTY-NINTH CLAIM FOR RELIEF
## AGAINST DEFENDANT UB'S BAGEL & CAFE INC.
### (Unjust Enrichment)

238.     Wilshire Bank repeats and re-alleges the allegations in paragraphs 1 through 237 of the Complaint with the same force and effect as if fully set forth herein.

239.     Defendant UB's Bagel & Cafe Inc. has been unjustly enriched in an amount to be determined at trial.

## SIXTIETH CLAIM FOR RELIEF
## AGAINST DEFENDANT UBK BAGELS CORP.
### (Unjust Enrichment)

240.  Wilshire Bank repeats and re-alleges the allegations in paragraphs 1 through 239 of the Complaint with the same force and effect as if fully set forth herein.

241.  Defendant UBK Bagels Corp. has been unjustly enriched in an amount to be determined at trial.

WHEREFORE, plaintiff Wilshire Bank demands judgment:

a.  Awarding compensatory damages as against each defendant in an amount to be determined at trial, plus interest as permitted by law;

b.  Awarding punitive damages against defendant Chon and defendant Ryu in an amount to be determined at trial;

c.  Awarding the costs and expenses, including attorneys' fees, incurred and to be incurred by Wilshire Bank in connection with this action; and

d.  Awarding such other relief as the Court may deem just, proper and equitable.

Dated:  March 19, 2014

LEE ANAV CHUNG WHITE & KIM LLP

By:  s/ Jane Chuang
          Jane Chuang (JC 9132)

156 Fifth Avenue, Suite 303
New York, New York 10010
(212) 271-0664

*Attorneys for Plaintiff*
*Wilshire Bank*

# EXHIBIT 3
(REDACTED)

Page 1

1          UNITED STATES DISTRICT COURT

2            DISTRICT OF NEW JERSEY

3

4    ------------------------------------------X

5    WILSHIRE BANK,

6                                    PLAINTIFF,

7            -against-      Index No.:

8                           02:14-CV-01770-JLL-JAC

9    MIYE CHON, a/k/a Karen Chon, SUK JOON RYU, a/k/a James S.

10   Ryu, HONG SIK HUR, TAE JONG KIM, BERGENFIELD BAGEL & CAFE

11   INC., d/b/a Cafe Clair, MAYWOOD BAGEL INC., UB'S PIZZA &

12   BAGEL INC., UB'S BAGEL & CAFE INC., and UBK BAGELS CORP.,

13   d/b/a Franklin Bagels & Cafe,

14                                    DEFENDANTS.

15   ------------------------------------------X

16

17            DEPOSITION OF KAREN CHON

18              NEWARK, NEW JERSEY

19             Thursday, June 23, 2016

20

21

22

23        Reported by:

24        JENNIFER DE LEON

25        Job No.  107961

Page 34

M. CHON

1
2  Ms. Kim's account?
3        A.  Yes.
4        Q.  And do you recall where you were when -- when
5  he told you this?
6        A.  In Palisades Park.
7        Q.  When you say "Palisades Park," are you
8  referring to the Palisades Park branch of Bank Asiana?
9        A.  The branch is on the first floor and on the
10  third floor there is a back office.
11        Q.  Could you tell us how you came to meet with
12  Mr. Ryu at the Palisades Park branch?
13        A.  It's not that we took the time to meet.  Every
14  month we have a meeting.  Not only that.  I mean, I --
15  sometimes I have to bring things to Palisades Park so I
16  visit often.
17        Q.  Okay.  But just to clarify, at the time that
18  you spoke to him at the Palisades Park branch, you were
19  working at the Fort Lee branch of Bank Asiana, correct?
20        A.  Yes.
21        Q.  When he told you that, did he tell you how he
22  found out?
23        MR. HARVEY:  Objection.  There's been no
24  testifo -- there's been no testimony about what he said.
25        MR. YI:  Okay.  Fair enough.

Page 35

M. CHON

1
2        Q.  Could you just tell us what he said to you at
3  that time?
4        A.  He mentioned about those transactions and he
5  said, don't you know that you are not supposed to do this,
6  do you know this is a big -- what a big wrongdoing this is?
7        Q.  Did he say anything else?
8        A.  This could become a big matter like, like
9  this, like this criminal matter.
10        Q.  Did he say anything else?
11        A.  So I got very scared about what I did.
12        Q.  Did he say anything else?
13        A.  And then he asked me to lend him money.
14        Q.  Did he ask you how much?
15        A.  At first $30,000.
16        Q.  And what did you say?
17        A.  I told him I didn't have the money.
18        Q.  What did he say?
19        A.  He said if I lend him the money, the way I did
20  those -- these transactions and he said that it could get
21  resolved like it wasn't going to take long for that to get
22  -- become resolved, resolved the matter.
23        Q.  Ms. Chon, did he ask to borrow 30,000 or did
24  he ask you to give him 30,000?
25        A.  He didn't use those exact words.  What I

Page 36

M. CHON

1
2  thought was borrowing.  To put it easily borrowing it, you
3  know.  I thought he was borrowing from the bank and then,
4  you know, it would get resolved quickly.
5        Q.  What did you say in response to that?
6        A.  I couldn't answer right away.
7        Q.  Let me ask you this:  Was it your
8  understanding that Mr. Ryu was asking you to make
9  unauthorized withdrawals from accounts belonging to Bank
10  Asiana customers in order to either lend him or give him
11  30,000?
12        A.  Yes.
13        Q.  And when he asked you that, did he threaten
14  you in any way?
15        A.  I heard it as a threat.
16        Q.  Did he say anything to you that you recall
17  that led you to believe that he was threatening you?
18        A.  Because I -- I had something that I did wrong
19  first, I was afraid of it becoming/turning into a serious
20  big matter because of that.
21        Q.  Do you remember Mr. Ryu saying anything else
22  at that time?
23        A.  No.
24        Q.  How did you end that discussion?
25        A.  I couldn't decide right then.  I told him I'll

Page 37

M. CHON

1
2  think about it.
3        Q.  Did he say anything in substance that if you
4  didn't cooperate with his request that he would turn you
5  into the authorities, in essence, report you for what you
6  had done?
7        A.  No, he didn't say that, but I thought he
8  would, of course, do that.
9        Q.  At the time that you had this conversation
10  with Mr. Ryu, was he Senior Vice President and Chief
11  Operating Office of Bank Asiana?
12        A.  Yes.
13        Q.  Did he tell you in that conversation how he
14  found out that you had made unauthorized withdrawals from
15  ███████████████████████████████
16        A.  No.  He probably found out because other
17  people knew about it.
18        Q.  Okay.  Ms. Chon, I'm not asking to you
19  speculate or guess.  If you know.
20        (Record read as follows: "QUESTION: Did he
21  tell you in that conversation how he found out that you had
22  made unauthorized withdrawals from ██████████████████
23  ███████████)
24        MR. JEON:  Okay.  Thank you.
25        Q.  Ms. Chon, when you had this conversation with

Page 38

M. CHON

1
2   Mr. Ryu, what was your relationship with Mr. Ryu?
3        A.   Just superior and the imperior -- employee.
4        Q.   Did you report to someone directly at the bank
5   at that time?
6        A.   Can you repeat the question?
7        Q.   Right.  So, you testified that you were the
8   head teller at the Fort Lee branch of Bank Asiana.  My
9   question is, is there someone in the organ --
10  organizational chart who was above you who directly
11  supervised you?
12       A.   Branch manager.
13       Q.   Okay.  Who was that?
14       [redacted]
15            THE INTERPRETER:  Suh is the last name.
16       Q.   And at that time, was Mr. Ryu's one of his
17  duties and responsibilities as the bank's vice president
18  and COO to supervise employees like you?
19       A.   Yes.
20       Q.   When he asked for the $30,000 in that
21  conversation, did he tell you yes needed it?
22       A.   No.
23       Q.   When was the next time you spoke to him?
24       A.   Maybe the following -- I think it was two days
25  after.

Page 39

M. CHON

1
2        Q.   Did you speak to him in person or by
3   telephone?
4        A.   By bank telephone.
5        Q.   When you said "bank telephone," were you
6   working at the Fort Lee branch at the time?
7        A.   Yes.
8        Q.   Did you call him or did he call you?
9        A.   I think I called him.
10       Q.   And was it during business hours of the bank?
11       A.   Yes.
12       Q.   Do you remember what you said to him and what
13  he said to you?
14       A.   I called him saying that I got it regarding
15  that.
16       Q.   What do you mean by that?
17       A.   Oh, I would lend him what he proposed; I will
18  do it.
19       Q.   Did he say anything to you at that time?
20       A.   No.
21       Q.   Was there any discussion between the two of
22  you at that time about how you would -- how you would come
23  up with the 30,000?
24       A.   No.
25       Q.   And did there come a time where you gave him

Page 40

M. CHON

1
2   the 30,000 that he asked for?
3        A.   Yes.
4        Q.   Could you describe to us how you were able to
5   come up with the 30,000 that he had asked for?
6        A.   The same way through the account using the
7   account.
8        Q.   When you say the same way using the account,
9   are you referring to the unauthorized withdrawals from CD
10  accounts either an installment account or CD account?
11       A.   Yes.
12       Q.   Do you recall whose account you made that
13  withdrawal from?
14       [redacted]
15       Q.   Ms. Chon, I'm not asking you to guess or
16  speculate.  If you recall.
17       A.   I don't know.
18       Q.   Is it fair to say that you made an
19  unauthorized withdrawal in the amount of $30,000 from an
20  account belonging to a Bank Asiana customer and gave that
21  30,000 to Mr. Ryu?
22       A.   Yes.
23       Q.   And is it fair to say that the $30,000, that
24  of unauthorized withdrawal, you did it the same way that
25  you had testified earlier which was making transfers

Page 41

M. CHON

1
2   ultimately to -- I'm sorry, just a minute, please -- to
3   currency and coin account and thereafter removing the cash
4   equivalent to the transfer amount out of the cash vault?
5        A.   Yes.
6            (Whereupon, Mr. Ryu leaves the room.)
7        Q.   Do you recall how you gave him the $30,000 in
8   cash?
9        A.   The same.  I went to the off -- that office.
10  I went to the branch.  I went to the room.
11       Q.   Okay.  Is it fair to say that you personally
12  delivered the cash of $30,000 to Mr. Ryu?
13       A.   Yes.
14       Q.   And when you gave it to him, you were in his
15  office?
16       A.   Yes.
17       Q.   Was there anyone present other than the two of
18  you?
19       A.   No.  In the room?
20       Q.   Yes.
21       A.   No.
22       Q.   Was the cash in an envelope, or a --
23       A.   Yes, in the envelope.  In an envelope.  It was
24  not the envelope for money.  It was a -- just a large, it
25  was a large envelope.

11

Page 42

M. CHON

1
2    Q.   Was it a large envelope belonging -- was it a
3  bank envelope?
4    A.   We have envelopes to deliver documents between
5  like among branch/branches.
6    Q.   So it's an interoffice bank envelope, bank
7  envelope?
8    A.   Yes.
9    Q.   When you gave him the money, did he say
10  anything to you?
11    A.   No.  I asked him when he could, you know,
12  return it/pay back.  He said it wasn't going to take long,
13  it would get resolved shortly and but didn't say exact
14  date.
15    Q.   By the way, when you said earlier that you
16  considered the unauthorized withdrawals from ███████
17  account, ███████ account to be borrowing, did you say
18  that because you intended to come up with money and
19  replenish those accounts?
20    A.   Yes, when I first -- when I first began doing
21  it just by myself.
22    Q.   And was it your understanding that when you
23  gave the $30,000 to Mr. Ryu, and Mr. Ryu made the statement
24  to you that you testified to, was it your expectation that
25  he would pay back the $30,000 so that you could then

Page 43

M. CHON

1
2  replenish the account from which you made the unauthorized
3  withdrawal?
4    A.   Yes.
5    Q.   Did he ever repay the $30,000?
6    A.   No.
7    Q.   Did you ever replenish the account from which
8  you made the $30,000 unauthorized withdrawal?
9    A.   No.  In the end, as a -- I mean ultimately
10  Eunchul Paek's account was replenished.
11    Q.   And ███████ account was replenished and Ms.
12  Kim's account was replenished by making unauthorized
13  transfers from accounts belonging to other Bank Asiana's
14  accounts, correct?
15    A.   Only ███████ account.
16    Q.   Did there come a time where Mr. Ryu asked you
17  for additional monies?
18    A.   Yes.
19    Q.   Do you recall when that was?
20    A.   I don't know when.  It was sometime after that
21  instant.
22    Q.   Approximately how many times did Mr. Ryu ask
23  you for money?
24    A.   Around ten times.
25    Q.   And is it fair to say that those ten times

Page 44

M. CHON

1
2  occurred sometime between 2010 and 2013?
3    A.   Approximately.
4    Q.   And in each instance when he asked you for
5  money, did he specify the amount that he wanted?
6    A.   Yes.
7    Q.   You mentioned, you testified that the first
8  time he asked you for $30,000; do you remember how much he
9  asked you for the second time?
10    A.   Second time maybe it was $20,000.
11    Q.   Do you remember the amount that he asked for
12  the third time?
13    A.   I don't know the amount, but the amount kept
14  getting larger.
15    Q.   When he asked you for money approximately ten
16  times that you testified, did you at any time say no?
17    A.   I have not told him so.  I just kept -- I kept
18  asking when this was going to get resolved.  He kept saying
19  the same -- what is it?  He said, you know, he will resolve
20  it shortly, yes.
21    Q.   Of approximately ten times that he asked you
22  for money and you mentioned that the amount kept getting
23  larger, do you recall the largest amount of money that he
24  asked you for?
25    A.   Hundred thousand dollars.

Page 45

M. CHON

1
2    Q.   In each of those instances, did you make one
3  or more unauthorized withdrawals from accounts belonging to
4  Bank Asiana's customers in order to give Mr. Ryu the money
5  he asked for?
6    A.   Yes.  But such a large amount cannot be done
7  at one time so I did it over several occasions.
8    Q.   And on those several occasions, did you give
9  him the money or deliver the money to him in the manner
10  that you described earlier?
11    A.   Yes, always in cash.
12    Q.   And was it always in the interoffice or
13  interbank delivery envelope?
14    A.   Yes.
15    Q.   And did you personally deliver it to him to
16  his office?
17    A.   No, not every time.  He often -- he would
18  visit the Fort Lee branch often.
19    Q.   So is it fair to say that on some occasions,
20  you delivered the cash in the envelope to him to his office
21  and on some occasions, he came to the Fort Lee branch to
22  pick up the envelope from you?
23    A.   Yes.
24    Q.   On all of the occasions when you personally
25  delivered the cash to him in the envelope, do you recall

M. CHON

1
2    Q.  Did Mr. Murphy ask you at that meeting about
3 the approximate total amount of the monies that you had
4 given to Mr. Ryu from unauthorized withdrawals that you
5 made?
6    A.  I really don't know.
7    Q.  I understand.  It's late in the day and I
8 understand that you're getting tired.  Let me just ask a
9 different way.  Do you recall telling Mr. Murphy at that
10 meeting that you had given to Mr. Ryu approximately
11 $700,000 from the unauthorized withdrawals?
12    A.  Yes.
13    Q.  Yes, you did tell him or, yes, you remember?
14    A.  I think I told -- I think I said -- I think I
15 told him.
16    Q.  Did you also tell Mr. Murphy at that meeting
17 that of the unauthorized withdrawals you kept for yourself
18 approximately $500,000?
19    A.  I don't recall whether I -- whether I told him
20 the exact number, but -- but I think I mentioned that I
21 kept -- the fact that I kept some, kept the money.
22    Q.  Ms. Chon, do you have anything, anything in
23 writing that would reflect the sums of cash that you gave
24 to Mr. Ryu from the unauthorized withdrawals?
25    A.  There is nothing in writing for record.

M. CHON

1
2    Q.  When you were employed by Bank Asiana, did you
3 keep a diary?  Did you maintain a diary?
4    A.  Bank diary.
5    Q.  When you left Bank Asiana -- withdrawn.
6      Do you still have those diaries?
7    A.  There was not much memo so I didn't keep it.
8 I didn't keep the diary.
9    Q.  Do you know where they are?
10    A.  I think that was all thrown away at the time
11 back then.
12    Q.  Other than the bank's calendar or diary that
13 you say were thrown away, did you keep or maintain during
14 your employment with Bank Asiana any personal calendar or
15 diaries?
16    A.  I had a calendar.
17    Q.  Do you have those to this day?
18    A.  No, I don't have mine, but I have some other
19 employees.
20    Q.  Why do you have calendar or diaries of other
21 -- of former Bank Asiana employees?
22    A.  Oh, in another employee's calendar, every
23 employee's ID and passwords were -- they were contained,
24 included.  They were contained, written and because of
25 that, I kept it.  But I'm not sure whether I still have it

M. CHON

1
2 up to now.
3    Q.  Were those calendar of other, either, current
4 employees or former employees of Bank Asiana's with -- with
5 -- would those calendar or diaries have reflect the
6 amounts, amounts of the unauthorized withdrawals that you
7 had made?
8    A.  No.
9    Q.  To your knowledge, did Mr. Ryu during your
10 employment at Bank Asiana maintain a bank issued calendar
11 or diary or appointment book?
12    A.  That, I don't know, probably his secretary of
13 state knows.
14    Q.  Again, I'm not asking you to guess or
15 speculate.  To your knowledge, does Mr. Ryu have anything
16 in writing which would reflect the total amount or the
17 various amounts that -- of cash that you delivered to him
18 from the unauthorized withdrawals that you made?
19    A.  I don't know.
20    Q.  Did you have any discussions during your
21 employment at Bank Asiana, did you have any discussions
22 with Mr. Ryu concerning a ███████████████████
███ ███████████████?
24    MR. YI:  I believe it's --
25    A.  She was just an employee.  What is the

M. CHON

1
2 question?
3    Q.  My question is, did you have any discussions
4 with Mr. Ryu concerning ███████████?
5    A.  I don't recall.
6    Q.  During your employment at Bank Asiana, did you
7 have any knowledge of the nature of the relationship
8 between Mr. Ryu and ███████?
9    A.  ███████?  I think he was doing that --
10 that kind of work.
11    Q.  Beyond that, did you have any knowledge about
12 the nature of the relationship between the two of them?
13    A.  I understood as ████████████████ --
14 business-wise somehow connected with James Ryu, James Ryu.
15    Q.  During your employment at Bank Asiana, did you
16 have any discussions with Mr. Ryu concerning a business
17 that he owned, a hair salon business that he owned called
18 Luz, or Luz, spelled L-U-Z?
19    A.  I think that is connected to ███████.
20    Q.  When you say that business was connected to
21 ███, can you just clarify what you mean?
22    A.  ████████████████████████
████████████████ I think that's what I
24 heard.  That's how I heard.
25    Q.  I'm sorry, let me just go back to my original



Page 110

M. CHON

1
2 question.  During your employment at Bank Asiana, did you
3 have any discussions with Mr. Ryu, any specific discussions
4 with Mr. Ryu concerning his hair salon business called Luz?
5     A.  No.
6     Q.  During your employment at Bank Asiana, did you
7 have any discussions with Mr. Ryu concerning a business
8 that he owned called a cafe business called Seleste,
9 S-E-L-E-S-T-E?
10     A.  No.
11     Q.  During your employment at Bank Asiana, did you
12 have any discussions with Mr. Ryu concerning Soyu
13 Architecture, S-O-Y-U?
14     A.  No.
15     Q.  Did you have any discussions with Mr. Ryu
16 concerning an individual named ███████████?
17     A.  ███████████████████, but we had a lot
18 of -- many internal calls concerning his account.
19     Q.  Do you recall any conversations with Mr. Ryu
20 in which he told you that he owed monies to Soyu
21 Architecture?
22     A.  The question right now, are you asking me the
23 conversation with Mr. Ryu?
24     Q.  Yes, did Mr. Ryu ever tell you?
25     A.  No.

Page 111

M. CHON

1
2     Q.  Did Mr. Ryu ever tell you that when he asked
3 you for money that he -- or at any other time whether he
4 owed monies to a person by the name of █████████
5     A.  No.
6     Q.  During your employment at Bank Asiana, did you
7 have any discussions with Mr. Ryu concerning a bank called
8 New Millennium Bank?
9     A.  No.
10     MR. YI:  Why don't we take a quick break.
11     THE VIDEOGRAPHER:  Stand by.  The time is
12 4:38.  We're going off the record.
13     (Brief recess was taken.)
14     THE VIDEOGRAPHER:  The time is 4:50.  We're
15 back on the record.
16     Q.  Ms. Chon, during your employment at Bank
17 Asiana, did you have any discussions with Mr. Ryu
18 concerning a business call Kore Consulting, K-O-R-E.
19     A.  In relations to the account, to an account.
20     Q.  Was ████████████████████████████
21 █████████████████?
22     A.  Yes.
23     Q.  So when you mentioned earlier that ██████████
24 was a customer of Bank Asiana, were you referring to Kore
25 Consulting?

