# EXHIBIT 10

CONFIDENTIAL

This is the status of the East Fort Lee Investigation as of 9:00 AM PST on March 28, 2014.

On January 24, 2014, Orest Hamersky, Internal Audit Manager, was asked to join Alicia Lee, Operations Administration Manager, and assist in the investigation of unauthorized certificate of deposit (CD) withdrawals conducted by Miye (Karen) Chon, former BankAsiana Operations Officer at the East Fort Lee Branch in New Jersey. Orest joined the investigation on January 26.

The embezzlement was detected when former BankAsiana customer ▮▮▮▮▮ came to one of the former BankAsiana branches and inquired why the account numbers in the recently issued 1099-INT's did not match his records and why he did not receive a 1099-INT for one of his CD's. The reason for the account number differences was that the 1099-INT's contained converted account numbers rather than the BankAsiana account numbers which he was familiar with.

At the time of Orest's arrival, the number of accounts which had unauthorized withdrawal activity totaled 19 and the estimated loss exposure to the Bank was $1,679,085. Unauthorized withdrawals were posted to the accounts of the following customers: ▮▮▮▮ (age 37), ▮▮▮▮ (age 95), ▮▮▮▮ (age 84), ▮▮▮ (age 87), ▮▮▮ (age 90), ▮▮▮▮ (age 80), and ▮▮▮▮ (age 73). It does not appear that any of the above customers are aware of the unauthorized transactions on their CD's.

The initial investigation which revealed $1,210,972 in unauthorized withdrawals was performed by Bo-Young Lee, Home Loan Coordinator, and Irene Lee, Operations Administration Officer, both former BankAsiana employees retained by Wilshire Bank (WB) located at the South Palisades operations center. The investigation was hampered by the fact that the transactions had to be researched on the BankAsiana deposit system (Jack Henry) and the fact that some of the account history had been purged. Since the account history of ▮▮▮ had been purged, Irene found an alternate method through Synergy to identity that customer's unauthorized withdrawals. In addition, Irene is alleged to be a close friend of Karen. Irene has since submitted her resignation due to the strain of the events. Bo-Young's and Irene's investigation centered on reviewing manual postings to General Ledger Account # ▮▮ ▮0101 (Currency & Coins) aka Vault Cash.

When Irene discovered the irregularities in vault cash she contacted Karen for an explanation. Karen requested a meeting with both Bo-Young and Irene which was held on January 22. In that meeting, she confessed stealing money from BankAsiana for years. Karen had been one of the original employees of the bank when it was founded in 2006. Karen also indicated that she funneled some of the misappropriated funds into her husband's business accounts and had forged his signature on checks. Her husband, Tae Kim, has several business accounts for his various bagel shops. Her husband's alleged partner, ▮▮▮▮, was the first victim of the unauthorized withdrawals. The number of checks forged by Karen on that account alone are numerous. Her husband signed checks on that account even though his name was not on the signature card and she even forged his signature on checks. In fact, it is believed that not only she forged signatures on checks but that she forged her husband's and her husband's partner's signatures on 6 of 9 signature cards. Karen's forgeries are easily recognizable not so much in the signature but rather in the way she dated the checks. She always used a dot instead of a slash or hyphen to separate the day from the month from the year when dating checks. On January 23, Alicia, as well as Bo-Young, and Irene met again with Karen at which time she again confessed to the

1



WB810

CONFIDENTIAL

crime and alleged that Suk Joon (James) Ryu, former BankAsiana Chief Operating Officer, was also involved in the embezzlement. She alleged that sometimes she delivered the stolen cash to him and at other times he came to the East Fort Lee Branch to pick up the cash.

