# EXHIBIT

# 11

Page 1

1          UNITED STATES DISTRICT COURT

2             DISTRICT OF NEW JERSEY

3

4    ------------------------------------------X

5    WILSHIRE BANK,

6                                   PLAINTIFF,

7             -against-      Index No.:

8                            02:14-CV-01770-JLL-JAC

9    MIYE CHON, a/k/a Karen Chon, SUK JOON RYU, a/k/a James S.

10   Ryu, HONG SIK HUR, TAE JONG KIM, BERGENFIELD BAGEL & CAFE

11   INC., d/b/a Cafe Clair, MAYWOOD BAGEL INC., UB'S PIZZA &

12   BAGEL INC., UB'S BAGEL & CAFE INC., and UBK BAGELS CORP.,

13   d/b/a Franklin Bagels & Cafe,

14                                   DEFENDANTS.

15   ------------------------------------------X

16

17            DEPOSITION OF KAREN CHON

18               NEWARK, NEW JERSEY

19              Thursday, June 23, 2016

20

21

22

23       Reported by:

24       JENNIFER DE LEON

25       Job No.  107961

Page 2

1       June 23, 2016
2       10:37 a.m.
3
4       Deposition of KAREN CHON, held
5   at 50 Walnut Street, Newark, New Jersey,
6   before Jennifer De Leon, Notary Public of the
7   State of New Jersey.
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 3

1   A P P E A R A N C E S :
2   LEE ANAV CHUNG WHITE & KIM
3       Attorneys for the Plaintiff WILSHIRE BANK
4       156 Fifth Avenue
5       New York, New York 10010
6       BY: MICHAEL YI, ESQ.
7           JANE CHUANG, ESQ.
8
9   MATTHEW JEON
10      Attorneys for the Defendants
11      MIYE CHON a/k/a KAREN CHON, TAE JONG KIM, BERGENFIELD
12      BAGEL & CAFE INC., d/b/A CAFE CLAIR, MAYWOOD BAGEL,
13      INC., UB's PIZZA & BAGEL, INC., and UB's BAGEL & CAFE, INC.
14      2400 Lemoine Avenue
15      New York, New York 07024
16      BY: MATTHEW JEON, ESQ.
17
18  STEVE HARVEY LAW
19      Attorneys for the Defendant SUK JOON RYU a/k/a JAMES RYU
20      1880 John F. Kennedy Boulevard
21      Philadelphia, Pennsylvania 19103
22      BY: STEPHEN HARVEY, ESQ.
23          DAVID DZARA, ESQ.
24
25  ALSO PRESENT:
    Marc Friedman and Christine

Page 4

M. CHON

1
2       THE VIDEOGRAPHER:  We are now on the record.
3   Please note the microphones are sensitive to this and may
4   pick up whispering and private conversations.  Please turn
5   off all cell phones or place them away from the
6   microphones, as they can interfere with deposition audio.
7   Recordings will continue until all parties agree to go off
8   the record.
9       My name is Marc Friedman representing Veritext
10  Legal Solutions.  The date today is June 23rd, 2016 and the
11  time is approximately 10:37 a.m.  This deposition is being
12  held at United States Federal Courthouse located at 50
13  Walnut Street, Newark, New Jersey, and is being taken by
14  the counsel of the plaintiff.
15      The caption in this case is Wilshire Bank
16  versus Miye Chon, et al.  This case is filed in United
17  District Court District of New Jersey; case number
18  20:14-CV-01770-JLL-JAK.  The name of the witness is Mia
19  Chon.
20      At this time, the attorneys in the room will
21  identify themselves, the parties they represent, starting
22  with the noticing attorney after which time our court
23  reporter, Jennifer de Leon, representing TSG Reporting will
24  swear in the witness and we can proceed.
25      Michael?

Page 5

M. CHON

1
2       MR. YI:  Yes.  Counsel for plaintiff Wilshire
3   Bank, my name is Michael Yi, and sitting to my left is my
4   colleague Jane Chuang, also counsel for the record for
5   plaintiff Wilshire Bank.
6       MR. JEON:  Good morning.  Matthew Jeon, Jeon,
7   Fort Lee on behalf of Ms. Chon.
8       MR. HARVEY:  I'm Steve Harvey with my
9   colleague, David Dzara, for James Ryu who's here today but
10  not in the courtroom right now.  He'll join us throughout
11  the day.  I'm sitting up here in the bench, but just to be
12  clear, I'm not the judge.  I'm not pretending to be the
13  judge.  I'm clearly a lawyer in the case, but I'm just
14  sitting up because it's convenient because of the way
15  the room is set up.
16      MR. JEON:  I thought he was your law clerk.
17      MR. HARVEY:  Again just for convenience.
18      C H R I S T I N E   L E E, called as the
19  interpreter in this matter, was duly affirmed by a Notary
20  Public of New Jersey to accurately and faithfully translate
21  the questions propounded to the witness from English to
22  Korean and the answers given by the witness from Korean
23  into English.
24              *  *  *
25

Page 6

M. CHON

1
2          M I Y E   C H O N, called as a witness, having
3   been first duly sworn by a Notary Public of the State of
4   New Jersey, was examined and testified as follows:
5   THE REPORTER:
6          Q.  Please state your name for the record.
7          A.  Karen Chon.
8          Q.  What is your address?
9          A.  11 3rd Street, Englewood Cliffs, New Jersey
10             07632.
11         THE INTERPRETER:  If I feel that you can
12  understand, I'm just not going to --  I'm going to let you
13  write down in English, you know what I mean?
14         MR. YI:  At this time I'd like to have Exhibit
15  1 to this deposition marked by the court reporter.  For the
16  record, Exhibit 1 to this deposition is keep of notice for
17  deposition, for this deposition, dated October 31, 2014.
18         And for the record this deposition is taken by
19  Wilshire Bank by me, pursuant to this notice of deposition.
20         (Plaintiff's Exhibit 1, Notice was
21             marked for identification, as of
22             this date.)
23  EXAMINATION BY
24  MR. YI:
25         Q.  Ms. Chon, you indicated your legal name of

Page 7

M. CHON

1   Miye Chon, are you also known as Karen Chon?
2          A.  Yes, at the bank.
3          Q.  Your legal name is Miye Chon, correct?
4          A.  (No verbal answer.)
5          Q.  Have you consumed anything such as alcohol
6   beverages or medication that would affect your ability to
7   testify at this deposition today?
8          A.  No.
9          Q.  Thank you.  Do you understand that you're
10  testifying under oath today and that you must answer each
11  question truthfully?
12         A.  Yes.
13         Q.  Thank you.
14         You've indicated your home address, are you --
15  are you married?
16         A.  Yes.
17         Q.  What is your husband's name?
18         THE WITNESS:  T-A.
19         Q.  Is that Tae; last name Kim, K-I-M?
20         A.  Yes.
21         Q.  Do you have any children?
22         A.  Two children.
23         Q.  How old are they?
24         THE WITNESS:  Nine year-old and two and a

Page 8

M. CHON

1
2   half.
3          THE INTERPRETER:  Two and a half -- can you
4   see me.
5          Q.  Have you ever been deposed prior to today?
6          A.  No.
7          Q.  Have you ever testified before today at any
8   legal proceeding?
9          A.  No.
10         Q.  Before I continue, just let me briefly tell
11  you that, I'm going to be asking a series of questions.
12  I'm going to ask you to listen to the question and try to
13  answer as best as you can.  If you don't understand any of
14  my questions, I will ask you to indicate that and I will
15  try to clarify if I can.
16         If your attorney, Mr. Jeon, objects, that
17  objection doesn't mean that you don't have to answer the
18  question; you will still have to answer the question unless
19  he tells you not to.  Okay?
20         A.  Yes.
21         Q.  Okay.  We're going to try to take a break
22  about every hour give or take.  But before we call for a
23  break, if you need to take a break, please let us know.
24  Okay?
25         A.  Yes.  Okay.

Page 9

M. CHON

1
2          Q.  And I would ask you to do that after you've
3   answered the question first.
4          A.  Yes.
5          Q.  Thank you.  Have you ever been sued prior --
6   asides from this case?
7          A.  Automobile accident, but I'm not sure whether
8   that was a lawsuit.  I'm not sure.
9          Q.  And is that matter still pending?
10         A.  No.
11         Q.  Have you ever sued anyone?
12         A.  No.
13         Q.  I am now going to ask you about your
14  educational background.  My understanding is that you
15  emigrated to the United States at some point; is that
16  correct?
17         A.  Yes.
18         Q.  What year was that?
19         THE WITNESS:  '91.
20
21         A.  '91.
22         Q.  1991?
23         A.  Yes.
24         Q.  And how old were you at that time?
25         THE WITNESS:  11.

Page 10

M. CHON

1
2     A.  11.
3        Q.  Did you attend public high school in New York
4  City?
5        THE WITNESS:  Yes.
6     A.  Yes.
7        Q.  How many years?
8        THE WITNESS:  Three years.
9     A.  Two years.
10       THE WITNESS:  Three years.
11       Q.  And was that middle school?
12       THE WITNESS:  High school.
13    A.  High school.
14       Q.  Are you referring to LaGuardia High School,
15  yes?
16    A.  Yes.
17       Q.  Did you graduate from that high school?
18    A.  Yes.
19       Q.  Did you attend any public school in New York
20  City before LaGuardia High School?
21       MR. JEON:  Bryant High School.
22    A.  Bryan High School.
23       THE WITNESS:  Freshman year.
24    A.  Freshman year.
25       THE WITNESS:  And middle school.

Page 11

M. CHON

1
2     A.  And middle school.
3        THE WITNESS:  IS73.
4     A.  IS73.
5        THE WITNESS:  That's the middle school.
6        Q.  Thank you.  And did you attend college?
7        THE WITNESS:  Just one semester.
8     A.  Just one semester.
9        Q.  And is that Fashion Institute of Technology?
10       THE WITNESS:  Yes.
11    A.  Yes.
12       Q.  In Manhattan?
13       THE WITNESS:  (Nodding.)
14    A.  Yes.
15       Q.  After your one semester at Fashion Institute
16  of Technology, did you work after that?
17    A.  Yes.
18       Q.  Where did you work?
19       THE WITNESS:  Liberty Bank of New York.
20    A.  Liberty Bank of New York.
21       Q.  From when to when did you work there?
22       THE WITNESS:  I started in 2001.
23    A.  I started in 2001.
24       THE WITNESS:  To one -- one -- one and a half.
25    A.  One and a half.  One and a half years.

Page 12

M. CHON

1
2        Q.  And what was your position or title at Liberty
3  Bank of New York?
4     A.  Teller.
5        Q.  And where did you work after working at
6  Liberty Bank of New York for approximately one and a half
7  years?
8        THE WITNESS:  I worked at -- I moved to Nara
9  Bank in Flushing.
10    A.  I moved to Nara Bank in Flushing.
11       THE WITNESS:  I worked there for six months.
12    A.  I worked there for six months.
13       MR. JEON:  I don't mean to object to my own
14  witness but I just want to tell Ms. Chon she's not
15  testifying in English, so you could speak Korean.  Of
16  course, that's why she's getting paid all the money so just
17  stick to one language.  Okay.  If you don't need an
18  interpreter, we can stop and bring her back, but the record
19  has to be clear one way or the other.  Okay.
20       So let's utilize her services.  Sometimes I
21  know some questions are very simple, but maybe if you're
22  feeling more comfortable now, I don't know, but since we
23  have an interpreter, let's utilize her services.
24       THE WITNESS:  Sorry.
25       MR. YI:  That's okay.

Page 13

M. CHON

1
2        Q.  Okay.  Ms. Chon, what was your position at
3  Nara Bank in --
4        THE WITNESS:  Teller.
5        Q.  -- in Flushing, New York?
6     A.  Teller.
7        Q.  And where did you work after Nara Bank?
8     A.  I took a little break and I went over to the
9  -- a Flushing bank of Liberty Bank of New York.  I started
10  working there again as a teller.
11       Q.  When you first began working at Liberty Bank
12  for New York in 2001, were you assigned to the Flushing
13  branch or Manhattan branch?
14    A.  Manhattan branch.
15       Q.  And how long did you work for Liberty Bank of
16  New York, the Flushing branch?
17    A.  Until 2006.
18       Q.  And where did you work after that?
19    A.  After that I moved to New Jersey and I
20  start -- began working at Asiana Bank.
21       Q.  Was that 2006 or 2007?
22       THE WITNESS:  2007.
23    A.  2007.
24       Q.  And from when to when did you work at Asiana
25  Bank of America in New Jersey?

Page 14

M. CHON

1
2      A.  I don't know when I began, but I worked until
3  September.  After that I worked at Bank of Asiana.
4          (Whereupon, Mr. Ryu enters the room.)
5      Q.  When did you begin working at Bank of Asiana?
6      A.  September of 2007.
7      Q.  Okay.  Going back to Asiana Bank of America in
8  New Jersey, what was your position or title there?
9      A.  Customer service.
10     Q.  And when you began working at Bank of Asiana,
11 what was your title or position?
12     A.  Teller and customer service.
13     Q.  Okay.  Let me try and see if I can clarify
14 something.  You testified, I believe, that you began
15 working at Asiana Bank of America customer service from
16 2007, and I believe you indicated also, that you began
17 working at Bank of Asiana as a teller and customer service
18 in September of 2007.  Is that correct?
19     A.  Yes.  Oh, a little after I joined the Asiana
20 bank; I switched, I moved.
21     Q.  Okay.  So you started working at Bank Asiana
22 in September of 2007.  Where or which branch were you
23 working starting in September of 2007?
24     A.  Palisades Park branch.
25     Q.  And is that branch located at 172 Main Street,

Page 15

M. CHON

1
2  Fort Lee, New Jersey?
3      A.  That's Fort Lee.  Palisades Park is 7 Broad
4  Avenue.
5      Q.  Thank you.  And did you continue to work at
6  that Palisades Park branch at Bank Asiana through
7  October 2013?
8      A.  No.  I move to Fort Lee.
9      Q.  Okay.  You moved to Fort Lee branch; when was
10 that?
11     A.  I don't recall exactly.
12     Q.  Was it from March 2010 to October 2013?
13     A.  Around that, I think.
14     Q.  When you were working at the Palisades Park
15 branch Bank of Asiana, what was your title or position?
16     A.  Just teller - customer service.
17     Q.  And when you moved to the Fort Lee branch of
18 Bank Asiana in or about March 2010, what was your position
19 or title at that time?
20     A.  The same.  At first the same, the customer
21 service.
22     Q.  You were also working as a teller, correct?
23     A.  Yes, teller.
24     Q.  At some point during your employment with Bank
25 of Asiana, was your title assistant vice president and

Page 16

M. CHON

1
2  operations officer?
3      A.  Yes.  I got promoted at first from customer
4  service.
5      Q.  Do you remember roughly when that was when you
6  received the promotion to that title?
7      A.  I don't.
8      Q.  At some point during your employment with Bank
9  Asiana at its Fort Lee branch, did you also become the head
10 teller there?
11     A.  No.  From the beginning.
12     Q.  Could you describe for us your duties and
13 responsibilities as the head teller at the Fort Lee branch
14 of Bank Asiana?
15     A.  The practical task that I'm in charge of are
16 managing the vault, the vault.  We just don't do one thing.
17 Including everything including customer care.  I think I
18 did everything.
19     Q.  Is it fair to say that your duties and
20 responsibilities included what's sort of customary of a
21 bank teller?
22     A.  Yes.
23     Q.  And you indicated that you, I believe, you
24 would -- you referred to a vault, are you referring to the
25 branch's cash vault?

Page 17

M. CHON

1
2      A.  Yes.
3      Q.  Did you have -- as the head teller at that
4  branch, did you have access to the cash vault of the
5  branch?
6      A.  All the tellers could.
7      Q.  And is it your testimony that each teller of
8  that branch had exclusive authority to enter or access the
9  cash vault?
10     A.  Yes.
11     Q.  So is it fair -- is it your testimony that
12 accessing the cash vault at that branch during that time
13 period did not require more than one person?
14         MR. JEON:  Objection as to form.
15     Q.  I'm speaking in terms of authority when I say
16 "more than one person."
17     A.  Always two control.  Two people.
18     Q.  And so is it fair to say that you alone could
19 not have accessed the cash vault at the branch during that
20 time period?
21     A.  Right.
22     Q.  As the head teller of that branch during that
23 time, did you also have access to Bank Asiana's computer
24 system?
25     A.  Yes.

Page 18

M. CHON

Q.  And Bank Asiana assigned to you as the head
teller username and password?
   A.  Yes.
   Q.  And you had exclusive -- only you were
assigned to that particular username and password, correct?
   A.  Yes.
   Q.  Was Bank Asiana's computer system at that
branch during that time period referred to as Jack Henry?
   A.  Yes.
   MR. YI:  At this time I am going to ask that
this document be marked as Exhibit 2 to this deposition.
It's a copy of the superseding indictment.
   THE REPORTER:  It's a copy of, what?
   MR. YI:  "The superseding indictment."
   THE REPORTER:  Oh, thank you.
      (Plaintiff's Exhibit 2, Superseding
      Indictment was marked for identification,
      as of this date.)
   Q.  Ms. Chon, I'm showing you what's been marked
as Exhibit 2 to your deposition.  Is this a copy of the
superseding indictment that was filed in the criminal case,
United States of America versus Miye Chon a/k/a Karen Chon,
which was filed by the U.S. Attorney's office in that
criminal case on November 23, 2015?

