# EXHIBIT 12

Page 1

1

2          IN THE UNITED STATES DISTRICT COURT

3            FOR THE DISTRICT OF NEW JERSEY

4    _____

     BANK of HOPE, as successor to  )
5    Wilshire Bank,                 )
                                    )
6                    Plaintiff,     )
                                    ) Case No.
7             vs.                   ) 2:14-cv-01770-JLL-JAD
                                    )
8    MIYE CHON, a/k/a Karen Chon,   )
     SUK JOON RYU, a/k/a James S.   )
9    Ryu, TAE JONG KIM,             )
     BERGENFIELD BAGEL & CAFÉ INC., )
10   d/b/a Café Clair, MAYWOOD      )
     BAGEL INC., UB'S PIZZA & BAGEL )
11   INC., UB'S BAGEL & CAFÉ INC.   )
     and UBK BAGELS CORP., d/b/a    )
12   Franklin Bagels & Café,        )
                                    )
13                   Defendants.    )
     -----------------------------)
14   (Caption continued on next page.)

15

16           DEPOSITION OF BO-YOUNG LEE

17                Newark, New Jersey

18           Thursday, October 13, 2016

19

20

21

22

23

24   Reported by:
     FRANCIS X. FREDERICK, CSR, RPR, RMR
25   JOB NO. 113794

## Page 2

```
1
2   --------------------------------
    SUK JOON RYU, a/k/a James    )
3   S. Ryu,                       )
                                  )
4        Counterclaim Plaintiff,  )
                                  )
5        v.                       )
                                  )
6   BANK OF HOPE, as successor   )
    to Wilshire Bank,             )
7                                 )
         Counterclaim Defendants, )
8   --------------------------------
    SUK JOON RYU, a/k/a James S.  )
9   Ryu,                          )
                                  )
10       Third-Party-Counterclaim )
         Plaintiff,               )
11                                )
         v.                       )
12                                )
    KWON HO JUNG, JAE WHAN YOO,   )
13  STEVEN S. KOH, and LISA PAI,  )
                                  )
14       Third-Party-Counterclaim )
         Defendants.              )
15  --------------------------------
    SUK JOON RYU, a/k/a James S.  )
16  Ryu,                          )
                                  )
17       Cross-Claim Plaintiff,   )
                                  )
18       v.                       )
                                  )
19  MIYE CHON, a/k/a Karen Chon,  )
    TAE JONG KIM, BERGENFIELD     )
20  BAGEL & CAFÉ INC., d/b/a Café )
    Clair, MAYWOOD BAGEL INC.,    )
21  UB'S PIZZA & BAGEL INC., UB'S )
    BAGEL INC., and UBK           )
22  BAGELS CORP., d/b/a Franklin  )
    Bagels & Café,                )
23                                )
         Cross-Claim Defendants.  )
24  --------------------------------
25
```

## Page 3

```
1
2
3
4
5        October 13, 2016
6        10:04 a.m.
7
8        Deposition of BO-YOUNG LEE, held
9   at One Gateway Center, Suite 2600,
10  Newark, New Jersey, pursuant to
11  Notice, before Francis X. Frederick, a
12  Certified Shorthand Reporter, Registered
13  Merit Reporter and Notary Public of the
14  States of New York and New Jersey.
15
16
17
18
19
20
21
22
23
24
25
```

## Page 4

```
1
2        A P P E A R A N C E S :
3
4        LEE ANAV CHUNG WHITE KIM
5        RUGER & RICHTER
6        Attorneys for Plaintiff
7             156 Fifth Avenue
8             New York, New York  10010
9        BY:  MICHAEL YI, ESQ.
10            JANE CHUANG, ESQ.
11
12       STEVE HARVEY LAW
13       Attorneys for Defendant-Counterclaim,
14       Plaintiff-Third-Party-Counterclaim,
15       Plaintiff-Cross-Claim Plaintiff,
16       Suk Joon Ryu, a/k/a James S. Ryu
17            1880 John F. Kennedy Boulevard
18            Philadelphia, Pennsylvania  19103
19       BY:  STEPHEN HARVEY, ESQ.
20            DAVID DZARA, ESQ.
21
22
23
24
25
```

## Page 5

```
1                 B. LEE
2   B O - Y O U N G  L E E,  called as a
3        witness, having been duly sworn by a
4        Notary Public, was examined and
5        testified as follows:
6   EXAMINATION BY
7   MR. HARVEY:
8        Q.   Good morning, Ms. Young.  Will you
9   please just tell us your name for the record.
10       A.   Bo-Young Kay Lee.
11       Q.   And that's Bo-Young and what's
12  your last --
13       A.   Kay is my middle name.  And Lee is
14  my last name.  L-E-E.
15       Q.   So it's Bo-Young Kay Lee?
16       A.   Um-hum.  You can call be Bo.
17       Q.   Okay.  Bo is okay?
18       A.   Um-hum.  Bo is fine.
19       Q.   Okay, Bo.  Where do you work
20  today?
21       A.   New Millennium Bank.
22       Q.   What do you do at New Millennium
23  Bank?
24       A.   Controller.
25       Q.   And how long have you been at New
```

Page 6

B. LEE

1
2  Millennium Bank?
3      A.   Since March 1st.
4      Q.   And where did you work before New
5  Millennium Bank?
6      A.   Wilshire.
7      Q.   And how long did you work for
8  Wilshire Bank?
9      A.   Since the -- since they purchased
10  the BankAsiana.
11      Q.   That was in 2013.
12      A.   Right.  October 2013.
13      Q.   So you worked for Wilshire Bank
14  from October 2013 until March of this year.
15      A.   February -- yeah, before I start
16  on March 1st.  So, you know, end of February.
17      Q.   I understand.  And what was your
18  job at Wilshire Bank during that time?
19      A.   In the beginning it was assistant
20  to the regional manager.  And home mortgage
21  coordinator.  And then sometime in May of 2014
22  I was branch manager.
23      Q.   Which branch?
24      A.   East Fort Lee branch.
25      Q.   And you were in that job until you

Page 7

B. LEE

1
2  left in March?
3      A.   Yes.
4      Q.   Prior to October of 2013 you
5  worked for BankAsiana?
6      A.   Um-hum.
7      Q.   I'm sorry.  You need to say yes
8  because the court reporter --
9      A.   Yes.
10      Q.   Let me start by asking you, have
11  you ever been deposed before?
12      A.   No.  This is the first time.
13      Q.   Okay.  So we're here -- let me
14  just explain the process to you.  We're here
15  today to -- you have received a subpoena,
16  correct?
17      A.   Yes.
18      Q.   And that subpoena required you to
19  come here today.
20      A.   Yes.
21      Q.   And I am going to ask you a series
22  of questions that are related to this lawsuit
23  between Wilshire Bank, Mr. Ryu, and other
24  people.
25      A.   Um-hum.

Page 8

B. LEE

1
2      Q.   And if you don't understand any of
3  my questions or you don't hear any of my
4  questions, will you please let me know.
5      A.   Okay.
6      Q.   If you need a break at any point,
7  please let me know.
8      A.   Okay.
9      Q.   The objective here is to get
10  truthful accurate testimony.  So if at any
11  point you don't understand what the question
12  is or don't understand what's going on, just
13  let me know and I'll rephrase the question.
14      A.   Okay.
15      Q.   Did you do anything to prepare for
16  today's deposition?
17      A.   No.  Not really.
18      Q.   Okay.  Now, I was starting to ask
19  you what you did prior to -- what was your job
20  prior to October of 2013 when Wilshire Bank
21  bought BankAsiana.
22      A.   I was controller at BankAsiana.
23      Q.   And how long were you in that
24  position for?
25      A.   I started as assistant controller.

Page 9

B. LEE

1
2  I don't remember exactly when I was promoted
3  to controller position.  But I was doing the
4  same thing, you know, for the whole time,
5  whole period that I was at BankAsiana.
6      Q.   And when did you start at
7  BankAsiana?
8      A.   June of 2007.
9      Q.   Where was your office at
10  BankAsiana?
11      A.   Palisades Park.
12      Q.   On the third floor?
13      A.   Yes.  Third floor.
14      Q.   Who was your boss?
15      A.   Frank Gleason.
16      Q.   Did you report to Mr. Ryu?
17      A.   At one time, because I was doing
18  the HR also, so he was the head of the HR.
19      Q.   So your job duties included Human
20  Resources at some point while you were at
21  BankAsiana?
22      A.   Yes.
23      Q.   For how long?
24      A.   For quite a bit of time.  I don't
25  remember exactly but I was involved with the

Page 10

B. LEE

1  
2  payroll until -- for the whole period.  But
3  the HR function, at one time somebody else was
4  performing that but I don't remember exactly.
5  But for most of the time period I was involved
6  with the HR and payroll to a degree.
7       Q.   Do you know who Karen Chon is?
8       A.   Yes.
9       Q.   Were you in the HR function -- let
10  me withdraw that question.
11            Was she already employed by the
12  bank when you started working there?
13       A.   No.
14       Q.   So she was hired while you were at
15  the bank.
16       A.   She was hired few months after I
17  think.  The decision may have been made
18  already because I wasn't involved with the
19  hiring process but she started -- I don't
20  know -- a couple months after.
21       Q.   Do you know anything about how she
22  was hired?  Such as who hired her or how she
23  came to be hired by BankAsiana?
24       A.   Not really.
25       Q.   Do you know anything about that?

Page 11

B. LEE

1  
2  Have you heard anything?
3       A.   I heard one of the teller at the
4  time -- we used to call them personal
5  bankers -- they recommended her.  That's what
6  I heard.  But I wasn't involved with the
7  hiring process at all so I'm not sure.
8       Q.   Okay.  Now, during the time that
9  you were working at BankAsiana, did you ever
10  have any knowledge that anyone was embezzling
11  money from the bank?
12       A.   No.
13       Q.   Did you have any responsibility
14  for cash at the -- at any of the branches?
15       A.   No.
16       Q.   Did you ever see -- you know Mr.
17  Ryu, James Ryu?  He's in the room with us
18  today.
19       A.   Um-hum.  Yes.
20       Q.   Did you ever see Mr. Ryu alone in
21  a room with Karen Chon?
22       A.   I don't think so.  His office was
23  on the other side of the office so, you
24  know -- so I don't think so.
25       Q.   So, to the best of your

Page 12

B. LEE

1  
2  recollection, you never saw the two of them
3  alone together.
4       A.   Not that I recall.
5       Q.   That's fine.  I was just trying to
6  understand.
7       A.   Yeah.
8       Q.   Now, what were your duties as
9  controller?
10       A.   I was responsible for the general
11  ledger.  Financial statements related to
12  reporting.  All the financial reporting.
13  Accounts payable.  So on.
14       Q.   Was there any function at the bank
15  of audit or cash management such that somebody
16  was looking to make sure that employees
17  weren't stealing?  Was there some -- let me
18  withdraw that and just say was there some
19  procedure at the bank to ensure that people
20  weren't stealing?
21       A.   Yes.  And we had -- internal audit
22  function was outsourced and we had a deposit
23  operations manager who were doing surprise
24  cash counts, you know, on a regular basis.
25       Q.   Were you responsible -- did you

Page 13

B. LEE

1  
2  manage that?
3       A.   No.
4       Q.   Okay.  So that was somebody else
5  in the bank who was responsible for that.
6       A.   Right.  Right.
7       Q.   Okay.  Now, when did you first
8  learn that -- let me ask another question.
9  Were you friendly with Karen when you were at
10  the bank?
11       A.   Yes.  I liked her very much.  She
12  was a very likable person.
13       Q.   Did you ever do things with her
14  outside of work?
15       A.   No.
16       Q.   Did you ever have lunch with her?
17       A.   I did have lunch with her.
18  Probably not alone but, you know, I -- because
19  I was doing the HR function and also it's a
20  small company.  You know, sometimes we'll do
21  lunch between the employees.  So I did have
22  lunch with her.  I don't remember if I was
23  alone with her but it probably was with other
24  people also.
25       Q.   Okay.  So the bank employees had

4

Page 14

B. LEE

1  lunch together as part of meetings at the
2  bank, periodically.
3      A.   It could be meeting or it could
4  just be friendly get-together kind of things,
5  you know.
6      Q.   I'm talking about a group of
7  employees having lunch together.  You know,
8  not me just asking you -- not one employee
9  going out to lunch.  But meetings where there
10 was lunch served.
11     A.   Right.
12     Q.   And that's where you had lunch
13 with Karen, in that setting?
14     A.   Yes.  It was all business-related
15 because I didn't have any personal
16 relationship with her outside of the work.
17     Q.   I understand.  So you may have had
18 lunch with her in connection with work
19 meetings but you didn't -- for example, you
20 and she didn't go to lunch together
21 separately, to the best of your recollection.
22     A.   Right.
23     Q.   So let me say, when did you first
24 learn about -- that there had been an

Page 15

B. LEE

1  embezzlement at BankAsiana?
2      A.   January of 2014 there was a
3  customer who complained about 1099 interest
4  not being correct.  So we were looking at one
5  of the -- that customer's account, CD account.
6  And when we were looking at the transactions
7  that something did not look right.  So Irene
8  and myself looked at it and Irene was
9  contacting Karen because when we saw that
10 something did not look right, the CDs, there
11 was transactions, money was taken out of CD
12 account and put back and so on, which
13 shouldn't be.  So I asked Irene to call Karen
14 because we saw that it was Karen's ID that was
15 doing that.
16         So -- and that was the day that we
17 had a big snowstorm.  So we all had to go home
18 early, you know.  And the next day she --
19 Irene said that Karen was coming in to talk to
20 us.  That's when we found out.
21         You know, the night before -- we
22 knew something was wrong but I didn't know
23 what to think of it and then the next day when
24 we met with Irene, myself and Karen, we met,

Page 16

B. LEE

1  and she told us that she's been taking money
2  out of customers' accounts.
3      Q.   And that meeting that you just
4  referred to, that was just you and Irene and
5  Karen.
6      A.   Yes.
7      Q.   And that was the day after the
8  snowstorm?
9      A.   Yes.
10     Q.   And then did Karen come in again
11 the following day to have a further meeting
12 with you and Irene and others?
13     A.   Yeah.  Alicia from LA, she flew in
14 and we had the meeting.
15     Q.   Do you happen to know the dates
16 that that happened?
17     A.   I don't remember the exact date.
18 But it was the -- after the holiday, toward
19 the end of 20-something.
20     Q.   I'll show you some documents later
21 but I can tell you that from the documents
22 it's obvious that the first meeting you had
23 was on January 22nd.
24     A.   Okay.

Page 17

B. LEE

1      Q.   With just you and Karen and Irene.
2  And the second meeting you referred to was on
3  January 23rd.  But I'll show you some
4  documents so you can see that.
5      A.   Okay.
6      Q.   Okay.  So now let's talk about the
7  first meeting that you had which was, as I
8  said, I believe on the 22nd.  That was you and
9  Karen and Irene, right?
10     A.   Um-hum, yes.
11     Q.   And that was Irene Lee?
12     A.   Yes.
13     Q.   Okay.  Now, tell us where did that
14 meeting take place?
15     A.   In a bakery downstairs in the same
16 building.
17     Q.   Do you actually remember going to
18 that meeting?
19     A.   Yes.
20     Q.   And do you remember if Karen was
21 there first or was -- did you and Irene go
22 together?  How did it come together?
23     A.   I'm not hundred percent sure but I
24 think Irene and I went downstairs and Karen I

Page 18

B. LEE

1  think was there already.  I think.
2
3      Q.    Okay.  So then the two of you had
4  a conversation with Karen?
5      A.    Yes.
6      Q.    How long did that conversation
7  take?
8      A.    Not sure but maybe half an hour to
9  an hour.
10     Q.    Okay.  And can you tell us what
11 you can remember, what was said in that
12 conversation, both either that any -- that you
13 said, that Irene said, or that Karen said.
14     A.    We asked her what happened.  And
15 then she said that she's been taking the money
16 out of the customers' accounts.  And we asked
17 which customers, because we knew -- there was
18 one customer that we knew, that was the one
19 with the 1099 problem.  And then I asked her
20 who else was involved.  And I think she gave
21 me a list of one or two customer names.  So
22 based on that I created that e-mail.  I looked
23 up all the transactions.
24          And that's when she told us that
25 somebody at the bank was involved.  And she

Page 19

B. LEE

1
2  wouldn't say who.  And I asked her how much
3  she thinks she took.  And she didn't remember.
4  She said she didn't remember.
5          And I also asked, How long have
6  you been embezzling money and she didn't
7  remember exactly either but she said it's been
8  for a while.
9      Q.    Now, she said there was somebody
10 else involved but she would not tell who that
11 was.
12     A.    Right.
13     Q.    Do you remember anything else she
14 said during this meeting between just you and
15 Irene and her?
16     A.    Anything else?  What else did she
17 say?
18          Basically we were just talking
19 about -- you know, same thing that I was
20 telling you.  And I was trying to find out the
21 magnitude of the embezzlement.  So after I
22 spoke with her we went back to the office and
23 ran the accounts.
24     Q.    Okay.  So you don't remember
25 anything else that was said during that

Page 20

B. LEE

1
2  meeting other than what you've just told us.
3      A.    It was a -- it wasn't like a
4  five-minute meeting.  It was a long meeting.
5      Q.    It's okay if you can remember any
6  more specifics.  I'm just trying to establish
7  whether you do remember any more specifics
8  because if you don't it's perfectly
9  understandable.
10     A.    Okay.  I cannot think of anything
11 now but if I do then I'll let you know.
12     Q.    That's exactly fine.  Thank you.
13          Okay.  Now, you met with Karen
14 again the next day, right?
15     A.    Right.
16     Q.    And who was present at that
17 meeting?
18     A.    Irene and Alicia Lee from LA.
19     Q.    Anyone else?
20     A.    No.  That was it.
21     Q.    So it was Irene, Alicia, Karen and
22 you.
23     A.    Yes.
24     Q.    Did anyone else come in during
25 that meeting?

