# EXHIBIT 13

1

2         IN THE UNITED STATES DISTRICT COURT

3            FOR THE DISTRICT OF NEW JERSEY

4            CASE NO. 2:14-cv-01770-JLL-JAD

5    -------------------------------X

     BANK OF HOPE, as successor to
6    Wilshire Bank,

7                      Plaintiff,

8                 VS.

9    MIYE CHON, a/k/a Karen Chon,

     SUK JOON RYU, a/k/a James S.

10   Ryu, TAE JONG KIM, BERGENFIELD

     BAGEL & CAFE INC., d/b/a Cafe

11   Clair, MAYWOOD BAGEL INC., UB'S

     PIZZA & BAGEL INC., UB'S BAGEL &

12   CAFE INC., and UBK BAGELS CORP.,

     d/b/a Franklin Bagels & Cafe,

13

                     Defendants.
14   -------------------------------X

15   (Caption continued on the next page.)

16

17                   DEPOSITION

18                      OF

19                   LISA PAI

20           Thursday, July 13, 2017

21             One Gateway Center

22             Newark, New Jersey

23

24   Reported by:

     AYLETTE GONZALEZ, RPR, CLR, CCR

25   JOB NO. 126896

Page 2

```
 1
 2    -------------------------------X
      SUK JOON RYU, a/k/a James S. Ryu,
 3
          Counterclaim Plaintiff,
 4
              VS.
 5
      BANK OF HOPE, as successor to
 6    Wilshire Bank,
 7         Counterclaim Defendant.
      -------------------------------X
 8    SUK JOON RYU, a/k/a James S. Ryu,
 9         Third-Party-Counterclaim
                    Plaintiff,
10
              VS.
11
      KWON HO JUN and LISA PAI,
12
          Third-Party-Counterclaim
13                 Defendants.
      -------------------------------X
14    SUK JOON RYU, a/k/a JAMES S. RYU,
15         Cross-claim Plaintiff,
16            VS.
17    MIYE CHON, a/k/a Karen Chon,
      TAE JONG KIM, BERGENFIELD
18    BAGEL & CAFE INC., d/b/a Cafe
      Clair, MAYWOOD BAGEL INC.,
19    UB'S PIZZA & BAGEL INC., UB'S
      PIZZA & CAFE INC., and UBK
20    BAGELS CORP., d/b/a Franklin
      Bagels & Cafe,
21
          Cross-claim Defendants.
22    -------------------------------X
23
24    *******************
25
```

Page 3

```
 1
 2          DATE:  July 13, 2017
 3          TIME:  10:00 a.m.
 4
 5
 6        Deposition of LISA PAI, held at the
 7    offices of Regus, One Gateway Center,
 8    Newark, New Jersey  07102, pursuant to
 9    NOTICE, before AYLETTE GONZALEZ, a
10    Registered Professional Reporter, Certified
11    LiveNote Reporter, Certified Court Reporter
12    and Notary Public of the States of New York
13    and New Jersey.
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 4

```
 1
 2    A P P E A R A N C E S:
 3
 4
 5    LEE ANAV CHUNG WHITE KIM RUGER & RICHTER
 6    Counsel for Bank of Hope, Kwon Ho Jung and
 7    Lisa Pai
 8         156 Fifth Avenue
 9         New York, New York  10010
10    BY:   MICHAEL YI, ESQ.
11
12
14    STEVE HARVEY LAW
15    Counsel for Suk Joon Ryu
16         1880 John F. Kennedy Boulevard
17         Philadelphia, Pennsylvania  19103
18    BY:   STEPHEN HARVEY, ESQ.
19
20
21
22         *********************
23
24
25
```

Page 5