Page 112

M. CHON

1
2     A.  ███████████ and nail salon called ████,
3 █████████████ -- I'm sorry, what was the --
4     Q.  I'm sorry, what was the name of the nail
5 salon?
6     A.  █████
7     Q.  █████████?
8     A.  Yes.
9     Q.  My question though was, do you recall having
10 any discussions with Mr. Ryu during your employment at Bank
11 Asiana about Kore Consulting?
12     A.  About -- regarding the business we have not
13 talked.
14     Q.  At any time when you delivered sums of cash to
15 Mr. Ryu or he picked them up, during that time period, did
16 he ever tell you why he needed the money or wanted the
17 money?
18     A.  No, but I knew he had debt.
19     Q.  Do you know who he owed monies to?
20     A.  ████████████
21     Q.  ████████████████████████
22 ████████████████?
23     A.  That, I don't know exactly.
24     Q.  Did he ever tell you about the nature about
25 the debt?

Page 113

M. CHON

1
2     A.  ████████████ told me.
3     Q.  And was that during your employment at Bank
4 Asiana?
5     A.  Yes.
6     Q.  Can you tell us what you remember him telling
7 you?
8     A.  ███████████ had a lot of accounts for ████
9 ████████  The accounts were always overdrawn.  It was
10 always -- they were always negative balance.  I mean, if
11 the -- the checks, the banks would not pay for them unless
12 they do deposits because there was not sufficient money
13 always.  Every time he'd call me, oh, to ask me to give one
14 more day like a grace period and -- but I didn't have the
15 authority for that and I had to get an approval from
16 Mr. Ryu, but I'm supposed to get it from the branch
17 manager.
18     But ███████████ would ask me to call directly
19 Mr. Ryu and so two -- those two people, they would talk on
20 the telephone and then James Ryu would instruct me to pay,
21 to pay and that was repeated several times.  The same
22 instant kept happening.  I would tell ███████████ I can't
23 do it; he needs to make a deposit and he would say, oh, if
24 James Ryu -- James Ryu would pay him the money then he
25 could use that money to deposit, but I don't -- you know,



Page 114

M. CHON

1
2  he doesn't have the money.  That's what he used to say.
3  That's how I found out.
4      Q.  So is it your testimony that during those
5  conversations with ██████, he told you that Mr. Ryu
6  owed him money?
7      A.  Yes.
8      Q.  Did he ever tell you how much Mr. Ryu owed to
9  ██████?
10     A.  No, he didn't say.  He's never said the exact
11  amount.
12     Q.  Did he ever tell you the nature -- withdrawn.
13         Did he ever tell you the -- why Mr. Ryu owed
14  monies to ██████?
15     A.  Everything I heard, like, from employees.  I
16  heard from employees, all the employees they knew.
17     Q.  When you say all the employees knew, what did
18  they know?
19     A.  Oh, that, you know, they didn't know what kind
20  of business/which business but through business this debt
21  was accumulated, this detective arose.
22     Q.  Is it your testimony that based on what you
23  heard from other employees from Bank Asiana that you had an
24  understanding that Mr. Ryu had debts relating to one or
25  more of his businesses?

Page 115

M. CHON

1
2      A.  Yes.
3      Q.  Did ██████ have -- at the
4  time you were employed by Bank Asiana have a loan with Bank
5  Asiana?
6      A.  Yes.
7      Q.  Do you remember the amount of the loan,
8  approximately?
9      A.  It was a lot.
10     Q.  Was it over a million dollars?
11     A.  A lot more.  Near five million.  It was just
12  not one loan, one.  Several, several loans.
13     Q.  Did ██████ ever tell you that Mr. Ryu
14  owed him money because a portion of the loan proceeds taken
15  out by ██████ was given to Mr. Ryu?
16     A.  No.
17     Q.  Earlier today you told us that before --
18  sometime before you left the employee of Bank Asiana that
19  you had lunch with Mr. Ryu and ██████, do you remember
20  that?
21     A.  Yes.
22     Q.  During your employment at Bank Asiana, did you
23  have any other lunches with just Mr. Ryu?
24     A.  Just two of us?
25     Q.  Yes.

Page 116

M. CHON

1
2      A.  Almost it was always with ██████.  I don't
3  recall.  Two of us.
4      Q.  Do you recall the circumstances leading up to
5  that lunch?
6      A.  When?
7      Q.  It was sometime before you left Bank Asiana,
8  you told us that you had lunch with Mr. Ryu and ██████,
9  how did the two of you come to have lunch together?
10     A.  Always ██████ calls me.  They always asked
11  me out unless I have another lunch appointment.
12     Q.  At that lunch, did you have any private
13  discussions with Mr. Ryu outside of your lunch with ██████
14  ██?
15     A.  No.
16     Q.  Ms. Chon, with respect to the unauthorized
17  withdrawals that you made while you were employed by Bank
18  Asiana, is there anything -- is there anything about those
19  withdrawals that you have not told us about today that you
20  have not covered?
21     A.  Apart from this?  No.
22     Q.  So, to the best of your knowledge and to the
23  best of your recollection, we have covered today thus far
24  all the facts as you know them related to your unauthorized
25  withdrawals that you made while you were employed at Bank

Page 117

M. CHON

1
2  Asiana?
3      A.  Yes.
4      Q.  With respect to Mr. Ryu and the fact that he
5  asked you for money and the fact that you delivered sums of
6  cash to him at his request from the unauthorized
7  withdrawals, is there anything that we have not covered in
8  that respect?
9      A.  No.
10         MR. YI:  I have no more questions at this
11  time.  Plaintiff Wilshire Bank reserves the right to
12  continue the deposition of this witness.
13     A.  One thing, one thing.
14     Q.  Okay.
15     A.  ██████████ personal loan, I
16  understand that -- I know as he asked for a personal loan
17  from the ██████ received a request, no, no. ██
18  ████████████ received a request from the
19  ██ to take a personal loan and lend them money to James
20  Ryu.
21     Q.  When you say ██, are you referring to
22  ████████?
23     A.  Yes.
24     Q.  Who during your employment with Bank Asiana
25  was ████████████?

Page 118

M. CHON

1
2   A.  Yes.
3   Q.  Is it your testimony that ████ approached
4   █████████████ to take a loan from the bank and
5   to use the proceeds of that loan and give it to Mr. Ryu?
6   A.  We didn't -- at Bank Asiana, you can get an
7   employee -- employee loan up to $25,000, but already James
8   Ryu took out his own -- his personal loan but he needed
9   more money, so the -- so ████ proposed to -- said to
10  ████, I am going to approve the loan, the personal
11  loan so take -- take the personal loan under your name and
12  give that money to James Ryu.  And at the time
13  discussed that with me and the manager.  But I know as
14  ████ refused that, that she couldn't.
15  Q.  Okay.  When you say you had a discussion about
16  the ████ proposal or suggestion, who's the manager that
17  you're referring to?
18
19
20
21  Q.  Did there come a time when you found out that
22  ████ had resigned from Wilshire Bank?
23  A.  Yes, I know.
24  Q.  Do you know why she resigned?
25  A.  I think because of this instant.  I think she

Page 119

M. CHON

1
2   probably had a lot of work like she was working overtime a
3   lot and she had to just get involved in this matter a lot.
4   So, I mean I'm just -- this is my thought, my thinking.
5   Q.  Did she ever tell you whether there was any
6   specific reason or reasons that she resigned?
7   A.  No.  We have not talked on the phone since
8   then.
9   Q.  Is there anything else that we have not
10  covered?
11  A.  No.
12  MR. YI:  I have no more questions at this
13  time.  Plaintiff Wilshire Bank hereby reserves the right to
14  continue the deposition of this witness, following
15  production of the documents we have requested including
16  those previously requested in Wilshire Bank's first
17  production of documents and first sets of interrogatories
18  each dated October 24, 2014.  Thank you.
19  EXAMINATION BY
20  MR. HARVEY:
21  Q.  I am now going to ask some questions.  Ms.
22  Chon, my name is Steve Harvey and I represent James Ryu.
23  Before you worked for Bank Asiana, you worked
24  for a bank in New York called Liberty, right?  True?
25  A.  Yes.

Page 120

M. CHON

1
2   Q.  And just you -- when you left Liberty Bank,
3   you went immediately on to maternity leave; isn't that
4   true?
5   A.  Yes.
6   MR. YI:  Objection to form.
7   Q.  And before you left Liberty Bank to go on that
8   maternity leave, you, in fact, made some unauthorized
9   withdrawals at Liberty Bank; isn't that true?
10  MR. YI:  Objection to form.
11  A.  No.
12  Q.  Were you ever -- to the best of your
13  knowledge, were you ever suspected of making unauthorized
14  withdrawals at Liberty Bank?
15  A.  Yes.
16  Q.  And who suspected you?
17  A.  My supervisors/branch manager.
18  Q.  And do you know why she suspected you?
19  A.  Because there was a -- cash was short in the
20  vault at the time.
21  Q.  How much was cash short at the vault at the
22  time?
23  A.  $10,000.
24  Q.  And do you know why the cash was short in the
25  vault?

Page 121

M. CHON

1
2   A.  At the time they couldn't find it.
3   Q.  Did you -- do you know why the cash was -- I'm
4   asking you if you know why that cash was short in the
5   vault?
6   A.  I don't know.
7   Q.  Did you take that $10,000?
8   A.  No.
9   Q.  Did you -- on your last day of your
10  employment, was your purse searched by an employee and
11  $4,000 was discovered in your purse?
12  MR. YI:  Objection to form.
13  A.  $4,000?
14  Q.  Yes.
15  A.  No.
16  Q.  Was any amount found in your purse on your
17  final day?
18  A.  I don't recall, but I was doing business at
19  the time so I always had some cash.
20  Q.  Large amount like several thousand dollars?
21  A.  I mean, it was -- at the time it was probably
22  after I made a deposit, but I don't always carry several
23  thousand dollars.
24  Q.  At the time though, at the time she left, did
25  she have several thousand of dollars carrying -- Karen,

## Page 130

M. CHON

1
2      THE REPORTER:  What was the last part you
3  said?
4      MR. JEON:  Objection to form.
5      A.  I have not paid off hundreds of thousands of
6  dollars.
7      Q.  How much did you pay for your husband's and
8  businesses debt?
9      A.  I don't know.
10      Q.  The -- do you understand that the restitution
11  order that is in connection with your guilty plea requires
12  you to pay back 1.4 million dollars?
13      MR. YI:  Objection to form.
14      A.  I don't understand the question.
15      Q.  The question is, do you understand that the
16  government in connection with your guilty plea is requiring
17  you to take out an obligation to pay back approximately 1.4
18  million dollars?
19      MR. YI:  Approximately, I think, he said.
20      A.  Yes.
21      Q.  How do you know if you didn't keep track that
22  the amount that you gave to James Ryu as you claim was
23  approximately $700,000?
24      A.  Because I knew who the CD accountholders were
25  and you go into those accounts and you can see how much

## Page 131

M. CHON

1
2  money was short.  And I always knew in my mind how much it
3  will be, you know how much you need to make up for that
4  money so that's how I knew.
5      Q.  And what was the total amount that you needed
6  to make up that money?
7      A.  That, I heard that was 1.4.
8      Q.  Not what she heard.  Not what you heard,
9  Karen.  What you knew based on keeping track of the amounts
10  that you were taking out of these customers' installment
11  CDs?
12      A.  I knew it was around million dollars, one
13  million.
14      Q.  And so of the million that you knew that you
15  had to pay back to these customers you had taken out of
16  their accounts, how did you know that the amount of that
17  million, the amount that went to James as you say was
18  700,000?
19      MR. YI:  Objection to form.
20      A.  I -- I mean, I -- I mean I had it in my head
21  approximately that amount.
22      MR. JEON:  Excuse me.  The garage closes at
23  6:00.  So, it's 5:00 --
24      MR. YI:  5:38.
25      MR. HARVEY:  I'll wrap up.  Just couple

## Page 132

M. CHON

1
2  minutes.
3      MR. JEON:  Okay.  Thank you.
4      Q.  Were you friends with James Ryu?
5      A.  No.
6      Q.  Did you know him well?
7      A.  I know as my work superior, supervisor.
8      Q.  Did you ever have a meeting with him outside
9  the office?
10      A.  No.
11      MR. HARVEY:  I think we can stop for now.  I
12  have further questions but this is a logical stopping
13  point.  We're going to hopefully be continuing this
14  deposition as soon as we can schedule it in relation to the
15  production of the documents.  Thank you for your time
16  today.
17      THE VIDEOGRAPHER:  Stand by.  The time is now
18  5:39.  We are going off the record.  This will end media
19  unit No. 5 and the deposition for today.
20      (Time noted:  5:39 p.m.)
21
22
23
24
25

## Page 133

1                    J U R A T
2
3      I,          , do hereby certify under
4  penalty of perjury that I have read the foregoing
5  transcript of my deposition taken on          ;
6  that I have made such corrections as appear noted
7  herein in ink, initialed by me; that my testimony as
8  contained herein, as corrected, is true and correct.
9
10      DATED this _____ day of _____, 20  ,
11  at _____,          .
12
13
14
15
16
17
18  _____
    SIGNATURE OF WITNESS
19
20
21
22
23
24
25

## Page 134

```
 1          C E R T I F I C A T E
 2
 3   STATE OF NEW JERSEY  )
 4                 ) Ss.:
 5   COUNTY OF HUDSON    )
 6
 7         I, JENNIFER DE LEON, a Notary Public
 8   within and for the State of New Jersey, do
 9   hereby certify:
10         That MIYE CHON, the witness whose
11   deposition is hereinbefore set forth, was duly
12   sworn by me and that such deposition is a true
13   record of the testimony given by such witness.
14         I further certify that I am not
15   related to any of the parties to this action by
16   blood or marriage; and that I am in no way
17   interested in the outcome of this matter.
18         IN WITNESS WHEREOF, I have hereunto set
19   my hand this 7th day of July, 2016.
20
21
22         ------------------------
23         JENNIFER DE LEON
24
25
```

## Page 135

```
 1   --------------------I N D E X-----------------
 2   WITNESS      EXAMINATION BY      PAGE
 3   MIYE CHON        MR. YI        5
 4             MR. HARVEY
 5   -------------------EXHIBITS-------------------
 6
 7   PLAINTIFF'S               PAGE LINE
 8
 9   Exhibit 1
10   Notice.................................19  16
11   Exhibit 2
12   Superseding Indictment.................18  15
13   Exhibit 3
14   Application For Plea...................19  8
15   Exhibit 4
16   Plea Agreement Dated 3/21/16...........20  11
17   Exhibit 5
18   Statement..............................49  24
19   Exhibit 6
20   Memorandum Dated 1/23/14...............59  19
21   Exhibit 7
22   Notes..................................92  22
23
24
25
```

## Page 136

```
 1         ERRATA SHEET FOR THE TRANSCRIPT OF:
 2   Case Name:   WILSHIRE BANK vs. MIYE CHON
 3   Dep. Date:   June 23, 2016
 4   Deponent:    MIYE CHON a/k/a KAREN CHON
 5         CORRECTIONS:
 6   Pg. Ln. Now Reads       Should Read   Reason
 7   ___ ___ _____   _____  _____
 8   ___ ___ _____   _____  _____
 9   ___ ___ _____   _____  _____
10   ___ ___ _____   _____  _____
11   ___ ___ _____   _____  _____
12   ___ ___ _____   _____  _____
13   ___ ___ _____   _____  _____
14   ___ ___ _____   _____  _____
15   ___ ___ _____   _____  _____
16   ___ ___ _____   _____  _____
17   ___ ___ _____   _____  _____
18   ___ ___ _____   _____  _____
19
20         _____
21         Signature of Deponent
22   SUBSCRIBED AND SWORN BEFORE ME
23   THIS___DAY OF _____, 2016.
24   _____
25   (Notary Public)  MY COMMISSION EXPIRES:_____
```

# EXHIBIT 4

(REDACTED)

```
                                                          Page 137

 1
          UNITED STATES DISTRICT COURT
 2            DISTRICT OF NEW JERSEY
 3   - - - - - - - - - - - - - - - - - - x
                                         :Case No.
 4   BANK OF HOPE, as Successor to        :2:14-CV-01770-
     Wilshire Bank,                       :JLL-JAD
 5                                        :
                             Plaintiff,   :
 6                                        :
                  - v. -                  :
 7                                        :
     MIYE CHON, a/k/a KAREN CHON; SUK     :
 8   JOON RYU, a/k/a James S. Ryu; TAE    :
     JONG KIM; BERGENFIELD BAGEL & CAFE,  :
 9   INC., d/b/a Cafe Clair; MAYWOOD      :
     BAGEL, INC.; UB'S PIZZA & BAGEL,     :
10   INC.; and UBK BAGELS CORP., d/b/a    :
     Franklin Bagels & Cafe,              :
11                                        :
                           Defendants,    :
12   - - - - - - - - - - - - - - - - - - x
     SUK JOCN RYU, a/k/a James S. Ryu,    : CONTINUED
13                                        : DEPOSITION
                  Counterclaim Plaintiff, : OF MIYE CHON
14                                        :
                  - v. -                  : Danbury, CT
15                                        :
     BANK OF HOPE, as Successor to        : Wednesday,
16   Wilshire Bank,                       : March 14, 2018
                                          :
17           Counterclaim Defendant.      :
     - - - - - - - - - - - - - - - - - - x
18   SUK JOCN RYU, a/k/a James S. Ryu,    :
                                          :
19           Third-Party-Counterclaim     :
                  Plaintiff,              :
20                                        :
                  - v. -                  :
21                                        :
     KWON HO JUNG, JAE WHAN YOO, STEVEN   :
22   S. HOH and LISA PAI,                 :
                                          :
23           Third-Party-Counterclaim     : Reported by:
                  Defendants.             : Joseph V. Connolly
24   - - - - - - - - - - - - - - - - - - x
                  (Continued)
25                                        Job No.  138181
```

Page 142

```
 1            M. CHON
 2       (Time noted:  12:14 p.m.)
 3       (Ryu Exhibit 85, Court
 4  Transcript, so marked for
 5  identification, as of this date.)
 6       (Ryu Exhibit 86, FBI Record of
 7  Alicia Lee, so marked for
 8  identification, as of this date.)
 9       (Ryu Exhibit 87, FBI Record of
10  Jin Hee Libene, so marked for
11  identification, as of this date.)
12       (Ryu Exhibit 88, FBI Record of
13  Miye Chon, a/k/a Karen Chon, so marked
14  for identification, as of this date.)
15       (Ryu Exhibit 89, FBI Record of
16  Karen Chon, so marked for
17  identification, as of this date.)
18       (Ryu Exhibit 90, Transcript of
19  Federal Probation (USA -v- Miye Chon),
20  so marked for identification, as of this
21  date.)
22       (Ryu Exhibit 91, USDC Consent
23  Order, so marked for identification, as
24  of this date.)
25       (Ryu Exhibit 92, East Fort Lee
```

Page 143

```
 1            M. CHON
 2  Investigation - Loss Summary, so marked
 3  for identification, as of this date.)
 4       (Ryu Exhibit 93, Cash Deposits &
 5  Loan Payments, 3/10/11-31/10/14, so
 6  marked for identification, as of this
 7  date.)
 8  H O N G   P I L   K I M,
 9       a Certified Interpreter, was duly sworn
10       by a Notary Public to translate English
11       into Korean and Korean into English on
12       behalf of the Deponent and Counsel.
13  M I Y E    C H O H,
14       a named Defendant herein, having been
15       called to testify by the Defendant Ryu,
16       pursuant to Notice, was duly sworn by a
17       Notary Public and testified under oath,
18       through an Interpreter, as follows:
19  EXAMINATION
20  BY MR. HARVEY:
21       Q.   We're here for the continuation
22  of your deposition in this case.
23          You understand that; right?
24       A.   Yes.
25       Q.   And, as you recall, we started
```

Page 144

```
 1            M. CHON
 2  the deposition or we began to depose you in
 3  June, of 2016?
 4       A.   Yes.
 5       Q.   And before you, in front of you
 6  on the table, is Ryu Exhibit 85, which is a
 7  copy of the transcript of your deposition
 8  from June 23, 2016.
 9       (Handed to the witness.)
10       Q.   Do you see that exhibit in front
11  of you?
12       (Witness reviews the exhibit.)
13       A.   Yes.
14       Q.   Have you read that?
15       A.   No.
16       Q.   Have you had occasion to think
17  about the testimony that you gave in June, on
18  June 23, 2016?
19       A.   No.
20       Q.   Do you know if the testimony that
21  you gave on June 23, 2016 was truthful and
22  accurate?
23       A.   Yes.
24       Q.   And, to the best of your belief,
25  it was truthful and accurate; is that
```