With the assistance of Jake Seo, Chief Information Officer, Alicia's investigation centered on reviewing CD withdrawals posted by Karen (user id ▮▮▮▮▮▮▮▮). The report generated by Jake totaled $3.2 million in CD account transactions which were posted by Karen from January 2010 – October 2003 and which was the basis of Alicia's high-end loss exposure reported in her memo dated January 23. Using that report, Alicia had to differentiate legitimate transactions from illegitimate transactions. Alicia's persistence led to further discoveries such as checks payable to New Millennium Bank and an employee loan to James. It is alleged that James is an employee of New Millennium Bank and that Hong Sik Hur, former BankAsiana Chief Executive Officer, also has an interest in the Bank. Discussion with Jennie Han, Human Resource Manager, revealed that Karen was a former WB employee, acquired in the Liberty Bank of New York merger in 2006. At that time, Karen left the Bank through maternity leave under a cloud of suspicion since she and/or her employees had several cash shortages, of which $10,000 was the largest. The Bank engaged CliftonLarsonAllen (CLA) to perform a forensics investigation. On January 27, Kanzaz Nguyen, Senior Manager, flew to New Jersey to join the investigation. Among other things, her role was to obtain the hard drives of the desktops and/or laptops of Karen, James, and Hong. Upon questioning Eunmoo Choi, MIS Manager, on January 28 and hearing various conflicting versions, it became abundantly clear that the control and security of desktops and laptops was non-existent. It appears that Hong took his desktop home sometime after the merger and that James also took the laptop and his desktop home which he alleged to be his own personal computer which he brought to the Bank. Kanzaz was able to image the hard drive on Karen's desktop and certain other unidentified hard drives that Eunmoo retained after employees left the bank. The search for the desktops and/or laptops resulted in reintroducing an issue that Eunmoo allegedly brought up with BankAsiana's senior management including Hong, James, Frank Gleeson, BankAsiana's former Chief Financial Officer, and briefly with WB management. Eunmoo, who was hired in January 2013, had concerns regarding BankAsiana's hardware and software vendor, F-One Communication owned by Paul Eom. Paul allegedly requesting payment in advance for purchases and did not always deliver the products. Whether BankAsiana senior management was no longer concerned with their assets when negotiating the merger with WB is unknown but the fact remains that control of the Bank's # 2 asset was non-existent. On January 29, Lisa Pai, Chief Legal and Human Resources Officer, requested that Orest include review of the F-One Communication invoices as part of his review. Of the 174 invoices paid to F-One Communication from 2007 – 2013, 28 were missing. Most of the missing invoices were paid in 2009 and 2010. It was suggested by both Eunmoo and Bo-Young that perhaps these invoices were requested by auditors in their annual reviews and they were returned in a separate file whose whereabouts are unknown. In addition, a $300 payment was made to the vendor for "Paul's yearend and congratulatory grant for a new baby" which was obviously not supported by an invoice. A review of the accounts payable files supporting the disbursements to F-One Communication revealed none of the transactions were supported by a purchase requisition authorizing the purchase of the hardware; none of the transactions were supported by a purchase order committing the vendor to supply the product at an agreed-upon price and time; and none of the transactions were supported by a packing slip documenting the receipt of the products. In other words, procurement controls were non-existent too.

WB811

CONFIDENTIAL

On January 29, Joel DeCapua, Special Agent of the FBI called Alicia to schedule an appointment to discuss the crime. That evening Alicia, Orest, Joel, and Carl, another Special Agent, met at the DoubleTree Hotel at Fort Lee and discussed the crime for 1.5 hours. Joel indicated that he will forward the case to the district attorney and indicated that he has seen them act within a range of 2 days to 2 years depending on circumstances such as workload, flight risk, etc. Joel expressed an interest to move on it immediately.

On February 4, Wilshire Bank and Wilshire Bancorp were served a subpoena to produce documents regarding the embezzlement by February 24. On February 5, Lisa, Jake, Alicia, Thomas Ng, Chief Risk Officer, Alix Nam, BSA Manager, Dom Tallerico, Chief Internal Auditor, and Orest met to discuss responsibilities for complying with the subpoena. Among other topics discussed in the meeting was that Alicia recorded Karen's confession of January 23 on her cell phone. The recording is poor but still could be used as evidence as long as New Jersey Law does not require prior notification of the taping. It was also learned that when Karen was a former WB employee through the Liberty Bank of New York merger and experienced the $10,000 cash shortage that branch employees searched her purse and found $4,000 in cash. She was not terminated and arrested for the cash shortage due to lack of sufficient evidence.