Page 19

M. CHON

   MR. JEON:  I think we have to give her the
document first.
   MS CHUANG:  (Handing.)
   Q.  Yes.
   MR. YI:  I'm now going to have Exhibit 3
marked and then Exhibit -- it is a copy of the application
for permission to enter plea of guilty which was filed in
the criminal case.
      (Plaintiff's Exhibit 3, Application
      For Plea was marked for identification,
      as of this date.)
   Q.  Ms. Chon, I'm showing you what's been marked
as Exhibit 3 to your deposition.  Is this a copy of
application for permission to enter plea of guilty that was
filed in the criminal case United States America versus
Miye Chon a/k/a Karen Chon on March 22nd, 2016?
   A.  Yes.
   Q.  I'm going to ask you to turn page 7 of this
exhibit.
   THE INTERPRETER:  3, or --
   MR. YI:  Yes, this is Exhibit 3.
   Q.  Does page 7 reflect your signature above the
line defendant?
   A.  Yes.

Page 20

M. CHON

   Q.  And that's your signature?
   A.  Yes.
   Q.  And did you sign this document on or about
March 22nd, 2016?
   A.  Yes.
   Q.  And did you sign this document after you
consulted with Mr. Jeon, your counsel?
   A.  Yes.
   MR. YI:  Thank you.  I am now going to ask
that Exhibit 4 be marked, copy of the plea agreement, dated
March 21, 2016.
      (Plaintiff's Exhibit 4, Plea
      Agreement Dated 3/21/16 was
      marked for identification,
      as of this date.)
   Q.  Ms. Chon, I'm showing you what's been marked
as Exhibit 4 of your deposition.  Is this a copy of the
plea agreement that you entered into with the U.S.
Attorney's office for the District of New Jersey dated
March 21, 2016?
   A.  Yes.
   Q.  I'm going to ask you to turn to page 8 of this
Exhibit 4.  Above the signature line, Miye Chon a/k/a Karen
Chon, is that your signature?

Page 21

M. CHON

   A.  Yes.
   Q.  Did you sign this agreement on or about
March 21, 2016?
   A.  Yes.
   Q.  And did you sign this agreement after you
consulted with your attorney, Mr. Jeon?
   A.  Yes.
   Q.  Is it fair to say that pursuant to this
agreement which is Exhibit 4, you pleaded guilty to Counts
1, 2 and 29 of the superseding indictment on March 22nd,
2016, before U.S. District Judge William Walls?
   MR. JEON:  Go ahead.
   THE INTERPRETER:  The count from 20?
   THE REPORTER:  1; 2; 29.
   A.  Yes.
   Q.  In pleading to Count 1 in the superseding
indictment, you pleaded guilty to bank fraud, correct?
   A.  Yes.
   Q.  And in pleading to Count 2 of the superseding
indictment, you pled guilty to embezzlement of funds by a
bank employee?
   A.  Correct.  Yes.
   Q.  And in pleading guilty to Count 29, you pled
guilty to aggravated identity theft, correct?

Page 22

M. CHON

1    A.  Yes.

2    Q.  Ms. Chon, is it fair to say that, that, by

3 pleading guilty to the three counts of the superseding

4 indictment, you acknowledged to the Court in the criminal

5 case that you stole money from Bank Asiana's customers,

6 correct?

7    A.  Yes.

8    Q.  When did you first begin stealing money from

9 Bank Asiana's customers?

10    A.  2010.

11    Q.  I know this is difficult for you, but I -- can

12 you just describe to us the circumstances that led you to

13 start stealing money?

14    A.  The bank, I had an account for my family, that

15 was like an instrument account like for a CD, CD account.

16 It was an account that you don't withdraw until its

17 maturity; I was managing that account.

18      Oh, I ended up withdrawing -- withdrawing that

19 money and using that money.  That was my family account so

20 it was -- and so, I thought that there would be no problem.

21 So, I had that instant.

22    Q.  When you say family account, Ms. Chon, who was

23 the accountholder of the account that you are referring to?

24    A.  Family and friends' account.

---

Page 23

M. CHON

1    Q.  Could you identify?

2    A.  It was --

3    Q.  Again, I understand this is difficult for you,

4 but could you identify for us the accountholders of that

5 account?

6    A.  Eunchul Paek and Soryo Kim.

7    Q.  Anyone else?

8    A.  No, that was the account that I was managing.

9    Q.  What was Mr. Eunchul's relationship to you?

10    A.  To put it exactly, that's my husband's

11 younger colleague, younger acquaintance.

12    Q.  And what was Ms. Soryo Kim's relationship to

13 you?

14    A.  That's my husband sister, sister-in-law.

15    Q.  Is it your testimony that when you started

16 stealing money from Bank of Asiana's customers, the first

17 account that you stole from belonged to your sister-in-law,

18 Ms. Kim, and her husband, Mr. Paek?

19    A.  Yes.

20    Q.  So Mr. Paek and Ms. Kim were husband and wife?

21    A.  No.

22    Q.  No?

23    A.  No, my husband's friend, and the other one, my

24 sister-in-law.

---

Page 24

M. CHON

1    Q.  But they were joint accountholders?

2    A.  No.

3    Q.  Oh, I see.  So are you referring to two

4 separate accounts?

5    A.  Yes.

6    Q.  Okay.  I apologize.  I misunderstood.  So

7 you're referring to one account belonging to Mr. Paek and

8 one account to Ms. Soryo Kim?

9    A.  Yes.

10    Q.  And were they both CD accounts?

11    A.  Installment account.

12    Q.  Is it fair to say that an installment account

13 is similar to a CD account in that the accountholder would

14 put money into an account for a period of time and earn

15 interest?

16    A.  Okay.  With a CD, you deposit the money at one

17 time and wait until -- I mean, leave it until its maturity.

18    THE INTERPRETER:  Installment, right?

19    A.  Installment.  And every month, you deposit and

20 then you withdraw at maturity.

21    Q.  Okay.  And if you make any early withdrawals

22 before you complete all of the installments and you are --

23 you're assessed a penalty or some type of penalty fee,

24 correct?

---

Page 25

M. CHON

1    A.  Yes.

2    Q.  Do you recall approximately how much money you

3 stole from Mr. Paek's installment account?

4    A.  I'm not sure.  I don't know for certain.

5    Q.  Was it thousands of dollars or tens of

6 thousands of dollars?

7    A.  Tens of thousands of dollars.  Probably over a

8 hundred thousand.

9    Q.  From Mr. Paek's installment account?

10    A.  Yes.

11    Q.  Is it fair to say that you didn't have

12 Mr. Paek's permission or authority to remove funds from his

13 account?

14    A.  Right, right.  No.

15    Q.  Do you recall how much you stole from the

16 installment account belonging to Ms. Soryo Kim?

17    A.  About $20,000.

18    Q.  And is it fair to say that you didn't have Ms.

19 Kim's permission or authority to remove the funds from her

20 account?

21    A.  No, my sister-in-law knew.

22    Q.  Did you have her permission and authority to

23 take money from her account?

24    A.  Yes, yes.  Because I was managing that

Page 26

M. CHON

account.

Q.  All right.  Could you describe for us how you took money out of Mr. Paek's account and Ms. Kim's account?  Can you just go -- describe it to us step for step.

A.  One moment, please.  So, you asked me to explain the process how I took the money out step by step?

Q.  Yes.

A.  You do a transaction as if you are withdrawing money from the account, the CD, you make a transaction as if you are taking money/cash out of the vault.

Q.  So, is it fair to say that in the case of Mr. Paek's installment account, you would -- in the computer -- bank's computer system, you would make a transfer from his account to an account, such as a deposit clearing account and then transfer from a deposit clearing account to currency and coin account?

A.  Yes.

Q.  And after you have tran -- you made those transfers ultimately to the currency and coin account, did you then go into the cash vault of the branch and remove the sum of money equal to the amount of the transfer?

A.  Yes.

Q.  You testified earlier that at least two employees of that branch, their authority was required to

Page 27

M. CHON

access the cash vault.  How were you able to access the cash vault by yourself?

A.  I didn't always go in by myself.  Oh, okay.  There were times when there were -- we had three employees or other times there would be two employees, but usually there were two employees there.  So, two people are, you know have to go into the vault together.

But if there is a customer -- oh, so it just wasn't me.  I mean if there is a customer, everybody would just go in alone.

Q.  Okay.  So, is it fair to say that Bank Asiana's policy was that you needed at least two people's authority in order to access the cash vault but that that policy was not always followed?

A.  You couldn't.

Q.  So, is it your testimony that in practice, it was possible for you to access the cash vault by yourself without a second teller being present?

A.  Yes.

Q.  Why did you begin stealing money from Bank Asiana's customer, customers?

A.  As I told you before, those two accounts -- at the time I needed some money and that money, I thought I was able to be responsible for.  And those accounts, that's

Page 28

M. CHON

how I ended up doing.

Q.  Let me ask it this way.  What did you -- what did you do with the money?  You mentioned that you stole over 100,000 from Mr. Paek's account and approximately 20,000 from Ms. Kim.  What did you do with that money?

A.  Can I take a break for a moment?

Q.  Yes, you can.  But as I told you at the outset, we can take a break after you answer the question.

MR. JEON:  Do you understand the question?

THE WITNESS:  Yes.

MR. JEON:  Are you talking about the first 100,000, approximately, where that money went, is that your question?  Or the 1.4 we're talking about?

MR. YI:  No, we're talking about --

MR. JEON:  Just the 100,000.

MR. YI:  What we've talked about so far.

MR. JEON:  Okay.  Just the 100,000.

A.  That was not like hundred thousand from the begin.  I mean -- I mean the story, I -- I think I would need to explain from the -- everything from the beginning because I don't think I should be talking about just that 100,000.

MR. YI:  Okay.  Why don't we take a break at this time, and --

Page 29

M. CHON

THE VIDEOGRAPHER:  Stand by.  The time is 11:34.  We're going off the record.  This will end media unit No. 1.  We're off.

(Brief recess was taken.)

THE VIDEOGRAPHER:  Stand by.  Go back on the record.  The time is 11:47.  We are back on the record.  This will be the start of media unit No. 2.  Counsel?

MR. YI:  Thank you.

Q.  Ms. Chon, earlier we talked about how you took money out of Mr. Paek's account, and you testified that you made a transfer from his account to the deposit clearing accounts and then to -- on to the currency and coin account, and thereafter, you removed the corresponding amount of cash from the cash vault, correct?

A.  Yes.

Q.  Did you also take money out of Mr. Peak's account and by transferring funds from his account to an account that was owned at the time by a company called UB's Pizza & Bagel?

A.  Oh.  The president of UB's Pizza & Bagel is Mr. Paek, Enchul Paek.

Q.  Now, when you began stealing money from Mr. Paek and you started taking money out of Ms. Kim's account, did anyone at Bank Asiana know what you were



Page 30

M. CHON

1
2    doing?
3         A.  That, I'm not sure.
4         Q.  Other than Mr. Paek's account and Ms. Kim's
5    account, did you steal money from any other accounts
6    belonging to Bank Asiana's customers?
7              MR. JEON:  Can we use the term unauthorized
8    removal as opposed to steal?
9              MR. YI:  That's fine.
10             MR. JEON:  Okay.  Thank you.
11        A.  Yes.
12        Q.  Approximately how many additional accounts did
13   you -- from which did you make unauthorized withdrawals?
14        A.  Soryo.
15             MR. JEON:  What time period please, up to
16   today?
17             MR. YI:  Beginning of 2010.
18             MR. JEON:  '10.  So, end or just in 2010?
19             MR. YI:  Let's stick with 2010 for now.
20             MR. JEON:  Okay.  If you can remember.
21        A.  Oh, I don't know the -- the number of
22   accounts, but the accountholders were about three to four
23   people.
24        Q.  In addition to Mr. Paek, did you also make
25   unauthorized withdrawals from a CD account belonging to --

Page 31

M. CHON

1
2    or CD accounts belonging to Mr. ███ ████?
3         A.  Yes.
4         Q.  Did you also make unauthorized withdrawals
5    from a CD account belonging to █████ █████?
6         A.  Yes.
7         Q.  Did you also make unauthorized withdrawals
8    from the CD account or accounts belonging to a Mr. ███
9    ██ █?
10        A.  Yes.
11        Q.  Did you also make unauthorized withdrawals
12   from CD account or accounts belonging to a Mr. ████████
13   ██████ and ████████.
14        A.  Yes.
15        Q.  Did you also make unauthorized withdrawals
16   from one or more CD accounts belonging to a Ms. █████
17   ████████████?
18        A.  Yes.
19        Q.  Did you also make unauthorized withdrawals
20   from one or more CD accounts belonging to a Ms. ████
21   ████████?
22        A.  Yes.
23        Q.  And is it fair to say that those withdrawals,
24   unauthorized withdrawals that I just mentioned all occurred
25   sometime beginning in 2010 through in or about

Page 32

M. CHON

1
2    October 2013?
3         A.  Yes.
4         Q.  Did there come a time when someone who worked
5    at Bank Asiana discovered that you were stealing -- I'm
6    sorry, you were making unauthorized withdrawals from
7    accounts belonging to Bank Asiana's customers?
8         A.  No.  What is it?  Around the time, there was a
9    merger of banks.  I thought -- I thought I should tell -- I
10   should tell them because there is an interest matter
11   connected to CD accounts, so they'll find out, I mean,
12   anyway, regardless.  So, I told them.
13        Q.  Okay.  I'm going to ask you to just go back to
14   2010, when you began the authorize -- unauthorized
15   withdrawals.  Was anyone else employed at Bank Asiana
16   involved in the unauthorized withdrawals?
17        A.  Yes.
18        Q.  Could you tell us who that was?
19        A.  James Ryu.
20        Q.  Can you tell us the circumstances under which
21   Mr. Ryu became involved in the unauthorized withdrawals
22   from accounts belonging to Bank Asiana's customers?
23        A.  I -- the accounts that I told you about
24   before, my sister-in-law, I took the money out of that
25   account.  And you are not supposed to; that account.  He

Page 33

M. CHON

1
2    knew that I did such a thing, he was aware.
3         Q.  Let me ask you, by the way, when you say James
4    Ryu, is his Korean name or legal name Suk Joon Ryu?
5              MR. YI:  Suk Joon.
6         A.  Yes.
7         Q.  And is he the gentleman who's in this room
8    today?
9         A.  Yes.
10        Q.  Do you remember when he first approached you
11   and told you that he found out what you were doing?
12             MR. HARVEY:  Objection.  Lack of foundation.
13        Q.  Let me rephrase the question in light of the
14   objection.  Could you tell us when -- when is the first
15   time he approached you and told you that he knew what you
16   were doing?
17             MR. HARVEY:  Same objection.
18        A.  I think, I think it was around after I took
19   the money out.  No.  In the accounts, I was not supposed to
20   make those, those transactions.
21        Q.  So, is it fair to say that it was sometime in
22   2010?
23        A.  Probably so.
24        Q.  And is it fair to say that it was following
25   your unauthorized withdrawals from Mr. Paek's account and

Page 34

M. CHON

1
2  Ms. Kim's account?
3      A.  Yes.
4      Q.  And do you recall where you were when -- when
5  he told you this?
6      A.  In Palisades Park.
7      Q.  When you say "Palisades Park," are you
8  referring to the Palisades Park branch of the bank?
9      A.  The branch is on the first floor and on the
10 third floor there is a back office.
11     Q.  Could you tell us how you came to meet with
12 Mr. Ryu at the Palisades Park branch?
13     A.  It's not that we took the time to meet.  Every
14 month we have a meeting.  Not only that.  I mean, I --
15 sometimes I have to bring things to Palisades Park so I
16 visit often.
17     Q.  Okay.  But just to clarify, at the time that
18 you spoke to him at the Palisades Park branch, you were
19 working at the Fort Lee branch of Bank Asiana, correct?
20     A.  Yes.
21     Q.  When he told you that, did he tell you how he
22 found out?
23         MR. HARVEY:  Objection.  There's been no
24 testifo -- there's been no testimony about what he said.
25         MR. YI:  Okay.  Fair enough.