Page 21

B. LEE

1
2      A.    No.  Not in the meeting.  I met a
3  couple I knew just to say hi but nothing to
4  that meeting.
5      Q.    Okay.  Who was that person that
6  you said hi to?
7      A.    I think it was one of the branch
8  manager at Wilshire but I'm not a hundred
9  percent sure.  I think.
10     Q.    Do you know that person's name?
11     A.    Kwon Ho Jung.
12     Q.    I understand that you're not a
13 hundred percent sure.  You thought it was Kwon
14 Ho Jung?
15     A.    Yes.  Might be.
16     Q.    And you just remember saying
17 pretty much hi?
18     A.    Yeah.
19     Q.    Okay.  Now, tell us at this
20 meeting with Irene, Alicia, Karen and you,
21 what can you remember that Karen said at that
22 meeting?
23     A.    Well, we asked her exactly what
24 happened, what she did.  You know, same thing
25 as, you know, the one before because Alicia

B. LEE

1  B. LEE
2  was there.
3          What else?
4          I think at that meeting I think
5  she might have said James was the one.  I'm
6  not hundred percent sure.  But, you know,
7  either she said it or we kind of knew that she
8  was referring to him.  I think she did say it.
9      Q.   And other than saying that he was
10 the one, by that you mean the person who was
11 involved in the embezzlement with her?
12     A.   Right.
13     Q.   Did she say anything else in
14 addition, such as how he was involved?
15     A.   I don't remember if she said
16 anything about how he was involved.  But she
17 said that she gave cash to him.  And that she
18 did not have any proof that he was involved.
19     Q.   Did she say anything else on that
20 subject about any involvement by Mr. Ryu?
21     A.   She said that she met with him
22 and, you know, she said that James said that
23 it's your problem kind of thing, you know.
24 Because I -- I might have asked that, you
25 know, if he was involved.  And, you know,

B. LEE

1  B. LEE
2  after they announced the merger I guess, you
3  know, she said she met with him.  But she
4  said -- and they were talking and I guess --
5  she said something like, you know, when she
6  spoke with him he said that that's your
7  problem kind of thing.
8      Q.   So she said -- and she said this
9  conversation occurred after the merger?
10     A.   No.  Before the merger.  After
11 they announced the merger.
12     Q.   I see.  Between the announcement
13 of the merger and when it became final.
14     A.   Right.  Because I think just
15 before the merger actually took place that she
16 was on the list of people who were -- who they
17 were going to let go.  And, you know, if she's
18 not there that somebody else will find out.
19 So sooner or later it's a matter of time
20 somebody will find it.  So I guess she was
21 worried about it.
22     Q.   And she said she had said this to
23 James?
24     A.   She discussed this situation with
25 James.  And she said James said that that's

B. LEE

1  B. LEE
2  your problem.
3      Q.   Okay.  Did she say anything else
4  about James and the embezzlement?
5      A.   Basically she was just -- she kept
6  on saying that she did not have any proof
7  because everything -- she gave cash to him and
8  she said how she gave money to him.  You know,
9  like, in the office envelope or something like
10 that, you know.  That kind of thing.
11     Q.   So she mentioned that she gave him
12 cash in an inter-office envelope?
13     A.   Yes.
14     Q.   But she didn't have any proof
15 because it was cash?  Is that what you --
16     A.   Yes.  Right, right.
17     Q.   And did she also say that there
18 were no voice mails or e-mails as well, so she
19 didn't have any proof of that?
20     A.   I don't know if she said something
21 specifically about voice mail or anything like
22 that.  But she said that she -- see, when I
23 was asking her a lot of questions I asked her,
24 like, you know -- I asked her to be -- to give
25 us all the information and don't worry about

B. LEE

1  B. LEE
2  proof or anything like that because, you know,
3  the expert will take care of it.  Just let us
4  know everything, you know, truthfully, you
5  know, so that, you know, that's the best she
6  could do.
7          But she kept on -- she was worried
8  that it's going to be all her doing because
9  there's no proof.
10     Q.   In other words, she said that it's
11 only her claim.  She had no proof.  It was
12 just her -- what she says.  She expressed
13 concern that she had nothing other than her
14 word to support this claim.  Do I understand
15 correctly?
16     A.   Right.
17         MR. YI:  Objection to the form.
18     Q.   Did you know that that meeting --
19 was that meeting tape recorded?
20     A.   I found out later that it was tape
21 recorded.  I didn't know at the time.
22     Q.   Who tape recorded it?
23     A.   I think Alicia did.
24     Q.   And do you know how she did it?
25     A.   I don't know but -- oh, her phone

Page 26

B. LEE

1
2  I think.
3      Q.   Did you see her?  Did she have her
4  phone out?
5      A.   She had her phone out.  I know she
6  kept on playing with her phone but I never
7  thought of her recording it.  But later on I
8  found out that she did record the conversation
9  but I didn't know.
10     Q.   Did you ever review -- did you
11 ever listen to that recording?
12     A.   No.
13     Q.   Did you ever see a transcript of
14 that recording?
15     A.   No.
16     Q.   Okay.  So is there anything else
17 you can remember about this meeting with Karen
18 on the 23rd?  Such as, for example, did she
19 say how much money she took?
20     A.   She did say that but she estimate
21 it to be a lot less than what she said
22 because between the first and the second
23 meeting, what I did was I looked at all the --
24 some of the CD accounts and also I looked --
25 because she said that she took the money, she

Page 27

B. LEE

1
2  transferred the money out of CD accounts into
3  the cash account and she took the money out of
4  the cash account.
5          So I looked at all the cash
6  accounts and I looked at all the big items.
7  You know, so I estimated 1.2 million or 1
8  point something.  You know, so I came up with
9  that and I wrote an e-mail and sent it to
10 Elaine Jeon.  She was the head of operations.
11         But before we sent out the e-mail
12 we did call.  After our meeting with the --
13 Karen on the first day, you know, Irene and I
14 called Elaine Jeon.  And we met on the second
15 day I asked -- either I asked or it came up
16 that, you know, how much she said she
17 embezzled.  And I think I told her that it was
18 a lot more.  And she didn't think it was that
19 much.
20         But she -- either she didn't want
21 to say it or she said she didn't know.
22     Q.   Did she give any number?
23     A.   She might have.  I remember either
24 the first meeting or second meeting she said
25 it was -- the amount she said was less than 1

Page 28

B. LEE

1
2  million.  She didn't say less than 1 million.
3  But she did say -- I don't know, 700-,
4  800,000.  I don't remember the exact amount
5  but it was a lot more than what she said, what
6  she estimated.
7      Q.   Did she say what she did with the
8  money?
9      A.   I don't remember.  I don't even
10 remember her mentioning that.
11     Q.   Okay.  So just again the same
12 question I asked you before.  And I'm going to
13 show you the documents so maybe you'll have
14 other memories but right now do you remember
15 anything else that was said at this meeting on
16 the 23rd?  By anyone.
17     A.   She said something about the loan.
18 But I don't remember the exact -- exactly what
19 was said.  But she said something about --
20 later on I found out that Irene -- somebody
21 asked Irene to get a loan and lend James money
22 or something like that.  So something like
23 that was said.
24         Let's see.
25         And I remember, at the time I

Page 29

B. LEE

1
2  think Mr. Hur, CEO, was in Hawaii I think and
3  so I was -- like, I remember worrying about --
4  you know, not worrying, but when Mr. Hur finds
5  out that he will be really shocked.  Because
6  at the time he was still I think employed by
7  Wilshire.
8          No, no.  He was gone by that time.
9      Q.   Do you remember anything else that
10 was said at the meeting?
11     A.   I can't think of it right now.
12     Q.   Okay.  Have you spoken to Karen
13 since that day, January 23rd?
14     A.   No.
15     Q.   Not by phone or by in person,
16 correct?
17     A.   No.
18     Q.   In other words, I'm correct.
19     A.   Yes.
20     Q.   Gotcha.
21     A.   You're correct.
22     Q.   After that meeting on January
23 23rd, have you ever been in any other
24 communication -- any conversations or
25 communications about whether James Ryu

B. LEE

1
2 actually was involved in the embezzlement?
3     A.   If I had any conversation with
4 anybody?
5     Q.   Correct.  After the date of
6 January 23rd.  After that meeting.  Did you
7 ever discuss with anybody at the bank or
8 anybody about whether James was involved in
9 the embezzlement?
10     A.   Yes.  We were talking to Alicia,
11 Karen, because I couldn't believe that that
12 was happening.  And I didn't know -- I was
13 really surprised to find out that Karen was
14 that kind of person because I always had a
15 very good opinion about her because she had a
16 really good attitude at the bank and she never
17 created any problems.  So I was really
18 surprised.  And then she said James was
19 involved.
20         So I was really surprised at that
21 also because, you know, anybody in the bank --
22 you know, he was in the bank for very long
23 time.  And anything that you do, you know, is
24 going to get caught sooner or later.  So, you
25 know, how could somebody be so stupid, both of

B. LEE

1
2 them, to do anything like that.  And I didn't
3 know what to believe.
4         One moment maybe she's right, next
5 moment I'm not sure she's right.  So I was
6 really confused.  I didn't know what to think
7 because everything was, like -- you know, it
8 was a really shocker.
9     Q.   Did you -- after the meeting on
10 the 23rd, did you have any conversations with
11 anyone, the people you mentioned, where you
12 talked about whether James was actually
13 involved?
14     A.   Right.
15     Q.   Yeah.  And who did you have those
16 conversations with?
17     A.   Irene and Alicia.  And outside of
18 the bank with my husband.  In the beginning I
19 didn't say anything because it was a very
20 confidential matter.  But I was coming home
21 really, really late every day so I had to tell
22 him.  You know, just talk about what had
23 happened.  You know, like I said before, I
24 didn't know what to think of it.  That was the
25 conversation basically.

B. LEE

1
2     Q.   Anybody else?  Such as the FBI?
3     A.   F -- oh, yeah.  FBI.  Was it the
4 FBI?  Somebody called.  I think they asked
5 questions.  And I don't remember exactly what
6 they asked me.  But -- yeah, I think it was
7 FBI while I was in Wilshire.  That was when I
8 was in Fort Lee.  So it was few months after I
9 think.
10     Q.   So you believe at some point you
11 talked to somebody from the government.
12     A.   Yeah.  I think so.
13     Q.   And it was by phone?
14     A.   Oh, it was by phone, yes.
15     Q.   And do you remember if you said
16 anything in that call about James Ryu?
17     A.   I don't think so.
18     Q.   Okay.  Now, you said you had
19 conversations -- I'm not going to ask you
20 about your conversations with your husband but
21 I am going to ask you about your conversations
22 with Alicia and Karen about whether James was
23 involved.
24         You had some conversations with
25 Alicia and Irene, I'm sorry.  Did I understand

B. LEE

1
2 you to say it was Alicia and Irene you had
3 those conversations with?
4     A.   Right.  Separately.
5     Q.   I see.  And do you remember what
6 you said or what they said?
7     A.   One thing I remember was -- you
8 know, I was asking her, you know, Karen is
9 saying that James was involved.  But I was
10 asking her, like, you know, he's a COO of the
11 bank, you know.  And how could he be so stupid
12 to get involved something like that.
13         So I had said -- you know, I was
14 just questioning, you know.  And also Lisa
15 Pai -- we also had an interview with all the
16 employees.  She asked a lot of questions.
17 They might have recorded everything also.  At
18 the time I didn't know.
19         But I don't remember detail.  I
20 remember Lisa Pai was asking about James.  And
21 also I remember I spoke to Alicia about, you
22 know, my relationship with James.  Work
23 relationship.  And, you know, that kind of
24 thing.
25     Q.   Um-hum.  Okay.  So you remember

B. LEE

1  telling either Alicia or Irene that it didn't
2  make sense to you that somebody who was the
3  COO of the bank could be that stupid to be
4  involved in this.  Did I understand you
5  correctly?
6       A.   Right, right, right.
7            MR. YI:  Objection to form.
8       Q.   Okay.  So then was that with
9  Alicia or was that with Irene or both?
10      A.   I think both because at first when
11 Karen said -- and at the same time, like, if
12 he wasn't involved why would Karen pick James.
13 So I really didn't know what to think of it
14 because it didn't make sense.
15      Q.   Did either -- either of those
16 women, Alicia or Irene say that she had some
17 evidence that James was involved other than
18 Karen's word?
19      A.   No.
20      Q.   Now, what about you said you had a
21 meeting with Lisa Pai.  Was that alone with
22 Lisa Pai or were there other people present?
23      A.   Alone.
24      Q.   And that was some time within a

B. LEE

1  few days or weeks after you first learned
2  about the problem?
3       A.   That's when -- I think when I met
4  you at the parking lot.  I don't remember when
5  it was.  It was --
6            MR. YI:  Indicating me.
7       A.   That was around the time there
8  because she was visiting from LA to here.  So
9  she was interviewing, you know, a few
10 employees.  Irene, me, and there was an IT
11 person she was interviewing.
12      Q.   And you met -- you said "you," but
13 you meant Mr. Yi, right, Michael Yi, who is in
14 the room with us?
15      A.   Right.  At the parking lot, yeah.
16 I just say hi.
17      Q.   Did you know him before that?
18      A.   No.
19      Q.   So did Lisa Pai introduce him?
20      A.   Yeah.
21      Q.   So you met Mr. Yi but you just
22 said hi.
23      A.   Yeah.
24      Q.   So was he in the meeting with you

B. LEE

1  and --
2       A.   No.
3       Q.   So you had a meeting alone with
4  Lisa Pai.
5       A.   Yes.
6       Q.   And you don't know whether she
7  recorded it.
8       A.   I don't know.
9       Q.   And do you remember what was said
10 in that meeting?
11      A.   I don't remember.  We talked about
12 a lot of, you know, personal stuff also.  And
13 then she asked about James but I don't
14 remember the details, you know.  But she was
15 playing with the phone also.  Every time --
16 now that I think -- you know, after I found
17 out that they recorded that phone -- the
18 conversation with the meeting, the -- Alicia
19 and Karen and Irene, I remember that they were
20 playing with the phone a lot, you know, when
21 we were talking.  But I didn't -- I really
22 didn't know that they were recording.
23      Q.   And I take it from what you just
24 said you don't remember what you said to Lisa

B. LEE

1  Pai about James.
2       A.   I don't remember to -- what I said
3  to Lisa Pai or to Alicia Lee but we were just
4  talking general about James' character kind of
5  thing, you know.
6       Q.   And so you discussed in a general
7  sense with Lisa James' character?
8       A.   I shouldn't say maybe James'
9  character.  But -- yeah, at one time or
10 another I think, you know, we talked about how
11 he was.
12      Q.   And do you remember what you said
13 about that?
14      A.   In general, that he was not an
15 easy person and he gets angry a lot.  That
16 kind of thing.
17      Q.   Did you say anything else other
18 than that he was not an easy -- you meant not
19 an easy person to work with.
20      A.   Right.
21      Q.   And that he got angry.  Did you
22 tell her that?
23      A.   Yeah.  I think so.  But not in
24 that exact terms but in that context.

B. LEE

1
2    Q.   Okay.  Did you say anything else
3  about his character other than that he was
4  what you just told us?
5        A.   One time -- I think I might have
6  said that to Alicia.  I'm not sure if I said
7  that to Lisa or not, but one time he had his
8  business and he asked me to come to his
9  business.  And then he was talking about -- he
10  was asking about, like, bookkeeping kind of
11  thing.  So I visited his place.  He had a
12  beauty salon.  So I think we talked about
13  that.
14        And at the time I was really,
15  really busy at the office, as it was during --
16  after year-end and the audit time, so I was
17  really busy.  But he asked me if I could visit
18  him.
19        So I told him that I would do that
20  after I -- after busy season.  And -- but he
21  said that he needed me -- he wanted me to
22  visit him earlier than that.  So one Sunday I
23  did go down to his office.  But at the time I
24  was a little uneasy about, you know, getting
25  involved with anything out of the workplace

B. LEE

1
2  since he was a boss at the time.  So that
3  uneasy feeling I had.
4        Q.   Did you tell this to Lisa Pai or
5  did you tell this to Alicia?
6        A.   Alicia -- with Alicia we talked
7  about it.  But I don't remember if I told Lisa
8  Pai or not.  I don't remember.
9        Q.   Okay.  So this office you said, it
10  was actually a beauty salon?
11        A.   Um-hum.
12        Q.   I'm sorry.  You need to say yes or
13  no for the court reporter.
14        A.   Yes.  I'm sorry.
15        Q.   That's okay.
16        And you actually did go to visit
17  the beauty salon with James on one -- one
18  occasion?
19        A.   Yes.  Just once.
20        Q.   And how long did that last?
21        A.   Not long.  I don't know.  Maybe
22  half an hour.
23        Q.   And James was asking you questions
24  about bookkeeping for this beauty salon.  Do I
25  understand you correctly?

B. LEE

1
2        A.   Something to that nature.  And I
3  told him to get a program.  And then after
4  that meeting he never mentioned anything about
5  it so I didn't mention anything either.
6        Q.   So if I understood you correctly
7  he was asking you for some advice about this
8  beauty salon?
9        A.   Right.  That's what I thought that
10  he was doing.
11        Q.   Okay.
12        A.   Accounting advice.
13        Q.   And this meeting took place on a
14  weekend.  Did I hear you correctly?
15        A.   Because I was working on Saturday
16  also so one Sunday I -- Sunday afternoon I
17  went down because I didn't want to postpone it
18  because he said he needed my advice, you know,
19  soon.  He didn't say my advice.  But...
20        Q.   So if I understand this correctly,
21  it was your understanding that he was asking
22  you for your advice on a personal basis about
23  this beauty salon and this happened on one
24  occasion, right?
25        A.   Um-hum.