```
 1          LISA PAI (7/13/17)
 2        (Ryu Exhibit 12, Introduction,
 3    2014R00082/6, Volume 1, Bates labeled
 4    WB795 through '808 was premarked for
 5    identification, as of this date.)
 6        (Ryu Exhibit 13, document Bates
 7    labeled WB810 through '817 was
 8    premarked for identification, as of
 9    this date.)
10        (Ryu Exhibit 14, handwritten notes
11    Bates labeled WB2054 through '2059 was
12    premarked for identification, as of
13    this date.)
14        (Ryu Exhibit 15, Notice of
15    Deposition was premarked for
16    identification, as of this date.)
17    L I S A   P A I,
18    called as a witness, having been
19    duly sworn by a Notary Public,
20    was examined and testified as
21    follows:
22        THE COURT REPORTER:  Please state
23    your name and address for the record.
24        THE WITNESS:  Lisa Pai.  Business
25    address, 3200 Wilshire Boulevard, 14th
```

floor, Los Angeles, California 90010.
EXAMINATION BY
MR. HARVEY:
Q. Ms. Pai, my name is Steve Harvey. I'm an attorney for the plaintiff, James Ryu, in this case and we are here to take your deposition; do you understand that?
A. Yes.
Q. Can you hear me?
A. Yes.
Q. If at any point today you can't hear me or you don't understand one of my questions, let me know, I'll be happy to speak up or rephrase; do you understand that?
A. Yes, I do.
Q. Do you understand that you're required to answer the questions that I'm going to ask you pertaining to this case to the best of your knowledge and ability subject to the oath that you just took unless your counsel instructs you not to answer a question?
A. Yes, I do.
Q. Have you ever been deposed before?





A. Yes, I have.
Q. How many times?
A. At least once, maybe twice.
Q. How recently?
A. It's been a while.
Q. Okay. Well, I've just given you the main instructions. The only one I would give at this point is that we can't speak over each other, because the court reporter sitting to your left and my right can't record when we're both talking at the same time.
I'll endeavor to let you finish speaking before I ask my next question and if you could do the same, we'll get a nice neat record in this case; okay?
A. Okay.
Q. Please tell me your current title.
A. Executive vice president and general counsel and chief administrative officer.
Q. For Bank of Hope?
A. For Bank of Hope.
Q. How long have you had that position?





A. For about a year.
Q. Have you had that since Bank of Hope has been in existence?
A. That's right.
Q. And before that, what job did you have?
A. Before that, I worked for Wilshire Bank, executive vice president and chief legal and human resources officer.
Q. How long did you hold that position?
A. For about three and a half years.
Q. When did you begin on that position?
A. I think December 2012 or I may be off a year.
Q. Well, the events in this case, the immediate events, the discovery of the embezzlement began in January of 2014; you recall that?
A. Yes, I do.
Q. Were you in this position, were you executive vice president, chief legal officer and head of human resources at that time?





A. Yes, I was.
Q. And had you been in that position for at least a period of months at that point?
A. That's right.
Q. What did you do before you held the position, that position or actually the positions before you held those positions for three and a half years, what did you do before that?
A. I was at another bank.
Q. Which bank?
A. Nara Bank.
Q. How do you spell that?
A. N-A-R-A. I'm sorry. I was at BBCN Bank.
Q. And what was your position at BBCN Bank?
A. The same title, EVP and chief legal and HR officer.
Q. How long did you hold that position at BBCN?
A. For about a year. For about a year since BBCN was first established.
Q. And before you worked at BBCN for

Page 10

LISA PAI (7/13/17)

1
2  that approximately year, what did you do?
3      A.  I worked at CentreBank, same
4  position, EVP and chief legal and HR officer
5  and Centre was merged into BBCN.
6      Q.  How long did you hold that position
7  at CentreBank?
8      A.  I think it was about three or four
9  years.
10     Q.  What did you do before that?
11     A.  Before that, I had my own practice
12  for about three months.
13     Q.  And then before that?
14     A.  And before that, I worked for Nara
15  Bank for about a year and a half.
16     Q.  What did you do during that time at
17  Nara Bank?
18     A.  I was the acting general counsel.
19     Q.  Before you worked as acting general
20  counsel at Nara Bank for a year and a half,
21  what did you do?
22     A.  I worked for Hanmi Bank as general
23  counsel.
24     Q.  Spell Hanmi, please.
25     A.  H-A-N-M-I.

Page 11

LISA PAI (7/13/17)

1
2      Q.  And how long did you do that for?
3      A.  For about a year, and Hanmi had
4  acquired my old bank Pacific Union Bank and I
5  was at Pacific Union Bank for about 11 years.
6      Q.  And what was your job at Pacific
7  Union Bank or did you have one job the whole
8  time or did you have multiple jobs?
9      A.  I was general counsel.
10     Q.  For 11 years?
11     A.  For 11 years.  Initially, my last
12  position was as senior vice president and
13  general counsel.  I think I started out as VP
14  and general counsel.
15     Q.  And what did you do before you
16  worked at Pacific Union Bank?
17     A.  I was at a law firm.
18     Q.  Which law firm?
19     A.  Thelen, Marrin, Johnson & Bridges.
20     Q.  In which office of Thelen?
21     A.  Los Angeles.
22     Q.  And how long were you there for?
23     A.  For about four years.
24     Q.  Was that your first job out of law
25  school?

Page 12

LISA PAI (7/13/17)

1
2      A.  Yes.
3      Q.  Where did you go to law school?
4      A.  UCLA.
5      Q.  What year did you graduate?
6      A.  1990.
7      Q.  What was your area of practice in
8  the four years you were at Thelen, Marrin?
9      A.  I started out in corporate, did a
10  little bit of bankruptcy and a little bit of
11  construction litigation support.
12     Q.  Is that during the four years you
13  were either in corporate bankruptcy or
14  construction litigation?
15     A.  Yes, in that order.
16     Q.  In other words, you started in
17  construction litigation then did bankruptcy
18  then you did corporate; did I get that right?
19     A.  The other way around.
20     Q.  I see.  So you went from working in
21  the area of construction litigation
22  approximately four years out of law school to
23  become general counsel to Pacific Union Bank?
24     A.  That's right.
25     Q.  And would it be correct to say that

Page 13

LISA PAI (7/13/17)

1
2  there is a thing called the Korean American
3  banking industry?
4      MR. YI:  Objection to form.
5      A.  Sure.
6      Q.  Right, there are banks that don't
7  exclusively focus or they don't exclude
8  customers who aren't Korean American, but they
9  focus on Korean American businesses; is that
10  correct?
11     A.  That's right.
12     Q.  In fact, your current employer is
13  such a bank?
14     A.  That's right.
15     Q.  Was Pacific Union such a bank?
16     A.  Yes.
17     Q.  And Pacific Union, did you say that
18  was merged into Hanmi?
19     A.  Acquired by Hanmi.
20     Q.  And was Hanmi a Korean American
21  bank?
22     A.  Yes.
23     Q.  And was Nara Bank also a Korean
24  American bank?
25     A.  Yes.

Page 14

LISA PAI (7/13/17)

1
2      Q.   And CentreBank was a Korean
3  American bank?
4      A.   Yes.  All of the banks I have
5  worked for are Korean American focused bank.
6      Q.   Is that the term you used in your
7  job; if you were explaining to someone, you
8  would say Korean American focused?
9      A.   Yes.
10      Q.   Do you speak Korean?
11      A.   Yes, I do.
12      Q.   Were you born in Korea?
13      A.   Yes, I was.
14      Q.   What year did you come to this
15  country?
16      A.   1973.
17      Q.   How old were you at the time?
18      A.   Thirteen years old.
19      Q.   Did you live in Los Angeles?
20      A.   No.  Initially we -- I lived in
21  Minnesota.
22      Q.   How long did you live in Minnesota?
23      A.   Until 1982.
24      Q.   Did you graduate from high school
25  in Minnesota?

Page 15

LISA PAI (7/13/17)

1
2      A.   Yes.
3      Q.   What high school?
4      A.   Marshall-University High School.
5      Q.   What town is that in?
6      A.   In Minneapolis.
7      Q.   And then from there you went to
8  college?
9      A.   Yes.
10      Q.   Where did you go to college?
11      A.   University of Chicago.
12      Q.   And then did you take time off
13  between University of Chicago and law school?
14      A.   Yes, I did.  I worked for five
15  years.
16      Q.   What did you do in that five years?
17      A.   I worked in insurance,
18  manufacturing.  I think those two fields.
19      Q.   Then you went to UCLA?
20      A.   Yes.
21      Q.   Did you study banking law at UCLA?
22      A.   Not necessarily, but I did take
23  some courses that were helpful in banking.
24      Q.   When you were executive vice
25  president, head of legal and head of human

Page 16

LISA PAI (7/13/17)

1
2  resources for Wilshire Bank during that three
3  and a half years, did you have a staff?
4      A.   Yes, I did.
5      Q.   How many people were in your staff?
6      MR. YI:  Objection to form.
7      A.   I think it was 10 or 11.
8      Q.   Can you tell me what was that
9  comprised of?  I'm assuming some admins and
10  some legal staff as well, maybe a paralegal or
11  two, but please tell me, what was that team to
12  the best you can recall comprised of.
13      A.   Yes, I had four in legal comprising
14  of one in-house counsel, one other in-house
15  counsel, she was part-time and three paralegal
16  type staff and in HR, I had -- I supervised a
17  manager plus three HR staff.
18      Q.   Now, you had some involvement with
19  the investigation into the embezzlement that's
20  the subject in this case and the decision to
21  begin a lawsuit against Karen Chon, James Ryu
22  and H.S. Hur, correct?
23      A.   Yes.
24      Q.   Was that a legal function or was
25  this an HR function to you or something else?

Page 17

LISA PAI (7/13/17)

1
2      A.   Mostly a legal function.
3      Q.   When you say "mostly," was any
4  aspect of it not a legal function?
5      A.   Not really.  They, the employees
6  that were involved in it were already
7  terminated, so I saw it as pretty much a legal
8  function.
9      Q.   Did you sit on the board of
10  Wilshire Bank?
11      A.   No, I did not.
12      Q.   Did you attend board meetings?
13      A.   Yes, I did.
14      Q.   Do you sit on the board of Bank of
15  Hope?
16      A.   No, I do not.  I attend board
17  meetings as corporate secretary.
18      Q.   So you have -- you're an officer of
19  the corporation, you're a corporate secretary?
20      A.   Yes.
21      Q.   Were you corporate secretary for
22  Wilshire Bank as well?
23      A.   Yes.
24      Q.   When you were in your position at
25  Wilshire Bank, to whom did you report?

Page 18

LISA PAI (7/13/17)

1               LISA PAI (7/13/17)
2     A.  To the CEO.
3     Q.  Who was that?
4     A.  J.W. Yoo.
5     Q.  Can you spell Yoo for the sake of
6 the court reporter.
7     A.  Y-O-O.
8     Q.  And who do you report to at Bank of
9 Hope?
10    A.  To the CEO Kevin Kim.
11    Q.  Did you do anything to prepare for
12 the deposition today?
13    A.  I met with our outside counsel.
14    Q.  How long did you meet for?
15    A.  About half day.
16    Q.  Did you review any documents?
17    A.  Yes, some.
18    Q.  Do you remember which documents you
19 reviewed?
20    A.  The deposition notice and some
21 declarations I had signed.
22    MR. YI:  Just for the record,
23 Steve, by deposition notice, I believe
24 she was referring to Ryu-15.
25    MR. HARVEY:  Thank you.

Page 19

1               LISA PAI (7/13/17)
2     Q.  Did you review any other documents?
3     A.  Yes, the internal audit reports.
4     Q.  Anything else?
5     A.  I think there were a few others,
6 but I can't seem to recall.
7     Q.  The declarations you had signed,
8 was it more than one declaration?
9     A.  I think there were two.
10    Q.  What was the substance of those two
11 declarations, to the best you can recall, if
12 you can just summarize it?
13    Let me help you with your memory.
14 One of those declarations related to the
15 recently filed motion that your counsel filed
16 to have Mr. Ryu stop making communications,
17 correct?
18    A.  That's right.
19    MR. YI:  Objection to form.
20    Q.  And so what was the other
21 declaration?
22    A.  I think it was a declaration in
23 support of our motion to dismiss.
24    Q.  Did you do anything else to help
25 prepare for your deposition?

Page 20

1               LISA PAI (7/13/17)
2     A.  Just had a discussion with our
3 outside counsel while reviewing those
4 documents.
5     Q.  Now, I'm going to hand you what's
6 been marked as Ryu Exhibit 15.  Please take a
7 moment to look at it.  My first question is
8 going to be whether this is the corporate
9 designee notice of deposition that you
10 reviewed with your counsel yesterday?
11    A.  Yes, it is.
12    Q.  And do you understand that Rule
13 30(b)(6) of the Federal Rules of Civil
14 Procedure requires a corporation that has been
15 served with such a 30(b)(6) Notice to produce
16 a person or persons to testify to the
17 knowledge that's possessed by the corporation
18 on the subject in the notice of deposition?
19    A.  Yes.
20    MR. YI:  Objection to form.
21    Q.  And are you prepared to testify as
22 the person designated for Bank of Hope about
23 the topics set forth in this notice?
24    MR. YI:  Objection to form.
25    A.  For most of the topics, yes.

Page 21

1               LISA PAI (7/13/17)
2     Q.  Which ones are you not prepared to
3 testify for the bank?
4     A.  No. 8, that's the only one that
5 pops out at me right now.
6     Q.  Okay.  We'll return to that.
7    You met with James Ryu in February
8 of 2014; isn't that correct?
9     A.  Yes, I believe so.
10    Q.  Prior to that, had you ever met
11 him?
12    A.  I think I did.
13    Q.  When was that?
14    A.  I think it was during the merger
15 due diligence period.  I met with him briefly.
16    Q.  Did you know James Ryu prior?
17    When you say "the merger due
18 diligence," you mean the merger due diligence
19 for the Wilshire Bank acquisition of
20 BankAsiana?
21    A.  That's right.
22    Q.  Did you ever meet him prior to
23 that?
24    A.  I don't believe so.
25    Q.  Did you know who he was prior to

Page 22

LISA PAI (7/13/17)

1
2  that, like had you heard of him or you just
3  knew him by name?
4      A.  No, I don't believe so.
5      Q.  You never heard about him or had
6  any dealings with him when you were at
7  CentreBank?
8      A.  Prior to the merger context, no, I
9  don't believe so.
10     Q.  Prior to -- when you say "the
11 merger," you mean again the
12 Wilshire-BankAsiana merger?
13     A.  That's right.
14     Q.  And your dealings with him in the
15 context of the BankAsiana merger, can you
16 recall what they were?
17     A.  I think it was related to board
18 record review, which I was responsible for and
19 on-site management interview.  I think that
20 was about it.
21     Q.  So in other words, you interviewed
22 him as part of interviewing the management in
23 connection with the due diligence?
24     A.  Yes, but not interview him in kind
25 of his personal context, but only in the

Page 23

LISA PAI (7/13/17)

1
2  context of the minutes.
3      Q.  So you had a meeting with him?
4      A.  I believe so.
5      Q.  And it was just you and him?
6      A.  That I cannot remember.
7      Q.  Do you remember how long the
8  meeting was?
9      A.  I don't think it was very long.
10     Q.  So you conducted an interview of
11 him, but just with regard to the subject of
12 the board minutes; do I understand that
13 correctly?
14     A.  That's my recollection.
15     Q.  And did you -- at that time, did
16 you learn that he had been -- you learned he
17 was Korean American like you, right?
18     A.  Yes.
19     Q.  Did you learn that he had been in
20 the Korean American banking industry himself
21 for a number of years?
22     A.  Yes.
23     Q.  And did you learn which banks he
24 had been in?
25     A.  Yes, I think he talked about being

Page 24

LISA PAI (7/13/17)

1
2  at CentreBank.
3      Q.  Did you learn anything else on that
4  subject?
5      A.  Not that I can remember, no.
6      Q.  Are you aware that when Karen Chon
7  worked at Liberty Bank of New York, she was
8  suspected of embezzlement?
9          MR. YI:  Objection to form.
10     A.  I learned that later in the process
11 of our investigations.
12     Q.  You learned that after the
13 embezzlement came to light when Karen
14 confessed?
15     A.  That's right.
16     Q.  Liberty Bank New York was a
17 predecessor of Wilshire Bank; isn't that true?
18     A.  Not a predecessor.  We acquired one
19 branch from Liberty Bank.
20     Q.  Was it the branch that Karen Chon
21 had worked at?
22     A.  I believe so.
23     Q.  And do you know if anyone from
24 Wilshire Bank ever alerted BankAsiana -- well,
25 let me withdraw the question.

Page 25

LISA PAI (7/13/17)

1
2      When you were conducting the due
3  diligence for the transaction, the merger,
4  BankAsiana, Wilshire Bank merger, did you meet
5  Karen Chon?
6      A.  No, I did not.
7      Q.  Did you learn that she worked
8  there?
9      A.  Not until -- towards the end of the
10 merger, yes.
11     Q.  And how was it that you learned
12 towards the end of the merger that she worked
13 there?
14     A.  Actually I think I learned that
15 towards the end of -- after, after the merger.
16     Q.  How did you learn it after the
17 merger?
18     A.  When her name came up in the
19 context of the embezzlement, we looked into
20 her records.
21     Q.  Do you know if Liberty Bank
22 New York ever took steps to alert BankAsiana
23 that it had hired someone who had been
24 suspected of embezzlement -- let me withdraw
25 the question.  The question needs some

Page 26

LISA PAI (7/13/17)

1    background.
2              When did Wilshire Bank acquire
3    Liberty Bank New York?
4         A.  It was some time before I joined.
5         MR. YI:  Objection to form.
6         A.  Wilshire Bank, I think it was prior
7    to 2007 since Ms. Chon started working at
8    BankAsiana in 2007.
9         Q.  Do you know whether Wilshire Bank
10   ever alerted BankAsiana that it had hired
11   Karen Chon who had been suspected of
12   embezzlement while she worked at Liberty Bank
13   New York?
14        MR. YI:  Objection to form.
15        A.  I don't know that Wilshire would
16   have known that BankAsiana had hired Karen
17   Chon.
18        Q.  Do you know if Wilshire Bank did
19   anything to alert the fact that Karen Chon who
20   had been an employee of Liberty Bank New York
21   had been suspected of embezzlement?
22        MR. YI:  Objection to form.
23        A.  I don't think Wilshire Bank was in
24   a position to alert anyone that she was one of

Page 27

LISA PAI (7/13/17)

1    the employees that they had interviewed when
2    there was a cash shortage in teller stations
3    and she was not charged with anything, so I
4    don't know that they would have been in a
5    position to alert anyone.
6         Q.  So to the best of your knowledge,
7    Wilshire Bank, to your knowledge, did not
8    alert anyone that Karen Chon had been
9    suspected of embezzlement before she left
10   Liberty Bank?
11        MR. YI:  Objection to form.
12        A.  That I do not know because I was
13   not at Wilshire Bank at the time and I didn't
14   see any records that indicated so.
15        Q.  When did you first learn that there
16   had been an embezzlement at BankAsiana?
17        A.  Either January or February 2014.
18        Q.  How did you first learn?
19        A.  I think I heard it first from
20   either Alicia Lee or Elaine Jeon.
21        Q.  Was the communication in writing or
22   was it oral?
23        A.  I think initially it was oral.
24        Q.  By telephone call?

Page 28

LISA PAI (7/13/17)

1         A.  No, I think it was an in-person
2    meeting.
3         Q.  And that was either Alicia Lee or
4    Elaine Jeon?
5         A.  Yes, or both.
6         Q.  Who is Alicia Lee?
7         A.  Alicia Lee was the operations --
8    operations manager I think.
9         Q.  For Wilshire Bank?
10        A.  For Wilshire Bank, and I mean
11   deposit operations.
12        Q.  Was she headquartered on the West
13   Coast?
14        A.  In Los Angeles, yes.
15        Q.  Who was Elaine Jeon?
16        A.  Elaine Jeon was Alicia's boss, the
17   chief operations administrator.
18        Q.  Do you remember what they told you?
19        MR. YI:  Objection to form.
20        A.  So they told me that -- that a
21   former employee of BankAsiana, the bank that
22   we had just acquired had just confessed to
23   embezzling a large sum of money from the bank
24   and from the bank, I mean BankAsiana.

Page 29

LISA PAI (7/13/17)

1         Q.  Do you remember that they --
2    anything else that they told you?
3         A.  I think at the time, they already
4    knew that she had implicated James Ryu as
5    well.
6         Q.  Do you remember them telling that
7    to you?
8         A.  I think so.  You know, some of the
9    information kind of merged in my brain, so I
10   don't remember if that's exactly what they
11   told me at that time or subsequently.  It's
12   been a while.
13            (Ryu Exhibit 16, e-mail chain
14        dated January 22, 2014 was marked for
15        identification, as of this date.)
16   BY MR. HARVEY:
17        Q.  Ms. Pai, the court reporter just
18   handed you what's been marked as Ryu 16.  It's
19   an e-mail that says David Dzara at the top,
20   that's just because he works for me and he
21   printed it out.
22            As you can see, it's from somebody
23   named Bo-Young Lee to Elaine Jeon and someone
24   named Seung Ho Park.  Please take a moment to

Page 30

LISA PAI (7/13/17)

1  look at it.  My first question is going to be
2  whether you've ever seen it before?
3      A.  I don't recall this specific
4  e-mail.  I may have seen it, but I can't
5  recall.
6      Q.  Who is Seung Ho Park?
7      A.  Seung Ho Park is the regional
8  manager for the eastern region that covers
9  New York and New Jersey offices.
10     Q.  Would you have expected that Alicia
11 Lee and whoever -- withdraw the question and
12 start over.
13         Would you have expected that you
14 would have been alerted right away when you
15 learned there had been a large embezzlement at
16 BankAsiana?
17     A.  Would I have expected?  I think I
18 was alerted right away.  I mean more or less
19 Elaine Jeon is a senior operations
20 administrator and I'm one of the people she
21 would update this type of information to.
22     Q.  Well, as general counsel of the
23 bank, if there's a large embezzlement with a
24 bank you merged with, you would have expected

Page 31

LISA PAI (7/13/17)

1  if not that day, the next morning, right?
2      MR. YI:  Objection to form.
3      A.  I don't know that I would have
4  expected it on the same day, not necessarily,
5  as long as it's promptly thereafter.
6      Q.  So I think the record shows the
7  communication was first had with Karen Chon on
8  January 22nd, in which she confessed to the
9  embezzlement; were you aware of that?
10     MR. YI:  Objection to form.
11     A.  Yes, I am aware of that.
12     Q.  I'm going to show you what's been
13 marked as Ryu Exhibit No. 3.
14     A.  Okay.
15     Q.  Have you had a chance to look at
16 what's been marked as Ryu-3?
17     A.  Yes.
18     Q.  You've seen this document before,
19 correct?
20     A.  Yes, I have.
21     Q.  Did you review this in preparation
22 for your deposition?
23     A.  Yes.
24     Q.  This is an e-mail dated

Page 32

LISA PAI (7/13/17)

1  January 23rd from Elaine Jeon -- from Alicia
2  Lee to Elaine Jeon reporting on a conversation
3  with Karen Chon?
4      MR. YI:  Objection to form.
5      Q.  Correct?
6      A.  Yes.
7      Q.  So I just want to understand, is it
8  your understanding that Karen Chon initially
9  confessed to the embezzlement on January the
10 22nd of 2014 and then she came in and had
11 further communications the following day
12 January 23, 2014, correct?
13     MR. YI:  Objection to form.
14     A.  Yes.
15     Q.  Did the bank have any knowledge
16 that Karen Chon was implicated in this
17 embezzlement prior to January 22, 2014?
18     A.  I'm sorry, can you repeat that.
19     Q.  Sure.  Did the bank have any
20 knowledge that Karen Chon was implicated in
21 the embezzlement prior to January 22, 2014?
22     A.  I don't believe so, based on these
23 documents.
24     Q.  Do you know how the bank first

Page 33

LISA PAI (7/13/17)

1  realized there was a problem with potential
2  embezzlement?
3      MR. YI:  Objection to form.
4      A.  Yes, I think the bank was initially
5  informed by Bo-Young Lee and possibly I.E.
6  Lee, after their conversation with Karen Chon.
7      Q.  Did you know that there was -- that
8  a customer had made some kind of a statement
9  that began the process of looking into some
10 unexplained transactions and that that's what
11 led to the first communication with Karen
12 Chon?
13     MR. YI:  Objection to form.
14     A.  That's right, that's my
15 understanding.
16     Q.  And what's your understanding of
17 what happened; you know, how did we go from
18 some customer making a statement to Karen Chon
19 confessing on January 22, 2014; what were
20 those facts; do you know?
21     A.  Yes.  So the customer ████████
22 came into the bank because of some discrepancy
23 on his CD account, 1099 statements and when
24 they started looking into that, there were

Page 34

LISA PAI (7/13/17)

1   
2   questions that Irene and Bo-Young could not
3   answer. So my understanding is they contacted
4   Karen Chon who was most familiar with the
5   branch transaction and during those
6   discussions, they discovered -- I guess Karen
7   confessed to embezzling the funds of the bank
8   relating to this customer's account.
9       Q. And did Karen confess to a -- did
10  she -- how much did she confess to embezzling;
11  do you know?
12      A. I don't know that she specifically
13  said the amount other than relating to
14  ██████, but like I said, my recollection
15  is kind of fuzzy on exactly when she confessed
16  to a specific amount.
17      Q. Well, do you know whether in her
18  first conversation that -- Karen's first
19  conversation in which she acknowledged that
20  she had embezzled money from the BankAsiana or
21  its customers, do you know whether they
22  implicated James Ryu in that initial
23  conversation?
24      A. That's my understanding.
25      Q. What is the basis for that

Page 35

LISA PAI (7/13/17)

1   understanding?
2       A. Initially reports from Alicia Lee,
3   based on her meeting with Karen, as well as
4   her conversations with Bo-Young and Irene and
5   I just noticed that this memo by Alicia Lee
6   says that Karen's recollection at the time is
7   that the amount, total amount is around a
8   million dollars.
9       Q. Okay. So I'm focused now on your
10  understanding that in the very first
11  conversation, that Karen -- in which Karen
12  acknowledged her responsibility for embezzling
13  money, she implicated James Ryu, you're basing
14  for saying that is something that Alicia Lee
15  told you?
16      A. Yes, Alicia Lee was the person that
17  informed me and/or Elaine Jeon.
18      Q. To be clear, they said in the
19  initial communication, Karen Chon implicated
20  James Ryu?
21      A. Like I said, I don't recall if it
22  was -- if you mean by initial, the first
23  instead of the second, that I cannot recall,
24  but whether it was first or second discussions

Page 36

LISA PAI (7/13/17)

1   
2   they had with her, I think the bank learned
3   within days of talking to Karen that James Ryu
4   -- that she was implicating James Ryu in the
5   embezzlement.
6       Q. I'm going to hand you what's been
7   marked as Ryu Exhibit 12. Please take a
8   moment to look at it.
9       A. Okay.
10      Q. This document has the Bates numbers
11  WB795 through '808 on it. And you've seen
12  this before, haven't you?
13      A. Yes, I have.
14      Q. This is one of the internal
15  investigation reports that the bank had
16  prepared for it with respect to its
17  embezzlement, correct?
18      A. Internal audit report, yes.
19      Q. Why do you call it an internal
20  audit report?
21      A. It was prepared by an internal
22  auditor.
23      Q. Who was that?
24      A. Orest Hamersky.
25      Q. Okay. Now I'm going -- we'll

Page 37

LISA PAI (7/13/17)

1   
2   probably ask you a bunch of questions as we go
3   on. I'm focused on one issue right now, and
4   that is at the bottom of page 1, which is
5   WB797, and if you read that paragraph, I'm not
6   going to ask you to read it out loud, the one
7   that begins "When Irene discovered" and goes
8   on to the second page of that. I'd like to
9   ask you a question about that. While you do
10  that, I'm going to take a short break.
11      MR. HARVEY: Let's go off the
12  record.
13      (Whereupon, at this time, a short
14  break was taken.)
15  BY MR. HARVEY:
16      Q. Ms. Pai, have you had a chance to
17  review that paragraph?
18      A. Yes, I have.
19      Q. And do you see in here in that
20  paragraph, it discusses a meeting on
21  January 22nd and there's no reference in
22  there -- would you agree with me, there's no
23  reference to James Ryu being implicated on
24  January 22nd?
25      A. It appears to be so, yes.

Page 38

LISA PAI (7/13/17)

1   Q. Then there is a reference to James
2   being implicated on January 23rd?
3       A. Yes, it appears to be so.
4       Q. So I'm trying to understand if you
5   had any conversation on that subject of
6   whether James Ryu was implicated in the
7   conversation, whether Karen Chon implicated
8   James Ryu on January 22nd or not?
9       A. Yes, it appears that Karen Chon
10  implicated James for the first time on
11  January 23rd when she had a meeting with
12  Alicia Lee and that's from whom I heard the
13  report, so by the time I heard it, James had
14  already been implicated.
15      Q. Okay. So just from your
16  perspective, I want to make sure we have the
17  facts right here. So the facts are that she
18  made some statements, she acknowledged
19  responsibility on January 22nd, didn't mention
20  James Ryu, and then had a further
21  communication on January 23rd in which she did
22  mention James Ryu; is that correct?
23      MR. YI: Objection to form.
24      A. That's right. I think my

Page 39

LISA PAI (7/13/17)

1   understanding is that on January 22nd,
2   discussion with Bo-Young and Irene were more
3   about transactions and explaining the
4   transactions, that when Alicia went and met
5   with her on January 23rd, it was more about
6   responsibility and her motivation.
7       Q. So as the bank's corporate
8   designee, I'm asking you, it's the bank's
9   understanding that the information in the
10  bank's possession that Karen didn't mention
11  James Ryu on the 22nd, but she did mention him
12  on the 23rd, correct?
13      MR. YI: Objection to form.
14      A. It appears to be so.
15      Q. You don't know whether the first
16  communication to you was on the 22nd or the
17  23rd; is that correct?
18      A. My recollection is it was either
19  the 23rd or thereafter.
20      Q. And why is it -- how was it that
21  you recollect that?
22      A. Because my recollection is I first
23  heard from Alicia and/or Elaine after she had
24  gone out there.

Page 40

LISA PAI (7/13/17)

1   Q. After Alicia had gone out there?
2       A. That's right, either Alicia was
3   there already when Elaine came into my office
4   and we had -- she -- Alicia called in or they
5   -- Alicia had come back and reported to me
6   together with Elaine. I cannot remember
7   which.
8       Q. Okay. So what did the bank do at
9   this point after you learned there had been
10  this embezzlement?
11      A. So the bank talked about who would
12  look into what, basically how to start our
13  investigation and I think we decided to
14  involve internal audit to help with sort of
15  forensic review of the transactions to assist
16  to work with Alicia Lee to understand how the
17  customer accounts were manipulated, more or
18  less, on a technical basis and I forget at
19  that time what else we talked about.
20      Obviously we eventually thought
21  about -- discussed, you know, to get an
22  outside counsel to assist us with the
23  investigations and I frankly -- I don't
24  remember exactly when that happened.

Page 41

LISA PAI (7/13/17)

1   Q. When did you first hear of New
2   Millennium Bank?
3       A. I think during the investigation
4   period.
5       Q. New Millennium Bank was a startup
6   Korean American bank in New Jersey; is that
7   correct?
8       MR. YI: Objection to form.
9       A. My recollection is that it was an
10  existing bank that was troubled and that James
11  Ryu and former CEO of BankAsiana, a bank that
12  we had just acquired was going to be joining
13  them as a new management team along with new
14  investors.
15      Q. And that it would be a Korean
16  American bank?
17      MR. YI: Objection to the form.
18      A. I don't think it was a Korean
19  American bank before, but I guess with the new
20  management team, it would become a Korean
21  American focused bank.
22      Q. Yes. It was a fail essentially,
23  completely or at least partially failed
24  New Jersey banking institution that certain

Page 42

LISA PAI (7/13/17)

1  
2  Korean American investors that were investing
3  were H.S. Hur as the CEO and James Ryu as the
4  No. 2 person there; was that your
5  understanding?
6      MR. YI:  Objection to form.
7      A.  Okay, more or less.
8      Q.  I mean, is there any part of that
9  that's incorrect, tell me which part is
10  incorrect?
11      MR. YI:  Objection to form.
12      A.  I wouldn't know if it's correct or
13  incorrect.  I mean that's all based on
14  information that I don't have first knowledge
15  of.
16      Q.  Right.  But you learned sometime
17  shortly after this investigation into the
18  embezzlement began, you learned that James Ryu
19  and H.S. Hur were involved in resuscitating a
20  financial institution and that it was going to
21  be a Korean American banking competitor of
22  Wilshire Bank, right, in the same area; is
23  that correct?
24      MR. YI:  Objection to form.
25      A.  Again, I don't know what area they

Page 43

LISA PAI (7/13/17)

1  
2  had branches in, but I did learn that Mr. Hur
3  and James Ryu were going to be part of the new
4  management team.
5      Q.  And that it would be a Korean
6  American bank, right?
7      MR. YI:  Objection to form.
8      A.  Well, again, I don't know what
9  their new focus or strategy is.
10      Q.  So at the time, you didn't know one
11  way or the other whether it was going to be a
12  Korean American bank?
13      MR. YI:  Objection to form.
14      A.  Well, whether their strategy is to
15  target Korean Americans, all I know is that at
16  that time, I probably assumed that.
17      Q.  It would be a fair assumption given
18  that those two gentlemen had their whole
19  careers in Korean American banks and had just
20  been at a Korean American bank, correct?
21      MR. YI:  Objection to form.
22      A.  Sure.
23      Q.  Now, did H.S. Hur have a
24  non-compete with BankAsiana?
25      A.  I don't recall actually.  I know he

Page 44

LISA PAI (7/13/17)

1  
2  had confidentiality obligations.
3      Q.  Were you concerned that either H.S.
4  Hur or James Ryu were breaching the
5  obligations they owed to BankAsiana, which of
6  course had been merged into Wilshire Bank at
7  that time with respect to their activities
8  with New Millennium Bank?
9      A.  I'm sorry, can you ask that again.
10      Q.  Sure.  At the time, at or around
11  the time that you learned that James Ryu and
12  H.S. Hur were involved in New Millennium Bank,
13  which I think was shortly after the
14  investigation began, correct?
15      A.  Yes.
16      Q.  So at or around that same time,
17  were you concerned that James Ryu and/or H.S.
18  Hur were possibly violating or breaching
19  duties they owed to BankAsiana with respect to
20  activities of the new bank New Millennium such
21  as noncompetes or confidentialities or other
22  obligations?
23      MR. YI:  Objection to form.
24      Did you mean BankAsiana or
25  Wilshire Bank?

Page 45

LISA PAI (7/13/17)

1  
2      MR. HARVEY:  I meant both because