Page 145

```
 1            M. CHON
 2  correct?
 3       A.   Yes.
 4       Q.   Do you recall attending a
 5  Sentencing Hearing before Judge Walls, in
 6  Federal Court in New Jersey, on October 25th,
 7  of 2016?
 8       A.   Yes.
 9       Q.   And do you recall that you made a
10  statement to the Court on that occasion?
11       A.   What I said?
12       Q.   Yes.
13       A.   Yes.
14       Q.   And do you --
15       A.   But right now, I'm not sure
16  exactly what I said.
17       Q.   All right.  Do you recall, as
18  well, that your attorney spoke to the Judge
19  that day?
20       A.   I'm not exactly sure.
21       Q.   Okay.  In front of you, what has
22  been marked has Ryu Exhibit 90, is a copy of
23  the transcript of the hearing, the Sentencing
24  Hearing, on June -- excuse me -- October 25,
25  2016.
```

3 (Pages 142 to 145)

Page 146

M. CHON

1
2      (Witness reviews the exhibit.)
3      A.    Yes.
4      Q.    And I'd like you to pick that up
5  and I want to ask you some questions about a
6  statement that's on page 7 of that Exhibit
7  No. 90.
8      (Witness reviews the exhibit.)
9      A.    What was the page number?
10     Q.    Page 7.
11     MR. YI:  It's double-sided.
12     MR. HARVEY:  (Indicating).
13     Q.    Now I would like you to actually
14  begin reading, on page -- you can start
15  however far back you need, 5 or 6 -- but I
16  wanted to ask you about this statement that's
17  highlighted on the top of the page 7.
18     A.    Right now, do you want me to read
19  it?
20     Q.    Yes, please.
21     (Witness reviews the exhibit.)
22     MR. JEON:  Just for the record,
23  she's using an Interpreter.
24     I think the question is:  Are you
25  able to read it in English and

Page 147

M. CHON

1
2  understand it?
3      A.    If you can translate?
4      MR. HARVEY:  Then I'll ask you a
5  couple of questions.
6      Q.    Do you speak English?
7      A.    Not good.
8      Q.    Do you read English?
9      A.    Yes.
10     Q.    And do you understand English?
11  Apart from speaking English, do you
12  understand it?
13     A.    My understanding is not prefect.
14     Q.    Are you capable of reading that
15  English or do you need the interpreter to
16  translate it?
17     MR. YI:  Objection to form.
18     (Witness reviews the exhibit.)
19     A.    If you can translate?
20     Q.    The question is:  Are you capable
21  of reading it in English and understanding
22  it?
23     (Witness reviews the exhibit.)
24     A.    I can read.  I can read.
25     Q.    Well, do you see, on page 7 of

Page 148

M. CHON

1
2  that transcript --
3      MR. HARVEY:  And You can
4  translate my words into Korean,
5  obviously.
6      Q.    -- that it says there, this is
7  your counsel, Mr. Jeon speaking, quote, "Now,
8  when she began to take these funds out, her
9  immediate supervisor, Mr. Ryu, found out what
10  was going on, confronted her and said, 'I
11  need the same funds,' and began to pressure
12  here to remove funds on his behalf.  And she
13  did so because there's -- we can explain the
14  650,000.  She's able to explain that amount.
15  But she can't explain the balance."
16     Do you see that, those words
17  there?
18     (Witness reviews the exhibit.)
19     A.    Yes.
20     Q.    And do you understand them, based
21  on the translation from your Translator?
22     MR. YI:  Objection to form.
23     A.    Yes.
24     MR. YI:  I think it's an
25  interpretation, by the way.

Page 149

M. CHON

1
2      When we're talking about
3  "translation," we're talking about an
4  interpretation.  There's nothing written
5  here.
6      Q.    And do you recall your attorney
7  saying that, at the hearing before Judge
8  Walls, in October?
9      A.    I don't recall.
10     Q.    Well, do you recall that you were
11  able to explain 650,000 of the missing,
12  approximately, $1.4 million?
13     A.    I don't recall.
14     Q.    Well, sitting here today, you
15  know that -- do you know the total amount of
16  funds that you took from accounts at Bank
17  Asiana?
18     A.    No.  I don't recall.
19     Q.    Do you know that you agreed to a
20  Forfeiture Order of approximately $1.4
21  million?
22     A.    I don't recall.
23     Q.    Do you recall that the amount
24  that you took was in excess of $1,000,000.00
25     A.    I don't recall.

4 (Pages 146 to 149)



**Page 150**

M. CHON

1
2      Q.    Do you recall, at your prior
3  deposition, that you told Mr. Yi, in response
4  to his questions, that the amount taken by
5  you was, approximately, $500,000.00 and that
6  you gave, approximately, $700,000.00 to James
7  Ryu?
8      A.    I don't recall.
9      MR. YI:  Approximately.
10      THE WITNESS:  I don't recall.
11      Q.    Do you recall that -- I'll
12  withdraw that question.
13      Do you recall that at your prior
14  deposition you testified about the meeting,
15  your first conversation with James Ryu, in
16  which he, supposedly, told you that he had
17  found out about certain transactions that you
18  had committed?
19      A.    I don't recall.
20      Q.    Okay.  Do you remember that --
21  would you tell us the first time that James
22  Ryu talked to you about your stealing of
23  money from Bank Asiana?
24      A.    I don't recall.
25      Q.    Did James Ryu ever talk to you

**Page 151**

M. CHON

1
2  about taking money or borrowing money from
3  Bank Asiana through you?
4      A.    I don't recall.
5      Q.    Do you recall that you, in fact,
6  did embezzle funds from Bank Asiana?
7      A.    I recall I was forced to do it.
8      Q.    Who "forced" you to do?
9      A.    James Ryu.
10      Q.    When did he force you to do it?
11      A.    I don't recall.
12      Q.    How did he force you to do it?
13      A.    I don't recall.
14      Q.    When did he force you to do it?
15      A.    I don't recall.
16      Q.    Do you recall any information,
17  whatsoever, about how James Ryu supposedly
18  forced you to embezzle funds from Bank
19  Asiana?
20      A.    Right now, I cannot recall
21  anything.
22      Q.    But you can recall that you
23  embezzled funds; right?
24      A.    I recall I was forced to.
25      Q.    Okay.  But you can't recall

**Page 152**

M. CHON

1
2  anything about how you were forced to; is
3  that right?
4      A.    I don't recall.
5      Q.    Okay.  And so, let's put aside
6  how you were forced to.
7      Do you recall how you embezzled
8  funds from Bank Asiana?
9      A.    I don't recall.
10      Q.    Do you recall that you embezzled
11  funds from the account of someone who was a
12  business colleague of your husband?
13      A.    I don't recall.
14      Q.    Do you recall that you borrowed
15  -- that you embezzled funds from --
16  withdrawn.
17      Do you remember that you
18  embezzled funds from the account of someone
19  ██████████████████████████████████████
20  ██████████████████████████████████████
21      A.    I don't recall.
22      Q.    Do you recall that you embezzled
23  funds from the account of someone named
24  ████████████?
25      A.    No, I do not.

**Page 153**

M. CHON

1
2      Q.    Do you recall that you embezzled
3  funds from the someone named ████████████████
4  ████?
5      A.    I don't recall.
6      Q.    Do you know who ████████████is?
7      A.    Yes.
8      Q.    Who is ████████████?
9      A.    ████████████████████
10      Q.    Do you recall embezzling funds
11  from the account of someone named ████████████
12  ████████
13      A.    I do not, no.
14      Q.    Do you recall embezzling funds
15  from someone named ████████?
16      A.    I do not know.
17      MR. YI:  Just to clarify the
18  record, was there a response that she
19  doesn't recall or that she doesn't know?
20      MR. INTERPRETER:  She said that
21  she doesn't know.
22      Q.    Are you saying you don't know
23  whether you did that or you don't recall
24  doing that?
25      A.    I don't recall.

5  (Pages 150 to 153)

M. CHON

1
2   Q.   When you were working at Bank
3   Asiana, you had access total vault without a
4   second Teller being present.
5   Isn't that correct?
6   A.   Can you repeat the question?
7   MR. HARVEY: Sure.
8   Q.   When you were a Teller at Bank
9   Asiana, you had access to the vault without a
10  second Teller being present.
11  Isn't that true?
12  A.   There was always a dual control.
13  Q.   But wasn't it the fact that it
14  was possible for you to access the cash vault
15  all by yourself, without a second Teller
16  being present?
17  A.   It was always dual control.
18  Q.   I understand that "it was always
19  dual control."
20  But did you ever access the vault
21  on your own, despite the rule being that you
22  was required to be dual controlled?
23  A.   I do not recall.
24  Q.   Please turn to page 27 of the
25  transcript in front of you.

M. CHON

1
2   A.   (Witness complies).
3   Q.   It's the deposition transcript,
4   which is this Deposition Exhibit 85.
5   MR. JEON: What page?
6   Q.   Exhibit 85, page 27, lines 17 to
7   20.
8   MR. JEON: All right.
9   A.   On this page (indicating)?
10  Q.   (Indicating).
11  A.   This one?
12  Q.   Yes, the line numbers, lines 17
13  through 20.
14  (Witness reviews the exhibit.)
15  Q.   Do you see what's stated there on
16  page 27, lines 17 through 20?
17  A.   Yes.
18  Q.   Do you recall giving that
19  testimony?
20  (Witness reviews the exhibit.)
21  A.   I don't recall.
22  Q.   Does looking at that help you
23  remember that, in fact, you did have access
24  to your own, despite there being a dual
25  personnel requirement?

M. CHON

1
2   A.   I don't recall.
3   Q.   Who was your supervisor at Bank
4   Asiana when you were working in the vault?
5   A.   I just can't recall the name
6   right now.
7   Q.   There was a Branch Manager. It
8   was a Branch Manager; right?
9   A.   Yes, a Branch Manager.
10  Q.   Someone with the ████████████
11  ████████?
12  A.   That's correct.
13  Q.   And is that a man or is that a
14  woman?
15  A.   A man.
16  Q.   Did that person know that you, at
17  any times, were taking money from Bank Asiana
18  that you weren't supposed to be taking?
19  A.   I don't recall.
20  Q.   Do you know who someone by the
21  name of ██████████████████
22  A.
23  Q.   And do you remember taking money
24  out of her account?
25  A.   I don't recall.

M. CHON

1
2   Q.   Do you ever have any
3   conversations with her about taking money out
4   of her account?
5   A.   I don't recall.
6   Q.   Do you remember any
7   conversations, at all, with James Ryu about
8   taking money or anything relating to taking
9   money from Bank Asiana?
10  A.   I don't recall.
11  Q.   Do you recall ever giving James
12  Ryu any money at Bank Asiana?
13  A.   Yes.
14  Q.   And what do you recall about
15  that?
16  A.   All I recall is I gave the money.
17  Q.   How much money did you give to
18  him?
19  A.   I don't recall.
20  Q.   How many times did you give him
21  money?
22  A.   I don't recall.
23  Q.   Was there anybody there when you
24  gave him the money?
25  A.   I don't recall.

Page 158

M. CHON

1
2  Q.  Did you tell anybody that you
3  were giving him the money?
4  A.  I don't recall.
5  Q.  Did your husband know that you
6  were giving him the money?
7  A.  My husband has nothing to do with
8  it.
9  I do not know.
10  Q.  Why did you give James Ryu the
11  money?
12  A.  I don't recall.
13  Q.  How many times did you give him
14  the money?
15  A.  I don't recall.
16  Q.  Where did you get the money from?
17  A.  I don't recall.
18  Q.  Please turn to page 37 of that
19  transcript that's in front of you.
20  A.  (Witness complies).
21  Q.  Lines 13 through 17.
22  (Witness reviews the exhibit.)
23  A.  Yes.
24  Q.  Do you see what's written there
25  at line 13 to 17, of page 37?

Page 159

M. CHON

1
2  A.  (No response).
3  Q.  Did you understand the question?
4  A.  I don't understand what it is.
5  Q.  All right.  Do you see the words
6  that are written there?
7  A.  Yes.
8  Q.  Lines 13 through 17?
9  A.  Yes.
10  Q.  Do you remember giving that
11  testimony?
12  (Witness reviews the exhibit.)
13  A.  I don't recall.
14  Q.  Do you remember testifying, at
15  your last deposition, that other people knew
16  about the fact that you were making
17  unauthorized withdrawals from the ████████
18  ████ accounts?
19  (Witness reviews the exhibit.)
20  A.  I don't recall.
21  Q.  Do you ever remember speaking to
22  James Ryu on the telephone?
23  A.  I don't recall.
24  Q.  Do you ever recall speaking to
25  him in person?

Page 160

M. CHON

1
2  A.  I don't recall.
3  Q.  Not even one -- can you not even
4  recall one time about speaking to James Ryu
5  in person?
6  A.  I don't recall.
7  Q.  Do you remember meeting with
8  Irene Lee and Bo Young on or about January
9  22nd, of 2014?
10  A.  Yes.
11  Q.  And do you remember why you met
12  with them?
13  A.  Yes.
14  Q.  And why was that?
15  A.  I think I talked about this case.
16  Q.  And what did you talk about --
17  what did you tell them about this case?
18  A.  I don't recall.
19  Q.  And do you remember meeting them
20  the following day, on January 23rd, except
21  this time there was a woman named ████████,
22  and she was also present?  Do you remember
23  that?
24  A.  I don't recall.
25  Q.  Do you recall meeting with agents

Page 161

M. CHON

1
2  from the FBI, who came to your house on or
3  about January 30th, of 2014?
4  A.  Yes.
5  MR. HARVEY:  I'm going to correct
6  that.
7  Q.  I believe the date the day of
8  that was February 7th and not January 30th.
9  A.  I'm not sure about the date.
10  Q.  But you remember the first
11  meeting that you had with FBI Agents?
12  A.  Yes.
13  Q.  And do you remember that they
14  came to your house?
15  A.  Yes.
16  Q.  And do you remember admitting to
17  them that you had stolen money from Bank
18  Asiana?
19  A.  I don't recall.
20  Q.  Do you remember -- withdrawn.
21  ████████████████████████████████████████
██  ████████████████████████████████████████
██  ████████████████████████████████████████
██  ████████████████████████████████████████
██  ████████████████████████████████████████

7 (Pages 158 to 161)



**Page 162**

M. CHON

**Page 163**

M. CHON

**Page 164**

12     Q.   Did James Ryu pressure you into
13 embezzling money?
14     A.   I don't recall.
15     Q.   You just recall that you gave him
16 some money.  That's the only thing that you
17 can recall?
18       MR. YI:  I would object to the
19 form.
20     A.   All I recall was I was forced to
21 do it.
22     Q.   "Forced to do" what?
23     A.   Excuse me?
24     Q.   "Forced to do" what?
25     A.   Embezzlement.

**Page 165**

1       M. CHON
2     Q.   And how were you forced to do
3 that?
4     A.   I don't recall.
5     Q.   Let's take a look now back at
6 Exhibit Ryu No. 90.
7       (Handed to the witness.)
8     Q.   And if you would you turn to page
9 11 of that document?
10     A.   (Witness complies.)
11     Q.   And do you see -- are you now on
12 page 11?
13     A.   Yes.
14     Q.   Do you see on page 11, at line 8,
15 the Court asks if you want to be heard and
16 then you make a statement, that begins at
17 page 18 and then continues onto the next
18 page, which is page 12, all the way through
19 line 16.
20       Would you take a look at those,
21 which is page 11, line 18, through page 12,
22 line 16.  That's a statement that you gave.
23 I want you to read it because I want to ask
24 you some questions about that.
25     A.   Yes.

8 (Pages 162 to 165)

Page 166

```
                    M. CHON
 1
 2          (Witness reviews the exhibit.)
 3          Q.    And are you reading that,
 4   Ms. Chon?
 5          A.    Yes.
 6          Q.    Okay.
 7          (Witness reviews the exhibit.)
 8          Q.    Have you had a chance to read
 9   through those words?
10          A.    A chance to read it right now?
11          Q.    Yes.  Did you read those right
12   now?
13          A.    Yes.
14          Q.    And did you understand those
15   words?
16          A.    Could you translate for me
17   (indicating)?
18          Q.    I'd ask you --
19          MR. YI:  I don't want you to use
20   the word "translate" because there's
21   nothing written in Korean.
22          INTERPRETER:  I'm translating it;
23   not interpreting it.
24          MR. YI:  To me "translation" is a
25   written translation of an English
```

Page 167

```
                    M. CHON
 1
 2   document.
 3          We don't have that.
 4          INTERPRETER:  Per the
 5   Interpreter:  My understanding of
 6   "translation" is when you do the written
 7   document and then speak the word.
 8          MR. YI:  Okay.
 9          INTERPRETER:  That's the way I
10   understand it.
11          MR. YI:  Okay.
12          INTERPRETER:  It doesn't matter.
13   I'll use the word.
14          MR. JEON:  For the record, the
15   words "translate" and "interpret" are
16   being simultaneously used and should be
17   held apart.
18          A.    Okay; I'm fine.  I understand.
19          Q.    And so, you've seen the words in
20   English and you understand them; is that
21   right?
22          (Witness reviews the exhibit.)
23          A.    Yes.
24          Q.    And do you remember saying these
25   words?
```

Page 168

```
                    M. CHON
 1
 2          (Witness reviews the exhibit.)
 3          A.    I don't recall.
 4          Q.    Do you recall that you gave a
 5   statement, that day, to the Court?
 6          A.    I don't recall.
 7          Q.    So, you don't recall whether you
 8   gave this statement here, that's on pages --
 9   that we've just looked at -- page 11, line
10   18, through page 12, line 16.  You don't know
11   whether you gave that statement or not.
12          Is that true?
13          A.    I don't recall.
14          Q.    Do you recall if you made any
15   part of this statement?
16          (Witness reviews the exhibit.)
17          A.    I don't recall.
18          Q.    Do you recall that you embezzled
19   all of the funds because of James Ryu or just
20   some of the funds were embezzled because of
21   James Ryu?
22          A.    I don't recall.
23          Q.    Do you recall that you were
24   embezzling funds and then James Ryu caught
25   you?
```

Page 169

```
                    M. CHON
 1
 2          A.    I don't understand.
 3          Q.    Do you recall that James Ryu
 4   somehow caught you embezzling funds at Bank
 5   Asiana?
 6          MR. YI:  Objection to form.
 7          A.    That didn't happen.
 8          Q.    Did James Ryu find out that you
 9   were embezzling funds at Bank Asiana?
10          A.    I think that question is wrong.
11          Q.    Why is the question "wrong"?
12          A.    I embezzled the money because I
13   was forced to.
14          Q.    "Forced to" by James Ryu; is that
15   right?
16          A.    Yes.
17          Q.    And you embezzled all of the
18   funds because you were forced to by James
19   Ryu.
20          Isn't that true?
21          MR. YI:  Objection to the form.
22          A.    I don't recall.
23          Q.    And you don't recall if the
24   amount you embezzled was, do you
25   remember if the amount you embezzled was more
```

9 (Pages 166 to 169)

Page 170

```
1              M. CHON
2    than $10,000.00?
3         A.    Yes.
4         Q.    How much more than 10,000?
5         A.    I don't recall.
6         Q.    Could it have been that you
7    embezzled $50,000.00, in total?
8         A.    I don't recall.
9         Q.    So, it might have been as little
10   as $50,000.00 that you embezzled.  You just
11   don't know?
12        A.    I don't recall.
13        Q.    Did you keep any of the money
14   that you embezzled for yourself?
15        A.    I don't recall.
16        Q.    Did you use any of the money that
17   you embezzled to pay debts of your husband's
18   businesses?
19        A.    I don't recall.
20        Q.    Do you know where the money that
21   you embezzled, where any of that money is
22   today?
23        A.    I don't recall.
24        Q.    Did your husband have some
25   businesses that failed?
```

Page 171

```
1              M. CHON
2         A.    Yes.
3         Q.    What were those businesses?
4         A.    What kind of business?
5         Q.    Yes.  What were they?  What were
6    the names of the businesses?
7         A.    I do not know.  I don't recall.
8         Q.    Did you use any of the money that
9    you embezzled to pay any debts?
10        A.    I don't recall.
11        Q.    Do you recall that you had, not
12   one, but two meetings with the FBI?
13        A.    I don't recall.
14        Q.    Do you recall being at a meeting
15   with an Assistant U.S. Attorney by the name
16   of Paul Murphy?
17        A.    Yes.
18        Q.    And do you recall, at that
19   meeting, telling him that James Ryu had --
20   that you had given the money that you
21   embezzled to James Ryu?
22        A.    I don't recall.
23        Q.    Earlier you said that James Ryu
24   did not catch you embezzling.
25              Isn't that right?
```