On February 7, a letter written by Michael Yi of the New York City law firm Lee, Anav, Chung, White & Kim LLP (outside legal counsel) was mailed via FedEx to James Ryu demanding return of the desktop, laptop, and severance payment. On February 7, CLA through a conference call updated WB on their progress of the forensics investigation. Present in Lisa's office were Alicia, Dom, and Orest. Present telephonically were Michael, John Taylor, Chairman of WSB Audit Committee, and the following CLA employees: Ron Durkin, Principal, Brian Lopez, Director, Kristine Tse, Manager of Valuation and Forensics Services, and Kanzaz. Among other topics discussed, CLA produced a spreadsheet listing possible unauthorized transactions totaling > $2.8 million which they believed to be over and beyond the $1.6 million already identified by Alicia. Orest subsequently reconciled all 82 transactions on the spreadsheet to the report run by Jake for Alicia. 59 transactions were recorded in Jake's report which Alicia reviewed; 16 transactions were < $3,000 which appear to be below the threshold of Jake's report and are considered immaterial for this investigation; leaving 7 close-outs of CD's which did not appear on Jake's report. Orest reviewed the 7 close-out transactions and determined 6 to be legitimate but has concerns about the 7th for $214,096.45 which will be discussed later.

Lisa flew to New Jersey the week of February 9. While there, she and the Bank's outside counsel met with James. James denied any involvement in the embezzlement and also indicated that he had met with Karen twice, both at her request. During their second meeting, she told him that she is trying to raise money to pay the Bank back and asked if he could help her. He said that he might consider helping her financially as long as she clears his name, since he was not involved in the embezzlement. He apparently made a recording of their conversation during the second meeting and told Lisa that he would send her a copy, but she has not received it. Lisa also interviewed Karen who said that she did not think that the total amount embezzled could exceed $1.2 million. She also told Lisa about the meetings with James and said that James had expressed his willingness to help her financially on the condition that she clear up his name by telling the Bank that she had originally lied about his involvement. Subsequent to the interviews, both James and Hong returned their desktops to WB. James also returned the laptop. CLA obtained the hard drives for both desktops and is currently

3

CONFIDENTIAL

extracting and analyzing the data. Back in Los Angeles, while searching through e-mails on Karen's computer, Kristine discovered a $160,000 SBA loan to ▉▉▉▉▉, one of Karen's husband's businesses. In reviewing the loan history, there were 4 large principal paydowns of $20,000 on 01/09/12; $18,000 on 08/02/13, of which $2,000 was cash; $11,000 on 08/15/13; and $12,500 on 08/20/13. Kristine surmised that the source of the principal paydowns may have been the following withdrawals from ▉▉▉▉▉'s and ▉▉▉'s accounts: 01/06/12 for $60,000; 07/29/13 for $60,000; and 08/12/13 for $50,000. The 10-year loan was paid off 7 years early on 08/26/13 with a principal payoff of $63,111.84. Orest determined the source of the payoff to be funds from Checking Account ▉▉▉2354 (▉▉▉▉▉). On 08/23/13, $63,646.97 was transferred to the account from CD Account ▉▉▉9590 (▉▉▉▉▉). The CD account was opened on 04/04/11 for $60,000 and was closed on 08/23/13. The source of the opening of the CD account is unknown because the data is unavailable on 4sight, most likely purged.

An asset search performed on James and Karen by Sovereign Investigations on February 14 revealed James maintains a checking account at JPMorgan Chase totaling almost $150,000 and Karen is a principal of a Japanese restaurant in Brooklyn whose property value alone has appreciated $536,000 since 1998 but the property is owned by Paula Nicole Inc.