---

Page 35

M. CHON

1
2      Q.  Could you just tell us what he said to you at
3  that time?
4      A.  He mentioned about those transactions and he
5  said, don't you know that you are not supposed to do this,
6  do you know this is a big -- what a big wrongdoing this is?
7      Q.  Did he say anything else?
8      A.  This could become a big matter like, like
9  this, like this criminal matter.
10     Q.  Did he say anything else?
11     A.  So I got very scared about what I did.
12     Q.  Did he say anything else?
13     A.  And then he asked me to lend him money.
14     Q.  Did he ask you how much?
15     A.  At first $30,000.
16     Q.  And what did you say?
17     A.  I told him I didn't have the money.
18     Q.  What did he say?
19     A.  He said if I lend him the money, the way I did
20 those -- these transactions and he said that it could get
21 resolved like it wasn't going to take long for that to get
22 -- become resolved, resolved the matter.
23     Q.  Ms. Chon, did he ask to borrow 30,000 or did
24 he ask you to give him 30,000?
25     A.  He didn't use those exact words.  What I

---

Page 36

M. CHON

1
2  thought was borrowing.  To put it easily borrowing it, you
3  know.  I thought he was borrowing from the bank and then,
4  you know, it would get resolved quickly.
5      Q.  What did you say in response to that?
6      A.  I couldn't answer right away.
7      Q.  Let me ask you this:  Was it your
8  understanding that Mr. Ryu was asking you to make
9  unauthorized withdrawals from accounts belonging to Bank
10 Asiana customers in order to either lend him or give him
11 30,000?
12     A.  Yes.
13     Q.  And when he asked you that, did he threaten
14 you in any way?
15     A.  I heard it as a threat.
16     Q.  Did he say anything to you that you recall
17 that led you to believe that he was threatening you?
18     A.  Because I -- I had something that I did wrong
19 first, I was afraid of it becoming/turning into a serious
20 big matter because of that.
21     Q.  Do you remember Mr. Ryu saying anything else
22 at that time?
23     A.  No.
24     Q.  How did you end that discussion?
25     A.  I couldn't decide right then.  I told him I'll

---

Page 37

M. CHON

1
2  think about it.
3      Q.  Did he say anything in substance that if you
4  didn't cooperate with his request that he would turn you
5  into the authorities, in essence, report you for what you
6  had done?
7      A.  No, he didn't say that, but I thought he
8  would, of course, do that.
9      Q.  At the time that you had this conversation
10 with Mr. Ryu, was he Senior Vice President and Chief
11 Operating Office of Bank Asiana?
12     A.  Yes.
13     Q.  Did he tell you in that conversation how he
14 found out that you had made unauthorized withdrawals from
15 Mr. Paek's account and Ms. Kim's account?
16     A.  No.  He probably found out because other
17 people knew about it.
18     Q.  Okay.  Ms. Chon, I'm not asking to you
19 speculate or guess.  If you know.
20         (Record read as follows: "QUESTION: Did he
21 tell you in that conversation how he found out that you had
22 made unauthorized withdrawals from Mr. Paek's account and
23 Ms. Kim's account?")
24         MR. JEON:  Okay.  Thank you.
25     Q.  Ms. Chon, when you had this conversation with

Page 38

M. CHON

1  
2  Mr. Ryu, what was your relationship with Mr. Ryu?
3      A.  Just superior and the imperior -- employee.
4      Q.  Did you report to someone directly at the bank
5  at that time?
6      A.  Can you repeat the question?
7      Q.  Right.  So, you testified that you were the
8  head teller at the Fort Lee branch of Bank Asiana.  My
9  question is, is there someone in the organ --
10  organizational chart who was above you who directly
11  supervised you?
12      A.  Branch manager.
13      Q.  Okay.  Who was that?
14      A.  Tai Kyo Suh.
15          THE INTERPRETER:  Suh is the last name.
16      Q.  And at that time, was Mr. Ryu's one of his
17  duties and responsibilities as the bank's vice president
18  and COO to supervise employees like you?
19      A.  Yes.
20      Q.  When he asked for the $30,000 in that
21  conversation, did he tell you yes needed it?
22      A.  No.
23      Q.  When was the next time you spoke to him?
24      A.  Maybe the following -- I think it was two days
25  after.

Page 39

M. CHON

1  
2      Q.  Did you speak to him in person or by
3  telephone?
4      A.  By bank telephone.
5      Q.  When you said "bank telephone," were you
6  working at the Fort Lee branch at the time?
7      A.  Yes.
8      Q.  Did you call him or did he call you?
9      A.  I think I called him.
10      Q.  And was it during business hours of the bank?
11      A.  Yes.
12      Q.  Do you remember what you said to him and what
13  he said to you?
14      A.  I called him saying that I got it regarding
15  that.
16      Q.  What do you mean by that?
17      A.  Oh, I would lend him what he proposed; I will
18  do it.
19      Q.  Did he say anything to you at that time?
20      A.  No.
21      Q.  Was there any discussion between the two of
22  you at that time about how you would -- how you would come
23  up with the 30,000?
24      A.  No.
25      Q.  And did there come a time where you gave him

Page 40

M. CHON

1  
2  the 30,000 that he asked for?
3      A.  Yes.
4      Q.  Could you describe to us how you were able to
5  come up with the 30,000 that he had asked for?
6      A.  The same way through the account using the
7  account.
8      Q.  When you say the same way using the account,
9  are you referring to the unauthorized withdrawals from CD
10  accounts either an installment account or CD account?
11      A.  Yes.
12      Q.  Do you recall whose account you made that
13  withdrawal from?
14      A.  Probably Eunchul Paek.
15      Q.  Ms. Chon, I'm not asking you to guess or
16  speculate.  If you recall.
17      A.  I don't know.
18      Q.  Is it fair to say that you made an
19  unauthorized withdrawal in the amount of $30,000 from an
20  account belonging to a Bank Asiana customer and gave that
21  30,000 to Mr. Ryu?
22      A.  Yes.
23      Q.  And is it fair to say that the $30,000, that
24  of unauthorized withdrawal, you did it the same way that
25  you had testified earlier which was making transfers

Page 41

M. CHON

1  
2  ultimately to -- I'm sorry, just a minute, please -- to
3  currency and coin account and thereafter removing the cash
4  equivalent of the transfer amount out of the cash vault?
5      A.  Yes.
6          (Whereupon, Mr. Ryu leaves the room.)
7      Q.  Do you recall how you gave him the $30,000 in
8  cash?
9      A.  The same.  I went to the off -- that office.
10  I went to the branch.  I went to the room.
11      Q.  Okay.  Is it fair to say that you personally
12  delivered the cash of $30,000 to Mr. Ryu?
13      A.  Yes.
14      Q.  And when you gave it to him, you were in his
15  office?
16      A.  Yes.
17      Q.  Was there anyone present other than the two of
18  you?
19      A.  No.  In the room?
20      Q.  Yes.
21      A.  No.
22      Q.  Was the cash in an envelope, or a --
23      A.  Yes, in the envelope.  In an envelope.  It was
24  not the envelope for money.  It was a -- just a large, it
25  was a large envelope.

M. CHON

1
2    Q.   Was it a large envelope belonging -- was it a
3  bank envelope?
4    A.   We have envelopes to deliver documents between
5  like among branch/branches.
6    Q.   So it's an interoffice bank envelope, bank
7  envelope?
8    A.   Yes.
9    Q.   When you gave him the money, did he say
10 anything to you?
11   A.   No.  I asked him when he could, you know,
12 return it/pay back.  He said it wasn't going to take long,
13 it would get resolved shortly and but didn't say exact
14 date.
15   Q.   By the way, when you said earlier that you
16 considered the unauthorized withdrawals from Mr. Paek's
17 account, Ms. Kim's account to be borrowing, did you say
18 that because you intended to come up with money and
19 replenish those accounts?
20   A.   Yes, when I first -- when I first began doing
21 it just by myself.
22   Q.   And was it your understanding that when you
23 gave the $30,000 to Mr. Ryu, and Mr. Ryu made the statement
24 to you that you testified to, was it your expectation that
25 he would pay back the $30,000 so that you could then

M. CHON

1
2  replenish the account from which you made the unauthorized
3  withdrawal?
4    A.   Yes.
5    Q.   Did he ever repay the $30,000?
6    A.   No.
7    Q.   Did you ever replenish the account from which
8  you made the $30,000 unauthorized withdrawal?
9    A.   No.  In the end, as a -- I mean ultimately
10 Eunchul Paek's account was replenished.
11   Q.   And Mr. Paek's account was replenished and Ms.
12 Kim's account was replenished by making unauthorized
13 transfers from accounts belonging to other Bank Asiana's
14 accounts, correct?
15   A.   Only Eunchul Paek's account.
16   Q.   Did there come a time where Mr. Ryu asked you
17 for additional monies?
18   A.   Yes.
19   Q.   Do you recall when that was?
20   A.   I don't know when.  It was sometime after that
21 instant.
22   Q.   Approximately how many times did Mr. Ryu ask
23 you for money?
24   A.   Around ten times.
25   Q.   And is it fair to say that those ten times

M. CHON

1
2  occurred sometime between 2010 and 2013?
3    A.   Approximately.
4    Q.   And in each instance when he asked you for
5  money, did he specify the amount that he wanted?
6    A.   Yes.
7    Q.   You mentioned, you testified that the first
8  time he asked you for $30,000; do you remember how much he
9  asked you for the second time?
10   A.   Second time maybe it was $20,000.
11   Q.   Do you remember the amount that he asked for
12 the third time?
13   A.   I don't know the amount, but the amount kept
14 getting larger.
15   Q.   When he asked you for money approximately ten
16 times that you testified to, did you at any time say no?
17   A.   I have not told him so.  I just kept -- I kept
18 asking when this was going to get resolved.  He kept saying
19 the same -- what is it?  He said, you know, he will resolve
20 it shortly, too.
21   Q.   Of approximately ten times that he asked you
22 for money and you mentioned that the amount kept getting
23 larger, do you recall the largest amount of money that he
24 asked you for?
25   A.   Hundred thousand dollars.

M. CHON

1
2    Q.   In each of those instances, did you make one
3  or more unauthorized withdrawals from accounts belonging to
4  Bank Asiana's customers in order to give Mr. Ryu the money
5  he asked for?
6    A.   Yes.  But such a large amount cannot be done
7  at one time so I did it over several occasions.
8    Q.   And on those several occasions, did you give
9  him the money or deliver the money to him in the manner
10 that you described earlier?
11   A.   Yes, always in cash.
12   Q.   And was it always in the interoffice or
13 interbank delivery envelope?
14   A.   Yes.
15   Q.   And did you personally deliver it to him to
16 his office?
17   A.   No, not every time.  He often -- he would
18 visit the Fort Lee branch often.
19   Q.   So is it fair to say that on some occasions,
20 you delivered the cash in the envelope to him to his office
21 and on some occasions, he came to the Fort Lee branch to
22 pick up the envelope from you?
23   A.   Yes.
24   Q.   On all of the occasions when you personally
25 delivered the cash to him in the envelope, do you recall

M. CHON

1   any -- any occasions when someone else was present in his
2   office?
3      A.  Okay.  There are a lot of employees in the
4   office, but he was in the room.  So, whether there was
5   somebody else, I don't recall exactly.  I don't remember.
6      Q.  When he came to the Fort Lee branch to pick up
7   the cash in the envelope from you on those occasions, do
8   you recall whether there was anyone present other than you
9   and Mr. Ryu when you handed him the envelope?
10      A.  There was an employee.
11      Q.  Do you recall the approximate total amount
12   that you gave to Mr. Ryu?
13      A.  Approximately 700- to 8,000 -- $800,000.
14      Q.  And do you remember the approximate total
15   amount that you kept for yourself?
16      A.  2- to $300,000.
17      Q.  Did you ever tell anyone at Bank Asiana about
18   what was going on starting in 2010 through 2013 that we
19   just -- that you just testified about?
20      A.  No.
21      Q.  To your knowledge, did any employee at Bank
22   Asiana find out that you were making unauthorized
23   withdrawals from customers' accounts and that you were
24   keeping some of the money for yourself and giving the rest

M. CHON

1   to Mr. Ryu?
2      A.  Did anyone find out?
3      Q.  To your knowledge.
4      MR. JEON:  Prior to Wilshire State Bank --
5   prior to Wilshire State's own investigation?
6      MR. YI:  Yeah.
7      A.  I mean, no.  I mean in my thinking, what I
8   think?  I mean, should I tell you or should I not tell you?
9      Q.  I'm not asking you to -- I'm not asking for
10   your opinion.  I'm not asking for your guess.  If you know.
11      A.  No.
12      MR. JEON:  I think this is a good time to
13   break.  It's 20 to 12:00.  I'm going up to Judge Walls.
14   One hour, right?  About one hour?
15      THE VIDEOGRAPHER:  Wait.  Let me get off the
16   record.  Stand by.  The time is 12:39.  We are going off
17   the record.  This will end media unit No. 2.
18      (Recess was taken.)
19      THE VIDEOGRAPHER:  The time is 1:33.  We are
20   back on the record.  This will be the start of media unit
21   No. 3.
22   BY MR. YI:
23      Q.  Good afternoon, Ms. Chon.  Just wanted to
24   remind you that you're still under oath.

M. CHON

1      A.  Yes.
2      Q.  You testified earlier that you estimate the
3   total amount of the money you gave to Mr. Ryu to be 700,000
4   to 800,000?
5      MR. HARVEY:  Object to the question.  I don't
6   believe that's what she testified.  I believe she said
7   800,000.
8      Q.  Approximately 800,000.  Did you keep any
9   records concerning the money you gave to Mr. Ryu in the
10   manner you described before the lunch break?
11      A.  No, none.
12      Q.  You also testified that of the unauthorized
13   withdrawals you kept for yourself somewhere between 200,000
14   and 300,000?
15      MR. HARVEY:  Object to the form of the
16   question.  Again, I though she said 200,000.
17      MR. JEON:  She gave a range of 200- and
18   300,000.  She gave a range of 200,000 to 300,000.  She also
19   -- the previous question also gave a range from 700- to
20   800,000.  I think you're just maxing out and minimizing
21   out.
22      MR. HARVEY:  Oh, okay.  Okay.  I looked at my
23   notes.  She did give a range, I agree.
24      Q.  Did you keep any records concerning the monies

M. CHON

1   that you kept for yourself?
2      A.  No.
3      Q.  You mentioned how you delivered the cash to
4   Mr. Ryu.  How did you communicate with him concerning your
5   delivery of cash to Mr. Ryu?
6      A.  By telephone.
7      Q.  When you say "telephone," what do you mean?
8      A.  Telephone at the bank, bank's interoffice
9   telephone.
10      Q.  On your end, did you have a telephone that was
11   assigned to you at the Fort Lee branch?
12      A.  Yes.
13      Q.  Do you recall what that number was?
14      A.  I don't know.
15      Q.  Back in 2010, did you have a cell phone or a
16   mobile phone?
17      A.  Yes.
18      Q.  And the number of your cell phone from 2010,
19   has that number remained the same to today?
20      A.  Yes.
21      Q.  And what is that number?
22      THE WITNESS:  646-265-8830.
23      A.  646-265-8830.
24      MR. YI:  At this time, I'm going to have a

Page 50

M. CHON

1
2  document marked as Exhibit, what are we up, 5 to this
3  deposition.
4       (Plaintiff's Exhibit 5, Statement
5       was marked for identification,
6       as of this date.)
7  Q.  Ms. Chon, I'm showing you a document that's
8  been marked as Exhibit 5 to your deposition.  I'm going to
9  ask you turn to the second page of this document and I'm
10 going to direct your attention to fourth line down, "No.
11 014, your name Miye Chon, Karen, parenthesis, AVP and
12 Operations Office."
13       Do you see that there's a direct telephone
14 number 201-676-2108?
15 A.  Yes.
16 Q.  To the best of your recollection, was that the
17 phone number that was assigned to you at the Fort Lee
18 branch at Bank Asiana?
19 A.  Yes.
20 Q.  And is that the telephone number that would
21 have been used for you to make calls and receive calls
22 during your employment at the Fort Lee branch of Bank
23 Asiana?
24 A.  Although these numbers are all direct numbers,
25 there is a separate main number, telephone number and among

Page 51

M. CHON

1
2  employees, you use the extensions, extension numbers.
3  Q.  And the extension number that you used at the
4  Fort Lee branch during your employment was 5601?
5  A.  Yes.
6  Q.  When you made a phone call from the telephone
7  call number that was assigned to you, was that number
8  201-676-2018?
9  A.  So, among employees, you use the extension
10 number, but when you make the outgoing call, I'm not sure
11 if this number shows this particular or the main number on
12 the receiving end.
13 Q.  And to the right, the cell phone number
14 indicated there 646-265-8830, was that your cell phone
15 during your employment with Bank Asiana?
16 A.  Yes.
17 Q.  And I'm going to ask you to look two lines up
18 from your name with the number "002, Suk J. Ryu, with James
19 in parenthesis, SVP, and COO;" do you see the number
20 201-282-5503?
21 A.  Yes.
22 Q.  And you see the extension number 5503?
23 A.  Yes.
24 Q.  When you made a phone call to Mr. Ryu, did you
25 dial the extension number 5503?

Page 52

M. CHON

1
2  A.  Yes.
3  Q.  And when you look at the cell phone number for
4  Mr. Ryu indicated to the right 213-770-2828, to the best of
5  your recollection, was that Mr. Ryu's cell phone number
6  during your employment at Bank Asiana?
7  A.  Yes.
8  Q.  Thank you.
9       Is it fair to say that when you made phone
10 calls to Mr. Ryu, you always used the telephone, your work
11 telephone at Bank Asiana?
12 A.  Yes.
13      MR. HARVEY:  Objection.  Asked and answered.
14 Q.  Did you ever make any phone calls to Mr. Ryu
15 from your cell phone during non-working hours?
16 A.  I don't think so.
17 Q.  Do you recall any phone calls to Mr. Ryu which
18 you originated from your cell phone as opposed to your work
19 phone?
20      MR. HARVEY:  Objection.  Asked and answered.
21 A.  Yes, there was.
22 Q.  Do you remember approximately how many times?
23 A.  Are you asking me for the period when I was
24 working?
25 Q.  Let's start with that, yes.