B. LEE

1
2        Q.   You have to say --
3        A.   Yes, I'm sorry.
4        Q.   And this made you a little bit
5  uncomfortable because he was the boss.  Did I
6  understand that correctly?
7        A.   Right, right.  Boss.  And also I
8  don't like to get involved with the co-workers
9  outside of the office, unless I'm a personal
10  friend with the person, then I'm -- you know,
11  that would be okay.  But otherwise that's
12  uncomfortable.
13        Q.   Okay.  So now -- and you told this
14  I believe to either Alicia or Lisa.
15        A.   Alicia I did -- I remember telling
16  her.  But I don't remember if I said that to
17  Lisa Pai or not.
18        Q.   Okay.  So earlier you said you may
19  have had conversations about James' character
20  and then you gave us I think two examples or
21  you said what you just told us about this
22  meeting at the beauty salon.
23        A.   Um-hum.
24        Q.   And then you also had a concern
25  that he lost his temper or was not easy to

B. LEE

1
2  work with.  Was there anything else other than
3  those two things when you said you told her
4  something to do with his character?
5      A.   There was one other incident that
6  I was really uncomfortable but I don't
7  remember who I said it to.
8           When we were moving from one
9  location to the headquarters, that he got
10 really upset and I was really scared of him,
11 you know.
12     Q.   When was this?
13     A.   Probably one year after we started
14 it.  We were at either Palisades Park or
15 Ridgefield office temporarily.  Then we moved
16 to the Palisades Park headquarters.  And when
17 we were moving, I don't remember exactly why
18 he was upset, but he was really upset.  And
19 there was one other girl and both of us were
20 really scared.
21     Q.   He was upset, like angry upset?
22     A.   He was really angry.  And then he
23 was, like, kicking boxes.  So we were really
24 upset -- we were really scared.
25     Q.   Did he --

B. LEE

1
2      A.   For few days -- few days we were
3  scared.
4      Q.   Did he say something in that
5  instance to suggest he was going to do
6  something to you or was he just kicking boxes
7  and that made you uncomfortable?
8      A.   He didn't say something to me.  He
9  was not nasty to me but the environment was
10 scary.
11     Q.   I understand.  Now, this had
12 happened -- what year was this?
13     A.   Probably 2008.
14     Q.   And was there ever any other
15 incidents like that that you told them about?
16     A.   I don't remember.
17     Q.   Do you remember whether there were
18 ever any other incidents like that that made
19 you afraid?
20     A.   I don't remember any particular
21 things that he did to me.  But when he's angry
22 sometimes he yells.  So that's scary.
23     Q.   And you told this to either Alicia
24 or Lisa.
25     A.   I might have said it to Lisa.

B. LEE

1
2      Q.   Alicia.  I'm sorry.  I apologize.
3      A.   Lisa.
4      Q.   You said Lisa Pai, okay.
5      A.   See, I don't remember exactly what
6  I said to either one.  But, you know -- and
7  how much detail I told them.  But something to
8  do with being uncomfortable sometimes.  You
9  know, that we discuss.
10     Q.   Okay.  So was there anything else
11 that you can recall that you told either Lisa
12 or Alicia about James Ryu as they were
13 discussing these matters following the days
14 after learning there was an embezzlement?
15     A.   I don't remember right now but if
16 I do I'll let know.
17          MR. HARVEY:  Okay.  Let's take a
18 short break.  I want to mark some
19 exhibits.
20          (Recess taken.)
21          (Ryu Exhibit 4, letter dated
22 August 30, 2016 with attached subpoena,
23 marked for identification as of this
24 date.)
25          (Ryu Exhibit 5, e-mail dated

B. LEE

1
2  January 22, 2014, marked for
3  identification as of this date.)
4          (Ryu Exhibit 6, e-mail dated
5  January 27, 2014, marked for
6  identification as of this date.)
7          (Ryu Exhibit 7, e-mail dated
8  January 37, 2014, marked for
9  identification as of this date.)
10         (Ryu Exhibit 8, e-mail dated
11 January 30, 2014, marked for
12 identification as of this date.)
13         (Ryu Exhibit 9, e-mail dated
14 February 4, 2014, marked for
15 identification as of this date.)
16         (Ryu Exhibit 10, e-mail dated
17 February 6, 2014, marked for
18 identification as of this date.)
19         (Ryu Exhibit 11, e-mail dated
20 October 29, 2015, marked for
21 identification as of this date.)
22 BY MR. HARVEY:
23     Q.   Ms. Lee, I'm going to hand you a
24 document that's been marked as Ryu Exhibit 4.
25 It's pretty obviously my letter to you with

B. LEE

1  the subpoena.
2     A.   Okay.
3     Q.   And I just want you to take a
4  moment and confirm that's the letter you
5  received from us with the subpoena in this
6  case.
7     A.   Yes.
8     Q.   Okay.  I have no further questions
9  on that.
10         I'd like to now ask you to take a
11  look at a document that's been previously
12  marked as Ryu Exhibit Number 2.  My first
13  question is going to be whether you've ever
14  seen it before.
15         (Document review.)
16     A.   I don't think so.
17     Q.   Actually, I think we might have
18  marked this Ryu 3 actually at the prior
19  deposition.  We'll get the number corrected.
20         In any event, it's a one-page
21  document that has on the lower right-hand
22  corner the number WB643.
23     A.   Okay.
24     Q.   Do you see that on the document

B. LEE

1  you're looking at, WB643?
2     A.   Yes.
3     Q.   Okay.  And it's dated January
4  23rd, 2014.
5     A.   Yes.
6     Q.   And have you read it now?  Do you
7  need a minute to read it?
8     A.   Yeah.  I'll read it now.
9         (Document review.)
10     Q.   You've had chance to read that
11  document?
12     A.   Yes.
13     Q.   Okay.  Just for the record, that
14  is Ryu 3.  I just confirmed that.
15         Now had you ever seen this
16  document before?
17     A.   I don't think so.  I don't
18  remember.  I don't recall seeing this one.
19     Q.   Okay.  Did reading this help you
20  remember anything about a meeting -- either of
21  the meetings that you had forgotten?
22     A.   Yes.
23         MR. YI:  Objection to form.
24     Q.   You can go ahead and answer.

B. LEE

1     A.   Yes.  I didn't quite remember this
2  $10,000 loan that's -- when this thing started
3  with.  I didn't remember that.  I knew there
4  was some kind of loan but I didn't exactly
5  remember that.
6     Q.   So let me just stop you there.
7  You see that it makes reference to something
8  about a $10,000 personal loan in here, right?
9     A.   Right.
10     Q.   And do you remember, you know --
11  do you remember any conversations about any
12  personal loan to James in this -- Karen saying
13  something about that?
14     A.   Yes.  I remember vaguely.  And
15  also that something to do with the loan
16  related to Irene.  Somebody was asking Irene
17  to get a personal -- a loan from the bank and
18  lend it to James.  That kind of thing I
19  remember.  That was discussed.
20     Q.   Okay.  You told us about that
21  earlier.
22     A.   Yes.  Right, right.
23     Q.   Does this reference on this page
24  to $10,000, does that help you remember that

B. LEE

1  there was a discussion about a $10,000 loan or
2  any other loan other than what you just told
3  us?
4     A.   No.  But I didn't remember the
5  amount, $10,000.
6     Q.   Sitting here today, do you
7  remember that amount, as -- I'm not asking
8  you --
9     A.   I don't remember, yeah.
10     Q.   Good, that's all I'm asking.  All
11  right.
12         Is there anything else in this
13  document that helps you remember things that
14  you didn't remember prior?  Not just because
15  it says it in there and you see it but that
16  you say, Oh, now I remember something that I'd
17  forgotten?
18     A.   No.  There were certain things
19  that I don't remember talked about.  But I
20  cannot recall anything more than what I said.
21     Q.   Okay.  How about there's a fourth
22  paragraph here that says -- begins with the
23  words "Since then..."
24     A.   Right.

Page 50

B. LEE

1
2      Q.   Do you remember Karen saying
3  something like that?
4      A.   Yes.  But I don't remember if she
5  said that or was through the company phone but
6  never over personal home or cell phone.  That
7  I don't remember exactly.
8          But she said -- what I remember is
9  whatever the contact that they did, she said
10 there's no proof.  You know, that much I
11 remember.
12     Q.   All righty.  I'd like you to --
13 well, actually, let's go down a couple lines.
14 There's a paragraph and a sentence that says:
15 "As per Karen's statement, Mr. Ryu mentioned
16 to here that he would 'compensate' her for her
17 'help'."
18          Do you see that?
19     A.   I don't remember that
20 conversation.
21     Q.   Now, I'd like you to take look at
22 another document.  This was previously marked
23 as Ryu Exhibit 2, and my first question is
24 going to be whether you've ever seen that
25 before.

Page 51

B. LEE

1
2      A.   Yes.  I wrote it.
3      Q.   And this is an e-mail that you
4  sent on January 22nd?
5      A.   Yes.
6      Q.   Is this the e-mail you testified
7  about earlier?
8      A.   Yes.
9      Q.   Who is Seung Ho Park?
10     A.   He's the regional director.
11 Because we called -- after the meeting with
12 Karen I called Seung Ho Park first and then I
13 called Elaine Jeon.  And then that afternoon I
14 looked at all the general ledger and, you
15 know, came up with this e-mail.
16     Q.   Okay.  I'd like you to now take a
17 look at another document.  This one has been
18 marked as Ryu Exhibit Number 5.  Please take a
19 moment to look at this.
20          (Document review.)
21     A.   Okay.
22     Q.   Have you had a moment to look at
23 what's been marked as Ryu 5?
24     A.   Yes.
25     Q.   Okay.  And at the bottom of the

Page 52

B. LEE

1
2  e-mail chain reading up, the bottom one is the
3  e-mail that we just looked at from you on
4  January 22nd.
5      A.   Yes.
6      Q.   And then is that Elaine Jeon
7  responding to you on January 22nd?
8      A.   Yes.
9      Q.   And that's telling you that Alicia
10 Lee was going to be coming out from Los
11 Angeles for a meeting that day.
12     A.   Yes.
13     Q.   And it's simply your response,
14 Thank you, that same note.
15     A.   Yes.
16     Q.   Now, I'd like to hand you what's
17 been marked as Exhibits 6 and 7.  Please take
18 a moment to look at them and my first question
19 is going to be whether you've ever seen them
20 before.
21     A.   Yes.
22     Q.   Take a look at both of them just
23 to make sure.
24          (Document review.)
25     Q.   Tell me what's Exhibit 6?

Page 53

B. LEE

1
2      A.   It's the e-mail that I send to
3  myself for follow-up on James' personal
4  account.
5      Q.   And then what's number 7?  Ryu
6  Number 7?
7      A.   My e-mail to myself probably to
8  follow up on Miye Chon.  Karen.
9      Q.   So number 7 e-mail -- excuse me --
10 Ryu 7 is an e-mail with screen shots that you
11 forwarded to yourself and the screen shots are
12 of Karen Chon's account -- multiple accounts?
13     A.   Right.
14     Q.   And number 6 was the same thing
15 but that was screen shots of accounts or
16 accounts for James.
17     A.   Right.
18     Q.   Okay.  Now, why did you do that?
19 Why did you print those out and forward them
20 to yourself?  Why did you forward that
21 information to yourself?
22     A.   A lot of times, like, you know, if
23 I need to follow up on it you, you know, I do an
24 e-mail.  I write myself an e-mail so that I
25 have that information because if I just print

B. LEE

1  it, if I misplace it, I lose it. So that's my
2  habit.
3      Q.   Okay. And did you -- we talked a
4  lot earlier already in this deposition about
5  the meetings on the 22nd and the 23rd. And I
6  think if you look at the documents I showed
7  you, you can see that -- for example, from Ryu
8  2 it clearly indicates that the first
9  conversation with Karen was on the 22nd of
10 January.
11     A.   Okay.
12     Q.   Right? And then the other one
13 that we looked at indicates that the meeting
14 with Alicia was the 23rd.
15     A.   Okay.
16     Q.   Now, did you have a role in the
17 investigation of the embezzlement by Karen
18 including whether James was involved after
19 January 23rd?
20     A.   Yes.
21     Q.   And what was that role?
22     A.   Well, I was heavily involved with
23 finding out what was happening. What
24 happened.
25

B. LEE

1      Q.   Okay. So you played an ongoing
2  role in the investigation.
3      A.   Yes.
4      Q.   How long did that continue for?
5      A.   I don't know. Maybe a month.
6      Q.   Okay. So it was at least several
7  weeks or maybe more?
8      A.   Yes.
9      Q.   And then what did you actually do
10 to help out in this investigation?
11     A.   After Alicia came, I think there
12 was an audit, internal audit came. I don't
13 remember when he came. And they were asking a
14 lot of questions also. And asked us to
15 investigate a lot of things. And at the same
16 time I wanted to know. So I did a lot of, you
17 know, looking up in the system.
18     Q.   So you looked up information in
19 the system to provide it to the auditor? Do I
20 understand you correctly?
21     A.   To the auditor or Alicia, yes.
22     Q.   And then you also just did some
23 investigating on your own because you were
24 trying to figure it out.
25

B. LEE

1      A.   Right.
2      Q.   Okay. What did you learn?
3      A.   That she took out a lot of money
4  from, you know, the few customers.
5      Q.   So you learned about the amount of
6  money that Karen embezzled or the information
7  relating to how much she embezzled, what she
8  embezzled, and things like that.
9      A.   Right. And which customers were
10 involved.
11     Q.   Did you learn anything about
12 James' alleged role in this?
13     A.   No.
14     Q.   Did you look at that?
15     A.   I looked at his account.
16     Q.   What were you looking for?
17     A.   To see if there's any big money or
18 any money going in there. Either, you know,
19 deposit or transfers.
20     Q.   Did you find anything that you
21 thought was relevant to the investigation with
22 respect to James?
23     A.   No.
24     Q.   I'm going to hand you now what's

B. LEE

1  been marked as Deposition Exhibit Ryu 8.
2      Please take a moment to look at
3  it. My first question is going to be whether
4  you've ever seen it before.
5      (Document review.)
6      Q.   Have you had a chance to look at
7  it?
8      A.   Yes.
9      Q.   Do you recognize it?
10     A.   Yes.
11     Q.   It's an e-mail exchange between
12 you and someone named Orest Hamersky.
13     A.   Yes. He's the internal auditor.
14     Q.   And this e-mail exchange, which
15 occurred between January 29th and January
16 30th, is an example of Mr. Hamersky, the
17 auditor, asking you for some information and
18 you providing it, correct?
19     A.   Yes.
20     Q.   Okay. Now, I'd like to ask you to
21 take a moment to look at Exhibit Number Ryu 7.
22     (Document review.)
23     Q.   Have you had a moment to look at
24 that?

Page 58

B. LEE

1
2      A.   Yes.
3      Q.   And can you tell me, do you
4   recognize it as an e-mail exchange between you
5   and somebody named Dona Maeng?
6      A.   Yes.
7      Q.   And who is Dona Maeng?
8      A.   She's the accounts payable person
9   at Wilshire.
10     Q.   And this is just an example of you
11  providing information to the bank about --
12  some information that you had about James.
13     A.   Right.  I don't remember who asked
14  for it but somebody must have asked for it.
15     Q.   Okay.  And it's quite
16  self-explanatory.  You're reporting that since
17  October 1 of 2013 the only payment to James
18  was in the amount of $418.73 for some expense
19  issue.
20     A.   Right.
21     MR. YI:  Objection to form.
22     Q.   Okay.  Thank you.
23     I'm going to hand you what's been
24  marked as Ryu 10.  Please take a moment to
25  look at it.

Page 59

B. LEE

1
2      (Document review.)
3      A.   Okay.
4      Q.   Can you tell us what this is?
5      A.   I'm answering what Orest was
6   asking about, who this teller drawer number
7   203 was.
8      Q.   And so this is another example of
9   you providing information to Mr. Hamersky?
10     A.   Yes.
11     Q.   That's the only question I have on
12  that.
13     I'm going to hand you what's been
14  marked as Ryu Exhibit 11.  Please take a
15  moment to look at it and my first question is
16  going to be whether you've ever seen it
17  before.
18     A.   Yes.
19     Q.   This is an e-mail of you
20  forwarding -- on October 29th of 2015, of you
21  forwarding to yourself your e-mail from
22  January 22nd of 2014; isn't that true?
23     A.   Yes.
24     Q.   Why did you forward this to
25  yourself in October 2015?