3  BankAsiana had merged with Wilshire.
4      A.  Yes.  At a certain point, I was
5  concerned that they might be breaching their
6  confidentiality and other related provisions.
7      Q.  Do you remember anything more
8  specific such as what obligations other than
9  confidentiality they might have been
10  breaching?
11      A.  I think breaching, taking customer
12  information was a --
13      Q.  Did you finish your answer?
14      A.  Yes.
15      Q.  So you became concerned that they
16  may be taking or using BankAsiana customer
17  information; is that correct?
18      MR. YI:  Objection to form.
19      A.  Yes, more for Mr. Hur.
20      Q.  Why more for Mr. Hur?
21      A.  I think he was more of the
22  marketing person.
23      Q.  What was your understanding of the
24  relationship between Mr. Hur and Mr. Ryu?
25      A.  I understood that they worked

Page 46

LISA PAI (7/13/17)

1 together for a long time.
2 
3    Q.  Had you met Mr. Hur?
4    A.  Yes, during the due diligence
5 visits.
6    Q.  Is he fluent in English?
7    A.  I'm not sure.  I usually spoke to
8 him in Korean.
9    Q.  He's older than Mr. Ryu; is that
10 correct?
11    A.  I believe so.
12    Q.  Did you have internal discussions
13 at Wilshire Bank about New Millennium Bank at
14 around this time?
15    MR. YI:  Objection to form.
16    A.  Again, I don't remember the exact
17 timing, but during the investigation, we were
18 concerned that they were -- they appeared to
19 be discussing the New Millennium Bank deal
20 during the merger negotiation period, that
21 they were using bank time and resources to be
22 involved and possibly using confidential
23 customer information.
24    Q.  So you were concerned that Mr. Ryu
25 and Mr. Hur might have plotted to start a

Page 47

LISA PAI (7/13/17)

1 
2 competitor in the Korean American banking
3 space while they were still employed at
4 BankAsiana?
5    A.  Yes, that was one of our concerns.
6    Q.  Did you have any other concerns?
7    A.  Well, with Mr. Ryu, we were
8 concerned that he had embezzled a large sum of
9 money from the bank.
10    Q.  Did you have any other concerns?
11    A.  We were also concerned that both
12 Mr. Hur and James Ryu had taken their
13 computers and laptops without any consent from
14 Wilshire Bank.
15    Q.  Did you have any other concerns?
16    A.  Other than relating to
17 embezzlement, I think that's all I can recall
18 right now.
19    Q.  Were these concerns shared among
20 the senior management of Wilshire Bank?
21    A.  With certain members, yes.
22    Q.  Which members?
23    A.  I think mostly Elaine Jeon and CEO
24 from time to time.
25    Q.  That would be Jae Whan Yoo?

Page 48

LISA PAI (7/13/17)

1 
2    A.  Yes, and we probably reported to
3 the board as well.
4    Q.  Would that have been reported in
5 board minutes?
6    A.  It may have been.
7    Q.  You just don't recall one way or
8 another whether it was in board minutes,
9 correct?
10    A.  Correct.
11    Q.  Now, when was outside counsel
12 engaged to assist with respect to the
13 embezzlement?
14    A.  Shortly thereafter, but I actually
15 don't recall the specific date.
16    Q.  What did you learn about James Ryu
17 and H.S. Hur, I think you said taking their
18 computers or laptops or something, you just
19 said that a couple minutes, that was one of
20 your concerns?
21    A.  Yes.
22    Q.  Tell me, was it that they took
23 laptops or hard drives; do you remember your
24 specific concern?
25    A.  Yes, my concern was since Karen was

Page 49

LISA PAI (7/13/17)

1 
2 implicating James that he may have taken the
3 laptop and his computer to conceal any
4 information that he may have had relating to
5 the embezzlement.
6    Q.  What about with respect to H.S.
7 Hur, did you have a concern he had taken the
8 laptop computer or anything like that or just
9 James?
10    A.  No, we were also concerned about
11 Mr. Hur taking his computer as well and that
12 at that point, we didn't know whether he was
13 also involved since he was so closely tied to
14 James Ryu and whether he also took his
15 computer to conceal any information that may
16 be residing in those computers.
17    Q.  So you thought it was possible that
18 Mr. Hur was also involved in the embezzlement,
19 correct?
20    A.  Yes, initially we definitely were
21 wondering about that.
22    Q.  And when you say "we," do you mean
23 the people you just talked about before,
24 Alicia Lee, Elaine Jeon and Jae Whan Yoo?
25    A.  Yes.

Page 50

LISA PAI (7/13/17)

1   Q.  Anyone else?
2   A.  No, at a high level, those are the
3   three.
4   Q.  Now, did you learn that the
5   circumstances under which Mr. Ryu and Mr. Hur
6   took their laptops and computers?
7   A.  I'm sorry.
8   Q.  Did you learn the circumstances
9   under which Mr. Ryu and Mr. Hur took their
10  laptops and computers?
11  A.  Yes.  So initially we asked IT
12  person from former BankAsiana and he did not
13  know that they had taken those computers until
14  he went to their offices and found them empty.
15  Q.  And who was that?
16  A.  His name is Eunmoo Choi.
17  Q.  Can you spell that, please.
18  A.  E-U-N, M-O-O, C-H-O-I, I think.
19  Q.  So you learned from directly --
20  yourself learned it from Mr. Choi that he told
21  you that he didn't know that Mr. Hur and
22  Mr. Ryu had taken their computers until he
23  went to their offices and found them missing;
24  is that correct?
25

Page 51

LISA PAI (7/13/17)

1   A.  I don't recall whether I spoke
2   directly to him at that point or through
3   Elaine Jeon or Alicia Lee.
4   Q.  But one way or another you learned
5   that he had reported that he -- that they were
6   -- that those computers were missing and he
7   had not -- he was not aware of it until he
8   found them missing, correct?
9   A.  That's right, because that was one
10  of the items that we would review as part of
11  our investigation.
12  MR. YI:  Steve, when you get a
13  chance, let's just take a quick break.
14  MR. HARVEY:  We can do it right
15  now.
16  (Whereupon, at this time, a short
17  break was taken.)
18  BY MR. HARVEY:
19  Q.  So I think, to be clear, you just
20  testified Eunmoo Choi told somebody who told
21  you that he had discovered, he first learned
22  that -- that the computers were missing
23  because they weren't in their offices when he
24  went to look, right?
25

Page 52

LISA PAI (7/13/17)

1   MR. YI:  Objection to form.
2   A.  That's my recollection, yes.
3   Q.  Would you please take a look at
4   what's been marked as Ryu Exhibit No. 12?
5   A.  Which page, I'm sorry?
6   Q.  Take a look.  Basically I want to
7   ask you, there's a reference on page 2 of
8   this, which is WB798 to Eunmoo Choi and it
9   doesn't contain the fact that you just state,
10  but I want you to confirm that yourself, that
11  it doesn't contain that statement.
12  And my question is why would a
13  relatively important fact like that be left
14  out of the audit report?
15  MR. YI:  Objection to form.
16  A.  Well, this is a report that Orest
17  had prepared and my answer was based on
18  discussions either with Eunmoo Choi or someone
19  else about discussions with Eunmoo Choi, so I
20  guess Orest wasn't told about that.  Orest was
21  mostly involved in reviewing transactions with
22  Alicia and to the extent he found out about
23  other conversations, he would incorporate
24  them, but that's why, you know, I'm referring
25

Page 53

LISA PAI (7/13/17)

1   to his report as internal audit report.  It's
2   just one aspect of our investigation and he
3   wasn't necessarily charged with reflecting
4   everything that everybody else found out
5   about, although he attempted to include what
6   he knew about in his reports.
7   Q.  Were you concerned -- you said you
8   were concerned that the laptops and computers
9   might have contained information relevant to
10  the embezzlement, correct?
11  A.  That was one of my concerns.
12  Q.  Did you ever find out whether they
13  actually did contain information relevant to
14  the embezzlement?
15  A.  Yes, I -- we later found out more
16  about what the computers -- what kind of
17  information the computer hard drives
18  contained.
19  Q.  Was there any information on there
20  pertaining to the embezzlement?
21  MR. YI:  Objection to form.
22  Q.  When I say on there, I mean any of
23  the computers and laptops, any information on
24  any of the computers or laptops that you later
25

Page 54

LISA PAI (7/13/17)

1 had reviewed that was pertinent to the
2 embezzlement?
3     A.  Right.  I think what's pertinent to
4 the embezzlement was, you know, we were
5 looking for information about James' role at
6 the bank and what may have led up to the
7 embezzlement.  So yes, I think the computers
8 contain information that explained -- gave
9 more light to James' role at the organization,
10 at the bank, BankAsiana and also what may have
11 led up to his participation in the
12 embezzlement.
13     Q.  So there was information on those
14 computers that was pertinent to the
15 embezzlement; is that right?
16     A.  Well, I think everything about his
17 role at BankAsiana is pertinent to
18 embezzlement, so if you know, that's....
19     Q.  So the fact that he showed up for
20 work on a day back in 2009 would be pertinent
21 to the embezzlement?
22     MR. YI:  Objection to form.
23     A.  Well, I wouldn't go that far.  The
24 -- I think his role as No. 2 person at the

Page 55

LISA PAI (7/13/17)

1 bank and who he supervised, he basically was
2 responsible for all of the operation at the
3 bank, supervised Karen Chon and supervised
4 deposit operations, even supervised BSA and
5 internal audit and other people at the bank
6 and some of his other roles at the bank,
7 basically I believed were all pertinent to our
8 investigation.
9     Q.  And this was the first time that
10 the bank had learned that he was No. 2 person
11 at the bank and had these responsibilities,
12 the bank didn't know this obviously prior to
13 the embezzlement?
14     MR. YI:  Objection to form.
15     Q.  The bank didn't know that James was
16 No. 2 person at BankAsiana and had these
17 responsibilities prior to learning about the
18 embezzlement; is that correct?
19     MR. YI:  Objection to form.
20     A.  I personally did not know about the
21 specifics of his role.  I knew he was No. 2 or
22 in the top three, but I think in the context
23 of this investigation, we wanted to know more
24 about his -- his relationship, for example,

Page 56

LISA PAI (7/13/17)

1 with the CFO, for example, with Karen Chon and
2 so on and so forth.
3     Q.  And that's all information that the
4 bank had access to during the due diligence,
5 correct?
6     MR. YI:  Objection to form.
7     A.  During due diligence, our focus was
8 different, we were looking for more merger
9 transaction related regulatory issues
10 possibly, financial issues at a high level.
11 Anything that effects kind of merger pricing,
12 for example.  I don't think we had time or
13 resources to investigate or review specific
14 relationships and how his role affected, you
15 know, behaviors of other employees.
16     Q.  How many employees at
17 BankAsiana when Wilshire Bank acquired it?
18     A.  My recollection is less than 50 or
19 60.  It was a very small bank.
20     Q.  So when Wilshire Bank reviewed
21 James Ryu's laptops, computers, whatever else
22 it received from him, did it find anything
23 specific about the embezzlement on those
24 computers?

Page 57

LISA PAI (7/13/17)

1     MR. YI:  Objection to form.
2     A.  I'm not sure what you mean by
3 specific.  Like I said in the earlier answer,
4 everything about his role to me was
5 potentially related to embezzlement, but if
6 you're talking about was there a direct
7 evidence that he took funds out of customers'
8 accounts, no, we didn't find anything like
9 that.
10     Q.  Was there any proof on there that
11 James had played a role in the embezzlement on
12 the laptops or computers?
13     MR. YI:  Objection to form.
14     A.  There were definitely information
15 in it that corroborated some of the stories
16 that I had heard from talking to employees
17 about his role and behavior at BankAsiana.
18     Q.  Was there any proof on there that
19 he had participated in the embezzlement on
20 those laptops or computers?
21     MR. YI:  Objection to form.
22     A.  Like I said, I don't know what you
23 mean by proof.  I think we were reviewing the
24 contents of the computer hard drives as part

LISA PAI (7/13/17)

1
2  of our investigations and investigations are
3  still ongoing actually as we speak.  We're
4  still in discovery stage, so we were trying to
5  gather information to eventually produce at
6  trial.
7      Q.  Let's be clear here, you don't
8  understand what I mean when I say -- when I
9  ask if there's any proof on those computers
10 that James Ryu was involved in the
11 embezzlement, correct, you don't understand
12 what I mean by proof; is that correct?
13     MR. YI:  Objection to the form;
14 argumentative.  I think the witness
15 has made her response clear earlier,
16 but I'll let you answer it.
17     A.  That's right.
18     Q.  Okay.  How about evidence, are you
19 familiar with the word evidence?
20     A.  Yes.
21     Q.  Was there any evidence on there
22 that James Ryu had participated, any evidence
23 on the laptop or computers or whatever
24 computer materials the bank received from
25 James Ryu that he had participated in the

LISA PAI (7/13/17)

1
2  embezzlement?
3      MR. YI:  Objection to form.
4      A.  I think that there is potential
5  information that could eventually become part
6  of our evidence.  At that point until we put
7  all the information together, it is hard to
8  say.
9      Q.  So right now, you can't tell me
10 whether there's any evidence on those
11 computers that James -- or laptops that James
12 Ryu had participated in the embezzlement, all
13 you can say there's information that may lead
14 to evidence; is that correct?
15     MR. YI:  Objection to form.
16     A.  Well, I think there's some
17 supporting information such as his financial,
18 personal financial problems that he had.  I
19 remember seeing information in -- from his
20 computer hard drive about financial losses
21 that he had incurred with businesses, personal
22 business investments he had made while working
23 at BankAsiana and that could potentially
24 become part of our evidence.
25     Q.  Right.  So you saw some information

LISA PAI (7/13/17)

1
2  suggesting that he had financial problems, but
3  you didn't see any information on there
4  suggesting that he had actually participated
5  in the embezzlement; isn't that true?
6      MR. YI:  Objection to form.
7      A.  Well, according to Karen, his
8  participation was directing her and possibly
9  blackmailing her to take money out of the
10 vaults, using customer -- by manipulating
11 customer accounts and delivering cash to him
12 in envelopes in a surreptitious manner, so if
13 you're asking did we find an e-mail
14 instructing her to do so, no, we did not.
15     Q.  You didn't find any e-mails
16 instructing him to do that, correct, that's
17 what you just said?
18     A.  That's correct.
19     MR. YI:  Objection to form.
20     Q.  And you didn't find any other
21 evidence on this -- on the computers or
22 laptops implicating James Ryu in the
23 embezzlement; isn't that true?
24     MR. YI:  Objection to form.
25     A.  No.  Like I said, I do think that

LISA PAI (7/13/17)

1
2  the computers contain information that
3  supports an explanation of why he would be
4  involved and what may have motivated him to
5  participate in embezzlement of large sums of
6  money from BankAsiana.
7      Q.  Okay.  You say there may be
8  evidence of motive, why he was involved, but
9  there's no evidence in there that he actually
10 was, in fact, involved, correct?
11     MR. YI:  Objection to form;
12 argumentative.  I think we've gone
13 over this.
14     A.  To me, that's all part of evidence.
15     Q.  I understand, but understand the
16 question, please.  There's no evidence on
17 there that he was in fact involved?  There's
18 only evidence as you say that he had financial
19 difficulties, a reason to be involved, but no
20 evidence on the computers that he in fact was
21 involved such as e-mails with Karen Chon or
22 any other information that would be considered
23 direct evidence that he was involved in this
24 embezzlement as you contend; isn't that true?
25     MR. YI:  Objection to form;

Page 62

LISA PAI (7/13/17)

1
2 argumentative; asked and answered.
3 I'm going to allow the witness to
4 answer just this one time if she can.
5     A.   I think there's a difference in
6 your definition of evidence and my definition
7 of evidence.  My definition of evidence is
8 broader than just direct evidence implicating
9 James and like I said, if you're asking if the
10 computers contained direct evidence
11 implicating him, then my answer is no, we
12 didn't find any direct evidence implicating
13 him.
14     Q.   What broader evidence did you find?
15 You said there was broader evidence in there
16 that he had financial difficulties; what did
17 you find?  What was found on the -- by the
18 bank on the computers that supported them?
19     MR. YI:  Objection to form.
20     A.   So I found evidence in the
21 computers that corroborated, that were
22 consistent with stories that I heard from the
23 employees of his financial hardship and his
24 involvement with the former employee that led
25 up to his business investments that failed or

Page 63

LISA PAI (7/13/17)

1
2 businesses that failed and his abuse of his
3 role in asking bank employees to prepare
4 financial -- personal financial statements for
5 him.  I think I'll stop there.
6     Q.   Did you find it yourself?  Did you
7 find this information yourself or did somebody
8 find it for you?
9     A.   We had engaged CliftonLarson, an
10 outside computer expert, I guess, that
11 reviewed hard drive content, so my information
12 is based on some of their findings.
13     Q.   And so all you know in this regard
14 is what CliftonLarson told you?
15     A.   No, I reviewed the -- some of the
16 e-mails myself.
17     Q.   And what were those e-mails that
18 you can recall?
19     A.   Well, I recall the financial
20 statements and the e-mails from CFO, former
21 CFO of BankAsiana to James or vice versa where
22 the CFO refers to preparing personal financial
23 statements for James and also information
24 about his losses.  I think it was in the
25 context of James trying to get a modification

Page 64

LISA PAI (7/13/17)

1
2 of his residential loan for his house in
3 California that was -- I think he was
4 delinquent in loan payments and was trying to
5 -- and he was under water, the value was --
6 had dropped and he was trying to get some kind
7 of modification approved and the former CFO
8 provided -- prepared some of this information,
9 which was very unusual from my perspective.
10     I forget what your original
11 question was.
12     Q.   Yes.  Specifically, what
13 information was on the computers that
14 suggested that though, that implicated James
15 in this broader sense of evidence and you've
16 said now there was some abuse of roles with
17 respect to personal financial statements, I
18 think that's what you testified about, you
19 mentioned something about a relationship, what
20 was that relationship?
21     A.   Some of the employees told me that
22 he had a -- what they believe was a romantic
23 relationship with a former employee that he --
24 that he had transferred her to -- I think she
25 was a teller at one of the branches, but that

Page 65

LISA PAI (7/13/17)

1
2 he had transferred her to -- I think closer to
3 the headquarters so that he could see her more
4 often and that he had gotten himself involved
5 in her failing businesses.  I think there were
6 two of them and maybe because of that he was
7 having a lot of financial problems, asking a
8 lot of coworkers including the CEO for a
9 personal loan.  And I did find a lot of
10 e-mails that he had sent to that former
11 employee basically -- I don't know if I can
12 characterize them as love letters, telling her
13 how much he misses her and stuff like that,
14 using the bank computer.
15     Q.   So was there anything else that you
16 can recall from the computer that provided
17 this broader evidence as you say that would
18 implicate James other than e-mails relating to
19 an affair he apparently had with someone who
20 worked at the bank, abuse of his role with
21 respect to personal financial statements as
22 you testified and asking coworkers for a
23 personal loan?
24     MR. YI:  Objection to form.
25     A.   That's all I can recall right now.

17

Page 66

LISA PAI (7/13/17)

1
2    Q.   What was it about asking coworkers
3  for a personal loan; can you remember any
4  specifics about that?
5    A.   So a lot of employees said he was
6  asking around to employees, both his superiors
7  as well as people that reported to him for
8  personal loans and that he was basically
9  pretty desperate.
10    Q.   That's what some employees told
11  you?
12    A.   Yes.
13    Q.   Was that on the computer?
14    A.   Well, the computer showed documents
15  that show what kind of financial trouble he
16  was facing.
17    Q.   And who were these employees that
18  told you about this?
19    A.   I think Irene was one of them,
20  Bo-Young may have been another one.  I don't
21  recall exactly who at this point.
22    Q.   But you think it was Irene, either
23  Irene or Bo-Young?
24    A.   Yes, and I did speak with a former
25  employee as well, name is Jessica Lee.

Page 67

LISA PAI (7/13/17)

1
2    Q.   You think Jessica Lee may have told
3  you this as well?
4    A.   It's possible.  I don't recall.
5    Q.   So from the fact that James Ryu had
6  an affair and that he had some financial
7  difficulties and that he asked for a personal
8  loan, from that you concluded that he
9  therefore embezzled money?
10    MR. YI:  Objection to form.
11    A.   Well, no, there was more than that.
12  He also not only asked for and obtained from
13  some of the employees personal loans, but he
14  also obtained personal loans from banks'
15  customers, banks' borrowers and one particular
16  borrower, Michael Kim, his business name is, I
17  think, Clear Riverside and Kore Consulting,
18  Kore with a K and I was particularly troubled
19  about that.
20    Q.   Why were you particularly troubled
21  about that?
22    A.   Because of the fact that he -- that
23  is against most bank codes of conduct, to get
24  a personal loan from banks' borrower and the
25  fact that the borrower that he got the

Page 68

LISA PAI (7/13/17)

1
2  personal loan from was -- loan as a hard money
3  lender and subsequently defaulted on numerous
4  bank loans, including an SBA loan, which we
5  later discovered was fraudulently obtained and
6  so I think that's what was troubling to me.
7    Q.   What's a hard money lender?
8    A.   That's a good question.  Someone
9  that charges high interest and makes personal
10  loans to people who don't otherwise qualify
11  for loans from banks or credit unions.
12    Q.   Is that illegal?
13    A.   Is that illegal?
14    Q.   Yes.
15    A.   No, I don't necessarily think it's
16  illegal as long as they don't violate usury
17  laws, but they are usually a last resort for
18  people who are desperate for money and I'll
19  leave it at that.
20    Q.   So from the fact that James had an
21  affair and that he had abused his role by
22  having the CFO help with some personal
23  financial statements that he had asked
24  coworkers for a financial loan, asked -- had
25  some financial difficulties and taken a loan

Page 69

LISA PAI (7/13/17)

1
2  from a hard money lender named Kim, from all
3  of those facts supported the idea that James
4  had engaged and participated in the
5  embezzlement; is that correct?
6    MR. YI:  Objection to form.
7    A.   Yes, not only may have engaged in,
8  participated in embezzlement, but also that he
9  may have disregarded any codes of conduct and
10  acted inappropriately in his capacity possibly
11  abusing his position at the bank.
12    I also remember talking to the
13  former CFO and asking him about an advance of
14  his pay that the bank didn't recover and the
15  former CFO Frank Gleason is his name told me
16  that James had told him he didn't have to pay
17  him back, so that was another -- again,
18  another instance of either abuse of position
19  in exchange for personal favor or
20  inappropriate by a bank senior officer.
21    Q.   So Frank Gleason told you that
22  James Ryu had taken an advance of his pay and
23  then didn't pay it back and said he didn't
24  need to; is that right?
25    A.   No, Frank Gleason had taken an

18

Page 70

LISA PAI (7/13/17)

1
2  advance, so basically borrowed, not exactly
3  borrowed.  It wasn't technically a personal
4  loan from the bank, but he had some financial
5  need and had received $5,000 in advance of his
6  pay.  I think when he started working for or
7  shortly after he started working for the bank
8  and later James had told Frank he didn't have
9  to pay it back.
10     Q.  Do you know if James ran that by
11 H.S. Hur?
12     A.  That I'm not sure.
13     Q.  So from all those facts that you
14 just mentioned, the ones you previously
15 mentioned and from that transaction that you
16 just testified about involving Frank Gleason,
17 you concluded that James Ryu had participated
18 in the embezzlement, correct?
19        MR. YI:  Objection to form.
20     A.  I believe that there was a higher
21 likelihood that he did, yes.
22     Q.  Now, after....
23        (Ryu Exhibit 17, website printout
24        dated January 30, 2014 was marked for
25        identification, as of this date.)

Page 71

LISA PAI (7/13/17)

1
2     A.  Okay.
3  BY MR. HARVEY:
4     Q.  Have you had a chance to take a
5  look at what's been marked Ryu-17?
6     A.  Briefly.
7     Q.  Do you recall seeing this around
8  January 30, 2014?
9     A.  No, I don't recall it specifically.
10    Q.  Okay.  You can put that aside.
11       If H.S. Hur told James Ryu that he
12 could take his computer because it was for
13 whatever reason said you can take a computer,
14 it's yours, take it home with you, would
15 BankAsiana -- would that have been stealing?
16       MR. YI:  Objection to form.
17    A.  Well, I don't think Mr. Hur or
18 James Ryu had the authority to take any assets
19 of BankAsiana after they sold the bank to
20 Wilshire Bank.  You know, the bank merger,
21 merger agreement or purchase agreement would
22 not allow them to take any assets of the bank
23 without consent of Wilshire Bank.
24    Q.  Understood.  And that would be
25 effective as of the closing date, correct?

Page 72

LISA PAI (7/13/17)

1
2     A.  It would be, but it was also
3  included in the merger agreement that was
4  signed before the closing, so actually they're
5  contractually bound by the covenants in the
6  agreement between the signing and the closing.
7     Q.  Right.  So if the bank -- James Ryu
8  wasn't a party to that transaction, was he?
9     A.  I think he was one of the officers
10 that signed the reps and warranties probably.
11 I don't recall specifically.  I'd have to
12 double-check, but I know at least Mr. Hur
13 would have signed it and James may have signed
14 officer certificate relating to all the reps
15 and warranties and agreeing to the covenants.
16    Q.  And so if James -- prior to the
17 closing of the merger, H.S. Hur told James
18 that he could take his computer and his laptop
19 with him as he left the bank, you contend that
20 would have been a violation by James of an
21 agreement with Wilshire Bank?
22    A.  Yes, because he was in a position
23 to know what the terms and conditions of the
24 merger agreement is, possibly even more than
25 Mr. Hur.  Most of the merger agreement

Page 73

LISA PAI (7/13/17)

1
2  negotiations were conducted with James as one
3  of the primary contact persons at BankAsiana
4  and I think he was the one that had most of
5  the discussions with the outside counsel that
6  represented BankAsiana.
7     Q.  Who was that outside counsel?
8     A.  I think it was Windel Marx or
9  something like that.
10    Q.  Do you know what firm that was
11 with; was that the name of a law firm or name
12 of a person?
13    A.  Name of a law firm.
14    Q.  Please spell that.
15    A.  It may be wrong, W-I-N-D-E-L, then
16 M-A-R-X.
17    Q.  So to be clear, if H.S. Hur told
18 James Ryu prior to the closing that you can
19 take your computer and laptop, you believe
20 that would have been a violation by James Ryu
21 of agreements between Wilshire Bank and
22 BankAsiana because he would have known that or
23 he should have known that that equipment was
24 supposed to be conveyed to Wilshire Bank?
25       MR. YI:  Objection to form.

Page 74

LISA PAI (7/13/17)

1
2    Q.  Is that correct?
3    A.  Right.  He should have known and
4 should have advised Mr. Hur, because I think
5 James was more familiar with the terms and
6 conditions of the merger agreement than was
7 Mr. Hur.  I'm sorry, I don't know that for
8 sure, but I would think.
9    Q.  That's because you were involved in
10 those merger negotiations as well?
11    A.  Right, review of the merger
12 agreement.
13    Q.  How do you know that was James that
14 was reviewing the merger agreement on the
15 other side of the transaction?
16    A.  Because he was listed in the main
17 contact persons for BankAsiana and his
18 position, he was the person, he or the CFO,
19 but I think James was more involved in the
20 merger agreement context than the CFO was.
21    Q.  How do you know that?
22    A.  Just overall dealings, seeing his
23 name in the e-mails.  Like I said, I think it
24 was.  You can ask James.
25    Q.  Who was the CFO?

Page 75

LISA PAI (7/13/17)

1
2    A.  Frank Gleason.
3    Q.  Did Frank Gleason stay on with
4 Wilshire Bank?
5    A.  No.
6    Q.  You said earlier you had three
7 concerns; one was a concern about the
8 embezzlement, second was a concern about the
9 laptops and computers, and a third one was a
10 concern about that H.S. Hur may have used
11 information, did I understand you correctly,
12 that he obtained from the bank for
13 New Millennium Bank?
14    MR. YI:  Objection to form.
15    A.  Yes, customer information, yes.
16    Q.  What was the basis for that
17 concern?
18    A.  I think that concern came about
19 later on and again, I don't remember the
20 timing.  I think it came up when some of the
21 VIP customers, again, it could have been much
22 later, but closed their accounts and told us
23 that they were moving the accounts to
24 New Millennium.
25    Q.  Who were those customers?

Page 76

LISA PAI (7/13/17)

1
2    A.  Either that or I don't know if it
3 was investments in New Millennium.
4    Q.  So it was either customers or it
5 was investment; is that right?
6    A.  The customers were moving --
7 taking, withdrawing money out of bank --
8 former BankAsiana accounts to either open new
9 accounts at New Millennium or to invest in
10 New Millennium.
11    Q.  Was this before or after Wilshire
12 Bank commenced the lawsuit against Karen,
13 James and H.S. Hur?
14    A.  It probably was after.
15    Q.  Do you believe that James Ryu took
16 trade secrets of BankAsiana?
17    MR. YI:  Objection to form.
18    A.  Do you mean when he took the
19 computers?
20    Q.  At any time.
21    A.  I mean yes.
22    Q.  And do you still believe that he
23 took trade secrets?
24    A.  Yes because his computer contained
25 a lot of e-mails, bank e-mails as well as bank

Page 77

LISA PAI (7/13/17)

1
2 information.
3    Q.  So you think all bank e-mails and
4 bank information qualifies trade secrets?
5    MR. YI:  Objection to form.
6    A.  Not all, but anything related to
7 financials or proprietary information or
8 customer information or even employee
9 information would be considered confidential.
10    Q.  Would they be trade secrets?
11    A.  And/or trade secrets.
12    Q.  In your mind, is confidential
13 information the same thing as trade secrets?
14    A.  No, not necessarily.
15    Q.  What are trade secrets as opposed
16 to confidential information?
17    MR. YI:  Objection to form.
18    A.  So trade secrets would include
19 customer information, VIP customers as well as
20 policies and procedures and potentially other
21 types of information about the bank.
22    Q.  Did James Ryu use any confidential
23 information or trade secrets that he took from
24 the bank?
25    A.  That I do not know.

Page 78

LISA PAI (7/13/17)

1
2      Q.   The bank originally brought a claim
3   against James for misappropriation of secrets
4   and confidential information, right?
5      A.   Yes, because we suspected that he
6   may -- the fact that he took the computers
7   that contained that information, so we assumed
8   that his intent was to use them.
9      Q.   It was a lot of personal
10  information on that computer too, wasn't it?
11     A.   Yes.
12     Q.   Pictures of his family, correct?
13     A.   I don't recall seeing pictures of
14  his family, but again I didn't review all of
15  it so.
16     Q.   Right.  But you know that there --
17  that he had used that for a variety of
18  purposes including personal, correct?
19     A.   Based on what I personally
20  reviewed, because of those letters, yes, I
21  guess he must have used them for personal and
22  business purposes.
23     Q.   Do you use your bank computer --
24  you have a bank computer, right?
25     A.   Yes.

Page 79

LISA PAI (7/13/17)

1
2      Q.   Do you use it for personal as well
3   as business?
4      A.   I use it mostly for business.
5      Q.   Do you ever use it for personal?
6      A.   I try very hard not to.
7      Q.   Do your friends ever e-mail you at
8   your work address?
9      A.   A few times.
10        MR. YI:  I'm going to instruct the
11     witness not to answer unless -- can
12     you tell me some relevance.
13        MR. HARVEY:  I'm asking her
14     questions about James Ryu's use of his
15     computer, the relevance of the subject
16     matter in litigation.  I think it's
17     quite obviously relevant.  I'm not
18     going to any specific information with
19     her and I think I'm entitled to ask
20     this and I don't think you have a
21     right to instruct the witness not to
22     answer.  I think if counsel instructs
23     a witness not to answer on relevance
24     grounds, he's responsible to the court
25     for doing that.  I don't think you

Page 80

LISA PAI (7/13/17)

1
2   have a right to do that unless it was
3   highly intrusive and personal and
4   believe me, I don't plan to get highly
5   intrusive and personal.
6        MR. YI:  I'll allow it if we stick
7     to the facts relevant to this case.
8        MR. HARVEY:  So we're sticking to
9     the facts relevant to this case, I can
10     assure you.
11        MR. YI:  Okay.
12   BY MR. HARVEY:
13     Q.   You at times use your computer for
14  personal reasons, correct?
15        MR. YI:  Objection to form.
16     A.   At times.
17     Q.   Does the bank have a policy that
18  you can't use your -- does the bank have a
19  policy that says you can never use your
20  computer for personal reasons?
21     A.   It doesn't say never, but it says
22  the bank computer should be used primarily for
23  business and only incidentally for personal,
24  so that's why I try not to use it for personal
25  purposes.

Page 81

LISA PAI (7/13/17)

1
2      Q.   Understood.  Now, why did the bank
3   drop its claim against James Ryu about
4   misappropriation of secrets and confidential
5   information?
6        MR. YI:  Objection to form, and I
7     think it's really going into attorney
8     work product area.  I'll let the
9     witness answer if she can.
10     A.   Yes, I was going to say that that
11  was based on consultation with outside counsel
12  and we make sometimes strategic decisions for
13  various reasons.
14     Q.   Did the bank have evidence that
15  James Ryu had, in fact, used confidential
16  information or trade secrets of the bank?
17     A.   Initially when we discovered that
18  he took the computers, we definitely had high
19  concern that he would use them, otherwise, we
20  wouldn't have taken them.
21     Q.   He gave the computers back to you
22  personally, didn't he?
23     A.   Yes, after demand was made.
24     Q.   He told you that he believed they
25  were his, but he was giving them to you

Page 82

LISA PAI (7/13/17)

1  because -- in a show of good faith; isn't that
2  true?
3          MR. YI:  Objection to form.
4      A.  I don't recall that.
5      Q.  He came to a meeting with you and
6  he gave you -- he gave you the computer and