Page 172

```
1              M. CHON
2         A.    I don't understand your question.
3         Q.    Just a few minutes ago I asked
4    you if James Ryu had caught you embezzling
5    and you said James Ryu did not catch you
6    embezzling.
7              MR. JEON:  Objection.
8              I thought she said, "I don't
9    know."
10             MR. HARVEY:  The Witness can
11   answer.
12        A.    I don't recall what I said.
13        Q.    Okay.  Well, did James Ryu catch
14   you embezzling?
15        A.    I don't recall.
16        Q.    Is it possible that James Ryu was
17   involved with the -- in the embezzlement with
18   you from the very beginning?
19             MR. YI:  Objection to the form.
20        A.    Can you repeat the question?
21             MR. HARVEY:  Sure.
22        Q.    Is it possible that James Ryu was
23   involved with you in embezzling funds from
24   Bank Asiana from the moment when you began
25   embezzling funds from Bank Asiana?
```

Page 173

```
1              M. CHON
2              MR. YI:  Objection to form.
3         A.    I was forced to do it.
4         Q.    Were you "forced to do it" from
5    the very outset?
6         A.    Yes.
7         Q.    But you don't recall anything
8    about how he forced you to do it; is that
9    correct?
10        A.    I don't recall.
11        Q.    Please take a moment to look at
12   Ryu Exhibit 89, which is not yet in front of
13   you.
14             (Handed to the Witness.)
15             MR. YI:  Off-the-record.
16             (Off-the-record discussion.)
17             MR. HARVEY:  Counsel has just
18   asked for a short break.  We'll take one
19   at this time.
20             MR. YI:  Thank you.
21             (Recess:  1:02 p.m.)
22             *      *      *
23             (Time noted:  1:06 p.m.)
24             MR. HARVEY:  All right; let's
25   continue.
```

10  (Pages 170 to 173)

Page 206

```
 1
 2                    INDEX
 3
 4    WITNESS         EXAMINATION      PAGE
 5
 6    MIYE CHON       MR. HARVEY        5
 7
 8
 9                   EXHIBITS
10
11    FOR ID      DESCRIPTION         PAGE
12
13    RYU
14
15    EXHIBIT 85    Court Transcript   142, 144,
16                      15
17    EXHIBIT 86    FBI Record         142
18    EXHIBIT 87    FBI Record         142, 182
19    EXHIBIT 88    FBI Record         142, 162,
20                      164
21    EXHIBIT 89    FBI Record         142, 173,
22                      177, 181
23    EXHIBIT 90    Probation Report   142, 145,
24                      146, 165
25    EXHIBIT 91    USDC Consent Order 142
```

Page 207

```
 1
 2    EXHIBIT 92    Loss Summary       142, 143,
 3                      190
 4    EXHIBIT 93    Cash Deposits & Loan  142
 5                  Payments
 6    EXHIBIT 94    Cross-claim Plaintiff 195
 7                  Suk Joon Ryu's Combined
 8                  Set of Interrogatories &
 9                  Document Requests for
10                  Defendant Miye Chon
11    EXHIBIT 95    Defendant Miye Chon's  195
12                  Response to Cross-claim
13                  Plaintiff Suk Jocn Ryu's
14                  Combined Set of
15                  Interrogatories & Document
16                  Requests
17
18
19    REQUESTS:    (None)
20
21
22        *      *      *
23
24
25
```

Page 208

```
 1
 2                  CERTIFICATE
 3
 4    STATE OF CONNECTICUT   )
 5                           : ss
 6    COUNTY OF FAIRFIELD    )
 7
 8          I, JOSEPH V. CONNOLLY, a Reporter
 9    and Notary Public, do hereby certify:
10          THAT MIYE CHON, the Witness whose
11    deposition is herein before set forth,
12    was duly sworn by me and that such
13    deposition is a true record of the
14    testimony given by such Witness.
15          I FURTHER CERTIFY that I am not
16    related to any of the parties to this
17    action by blood or marriage and that I am
18    in no way interested in the outcome of
19    this matter.
20          IN WITNESS WHEREOF, I have hereunto
21    set my hand this 27th day of March, 2018.
22
23
                   _____
24                 JOSEPH V. CONNOLLY
25                 REGISTRATION NO. 01C06174436
```

Page 209

```
 1    NAME OF CASE:
 2    DATE OF DEPOSITION:
 3    NAME OF WITNESS:
 4    Reason Codes:
 5       1. To clarify the record.
 6       2. To conform to the facts.
 7       3. To correct transcription errors.
 8    Page _____ Line _____ Reason _____
 9    From _____ to _____
10    Page _____ Line _____ Reason _____
11    From _____ to _____
12    Page _____ Line _____ Reason _____
13    From _____ to _____
14    Page _____ Line _____ Reason _____
15    From _____ to _____
16    Page _____ Line _____ Reason _____
17    From _____ to _____
18    Page _____ Line _____ Reason _____
19    From _____ to _____
20    Page _____ Line _____ Reason _____
21    From _____ to _____
22    Page _____ Line _____ Reason _____
23    From _____ to _____
24
25              Signature of Deponent
```

19 (Pages 206 to 209)

# EXHIBIT 5
(ENTIRE EXHIBIT UNDER SEAL)

# EXHIBIT 6
(ENTIRE EXHIBIT UNDER SEAL)

# EXHIBIT 7

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| BANK OF HOPE, as successor to Wilshire Bank, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| MIYE CHON, a/k/a Karen Chon, SUK JOON RYU, a/k/a James S. Ryu, TAE JONG KIM, BERGENFIELD BAGEL & CAFÉ INC., d/b/a Café Clair, MAYWOOD BAGEL INC., UB'S PIZZA & BAGEL INC., UB'S BAGEL & CAFÉ INC., and UBK BAGELS CORP., d/b/a Franklin Bagels & Café, | : | CASE NO. 2:14-cv-01770-JLL-JAD |
| | : | |
| Defendants. | : | |
| | : | |
| ******************************** | : | |
| | : | |
| SUK JOON RYU, a/k/a James S. Ryu, | : | |
| | : | |
| Counterclaim Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| BANK OF HOPE, as successor to Wilshire Bank, | : | |
| | : | |
| Counterclaim Defendant. | : | |
| | : | |
| ******************************** | : | |
| | : | |
| SUK JOON RYU, a/k/a James S. Ryu, | : | |
| | : | |
| Third-Party Counterclaim Plaintiff, | : | |

|  | : |  |
|---|---|---|
| **v.** | : | |
| | : | |
| **LISA PAI,** | : | |
| | : | |
| **Third-Party Counterclaim Defendant.** | : | |
| | : | |
| **\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*** | : | |
| | : | |
| **SUK JOON RYU, a/k/a James S. Ryu,** | : | |
| | : | |
| **Crossclaim Plaintiff,** | : | |
| | : | |
| **v.** | : | |
| **MIYE CHON, a/k/a Karen Chon, TAE JONG KIM, BERGENFIELD BAGEL & CAFÉ INC., d/b/a Café Clair, MAYWOOD BAGEL INC., UB'S PIZZA & BAGEL INC., UB'S BAGEL & CAFÉ INC., and UBK BAGELS CORP., d/b/a Franklin Bagels & Café,** | : | |
| | : | |
| **Crossclaim Defendants.** | : | |

## SUK JOON RYU'S MEMORANDUM OF LAW
## <u>IN SUPPORT OF HIS MOTION FOR SUMMARY JUDGMENT</u>

David V. Dzara
Stephen G. Harvey\*
STEVE HARVEY LAW LLC
1880 John F. Kennedy Blvd.
Suite 1715
Philadelphia, PA 19013
(215) 438-6600

*Attorneys for Defendant/Counterclaim Plaintiff/Third-Party Counterclaim Plaintiff/Crossclaim Plaintiff Suk Joon Ryu, a/k/a James S. Ryu*
*\* Admitted pro hac vice*

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ....................................................................... iii

I.    INTRODUCTION ........................................................................... 1

II.   FACTUAL BACKGROUND ............................................................ 2

      A.    General Background ............................................................ 2

      B.    Chon's Initial Meetings with Wilshire Bank Representatives
            on January 22 and 23, 2014 ................................................ 3

      C.    Chon's First Meeting with the FBI on February 4, 2014 ...... 4

      D.    Chon's Second Meeting with the FBI on February 11, 2014 .. 6

      E.    Wilshire Bank's Investigation Reports .................................. 7

      F.    Wilshire Bank Sues Chon and Ryu ..................................... 8

      G.    Chon Pleads Guilty ............................................................ 10

      H.    Chon's First Day of Deposition .......................................... 10

      I.    Wilshire Bank's Interrogatory Response .............................. 11

      J.    Chon's Criminal Sentencing Hearing .................................. 12

      K.    Chon's Second and Third Days of Deposition ..................... 13

      L.    Wilshire Bank's Seizure of Ryu's Bank Account .................. 15

      M.    Bank of Hope's Has No Damages for its Conversion Claims
            Related to Ryu's Computers ............................................... 18

III.  ARGUMENT ................................................................................ 19

      A.    Standard for a Motion for Summary Judgment .................... 19

      B.    Ryu Is Entitled to Summary Judgment on Bank of Hope's
            Embezzlement Claims (Counts 13-17) Because Chon's
            Testimony Is Inadmissible and Insufficient to Support a
            Jury Verdict in Any Event ................................................. 20

C.    Ryu Is Entitled to Summary Judgment on Bank of Hope's
      Computer Conversion Claims (Counts 18-19) Because It
      Has No Damages ................................................................................. 26

D.    Ryu Is Entitled to Summary Judgment on Liability for Count III
      of His Counterclaims (Illegal Seizure of Funds on Deposit)................. 27

IV.   CONCLUSION ................................................................................................ 33

# TABLE OF AUTHORITIES

**CASES**                                                                          **Page(s)**

*All Am. Auto. Salvage v. Camp's Auto. Wreckers,*
   679 A.2d 627 (N.J. 1996) ................................................................. 32

*Anderson v. Liberty Lobby, Inc.,*
   477 U.S. 242 (1986) ................................................................. 19-20, 24

*Brunswick Hills Racquet Club, Inc. v. Route 18 Shopping Ctr. Assocs.,*
   864 A.2d 387 (N.J. 2005) ................................................................. 30

*Celotex Corp. v. Catrett,*
   477 U.S. 317 (1986)................................................................. 20

*Dean Witter Reynolds Inc. v. Variable Annuity Life Ins. Co.,*
   373 F.3d 1100 (10th Cir. 2004)................................................................. 32

*Fed. Deposit Ins. Corp. v. Pioneer State Bank,*
   382 A.2d 958 (N.J. Super. Ct. Law Div. 1977)................................................. 32

*Forbes v. First Camden Nat'l. Bank & Tr. Co.,*
   95 A.2d 416 (N.J. Super. Ct. App. Div. 1953) ................................................. 30, 32

*Foye v. Septa,*
   No. CV 15-1036, 2017 WL 1150259 (E.D. Pa. Mar. 28, 2017)........................ 19-20

*Hugh v. Butler Cty. Family YMCA,*
   418 F.3d 265 (3d Cir. 2005) ................................................................. 20

*Lord Abbett Mun. Income Fund, Inc. v. Citigroup Glob. Markets, Inc.,*
   No. CV 11-5550 (CCC), 2017 WL 5515912 (D.N.J. Aug. 4, 2017)........................ 25

*Manahawkin Convalescent v. O'Neill,*
   85 A.3d 947 (N.J. 2014) ................................................................. 29

*McAdam v. Dean Witter Reynolds, Inc.,*
   896 F.2d 750 (3d Cir. 1990) ................................................................. 26

*Moses v. Edward H. Ellis, Inc.,*
   72 A.2d 856 (N.J. 1950) ................................................................. 30

*Musico v. Musico,*
   43 A.3d 1274 (N.J. Super Ct. Ch. Div. 2012) ................................................. 29-30

*Pacifico v. Pacifico,*
   920 A.2d 73 (N.J. 2007) ................................................................. 30

iii

*Peloro v. United States,*
    488 F.3d 163 (3d Cir. 2007) ....................................................................... 26

*Rickett v. Barry,*
    Civ. No. 13-6804, 2015 WL 1013547 (D.N.J. Mar. 9, 2015) .................................. 26

*Roach v. BM Motoring, LLC,*
    155 A.3d 985 (N.J. 2017) ....................................................................... 30

*United States v. Bryant,*
    766 F.2d 370 (8th Cir. 1985) ..................................................................... 23

**OTHER AUTHORITIES**

Fed. R. Civ. P. 56 ........................................................................... 1, 19-20, 24

Fed R. Evid. 403 ................................................................................... 24

Fed R. Evid. 602 ................................................................................ 1, 24

27 Fed. Prac. & Proc. Evid. § 6023 (2d ed.) ............................................................. 23

5A Michie on Banks and Banking Ch. 9 § 115a. at 443
(1994 Replacement Volume) ......................................................................... 32

Defendant/Counterclaim Plaintiff/Third-Party Counterclaim Plaintiff/Crossclaim Plaintiff Suk Joon Ryu, a/k/a James S. Ryu ("Ryu"), by and through his undersigned counsel, hereby submits this Brief in Support of his Motion for Summary Judgment.

## I. **INTRODUCTION**

Ryu seeks summary judgment on all of Plaintiff/Counterclaim Defendant Bank of Hope's claims against him. The bank cannot prevail on its claims based on the allegation that he participated in the embezzlement of $1.5 million, because its star witness Defendant/Crossclaim Defendant Miye Chon, a/k/a Karen Chon ("Chon"), at her recent deposition while in federal prison, testified that she cannot recall anything except the vague and general assertion that Ryu forced her to embezzle and she gave some money to him, with no other details and no memory about her past testimony and statements in this case. Any reader of this brief can turn to the deposition transcripts submitted with this motion and review Chon's testimony on March 14 and 15, 2018, taken at the federal prison in Dansbury, Connecticut, and they will be amazed at the extent of her lack of memory of things she should know relating to the embezzlement. The testimony is inadmissible for lack of personal knowledge, which includes the ability to recall, under Fed. R. Evid. 602, and it is insufficient for a jury to return a verdict and thus fails to satisfy Fed. R. Civ. P. 56(e).

Bank of Hope's claims against Ryu based on his alleged conversion of two computers fail because the bank has no damages, as its corporate designee admitted. Bank of Hope has no other claims against Ryu.

That leaves to be tried Ryu's claims, including his counterclaim against Bank of Hope for illegally withholding $54,000 that he had on deposit with the bank, from January 2014 until October 2015, when his counsel forced the bank to return the funds. On this counterclaim, Ryu seeks partial summary judgment that the bank had no right to withhold the funds, leaving for trial Bank of Hope's mental state and damages.

## II.  FACTUAL BACKGROUND

### A.  General Background

BankAsiana was a commercial bank founded in 2006 and chartered under the laws of the State of New Jersey. SOF ¶ 1.[1] In October 2013, Wilshire Bank, then known as Wilshire State Bank, acquired by way of merger all of the assets of BankAsiana (the "Merger"). *Id*. ¶ 2. The Merger was completed on or about October 1, 2013. *Id*. ¶ 3. Prior to the Merger, Chon was BankAsiana's Assistant Vice President and Operations Officer. *Id*. ¶ 4. Prior to the Merger, Ryu was BankAsiana's Senior Vice President and Chief Operating Officer. *Id*. ¶ 5. Defendant/Crossclaim Defendant Tae Jong Kim is Chon's husband. *Id*. ¶ 6.

---

[1]     Ryu has filed a Statement of Undisputed Material Facts in support of his Motion for Partial Summary Judgement, which is referred to herein as "SOF."

2

Bank of Hope was created when Wilshire Bank merged with BBCN

Bank on July 29, 2016.[2] *Id.* ¶ 7.

**B.    Chon's Initial Meetings with Wilshire Bank Representatives on January 22 and 23, 2014**

In January 2014, Wilshire Bank received an inquiry from a customer,

who had maintained certificate of deposit ("CD") accounts since prior to the Merger,

concerning certain inaccuracies in the 1099-INT forms he had received. *Id.* ¶ 8. In

response to that inquiry, Wilshire Bank commenced an internal investigation and

examined BankAsiana's records relating to its customers' CD accounts prior to the

Merger. *Id.* ¶ 9.

Bo-Young Lee (Wilshire Bank's former Home Loan Coordinator) and

Jinhee (Irene) Lee (Wilshire Bank's Operations Administration Officer) performed

the initial investigation. *Id.* ¶ 10. Bo-Young Lee and Irene Lee's investigation

focused on reviewing manual postings to the General Ledge Account (Currency &

Coins), which is also known as the vault cash account. *Id.* ¶ 11.

Irene Lee discovered irregularities in the vault cash and contacted

Chon for an explanation. *Id.* ¶ 12. Chon requested a meeting with Irene Lee and Bo-

Young Lee which occurred on January 22, 2014. *Id.* ¶ 13. At a meeting held on the

January 22. 2014, Chon confessed to embezzling money from BankAsiana for years

by debiting CD accounts and crediting the vault cash account. *Id.* ¶ 14. Chon stated

that she transferred funds from one CD account to another to cover the shortage in

---

[2]    Ryu will refer to the Plaintiff/Counterclaim Defendant as Wilshire Bank prior to this merger and as Bank of Hope after it.

the CD accounts she had debited. *Id*. Chon also stated that she funneled some of the stolen money into her husband's business accounts he had at BankAsiana, and that she had forged his signature on checks for the business accounts. *Id*.

On January 23, 2014, Alicia Lee (then Wilshire Bank's Chief Operations Administrator), Bo-Young Lee, and Irene Lee met with Chon. *Id*. ¶ 15. Chon again confessed to embezzling money from BankAsiana and claimed that Ryu was also involved in her embezzlement. *Id*. Chon stated that Ryu initially contacted Chon and asked her for a personal loan to which Chon responded no. *Id*. According to Chon, Ryu then asked Chon if there was any way that she could facilitate $10,000 to him. *Id*. Chon stated that after the initial $10,000, she provided cash to Ryu whenever he asked for it. *Id*. She stated that sometimes she delivered the stolen cash to Ryu, and other times he came to the Fort Lee Branch to pick it up. *Id*. Chon stated that Ryu contacted her by BankAsiana company phone, not home or cell phone, when he wanted her to give him cash. *Id*. Chon stated that Ryu mentioned to her that he would "compensate" or "help" her. *Id*. Chon also stated that money she embezzled went to her husband's business use, and she admitted to forging her husband's signature to issue checks from her husband's BankAsiana business account. *Id*.

### C. Chon's First Meeting with the FBI on February 4, 2014

Two FBI agents interviewed Chon outside of her residence on February 4, 2014. *Id*. ¶ 16. The FBI drafted a memo of the February 4 interview of Chon, with the key portions of the memo provided here:

4

a.  When informed that the FBI was investigating allegations that MIYE CHON was working with other bank employees to steal money from BANKASIANA, CHON immediately admitted that she had acted alone. CHON stated that she had been stealing money from the bank for approximately 2 to 3 years. *Id* ¶ 17(a).

b.  At the present, CHON did not have any of the stolen money left. She did not keep track of exactly how much she took, but was aware, based on her recent interviews with bank auditors, that she had taken more than $1 million. No one in her family knew that she had been stealing money from the bank. No one else at BANKASIANA knew that she was stealing money from the bank while she was doing it. *Id.* ¶ 17(b).

c.  JAMES RYU was not involved in the scheme to steal money from the CD accounts. CHON last met with JAMES RYU on or about Thursday, January 30, 2014. CHON and RYU met at the ENGLEWOOD DINER. CHON apologized to JAMES RYU for all the trouble he was experiencing with WILSHIRE BANK. CHON admitted to RYU that CHON had lied to bank auditors about RYU being involved in the scheme to take money from the CD accounts. CHON told RYU that CHON was going to tell the truth and clear RYU of wrongdoing. *Id.* ¶ 17(c).

d.  RYU did not threaten CHON in any way. During this meeting, RYU laughed at the situation in disbelief. RYU appeared to be shocked. *Id.* ¶ 17(d).

e.  Chon lied about JAMES RYU's involvement because the bank auditors suggested to CHON that RYU was involved. The auditors seemed to suspect RYU from the beginning. They did not believe that CHON accomplished the scheme by herself. CHON agreed with the auditors that JAMES RYU was involved. *Id.* ¶ 17(e).

f.  CHON was not friends with JAMES RYU. Their relationship was strictly professional. *Id.* ¶ 17(f).