On February 21, Orest provided Lisa a 1-page summary of the loss; 3-page audit trail of the embezzled funds; and 2 binders of documentation supporting each unauthorized transaction and all documents believed to be forged by Karen in time for the subpoena deadline of February 24. The original loss projection ($1,679,085) in the prior narrative has been reduced to $1,575,754 due to duplicate transactions or unauthorized transactions credited to another account of the customer. As stated earlier, Orest is concerned about a 7th CD close-out transaction for $214,096.45 on 10/01/13 found on CLA's spreadsheet. The withdrawal was from CD ▉▉▉0094 (▉▉▉▉▉) who is Karen's husband's business partner. This is the 1st account that Karen stole from. On 10/01/13 this account was closed and the funds were transferred to Account ▉▉▉0330 (▉▉▉▉▉). This account was closed on 10/03/13 with a $217,807.31 check payable to ▉▉▉▉▉ and deposited at JPMorgan Chase. The close-out of the 1st account was posted by Karen and it is believed the check closing the 2nd account was forged by Karen. Internal Audit mailed a confirmation letter to ▉▉▉▉▉ confirming both transactions on 02/28/14. A second request was mailed on 03/10/14 and a third request was mailed on 03/17/14. On March 24, 2014, Internal Audit received the confirmation (second request) back from the customer confirming both transactions. Also, in preparing the documentation for the subpoena, all transactions with the exception of 1 were posted by Karen. On 12/15/11, the $3,000 transfer from Account ▉▉▉1307 (▉▉▉▉▉), one of Karen's husband's business account, to Account ▉▉▉0381 (Karen Chon) was posted by Jenna Lee (Chung) who is now employed by the SBA Department in the Eastern Region. This was an unauthorized transaction since Karen is not a signer on the account. We believe 239 financial transactions totaling $452,569.94 were forged by Karen and another 241 financial transactions totaling $255,113.77 were either signed by her husband (▉) who is not an authorized signer on the account or were signed by Karen who forged her husband's signature.

A review was also performed of the activity on Karen's, James's, and ▉▉▉'s BankAsiana and WB converted accounts to determine whether James and ▉▉▉ also benefited from the embezzlement. A review of Karen's account revealed that 281 cash deposits totaling $157,325 were posted into her checking account from March 2010 – September 2013 by an employee who earned $52,999. This alone

CONFIDENTIAL

should have been a red flag in BankAsiana's BSA monitoring system. On 10/27/10 she obtained a ▮▮▮▮ employee loan. On 08/12/13, there was a ▮▮▮▮ principal pay down; on 08/20/13, there was a ▮▮▮▮ principal pay down of which ▮▮▮▮ was paid in cash, and on 08/23/13 the principal balance was paid off early for ▮▮▮▮. On 11/04/10, Karen obtained a 401K loan for $▮▮▮▮. ▮▮▮▮ of ▮▮▮▮; ▮▮▮▮ (2); ▮▮▮▮; ▮▮▮▮; and ▮▮▮▮ drawn on her JPMorgan Chase checking account were deposited in her BankAsiana checking account and ▮▮▮▮ of ▮▮▮▮; ▮▮▮▮; and ▮▮▮▮ drawn on her BankAsiana checking account were deposited in her JPMorgan Chase checking account. On 04/07/11, 2 checks for ▮▮▮▮ and 2 checks for ▮▮▮▮ drawn on her BankAsiana checking account were paid to the US Department of Homeland Security Citizens & Immigration Services. 2 checks of $▮▮▮▮ and $▮▮▮▮ drawn on her BankAsiana checking account were paid to a dentist and ▮▮▮▮ and $▮▮▮▮ payments to Gap were also observed.

A review of James's account revealed an apparent $15,000 loan from ▮▮▮▮▮▮▮▮ on 05/13/10 which appeared to be paid back on 01/13/12 by an apparent $18,000 loan from ▮▮▮▮▮▮▮▮ which appeared to be paid back in $1,500 monthly installments ending on 01/15/13. ▮▮▮▮▮▮▮▮, an alleged hard-money lender, is the signer on the ▮▮▮▮▮▮▮▮ account at BankAsiana. The review also revealed a $25,000 personal loan from BankAsiana on 10/15/10 which was paid off on 10/18/13 and a $30,900 401K loan for financial hardship originated in October 2009. Payments of $549 on the 401K loan were observed in October and December 2013. A $1,500 check drawn on his BankAsiana checking account was paid to ▮▮▮ on 12/20/12. On 12/18/13 and 01/09/14, there were check deposits of $6,667 and $3,722 and $6,667 and $1,500, respectively, into his BankAsiana checking account. The checks were written by Windels, Marx, Lane & Mittendorf for "salary/expenses New Millennium Bank and business, tolls, gas, allowance". On 02/03/14, he received a $40,030 incoming wire from Charles Pak into his BankAsiana checking account.