Page 53

M. CHON

1
2  A.  Probably there were times.
3  Q.  What about after you left Bank Asiana?
4  A.  After I left I had called.
5  Q.  Do you remember how many times approximately?
6  A.  About two or three time.
7  Q.  On the occasions when Mr. Ryu called you, did
8  he always you when you were at work at the Fort Lee branch
9  of Bank Asiana?
10 A.  Yes.
11 Q.  Did he ever call you, during your employment
12 at Bank Asiana, did he ever call you after hours, after
13 working hours?
14 A.  Yes.  Relating to bank matters, emergency
15 situations but rarely, almost none.  Rarely.
16 Q.  With respect to Mr. Ryu's request for monies
17 from you and your delivery of monies to him, did he ever
18 make calls to you on your cell phone during your employment
19 at Bank Asiana?
20 A.  No.
21 Q.  When you were employed with Bank Asiana, did
22 you have a home telephone number, home telephone?
23 A.  No.
24 Q.  Did you ever communicate with Mr. Ryu by
25 email?

Page 54

M. CHON

1
2    A.  For privately, no.
3    Q.  Did you communicate with Mr. Ryu by email
4  concerning work matters at Bank Asiana?
5    A.  Company email, bank email.
6    Q.  To the best of your knowledge, did any of that
7  email correspondence -- in those email correspondences, did
8  you ever discuss with him the monies that he asked from you
9  and the monies you in turn delivered to him?
10    A.  No.
11    Q.  Did you communicate with Mr. Ryu at any time
12  during your employment at Bank Asiana by text?
13    A.  No.
14    Q.  During your employment at Bank Asiana, did you
15  ever communicate with Mr. Ryu by letter?
16    A.  No.
17    Q.  Did Mr. Ryu ever send you any greeting cards
18  during your employment at Bank Asiana?
19    A.  No.
20    Q.  Did he ever send you any greeting cards after
21  you left Bank Asiana's employ?
22    A.  I'm not sure what greeting card is exactly.
23    Q.  By greeting card, I mean birthday card,
24  holiday card, thank you card, of that nature.
25    A.  No.  Right before I left, I left -- we -- we

Page 55

M. CHON

1
2  had dinner -- we had a meal between, you know, Irene Lee
3  and James Ryu, three of us.  Or at the time, I received
4  something like a gift card, but I think that was given by
5  -- I thought that was given by the bank.
6    Q.  Okay.  I'd like to go back a little bit.  You
7  mentioned before the break that in one of your
8  conversations with Mr. Ryu about monies he wanted you to
9  deliver to him that you had asked him when this was going
10  to get all resolved and he said that it would be resolved
11  shortly, what was your understanding of the word "resolved"
12  or "resolution"?  What did you understand that to be?
13    A.  Make up the money.  Pay back the money.
14    Q.  And did Mr. Ryu ever pay back the monies that
15  you delivered to him at any time?
16    A.  No.
17    Q.  Before you left Bank Asiana -- withdrawn.
18        When did you leave Bank Asiana's employ?
19    A.  As the banks merged.  At the time merger.
20  October 2013.
21    Q.  I represent to you that the effective date of
22  the merger between Bank Asiana and Wilshire Bank known at
23  that time as Wilshire State Bank was October 1st, 2013.
24  Does that refresh your recollection as to around when you
25  left Bank Asiana's employ?

Page 56

M. CHON

1
2    A.  It was in the first week, probably Friday.
3    Q.  When you say first week, probably Friday, are
4  you referring to the month of September 2013?
5    A.  No.  October.
6    Q.  Okay.  Before you left the Bank Asiana, did
7  you have a meeting or conversation, telephone conversation
8  with Ms. Ryu, concerning the monies that you had delivered
9  to him?
10    A.  Yes.
11    Q.  Do you remember when that was?
12    A.  When we start talking about it was when we
13  heard about the merger.  So, I heard about it.  I kept -- I
14  start asking him to resort the matter quickly.  And from
15  that point on, I thought things were going wrong.
16    Q.  When you say you asked him to resolve the
17  matter, do you recall what you actually said to him?
18    A.  To pay back the money quickly.
19    Q.  And what did he say to you at that time?
20    A.  He said he doesn't know about it, you know,
21  what are you talking about.  So I've been thinking
22  something like this could happen.  Since then I started
23  thinking now it was becoming a situation.  I might end up
24  being responsible for myself.
25    THE REPORTER:  What was the last part?

Page 57

M. CHON

1
2    THE INTERPRETER:  For -- responsible for by
3  myself on my own.
4    A.  I made a few more telephone calls.  And at the
5  time, he said the same, like, he said he no connection to
6  that and who -- he said who actually carried out this, you
7  know, actually, actually acted on it, who did this
8  actually.
9    Q.  When he said that to you in those telephone
10  conversations, what did you say to him?
11    A.  I couldn't say anything.  From the point on, I
12  start just thinking about things on my own how to solve
13  this issue.
14    Q.  So is it your testimony that when you began
15  discussions with him in anticipation of the merger sometime
16  prior to October 2013, he denied any knowledge or
17  involvement to you?
18    A.  Yes.
19    Q.  Do you remember how many phone calls
20  approximately you had with him after you found out about
21  the merger prior to October 2013?
22    A.  I heard about the merger and I called him and
23  I asked him to pay back quickly because I was -- I was
24  really nervous; at first he said okay.  After that ever
25  since I was very nervous.  I don't recall exactly.  I

Page 58

M. CHON

1
2  re-asked him several times.
3      Q.  And those telephone calls you made to Mr. Ryu,
4  did you make it from your work telephone at the Fort Lee
5  branch at Bank Asiana?
6      A.  Yes.
7      Q.  Did you make any of those phone calls from
8  your cell phone, to your knowledge?
9      A.  I don't recall.
10     Q.  And --
11     A.  I don't think I did.
12     Q.  -- when you made those phone calls to Mr. Ryu,
13 did you call him at his work telephone at the Palisades
14 Park branch of Bank Asiana?
15     A.  Yes.
16     Q.  After you had these telephone conversations
17 with Mr. Ryu prior to the merger in October 2013, after he
18 denied any involvement, after he denied any knowledge, did
19 you tell anyone what Mr. Ryu had said to you?
20     A.  No.
21     MR. YI:  At this time, I'm going have a
22 document marked as Exhibit 6 for this deposition.
23     (Plaintiff's 6, Memorandum Dated
24      1/23/14, was marked for identification,
25      as of this date.)

Page 59

M. CHON

1
2      Q.  Ms. Chon, I am going to direct your attention
3  to the date of January 23, 2014.  Do you recall having a
4  meeting with employees of Wilshire Bank on that day?
5      A.  Yes.
6      Q.  Did you meet with Alicia Lee, Irene Lee and Bo
7  Yun Lee on that day?
8      A.  Yes.
9      Q.  And was the meeting at the South Palisades
10 Park branch of Wilshire Bank?
11     A.  No, that was for -- between Irene Lee and Bo
12 Yun Lee.
13     Q.  Okay.  I'm referring to a meeting that
14 occurred on January 23, 2014.  Who did you meet with that
15 day?
16     A.  Oh, at a bakery that is in front of the
17 Palisades Park branch.  I met with Irene Lee and Bo Young
18 Lee and later and together with Alicia Lee.  We met at Fort
19 Lee at a bakery.
20     Q.  Okay.  I just want to clarify what you just
21 testified to.  So, is it fair to say that you had a meeting
22 with all three of them, Alicia Lee, Irene Lee and Bo Yun
23 Lee, in a bakery in Fort Lee, New Jersey that day?
24     A.  Yes.
25     Q.  And at that time Alicia Lee was First Vice

Page 60

M. CHON

1
2  President and Operations Administration Manager of Wilshire
3  Bank?
4      A.  I don't know.  I'm not sure about this, but
5  yes.
6      Q.  And at that time Irene Lee was Assistant Vice
7  President and Operations Administration Officer of Wilshire
8  Bank?
9      A.  Yes.  But even from Bank Asiana times.
10     Q.  Okay.  And Irene Lee's legal name is Jin Hee
11 Lee, correct?
12     A.  Yes.
13     Q.  And do you recall Bo Yun Lee's title or
14 position?
15     A.  VP and HR.  HR manager, yeah.  HR, human
16 resources manager.
17     Q.  Could you describe to us the circumstances
18 that, leading up your meeting with Alicia Lee, Irene Lee
19 and Bo Yun Lee at the bakery at Fort Lee?
20     A.  I quit my work and in relation to the
21 instant -- Irene Lee called me regarding the interest on
22 the CD accounts.  I kept getting inquires, questions.  So,
23 I thought I could just not leave this alone and so I told
24 her that I would like to have a meeting.
25     And so at first I met with Bo Young Lee and

Page 61

M. CHON

1
2  Irene Lee in Palisades Park, bakery, I think.  And they
3  made a -- prepared a report, I think, but I don't know
4  exactly.  So, a few days later I met also with Alicia Lee
5  and Bo Young Lee and Irene Lee and we talked about this.
6  So, I told them all the things that went on at that
7  meeting.
8      Q.  All right.  So is it fair to say that you had
9  two meetings; the first meeting was at a bakery in
10 Palisades Park with Irene Lee and Bo Yun Lee?
11     A.  Yes.
12     Q.  And the second meeting was at a bakery in Fort
13 Lee, New Jersey and at that time you met with all three of
14 them, Alicia Lee, Irene Lee and Bo Yun Lee?
15     A.  Yes.
16     Q.  Okay.  Let's start with the first meeting at
17 the bakery in Palisades Park with Irene Lee and Bo Young
18 Lee.
19     A.  Yes.
20     Q.  Please tell us what they asked you and what
21 you told them at that meeting.
22     A.  I told them everything, you know, the way --
23 how things happened and they heard my story and after
24 hearing me, I think, they asked me a few questions.
25     Q.  Okay.  To the best of your recollection, could

Page 62

M. CHON

1
2  you specify for us what they asked you and what you told
3  them at that meeting?
4      A.  I told them how I took the money out of the CD
5  account and, you know, who was involved.  At the time I
6  don't think I told them who it was.
7      Q.  When you say "at that time" -- I didn't tell
8  -- "I don't think I told them who it was," are you
9  referring to Mr. Ryu?
10     A.  Yes.
11     Q.  What else do you remember telling them at that
12 meeting?
13     A.  I told them what I've been talking about up to
14 this point.  Everything.
15     Q.  Okay.  Let's go to the second meeting, the
16 meeting with all three of them at the bakery in Fort Lee,
17 New Jersey.  What do you recall them asking you and what do
18 you recall telling them?
19     A.  The same story.
20     Q.  Let's go back to the first meeting with just
21 Irene Lee and Bo Young Lee.  Do you recall whether either
22 of them recorded the conversation with you?
23     A.  I don't know.
24     Q.  Back to the second meeting with all three of
25 them, do you recall whether any of the three of them

Page 63

M. CHON

1
2  recorded their conversation with you?
3      A.  I don't know.
4      Q.  Do you recall any of them telling you that
5  they would be recording the conversation?
6      A.  They have not told me so.
7          THE VIDEOGRAPHER:  Christine, just tell her to
8  keep her voice up.  It's starting to go down a little.
9          THE INTERPRETER:  Okay.
10         THE VIDEOGRAPHER:  Thank you.
11         THE INTERPRETER:  You can hear me, right?
12         THE VIDEOGRAPHER:  Yeah.
13     Q.  Other than those two meetings, did you have
14 any subsequent meetings with any employees or officers of
15 Wilshire Bank concerning your unauthorized withdrawals?
16     A.  Yes.  One more time.
17     Q.  Okay.  Before we get to that, let me ask you
18 this:  The two meetings that we were just discussing, did
19 those two meetings occur on the same day?
20     A.  No.
21     Q.  Is it fair to say that the second meeting with
22 all three of them occurred on January 23, 2014?
23     A.  Three people together with Alicia?
24     Q.  Yes.
25     A.  I don't know the exact date.  January 21st is

Page 64

M. CHON

1
2  my birthday, so now I remember.  The next day I met with
3  Irene Lee and Bo Young Lee.
4      Q.  All right.
5      A.  And I don't know how many days after.
6      Q.  Okay.  Before you met with Irene Lee and Bo
7  Young Lee at the bakery in Palisades Park, New Jersey on or
8  about January 22nd, 2014, did you have a telephone
9  conversation with Mr. Ryu?
10     A.  I called him, but I don't know when that was.
11 But I called him after meeting with Wilshire Bank people.
12     Q.  When you say "after meeting with Wilshire Bank
13 people," which meeting are you referring to?
14     A.  I think, probably, I think it was after the
15 second meeting.
16     Q.  Okay.  Your first meeting with Irene Lee and
17 Bo Young Lee on or about January 22nd, did you call Mr. Ryu
18 prior to that first meeting?
19         MR. HARVEY:  Objection.  Asked and answered.
20     A.  I didn't call before.
21     Q.  Do you recall any phone calls to Mr. Ryu in
22 which you told him that you would be meeting with either
23 employees or officers of Wilshire Bank?
24     A.  No.
25     Q.  The telephone call that you just mentioned

Page 65

M. CHON

1
2  following the meeting with representatives of Wilshire
3  Bank, do you recall what you said to Mr. Ryu?
4      A.  When I called him after I met with him?
5      Q.  Yes.
6      A.  I asked him to meet with me.
7      Q.  Why?
8      A.  Because I was going to tell him that I
9  reported everything.
10     Q.  And when you say "I reported everything," are
11 you referring to the fact that you had told representatives
12 of Wilshire Bank not only about what you had done but also
13 what Mr. Ryu had done?
14     A.  Yes.
15     Q.  And do you recall what he said to you at that
16 time?
17     A.  Oh, I told him -- this is something that I
18 told him upon meeting with him in person.
19     Q.  So is it fair to say that phone call occurred
20 -- withdrawn.
21         Do you recall when you called him, do you
22 remember the approximate date relative to your date of
23 birth of January 21?
24     A.  I think I made a call right -- right away, but
25 I don't know exactly.

Page 66

M. CHON

1
2    Q.  And did you meet with him on the same day that
3    you made the phone call to him?
4    A.  Yes, I think so.
5    Q.  Do you recall where you met him?
6    A.  Yes.
7    Q.  Where?
8    A.  Englewood.
9    Q.  Where specifically?
10   A.  I think it was at a diner.
11   Q.  Do you remember the name of the diner?
12   A.  I don't know the name.  I know where it is.
13   Q.  Do you remember the street it was on?
14   A.  On Grand Avenue.
15   Q.  What do you remember him saying to you and you
16   saying to him at that meeting?
17   A.  I said, you know, I told Wilshire Bank people
18   everything.  I asked him one more time at the time to
19   resolve this matter however.  And he denied the same that
20   he has no knowledge of it.
21   Q.  When you say you asked him again at that
22   meeting to resolve the matter, what specifically did you
23   ask him?
24   A.  To pay back the money.
25   Q.  What else did you say to him?

Page 67

M. CHON

1
2    A.  I mean he knew -- he knew well about this kind
3    of matter because he's been working in bank -- in a bank a
4    long time.  He knew about these things.  So I asked him
5    then what happened to me; he said that I would be punished
6    from his experience, speaking from his experience.
7    Q.  You testified that at that meeting Mr. Ryu
8    again denied any involvement or knowledge.  What do you
9    recall him specifically saying to you, to the best of your
10   recollection?
11   A.  He said the same, is there any proof that he
12   did it himself?  The person who processed this is you, he
13   said, up to now.
14   Q.  Do you remember anything else that he said?
15   A.  He just repeated the -- such, you know, such
16   things, the same.
17   Q.  Did he -- at that meeting, did he -- do you
18   recall whether he asked you or told you not to cooperate
19   with representatives of Wilshire Bank?
20   A.  Oh, I don't understand the -- I didn't
21   understand the question.
22       I don't recall.
23       MR. HARVEY:  May I ask a point of
24   clarification of the translator.  The question you just
25   asked her the second time, were you just repeating the

Page 68

M. CHON

1
2    question the second time?
3        THE INTERPRETER:  Yes.
4    Q.  Do you recall at that meeting Mr. Ryu advised
5    you to retain counsel?
6    A.  To retain a lawyer?  He mentioned something
7    about a lawyer, but I don't remember exactly what he said
8    what -- in what substance.
9    Q.  Did he tell you at that meeting in substance,
10   hey, you better go get a lawyer?
11   A.  No.
12   Q.  All right.  You mentioned that after the first
13   two meetings that we discussed there was a third meeting
14   with representatives of Wilshire Bank.  Do you recall when
15   that was?
16   A.  I think it was in February.
17   Q.  Are you referring to a meeting that you had
18   with Wilshire Bank's general counsel or chief legal
19   officer, Lisa Pai.
20   A.  I don't know who he was.  I just had a
21   meeting.
22       THE REPORTER:  "I just had" --
23       THE INTERPRETER:  "I just had a meeting."
24   Q.  Do you remember meeting with Lisa Pai, the
25   chief legal officer of Wilshire Bank on February 12, 2014,

Page 69

M. CHON

1
2    at a hotel in Fort Lee, New Jersey?
3    A.  Yes.
4    Q.  Do you recall how that meeting was arranged?
5    A.  I'm not sure whether it was Irene Lee or Bo
6    Young Lee, but I got a telephone call from one of them, so
7    they said they wanted to meet with me so we ended up
8    meeting.
9        MR. YI:  Did you want to take --
10       MR. JEON:  I'm taking a break by myself.
11   Q.  Ms. Chon, are you okay or can we continue or
12   would you like to take a short break?
13   A.  I can continue.
14   Q.  You testified earlier about meeting with
15   Mr. Ryu at a diner.  Did you have any meetings with special
16   agents of the FBI prior to the meeting with Mr. Ryu?
17   A.  Yes.
18   Q.  Do you remember when that was?
19   A.  The first time I met with him was after
20   meeting with Wilshire Bank people and told them everything.
21   Q.  Do you remember who you met with?
22   A.  FBI?
23   Q.  Yes.
24   A.  Nathan Kim and another person.  I don't
25   remember the name.