Page 60

B. LEE

1
2      A.   It's probably -- again, like, you
3   know, I forward myself an e-mail.  If it was
4   long time ago then I have to go through them.
5   So if I have to do something to follow up,
6   it's probably to refresh my memories with the
7   interview, the phone interview maybe.  I
8   probably -- that's why probably I forward it
9   to myself.  So I will have it on top of my
10  list.
11     Q.   Okay.
12     A.   Yeah.
13     Q.   Okay.  So -- was that the phone
14  interview with the government that you
15  mentioned earlier?
16     A.   Yeah.  I think so.
17     Q.   That's the same one you told us
18  about earlier?
19     A.   Yeah.  I think so.  But I'm not
20  hundred percent sure.  But when I need to
21  follow up on something then I'll send myself
22  an e-mail, I'll forward it to myself.
23     Q.   Okay.  So you told us generally
24  about your role in the investigation.  And did
25  there ever come a time when you were in a

Page 61

B. LEE

1
2   meeting where anyone asked you about --
3   anybody other than the people we've already
4   talked about, Lisa, Alicia, asked you, or the
5   FBI, government, asked you about James' role
6   in this?
7      A.   Anybody other than that?
8      Q.   Yes.
9      A.   Well, after everything was on the
10  newspaper, you know, people were -- they were
11  not really asking me personally but they were
12  just -- people are wondering.  And I didn't
13  say that I was actively involved with the
14  investigation, you know, but, you know, people
15  will ask.
16     Q.   Is that people who are outside the
17  bank such as friends in the Korean-American
18  community or people you know?
19     A.   Yeah.  People like -- you know,
20  anybody who saw the newspaper would bring that
21  up because that was a big news.
22     Q.   So was it brought up with you more
23  than once?
24     A.   Oh, yeah.
25     Q.   And did they mention James in that

Page 62

B. LEE

1
2 conversation?
3     A.   Yes, because on the newspapers I
4 think it had it his name on it.
5     Q.   Do you remember who you had those
6 conversations with?
7     A.   Former employees, you know.
8     Q.   So you remember having the
9 conversation with some former employees?
10    A.   Right.
11    Q.   Anybody specific that you can
12 remember?
13    A.   Jessica Kim.
14    Q.   Okay.  Anyone else other than
15 Jessica Kim?
16    A.   And Jenny Lee.
17    Q.   Jenny Lee?
18    A.   Yeah.  Jenny Lee.  She's an
19 ex-employee also.
20    Q.   Anyone else you can remember
21 having those conversations with?
22    A.   One of the store owner at the
23 bank.  At the -- where the bank was located,
24 there was a jewelry store and she asked, you
25 know.  But I didn't -- we didn't really have a

Page 63

B. LEE

1
2 conversation but she was just asking what
3 happened.  A lot of people were asking what
4 happened including customers.
5     Q.   Did you ever have a meeting with
6 any lawyers from the bank other than Lisa Pai?
7 Like Mr. Yi?
8     A.   I never had a meeting with him.
9     Q.   Did you ever discuss this case
10 with him?
11    A.   No.
12    Q.   Did you ever have any
13 conversations with him other than that one
14 meeting in the parking lot?
15    A.   I don't think so.
16    Q.   Do you remember any other meetings
17 or communications that you had as part of this
18 investigation when you were at the bank where
19 people talked about whether James was involved
20 in this or not?  Either you or anybody else
21 talked about whether James was involved or
22 not?
23    A.   Well, people were talking about it
24 a lot.
25    Q.   You mean among the employees.

Page 64

B. LEE

1
2     A.   No.  Even like the people -- like,
3 for example, my mother-in-law was asking, you
4 know, there was something -- there was an
5 embezzlement where you're working.  And she
6 was asking what happened.  That kind of thing.
7     Q.   Let's talk about within the bank,
8 right, you --
9     A.   Within the bank?
10    Q.   Yes.  Within the bank.  Did you
11 have communications -- and I don't mean  --
12 I'm not referring now to, you know, a casual
13 conversation with an employee who might have
14 mentioned something.  But the people who were
15 working on the investigation, that's you,
16 Alicia, Lisa Pai, Orest, any other meetings
17 you've already told us where people were
18 talking about whether or not James was
19 involved in this?
20    A.   No.  I don't think so.
21    Q.   Did you ever hear anybody say
22 James was involved other than Karen?
23    A.   No.
24    Q.   Did you know that Karen at one
25 point worked for Liberty Bank in New York?

Page 65

B. LEE

1
2     A.   Yes.  I heard.
3     Q.   Did you understand that there had
4 been an allegation that she was embezzling
5 while at Liberty Bank?
6     A.   I heard.
7     Q.   Did you hear that while you were
8 still employed by Wilshire Bank?
9     A.   When I was at BankAsiana I heard.
10    Q.   Who did you hear that from at
11 BankAsiana?
12    A.   Jessica Kim.
13    Q.   Did you ever tell anybody that
14 when you were at BankAsiana?
15    A.   No.
16    Q.   Who was Jessica Kim?  Was she an
17 employee?
18    A.   She was a deposit operations
19 manager who left in 2013 -- before the merger.
20    Q.   And she told you that she had
21 heard -- well, tell what was she told you
22 about Liberty Bank and Karen.
23    A.   Something with that the money was
24 missing and she was suspected of stealing it.
25 But I don't think it was -- I'm not sure if it

B. LEE

1  was proof that she was guilty of stealing.  So
2  when I hear something like that, I don't want
3  to repeat that to other people because I might
4  accuse somebody of something, you know, and
5  they're not -- for something that they might
6  have not done.  So I heard it but I didn't say
7  that to anybody but I heard something like
8  that.
9       Q.   Did you hear that again during the
10  investigation?  Was that ever discussed?
11       A.   Yes.
12       Q.   Who was that discussed with?
13       A.   I don't remember.  But she was the
14  first person to let go after the merger.  And
15  I heard -- I don't remember where I heard it
16  from but there were the rumor that she had a
17  problem -- Wilshire bought Liberty and there
18  was a problem and she was one of the first
19  person to let go.  That's what I heard.
20       Q.   Who did you hear that from?
21       A.   I don't remember who I heard from
22  it.
23       Q.   During the course of the
24  investigation that we've been talking about

B. LEE

1  that began on or about January 22nd, did you
2  ever hear any conversations with Lisa Pai or
3  Alicia or anyone else at the bank about the
4  subject of Karen having embezzled from her
5  prior bank or allegedly having embezzled from
6  her prior bank?
7       A.   I might have heard it but I don't
8  remember -- I don't know if Lisa Pai mentioned
9  it or -- I don't remember.  But I might have
10  heard it.  I might have heard it.  But I don't
11  remember.
12       Q.   Did you know that James' checking
13  account was frozen in or around January of
14  2014?
15       A.   I heard later.  I didn't know at
16  the time but I heard later.
17       Q.   What did you hear?
18       A.   Where?
19       Q.   What did you hear later?
20       A.   That he was -- he couldn't take
21  the money out of his account.  That it was
22  frozen.  It was --
23       Q.   Who did you hear that from?
24       A.   I might have heard from Irene.

B. LEE

1  I'm not sure.
2       Q.   Did you ever learn about how that
3  was resolved, that money -- the freezing of
4  his checking account?
5       A.   I heard it was released but I
6  don't know because I wasn't -- I was not
7  really interested in finding out so --
8       Q.   So you don't know anything more
9  about that.
10       A.   No.
11       Q.   Okay.
12       MR. HARVEY:  Let's just take a
13  very short break.  I'm just going to
14  organize myself.  I may have no further
15  questions.  And then Mr. Yi may have some
16  questions.  We'll try to get you out of
17  here as quickly as possible.
18       THE WITNESS:  Okay.
19       (Recess taken.)
20       MR. HARVEY:  I've concluded my
21  questions and Mr. Yi is going to now ask
22  you some questions.
23       THE WITNESS:  Okay.
24       * * *

B. LEE

1  EXAMINATION BY
2  MR. YI:
3       Q.   Thank you.  Good afternoon, Ms.
4  Lee.  My name is Michael Yi and I represent
5  the plaintiff, Bank of Hope, as successor to
6  Wilshire Bank.
7       A.   Okay.
8       Q.   The original plaintiff in this
9  case.
10       First, I'd like to ask you what is
11  your current home address.
12       A.   117 Aspen Court, Norwood, New
13  Jersey, 07648.
14       Q.   Was your previous home address 7
15  Broad Avenue?
16       A.   No.  That's the bank address.
17       Q.   I see.  Thank you.
18       A.   BankAsiana.
19       Q.   That was the address of
20  BankAsiana's Palisades Park branch.
21       A.   Right.  Headquarter.
22       Q.   I see.
23       You testified earlier, when Mr.
24  Harvey was questioning you, that your position

Page 70

B. LEE

1
2  or title at BankAsiana prior to the merger
3  with Wilshire Bank was controller, correct?
4      A.   Right.
5      Q.   Did you have any other title or
6  position at BankAsiana prior to the merger?
7      A.   Assistant controller.  I started
8  out as an assistant controller.
9      Q.   Was --
10     A.   Doing the same thing.
11     Q.   Did you have a title of first vice
12 president in addition to controller?
13     A.   Yes.
14     Q.   I know you testified earlier about
15 your responsibilities as controller of
16 BankAsiana.  If you don't mind, I'd just like
17 to go over that briefly.  You mentioned that
18 as controller I believe you mentioned
19 financial and regulatory reporting?
20     A.   Yes.
21     Q.   Could you elaborate just briefly
22 what you meant by that.
23     A.   Financial reporting is, you know,
24 doing the balance sheet, income statement.
25 You know, the actual financial condition of

Page 71

B. LEE

1
2  the bank.  So do it on a monthly basis or
3  prepare the financials and report it to the
4  board of directors.
5          And on a quarterly basis we will
6  do our full report, that's to the FDIC.  All
7  the banks are required to do.  So that's the
8  regulatory reporting.
9          And also I was responsible for the
10 annual reports.  So that's the outside annual
11 financial statements and footnotes that goes
12 with it.
13     Q.   Okay.  So when you talked about
14 financial reporting, were you talking about
15 financial reporting to the board of directors
16 of the bank?
17     A.   Yes.
18     Q.   And senior management of the bank?
19     A.   Yes.
20     Q.   And would that include you?  Were
21 you considered senior management at
22 BankAsiana?
23     A.   No.  I'll prepare it.  And then
24 the CFO will present it to the board.
25     Q.   And was there any financial

Page 72

B. LEE

1
2  reporting outside the bank?
3      A.   The regulatory reporting on
4  quarterly basis.
5      Q.   Okay.
6      A.   And the annual report that we do,
7  the financial statements, audited financial
8  statements, that will go out to the
9  shareholders and the regulatory agencies as
10 well.
11     Q.   Okay.  Did you have any other
12 responsibilities -- I think you mentioned -- I
13 believe you referred to it as HR and payroll?
14     A.   Yes.
15     Q.   Did you also have those
16 responsibilities?
17     A.   Yes.
18     Q.   Could you just briefly describe
19 what those responsibilities were.
20     A.   I didn't have a hiring authority
21 but I was involved with all the process.  You
22 know, do the interviews.  And all the HR
23 functions.  And the payroll processing.  You
24 know, and all the benefits.
25     Q.   Okay.

Page 73

B. LEE

1
2      A.   That kind of thing.
3      Q.   Thank you.
4          All right.  I'd like to now go to
5  your meeting with Karen Chon who is also known
6  as Miye Chon.
7      A.   Okay.
8      Q.   And you and Irene Lee's meeting
9  with Karen Chon on January 22nd.
10     A.   Okay.
11     Q.   I'd like you to take a look at
12 what was previously marked as Ryu Deposition
13 Exhibit 2.
14     A.   Okay.
15     Q.   Do you have that in front of you?
16     A.   Yes.
17     Q.   Okay.  Just for the -- I just want
18 to make the record clear.  So this is a copy
19 of your e-mail to Elaine Jeon and Seung Ho
20 Park with a copy to Irene Lee from January 22,
21 2014, correct?
22     A.   Yes.
23     Q.   And in that e-mail, you stated to
24 Elaine and Mr. Park: "As you have requested
25 over the phone earlier today, here is the

Page 74

B. LEE

summary of what we have uncovered so far.
While reviewing the interest income reported
on Form 1099-INT for Mr. ███████, one
of the former BankAsiana customers, yesterday
afternoon, we have uncovered the following
irregularities.  The funds from the following
seven CDs were transferred into the customer
CD accounts, unrelated, listed below (see
attached)."
        Do you see that?
    A.   Yes.
    Q.   And the Form 1099-INT for Mr.
███████ was that the 1099 that you
were discussing with Mr. Harvey during this
questioning?
    A.   Yes.
    Q.   And to your recollection or
knowledge, was ███████ one of the
BankAsiana customers whose account, CD
accounts, were the subject of the
embezzlement?
    A.   Right.
    Q.   Okay.  You go on to say in that
e-mail:  "In questioning these transactions,

Page 75

B. LEE

Irene Lee and I met with Karen Miye Chon
former East Fort Lee operations officer this
morning at Ms. Chon's request."
        Do you see that?
    A.   Yes.
    Q.   So is it your recollection that it
was Karen Chon that actually asked to meet
with you and Irene Lee?
    A.   Yes.  The night before when we
were looking at Mr. ███████ accounts that
something did not look right.  So I asked
Irene to call Karen and then Karen was asking
was it her.
        So, you know, Irene said that was
her ID that was doing the transactions.  And
then we had more questions later on.  So I
asked Irene to call and I don't know -- later
on we couldn't get in touch with her.  So --
and then we all had to go home because after
snowstorm.  It was late -- it was -- I don't
know -- 5:00 we went home, something -- 5,
6:00.  Usually I work later than that.
        So I asked her -- I asked Irene to
call Karen and ask about it.  And I guess that

Page 76

B. LEE

night they spoke or the next morning when I
was coming in -- I came in little late because
of the snowstorm thing and Irene called me and
told me that Karen asked, you know, to meet
with us.  She was coming to the -- to that
bakery.
    Q.   Okay.  And so the meeting took
place at a bakery in the building where the
bank branch was located.
    A.   Right.
    Q.   Okay.  Let me just -- you go on to
say in this e-mail:  "She said that she had
been stealing money from the bank for the last
few years."
        Do you see that?
    A.   Yes.
    Q.   And is that consistent with your
recollection?
    A.   Yes.
    Q.   You then go on to say:  "She
didn't remember exactly when she had started."
    A.   Right.  She said that.
    Q.   "Ms. Chon told us that she had
been taking money from the bank by crediting

Page 77

B. LEE

the currency and coins account and debiting
CDs."
        Do you see that?
    A.   Yes.
    Q.   Could you just briefly tell us
what you meant by that.
    A.   Like, for ███████ case, or
anybody else, the CD will be the credit
balance on our general ledger because
that's -- you know, somebody gave us some
money to hold on so it's our liability.
        So by debiting this account she's
taking the money out of the CD accounts.  So
we will only debit that account when somebody
take the money out of that account.  So she'll
debit that CD account and credit cash account.
That means, if you just look at that, somebody
withdrew money from that account.  But that
money, credit cash, that money did not go to
the customer.  She took the money.
    Q.   Right.  And when you say cash
account, you're referring to what was known as
the currency and coins account.
    A.   Right.  That was the name of the

Page 78

B. LEE

1 general ledger account.
2
3     Q.   Okay.  And is it fair to say that
4 when you reviewed these CD accounts and you
5 saw this type of transaction you thought there
6 was something unusual because customers of CD
7 accounts customarily do not withdraw funds out
8 of CD accounts until the maturity date?
9     A.   Right.  But the only thing was we
10 did have a special promotional CD that people
11 could take the money out from the CD account
12 before the maturity.  I don't know how many
13 times.  Like six times or whatever.  So we did
14 have that kind of promotional CD.
15     Q.   And the customer CD accounts that
16 you reviewed in connection with Karen Chon,
17 were any of those CD accounts the promotional
18 CD accounts that you were just mentioning?
19     A.   I don't think so.
20     Q.   Is it fair to say --
21     A.   I don't remember if there were
22 special CD accounts.  But those are the --
23 she -- the older accounts that she took the
24 money out, there was like elderly senior
25 customers who are having those CDs kept on

Page 79

B. LEE

1 rolling over.  So they're not like, you know,
2 in need of money, they take the money out,
3 that kind of customers.
4
5     Q.   Okay.  And when you say rolling,
6 these customers are rolling their C --
7     A.   Renew.  Automatic renewal.
8     Q.   So upon maturity they would roll
9 it over into a new CD.
10     A.   Right.
11     Q.   You then go on to say here:  "In
12 reviewing the currency GL account, we found
13 about 30 manual questionable credits, total of
14 $1.2 million ranging from $10,000 to $100,000
15 from May 2011 to September 2013."
16          Do you see that?
17     A.   Yes.
18     Q.   And then you say:  "See attached."
19          Was there an attachment to this
20 e-mail?
21     A.   Yes.
22     Q.   And do you recall --
23     A.   There was an Excel spreadsheet
24 that what I did was I just looked at all the
25 transactions off that cash account because she

Page 80

B. LEE

1 told us that she took the money out of that
2 cash account.  So we looked at the -- that
3 cash account and looked at all the big items.
4 Manual transactions.  So that summary was
5 attached.
6     Q.   Okay.
7     A.   It was Excel spreadsheet.
8     Q.   This Excel spreadsheet summary,
9 was that a summary that you had prepared?
10     A.   Yes.
11     Q.   And is it fair to say that that
12 summary reflected the 30 manual questionable
13 credits ranging from $10,000 to $100,000 from
14 May 2012 to September 2013?
15     A.   Yes.
16     Q.   You then go on to say:  "Ms. Chon
17 also told us that she had been transferring
18 funds from one CD to another to cover this
19 shortage."
20          Do you see that?
21     A.   Right.
22     Q.   Do you recall anything else she
23 told you about that?
24     A.   Right.  See, the way she was

Page 81

B. LEE

1 taking the money was if somebody had $300,000
2 CD and maturity is in like two years, in
3 between those maturity date and during that
4 period she will take the money out and when
5 it's time for the CD to mature she'll take the
6 money out of other CD to cover it because you
7 have to renew it, you need to have $300,000.
8          So that's what she was doing from
9 another CD.  So she was transferring money
10 between and then she will take the money out
11 and, you know, before it matures she will take
12 the money out of another CD and put it in
13 there.  That's why the 1099 interest was so
14 small because the $300,000 was not there the
15 whole time.
16     Q.   Okay.  And the $300,000 was not
17 there the whole time, you're referring to one
18 of the CD accounts that Mr. ████ had been
19 inquiring about.
20     A.   Yes.  Right.
21     Q.   All right.  Now, you testified
22 earlier that at this meeting Ms. Chon told you
23 and Irene Lee that there was another person or
24 there was -- another person at the bank who

Page 82

B. LEE

1  was involved in the embezzlement.  Do you
2  remember that?
3  A.   Right.  Yes.
4  Q.   Could you just tell us, to the
5  best of your recollection, what she told you
6  in that regard at that meeting.  As best as
7  you can recall.
8  A.   She said that there was somebody
9  else involved with the embezzlement and -- but
10 she didn't say who it was.  We asked and
11 she -- she didn't say.  She didn't want to
12 say.
13 Q.   Do you recall whether she told you
14 how this other person at the bank was involved
15 in the embezzlement?
16 A.   I don't remember exactly but she
17 made it sound like that person gave her the
18 idea or they were talking together to come up
19 with the method or that kind of thing.  But I
20 don't remember exactly.
21 Q.   Okay.  I'm not asking you to
22 speculate or guess.
23 A.   Right.
24 Q.   I'm asking for your best
25