7  the laptop or whatever it was, he gave it
8  personally to you, correct?
9      A.  Yes, he handed it personally to me.
10      Q.  Freely gave it to you, he wasn't
11  coerced in any way, correct?
12      A.  Yes, and I believe he gave it back
13  freely as he agreed that it was bank property
14  that should not have been taken in the first
15  place.
16      Q.  So he said that; did he say it was
17  bank property that shouldn't have been taken
18  in the first place?
19      A.  I don't recall what he said
20  specifically when he handed it over.
21      Q.  Are you surmising?  So you said you
22  believed he did it because that; on what basis
23  do you believe that he did it because he
24  acknowledged that it was bank property?
25

Page 83

LISA PAI (7/13/17)

1          MR. YI:  Objection to form.
2      A.  Because that's what I -- that's
3  what we said in our letter to him, that it's
4  bank property and please return it as soon as
5  possible and do not delete any information
6  that's contained in the computers because
7  that's also bank property and he promptly
8  contacted us and said he would return it and
9  return them and made arrangements to return
10  them personally to me since I was going to be
11  in town, so I assumed he agreed with the
12  bank's contentions.
13      Q.  Do you recall whether he said I'm
14  giving this back to you even though it's mine
15  or words to that effect?  In a show of good
16  faith, I'm giving this to you now even though
17  it's mine; do you recall that he said anything
18  like that?
19          MR. YI:  Objection; asked and
20  answered.
21      A.  No, I don't recall that.
22      Q.  So I want to know, is it your
23  testimony that he definitely didn't say
24  anything like that or simply you don't recall
25

Page 84

LISA PAI (7/13/17)

1  one way or the other?
2          MR. YI:  Objection; asked and
3  answered.
4      A.  I don't recall it.
5      Q.  So did the bank ever make a
6  determination that he had used any of the
7  information that was on the laptop or the
8  computer?
9      A.  Did we make a determination; I
10  think investigation is ongoing and to the
11  extent it's still relevant, we would continue
12  to try to make that determination.
13      Q.  Let me ask it a little differently.
14  So you believed when you filed the lawsuit,
15  that he may have misappropriated trade secrets
16  or confidential information, specifically he
17  may have used the information on the laptops
18  or the computer for purposes other than bank
19  purposes, right, BankAsiana purposes?
20          MR. YI:  Objection to form.
21      A.  Can you repeat the question, I'm
22  sorry.
23      Q.  Sure.  So when you brought the
24  lawsuit, when you authorized the lawsuit
25

Page 85

LISA PAI (7/13/17)

1  against James Ryu and the claim against him
2  for misappropriation of trade confidential and
3  trade secrets, that was based upon your
4  understanding that he had taken the laptop and
5  computer when he had left the bank and may
6  have in fact used the information on that
7  laptop or computer in some improper way,
8  correct?
9      A.  That's correct.
10      Q.  Did you ever find out any -- did
11  the bank ever have any -- uncover any evidence
12  that he had in fact used the information on
13  that laptop or computer for anything?
14          MR. YI:  Objection; asked and
15  answered.
16      A.  Well, that would involve
17  interviewing a lot of outside people, which we
18  haven't gotten to at this point of our
19  discovery, so I can't recall specific
20  information that, you know -- that would
21  enable me to answer that question.
22      Q.  Well, in other words, you're not
23  aware of any evidence that he used the
24  information on that computer or laptop after
25

Page 86

LISA PAI (7/13/17)

1  he took it from BankAsiana, correct?
2  
3      A.  That I can recall, no.
4      Q.  In other words, I'm correct to the
5  best of your recollection?
6      A.  Well, I'm not sure what we have
7  been able to discover so far on that
8  particular issue, so.
9      Q.  I'm just asking for your knowledge.
10     A.  From my current recollection, not
11 that I can think of.
12     Q.  Now, if you'd look again please at
13 what's been marked as Ryu No. 12 in front of
14 you, please.
15     A.  Is that internal audit?
16     Q.  Yes.  Do you have that in front of
17 you?
18     A.  Yes.
19     Q.  So this was the first of two
20 reports that were prepared by Mr. Hamersky; is
21 that H-A-M-E-R-S-K-Y?
22     A.  I believe so.  One is dated
23 February 25th.
24     Q.  And did Mr. Hamersky prepare this
25 document himself; do you know?

Page 87

LISA PAI (7/13/17)

1  
2      A.  Yes, I believe is.
3      Q.  Have you discussed this with Mr. --
4  have you discussed this report with
5  Mr. Hamersky?
6      A.  I think he sent it to me.
7      Q.  How did he send it to you?
8      A.  Possibly by e-mail.
9      Q.  Did you share it with others in the
10 bank?
11     A.  Yes, I believe -- I think he
12 probably sent it to others at the bank as
13 well.
14     Q.  Who would that be?
15        MR. YI:  I'm going to instruct the
16     witness not to speculate.  If you
17     know.
18     A.  I don't recall to whom he sent it
19 to unless you show me the e-mail.
20        MR. HARVEY:  I'm going to ask your
21     counsel not to coach the witness
22     improperly as he just did.  That was
23     clearly coaching the witness to say
24     that she didn't recall.
25     Q.  So do you know if he sent this, if

Page 88

LISA PAI (7/13/17)

1  
2  this was shared with Mr. Jae Whan Yoo?
3      A.  I don't recall.
4      Q.  Did you discuss it with Mr. Jae
5  Whan Yoo?
6      A.  I discussed with Mr. Yoo at a high
7  level.  I don't recall if I had a discussion
8  with him specifically about the -- about this
9  document.
10        MR. YI:  By the way, for the
11     record, I disagree with Mr. Harvey
12     that I was coaching this witness.  I
13     think my understanding is it's proper to
14     instruct the witness not to speculate
15     or guess, but to testify as to her
16     knowledge and information.
17        MR. HARVEY:  I think when you do
18     that selectively as you just did, it's
19     clearly coaching.
20     Let's move on.
21     Q.  On the first page of this memo,
22 page 1, WB797, it says "Irene is alleged to be
23 a close friend of Karen"; you see that?
24     A.  Which paragraph?
25     Q.  The first -- the fifth paragraph,

Page 89

LISA PAI (7/13/17)

1  
2  center of the page, the paragraph that begins
3  "The initial investigation," the third
4  sentence from the back says "In addition,
5  Irene is alleged to be a close friend of
6  Karen"?
7      A.  Yes, I see it.
8      Q.  You read that of course when you
9  received this memo, right?
10        MR. YI:  Objection to form.
11     A.  I received this memo, so I must
12 have read it.
13     Q.  Did you suspect that Irene might
14 have been involved in the embezzlement because
15 she'd been a close friend of Karen's?
16     A.  Initially -- initially we were
17 wondering who else may have been involved and
18 Irene was one of the employees that we spoke
19 with to determine whether she may have been
20 involved, but I think we quickly concluded
21 that she probably was not involved.
22     Q.  Why not?
23     A.  Because of her help in discovering
24 the embezzlement and just her role at the
25 bank, just the overall context of the

Page 90

LISA PAI (7/13/17)

1  information she provided, we did not believe
2  about this time, that she was involved.
3      Q.  Did you at any time believe she was
4  involved?
5      A.  Like I said initially, we were
6  trying to determine how many people were
7  involved and who were involved, so she was in
8  that group of former BankAsiana employees that
9  we had questioned.
10     Q.  If you turn to the next page,
11  there's a paragraph that begins with the words
12  "With the assistance of"?
13     A.  Yes.
14     Q.  And about nine lines down, there's
15  a sentence that the line begins with the words
16  "Also has an interest in the bank"?
17     A.  Yes, I see that.
18     Q.  And then it says -- makes a
19  reference to -- it says "Discussion with
20  Jennie Han, Human Resource Manager, revealed
21  that Karen was a former WB employee, acquired
22  in the Liberty Bank of New York merger in
23  2006.  At that time, Karen left the Bank
24  through a maternity leave under a cloud of

Page 91

LISA PAI (7/13/17)

1  suspicion since she and/or her employees
2  allegedly had several cash shortages, of which
3  $10,000 was the largest"; you see that?
4      A.  Yes.
5      Q.  Did you ever speak directly with
6  Jennie Han yourself?
7      A.  Yes.
8      Q.  Do you remember, did you discuss
9  this subject with her?
10     A.  Yes.
11     Q.  What did she tell you?
12     A.  So she explained to me what she
13  knew about this incident and I think she told
14  me that the bank, Wilshire Bank at that time
15  didn't have enough information to actually
16  charge her of any embezzlement at that time.
17  The only thing that led to the suspicion was
18  because she had -- I think it was about $4,000
19  of cash in her purse, when all of the tellers
20  were questioned and their purses and other
21  personal belongings inspected, but that Karen
22  had explained that her $4,000 cash was from a
23  Korean Kae, K-A-E.  It's a Korean sort of
24  personal loan scheme, not necessarily scheme

Page 92

LISA PAI (7/13/17)

1  in a bad sense, but that a lot of Koreans are
2  involved in, especially if they do business
3  and so there wasn't enough information to give
4  her any kind of notice, so that was Jennie's
5  recollection.
6      Q.  And did she also tell you that was
7  her last day at the bank, Karen's last day at
8  the bank that that was discovered?
9      A.  What I recall Jennie telling me is
10  that even though she couldn't be charged with
11  this teller shortage of ten thousand, but
12  because Wilshire Bank was acquiring Liberty
13  Bank branch at the time in connection with the
14  merger, Wilshire had a right to select which
15  employees to continue to hire basically,
16  because it was a branch acquisition, there was
17  no obligation to hire all employees of former
18  Liberty Bank, that Karen was not given an
19  opportunity to work for Wilshire Bank.
20     Q.  Is that because Wilshire Bank
21  suspected Karen of possibly having been
22  involved in embezzlement?
23     A.  Well, because she was one of the
24  potential suspects for the shortage and yes,

Page 93

LISA PAI (7/13/17)

1  that the fact that we discovered, Wilshire
2  Bank discovered four thousand in her purse was
3  one of the factors that they used in not
4  making her an offer.
5      Q.  So at the time that you received
6  this memo from Orest Hamersky and the memo is
7  dated February 5, 2014, you can see that on
8  the front page?
9      A.  Yes.
10     Q.  Did you receive it prior to that
11  date?
12     A.  Did I receive this information
13  prior to that date?
14     Q.  Yes.
15     A.  I don't remember the specific day.
16     Q.  Do you remember if you got e-mail
17  or other reports while this investigation was
18  being conducted?
19         MR. YI:  Objection to form.
20     A.  That I don't remember.  This is one
21  of the background information about Karen.
22     Q.  So you believed you would have
23  received this either on February 25th or
24  shortly thereafter?

Page 94

LISA PAI (7/13/17)

MR. YI:  Objection to form; asked
and answered.

A.   Again I don't remember exactly what
date I received this particular information
during the investigation.

Q.   In any event, you learned that
Karen had been suspected of embezzlement while
she was at Liberty Bank, correct?

MR. YI:  Objection to form.

A.   The only problem I have with that
statement is being suspected of embezzlement,
it sounds a bit strong, because yes, we found
$4,000 in her purse.  The other employees
didn't have that much cash, but $4,000 is much
shorter than $10,000 that was short that day,
so like I said, it was one of the factors that
was -- that I heard that Wilshire used to
decide to not make her an offer, so whether
she was suspected of embezzlement, I don't
know that I would be able to say that.

Q.   Well, the memo says -- from
Mr. Hamersky, refers to "cloud of suspicion";
you see that?

A.   Yes.

Page 95

LISA PAI (7/13/17)

Q.   And then it says there were not
just one, but several cash shortages of which
$10,000 was the largest, right?

A.   Oh, I see that.

Q.   This actual version of this report
doesn't say anything about $4,000 in her purse
on the last day, does it?

A.   No, but that's what I recall.  I
recall it wasn't ten thousand.  I recall it
was four thousand.

Q.   Now, in this report from
Mr. Hamersky ends well towards the end of it
on page 4, page WB800, third paragraph, first
sentence, says "In conclusion, the
embezzlement was a well-conceived plan to
defraud the bank, regardless of whether James
was involved"; do you see that?

A.   Yes, I see that.

Q.   Would you agree with me that this
report makes no conclusions about whether
James Ryu was involved in the embezzlement?

A.   He used the term "in conclusion,"
but this was an internal audit report that
started the investigation.  It's not a

Page 96

LISA PAI (7/13/17)

conclusion of the investigation.

Q.   Agreed.

A.   So I think he means in conclusion
of his memo.

Q.   So this is a report or memo or a
report, correct?

A.   Yes, it's his report.

Q.   So this report, we'll look at a
later one, takes no position on whether James
was involved in the embezzlement; is that
correct?

A.   Yes.

(Whereupon, at this time, a short
break was taken.)

BY MR. HARVEY:

Q.   I believe you just testified that
the report that we looked at, the one that was
marked as Ryu-12 does not reach any other --
make any conclusion that James Ryu was
involved in the embezzlement; is that correct?

A.   Yes.

Q.   Did Mr. Hamersky ever make such a
conclusion?

A.   I don't know that it was his role

Page 97

LISA PAI (7/13/17)

to make such conclusion.

Q.   Do you understand the question; did
he ever make such a conclusion?

A.   I don't remember if he did.  I mean
he used terms like in conclusion quite a bit.

Q.   Do you remember whether -- do you
know whether Mr. Hamersky ever made a
conclusion that James Ryu was involved in the
embezzlement?

A.   Like I said, I don't know that it
was his role to make that kind of conclusion.
His job was to help identify facts as an
internal auditor and to help work with Alicia
to review the transactions and make sure that
it made sense that we come up with correct
amount of loss which changed from the initial
amount and because he originally thought that
some of the accounts, some of the transactions
should be included, but then he later thought
that they should not be.

Q.   So he did not make such a
conclusion therefore?

MR. YI:  Objection to form.

Q.   Right, he did not include --

LISA PAI (7/13/17)

1  
2     MR. YI:  Asked and answered.
3     Q.  -- a conclusion about whether James
4  Ryu was involved in the embezzlement
5  apparently because it wasn't his role to make
6  such a conclusion, correct?
7     A.  I don't recall if he made those
8  conclusions from his perspective.
9     Q.  So he may have, he may not have,
10  you just don't know?
11     A.  That's right.  If you show me some
12  documents, then maybe I can answer your
13  questions.
14     Q.  Well, we -- okay.  We'll look at
15  the next one.  I'm just asking right now just
16  off the top of your head, he clearly didn't
17  make the conclusion in here, you don't know
18  whether he made the conclusion either in
19  another document or in any other context,
20  correct?
21     MR. YI:  Objection to form.
22     A.  Correct.
23     Q.  Do you know whether anyone else
24  made that conclusion?
25     A.  No.  Like I said, our investigation

LISA PAI (7/13/17)

1  
2  is still pending.  We're still in discovery,
3  so we're not in a position to make a final
4  conclusion.
5     Q.  About whether James was involved in
6  the embezzlement; is that correct?
7     A.  That's right.
8     Q.  Did anybody make any preliminary
9  conclusions prior to filing the lawsuit?
10     MR. YI:  Objection to form.
11     A.  Prior to filing the lawsuit, yes,
12  we definitely had high suspicion that he was
13  involved.  He was implicated by Karen.
14     Q.  Well, you filed a lawsuit in
15  federal court saying that he did it, that he
16  was involved, correct; you, the bank?
17     A.  Yes, we filed a complaint.
18     Q.  And that complaint said he did it,
19  right?
20     A.  That we believed he did it, yes.
21     Q.  It didn't say we believe he did it;
22  it said he did it?
23     MR. YI:  Objection to form.
24     Q.  It said he conspired, participated
25  and was part of the embezzlement, right?

LISA PAI (7/13/17)

1  
2     MR. YI:  Objection to form.
3     A.  Okay.  I mean I think the complaint
4  speaks for itself.
5     Q.  Well....
6     MR. HARVEY:  Please mark this.
7     (Ryu Exhibit 18, Complaint was
8  marked for identification, as of this
9  date.)
10  BY MR. HARVEY:
11     Q.  Ms. Pai, the court reporter handed
12  you what's been marked as Ryu-18.  It is a
13  35-page document and you can see that it
14  appears to be the Complaint that Wilshire Bank
15  filed against Mr. Ryu, Ms. Chon and others,
16  March the 19th, 2014?
17     A.  Yes.
18     Q.  You reviewed this before it was
19  filed, correct?
20     A.  Yes.
21     Q.  And if you look at paragraph 20, on
22  page 4, I don't need you to read it aloud, as
23  you say, it speaks for itself, but here it's
24  clearly saying that the bank discovered that
25  Ryu conspired and engaged in a fraudulent

LISA PAI (7/13/17)

1  
2  scheme and aided and abetted Chon in the
3  removal of sums of cash from the vault in the
4  concealment of such theft, among other things,
5  that's what it says, right?
6     A.  Yes.
7     MR. YI:  Objection to form.
8     Q.  Now, prior to making that
9  accusation, did the bank reach a conclusion
10  that he had, in fact, done that?
11     A.  Yes.
12     Q.  And who at the bank reached that
13  conclusion?
14     A.  I among others, yes.
15     Q.  Who were the others?
16     A.  Everyone that was -- let me take
17  that back.  The senior management that was
18  involved in this investigation.
19     Q.  And who was that other than you?
20     A.  Alicia Lee and, well, Elaine Jeon
21  and myself were senior management.  Alicia is
22  not necessarily.
23     Q.  So you and Elaine Jeon made the
24  conclusion that he had done that as alleged in
25  paragraph 20 and elsewhere?

Page 102

LISA PAI (7/13/17)

1
2   A.  Yes, I guess we could say that.
3   Q.  Was there anybody else that reached
4   that conclusion?
5   A.  Well, I think we reported it to
6   Mr. Yoo, but it was primarily my job to gather
7   all of the information we had received by then
8   and discuss it with our outside counsel.
9   Q.  Okay.  And in terms of internal
10  reports on this subject, is there anything
11  other than the reports of Mr. Hamersky's
12  reports on the evidence that you had gathered?
13  A.  Written reports?
14      MR. YI:  Objection to form.
15  Q.  Yes.
16  A.  Other than various e-mails, no, I
17  can't recall a written report.
18  Q.  So you can't recall any written
19  reports other than Mr. Hamersky's reports, am
20  I correct?
21      MR. YI:  Objection to form.
22  A.  Yes.
23  Q.  Did anyone participate in the
24  investigation with you other than Ms. Jeon?
25  A.  So for the transaction review, it

Page 103

LISA PAI (7/13/17)

1
2   was Orest and Alicia.  For interviewing
3   various employees, it was myself and outside
4   counsel.  And for reviewing computer content,
5   it was outside consultant CLA.  I think that
6   was pretty much the groups that were involved
7   in the initial investigations.
8   Q.  So you said CLA was responsible for
9   the computers, correct?
10  A.  Review.
11  Q.  You and Mr. Yoo were responsible
12  for interviewing the witnesses, correct?
13  A.  Yes.
14  Q.  Alicia was responsible for what?
15  A.  For reviewing transactions,
16  customer transactions.
17  Q.  And that was with Hamersky?
18  A.  With Hamersky.  And I guess they
19  would have interviewed employees for the
20  purpose of trying to understand the
21  transactions.
22  Q.  Was there anyone else involved in
23  the investigation other than the people you
24  just mentioned?  I mean obviously they
25  interviewed people.  I'm not referring to the

Page 104

LISA PAI (7/13/17)

1
2   people that they interviewed, but the people
3   assisting you in this investigation?
4   A.  That's all I can recall right now.
5   Q.  And did CLA ever prepare a report
6   for you?
7   A.  No, we had discussions about some
8   of their findings, but not a final kind of
9   report in written form.
10  Q.  Which witnesses did you interview?
11  A.  So I interviewed Karen Chon, James
12  Ryu, Irene, Irene Lee, Jessica Lee.  I think I
13  spoke with Eunmoo Choi.  Did I say Bo-Young
14  Lee?  And I spoke with former CFO Frank
15  Gleason.  That's what I recall right now.
16  Q.  Did you make notes during these
17  meetings, these interviews?
18  A.  Some of them I did, yes.
19  Q.  Have those been produced?
20  A.  I believe so.
21  Q.  Okay.  Now you can put that down
22  for just a second, the document we just looked
23  at, and I'd like you now to take a look at
24  what's been marked as Ryu-13.
25      Now, please take a moment to take a

Page 105

LISA PAI (7/13/17)

1
2   look at this document, which has the Bates No.
3   WB810 through '817.  My first question is
4   going to be do you recognize it?
5   A.  Yes.
6   Q.  And what is it?
7   A.  It's an updated internal audit
8   report by Orest Hamersky dated March 28, 2014.
9   Q.  And you received it sometime after
10  that date you believe?
11  A.  Yes.
12  Q.  And can you tell me whether
13  Mr. Hamersky reaches any conclusion in here
14  about James' involvement and I'm going to
15  refer you to page 7, WB816, beginning of the
16  -- it's the paragraph that begins with the
17  words "in conclusion"?
18  A.  I don't see a mention of James
19  Ryu's name on this paragraph.  Oh, he does
20  mention his name in the last sentence on
21  page 7, that states information from JPMorgan
22  Chase account should be interesting since the
23  following parties deposited and/or wrote
24  significant checks drawn on that bank and that
25  includes James as well as Karen.

27

Page 106

LISA PAI (7/13/17)

1
2    Q.  I see that.
3    A.  I don't seem to find any other
4  reference to James in this paragraph.
5    Q.  Would you agree with me that it
6  doesn't reach any conclusion, not in this
7  report, Mr. Hamersky doesn't reach any
8  conclusion about Mr. Ryu's involvement?
9    A.  That's right.
10   Q.  And if you would look, you'll see
11 that this paragraph is not the same as, but
12 it's clearly based upon corresponding
13 paragraph in the prior report by Mr. Hamersky,
14 which is Ryu-12, the one that begins as well
15 "in conclusion"; do you see that?
16   A.  Yes.
17   Q.  So if you look at page 4 of Ryu-12
18 and compare it to page 7 of Ryu-13, you'll see
19 that in Ryu-12, it says "In conclusion, the
20 embezzlement was a well-conceived plan to
21 defraud the bank regardless of whether James
22 was involved" and that corresponding paragraph
23 in Ryu-13 says, "In conclusion, that
24 embezzlement was a well-conceived plan to
25 defraud the bank performed by the operations

Page 107

LISA PAI (7/13/17)

1
2  officer"; do you see that?
3    A.  Yes, I see that.
4    Q.  Did you understand Mr. Hamersky was
5  reporting to you that he didn't have any
6  evidence that James Ryu was involved in the
7  embezzlement?
8    MR. YI:  Objection to form.
9    A.  You mean because of those two
10 sentences?
11   Q.  Yes.
12   A.  Oh, no, not at all.  I had asked
13 him to look into -- between the first version
14 and the second version, I had asked him to
15 look into the CLO Riverside loan that I
16 suspected that James may have been involved
17 in, because that's the loan that Michael Kim
18 was involved in and that's the fraudulent loan
19 that Michael Kim was involved in and in terms
20 of timing, that occurred right at the end of
21 year 2010 and year 2010 is when James was
22 having a lot of financial difficulties and you
23 know, loans take a while to book, so this loan
24 would have started, I don't know, two, three
25 months, possibly even longer before, so

Page 108

LISA PAI (7/13/17)

1
2  towards the end of the year 2010.
3    So basically I wanted Orest to kind
4  of expand transaction review into these loans
5  and not just the deposit accounts that Karen
6  had manipulated.  So maybe that's why he took
7  out that reference to regardless of whether
8  James was involved, because he's listing here
9  James as one of the persons that we need to
10 look further into.
11   Q.  Does he say that?
12   MR. YI:  Objection to form.
13   A.  No, I'm just explaining my
14 understanding of the difference of two
15 sentences, difference in the two sentences,
16 and I'm trying to answer why I don't think
17 that means -- the difference means that Orest
18 concluded that James was not involved.
19   Q.  Okay.  Did you ever talk with
20 Mr. Hamersky in which he told you that he
21 thought James was involved?
22   A.  I'm sorry, can you repeat that
23 question.
24   Q.  Did Mr. Hamersky ever tell you that
25 he thought James was involved in the

Page 109

LISA PAI (7/13/17)

1
2  embezzlement?
3    A.  You know, I don't -- that wasn't
4  his role.  His role was to investigate
5  transactions and provide facts so that we can
6  -- so that I can discuss them with outside
7  counsel, whether from time to time, he leads
8  to certain conclusions, that's something I may
9  consider, but he doesn't have that role, but
10 did I ask him to look into the loans because
11 that's what he's good at looking at,
12 transactions, and looking at the details and
13 showing us, you know, the details of that
14 might be helpful in our investigation.
15   Q.  So to be clear, he never told
16 you -- but we don't need to go through this,
17 we did this earlier.  I had forgotten.  I had
18 asked you that question.  Previously we agreed
19 Mr. Hamersky never told you that because you
20 said that wasn't his role, so moving on.
21   MR. YI:  Objection to form.
22   Q.  Do you -- did they ever -- did they
23 ever get to the bottom of those loans?
24   MR. YI:  Objection to form.
25   A.  So we did find -- I did find more

Page 110

LISA PAI (7/13/17)

1
2  information, whether it came from Orest or
3  other persons, I don't recall.  I think they
4  -- he did find some additional information
5  that was helpful to me regarding Clear
6  Riverside loan and the fact that there were
7  forgeries.  I think he's the one that helped
8  discover that, that there were forgeries by
9  bank employees, potentially forgeries by bank
10  employees in getting that loan approved.
11       Q.  Who were those bank employees who
12  engaged in forgeries?
13       A.  Well, we're not at --
14       MR. YI:  Objection to form.
15       A.  I think we're not at a point in our
16  investigation for me to be able to answer that
17  to you specifically, but we're in the process
18  of discovery.
19       Q.  Do you know, do you have suspicions
20  as to who they were?
21       A.  Well, I think that James may have
22  been involved because of the timing of the
23  loan, because of the fact that Michael Kim had
24  given him a personal loan just before, I think
25  within six months of this loan being booked

Page 111

LISA PAI (7/13/17)

1
2  and I think some of the transactions were loan
3  transactions, were posted subsequently by I
4  think both Karen and former CFO, I forget his
5  name.
6       Q.  Frank Gleason?
7       A.  Frank Gleason, which appear to be
8  unusual to me that they would be posting
9  principal paydowns or loan payments by this
10  borrower, that's out of the ordinary and
11  because those two are employees that James was
12  involved in either through the embezzlement or
13  who was giving -- doing personal favors for
14  James, that's....
15       Q.  So to be clear, you think -- you
16  believe that there was some forgeries by some
17  bank employees and some of those forgeries may
18  have involved James, right?
19       MR. YI:  Objection to form.
20       A.  May have, yes.
21       Q.  Do you have the documents on that
22  somewhere in your possession such as your
23  office or your computer?
24       A.  We're still conducting discovery,
25  but....

Page 112

LISA PAI (7/13/17)

1
2       Q.  Who's conducting the discovery?
3       A.  Well, I think a lot of it will have
4  been done through future depositions of
5  Michael Kim and possibly other employees that
6  were involved in that loan.
7       Q.  Are you referring to depositions in
8  this case?
9       A.  Sure.
10       Q.  Have you produced any documents on
11  this?  Has the bank produced any documents
12  about this?
13       MR. YI:  Objection to form.
14       A.  I don't recall.  Well, this
15  document refers to Clear Riverside loan as
16  being one of the suspicious transactions, so
17  this is one document that refers to it.
18       Q.  So there were some -- you believe
19  there were some forged transactions; how many
20  of these transactions were there?
21       MR. YI:  Objection to form.
22       A.  My recollection is Clear Riverside
23  and Michael Kim.  Michael Kim was one of the
24  principals of Clear Riverside.  He had
25  multiple entities who had multiple loans from

Page 113

LISA PAI (7/13/17)

1
2  the bank and the largest loan, SBA loan in
3  excess of a million dollars was obtained
4  fraudulently because the down payment for the
5  purchase, the supposed down payment from the
6  purchase was not actually made, but the down
7  payment was documented as having been made out
8  of deposit account that was at BankAsiana.
9       So the bank was in a position to
10  know and verify whether or not that down
11  payment was made, but they did not and I
12  suspect that the bank knew that it was not
13  made, but documented as if it was made, so
14  that they can get this loan booked and
15  eventually when the loan went into default, we
16  were unable to get the SBA, U.S. SBA to pay
17  the guarantee portions.
18       So the bank, Wilshire Bank incurred
19  additional losses and that's something that
20  after further discovery, we may potentially
21  increase damages.
22       Q.  What was the amount of the loss?
23       A.  I think almost the full amount was
24  charged off.
25       Q.  A million dollars?

LISA PAI (7/13/17)

1
2    A.  Yes.
3    Q.  And the -- when was that loan taken
4    out?
5    A.  My recollection is around
6    December 2010.
7    Q.  What was the amount of the down
8    payment that was not made?
9    A.  That I don't recall.
10   Q.  Do you have the documentation on
11   this in your office?
12   A.  I think the special assets
13   department probably has the loan files on that
14   loan.
15   Q.  You're working with outside
16   counsel, Mr. Yi, on this matter, on this
17   subject?
18   A.  Well, it was included.  It was a
19   transaction that I had asked Orest to look
20   into initially and actually it's one of the --
21   one of the transactions that we need to look
22   further into.  I think we got sidetracked a
23   little bit because Michael Kim filed
24   bankruptcy and so on and so forth, so -- and
25   that part, our outside counsel on this case

LISA PAI (7/13/17)

1
2    was not involved in.
3    Q.  Do you have onsite counsel engaged
4    in that?
5    A.  In the collection matter against
6    Michael Kim?
7    Q.  Yes.
8    A.  Yes.
9    Q.  Who is that?
10   A.  I don't recall his name.
11   Q.  Who's the person most knowledgeable
12   at the bank about this alleged transaction
13   with Cleo and forged signatures?
14   MR. YI:  Objection to form.
15   A.  Probably someone in the special
16   assets.
17   Q.  Do you know who that would be?
18   A.  Because we had mergers since this,
19   I'd have to go back and figure out who that
20   is.
21   Q.  Who's in charge of special assets?
22   A.  Currently, Andrew Park, but he is
23   from former BBCN Bank, so he would not have
24   been involved and may not know about this
25   transaction.

LISA PAI (7/13/17)

1
2    Q.  Have you interviewed any former
3    BankAsiana employees about this?
4    A.  I'm sorry, ask that again.
5    Q.  Have you interviewed any former
6    BankAsiana employees about this?
7    A.  I may have asked questions about
8    Michael Kim to some of the people I
9    interviewed.  I don't recall if I asked Karen
10   Chon or James Ryu.  I don't recall at this
11   time.
12   Q.  How many -- is there anyone other
13   than James Ryu that you believe or suspect was
14   involved in forgeries?
15   A.  With respect to this loan?
16   Q.  Yes.
17   A.  Yes, the loans from -- processed by
18   loan officers and possibly approved by
19   management and/or directors, loan committee,
20   but I don't -- I don't suspect the management
21   or loan, you know, directors, loan committee
22   members.  It's possible that some of the loan
23   officers may have been involved, but a lot of
24   times they're just doing underwriting and they
25   don't really know the principals behind these

LISA PAI (7/13/17)

1
2    businesses or loans.  Right now, my suspicion
3    is James Ryu, because he had that personal
4    lending relationship with Michael Kim.
5    Q.  Anyone else you suspect?
6    A.  Not at this time.  I think I told
7    you about some of the transactions being
8    posted by Karen as well as Frank Gleason, so
9    those are the two people that may or may not
10   are been involved in the fraud, but may have
11   been told by James to post certain
12   transactions so.
13   Q.  How many forgeries were there?
14   A.  Well, one.  I'm just referring to
15   the large SBA loan when I mentioned forgery.
16   Q.  And was there one signature on
17   there that was forged, multiple signatures
18   that were forged; do you know?
19   A.  It's not a signature forgery like
20   in a check deposit context.  When I mean a
21   forgery, I mean they basically lied about the
22   down payment being made and may have inflated
23   the purchase price, so they, being the
24   borrower and/or whoever is inside at the bank,
25   knowledgeable about the borrower.

Page 118

LISA PAI (7/13/17)

1          LISA PAI (7/13/17)
2      Q.  I see.  So the forgery wasn't a
3  signature; it was false information about the
4  amount of the down payment?
5      A.  Yes, fraudulent loan might be a
6  better description.
7      Q.  So what was the amount of the
8  purported amount of the down payment?
9      A.  I don't recall.
10     Q.  And was there -- and so the loan
11 was taken upon the pretext that a down payment
12 had been made and that down payment will not
13 been made and someone in the bank,
14 specifically Mr. Ryu you believe knew that; do
15 I understand correctly?
16     A.  Yes.
17     Q.  Is there anything else to that
18 transaction?  I think I summarized what would
19 be wrong with that; is there something else
20 that was done that was wrong that you believe
21 other than what you just described?
22     A.  Yes.  What I recall is the loan
23 that was made, the SBA loan that was
24 fraudulently obtained from the bank was used
25 to pay off another existing loan under which

Page 119

LISA PAI (7/13/17)

1          LISA PAI (7/13/17)
2  Michael Kim was obligated to the bank and
3  possibly others at the bank, that were -- that
4  had invested in the original business so.
5      Q.  What business?
6      A.  So the loan was obtained to
7  purchase a business.  I think it was a large
8  hair salon, kind of high end hair salon
9  business and my vague recollection is that the
10 original loan, original business -- the
11 business that was being sold to a new group,
12 supposedly being sold to a new group wasn't
13 necessarily generating enough business to be
14 able to be sold for such a larger amount, but
15 I think it was fraudulently set up, this
16 purchase, kind of a bogus purchase was set up
17 in order to get a larger loan from the bank to
18 pay off original loans, so that Michael Kim,
19 among others, could be -- could recoup the
20 original investment and later the loss was
21 borne by BankAsiana, which was acquired by
22 Wilshire Bank.
23     Q.  If I understand correctly then, the
24 loan that you talked about earlier that was an
25 SBA loan, that was where there was -- down

Page 120

LISA PAI (7/13/17)

1          LISA PAI (7/13/17)
2  payment wasn't made, right, that loan was used
3  to pay off another loan, correct?