### D.   Chon's Second Meeting with the FBI on February 11, 2014

The FBI interviewed Chon a second time on February 11, 2014. *Id.* ¶

18. The FBI drafted a memo of the February 11 interview of Chon, with the key

portions of the memo provided here:

a.   Approximately three years ago CHON found out that RYU needed money. Around this same time CHON started taking money out of the CD accounts. It was CHON's idea to take money out of the CD accounts. The first time RYU asked CHON to steal for him was around the same time he asked her for a personal loan. CHON told RYU about her scheme. RYU told her to get him some money and he would pay it back. RYU assured CHON that he would repay her soon. RYU knew that the only way she could get him money was via illegal means. RYU and CHON both intended to pay the money back. RYU never gave CHON any money back. *Id.* ¶ 19(a).

b.   CHON estimates that she gave cash to RYU about 10-15 times over a 2-year period. RYU would call her on the office phone and tell her how much she needed. . . . CHON would make the changes in the CD accounts, take the cash out of the vault, and then send it to him in an interoffice envelope. Sometimes CHON gave RYU cash in person. The last time she gave RYU cash was the Spring of 2013. Each time she sent cash it was in $100 bills in an amount between $20,000 and $50,000. CHON estimates she gave between $600,000 to $700,000 to RYU. CHON does not know what RYU did with the cash. *Id.* ¶ 19(b).

c.   RYU never gave CHON anything in exchange for the cash. . . . CHON does not know why she stole money and gave it to RYU. She thought that if she helped Ryu borrow money from the bank, it would benefit her because he was her supervisor. *Id.* ¶ 19(c).

d.   On the day prior to the FBI coming to speak to CHON, she met with RYU at the Englewood Diner. CHON told RYU she was in trouble and demanded what he would do about it. RYU told her there was nothing for the bank to discover involving him. The day prior to this meeting, RYU called CHON to ask how everything was going. The next day she

6

called RYU on his cell and set up a meeting because she did not want to talk over the phone. CHON told RYU that she was going to tell the truth to investigators. She asked RYU what was going to happen to her and he gave her advice. *Id.* ¶ 19(d).

e.    CHON said she lied to the FBI agents when they initially approached her because she was going through emotional distress. CHON said that after meeting with RYU, she was not confident she could prove that she was giving the cash to RYU. Also, CHON said she was afraid of RYU. RYU did not tell her to lie to the agents." *Id.* ¶ 19(e).

### E.    Wilshire Bank's Investigation Reports

Wilshire Bank's internal investigation reports consist of what appear to be three separate documents. *Id.* ¶ 20. The first is a single page that describes the documents relevant to the embezzlement that Wilshire Bank provided to the U.S. Department of Justice pursuant to subpoena. *Id.* ¶ 21. Wilshire Bank redacted two pieces of information on this page, presumably when it produced it in this action. *Id.* ¶ 22. One piece of redacted information appears to be the name of a customer and the second piece of redacted information is an account number. *Id.*

The second document reports on the status of Wilshire Bank's investigation as of February 25, 2014. *Id.* ¶ 23. It describes how Wilshire Bank detected the embezzlement, Chon's initial confession to the embezzlement, Chon's later statement implicating Ryu, and the steps undertaken in the investigation from late January to February 25, 2014. *Id.* ¶ 24. It also describes how Wilshire Bank realized that it had previously employed Chon and it suspected her of embezzlement. *Id.* ¶ 25. The report contains numerous redactions of the account numbers and customer names. *Id.* ¶ 26. It contains no evidence linking Ryu to the

7

embezzlement and implicitly acknowledges that Wilshire Bank lacked such evidence. *Id.* ¶ 27.

The third document reports on the status of Wilshire Bank's investigation as of March 28, 2014. *Id.* ¶ 28. It contains much of the language contained in the second document, with some additional material, including additional information about Wilshire Bank's suspicion that Chon had embezzled funds when previously employed by a predecessor of Wilshire Bank. *Id.* ¶ 29. It also includes information about Ryu's accounts with Wilshire Bank including transactions between Ryu and a customer of Wilshire Bank as well as a review of the accounts and transactions of that customer, whose name is not redacted. *Id.* ¶ 30. Apart from the suggestion that Ryu may have had some financial difficulty in 2010 and 2011, nothing in the third report links Ryu in any way to the embezzlement. *Id.* ¶ 31.

## F.   Wilshire Bank Sues Chon and Ryu

On March 19, 2014, Wilshire Bank filed a complaint naming as defendants Chon, Ryu, and others ("Original Complaint"). *Id.* ¶ 32. Wilshire Bank alleged that Chon and Ryu conspired together to embezzle $1,575,754 from BankAsiana. *Id.* ¶ 33. Based on these allegations, Wilshire Bank asserted seven counts against Ryu for conversion of cash from BankAsiana's vault, a fraud claim, a civil conspiracy to defraud claim, and three counts of breach of fiduciary duty related to the alleged conversion of cash, causing Chon to falsify BankAsiana's

records to conceal the theft of cash, and Ryu's conspiracy with Chon to maliciously and willfully enter into a scheme to perpetrate the embezzlement. *Id*. ¶ 34.

Wilshire Bank also alleged that three days before the Merger Agreement because effective, Ryu removed from BankAsiana a laptop computer and desktop computer that allegedly contained Wilshire Bank's confidential and proprietary information and trade secrets. *Id*. ¶ 35. Based on these allegations, Wilshire Bank asserted four additional counts for breach of fiduciary duty, two conversion claims, two unjust enrichment claims, and claims for misappropriation of trade secrets and misappropriation of confidential information. *Id*.

On July 11, 2016, Wilshire Bank filed an amended complaint ("Amended Complaint") against Chon, Ryu, and others. *Id*. ¶ 36. The material allegations regarding the embezzlement and Ryu's alleged role in the Amended Complaint are the same as the Original Complaint. *Id*. ¶ 37. In the Amended Complaint, Wilshire Bank consolidated its seven conversion counts related to embezzling the cash against Ryu into one conversation count. *Id*. ¶ 38. Wilshire Bank asserted the same civil conspiracy to defraud claim as in the Original Complaint, but dropped its fraud claim. *Id*. ¶ 39.  Wilshire Bank consolidated its three counts for breach of fiduciary duty against Ryu based on his alleged role in the embezzlement into two counts. *Id*. ¶ 40. Also, Wilshire Bank dropped the counts for alleged misappropriation of trade secrets and misappropriation of confidential information, associated breach of fiduciary duty claims for these counts, unjust enrichment claims for the removal of the two computers, and breach of fiduciary

9

duty claims related to the computers. *Id.* ¶ 41. Wilshire Bank kept the two conversion claims for the computers. *Id.*

### G. Chon Pleads Guilty

On March 21, 2016, Chon plead guilty to bank fraud, embezzlement of $1,431,195.22, and aggravated identity theft. *Id.* ¶ 42. She also agreed to pay back the amount she embezzled. *Id.*

### H. Chon's First Day of Deposition

Chon was first deposed in this matter on June 23, 2016. *Id.* ¶ 43. Chon testified that she first started stealing from accounts of people she knew well: her husband's sister and her husband's business associate. *Id.* ¶ 44.

Chon testified that she began her embezzlement without the knowledge of Ryu. *Id.* ¶ 45. Chon testified that Ryu approached her after a monthly meeting at BankAsiana's Palisades Park branch and said that he had discovered her embezzlement activities (although she did not say how he had supposedly discovered it), and he asked her to lend him $30,000. *Id.* ¶ 46. Chon thought about his request for $30,000 for a couple of days and then decided to give him that amount. *Id.* ¶ 47.

Chon testified that after the first $30,000, Ryu asked for loans on ten occasions between 2010 and 2013, and she gave him a total of $700,000-$800,000 in cash on those ten occasions. *Id.* ¶ 48. She later testified that she only gave him $700,000. *Id* ¶ 49. Chon testified that she either delivered the cash to him (all in $100 bills) in an envelope at Ryu's office at the Palisades Park branch or he picked

up the cash at the Fort Lee branch where she worked. *Id.* ¶ 50. Chon testified that she thought she was just loaning the money to Ryu, and that he would give it back to her so she could put it back. *Id.* ¶ 51. She said she raised this with him, but he never gave her any of the money back. *Id.* She testified that Ryu said he would compensate her for loaning him a large sum of money that she had stolen, which she interpreted to mean that perhaps he would help her to get promoted at BankAsiana. *Id.* ¶ 52.

Chon admitted that there are no records or witnesses to corroborate her claim that she gave $700,000; rather, she testified that she kept track of how much she gave Ryu in her head. *Id.* ¶ 53. Chon testified that she kept $200,000-$300,000, and used it to pay her personal debts, her husband's business debts, and her family's living expenses, but then testified that she kept $500,000. *Id.* ¶ 54.

## I.    Wilshire Bank's Interrogatory Response

On April 29, 2016, Ryu served a Fourth Set of Interrogatories to Wilshire Bank. *Id.* ¶ 55. Interrogatory No. 3 provides as follows:

> Provide the factual basis for your allegations in Paragraph 20 of the Complaint that Ryu (a) conspired with Chon to engage in "lapping" and perpetrate the embezzlement, and (b) aided and abetted Chon in the embezzlement."

*Id.* ¶ 56.

On May 12, 2016, Wilshire Bank served its Responses and Objections to Ryu's Fourth Set of Interrogatories. *Id.* ¶ 57. Wilshire Bank's response to Interrogatory No. 3 provides as follows:

> Wilshire Bank objects to Interrogatory No. 3 on the grounds that it is multiple interrogatories and duplicative and cumulative of defendant Ryu's requests for production of documents. Without waiving such objections or the General Objections set forth above, Wilshire Bank states that defendant Miye Chon's statements to Irene Lee, Bo-Young Lee, Alicia Lee and Lisa Pai provided the factual basis for its allegation in Paragraph 20 of the Complaint.

*Id.* ¶ 58. Wilshire Bank's interrogatory responses were verified as true by its counsel, Michael M. Yi. *Id.* ¶ 59.

Lisa Pai, Wilshire Bank and Bank of Hope's general counsel, testified as Wilshire Bank's corporate representative, and when questioned about this interrogatory response, she confirmed that Wilshire Bank had no other direct evidence supporting Chon's claim that Ryu was involved in the embezzlement other than Chon's accusation. *Id.* ¶ 60.

### J.     Chon's Criminal Sentencing Hearing

On October 24, 2016, Chon was sentenced to 81 months in federal prison. *Id.* ¶ 61.

During the sentencing hearing, Chon's counsel stated on her behalf that she stole $1.35 million from BankAsiana, but she only kept approximately $600,0000 to $650,000 for herself and gave the remainder to Ryu. *Id.* ¶ 62. Chon's counsel further stated the following:

a.     She was pressured into taking the funds for Mr. Ryu. And that's not to say that she didn't do it, but, she was pressured. *Id.* ¶ 63(a).

    b.    Now, when she began to take these funds out, her immediate supervisor Mr. Ryu found out what was going on, confronted her and said I need the same funds and began to pressure her to remove funds on his behalf. And she did so because there's, we can explain the 650,000. She is able to explain that amount. But, she can't explain the balance. *Id.* ¶ 63(b).

Chon made the following statement at the sentencing hearing:

Due to businesses that continue to fail, I was, so I was going through severe economic hardship. Whenever I was having difficulty due to stress and depression, I ended up getting involved in this instance because of my supervisor James Ryu.

At first I thought it was going to end at first ten thousand dollars. But, the amount continued to grow to the point where I couldn't handle anymore at the bank. And for a long period of time there was no way I could have done this amount, I mean such huge amount of money alone.

It's because there was someone else behind me who was watching over me this was possible. However, I have no proof regarding this matter, nor do I have a witness who could testify for me.

*Id.* ¶ 64.

## K.    Chon's Second and Third Days of Deposition

Chon's deposition was continued on March 14 and March 15, 2018. *Id.* ¶ 65.

During her deposition on March 14, all that Chon recalled about the embezzlement was that Ryu "forced" her to embezzle and that she gave him some money. *Id.* ¶ 66. Other than that, Chon could not recall anything about the embezzlement, including when Ryu allegedly forced her, how he forced her, their

communications, how many times she allegedly gave him money, where she got the money from that she allegedly gave to him, or anything else on the subject. *Id.* ¶ 67.

Chon responded "I don't recall" 130 times during the less than two-hour deposition on March 14, including, but not limited to, on the following issues:

a. how she embezzled funds from BankAsiana or whether she ever stole money from BankAsiana;

b. the accountholders from which she embezzled money;

c. making any statements to the FBI, including her statements to the FBI on February 4, 2014, provided in the FBI interview memo, and her statements to the FBI on February 11, 2014, provided in the FBI interview memo;

d. how much money she embezzled;

e. if she kept any of the money for herself that she embezzled, if she used any money to pay her husband's business debts, or where any of the money is today; and

f. that she plead guilty to the criminal charges related to her embezzlement.

*Id.* ¶ 68.

During her deposition on March 15, Chon responded "I don't recall" 186 times during the approximately two-hour deposition, including, but not limited to, on the following issues:

a. anything that she said at her deposition on June 23, 2016;

b. any of her financial information she provided in the net worth statement and monthly cash flow statement she submitted to federal probation office prior to her sentencing other than a life insurance policy she listed;

14

      c.      any of the deposits she made into her JPMorgan Chase Bank account during the embezzlement time-period; and

      d.      any of the withdrawals she made from her JPMorgan Chase Bank account during the embezzlement time-period other than payments made to the school where her daughter attended kindergarten (*id.* at 264:25-276:6).

*Id.* ¶ 69.

## L.    Wilshire Bank's Seizure of Ryu's Bank Account

Wilshire Bank froze Ryu's account (the "Account") with funds on deposit of $54,035.63 from on or about January 22, 2014 until October 9, 2015, a period of almost 21 months. *Id.* ¶ 70. The Account was a personal checking account that Ryu opened at BankAsiana in 2007 and that became a Wilshire Bank account after Wilshire Bank acquired BankAsiana effective October 1, 2013. *Id.* ¶ 71. Ryu first noticed there was a problem with accessing the funds in the Account on or about January 22, 2014. *Id.* ¶ 72.

On February 7, 2014, Wilshire Bank informed Ryu that it had "placed an administrative hold on the account, pending its investigation." *Id.* ¶ 73. As support for its administrative hold, Wilshire Bank cited language in a Wilshire Bank Deposit Agreement dated July 11, 2011, as follows:

> You agree not to violate the laws of the United States. You may not use your account or any account-related service to conduct any activity that would violate applicable law. If we are uncertain regarding the legality of any transaction, we may . . . freeze the amount in question while we investigate this matter.

*Id.* ¶ 74.

15

Ryu never agreed to the terms in the Wilshire Bank Deposit Agreement dated July 11, 2011. *Id.* ¶ 75. He has no memory of ever seeing it or consenting to it, and it is obviously not the deposit agreement that governed his account, because the account was with BankAsiana until October 1, 2013. *Id.* Ryu does not have a copy of the BankAsiana deposit agreement that governed the account. *Id.*

Wilshire Bank froze the Account because it suspected Ryu of participating with Chon in the embezzlement of $1.5 million. *Id.* ¶ 76. Wilshire Bank decided to return the funds in the Account to Ryu in October 2015 based on discussions with counsel. *Id.* ¶ 77. Wilshire Bank returned the funds in the Account because it "couldn't tie it directly to the embezzlement." *Id.* ¶ 78.

Bank of Hope thinks Chon embezzled approximately $1.6 million. *Id.* ¶ 79. Of that $1.6 million, Bank of Hope believes Chon used $535,000 to make payment on accounts for her husband. *Id.* ¶ 80. That leaves approximately $1 million that is missing. *Id.* ¶ 81. Chon told Pai that she gave the remainder to Ryu, and on that basis Bank of Hope believes that the missing $1 million went to Ryu. *Id.* ¶ 82. Bank of Hope thinks Ryu used some of the $1 million to pay debts for failed business ventures, and that he took at least several hundreds of thousands of dollars beyond what was needed to pay business debts. *Id.* ¶ 83.

Bank of Hope claimed it needed to investigate the source of the $54,035.63 on deposit in the Account. *Id.* ¶ 84. Ryu through his counsel demanded return of the funds in the Account multiple times, including in writing on March 21,

16

March 25, July 11, and August 23 of 2014. *Id.* ¶ 85. On July 18, 2014, Wilshire Bank's counsel asked Ryu's counsel to explain the source for certain deposits identified in an attachment to that letter. *Id.* ¶ 86. On August 23, 2014, Ryu's counsel responded that the deposits in question were small in relation to the amount of the embezzlement and self-explanatory as indicated on the attachment to the letter of July 18, 2014. *Id.* ¶ 87. Ryu's counsel therefore asked Wilshire Bank to "point out item by item and explain which item and why it is suspicious or uncertain." *Id.* Wilshire Bank never responded to this request. *Id.*

The deposits (30 in total) that were the subject of the letter of July 18, 2014, from Wilshire Bank's counsel were obviously all legitimate. *Id.* ¶ 88. Seventeen of the 30 deposits were drawn on BankAsiana. *Id.* ¶ 89. Bank of Hope has access to all of the records needed to check out those deposits. *Id.* Four of the deposits were made after Wilshire Bank acquired BankAsiana. *Id.* ¶ 90. One of the deposits was a check drawn on the U.S. Treasury. *Id.* ¶ 91. Two of the deposits (totaling $4,300) were drawn on Ryu's account at Center Bank. *Id.* ¶ 92. One of the deposits (for $2,000) was an electronic transfer from an account Ryu held at Chase. *Id.* ¶ 93. Three of the deposits were loans taken out by Ryu as Wilshire Bank knew from its own investigation memo dated March 28, 2014, and as discussed with Ryu in a meeting with Wilshire Bank's General Counsel and outside counsel on February 13, 2014. *Id.* ¶ 94. That leaves only two deposits unexplained, each for $500 on April 16, 2012. *Id.* ¶ 95.

17

In May 2015, Ryu engaged Steve Harvey Law LLC to replace Mr. Kim as his counsel in this case. *Id*. ¶ 96. Counsel at Steve Harvey Law communicated with counsel for Wilshire Bank numerous times in writing and orally about the freeze on the Account, including letters on June 19, July 27, and September 11 of 2015. *Id*. On September 23, 2015, Ryu's counsel told Wilshire Bank's counsel that Ryu intended to move right away for an injunction and Wilshire Bank's counsel responded that the bank's senior management was considering the request and he (the bank's counsel) considered it likely the bank would accede. *Id*. ¶ 97. Ryu's counsel also raised the subject with Magistrate Judge Dickson during a conference on September 25, 2015, and Wilshire Bank's counsel said that Wilshire Bank would release the hold on the Account. *Id*.

On October 6, 2015, Wilshire Bank's counsel confirmed in writing that Wilshire Bank would release the hold and sent a check for $54,035.63 to Ryu on October 9, 2015. *Id*. ¶ 98.

## M. Bank of Hope's Has No Damages for its Conversion Claims Related to Ryu's Computers

Bank of Hope Asserts two claims against Ryu for conversion of two computers, a Dell XPS 8500 workstation and a Sony Vaio Z2160. *Id*. ¶ 99. Bank of Hope seeks monetary damages for these claims. *Id*. ¶ 100.

Ryu took the computers on or about September 28, 2013. *Id*. ¶ 101. Ryu met with Pai and Wilshire Bank's outside counsel on February 13, 2014. *Id*. ¶ 102. At that meeting, Ryu provided the computers to Pai even though they were his to keep. *Id*. ¶ 103.

18

Topic No. 10 of Ryu's Rule 30(b)(6) corporate designee deposition notice to Bank of Hope provides as follows:

> The damages, if any, Bank of Hope suffered as a result of not having the Dell XPS and Sony Vaio computers between September 28, 2013, and when Ryu returned them on February 12, 2014.

*Id.* ¶ 104. Pai, Bank of Hope's corporate representative on this topic, testified that Bank of Hope did not suffer any harm from not having the computers:

> Q:      Yeah. So I'm just trying to just establish here from - - the bank didn't suffer any harm from not having the computers as opposed to the content of the computers; right?
>
> A:      Right.

*Id.* ¶ 105.