A review of ▮▮▮▮'s accounts revealed ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

A review of ▮▮▮▮ BankAsiana account revealed ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

A review of ▮▮▮▮▮▮▮▮'s (▮▮▮▮'s company) accounts revealed a $25,000 check deposit on 12/29/11 written by James drawn on Royal Asian Bank. In the memo line of the check it indicated "918,500". This may be significant because in James's $1,500 repayments of his $18,000 loan to ▮▮▮▮ he kept track of the loan balance on the memo line of each check he wrote to ▮▮▮▮ ▮▮▮▮▮▮▮▮ In other words, James may have owed a hard-money lender close to $1 million. Also, on 08/16/10, ▮▮▮▮ withdrew $13,450 in cash from 2 different BankAsiana accounts in amounts of

5

WB814

CONFIDENTIAL

$8,000; $2,000; $1,750; and $1,700. This may be cash structuring designed to evade currency transaction reporting under the BSA.

On 03/17/14, Orest adjusted his calculate loss to WB slightly downward to $1,569,164.25. There were 2 unauthorized withdrawals from ▮▮▮'s accounts for $5,586.15 and $1,003.70 on 05/15/12 and 06/25/12, respectively, but they were offset when his account was over replenished on 10/04/13 from funds from ▮▮▮'s account.

Lisa requested a review of any BankAsiana loans disbursed to ▮▮▮ or ▮▮▮ (▮▮▮ who provided funds to James. The review revealed:

- 2 loans (possibly SBA) to ▮▮▮ which were charged off for $29,564.46 and $176,011.92, respectively, on 09/28/12
- 1 loan (28100034) to ▮▮▮ which was a SBA guaranteed (90%) loan was partially charged off for $51,371.41 on 06/30/12; was partially charged off for $53,811.12 and partially recovered for -$600 on 12/31/12; was partially recovered for -$800 on 08/06/13; was partially charged off for $5,901.69 on 10/31/13; and was charged off for $987,158.01 on 12/30/13. The final charge-off was the SBA's portion of the loan because the Special Assets Department felt it was likely that WB will not receive the guaranty due to a fraudulent down payment. This was a fraudulent loan (see the separate narrative on this loan). Karen posted 6 of the 10 transactions involved in funding the loan. Also, Frank posted a $21,378.11 principal pay down on this loan on 09/18/12. Bo-Young could not explain the transaction. Finally, Kenny Hong, former BankAsiana senior loan officer, was the "initiator" of the loan which funded on 12/31/10. A review of BankAsiana accounts in the name of ▮▮▮'s company (▮▮▮) indicated that ▮▮▮ wrote 6 checks ranging from $600 to $3,000 totaling $7,800 between September 2011 and November 2012 to Kenny which Kenny endorsed. Of those, 4 were deposited at JCPMorgan Chase. These may be kickbacks. Kenny's personnel file is missing. A ▮▮▮ check was also written on 03/14/11 payable to Kenny Huang or Hwang with "▮▮▮" written in the memo line of the check.
- 1 loan to ▮▮▮ (possibly SBA) was paid off
- 1 SBA guaranteed (75%) loan to ▮▮▮ is outstanding for $396,849.83
- 1 overdraft protection plan (ODP) to ▮▮▮ was charged off for $20,000
- 1 ODP to ▮▮▮ was charged off for $20,462.86

On 02/13/14, Kanzaz provided copies of checks for $▮▮▮ $▮▮▮ (2); $▮▮▮ $▮▮▮ and $▮▮▮ which were drawn on BankAsiana (▮▮▮) or other banks (Nara Bank and NewBank) and were endorsed and deposited by Karen at JCPMorgan Chase. She also provided a copy of a $▮▮▮ check which Karen wrote to ▮▮▮ drawn on JCPMorgan Bank. A review of the account history of ▮▮▮ and ▮▮▮ revealed large dollar wire activity; large-dollar check deposits; and large-dollar checks drawn off the latter account which is a joint personal account. In addition, on the account of ▮▮▮ and ▮▮▮, the following activity related to Karen. She was not a signer on the account.