Page 70

M. CHON

1
2      Q.   Was it Special Agent Joel Decapua,
3  D-E-C-A-P-U-A?
4      A.   Yes.
5      Q.   Anyone else?
6      A.   Those two.
7      Q.   Do you remember where the meeting was?
8      A.   They came to my home.
9      Q.   Is it fair to say that meeting took place
10 after January 23, 2014?
11     A.   Yes, after.
12     Q.   And what do you remember them asking you and
13 you telling them?
14     A.   From the beginning, like what you asked, like,
15 you know, my background, when I came to the U.S.; all of
16 that.  And -- and related to the bank.
17     Q.   And when you say "related to the bank," are
18 you referring to the unauthorized withdrawals that you made
19 from customers' accounts?
20     A.   Yes.
21     Q.   Did you also tell them about the fact that
22 Mr. Ryu, after discovering what you had done, asking you
23 for monies and you delivering monies to him?
24     A.   I didn't tell them that the first time we met.
25     Q.   So, is it your testimony that at the first

Page 71

M. CHON

1
2  meeting with Special Agents Nathan Kim and Joel Decapua,
3  you didn't tell them about the fact that Mr. Ryu had asked
4  you for monies and that you had delivered monies to Mr. Ryu
5  in return?
6      A.   Right.  The first time I didn't tell them.
7      Q.   Why not?
8      A.   At the time nobody else knew about this.  I --
9  my alone was -- I was responsible for this matter.  I was
10 handling it on my own and I thought I was a little bit
11 frightened.  I was going through a lot of thoughts.  I was
12 in a state where it was very difficult mentally, very
13 difficult.  At the time I thought I shouldn't tell them.
14     Q.   Why not?
15     A.   I was worried that something maybe could
16 happen to me.  I mean at that point, I already, you know,
17 confessed that I did everything and I thought I should be
18 response -- I should take responsibility for it.
19     Q.   What did you mean when you said something
20 might or could happen to me?  What did you mean by that?
21     A.   I was afraid.  Maybe something bad could --
22 might happen.
23     Q.   What do you mean?
24     A.   In case when I -- when I say someone else had
25 me to do then I could get a revenge perhaps.

Page 72

M. CHON

1
2      Q.   Ms. Chon, I want to be very clear about this.
3  As of your first meeting with the special agents, did
4  Mr. Ryu do anything that led you to believe that he had
5  threatened you in any way?
6      A.   No, no.  I just -- that's what I felt on my
7  own.
8      Q.   Did he say or do anything as of that meeting
9  with the FBI agents that led you to believe that you may be
10 in danger from Mr. Ryu?
11     A.   Yes, this is what I felt.
12     Q.   Do you recall anything else that you told
13 Special Agents Nathan Kim and Joel Decapua the first
14 meeting?
15     A.   No.
16     Q.   Do you remember whether your meeting with
17 those two agents were being recorded in any way?
18     A.   I don't know.
19     Q.   Was there a subsequent meeting with
20 representatives of the FBI?
21     A.   Yes.
22     Q.   Do you remember when that was?
23     A.   I met once with my attorney.  Apart from that
24 I met separately.
25     Q.   Okay.  So is it fair to say that you met with

Page 73

M. CHON

1
2  special agents of the FBI on three separate occasions?
3      A.   Yes.  Two times just, you know, meeting with
4  -- only with me when they came to my home and -- and once
5  outside separately we met.
6      Q.   Okay.  So you've testified about the first
7  time you met with Special Agents Nathan Kim and Joel
8  Decapua at your home.  Was the second meeting the meeting
9  that Mr. Jeon attended?
10     A.   I'm not sure if that was the second meeting.
11 I think the second time was when we met separately.
12     Q.   Okay.  The second meeting, do you recall when
13 that was?
14     A.   Maybe that was also in February, but I don't
15 know exactly.
16     Q.   It was before your meeting with Mr. Ryu at the
17 diner, correct?
18     A.   You mean meeting with the FBI?
19     Q.   Yes, a second meeting.
20     A.   After.
21     Q.   Okay.  Did you have any other meetings with
22 special agents of the FBI prior to your meeting with
23 Mr. Ryu at the diner?
24     A.   No, I don't think so.
25     Q.   Okay.  The first meeting with Special Agents

Page 74

M. CHON

1 Kim and Decapua, was there any discussion about arranging a
2 meeting with Mr. Ryu?
3     A.  Yes.
4     Q.  Can you tell us what you remember about that
5 discussion?
6     A.  The first time I met with them because I have
7 not told them about James Ryu, so it was not at that time.
8 And later, I think I had a call with FBI and I made a --
9 you know, we made an arrangement to meet with James -- for
10 me to meet with James Ryu.  We made a call together.
11    Q.  When you say "we," who are you referring to?
12    A.  FBI.
13    Q.  And when you say FBI, are you referring to
14 Special Agents Nathan Kim and Joel Decapua?
15    A.  Yes.
16    Q.  Where were you when you made that call in
17 their presence?
18    A.  Libe -- library parking lot in Englewood.
19    Q.  Were you in their vehicle at the time?
20    A.  Yes.
21    Q.  And did you call Mr. Ryu from your cell phone?
22    A.  I made the call first and I think we -- it was
23 arranged for him to call me back again.
24    Q.  Okay.  I'm just asking for your best

Page 75

M. CHON

1 recollection.  I understand it's some time ago.  You may
2 not remember everything.  You testified about your initial
3 meeting with the special agents then you are now telling us
4 about your phone call to Mr. Ryu in the presence of the
5 special agents in their car.
6     What -- could you tell us the discussions or
7 any meetings that took place between your initial meeting
8 with the special agents and the phone call that you made to
9 Mr. Ryu from their vehicle?
10    A.  When we first met, I didn't -- I left them
11 without talk -- telling them about Mr. Ryu.  So now this is
12 after I told them all the context; everything about
13 Mr. Ryu.  So FBI -- so, FBI had me, I mean, arranged it for
14 me to have a meeting with them by, you know, by telephone
15 call to get evidences.
16    Q.  Okay.  After the first, your initial meeting
17 with the special agents, you said after that you told them
18 about James Ryu.  Was there a second meeting with the
19 special agents?
20    A.  No.  That was done through an attorney.
21    Q.  When you say "through an attorney," are you
22 referring to Mr. Jeon who's sitting to your left?
23    A.  Yes.
24    Q.  Is it your testimony that you asked Mr. Jeon

Page 76

M. CHON

1 to speak with the special agents about Mr. Ryu?
2     MR. JEON:  Wait.  Don't answer that.  That may
3 be privileged.  Whatever conversation she and I had
4 regarding this may be privileged, so don't answer that.
5     MR. HARVEY:  Can you have the question and
6 answer read back, please.
7     (Whereupon, the record was read back by the
8 Court Reporter.)
9     MR. JEON:  I want to explain to her what
10 "privileged" means.
11    (Whereupon, Mr. Harvey leaves the room.
12    MR. JEON:  Where are you going?
13    MR. HARVEY:  I'll be back.
14    MR. JEON:  Oh, you're going to sit in.
15    Q.  Ms. Chon, you testified earlier, I believe,
16 that when you first met with the special agents, you had
17 decided to take all the responsibility for what happened;
18 is that correct?
19    A.  Yes.
20    Q.  And is it fair to say that at that time, you
21 decided that you would not tell them about James Ryu's
22 involvement, correct?
23    A.  Yes.
24    Q.  What made you change your mind?

Page 77

M. CHON

1     A.  Because I thought it was so unfair.
2     Q.  What was unfair?
3     A.  It is certain that I did wrong.  I didn't
4 spend all that money, all the money from -- about that
5 point.
6     (Whereupon, Mr. Harvey enters the room.)
7     Q.  Let's go back to your telephone call to
8 Mr. Ryu in the presence of the special agents in their
9 vehicle.  Do you recall what you said to Mr. Ryu and what
10 Mr. Ryu said to you in that conversation?
11    A.  That conversation was asking to meet.
12    Q.  And did he agree to meet with you at that
13 time?
14    A.  Yes.
15    Q.  And is that the meeting at the diner that you
16 told us about earlier?
17    A.  No, this is a different date.
18    Q.  The meeting that you told us about with
19 Mr. Ryu at a diner, did that happen before you met with
20 special agents of the FBI?
21    A.  The meeting at the diner, I don't know
22 exactly.  That meeting, I called him and we met.  For me,
23 in order, I mean for me to tell him that I report it the
24 second time, FBI told me to meet him, meet with him.

Page 78

M. CHON

1
2       Q.  Did the special agents of the FBI give you any
3   other instructions about your meeting with Mr. Ryu?
4       A.  Yes.
5       Q.  What did they tell you?
6       A.  To -- to induce him to say that he was
7   involved.
8       Q.  Did they give you any other instructions?
9       A.  Just -- just, yeah, to keep saying -- to tell
10  him to pay back the -- ask him to pay back the money so
11  that, you know, I'll hear him saying.
12      Q.  Do you recall whether they asked you to wear a
13  recording device for this meeting?
14      A.  No, there was a camera.
15      Q.  When you say "there was a camera," where?
16  What are you referring to?
17      A.  Oh, they gave me a bag.
18      Q.  What was in the bag?
19      A.  I didn't look, but I heard that was the
20  camera.
21      Q.  Did they tell you it was a camera or audio
22  recording device?
23      A.  I knew it was audio.  But I thought I
24  understood that it was a camera because I was told to
25  adjust its location.

Page 79

M. CHON

1
2       Q.  Okay.  Is it fair to say, though, that you do
3   not know as you sit here today whether there was any video
4   equipment inside that bag; is that correct?
5       A.  I know the -- I knew that it was a
6   videocamera.
7       Q.  Okay.  Other than what they told you, you
8   don't know for a fact that there was a video -- any kind of
9   video equipment in the bag, right, you don't know yourself?
10      A.  Right.
11      Q.  I'd like to go back to Exhibit 6 for a moment,
12  if we may, and I'll represent to you that this exhibit is a
13  copy of a memorandum dated January 23rd, 2014, from Alicia
14  Lee to Elaine Jun.  Alicia Lee being First Vice President
15  and Operations Administrations Manager of Wilshire Bank to
16  Elaine Jung Senior Vice President and Chief Operations
17  Administrator of Wilshire Bank.  Subject is BA, or Bank
18  Asiana, unauthorized CD withdrawal incident.
19          The first paragraph states:  "This afternoon
20  after my arrival at South Palisades Park branch at around
21  12:10 p.m., Irene Lee, Bo Young Lee and I, had a meeting
22  with Karen Chon, former BA employee who had been involved
23  in the unauthorized withdrawals of funds from customer's
24  CD."  Do you see that?
25      A.  Yes.

Page 80

M. CHON

1
2       Q.  And does that statement accurately reflect the
3   meeting that you had with the three of them?
4       A.  Yes.
5       Q.  The second paragraph of this memorandum, it
6   says, "The details of the interview will be submitted
7   separately, but to summarize today's" -- "today interview,
8   Karen Chon confessed the unauthorized transactions were her
9   wrongdoing and that the funds were delivered to James Ryu,
10  BA COA," do you see that?
11      A.  Yes.
12      Q.  Did you, in fact, confess to them at that
13  meeting that the unauthorized transactions were your
14  wrongdoing and that the funds were delivered to Mr. Ryu?
15      A.  Yes.
16      Q.  The next paragraph states:  "The initial
17  contact was made by Mr. Ryu who had asked Karen for
18  personal loan to which she responded no, but he had asked
19  her if there was any way that he could" -- "we could
20  facilitate $10,000."  Do you see that?
21      A.  Yes.
22      Q.  Is that an accurate statement of you told
23  them?
24          MR. YI:  No.
25          THE INTERPRETER:  Oh, sorry.

Page 81

M. CHON

1
2           MR. YI:  Let me repeat the question.
3       Q.  Is that an accurate statement of what you told
4   them at that meeting?
5       A.  I'm not sure.
6       Q.  Okay.  I'm just clarifying because earlier,
7   you told us that the first time Mr. Ryu spoke with you
8   about the unauthorized withdrawals, he asked you for
9   $30,000.  This memorandum refers to Mr. Ryu asking you if
10  there was any way that you could facilitate $10,000.
11      A.  Although, he asked for $30,000 but he said
12  $10,000 and $10,000 separately.  But I don't know -- but I
13  don't recall clearly.  I'm not sure.
14      Q.  All right.  So is it fair to say that when he
15  asked for a specific amount of money, say, for example
16  30,000, it's possible that you gave him $10,000, three
17  separate times?
18      A.  No.  At first it was $30,000.
19      Q.  In one lump sum?
20      A.  Yes.
21      Q.  Okay.  So is it fair to say that this
22  statement in this memorandum may not be correct?
23      A.  Yes.
24      Q.  Okay.  And the fourth paragraph of this
25  memorandum states, "Since then, she had provided Mr. Ryu

Page 82

M. CHON

1
2 with cash whenever he had asked for it and he had always
3 made contact with her through company phone and never over
4 her personal home or cell phone number." Do you see that?
5      A.   Yes.
6      Q.   Is that a correct statement?
7      A.   Yes.
8      Q.   The next paragraph says, "Deliveries of the
9 funds were always in cash according to Karen Chon and that
10 either it was delivered personal by her or Mr. Ryu would
11 stop by at her branch to pick it up." Do you see that?
12      A.   Yes.
13      Q.   Is that a -- is that a correct statement?
14      A.   Yes.
15      Q.   The next statement or the next paragraph
16 states as per Karen's statement, "Mr. Ryu mentioned to her
17 that he would -- open quote -- "compensate" -- closed
18 quote -- "her for her help" -- also in quotation marks.
19           Do you see that?
20      A.   Yes.
21      Q.   Is that also a correct statement?
22      A.   Yes.
23      Q.   When he told you that he would compensate you
24 for your help, did you know what he was talking about?
25      A.   Maybe I could get promoted.

Page 83

M. CHON

1
2      Q.   Ms. Chon, again I'm not asking you to guess or
3 speculate, conjecture. I'm asking you whether you recall
4 Mr. Ryu saying anything specifically in this regard?
5      MR. HARVEY:   Objection.   You asked her -- you
6 didn't let her permit the answer to the first question.
7 The first question, did you know what she mean and she said
8 maybe a promotion.   She wasn't done answering that question
9 before you cut her off.   I believe she's entitled to --
10 entitled to answer that question.
11      Q.   I'm sorry I cut you off.   I didn't mean to.
12 Please go ahead and finish your answer.
13      A.   That's how I understood it.
14      MR. YI:   Could you read back, please.
15      (Record read as follows: "QUESTION: When he
16 told you that he would compensate you for your help, did
17 you know what he was talking about?")
18      Q.   So when he told you he would compensate you
19 for your help, you understood the word "compensate" to be a
20 promotion?   Is that your testimony?
21      A.   That's just my thinking.
22      Q.   All right.   The next paragraph of this
23 memorandum states, "Her recollection of the accounts
24 affected where" -- and then there's some redactions there.
25 I believe the word "where" I think meant to be were --

Page 84

M. CHON

1
2 "which she approximates to be around one million dollars."
3 Do you see that?
4      A.   Yes.
5      Q.   Is that a correct statement?
6      A.   Are you talking about the money withdrawn from
7 the CD accounts?
8      Q.   Yes.   The approximate total amount of the
9 unauthorized withdrawals from --
10      A.   Yes.
11      Q.   -- customer accounts?
12      A.   Yes.
13      Q.   The next paragraph states, "During the
14 interview, we have uncovered that Karen Chon has taken
15 funds from customer CDs for her husband's business use."
16 Do you see that?
17      A.   This, I don't know for certain.   I don't know
18 exactly.   I don't know what this is talking -- what they're
19 talking about.
20      Q.   You testified earlier, Ms. Chon, that to the
21 best of your recollection, approximately, 200- to 300,000
22 of the unauthorized withdrawals from customer accounts, you
23 kept for yourself, do you remember that?
24      A.   Yes.
25      Q.   Did you use all or a portion of those funds to

Page 85

M. CHON

1
2 help your husband in connection with his businesses?
3      A.   To pay off debt.
4      Q.   When you say "to pay off debt," did that debt
5 or debts belong to your husband or his businesses?
6      A.   What is it, that was the debt arose from close
7 or closed business.
8      THE REPORTER:   Clothes?
9      THE INTERPRETER:   Closed.   I'm trying to
10 und -- clearly understand.
11      A.   Oh.   Failed business.   Business went out of
12 business.
13      MR. YI:   All right.   We're going to take a
14 quick break at this time and we'll continue.
15      THE VIDEOGRAPHER:   Stand by.   The time is
16 3:17.   We're going off the record.   This will end media
17 unit No. 3.
18      (Brief recess was taken.)
19      THE VIDEOGRAPHER:   The time is 3:29.   We are
20 back on the record.   This begins media unit No. 4.
21 BY MR. YI:
22      Q.   Ms. Chon, I just want to clarify one point we
23 were trying to cover before the break.   When you referred
24 to debts of your husband's earlier, I just want to clarify,
25 are those -- is that debt or are those debts that's of your

Page 86

M. CHON

1
2 husband or your husband's businesses?
3     A.  Yes.
4     Q.  This paragraph goes out to state, "She
5 admitted forging her husband's signature as well as" -- and
6 there's a redaction -- "signature to issues checks from her
7 husband's business account."  Do you see that?
8     A.  Yes.
9     Q.  Did you, in fact, forge your husband's
10 signature in connection with his business account at Bank
11 Asiana?  I'm sorry.  Let me withdraw that question.
12         Do you recall during the time period of 2010
13 to 2013, did your husband maintain a bank account at Bank
14 Asiana, either your husband or his businesses?
15     A.  Business account.
16     Q.  You remember approximately how many?
17     A.  Three.
18     Q.  Was one of them account in the name of UB's
19 Pizza & Bagel, Inc.?
20     A.  Yes.
21     Q.  Was the other one an account under the name of
22 Bergenfield Bagel & Cafe, Inc.?
23     A.  Yes.
24     Q.  And was the other one Maywood Bagel, Inc.?
25     A.  Yes.