Page 83

B. LEE

1  recollection.
2  A.   Okay.
3  Q.   If you recall.
4  A.   Yeah.  She did say something
5  like -- that they talked about it but I'm not
6  sure.  I'm not exactly sure.
7  Q.   Now, you also testified earlier
8  that at this January 22 meeting with Ms. Chon
9  she didn't tell you who this other person at
10 the bank was who was involved in the
11 embezzlement.
12 A.   Right.
13 Q.   But you also mentioned earlier
14 that you sort of knew or suspected who that
15 person may have been.  Do you remember that?
16 A.   Yes.
17 Q.   And I apologize if I'm not
18 accurately describing your earlier testimony.
19 Could you tell us what you meant
20 by that.
21 A.   In that first meeting she didn't
22 say who it was.  But I believe on the -- in
23 the second meeting she did mention the name I
24 think.
25

Page 84

B. LEE

1  Q.   Right.  I understand.
2  A.   Right.
3  Q.   You testified earlier that at the
4  second meeting with Ms. Chon the following day
5  on January 23rd, she told you and the other
6  two bank employees who were present that James
7  Ryu was involved in the embezzlement.
8  I'm asking about the January 22nd
9  meeting.  You testified that she didn't
10 identify the other person at the bank who was
11 involved in the embezzlement.  But I believe
12 you testified earlier that even though she
13 didn't tell you who it was, that you knew who
14 she was referring to, I believe.
15 MR. HARVEY:  Object to the
16 question -- the form of the question.  I
17 don't believe that she did testify but
18 she can answer the question.
19 A.   What I said was on the second day
20 I don't remember if she said that it was James
21 Ryu or we knew -- at the time we knew -- on
22 the second meeting while we were talking we
23 knew that it was James.  But I didn't remember
24 exactly if she said James, you know.  That's
25

Page 85

B. LEE

1  what I said.
2  But on the first day she didn't
3  say.
4  Q.   Okay.
5  A.   She didn't want to say.
6  Q.   When you say she didn't want to
7  say, is that what she told you; that she
8  didn't want to identify --
9  A.   She wouldn't say.  She wouldn't
10 say the name.
11 Q.   Okay.
12 A.   And at the time we were just --
13 everything was a shock so we -- I didn't know
14 what to think actually.  Everything was a --
15 since I was in the state of shock in those few
16 days.
17 Q.   Okay.  Now, I just want to clarify
18 your participation, your work in the internal
19 investigation of this embezzlement.
20 A.   Okay.
21 Q.   Could you tell us exactly what you
22 were asked to do and what you did in
23 connection with the investigation of this
24 embezzlement.
25

Page 86

B. LEE

1    A.   Investigating exactly what
2
3    happened, because on the system -- because we
4    had a system so we could trace them.  So
5    that's what we did.
6    Q.   Okay.  Let me step back a second.
7         As of January 22nd, 2014, is it
8    fair to say that you were an employee of
9    Wilshire Bank?
10   A.   Right.
11   Q.   This was after the merger.
12   A.   Right.
13   Q.   And do you remember what your
14   title or position was at Wilshire Bank at that
15   time?
16   A.   Home mortgage coordinator I think.
17   And I was assistant to Mr. Park, the regional
18   bank -- regional director.
19   Q.   And you testified earlier, I
20   believe, that you reviewed the CD accounts
21   that were the subject of the embezzlement?
22   A.   Yes.
23   Q.   How did you do that?
24   A.   How did I do that?  I started with
25   Mr. ▮▮▮▮ and I traced the -- with the

Page 87

B. LEE

1    transactions, all the transactions, debits and
2
3    credits, and I followed that.
4         And on that meeting with Karen I
5    asked her who else, you know -- whose account
6    did she took the money out.  And she gave me a
7    list of one or two person's name.  So with
8    that ▮▮▮▮▮ and that person, I was tracing all
9    the debits and credits.  And we were able to
10   see -- you know, I just follow all the debits
11   and credits and then I came up with the list.
12   Q.   Okay.  I'm just trying to clarify.
13   I understand that Irene Lee was also assisting
14   in the investigation.
15   A.   Yes.
16   Q.   So I'm trying to understand what
17   you did, what Irene Lee did, in terms of
18   reviewing the CD accounts.  Are you able to
19   tell us what you did?
20   A.   Okay.  What I did was --
21   everything was on the system.  That part I
22   did.  You know, tracing all the transactions,
23   debits and credits, and see who else is
24   involved.  You know, I mean, in terms of
25   customers' accounts.  So anything I could

Page 88

B. LEE

1    see -- see, I had access to this system so
2
3    that's where I helped.
4         And Irene was at the branch -- she
5    was helping with this system side also because
6    it's -- takes a lot of time to trace things.
7    You know, you have to look for all the
8    transactions in the system.
9         And also she had -- she was
10   helping Alicia and the other guy, Orest, the
11   internal auditor at the branch.  So at the
12   branch they will have the physical documents
13   as well.  So she was helping with that as
14   well.
15   Q.   So in reviewing these CD accounts
16   and the transactions, credits and debits, you
17   mentioned you were using the system.
18   A.   Right.
19   Q.   What are you referring to when you
20   say system?
21   A.   General ledger system.  Deposit
22   system.  And all the reports.
23   Q.   And are you referring to -- when
24   you say systems, are you referring to a
25   particular computer program or software?

Page 89

B. LEE

1    A.   Yes.
2
3    Q.   Do you recall what that was call?
4    A.   Jack Henry.
5    Q.   And was that a computer program or
6    software that was used by BankAsiana?
7    A.   Yes.
8    Q.   Prior to the merger?
9    A.   Yes.
10   Q.   And was that program or software
11   being used by Wilshire Bank after the merger?
12   A.   Until they did the conversion in
13   November of 2014.  I think November --
14   beginning of November was the conversion date.
15   Q.   So as of January 2014 the Jack
16   Henry computer software was still being used
17   by Wilshire Bank?
18   A.   It wasn't being used because we
19   converted to their system I believe but we had
20   access to all the information.
21   Q.   Okay.  When you said November 2014
22   earlier were you referring to November 2013?
23   A.   Yeah, November 2013.  Sorry.
24   Q.   All right.  But is it fair to say
25   that you were familiar with that software,

Page 90

B. LEE

1
2 Jack Henry?
3     A.   To a degree.  But the deposit
4 system, Irene was more familiar with it.  But
5 I do inquiries.  So...
6     Q.   And was there any other soft --
7 computer software program that you utilized in
8 reviewing the CD accounts and the credits and
9 debits transactions in those accounts?
10     A.   No.  Just the Jack Henry has
11 everything.  General ledger report.  Audit
12 reports.  And deposit system.  Loan system.
13     Q.   Did you review the bank system to
14 look for any backup documents such as deposit
15 slips, withdrawal slips?
16     A.   Yeah.  Deposit slips, those
17 things -- withdrawal slips, those things are
18 all physical I think.  You know, those at --
19 the branch they will have it.  So I'll get
20 help from Irene or the people -- Irene will
21 talk to somebody at the branch I think.
22     Q.   Other than the physical hard copy
23 documents, do you recall whether BankAsiana
24 had a computer software program that allowed
25 someone at the bank to access any backup

Page 91

B. LEE

1
2 documents?
3     A.   It's the Jack Henry system that
4 has I think deposits, check copies.  That's
5 still Jack Henry system.  Within the Jack
6 Henry they have bank statement -- I don't
7 remember the name of the system but it's all
8 Jack Henry system.  Just the checks, copy of
9 the checks.  I think those are -- yeah,
10 deposit slip also I think.
11     Q.   Do you remember a computer
12 software or a program that was being used at
13 BankAsiana called Synergy or Synergy?
14     A.   Synergy is the Jack Henry report
15 system.
16     Q.   Okay.
17     A.   Everything that we use is Jack
18 Henry.
19     Q.   Okay.
20     A.   I think it's -- it's deposit slips
21 and checks.  I think it's called Foresight and
22 I don't remember the spelling but that's also
23 Jack Henry.
24     Q.   Okay.  I'd like to now turn to
25 what was previously marked as Deposition

Page 92

B. LEE

1
2 Exhibit Ryu 3.  Do you have that in front of
3 you?
4     A.   Yeah.
5     Q.   And I'll represent to you that
6 Deposition Exhibit Ryu 3 is a copy of Elaine
7 Jeon's memorandum to -- I'm sorry -- Alicia
8 Lee's memorandum to Elaine Jeon from January
9 23rd, 2014.  And the subject is BA, or
10 BankAsiana, Unauthorized CD Withdrawal
11 Incident.
12         Do you see that?
13     A.   Yes.
14     Q.   Okay.  I'd like to go over this
15 with you.
16         In the first paragraph Alicia Lee
17 states in this memorandum:  "This afternoon
18 after my arrival at South Palisades Park
19 branch at around 12:12 p.m. Irene Lee,
20 Bo-Young Lee, and I had a meeting with Karen
21 Chon, former BA employee that had been
22 involved in the unauthorized withdrawals of
23 funds from customers' CD."
24         Do you see that?
25     A.   Yes.

Page 93

B. LEE

1
2     Q.   Is that statement accurate?
3     A.   Yes.
4     Q.   The next:  "The details of the
5 interview will be submitted separately, but to
6 summarize today interview, Karen Chon
7 confessed that the unauthorized transactions
8 were her wrongdoing and that the funds were
9 delivered to James Ryu BACOA."
10         Do you see that?
11     A.   Yes.
12         It's COO.
13     Q.   That should have been COO.  Do you
14 believe that that was a typographical error?
15     A.   I don't know.
16     Q.   But your understanding is that
17 James Ryu was BankAsiana's COO, correct?
18     A.   Um-hum, yes.
19     Q.   And other than that COA, is this
20 statement accurate, to your knowledge?
21         MR. HARVEY:  Object to the form of
22 the question.
23     A.   Yeah.  But that he -- she said
24 that -- this one looks like the funds were all
25 delivered to James Ryu.  But she said that he

B. LEE

1  was involved and she had given him the money.
2  I guess some funds were delivered.  Or given
3  to James Ryu.  I don't know if that makes a
4  difference.
5      Q.   Okay.  At that meeting do you
6  recall Karen telling you and the others the
7  circumstances under which she began to
8  embezzle money from the bank?
9      A.   No, I don't think so.
10      Q.   Do you remember her telling you or
11  the others at that meeting why she was making
12  unauthorized transactions or withdrawals from
13  the CD accounts and delivering funds from
14  those withdrawals to Mr. Ryu?
15      A.   Why?
16      Q.   Yes.
17      A.   I don't think she said why.  She
18  just said that she did give money to him.  But
19  I don't remember her telling us why.
20      Q.   Okay.  Did you or Alicia Lee or
21  Irene Lee ask at that meeting why she was
22  making unauthorized withdrawals from customer
23  CD accounts and taking those funds and
24  giving -- delivering them to Mr. Ryu?
25

B. LEE

1      A.   I don't remember but I must have
2  asked.  I guess that would be the first
3  question why she would do that.  Why she would
4  take the money.  And -- but I don't think I
5  got the answer why.  But she just mentioned
6  that James was involved and that she had given
7  money to him.  But she didn't say -- I don't
8  remember why.
9      Q.   Okay.  Do you have any
10  recollection as to whether Ms. Chon told you
11  or the others when she started delivering
12  money to Mr. Ryu?
13      A.   When she started?
14      Q.   Yes.
15      A.   I don't remember.  She just
16  said -- the way I remember is just, you know,
17  on various occasions that she did give money
18  to James.  And I don't recollect anything on
19  when or why.
20      Q.   Do you remember at all whether Ms.
21  Chon mentioned an employee dinner, which --
22  that something happened at that dinner that
23  began her delivery of monies to Mr. Ryu?
24      A.   She did say that.  She did say
25

B. LEE

1  that there was something happened that -- at
2  the dinner but she didn't say what it was.
3  That -- yeah, she did say that.  She did say
4  something --
5      Q.   Could you tell us to the best of
6  your recollection what you remember her
7  telling and you the others at that meeting
8  about that.
9      A.   She said something had happened at
10  the dinner; that Mr. Ryu found out or saw or
11  something, that he had a knowledge of that;
12  that she -- I guess something not good that
13  she wanted to be known that he had a knowledge
14  that -- that he was holding against her kind
15  of thing.  But that's why she start giving him
16  money I think.  She did say something like
17  that.
18      Q.   Do you have any recollection,
19  either at the January 22nd meeting or the
20  January 23rd meeting, of Karen Chon telling
21  you or Irene Lee or Alicia Lee that she had
22  been making unauthorized withdrawals from her
23  sister-in-law's bank account and her husband's
24  business partner's bank account?
25

B. LEE

1      A.   I don't remember her sister-in-law
2  but there was somebody that she was doing the
3  banking -- either banking for the person or
4  she was writing checks for the person.  Yeah,
5  there was something but I don't remember
6  exactly.
7      Q.   Does the name Eunchul Paec ring a
8  bell?
9      A.   Yeah.  Something like that.
10      Q.   Was that -- do you recall whether
11  that gentleman was Karen Chon's husband's
12  business partner?
13      A.   Yeah.  They had some kind of
14  business relationship.  I think the way I
15  remember was -- now that you mention his name,
16  that he had an installment loan -- installment
17  CD kind of thing, that it's someone's CD that
18  she's been making payments.  Then at one time
19  I think she withdraw money from that account.
20  I think.
21      Q.   Was Mr. Eunchul Paec's installment
22  CD account one of the CD accounts that you
23  reviewed in connection with your investigation
24  of the embezzlement?
25

Page 98

B. LEE

1
2    A.  Yeah.  I did.  I did look at that
3    account.
4    Q.  Do you recall the same Soryo Kim?
5    A.  I don't remember.  Yeah.  I looked
6    at a lot of the accounts but I don't remember
7    that name.
8    Q.  Did Karen Chon mention to you that
9    she had made unauthorized withdrawals from any
10   bank accounts or CD accounts other than Mr.
11   Eunchul Paec?
12   A.  Yeah.  Like ████ --
13   Q.  And other than the CD accounts
14   that you had testified to earlier.
15   A.  I don't recall.
16   Q.  You don't recall the name Soryo
17   Kim?
18   A.  No.  No.  You see, the thing is I
19   remember vaguely -- I didn't know about all
20   the relationship with her and her relatives or
21   friends.  So I might have looked at the
22   account but not realizing who it was and I
23   might have heard it later on but I don't
24   recall -- I vaguely remember something but I
25   don't -- I'm not sure.

Page 99

B. LEE

1
2    Q.  You testified earlier that you
3    remember Karen Chon telling you at the January
4    23rd meeting that she had done something and
5    that Mr. Ryu knew about it.  Do you remember
6    anything else about what she had done that Mr.
7    Ryu was aware of?
8    A.  I didn't know what it was.
9    Q.  Did she tell you what it was?
10   A.  No.
11   Q.  And do you remember anything else
12   about Karen Chon telling you what Mr. Ryu may
13   have said at this employee dinner?
14   A.  No.
15   Q.  Do you recall anything that she
16   told you about what Mr. Ryu may have said at
17   that employee dinner?
18   A.  I don't remember.  Sorry.  I don't
19   recall.
20   Q.  Okay.  Do you have any
21   recollection of Karen Chon telling you that
22   she began to deliver money to Mr. Ryu from the
23   embezzlement because he had threatened her or
24   blackmailed her?
25   A.  I don't recall anything.  But

Page 100

B. LEE

1
2    because of his knowledge of whatever happened
3    at the meeting -- at the dinner, that, you
4    know, I just got that impression that she was
5    kind of feel threatened to deliver the money.
6    But that was just an impression I got.  But I
7    don't remember the exact -- exactly what was
8    said.
9    Q.  Okay.  Let's get to the next
10   paragraph in this memorandum.  Alicia Lee then
11   states: "The initial contact was made by Mr.
12   Ryu who had asked Karen for personal loan to
13   which she responded no but she had asked her
14   if there was any way that we could facilitates
15   $10,000."
16       Do you see that?
17   A.  Um-hum.
18   Q.  Do you recall discussion about
19   that at this meeting?
20   A.  Like I said before, you know,
21   after I read this one, I remember vaguely
22   about the loan kind of situation.  And -- but
23   I don't remember, like, you know, exact amount
24   $10,000 or anything like that.  But he had I
25   think little bit of financial difficulties at

Page 101

B. LEE

1
2    the time I think.  But I don't remember the
3    details.
4    Q.  When you say you believe Mr. Ryu
5    had financial difficulties at that time, could
6    you clarify or elaborate on what you mean by
7    that.
8    A.  I think he had asked few people at
9    the bank for loan.  But I don't remember when
10   it was.  But maybe not -- I don't know when
11   that was but he had asked for loans from
12   employees.
13   Q.  Is it fair to say that that would
14   have been prior to the merger with Wilshire
15   Bank?
16   A.  Yes.
17   Q.  Do you believe it was sometime in
18   2013?
19   A.  I don't remember.
20   Q.  Okay.
21   A.  I don't know exactly when.
22   Q.  Did Mr. Ryu ever ask you for a
23   personal loan?
24   A.  Yes.  I told him no.
25   Q.  Do you recall how many times?