4      A.  Yes.
5      Q.  And the amount of -- are you saying
6  that the amount of the loan, the SBA loan, the
7  one forged, that there was no proper down
8  payment, that the amount of the loan was
9  inflated?
10     A.  Yes, that would be part of the
11 fraudulent scheme.
12     Q.  Right.  And that it was inflated
13 because the business, the loan for which it
14 was being paid, used to payoff the business
15 underlying that was the cash, the bill to
16 generate revenue was being inflated?
17     A.  Right.
18     Q.  And was there anything else
19 improper or allegedly improper about that
20 other than that those two aspects of it, that
21 it was being used to payoff another debt, that
22 it was improperly inflated and that the down
23 payment wasn't actually made?
24     MR. YI:  Objection to form.
25     A.  Right, and then the other unusual

Page 121

LISA PAI (7/13/17)

1          LISA PAI (7/13/17)
2  aspects were Karen posting some of the loan
3  payments and Frank Gleason posting some of the
4  loan payments and I think James Ryu also may
5  have made some of the loan payments.
6      Q.  Why would that be unusual?
7      A.  Because loan payments are normally
8  posted through the note department or loan
9  officers or branch managers that make the
10 loan, not head office or James and Frank being
11 head office people or operations officer.
12 These involved with deposits, not with the
13 loan side.
14     Q.  Is there anything else that's
15 allegedly improper about this other than the
16 amounts of the deposit that James, Karen and
17 Frank Gleason posted payments that the amount
18 of the down payment was not made and that the
19 -- it was -- being that the purpose for which
20 it was being used was being inflated?
21     MR. YI:  Objection to form.
22     A.  Right, and then the fact that James
23 had a prior relationship with Michael Kim
24 lending -- personal lending relationship.
25     Q.  And through one call to the head of

Page 122

LISA PAI (7/13/17)

1
2    special assets, you could figure out who would
3    be the person who would be the most
4    knowledgeable about this particular
5    transaction; isn't that right?
6         MR. YI:  Objection to form.
7         A.  Yes.
8         (Ryu Exhibit 19, Plaintiff
9         Wilshire Bank's Responses and
10        Objections to Defendant Suk Joon Ryu's
11        Fourth Set of Interrogatories was
12        marked for identification, as of this
13        date.)
14   BY MR. HARVEY:
15        Q.  Have you had a chance to look at
16   this Ryu-19?
17        A.  Yes.
18        Q.  It's Wilshire Bank's Responses to
19   Defendant's Fourth Set of Interrogatories and
20   it was served on or about May the 12, 2016;
21   you see that?
22        A.  Yes.
23        Q.  And have you ever seen it before?
24        A.  I believe so.
25        Q.  And can you please look at the

Page 123

LISA PAI (7/13/17)

1
2    response to interrogatory No. 3?
3         A.  Yes.
4         Q.  Now, that interrogatory asked for
5    the factual basis for the allegation in
6    paragraph 20 that we looked at just a few
7    minutes ago; do you remember looking at
8    paragraph 20 a few minutes ago?
9         A.  Yes.
10        Q.  And would you -- I mean obviously
11   this says that the Wilshire Bank's basis for
12   that allegation was Karen Chon's statements,
13   right?
14        A.  Yes.
15        Q.  So in other words, the time that
16   the bank filed a Complaint, the evidence that
17   it had that James Ryu was engaged in these
18   acts, this conspiring with Chon to perpetrate
19   the embezzlement and aiding and abetting her
20   was the fact that she had actually said that
21   he had participated with her, right?
22        A.  That's right.
23        Q.  And the bank had no other -- what
24   I'll call direct evidence, in other words, we
25   talked earlier about a broad -- you said

Page 124

LISA PAI (7/13/17)

1
2    there's evidence about why he may have done
3    it, there's no other evidence that he actually
4    did do it other than Karen Chon's word?
5         MR. YI:  Objection to form.
6         A.  Okay.
7         Q.  Right?  You understand that right?
8         A.  I know we had some discussions
9    about direct evidence, yeah, so with the --
10   with my understanding of what you mean by
11   direct evidence, yes.
12        Q.  Let's be real clear about this, so
13   there's no misunderstanding.  We earlier had a
14   long discussion, if you will, about evidence
15   proof and we came to the, I think,
16   acknowledgment by you as the witness here that
17   you had evidence that James Ryu had financial
18   problems and had done certain things in the
19   past, which made you suspicious of him as a
20   person, but the evidence that you had that he
21   was actually involved in the embezzlement,
22   actually engaged in this embezzlement was
23   limited to the word of Karen Chon that he
24   did --
25        MR. YI:  Objection to form.

Page 125

LISA PAI (7/13/17)

1
2         A.  Right.  Her statements and my
3    interview of her and my interview of James Ryu
4    and others, between the time we found out
5    about the embezzlement and the time we filed
6    the Complaint.
7         Q.  So essentially as for what we're
8    calling direct evidence here, it was the word
9    of Karen Chon, right?
10        A.  Primarily, yes.
11        Q.  Well, primarily, is there anything
12   else, direct evidence that he engaged in the
13   embezzlement as opposed to evidence that he
14   may have had a motive to do so?
15        MR. YI:  Objection to form.
16        Q.  Was there anything else?
17        A.  Well, her explanation to me of what
18   happened and his statements or the impressions
19   that I received when I spoke with him, yes.
20        Q.  What was it that he said to you
21   that -- did he say something to you that you
22   thought suggested that he had engaged in this?
23        A.  Well, I mean what he said was he
24   denied it of course, but his body language I
25   felt was not reflective of somebody that would

LISA PAI (7/13/17)

1  have been really innocent.  He seemed very
2  jittery and, you know, that was the first,
3  that was the impression I got.  He seemed to
4  me like he was lying and she seemed to me like
5  she was telling the truth, because -- and just
6  based on my discussions with other employees,
7  he was always very -- he was No. 2 person at
8  the bank and very intimidating, would yell at
9  employees, so they -- some of the employees
10 thought that he would be the last person that
11 she would implicate unless she really --
12 unless that's really what happened because of
13 course, I'm, you know, interviewing the two
14 people and interviewing other employees, I
15 have to think about who do I believe, because
16 it's he said versus she said or she said
17 versus he said.  But based on his role at the
18 bank and then his position also and the amount
19 that was supposedly taken.  Based on all that,
20 I thought she was much more believable than he
21 was.
22    Q.  Okay.  So you believed her and not
23 him obviously?
24    A.  Yes.

LISA PAI (7/13/17)

1     Q.  And did you consult with anyone
2  else as to that decision about who to believe,
3  him or her?
4     A.  I think I discussed it with our
5  outside counsel.
6     Q.  Did you discuss it with anyone
7  else?
8     A.  Yes.  Like I said, I asked some
9  employees whether they thought what they
10 thought about her implicating James Ryu and
11 probably discussed it with senior officers at
12 Wilshire Bank about my conclusions.
13    Q.  So just -- so one of the things --
14 reasons you believed her, not him, was because
15 of James' body language when you talked to
16 him, right?
17    MR. YI:  Objection to form.
18    A.  That's one the factors, sure.
19    Q.  And then you also asked employees
20 what they thought about her implementing him,
21 right, that was another factor that convinced
22 you to believe her, not him, correct?
23    MR. YI:  Objection to form.
24    I think you meant implicate.

LISA PAI (7/13/17)

1     MR. HARVEY:  I'm sorry, I meant to
2  say implicate.  Let me ask it again.
3     Q.  Another factor other than body
4  language was based on your interviews of
5  employees about what they thought about her
6  implication of James Ryu, correct?
7     A.  Correct.
8     Q.  And then a third one, you say you
9  may have discussed it with senior bank
10 officers, right?
11    A.  Sure.
12    Q.  And then finally, if I might
13 summarize his role at the bank and background
14 and that type of information, that also led
15 you to believe her and not him, right?
16    MR. YI:  Objection to form.
17    A.  That's right.  I basically
18 concluded that based on all of that
19 information and based on my discussions with
20 other employees, that unless it was true, he
21 would be the last person that she would
22 implicate because she was basically
23 intimidated by him and he was far superior
24 position at the bank.

LISA PAI (7/13/17)

1     Q.  So I just wanted to make sure I had
2  a complete list of the things that you had
3  focused on in your decision to believe her and
4  not him; is there anything else?  Did I miss
5  -- was there anything else that convinced you
6  that it was her, not him, other than the
7  things I just listed which is the summary of
8  what you previously told me?
9     MR. YI:  Objection to form.
10    I think she's spent a great deal
11    of time earlier talking about all the
12    different things.
13    A.  Yes, and only --
14    Q.  Let's be clear, I'm not interested
15 -- you previously had said all kinds of
16 information you had about why he may have done
17 it.  So would it be fair to say then to add to
18 this list, you had some concerns he might have
19 had a motive to do it because he had financial
20 difficulties and he had a lending relationship
21 with Michael Kim and all the things
22 essentially would be, if you'd agree with me,
23 evidence of motive?
24    MR. YI:  Objection to form.

Page 130

LISA PAI (7/13/17)

1
2    Q.  Do I understand correctly?
3    A.  Yes, and the only thing I would add
4  is, you know, it's been a long time, so if
5  you're saying are those the only things that
6  led to my conclusion, to the best of my
7  recollection now.
8    Q.  Of course, understandable.
9    So let's just -- let's talk about
10  the body language.  You interviewed James Ryu
11  how many times?
12    A.  I think I meet with him once.
13    Q.  And can you tell me everything you
14  can recall about that interview?
15    MR. YI:  Objection to form.
16    A.  I think I was in that meeting with
17  our outside counsel, my recollection, like I
18  said earlier, he was very jittery and
19  basically said that she had acted alone, that
20  he was not involved, but said something like
21  he might help her financially to pay back the
22  bank if she tells the truth and clears up his
23  name or something to that effect.  Which I
24  thought was kind of odd coming from somebody
25  who claims to be falsely accused of being

Page 131

LISA PAI (7/13/17)

1
2  involved in a very large embezzlement.  But he
3  said that he kind of felt sorry for her and
4  that's how he explained why he would even
5  consider helping her financially to repay the
6  bank and he claimed that she had tried to
7  contact him and that they had met I think once
8  or twice and that he had made a recording of
9  some statement that Karen had made that clears
10  up his role that he was not involved.
11    But we had also heard Karen's
12  version of that meeting or meeting or
13  conversation with James and of course, she --
14  her perspective was very different.
15    Q.  In deciding to accept her word, did
16  you consider that she may have embezzled on a
17  prior occasion?
18    A.  I think when I spoke with her, when
19  I met with her initially, I'm trying to recall
20  the timeline, I'm not sure if I was aware of
21  that at that time or if I discovered it
22  subsequently, but at least even if it was
23  subsequently, I think her prior suspicions or
24  cloud of suspicions as Orest would put it was
25  at a much smaller dollar amount and I think

Page 132

LISA PAI (7/13/17)

1
2  she herself said that James had discovered
3  that she was involved in manipulating
4  accounts, but it was her husband's partners'
5  account and it was her sister-in-law's
6  account, so she kept it at a family or close
7  level as opposed to touching just some random
8  customer accounts.  And so I think there were
9  significant differences.
10    And my focus was would she embezzle
11  up to 1.2, 1.4, $1.6 million by herself in her
12  position as a branch operations officer, that
13  and -- that was kind of the way I asked other
14  employees as well because they knew her better
15  and they knew James and my conclusion was that
16  even with some past cloud of suspicion and
17  possibly a smaller amount incident involving
18  smaller amounts, that she would not be able
19  to, you know, do this type of embezzlement on
20  her own.
21    Q.  So you do know that she has
22  testified that she embezzled the entire amount
23  on her own and claimed that she gave some of
24  it to James Ryu; you know that?
25    MR. YI:  Objection to form.

Page 133

LISA PAI (7/13/17)

1
2    A.  Yes, she told me that she felt
3  coerced and because James had something on
4  her, that she was afraid of James using that
5  information and so it was -- she felt she was
6  blackmailed basically and that she had no
7  choice, but to keep giving him money.  That he
8  started out asking for smaller amounts and
9  then eventually the amounts grew and it never
10  stopped, so I think she actually was relieved
11  to confess finally because she was living with
12  it, you know.
13    Q.  So you found her sympathetic?
14    A.  No, not necessarily.  I didn't
15  really sympathize with her obviously, but
16  having met with her and spoken with her and
17  hearing about her, I felt that it was much
18  more likely that James would have been
19  involved.  James really knew operations very
20  well.  He knew BSA very well.  He some -- so
21  she was much more believable and I didn't
22  actually -- there were a couple other things,
23  now I remember, that also helped me lead to my
24  conclusion.  And again, the timing of it is
25  unclear in my mind now, the exact timing of

Page 134

LISA PAI (7/13/17)

1
2  it, but her branch did not have a normal
3  branch manager and I actually was asking her
4  about that because she pretty much had
5  authority that a typical branch manager would
6  have.  She didn't have a superior at that
7  branch.  She pretty much ran the show at that
8  branch and I thought that was suspicious
9  because James is involved.  His role is to
10 hire branch managers and to transfer them as
11 he sees fit and I understood that the branch
12 manager at that branch was, I think, let go,
13 that I'm not sure about, but he never replaced
14 him or her.
15       And the other thing that I thought
16 was suspicious is at the headquarters, someone
17 is in charge of overseeing all the branch
18 deposit operations and that someone was
19 Jessica.  She was told to me that she was very
20 experienced in operations, that James would
21 have relied on to oversee all of the bank's
22 deposit operations, but she also either was
23 let go or felt that she had to leave.
24       I understood that she had a very
25 difficult relationship with James and when

Page 135

LISA PAI (7/13/17)

1
2  somebody that's in charge of deposit
3  operations from the headquarters leaves,
4  normally the COO would replace them because
5  you know, you need to oversee branch officers,
6  especially someone like Karen, but she was not
7  replaced and Irene told me that she had to
8  kind of fill in that role and she said she had
9  no idea what she was doing.  She didn't
10 understand branch operations.  Irene was
11 James' personal assistant, so I thought that
12 was kind of also telling.
13       And when I spoke with Jessica, she
14 told me that when she started at BankAsiana
15 and noticed that Karen Chon was working there,
16 she immediately told James Ryu and Mr. Hur
17 that Karen had some prior history of cloud of
18 suspicion, I guess somehow she had that
19 information.  Oh, I think because maybe
20 Jessica had previously worked at Wilshire Bank
21 also, so she told them, but they just did not
22 want to do anything about Karen.  So that was
23 another factor that I thought was suspicion
24 and really supports the, you know -- my
25 overall conclusion that James must have been

Page 136

LISA PAI (7/13/17)

1
2  was involved, right, because it would make
3  sense.
4        He really understands bank
5  operations.  He's -- like I said, was in
6  charge of a lot of different areas and by
7  keeping the branch pretty much, you know, open
8  for Karen to do whatever she wanted which she
9  did and then no one to oversee and challenge
10 deposit operations at the branch level and he
11 had -- he was the one decision-maker that
12 could have replaced those roles.  I think he
13 intentionally kept them vacant while the bank
14 is being run.  So all of that really supports
15 my conclusion.
16    Q.  Right.  Okay.  So among the facts
17 that -- so.
18        When did you make your final
19 decision that in your mind you were going to
20 accept Karen's word and not James?
21    A.  Well, by the time we filed the
22 Complaint, I pretty much concluded he was
23 involved and as we were gathering more
24 information and we're still gathering
25 information, more and more information, it's

Page 137

LISA PAI (7/13/17)

1
2  like putting pieces of the puzzle together and
3  we're starting to see more and more of the
4  picture of his involvement.
5    Q.  And today you're still convinced
6  that you were right to accept Karen's word?
7    A.  Yes, I believe so.
8        (Whereupon, at this time, a lunch
9  break was taken.)
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

35

Page 138

LISA PAI (7/13/17)

1     A F T E R N O O N   S E S S I O N
2
3
4         (Time noted:  2:31 p.m.)
5
6         (Whereupon, the referred to
7     testimony was read back by the
8     Reporter.)
9  L I S A   P A I, resumed and testified as
10 follows:
11 EXAMINATION BY (Cont'd.)
12 MR. HARVEY:
13     Q.  Earlier in this deposition I asked
14 you whether the bank had made -- I believe I
15 used the word determination that James Ryu had
16 engaged with Karen Chon in this embezzlement
17 and you said that you -- that it hadn't made a
18 final determination yet; do you recall that?
19     A.  Yes.
20     Q.  Can you explain why if the bank
21 hadn't made a final determination at the time
22 it filed the Complaint, why it filed the
23 Complaint?
24     A.  So I think I didn't really
25 understand, fully understand what you mean by

Page 139

LISA PAI (7/13/17)

1  determination.  You know, if you mean did you
2  make a determination before you filed a
3  Complaint, yes, we did.  I think what I'm
4  referring to when I say final determination
5  is, you know, sufficient evidence to prove at
6  trial, so that's kind of what I'm referring
7  to.
8      Q.  Does that mean you had enough --
9  you thought you had enough to go forward with
10 the Complaint, but you didn't know for sure
11 whether you were going to win or not?
12     A.  Well, I thought we had enough to go
13 forward with the Complaint and through
14 investigation through discovery.  We hoped to
15 bolster the evidence or gather enough evidence
16 to be able to win, yes.
17     Q.  To your knowledge, have you
18 gathered that evidence in discovery?
19     A.  We are still gathering and we have
20 more now than when we first started, yes.
21     Q.  What more now do you have since you
22 first started?
23     A.  Better understanding, pretty much
24 all the stuff I've been discussing with you.
25

Page 140

LISA PAI (7/13/17)

1      Q.  Did you tell anyone -- did you tell
2  Jae Whan Yoo that you were going to file the
3  Complaint against James Ryu?
4      A.  Yes, I believe I did.
5      Q.  Did he approve?  What was his role
6  in that decision?
7      A.  Yes.  Well, he -- we don't go
8  through approval kind of consent, type of
9  process, but yes, he agreed that we should
10 file the Complaint.
11     Q.  Did he say why he agreed that you
12 should file the Complaint?
13     A.  Based on my discussions with him at
14 the time of what we knew so far.
15     Q.  And did they know that the only
16 thing that you had that was direct was Karen's
17 word?
18     MR. YI:  Objection to form.
19     A.  I don't know that I discussed it
20 like you said.  He knew that the primary
21 evidence we have is Karen's confession and I
22 discussed all the other information we were
23 able to gather by then.
24     Q.  Did you think that you'd be able to

Page 141

LISA PAI (7/13/17)

1  recover any significant judgment against James
2  Ryu?
3      A.  Yes, I hoped that we would be able
4  to recover a significant judgment against Ryu
5  to the extent that he was involved.
6      Q.  Did you think he had the money to
7  pay a big judgment?
8      A.  Are you asking at the time of the
9  Complaint?
10     Q.  Yes.
11     A.  I didn't know whether he did or not
12 at that time.  I would have -- I think we
13 thought he may have some of the proceeds or
14 whether he had used it up, I don't know.
15     Q.  Did you think about repercussions
16 on him if the allegation turned out to be
17 incorrect?
18     A.  I'm sure we thought about it.
19     Q.  It's a very serious allegation,
20 right, somebody engaged in embezzlement when
21 they're an officer of a bank; you'd agree
22 that's a --
23     A.  Absolutely.
24     Q.  Would you expect that if such an

Page 142

LISA PAI (7/13/17)

1
2 allegation was made against you, you would
3 never again work in the banking or any other
4 industry that required respect or trust?
5          MR. YI:  Objection to form.
6          A.  If I had been involved in an
7 embezzlement like that, then I shouldn't
8 expect to work in banking ever.
9          Q.  If an allegation was wrongly made
10 against a bank officer that they engaged in
11 embezzlement, they would never -- they really
12 would never work again in the industry; do you
13 understand that to be the case?
14          MR. YI:  Objection as to form;
15          calls for speculation.
16          A.  I don't know how to answer that.
17          Q.  Would you ever encourage -- would
18 you ever permit the bank to hire somebody who
19 had been accused of a major embezzlement at
20 another bank?
21          A.  Ask that question again, I'm sorry.
22          Q.  You're head of HR for the bank,
23 would you permit the bank to hire somebody for
24 a senior position or any position who had been
25 accused of a major embezzlement at another

Page 143

LISA PAI (7/13/17)

1
2 bank?
3          A.  I think each case has to be looked
4 at separately.  I don't know that I can make a
5 blanket statement like that.
6          Q.  So you might, you might tell the
7 bank it's okay to hire somebody who had been
8 accused of a serious embezzlement at another
9 bank; is that right?
10          MR. YI:  Objection to form; again
11          calls for speculation.
12          A.  Yeah, I mean, like I said, I'd have
13 to look at each case and the facts and
14 circumstances and I would take their
15 statements and try to understand all of that.
16 If it was just an accusation as opposed to,
17 you know, anything further.
18          Q.  Let's just say a lawsuit was filed
19 against them, based on that lawsuit by a major
20 bank, would you -- you can imagine a
21 circumstance under which you would tell the
22 bank I advise you to hire this person?
23          MR. YI:  Objection to form.
24          A.  Would I imagine a circumstance?  I
25 mean each case is different.  I really can't

Page 144

LISA PAI (7/13/17)

1
2 say yes or no.
3          Q.  So there's some -- so there are
4 some circumstances under which you think you
5 might tell the bank to hire somebody who was
6 accused, who was sued by a major bank for
7 embezzlement, there's some circumstances under
8 which you would say to a bank, go ahead, hire
9 that person?
10          MR. YI:  Objection to form.
11          A.  Well, HR is a very complicated
12 field and there are information that we are
13 allowed to consider and then there are
14 information that we're not allowed to consider
15 and so for example, you know, someone files
16 bankruptcy, we're not allowed to consider that
17 even though we are allowed to look at credit
18 reports and so I would have to look at each
19 case very carefully and if it's just an
20 accusation, I would have to look into the
21 facts and make a decision, not just rely only
22 on the fact that they've been accused.  I
23 would be very careful about doing that.
24          Q.  You said that you, in deciding to
25 accept Karen Chon's word, you decided that she

Page 145

LISA PAI (7/13/17)

1
2 couldn't have done an embezzlement of this
3 magnitude without James Ryu; did I understand
4 what you said correctly?
5          MR. YI:  Objection to form.
6          A.  More or less, I think that's what I
7 said.
8          Q.  Now you knew that she -- as we
9 discussed earlier, that she had been suspected
10 of embezzlement at Liberty Bank, right?
11          A.  She was one of the employees that
12 was investigated because of a teller shortage,
13 yes.
14          Q.  Did you -- in deciding whether to
15 accept her word over James' word, did you
16 essentially assume that she had been guilty of
17 that prior embezzlement or did you say I can't
18 make that -- in analyzing that, did you assume
19 that she probably had done that or did you say
20 well, she may -- she may not have done that as
21 I analyzed the facts?
22          MR. YI:  Objection to form.
23          A.  I'm sorry, can you repeat that
24 question?
25          Q.  Yes.  In making your decision to

Page 146

LISA PAI (7/13/17)

1
2  accept Karen's word over James' word, you
3  obviously considered the fact that she had
4  been suspected of embezzlement at a prior
5  bank, right?
6        MR. YI:  Objection to form.
7        A.  As to timing, I mean, like I said,
8  I don't remember exactly when each piece of
9  information came to, you know, be known to me,
10  but I looked at the overall set of information
11  rather than one particular one so.
12        Q.  Sure.  But you knew prior to filing
13  the Complaint that she had been suspected, the
14  cloud of suspicion, you knew about that prior
15  to the filing of the Complaint, correct?
16        A.  Well, I don't have a present
17  recollection, but if that's what the documents
18  show, then I will concede to that.
19        Q.  Sure.  You can see that the
20  Complaint which we looked at was dated May the
21  19th, 2014, right, and the second report which
22  we looked at, which is Ryu-13 was dated March;
23  was -- the first report was dated February 25,
24  2014, right?
25        A.  Yes.

Page 147

LISA PAI (7/13/17)

1
2        Q.  So therefore it's obvious that you
3  did know about Karen's suspected involvement
4  in embezzlement at Liberty Bank at the time
5  you filed -- authorized the filing of the
6  Complaint, correct?
7        A.  Yes.
8        MR. YI:  Objection to form.
9        Q.  And did you make a determination in
10  your own mind that she had done it or had she
11  not done it or did you say we'll -- I really
12  didn't know if she did it or not at Liberty
13  Bank in New York or if it's a suspicion in
14  deciding to accept her word over James?
15        MR. YI:  Objection to form.
16        A.  So she wasn't denying that she was
17  involved.  She was just telling us that he was
18  also involved, so her involvement in it was
19  consistent with prior Liberty Bank incidents
20  which was a much smaller amount and the fact
21  that she had admitted to taking money for
22  temporary loans out of her husband's partner's
23  account and using her sister-in-law's account
24  was consistent with what she had said about
25  what was consistent with Liberty Bank, so that

Page 148

LISA PAI (7/13/17)

1
2  by itself didn't convince me that James was
3  not involved.
4        Q.  You say, I mean, she took a lot of
5  money out of other people's accounts other
6  than her relatives, right?
7        A.  I think my understanding is she
8  started taking money out of other customers'
9  accounts in order to provide cash that James
10  was demanding.
11        Q.  Okay.  So it's your understanding
12  that she was stealing from her relatives and
13  then James got involved and she started
14  stealing from other customers at the bank,
15  correct?
16        A.  That's my general understanding,
17  yes.
18        MR. YI:  Objection to form.
19        Q.  And it's not okay to steal?  I mean
20  when you're working at a bank, it's not okay
21  to steal from your relatives, is it?
22        A.  No, of course not.
23        Q.  There's no real difference between
24  stealing from your relatives and stealing from
25  other customers of the bank or any legal or

Page 149

LISA PAI (7/13/17)

1
2  moral reason, is there, that you can think of?
3        A.  Legal or moral, no, there's no
4  legal difference unless the relative gave her
5  authority, I guess.
6        Q.  Did you understand that her
7  relatives had given -- strike that.
8        You think a relative can give an
9  employee authority to steal from their
10  account?
11        A.  In this case, I don't know whether
12  she had that kind of consent, but I'm just
13  comparing embezzlement involving family or
14  close business partners versus touching, you
15  know, other customer accounts.  I think there
16  is a difference.  I'm not saying one is legal
17  and one is not, but there is a difference.
18        Q.  I guess there's a factual
19  difference that one is your relative and one
20  is not, but in the eyes of the bank, it's
21  equally egregious, is it not?
22        A.  Yes, it is.
23        Q.  Your understanding she was stealing
24  from her -- you already testified to that.
25  Withdraw that.

Page 150

LISA PAI (7/13/17)

1
2    You said that she had stolen, I
3  think you said relatively small amounts from
4  Liberty Bank?
5    A.  Yes.
6    Q.  So once she admitted that she had
7  embezzled, whether or not James Ryu was
8  involved, she embezzled from BankAsiana, it
9  was obvious to you that she had embezzled on
10  the prior case at Liberty Bank, right?
11    MR. YI:  Objection.
12    Q.  That wasn't just a suspicion?
13    MR. YI:  Objection to form.
14    A.  I don't know that for sure, but it
15  would appear more likely that she would have
16  been involved, that she would have embezzled
17  money from Liberty.
18    Q.  Did you ask her whether she had
19  embezzled money from Liberty Bank?
20    A.  When I met with her?
21    Q.  Yes.
22    A.  No.  We didn't have time to get
23  into the Liberty Bank transaction.
24    Q.  Could you have met with her on a
25  subsequent occasion if you wanted to?

Page 151

LISA PAI (7/13/17)

1
2    A.  No, because she said she wasn't
3  available.
4    Q.  When did she say that?  Did she say
5  that direct -- to you directly?
6    A.  Well, when I met with her, I had
7  wanted to speak with her longer, but she said
8  she wasn't available because of baby-sitting
9  problems and she had a small child and so --
10  and I actually never got a chance to arrange a
11  subsequent meeting because I think on advice
12  of her counsel, I think she -- I had to make
13  arrangements through her counsel.
14    Q.  Did you demand that she meet with
15  you again so that you could get enough
16  information to conclude this inquiry that you
17  were conducting, this very important inquiry
18  you were conducting for the bank?
19    MR. YI:  Objection to form.
20    She already asked.  She was asked
21  to make arrangements through counsel.
22    A.  So --
23    MR. YI:  You can answer.
24    A.  So yeah, I expected any further
25  meetings to be done through counsel.

Page 152

LISA PAI (7/13/17)

1
2    Q.  I understand that you expected
3  further meetings to be done through counsel,
4  but did you say I want to meet with her again,
5  I need to ask further questions of her, please
6  make her available to me; did you make that
7  request?
8    A.  Through counsel, I think we made
9  that request.
10    Q.  And what was the response to that
11  question?
12    A.  I think my recollection is
13  originally my understanding is that she was
14  going to not answer any questions until the
15  criminal investigation came to some kind of a
16  conclusion, so whether it's through informal
17  meetings or depositions, she was going to take
18  the fifth.  I think that was -- that's my
19  recollection now.  I mean it's getting kind of
20  fuzzy.
21    Q.  Your recollection, she refused to
22  cooperate with you, you met with her once and
23  after that, she refused to cooperate with you,
24  right?
25    MR. YI:  Objection to form.

Page 153

LISA PAI (7/13/17)

1
2    A.  I think that's what her criminal
3  counsel had advised her, that's my
4  understanding.
5    Q.  And despite that, you still chose
6  to accept her word over James Ryu's word,
7  correct?
8    MR. YI:  Objection to form.
9    A.  Well, I understood why her counsel
10  would advise her to do that, because of the
11  criminal context.
12    Q.  Right.
13    A.  So that did not change my -- that
14  did not change my conclusion about believing
15  her over James Ryu.
16    Q.  So the fact that she would not
17  cooperate with you and have a second meeting
18  with you did not factor into your -- into your
19  decision about who was telling the truth;
20  true?
21    MR. YI:  Objection as to form;
22    asked and answered.
23    A.  Yes.
24    Q.  Now you said that she had stolen a
25  relatively small amount of money from Liberty

Page 154

LISA PAI (7/13/17)

Bank. I don't know if those were your exact
words, small in comparison to the amounts she
stole from BankAsiana?

    A.  That's right.  That's what I meant
by relative.

    Q.  Still really any amount of stealing
from the bank is a serious thing, right?

    A.  Yes, with...

    Q.  Even $1, right?

    A.  Yes, even $1.

    Q.  Certainly $5,000 would be a lot of
money to steal from the bank?

    A.  Yes.

    Q.  I mean if somebody stole $1 because
they have to get -- that's such a small
amount, it's negligible, it's a violation of
policy, it's really almost negligible, but
hundreds or thousands of dollars is an
indication of serious criminality, correct?

    MR. YI:  Objection to form.

    A.  Yes.

    Q.  And you weren't suggesting -- you
did suggest, however, that even though she had
engaged in serious criminality at Liberty Bank

Page 155

LISA PAI (7/13/17)

of New York, she was incapable of stealing
what has turned out almost $1.5 million or
approximately $1.5 million; was that your
view, was that your thinking at the time you
made your decision to accept her word over
James Ryu's word?

    MR. YI:  Objection to form.

    A.  Yes.  Given the small size of the
bank, BankAsiana being small and given her
role at the branch and there are -- most banks
have someone in deposit operations, central
deposit operations that oversees transactions,
there are internal audit reviews of
transactions over such a long period of time,
we concluded that she would not have been able
to continue to take such large sums of money
without some assistance at a higher level and
overtime with additional information, I was
able to better understand why she was able to
do that, to take to embezzle such a large
amount, but gradually without detection.

    I think what we were really
focusing on also was how was she -- how was
the bank unable to detect what was going on,

Page 156

LISA PAI (7/13/17)

you know.  It's a smaller bank and if there
was a branch manager that was overseeing her,
if there was an operations administrator that
was overseeing her, if there were internal
audit and financial -- you know, actually, she
-- that would have been detected and
apparently James did detect something was
going -- that she was doing something
improper, but instead of doing something about
that, he colluded with her or abused his
position to extract, to coerce her into taking
more money so that it can help him
financially.

    And he had every financial
motivation to -- he needed money, clearly
everybody knew he needed money.  He
desperately needed money.  He was tapping into
every possible source for money, including
asking her for a personal loan, which she
initially said -- she said she couldn't --
didn't have money to give to him because she
actually also had some personal loans.

    And, you know, he had taken out a