## III.   ARGUMENT

### A.     Standard for a Motion for Summary Judgment

Rule 56(a) provides: "A party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought." Fed. R. Civ. P. 56(a). The Court shall grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Foye v. Septa,* No. CV 15-1036, 2017 WL 1150259, at *5 (E.D. Pa. Mar. 28, 2017) (citing Fed. R. Civ. P. 56(c)). A factual dispute is "material" if it might affect the outcome of the case under governing law. *Id.* (citing *Anderson v.*

*Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986)). An issue of fact is "genuine … if the

evidence is such that a reasonable jury could return a verdict for the nonmoving

party." *Id.* (citing *Anderson*, 477 U.S. at 248). In evaluating a summary judgment

motion, the court "must view the facts in the light most favorable to the non-moving

party" and make every reasonable inference in that party's favor. *Id.* (citing *Hugh v.*

*Butler Cty. Family YMCA*, 418 F.3d 265, 267 (3d Cir. 2005)). A party seeking

summary judgment bears the initial responsibility for informing the district court of

the basis for the motion and identifying those portions of the record that

demonstrate the absence of a genuine issue of material fact. *Id.* (citing *Celotex Corp.*

*v. Catrett,* 477 U.S. 317, 322 (1986)). Where the non-moving party bears the burden

of proof on a particular issue at trial, the moving party's initial burden may be met

by "pointing out to the district court that there is an absence of evidence to support

the non-moving party's case." *Id.* (citing *Celotex*, 477 U.S. at 325). Summary

judgment is proper if the non-moving party fails to rebut by making a factual

showing "sufficient to establish the existence of an element essential to that party's

case, and on which that party will bear the burden of proof at trial." *Id.* (citing

*Celotex*, 477 U.S. at 322); *see also* Fed. R. Civ. P. 56(e)(3).

B.    **Ryu Is Entitled to Summary Judgment on Bank of Hope's**
      **Embezzlement Claims (Counts 13-17) Because Chon's**
      **Testimony Is Inadmissible and Insufficient to Support a Jury**
      **Verdict in Any Event**

The Court should grant summary judgment for Ryu on all of Bank of

Hope's claims based on the factual allegation that he participated in the

embezzlement with her and she gave most of the embezzled funds to him (i.e.,

Amended Complaint Counts 13-17). The only direct evidence relied upon by Bank of Hope in support of this allegation is the testimony of Chon. SOF ¶ 60. This is a fatal flaw in the bank's case against Ryu, because at her recent deposition Chon testified that she could recall virtually nothing other than she had embezzled some funds, that Ryu somehow forced her to do it, and that she "gave the money" to Ryu. Chon Depo. 3/14 at 151:5-152:9, 157:6-158:17, 164:12-165:4. She recalls virtually nothing else, not the how, when, where, or any other details about the embezzlement. SOF ¶¶ 66-67. When asked about whether she ever talked to Ryu about taking money she said "I don't recall." Chon Depo. 3/14 at 150:25-151:4. When asked if Ryu pressured her to embezzle, she said "I don't recall." *Id.* at 164:12-14. At the end of the deposition, when asked for "any information" about "Ryu participating with you in embezzling money with you from BankAsiana" and "any information" about "your own conduct in embezzling money from BankAsiana" she replied "I do not recall" to both questions. Chon Depo. 3/15 at 293:5-13.

At a prior deposition, Chon provided detail about Ryu's supposed involvement, but she no longer recalls any of these details. Chon Depo. 3/14 at 150:2-19; 158:18-159:13; 3/15 221:7-22:11. She told the FBI in February 2014 that Ryu had nothing to do with the embezzlement and the bank had encouraged her to implicate him. SOF ¶¶ 16-17. She now recalls nothing about her conversations with the FBI. Chon Depo. 3/14 at 161:10-164:11. She also recalls nothing at all about the hundreds of thousands of dollars that moved through her bank account during the years (2010-2013) she embezzled the $1.5 million. SOF ¶¶ 69(c)-(d). And, of course,

she recalls nothing about the approximately $900,000 that she failed to account for and that Bank of Hope claims was given to Ryu. SOF ¶¶ 68(d)-(e).

Chon is obviously lying about her lack of recollection, unless something dramatic happened to wipe her memory clean. But when asked if something had happened since the last time she was deposed that might explain the onset of profound memory loss, Chon replied, "I don't recall." Chon Depo. 3/14 at 238:14-240:6.

The Court does not need to decide whether Chon is lying or has some mental defect that made her forget nearly anything relevant to this lawsuit including the whereabouts of the remainder of the $1.5 million money she stole. It does not matter why her testimony is so egregiously flawed. The Court need only recognize that Chon's testimony is of extremely limited probative value because of her inability to recall anything but the most vague and general assertions.

Recognizing the serious problem with Chon's testimony, the Court should grant summary judgment for Ryu for two reasons. First, as made clear by Fed. R. Civ. P. 56(c), only admissible evidence can be used to defeat a summary judgment motion. To be admissible, Chon's testimony must satisfy the personal knowledge requirement of Fed. R. Evid. 602. This includes ability to recall. Many judges have said in many cases that say that questions of recollection go to the jury to assess, but there is clearly a lower limit to this principle, and Chon's testimony is below it.

As set forth in a leading treatise on evidence:

> The third component of personal knowledge is recollection. A witness who perceived events in the past will not be permitted to testify if she lacks present recollection of that perception. This commonsense conclusion is buttressed by the language of Rule 602, which uses the present tense when describing the personal knowledge requirement: The evidence must be sufficient to support a finding the witness "has" personal knowledge. This conclusion is also supported by Rule 803(5), the recorded recollection exception to the hearsay rule. Using the past tense, Rule 803(5) states that a witness who suffers from a failure of memory is a person who, "once had knowledge." Thus a person who "once has knowledge" is not a person who, using the language of Rule 602, "has" knowledge.
>
> Just as the law does not require perception to be perfect, memory gaps usually affect only the weight of testimony, not its admissibility. This aspect of the personal knowledge requirement is satisfied so long as the witness has some, albeit limited, recollection. If, however, the witness' memory is so impaired that she cannot testify coherently without filling the gaps in her memory with hearsay or speculation, the witness lacks personal knowledge.

27 Fed. Prac. & Proc. Evid. § 6023 (2d ed.) (footnotes omitted).

Chon's testimony is clearly inadmissible to prove that Ryu participated in the embezzlement in any way. It would make a mockery of the judicial process for a witness who recalls so little to be permitted to testify in a federal civil action. Courts have excluded testimony a lot closer to the line than this. *See, e.g., United States v. Bryant*, 766 F.2d 370, 377 (8th Cir. 1985), *cert. denied*, 474 U.S. 1054 (district court did not abuse discretion in preventing witness from testifying that hundreds of credit transactions had occurred where witness could remember only three specific credit transactions.).

Other cases are cited in the footnotes of the above-quoted treatise excerpt. Counsel has been unable to locate another case factually similar to this one, because the facts here are so unusual and egregious. The Court will be setting no precedent to hold that Fed. R. Evid. 602 bars the testimony of a witness who claims as little memory of the facts as Chon. In the alternative, Chon's testimony is *per se* inadmissible under Fed. R. Evid. 403, because the probative value is so slight in relation to its ability to confuse the jury.

Second, Chon's testimony is insufficient to create a genuine issue of fact for trial, under Fed. R. Civ. P. 56(e)(3), because it would not be enough for a jury to return a verdict for Bank of Hope. The Court may consider the first point, the inadmissibility of Chon's testimony, in support of the second point, the lack of evidence to create a genuine issue of fact for trial, but it could also grant summary judgment on either ground independently.

> If the defendant in a run-of-the-mill civil case moves for summary judgment or for a directed verdict based on the lack of proof of a material fact, the judge must ask himself not whether he thinks the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented. The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff. The judge's inquiry, therefore, unavoidably asks whether reasonable jurors could find by a preponderance of the evidence that the plaintiff is entitled to a verdict—"whether there is [evidence] upon which a jury can properly proceed to find a verdict for the party producing it, upon whom the onus of proof is imposed."

*Anderson*, 477 U.S. at 252.

No reasonable jury could find for Bank of Hope on the allegation that Ryu participated in the embezzlement by forcing Chon to embezzle and then taking most of the stolen money based on Chon's testimony, because her testimony is inconclusive at best and limited by lack of supporting details. Bank of Hope's fraud claims (Counts 8 and 9) requires "clear and convincing evidence." *Lord Abbett Mun. Income Fund, Inc. v. Citigroup Glob. Markets, Inc.*, No. CV 11-5550 (CCC), 2017 WL 5515912, at *8 (D.N.J. Aug. 4, 2017) (citations omitted). But all of Bank of Hope's counts fail because Chon's testimony cannot satisfy the lower preponderance standard.

This is evident from Chon's March 2018 deposition testimony. With respect to her claim that she gave Ryu money, she cannot even recall that it was money from the embezzlement: "All I recall is I gave the money." Chon Depo. 3/14 at 157:11-16. As for her claim that Ryu forced her to do it, she cannot recall how, why, or where he forced her to do it. *Id*. at 151:5-21. He could have done it by appearing to her in a dream for all we know. No reasonable jury could listen to Chon's testimony and conclude from that testimony Ryu forced her to embezzle any amount and give it to him, much less that he forced her to embezzle $1.5 million and give $900,000 to him, as Bank of Hope claims.

Bank of Hope acknowledged that, while it claims to have evidence of motive and opportunity, it has no direct evidence of Ryu's involvement other than Chon's testimony. SOF ¶ 60. Chon's testimony—the lynchpin of the bank's case—is inadmissible and insufficient for a reasonable jury to return a verdict for Bank of

25

Hope. Therefore, the Court should grant summary judgment for Ryu on all the claims against him based on Bank of Hope's allegations that he participated in the embezzlement.

### C. Ryu Is Entitled to Summary Judgment on Bank of Hope's Computer Conversion Claims (Counts 18-19) Because It Has No Damages

In its Amended Complaint, Bank of Hope asserts as Counts 18 and 19 claims against Ryu for conversion of two computers. SOF ¶ 99. Both claims fail because Ryu returned the computers to Bank of Hope and it has suffered no damages.

"Under New Jersey law, '[c]onversion is essentially the wrongful exercise of dominion and control over the property of another in a manner inconsistent with the other person's rights in that property.'" *Peloro v. United States*, 488 F.3d 163, 173-74 (3d Cir. 2007) (quoting *McAdam v. Dean Witter Reynolds, Inc.*, 896 F.2d 750, 771 (3d Cir. 1990)). "The elements of common law conversion under New Jersey law are (1) the existence of property, (2) the right to immediate possession thereof belonging to plaintiff, and (3) the wrongful interference with that right by defendant." *Rickett v. Barry*, Civ. No. 13-6804, 2015 WL 1013547, at *8 (D.N.J. Mar. 9, 2015).

Ryu took the computers on September 28, 2013. SOF ¶ 101. It is undisputed the Ryu provided the computers to Pai on February 13, 2014. *Id.* ¶¶ 102-103. It is also undisputed that Bank of Hope suffered no harm as a result of not having the computers between September 28, 2013 and February 13, 2014. *Id.* ¶

26

105. Therefore, Bank of Hope has suffered no damages. Its conversion claims regarding the computers fail and Ryu should be granted judgment on them.

### D.   Ryu Is Entitled to Summary Judgment on Liability for Count III of His Counterclaims (Illegal Seizure of Funds on Deposit)

Ryu seeks partial summary judgment on Count III of his Counterclaims. Specifically, Ryu seeks a determination that Bank of Hope breached its contractual obligation to return to Ryu $54,035.63 that he had on deposit with it. Ryu ultimately seeks to recover compensatory damages, including emotional distress damages, as well as punitive damages, but he is not seeking summary judgment on the right to such damages. Now, he seeks only to establish that Bank of Hope breached its obligation to return his funds to him, when it froze his account and refused to give him the approximately $54,000 of funds on deposit from January 2014 until it finally gave him the funds on October 9, 2015. His right to recover emotional distress damages and punitive damages as well as the amount of such damages are reserved for trial.

The facts pertaining to Bank of Hope's breach of its contractual obligation to give Ryu his funds on demand are set forth *supra* at 15-18. They can be summarized, briefly, as follows. On or about January 22, 2014, Wilshire Bank froze Ryu's personal checking account with $54,035.63 in it. SOF ¶ 70. It claimed that it had a right to seize the funds pursuant to a clause in the Wilshire Bank Deposit Agreement dated July 21, 2011, that "[i]f we are uncertain regarding the legality of any transaction, we may . . . freeze the amount in question while we investigate this matter." *Id.* ¶ 74. Wilshire Bank froze the Account because it

believed (and still maintains) that Chon gave approximately $1 million to Ryu, and it wanted to investigate the source of the deposits for the money in the Account. *Id*. ¶¶ 74, 76.

Ryu through counsel demanded the return of the funds numerous times. *Id*. ¶ 85. On July 18, 2014, Wilshire Bank's counsel asked Ryu to explain the source of certain deposits. *Id*. ¶ 86. Ryu's counsel responded on August 23, 2018, that the source of the deposits that were the subject of the bank's inquiry were obvious from information in the bank's possession and bore no relationship to the embezzled funds. *Id*. ¶ 87. It also asked the bank to explain why it was suspicious or uncertain as to any of the deposits. *Id*. The bank never responded. *Id*.

Ryu engaged new counsel at SHL in May 2015, and new counsel renewed the demand for return of the funds in the Account. *Id*. ¶ 96. On September 29, 2015, in response to counsel's statement made in front of Magistrate Judge Dickson that a motion for an injunction for return of the funds would be made shortly unless Wilshire Bank relented, the bank's counsel agreed to release the funds. *Id*. ¶ 97. Wilshire Bank sent Ryu a check for all of the funds in the account on October 9, 2015. *Id*. ¶ 98.

The Court should grant partial summary judgment for Ryu for two reasons. First, although Ryu concedes that there was a contract between him and Wilshire Bank regarding the Account, he never agreed to the terms of the Wilshire Bank Deposit Agreement dated July 21, 2011. *Id*. ¶ 75. That deposit agreement contains the language relied upon by Wilshire Bank as grounds for failing to

provide to Ryu the funds on deposit in the Account from January 22, 2014 to October 9, 2015. *Id.* ¶ 74. Because Ryu never agreed to that contract language, the bank cannot rely on it as grounds for freezing Ryu's Account for almost 21 months.

Second, even if Ryu consented to the terms of the Wilshire Bank Deposit Agreement of July 21, 2011, the language relied upon by Wilshire Bank did not give it a right to freeze the Account for over a year after it already had ample time to investigate the Account and see that the funds on deposit were not based on cash deposits from Chon or otherwise suspicious in any way. In reality, Wilshire Bank froze the Account in an illegal attempt to use Ryu's funds on deposit to offset its unproven claims against Ryu asserted in this action.

The Court's analysis must begin with the language of the contract. New Jersey follows the rule that "unambiguous contracts will be enforced as written unless they are illegal or otherwise violate public policy." *Manahawkin Convalescent v. O'Neill*, 85 A.3d 947, 959 (N.J. 2014) (citations omitted). The language of the Wilshire Bank Deposit Agreement relied upon by Wilshire Bank appears to be clear, except that the length of the permitted freeze is potentially ambiguous. The language says that the freeze may only last "while we investigate this matter." That language cannot be read to give the bank the right to impose an unduly long freeze on Ryu's Account, because that would violate the rule that "[c]ontracts should be read 'as a whole in a fair and common sense manner.'" *Id.* at 958. (citations omitted). *See also Musico v. Musico*, 43 A.3d 1274, 1278 (N.J. Super Ct. Ch. Div. 2012) ("Where the parties' intention is ambiguous, the most fair and

reasonable construction imposing the least hardship upon either of the parties should be adopted.") (citations omitted).

Permitting Wilshire Bank to impose an unreasonably long freeze on the Account would also violate the rule of *contra proferentem*, as Wilshire Bank and Ryu clearly had unequal bargaining power regarding the terms of the deposit agreement. *See Pacifico v. Pacifico*, 920 A.2d 73, 78-79 (N.J. 2007); *see also Forbes v. First Camden Nat'l. Bank & Tr. Co.*, 95 A.2d 416, 418 (N.J. Super. Ct. App. Div. 1953) ("The instruments before us were drafted by the bank and in case of ambiguity should be construed most strongly against it.") (citing *Moses v. Edward H. Ellis, Inc.*, 72 A.2d 856, 860 (N.J. 1950)).

It would also violate "the duty of good faith and fair dealing that all contracts impose on their parties." *Roach v. BM Motoring, LLC*, 155 A.3d 985, 992 (N.J. 2017) (citations omitted). "This duty is an implied covenant that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." *Id.* (citations and internal quotations omitted). The implied covenant applies to "both the performance and enforcement of the contract." *Brunswick Hills Racquet Club, Inc. v. Route 18 Shopping Ctr. Assocs.*, 864 A.2d 387, 395 (N.J. 2005). For all these reasons, the language of the deposit agreement relied upon by Wilshire Bank should be read to mean that the bank's investigation into the matter should have been no longer than reasonably necessary to investigate the questioned transactions.

Here, the questioned transactions were the deposits that were the source of Ryu's funds on deposit in the Account. SOF ¶ 88. Wilshire Bank had the opportunity to investigate the source of these deposits beginning in January 2014. In response to demands by Ryu's attorneys for return of the funds on deposit, on July 18, 2014, the bank's counsel provided a list of deposits questioned by Wilshire Bank. *Id.* ¶ 86.

As Ryu explains in his Declaration, Wilshire Bank's suggestion that these 30 deposits had some connection to the $1.6 million that Chon embezzled "was and is ludicrous." Ryu Decl. ¶ 17. They include four deposits made after Wilshire Bank acquired BankAsiana, seventeen checks drawn on BankAsiana that Wilshire Bank could have easily investigated, a check from the U.S. Department of Treasury, and three checks that Ryu explained to Wilshire Bank's general counsel and outside counsel at a meeting on February 13, 2014, and that are explained in the bank's own investigative report dated March 28, 2014 (WB814). SOF ¶¶ 89-91, 94. Ryu's counsel wrote to Wilshire Bank's counsel on August 23, 2014, asking it to explain the basis for claiming that any of these deposits were suspicious or uncertain. *Id.* ¶ 87. Wilshire Bank's counsel never responded. *Id.*

It is clear that *at least as of that date*—August 23, 2014—Wilshire Bank's investigation into the source of the funds on deposit in the Account had ceased, because the bank would not or could not then explain why any of the deposits it questioned were suspicious or uncertain. If Wilshire Bank now tries to claim that it was still investigating as of that date, the Court should reject that

position as contradicted by the facts and based on an unreasonable reading of the language of the deposit agreement. For these reasons, even if the Court permits Wilshire Bank to rely on language in a contract never agreed to by Ryu, the bank still breached the contract by waiting for over a year after August 23, 2014, to give Ryu the funds on deposit in the Account, and then only after Ryu's new counsel threatened to sue for injunctive relief unless the bank relented.[3]

There is no question that Ryu's funds on deposit with Wilshire Bank were the subject of contract, because that is the nature of a bank-depositor relationship. *Forbes*, 95 A.2d at 418 ("The relation between a depositor and a bank is one of creditor and debtor, and their rights and liabilities depend upon the contract between them.") (citations omitted). Ryu did not keep a copy of the deposit agreement that he entered into with BankAsiana when he opened the Account in 2007 (Ryu Decl. ¶ 4), but it obviously included the right to have his funds provided to him upon demand. *See, e.g., Dean Witter Reynolds Inc. v. Variable Annuity Life Ins. Co.*, 373 F.3d 1100, 1107 (10th Cir. 2004) ("The common law thus conceptualized a general deposit as a loan of the funds to the financial institution. Unlike a bailment, a general deposit passes title to the financial institution, which

---

[3]      Nor can Wilshire Bank justify the freeze based on the right of offset. "Generally, a bank has a right of set off against all monies or funds in its possession belonging to a depositor to secure the payment of the depositor's indebtedness to the bank." *All Am. Auto. Salvage v. Camp's Auto. Wreckers*, 679 A.2d 627, 631-32 (N.J. 1996) (citations and internal quotations omitted). In order to offset a debt, however, the debt claimed by the bank "must be due and owing." *Id.* (citing *Fed. Deposit Ins. Corp. v. Pioneer State Bank*, 382 A.2d 958, 962 (N.J. Super. Ct. Law Div. 1977); 5A Michie on Banks and Banking Ch. 9 § 115a. at 443 (1994 Replacement Volume)).

is required to repay the loan from its own funds upon demand.") (citations and footnote omitted). He clearly demanded that his funds on deposit be provided to him, and Wilshire Bank clearly violated that right by waiting until long after it completed any investigation into the source of the funds on deposit. For these reasons, the Court should grant partial summary judgment for Ryu and find that Wilshire Bank breached the deposit agreement.