01/19/12 -$▮▮▮ check written by Karen, endorsed by her, and deposited at JPMorgan Chase

WB815

CONFIDENTIAL

04/04/12 -$▮▮▮▮ principal paydown posted by Karen on SBA Loan ▮▮0022 (▮▮▮▮▮▮▮▮)
05/24/12 -$▮▮▮▮ check endorsed by Karen and deposited at JPMorgan Chase
11/14/12 -$▮▮▮▮ check endorsed by Karen and deposited at JPMorgan Chase
11/28/12 -$▮▮▮▮ check deposited which was written by Karen drawn on JPMorgan Chase
11/30/12 -$▮▮▮▮ check endorsed by Karen and deposited at JPMorgan Chase
The ▮▮▮▮▮ SBA loan mentioned above was paid off early with a principal payment of $▮▮▮▮▮ on 08/22/12 and was posted by ▮▮▮▮▮. Per Jennie, ▮▮▮ is not related to James.

The following activity related to Karen was noted on the ▮▮▮▮▮▮ account even though she is not a signer on the account:

▮▮▮▮▮▮▮▮ check written by Karen, endorsed by her, and deposited at JPMorgan Chase

Lisa indicated the activity observed in the above accounts may represent activity performed by a Korean Gae, an informal private banking arrangement. A review of other accounts involved in the Gae revealed a ▮▮▮▮ check written on 12/15/10 by Sang Han (member of the Gae) which was deposited into the ▮▮▮▮▮▮▮ account at BankAsiana which is one of Karen's husband's business accounts.

In conclusion, the embezzlement was a well-conceived plan to defraud the Bank performed by the Operations Officer. Karen tested the control environment by conducting the first transactions through an elaborate transfer of funds through various accounts of her husband's alleged business partner. Seeing that this theft went unnoticed, she continued and disbursed the funds through vault cash. As time went on, the cash withdrawals increased with the largest single cash withdrawal of $100,000 occurring on 11/01/12. The months with the largest cash withdrawals included November 2011 ($234,190), January 2012 ($130,000), and November 2012 ($150,000). This was a classic case of "lapping", stealing from one customer and when the CD neared maturity, stealing from another customer to cover the first customer. She chose her customers carefully, mostly elderly, hoping they would not notice or were deceased but she underestimated the oldest victim when closing one of his CD's. She completed her final 2 lapping transfers of $860,000 on September 27 and over $350,000 on October 4, her last day of employment at WB. The loss was calculated by the sum of the shortages in ▮▮'s, ▮▮'s, ▮▮▮▮'s, and ▮▮▮▮▮'s accounts. To date, $1,210,971.50 in stolen funds have been credited back by WB to ▮▮▮'s and ▮▮▮'s accounts; however, the funds stolen from ▮▮▮▮▮'s and ▮'s accounts have not been replenished. When calculating the final loss to WB, besides the $1,569,164 in stolen customer funds, the expenses incurred to CliftonLarsonAllen and Lee, Anav, Chung, White & Kim LLP should be included. Should ▮▮▮▮▮▮▮▮ be involved, the loss charge-offs totaling $1,096,842 should also be included, although they have already been incurred. Camera footage at the East Fort Lee Branch is no longer available for the investigation period. On February 7, under Section 314(b) of the BSA, Orest requested via Alix information from JPMorgan Chase regarding 2 accounts where Karen deposited large checks drawn on BankAsiana. A 3rd account was added on March 13. It was later determined that information obtained via Section 314(b) would be limited and insufficient. A subpoena would be necessary to obtain sufficient evidence. Information from JPMorgan Chase should be interesting since the following parties deposited and/or wrote significant checks drawn on that bank: Karen, James, ▮▮▮▮ ▮▮▮ (▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮), and ▮▮▮▮

CONFIDENTIAL

By the amount of cash ($157,325) flowing into Karen's account over 40 months by an employee who earned only $53,000, senior management should have filed SAR's based on that activity alone. In addition, had BankAsiana verified maker's signatures on its large on-us checks, the forged and unauthorized signer transactions would have been detected as early as 03/26/10 when a $5,000 unauthorized check cleared. Finally, the 2 other ▮▮▮▮ loans with charge-offs should be investigated for loan fraud; ▮▮▮ ▮▮▮ should be questioned about the payments received from ▮▮▮ and Jenna Lee should be reprimanded for posting the unauthorized $3,000 transfer as well as questioned as to why she was writing checks to Karen. By virtue of the $30,000 check written by a member of the Gae which was deposited into one of Karen's husband's business accounts, the Gae's involvement in this embezzlement cannot be ruled out.

WB817