Page 87

M. CHON

1
2     Q.  And is it correct that in connection with
3 those three business accounts, you forged your husband's
4 signature from time to time during your employment at Bank
5 Asiana?
6     A.  Yes.
7     Q.  Was your husband aware that you were forging
8 his signature in connection with his business accounts?
9     A.  Yes.
10     Q.  Is it fair to say that in addition to your
11 husband's signatures, you also forge the signatures of
12 other Bank Asiana customers who had accounts at Bank
13 Asiana?
14     A.  In order to take out money?  Withdraw money?
15     Q.  Either to make unauthorized withdrawals or to
16 make transfers from those customers' accounts to another
17 customer's account?
18     A.  No.
19     Q.  Other than your husband's signature, did you
20 forge the signature or signatures of any Bank Asiana
21 customers during your employment there?
22     A.  No.
23     Q.  All right.  Let's go back to your meeting with
24 Mr. Ryu at the diner following your call to him from the
25 vehicle with the special agents.  You testified earlier

Page 88

M. CHON

1
2 that the special agents gave you a bag to take with you to
3 the meeting, correct?
4     A.  Yes.
5     Q.  And did you meet with Mr. Ryu that day?
6     A.  Yes.
7     Q.  And did you meet with him also at a diner?
8     A.  Different restaurant.
9     Q.  But it was also a diner?
10     A.  Kind of.
11     Q.  Okay.  Did you meet with Mr. Ryu the same day
12 that you placed a call to him from the vehicle with the
13 special agents?
14     A.  Yes.
15     Q.  Was that February 12, 2014?
16     A.  I don't know the date.
17     Q.  Is it fair to say that it was in
18 February 2014?
19     A.  Maybe.  I think it was February.
20     Q.  Okay.  Could you tell us what you remember
21 about that meeting?
22     A.  At the time I met with him?
23     Q.  Let's start with this, how did you get to the
24 restaurant or the diner?
25     A.  I drove my car.

Page 89

M. CHON

1
2     Q.  And what happened when you got to the diner?
3     A.  I met -- we met.  I said -- Oh, according to
4 what they said from Wilshire Bank, if I pay back all this
5 money to Wilshire Bank, it would be -- I'll be okay.  So, I
6 asked him to pay me back that money promptly.
7     Q.  And what did he say to you in response to
8 that?
9     A.  Did the bank say that, did they say so, he
10 asked.  So, I kept saying -- I didn't want to stimulate
11 him, like I didn't want to make him angry so I just kept
12 begging -- I kept asking him to help me to pay back, and it
13 appeared that he was thinking -- he was thinking about it.
14     Q.  Can you tell us -- withdrawn.
15         What did he -- what, if anything, did he say
16 to you in return in response?
17     A.  Just like what I just told you before.  So, I
18 told him that from the bank's side as long as, you know, I
19 pay the money to make up the loss, they weren't going to --
20 you know, it appeared they weren't -- they said they
21 weren't going to turn it into a big issue, a big problem.
22 So I told him that.  And he said -- he asked me, did the
23 bank say that for sure, and he said that he will think
24 about it.
25         And so, I mean -- and so I said, if he can

Page 90

M. CHON

1   also -- if -- that's a lot of money, so if he can give me
2   that money to me then I can pay back, and I can make up
3   that money, and I just kept asking him to help me.
4   
5       Q.  Do you recall him saying anything else in
6   response to what you asked him?
7       A.  I mean he didn't really say much.  He didn't
8   really reply.  He didn't really answer for certain, in
9   certainty.
10      Q.  Did you do anything or say anything at that
11  meeting to get him to acknowledge the fact that he asked
12  you for monies and that you delivered monies to him?
13      A.  Whether I did, I don't recall.  We just kept
14  talking about that to give me the money back.
15      Q.  How did you end the meeting with him?
16      A.  I think I might have said -- I think I asked
17  him to -- to contact me, give me a call.
18      Q.  And what was his response?
19      A.  He said he got it, yes, he got it.
20      Q.  Is it fair to say that you didn't tell him
21  about the bag that you were carrying that the special
22  agents gave you?
23      A.  No, I didn't.
24      MR. JEON:  Stipulated.
25      Q.  Since that meeting at the diner, have you met

Page 91

M. CHON

1   with Mr. Ryu prior to today?
2       A.  No, I haven't.
3       Q.  Since that meeting at the diner with Mr. Ryu,
4   have you had any -- other than a meeting, have you had any
5   telephone communication with him?
6       A.  No.
7       Q.  Have you had any other communication
8   whatsoever with Mr. Ryu since that meeting at the diner?
9       A.  No.
10      Q.  Let's go back to your meeting with Lisa Pai,
11  the chief legal officer of Wilshire Bank.  Is it fair to
12  say that you met with Ms. Pai after your meeting with James
13  Ryu at the diner we just talked about?
14      A.  It was after we talked, yes.
15      Q.  Okay.  Before we get to the meeting, your
16  meeting with Ms. Pai, did you have any meetings with any
17  representatives of the U.S. Attorney's office for the
18  District of New Jersey?
19      A.  I don't know if it was before.  I'm not sure.
20      Q.  Did there come a time when you had a meeting
21  with representatives of the U.S. Attorney's office of the
22  District of New Jersey?
23      A.  Yes.
24      Q.  All right.  Let's go back to the meeting with

Page 92

M. CHON

1   Ms. Pai.  Do you recall the circumstances that led to that
2   meeting?  And I apologize, I may have asked you this
3   question before during one of our breaks.
4       A.  They wanted to meet from the bank first.
5       Q.  When you say "they," who are you referring to?
6       A.  I think it's one of either Bo Young Lee,
7   manager Lee, or Irene Lee.
8       Q.  Do you remember having a telephone
9   conversation with Lisa Pai before meeting with her?
10      A.  I don't know.  I don't recall.
11      Q.  Okay.  Where was the meeting?
12      A.  Double Tree Hotel in Fort Lee.
13      Q.  Was the meeting on February 14, 2014, if you
14  recall?
15      A.  I think it was.
16      Q.  Was anybody there other than Lisa Pai?
17      A.  I think only with her.
18      Q.  And can you tell us what you remember her
19  asking you at that meeting and you telling her?
20      A.  What I talked with Wilshire Bank people like
21  how I began and everything.  I told her everything, the
22  same story.
23      MR. YI:  At this time, I'm going to have a
24  document marked as Exhibit 7 to this deposition.

Page 93

M. CHON

1       (Plaintiff's 7, Notes was marked for
2           identification, as of this date.)
3       Q.  Ms. Chon, I'm showing you what's been marked
4   as a document that's been marked Exhibit 7 to your
5   deposition and I'm going to ask you to take a look at the
6   first page first.  There's a reference to -- and I
7   represent to you that these are handwritten notes by Lisa
8   Pai of her meeting with you on February 14th, 2014.
9       On the top, it says, "Karen," dash, "meeting"
10  or MTG.  And the first line says, "husband," dash,
11  "concentrates on work," does that --
12      THE INTERPRETER:  Notes before meeting.
13      MR. YI:  No.
14      THE INTERPRETER:  Oh, okay.  So not the first
15  page.  We are on -- what you're talking is one, two,
16  three -- fourth page, yes?  Page number four?
17      MR. YI:  Yes, this exhibit actually -- the
18  first page of this exhibit should be WB2057.
19      MS. CHUANG:  What does that have?
20      MR. JEON:  No, 54.  You have it wrong.  It
21  starts at 2054, and goes in numerical order to --
22      MR. YI:  Okay.
23      MR. JEON:  -- 059.
24      MR. YI:  Okay.  If you could just turn to the

Page 94

1                      M. CHON

2  page numbered WB2057 which, I believe, should be the third

3  page of that exhibit.

4           MR. JEON:  Fourth page.

5           MR. YI:  Fourth page.

6           Can you we make that correction right now,

7  please?  The first three pages should not be part of this

8  exhibit.

9           MS. CHUANG:  Okay.

10         MR. JEON:  You gave us notes of your own notes

11  they took down before the meeting.  Your own prep notes, I

12  guess.

13         MR. YI:  They're not mine.

14         MR. JEON:  I mean not yours but the bank.

15         MR. YI:  Yeah, they've been produced.

16         MR. JEON:  Okay.  So are we correcting it to

17  be 2057, 2059 or just 2057?

18         MR. YI:  2057 and 2058 and 2059.

19         MR. JEON:  Okay.

20       Q.  Okay.  On the fist page, Ms. Chon, there's

21  reference to "husband" -- dash -- "concentrates on work."

22  Does that refresh your recollection as to --

23         MS. CHUANG:  I'm sorry, I have to give this

24  back.

25         THE INTERPRETER:  Okay.  Do it after.

Page 95

1                    M. CHON

2        MS. CHUANG:  Yeah, I'll do it after.

3       Q.  Does that refresh your recollection as to your

4  conversation with Ms. Pai at that meeting about your

5  husband?

6       A.  Yes.

7       Q.  Is it fair to say that this is reference

8  saying her inquiry as to whether your husband was aware of

9  what you had done?

10        MR. JEON:  Mr. Yi, I'm going to object to this

11  line of question only because how is she going to guess

12  what this indiv -- whoever asked her these questions, I

13  guess Ms. Pie, I'm assuming these are her -- the notes, Ms.

14  Pie's notes.

15        MR. YI:  Right.  I'll withdraw the question.

16  I'll rephrase the question.

17        MR. JEON:  I mean you could just ask her, hey,

18  listen, is it -- did you tell Ms. Pie your husband didn't

19  know about this because he's too busy concentrating on

20  work.  But to ask what these answers are responsive too,

21  she can't guess from what happened two years ago.

22        MR. YI:  Fair enough.

23        MR. JEON:  I don't remember what I did this

24  morning, so.

25       Q.  Do you remember having a discussion with Ms.

Page 96

1                    M. CHON

2  Pai at that meeting in which she asked you whether your

3  husband was aware of what you had done?

4       A.  She asked me whether he knew and I answered I

5  didn't know.

6       Q.  Do you remember telling her anything else?

7       A.  I don't know.

8       Q.  Is it fair to say that there came a time when

9  you did tell her husband what you had done?

10       A.  After having an interview with the FBI.  After

11  that.

12       Q.  Prior to that, did your husband ask you about

13  the monies that you kept for yourself from the unauthorized

14  withdrawals?

15       A.  My husband was not aware at all, didn't know

16  at all.

17       Q.  Ms. Chon, you know what a "gae" is, right,

18  G-A-E?

19       A.  Yes.

20       Q.  Did you at any time tell your husband that the

21  monies that you kept from the unauthorized withdrawals were

22  sources from a Korean "gae"?

23       A.  I was always involved in this gae.  And if I

24  had any cash, he always knew it was -- it was money from

25  gae.  He assumed it was money from Gae.

Page 97

1                    M. CHON

2        MR. JEON:  Mr. Harvey, do you need explanation

3  on gae or are you just going to let that go?

4        MR. HARVEY:  I'm happy with the way the

5  testimony's been going.

6        MR. JEON:  Okay.

7       Q.  I'm going to ask you to refer to the last page

8  of this exhibit No. WB2059.  During your meeting with Ms.

9  Pai at the Double Tree Hotel, did there come a time during

10  that meeting when Ms. Pai asked you the approximate total

11  amount of the unauthorized withdrawals you made?

12       A.  I think she told me how much it was.

13       Q.  Do you have any recollection of her asking you

14  approximately the approximate total amount of the

15  unauthorized withdrawals that you had made?

16       A.  I don't recall.

17       Q.  At that meeting, did you have any discussions

18  with Ms. Pai about the approximate or estimated total

19  amount of the unauthorized withdrawals that you made?

20        (Whereupon, the record was read back by the

21  Court Reporter.)

22       A.  I just heard -- I was told what the

23  approximate amount was.  I just -- I don't remember what I

24  said regarding that.

25        MR. JEON:  If you looked at this document,

Page 98

M. CHON

1
2 would it help you remember?
3     A.  I'm looking at it right now.
4        MR. JEON:  Would it help you remember?  I
5 don't know.  She said it --
6     Q.  Ms. Chon.
7     A.  I don't recall exactly.
8     Q.  If you -- the last page of this exhibit
9 WB2059, there's reference to a 1.2 mil; do you see that?
10 Does that refresh your recollection as to the approximate
11 total amount of the unauthorized withdrawals that you made
12 which you discussed with Ms. Pai at that meeting?
13     A.  I think she said it was this much.
14     Q.  Okay.  And during that discussion, do you
15 remember whether you told her the approximate total amount
16 that you had given to Ms. Ryu from the unauthorized
17 withdrawals?
18     A.  It seems that I -- I told her that I gave him
19 $700,000.
20     Q.  And is that your recollection?
21     A.  Yes.
22     Q.  And do you recall whether you told Ms. Pai at
23 that meeting during that discussion how much approximately,
24 -- approximately how much the total amount that you kept
25 for yourself from those unauthorized withdrawals?

---

Page 99

M. CHON

1
2     A.  Yes.
3     Q.  What did you tell her?
4     A.  I think I said approximately I gave Mr. Ryu
5 $700,000 and the rest I spent it.  I kept it.
6        MR. JEON:  You caught yourself.
7     Q.  Before the lunch break earlier today, I had
8 asked you for the approximate total amount that you had
9 kept from the unauthorized withdrawals, you testified at
10 that time that your estimate was in the range of 200,000 to
11 300,000.  My question to you is, as you sit here today, to
12 the best of your recollection, is it in the range of
13 200,000 to 300,000 or is it approximately 500,000?
14     A.  $500,000.
15     Q.  Thank you.  Could you tell us what you did
16 with the approximately -- the approximate $500,000 that you
17 kept from the unauthorized withdrawals?
18     A.  As I told you before to pay off debt.
19     Q.  And I apologize if I asked this earlier, but
20 the debt that you're referring to, the debts that you're
21 referring to, is that the debt or debts of your husband's
22 businesses?
23     A.  Yes, that plus personal debt, plus.
24     Q.  So the debts that you're referring to include
25 the debts of your husband's company Bergenfield Bagel &

---

Page 100

M. CHON

1
2 Cafe Inc., doing business as Cafe Clair, correct?
3     A.  That, no, no.  That is the one is the current
4 business he's doing.
5     Q.  And did the debts that you were referring to
6 earlier include the debts of Bergenfield Bagel & Cafe,
7 Inc.?
8     A.  No.
9     Q.  So is it your testimony that none of the
10 approximate 500,000 was used to pay off the debts of
11 Bergenfield Bagel & Cafe, Inc.?
12     A.  Not there.  Not that.
13     Q.  Was any portion of the approximately 500,000
14 used to pay off debt or debts of Maywood Bagel, Inc.?
15     A.  Yes.
16     Q.  Was any portion of the approximately $500,000
17 used to pay off the debts of UB's Pizza & Bagel, Inc.?
18     A.  Yes.
19     Q.  Was any portion of the approximately $500,000
20 used to pay off the debts of UB's Bagel & Cafe, Inc.?
21     A.  That, I'm not sure.
22     Q.  Was any portion of the approximately $500,000
23 used to pay off the debts of UBK Bagel's Corp. doing
24 business as Franklin Bagels & Cafe?
25     A.  No.

---

Page 101

M. CHON

1
2     Q.  Do you know who currently owns and operates
3 Franklin's Bagels & Cafe?
4     A.  My sister-in-law.
5     Q.  Was your husband ever an officer or
6 shareholder of UBK Bagels Corp.?
7     A.  He was the president.  No longer.  Not now.
8     Q.  Is it fair to say that he either sold the
9 shares of the corporation or the assets of the corporation
10 to your sister-in-law at some point?
11     A.  Yes.
12     Q.  Do you remember when that was?
13     A.  Two, three years.  I don't know exactly.
14     Q.  Was it before or after you left Bank Asiana?
15     A.  Before, I think, it was.
16     Q.  Do you remember the sale price?
17     A.  I don't know exactly.  My husband knows.
18     Q.  I'd like to clarify one point.  You said
19 earlier that portions of the approximately 500,000 was used
20 to pay off the debts of the three companies that we just
21 talked about, and also, you made reference to personal
22 debts.  When you made reference to personal debts, were you
23 talking about just you or both you and your husband?
24     A.  Mine.
25     Q.  Was any portion of the approximately $500,000

Page 102

M. CHON

1  used to pay off the personal debts of your husband?
2      A.  No.
3      Q.  You testified earlier that you had a meeting
4  with the U.S. Attorney's office of the District of New
5  Jersey, correct?
6      A.  Yes.
7      Q.  How many times did you meet with
8  representatives of the U.S. Attorney's office of the
9  District of New Jersey?
10     A.  Once.
11     Q.  Is it fair to say that meeting took place
12 after your meetings with special agents of the FBI?
13     A.  I think it was after.
14     Q.  Did that meeting occur in February of 2014?
15     A.  I don't know.
16     Q.  Was it before or after your meeting with
17 Mr. Ryu at the diner?
18     A.  After.
19     Q.  Where was the meeting?
20     A.  With U.S. attorney?
21     Q.  Yes.
22     A.  I think it was here.
23     Q.  Was it at the U.S. Attorney's office?
24     A.  This build -- was it this building or not?