B. LEE

1
2     A.   Just once.
3     Q.   Could you tell us what you
4  remember.
5     A.   He had asked for a loan.  So I --
6  I don't remember the amount.  Few thousand
7  dollars.  So I told him that I'll have to talk
8  to my husband.  And I thought about that and I
9  told him that was not a good idea to have,
10 like -- you know, to lend him the loan as a,
11 you know, co-worker.  And with the -- he was
12 the big boss at the bank.  So I didn't think
13 it was a good idea to lend him money.  And he
14 said no problem.
15    Q.   Do you remember when that was?
16    A.   I don't remember when that was.
17    Q.   Is it fair to say that it was
18 prior to the merger with Wilshire Bank?
19    A.   Yes.
20    Q.   To your knowledge, did Mr. Ryu ask
21 anyone else at the bank for a personal loan?
22    A.   Yes.
23    Q.   Who else?
24    A.   Jessica Kim.  And Chan Lai Park.
25 And I heard Mr. Hur, the CEO.  But I didn't

B. LEE

1
2  hear from Mr. Hur or Chan Lai Park.  Actually,
3  Chan Lai Park I did hear from her later on but
4  I never...
5     Q.   Okay.  So let's first take Jessica
6  Kim.
7     A.   Um-hum.
8     Q.   What do you remember about Mr. Ryu
9  asking Jessica Kim for a personal loan?
10    A.   I think it was probably at the
11 same time.  She told me that.  So it must
12 have -- so it was -- it must have been in
13 20 -- before January 2013 because that's when
14 she left the bank.  So she told me that he had
15 asked for a loan -- to borrow money from her.
16    Q.   And do you recall how -- whether
17 she told you how much he had asked to borrow?
18    A.   I don't remember exactly but not a
19 lot.  Like, couple thousand or something.  I
20 don't know.  I don't remember.
21    Q.   Okay.
22    A.   He might have not have specified
23 the amount.  I don't know.
24    Q.   Okay.  The second person you
25 mentioned -- we need to spell out his name if

B. LEE

1
2  we can.  Do you know how the spell that
3  person's name?
4     A.   C-H-A-N, L-A-I, P-A-R-K.
5     Q.   So the last name is Park?
6     A.   Yes.  It's she.
7     Q.   Okay.  And what do you remember
8  about Mr. Ryu asking her for a personal loan?
9     A.   I just heard that he had asked her
10 for a loan also.  That's all I know.
11    Q.   And is that based on what Ms. Park
12 told you?
13    A.   At the time I think I heard it
14 from either -- I probably heard it from
15 Jessica Kim.  I don't remember.  But I did
16 hear that.
17    Q.   And do you have any recollection
18 as to how much he had -- Mr. Ryu had asked Ms.
19 Park?
20    A.   No.  I don't know.
21    Q.   And do you recall anybody else?
22    A.   Mr. Hur.
23    Q.   Mr. Hur, that's H-U-R, correct?
24    A.   Right.
25    Q.   And that's his last name.

B. LEE

1
2     A.   Right.
3     Q.   And  Mr. Hur was president and CEO
4  of BankAsiana.
5     A.   Right.
6     Q.   What do you remember about Mr.
7  Hur?
8     A.   I think I might have heard it from
9  Jessica Kim also that James had asked for a
10 loan from him.
11    Q.   And do you remember how much he
12 had asked Mr. Hur for?
13    A.   No.
14    Q.   Any other --
15    A.   That's all I know.
16    Q.   Did BankAsiana have an employee
17 loan program, to your knowledge?
18    A.   I think we did.
19    Q.   Do you recall whether Mr. Ryu had
20 taken an employee loan from BankAsiana during
21 his employment with the bank?
22    A.   I think so.  I don't remember the
23 amount but he -- I think he did.
24    Q.   And do you recall the -- sort of
25 the maximum amount that an employee could

Page 106

B. LEE

1  borrow from the bank?
2      A.   I don't remember.  I don't
3  remember if there was a maximum amount.
4  But -- I don't think it was a lot.  I don't
5  know.  20,000.  You know, 50 -- I don't
6  remember.  But it wasn't -- it wasn't a lot.
7      Q.   Okay.  I'd like to just move onto
8  the next section of this memorandum.  "Since
9  then she had provided Mr. Ryu with cash
10  whenever he had asked for it and he had always
11  made contact with her through company phone
12  and never over her personal home or cell phone
13  number."
14      Do you see that?
15      A.   Um-hum.
16      Q.   Okay.
17      A.   Yes.
18      Q.   Now, the cash that's referred to
19  in this paragraph, is it your understanding
20  that Ms. Chon was referring to cash that was
21  the proceeds of the embezzlement that she had
22  admitted to?
23      A.   That was the impression that we
24  got.
25

Page 107

B. LEE

1      Q.   Right.  So is it fair to say that
2  she would withdraw -- make unauthorized
3  withdrawals from CD accounts and then have a
4  credit indicated on the cash and coins account
5  and then take the cash out of the bank's
6  vault?
7      A.   Yes.
8      Q.   And so the cash that's referred to
9  here would have been sums of cash that she
10  removed from the bank vault.
11      A.   Yes.
12      Q.   As part of the embezzlement.
13      A.   Right.
14      Q.   And could you describe to us this
15  inter-office bank envelope that you referred
16  to earlier today.
17      A.   When I said inter-office envelope,
18  she didn't send it -- she used that
19  inter-office envelope but she didn't send it
20  inter-office.  She didn't send the cash to
21  inter-office.
22      You know, she will put it in
23  the -- I remember her saying she'll put the
24  money in the inter-office envelope.  It's
25

Page 108

B. LEE

1  either the yellow one that everybody use, you
2  know, from Staples with the holes.  You know,
3  the one with the lines.  We use that one.  And
4  also we will use any envelope and put the --
5  you know, lines, you know, and use it as an
6  inter-office envelope.
7      Q.   When Ms. Chon told you about the
8  delivery of the cash, sums of cash to Mr. Ryu,
9  did she mention delivering the cash in that
10  yellow inter-office envelope?
11      A.   Yes.  Um-hum.  It could be yellow
12  or white, you know.
13      Q.   And do you recall whether during
14  your tenure at BankAsiana there was a monthly
15  meeting at Palisades Park headquarters of the
16  bank?
17      A.   Yeah.  We used to have managers
18  meeting on monthly basis.
19      Q.   And do you recall whether Ms. Chon
20  attended those meetings on a monthly basis?
21      A.   There are a lot of -- used to have
22  all employee meetings also.  And, yeah, there
23  was some -- if there was all employees, she
24  would attend that.
25

Page 109

B. LEE

1      Q.   And do you recall how often the
2  employee meetings were?
3      A.   Well, they were different at
4  times.  At one time we used to have monthly.
5  Then sometimes it's quarterly.  It wasn't --
6  yes, I don't remember exactly.  But...
7      Q.   Okay.
8      MR. YI:  We'll just go off the
9  record for a second.
10      (Discussion held off the record.)
11  BY MR. HARVEY:
12      Q.   The next paragraph of this
13  memorandum states:  "The deliveries of the
14  funds were always in cash according to Karen
15  Chon and that either it was delivered personal
16  by her or Mr. Ryu would stop by at her branch
17  to pick it up."
18      Do you see that?
19      A.   Yes.
20      Q.   And is that consistent with your
21  recollection?
22      A.   Yes.
23      Q.   Next is: "As per Karen's
24  statement, Mr. Ryu mentioned to her that he

25                                              28

B. LEE

1              B. LEE
2  would compensate her for her help."
3        Do you see that?
4       A.  Yes.
5       Q.  You testified earlier that you do
6  not have any recollection of Karen Chon
7  discussing that at the meeting; is that
8  correct?
9       A.  Right.  I don't recall that
10  comment.
11       Q.  Okay.  But is it fair to say that
12  at that meeting she told you that of the funds
13  that were embezzled, the cash sums of money
14  that were removed from the bank's cash vault,
15  that she gave some of the cash -- sums of cash
16  to Mr. Ryu but that she also kept some for
17  herself?
18       A.  Right.
19       Q.  Did she tell you at that meeting
20  approximately how much she gave to Mr. Ryu and
21  how much she kept for herself?
22       A.  I don't remember.  I don't
23  remember.  I don't remember --
24       Q.  When you say you don't remember,
25  do you mean you don't remember how much or

1              B. LEE
2  whether she told you or not?
3       A.  Both.  I don't recollect if she
4  ever said that or not.
5       Q.  Do you have any recollection of
6  anyone asking her at this meeting how much she
7  had embezzled from the bank, how much she had
8  kept for herself of that amount, and how much
9  she had given to Mr. Ryu?
10       A.  I don't recollect.  I know she did
11  mention -- she estimated it to be certain
12  amount in the first meeting.  And on the
13  second meeting when we asked her all the
14  questions she -- she didn't -- the amount she
15  estimated that she took was less than what I
16  knew at that time because based on my
17  preliminary investigation, it was 1.2 million.
18  But when I told her it was that much -- at
19  first we asked her how much.  Then I think
20  she -- she didn't say -- whatever the amount
21  she came up with was a lot less than what I
22  came up with.  So when I told her that it was
23  1.2 million or something, then she said she
24  was surprised to -- that it was that much.
25       Q.  All right.  Let me move onto the

1              B. LEE
2  next paragraph of this memorandum.
3        "Her recollection of the accounts
4  affected were," and I believe there's a typo
5  there where it says "where," "which she
6  approximates at around $1 million."
7        Do you see that?
8       A.  Yes.
9       Q.  Is that consistent with your
10  recollection of the meeting?
11       A.  On the second meeting I don't
12  remember what she said.  But she -- whatever
13  she estimated was less than what I came up
14  with, which was 1.2 million.  But I don't
15  recollect it was $1 million.
16        But the day before it was -- I
17  thought it was less than that but I don't
18  recollect the amount because I did ask her.
19       Q.  All right.
20        The next paragraph states:
21  "During the interview, we have uncovered that
22  Karen Chon has taken funds from customers' CDs
23  for her husband's business use."
24        Is that consistent with what she
25  told you at the meeting?

1              B. LEE
2       A.  Yes.
3       Q.  "She admitted forging her
4  husband's signature as well as..."  and
5  there's a redaction there, someone's signature
6  "...to issue checks from her husband's
7  business account."
8        Do you recall her telling you that
9  at the meeting?
10       A.  I don't recall the forging part.
11  But she was doing the bookkeeping for her
12  husband's business but I don't recall forging
13  her husband's signature.
14       Q.  At some point during your
15  investigation of the embezzlement, did you
16  learn that Karen Chon had forged her husband's
17  signature and her husband's business partner's
18  signature?
19       A.  I don't recall forging part but
20  that she was doing the bookkeeping for the
21  business.  I don't know if it's -- I don't
22  remember.  But what she said was she said her
23  husband had no knowledge of all this and she
24  was really worried.
25       Q.  Okay.  Alicia Lee goes on to state

Page 114

B. LEE

1
2  in this memorandum: "We have detected unusual
3  transactions dating back to 2010."
4        Is that consistent with your
5  recollection of the discussions at the
6  meeting?
7        A.  I don't remember.  I don't
8  recollect if it was 2010.  But from my
9  investigation it was, you know, 2011.  And
10  Karen did not remember exactly when she
11  started it.
12        Q.  Okay.
13        A.  That much I remember.
14        Q.  Okay.  Alicia Lee goes on to
15  state: "Transactions total from 2010 to 2013
16  has added up to $3 million but we still need
17  to verify the amount.  Transactions for 2013
18  only amounts to $1.9 million."
19        Do you see that?
20        A.  Yes.
21        Q.  Is that consistent with your
22  recollection of what was discussed at the
23  meeting?
24        A.  No.  She must have wrote this
25  based on what she found or -- because the way

Page 115

B. LEE

1
2  I remember, she -- Karen didn't -- whatever
3  her estimated embezzlement amount was less
4  than what I came up with, $1.2 million.  And,
5  you know, I don't know how Alicia came up with
6  the $3 million and $1.9 million.  That must be
7  all the trans -- the sum of all the
8  transactions because the one I came up with,
9  the 1.2 was not the sum of all the
10  transactions.  The suspected items that I came
11  up with was $1.2 million.
12        Q.  Perhaps I can rephrase the
13  questions.
14        What I just read to you, is that
15  consistent with your recollection of your
16  discussions with Alicia Lee and Irene Lee
17  sometime following the meeting with Karen
18  Chon?
19        A.  No.  We didn't -- see, she must
20  have came up with this amount based on
21  whatever we provided.  But she's the one who
22  came up with this amount.
23        Q.  Is it fair to say that the review
24  of the CD accounts as part of the
25  investigation of the embezzlement concerned or

Page 116

B. LEE

1
2  totaled some $3 million?
3        A.  Say that again.  The total CDs
4  involved?
5        Q.  I'm not talking about what you
6  ultimately determined were the subject of the
7  embezzlement.
8        A.  Uh-huh.
9        Q.  I'm asking in terms of your review
10  to determine the extent of the embezzlement,
11  were you were looking at the CD accounts --
12        A.  It could be.
13        Q.  -- and the total amount of all the
14  CD accounts totaled some $3 million?
15        A.  It could be.  But I wouldn't know.
16  I don't remember.
17        Q.  Okay.  And in the last sentence of
18  this memorandum Alicia Lee states: "The exact
19  amount hasn't been verified yet, but we are
20  suspecting that it is at least $1.9 million."
21        Do you see that?
22        A.  Yes, I see it.
23        Q.  And is that consistent with your
24  recollection of what was being discussed among
25  you, Alicia Lee, and Irene Lee at that time?

Page 117

B. LEE

1
2        A.  She didn't come up -- she came up
3  with that amount.  Like I said before, I --
4  based on what I did, I gave her all the
5  documentation.  So she's the one who came up
6  with the $1.9 million.
7        So she didn't -- we didn't discuss
8  it and come up with that amount.  She did.
9  Based on all the documentation.
10        Q.  And it's your testimony that --
11  your recollection is that your preliminary
12  finding was that the total amount of
13  embezzlement was some $1.2 million.
14        A.  Right.  But that was a very
15  preliminary on the day -- you know, on the
16  22nd, based on just those CDs.  So she could
17  be right but I wouldn't know.
18        Q.  Okay.  Is it fair to say that your
19  participation in the investigation of the
20  embezzlement focused on reviewing of customer
21  CD accounts?
22        A.  Yes.
23        Q.  And the bank account or accounts
24  of Mr. Ryu and Ms. Chon?
25        A.  Yes.

Page 118

B. LEE

1
2    Q.   And is it fair to say that your
3    participation in the investigation of this
4    embezzlement did not concern Mr. Ryu in
5    particular other than reviewing his bank
6    account or accounts?
7         MR. HARVEY:  Object to the form of
8    the question.
9    A.   I didn't quite understand what you
10   mean.
11   Q.   Did anyone at the bank ask you to
12   do anything in terms of the investigation of
13   the embezzlement to determine whether Mr. Ryu
14   was involved in the embezzlement and the
15   extent of his involvement in the embezzlement?
16   A.   No, they didn't ask me.  Like I
17   said before, I was just looking at all the
18   CDs.  Started out with few CDs and then I just
19   trace it to -- I trace all the debits and
20   credits.  And because Karen said that James
21   was involved, so I looked at those accounts.
22   Q.   Okay.  Now, you testified earlier
23   that you believe that Mr. Ryu had financial
24   difficulties and you didn't remember the time
25   frame but you believed that it was sometime

Page 119

B. LEE

1
2    prior to the merger, the bank's merger with
3    Wilshire Bank.  Do you remember that?
4    A.   Yes.
5    Q.   Could you just tell us as best as
6    you recall, what's the basis of your statement
7    that you believed that he was having financial
8    difficulties at the time?  What do you
9    remember?
10   A.   It's something that I -- I didn't
11   hear from James but it was just people were --
12   I just heard from people that he was -- he
13   took over the beauty salon and also he was
14   doing, I think, café.  But I don't -- I don't
15   know the details of his financial
16   difficulties.  But I heard that he was having
17   financial difficulties.  You know, I heard
18   that when he was asking for loans.  That's
19   what I heard.
20   Q.   Did Mr. Ryu ever tell you that he
21   was having financial difficulties because of
22   his businesses?
23   A.   No.  No, he didn't.
24   Q.   Do you remember the name of the
25   beauty salon that you visited on the one

Page 120

B. LEE

1
2    occasion on Sunday afternoon?
3    A.   Not sure.  But I might have Luxe
4    in it.  You know, I don't know if that was a
5    full name.  I'm not sure.  It was in
6    Edgewater.
7    Q.   When you say Edgewater, you're
8    referring to Edgewater, New Jersey?
9    A.   Yes.
10   Q.   And when you say Luz are you
11   spelling that L-U-Z?
12   A.   No.  L-U-X-E.  Luxe.  I'm not
13   sure.  I'm not sure of the spelling and I'm
14   not sure of the name.  Because I only visited
15   one time.  I don't remember the name.
16   Q.   When you visited the beauty salon
17   on that one occasion on a Sunday afternoon and
18   Mr. Ryu asked for your advice in terms of
19   accounting or bookkeeping in connection with
20   his beauty salon business, do you remember him
21   telling you whether he was having financial
22   difficulty?
23   A.   No.
24   Q.   And you mentioned the café.  What
25   do you know about the café?

Page 121

B. LEE

1
2    A.   There was a coffee shop that I
3    think his wife and he was operating.
4    Q.   And do you remember the name of
5    the coffee shop or café?
6    A.   It used to be Kudo Beans but I
7    don't know if that was the name of the café.
8    He took it over -- I think he took over the
9    coffee shop.  But I don't -- at one time it
10   used to be Kudo Beans.  But I don't remember
11   if it was the same name afterward.  After he
12   took over.
13   Q.   And by Kudo, is that K-U-D-O?
14   A.   I don't know if it's K-O-O or K-U.
15   Q.   And what, if anything, do you
16   recall about Mr. Ryu's coffee shop business or
17   café business?
18   A.   We went there couple of times.
19   You know, at lunch or, you know, dinner.
20   Q.   Did you have any discussions with
21   Mr. Ryu during your tenure at the bank about
22   his coffee shop business?
23   A.   Well, he was excited about the new
24   business his wife was doing and I think he
25   used to cook there also after work I think.