personal loan, a 401(k) loan, you know, all

Page 157

LISA PAI (7/13/17)

kinds of loans.  I don't think he asked around
in 2011 for loans from other people.  Those
are all the reasons.

    Q.  So one of the reasons, essentially
the controls were very laxed?

    A.  That's right.

    Q.  That would be a shorthand way of
saying that, right, the controls were laxed;
there wasn't a branch manager, right?

    A.  Yes.

    Q.  Internal audit didn't pick it up?

    A.  That's right.

    Q.  And nobody else picked it up?

    A.  No, there was no operations
administrator to be able to pick it up because
James was overseeing operations directly with
assistance from his -- from Irene and Irene
really didn't understand deposit operations.
She told me she didn't understand.

    Q.  In your career at the banks, have
you ever had another large embezzlement?

    MR. YI:  Objection to form.

    A.  Not quite at this level.

    Q.  What's the largest other

Page 158

LISA PAI (7/13/17)

1
2  embezzlement that you ever had at any of your
3  other banks, any job, any bank you worked at?
4      A.  Maybe 300,000.
5      Q.  How would internal audit have
6  picked this up?
7      A.  Sometimes they do testing of
8  customer balances.  Sometimes -- I'm not an
9  internal auditor.  I don't know, but they do
10 testing, independent testing of various
11 transactions in order to try to detect any
12 improprieties, irregularities.
13     Q.  You think internal auditing should
14 have picked this up?
15     A.  Well, I don't know about should
16 have, because it's hard to detect everything,
17 but it was a small -- relatively small bank.
18 I think if somebody was paying attention, I
19 think it could have picked it up.
20     Q.  Obviously you think James Ryu did
21 pick it up, correct?
22     A.  Yes.
23     Q.  How did James Ryu pick it up?
24     A.  That I don't know.  We hoped to
25 find out when we depose James Ryu.

Page 159

LISA PAI (7/13/17)

1
2      Q.  Now, so exactly -- you know how she
3  was doing this, it's described in the report
4  by Mr. Hamersky?
5      A.  Yes.
6      Q.  She was stealing from one customer
7  and then fudging the records, right?
8      A.  Yes.
9      Q.  And it actually didn't turn up
10 until a customer came in and noticed there was
11 a discrepancy as you testified earlier in the
12 bank, in the numbers in their account, right?
13         MR. YI:  Objection to form.
14     A.  Yes, it was not discovered until
15 after the customer came in.
16     Q.  So if you don't know how James Ryu
17 supposedly -- was supposed to have detected
18 this and you don't know how he's supposed to
19 have detected this, right?
20     A.  Right.
21     Q.  Do you know somebody who does know
22 that?
23     A.  Not how.  Let me start over.
24         So when Alicia and Orest were
25 reviewing and doing it, reviewing the

Page 160

LISA PAI (7/13/17)

1
2  transactions to figure out exactly how it was
3  done, what they said, one of the things they
4  said was anybody that knows about operations,
5  deposit movements would have found it very
6  unusual that CDs were closed out in the middle
7  of the term and then reopened, you know.
8  There were a number of, I think,
9  irregularities that could have been detected,
10 fiduciary duty, somebody was looking at them,
11 that's what I recall.
12     Q.  So Alicia told you that?
13     A.  Either Alicia or Orest.  It's
14 possible it may have been Alicia.  There were
15 some flags that she thought that could have
16 been picked up, you know, through various
17 reports.
18     Q.  Did Orest think there were flags
19 that could have been picked up through
20 reports?
21     A.  I don't know if Orest is as
22 knowledgeable about deposit operations, fund
23 movements, as Alicia is, so I'm not sure.  I
24 can't answer that.
25     Q.  Did Alicia work at BankAsiana?

Page 161

LISA PAI (7/13/17)

1
2      A.  No, Alicia worked for Wilshire
3  Bank.
4      Q.  But Alicia definitely told you that
5  there were flags that should have been -- that
6  would have picked this up?
7         MR. YI:  Objection to form.
8      A.  I don't think she necessarily -- I
9  don't remember if she necessarily used the
10 term flags, but she said there were unusual
11 transactions because they were CDs and not
12 checking accounts.
13     Q.  Well, clearly this was done through
14 CDs, not checking accounts, right?
15     A.  Right.
16     Q.  Was there something other than the
17 fact -- than CDs that was unusual about it or
18 some specific CDs?
19     A.  No, I think what she was referring
20 to, she or Orest, I really don't recall who it
21 was, but what they were referring to is the
22 fact that even though Karen moved around funds
23 so that the 1099 forms for maturity notices
24 would go out timely and then move the funds
25 back again, but somebody that knows

Page 162

LISA PAI (7/13/17)

1    LISA PAI (7/13/17)
2    operations, deposit operations would have or
3    could have picked up sort of middle of the
4    term withdrawals, things like that that -- so
5    it could have been detected.
6        Q.  Did you consider the fact -- you
7    knew Karen was taking some of the money and
8    using it to pay some of her husband's debts?
9        A.  That's what she said, yes.
10       Q.  Did you consider that she was
11   acting to -- that her husband was implicated
12   in this and she was blaming James Ryu to
13   divert attention from her husband?
14       A.  Well, when I talked to her, she
15   explained that her husband didn't know what
16   she was doing.  That she was doing it, all the
17   financials for all her husband's business.  He
18   wasn't really a financial guy.  He just had a
19   passion for running bagel shops and really got
20   into the operation and enjoyed running
21   businesses, but he didn't understand the
22   economics of it, so that's why the businesses
23   were not doing well.  They were not profitable
24   and she said she didn't have the heart to tell
25   her husband that the businesses he loved so

Page 163

1    LISA PAI (7/13/17)
2    much were failing.
3        Q.  What did he say when you
4    interviewed him?
5        A.  I did not interview her husband.
6        Q.  Why didn't you interview her
7    husband?
8        A.  I think I left that up to our
9    outside counsel to pursue through discovery.
10       Q.  But you didn't even ask to
11   interview her husband; is that correct?
12       A.  There were -- yes, my recollection
13   is I didn't ask her to make arrangements for
14   her husband to come in.
15       Q.  Correct.
16       A.  No, I don't think it was a
17   priority at that time.
18       Q.  Because you believed what she had
19   told you about her husband?
20       MR. YI:  Objection to form.
21       A.  Well, but we decided to name the
22   husband's businesses, so whether he was
23   directly involved or not was not as critical
24   at the time because he benefited through
25   stolen money, so my recollection is I don't --

Page 164

1    LISA PAI (7/13/17)
2    I think that was, like I said, not a priority
3    to speak with him directly.
4        Q.  Did you believe her when she said
5    that her husband didn't know about this?
6        A.  Yes, I did believe her.
7        Q.  Did the bank determine whether any
8    of the funds that were embezzled made its way
9    into James' bank accounts?
10       A.  Any of James Ryu's bank accounts at
11   BankAsiana or at other institutions?
12       Q.  Let's start with at BankAsiana.
13       A.  My vague recollection is either
14   Alicia or Orest did look at the BankAsiana
15   accounts and did not find any direct evidence
16   of large sums of cash being deposited, but
17   that was understandable because he knew BSA
18   laws and regulations very well and he knew
19   that would create a huge red flag.
20       Q.  Did you check to see whether he put
21   it into bank accounts elsewhere?
22       A.  That was on the list of things to
23   investigate further, yes.
24       Q.  Did you investigate that further?
25       A.  Not me personally, but through

Page 165

1    LISA PAI (7/13/17)
2    outside counsel, I did list that as something
3    that we should do, subpoena records of either
4    some or all of his other bank accounts to the
5    extent we can find out, yes.
6        Q.  Did you know what the upshot of
7    that was?  Did you ever find out whether any
8    money was ever deposited into any other
9    accounts outside of BankAsiana?
10       A.  I don't have a really clear
11   recollection, but again, we're talking about
12   cash and there are other transactions that he
13   -- his accounts show, it's -- unless there is
14   a large cash deposit made, we wouldn't be able
15   to directly tie it so -- so my -- but I don't
16   have a clear recollection what we did find in
17   those other accounts to the extent we have
18   received subpoenaed records.
19       James knew BSA laws and any bank
20   that receives large cash deposits would report
21   to the government suspicious filings.
22       Q.  So you believe he would have not
23   done that, correct?
24       A.  Absolutely.
25       Q.  You're pretty convinced he did it,

LISA PAI (7/13/17)

1
2  aren't you?
3          MR. YI:  Objection to form.
4      Q.  You're really quite convinced that
5  James did this?
6          MR. YI:  Objection to form;
7  argumentative.
8          MR. HARVEY:  It's not
9  argumentative.
10         MR. YI:  When you go to trial,
11  you'll have an opportunity to
12  cross-examine this witness.  This is a
13  deposition.  If you want to make
14  arguments, I don't think it's
15  appropriate.
16         MR. HARVEY:  Counsel, obviously
17  you don't have that much experience in
18  depositions because I can conduct a
19  cross-examination at deposition just
20  as well I can at trial.  In fact, the
21  testimony is exactly the same as at
22  trial.  I can do -- anything I can do
23  at trial, I can do at deposition.
24         MR. YI:  If you want to continue
25  to make arguments, I think it will be

LISA PAI (7/13/17)

1
2  an issue for us.  If you want to ask
3  factual questions, please proceed.
4          MR. HARVEY:  Counsel, I intend to
5  continue asking necessary.  If that
6  creates an issue for you, you do what
7  you need to do.
8  BY MR. HARVEY:
9      Q.  Ms. Pai, you're really quite
10  convinced, are you not, that James Ryu
11  participated in this embezzlement with Karen
12  Chon?
13         MR. YI:  Objection to form; asked
14  and answered.
15     A.  Yes, I believe he was involved.
16     Q.  You're certain; is that right?
17         MR. YI:  Objection to form; asked
18  and answered.
19     A.  Well, I believe he was involved.
20     Q.  I'm asking you if you're certain.
21  It's a different question; are you certain?
22         MR. YI:  Objection to form; asked
23  and answered.
24     A.  I mean being certain is a matter of
25  degree, so where do you cutoff being certain.

LISA PAI (7/13/17)

1
2  I mean I was certain enough to approve the
3  filing of the Complaint, yes.
4      Q.  Correct, there's degrees of
5  certainty.  I'm certain I'm here in this room
6  asking you questions right now and I'm certain
7  that my wife took my son to camp today even
8  though I didn't see it, otherwise, I would
9  have gotten a report.  So there's degrees of
10  certainty.
11         But you seem to be just in
12  everything you said, what you said his bank,
13  you know, you seem to have some knowledge what
14  he would have know about the Bank Secrecy Act
15  and I'm asking you, are you 100 percent
16  certain that James Ryu participated in this
17  embezzlement with Karen Chon?
18         MR. YI:  Objection to form; asked
19  and answered.
20     A.  Well, let me put it this way, the
21  more information that I get, I think, like I
22  said before, it's supporting my conclusion,
23  initial conclusion that he was involved.
24     Q.  Now, the evidence that you have
25  learned of since you filed -- since you

LISA PAI (7/13/17)

1
2  authorized the filing of the Complaint has
3  made you more certain than you were at the
4  time of the filing of the Complaint, true or
5  false?
6      A.  True.
7          MR. YI:  Objection as to form;
8  asked and answered.
9      Q.  Did you know that the federal
10  authorities charged Karen Chon with
11  embezzlement?
12     A.  Yes.
13     Q.  Did you know the federal
14  authorities did not charge James Ryu with
15  embezzlement?
16     A.  Yes.
17     Q.  You know she's in prison, in
18  federal prison in Danbury, Connecticut; did
19  you know that?
20     A.  Yes.
21     Q.  Do you know he's been to see the
22  FBI several times without the benefit of any
23  proffer letter, walked into the FBI without
24  counsel, without a proffer letter; did you
25  know that --

Page 170

LISA PAI (7/13/17)

1          LISA PAI (7/13/17)
2          MR. YI:  Objection to form.
3          Q.  -- to cooperate in this
4  investigation?
5          MR. YI:  Objection to form;
6     assuming facts not in evidence.  If
7     you can answer, you can.
8          A.  I think I heard that he -- the FBI
9  talked -- a special agent talked to him, but I
10  don't know the context.  I don't recall
11  hearing about the context of how that came
12  about.
13          Q.  Did you ask to interview James Ryu
14  again after that initial interview, that one
15  interview you had with him?
16          A.  Again, well, I think that I did
17  ask.  I think I asked our outside counsel to
18  pursue any further interviews or depositions
19  of James Ryu, yes.
20          Q.  But before you filed a Complaint,
21  did you seek to interview him again to ask
22  about questions, about things you might have
23  questions about?
24          A.  I don't recall if I did.
25          Q.  You know you could have if you

Page 171

1          LISA PAI (7/13/17)
2  wanted to ask him to meet with you, again, to
3  provide additional information, answer
4  additional questions, you could have done
5  that, right?
6          A.  Yes, but it was clear to me the
7  position that James was going to take which
8  was to deny everything.
9          Q.  Well, if he didn't do it, of course
10  he would deny, right?
11          MR. YI:  Objection to form.
12          A.  Right.
13          Q.  So -- but you had already made up
14  your mind he did do it, so therefore senseless
15  to ask him any questions; is that your
16  testimony?
17          MR. YI:  Objection to form; asked
18     and answered.
19          I find this whole line of
20     questioning to be really inappropriate
21     and improper, but I'll let you
22     continue, if you can answer.
23          A.  I'm sorry, what was the question
24  again.
25          Q.  The question is this, you didn't

Page 172

1          LISA PAI (7/13/17)
2  interview him again because you already knew
3  that he denied the crime, correct?
4          A.  Yes, and --
5          MR. YI:  Objection to form.
6          You are repeatedly in your
7     questions mischaracterizing this
8     witness' testimony, but again with
9     that objection, if you can answer, you
10     can go ahead.
11          MR. HARVEY:  Counsel, keep your
12     speaking objections to yourself.
13     They're patently improper and you're
14     really evidencing a desire to disrupt
15     this deposition.  Perhaps you're not
16     familiar with federal practice.  You
17     do not need to make these speaking
18     objections.  The witness -- I'm asking
19     proper questions.  The witness is an
20     attorney, general counsel to the bank.
21     I'm not acting disrespectful in any
22     way.  She's capable of answering the
23     question.
24          MR. YI:  I'm trying my best to do
25     that.  I apologize for the speaking

Page 173

1          LISA PAI (7/13/17)
2  objections.  You repeatedly in your
3  questions are mischaracterizing this
4  witness' testimony and I would
5  respectfully ask that you refrain from
6  doing that, but in any event, let's
7  continue.
8          MR. HARVEY:  Please read back my
9  last question.
10          (Whereupon, the referred to
11  question was read back by the
12  Reporter.)
13          MR. HARVEY:  Just to be clear,
14  Counsel, I'm asking her a direct
15  question.  She can answer it.  I'm not
16  characterizing her testimony at all.
17  I'm asking her whether she agrees with
18  that statement or not.
19          MR. YI:  Objection to form.  Go
20  ahead.
21          THE WITNESS:  I mean that's one of
22  the factors, but you know, I don't
23  have a clear recollection of all the
24  other factors that we considered at
25  that time.

Page 174

LISA PAI (7/13/17)

BY MR. HARVEY:

Q.  Well, for example, you had some questions in your mind about laxed controls, right?

A.  Sure.

Q.  You had your questions in your mind about something Jessica Lee had told you about supposedly having told James and H.S. that Karen had some kind of problems at Liberty Bank, right, you had that, you had a question in your mind about that?

A.  Yes.

Q.  Wouldn't you have wanted to ask James what the story was on that, how you decide what the truth is in deciding how to choose between him and Karen?

A.  I think you -- what we looked at, basically, a collection of information and we, after discussion with outside counsel, felt we have enough to file a Complaint.  I don't think we have to conclude all the discovery by the time we file a Complaint.

Q.  So you didn't want to know, for example, what his response was going to be

Page 175

LISA PAI (7/13/17)

about that particular issue, the Jessica statement about Karen, right, you didn't want to know what James' story was on that issue, correct?

A.  I don't think that's what I said.

MR. YI:  Objection to form.

Q.  I'm asking you.  I didn't say that's what you said.  Did you or did you not want to have --

MR. YI:  Objection to form.  I don't think there's been discussion about what was discussed at her meeting with James Ryu, so I'm not sure this is proper.  I mean if you want to establish that, let's establish that first.

MR. HARVEY:  Sure.

Q.  Did you ask James at your meeting with him about this statement that Jessica Lee had made?

A.  Actually, most of the questions at the meeting with James were made by our outside counsel.

Q.  Did outside counsel ask James about

Page 176

LISA PAI (7/13/17)

that?

A.  I don't have a specific recollection.

Q.  Do you know a memo was made of that interview?

A.  I don't recall.

Q.  Did you know whether James was asked about the subject of laxed controls?

A.  I don't recall that either.

Q.  Do you know whether he was asked about the fact that there was no branch manager at the branch that Karen worked at?

A.  So I don't recall those specifics.

Q.  Would you have wanted to know sitting here today, thinking back, would you have wanted to know the answers to those questions in deciding whether or not to accept James' word or Karen's word?

A.  Would I have wanted to know?

Q.  Yes.

A.  Eventually I think those are topics that should be covered by discovery, further discovery.

Q.  Now, were you surprised that the

Page 177

LISA PAI (7/13/17)

FBI charged Karen, but not James?

MR. YI:  Objection to form.

A.  Was I surprised?

Q.  Yes.

A.  I don't remember if that was the feeling I was having at the time.  I think it made sense to me that they would want to charge Karen first because she confessed and it was an easy claim for them to pursue, so I don't know that I was necessarily surprised.

Q.  You said that things -- since the filing of the Complaint, things that have happened have made you more certain that James did it, right?

MR. YI:  Objection to form.

A.  Yes.

Q.  Was the Department of Justice's charging of Karen with a crime one of those things or not?

MR. YI:  Objection to form.

A.  I don't really understand your question.

Q.  Did the fact that the federal government charged Karen with a crime and that

LISA PAI (7/13/17)

1   she was convicted of it and pled and was
2   sentenced, but they didn't charge James, was
3   that one the things that made you more certain
4   that James was involved?
5        MR. YI:  Objection to form.
6        A.  I don't know that I would say that.
7   I understood why the U.S. Attorney's Office
8   would want to pursue something that's easier
9   for them to pursue.  It takes -- based on my
10  experience with the U.S. Attorney's Office, it
11  takes a long time to pursue something and
12  they have to because it's a criminal context,
13  they require a lot more evidence up front
14  before they will bring a claim.  I just know
15  that as part of my past experience with them.
16       Q.  So the fact that they charged Karen
17  and not James is of no moment, doesn't matter
18  to your analysis about whether James actually
19  did this or not, correct?
20       MR. YI:  Objection to form.
21       A.  I'm sorry, I don't understand that
22  question.
23       Q.  Sure.  The question is this, the
24  fact that Karen has been convicted of a crime

LISA PAI (7/13/17)

1   for the embezzlement and James has not been
2   charged is not of significance, doesn't matter
3   to you in determining whether or not James --
4   we've got evidence against James or not, in
5   other words, that he did this; is that
6   correct?
7        MR. YI:  Objection.
8        A.  All I can say is yes, I believe
9   there was a difference in the criminal
10  proceeding versus civil proceeding and we felt
11  we had enough to charge him in the civil
12  context as a former officer of BankAsiana that
13  we had acquired.
14       (Ryu Exhibit 20, memo dated
15       February 10, 2014, Bates labeled
16       Exhibit 1 D000005 through '9 was
17       marked for identification, as of this
18       date.)
19  BY MR. HARVEY:
20       Q.  Ms. Pai, the court reporter just
21  handed you what's been marked as Ryu-20, a
22  document that was produced to the parties in
23  this case by the federal government.  My first
24  question is going to be whether you've ever

LISA PAI (7/13/17)

1   seen it before?
2        A.  I don't think I have.  Do you want
3   me to read this?
4        Q.  I'm going to direct you, you're
5   free to read this.  I will direct you to
6   things.  You're free to read as much or as
7   little.  You can wait until you hear the
8   questions.
9        A.  That probably is easier, because
10  it's kind of long.
11       Q.  This is obviously an FBI
12  investigation memo.  It's got the Bates No. on
13  the bottom, Exhibit 1 D000005 through '000009,
14  and I see it came from the government, I
15  forget maybe Mr. Jeon, maybe Ms. Chon's lawyer
16  produced this, I can't remember.  One way or
17  the other, it came from the files of the
18  Department of Justice.
19       You'll see if you look at it, it's
20  date of entry, February the 10th, 2014 at the
21  top right-hand corner?
22       A.  Yes, I see that.
23       Q.  If you look at that, the first
24  paragraph, you see she was interviewed by two

LISA PAI (7/13/17)

1   government agents name Joel DeCapua and Nathan
2   Kim.  Mr. Kim is a native Korean speaker and
3   he translated?
4        MR. YI:  Objection to form.
5        A.  Okay.
6        Q.  Now, if you go to the second page,
7   there is a statement in the second full
8   paragraph.  The end of the first sentence,
9   I'll read the sentence, it says "When informed
10  that the FBI was investigating allegations
11  that Miye Chon was working with other bank
12  employees to steal money from BankAsiana, Chon
13  immediately admitted that she had acted
14  alone"; you see that?
15       A.  Yes.
16       Q.  Did you know that at any point
17  Karen Chon had taken the position that she
18  acted alone without -- i.e., without the
19  assistance of James Ryu, were you aware of
20  that?
21       A.  No.
22       Q.  Turn to page 4 of this, it says 4
23  of 5, the pages are in the upper right-hand
24  corner.  The fourth full paragraph on that

46

Page 182

LISA PAI (7/13/17)

1   page begins with the words -- well, I'll read
2   it just to make sure we're not missing
3   anything.  "James Ryu was not involved in the
4   scheme to steal money from the CD accounts.
5   Chon last met with James Ryu on or about
6   Thursday, January 30, 2014.  Chon and Ryu met
7   at the Englewood diner.  Chon apologized to
8   James Ryu for all of the trouble he was
9   experiencing with Wilshire Bank.  Chon
10  admitted to Ryu that Chon had lied to bank
11  auditors about Ryu being involved in the
12  scheme to take money from the CD accounts.
13  Chon told Ryu that Chon was going to tell the
14  truth and clear Ryu of any wrongdoing"; you
15  see that?
16      A.  Yes.
17      Q.  This is in the statement that Karen
18  Chon gave to the federal government on
19  February the -- interestingly, I note that the
20  date on this page is February the 4th, 2014
21  and the date on the first page is February the
22  10th, 2014.  I cannot explain the discrepancy.
23      I just want to see if you know that
24  Chon had a meeting with James Ryu at the

Page 183

LISA PAI (7/13/17)

1   Englewood diner and at that meeting, she
2   admitted that she had lied to the bank
3   auditors about Ryu being involved?
4       A.  Is that a question?
5       Q.  Yes.  Were you aware of that, that
6   she had a meeting with James Ryu at a diner,
7   at the Englewood diner and at that meeting,
8   she admitted that she had lied to the bank
9   auditors about his involvement in the scheme
10  to take money from the CD accounts?
11          MR. YI:  Objection to form.
12      A.  That she admitted to Ryu that she
13  had lied?
14      Q.  Yes.
15      A.  So that's inconsistent with the
16  statement that she made to us at our meeting,
17  at my meeting with her, at which time she did
18  tell me about a meeting with James, but she
19  said that James was offering her money to pay
20  back the bank, if she would clear up his name
21  and she even had an amount of $500,000 and at
22  the time, I think my recollection is she was
23  asking if the bank would not press criminal
24  charges against her if she enters into a

Page 184

LISA PAI (7/13/17)

1   settlement.  Basically, agreement to pay us
2   back and that was the amount that she had
3   floated and my understanding was that James
4   Ryu -- my understanding was that Karen
5   believed James Ryu was going to help her raise
6   that money.
7       Q.  Did you know that Karen Chon met
8   with James Ryu twice at a diner, at the
9   Englewood diner?
10      A.  Yes, I think that was the number
11  they both told me, they met twice.
12      Q.  But my question was simply did you
13  know one or the other meetings, that she
14  admitted to him that she had lied to the bank
15  auditors about his involvement in the scheme?
16          MR. YI:  Objection to form.
17      Q.  Were you aware of that?
18          MR. YI:  Objection to form.
19      A.  No, because she told me that he
20  said unless she clears up his name that he was
21  not going to help her financially to pay back
22  the bank, so she can avoid jail time and she
23  was -- and that's what -- I don't remember
24  what I was going to say after that, sorry.

Page 185

LISA PAI (7/13/17)

1       Q.  I'm just asking you weren't aware
2   of that.
3       And were you aware that at that
4   meeting at the bank -- excuse me, at the
5   dinner, that she told Ryu that she was going
6   to tell the truth and clear him of wrongdoing?
7       A.  That's what James told us, but like
8   I said before, James' account of what she
9   discussed is different than Karen's account of
10  what they discussed, right, so.
11      Q.  And it appears Karen's account of
12  what they discussed is also different than
13  what she told the FBI, right?
14          MR. YI:  Objection to form.
15      A.  Well, it looks like what she told
16  the FBI, I mean this is....
17      Q.  It's not what she told you, is it?
18      A.  No.
19      Q.  Okay.  Next paragraph says "Ryu did
20  not threaten Chon in any way."  Did Karen tell
21  you that Ryu had threatened her?
22      A.  She told me that that's why she had
23  to take money out of customer accounts and
24  give to him as he had instructed her to do.

47

Page 186

LISA PAI (7/13/17)

1
2      Q.  And you weren't aware that she told
3  the FBI that he didn't threaten her in any
4  way, did you?
5          MR. YI:  Objection to form;
6      assumes facts not in evidence.
7          If you know.
8      A.  Yeah, I mean, I guess that would be
9  consistent with her trying to clear up his
10  name, so that he can help her financially pay
11  back the bank, that we would not press
12  criminal charges against her.
13      Q.  I'm just simply asking if you know
14  she told the FBI that Ryu did not threaten her
15  in any way?
16          MR. YI:  Objection to form;
17      assumes facts not in evidence.
18      A.  No, I did not.
19      Q.  Two paragraphs down, it says "Chon
20  lied about James Ryu's involvement because the
21  bank auditors suggested to Chon that Ryu was
22  involved."  This is apparently her statement
23  to the FBI.  Do you know anything -- do you
24  know whether the bank auditors suggested to
25  Chon that Ryu was involved?

Page 187

LISA PAI (7/13/17)

1
2          MR. YI:  Objection to form.
3      A.  Do I know that, no, I don't know
4  that.  That's not consistent with what I know.
5  In fact, I don't know that the bank auditor
6  even spoke to her when she first confessed
7  about Ryu's involvement.
8      Q.  We don't know what they mean when
9  they -- but here it says bank auditors, we
10  don't know who that is, right?
11          MR. YI:  Objection to form.
12      Q.  We know for you, the auditors
13  Hamersky and maybe Alicia, maybe she thought
14  the auditors included Bo-Young and Karen.  We
15  just don't know what she means by bank
16  auditors, right?
17          MR. YI:  Objection to form.
18      A.  She wouldn't think that Bo-Young
19  Lee and Irene are bank auditors because she
20  worked with them previously for a long time
21  and I don't think she would think that Alicia
22  was a bank auditor because Alicia was head of
23  operations.
24      Q.  What about Elaine Jeon?
25      A.  Elaine did not speak with Chon

Page 188

LISA PAI (7/13/17)

1
2  directly.
3      Q.  You're saying she wouldn't have
4  thought of Alicia Lee as a bank auditor?
5      A.  I would not think so, but I don't
6  know.
7      Q.  Well, who else did -- Karen never
8  spoke directly with Hamersky, did she?
9      A.  I don't recall.  The -- I don't
10  think so, but I don't recall specifically.
11      Q.  In any event, you were not aware
12  that the bank -- are you aware that anyone
13  from the bank, Alicia Lee or anyone else
14  suggested to Chon that Ryu was involved?
15      A.  No, I'm not aware.
16      Q.  And you wouldn't know one way or
17  another because you weren't present, correct?
18      A.  Right, not at that time.
19          MR. YI:  Steve, is this a document
20      produced by Matt Jeon?
21          MR. HARVEY:  I believe so.
22          MR. YI:  These are his production
23      numbers?
24          MR. HARVEY:  I believe so.  I
25      wouldn't have gotten this from anybody

Page 189

LISA PAI (7/13/17)

1
2  else.
3          (Ryu Exhibit 21, memo dated
4      February 24, 2014, Bates labeled
5      Exhibit 1 D000001 through '4 was
6      marked for identification, as of this
7      date.)
8  BY MR. HARVEY:
9      Q.  The court reporter has handed you
10  what's been marked as Ryu-21.  It's another
11  FBI interview memo.  This one is of an
12  interview with Alicia Lee and I'm going to ask
13  you some questions about it.  I'll direct you
14  to the parts that I would like to ask you
15  questions about, but please take a moment to
16  familiarize yourself with the document, if you
17  wish?
18      A.  So I received two.  Let's -- are
19  they the same or are they two different?  They
20  both start with Alicia Lee.
21          MR. YI:  You might have two
22      copies.
23      A.  Of the same thing?
24      Q.  Yes.  It's just two copies of the
25  same thing.

LISA PAI (7/13/17)

1          LISA PAI (7/13/17)
2     MR. YI:  Can we take a break.
3     (Whereupon, at this time, a short
4 break was taken.)
5     (Ryu Exhibit 22, memo dated
6 March 18, 2014, Bates labeled D000010
7 through '12 was marked for
8 identification, as of this date.)
9 BY MR. HARVEY:
10    Q.  I'm next going to ask about this
11 one.
12     MR. HARVEY:  In your absence, I
13 gave the witness the next exhibit to
14 read, just so she wouldn't have to
15 take anymore time.
16    Q.  We were just looking at the first
17 one.  I'd like you to look at Ryu-21.
18    A.  Ryu-21?
19    Q.  Yes.
20    A.  Okay.
21    Q.  That's the interview with Alicia
22 Lee?
23    A.  Yes.
24    Q.  We had a ten-or-fifteen-minute
25 break; did that give you enough time to read

1          LISA PAI (7/13/17)
2 the whole memo?
3    A.  Yes, I read Alicia's memo.
4    Q.  So reading it, this is an interview
5 that Alicia Lee gave with the Federal Bureau
6 of Investigations on February 4, 2014, you can
7 see that right at the top of the first page?
8    A.  Yes, I think it's -- it's a summary
9 of FBI's interview of Alicia Lee, not
10 something she wrote herself.
11    Q.  Correct.
12    A.  Yeah.
13    Q.  According to the memo, Orest
14 Hamersky was with her?
15    A.  Yes, it appears to be so.
16    Q.  Now, did you know that they met
17 with the FBI?
18    A.  Yes, I remember hearing about it.
19    Q.  Did you authorize it?
20    A.  I believe I did.
21    Q.  And is there anything in this memo
22 that you read that jumps out at you as
23 inconsistent with what you recall?
24    A.  That's inconsistent with what I
25 recall?

1          LISA PAI (7/13/17)
2    Q.  Yes.
3    A.  Yes, I don't recall that she had
4 said that she spent only $200,000.
5    Q.  What do you recall she said?
6    A.  Actually, I just have a
7 recollection of my meeting with her and what I
8 meant, it's inconsistent with my recollection
9 of my meeting with her, so maybe that's not
10 what you were asking.
11    Q.  Well, you know what, why don't I
12 give you what's been marked Ryu Exhibit 14.  I
13 believe that's your notes with her.  They're
14 partially in Korean, so I can't read them.
15    A.  Yes.
16    Q.  Is that what they are, your notes
17 of your meeting with her?
18    MR. YI:  Objection to form.
19    A.  It looks like notes before the
20 meeting as well as notes from the meeting,
21 yes.
22    Q.  So just -- we'll go through them
23 later in detail.  Can you tell by looking at
24 your notes, does it tell you what she told you
25 about how much she had kept?

1          LISA PAI (7/13/17)
2    A.  Yes.
3    Q.  How much does it say?
4    A.  About $500,000 she kept.
5    Q.  So that's inconsistent with what is
6 the Alicia Lee memo, right, where Chon said
7 she personally said she spent 200,000?
8    A.  Yes.
9    Q.  Anything else in here in this
10 Ryu-21 inconsistent with your memory of the
11 facts?
12    A.  Not that I can see right now.
13    Q.  Okay.  Just ask a few questions
14 about some things in here.  On the second page
15 of this second paragraph, the end of the
16 second paragraph says that it describes the
17 meeting on January 22nd and then at the end of
18 it says "Chon-Kim said that she was giving the
19 cash to another person, but that she was
20 afraid of that person and did not want to
21 reveal his name"; do you see that?
22    A.  Yes.
23    Q.  You understand Chon Kim to be Karen
24 Chon, right?
25    A.  Yes.

LISA PAI (7/13/17)

1
2    Q.   Is that your recollection that you
3  were told -- do you remember being told that?
4    A.   Yes, I do remember being told that.
5    Q.   What do you remember being told
6  just as it's written there, something
7  additional?
8    A.   Yes, I remember being told that
9  initially she didn't want to say who it was
10 and then later, I think the next day, she said
11 who it was.  She was afraid.
12   Q.   And then I was going to ask about
13 the 200,000, which is two paragraphs down and
14 that's inconsistent with what she told you?
15   A.   Right.
16   Q.   Karen that is?
17   A.   That's right.
18   Q.   It says "Chon-Kim said that she and
19 Ryu were very close"; did you ask Karen Chon
20 whether she and Ryu were close?
21   A.   I don't recall specifically asking
22 her in that way, but I may have asked her how
23 often they met.  It's a vague recollection.
24 I'm not 100 percent sure.
25   Q.   How many criminal -- would you

LISA PAI (7/13/17)

1
2  agree this investigation was sort of quasi
3  criminal investigation that you conducted?
4    MR. YI:  Objection to form.
5    A.   I don't know what you mean by quasi
6  criminal.  I'm not usually involved in
7  criminal investigations.
8    Q.   Are you involved throughout your