## IV.   CONCLUSION

For foregoing reasons, Ryu respectfully requests that this Court enter summary judgment in his favor and against Bank of Hope on all claims asserted by Bank of Hope against Ryu in its Amended Complaint The Court should also grant partial summary judgment for Ryu and against Bank of Hope on Count III of his Counterclaims that the bank breached its contractual obligations to return his $54,000 on deposit.

Respectfully submitted,

STEVE HARVEY LAW LLC

By:   <u>s/ David V. Dzara</u>
       David V. Dzara
       Stephen G. Harvey*
       1880 John F. Kennedy Blvd.
       Suite 1715
       Philadelphia, PA 19013
       (215) 438-6600

*Attorneys for Defendant/Counterclaim Plaintiff/Third-Party Counterclaim Plaintiff/Crossclaim Plaintiff Suk Joon Ryu, a/k/a James S. Ryu*
*\* Admitted pro hac vice*

Dated: November 9, 2018

# EXHIBIT 8

**NOT FOR PUBLICATION**

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| BANK OF HOPE, | : CIVIL ACTION NO. 14-1770 (JLL) |
| Plaintiff, | : **OPINION** |
| v. | : |
| MIYE CHON, *et al.*, | : |
| Defendants. | : |
| SUK JOON RYU, | : |
| Counterclaim Plaintiff, | : |
| v. | : |
| BANK OF HOPE, | : |
| Counterclaim Defendant. | : |

**LINARES**, Chief District Judge

The plaintiff, Bank of Hope (hereinafter, "the Bank"), alleges that the defendant Suk Joon Ryu (hereinafter, "Ryu"), who was employed as an officer by the Bank, and other defendants embezzled in excess of one million dollars from the Bank by facilitating unauthorized withdrawals from several customer accounts. (ECF No. 92.) The Bank has brought — among other claims — claims against Ryu: (1) related to that alleged

embezzlement for conversion, fraud, breach of fiduciary duty, and unjust enrichment (hereinafter "the Embezzlement Claims"); and (2) for conversion based upon allegations that Ryu removed two of the Bank's computers (hereinafter, "the Two Computers") from the Bank's premises without permission (hereinafter, "the Computer Conversion Claims"). (*Id.* at 11–14.)

Ryu has brought — among other counterclaims — a counterclaim against the Bank for breach of the deposit agreement between them (hereinafter, "the Breach Counterclaim"). (ECF No. 111 at 46–47.) Specifically, Ryu alleges that the Bank wrongfully withheld about $54,000 of his funds from January 2014 through October 2015 that he had deposited in his personal account at the Bank. (*Id.*)

Ryu now moves pursuant to Federal Rule of Civil Procedure 56 (hereinafter, "Rule 56") for summary judgment in his favor on the Embezzlement Claims, the Computer Conversion Claims, and the Breach Counterclaim. (ECF No. 253 through ECF No. 253-2; ECF No. 254; ECF No. 255; ECF No. 256 through ECF No. 256-15; ECF No. 257-1 through ECF No. 257-15; ECF No. 258 through ECF No. 258-5; ECF No. 267.) The Bank opposes the motion. (ECF No. 263; ECF No. 264; ECF No. 264-1; ECF No. 265 through ECF No. 265-6; ECF No. 266.)

The Court resolves the motion upon a review of the papers and without oral argument. *See* L. Civ. R. 78.1(b). The Court presumes that the parties are familiar with the factual context and the procedural history of this action. (*See, e.g.*, ECF No. 137 at

2

1–12 (a previous Opinion from the Court, entered on January 4, 2017, addressing a

motion to dismiss); ECF No. 191 at 1–9 (a previous Order from the Court, entered on

February 13, 2018, addressing an appeal from a Decision issued by the Magistrate

Judge).)  For the following reasons, the Court will deny the motion in its entirety.

## I.  BACKGROUND

### A.  Chon and Ryu

The defendant Miye Chon (hereinafter, "Chon") and Ryu, who was Chon's

supervisor, were employed at certain New Jersey locations of the Bank as officers.  (ECF

No. 254 at 3.)[1]  Ryu voluntarily left his position at the Bank in October 2013 after a

merger, and he took a new position with another banking institution.  (ECF No. 137 at 3.)

### B.  Embezzlement Is Discovered

In January 2014, the Bank discovered that large unauthorized withdrawals were

made from several customer accounts between 2010 and 2013.  (*Id.*)  The Bank's

investigation pointed to Chon as being the main culprit, and the Bank notified law

enforcement.  (*Id.*)

### C.  Chon's Deposition Testimony From June 2016

Upon being questioned by the Bank and federal agents in 2014 concerning the

---

[1]    The name of the Bank has changed several times over the course of this litigation due to
mergers with other banking institutions, *e.g.*, BankAsiana and Wilshire Bank.  Those
name changes are not relevant to the Court's disposition of this motion.

unauthorized withdrawals from customer accounts at the Bank, Chon confessed to the following, which she reiterated in the testimony that she provided in her deposition in June 2016 (*see* ECF No. 256-9 at 10–14, 19–20, 23–25, 28–29):

(1) she had made those withdrawals in order to pay off the debts that had been incurred by her husband;

(2) she knew she was behaving in an illegal manner;

(3) Ryu discovered that Chon was embezzling funds, and thereupon asked Chon to embezzle funds for his benefit as well;

(4) she made several unauthorized withdrawals for the express purpose of giving Ryu money approximately ten times between 2010 and 2013 at Ryu's request each time;

(5) she would put cash in an interoffice envelope and then personally deliver $100 bills in amounts between $20,000 and $100,000 to Ryu;

(6) she embezzled approximately $700,000 to give to Ryu during that time period; and

(7) Ryu told Chon that in return he would eventually compensate her or help her in his role as Chon's supervisor at the Bank.

The General Counsel for the Bank confirmed in her own deposition testimony that Chon had indeed admitted to these things when Chon was questioned by the Bank. (*See* ECF No. 265-5 at 146–47.)

Chon testified that she accomplished her acts of embezzlement by manipulating the Bank's computer system in order to make unauthorized withdrawals from the accounts of certain customers of the Bank. (ECF No. 256-9 at 8–10.) In addition, Chon testified that she exploited the Bank's failure to enforce its own protocols for overseeing and controlling transactions. (*Id.*)

Chon further testified that she had heard from other Bank employees that Ryu had incurred large debts related to business activities that were separate from his employment at the Bank. (*Id.* at 30–31; *see also* ECF No. 256-14 at 10 *and* ECF No. 265-5 at 19 (the Bank's General Counsel testifying in her depositions in July 2017 and August 2017 that Ryu "was in such desperate need of money" because "[a]pparently, he had a lot of debts," and that "a lot of employees said [Ryu] was asking around to employees, both his superiors as well as people that reported to him for personal loans and that he was basically pretty desperate"); ECF No. 258-5 at 2 (Chon's statement to federal agents that Ryu had gone into debt due to failed business ventures, and that Ryu asked Chon to embezzle money for him after he found out about Chon's scheme).)

## D.    Criminal Matter

Chon's embezzlement scheme ultimately came to light when one of the affected customers complained to the Bank about a discrepancy in an account. (ECF No. 265-5 at 10-11.) As a result, Chon: (1) was criminally charged in relation to the embezzlement; (2) "pleaded guilty to bank fraud, embezzlement of funds by a bank employee, and

aggravated identity theft"; and (3) was sentenced to a term of imprisonment and "$1,351,090 in restitution." *United States v. Chon*, 725 F. App'x 125, 126 (3d Cir. 2018) (affirming the sentence issued by the District Court).

**E.    Chon's Deposition Testimony From March 2018**

Chon was deposed again in March 2018 while she was serving her sentence in prison, which was almost two years after her initial deposition in June 2016. (ECF No. 256-12 at 2; ECF No. 256-13 at 2.)  However, when Chon was asked during that March 2018 deposition to either clarify or confirm her testimony from her June 2016 deposition, she repeatedly responded with "I don't recall" and variations thereof. (*See generally* 256-12; ECF No. 256-13.)  Nevertheless, Chon testified in that March 2018 deposition in reference to her embezzling conduct that Ryu "forced [her] to do it." (ECF No. 256-12 at 6; *see also id.* at 10 (testifying to the same).)

**F.    Interactions Between The Bank And Ryu After The Embezzlement Was Discovered**

As discussed above, Chon claimed that Ryu took part in the embezzlement scheme when she was questioned by the Bank and by federal agents. However, Ryu was neither arrested nor criminally charged in relation to the embezzlement, and he has denied having any involvement in the embezzlement scheme. (ECF No. 137 at 4.)

Ryu took the Two Computers, which he used during the course of his employment at the Bank, with him for his personal use as he left the Bank in 2013. (ECF No. 255 at

24.)  The Bank thereafter wanted to review items that had been stored on the Two

Computers as part of its embezzlement investigation, and the Bank demanded that Ryu

return the Two Computers soon after it commenced that investigation.   (ECF No. 257-1

at 2–3 (the Bank's written demand to Ryu for the return of the Two Computers).)   Ryu

complied with the Bank's demand in February 2014.  (ECF No. 255 at 24.)  Ryu claims

that the president of the Bank in 2013 gave him permission to keep the Two Computers

when he left (ECF No. 265 at 8; ECF No. 265-3 at 3–4), whereas the Bank asserts that

Ryu removed the Two Computers from the Bank's premises without permission.  (ECF

No. 263 at 15–16.)

Ryu also had a personal account at the Bank, which contained approximately

$54,000 and which Ryu kept open even after Ryu left his job at the Bank in 2013.  (ECF

No. 255 at 21.)  Upon being informed by Chon of Ryu's alleged involvement in the

embezzlement, the Bank froze Ryu's account from January 2014 through October 2015

while it investigated whether Ryu was indeed involved with Chon in embezzling funds.

(*Id.*)

## II.    DISCUSSION

### A.    Rule 56

It is not necessary for the Court to restate the standard for resolving a motion for

summary judgment made pursuant to Rule 56, because that standard has been already

enunciated.  *See* Fed. R. Civ. P. 56(a) (providing for an award of summary judgment if

there is no genuine dispute of material fact and the movant is entitled to judgment as

matter of law); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986) (setting

forth the standard); *United States ex rel. Kosenke v. Carlisle HMA, Inc.*, 554 F.3d 88, 94

(3d Cir. 2009) (setting forth the standard).

**B.      The Embezzlement Claims**

Ryu argues that he is entitled to summary judgment in his favor on the Bank's

Embezzlement Claims because: (1) the viability of those claims hinges solely upon

Chon's assertions concerning his alleged involvement in the embezzlement scheme; (2)

Chon testified in her March 2018 deposition that she no longer recalled the extent of

Ryu's alleged involvement in the embezzlement scheme, thereby diminishing the value

of her detailed June 2016 deposition testimony on that subject; and (3) no reasonable jury

could find him liable as to the Embezzlement Claims as a result.  (ECF No. 255 at 19–20,

27; *see also* ECF No. 267 at 11 (Ryu arguing that "Bank of Hope has no evidence

implicating Ryu as a participant in the embezzlement other than Chon's testimony").)

Indeed, the Bank's General Counsel testified at her own deposition that the Bank's basis

for bringing the Embezzlement Claims against Ryu was based on the information that

Chon relayed to the Bank.  (*See* ECF No. 256-10 at 4 (when asked "So essentially as for

what we're calling direct evidence here [about Ryu's conduct], it was the word of . . .

Chon, right?", the General Counsel answered, "Primarily, yes.").)

Ryu argues further that "[b]ecause Chon has without a doubt lied at least once already about Ryu's alleged role in the embezzlement, her testimony is the only evidence linking Ryu to the crime, and she has not been subject to cross-examination about her prior testimony and cannot be subject to cross-examination at trial, there is no way for a rational jury to decide whether Ryu is liable or not without engaging in speculation." (ECF No. 267 at 12; *see also* ECF No. 255 at 28 (Ryu arguing that "Chon is obviously lying about her lack of recollection" in the March 2018 deposition).)

In contrast, the Bank argues that summary judgment should be denied because: (1) despite Chon's professed lack of recall in March 2018, Chon did not alter her detailed June 2016 deposition testimony that Ryu had asked her to embezzle money for him on ten occasions and that she gave him approximately $700,000 overall; (2) Chon simply testified that she could not recall what had occurred four years prior to testifying in March 2018; and (3) it is within the province of the jury to weigh the relative value of Chon's June 2016 deposition testimony against her March 2018 deposition testimony. (ECF No. 263 at 9–11.)

The Court agrees with the Bank and concludes that genuine issues of fact remain as to the merits of the Embezzlement Claims. It is true that in contrast to the detailed testimony that Chon provided in her June 2016 deposition, Chon's March 2018 deposition testimony is lacking in the details concerning Ryu's involvement with the embezzlement. However, Chon did testify in March 2018 that Ryu forced her to

9

embezzle funds for his benefit, which is consistent with her detailed June 2016 deposition testimony that Ryu asked her to procure funds for him after he discovered her embezzling conduct.

Furthermore, it is for a jury to determine whether Chon's June 2016 deposition testimony, which was provided closer in time to the alleged events at issue, is to be believed in view of her March 2018 deposition testimony, which was provided while Chon was in prison more than four years after the alleged events at issue. *See LaBeau v. Rentzis*, No. 08-6300, 2010 WL 2521764, at *4 (D.N.J. June 14, 2010) (holding in a contract dispute that insofar as a party's inconsistent statements were concerned, "[i]t will be for the jury to determine the credibility of [the witness's] testimony in light of these inconsistencies, not this Court").

This matter presents issues concerning Chon's credibility that must be weighed by a jury, and nothing prevents Ryu from challenging Chon's credibility on cross-examination before a jury. *See Mest v. Cabot Corp.*, 449 F.3d 502, 514 (3d Cir. 2006) (holding that while the credibility of contradictory deposition testimony may be disputed, the summary judgment standard requires the District Court to look at all facts in the light most favorable to the non-moving party and reserve the issues of credibility for a jury); *see also Brunozzi v. Crossmark, Inc.*, No. 13-4585, 2016 WL 112455, at *4 (D.N.J. Jan. 11, 2016) (holding, in a case to recover damages for failure to pay overtime wherein the plaintiff employee provided "inconsistent deposition testimony" about the surrounding

circumstances, that the defendant employer "is not entitled to summary judgment on the basis of [plaintiff's] conflicting deposition testimony," because "[w]hile the conflicting testimony undercuts [plaintiff's] credibility," determining "[w]hich portions of [plaintiff's] deposition testimony are truthful is a job for the jury and not this Court"). Therefore, the part of Ryu's motion wherein he seeks summary judgment in his favor on the Embezzlement Claims is denied.

## C.    The Computer Conversion Claims

Ryu argues that he is entitled to summary judgment in his favor on the Computer Conversion Claims.  In support, Ryu argues that the president of the Bank at the time of his voluntary departure gave Ryu permission to keep the Two Computers for his personal use regardless of whether Ryu continued his employment with the Bank, and that he stored personal information on the Two Computers as a result.  (ECF No. 255 at 24; *see also* ECF No. 265 at 8 (Ryu testifying in his deposition that the Bank's president gave him permission on several occasions to take the Two Computers when he left his employment at the Bank).)  Ryu also argues that the Bank has not suffered any damages as a result of the alleged conversion, since he gave the Two Computers back to the Bank. (ECF No. 267 at 12; *see also* ECF No. 255 at 32.)

In contrast, the Bank argues that the Two Computers were not for Ryu to keep, and that Ryu did not have permission to remove them from the Bank's premises when he left the Bank's employment in 2013 because the Two Computers contained the Bank's

11

confidential and proprietary information.  (ECF No. 263 at 14–16.)  In addition, the Bank

argues that Ryu's alleged conversion of the Two Computers prevented the Bank from

using them for the four-month period that they were in Ryu's possession, and that the

Bank expended effort in locating the Two Computers once it realized that they were

gone, and thus the Bank suffered damages thereby.  (*Id.* at 11; *see also* ECF No. 264 at 4,

6 (declaration of Bank's General Counsel asserting the same).)

It is apparent from the Court's recitation of the parties' arguments that genuine

issues of fact remain as to whether Ryu converted the Two Computers and whether the

Bank suffered any damages as a result of the alleged conversion.  Furthermore, the Court

notes upon its review of the record that the president of the Bank at the time of Ryu's

departure testified in his deposition that he did not give Ryu permission to take the Two

Computers for his personal use, thereby adding to the Court's conclusion that issues of

fact remain to be weighed by a jury.  (ECF No. 265-4 at 3 (when asked, "Did you give

[Ryu] permission to take that computer?", the former Bank president answered, "No.").)

In addition, it appears that the determination of whether the Bank was justified in

demanding the return of the Two Computers to aid in its embezzlement investigation

could be dependent upon the resolution of the Embezzlement Claims that are asserted

against Ryu.  *See Metex Mfg. Corp. v. Manson*, No. 05-2948, 2008 WL 877870, at *13

n.4 (D.N.J. Mar. 28, 2008) (denying summary judgment on a damages claim in a breach

of contract case, because "depending on how the jury resolves whether [the plaintiff] took

reasonable steps to mitigate its damages, [the plaintiff's] recovery of incidental damages may be altered by the jury to reflect its finding"); *Grenci v. Ocean County*, No. 04-5806, 2006 WL 2376914, at *7 (D.N.J. Aug. 15, 2006) (denying summary judgment on an excessive force claim "[i]n light of the varying accounts, and not yet decided invasion of privacy claim").

Furthermore, the Bank may ultimately recover on its Computer Conversion Claims even if its damages are minimal. *See City Select Auto Sales, Inc. v. David Randall Assocs., Inc.*, No. 11-2658, 2014 WL 4755487, at *8 (D.N.J. Sept. 24, 2014) (holding that a conversion claim may proceed for only nominal damages concerning the degree to which the property at issue was allegedly converted). Therefore, the part of Ryu's motion wherein he seeks summary judgment on the Computer Conversion Claims is denied.

**D.     The Breach Counterclaim**

Ryu argues that he is entitled to summary judgment in his favor on the Breach Counterclaim. In support, Ryu argues that the Bank breached the relevant account agreement that it has with its depositors by freezing the personal account that he kept at the Bank containing approximately $54,000 without justification in January 2014, and by not returning the money to him until October 2015. (ECF No. 255 at 21–24.)

However, the Bank argues in opposition that it was expressly authorized to freeze Ryu's account under the terms of the account agreement while it investigated whether

Ryu had embezzled funds.  (ECF No. 263 at 19–21.)  As Ryu himself alleges in support

of the Breach Counterclaim, that agreement provides that if the Bank is "uncertain

regarding the legality of any transaction, we may . . . freeze the amount in question while

we investigate further."  (ECF No. 111 at 30; ECF No. 255 at 21; *see also* ECF No. 257-7

at 27–28 (the relevant portion of the account agreement).)  In addition, the Bank argues

that part of the delay in releasing Ryu's account funds was attributable to the fact that

discovery had been stayed in this action from February 2015 through June 2015 pending

the disposition of Chon's criminal matter.  (ECF No. 263 at 21.)  Also, the General

Counsel for the Bank pointed out that it was difficult to try to trace the origin of the funds

in Ryu's account, as "[m]oney can be layered to go through multiple accounts,"

particularly in view of Ryu's banking expertise.  (ECF No. 256-14 at 4.)

The Court concludes that genuine issues of triable fact remain as to whether the

Bank acted appropriately in exercising its authority to freeze Ryu's account when the

Bank suspected that the funds contained therein originated from the alleged

embezzlement scheme.  For example, there is a triable issue of fact as to whether the

Bank should have frozen Ryu's account based on Chon's statements that Ryu was

involved in the scheme, and based on the Bank's belief that Ryu needed funds because

Ryu suffered from tremendous personal debt and that he had been seeking personal loans

from other employees.  (ECF No. 265 at 17.)  Furthermore, as the Court has held

concerning the resolution of the Computer Conversion Claims, it appears that the

resolution of the Breach Counterclaim could be dependent upon the resolution of the

Embezzlement Claims.  Therefore, the part of Ryu's motion wherein he seeks summary

judgment on the Breach Counterclaim is denied.

## III.    CONCLUSION

Ryu's motion for summary judgment is denied, as there are triable issues of fact

concerning the Embezzlement Claims, the Computer Conversion Claims, and the Breach

Counterclaim.  The Court will enter an appropriate Order.