Page 103

M. CHON

1  But it was in Newark.
2      Q.  And was your attorney, Mr. Jeon, with you?
3      A.  Yes.
4      Q.  And do you remember who was at that meeting?
5      A.  Two FBI agents, the U.S. Attorney, or a USA,
6  assistant USA prosecutor.  Not the attorney, prosecutor.
7      Q.  Okay.  Prosecutor or U.S. Attorney or
8  assistant U.S. Attorney.  Do you remember how many U.S.
9  assistants were at that meeting?
10     A.  One.
11     Q.  Do you remember his name or her name?
12         MR. JEON:  His name.
13     A.  Paul.
14     Q.  Was it Paul Murphy?
15     A.  Yes.
16         MR. YI:  Off the record for a second.
17         THE VIDEOGRAPHER:  Stand by.  The time is
18 4:15.  We're going off the record.
19         (Whereupon, an off-the-record discussion was
20 held.)
21         THE VIDEOGRAPHER:  The time is now 4:17.
22 We're back on the record.
23     Q.  Ms. Chon, just directing your attention to
24 your meeting with Assistant U.S. Attorney, Paul Murphy, in

Page 104

M. CHON

1  or about February of 2014, could you tell us what you
2  remember about what Mr. Murphy asked you at that meeting
3  and what you told him at that meeting?
4      A.  I think it was the same story, same substance.
5      Q.  When you say "same story, same substance," is
6  it your testimony that what you told Mr. Murphy at that
7  meeting is in substance substantially the same as what you
8  told the representatives of Wilshire Bank and what you told
9  the special agents of the FBI?
10     A.  I don't recall exactly.
11         MR. JEON:  Your question is general.  You
12 might want to ask specific questions, specific substance
13 with specific --
14     Q.  Right.  Let's go back to that meeting at the
15 U.S. Attorney's office.  Just to the best of your
16 recollection, tell us what you remember Mr. Murphy asking
17 you at that meeting and what you told him at that meeting?
18         MR. JEON:  Objection as to form.  Again, I
19 think it's just too general to ask her what Mr. Murphy said
20 and how she responded.  If you want to ask her, for
21 example, hey, did you -- did you give that money to
22 Mr. Ryu, and did you tell him that you gave him $700,000
23 like you told Ms. Pai, I think if you asked -- I don't mean
24 to prolong this deposition, but if you asked that way, she

Page 105

M. CHON

1  may remember, yes or no.  But if you asked her what did
2  Paul say; Paul said good morning, I'm an assistant U.S.
3  Attorney, you're here; you know, she can't remember all
4  that.  Heck, I can't remember all that.
5      But I can remember what she said because I
6  have my notes, but again, you have to refresh her
7  recollection almost like a cross; say, hey, did you tell
8  him that you were married; yeah, I told him I'm married,
9  for example.
10     Q.  Did Mr. Murphy at that meeting ask you about
11 the unauthorized withdrawals that you made from Bank
12 Asiana's customer accounts?
13     A.  Yes, how I did it.  I told him about how I did
14 it and everything.
15     Q.  And at that meeting, did you tell Mr. Murphy
16 that Mr. Ryu had at some point learned about what you had
17 done and had asked you for monies and that you subsequently
18 delivered sums of cash to him on approximately ten
19 occasions?
20     A.  Yes.
21     Q.  And was there discussion at that meeting with
22 Mr. Murphy about the approximate total amount of the
23 unauthorized withdrawals that you had made?
24     A.  I don't know.

Page 106

M. CHON

1
2      Q.   Did Mr. Murphy ask you at that meeting about
3  the approximate total amount of the monies that you had
4  given to Mr. Ryu from unauthorized withdrawals that you
5  made?
6      A.   I really don't know.
7      Q.   I understand.   It's late in the day and I
8  understand that you're getting tired.   Let me just ask a
9  different way.   Do you recall telling Mr. Murphy at that
10 meeting that you had given to Mr. Ryu approximately
11 $700,000 from the unauthorized withdrawals?
12     A.   Yes.
13     Q.   Yes, you did tell him or, yes, you remember?
14     A.   I think I told -- I think I said -- I think I
15 told him.
16     Q.   Did you also tell Mr. Murphy at that meeting
17 that of the unauthorized withdrawals you kept for yourself
18 approximately $500,000?
19     A.   I don't recall whether I -- whether I told him
20 the exact number, but -- but I think I mentioned that I
21 kept -- the fact that I kept, kept the money.
22     Q.   Ms. Chon, do you have anything, anything in
23 writing that would reflect the sums of cash that you gave
24 to Mr. Ryu from the unauthorized withdrawals?
25     A.   There is nothing in writing for record.

Page 107

M. CHON

1
2      Q.   When you were employed by Bank Asiana, did you
3  keep a diary?   Did you maintain a diary?
4      A.   Bank diary.
5      Q.   When you left Bank Asiana -- withdrawn.
6           Do you still have those diaries?
7      A.   There was not much memo so I didn't keep it.
8  I didn't keep the diary.
9      Q.   Do you know where they are?
10     A.   I think that was all thrown away at the time
11 back then.
12     Q.   Other than the bank's calendar or diary that
13 you say were thrown away, did you keep or maintain during
14 your employment with Bank Asiana any personal calendar or
15 diaries?
16     A.   I had a calendar.
17     Q.   Do you have those to this day?
18     A.   No, I don't have mine, but I have some other
19 employees.
20     Q.   Why do you have calendar or diaries of other
21 -- of former Bank Asiana employees?
22     A.   Oh, in another employee's calendar, every
23 employee's ID and passwords were -- they were contained,
24 included.   They were contained, written and because of
25 that, I kept it.   But I'm not sure whether I still have it

Page 108

M. CHON

1
2  up to now.
3      Q.   Were those calendar of other, either, current
4  employees or former employees of Bank Asiana's with -- with
5  -- would those calendar or diaries have reflect the
6  amounts, amounts of the unauthorized withdrawals that you
7  had made?
8      A.   No.
9      Q.   To your knowledge, did Mr. Ryu during your
10 employment at Bank Asiana maintain a bank issued calendar
11 or diary or appointment book?
12     A.   That, I don't know, probably his secretary of
13 state knows.
14     Q.   Again, I'm not asking you to guess or
15 speculate.   To your knowledge, does Mr. Ryu have anything
16 in writing which would reflect the total amount or the
17 various amounts that -- of cash that you delivered to him
18 from the unauthorized withdrawals that you made?
19     A.   I don't know.
20     Q.   Did you have any discussions during your
21 employment at Bank Asiana, did you have any discussions
22 with Mr. Ryu concerning a woman named Eun Hee Pak, E-U-N,
23 H-E-E, P-A-K?
24          MR. YI:  I believe it's --
25     A.   She was just an employee.   What is the

Page 109

M. CHON

1
2  question?
3      Q.   My question is, did you have any discussions
4  with Mr. Ryu concerning Ms. Pak?
5      A.   I don't recall.
6      Q.   During your employment at Bank Asiana, did you
7  have any knowledge of the nature of the relationship
8  between Mr. Ryu and Ms. Pak?
9      A.   His secretary?   I think he was doing that --
10 that kind of work.
11     Q.   Beyond that, did you have any knowledge about
12 the nature of the relationship between the two of them?
13     A.   I understood as Eun Hee Pak's husband's --
14 business-wise somehow connected with James Ryu, James Ryu.
15     Q.   During your employment at Bank Asiana, did you
16 have any discussions with Mr. Ryu concerning a business
17 that he owned, a hair salon business that he owned called
18 Luz, or Luz, spelled L-U-Z?
19     A.   I think that is connected to Eun Hee Pak.
20     Q.   When you say that business was connected to
21 Ms. Pak, can you just clarify what you mean?
22     A.   Whether they are partners -- whether they --
23 it was sold from one to another.   I think that's what I
24 heard.   That's how I heard.
25     Q.   I'm sorry, let me just go back to my original

Page 110

M. CHON

1
2  question. During your employment at Bank Asiana, did you
3  have any discussions with Mr. Ryu, any specific discussions
4  with Mr. Ryu concerning his hair salon business called Luz?
5      A. No.
6      Q. During your employment at Bank Asiana, did you
7  have any discussions with Mr. Ryu concerning a business
8  that he owned called a cafe business called Seleste,
9  S-E-L-E-S-T-E?
10     A. No.
11     Q. During your employment at Bank Asiana, did you
12 have any discussions with Mr. Ryu concerning Soyu
13 Architecture, S-O-Y-U?
14     A. No.
15     Q. Did you have any discussions with Mr. Ryu
16 concerning an individual named Michael Kim?
17     A. Michael Kim was our customer, but we had a lot
18 of -- many internal calls concerning his account.
19     Q. Do you recall any conversations with Mr. Ryu
20 in which he told you that he owed monies to Soyu
21 Architecture?
22     A. The question right now, are you asking me the
23 conversation with Mr. Ryu?
24     Q. Yes, did Mr. Ryu ever tell you?
25     A. No.

Page 111

M. CHON

1
2      Q. Did Mr. Ryu ever tell you that when he asked
3  you for money that he -- or at any other time whether he
4  owed monies to a person by the name of Michael Kim?
5      A. No.
6      Q. During your employment at Bank Asiana, did you
7  have any discussions with Mr. Ryu concerning a bank called
8  New Millennium Bank?
9      A. No.
10     MR. YI: Why don't we take a quick break.
11     THE VIDEOGRAPHER: Stand by. The time is
12 4:38. We're going off the record.
13     (Brief recess was taken.)
14     THE VIDEOGRAPHER: The time is 4:50. We're
15 back on the record.
16     Q. Ms. Chon, during your employment at Bank
17 Asiana, did you have any discussions with Mr. Ryu
18 concerning a business call Kore Consulting, K-O-R-E.
19     A. In relations to the account, to an account.
20     Q. Was Michael Kim the president and shareholder
21 of Kore Consulting?
22     A. Yes.
23     Q. So when you mentioned earlier that Michael Kim
24 was a customer of Bank Asiana, were you referring to Kore
25 Consulting?

Page 112

M. CHON

1
2      A. Kore Consulting and nail salon called Cleo,
3  he's the president of the -- I'm sorry, what was the --
4      Q. I'm sorry, what was the name of the nail
5  salon?
6      A. Cleo.
7      Q. C-L-E-O?
8      A. Yes.
9      Q. My question though was, do you recall having
10 any discussions with Mr. Ryu during your employment at Bank
11 Asiana about Kore Consulting?
12     A. About -- regarding the business we have not
13 talked.
14     Q. At any time when you delivered sums of cash to
15 Mr. Ryu or he picked them up, during that time period, did
16 he ever tell you why he needed the money or wanted the
17 money?
18     A. No, but I knew he had debt.
19     Q. Do you know who he owed monies to?
20     A. Michael Kim.
21     Q. Was it Michael Kim or was it companies or
22 businesses owned by Michael Kim?
23     A. That, I don't know exactly.
24     Q. Did he ever tell you about the nature about
25 the debt?

Page 113

M. CHON

1
2      A. Michael Kim has told me.
3      Q. And was that during your employment at Bank
4  Asiana?
5      A. Yes.
6      Q. Can you tell us what you remember him telling
7  you?
8      A. Michael Kim had a lot of accounts for Cleo
9  Nail Salon. The accounts were always overdrawn. It was
10 always -- they were always negative balance. I mean, if
11 the -- the checks, the banks would not pay for them unless
12 they do deposits because there was not sufficient money
13 always. Every time he'd call me, oh, to ask me to give one
14 more day like a grace period and -- but I didn't have the
15 authority for that and I had to get an approval from
16 Mr. Ryu, but I'm supposed to get it from the branch
17 manager.
18     But Michael Kim would ask me to call directly
19 Mr. Ryu and so two -- those two people, they would talk on
20 the telephone and then James Ryu would instruct me to pay,
21 to pay and that was repeated several times. The same
22 instant kept happening. I would tell Michael Kim I can't
23 do it; he needs to make a deposit and he would say, oh, if
24 James Ryu -- James Ryu would pay him the money then he
25 could use that money to deposit, but I don't -- you know,

Page 114

M. CHON

1
2  he doesn't have the money.  That's what he used to say.
3  That's how I found out.
4       Q.  So is it your testimony that during those
5  conversations with Michael Kim, he told you that Mr. Ryu
6  owed him money?
7       A.  Yes.
8       Q.  Did he ever tell you how much Mr. Ryu owed to
9  Michael Kim?
10      A.  No, he didn't say.  He's never said the exact
11  amount.
12      Q.  Did he ever tell you the nature -- withdrawn.
13          Did he ever tell you the -- why Mr. Ryu owed
14  monies to Michael Kim?
15      A.  Everything I heard, like, from employees.  I
16  heard from employees, all the employees they knew.
17      Q.  When you say all the employees knew, what did
18  they know?
19      A.  Oh, that, you know, they didn't know what kind
20  of business/which business but through business this debt
21  was accumulated, this detective arose.
22      Q.  Is it your testimony that based on what you
23  heard from other employees from Bank Asiana that you had an
24  understanding that Mr. Ryu had debts relating to one or
25  more of his businesses?

Page 115

M. CHON

1
2       A.  Yes.
3       Q.  Did Michael Kim's company Cleo have -- at the
4  time you were employed by Bank Asiana have a loan with Bank
5  Asiana?
6       A.  Yes.
7       Q.  Do you remember the amount of the loan,
8  approximately?
9       A.  It was a lot.
10      Q.  Was it over a million dollars?
11      A.  A lot more.  Near five million.  It was just
12  not one loan, one.  Several, several loans.
13      Q.  Did Michael Kim ever tell you that Mr. Ryu
14  owed him money because a portion of the loan proceeds taken
15  out by Cleo was given to Mr. Ryu?
16      A.  No.
17      Q.  Earlier today you told us that before --
18  sometime before you left the employee of Bank Asiana that
19  you had lunch with Mr. Ryu and Irene Lee, do you remember
20  that?
21      A.  Yes.
22      Q.  During your employment at Bank Asiana, did you
23  have any other lunches with just Mr. Ryu?
24      A.  Just two of us?
25      Q.  Yes.

Page 116

M. CHON

1
2       A.  Almost it was always with Irene Lee.  I don't
3  recall.  Two of us.
4       Q.  Do you recall the circumstances leading up to
5  that lunch?
6       A.  When?
7       Q.  It was sometime before you left Bank Asiana,
8  you told us that you had lunch with Mr. Ryu and Irene Lee,
9  how did the two of you come to have lunch together?
10      A.  Always Irene Lee calls me.  They always asked
11  me out unless I have another lunch appointment.
12      Q.  At that lunch, did you have any private
13  discussions with Mr. Ryu outside of your lunch with Irene
14  Lee?
15      A.  No.
16      Q.  Ms. Chon, with respect to the unauthorized
17  withdrawals that you made while you were employed by Bank
18  Asiana, is there anything -- is there anything about those
19  withdrawals that you have not told us about today that you
20  have not covered?
21      A.  Apart from this?  No.
22      Q.  So, to the best of your knowledge and to the
23  best of your recollection, we have covered today thus far
24  all the facts as you know them related to your unauthorized
25  withdrawals that you made while you were employed at Bank

Page 117

M. CHON

1
2  Asiana?
3       A.  Yes.
4       Q.  With respect to Mr. Ryu and the fact that he
5  asked you for money and the fact that you delivered sums of
6  cash to him at his request from the unauthorized
7  withdrawals, is there anything that we have not covered in
8  that respect?
9       A.  No.
10          MR. YI:  I have no more questions at this
11  time.  Plaintiff Wilshire Bank reserves the right to
12  continue the deposition of this witness.
13      A.  One thing, one thing.
14      Q.  Okay.
15      A.  To other employee, Irene Lee personal loan, I
16  understand that -- I know as he asked for a personal loan
17  from the CEO -- the CEO received a request, no, no.  Irene
18  Lee, the CEO -- the Irene Lee received a request from the
19  CEO to take a personal loan and lend them money to James
20  Ryu.
21      Q.  When you say CEO, are you referring to
22  Mr. Hong Sik Hur?
23      A.  Yes.
24      Q.  Who during your employment with Bank Asiana
25  was president and CEO of Bank Asiana?