Page 122

B. LEE

1
2     Q.   And do you recall having
3     discussions with anyone else at the bank about
4     Mr. Ryu's coffee shop business?
5     A.   Well, just casual discussions
6     that, you know -- because since they opened up
7     a new business, everybody, you know, went
8     there, you know.  So other than that...
9     Q.   And do you recall any discussions
10    with anyone about Mr. Ryu having financial
11    difficulties as a result of the coffee shop?
12    A.   I don't know if it was related to
13    the coffee shop or the beauty salon.  But I
14    heard that he was having financial
15    difficulties.  That's what I heard.
16    Q.   When Mr. Ryu asked you for a
17    personal loan --
18    A.   Yes.
19    Q.   -- did he tell you why he needed
20    the money?
21    A.   I don't remember.  I don't
22    remember if he told me or not.
23    Q.   Okay.
24    A.   But I didn't want to get into it
25    too much detail because, you know, I wasn't

Page 123

B. LEE

1
2     asking any question because I felt
3     uncomfortable doing any financial transaction
4     with the employees.
5     Q.   Okay.
6          MR. YI:  I think if we can take a
7     quick break I'd just like to review my
8     outlines.
9          MR. HARVEY:  Sure.
10         (Recess taken.)
11    BY MR. YI:
12    Q.   Ms. Lee, I'd like to go back to
13    your earlier testimony about your meeting with
14    Lisa Pai.
15    A.   (Witness nods.)
16    Q.   In-house counsel with Wilshire
17    Bank.  Then Wilshire Bank.
18    A.   Okay.
19    Q.   You mentioned that during the
20    meeting that Ms. Pai was playing with her
21    phone.  Are you talking about her smartphone?
22    A.   Yes.
23    Q.   You don't know whether Ms. Pai was
24    recording her conversation with you at that
25    time, correct?

Page 124

B. LEE

1
2     A.   I don't know.
3     Q.   Is it fair to say that it was just
4     a speculation on your part?
5     A.   Yes.  It was a speculation based
6     on, you know, the first meeting that I had
7     with Karen and Irene and she was playing with
8     it and I thought that was -- you know, that
9     caught my attention that she was playing with
10    it.  But I never thought that she would record
11    it.
12         And when I found out that -- I
13    remember each time when I spoke with them,
14    they were playing with the phone.  They had
15    their phones on -- in their hands.  So I was
16    speculating that they might be -- they might
17    have recorded everything.
18    Q.   Okay.  When you say "they" who are
19    you referring to?
20    A.   Alicia Lee and Lisa Pai.
21    Q.   Okay.  I'm now talking about your
22    meeting with Lisa Pai.  There was no one else
23    at this meeting, right?
24    A.   Right.
25    Q.   It was just you and Ms. Pai,

Page 125

B. LEE

1
2     right?
3     A.   Right.
4     Q.   And Ms. Pai never told you that
5     she was recording her conversation with you.
6     A.   Right.
7     Q.   And is it fair to say that other
8     than you seeing her playing with her
9     smartphone, there's no -- there's nothing to
10    indicate that she did, in fact, record the
11    conversation, right?
12    A.   Right.
13    Q.   Okay.  Did you ever ask her during
14    the meeting whether she was recording the
15    conversation?
16    A.   No.  Because it never occurred to
17    me that anybody would be recording our
18    conversation.
19    Q.   Okay.  So other than you seeing
20    her -- observing her playing with her
21    smartphone during the meeting, is there
22    anything else that leads you to speculate that
23    she may have recorded the conversation?
24    A.   No.
25    Q.   Okay.  Back to your meeting with

Page 126

B. LEE

1
2 Karen Chon, January 23rd, 2014. You went over
3 what was discussed at that meeting, what Karen
4 Chon told you and Alicia Lee and Elaine at
5 that meeting.
6         Do you recall Karen Chon telling
7 you anything about someone named Michael Kim?
8     A.   She might have but I don't recall
9 anything. I know the name.
10     Q.   Do you recall at some point during
11 that meeting or interview of Ms. Chon, one of
12 you, either you, Irene Lee, or Alicia Lee,
13 asking a question something in substance does
14 this belong to Michael Kim, CEO?
15     A.   No. CEO? Michael Kim was a
16 broker that I thinking about.
17     Q.   Okay. So let's first talk about
18 whether you have any recollection from that
19 meeting on January 23rd, 2014 of Karen Chon
20 being asked about Michael Kim or Karen Chon
21 talking about Michael Kim.
22     A.   I don't recall anything on Michael
23 Kim.
24     Q.   Now let me ask you this. Do you
25 know a person named Michael Kim?

Page 127

B. LEE

1
2     A.   Yes. Not personally but he --
3 he's a customer and also he was a broker, I
4 believe. Loan broker. He refer loans to us I
5 believe.
6     Q.   Okay. So is it fair to say that
7 during your tenure at BankAsiana Michael Kim
8 was a customer of the bank?
9     A.   Yes.
10     Q.   And is it fair to say that he was
11 a loan broker who referred potential borrowers
12 to the bank?
13     A.   Right.
14     Q.   And does a company name Core
15 Consulting ring a bell to you?
16     A.   Yeah. That was his company I
17 believe.
18     Q.   Okay. That's Michael Kim's
19 business?
20     A.   I think so.
21     Q.   And is that the loan broker
22 business that you referred to?
23     A.   I think so.
24     Q.   And does the firm or company by
25 the name of Soyu Architecture ring a bell?

Page 128

B. LEE

1
2     A.   Yes.
3     Q.   Do you know whether there's any
4 relationship between Michael Kim and Soyu
5 Architecture?
6     A.   No, I don't know.
7     Q.   Was Soyu Architecture a customer
8 of BankAsiana during your tenure?
9     A.   He might have had account with us
10 but he was the architect who designed the Fort
11 Lee branch. Mr. Yoo is the one who designed
12 the branch.
13     Q.   And does Mr. Yoo spell his name
14 Y-U or Y-O-O?
15     A.   I don't know.
16     Q.   Do you know his first name?
17     A.   I don't know.
18     Q.   You believe that the spelling of
19 his name is Y-O-U-N-G S-A-N?
20     A.   M.
21     Q.   M.
22     A.   But I'm not sure of the spelling.
23 But Young Sam. It could be Y-O-O but I'm not
24 sure of his spelling.
25     Q.   Do you remember --

Page 129

B. LEE

1
2     A.   Maybe Yu, Y-U, maybe.
3     Q.   Does the name Silkroad ring a bell
4 to you?
5     A.   Yes. It was our advertising
6 company and design -- they used to do the
7 design for us.
8     Q.   Okay. So Silkroad was a company
9 that provided design services for the bank
10 during your tenure?
11     A.   Right. Yeah.
12     Q.   And do you remember the principal
13 of that company?
14     A.   Mr. Lee. I don't recall his first
15 name. Mr. Lee.
16     Q.   Was there someone named Cookie at
17 that company or firm?
18     A.   Yes.
19     Q.   Do you remember the full name of
20 that person?
21     A.   No. I only know her as Cookie.
22     Q.   And do you recall whether that was
23 her name or nickname?
24     A.   It might be a Korean name. Cook
25 Key (phonetic). But I'm not sure. I did ask

Page 130

B. LEE

1  her but I don't remember what her answer was.
2  I don't think it's a cookie that we know.  I
3  don't think that was the spelling.
4      Q.   During your tenure at BankAsiana,
5  did Michael Kim or his firm or company, Core
6  Consulting, have any outstanding loans with
7  the bank?
8      A.   I think so.  I'm not sure but I
9  heard that -- I think so.  I think he was
10 involved with one or -- a couple loans.  But
11 I'm not sure exactly what his involvement was
12 with those companies.
13     Q.   Do you recall how many loans --
14 how many loans either Michael Kim or his
15 company, Core Consulting, had with the bank
16 during your tenure?
17     A.   I'm not sure.
18     Q.   Do you recall the amounts of the
19 loan or loans that Michael Kim and/or Core
20 Consulting may have had with the bank?
21     A.   I'm not sure.  There was this one
22 loan, couple million dollars.  But I don't
23 know exactly what his involvement was with
24 that loan if he was the -- part of the owners.
25

Page 131

B. LEE

1  I'm not really sure.
2      Q.   Okay.  Do you know whether Mr. Ryu
3  owed any monies to Michael Kim during your
4  tenure at the bank?
5      A.   Yes.  I was aware of it.
6      Q.   How were you aware of it?  How did
7  you come to know?
8      A.   Because we looked at the employee
9  accounts.  I think the auditors had asked for
10 copies of the bank statement because they
11 would look at all the employee loans and
12 deposits for the audited financial statement.
13 It's one of the footnotes.  And they asked for
14 bank statement I think for James.  They might
15 have asked for mine, too.
16     But, anyway, and at this point I
17 gave it to them.  You know, I'll print it out
18 from the system, I'll look at it to make sure
19 that everything was -- looks okay, and then I
20 think I saw a big amount so I did research on
21 it and then I think it was -- I found out
22 there was a loan.  So I just told our CFO that
23 there was a transaction.  And that was the end
24 of my involvement.
25

Page 132

B. LEE

1      Q.   And the CFO that you're referring
2  to is Frank Gleason?
3      A.   Yes.
4      Q.   Who you testified was your direct
5  boss?
6      A.   Yes.
7      Q.   At the bank.
8          When you say auditor, are you
9  referring to an internal auditor of the bank?
10     A.   Outside auditors.
11     Q.   Outside auditors.  Now, you
12 mentioned that BankAsiana during your tenure
13 at the bank had outsourced internal audit.  So
14 when you say outside auditor you're not
15 referring to an outsourced internal auditor.
16     A.   No.  It's Crowe, C-R-O-W-E, I
17 believe, and something else.
18     Q.   So you're referring to an outside
19 auditor who's auditing the books and records
20 of the bank in connection with preparation of
21 audited financial statements?
22     A.   Right.
23     Q.   And you mentioned bank statements.
24 Are you telling us that the auditors had asked
25

Page 133

B. LEE

1  for Mr. Ryu's bank statements?
2      A.   Um-hum.  That's a normal course of
3  audit; that, you know, we'll give them a list
4  all our employees and directors and their
5  outstanding balances.  And then they will
6  sometimes pick few as a sample and they ask
7  for bank statements.
8      Q.   Okay.  And when you say Mr. Ryu's
9  bank statements, you're referring to bank
10 statements of Mr. Ryu for the BankAsiana
11 account, personal account that Mr. Ryu had.
12     A.   Yes.  Yes.
13     Q.   And is it your testimony that you
14 learned that upon review of the bank's -- Mr.
15 Ryu's bank statements that there was a
16 determination that Mr. Ryu had owed money to
17 Michael Kim, who was then a customer of the
18 bank?
19     A.   I don't know if he was a customer
20 at the time.  But at least he was a broker I
21 believe.  And there was a -- I don't remember
22 what I saw in the bank statement, if it was
23 money going in and the check was from him.  Or
24 the paying back part of the loan that was
25

B. LEE

1  payable to him. I don't remember which side.
2  But, you know, any big
3  transactions that -- you know, I'll look at
4  the detail to see everything looks okay. And
5  then when I saw that -- I don't remember if it
6  was from the company or from him directly.
7  But, you know, that caught my attention. So I
8  let my boss know that that was the -- that was
9  what I found.
10    Q.  Do you recall the approximate
11  amount of the loan that was reflected in Mr.
12  Ryu's bank statements from Michael Kim?
13    A.  It wasn't a lot. 10,000. 20,000.
14  Something like that.
15    Q.  Other than that, do you recall
16  anything else that --
17    A.  No.
18    Q.  -- that you believe was the basis
19  for your understanding that Mr. Ryu had
20  owed -- had borrowed money from Michael Kim?
21    A.  No.
22    Q.  Does the name Cleo Riverside ring
23  a bell?
24    A.  Yeah. That was the nail salon I

B. LEE

1  think that I was referring to. It might be --
2  I don't know if it was couple million dollars
3  or -- I don't remember the loan amount. But
4  that was -- that was the nail salon that I
5  thought Michael Kim was somehow either
6  involved or referred. But I don't know the
7  detail.
8    Q.  Okay. During your tenure at
9  BankAsiana, did you learn at some point that
10  an entity called Cleo Riverside had
11  borrowed -- had received a loan from the bank,
12  a business loan?
13    A.  Yeah.
14    Q.  And do you recall whether that was
15  an SBA guaranteed loan, business loan?
16    A.  I don't remember whether it was
17  SBA loan or not.
18    Q.  And is it your testimony that your
19  recollection is that the loan amount was
20  approximately $2 million?
21    A.  I could be wrong. I don't
22  remember the amount.
23    Q.  And is it your testimony Mr.
24  Michael Kim was the principal of Cleo

B. LEE

1  Riverside?
2    A.  I don't know if he was a
3  principal. I heard that he was somehow
4  involved. I don't know if he referred that
5  loan to us or if he was the part owner, you
6  know, hundred percent owner. I'm not sure.
7    Q.  Why do you remember that
8  particular loan?
9    A.  I think that might have been a bad
10  loan.
11    Q.  When you say a bad loan, you're
12  saying --
13    A.  Not a pool loan. I don't remember
14  if it was -- we charged off on that one or --
15  at least there was at one time I think it was
16  a non-pool loan. But I'm not hundred percent
17  sure.
18    Q.  But when you say bad loan, you're
19  referring to the fact that there was some sort
20  of an event of default?
21    A.  Right. The payment was not made
22  on timely basis.
23    Q.  And do you recall whether the bank
24  recovered anything on that loan?

B. LEE

1    A.  I don't remember. There might
2  have been more than one -- one account. But I
3  don't -- I'm not sure.
4    Q.  Is there anything else you
5  remember about the Cleo Riverside loan?
6    A.  No. I don't remember anything in
7  details. I know the name. And that I think
8  it was a bad loan. Or a non-recall loan.
9    Q.  Now that we've talked about
10  Michael Kim and Cleo Riverside and Core
11  Consulting, does that discussion refresh your
12  recollection at all about what if anything
13  Karen Chon may have said about Michael Kim at
14  the meeting on January 23rd, 2014?
15    A.  No. I don't recall anything.
16    Q.  Okay. Now, going back to your
17  meeting with Lisa Pai -- and I believe that
18  was in February of 2014, correct?
19    A.  I don't remember when it was. I
20  know it was very cold day.
21    Q.  Right. But it was after your
22  meeting with Karen Chon on January 23rd, 2014.
23    A.  Right. Right, right.
24    Q.  At that meeting do you recall

B. LEE

1
2 telling Ms. Pai that Mr. Ryu had taken a work
3 laptop?
4     A.  I don't know if it was a laptop or
5 computer.  Yeah.
6     Q.   What do you remember telling Ms.
7 Pai in that meeting?
8     A.   I don't remember.
9     Q.   Let me withdraw that question.
10        Let me ask you this way.
11        Is it fair to say that you
12 discussed with Ms. Pai the fact that Mr. Ryu
13 had taken either a laptop or a computer?
14     A.   Yes.
15     Q.   What do you remember about that?
16     A.   Actually, I don't -- I don't
17 remember too much about it.  But I know that
18 there was a big issue with the computers
19 because they were looking for computer --
20 yeah, laptop, too, because I think he returned
21 it and it was sent to LA.  But I don't
22 remember details.  Sorry.
23     Q.   Okay.  During your tenure at
24 either BankAsiana or Wilshire Bank do you have
25 any recollection of the bank -- senior

B. LEE

1
2 management at the bank, allowing or permitting
3 a bank employee to take a bank computer or a
4 bank laptop or any bank equipment home with
5 them for their own personal use?
6     A.   Well, everything is for the
7 business purposes and they could take it home
8 because if they are working at home.  But I
9 don't think -- I don't -- I'm not aware that
10 they are to be used as a personal use at home.
11     Q.   Do you have any recollection of
12 anyone being allowed to take bank property
13 home with them and just keep it for their own
14 personal use and benefit?
15     A.   Well, Frank Gleason had a laptop
16 that he took.  And I think he returned it
17 later on.
18     Q.   And do you recall Frank Gleason
19 getting a loan from BankAsiana in the amount
20 of $5,000?
21     A.   I know that on our books there was
22 a receivable set up for $5,000 since the very
23 beginning.
24     Q.   And do you know anything about
25 that?