9  career -- have you been involved in many
10 investigations?
11   MR. YI:  Objection to form.
12   A.   Some investigations.  Some
13 investigations.  I don't know if I would say
14 many.  I get involved in a lot of things at
15 the bank.
16   Q.   Have you ever been involved in an
17 investigation with serious wrongdoing at any
18 of the banks you've been engaged in other than
19 this?
20   MR. YI:  Objection to form.
21   A.   So at least a few others, yes.
22   Q.   What were the nature of those
23 matters just generally?
24   A.   The only one I can think of now is
25 the one that I was referring to earlier, about

LISA PAI (7/13/17)

1
2  $300,000 embezzlement.
3    Q.   And what bank was that at?
4    A.   I think it was CentreBank.
5    Q.   And approximately we can tell by
6  looking, the years, what years were you at
7  CentreBank?
8    A.   I think it was around 2007 to maybe
9  2010 or '11.
10   Q.   So sometime in that time frame you
11 were involved in an investigation of an
12 embezzlement of approximately $300,000,
13 correct?
14   A.   Correct.
15   Q.   Did you interview the witnesses?
16   A.   Yes, I believe so.
17   Q.   Were you the head of the
18 investigation?
19   MR. YI:  Objection to form.
20   A.   Along with consultants and outside
21 counsel.
22   Q.   Who was your outside counsel in
23 that case?
24   A.   Oh, I don't remember.
25   Q.   Okay.  So you don't have a lot of

LISA PAI (7/13/17)

1
2  experience with conducting this type of
3  investigation, would that be fair to say?
4    MR. YI:  Objection to form.
5    A.   That would be fair to say.
6    Q.   Now, it says here in the bottom of
7  page 2 carrying over to page 3, that "Chon-Kim
8  had already begun her scheme and she shared
9  her method with Ryu.  Ryu told her to begin
10 giving money to him and that she can be
11 compensated later on"; you see that?
12   A.   Yes.
13   Q.   It doesn't say anything about Ryu
14 finding out that she had been involved in the
15 scheme, discovering her, catching her, if you
16 will, does it?
17   MR. YI:  Objection to form.
18     I think the document speaks for
19 itself, but you can answer if you can.
20   A.   No, it doesn't say that here.
21   Q.   Was it -- did Karen tell you that
22 James Ryu had caught her?
23   A.   Yes, I believe so.
24   Q.   Did she tell you how he caught her?
25   A.   She didn't go into details.  She

Page 198

LISA PAI (7/13/17)

1
2  just told me that he knew and was holding that
3  against her and -- which is why she couldn't
4  say anything and had to follow his
5  instructions.
6      Q.  Now, Alicia Lee interviewed Karen
7  separately from you, right?
8      A.  Yes, Alicia interviewed Karen
9  before me.
10     Q.  And Alicia Lee wasn't present
11 during your interview of Kim?
12     A.  That's right.
13     Q.  Did you share with Alicia the
14 details of what your interview was with Karen?
15     A.  I don't recall whether I shared
16 specific details with Alicia.
17     Q.  Well, in the same paragraph, it
18 goes onto say -- first of all, Karen clearly
19 told you that she was afraid of James Ryu and
20 that he was going to turn her in if she didn't
21 give him money?
22     A.  Right.
23        MR. YI:  Objection to form.
24     Q.  But that's not what Alicia says in
25 this memo, is it?

Page 199

LISA PAI (7/13/17)

1
2        MR. YI:  Objection to form; asked
3     and answered.
4      A.  Well, again, this is not a memo by
5  her.  It's a memo by FBI, interpreting, I
6  guess, summarizing the discussions with her.
7      Q.  Understood.  But in any event,
8  there's no record here that she said that
9  Alicia Lee said that to the FBI, correct?
10        MR. YI:  Objection; asked and
11     answered.
12     A.  Yes, there's no indication here as
13 far as I can see.
14     Q.  Did you talk to Alicia Lee about
15 her interview of Karen in detail?
16     A.  I don't recall how much detail.  I
17 remember seeing her memo and I don't recall
18 specific discussions with Alicia about details
19 after that point.
20     Q.  Did you make any efforts to compare
21 what Karen had told Alicia, Bo-Young, Karen or
22 anyone else with what she told you to see if
23 there was consistency or inconsistency?
24        MR. YI:  Objection to form.
25     A.  Did I make any efforts?

Page 200

LISA PAI (7/13/17)

1
2      Q.  Yes.
3      A.  So I do remember that there were
4  some inconsistencies initially on Karen's
5  accounts and I believed that it had to do with
6  her attempt to try to get -- raise money
7  quickly, so that she can get the bank to not
8  pursue criminal charges, because I was told
9  that she was extremely afraid of having to go
10 to jail.  She had a three-month old baby at
11 the time and a young child also and that, you
12 know -- so I believe that she was very
13 confused and that's why she was -- had some
14 inconsistencies because initially she believed
15 that James might be able to help her
16 financially.
17     Q.  So what were the inconsistencies
18 you were aware of at the time?  Not looking
19 now, but at the time, what inconsistencies in
20 Karen's story were you aware of?
21     A.  At the time that I interviewed her?
22     Q.  Yes.  And/or at the time you made
23 the decision to accept her word over James'
24 word and file the lawsuit?
25     A.  Yes, I do remember hearing about

Page 201

LISA PAI (7/13/17)

1
2  some inconsistencies.  I don't recall the
3  specifics, but I do recall that she was trying
4  desperately to raise money and ask the bank if
5  $500,000 would be sufficient for the bank to
6  reconsider pressing criminal charges.  She
7  just simply thought that if she could come up
8  with that money, that the bank would not have
9  to go no further and she wouldn't have to go
10 to jail.
11     Q.  Did she say that to you?
12     A.  I don't recall if we had that
13 discussion.  By the time I spoke with her
14 directly, I think by then she was telling me
15 that James was -- she was telling me about the
16 two meetings she had with James and that that
17 was his condition, but by telling us, she --
18 you know, she wanted us, wanted the bank to
19 know that these were his conditions.
20     Q.  Did she tell somebody at the bank
21 that if she came up with $500,000 or did she
22 ask whether she came up with a $500,000, gave
23 it to the bank, the matter would go away?
24        MR. YI:  Objection to form.
25     A.  My recollection is she spoke to

LISA PAI (7/13/17)

1  LISA PAI (7/13/17)
2  somebody at the bank.
3      Q.  Do you know who that was?
4      A.  I don't recall.
5      Q.  Do you remember what she was told
6  in response to her inquiry about paying
7  $500,000 to make the matter go away?
8      A.  I think I told somebody at the bank
9  that just her giving us $500,000 may not be
10 sufficient for the bank to make the matter go
11 away basically.
12     Q.  Do you remember who you said that
13 to?
14     A.  No, I don't recall.
15     Q.  But your pretty clear memory that
16 communication was had, you just can't remember
17 with whom?
18     A.  Well, so I'm trying to think.  I do
19 remember in that conversation also saying that
20 yes, the bank definitely wants to recover some
21 money because I was concerned about being
22 unable to recover any money, so I don't think
23 it was a clear cut no, but more like, you
24 know, we'll see how much can she raise, we
25 want to know.  I think that was the

1  LISA PAI (7/13/17)
2  discussion.
3      Q.  She was offering approximately
4  $500,000?
5      A.  She thought she could raise
6  $500,000, that's my recollection.  She thought
7  she could and I think she thought she could
8  with the help of James Ryu.
9      Q.  And you don't remember how you got
10 that information; you just know that you
11 thought that?
12         MR. YI:  Objection to form.
13     A.  I think it may have come either
14 through Alicia or Irene.
15     Q.  I'd asked you before about
16 inconsistencies about what Karen had told you,
17 told the bank, either you or Alicia or anyone
18 else at the bank and you said there were some
19 inconsistencies; did I understand correctly
20 you can't recall what the inconsistencies
21 were?
22     A.  It's kind of blurry in my mind,
23 because I'm trying to isolate at that time,
24 you know, what did I know and then things are
25 kind of blurring, so I know there's some

1  LISA PAI (7/13/17)
2  inconsistencies overtime, not knowing exactly
3  when it was, about the amount and about
4  whether James was involved, because I think
5  she was very confused at the time.
6      Q.  So you don't recall what the
7  inconsistencies were, am I correct?
8      A.  Yes, it's not very clear in my mind
9  as to exactly that time.
10     Q.  You think that Karen was confused,
11 whatever they were, you attribute it to her
12 being confused because she had a baby and was
13 afraid of going to prison?
14     A.  That's what I remember thinking.
15     Q.  Do you remember making any effort
16 to say let's get the stories she told and line
17 them up, let's see if there's any
18 consistencies in the inconsistencies?
19     A.  So I remember -- sorry, can you
20 repeat that question?
21     Q.  Yes.  Sure.
22         In connection with your decision to
23 accept Karen's word over James' word, that you
24 wanted to see what specifically she had told
25 you versus what she told Alicia versus what

1  LISA PAI (7/13/17)
2  she told anybody else at the bank,
3  specifically to lineup the accounts and see if
4  they're consistent or inconsistent?
5          MR. YI:  Objection to form.
6      A.  So at the time, what I was thinking
7  is there are obviously a lot of things I'd
8  like to know and lineup, but the criminal FBI
9  was already involved and they were
10 investigating, so I think we, in my mind, I
11 was deferring some of the investigation to the
12 FBI.  They didn't always share everything with
13 me, but I knew that they were meeting with
14 Karen.  They were meeting with Alicia.  They
15 were meeting with Orest.  So at that point, I
16 didn't necessarily think that me requesting
17 separate meetings would necessarily help at
18 that point, that they were conducting probably
19 a more thorough investigation, but I don't
20 know, that's what I was thinking.
21     Q.  Did you have communications with
22 the FBI about their investigation other than
23 perhaps to facilitate the interview of
24 witnesses?
25     A.  Right.  It was mostly or all of it

LISA PAI (7/13/17)

1
2  was to facilitate.  They don't necessarily --
3  I think it's their policy not to share content
4  of what they discover.
5      Q.  So in other words, they didn't tell
6  you anything about the substance of what they
7  were finding out or did they?
8      A.  Right, it was mostly just in the
9  context of lining up.
10     Q.  And did you say to yourself I
11 should get the various accounts and line them
12 up for consistency or do you not recall
13 thinking about that at all, specifically
14 taking that step before you filed the lawsuit
15 of examining Karen's various statements for
16 consistency?
17     A.  Right.  So I did, the bank was
18 taking steps already to lineup the
19 transactions because that was an area that FBI
20 wasn't able to -- FBI special agents weren't
21 able to get to right away and understood
22 that's something the bank would have to do.
23 So yes, Alicia and Orest were charged with
24 lining up the transactions and documenting the
25 movement of the money and trying to understand

LISA PAI (7/13/17)

1
2  each step that she took to carry out her
3  scheme, carry out the embezzlement, I should
4  say.  So that part, we were very actively
5  involved, but interviewing potential
6  witnesses, that was something I understood FBI
7  agents were doing and if I tried to do on my
8  own, that I might just interfere with what
9  they were doing, so.
10     Q.  Maybe I wasn't clear.  I'm
11 interested in the statements that Karen gave
12 to you, Alicia Lee, to other bank employees;
13 did you make any effort to take exactly what
14 -- go to those people and say what did she say
15 to you, what did she say to you, what did she
16 say to you, line them up to see whether they
17 were consistent or inconsistent or do you have
18 no recollection one way or the other on that?
19     A.  Well, part of what was -- Orest
20 wrote up included some of the information
21 relating to what various people found out, so
22 I used some of this information to lineup what
23 information was being gathered.
24     Q.  So you did make an effort to lineup
25 the various statements to see whether they

LISA PAI (7/13/17)

1
2  were consistent or inconsistent; do I
3  understand you correctly?
4      MR. YI:  Objection to form.
5      A.  To an extent, I could at the time
6  with the resources I had, and again what made
7  sense at the time, yes.
8      Q.  So to whom did Karen make
9  statements other than you?
10     A.  So initially I think she made
11 statements to Bo-Young Lee and Irene Lee and
12 then to Alicia and then to the FBI and then to
13 me, I think that was....
14     Q.  Do you remember what Bo-Young Lee
15 told you about her, the statements that Karen
16 had made to her?
17     A.  Yes, I think when I went to visit
18 BankAsiana, former BankAsiana and met with
19 Bo-Young, I think we did go over what she
20 heard from Karen and also what she knows about
21 James and she answered any questions I had
22 about both of them.
23     Q.  Did you make notes of that
24 conversation?
25     A.  I don't recall.  Some of the

LISA PAI (7/13/17)

1
2  meetings I took notes.  Some of them were just
3  verbal.
4      Q.  Did you interview Irene?
5      A.  Yes, I met with her.
6      Q.  Do you remember what she told you?
7      A.  She recounted similar to Bo-Young,
8  Irene also recounted her meeting and
9  conversations with Karen and then she answered
10 some of my questions about what she knew about
11 Karen and James Ryu, then I don't remember if
12 it was at that meeting or subsequent meeting
13 or discussion with Irene, but she also relayed
14 to me that James Ryu was calling her a lot and
15 leaving messages and that she was getting
16 nervous and afraid that to the point where she
17 was afraid to go to the parking lot by herself
18 at the end of a long day in case he might show
19 up and confront her.
20     Q.  Sure.  Did she tell you that she
21 thought Ms. Karen was lying, specifically
22 lying about James' involvement?
23     A.  No, I mean other than, yes, I think
24 they both acknowledged that there was some
25 inconsistencies, but I think she -- my

Page 210

LISA PAI (7/13/17)

1  recollection is she believed Karen more than
2  James.
3      Q.  Did you ask her whether she
4  believed Karen or James?
5      A.  Yes, I asked her in various ways,
6  but obviously, you know, they were careful not
7  to make statements of facts that they were not
8  really sure about, because they didn't witness
9  anything, so they were careful.
10     Q.  But she told you she believed Karen
11 over James?
12     A.  My big recollection, she may not
13 have said it quite that way, but that she --
14 both -- everyone I spoke to was surprised that
15 Karen would implicate James because everyone
16 at the bank was intimidated and scared of
17 James who had a temper and who was often very
18 harsh to employees and had a lot of authority
19 at the bank, so that it was surprising to them
20 if she would falsely implicate anybody, that
21 it would be James, but they were again very
22 careful about not saying things they didn't
23 have direct knowledge.
24     Q.  So look at -- please take a look, a

Page 211

LISA PAI (7/13/17)

1  second look at the exhibit marked as Ryu-22.
2  It's a three-page document.
3      A.  Yes.
4      Q.  Appears to be an FBI interview of
5  Jin Hee, Irene Lee?
6      A.  Yes.
7      Q.  The date says 3/18/2014?
8      A.  Yes.
9      Q.  You read this during the break,
10 didn't you?
11     A.  I did, but different interviews are
12 kind of -- yeah, I did.
13     Q.  I just want to ask a few questions
14 about it but apropos of the subject we were
15 just discussing, if you turn to page 3 of this
16 memo, first full paragraph, it says "Lee
17 stated that it is her belief that Ryu was
18 unaware of Chon's embezlement scheme.  Lee
19 said she believed Chon's story during their
20 first meeting, however, after hearing all the
21 inconsistencies in Chon's story during the
22 second meeting, Lee no longer thinks Chon is
23 telling the truth"; you see that?
24     A.  Yes, I see that.

Page 212

LISA PAI (7/13/17)

1      Q.  Did she say anything like that to
2  you?
3      A.  Like I said, both Irene and Alicia
4  did tell me about some inconsistencies that
5  raised out in their mind.
6      Q.  So is it possible she told you
7  that?
8      A.  It's possible she told me that,
9  yes.
10     Q.  Let me ask you a few questions
11 about this.
12     A.  And what else she said, I remember
13 is that she really didn't want to be involved.
14 She really didn't want to -- like I said, she
15 was very careful about what she said and she
16 said she didn't want to be involved.  She
17 didn't want -- the impression I got is she
18 didn't want to upset James in any way because
19 even though he kept calling, especially
20 because he kept calling her and it was
21 literally scaring her.  So she just said she
22 didn't want to be put in that position.
23     Q.  Position of what?
24     A.  Of being in the middle of James and

Page 213

LISA PAI (7/13/17)

1  the bank and Karen.
2      Q.  Right.
3          But nonetheless she was in that
4  position, right, because of her position in
5  the bank?
6      A.  Yes, but she knew what James is
7  saying and what Karen is saying are two
8  different things and you know, she just didn't
9  want to be asked what she thought.
10     Q.  Did she say that?
11     A.  No, that was the impression I got.
12     Q.  So if you look at this memo, it
13 says on the bottom of the first page, doesn't
14 talk about first meeting, it says this is --
15 if you read the paragraph that begins on the
16 bottom of the first page and carries over to
17 the second page.
18     A.  Okay.
19     Q.  Now, on the second page, the first
20 full paragraph, the single sentence, do you
21 know who Tai Kyo Soh is; do you know who that
22 is?
23     A.  No, I don't.
24     Q.  Well, she's clearly talking in

LISA PAI (7/13/17)

1
2  here, maybe not taken down correctly in the
3  FBI memo, but clearly talking about a
4  subsequent call or subsequent meeting by
5  somebody with -- of BankAsiana with Chon in
6  person, whether that was Alicia Lee, how do
7  you -- how do you say Alicia Lee's name in
8  Korean?
9      A.  I don't know her name in Korean.
10  She doesn't go by her Korean name.
11      Q.  So we don't know who that is.  It
12  may not be Alicia Lee.  All right.
13      But in the paragraph carried over
14  from the first page to the second page, it
15  says that the next day, Lee called Chon to ask
16  about the transactions, Chon told Lee she
17  wanted to tell the truth and admitted she had
18  stole money from BankAsiana and then taking
19  cash out of the vault, Chon told Lee she
20  learned how to embezzle from her formal
21  supervisor?
22      A.  I'm lost, okay.
23      Q.  "This supervisor showed Chon how to
24  make the accounting changes needed to take
25  cash out of the bank's vault undetected"; do

LISA PAI (7/13/17)

1
2  you see that?
3      A.  Yes.
4      Q.  Now, that's somewhat inconsistent
5  with what Karen told you, which is that she
6  had been doing this for a while and James Ryu
7  caught her?
8      A.  Oh, I think the way to explain that
9  is what she had been doing before is just
10  taking money out of her husband's partner's
11  account, so it involved just a single account,
12  which is easy to do.  She was temporarily
13  borrowing it to help her husband's business,
14  but I think she's talking about taking money
15  out of customers' accounts, multiple customer
16  accounts requires more thought, more
17  procedure.  I don't know how to describe it.
18  I think that's the difference.
19      Q.  Are you just assuming that or do
20  you remember that from something that someone
21  told you such as Irene Lee?
22      A.  So I do recall when I spoke with
23  Karen, she was describing how she kind of came
24  up with the way to do that without -- to not
25  be detected and to take money out of multiple

LISA PAI (7/13/17)

1
2  accounts, because I was asking her about does
3  she -- how does she keep track, things like
4  that, so she had to kind of talk a little bit
5  about how it was set up, so I think that's
6  what she's referring to.
7      Q.  So she was initially -- she told
8  you she was initially stealing from one
9  account, she was stealing from two accounts,
10  right, initially?
11      A.  Yes, her -- mostly I think -- my
12  recollection is mostly she was taking money
13  out of her husband's partner's account.  I
14  actually don't recall specifically what she
15  was doing with her sister-in-law's account,
16  maybe borrowing her identity.
17      Q.  And then James caught her at that,
18  stealing from whoever one or two people she
19  was related to, and it was at that point he
20  caught her and taught her how to steel from
21  more accounts, widely taught her how to steel
22  from more accounts; is that what she told you?
23      MR. YI:  Objection to form.
24      A.  No, I don't think she said it quite
25  that way that he taught her.  Think my

LISA PAI (7/13/17)

1
2  recollection of how she described it is he
3  kind of gave her suggestions on how she can
4  figure it out, you know.  I think she
5  referenced some BSA training, that kind of --
6  something like he kind of gave her suggestions
7  about how she could figure it out herself.
8      Q.  What were those suggestions?
9      A.  I think kind of statements like
10  you'll figure it out, you know, BSA and you
11  know, operations, that kind of suggestions.
12  So I don't think he -- that was the impression
13  I got from that conversation is he didn't
14  literally tell her do this and then this and
15  this and that, but kind of encouraged her to
16  figure out how to get the money out because he
17  needed money and you better do it and I'm sure
18  you can come up with ideas from, you know, BSA
19  to avoid kind of detection through BSA.  I'm
20  sure you'll come up with something.  You
21  better come up with something.  That was the
22  impression I got and the rest of it was up to
23  her to figure out.
24      Q.  Well, this memo which is purporting
25  to state what Irene Lee told the FBI is that

Page 218

LISA PAI (7/13/17)

1
2  Chon told Lee that she learned how to embezzle
3  from the former supervisor, this supervisor
4  showed Chon how to make the accounting changes
5  needed to take the cash out of the vault
6  undetected; you see that?
7      A.  Yes, I see that.
8      Q.  Did Karen say anything like that to
9  you?
10     A.  So it's consistent with the fact
11 that she -- James basically told her that she
12 needed to figure it out and that she was
13 concerned about detection.
14     Q.  Did she say anything like that to
15 you, that the supervisor showed her how to
16 make the accounting changes needed to take the
17 cash out of the bank's vault undetected?
18     A.  No.  The way she said it to me was
19 like he made some broad suggestions on how she
20 could figure it out and that the rest was --
21 the rest of it was up to her to figure out the
22 details.  So it's more or less consistent, but
23 I wouldn't say she learned how to embezzle
24 from the former supervisor other than the fact
25 that I think James did conduct BSA training at

Page 219

LISA PAI (7/13/17)

1
2  the bank, maybe that's what she meant.  She
3  said BSA training materials gave her some
4  ideas.
5      Q.  Karen said BSA training materials
6  gave her ideas?
7      A.  I think she referenced some kind of
8  training.
9      Q.  Did she say BSA training materials
10 gave her ideas or did she just make reference
11 to BSA training materials?
12     A.  Exact words, I don't have a clear
13 recollection, but she may have said she got
14 ideas from BSA materials.
15     Q.  She may have said or did say; do
16 you remember?
17     A.  I do remember BSA training, that's
18 kind of etched in my brain from my
19 conversation with her.  Exactly how she said
20 it, I don't recall.
21     Q.  Now, this memo says that "Irene
22 said that the supervisor told Chon to embezzle
23 the money and then give it all to him.  At
24 first, the supervisor said he would only take
25 $10,000 out for a short time and then pay it

Page 220

LISA PAI (7/13/17)

1
2  all back"; do you see that?
3      A.  Um-hum.
4      Q.  You have to say yes or no.
5      A.  Yes, I see that.
6      Q.  She's clearly suggesting from the
7  outside, all the money went to James, right?
8      A.  So I don't know.
9          MR. YI:  Objection to form.
10     Q.  Well, if you wanted to see that,
11 you can see it, it becomes clear at the end of
12 the second sentence of the third paragraph,
13 full paragraph beginning on page 2.  I'll read
14 it, that whole paragraph.  It says "A few days
15 after speaking to Chon, Lee noticed that some
16 of the money that Chon stole was transferred
17 into her business account at BankAsiana.  This
18 contradicted Chon's statement that all of the
19 money went to her unnamed supervisor"; you see
20 that?
21     A.  Which paragraph are you reading?
22     Q.  Second page.
23     A.  "A few days after," okay.
24     Q.  Read that paragraph.
25     A.  "A few days after speaking to Chon,

Page 221

LISA PAI (7/13/17)

1
2  Lee noticed that some of the money that Chon
3  stole was transferred into her business
4  account at BankAsiana," okay.
5      Q.  So if I understand from this memo,
6  that Irene said that Karen initially told her
7  that James was present at the outset of the
8  scheme, not at some later point and all the
9  money went to him?
10         MR. YI:  Objection to form.
11     A.  See, I don't under -- I don't know
12 what Irene is referring to here because a few
13 days after speaking to Chon, that's not --
14 this is after the fact.  These are not talking
15 about -- she's not talking about money being
16 embezzled out of customer accounts.  She's not
17 talking about -- she's not referring to the
18 embezzlement.  I think she's referring to
19 after she talked to Karen, Karen who still had
20 some accounts at BankAsiana, transferred some
21 money out of, was transferred into -- some
22 money was transferred into BankAsiana account,
23 so I think she's just talking about some
24 transfer of money in Karen's account.
25     Q.  Sure.

LISA PAI (7/13/17)

1
2    A.  This is all after the embezzlement.
3  She's not describing the embezzlement.
4    Q.  No.  She's says in the next
5  sentence, "this contradicted Chon's statement
6  that all of the money went to her unnamed
7  supervisor"; that would suggest that -- I
8  think it was no other reasonable way to read
9  that except that Chon had told her previously
10  that all of the money went to her unnamed
11  supervisor and if you go back to the sentences
12  that I referred you to, at the bottom of the
13  first -- second page, that clearly confirms
14  that.  Please take a moment to read that.
15    A.  I just --
16    MR. YI:  I just want to make this
17    record, this appears to be a summary
18    prepared by a representative of the
19    FBI based on the interview.  If you
20    can answer, you can.
21    A.  But this exhibit is a summary of
22  the interview of Irene.
23    Q.  Yes, this is a summary of an
24  interview with Irene Lee.
25    A.  And the date, a few days after

LISA PAI (7/13/17)

1
2  speaking to Chon.
3    MR. YI:  Sorry, for the record
4    though, it says Alicia Lee.
5    MR. HARVEY:  Yes, the second and
6    third pages do say that and also have
7    the date of February the 4th, 2014.
8    The top page, the first page says
9    3/18/2014, so presumably they used the
10    same form and forgot to change the
11    date on the second and third pages.
12    A.  That's kind of confusing.
13    Q.  Whatever it is, it appears from the
14  FBI memo that Karen told Irene from the
15  beginning all of the money went to James?
16    MR. YI:  Objection to form.
17    A.  I think --
18    Q.  You don't agree with that?
19    A.  No, I think this paragraph is
20  summary by FBI agent who probably
21  misunderstood what Irene is trying to say,
22  because the timing of the transfer of money in
23  Karen's account is really not related to the
24  embezzlement, but a movement of funds in her
25  account after Irene spoke with Karen.

LISA PAI (7/13/17)

1
2    Q.  Let's cut this short.  You were not
3  aware or were you aware that Irene told the
4  FBI that Karen told her initially that all of
5  the money from the beginning went to James,
6  you either were aware of that or you were not
7  aware of that?
8    A.  So --
9    MR. YI:  Objection to form.
10    A.  So I wasn't aware that Irene had
11  that -- said that to the FBI or if I was, I
12  don't recall, but this is consistent with what
13  Karen told me is initially James asked to loan
14  money that she can kind of get out of bank
15  accounts somehow and that he was going to pay
16  it back.  And so initially that's what she did
17  was take it out and give it to him expecting
18  him to pay it back, but pretty soon it became
19  clear that he wasn't going to give any of it
20  back and he kept asking for more and more and
21  more and larger and larger amounts.  So then
22  that's when she realized that he is never
23  going to pay it back and I think that's what
24  she means about originally she only took out
25  the money that he asked for, but eventually

LISA PAI (7/13/17)

1
2  when she realized that he's not going to pay
3  it back, then she started taking money out
4  also to help her husband's business.  I think
5  that's what she means by initially all of it
6  went to James.
7    Q.  Which page, which words are you
8  focused on here in the memo?
9    A.  Second page, top, where it said the
10  supervisor said he would only take 10,000 out
11  for a short time, pay it all back.
12    MR. YI:  Can we go off the record.
13    (Whereupon, at this time, a short
14    break was taken.)
15  BY MR. HARVEY:
16    Q.  So to be clear, I'm asking you, I'm
17  putting the statements in front of you.  These
18  aren't your statements.  They're somebody
19  else's statements.  I'm asking about some of
20  the stuff in here.  If it's clear what was
21  said, I can ask.  If it's unclear, I don't
22  think either of us is in a position to
23  speculate about what was actually said.  Maybe
24  they took it down wrong.
25    I'm asking you about statements in

Page 226

LISA PAI (7/13/17)

1  
2  here to see if those statements were the same
3  as what was said to you.  I'm asking about
4  what you know.  I'm ultimately not asking to
5  interpret this memo other than to tell me how
6  it relates to what you remember was told to
7  you.
8          But the bottom line is you don't
9  remember, do you, Irene Lee saying to you or
10  communicating in any way that at first Karen
11  told me all of the money was going to go to
12  James in the beginning and then noticed not
13  all the money was going to James, some of it
14  was going to her; do you remember Karen
15  telling you that -- excuse me, do you remember
16  Irene telling you that?
17      A.  No, I don't remember Irene telling
18  me that.
19      Q.  If you look further down, in the
20  further full paragraph on page 2.
21      A.  Yes.
22      Q.  It said -- it says "Specifically,
23  in the first meeting, Chon said that her
24  supervisor taught her how to embezzle.  In
25  this second meeting, Chon said that she and

Page 227

LISA PAI (7/13/17)

1  
2  Ryu came up with the embezzlement scheme
3  together"; you see that?
4      A.  Yes.
5      Q.  Do you remember Irene Lee telling
6  you either of those things?
7      A.  I don't have that.  I don't have a
8  recollection of her telling me this.
9      Q.  Did Irene Lee tell you that Chon
10  had said anything about a possible romantic
11  link between herself and Ryu?
12      A.  I do recall hearing about a
13  possible relationship.  I think everyone --
14  because Karen -- whatever Karen told them was
15  very vague, so I think Irene and/or Alicia or
16  Bo-Young suspected it was romantic
17  relationship, that's what I remember hearing.
18      Q.  Did Karen Chon say anything about a
19  romantic relationship between her and James
20  Ryu to you?
21      A.  I don't think so.  She basically
22  said he has, you know, something on her, but I
23  didn't understand that to be a romantic
24  relationship.
25      Q.  Do you remember Irene Lee saying to

Page 228

LISA PAI (7/13/17)

1  
2  you anything about a romantic relationship
3  between Karen Chon and James?
4      A.  Yes.  So as I just said before,
5  that's what they were suspecting, that it was
6  a romantic relationship, but I remember Irene
7  and/or Alicia telling me that because the
8  words that Karen had used were vague, they
9  weren't 100 percent clear that it was a
10  romantic relationship, but that they suspected
11  it was a romantic relationship.
12      Q.  If this is to be believed in the
13  plain language used here, Irene told the FBI
14  that in one interview, Chon said there was a
15  romantic relationship, a romantic link and the
16  other, she said there wasn't a romantic link;
17  did Irene say anything about Chon saying there
18  was or was not a romantic link?
19      MR. YI:  Objection to form.
20      A.  Yeah, so my recollection is that
21  she thought there was a romantic relationship,
22  but that Karen had used words that were vague,
23  so she wasn't sure, so she assumed they were
24  romantically involved.
25      Q.  So Irene told you just that she had

Page 229

LISA PAI (7/13/17)

1  
2  made vague references that might have been
3  interpreted to suggest that?
4      A.  Right.
5      Q.  She didn't say on one occasion she
6  said there was or one occasion there wasn't;
7  she didn't say that to you?
8      MR. YI:  Objection to the form.
9      A.  No, not like that.
10      Q.  Did you know that Karen Chon was
11  sentenced by the federal court in New Jersey?
12      A.  Yes, I remember.
13      Q.  Did you get a report on what Karen
14  Chon and the FBI said at the sentencing
15  hearing?
16      A.  I think I did, but I can't
17  specifically.  I do remember reading various
18  accounts, whether it was newspaper reports or
19  I think there was some kind of notification to
20  victims about criminal proceeding progress.
21      MR. YI:  Would this be a good time
22  to take a break now.
23      (Whereupon, at this time, a short
24  break was taken.)
25      (Ryu Exhibit 23, transcript of

Page 230

LISA PAI (7/13/17)

1
2   proceedings was marked for
3   identification, as of this date.)
4   (Time noted:  4:54 p.m.)
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

---

Page 231

LISA PAI (7/13/17)

1
2
3       J U R A T
4
5
6       I, LISA PAI, do hereby certify
7   under penalty of perjury that I have
8   read the foregoing transcript of my
9   deposition taken on July 13, 2017;
10  that I have made such corrections as
11  appear noted herein in ink, initialed
12  by me; that my testimony as contained
13  herein, as corrected, is true and
14  correct.
15
16
        _____
17          LISA PAI
18
19
    Subscribed and sworn to before me
20
    This _____ day of _____, 2017.
21
22  _____
        NOTARY PUBLIC
23
24
25

---

Page 232

LISA PAI (7/13/17)

1
2   ----------------I N D E X----------------
3   WITNESS        EXAMINATION BY        PAGE
4   LISA PAI      MR. HARVEY        6
5
6
7
8   ----------------E X H I B I T S-------------
9   RYU EXHIBIT            FOR I.D.
10  Ryu Exhibit 12,            5
11  Introduction, 2014R00082/6,
12  Volume 1, Bates labeled WB795
13  through '808
14
15  Ryu Exhibit 13,            5
16  Document Bates labeled WB810
17  through '817
18
19  Ryu Exhibit 14,            5
20  Handwritten notes Bates labeled
21  WB2054 through '2059
22
23  Ryu Exhibit 15,            5
24  Notice of Deposition
25

---

Page 233

LISA PAI (7/13/17)

1
2   Ryu Exhibit 16,            29
3   E-mail chain dated
4   January 22, 2014
5
6   Ryu Exhibit 17,            70
7   Website printout dated January
8   30, 2014
9
10  Ryu Exhibit 18,            100
11  Complaint
12
13  Ryu Exhibit 19,            122
14  Plaintiff Wilshire Bank's
15  Responses and Objections to
16  Defendant Suk Joon Ryu's Fourth
17  Set of Interrogatories
18
19  Ryu Exhibit 20,            179
20  Memo dated February 10, 2014,
21  Bates labeled Exhibit 1 D000005
22  through '9
23
24
25

Page 234