Date:  March _____ 11 _____ , 2019

JOSE L. LINARES
Chief Judge, United States District Court

# EXHIBIT 9

Michael M. Yi
LEE ANAV CHUNG WHITE
KIM RUGER & RICHTER LLP
99 Madison Avenue, 8th Floor
New York, New York 10016
Telephone:  (212) 271-0664
Facsimile:  (212) 271-0665
E-mail:  michaelyi@lacwkrr.com

*Attorneys for Plaintiff/Counterclaim-*
*Defendant Bank of Hope and*
*Third-Party Defendant Lisa Pai*

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

-------------------------------------------------------------------X

BANK OF HOPE, as successor to Wilshire Bank,                ECF CASE

                     Plaintiff,                 2:14-CV-01770-JLL-JAD

     v.                                                    Motion Day:  April 15, 2019

MIYE CHON, a/k/a Karen Chon, SUK JOON
RYU, a/k/a James S. Ryu, TAE JONG KIM,
BERGENFIELD BAGEL & CAFÉ INC., d/b/a
Café Clair, MAYWOOD BAGEL INC., UB'S
PIZZA & BAGEL INC., UB'S BAGEL & CAFÉ
INC., and UBK BAGELS CORP., d/b/a Franklin
Bagels & Café,

                     Defendants.

-------------------------------------------------------------------X

SUK JOON RYU, a/k/a James S. Ryu,

                     Counterclaim-Plaintiff,

     v.

BANK OF HOPE, as successor to Wilshire Bank,

                     Counterclaim-Defendant.

-------------------------------------------------------------------X

SUK JOON RYU, a/k/a James S. Ryu,

                     Third-Party Plaintiff,

v.

LISA PAI,

Third-Party Defendant.

-------------------------------------------------------------------X

SUK JOON RYU, a/k/a James S. Ryu,

Cross-claim Plaintiff,

v.

MIYE CHON, a/k/a Karen Chon, TAE JONG KIM,
BERGENFIELD BAGEL & CAFÉ INC., d/b/a Café
Clair, MAYWOOD BAGEL INC., UB'S PIZZA &
BAGEL INC., UB'S BAGEL & CAFÉ INC., and
UBK BAGELS CORP., d/b/a Franklin Bagels &
Café,

Cross-claim Defendants.

-------------------------------------------------------------------X

## PLAINTIFF/COUNTERCLAIM-DEFENDANT
## BANK OF HOPE'S MEMORANDUM OF LAW IN SUPPORT
## OF ITS MOTION TO DISMISS ITS CLAIMS FOR RELIEF
## AGAINST DEFENDANT/COUNTERCLAIM-PLAINTIFF SUK JOON RYU

ii

# Table of Contents

Table of Authorities ................................................................................................ iii

Preliminary Statement ............................................................................................. 1

Factual and Procedural Background ....................................................................... 1

Argument .................................................................................................................. 1

     LEGAL STANDARD ........................................................................................ 1

I.     THIS COURT SHOULD PERMIT BANK OF HOPE
       TO VOLUNTARILY DISMISS, WITH PREJUDICE,
       ITS CLAIMS FOR RELIEF AGAINST SUK JOON RYU ................................... 2

       A.     Voluntary Dismissal With Prejudice Should Be Granted
             Because There Is No Potential Prejudice To Ryu ........................................ 2

       B.     Nor Would Ryu Be Prejudiced Under The Higher
             Standard Of Voluntary Dismissal *Without* Prejudice ................................. 4

Conclusion .............................................................................................................. 7

### <u>Table of Authorities</u>

**Cases**                                                                                           Pages

*Hayden v. Westfield Ins. Co.*
586 F. App'x 835 (3d Cir. 2014) ........................................................................1, 2

*Kean v. Adler*
65 F. App'x 408 (3d Cir. 2003) .................................................................................6

*Ockert v. Union Barge Line Corp.*
190 F.2d 303 (3d Cir. 1951) ......................................................................................2

*Sypniewski v. Warren Hills Reg'l Bd. of Educ.*
CIVIL NO. 01-3061 (TJB), 2006 U.S. Dist. LEXIS 3543 (D.N.J. Jan. 25, 2006)........................3

*Tracy v. Boardwalk Regency Corp.*
No. 10-1381 (JBS/AMD), 2011 U.S. Dist. LEXIS 88013 (D.N.J. Aug. 8, 2011)......................2, 4

*Williamson v. Daiichi Sankyo, Inc.*
Civil Action No: 1:16-CV-05371; Master Docket No. 15-2606 (RBK/JS),
2017 U.S. Dist. LEXIS 77191 (D.N.J. May 22, 2017) .................................................4

**Statutes**                                                                                        Pages

Fed. R. Civ. P. 41(a)(1)..............................................................................................1

Fed. R. Civ. P. 42(a)(2)..........................................................................................1, 2

## Preliminary Statement

Plaintiff/counterclaim-defendant Bank of Hope ("Bank of Hope") brings this motion for the Court's permission to voluntarily dismiss *with prejudice* all of its claims against defendant/counterclaim-plaintiff Suk Joon Ryu ("Ryu"). This motion is made necessary because Bank of Hope and Ryu have been unable to agree on the terms of the stipulation for such dismissal. As explained in the accompanying declarations, Bank of Hope seeks such dismissal at this time because of the recent developments in a related civil action, pending in the United States District Court for the Southern District of New York, which have caused Bank of Hope to incur costs that will soon exceed the amount it has sought to recover in this action.

## Factual and Procedural Background

The pertinent facts and procedural background are set forth in the accompanying declarations of Lisa K. Pai, Esq. ("Pai Decl."), dated March 21, 2019, and Michael M. Yi, Esq. ("Yi Decl."), dated March 22, 2019.

## Argument

## LEGAL STANDARD

"[A]n action may be dismissed at the plaintiff's request only by court order, on terms that the court considers proper," Fed. R. Civ. P. 41(a)(2), except that the parties also may enter into a stipulation with the defendant without a court order, Fed. R. Civ. P. 41(a)(1). Where a defendant has asserted a counterclaim, "the action may be dismissed over the defendant's objection only if the counterclaim can remain pending for independent adjudication." Fed. R. Civ. P. 41(a)(2).

Voluntary dismissals are favored by the courts. *See Hayden v. Westfield Ins. Co.*, 586 F. App'x 835, 842 (3d Cir. 2014) ("Rule 41 motions should be allowed unless [the] defendant will

suffer some prejudice other than the mere prospect of a second lawsuit") (quoting *In re Paoli R.R. Yard P.C.B. Litig.*, 916 F.2d 829, 863 (3d Cir. 1990)).  Even with potential prejudice to the defendant, dismissal may be granted if the court "impose[s] curative conditions."  *Tracy v. Boardwalk Regency Corp.*, No. 10-1381 (JBS/AMD), 2011 U.S. Dist. LEXIS 88013, at *3 (D.N.J. Aug. 8, 2011) (internal citation omitted).

## I.

### THIS COURT SHOULD PERMIT BANK OF HOPE TO VOLUNTARILY DISMISS, WITH PREJUDICE, <u>ITS CLAIMS FOR RELIEF AGAINST SUK JOON RYU</u>

Bank of Hope, pursuant to Fed. R. Civ. P. 42(a)(2), seeks an order permitting it to voluntarily dismiss, with prejudice, all its claims for relief against Ryu set forth in the *Amended Complaint*, dated July 11, 2016.  Typically, a plaintiff seeking to dismiss its claims against a defendant with prejudice would not need to invoke Rule 42(a)(2), but would enter into a stipulation with the defendant.  Bank of Hope and Ryu have attempted to stipulate to a voluntary dismissal, but could not agree on the terms. Pai Decl., ¶ 2; Yi Decl., ¶¶ 3-5.

For the reasons below, Bank of Hope's motion to voluntarily dismiss, with prejudice, its claims against Ryu should be granted.

**A.    Voluntary Dismissal With Prejudice Should Be Granted**
<u>      **Because There Is No Potential Prejudice To Ryu**      </u>

In deciding a motion under Fed. R. Civ. P. 41(a)(2), courts are concerned primarily with the risk of future litigation of the claims to be dismissed.  *See Hayden v. Westfield Ins. Co.*, 586 F. App'x 835, 842 (3d Cir. 2014) ("Chief among the factors to consider [] are the extent to which litigation has progressed and the extent to which the defendant will be exposed to new litigation in another forum") (citing *Ferguson v. Eakle*, 492 F.2d 26, 28-29 (3d Cir. 1974); *Ockert v. Union Barge Line Corp.*, 190 F.2d 303, 304 (3d Cir. 1951); *see also Tracy v.*

2

*Boardwalk Regency Corp.*, No. 10-1381 (JBS/AMD), 2011 U.S. Dist. LEXIS 88013, at \*4

(D.N.J. Aug. 8, 2011) (dismissal of claims with prejudice would provide "finality" necessary to

prevent potential prejudice to defendant). For dismissals with prejudice, that concern is not

present.

When, as here, the plaintiff seeks dismissal with prejudice, "a court lacks the discretion

to deny a motion under Fed. R. Civ. P. 41(a)(2)." *Sypniewski v. Warren Hills Reg'l Bd. of*

*Educ.*, CIVIL NO. 01-3061 (TJB), 2006 U.S. Dist. LEXIS 3543, at \*12 (D.N.J. Jan. 25, 2006)

(internal citations omitted). On such a motion, denial "may constitute an abuse of discretion."

*Id.* at \*14 (internal citation omitted).

Bank of Hope seeks to dismiss its claims against Ryu in this action in light of the recent

developments in the related civil action (the "Advancement Action") commenced by Ryu in

February, 2018 against Hope Bancorp, Inc. ("Hope Bancorp"), Bank of Hope's holding

company, seeking advancement of attorneys' fees allegedly incurred in connection with the

Government Investigation[1], this action, and the Advancement Action. Pai Decl., ¶¶ 3, 5; Yi

Decl., ¶¶ 3, 6-8. As a result of such developments, Bank of Hope has determined that it is no

longer economically sensible to continue to litigate its claims against Ryu. Pai Decl., ¶ 8; Yi

Decl., ¶¶ 25, 30-31.

By granting Bank of Hope's motion, the Court would provide Ryu what he seeks in his

defense against those claims—no finding of wrongdoing, no financial liability for the claims

against him, and no risk of future litigation on the same claims. Thus, dismissal of its claims

against Ryu, with prejudice, is appropriate.

---

[1] The "Government Investigation" refers to the Federal Bureau of Investigation and the Office
of the United States Attorney for the District of New Jersey's investigation of the
Embezzlement. Pai Decl., n.1.

**B.  Nor Would Ryu Be Prejudiced Under The Higher
    <u>Standard Of Voluntary Dismissal *Without* Prejudice</u>**

Nor would a voluntary dismissal prejudice Ryu under the traditional factors governing

voluntary dismissal without prejudice.  Indeed, Bank of Hope would satisfy even the *higher*

standard of dismissal *without* prejudice.  It is well-settled that:

> [I]n deciding a Rule 41(a)(2) motion, a court must examine the
> prejudice to the defendant, both in terms of legal prejudice and
> litigation expense . . . and consider:
>
> (1)  the excessive and duplicative expense of a second
>      litigation;
> (2)  the effort and expense incurred by defendants in
>      preparing for trial;
> (3)  the extent to which the current suit has progressed;
> (4)  plaintiffs' diligence in bringing the motion to
>      dismiss and the rationale for it; and
> (5)  the pendency of a dispositive motion by the non-
>      moving party.

*Williamson v. Daiichi Sankyo, Inc.*, Civil Action No: 1:16-CV-05371; Master Docket No. 15-

2606 (RBK/JS), 2017 U.S. Dist. LEXIS 77191, at *253 (D.N.J. May 22, 2017) (internal

citations and quotation marks omitted).

Bank of Hope satisfies each of these five factors.

*First:*  There is no concern of excessive or duplicative expense of a second litigation of

Bank of Hope's claims against Ryu.  Bank of Hope seeks dismissal of all of its claims against

Ryu with prejudice and will not reassert those claims in the future.  Pai Decl., ¶ 2; Yi Decl., ¶ 2.

*See Tracy v. Boardwalk Regency Corp.*, Civil No. 10-1381 (JBS/AMD), 2011 U.S. Dist. LEXIS

88013, at *3 (D.N.J. Aug. 8, 2011) (that dismissal is with prejudice would cure any potential

prejudice to the defendant).

*Second:*  The parties have not yet prepared for trial.  In an *Opinion*, dated March 11,

2019 (the "Opinion"), this Court denied Ryu's motion for summary judgment in its entirety.  Yi

4

Decl., ¶ 28.  A final pre-trial conference is currently scheduled for May 29, 2019.  *Id.* at ¶ 29.

*Third:*  While the progress in this case has been significant, much work remains prior to trial.  For example, in the Opinion, the Court identified several issues of fact which, in turn, would largely depend on the testimony of approximately 15 witnesses.  ECF No. 283.  Moreover, the credibility of the witnesses would be at issue, particularly defendant Miye Chon, whose statements span a government criminal investigation, the bank's internal investigation, and depositions taken over the course of three days.  *Id.*  Dismissal now would spare the parties and the Court such work.

*Fourth:*  Bank of Hope has been diligent in seeking the present motion and has good reason to do so.  As set forth in the accompanying Pai and Yi declarations, as a result of the recent developments in the Advancement Action, Hope Bancorp has been required to advance to the four different law firms that have represented Ryu in this action and the Advancement Action a total of $559,863.64.[2]  Pai Decl., ¶ 7; Yi Decl., ¶ 24.  In light of such outcome, Hope Bancorp—in an effort to mitigate its litigation costs (including the on-going monthly advancements to Ryu's attorneys)—voluntarily withdrew its appeal of the district court's September 2018 order.[3]  Pai Decl., ¶ 8; Yi Decl., ¶ 25.  In connection with such withdrawal, Hope Bancorp was required to advance to Ryu's attorneys an additional $755,583.23.  Pai

---

[2] The four law firms are Tressler LLP, Law Office of Jungsup Kim LLC, Steve Harvey Law LLC, and Greenberg Freeman LLP.  Steve Harvey Law LLC remains Ryu's counsel of record in this action.  That law firm and Greenberg Freeman LLP remain Ryu's counsel of record in the Advancement Action.  Pai Decl., n.2.

[3] Had Hope Bancorp not done so, Ryu's counsel would have continued to bill for opposing the appeal.  Indeed, despite Hope Bancorp's voluntary withdrawal of its appeal, Ryu is continuing his cross-appeal, seeking to recover additional advancement in excess of $500,000, and his attorneys are continuing to bill Hope Bancorp for that cross-appeal.  Pai Decl., n.3.; Yi Decl., ¶¶ 26, 30-31.

Decl., ¶ 8; Yi Decl., ¶ 25.

Thus, to date, Hope Bancorp has had to advance to Ryu's attorneys a total of $1,315,446.87.[4]  Pai Decl., ¶ 9; Yi Decl., ¶ 30.  And Hope Bancorp will have to continue to make monthly advancements to Ryu's attorneys for this action and the Advancement Action, as well as Ryu's cross-appeal to the Second Circuit.  Pai Decl., ¶ 9; Yi Decl., ¶ 30.  Under the circumstances, Bank of Hope believes that it is in its best interest to voluntarily dismiss its claims against Ryu at this time and attempt to further mitigate its litigation costs.  Pai Decl., ¶ 9; Yi Decl., ¶¶ 30-31.

*Fifth:* There is no dispositive motion pending by Ryu. This Court denied his motion for summary judgment. Yi Decl., ¶ 28.  With respect to Bank of Hope's claims against him, they must be resolved by trial or on the present motion. Ryu's counterclaims would remain pending for independent adjudication.  ECF No. 283.

It is important to note that Bank of Hope's opposition to Ryu's motion for summary judgment is consistent with its efforts now to dismiss its claims against him with prejudice. Bank of Hope continues to believe that its claims (and defenses) are meritorious, and that, if tried, it would prevail on them.  Pai Decl., ¶ 9; Yi Decl., ¶ 25.  Indeed, the Court's opinion recognized that there remain genuine issues of fact, and that the jury could ultimately rule in Bank of Hope's favor. ECF No. 283. That is important—Bank of Hope maintains that its claims against Ryu have merit, and that its actions which give rise to Ryu's counterclaims were appropriate. Pai Decl., ¶ 9; Yi Decl., ¶ 25.

Voluntary dismissal is a "procedural ruling[], not final judgment[] on the merits." *Kean v. Adler*, 65 F. App'x 408, 415 (3d Cir. 2003).  It has the same effect, for example, as a

---

[4] By contrast, the amount Bank of Hope has sought to recover from defendants in this action is approximately $1.4 million. Pai Decl., n.4.

6

stipulation to settle a case, with prejudice, and without any admission of liability. Rather than reflect a changed view of the merits, the present motion results from the now-increased costs to litigate this case—a direct result of recent developments in the Advancement Action. Pai Decl., ¶ 9; Yi Decl., ¶¶ 30-31. Confronted with that new economic reality, Bank of Hope, rather than further expend its own resources—or the resources of this Court—believes it would be prudent to voluntarily dismiss its claims before any more work is required. Pai Decl., ¶ 9; Yi Decl., ¶¶ 30-31.

## Conclusion

For the foregoing reasons, Bank of Hope's motion to voluntarily dismiss its claims for relief against defendant Suk Joon Ryu should be granted.

Dated: New York, New York
       March 22, 2019

Respectfully submitted,

LEE ANAV CHUNG WHITE
KIM RUGER & RICHTER LLP

By:
        Michael M. Yi

99 Madison Avenue, 8th Floor
New York, New York 10016
(212) 271-0664

*Attorneys for Plaintiff/Counterclaim-
Defendant Bank of Hope and
Third-Party Defendant Lisa Pai*

7

# EXHIBIT 10

**NOT FOR PUBLICATION**

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

|  |  |  |
|---|---|---|
| BANK OF HOPE, | : | CIVIL ACTION NO. 14-1770 (JLL) |
| Plaintiff, | : | **ORDER** |
| v. | : | |
| MIYE CHON, *et al.*, | : | |
| Defendants. | : | |
| ———————————— | : | |
| SUK JOON RYU, | : | |
| Counterclaim Plaintiff, | : | |
| v. | : | |
| BANK OF HOPE, | : | |
| Counterclaim Defendant. | : | |
| ———————————— | : | |
| SUK JOON RYU, | : | |
| Third-Party Plaintiff, | : | |
| v. | : | |
| LISA PAI, | : | |
| Third-Party Defendant. | : | |
| ———————————— | : | |

|  | : |
| SUK JOON RYU, | : |
|  | : |
|     Cross-Claim Plaintiff, | : |
|  | : |
|     v. | : |
|  | : |
| MIYE CHON, *et al.*, | : |
|  | : |
|     Cross-Claim Defendants. | : |

THIS MATTER having come before this Court on the motion (hereinafter, "the Motion") brought by Bank of Hope in its capacity as the plaintiff pursuant to Federal Rule of Civil Procedure 41(a)(2) for an order permitting Bank of Hope to voluntarily dismiss with prejudice all of its claims for relief that are asserted against Suk Joon Ryu in his capacity as a defendant that are set forth in the Amended Complaint dated July 11, 2016 (ECF No. 285 through ECF No. 285-2; ECF No. 286; ECF No. 287 through ECF No. 287-2; ECF No. 288); and Suk Joon Ryu responding to the Motion (ECF No. 290; ECF No. 290-1; ECF No. 291); and as part of that response, Suk Joon Ryu stating that "[he] does not oppose and supports the dismissal with prejudice of Bank of Hope's claims against him," and that "[h]e welcomes it" (ECF No. 290 at 3); but Suk Joon Ryu also seeking to clarify that even though he does not oppose the Motion, the following claims remain pending: (a) his counterclaims that are asserted against Bank of Hope, (b) Bank of Hope's claims that are asserted against certain other defendants, and (c) his

cross-claims that are asserted against certain other parties to this action (*id.* at 5); and the Court, with the acknowledgment of Suk Joon Ryu's clarification, intending to grant the Motion; and for good cause shown:

**IT IS** on this ___*10th*___ day of April, 2019, **ORDERED** that the motion by Bank of Hope in its capacity as the plaintiff pursuant to Federal Rule of Civil Procedure 41(a)(2) for an order permitting the voluntary dismissal with prejudice of all of its claims for relief that are asserted against Suk Joon Ryu in his capacity as a defendant that are set forth in the Amended Complaint **(ECF No. 285)** is **GRANTED**; and it is further

**ORDERED** that Bank of Hope's Thirteenth Claim For Relief through Nineteenth Claim For Relief in the Amended Complaint, all of which are asserted against Suk Joon Ryu is his capacity as a defendant herein (ECF No. 92), are **VOLUNTARILY DISMISSED WITH PREJUDICE**; and it is further

**ORDERED** that the Clerk of the Court will designate as terminated only the part of the action that has been brought by Bank of Hope in its capacity as the plaintiff against Suk Joon Ryu in his capacity as a defendant.

**JOSE L. LINARES**
Chief Judge, United States District Court

3