Page 118

M. CHON

1
2       A.  Yes.
3       Q.  Is it your testimony that Mr. Hur approached
4   Irene Lee and asked Irene to take a loan from the bank and
5   to use the proceeds of that loan and give it to Mr. Ryu?
6       A.  We didn't -- at Bank Asiana, you can get an
7   employee -- employee loan up to $25,000, but already James
8   Ryu took out his own -- his personal loan but he needed
9   more money, so the -- so the CEO proposed to -- said to
10  Irene Lee, I am going to approve the loan, the personal
11  loan so take -- take the personal loan under your name and
12  give that money to James Ryu.  And at the time Irene Lee
13  discussed that with me and the manager.  But I know as
14  Irene Lee refused that, that she couldn't.
15      Q.  Okay.  When you say you had a discussion about
16  the CEO's proposal or suggestion, who's the manager that
17  you're referring to?
18      A.  Bo Young Lee manager, I think, it was.
19      Q.  Bo Young Lee?
20      A.  Bo Young Lee.
21      Q.  Did there come a time when you found out that
22  Irene Lee had resigned from Wilshire Bank?
23      A.  Yes, I know.
24      Q.  Do you know why she resigned?
25      A.  I think because of this instant.  I think she

Page 119

M. CHON

1
2   probably had a lot of work like she was working overtime a
3   lot and she had to just get involved in this matter a lot.
4   So, I mean I'm just -- this is my thought, my thinking.
5       Q.  Did she ever tell you whether there was any
6   specific reason or reasons that she resigned?
7       A.  No.  We have not talked on the phone since
8   then.
9       Q.  Is there anything else that we have not
10  covered?
11      A.  No.
12          MR. YI:  I have no more questions at this
13  time.  Plaintiff Wilshire Bank hereby reserves the right to
14  continue the deposition of this witness, following
15  production of the documents we have requested including
16  those previously requested in Wilshire Bank's first
17  production of documents and first sets of interrogatories
18  each dated October 24, 2014.  Thank you.
19  EXAMINATION BY
20  MR. HARVEY:
21      Q.  I am now going to ask some questions.  Ms.
22  Chon, my name is Steve Harvey and I represent James Ryu.
23          Before you worked for Bank Asiana, you worked
24  for a bank in New York called Liberty, right?  True?
25      A.  Yes.

Page 120

M. CHON

1
2       Q.  And just you -- when you left Liberty Bank,
3   you went immediately on to maternity leave; isn't that
4   true?
5       A.  Yes.
6           MR. YI:  Objection to form.
7       Q.  And before you left Liberty Bank to go on that
8   maternity leave, you, in fact, made some unauthorized
9   withdrawals at Liberty Bank; isn't that true?
10          MR. YI:  Objection to form.
11      A.  No.
12      Q.  Were you ever -- to the best of your
13  knowledge, were you ever suspected of making unauthorized
14  withdrawals at Liberty Bank?
15      A.  Yes.
16      Q.  And who suspected you?
17      A.  My supervisors/branch manager.
18      Q.  And do you know why she suspected you?
19      A.  Because there was a -- cash was short in the
20  vault at the time.
21      Q.  How much was cash short at the vault at the
22  time?
23      A.  $10,000.
24      Q.  And do you know why the cash was short in the
25  vault?

Page 121

M. CHON

1
2       A.  At the time they couldn't find it.
3       Q.  Did you -- do you know why the cash was -- I'm
4   asking you if you know why that cash was short in the
5   vault?
6       A.  I don't know.
7       Q.  Did you take that $10,000?
8       A.  No.
9       Q.  Did you -- on your last day of your
10  employment, was your purse searched by an employee and
11  $4,000 was discovered in your purse?
12          MR. YI:  Objection to form.
13      A.  $4,000?
14      Q.  Yes.
15      A.  No.
16      Q.  Was any amount found in your purse on your
17  final day?
18      A.  I don't recall, but I was doing business at
19  the time so I always had some cash.
20      Q.  Large amount like several thousand dollars?
21      A.  I mean, it was -- at the time it was probably
22  after I made a deposit, but I don't always carry several
23  thousand dollars.
24      Q.  At the time though, at the time she left, did
25  she have several thousand of dollars carrying -- Karen,

Page 122

M. CHON

```
 2   excuse me, did you have several thousand of dollars in your
 3   purse on your last day at Liberty Bank?
 4        A.  I don't recall.
 5        Q.  When you met with Lisa Pai from Wilshire Bank,
 6   did she ask you about your experience at Liberty Bank and
 7   whether you had taken any money while you were at Liberty
 8   Bank?
 9        A.  I don't recall.
10        Q.  Did anybody at any time after the -- this came
11   to light, this embezzlement from Bank Asiana, did anyone
12   either from Wilshire, or anyone else, or the United States
13   Government, or anyone ask you about the -- about missing
14   funds from while you were at Liberty Bank?
15        A.  No.
16        Q.  So no one ever asked you whether you had
17   embezzled funds from Liberty Bank, true?
18        A.  I have not embezzled.
19        Q.  Did anyone -- I understand.  Did anyone ever
20   ask her about embezzling or unauthorized funds or any money
21   that's been improperly taken while she was at Liberty Bank?
22   Was she ever asked about that at any point of the
23   investigation or investigations of the matters that we have
24   been talking about today?
25        MR. HARVEY:  Do you want me to rephrase?
```

Page 123

M. CHON

```
 2        THE INTERPRETER:  Yes, please.  I'm not clear.
 3        MR. HARVEY:  I just want to be clear.
 4        Q.  In all the times since January 2014, when
 5   people had been asking about what happened with this money
 6   from Bank Asiana, did anybody ask at -- whether you had
 7   taken any money or done anything improper while at Liberty
 8   Bank?
 9        A.  No.
10        Q.  You said that James Ryu -- I think you said
11   that he discovered or caught that you had taken or made
12   unauthorized withdrawals; is that your testimony?
13        A.  Yes.
14        Q.  And how did he catch you or discover it?
15        A.  Because he told me.
16        Q.  What did he say?
17        A.  He first told me about the -- let me clarify.
18   James Ryu told me first -- James Ryu said -- one moment,
19   please -- told me about this friend's account and my
20   sister-in-law's account, you know, to take the money out of
21   the CD or instrument accounts.  One moment, please.
22             When he first called me over, he told -- he
23   said that to me that he knows that -- he knows everything
24   about that I made such transactions.  And he said, do you
25   know this is wrong and he said that that's how I learned he
```

Page 124

M. CHON

```
 2   found out.
 3        Q.  And did he say which transactions or which
 4   accounts that he was aware?
 5        A.  No, he didn't say names.
 6        Q.  And at the point where he caught you, you had
 7   only taken money from two accounts; that was the account
 8   you had told us earlier, the man named Paek and the woman
 9   named Kim?
10        A.  Yes.
11        Q.  How much money had you taken out - how much
12   was the amount of the unauthorized withdrawals at the time
13   he caught you, approximately?
14        A.  I don't recall.
15        Q.  What was the total amount that she took
16   from -- Ms. Chon, what was the total amount that you took
17   out from Ms. Kim's account?
18        A.  I don't know.  Not sure.
19        Q.  How about the total amount you took out from
20   Mr. Paek's account --
21        A.  I don't know.
22        Q.  When you took money out of the ca -- out of
23   the vault, how did you actually physically bring the cash
24   out of the vault without anybody seeing you?
25        A.  I mean -- I mean I wasn't trying to hide it
```

Page 125

M. CHON

```
 2   from anyone.  You just take the -- carry, you just carry
 3   the cash out.  All the employees saw it.
 4        Q.  And so when you took the cash out of the
 5   vault, you had to get it home with you somehow.  So, did
 6   you put it in your purse or did you put it in your socks or
 7   how did you get the money, the cash out of the bank without
 8   people seeing you taking cash out of the bank?
 9        A.  I rarely took it home.  It was always at the
10   bank.
11        Q.  So you kept -- you took the money out of the
12   vault and then you kept it at your work station?  Do I
13   understand that correctly?
14        A.  Yes.
15        Q.  Where did you keep the money at your work
16   station?
17        A.  In the drawer.
18        Q.  And then would you ever take some cash to pay
19   the debts for your husband's business or is this your
20   personal debt?  Would she ever take the cash outside the
21   bank?
22        A.  No, you make a deposit.  But the amount I gave
23   to James Ryu was more so I kept it in order to give it to
24   James Ryu.
25        Q.  So, you took cash out and you put it in a
```

<br>

**Page 126**

M. CHON

1  
2  drawer at your work station so that you could then send at
3  least some of the money to James Ryu?  Do I understand you
4  correctly?
5      MR. YI:  Objection to form.
6      A.  Yes.
7      Q.  And then on the occasions when he would come
8  and get it, you would put some of the cash in an envelope
9  and then hand it to him?  Is that how it worked?
10     A.  Yes.
11     Q.  When you took money out of the vault, did you
12 typically take ones, and fives, or tens, and twenties or
13 was it hundreds or some?  Or was the cash in the vault
14 organized so you can take it out in denomination?
15     A.  The vault is organized in denomination.
16     Q.  Which denominations?  Which did you take?
17     MR. YI:  Objection to form.
18     A.  Hundreds.
19     Q.  Did you ever take out any bills larger than
20 hundreds?
21     A.  No.
22     Q.  How do you know that the amount that you paid
23 on your husband's debts and your personal debt was $500,000
24 approximately if you didn't keep track of it?
25     A.  We had a loan at -- with the -- with Bank

**Page 127**

M. CHON

1  
2  Asiana so we were -- you know, I was paying off that loan.
3  So it was the amount that I could tell without writing
4  down.
5      Q.  And what was the amount of that loan that was
6  paid off?
7      A.  I don't know.
8      Q.  She said -- Karen, you said that you paid off
9  some personal debt too, how much was that?
10     A.  That was also a bank loan.
11     Q.  Who was that bank loan with?
12     A.  Bank Asiana.
13     Q.  How much was that bank loan?
14     A.  That was $25,000.
15     Q.  And so the remainder of $475,000 that you took
16 was used to pay debts of your husband's businesses which
17 you paid directly at the bank, do I understand that
18 correctly?
19     MR. YI:  Objection to form.
20     A.  No.
21     Q.  How did she pay it then?
22     A.  Which one?
23     Q.  The loans for her husband's businesses.
24     A.  You are asking me how I paid the bank debt,
25 bank loan, right?

**Page 128**

M. CHON

1  
2      Q.  I'm asking how she spent all the money other
3  than the $25,000 that she used to pay her personal loan;
4  how physically were those monies paid to those debts?
5      A.  I make deposit and then pay it.
6      MR. YI:  Okay.  Can I just clarify one thing?
7  I think -- I think you may have heard about one loan.  I
8  heard about more than one a lot with Bank Asiana.  One
9  personal loan for 25,000 and I believe she mentioned the
10 loan to one or more of her husband's businesses.  You may
11 not have heard that.
12     MR. HARVEY:  Thank you.
13     Can you read back the last answer please,
14 court reporter?
15     (Record read as follows: "ANSWER: I make
16 deposit and then pay it.")
17     Q.  So you make deposits at Bank Asiana with that
18 cash?
19     A.  Yes.
20     Q.  And so if we went to the records and we saw
21 the amounts that were paid on the loans for your husband's
22 businesses, we would know the total amount that you paid;
23 is that correct?
24     A.  I don't know if that money was all used for
25 that.  I'm not sure.

**Page 129**

M. CHON

1  
2      Q.  Well, did you ever take any of the money that
3  you took of the unauthorized withdrawals and use it to
4  spend on yourself, for example, to go away for the weekend
5  or to go buy some clothing or gift or -- did you ever use
6  the cash that you took out for any reasons other than to
7  pay this personal loan or these other loans that you
8  mentioned?
9      A.  I've used it.  I've spent it.
10     Q.  And what kinds of things did you spend it on?
11     A.  I think just for living.  I used it.
12     Q.  Did you use it to buy drugs?
13     A.  No.
14     Q.  Did you have any relationships, any friends
15 that you would go out and spend money with?
16     A.  No.
17     Q.  When you said that you just used it to for
18 living expenses, what are examples of living expenses that
19 you used this money for?
20     A.  Like rent for instance, pay for mortgage.
21     Q.  Did your husband ever notice that hundreds of
22 thousands of dollars of his debts were being paid?
23     MR. JEON:  Objection as to form.
24     (Whereupon, the reporter requested
25 clarification.)

Page 130

M. CHON

2  THE REPORTER:  What was the last part you
3  said?
4  MR. JEON:  Objection to form.
5  A.  I have not paid off hundreds of thousands of
6  dollars.
7  Q.  How much did you pay for your husband's and
8  businesses debt?
9  A.  I don't know.
10  Q.  The -- do you understand that the restitution
11  order that is in connection with your guilty plea requires
12  you to pay back 1.4 million dollars?
13  MR. YI:  Objection to form.
14  A.  I don't understand the question.
15  Q.  The question is, do you understand that the
16  government in connection with your guilty plea is requiring
17  you to take out an obligation to pay back approximately 1.4
18  million dollars?
19  MR. YI:  Approximately, I think, he said.
20  A.  Yes.
21  Q.  How do you know if you didn't keep track that
22  the amount that you gave to James Ryu as you claim was
23  approximately $700,000?
24  A.  Because I knew who the CD accountholders were
25  and you go into those accounts and you can see how much

Page 131

M. CHON

2  money was short.  And I always knew in my mind how much it
3  will be, you know how much you need to make up for that
4  money so that's how I knew.
5  Q.  And what was the total amount that you needed
6  to make up that money?
7  A.  That, I heard that was 1.4.
8  Q.  Not what she heard.  Not what you heard,
9  Karen.  What you knew based on keeping track of the amounts
10  that you were taking out of these customers' installment
11  CDs?
12  A.  I knew it was around million dollars, one
13  million.
14  Q.  And so of the million that you knew that you
15  had to pay back to these customers you had taken out of
16  their accounts, how did you know that the amount of that
17  million, the amount that went to James as you say was
18  700,000?
19  MR. YI:  Objection to form.
20  A.  I -- I mean, I -- I mean I had it in my head
21  approximately that amount.
22  MR. JEON:  Excuse me.  The garage closes at
23  6:00.  So, it's 5:00 --
24  MR. YI:  5:38.
25  MR. HARVEY:  I'll wrap up.  Just couple

Page 132

M. CHON

2  minutes.
3  MR. JEON:  Okay.  Thank you.
4  Q.  Were you friends with James Ryu?
5  A.  No.
6  Q.  Did you know him well?
7  A.  I know as my work superior, supervisor.
8  Q.  Did you ever have a meeting with him outside
9  the office?
10  A.  No.
11  MR. HARVEY:  I think we can stop for now.  I
12  have further questions but this is a logical stopping
13  point.  We're going to hopefully be continuing this
14  deposition as soon as we can schedule it in relation to the
15  production of the documents.  Thank you for your time
16  today.
17  THE VIDEOGRAPHER:  Stand by.  The time is now
18  5:39.  We are going off the record.  This will end media
19  unit No. 5 and the deposition for today.
20  (Time noted:  5:39 p.m.)

Page 133

1  J U R A T

3  I,         , do hereby certify under
4  penalty of perjury that I have read the foregoing
5  transcript of my deposition taken on          ;
6  that I have made such corrections as appear noted
7  herein in ink, initialed by me; that my testimony as
8  contained herein, as corrected, is true and correct.

10  DATED this _____ day of _____, 20  ,
11  at _____,         .

18  _____
18  SIGNATURE OF WITNESS

Page 134

```
 1          C E R T I F I C A T E
 2
 3    STATE OF NEW JERSEY  )
 4              ) Ss.:
 5    COUNTY OF HUDSON    )
 6
 7        I, JENNIFER DE LEON, a Notary Public
 8    within and for the State of New Jersey, do
 9    hereby certify:
10        That MIYE CHON, the witness whose
11    deposition is hereinbefore set forth, was duly
12    sworn by me and that such deposition is a true
13    record of the testimony given by such witness.
14        I further certify that I am not
15    related to any of the parties to this action by
16    blood or marriage; and that I am in no way
17    interested in the outcome of this matter.
18        IN WITNESS WHEREOF, I have hereunto set
19    my hand this 7th day of July, 2016.
20
21
22        -------------------------
23        JENNIFER DE LEON
24
25
```

Page 135

```
 1    --------------------I N D E X-----------------
 2    WITNESS       EXAMINATION BY       PAGE
 3    MIYE CHON         MR. YI        5
 4              MR. HARVEY
 5    -------------------EXHIBITS-------------------
 6
 7    PLAINTIFF'S               PAGE LINE
 8
 9    Exhibit 1
10    Notice...............................19  16
11    Exhibit 2
12    Superseding Indictment................18  15
13    Exhibit 3
14    Application For Plea..................19  8
15    Exhibit 4
16    Plea Agreement Dated 3/21/16..........20  11
17    Exhibit 5
18    Statement.............................49  24
19    Exhibit 6
20    Memorandum Dated 1/23/14..............59  19
21    Exhibit 7
22    Notes.................................92  22
23
24
25
```

Page 136

```
 1        ERRATA SHEET FOR THE TRANSCRIPT OF:
 2    Case Name:   WILSHIRE BANK vs. MIYE CHON
 3    Dep. Date:   June 23, 2016
 4    Deponent:    MIYE CHON a/k/a KAREN CHON
 5            CORRECTIONS:
 6    Pg. Ln. Now Reads      Should Read  Reason
 7    ___ ___ _____   _____  _____
 8    ___ ___ _____   _____  _____
 9    ___ ___ _____   _____  _____
10    ___ ___ _____   _____  _____
11    ___ ___ _____   _____  _____
12    ___ ___ _____   _____  _____
13    ___ ___ _____   _____  _____
14    ___ ___ _____   _____  _____
15    ___ ___ _____   _____  _____
16    ___ ___ _____   _____  _____
17    ___ ___ _____   _____  _____
18    ___ ___ _____   _____  _____
19
20        _____
21        Signature of Deponent
22    SUBSCRIBED AND SWORN BEFORE ME
23    THIS___DAY OF _____, 2016.
24    _____
25    (Notary Public)  MY COMMISSION EXPIRES:_____
```