B. LEE

1
2     A.   I heard that when he was hired he
3 had some money owed.  I don't know if it was a
4 credit card or whatever.  So the company lend
5 money to him.  Or they paid it.
6     Q.   When you say they paid it who are
7 you referring to?
8     A.   I mean the BankAsiana paid it but
9 it was set up as a -- we had it as  a
10 receivable so I'm assuming that it was a loan.
11     Q.   And do you ever recall Mr. Ryu
12 telling Mr. Gleason that Mr. Gleason did not
13 have to pay back that loan to BankAsiana?
14     A.   No.
15     Q.   You don't recall that.
16     A.   Un-huh.  Because I was trying to
17 get the money from Mr. Gleason.  So I think he
18 was talking to Lisa Lee.
19     Q.   Okay.  I think I'm almost done.  I
20 just want to go back right now to the employee
21 loan program that we talked about earlier.
22     A.   Okay.
23     Q.   Do you have any recollection of
24 any discussions with anyone at the bank about
25 the fact that Mr. Hur, the president and CEO

B. LEE

1
2 of BankAsiana, has asked Irene Lee, a bank
3 employee, to take an employee loan and then
4 lend that money to Mr. Ryu?  Do you have any
5 recollection about that?
6     A.   Yes.  I heard that.
7     Q.   And do you remember who told you
8 that?
9     A.   Jessica Kim.
10     Q.   Could you tell us what you
11 remember she told you about that.
12     A.   That's exactly what she told me.
13 That Mr. Hur asked Irene to take out the
14 money, personal loan, and lend it to James.
15     Q.   Did you have any discussions with
16 Mr. Hur about that?
17     A.   No.
18     Q.   Did you have any discussions with
19 Mr. Ryu about that?
20     A.   No.
21     Q.   Did you have any discussions with
22 anyone other than Jessica Kim at the bank
23 about that?
24     A.   No.  But I think that came up in
25 the second meeting.  I don't know the details

Page 142

B. LEE

1    but that was discussed.
2    
3    Q.   Do you remember the circumstances
4    in which Jessica Kim told you this?
5    A.   I don't recall but she -- she just
6    mentioned that to me that that's what
7    happened.  And that Irene said no.
8    Q.   And did you have any discussions
9    with Irene Lee about that?
10   A.   No.  I never asked her.
11   Q.   And do you recall why Mr. Hur had
12   asked Irene Lee to do that?
13   A.   I don't know.  I don't remember.
14   Only remember that -- Jessica telling me that
15   Mr. Hur had asked Irene and I don't know the
16   circumstances.
17   Q.   Do you recall any discussions
18   about the fact that Mr. Hur had made his
19   request to Irene Lee because of Mr. Ryu's
20   financial difficulties?
21   A.   Well, I'm assuming that if he
22   needs a loan that he is having difficulties.
23   And I don't really know exactly when that
24   happened so I don't know if that was the time
25   that he was asking the employees for a few

Page 143

B. LEE

1    thousand dollars.  But I don't know if it was
2    the same time.  But I just assumed that, you
3    know, if -- you know, if he need money -- if
4    he doesn't need money he wouldn't ask for it.
5    But...
6    Q.   During your tenure at BankAsiana,
7    were you aware that Mr. Ryu had taken a loan
8    against his 401(k) savings?
9    A.   Yeah, I think he did because I'm
10   the one who will administer that, yeah.
11   Q.   And do you recall that the 401(k)
12   plan administrator was John Hancock?
13   A.   Yes.  John Hancock was the...
14   Q.   And do you recall after Mr. Ryu
15   left the employ of Wilshire Bank you had
16   communications, e-mail communication with
17   Irene Lee concerning Mr. Ryu's repayment of
18   that 401(k) loan?
19   A.   I don't recall -- I don't recall
20   all the details.  But I know that when you
21   leave the bank I think they have to pay back
22   the loan I think.
23   Q.   And do you recall having e-mail
24   correspondence with Irene Lee concerning the
25

Page 144

B. LEE

1    monthly loan repayments that Mr. Ryu was to
2    make to John Hancock?
3    A.   I must have because every time
4    when I needed to get information from James, I
5    used to do it through Irene I think.
6    Q.   Is it fair to say that -- was it
7    your understanding that Irene Lee was making
8    the remaining loan repayments on behalf of Mr.
9    Ryu to John Hancock after Mr. Ryu left the
10   bank?
11   A.   I don't know.
12       (Discussion held off the record.)
13   Q.   Ms. Lee, I'm showing you
14   Plaintiff's Deposition Exhibit 1 from Irene
15   Lee's deposition and on the bottom of this
16   exhibit, is that a copy of your e-mail to
17   Irene Lee from October 30, 2013?
18   A.   Yes.
19   Q.   And do you see a reference to
20   401(k) loan payment due for Mr. Ryu?
21   A.   Yes.
22   Q.   And there's an amount indicated.
23   A.   Right.
24   Q.   $549.22 per month.
25

Page 145

B. LEE

1    A.   Right.
2    Q.   Could you just briefly tell us
3    what you remember about that e-mail.
4    A.   I was asking I guess -- she might
5    have came in and asked me how much the loan
6    payment was.  I don't know.  Because I
7    wouldn't just send it to Irene, the amount.
8       So there must have been something
9    bad happen before this e-mail.  So I must --
10   she or somebody must have asked for the
11   amount.  So I guess I was responding to that
12   request, how much the loan amount is.  And
13   then I guess Irene was taking care of this one
14   for James.
15   Q.   Okay.  And do you know why Irene
16   Lee was taking care of the loan repayment for
17   Mr. Ryu?
18   A.   No, I don't.
19   Q.   And do you know how she was taking
20   care of the loan repayment for Mr. Ryu?
21   A.   I don't recall how the payment was
22   made.  I assume that probably was a check
23   payment but I don't recall.
24   Q.   Do you recall having any
25

B. LEE

1  B. LEE
2  discussions with Irene Lee about what she was
3  doing on behalf of Mr. Ryu?
4      A.   I don't remember.  But she must
5  have asked for the information or -- I don't
6  know if I -- I don't remember but there has to
7  be something for me to send an e-mail to
8  Irene, somebody must have requested that
9  information.
10      Q.   Are you aware of any reason why
11  Mr. Ryu could not have made the loan repayment
12  directly to John Hancock?
13      A.   I think all the loan payments we
14  used to -- I used to get it.  And then I would
15  submit it to the John Hancock.  That's what we
16  used to do before the merger.  I don't
17  remember after merger if there was -- you
18  know, if they could send it directly to them.
19  Because this is right after the merger.
20  Probably the first one, first pay -- probably
21  the first payment after the merger.  So --
22      Q.   So if you were collecting all the
23  checks that represented loan repayments on the
24  401(k) loans for employees, is there any
25  reason why -- is there anything that would

B. LEE

1  B. LEE
2  have prevented Mr. Ryu from sending a check
3  directly to you to repay that loan?
4      A.   No.  There's nothing preventing
5  that.
6      Q.   Was there any particular reason
7  why Mr. Ryu had to go through Irene Lee in
8  order to make the loan repayments?
9      A.   There isn't any reason.  They just
10  chose to do it -- handle it that way.  So it
11  was between James and Irene.  Probably because
12  Irene was, you know, at the same location
13  maybe James asked her.  But I don't know.
14  That's between them.
15      Q.   You don't have an understanding as
16  to why Irene Lee was taking care of loan
17  repayments for Mr. Ryu.
18      A.   No.
19      Q.   I'm showing you what's been marked
20  as Plaintiff's Exhibit 10 that was marked at
21  Irene Lee's deposition two days ago.  I'm
22  directing your attention to first the e-mail
23  on the bottom.
24          Is that a copy of -- is that a
25  copy of your e-mail to Mr. Ryu from December

B. LEE

1  B. LEE
2  10, 2013?
3      A.   Yes.
4      Q.   What do you remember about this
5  e-mail?
6      A.   That he wanted to probably pay
7  back the loan so we asked for I guess the
8  information.
9      Q.   Do you remember anything else?
10      A.   No.  But I think the 401(k)
11  payments for ex-employees or the 401(k) loans
12  had to pay off I think.  That's why
13  probably.
14      Q.   I'm sorry?
15      A.   The -- any loans against the
16  401(k) after they leave the company I think
17  they had to be paid off.  So he was trying
18  to -- but -- for whatever reason, you know, I
19  think he wanted to pay off the loan.
20      Q.   All right.  Is it fair to say that
21  with respect to Mr. Ryu's 401(k) loan
22  repayment --
23      A.   Right.
24      Q.   -- Irene Lee is the one who
25  delivered the checks to you to make that

B. LEE

1  B. LEE
2  repayment?
3      A.   For -- this one is not for the
4  repayment.  This is related to repayment.
5  This is just a monthly payment.  A monthly
6  repayment.  But this is to pay off the loan,
7  yeah.  Repayment.  But this is monthly
8  repayment.  This is to pay off the loan I
9  think.
10      Q.   All right.  So with respect to
11  Plaintiff's Exhibit 1 marked at Irene Lee's
12  deposition, you're referring to the amount
13  indicated there in your e-mail of October 30,
14  2013 and you're indicating that in that e-mail
15  you were indicating the monthly amount that
16  was due.
17      A.   Yes.
18      Q.   And referring to Plaintiff's
19  Exhibit 10 marked at Irene Lee's deposition,
20  you're indicating that in your e-mail to Mr.
21  Ryu from December 10th, 2013, you were
22  indicating, among other things, the loan
23  balance amount.
24      A.   Right.  To pay off the loan.
25      Q.   For purposes of a payoff of the

<br>

Page 150

B. LEE

1  loan.
2      A.   Yes.  Must be.  Because it says
3  proceed below for the information you have
4  requested.  Original loan amount.  Loan
5  balance as of -- we got the last payment.
6  Last payment.
7      Q.   Let me go back to my earlier
8  question, Ms. Lee.  My question was do you
9  recall receiving checks from Irene Lee for Mr.
10 Ryu's repayment of the 401(k) loan?
11     A.   I don't remember.  I don't
12 recollect, you know, getting the payment.  But
13 based on this e-mail I must have.
14     Q.   So you have no recollection as to
15 whose check you were receiving from Irene Lee
16 in terms of Mr. Ryu's repayment of this 401(k)
17 loan.
18     A.   No.
19     (Discussion held off the record.)
20     MR. YI:  Just give us one second,
21 please.  We're almost done.
22     (Pause on the record.)
23 BY MR. YI:
24     Q.   Ms. Lee, we talked earlier about

Page 151

B. LEE

1  Michael Kim who was a customer of the bank
2  during your tenure at BankAsiana.  Do you
3  recall any discussions about Michael Kim's
4  account or accounts at BankAsiana being
5  overdrawn?
6      A.   No.
7      Q.   So you don't have any recollection
8  about any discussion at the bank about Michael
9  Kim's bank account or accounts having a
10 negative balance?
11     A.   No.
12     Q.   Do you know a woman by the name of
13 Eunhee Pak?
14     A.   Um-hum.  Yes.
15     Q.   Was she an employee of BankAsiana?
16     A.   Yes.
17     Q.   Was she an employee of BankAsiana
18 during your tenure at the bank?
19     A.   Yes.
20     Q.   And do you recall approximate time
21 frame when she left the bank?  Left the employ
22 of the bank?
23     A.   I don't remember.  20-maybe-12.
24     Q.   Okay.

Page 152

B. LEE

1      A.   I don't remember.  But, you know,
2  it was in the wintertime.
3      Q.   Is it fair to say that Ms. Pak
4  left BankAsiana's employ prior to the merger
5  with the Wilshire Bank?
6      A.   Yes.
7      Q.   And is it fair to say that Ms. Pak
8  worked for BankAsiana during your tenure at
9  the bank and Mr. Ryu's tenure at the bank?
10     A.   Yes.
11     Q.   Do you recall what her title or
12 position was?
13     A.   She was assistant to James.
14     Q.   Do you remember any particular
15 formal position or title that she had at the
16 bank?  Was it just assistant to the COO?
17     A.   She was assistant but I don't
18 remember her title.
19     Q.   And do you remember the
20 circumstances under which she left the bank's
21 employ in or about 2012?
22     A.   I think Mr. Hur asked -- I don't
23 know if she resigned or if she was asked to
24 resign by Mr. Hur.  I'm not sure.

Page 153

B. LEE

1      Q.   Do you remember anything about the
2  circumstances under which she left the bank?
3  I'm not asking you to guess or speculate.  If
4  you know.  If you remember.
5      A.   I think she was a part -- maybe
6  her husband was a partner at Kudo Bean.
7  That's probably why, because he was a partner
8  also.  I'm not -- I'm not sure.  Because they
9  were working at the café together.
10     Q.   So is it your testimony your
11 understanding is that Ms. Pak's husband was
12 business partners with Mr. Ryu in the coffee
13 shop business that you knew previously as Kudo
14 Beans?
15     A.   Yes.  I don't know if he was
16 partner, but they were working together.  And
17 somehow they were related -- they had a
18 business relationship with that hair salon
19 also.  But I don't know the detail.
20     Q.   And when you say they had some
21 sort of business relationship also with the
22 hair salon --
23     A.   James and the ex-employee's
24 husband.

Page 154

B. LEE

1
2    Q.   Ms. Pak's husband.
3    A.   Right.
4    Q.   Okay.  Let me go back to what I
5  had asked you earlier.  My question was do you
6  remember anything about the circumstances
7  under which Ms. Pak left the bank's
8  employment?
9    A.   Other than what I just told you --
10    Q.   Other than that.
11    A.   No, I don't recall anything.  No,
12  it's not that I don't recall anything.  I'm
13  not aware of anything.
14    Q.   Were there -- did you hear any
15  discussions within the bank about whether Ms.
16  Pak had a relationship with Mr. Ryu other
17  than -- meaning outside the bank?  A personal
18  relationship outside the bank?
19    A.   There was a rumor.
20    Q.   What do you recall being
21  discussed?
22    A.   That they're very close.
23    Q.   What else do you remember?
24    A.   And that they had a business
25  relationship also.

Page 155

B. LEE

1
2    Q.   Anything else?  Do you remember
3  anything else?
4    A.   No.
5    Q.   Did you ever have any discussions
6  with Ms. Pak about the rumors that you just
7  mentioned?
8    A.   No.
9    Q.   Did you have any discussions with
10  Mr. Ryu at any time about the rumors?
11    A.   I never asked him.  Later on he
12  mentioned it.  You know, but I never asked
13  him.
14    Q.   When you say later on he mentioned
15  it, are you referring to Mr. Ryu?
16    A.   Yes.
17    Q.   What did he tell you?
18    A.   That he liked her.
19    Q.   Did he say anything else?
20    A.   He wanted to help her with the
21  business because her husband was having
22  problems with the business so he wanted to
23  help.
24    Q.   Did he tell you anything else?
25    A.   No.

Page 156

B. LEE

1
2    Q.   Did he ever tell you that he was
3  having a romantic relationship with her?  That
4  he had a romantic relationship with her?
5    A.   I'm not sure if he said that or if
6  he liked her a lot.  That he was in love with
7  her.
8    Q.   Is that what he told you?
9    A.   Yes.  But that was after --
10  afterward.
11    Q.   Other than him telling you -- Mr.
12  Ryu telling you that he was in love with Ms.
13  Pak, did he ever tell you that he was having
14  an extramarital affair with Ms. Pak?
15    A.   He didn't say it that way.
16    Q.   In what way did he --
17    A.   He said that he loved her.
18    Q.   Was there anything Mr. Ryu told
19  you that led you to believe that he was having
20  an extramarital affair with Ms. Pak?
21    MR. HARVEY:  Objection.  This is a
22  ridiculous line of questions.  You've
23  asked and answered it -- the witness has
24  answered your question.  You're beating a
25  dead horse.

Page 157

B. LEE

1
2    Q.   You can answer if you can.
3    A.   What was the question again?
4    MR. YI:  I'll have it read back.
5    (Record read.)
6    A.   Well, there wasn't anything that
7  he said that made me believe that he was.  But
8  he said that he was in love with her.  So, you
9  know...
10    MR. YI:  All right.  Thank you.  I
11  have no more questions at this time.
12    MR. HARVEY:  I have no questions.
13  Thanks for your time today.
14    (Time Noted:     2:00 p.m.)
15
16
17
18
19    _____
20    BO-YOUNG LEE
21
22  Subscribed and sworn to before me
23  this ___ day of _____, 2016.
24
25  _____

Page 158

```
 1
 2        C E R T I F I C A T E
 3   STATE OF NEW YORK   )
 4                       : ss.
 5   COUNTY OF NEW YORK  )
 6        I, FRANCIS X. FREDERICK, a
 7   Notary Public within and for the State
 8   of New York, do hereby certify:
 9        That BO-YOUNG LEE, the witness
10   whose deposition is hereinbefore set
11   forth, was duly sworn by me and that
12   such deposition is a true record of
13   the testimony given by the witness.
14        I further certify that I am not
15   related to any of the parties to this
16   action by blood or marriage, and that
17   I am in no way interested in the
18   outcome of this matter.
19        IN WITNESS WHEREOF, I have
20   hereunto set my hand this 25th day of
21   October, 2016.
22
23        _____
24        FRANCIS X. FREDERICK
25
```

Page 159

```
 1
 2   ---------------- I N D E X ----------------
 3   WITNESS      EXAMINATION BY      PAGE
 4   BO-YOUNG LEE      MR. HARVEY        5
 5              MR. YI          69
 6
 7
 8
 9
10
11   ---------- INFORMATION REQUESTS ------------
12   DIRECTIONS:  NONE
13   RULINGS:  NONE
14   TO BE FURNISHED:  NONE
15   REQUESTS:  NONE
16   MOTIONS:  NONE
17
18
19
20
21
22
23
24
25
```

Page 160

```
 1
 2   ------------------ EXHIBITS ------------------
 3   RYU                        FOR ID.
 4   Exhibit 4
 5   letter dated August 30,
 6   2016 with attached subpoena............. 8
 7   Exhibit 5
 8   e-mail dated January 22, 2014........... 44
 9   Exhibit 6
10   e-mail dated January 27, 2014........... 45
11   Exhibit 7
12   e-mail dated January 37, 2014........... 45
13   Exhibit 8
14   e-mail dated January 30, 2014........... 45
15   Exhibit 9
16   e-mail dated February 4, 2014........... 45
17   Exhibit 10
18   e-mail dated February 6, 2014........... 45
19   Exhibit 11
20   e-mail dated October 29, 2015........... 45
21
22
23
24
25
```

Page 161

```
 1
 2   NAME OF CASE:  BANK OF HOPE v. CHON
 3   DATE OF DEPOSITION:  OCTOBER 13, 2016
 4   NAME OF WITNESS:  BO-YOUNG LEE
 5   Reason codes:
       1. To clarify the record.
 6     2. To conform to the facts.
       3. To correct transcription errors.
 7   Page _____ Line _____ Reason _____
 8   From _____ to _____
     Page _____ Line _____ Reason _____
 9   From _____ to _____
10   Page _____ Line _____ Reason _____
     From _____ to _____
11
12   Page _____ Line _____ Reason _____
13   From _____ to _____
     Page _____ Line _____ Reason _____
14   From _____ to _____
15   Page _____ Line _____ Reason _____
16   From _____ to _____
     Page _____ Line _____ Reason _____
17   From _____ to _____
18   Page _____ Line _____ Reason _____
19   From _____ to _____
     Page _____ Line _____ Reason _____
20   From _____ to _____
21   Page _____ Line _____ Reason _____
22   From _____ to _____
     Page _____ Line _____ Reason _____
23   From _____ to _____
24        _____
25        BO-YOUNG LEE
```