```
 1            LISA PAI (7/13/17)
 2    Ryu Exhibit 21,          189
 3    Memo dated February 24, 2014,
 4    Bates labeled Exhibit 1 D000001
 5    through '4
 6
 7    Ryu Exhibit 22,          190
 8    Memo dated March 18, 2014, Bates
 9    labeled D000010 through '12
10
11    Ryu Exhibit 23,          229
12    Transcript of proceedings
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 235

```
 1            LISA PAI (7/13/17)
 2       C E R T I F I C A T E
 3
 4    STATE OF NEW JERSEY   )
 5                 : SS.:
      COUNTY OF MONMOUTH   )
 6
 7        I, AYLETTE GONZALEZ, a Notary Public
 8    for and within the State of New Jersey, do
 9    hereby certify:
10        That the witness, LISA PAI, whose
11    examination is hereinbefore set forth was
12    duly sworn and that such examination is a
13    true record of the testimony given by that
14    witness.
15        I further certify that I am not
16    related to any of the parties to this action
17    by blood or by marriage and that I am in no
18    way interested in the outcome of this matter.
19        IN WITNESS WHEREOF, I have hereunto
20    set my hand this 25th day of July, 2017.
21
22    _____
          AYLETTE GONZALEZ
23
24
25
```

Page 236

```
 1            LISA PAI (7/13/17)
 2       ERRATA SHEET FOR THE TRANSCRIPT OF:
 3    Case Name:    BANK OF HOPE vs. MIYE CHON
      Dep. Date:    July 13, 2017
 4    Deponent:     LISA PAI
 5    Pg. Ln. Now Reads    Should Read   Reason
 6    ___ ___ _____ _____ _____
 7    ___ ___ _____ _____ _____
 8    ___ ___ _____ _____ _____
 9    ___ ___ _____ _____ _____
10    ___ ___ _____ _____ _____
11    ___ ___ _____ _____ _____
12    ___ ___ _____ _____ _____
13    ___ ___ _____ _____ _____
14    ___ ___ _____ _____ _____
15    ___ ___ _____ _____ _____
16    ___ ___ _____ _____ _____
17    ___ ___ _____ _____ _____
18    ___ ___ _____ _____ _____
19    ___ ___ _____ _____ _____
20    ___ ___ _____ _____ _____
      _____
21          LISA PAI

22    SUBSCRIBED AND SWORN BEFORE ME,

23    This___ day of_____, 2017.

      _____
24        Notary Public
25    My Commission Expires:_____
```