# EXHIBIT

# 14

Page 237

1          IN THE UNITED STATES DISTRICT COURT
            FOR THE DISTRICT OF NEW JERSEY
2
                CASE NO. 2:14-cv-01770-JLL-JAD
3
     ---------------------------------*
4    BANK OF HOPE, as successor to
     Wilshire Bank,
5
                              Plaintiff,
6
            vs.
7
     MIYE CHON, a/k/a Karen Chon, SUK
8    JOON RYU a/k/a James S. Ryu; TAE
     JONG KIM; BERGENFIELD BAGEL & CAFE,
9    INC., d/b/a Cafe Clair, MAYWOOD
     BAGEL, INC.; UB'S PIZZA & BAGEL,
10   INC.; UB'S BAGEL & CAFE, INC.; and
     UBK BAGELS CORP., d/b/a/ Franklin
11   Bagels & Cafe,
12                            Defendants.
     ---------------------------------*
13   (Caption continued on next page.)
14
15
16            DEPOSITION OF:  LISA PAI
17                 VOLUME II
18
            DATE TAKEN:  Friday, August 18, 2017
19
20
21
22
23
24
25   JOB NO 128677

## Page 238

```
  1        ------------------------------*
  2    SUK JOON RYU, a/k/a James S. Ryu,
  3              Counterclaim Plaintiff,
  4         vs.
  5    BANK OF HOPE, as successor to Wilshire
       Bank,
  6
              Counterclaim Defendant,
  7        ------------------------------*
       SUK JOON RYU, a/k/a James S. Ryu,
  8
              Third-Party Counterclaim
  9              Plaintiff,
 10         vs.
 11    KWON HO JUNG; JAE WHAN YOO; STEVEN S.
       KOH and LISA PAI,
 12
              Third-Party Counterclaim
 13              Defendants.
           ------------------------------*
 14    SUK JOON RYU, a/k/a James S. Ryu,
 15              Cross-Claim Plaintiff,
 16         vs.
 17    MIYE CHON, a/k/a Karen Chon; TAE JONG
       KIM; BERGENFIELD BAGEL & CAFE, INC.,
 18    d/b/a Cafe Clair; MAYWOOD BAGEL, INC.;
       UB'S PIZZA & BAGEL, INC.; UB'S BAGEL
 19    & CAFE, INC.; and UBK BAGELS CORP.,
       d/b/a Franklin Bagels & Cafe,
 20
              Cross-Claim Defendants.
 21        ------------------------------*
 22
 23
 24
 25
```

## Page 239

```
  1        T R A N S C R I P T of the stenographic
  2    notes of the proceedings in the above-entitled
  3    matter, as taken by and before PATRICIA A.
  4    MOHYLA-KLEIN, a Certified Court Reporter and Notary
  5    Public of the State of New Jersey, held at the
  6    office of REGUS, One Gateway Center, Newark, New
  7    Jersey, on Friday, August 20, 2017, commencing at
  8    10:17 a.m.
  9
 10    A P P E A R A N C E S :
 11        Lee Anav Chung White Kim Ruger
           & RICHTER
 12        BY:  MICHAEL YI, ESQ.
              156 Fifth Avenue
 13           New York, New York 10010
              Attorneys for Plaintiff-Counterclaim
 14           Defendant
              BANK OF HOPE, as successor to
 15           Wilshire Bank
              And Third-Party Counterclaim
 16           Defendants
              KWON HO JUNG, JAE WHAN YOO, STEVEN S.
                 KOH and LISA PAI
 17
       STEVE HARVEY LAW
 18        BY:  STEPHEN HARVEY, ESQ.
              1880 John F. Kennedy Boulevard
 19
              Philadelphia, Pennsylvania 19013
 20           Attorneys for Defendant-Counterclaim
              Plaintiff, Third-Party Counterclaim
 21           Plaintiff, Cross-Claim Plaintiff
              SUK JOON RYU, a/k/a James S. Ryu
 22
 23
 24
 25
```

## Page 240

```
  1
                    I N D E X
  2
  3
  4    WITNESS               DIRECT (contd.)
  5    LISA PAI
         BY:  Mr. Harvey          241
  6
  7    EXHIBIT      DESCRIPTION       IDENT.
  8    Ryu 14  Handwritten notes       247
  9    Ryu 24  E-mail chain        386
 10    Ryu 25  E-mail chain        400
 11    Ryu 26  E-mail dated February 4, 2014    406
 12    Ryu 27  Audit committee report      405
 13    Ryu 28  E-mail chain        411
 14    Ryu 29  E-mail chain        411
 15    Ryu 30  Letter dated September 11, 2015   411
 16    Ryu 31  E-mail chain        411
 17    Ryu 32  E-mail chain        411
 18    Ryu 33  Jury Trial Demand       473
 19    Ryu 34  Answer and Counterclaim     474
 20    Ryu 35  Plaintiff Counterclaim, Defendant  473
           Bank of Hope and Third-Party
 21        Defendant's Answer to Counts 3, 4
           and 5 Claims
 22
 23        (EXHIBITS RETAINED BY COUNSEL.)
 24
 25
```

## Page 241

```
  1            L. Pai
  2        L I S A   P A I, business
  3    address of 3200 Wilshire Boulevard, 14th Floor, Los
  4    Angeles, California, 90010, having been duly sworn,
  5    testifies as follows:
  6
  7    DIRECT EXAMINATION BY MR. HARVEY:
  8
  9        Q     Okay.  Miss Pai, we're back on the
 10    record here for the continuation of your deposition.
 11    You're still under oath; you understand that; right?
 12        A     Yes.
 13        Q     Did you do anything to prepare for
 14    today?
 15        A     Yes.
 16        Q     Tell me, please, what you did to
 17    prepare.
 18        A     I reviewed the transcript of the early
 19    deposition and had a meeting with our outside
 20    counsel.
 21        Q     Did you talk to anyone about the
 22    deposition other than your outside counsel?
 23        A     No, other than just letting people know I'm
 24    going to be out of the office.
 25        Q     And did you read the transcript?
```

Page 242

L. Pai

1  Q    Yes, I read the transcript.
2  A    Yes, I read the transcript.
3  Q    Was there anything in there that
4  you noted that you thought was incorrect?
5  A    There were some typos, which I gave to
6  our -- my outside counsel.
7  Q    Other than the typos, was there
8  anything in there that you -- was incorrect that
9  you're aware of?
10 A    No, I -- no, not that I can recall.
11 Q    Okay.  When did you read that
12 transcript?
13 A    When Michael first sent it to me as well as
14 yesterday.
15 Q    Okay.  So you read it -- did you
16 read it again yesterday?
17 A    Yes.  Skimmed over it yesterday.
18 Q    Okay.  You -- but you had
19 previously read it in full?
20 A    Yes.
21 Q    And so let's go back now to your
22 meeting with Karen Chon.  Do you recall having a
23 meeting with Karen Chon?
24 A    Yes.
25 Q    And how many times did you meet

Page 243

L. Pai

1  with Karen Chon?
2  with Karen Chon?
3  A    I met with her once.
4  Q    And was anyone present in that
5  meeting other than you?
6  A    No.  It was just me.
7  Q    And where did that meeting take
8  place?
9  A    At a hotel that I was staying at.
10 Q    Where?
11 A    I think it was in New Jersey, but I don't
12 recall the name of the town.
13 Q    But it was definitely in New
14 Jersey?
15 A    Yes.
16 Q    And when was that meeting?
17 A    That was early February 2014, I believe.
18 Q    What else do you recall happening
19 on the day of the meeting?
20 A    What do you mean what else happened?
21 Q    Did you do anything else that day
22 that you met with Karen in early February 2014?
23 A    I met with Michael, outside counsel,
24 shortly after the meeting with Karen.
25 Q    Did you do anything else that day

Page 244

L. Pai

1  that you can recall?
2  that you can recall?
3  A    I can't remember if it was the same day I
4  was supposed to fly back to LA.  I don't recall
5  really what I did after our -- my meeting with Karen
6  and then with Michael.
7  Q    Did you visit the branch, any
8  branches of the bank that day?
9  A    I may have.  I -- I don't recall if it was
10 that day or the day before or day after.
11 Q    Did you visit -- do you recall that
12 you visited branch operations during that trip that
13 you came out for?
14 A    Yes.
15 Q    And which branches do you recall
16 visiting?
17 A    I think it was our Palisades Park branch.
18 Q    Did you visit any other branches?
19 A    I may have visited Fort Lee branch.
20 Q    Was the primary purpose of the trip
21 to meet with Karen?
22 A    To meet with Karen as well as to talk to
23 former Bank Asiana employees about the incident.
24 Q    So the purpose of the trip was to
25 talk to Karen as well as to talk to other former

Page 245

L. Pai

1  Bank Asiana employees; is that correct?
2  Bank Asiana employees; is that correct?
3  A    Yes.  And to meet with James, if possible.
4  Q    Did you meet with James?
5  A    Yes.  I think I met with James on that
6  trip.
7  Q    Okay.  So which -- which former
8  Bank Asiana employees did you talk to other than
9  James and Karen on that trip?
10 A    I remember talking with Bo Young Lee, with
11 Irene Lee and then Karen and James.  I probably
12 spoke with Eun Moo Choi at the time and other
13 employees whose names I don't recall.
14 Q    How many other employees did you
15 talk to?
16 A    Since I was at the branch offices, I
17 probably introduced myself to whoever I ran into.
18 Q    Okay.  So you recall meeting with
19 Irene Lee; did I hear you correctly?
20 A    Yes.
21 Q    Bo Young Lee?
22 A    Bo Young Lee.
23 Q    Bo Young is B-o, Y-o-u-n-g;
24 correct?
25 A    Right.

Page 246

L. Pai

1
2    Q     And then you also talked with Eun
3    Moo Choi during that trip?
4    A     I believe so, yes.
5    Q     And can you spell for the court
6    reporter, Eun Moo Choi?
7    A     Eun Moo Choi.  E-u-n, M-o-o.  Choi,
8    C-h-o-i.
9    Q     Now, was anybody -- so let's talk
10   first about your meeting with Karen.  Did you -- why
11   didn't you have your outside counsel with you during
12   that meeting?
13   A     Well, he was supposed to come and I think
14   he may have been running late and Karen had to come
15   earlier and she couldn't stay because of her
16   babysitting issues, so she had to leave before
17   Michael arrived.
18   Q     So you met with her alone?
19   A     So I met with her alone, yes.
20   Q     Did you have a set of questions you
21   wanted to ask her?
22   A     I did, yes.
23   Q     And was it -- were they in writing?
24   A     I'm sorry?
25   Q     Were they in writing?

Page 247

L. Pai

1
2    A     I had scribbled some things I might want to
3    cover with her.  Originally it was going to be the
4    outside counsel that was going to question her, but
5    since she came early and he couldn't make it, so I
6    scribbled some things I might want to ask her.
7    Q     Do you know whether your outside
8    counsel later met with Karen or talked to her?
9    A     I don't recall specifically.  I know mostly
10   he talked to Karen's counsel.  Whether he was able
11   to talk to her directly, I -- I don't recall.
12   Q     I brought with us the stack of
13   exhibits from the last time, and I'm going to ask
14   you to look at what's been marked as Ryu 14.  The
15   only problem is it's not in the stack.  So --
16   MR. YI:  Oh, I have a copy.
17   MR. HARVEY:  I believe I have an
18   extra copy of that.  One second, please.
19   Could you please just mark that as Ryu 14?
20   (Whereupon handwritten notes are
21   marked as Exhibit Ryu 14 for identification.)
22   Q     I appear to have misplaced a copy
23   of Ryu 14, so I had the court reporter mark another
24   copy of it.  It's got the Bates numbers WB 2054
25   through 59.  I'm handing it to you.  Please take a

Page 248

L. Pai

1
2    moment to look at it.  My first question is going to
3    be whether you've ever seen it before.
4    A     Yes, I have.
5    Q     Please take a moment to look at
6    every page of it just to ensure that you're really
7    familiar with each page of it.
8    (Whereupon the witness reviews the
9    document.)
10   A     Okay.
11   Q     So now you've looked at every page?
12   A     Yes.
13   Q     Did you read them or just look at
14   them?
15   A     I quickly read through it.
16   Q     Okay.  Now, is this -- do I
17   understand that this is a copy of the notes that you
18   made prior to the deposition as well as the notes --
19   the interview of Karen -- the meeting with Karen as
20   well as the notes of the meeting?
21   MR. YI:  Objection to form.  I
22   think you said deposition, Steve.
23   MR. HARVEY:  I -- I corrected
24   myself.  I meant meeting.
25   MR. YI:  Okay.

Page 249

L. Pai

1
2    A     Yes, that's right.
3    Q     Okay.  Now, how long approximately
4    was the meeting with Karen?
5    A     I think it was -- I believe it was about an
6    hour or shortly less.
7    Q     So it was less than an hour?
8    A     It was close to an hour.
9    Q     And the meeting took place in your
10   hotel room?
11   A     No.  We -- I used a conference room that
12   was available at the hotel.
13   Q     And do you remember what -- how the
14   meeting began, what was said right at the beginning
15   of the meeting?
16   A     Well, at the beginning, greetings, because
17   I had never met her before.  So we introduced each
18   other, and because she told me right up front that
19   she didn't have much time, she had to get back to
20   take her kid back from her -- either mother or
21   mother-in-law, we had to leave in about an hour.  So
22   we sat down and I started asking her questions from
23   my notes.
24   Q     Did you -- did you speak to her in
25   Korean or in English?

Page 250

L. Pai

1
2  A      Yes.  It was in Korean.
3          Q      The entire interview -- the entire
4  meeting was in Korean?
5  A      That's right.
6          Q      Now, did she come early -- do I
7  understand correctly that she came early to the
8  meeting?
9  A      I don't recall if she was early or if
10  Michael was late.  I just remember she arrived
11  before Michael, and by the time she had to leave,
12  Michael hadn't arrived yet.
13          Q      She had limited time, do I
14  understand --
15  A      She had limited time, yes.
16          Q      Do you remember what she looks --
17  what she looked like that day?
18  A      Yes.  I remember what she looked like that
19  day.
20          Q      What did she look like that day?
21  A      She looked to me like a young woman,
22  petite, seemed very afraid and worried.
23          Q      How was -- how was she dressed?
24  A      I don't remember what she was wearing,
25  but -- I just don't remember what she was wearing.

Page 251

L. Pai

1
2          Q      Was she dressed for, like, business
3  attire or was she dressed in casual attire?  Do --
4  do you remember that level of detail?
5  A      I don't think she was dressed up in a
6  business outfit and it wasn't really casual either.
7  So something in between.
8          Q      Do you remember if she had her hair
9  fixed with her makeup on or was she sort of
10  without -- you know, without her hair fixed and
11  makeup?  You know what I'm talking about, with --
12  A      Yes.  She was very well put together in
13  terms of her appearance.  She's a very attractive
14  young woman, so I just noted that -- I remember
15  thinking that, wow, I can't believe someone that
16  appears like she -- I couldn't believe that she had
17  taken $1.6 million from the bank.
18          Q      She appeared innocent in her
19  demeanor and her -- when looking at her, she
20  looked -- because she's a young woman, she looked
21  somewhat innocent to you; would that -- would that
22  be fair to say?
23  A      Well, I don't know that I thought that she
24  looked innocent because she had just confessed.  It
25  just for someone that would take that much money,

Page 252

L. Pai

1
2  she seemed very much afraid.
3          Q      Okay.  So what -- what -- on these
4  notes that you would have, Ryu 14, are -- the notes
5  prior to the meeting are WB 2054 to 56, and then the
6  notes during the meeting are 57 through 59; is that
7  correct?
8  A      That's right.
9          Q      And these notes prior to the
10  meeting, you made them that morning?
11  A      I may have made them before that morning.
12  Maybe a few days before.
13          Q      Why did you want to meet with her?
14  A      Well, because she confessed to a very large
15  embezzlement, and by that -- by the time I met with
16  her, I knew that she had implicated a very senior
17  person from former bank Asiana Bank and I wanted to
18  know details of what motivated her; what were some
19  of the details about how she was able to get away
20  were such embezzlement without any detection by the
21  bank.  I just wanted more details.
22          Q      Okay.  So what -- what questions --
23  what questions did you have for her prior to the
24  meeting; were the questions in your mind that you
25  wanted to ask her?

Page 253

L. Pai

1
2  A      So -- so based on my notes here, it looks
3  like I had questions about who the branch manager
4  was at the branch where she was the operations
5  officer.  So obviously I was concerned -- I was
6  trying to find out why no one detected it, and a
7  branch manager would have a role in knowing what's
8  going on at the bank and should be in a position to
9  detect any improper transactions.
10          So my first question on this note is, "Why
11  did Cho Young Nam" -- C-H-O, Y-O-U-N-G, N-A-M --
12  "decide to leave Fort Lee branch."  He was the
13  former branch manager, and my question was, "Did
14  James want to drive him out for some reason?"  I
15  thought she might be able to answer some questions
16  about what made Mr. Cho leave as a branch manager.
17          And then my second question written down
18  here was, "Why did Mr. Choi" -- "Why was Mr. Choi
19  assigned as a branch manager when he did not have
20  any prior branch manager experience?"  He was an SBA
21  loan manager, and usually SBA loan managers are not
22  assigned as a branch manager.
23          And then apparently Mr. Choi also left or
24  was let go.  And so my third bullet is "Why Taegyo
25  Suh," T-A-E-G-Y-O, S-U-H, "was assigned as branch

Page 254

L. Pai

manager when Mr. Choi left." And again Mr. Suh,
S-U-H, was an SBA -- I think he may have been
marketing manager bankwide. And again, he was not a
typical branch manager.

So it was -- I was curious as to why
Mr. Suh was put in charge of Fort Lee branch.

Q      And --

MR. YI: Steve, may I just try to
see if I can clarify the record on one thing? There
was a name of Mr. -- Ms. Cho, I believe --

THE WITNESS: Oh, Ms. Cho.

MR. YI: Would you like to spell
that for the reporter?

A      The first name Cho Young Nam, C-H-O. Oh,
Nam -- Cho Nam Young, C-H-O, N-A-M, Y-O-U-N-G.

THE REPORTER: That's three words,
right?

THE WITNESS: Three syllables of
her name.

MR. YI: Last name being Cho, I
believe.

THE WITNESS: Last name being
Ms. Cho.

Q      So it's C-H-O, space, N-A-M, space,

Page 255

L. Pai

Y-O-U-N-G; correct?

A      N-A-M.

Q      But I'm correct about the spaces?

A      Yes.

Q      And what were the other names?

A      So there's Ms. Cho, C-H-O, and there's
Mr. Choi, C-H-O-I, and then there's Mr. Suh, S-U-H.

Q      And then Mr. Choi, that's a
different Mr. Choi than Eun Moo Choi; correct?

A      That's correct.

Q      Okay. So you knew that -- and
which -- before we go on, there's a date in the
right-hand corner; is that right, of your notes,
top -- right at the top? Is that the date?

A      Yes.

Q      What's the date there?

A      February 14, 2014, Friday.

Q      So does that mean that you wrote
the -- you wrote these notes out on that date?

A      Oh, yes, it appears to be so.

Q      Okay. So -- and the -- when we --
it says "why did," and then there's Korean
handwriting; right? What -- and that -- what name
is that right there next to "why did" at the top?

Page 256

L. Pai

A      "Ms. Cho."

Q      That's Ms. Cho.
And then down a few lines it says "why" and
then there's some more Korean writing, "assigned
instead." Whose name is that right there?

A      That's Mr. Choi, C-H-O-I.

Q      Okay. And then further down, still
the third hashmark says "why" and there's another
Korean handwriting and a question mark. Is that
Mr. Suh right there?

A      Yes.

Q      Now, did you -- where did you get
this information about these -- I take it you didn't
know these three people personally; right?

A      That's right.

Q      And you never worked with them or
heard of them prior to this; right?

A      That's right.

Q      Where did you get those names from?

A      I probably got them from either talking to
HR to see who was in charge of Fort Lee branch where
she worked or by talking to others at the branch as
to who were in charge.

Q      And did you think that James Ryu

Page 257

L. Pai

had done something with respect to the management of
the Fort Lee branch that made it possible for Karen
to steal all that money?

A      That's what I wanted to find out, because
James was in charge of overseeing all of HR
decisions at Bank Asiana and he was number two guy
other than the CEO, and because this was the branch
where she conducted all the embezzlement or she was
able to manipulate so many accounts, I wanted to
find out who was in charge of the branch; who was in
a position to oversee her, supervise her and detect
any improper transactions.

Q      During the course of your
investigation of this matter, did you ever talk to
H.S. Hur?

MR. HARVEY: H-U-R.

A      No, I don't recall talking to Mr. Hur
directly during the investigation. I met with him
before during the merger due diligence meetings.

Q      He was the senior person at
Bank Asiana?

A      He was the CEO.

Q      Correct. He was the number one
person at Bank Asiana?

Page 258

L. Pai

1
2  A    Yes.
3      Q    He was Chairman of the Board, too;
4  was that correct?
5  A    I think they had a different chairman.
6      Q    But you never spoke to him at any
7  point during this investigation; correct?
8  A    That's right.
9      Q    Did you try to speak to him?
10  A    No, I did not. I was under the impression
11  that almost all of the operational issues were
12  made -- operational decisions were made by James
13  Ryu, that Mr. Hur was mostly a marketing CEO who
14  spent time with cust -- bank customers, bank
15  borrowers, but in -- for -- in marketing effort
16  meetings, but left most of the operational issues --
17  left James in charge of most of the operational
18  issues.
19      Q    You said that was an assumption
20  or -- that you made or was that something that
21  someone told you?
22  A    That was the belief I came to after talking
23  to a number of people about how Bank Asiana's
24  operations were.
25      Q    Do you know, did -- at any point

Page 259

L. Pai

1
2  did your -- did the -- did your outside counsel make
3  an effort to speak to Mr. Hur?
4  A    That I don't recall.
5      Q    Did you make any attempt to speak
6  to any of the board members of Bank Asiana?
7  A    Not directly, no.
8      Q    Did you make any attempt to do it
9  indirectly?
10  A    No. I did not, but I do note -- I did
11  notice some names came up during discussions or
12  during the investigation for further potential
13  discovery.
14      Q    And did you or your counsel ever
15  try to speak to those people?
16  A    Not yet. I think they're on our list of
17  people to talk to before we complete our discovery.
18      Q    What about these people that you
19  mentioned at the top of these notes, Ms. Cho Nam
20  Young, Mr. Choi and Mr. Suh, did you ever speak to
21  any of those people?
22  A    Not yet. Again, they are potential
23  witnesses. We will have to determine whether --
24  whether we're going to talk to all three or any one
25  of them before we complete our discovery.

Page 260

L. Pai

1
2      Q    So neither you nor your outside
3  counsel spoke to them -- have spoken to them --
4  until as of now, you haven't spoke to any of them;
5  correct?
6  A    That's right.
7      Q    Who else worked at the Fort Lee
8  branch other than Karen and the three people that
9  you mention here?
10  A    So apparently, Karen was the person in
11  charge right below the branch manager, and I believe
12  there were at least two or three other staff
13  below -- below her including tellers, perhaps more.
14      Q    Did you make any attempt to figure
15  out who those people were, specifically their names?
16  A    Not at that time.
17      Q    Did you do that later?
18  A    I think we probably -- I don't recall if we
19  got the list of employees, but based on what Karen
20  had told us, Karen, Irene, Bo Young, we -- we had
21  enough information at that time, and I don't recall
22  what determination we made as to which one, if any,
23  we would want to talk to later.
24      Q    But you or your counsel never
25  reached out or tried to interview or talk to those

Page 261

L. Pai

1
2  other people who worked in the Fort Lee branch with
3  Karen; is that correct?
4  A    I have not. I don't remember if our
5  counsel has or has not.
6      Q    But no one did it prior to filing
7  the lawsuit against James and Karen; correct?
8  A    That's right.
9      Q    Now, you mentioned, of course, Bo
10  Young Lee and Irene Lee, but neither of those people
11  worked at the Fort Lee branch; is that correct?
12  A    Irene, I believe, worked briefly with Karen
13  before she was transferred to the headquarters by
14  James. But Bo Young, I don't think had worked at
15  the branch.
16      Q    What was Bo Young's job at
17  Bank Asiana?
18  A    She was in accounting.
19      Q    What did she do in accounting?
20  A    I guess she prepared the bank's books.
21      Q    Do you know what her title was?
22  A    I don't recall if she was the acting
23  manager. Maybe she was an accounting officer.
24      Q    Do you know who she reported to?
25  A    She probably reported to the CFO.

Page 262

```
 1              L. Pai
 2       Q     You say "probably."  Do you know,
 3  or are you just assuming?
 4       A     I'm assuming.
 5       Q     So you don't know who she reported
 6  to; correct?
 7       A     Right.  I don't recall seeing an
 8  organizational chart.
 9       Q     What about Irene Lee?  What was her
10  job at the bank?
11       A     So Irene's job at the bank was assisting
12  James.  So she was like a personal assistant to him
13  as well as operations administrative officer
14  overseeing all of the bank deposit operations.
15       Q     Now, let's go on with this --
16  these -- your notes here.  The first page, WB 2054.
17  There's a -- after the part you -- we previously
18  discussed, there's a word that says "checks," and
19  then beneath that it says something appears like
20  A-H-N-E Law, P.C.; do you see that?
21       A     Yes.
22       Q     What's that a reference to?
23       A     I think it's referring to a check that was
24  made payable to Ahne Law, P.C., the date which is --
25  which was dated July 12th, 2012, for $60,000, and I
```

Page 263

```
 1              L. Pai
 2  wanted to ask her about that check.
 3       Q     And what did you want to ask her
 4  about that?
 5       A     Because these are large amounts, we wanted
 6  to know why did she write a check -- such a large
 7  check to Ahne Law, P.C.
 8       Q     Oh, so this is a check Karen wrote?
 9       A     I think these were checks out of her
10  account.
11       Q     And what about the next one, Ub's
12  Pizza?  What was that?
13       A     So again, a check appears to be payable to
14  Ub's Pizza dated September 6th, 2012, for
15  $27,000 that I wanted to ask her about.
16       Q     And why did you want to ask about
17  that?
18       A     Again, a large amount.  Ub's Pizza sounds
19  like a business.  We wanted to know why would she
20  write a check to that business for $27,000, a large
21  sum.
22       Q     And then beneath that it says, "new
23  bank account; who?  30K."  Did I read that
24  correctly?
25       A     Yes.
```

Page 264

```
 1              L. Pai
 2       Q     What was that?
 3       A     I don't recall specifically.  It was
 4  probably one of the transactions that either Aleesha
 5  or Orest had listed, whether they were from her
 6  account or maybe deposits made into her account or a
 7  transfer from her other account to this new bank
 8  account, one or the other.  And the amount is
 9  30,000, I wanted to ask what is that?  Is that -- I
10  wanted to ask her if that was her account, her
11  husband's account or whose account it was.
12       Q     And then beneath that is what looks
13  like an account number that begins with 040; do you
14  see that?
15       A     Yes.
16       Q     And then a number 97 and then the
17  date 9/11/12; do you see that?
18       A     Yes.
19       Q     Do you remember what that was?
20       A     I don't remember what number 97 and 98
21  means.  Either a check number, but the long string
22  of numbers, it looks like a bank account number,
23  probably a new bank account number.  And I wanted to
24  ask her how is that -- why is there a transaction
25  between her account and new bank account.  I wanted
```

Page 265

```
 1              L. Pai
 2  to find out more details.
 3       Q     And then it says "whose account at
 4  new bank"; right?
 5       A     That's right.
 6       Q     And what did that mean?
 7       A     Basically, what I just said.  I wanted to
 8  know whose name that new bank account is in; whether
 9  it's in her name or her husband's or someone else's.
10       Q     And then beneath that it says,
11  "Christine, Inc., $100K to cash."  Did I read that
12  correctly?
13       A     Yes.
14       Q     A "100K" means $100,000; right?
15       A     Yes.
16       Q     And what does this mean, this
17  "Christine, Inc., to cash"?
18       A     So it looks like I made a note about a
19  check that was written by Christine, Inc., payable
20  to cash for $100,000 dated September 21, 2012, that
21  was probably deposited into her account.
22       Q     So she had deposited $100,000 into
23  her account in cash; was that your -- is that
24  correct?
25       A     That's what it appears to be.
```

Page 266

L. Pai

1
2      Q      And then underneath that -- again,
3  that was on September the 21st, 2012?
4      A      That's right.
5      Q      And beneath that it says -- it
6  says, "Miye Chon to Mi Ok -- Ok, Yi."
7            MR. HARVEY:  I'm going to spell
8  that for the court reporter.  Miye Chon is M-I-Y-E.
9  Chon is C-H-O-N.  Then it says "to Mi," M-I.  Ok, O
10  and a K, space, Y-E.
11      Q      Did I read that correctly?
12      A      Y-I.
13      Q      Y-I.  Thank you.
14         So what does that mean?
15      A      So it looks like a note to ask her about a
16  check that Miye Chon -- Miye is Karen, it's a Korean
17  name -- that she wrote to Mi Ok Yi for $100,500
18  dated July 13th, 2012, and I wanted to ask her who
19  is Mi Ok Yi and why did you write her a check for
20  $100,000.
21      Q      And then beneath that it says,
22  "Chase BKSTMT as of."  Does that mean Chase Bank
23  statement as of?
24      A      That's right.
25      Q      And then beneath that it says,

Page 267

L. Pai

1
2  "Mi," M-I, space O, space Y-E, hyphen, BAACTT.  So
3  it looks like it's saying Mi, this person M-I, space
4  O, space Y-E, and there's something about their bank
5  account; correct?
6      A      Yes.
7      Q      And then it says "to cash," and
8  there's a dollar sign -- I mean there's an arrow
9  that says "to Karen" and then it says $50,000;
10  right?
11      A      Yes.
12      Q      And what did that mean?
13      A      So it's a note for me to ask Karen about a
14  deposit that she had made into her account of a
15  check written by Mi O Ye, payable to cash for
16  $50,000 dated November 12, 2012.  And my notes make
17  it look like Mi O Ye also had a Bank Asiana account.
18      Q      Oh, so the words "B-A" in front of
19  "A-C-C-T" means -- that means Bank Asiana?
20      A      That's right.  That was my shorthand for
21  Bank Asiana.
22      Q      Now, where did you get this
23  information on this page about these checks and
24  these accounts?
25      A      These probably came from review of her

Page 268

L. Pai

1
2  checking -- review of her accounts at Bank Asian --
3  review of Karen's accounts at Bank Asiana.
4      Q      You say "probably."  Do you
5  remember, or are you just assuming?
6      A      I vaguely remember.  I just don't remember
7  exactly what I was looking at when I made these
8  notes, but I know I had asked Orest to review her
9  bank account activities and let me know if there are
10  any suspicious transactions, any large amounts
11  either deposited or checks that she had written to
12  third parties so that we can look into them.
13      Q      Now, if you turn to the next page
14  of this, it says -- WB 2055 is the page number.  And
15  then it says at the top, "Karen's Chase account,"
16  and then there's a number; right?
17      A      Yes.
18      Q      And was this some information about
19  an account that Karen had at the Chase Bank?
20      A      That's right.  We learned that Karen had a
21  bank account at Chase and "... ▮▮▮" is referring to
22  her Chase Bank account number, and I wanted to ask
23  her about $70,000 deposit that she had made to Chase
24  account on November 13th, 2012, as well as an $8,000
25  deposit that she had made to Chase account on

Page 269

L. Pai

1
2  November 6th, 2012.
3      Q      Where did you get information about
4  her Chase account?
5      A      So from review of her Bank Asiana account,
6  we can usually tell if she wrote a check, where
7  those checks were deposited by looking at the back
8  of the check and we can get the third-party bank
9  name and account number, but that's about the limit
10  of what we can get.  So we were able to determine
11  that she had a Chase Bank account as well as
12  Bank Asiana accounts.
13            MR. YI:  Steve.  Can we go off the
14  record for one second?
15            MR. HARVEY:  Yes.
16            (Whereupon there is a discussion
17  held off the record.)
18            (Whereupon the last question and
19  answer were read by the reporter.)
20      Q      Okay.  We're back on the record,
21  Ms. Pai, and then we're still on the same page, WB
22  2055, and then it says two -- there's a little
23  squiggly sign.  I take it that has no significance;
24  right?
25      A      That's right.

Page 270

L. Pai

Q   And then it says "two suspicious accounts."

A   Yes.

Q   And then there's a listing of what looks like four accounts.

A   Yes.

Q   So why does it say "two suspicious accounts" and then there's a listing of what looks like four accounts?

A   I have no idea.

Q   Okay.

A   I probably started out with two suspicious accounts and then started adding to it.

Q   Okay.  So there was actually, in your mind, at least as of this time, four suspicious accounts; right?

A   Five, because it continues on the next page with another account.

Q   Okay.  So then if we go to the next page, there's references to 5/2/13, that's May the 2nd, 2013, Ub's Pizza Bagels, Inc., for $10,000 in cash; right?

A   Yes.  Actually, now that I see another squiggly line underneath four -- list of four

Page 271

L. Pai

accounts, yes, four suspicious accounts.  And the other one looks like just a transaction out of her own account.

Q   Okay.  And then it says, "yellow plus green, still not sure."  What does that mean?

A   I don't recall.

Q   Well, do you think you had some kind of a document that was marked with yellow and green?

A   That's probably what it was.  List of transactions from her checking -- from her accounts, Bank Asiana account that we may have highlighted yellow and -- or green to ask about.

Q   Okay.  Now, if you turn to page WB 2057 through 59, these are the notes of the actual meeting; right?

A   That's right.

Q   Did you take the notes during the meeting, or did you make them after the meeting?

A   I took them during the meeting while she was speaking.

Q   Did you just write down -- I mean, I assume you didn't write down everything.  You just wrote down a few things throughout the meeting;

Page 272

L. Pai

correct?

A   That's right.

Q   Okay.  So at the top it says, "Karen meeting, 2/14/14, Friday a.m.?"; right?

A   Yes.

Q   So this is a Friday, February 14th, 2014, meeting with Karen; right?

A   Yes.

Q   And then the first thing it says, it says, "Husband concentrates on work"; right?

A   Yes.

Q   And then what does it say next to that?  And there's some Korean handwriting with an underlining.

A   It refers to a statement she made that some of the money that were deposited into her Bank Asiana account came from a Korean small group financing arrangement where privately -- a small group of people get together and they lend each other money, whoever needs -- they take a turn to come up with a collective sum, large sum, and one of them will take the money and then the rest of the time they have to make installment payments to pay that amount back to the rest of the group, so --

Page 273

L. Pai

Q   What's the name for that arrangement?

A   Gae, G-A-E.

Q   And how do you -- what -- how do you pronounce that in English?

A   Gay.

Q   Basically gay; right?

A   Yes, gay.

Q   Like phonetically, G-A-Y, if we were going to spell it in English?

A   Right.  I just said G-A-E, but it can be spelled G-A-Y.

Q   Okay.  And that's a fairly well-known thing in the Korean-American community; is that correct?

A   That's right.

Q   And a lot of people, as I understand it, who may own small businesses such as a laundromat or small restaurant, they participate in this small group financing arrangement called the gae and they contribute their money, and then when it's their turn, they have access to capital to start their business; is that essentially how it works?

Page 274

L. Pai

1               L. Pai
2 A    Yes. That's right.
3     Q    Have you ever participated in that
4 yourself?
5 A    No, never.
6     Q    Is it considered -- is it
7 considered reputable?
8 A    No. For bank employees, we absolutely
9 discourage it.
10     Q    Why?
11 A    Because there are a lot of risks involved
12 with trusting other people. It's basically a
13 private lending transaction and a lot of people get
14 defrauded.
15     Q    Did you know that in 2006 when
16 Karen was suspected of embezzlement at Liberty
17 branch that she worked at in New York, that she
18 claimed that she had a lot of cash from -- because
19 she was involved with the gae?
20 A    I recall hearing that, yes.
21     Q    When did you hear that?
22 A    I think after this incident when I was
23 talking to H.R. about Karen's prior history at
24 Liberty Bank where she was among the employees that
25 were investigated for a cash shortage, teller cash

Page 275

L. Pai

1 shortage.
2     Q    So this reference here on the page
3 that we're looking at, page WB 2057, literally --
4 can you just tell us literally what those words mean
5 above the second line down above the handwriting --
6 above the underlining? Can you just literally
7 translate those, please.
8 A    "She said the money is from gae."
9     Q    Or the -- what we've been -- what
10 I've been saying is gae?
11 A    Right. Gae.
12     Q    Okay. What does it say beneath
13 that? There's some more Korean handwriting and then
14 the word "business," but before the word "business,"
15 it's in Korean. Can you please translate that for
16 me?
17 A    It's a -- it says, "business was sold to
18 sister-in-law" -- I'm sorry -- "business that was
19 sold to a sister -- to sister-in-law."
20     Q    And do you know what that -- what
21 that means?
22 A    She was talking about her husband's
23 businesses and she referred to one of his
24 businesses -- one of their businesses was sold to a

Page 276

L. Pai

1               L. Pai
2 sister-in-law. So that's what I jotted down.
3     Q    One of her and her husband's
4 businesses; is that what that means?
5 A    Well, I guess they were her husband's
6 business that she helped with.
7     Q    Okay. So the first line, the
8 reference to the gae, she said -- do you remember
9 that she said to you that the money came from the
10 gae?
11 A    Right. And that's referring to the
12 transactions that I had listed that I had asked her
13 about, large transactions out of her Bank Asiana
14 account. Her explanation was most or all of the
15 large sums were related to Korean gae, gae.
16     Q    Okay. Did you believe her?
17 A    Yes.
18     Q    Did you do anything to investigate
19 that beyond asking her?
20 A    No, I don't.
21     Q    And this business that was sold to
22 a sister-in-law, does -- did that mean that she was
23 saying that some of these transactions also related
24 to a business that was sold to a sister-in-law?
25 A    No, I don't think that directly relates to

Page 277

L. Pai

1 the transactions, but she was trying to answer my
2 questions about how many businesses her husband
3 currently, at that time, was operating.
4     Q    Okay. And so underneath that it
5 says, "Deli group/grocery Cafe Claire," C-L-A-I-R-E;
6 is that correct?
7 A    Yes.
8     Q    What's that a reference to?
9 A    So that's the name of the business that the
10 husband was still operating and she explained that
11 it was a deli grocery.
12     Q    And then beneath that, it says,
13 "1.6," what is that -- can you read that next line?
14 A    Million, M-I-L. I'm referring to
15 $1.6 million, and the rest in Korean is basically
16 saying she does not think the amount totals $1.6.
17     Q    And then underneath that, there's
18 some more handwriting in Korean. What's that?
19 A    It looks like part of it is a circle in
20 front of the slashes cut off, but it -- it refers to
21 a phrase that she said that she did not think it
22 would add up to this amount, such a large amount.
23     Q    And you're referring to the -- the
24 Korean handwriting that's next to the "1.6 mil" or

Page 278

L. Pai

1
2  below the "1.6 mil"?
3  A    Below.
4      Q    Okay.  And then below that is some
5  more Korean handwriting with a line underneath it;
6  do you see that?
7  A    Yes.
8      Q    And can you please read that?
9  A    That refers to her statement that James Ryu
10 treated her well.
11     Q    And is that what it says?  Is that
12 the literal translation of it?
13 A    Yes, that's one little translation of it.
14     Q    Is there another literal
15 translation of it?
16 A    It could also be translated into he was
17 generous with me or treated me well.
18     Q    Okay.  And then underneath the
19 underlining, immediately beneath what you just read,
20 is another Korean word or words.  Can you read that
21 to me?
22 A    You mean translate it to you in English?
23     Q    Please.
24 A    I think it's the same manner of speaking or
25 by his tone or something like that.

Page 279

L. Pai

1
2      Q    So it translates to, "same manner
3  of speaking by his tone"; do I understand you
4  correctly?
5  A    No.  I just -- from something she said
6  about how he instructed her, she was trying to
7  explain how they communicated.
8      Q    So please just tell me again.  I
9  don't think I understand.  Can you literally
10 translate that word or words?
11         MR. YI:  Objection to form.
12 A    Literally, I would say his manner of
13 speaking, something referring to the way he -- his
14 speech pattern.  It's kind of she knew what he was
15 saying by the way he was speaking.  So because I --
16 she was referring to how he would call it a loan
17 when he asked for money.  When he asked her to get
18 money for him, she referred -- she originally
19 referred to it as a short-term loan because she was
20 always concerned about when is he going to pay it
21 back.
22     He was asking her to embezzle money from
23 the bank and give it to him, you know, in certain
24 sums, gradually increasing sums.  And she knew what
25 he was asking by the tone and the manner of

Page 280

L. Pai

1
2  speaking, he would literally call it a loan as
3  if he was going to pay it back, but she quickly
4  realized that he was never going to pay it back.
5      Q    Is this what she told you?
6  A    Yes.
7      Q    Okay.  And so that's just a
8  reference to something about his manner of speaking;
9  correct?
10 A    Yes.
11     Q    You made a little note there that
12 just says "his manner of speaking"; right?
13 A    Yes.
14     Q    And then you said in English,
15 "first he asked her for a loan"; right?
16 A    Yes.
17     Q    And beneath that you wrote, "from
18 BSA training, past incidents."  And then there's an
19 arrow and it says "idea," the English word "idea";
20 correct?
21 A    Yes.
22     Q    And then there's a Korean -- some
23 Korean handwriting there?
24 A    Yes.
25     Q    What does that Korean handwriting

Page 281

L. Pai

1
2  say?
3  A    That she got an idea.
4      Q    So the Korean handwriting basically
5  means "that she got" because --
6  A    That she was able to come up with an idea,
7  and that whole line is referring to -- that line and
8  the line above, first he asked for -- asked her
9  personally for a loan and she told him that she
10 didn't have money to loan him -- loan to him.  And,
11 you know, he had been asking a lot of other
12 employees also for a personal loan and was able to
13 get a personal loan from some people and --
14     Q    So she told you -- you're telling
15 us what she told you.  She told you on that occasion
16 that he had been asking a lot of employees for a
17 personal loan and was able to get a loan?
18 A    From a few people.
19     Q    That's what she -- just to be
20 clear, you're telling us what she told you at that
21 meeting?
22 A    From her -- from this meeting as well as my
23 conversations with other employees, it was -- I was
24 told that it was pretty clear to everyone at the
25 bank that James was in desperate need of money.  He

Page 282

L. Pai

1
2  was asking everyone for money.  Everyone knew --
3  everybody knew that he was in money trouble --
4      Q      Did he ask --
5  A      -- was having money troubles.
6      Q      Right.  And he asked Irene for a
7  loan; didn't he?
8  A      Yes.
9      Q      So that's your understanding, that
10  he asked Irene for a loan; right?
11  A      Yes.  He asked --
12          MR. YI:  Objection to form.
13  A      -- Irene for a loan and he asked the CEO
14  for a loan.
15      Q      How much did he ask of a loan from
16  Irene?
17  A      I don't recall the amount.
18      Q      Okay.  And was it your
19  understanding that he was asking people to borrow
20  money from the bank so that they could loan it to
21  him?
22  A      No, not to other people.  He was asking
23  Karen.  So when Karen told him --
24          MR. YI:  Wait.  I'm not sure you
25  understood his question.

Page 283

L. Pai

1
2      Q      I'll -- I'll clarify.
3          Go ahead.  You can finish -- finish your
4  answer and then I'll clarify.
5  A      So what I was trying to clarify is, no, I
6  don't believe he asked anyone else at the bank to
7  borrow money from the bank, but he asked Karen to
8  take -- get money from bank depositors and to lend
9  it to him.
10      Q      Okay.  But -- so for a second there
11  you started to talk to us about what you learned
12  from other sources for just -- all right.  I want to
13  go back to that for just a minute and then we'll go
14  back to these notes.
15          You learned from other people as well as
16  Karen that he was in desperate need of money and he
17  asked employees of the bank for a loan; correct?
18  A      That's right.
19      Q      And you -- one of those people he
20  asked for a loan was Irene?
21  A      Yes.
22      Q      And you learned that from whom?
23  A      Irene as well as others.
24      Q      Irene said that he had asked her
25  for a loan; correct?

Page 284

L. Pai

1
2  A      That's right.
3      Q      Okay.  Now, let's focus on these
4  notes here.  After -- after the language that we
5  were just looking at where it says, "she was able to
6  come up with an idea," the next line is some more
7  Korean handwriting and then it says -- and then
8  there's an arrow and it says "BM can't remember."
9  What does that mean?
10  A      First Korean word is -- at the beginning
11  or -- at the beginning.  "BM," I'm referring to
12  branch manager.  And then dash, "cannot remember."
13  So I was asking her about branch managers and why
14  some of them were replaced, and she must have told
15  me she cannot remember.
16      Q      Did you go to -- did you go to
17  college right out of high school?
18  A      Me personally?
19      Q      Yes.
20  A      Yes.
21      Q      And did you hold any jobs when you
22  were in college?
23  A      Sure.
24      Q      What did you do?
25  A      I worked at the college library.

Page 285

L. Pai

1
2      Q      Anything else?
3  A      Mostly libraries.
4      Q      That was at the University of
5  Chicago; right?
6  A      Yes.
7      Q      And then did you go to law school
8  right after -- right after college?
9  A      No.
10      Q      You took five years off; right?
11  A      Yes.
12      Q      Okay.  And then you were a
13  construction litigator, as I recall, for several
14  years at the Thelen firm in San Francisco or
15  someplace in California?  I assume you were in the
16  Los Angeles office; right?
17  A      Yes, Los Angeles office.  And I started out
18  doing transactional work and bankruptcy and
19  construction litigation was just at the tail end.
20      Q      And then -- and then your next job
21  was as general counsel at the bank?
22  A      That's right.
23      Q      So you were a lawyer for four years
24  and then you became general counsel at the bank?
25  A      Uh-huh.  Yes.

Page 286

L. Pai

Q    Okay.  So let's go on here.  What's
that next thing it says underneath the line where it
says, "at the beginning, branch manager, can't
remember"?  What's the next Korean word or words on
the next line?

A    It's referring to internal control being
very lax or too lax.

Q    And that's what she told you?

A    Yes.

Q    And then what's the next line down
beneath that?  It says -- there's something in
Korean, then there's an arrow and then it says -- it
looks like three-something, and then it says
"customer accounts."  Can you tell me what that is?

A    I'm referring to number of employees from
two to three, and it is their role in customer
accounts.

Q    So she was saying there were two to
three employees in the bank, in the branch?

A    I believe so.

Q    And then beneath that, it says,
"I.D. password," something "with other employees"
and then a Korean word.  Can you tell us what that
means?

Page 287

L. Pai

A    Yeah.  So the Korean word is referring to
when the employees are not available, and the
shorthand basically are referring to her
explanation.  I asked her how was it that she was
able to get all of these transactions when -- done
by herself when some of them may have had dual
control requirements.  It required two employees to
approve, and she said that the internal controls
were very lax; that they shared, really shared
passwords with each other because -- since the
branch was small, not too many employees were
working there, they needed to be able to complete
transactions to bypass the dual control
requirements.  So they shared passwords with each
other so that they can complete transactions.

Q    Did you conclude from this that
this was an atmosphere in which it was easy to steal
money?

A    Yes, absolutely.

Q    And then it says, "Karen had
override authority."  What's that mean?

A    And she was able to override any
transactions that any of her staff had inputted, so
she basically had absolute control over all of the

Page 288

L. Pai

customer transactions at this branch.

Q    Was it your thinking at the time
that James Ryu had set up the branch so that she
could easily steal?

A    Yes, that was my thinking.

Q    And is that still your thinking?

A    Yes, that's still my thinking.

Q    And then if you go to the next
line, it says -- next page, excuse me, WB 2058, and
then it says, "Christine"; right?

A    Yes.

Q    And then there's an arrow and then
there's something in Korean; right?

A    Yes.

Q    What is that word in Korean next to
the arrow?

A    Next to the arrow on the right side, that's
referring to that Korean gae again.  And this note
is referring to the fact that Christine -- that's
the name of a business -- was involved in that
Korean gae that she was referring to.  And the
Korean name underneath "Christine" is Ms. Yi, Y-I.
Mi Ok, that I had referred to earlier.  So I guess
that's a person behind the business Christine.

Page 289

L. Pai

Q    So that's Y-I, space, what?

A    M-I and O-K.

Q    And then a space between the M-I
and the O-K?

A    Yes.  Three syllables.

Q    Okay.  And do you know where that
person -- so she was saying that this person,
Ms. Yi Mi Ok, was the person that she was involved
with in the gae?

A    Yes.

Q    Do you know where this person is
today?

A    No.

Q    Did you ever try to reach out and
talk to her?

A    No.

Q    So Karen was saying that this money
that she received -- was the money received or money
she gave to this person?

A    I think it was money that she received from
Christine, Inc., that was payable to cash, $100,000
on September 21, 2012.  That's the transaction that
the -- that I was referring to.

Q    So it was, if I understand

Page 290

L. Pai

1
2  correctly, it was -- it was a check from somebody
3  named Christine, Inc., and it was payable to cash
4  and then it was put in her account?
5      A     That's right.
6      Q     How does one deposit a check
7  payable to cash to your account?  Doesn't the check
8  need to be made out to you to deposit into your
9  account?
10     A     No.  If it's made payable to cash, then
11 anyone can deposit it.
12     Q     So this money from this Christine
13 was in an account -- was in some other account from
14 somewhere else in the name of this person Christine;
15 right?  That was her English name; right?
16     A     No.  Christine, Inc., is the name of the
17 business and it's a business account, check out of a
18 business account held by Christine, Inc., that was
19 written to cash.  So anyone could have deposited it,
20 and it was deposited into Karen's Bank Asiana
21 account.
22     Q     And she said "This was a
23 transaction I had done in connection with the gae"?
24     A     That's right.
25     Q     Now, the gae, I take it, is not --

Page 291

L. Pai

1
2  there's not one gae; right?  Gae is a concept?
3  There's lots of -- there's lots of these financial
4  pools or arrangements; correct?
5      A     Usually.
6      Q     When you say "usually," I mean,
7  what do you mean by that?
8      A     Well, I've never participated in a gae, so
9  I don't know if there's a limit to how many people
10 can participate.  So usually I -- when I hear about
11 gae, I think there are more than two people
12 involved, but in this case, I don't know how many
13 people were involved.  She just explained that that
14 check was associated with a gae transaction.
15     Q     Right.  But when I say "the gae,"
16 there's not -- there's no central place for the gae;
17 the gae doesn't have a headquarters; the gae is not
18 a formal thing; correct?
19     A     That's right.
20     Q     It's just basically a word that
21 means sort of like investment club?
22     A     Yes.
23     Q     So you say there's an investment
24 club.  You could have investment clubs all over this
25 country and foreign countries; right?  There's not

Page 292

L. Pai

1
2  one investment club; right?
3      A     Right.
4      Q     And then -- and did you ever make
5  any effort to investigate this particular gae?
6      A     No, not yet, but if -- if necessary, we
7  would investigate, but this is one of the -- the
8  transactions that involved Karen's account.
9      Q     So Karen deposited essentially
10 $100,000 from this gae into her account; correct?
11     A     Right.
12     Q     And what's the next line say
13 beneath that?  It says something "law group."
14     A     So the Korean in front of law group is Ahn,
15 A-H-N.  And to the right of the arrow, I'm referring
16 to the statement she made that this Ahn Law group
17 transaction, a check I think that was written to Ahn
18 Law group was related to a business that her husband
19 was going to purchase, but then it was canceled.
20     MR. YI:  I'm just going to point
21 out something in front of the witness.  I think it's the
22 spelling of the name Ahne.
23     THE WITNESS:  Oh, yes, it's
24 A-H-N-E.
25     Q     Okay.  And then -- so the words to

Page 293

L. Pai

1
2  the right with the arrow, it says "business" and
3  then there's a word in Korean and then there's an
4  underlining and then there's two words underneath
5  that.  Those words together mean what?
6      A     Business they were going to purchase, but
7  was canceled.
8      Q     And that's the words above the line
9  and below the line; correct?
10     A     That's right.
11     Q     So that's how she explained the
12 $60,000 check to the Ahne Law group?
13     A     Yes.
14     Q     And did you ever investigate that?
15     A     No, not yet.
16     Q     You're still going to investigate
17 that?
18     A     If necessary.
19     Q     Well, what would make it necessary?
20     A     It may not be relevant to what we're trying
21 to do in this case.  And if it's not relevant, then
22 we probably would not investigate it.  At the time,
23 I was just asking her about it because it was a
24 large check amount and I wanted to know.  It seemed
25 like a plausible explanation.

Page 294

L. Pai

Q      And then beneath that is another Korean -- beneath Ahne Law group is a word -- or words in Korean with a squiggly at the front and a squiggly at the back and then it's underlined.  What does that say?

A      This is a term I don't really know the meaning of.  So sometimes when someone says something in Korean that I don't understand, I will just write it down so that I can find out later what it means unless I decide to ask, "What do you mean by that" or "What does this mean?"

So I don't recall whether I asked her what it means, but she -- this is literally what she said, and I don't really know what it means.

Q      Does it translate in English?

A      That's what I mean, I don't know what it means in English because I don't know the word -- the meaning of the word -- the first few syllables of what she said, which is the critical part of the -- for me to know what it means.

Q      So you cannot -- it's impossible for you to translate that into English; is that -- do I understand correctly?

A      Well, it's not impossible.  I can look it

Page 295

L. Pai

up in a Korean-English dictionary, but I have not.

Q      But sitting here right now, in other words, without looking it up, you can't tell me what that -- that's a -- that's just a bunch of Korean letters and you don't know what it means in English?

A      Right.

Q      Okay.  What's the next word?  Underneath that it says, "H's" husband's "partner's account"; is that what that says?

A      Yes, husband's partner's account.

Q      And then beneath that, there's a line and then there's some more Korean handwriting.  And on the right-hand side it says, "did not count."  So can you tell me what it says in Korean before "did not count"?

A      So this is -- these are my notes when she was talking about how she borrowed money from her husband's partner's account originally, and she was going to use it just for short term.  And "did not count," I think she's referring to -- she didn't add it up.

Q      And then underneath that it says, "personal loans;" right?

Page 296

L. Pai

A      Yes.  I must have asked her about personal loans.

Q      Okay.  And then if you turn to the final page, WB 2059, it says, "from 1.2 mil," and then it says "700 gave to James, 500 Karen kept."  Did I understand that correctly?

A      That's right.

Q      Okay.  So now you've had a chance to go through this.  Tell me, what do you recall that Karen told you in this meeting?

A      So Karen told me -- I was -- I was interested in how -- initially how James went about asking her for money.  And she explained that, you know, he called it a short-term loan and that he told her she can figure out the details of how to get the money.  She understood that she didn't have any money personally to, quote, lend to him, but he told her she -- she knew -- she can figure out how to get it from the bank and how would give her -- he would ask her for a certain sum and asked her to get it for him by a certain time.  And gradually, the amounts increased and she was worried about when he was ever going to pay it back and she was worried about the amounts increasing gradually and it went

Page 297

L. Pai

on for several years.

Originally it started because he found out that she had been moving -- using funds from her husband's partner's accounts and he used that as a threat; told her that he could -- that she would -- she could be put away if he revealed that to others, and so she felt like she had no choice but to do what he asked.  And the idea of taking money out of CD's, large CD accounts held by elderly customers was something that -- something that she was able to figure out from -- and how to keep it from detection was something that she got out of some BSA training.

And when she heard about -- she heard a rumor that the bank was -- Bank Asiana was going to be sold to Wilshire Bank, she called him to ask when -- what he was going to do about it, about all the money that she had given to him at his request, and he made it sound like, "What are you talking about?"  He made it pretty clear that it was her -- that he wasn't going to acknowledge any part of the embezzlement.  That's when she became really worried.

So that was basically a gist of what I got from my conversation with her other than her

Page 298

L. Pai

1
2  answering some specific questions about some other
3  transactions that we were curious about.  And -- and
4  then she talked about how easy it was for her
5  because of lax controls at the branch, no branch
6  manager oversight since there were no branch
7  managers that knew anything about bank operations,
8  deposit operations.
9          And I think she also talked about -- and I
10 did ask her about James Ryu's financial problems.
11 She said everyone knew that he was having financial
12 problems.  He was getting loans, asking for loans,
13 personal loans from employees.  He got a personal
14 loan from the bank.  I think he got a loan from a
15 broker that was also a borrower, bank borrower, and
16 she referred to that borrower/loan broker as someone
17 that James Ryu knew very well.  He had obtained a
18 personal loan from him, and she -- he often told her
19 to approve NSF, nonsufficient fund checks, to give
20 immediate credit or not to return checks even though
21 Michael Kim, the broker, had insufficient funds to
22 cover the checks that he had written on his account.
23        Q     Is that everything you can recall
24 that she told you?
25        A     Yes.

Page 299

L. Pai

1
2         Q     And you believed it all?
3         A     It all made sense to me.
4         Q     And you believe it all?
5         A     Yes, I believed it all.
6         Q     Now, did you -- why didn't you get
7  a statement?  Why didn't you get a written statement
8  from her?
9         A     At the meeting, we didn't have time.
10        Q     So you had no opportunity at that
11 point to get a written statement from her; correct?
12        A     Right.  And --
13        Q     Would you have liked to have gotten
14 a written statement from her?
15        A     Sure, of course.
16        Q     If she wasn't in a hurry, you would
17 have done that; right?
18        MR. YI:  Objection to form.
19        A     I guess.
20        Q     Well, I mean, were you planning on
21 doing that?  Was that your plan to get a written
22 statement from her?
23        A     Well, I was working with our outside
24 counsel and that would have been a good thing to do
25 at the time if -- if we had the time and her

Page 300

L. Pai

1
2  cooperation.
3         Q     Right.  But she didn't give you
4  that cooperation; right?
5         A     Well, I didn't ask her at the time because
6  we were pressed.  She had a very short time, so I
7  just -- my immediate concern was to be able to ask
8  as many questions informally and --
9         Q     So you didn't ask her for a
10 statement?  You didn't ask her to stay and give
11 you -- so you could get a written statement?
12        MR. YI:  Objection to form.
13        A     Oh, I did ask her to stay.  She couldn't.
14        Q     Okay.  So --
15        A     I asked her to stay longer so -- until
16 Michael could arrive, but she couldn't and she had
17 to make several calls.  She said she was late, that
18 she had to leave.
19        Q     Well, so you -- so at your -- at
20 your next meeting with her, you scheduled another
21 meeting with her to go into this in greater detail;
22 correct?
23        MR. YI:  Objection to form.
24        A     Well, we were hoping to schedule another
25 meeting with her, but then she got counsel and we

Page 301

L. Pai

1
2  had to make arrangements through her counsel.
3         Q     Okay.  So -- but -- so then you
4  made arrangements with her through her counsel.
5  When you had that next meeting with her, which was
6  arranged through her counsel, what did she tell you
7  then?
8         MR. YI:  Objection to form.
9         A     I did not attend another meeting with her.
10        Q     You didn't?  Why not?
11        A     I don't think we were able to arrange
12 another meeting with her because of the criminal
13 proceedings.
14        Q     So she wasn't -- did -- did you ask
15 her to have another meeting with you?
16        A     Well, I knew that she was meeting with the
17 F.B.I. and I knew that that was her priority.  She
18 was very much concerned about the possibility of
19 going to jail, and she was very concerned about the
20 possibility that -- about the fact that James
21 not acknowledging his involvement and --
22        Q     So -- so did you or did you not ask
23 to have another meeting with her?
24        MR. YI:  Objection to form.
25        A     Oh, no, I -- it was very much my assumption

Page 302

L. Pai

```
 1
 2   that we would have subsequent meetings.
 3        Q     I didn't ask you for your
 4   assumption.  Did you or did you not ask for a
 5   subsequent meeting with her?
 6            MR. YI:  Objection to form.  Asked
 7   and answered.
 8   A     At the time, I probably did ask her.
 9        Q     Probably did or you remember it?
10   A     I don't recall the exact words.
11        Q     Okay.  But putting aside exact
12   words, we don't need exact words.  You said you
13   probably did.  Do you remember, whether you can
14   remember the exact words or not, whether you asked
15   for another meeting with her?
16            MR. YI:  Objection to the form.
17   Asked and answered.
18   A     Well, you know, it was a long time ago and
19   I'm recalling a lot from these notes and I don't see
20   a note that I specifically asked her for another
21   meeting, but that was absolutely something in my
22   mind.
23            MR. YI:  Just off the record.  May
24   I?
25            MR. HARVEY:  No, let's stay on the
```

Page 303

L. Pai

```
 1
 2   record.  Let's stay on the record.  This is
 3   important.
 4        Q     So it was in your mind -- it was in
 5   your mind that you wanted to have another meeting
 6   with her, but you don't remember whether you
 7   actually asked for another meeting with her; do I
 8   understand you correctly?
 9            MR. YI:  Objection to the form.
10   Asked and answered.
11   A     I probably did ask.
12        Q     There's a difference between
13   probably did ask and remember that you did ask.  Do
14   you remember that you did ask for another meeting?
15   A     I don't recall.
16            MR. YI:  Objection to form.  Asked
17   and answered.
18        Q     Do you remember whether your
19   counsel asked for another meeting with her?
20   A     Oh, yes.
21        Q     And you know that your counsel did
22   ask for another meeting with her?
23   A     Sure.
24        Q     And that was Mr. Yi asked for
25   another meeting with her?
```

Page 304

L. Pai

```
 1
 2   A     Yes.
 3        Q     How did he make that request to
 4   her?
 5   A     Through her counsel.
 6        Q     And her counsel cooperated with
 7   that request?
 8   A     Well, no, not cooperated.  I mean, not
 9   immediately because he was -- like I said, they were
10   concerned about the criminal proceedings.  They had
11   meetings with the F.B.I. and his -- her counsel told
12   my counsel, Michael, that their priority was the
13   criminal proceedings and the civil would have to
14   wait until the criminal proceedings could go
15   forward.
16        Q     So -- so then your counsel, of
17   course, said -- insisted -- your counsel insisted on
18   having a meeting with her?
19            MR. YI:  Objection to form.
20        Q     Or did he just accept that
21   explanation from her counsel?
22   A     I don't remember the specifics.
23        Q     They know each other, your counsel
24   and her counsel know each other because they used to
25   work at the district attorney's office; right?
```

Page 305

L. Pai

```
 1
 2   A     Yes.  Right.
 3        Q     You know that; right?
 4   A     Yes.
 5        Q     And so your counsel simply
 6   acquiesced in her counsel's refusal to cooperate; is
 7   that correct?
 8            MR. YI:  Objection to form.
 9   A     I believe we both understood her situation
10   that her criminal -- that a possible criminal
11   proceeding was her priority.
12        Q     And you were very understanding of
13   that; correct?
14   A     Sure, we were --
15            MR. YI:  Objection to form.
16   A     -- understanding of it.
17        Q     Now, you know today that, as a
18   matter of fact, she had met with the United States
19   attorney's office several days before she met with
20   you; right?
21   A     Yes.
22            MR. YI:  Objection to form.
23        Q     And you know that at that meeting
24   with the United States' attorneys, she told you that
25   the United States' attorneys -- the F.B.I., that
```

L. Pai

```
 1              L. Pai
 2  James Ryu was not involved; correct?
 3          MR. YI:  Objection to form.  Are
 4  you referring to the U.S. Attorney's office or the
 5  F.B.I. or both?
 6          MR. HARVEY:  Both.
 7          MR. YI:  Can we clarify that,
 8  please?
 9          MR. HARVEY:  I think it's clear.
10      Q      You know, we looked at this after
11  your last -- when we were last together; remember
12  that?  We can take a look at it if you need to.  You
13  remember that, looking at notes of a memo -- excuse
14  me -- an interview memo prepared by the United
15  States Attorney's office of a meeting with Karen
16  Chon on February 7th, 2014.  It was Exhibit Ryu 20.
17      Do you remember looking at that the last
18  time we were together?
19      A      Yes.
20      Q      And you know from looking at that
21  that she told the F.B.I. that James Ryu was not
22  involved; right?
23      A      Yes.
24      Q      And that was seven days before she
25  met with you; right?
```

L. Pai

```
 1              L. Pai
 2      A      Yes.
 3      Q      And so today you are very unsure
 4  about whether she told you the truth at that meeting
 5  on February the 14th; isn't that true?
 6          MR. YI:  Objection to form.
 7      Q      I'm asking about your present
 8  mental state right now.  You're not sure whether
 9  Karen told you the truth on February 14th of 2014;
10  isn't that true?
11          MR. YI:  Objection to form.
12      A      No, that's not true.  I -- I still believe
13  her.
14      Q      So the fact that she told the
15  F.B.I. something totally different two days
16  before, that doesn't -- that doesn't play into your
17  consideration in any way; is that correct?
18          MR. YI:  Objection to form.  I
19  think it's mischaracterizing.  There was a second
20  meeting with the F.B.I. and the U.S. Attorney's
21  Office, and I think you know that.
22          MR. HARVEY:  And I think you're
23  making speaking objections in a totally improper
24  manner.  I wish you'd stop.
25      Q      Right?  So you knew that she told
```

L. Pai

```
 1              L. Pai
 2  you -- well, first of all, she clearly lied; right?
 3  She clearly lied to the F.B.I.; right?
 4          MR. YI:  Objection to form.  At
 5  which time are we talking about?  Are we talking --
 6          MR. HARVEY:  Counsel, keep your
 7  objections to yourself.
 8          MR. YI:  Okay.  I just --
 9      Q      On February the 7th of --
10          MR. YI:  -- want to make very clear
11  as to which meeting we're talking about.
12          MR. HARVEY:  And I will instruct
13  you to stop disrupting this deposition.  You have
14  destroyed this man's life with your baseless
15  allegations, and we're getting to the heart of this
16  right now.
17      Q      She clearly lied to the F.B.I. on
18  February the 7th of 2014, in your view, when she
19  told them that James Ryu had nothing to do with
20  this; isn't that correct?
21      A      I think I understand why she said what she
22  said at her meeting with the F.B.I. on February 7th,
23  2014.
24      Q      Okay.  But that wasn't my --
25      A      So it really does not change what I --
```

L. Pai

```
 1              L. Pai
 2  whether I believe her account of what happened to
 3  me.
 4      Q      Okay.
 5          MR. YI:  I would like the record to
 6  reflect that just prior to this answer, Mr. Harvey
 7  stood up, banged on the table, and my perception of
 8  that was that in essence he was extremely upset and
 9  directing extreme anger at me with certain
10  allegations, which I absolutely do not agree with.
11          MR. HARVEY:  Counsel, what I said
12  was clearly on the record.  The court reporter
13  recorded it.  I will admit, I banged my hand, my
14  fist on the table one time as I made that statement.
15  But let's not go back to it.
16      Q      So the question that I asked you
17  was that he -- Ms. Chon, Karen, lied to the F.B.I.
18  on February the 7th, 2014, in your view when she
19  said to them -- to the F.B.I. that James Ryu had
20  nothing to do with this; correct?
21          MR. YI:  Objection to the form.
22      A      I believe she was instructed by James to
23  tell the F.B.I. that she -- to basically retract
24  what she had told the bank about his involvement in
25  order for him to consider helping her financially to
```

Page 310

L. Pai

1
2  repay the bank, at least a good portion of the money
3  that was embezzled, so that the bank would not press
4  charges against her and so that she would not have
5  to go to jail. So I fully understand why she said
6  what she said to the F.B.I. on February 7th.
7      Q    Let me repeat my question.
8      She clearly lied to the F.B.I. on February
9  7th; true or false?
10          MR. YI:  Objection to form.  And
11  may I just correct one thing?  This document,
12  Exhibit 20, says that the investigation was on
13  February 4th; that this report was drafted on
14  February 7th.
15      Q    Do you have my question in front of
16  you?
17      A    Yes.
18      Q    She clearly lied to the F.B.I. when
19  she met with them on February the 7th of 2014; isn't
20  that true?
21          MR. YI:  Objection to form.
22      A    Yes, I believe she was told to lie and she
23  complied with that.
24      Q    Okay.  So now you believe -- and
25  she lied about James Ryu's involvement; right?

Page 311

L. Pai

1
2          MR. YI:  Objection to form.
3      Q    Did she lie about anything else at
4  that meeting with the F.B.I.?
5      A    That I would have to review this again and
6  refresh my recollection --
7      Q    Okay.
8      A    -- or not -- not even my recollection.  I
9  mean, this was something that I saw for the first
10  time at my first deposition.
11      Q    Okay.  Now, how do you know that
12  James Ryu told her to lie to the F.B.I.?
13      A    Uhm, because we -- like I said, Karen was
14  very much concerned about the possibility of going
15  to jail.  And right after she had confessed to the
16  bank, she was trying very hard to come up with some
17  money to repay the bank.  She made it clear to the
18  bank that she is trying to raise money; that
19  James -- and then James also said that he was
20  willing to consider helping her when -- even though
21  he said he did not participate in the embezzlement.
22  And because of that possibility of James helping her
23  repay the bank, I think she was willing to clear up
24  his name.
25      Q    Okay.  So this is a conclusion that

Page 312

L. Pai

1
2  you have reached that -- right?  That James -- this
3  is your own personal -- at least a pie conclusion
4  that James encouraged or induced Karen to lie to the
5  F.B.I. on February 7th and he did that by telling
6  her that he was going to help her come up with some
7  money; do I understand that correctly?
8          MR. YI:  Objection to form.
9      A    Yes.
10      Q    And when did -- and when did you --
11  how do you know that James told her he was going to
12  help her come up with some money?
13      A    Because that's what James told me -- told
14  us.
15      Q    Okay.  So because James -- and he
16  told you that when?
17      A    When we met with him.
18      Q    And when did he tell Karen that he
19  was going to help her come up with the money?
20      A    I think shortly after she embezzled -- or
21  she confessed, they had discussions.
22      Q    Okay.  And how do you know that?
23      A    I think it was from one of these F.B.I.
24  reports where she referred to a meeting with James
25  at the end of January before my meeting with her.

Page 313

L. Pai

1
2      Q    And you think at that meeting James
3  told her that -- so you think at the meeting that --
4  you know that James had two meetings with Karen;
5  right?
6      A    Yes.  Yeah.
7          MR. YI:  Objection to form.
8      A    I remember hearing that.
9      Q    Both of them were at a diner in
10  Fort Lee?
11      A    Yes, I remember hearing that.
12      Q    Do you know the dates of those?
13      A    I remember one day was end of January,
14  January 30th.  I don't recall the next date.
15      Q    It was the same date that he met
16  with you; wasn't it?
17      A    Yes.
18      Q    He came from a meeting with her and
19  he brought a tape of that meeting and he gave it to
20  you; didn't he?
21      A    Right.
22      Q    And you think it was at the -- and
23  that was before or after you met with Karen?
24      A    It was after, I believe.  I don't know.
25  Can you refresh my recollection what the date of our

Page 314

L. Pai

1 meeting with James?
2
3    Q    One second, please.
4        The first meeting, my belief is, was on
5 January 30th and the second meeting was on February
6 the 13th.
7    A    So it was before my meeting with Karen.
8 That's James's meeting with us?
9    Q    Yes.
10   A    James's --
11       Q    I believe that was on February the
12 13th.
13   A    Yeah.  February 13th.
14       Q    So if that's correct, then you met
15 with James on the 13th and you met with Karen on the
16 14th; right?
17   A    Right.
18       Q    And Karen met with the F.B.I.,
19 according to the memo from the F.B.I., on February
20 the 7th; right?
21   A    February 4th.
22       Q    Do you get that by looking at the
23 exhibit?
24   A    Yes.
25       Q    Ryu Exhibit 20?

Page 315

L. Pai

1
2    A    Yes.
3        Q    Now, if you look at Exhibit 20,
4 you'll see in the bullet -- lower left-hand corner,
5 it says, "Investigation on 2/4/14"; right?
6    A    Yes.
7        Q    And then if you look on the upper
8 right-hand corner, it says "Date of entry:
9 2/10/14;" right?
10   A    Yes.  It's very confusing.
11       Q    Right.  But actually in the memo
12 itself, if you look at the end of the first
13 sentence, it says, "She was interviewed outside of
14 her residence on Tuesday, February 7th, 2014."
15   A    Oh, I see that.  Yes.
16       Q    Whether it was the 4th or the 7th
17 or the 10th doesn't really matter.  In any case, it
18 was before your meeting with her; correct?
19   A    Yes.
20       Q    And it was after the meeting on the
21 30th between James and Karen; right?
22   A    Yes.
23       Q    And so you think it's your belief
24 that on the 30th, that James Ryu told Karen he would
25 help her come up with the money?

Page 316

L. Pai

1
2    A    Yes.  That he made her believe that he
3 would or could help her come up with the money to
4 pay back the bank so that she can avoid jail time.
5    Q    And he told you that he told her
6 that on January 30th; is that correct?
7    A    He told us at the meeting we had with him
8 on February 13th that he told her that and that he
9 was willing to consider that, but of course he said
10 it in a different way.  He said because he's
11 innocent and because Karen had wrongfully implicated
12 him, that he had offered to help if she would
13 correct herself and tell the truth to the bank and
14 the F.B.I. and clear up his name.
15       Q    When did he tell you that he told
16 her that?  On what -- he told you this on February
17 13th; correct --
18   A    Yes.
19       Q    -- at your meeting with him; right?
20        Did he tell you when he had told that to
21 Karen?
22   A    I think he was referring to the meeting
23 that he had earlier in the day with her and when he
24 supposedly made that recording.  I don't recall if
25 he had also told us about an earlier meeting.  He

Page 317

L. Pai

1
2 may have.
3    Q    He may have.  You recall that he
4 told you about an earlier meeting?
5    A    I don't recall.
6        Q    Well --
7    A    But I knew -- he told us about at least one
8 meeting with Karen and -- and referred to -- he
9 referred to the recording.
10       Q    Well, in order for James to have
11 induced Karen to lie to the F.B.I. on February 7th
12 by promising that he would help her come up with the
13 money, he would have had to have told her that
14 before February 7th; right?
15   A    Right.
16       Q    So do you believe that there's some
17 evidence in this case -- I'm asking you now as the
18 corporate designee of the bank -- are you aware of
19 any evidence that James Ryu had such a conversation
20 with Karen any time before February 7th to that
21 effect?
22   A    Yes.  Her testimony to the F.B.I. referring
23 to an earlier meeting on January 30th, and I think
24 we have some phone records of phone calls between
25 the two of them.

Page 318

L. Pai

1
2     Q     Right. So yes, they clearly --
3     A     Before -- before -- that took place before
4  February 7th.
5     Q     Right. They definitely
6  communicated at a meeting on the 30th and they
7  definitely had a phone call or maybe two to set up
8  that meeting, but do you have any evidence that he
9  said that to her at that time, on January 30th, that
10 he would help her come up with the money or in one
11 of those phone calls?
12    A     Yeah. I mean, her reference to the fact
13 that she had had conversations with him and that he
14 was willing to consider helping her --
15    Q     Yes.
16    A     -- repay the bank.
17    Q     And she said that to you?
18    A     I think she -- I -- she was referring to
19 the fact that he might be able to help; that she was
20 trying to raise the money; that she didn't have it.
21    Q     She told that to you at your
22 meeting with her on February 14th?
23    A     No. It was after that meeting when she
24 told someone at the bank to tell me that she was
25 raising money to pay back the bank.

Page 319

L. Pai

1
2     Q     Okay. So this was after your
3  meeting with her, you had a communication from her
4  through an employee at the bank?
5     A     Yes.
6     Q     And who was that employee?
7     A     It was either Bo Young or Irene, but I
8  think they told -- they may have told Aleesha who
9  told me or it may be Bo Young that I spoke with.
10 It's also possible it was Irene. I don't recall
11 exactly who, but a day or two after I met with
12 Karen, I learned that she was trying to raise money
13 to repay the bank. There were two or three, I don't
14 recall, shortly after.
15    Q     And this was a communication that
16 either Bo Young or Irene had with Karen?
17    A     That's my recollection, that Karen had told
18 one or the other, because they were both involved in
19 the investigation and they were the ones that spoke
20 with her initially when she confessed.
21    Q     Okay. So -- but the meeting with
22 the F.B.I. was either on the 4th, the 7th, or the
23 10th. We have already talked about that; right?
24    A     Yes.
25    Q     So what evidence do you have that

Page 320

L. Pai

1
2  James Ryu told Karen Chon before the 7th -- whatever
3  that date was, the 4th, the 7th, or the 10th that he
4  was going to help her raise the money?
5     A     Well, his own statement to us, that that's
6  what he was willing to do.
7     Q     He told you that that's what he
8  told her at the meeting on February 13th; correct?
9     A     Yes.
10          MR. YI: Objection to form.
11    Q     Yeah.
12    A     Yes. Or possibly earlier.
13    Q     Did he say that, that he had said
14 that earlier?
15    A     Like I said, I don't recall how many
16 meetings he referred to, but he made it clear that
17 he's had either meetings or conversations with
18 Karen.
19    Q     Yes. Correct. He clearly told you
20 about a meeting on the 13 -- that he had had just
21 prior to coming over to see you; correct?
22    A     Yes.
23    Q     And he told you, "I told her this."
24 He explicitly said, "I told her that -- she talked
25 about raising the money, and I said I might help

Page 321

L. Pai

1
2  her," or something to that effect; correct?
3          MR. YI: Objection to form.
4     A     Something like that, yes.
5     Q     And he had a tape of this
6  conversation; correct?
7     A     Yes.
8     Q     Now, you think that he may have
9  also said that he had previously told her this. Not
10 only just prior to coming over to see you, but that
11 he might have said -- told her this in a previous
12 conversation; is that your recollection?
13    A     Well, my recollection is a bit fuzzy about
14 which dates he was referring to.
15    Q     Well, if it turns out that he told
16 you that on the 13th and then he didn't have that
17 conversation with her at any time prior to the 13th,
18 then he couldn't have induced her to lie to the
19 F.B.I. in the manner that you are suggesting; isn't
20 that true?
21    A     Well, I know for a fact that he had a
22 meeting with her on the 30th.
23    Q     Correct. But if he didn't -- I'm
24 just saying, if there's no evidence that he at that
25 meeting told her he was going to come up with the

Page 322

L. Pai

money, as you suggested, if there's no evidence that
that happened on the 30th, then he could not have
induced her to lie to the F.B.I., at least not in
the manner that you're suggesting happened; isn't
that correct?

A    Well, I know that he also found out about
her implicating him much earlier than -- definitely
much earlier than the date of Karen's meeting --
interview with the F.B.I.

Q    And what was that date that he
first learned that she was implicating him?

A    I think shortly after her -- her
confession.

Q    It was the meeting with her on
January 30th; correct?

MR. YI:  Objection to form.

A    That I'm not sure.  He may have heard
before, because I think he was in communications
with bank employees.

Q    Yeah.  He was -- he spoke to Irene
before that -- or no.  Actually, he attempted to
contact Irene; are you aware of that?

A    Yes.  I remember Irene saying that he had
called her.

Page 323

L. Pai

Q    Right.  So you -- you think that --
so that -- is -- no dispute that he met with Karen
on January 30th after having received a phone call
with her.  But you think that maybe a bank employee
prior to that meeting with Karen had told James that
she was implicating him?

A    That, I'm not sure.

Q    Well, you say you're not sure.  Do
you have any -- do you have anything to suggest that
that's the case?

A    Well, I think I'm referring to Karen's
statements that she was trying to raise money and
that she was trying to get James to help her.

Q    And that was a statement that she
made through --

A    That was a --

Q    -- Bo Young or Irene to you;
correct?

A    That's right.

MR. YI:  Can we take a short break
when you get a chance?

MR. HARVEY:  Sure.  We can take a
short break right now if you'd like.

(Whereupon a short recess was

Page 324

L. Pai

held.)

MR. HARVEY:  Let's go back on the
record, please.

Q    Ms. Pai, during the break, you and
your counsel pointed out to me that having studied
your notes at the meeting, this is Ryu 14, you
realized that you might have misspoken on a couple
of small points, relatively small -- well, whether
they're small or not, I don't know.  But you
referred me to page WB 2057; isn't that right?

A    Yes.

Q    There's a word at the top, it's
underlined, it's right underneath "husband
concentrates on work."  There's something in Korean.
You wanted to clarify your testimony on that?

A    Yes.

Q    Please.

A    I wanted to clarify that earlier I was
referring to this gae transaction as her explanation
about the specific check, but instead, looking at it
again, it was what she told me that she had told to
her husband, because the husband didn't know she was
taking money from the bank and she explained to her
husband that she had received large sums through

Page 325

L. Pai

participating in gae.

Q    So that's -- she told you that's
how she explained to her husband where she'd come up
with this money?

A    That's right.

Q    So she lied to her husband?

A    Yes.

Q    And then -- then farther down you
said there was another clarification you had.  There
was the letters BM.  It's like the -- toward the
bottom of this -- the bottom third of this, right
before the words "cannot remember."  And you wanted
to say something about that as well?

A    Yes.  So I couldn't remember earlier what
"the beginning" and "BM" and "cannot remember"
meant, but now I remember.  It was when I asked her
when she first started embezzling money, who was the
branch manager at the Fort Lee branch and that her
response was she could not remember.

Q    Okay.  Now, let's go back to what
we were discussing and maybe we can wrap this up and
then move on, but we were talking about your
statement that you believed that Karen lied to the
F.B.I. because James Ryu induced her to lie to the

Page 326

L. Pai

1  F.B.I.; correct?  You remember talking about that?
2
3  A     Yes.
4        Q     And you told me that you believed
5  he had done that because he had told her he would
6  help her come up with the money to pay it back;
7  correct?
8  A     Yes.
9        Q     Do you have any other basis on
10  which to think that James Ryu induced Karen to lie
11  to the F.B.I. other than that there was something --
12  some statement by him to her at some point about
13  helping her pay back the money maybe?
14  A     Yeah.  So I'm just referring to -- I'm
15  referring to the overall sequence of events after
16  she confessed to the bank, and then shortly after I
17  found out she's trying to raise money, she realized
18  she needed to raise money to pay back the bank so
19  that the bank would not press charges.  And shortly
20  after that, she met with James.  And then shortly
21  after that, she was interviewed by the F.B.I. where
22  she completely changed her story from what she had
23  confessed.  And then after that, she realized that
24  James was not going to necessarily come up with the
25  money and I think she was advised by counsel to tell

Page 327

L. Pai

1
2  the truth.  And so that is what I was referring to,
3  why I still believe her original confession.
4        Q     But I -- just to be clear, I asked
5  you whether there was anything other than this idea
6  that James was going to help her pay back the money
7  that led you to believe that James induced her to
8  lie to the F.B.I.  Do you have anything else other
9  than this idea that he promised to help her pay back
10  the money?
11        MR. YI:  Objection to form.  Asked
12  and answered.
13  A     Yes.  I think at the last deposition I
14  spoke about my meeting with -- our meeting with
15  James and his body language and what he said, even
16  though he said that he did not participate in the
17  original embezzlement that Karen had said, how he
18  felt sorry for her, that he would still consider
19  helping her financially.  It was just not believable
20  to me.  His body language and what he said and the
21  fact that he was shaking and seemed extremely
22  nervous was also what led me to believe her instead
23  of what he was saying.
24        Q     Okay.  We'll get to that.  But you
25  don't have any other evidence that he -- other than

Page 328

L. Pai

1
2  what -- you know, your generalized suspicion of him
3  that he induced her to lie to the F.B.I. other than
4  this idea that he promised that he'd help her pay
5  back the money as told to you on the 13th; correct?
6        MR. YI:  Objection to the form.
7  Asked and answered.
8  A     Yeah.  I mean, overall sequence of events
9  and general context, that's right.
10        Q     Okay.  You mentioned his body
11  language.  What about his body language?  What
12  was -- let me withdraw the question.
13        What do you mean by "body language"?
14  A     Well, I -- we met with him in person
15  relatively shortly after he was implicated in a
16  large embezzlement in a bank that he basically
17  operated.  He was the second man in charge, by a
18  relatively low-level employee at one of the
19  branches, operations officer.  I would have thought
20  that he would just be flabbergasted, you know, and
21  angry and -- but he instead told us he felt
22  sympathetic and wanted to help her, and the way he
23  said it was just not believable.  I could tell that
24  he was lying to me, lying to us.
25        Q     But -- so when you say -- but the

Page 329

L. Pai

1
2  question was body language.  What do you mean by
3  "body language"?  Do you mean the way somebody
4  moved, like body, like the way he moved?  I don't
5  understand what you mean by "body language."
6  A     Well, when somebody tells you something,
7  you look at the person and how they're saying it,
8  not just the words.  It was clear he wanted to get
9  us to -- you know, he wanted us to believe that he
10  was innocent, but I could tell that he was not.
11        Q     Correct.  Because you're a trained
12  forensic investigator; correct?
13        MR. YI:  Objection.
14  A     Well --
15        MR. YI:  Objection to --
16        Q     No.  Are you a trained forensic
17  investigator or not?
18        MR. YI:  Objection to form.
19  A     No, I'm not.
20        Q     Do you have any training on that
21  subject whatsoever?
22  A     Other than as an attorney, no.
23        Q     Okay.  So let's just go back to
24  this body language for just a second.  So those are
25  two words.  Body, by "body" do you mean, like, arms,

Page 330

L. Pai

1  legs, or do you mean mouth or eyes?  What do you
2  mean by "body language"?  I don't understand.
3          MR. YI:  Objection to form.  Asked
4  and answered.
5          MR. HARVEY:  And not answered.
6  Asked and not answered repeatedly.
7      Q      "Body language," what does that
8  mean?
9          MR. YI:  Objection to form.
10     A      So I'm just referring to everything you
11  said when a person is talking to you.  I met with
12  James one day and then I met with Karen the next
13  day, so I assessed both of their body language along
14  with what they told me and they were telling me two
15  completely different stories.  So I --
16     Q      Sure.  But --
17     A      -- I had to --
18     Q      -- we're focused on the words "body
19  language."  Do -- like, have you ever seen those
20  words used in a book, "body language"?
21     A      No.
22     Q      So how -- I don't understand what
23  you mean by "body language."  Can you tell us what
24  you mean specifically by "body language"?  Just in

Page 331

L. Pai

1  general, what is body language?
2     A      Well, I'm referring to his facial
3  expression, fidgeting, looked kind of nervous.
4     Q      How is it that you're qualified to
5  judge somebody's body language?  Is this just a
6  lay -- is this just a lay -- this is just a
7  layperson's assessment of -- is that what you mean,
8  just this general impression that you had?
9     A      Yes.  The general impression I got from
10  what he said versus what she said.
11     Q      Well, that's a comparison of words.
12  We can all compare words, but we're talking now
13  about something that you said, which was "body
14  language."  What was James specific body language
15  that you're referring to?
16          MR. YI:  Objection to form.  Asked
17  and answered.
18     A      For a person that I was told was very
19  authoritative, very -- had a big temper, used to
20  yell at employees, the employees were -- especially
21  employees at lower level were very intimidated by
22  him.  For someone like that -- and also because I
23  had met him before during the merger due diligence
24  meetings, he had a much different demeanor when he

Page 332

L. Pai

1  spoke to me earlier than when he was speaking to me
2  about Karen's embezzlement.  That's basically what
3  I'm referring to.
4     Q      Okay.  So his demeanor was
5  different on the day that you interviewed him on
6  February 13th when you had previously talked to him
7  about some board minutes; right?
8     A      Sure.
9          MR. YI:  Objection.  Form.
10     Q      Now, the meeting about the board
11  minutes, how long did that last?
12     A      Maybe several hours.
13     Q      You meet with him for several hours
14  about the board -- like more than two?
15     A      I know I had lunch with him at one of the
16  meetings, which was probably a couple of hours, and
17  then bank-related matters, maybe a couple of hours.
18     Q      Okay.  So the fact that he seemed
19  different when you met with him prior -- during your
20  due diligence for this acquisition and when you met
21  with him -- when you were considering this
22  allegation, this very serious allegation against
23  him, the fact that he acted physically differently
24  during those two meetings convinced you that was

Page 333

L. Pai

1  another factor that he -- why you should believe
2  Karen and not him; right?
3          MR. YI:  Objection to form.
4     A      Yes.  That was definitely another factor.
5     Q      Okay.  But let's go back to it.
6  What was it -- I mean, I understand that you feel he
7  was different in his body language, but what was
8  different in his body language on those two
9  occasions?
10          MR. YI:  Objection to form.  Asked
11  and answered.
12     A      I just felt he wasn't telling the truth.
13     Q      I understand that you felt that,
14  but what was it about his body language?
15     A      Well, he seemed overly nervous.  He seemed
16  unlike his normal -- he acted unlike his normal
17  prior behavior and demeanor.
18     Q      How did he act previously than was
19  different than this meeting?
20     A      Well, before he was very sure of himself;
21  boasting of himself; somebody that was in charge of
22  the bank.  And at this meeting, he seemed very
23  nervous, shaken, and yet trying to convince us that
24  he had nothing do with the large embezzlement.

Page 334

L. Pai

1
2     Q.    Okay.  So we finally got to it.
3  You said he was shaking; right?  On this occasion,
4  he was shaking.  On the previous occasion, he wasn't
5  shaking; correct?
6             MR. YI:  Objection to form.  I
7  don't think that's the word she used.
8     Q.    Didn't I hear you say -- did you
9  not say the word "shaken" or "shaking"?
10            MR. YI:  I think she said "shaken."
11    A     Yeah, shaking, shake --
12    Q     Did you mean --
13    A     Well, shake -- he seemed very nervous
14  instead of angry, which is what I would have
15  expected of someone with his supposed temper.  It
16  wasn't a response that I expected based on his
17  reputation in my prior meetings with him.
18    Q     So the fact that he wasn't angry at
19  the meeting was one of the things that convinced you
20  that he -- you should believe Karen and not him;
21  correct?
22    A     Right.
23            MR. YI:  Objection to the form.
24    A     He didn't -- that's right.  He didn't seem
25  angry at Karen, and I would have expected him to

Page 335

L. Pai

1
2  seem very angry at Karen for implicating him
3  wrongfully.  He seemed -- he made us -- he made us
4  want to believe that he was understanding, felt
5  sorry for her instead of being angry that she would
6  implicate him when he was innocent.
7     Q     Did he say he felt sorry for her?
8     A     Yes.  I think so.
9     Q     Okay.
10    A     He -- well, felt sorry or was sympathetic,
11  that is why -- because I asked him, well, why would
12  you try to help someone financially; someone, you
13  know -- why would you want to help her financially
14  when she, as you say, out of the blue named him as a
15  co-conspirator when you claim that you know, that
16  you had nothing to do with it?  And --
17    Q     Did you ask -- and you asked him
18  that?
19    A     Yes, more or less that way and -- because I
20  was curious.  And he explained that, you know, he
21  was sympathetic, wants to try to help.
22    Q     He used those words, "sympathetic"
23  and "try to help"?
24    A     I think it was either sympathetic or felt
25  sorry, something.  One of those two.

Page 336

L. Pai

1
2     Q     So he either said he was
3  sympathetic or sorry; correct?
4     A     Yeah, I mean -- yeah.
5     Q     Did he say what he was sympathetic
6  or sorry about?
7     A     That Karen had to embezzle money.
8     Q     And she was such a pathetic, stupid
9  person that she stole $1.6 million from the bank and
10  she's 34-years old and had two children; is that
11  what he said he was sorry about?
12            MR. YI:  Objection to form.
13    A     Well, he didn't go into that kind of
14  detail.  He said that was what motivated him to want
15  to help her financially.
16    Q     He said he was motivated to help
17  her financially because he felt sorry for her?
18    A     Well, I wanted to know why would you want
19  to help her raise money; that he was thinking -- he
20  was -- he was considering lending her money.  And so
21  that's what I mean by "motivated," that's his
22  explanation.
23    Q     Let's go back to the meeting with
24  Karen.  She told you that she had taken $500,000 for
25  herself; right?

Page 337

L. Pai

1
2     A     That was her estimate of how much she
3  probably took out of 1.2 million, which was the
4  figure that she estimated as opposed to the higher
5  amount that the bank estimated.
6     Q     And did she tell you what she did
7  with the $500,000?
8            MR. YI:  Objection to form.
9     A     Yes.  I think she said that she used it for
10  her husband's business.
11    Q     Did she say how she used it for her
12  husband's business?
13    A     She didn't go into details other than to
14  say that her husband's business was not generating
15  enough income to be sustainable.
16    Q     So -- but did you ask her?  Did
17  you -- did you specifically ask her where's the
18  $500,000?
19            MR. YI:  Objection to form.  Asked
20  and answered.
21    A     Yes.  I think she said she didn't have any
22  money left, that it was used for operating the
23  business.
24    Q     And did she say anything about
25  having a relationship, a romantic or other

Page 338

L. Pai

1  
2 relationship -- or any kind of relationship with  
3 James Ryu outside of work?  
4   A   I don't believe so. She talked about --  
5 she talked about James finding out about her prior  
6 improper transactions relating to her husband's  
7 business partner's accounts and that he had used  
8 that as a threat to get her to do what he wanted her  
9 to do, but she did not refer to any kind of romantic  
10 relationship.  
11   Q   Did you hear that -- you heard from  
12 other employees that they had some kind of a  
13 romantic relationship; right?  
14   A   That they --  
15       MR. YI: Objection to form.  
16   A   That they thought that she had some kind of  
17 romantic relationship, because I think she was  
18 referring to something that he had over her, and  
19 they interpreted that as some kind of romantic  
20 relationship when I think she was actually referring  
21 to James discovering that she had, you know,  
22 manipulated the partner's account -- business -- her  
23 husband's business partner's account and that he was  
24 threatening her with that discovery.  
25   Q   But she didn't -- just to be clear,  

Page 339

L. Pai

1  
2 she didn't say anything about a romantic  
3 relationship with James in her meeting with you;  
4 correct?  
5   A   Right.  
6   Q   And the conversations that you had  
7 with about James's supposedly or this -- you had  
8 heard something about the possibility that the  
9 rumor, whatever it was, that they had a romantic  
10 relationship, you heard that from some bank  
11 employees?  
12   A   Yes.  
13       MR. YI: Objection to form.  
14   Q   Who did you --  
15   A   I remember hearing that from some employee,  
16 but it was, I guess, their speculation.  
17   Q   And who was that?  
18   A   I can't remember if it was Bo Young or  
19 Irene.  
20   Q   But it was definitely one of them,  
21 Bo Young or Irene told you that?  
22   A   Or it could have been Aleesha that told me  
23 that.  
24   Q   Aleesha Lee was never a Bank Asiana  
25 employee; was she?  

Page 340

L. Pai

1  
2   A   No. But she may have just relayed what she  
3 had heard from Bank Asiana employees.  
4       MR. YI: I'm going to instruct the  
5 witness not to guess or speculate.  
6   Q   Well, if you look at what's  
7 previously been marked as Ryu 22, which is a  
8 document we looked at at your last deposition, at  
9 the -- on the second page of this document, at the  
10 very last sentence -- and you can take as much time  
11 as you want to read this -- it says, "Chon also  
12 alluded to a possible work outing that resulted in a  
13 romantic link between her and her unnamed  
14 supervisor."  
15   A   Yes, I see that.  
16   Q   Now, according to the F.B.I.,  
17 that's what Irene told the F.B.I. when it -- the  
18 F.B.I. interviewed her; correct?  
19   A   Yes.  
20   Q   And she's clearly saying that's  
21 what Karen told her at that meeting in around  
22 January the 22nd or 23rd; correct? 22nd, actually,  
23 to be correct.  
24   A   Well, because of the words "alluded" and  
25 "possible," I don't know if Irene is referring to an  

Page 341

L. Pai

1  
2 actual statement by Karen or just her assumption  
3 based on something that Karen may have told her.  
4   Q   So you think that means -- you  
5 think this could mean -- this language could be read  
6 to mean Chon also assumed that there was a  
7 possible -- is that -- is that how you read that?  
8   A   Not Chon also assumed, but Irene was  
9 referring to what Chon had told her, but because  
10 she's using "alluded" and "possible," it shows that  
11 Irene made some assumptions based on whatever it was  
12 that Chon had told her about some event.  
13   I just remember when I spoke to employees  
14 of Bank Asiana, that no one knew what it was that  
15 was -- that James was kind of -- James had on Karen,  
16 but they all knew that Karen was referring to  
17 something that James had on her --  
18   Q   Correct.  
19   A   -- that made her do what she did.  
20   Q   And in this memo it's saying that  
21 that was a possible romantic link was the -- that's  
22 the suggestion; right?  
23   A   That's -- that seems to be the suggestion  
24 being made by Irene.  
25   Q   Okay. And then if you look down in

L. Pai

1  the fourth full -- fourth full paragraph on page 2,
2  you'll see the penultimate sentence says, "Also in
3  this second interview, Chon did not mention any
4  possible romantic link between her and Ryu."  Do you
5  see that?
6      A     Yes.
7      Q     Now, did you know -- you know --
8  did you know prior to looking at this that Irene had
9  given this statement to the F.B.I.?
10     A     I --
11     Q     Let me ask it -- let me withdraw
12  the question.  You wouldn't know that.  I withdraw
13  the question.
14     Did Irene tell this to you, that -- in the
15  first meeting, that Karen said something about a
16  possible romantic link or there was something about
17  a possible romantic link, in the second meeting,
18  nothing about a possible romantic link?
19         MR. YI:  If you recall.
20     A     No, I don't recall any conversation
21  directly with Irene about what Karen had told her at
22  the first meeting versus second meeting on January
23  22nd and 23rd with respect to this particular topic.
24     Q     Okay.  So you don't remember Irene

L. Pai

1  telling you anything -- you don't remember that
2  subject coming up with Irene at all; correct?
3      A     Other than just her saying that whatever
4  Karen said referred to something that James had on
5  her, which is why Karen felt she had to do what she
6  did and she couldn't just say no.
7      Q     Well, I'm just trying to be clear.
8  Did Irene mention anything about this -- in your
9  conversations with Irene, did she mention anything
10 about what this thing was that -- first of all, did
11 Irene tell you that Karen -- that Karen had told her
12 that James had something on her?  Regardless of what
13 the thing he had on her was, did Irene tell you
14 that?
15     A     Yes.  Irene and everyone else told me that.
16     Q     Okay.  Now, did Irene tell you what
17 she thought this potential thing was?
18     A     Yes.  So Irene and several others thought
19 it was a romantic relationship, which later I have
20 found out was not true.  And it was actually a
21 threat to reveal Karen's improper transactions
22 involving her husband's partner's accounts.
23     Q     Okay.  But Irene -- just to be
24 clear, Irene didn't tell you or she did -- you tell

L. Pai

1  me, she did tell you or she didn't tell you that on
2  the first occasion, she mentioned something about a
3  possible romantic relationship and then the second
4  time she said it was something different or --
5          MR. YI:  Objection.
6      Q     -- or vice versa?  There's some
7  inconsistency there.
8          MR. YI:  Asked and answered.
9      Go ahead.
10     A     That's right.  I said earlier I don't
11 recall having a specific discussion with Irene about
12 what did Karen tell you first day and what did she
13 say on the second day and was there something, you
14 know, about a romantic relationship she mentioned on
15 one day but not the other.  I did not have that kind
16 of discussion with Irene.
17     Q     Okay.  Now, you are certainly, as
18 the general counsel for the bank, very interested in
19 getting at the truth of what happened in this case;
20 isn't that true?
21     A     Yes.
22     Q     And if evidence was presented to
23 you that suggested that you were wrong, you'd want
24 to know about that; wouldn't you?

L. Pai

1      A     Yes.
2      Q     Have you -- are you familiar with
3  Irene's deposition?  Have you read Irene's
4  deposition?
5      A     It's been a long time.  I don't -- yes, I
6  read it, but I don't recall.
7      Q     Well, let me tell you what she said
8  on this point.  I'm going to read it to you.  This
9  is page 79.
10         MR. YI:  Do you have a copy?
11         MR. HARVEY:  It's page 79.  No.
12 You can look on with me, if you'd like.
13     Q     On page 79, I said at the
14 deposition of Irene Lee:
15     "I'm going back on the record.  This is
16 Steve Harvey.  I just concluded my examination and
17 we took a lunch break, but during the lunch break I
18 talked to my client who speaks Korean and he said
19 that Ms. Lee's last answer said something slightly
20 different than the response I was provided through
21 the translator.  And she may have said the word
22 'but,' and so I'd like to ask you the question
23 directly.
24     "Did you mean to say, Ms. Lee -- I asked

Page 346

L. Pai

1  
2  you in that last couple of questions whether you
3  thought Karen Chon was not being truthful at that
4  meeting on January 23rd, and you said no. Do you
5  recall that? You did not think she was being
6  untruthful?
7      "ANSWER: So whether she was -- like I
8  didn't think she was being untruthful. Like only
9  thing -- the content of Mr. Ryu's blackmail was
10  different. It was slightly different from the first
11  meeting to the second meeting. I thought of like --
12  I realized -- I mean, I thought it was different,
13  but other than that, I wouldn't know.
14      "QUESTION: What was different about it?"
15      And there was an objection, and then the
16  answer.
17      "ANSWER: At the first meeting, the content
18  of black -- the reason for the blackmailing was
19  because Karen opened the account she shouldn't have
20  opened. She was blackmailed for that. At the
21  second meeting, she said something occurred during
22  the dinner."
23      That's pages 79 to 80. I'll put it in
24  front of you if you want to review that to refresh
25  your recollection so you can look at it.

---

Page 347

L. Pai

1  
2      MR. YI: I'm just pointing to
3  the -- pointing this out to the witness, so he read
4  just now from here to here (indicating).
5  A    So I'm sorry, what's the question?
6      Q    The question is: Were you -- did
7  you read that -- but before me reading that, were
8  you aware that Irene had given that testimony?
9  A    I don't recall specifically.
10      Q    But you do recall that you read the
11  deposition; right?
12  A    Sure.
13      Q    Now, doesn't that suggest that
14  Irene -- Irene is saying that Karen said something
15  different to her on those two meetings; right, about
16  the reason for the blackmail?
17      MR. YI: Objection to form. I
18  don't think she could testify as to what somebody
19  else testified to or meant to testify about.
20      But if you can answer, go ahead.
21  A    In my mind, I -- I don't think it was
22  significant difference because of the Korean
23  language. You know, when Karen explained something,
24  it was very vague that there was something that
25  James had on her, and so a lot of people were

---

Page 348

L. Pai

1  
2  assumptions that it was a romantic link, but it
3  wasn't. So in -- and it's easy for me to understand
4  why there was misassumption.
5      I think part of the fact that James was
6  known to like pretty women and was kind of -- you
7  know, all of that -- kind of that reputation that he
8  had, so I think people immediately assumed it was a
9  romantic relationship that led Karen to do what
10  James told her to do, but it wasn't.
11      So I didn't really think that it was a big
12  deal that Irene or whoever else, you know -- how
13  they responded about the difference.
14      Q    Okay. So the fact that Karen told
15  two separate different stories to Irene and that
16  Irene concluded that she was not being truthful,
17  that plays no -- no role. You still -- you still --
18  you don't -- you think you should still trust Karen
19  even though she told Irene, according to Irene, two
20  different things from January 22nd to 23rd?
21      MR. YI: Objection to form.
22  A    Yes. I don't think it was what Karen -- I
23  don't think it was Karen's telling two different
24  stories. I think it was Irene making two different
25  assumptions. She made assumptions along with other

---

Page 349

L. Pai

1  
2  bank employees that there was something romantic.
3      Q    Correct. But that's not what she
4  said. Her testimony was that she -- it wasn't
5  anything about an assumption. Irene said that Karen
6  had lied to her on this. She said that she had made
7  statements and they were inconsistent, and she
8  concluded from these statements that they were
9  untruthful. There is nothing about an assumption in
10  that testimony; is there?
11      MR. YI: Objection to form. I
12  think the record speaks for itself.
13      You can answer it if you can --
14      MR. HARVEY: You are correct. The
15  record does speak for itself on this one.
16      MR. YI: You can answer it, if you
17  can.
18  A    The transcript says something occurred
19  during the dinner. It doesn't say that there was a
20  romantic episode during the dinner. So, you know,
21  it could have been that James told her during
22  dinner about his knowledge of inci -- the
23  transactions, improper transactions. And he could
24  have told her, you know, that unless you listen to
25  me and get me the money I need, that he was going to

L. Pai

1  make sure that she'll go to jail, so -- or get in
2  trouble.
3
4        So I think it was really the assumptions
5  that Irene made rather than what Karen said, because
6  it was made clear to me by all the employees I spoke
7  with that what she said was very ambiguous and that
8  they were making assumptions about a romantic
9  relationship.  They did not know that for a fact.
10       Q      And this is -- this is they -- when
11  you were doing this, interviewing these employees,
12  right, this is --
13  A      Yes, including Irene.
14       Q      Right.  And you took careful notes;
15  right?
16  A      Well, not about that.
17       MR. YI:  Objection.
18       Q      Did you take any notes of your
19  meeting with Irene?
20  A      I don't recall.
21       Q      Was there -- did you -- is there a
22  memo that -- that describes what she said?  Did you
23  take a witness statement?
24  A      I don't recall.  I mean, if -- if she did,
25  then we would have produced it to you.

L. Pai

1
2        Q      We have seen no such thing.
3  A      Okay.  Well, I handed over everything that
4  I had to our outside counsel, who produced it to
5  you, so...
6        Q      Well, actually I have a statement
7  from Irene that was taken under oath and I just
8  showed it to you.  And you're saying that that
9  statement -- that Irene's statement under oath is
10  different than what she -- pages 79 to 80 is
11  different than what she told you?
12       MR. YI:  Objection to form.
13  Mischaracterizes the witness's testimony.
14       You can answer, if you can.
15  A      Yeah, I just read what you --
16       Q      Is --
17  A      -- I just saw -- I'm looking at what you
18  read, and it doesn't say that literally Karen told
19  her there was a romantic relationship between her
20  and James.
21       Q      She said that --
22  A      Something --
23       Q      -- the second time it was something
24  about a dinner and the first time it was something
25  about opening an account; correct?  I've highlighted

L. Pai

1
2  it in that passage.
3  A      Okay.
4        Q      Okay.  So is that what Irene told
5  you?
6  A      Uhm --
7        MR. YI:  Objection to form.
8  A      -- either Irene or Karen -- no, what -- the
9  first part is what Karen told me about blackmailing,
10  something during the dinner, I think was the general
11  reference to everyone thought that there was some
12  kind of romantic relationship, but it turned out not
13  to be true.
14       Q      That's not what we're talking
15  about.  Irene testified on pages 79 to 80, and
16  particularly on page 80 of that transcript, that the
17  first -- on one of the times -- let me go back.
18       She said, "At the first meeting, the
19  content -- the reason for the blackmailing was
20  because Karen opened the account she shouldn't have
21  opened.  She was blackmailed for that.  At the
22  second meeting, she said something occurred during
23  the dinner."  Do you see that?
24  A      Uh-huh.
25       Q      All right.  Is that what -- is that

L. Pai

1
2  what Irene told you?
3  A      No.  I just said that I don't recall
4  what -- having a conversation with her on those
5  specific topics.
6        Q      So I -- so -- okay.  So the fact
7  that now that you can see that, that now that's
8  Irene's sworn testimony in this case, doesn't that
9  suggest that there was a serious inconsistency by
10  Karen between what she said on the 22nd and the
11  23rd?
12  A      And I told you earlier that I didn't see it
13  as a serious inconsistency because --
14       Q      You didn't --
15  A      -- because --
16       MR. YI:  Let her finish, please.
17       MR. HARVEY:  The testimony is
18  nonresponsive.  I wasn't asking her what she saw.
19       Q      You told me you don't remember
20  asking Irene about that before; right?
21       MR. YI:  Let her finish, please.
22  Right?  You have the right to finish your answer.
23       Q      Go ahead, finish the answer.
24  A      You know, because it -- whatever, you know,
25  I saw or heard about a possible inconsistency in the

L. Pai

explanation of what -- what it was that James had
over her, I think people made a lot of assumptions,
which led to what seems like an inconsistency.
    Q    Correct.  But the highlighted
language that I just read to you a minute ago, you
weren't aware of that because you have no
recollection of Irene telling you that; isn't that
true?  That's what you just testified a few minutes
ago; right?
    A    Of no recollection of Irene making the
differentiation, but Irene, along with others, did
tell me that -- that Karen had referenced something
that James had overheard, that was why she had to do
it.
    Q    Right.  But she didn't -- you don't
remember him asking what that thing was; right?
    A    They all assumed that it was a romantic
relationship --
    Q    I'm not --
    A    -- initially.
    Q    I'm not asking about anybody but
Irene; okay?  Stay focused here.  We're talking
about Irene.
    A    Okay.

L. Pai

    Q    What did Irene say to you about
what thing was that James had over her?
        MR. YI:  Objection.  Asked and
answered.
    A    Initially she told me that she assumed it
was a romantic relationship.
    Q    Okay.  Did she tell you what she
said in her testimony here, which is specifically
that the first time she said that it was something
about opening an account and the second time it was
something about a dinner?  Did she tell you that?
        MR. YI:  Objection to form.
    A    To my recollection, it wasn't Irene that
told me that.  It was my discussion with Karen when
I discovered -- when she told me that it was -- that
she was blackmailed because of her handling of some
accounts.
    Q    Okay.  So Karen clearly told you
that it was -- she was blackmailed because of the
handling of some accounts; right?
    A    Yes.
    Q    And -- but what Irene is saying is
that she said something different on January 23rd.
She said that it had something to do that occurred

L. Pai

during dinner.
    A    Uh-huh.
    Q    Do you see that?  That was her
testimony; right?
    A    Yes.
    Q    And that's not something she told
you; correct?
        MR. YI:  I'm sorry, who told her?
    Q    That's not something Irene told
you?
    A    What Irene told me was that Karen had told
her there was something that James had over her and
that Irene assumed that would -- that it was a
romantic relationship.  That's what I remember.
    Q    Okay.
    A    That's all I remember.
    Q    Okay.  Your memory could be
mistaken; right?
        MR. YI:  Objection to form.
    A    I guess it could be mistaken.
    Q    Right.  You don't have any notes of
the meeting of that conversation; do you?
    A    Right.  And, I mean, I -- I've had --
    Q    Was anybody else present?

L. Pai

    A    -- conversations with many other people
and, you know, we've had subsequent discovery, so --
so -- but that's my recollection of my conversation
with Irene.
    Q    Well, now that you see from the
testimony, the sworn testimony of Irene Lee to --
given under oath here in these proceedings in
Federal District Court in the District of New
Jersey, she said that there was an inconsistency
between what Karen said on the 22nd and 23rd.  You
see that in the testimony; correct?
        MR. YI:  Objection to form.  The
record speaks for itself.
    A    Yes, I see it, but like I said, I think
she -- one instance she's talking about is her own
assumption based on vague statements Karen made and
then the second one is, you know, more
clarification.
    Q    Right.  How do you -- how do you
make that assumption?  Have you spoken to Irene
about this testimony?
    A    No, not since her deposition.  No.
    Q    You're just making that up right
now; aren't you?

## Page 358

L. Pai

1
2     MR. YI:  Objection to form.
3 Argumentative.
4     MR. HARVEY:  No.  It is not
5 argumentative.
6     Q     She's -- according to the plain
7 English, she said she was told two different things,
8 and you're saying that you -- you don't -- you don't
9 think she's correct there in her statement?
10     MR. YI:  Objection to form.  The
11 record speaks for itself.  We have the transcript.
12     A     I'm just explaining to you why I think it's
13 not an inconsistency on the part of Karen.  I think
14 it's an inconsistency that arose because a lot of
15 people were making a lot of assumptions based on
16 vague statements that Karen had made about something
17 that James had on her that made her do what she did.
18     Q     Fair enough.
19     So you think the testimony of Irene is just
20 incorrect?
21     A     Well, incorrect in that she's talking about
22 assumptions she made.
23     Q     Karen is talking -- I mean, Irene
24 in that testimony is talking about assumptions she
25 made; is that your testimony?

## Page 359

L. Pai

1
2     A     Irene's assumptions based on vague
3 statements that Karen had made.  Because her initial
4 meeting, you know, she really did not want to reveal
5 who it was, but she made it known that the -- she
6 didn't do it alone.
7     Q     Okay.  So you're -- Karen --
8 Irene's testimony that we've been looking at is
9 based on assumptions; correct?
10     MR. YI:  Objection to form.
11     A     That's my belief, yes.
12     Q     Okay.  And was the belief -- what
13 is that belief based on?  This testimony that --
14 we're focusing on the testimony.  She made these
15 exact statements that your counsel has pointed out
16 the record speaks for itself, what about that
17 suggests to you that that's assumptions as opposed
18 to what she heard from Karen's mouth?
19     MR. YI:  Objection to form.  Asked
20 and answered.
21     A     So, yeah, I'm referring to my discussion
22 directly with Irene and then my discussions with
23 Karen and others and all of the subsequent events.
24 I'm saying I understand why it seemed inconsistent.
25     Q     Right.  We're talking about this

## Page 360

L. Pai

1
2 testimony here that we just looked at.  You said
3 that's based on assumptions and you know that's
4 based on assumptions because of your conversations
5 with Karen, your conversations with Irene, and your
6 conversations with other people; correct?
7     A     Yes.
8     Q     Okay.  What conversations with
9 Irene leads you to believe that what she testified
10 here under oath is not actually correct, but it's
11 just based on assumptions?
12     MR. YI:  Objection to form.  Asked
13 and answered.
14     A     Well, because I spoke with -- I met with
15 Irene after those first two days that she's
16 referring to, and I did not get an impression from
17 Irene at that time of this huge inconsistency, but I
18 did --
19     Q     I'm not talking about a huge
20 inconsistency.  We're talking about this specific
21 inconsistency that she's referring to that led her
22 to believe that it was not truthful.
23     Do you -- what -- what did she say to you
24 that made you believe -- that makes you believe
25 today that this is actually, she's incorrect, it was

## Page 361

L. Pai

1
2 just assumptions, it's not something Karen said?
3     MR. YI:  Objection to form.  Asked
4 and answered.
5     A     Yeah.  Like I said, I referred earlier to
6 Korean language, how it tends to be very vague and
7 they -- my recollection of what Irene had told me
8 when I spoke with her.  And then my recollection of
9 how Karen described things, very vague terms or
10 broad terms that could lead to different
11 assumptions.  Those are all the things that I'm
12 referring to.
13     Q     Let's talk about this meeting with
14 Irene.  How many meeting -- was it just one meeting
15 with Irene?
16     A     I met with her when I visited Bank Asiana
17 and then I may have spoken with her on the phone
18 subsequently.
19     Q     May have or did?
20     A     I think I did at least once, if not more,
21 when I -- after I came back to LA.
22     Q     Okay.  You said you spoke with her
23 once, if not more.  Do you recall speaking with her
24 more than once or not?
25     A     I spoke with a lot of different people, so

L. Pai

I -- I recall talking to her on the phone at least once.

Q Okay. Do you remember what you talked about?

A I -- I don't recall if it was Karen wanting to raise money, or I don't recall if that came from Aleesha. To be honest, I just can't remember who it came from. I just remember the content.

Q Okay. So -- and -- but you don't know whether you got that from Irene or from Aleesha; correct?

A Right.

Q So you had at least one conversation with Irene on the phone; right?

A Yes.

Q And do you remember anything that was said in that -- I understand that she may have said something, you can't remember, so you don't need to repeat that. She may have said something about money, raising money to help Irene -- to help Karen.

Do you remember anything else that was said in that phone conversation with Irene?

A I don't have a recollection of specific



L. Pai

conversations. I mean, there were so many in --

Q And the meeting with -- with Karen, where was that meeting?

A Meeting with Karen?

Q Irene. Excuse me. I apologize.

The meeting with Irene. You said you had a meeting with Irene?

A Yeah. So when I visited -- when I came up to visit Bank Asiana, I met with Bo Young. I met with Irene and others at the bank.

Q Okay. So you met her at the branch; is that correct?

A Yes.

Q Which branch?

A I think it was Palisades Park. That branch also has a headquarters office for Bank Asiana.

Q Where did you meet with her inside the branch?

A I think it was either second or third floor, headquarters office, not the branch on the first floor.

Q Okay. So you met with her in a conference room?

A Either a conference room or an empty



L. Pai

office.

Q Okay. And how long did the meeting last?

A I don't recall.

Q Do you -- was anybody present?

A I think I met individually with employees.

Q Did you have counsel with you or were you by yourself?

A No, I was by myself.

Q Did you take notes?

A I -- I don't recall which meetings I took notes and which meetings I didn't take notes.

Q You produced -- your counsel has produced some notes. You didn't destroy any notes; did you?

A No.

Q So if you had notes, you would have saved them; right?

A I would have given them to -- to counsel.

Q So the fact that you have no note -- that there's been no notes produced of the meeting with Irene --

A Yeah.

Q -- would suggest there were no



L. Pai

notes; correct?

A Right.

Q So there was a meeting with you and Irene, no notes, and do you remember what was said at the meeting?

A So basically, she relayed to me her meeting with Karen and then just described her working relationship with James, her own history of positions at the bank. Yeah. So that -- that pretty much -- I tried to keep it informal and not like an interrogation to, you know, make her feel comfortable and feel open to have a discussion.

Q So it was a very informal conversation; is that what you're suggesting?

A Yes.

Q And so what did she tell you about the meeting on the 22nd? And I mean specifically what you can recall from this meeting with Irene, which -- what did she tell you about the meeting on the 22nd about -- when you met with her?

A So my recollection is that I didn't really talk specifically about each meeting. To me, that wasn't as important as just what she knew and then getting a better understanding of how -- how it was

L. Pai

1   at Bank Asiana, what her role was, what James's role
2   was, what Karen's role was.  Just understanding --
3   you know, I wasn't very familiar with Bank Asiana at
4   the time.  Deposit operations was not an area that I
5   was involved in looking into during the merger due
6   diligence.
7       So like I said, I tried to keep it
8   informal, just kind of having a conversation with
9   each employee to understand, oh, you know, this is
10  how Bank Asiana operated.  Obviously, I tried to
11  kind of focus on the embezzlement without making it
12  seem like it was an interrogation.
13      Q     Sure.  Did you ask her whether she
14  had seen anything -- James Ryu do anything that
15  would suggest to her that she had been involved in
16  this embezzlement?
17  A     Yeah.  So with Irene, I focused on her
18  experience and her relationship with James.  She was
19  very close to James Ryu.  James was the one that got
20  her to transfer from the branch to the headquarters,
21  and -- but she -- she said she didn't have much
22  branch experience or deposit operations experience.
23      I remember thinking that she was put in
24  charge of an area that she really didn't know and

L. Pai

1   she, in fact, told me she didn't know much about it.
2   So I was curious as to why James would put her in
3   charge of deposit operations.  She said that her
4   predecessor -- she talked about her predecessor,
5   Jessica, who knew a lot about deposit operations,
6   but that she, Jessica, did not get along with James
7   and eventually either she was forced out or left.
8       And how Irene was nervous to be put in
9   charge of an area that she didn't know, but, you
10  know, James said, you know, she didn't have to worry
11  about it, that she -- that he was going to help her.
12  So -- and he also -- she also was like a secretary
13  to him.  But even though he was very nice to her,
14  but at the same time he was very intimidating to
15  everyone.  So she was basically afraid of him.  That
16  was the impression I got from the discussion with
17  her.
18      MR. HARVEY:  Can you read the
19  question back, please.
20      (Whereupon the last question is
21  read by the reporter.)
22  A     Okay.  So thank you for reminding me about
23  the question.
24      So yes, I did talk to her and others about

L. Pai

1   whether Karen -- what Karen is saying about James's
2   role seemed true based on their working relationship
3   with James and Karen.  And a lot of people, I think
4   including Irene -- of course they were careful
5   because they -- about what to say what they thought,
6   whether James was involved or not as Karen had
7   referred to.  They were careful, but at the same
8   time they all thought that Karen would not have
9   implicated James unless he had something to do with
10  it because he would have been the last person that
11  Karen would have implicated because everybody was
12  afraid of him and he would be extremely upset if he
13  really wasn't involved.
14      MR. HARVEY:  Please read the
15  question back.
16      (Whereupon the last question is
17  read by the reporter.)
18      MR. YI:  Objection.  Asked and
19  answered.
20      MR. HARVEY:  Asked certainly twice,
21  not answered.
22      Q     Please, can you please answer that
23  question?
24      MR. YI:  You can answer it, if you

L. Pai

1   can.
2   A     Yeah.  I mean, did -- did I ask her if
3   there was something that James said or did?
4       Q     Do you not understand the question?
5       A     No, I don't understand the question.
6       Q     Okay.  Let me ask another question.
7   I'll rephrase it.
8       Did you ask Irene in your meeting with her
9   whether she had seen anything that would suggest to
10  her that James had been involved in the embezzlement
11  with Karen?
12      MR. YI:  Objection to the form --
13  A     Yes.
14      MR. YI:  -- and asked and answered.
15  A     Yes.  So that was generally the gist of my
16  conversation with her was to find out and --
17      Q     I didn't ask you about the gist of
18  your conversation.  I asked you whether you asked
19  that question.
20  A     Yeah, I think the --
21      MR. YI:  Objection to the form.
22      Q     Okay.  So you asked that question
23  definitely; correct?
24  A     Yes.

Page 370

L. Pai

1
2    Q.    Okay.  And what did she say?
3    A.   That she didn't have anything that pointed
4 to his direct involvement, but she did agree that he
5 would be the last person that Karen would implicate.
6    Q.    You asked her whether -- you asked
7 her whether or not Karen would have implicated James
8 if it were not true; do I understand correctly?
9    MR. YI:  Objection to form.
10   A.   Yes, I think I did ask her that.  Yeah.  I
11 asked her that to a lot of people.
12    Q.    Well, did you ask it to Irene?
13 We're talking about Irene now.  Did you ask that to
14 Irene?
15   A.   Yeah.  I'm pretty sure I did.
16    Q.    Okay.  And she told you that Karen
17 wouldn't have implicated James because she was
18 afraid of him; is that correct?
19    MR. YI:  Objection to form.
20   A.   Unless it was true.
21    Q.    Unless it was true.  She told you
22 that; right?
23   A.   That was my -- yeah, I mean, I -- I think
24 that was the -- like I said, that was the impression
25 I got.  Obviously, we were talking about the

Page 371

L. Pai

1
2 likelihood.  I mean, they -- they didn't have any
3 facts to show one way or another --
4    Q.    Okay.
5   A.   -- other than what Karen had said.  And
6 everybody was basically surprised that Karen had
7 named James Ryu and so I wanted to -- I made it, you
8 know, clear to her, I'm trying to understand -- I'm
9 trying to find out whether this might be true.  And
10 of course they didn't have an answer for me other
11 than but it's very strange that Karen would
12 implicate James.
13    MR. HARVEY:  Can you please read
14 the question back.
15    (Whereupon the last question is
16 read by the reporter.)
17    Q.    So she told -- she told you --
18 that's my question, it's a yes-or-no answer -- she
19 told you that James wouldn't have implicated --
20 Karen wouldn't have implicated James unless it were
21 true?  I'm asking you did she say that to you?
22    MR. YI:  Objection to form.
23   A.   Did Irene say that to me?
24    Q.    Yes.
25   A.   Yeah, more or less that was my

Page 372

L. Pai

1
2 recollection.
3    Q.    Okay.  And then you also said that
4 you believed -- that it was your impression from
5 meeting with all these people that that was the
6 fact -- that was, in fact, true; that Karen would
7 not have implicated James unless it was true because
8 they were all afraid of him; correct?
9    MR. YI:  Objection to form.
10   A.   Yes, more or less.
11    Q.    Now, what was it that they were --
12 Bank Asiana didn't even exist anymore; right?
13   A.   Does not exist anymore.
14    Q.    At the time of those statements,
15 Bank Asiana didn't exist anymore; correct?
16   A.   Oh, that's right.  It was after the merger.
17    Q.    So none of them worked for James
18 Ryu anymore; right?
19   A.   That's right.
20    Q.    So what was the -- what was the
21 fear of James if they didn't work for him anymore
22 and actually hadn't worked for him for several
23 months and were never going to work for him again,
24 at least not at that bank?
25    MR. YI:  Objection to form.

Page 373

L. Pai

1
2   A.   So my understanding is James wanted Irene
3 to work with him at the new bank that he was going
4 to go to, and it was clear from my meeting with
5 Irene that she really didn't want to work for James,
6 and she also did not want to be involved in the
7 investigation because she felt a lot of pressure
8 from James and felt kind of loyalty to James, I
9 guess, that she was being put in a difficult
10 position of having to help Wilshire Bank investigate
11 this embezzlement scheme where James was implicated,
12 and because he was in touch with her constantly,
13 that she was afraid.
14    And she actually told me, now I remember,
15 at that meeting that she was afraid to go down to
16 the basement where her car was parked in case James
17 might show up.  So she was feeling a lot of
18 emotional stress from still being at, you know,
19 Wilshire Bank and helping us out with the
20 investigation.
21    Q.    Did -- but what was it -- I'm
22 talking about Karen now.  Maybe I wasn't precise in
23 my question.
24    In your mind, what was it -- why was Karen
25 afraid of James if she no longer worked for him, if

Page 374

L. Pai

1  she no longer worked at the same place as him;
2  right?  Karen wouldn't have said this because she
3  was afraid of James unless it was truth, that's what
4  you told us.  What was Karen -- in your mind, what
5  was Karen -- why was Karen afraid of a guy she used
6  to work for?
7  A    I'm sorry.  I was just referring to Irene,
8  not Karen.
9  Q    I know.  I apologize.  Maybe my
10 question was imprecise.
11       I'm asking now, your testimony is is that
12 Karen wouldn't have implicated James unless it were
13 true because she was afraid of him.  And my question
14 is:  What was she afraid of, in your mind?
15 A    I think everyone at the bank -- well, not
16 everyone -- but many younger employees at the bank
17 were afraid of James because he had a lot of
18 authority and he had a huge temper.  He would yell
19 at people.  He -- I think I even heard he threw
20 things at people and terminated them.  So not only
21 Karen but Irene also were generally intimidated by
22 him, if not afraid.
23 Q    Right.  But we already established
24 Bank Asiana went out of business in October of 2013

Page 375

L. Pai

1  and she's implicating him in January of 2014.  She
2  no longer works for him; isn't that true?  At that
3  time, she no longer worked for him?
4  A    Karen?
5  Q    Yes.
6  A    Right.
7  Q    All right.  So what was -- in your
8  mind, what was -- why was Karen afraid of James, so
9  afraid of James that she would essentially -- you
10 know, this would be a major factor here in her
11 telling the truth when she no longer worked for the
12 guy?  What was it -- what was it she was afraid of
13 months after she stopped working for him?
14      MR. YI:  If you know.
15 A    I see what you're asking.  You're talking
16 about after she confessed?
17 Q    Correct.
18 A    I don't think Karen was afraid of James
19 after she confessed.  She, I -- I think said that
20 she actually felt relief of having confessed because
21 it was really kind of eating at her about this
22 embezzlement and being under duress or having to do
23 this for James for a long time.
24      So I think for Karen, after her confession,

Page 376

L. Pai

1  it was more of she realized that James was not going
2  to own up to any involvement; that he was going to
3  let her be -- let her take all the blame.  And so
4  for Karen, it wasn't -- she -- I don't think she was
5  afraid of him the way she used to be because he no
6  longer had anything over her once she confessed.
7  Q    Right.  But -- so you're telling
8  me -- I mean, so I have to point out to you that
9  there's -- what you testified about earlier doesn't
10 make any sense, I think you'd have to agree, because
11 you said that you concluded that James was the last
12 person that she would have implicated because she
13 was afraid of him.  That was your testimony; wasn't
14 it --
15      MR. YI:  Objection.
16 Q    -- previously?
17      MR. YI:  Objection to form.
18 A    That's what other employees thought.
19 Q    Right.  But that didn't make any
20 sense because she no longer worked for him, and you
21 just explained to me she no longer had any reason to
22 fear him; right?
23      MR. YI:  Objection to form.
24 A    After she confessed.  So when I referred to

Page 377

L. Pai

1  her being afraid of James, it was before the
2  confession.
3  Q    Okay.  And -- and I'm referring to
4  now at the time of the confession.  When she said
5  James was the person who participated in this with
6  me, you believed her because she wouldn't have
7  implicated him unless it were true because she was
8  afraid of him.  That was your testimony; right?
9      MR. YI:  Objection to form.
10 A    Right.  Unless he was involved.
11 Q    No.  You said unless -- because she
12 was afraid of him.
13 A    Because everyone at the bank was afraid of
14 James.  Why would -- if you were lying about his
15 involvement, why would you implicate someone that,
16 you know, had such anger problems and intimidated
17 all the employees because he would -- you should be
18 afraid of how he would respond unless it was true.
19 Q    Got you.  So what was she afraid
20 of, though?  When she confessed, she no longer
21 worked for him, so why was she afraid of him at the
22 time of her confession?
23      MR. YI:  Objection to form.  That's
24 not what she testified to.

Page 378

L. Pai

1
2      MR. HARVEY:  It's a question,
3  Michael.
4      MR. YI:  She said before.  She
5  didn't say at the time or after.  In any event, I
6  apologize for a speaking objection.  I'll just
7  object to the form.  And I would like to take a
8  lunch break sometime soon.
9      You can answer.
10  A      Yes.  I mean, I think it's the timing,
11  you're mixing up the timing of when -- she obviously
12  overcame her fear when she implicated him.
13      Q      Okay.  So at the time she
14  implicated him, she was no longer afraid of him;
15  true?
16  A      I think she decided that -- that she really
17  didn't want to live with it anymore.
18      Q      At the time that she implicated
19  him, she was no longer afraid of him; true?
20      MR. YI:  Objection to form.  Asked
21  and answered.
22  A      Well, she didn't -- she didn't say that to
23  me, but that's -- I think she did say it was hard
24  for her to -- to live with it.
25      Q      You thought that at the time she

Page 379

L. Pai

1
2  implicated him, she was no longer afraid of him, at
3  the time when you interviewed her in and around
4  February of 2014; true?
5      MR. YI:  Objection.  Asked and
6  answered.
7  A      Yeah, I believed that she -- that was no
8  longer a factor.
9      MR. HARVEY:  Okay.  We can take our
10  lunch break now if you'd like.
11      (Whereupon the luncheon recess was
12  held.)
13      MR. HARVEY:  Okay.  We're ready to
14  go back on the record.
15      Q      Now, have you told us everything
16  you can recall that Irene -- that you discussed in
17  your meeting with Irene that you have testified
18  about?
19  A      Yes.
20      Q      Did you know that Irene testified
21  that James Ryu didn't -- or ask to borrow any money
22  from her, that it was H.S. Hur who asked, without
23  James's knowledge, if James could borrow some money?
24  Did you know that?
25      MR. YI:  Objection to form.

Page 380

L. Pai

1
2  A      Oh, yeah.  I recall now that you mentioned
3  that.  So I misspoke then.
4      Q      Okay.  So was the -- did Irene tell
5  you that?
6  A      I recall that someone had asked her to lend
7  money to James.  So now that you mention it, I guess
8  that someone was Mr. Hur, and I -- and earlier I
9  thought that was James asking her directly.  So I
10  stand corrected.
11      Q      Okay.  Did you know that James --
12  that Irene testified that James apologized for that;
13  that H.S. Hur had asked to borrow money on his
14  behalf?
15  A      That, I don't recall seeing.
16      Q      She didn't tell you that?
17  A      Not that I -- yeah, not that I can recall.
18      Q      Did you know that she told Karen
19  about that incident where H.S. Hur had asked to
20  borrow money -- had asked her to lend money to James
21  without James's knowledge, did you know that -- and
22  this is before the -- you know, before all this came
23  to light, Karen -- excuse me -- Irene told Karen
24  about that incident; did you know that?
25      MR. YI:  Objection to form.

Page 381

L. Pai

1
2  A      I don't have a specific recollection.  What
3  I just generally recall is that multiple employees
4  knew that James had either asked them for a personal
5  loan or others, like Mr. Hur, had asked employees to
6  give James a personal loan because he needed money.
7      Q      So -- and just to be clear, you
8  didn't know that Irene told Karen about the incident
9  where H.S. Hur asked for money -- her to lend money
10  to James without his knowledge; you didn't know --
11  you didn't know about that?  That didn't come up?
12  A      I don't recall that specific conversation.
13      Q      What other employees said James
14  asked to borrow money from them?
15  A      Again, I don't -- my -- I don't have
16  specific recollection of exactly who had said that,
17  but I know it was multiple employees that referenced
18  it, and it could just be Irene and Karen that he had
19  asked or others had asked them to consider making a
20  personal loan to James.
21      Q      So you don't know anybody specific
22  other than possibly Irene and Karen; is that
23  correct?
24  A      That I can recall now.
25      Q      Well, is there some way you could

Page 382

L. Pai

1 figure that out?

2 A     If you show me maybe statements they may

3 have had made, but no, I -- I mean, I can't think of

4 any specifics right now that would refresh

5 my recollection.

6 Q     And you know there was a meeting at

7 the bank on January 23rd where Bo Young, Aleesha

8 Lee, and Irene met with Karen; right?

9 A     Right.

10 Q     Do you know that at that meeting

11 Karen raised the subject and asked Irene to tell the

12 story about how H.S. Hur had tried to borrow money?

13 MR. YI:  Objection to form.

14 Q     For -- how -- about how H.S. Hur

15 had asked Irene to lend money to James without

16 James's knowledge; did you know that Karen raised

17 that subject and asked Irene to tell about that at

18 the meeting on January 23rd?

19 MR. YI:  Objection to form.

20 A     I don't recall that specific part.

21 Q     Would you agree with me that would

22 be pretty unusual if Karen did that?

23 MR. YI:  Objection to form.

24 A     What do you mean "unusual"?  In what sense?

Page 383

L. Pai

1 Q     In the sense that it would suggest

2 that she was lying about her implication.  She was

3 looking for a means to implicate James Ryu.

4 A     I'm not sure if it was unusual.  I guess if

5 he -- in my mind, that's just her explaining --

6 trying to explain the fact that James was asking

7 around for loans, I think.  I -- so in that way, I

8 don't know what you mean by "unusual."

9 Q     Well, if Karen went to the meeting

10 in which she implicated James, which was on January

11 23rd; right?

12 A     Right.  Correct.

13 Q     If she said that she asked Irene

14 to -- if she brought up this incident where James

15 had -- where H.S. Hur had asked to borrow -- asked

16 Irene to loan money to James without James's

17 knowledge, Karen brought that up at that meeting,

18 that would suggest, would it not, that Karen was

19 looking to make a scapegoat of James Ryu?

20 MR. YI:  Objection to form.

21 A     Either that or just a validation from

22 someone other than herself that James was asking

23 around for a personal loan or that he was in a

24 financial difficulty where he needed a personal loan

Page 384

L. Pai

1 from multiple employees.

2 Q     Right.  So Karen was quite aware of

3 James's financial difficulties, whenever that was in

4 2010, '11, or '12; right?

5 MR. YI:  If you know.  I'm going to

6 instruct the witness not to speculate.

7 Q     Don't speculate at any point when

8 I'm asking you questions here.

9 Do you know that Karen was well aware that

10 James had had financial difficulties in, you know,

11 2010, '11, or '12 relating to some investments that

12 he had made that had gone bad?

13 A     Yes.  That's what Karen told me.

14 Q     Right.  Okay.  Now -- okay.  So in

15 addition to meeting with Irene -- and that meeting

16 with Irene lasted approximately how long?  Do you

17 remember?

18 A     I don't recall specifically.

19 Q     Okay.  You also had a meeting with

20 Bo Young?

21 A     Yes.

22 Q     And how long was the meeting with

23 Bo Young?

24 A     So I don't recall specifically.

Page 385

L. Pai

1 Q     And it was that same day that you

2 met with Irene?

3 A     Probably.

4 Q     Well, I mean, let me see.  We

5 already established that you met with Karen on the

6 14th; right, of February?

7 A     Yes, yes.

8 Q     You met with James Ryu on the

9 13th --

10 A     Yes.

11 Q     -- of February?

12 Do you think your meeting with Irene was on

13 the 13th of February as well?

14 A     I don't recall the specific date.  My trip

15 to Bank Asiana or to New Jersey wasn't that long, so

16 it would have been right around that time.

17 Q     It was clearly in that same trip;

18 correct?

19 A     Yes.

20 Q     Okay.  So on that same trip, you

21 also met with Bo Young Lee; correct?

22 A     Yes.

23 Q     And you don't recall how long that

24 meeting was, you just told me that.

L. Pai

And where did that meeting take place?

A    Same place where I met with Irene.

Q    Okay.  And was anybody present with you during that meeting?

A    So my recollection, like I said earlier, was I tried to meet with individuals separately. Although it was informal, I just wanted to hear different people's accounts of what they knew individually, I think.

Q    Okay.  Now, I think you testified, but clarify for me, please, that when you met with Irene, you didn't ask her what was said on the 22nd by Karen and what was said on the 23rd by Karen. You had more general questions; do I understand you correctly on that?

A    That's my recollection.

Q    Likewise, with Bo Young Lee, did you ask her what had happened on the 22nd and the 23rd of January and her -- the communications she had with Karen?  Did you ask about those?

A    Yeah.  Again, my recollection is that I didn't really say, okay, on this day, what did she say?  On this day, what did she say?  It was, what did she say and then also asked Bo Young about just

L. Pai

generally her work roles and so on and so forth.

Q    So you did not ask Bo Young specifically about what was said on the January 22nd and January 23rd; do I understand that correctly?

A    That's my recollection, yeah.

Q    Okay.  Did she -- do you remember her telling you anything about what was said by Karen or what occurred on January 22nd and 23rd irrespective of you asking about it, did she tell you anything about it?

MR. YI:  I'm sorry.  Which person are we referring to now?

MR. HARVEY:  We're referring to Bo Young right now.

A    Yeah.  Again with Bo Young, just like with Irene, I was interested in what they were -- what they found out up to that point and then just trying to understand how things operated at Bank Asiana.

Q    Well, do you remember what Bo Young -- do you remember specifically what Bo Young told you at that meeting?

A    So what I recall is Bo Young didn't know as much -- or didn't have as close of a working relationship with James as Irene and, I guess,

L. Pai

Karen.  Other than that, I -- I can't call -- recall anything specific that I -- that I may have asked her.

Q    And then I haven't seen any notes, so I presume there -- I presume you didn't take any notes during that meeting; is that correct?

MR. YI:  Objection to form.

A    I guess not.  I would have produced anything that I wrote down if I had taken something down.

Q    Okay.  Then in addition to -- so you can't -- well, if you -- can you recall anything more about what Bo Young told you in that meeting?

A    She and I may have talked about the -- some of the financial transactions.  I -- I really don't recall the specifics.  I really don't.

Q    Okay.  So in addition to Irene and Bo Young, you met with Eun Moo Choi; right?

A    Eun Moo Choi.

Q    Correct.  And how long did you meet with Mr. Choi?

A    I don't recall exactly how long I met with him.  The hours -- the only thing I recall is it was shorter than with the others, but other than that, I

L. Pai

can't say how long it was.

Q    Do you remember what you discussed with him?

A    Yes.  So it was about his role as an IT administrator.  And then he had a lot to say about a particular IT vendor that he felt was defrauding the bank with false invoices and just generally about how he came to the bank, things like that.

Q    And this vendor who defrauded the bank, what was the name of that vendor?

A    Was it FI Communications?  I -- I think something like that.

Q    And did you investigate that further to see whether that vendor had actually defrauded the bank?

A    That was not on the top of my priority, although I did, I think, ask Orest to look into it.

Q    What was the amount of the fraud?

A    You know, I don't recall the amount, but it was over time.  I don't recall the amount.

Q    Did he tell you anything about James Ryu?

A    Yes.  In the context of that discussion, I think this vendor that he was referring to was a

Page 390

L. Pai

vendor that James brought to Bank Asiana.

Q      Did he tell you anything else about James Ryu?

A      So we may have had discussions at that time about James Ryu's computers.  I can't recall if it was that time or thereafter.

Q      Did you have a -- did you have any other conversations with Mr. Choi other than that meeting?

A      We may have had discussions subsequently about the drop off of -- of the computer, that -- arranging IT-related matters.

Q      May have or did; do you recall?

A      I probably did.

Q      Do you -- well, do you remember what was said during that conversation that you probably had?

A      It was mostly just making arrangements, the procedural nature, not -- well, procedural nature.

Q      In other words, just getting access to it and turning it over.  It wasn't about what had happened, just about getting access to the computer and transferring it, that kind of thing?

A      That's right.

Page 391

L. Pai

Q      Did you ever have any conversations with Bo Young about this other than the meeting you just testified about a minute ago?  Any communications with Bo Young other than that meeting that we just talked about?

A      Oh, yes.  I mean, about the merger.  She and I had other conversations.

Q      I mean about the embezzlement and James Ryu and Karen Chon.

A      I don't recall specific conversations other than meeting with her.  Then there may have been some follow-up, but I don't recall.

Q      Okay.  You said you might have introduced yourself to other employees when you were out there on that trip.  Did you talk to any other employees about the embezzlement and/or Karen and/or James Ryu?

A      Uhm, most of my discussions about the embezzlement, because at the time only a limited number of people knew about it, so my conversations were with limited people.  But since I was at the bank, you know, I was introduced to branch managers and so had other interactions with other employees.

Q      Well, do you remember any specific

Page 392

L. Pai

conversations about the embezzlement or James Ryu or Karen Chon other than what you told us about your meetings with Irene, Bo Young, and Mr. Choi?

A      Not that I recall at this time.

MR. HARVEY:  Please mark this as -- we're at Exhibit 24.

(Whereupon an e-mail chain is marked as Exhibit Ryu 24 for identification.)

MR. YI:  Steve, do you have the production numbers?

MR. HARVEY:  No, I don't.  I apologize.

(Whereupon the witness reviews the document.)

A      Okay.

Q      Have you had a chance to look at this Ryu 24 before?

A      Right now, yes.

Q      Okay.  Now, you recognize the first page as an E-mail from -- the top of the first page as an E-mail from Dom Tallerico to you on February 4th, 2014?

A      Yes.

Q      And then there's reference in the

Page 393

L. Pai

E-mail to a document, only one of which I've attached here, and it refers to your edited version of a Alex Ko's timeline?

A      Yes.

Q      Do you recognize this -- what's attached here as that timeline?

A      Yes.

Q      And is this something -- do you recall editing this?

A      I don't recall, but it looks like I did.

Q      And do you -- looking at it, do you recall seeing this document before, this timeline?

A      Generally, yes.

Q      Okay.  Now, who was Alex Ko?

A      Alex Ko was Wilshire Bank CFO.

Q      And why did he prepare this timeline?

A      It looks like he was the one that normally makes presentations to board or board audit committee.  So that's probably why he was involved.

Q      Okay.  And so this document -- is this a correct recitation of the facts according to the best of your knowledge?

A      Yes.

Page 394

L. Pai

1  Q   On January 22nd, there's no
2  reference there to James Ryu; correct?
3  A   Okay.  Yes.
4  Q   And then on January 23rd, there's a
5  statement there, the last bullet, it says,
6  "Corruption with and/or unlawful pressure from James
7  Ryu, a former VAT operating administrator and
8  inappropriate relationship with Karen were
9  discovered."
10  A   Yes.
11  Q   And this is referencing the --
12  obviously this is based on Karen's statement to Bo
13  Young, Aleesha Lee, and Irene Lee?
14  A   Yes, I assume so.
15  Q   Had the bank made a conclusion as
16  of this date, February 4th, when this document
17  was -- that actually -- that it was true, that James
18  Ryu had engaged in corruption, unlawful pressure,
19  and inappropriate relationship?
20  A   The -- I think it's referring to Karen's
21  allegations probably at that point.
22  Q   Well, it's not referenced as an
23  allegation.  It's referenced as a discovery; isn't
24  that true?

Page 395

L. Pai

1  MR. YI:  Objection to form.
2  A   It's referenced as Aleesha's initial
3  findings.
4  Q   Okay.  So the bank hadn't made up
5  its -- hadn't made a decision on this subject as of
6  this point?
7  A   We're just reporting on the initial
8  findings.
9  Q   Yes, it's an initial finding.  I'm
10  asking you had the bank -- had you -- did you think
11  at this point that James Ryu actually had done what
12  Karen said he had done?
13  MR. YI:  Objection to form.  Asked
14  and answered.
15  A   Yeah.  I think as of this point, we knew --
16  we had received Karen's confession and allegation
17  about James's involvement.
18  Q   Had you concluded at this date that
19  James was involved or was not involved?
20  A   I don't recall as to my state of mind
21  exactly at this point in time.
22  Q   Do you remember when you decided --
23  there came a point at which you decided James Ryu
24  was definitely involved; right?  As Karen had a

Page 396

L. Pai

1  alleged; right?
2  MR. YI:  Objection to form.
3  A   That I believed that he was --
4  Q   Yes.
5  A   -- involved.
6  Q   And when did you come to that
7  conclusion?  When did you make that conclusion?
8  A   I think you asked me that at the last
9  deposition.  Again, I -- the timeline is such that
10  I'm looking back and I don't recall at any point
11  saying, oh, this is when I conclude.  So it was very
12  hard for me to answer exactly at what point in time
13  in -- at the first deposition.  And -- and I really
14  have the same answer now.  I can't say exactly at
15  what point in time I said, oh, I conclude that James
16  was involved.
17  Q   Okay.  So you don't recall when you
18  made that conclusion; would be a fair statement?
19  A   Yes.  I don't recall as to exact timeline
20  of when -- when I made that mental conclusion.
21  Q   It was clearly prior to filing the
22  complaint in this action; right?
23  A   Right.
24  Q   Do you remember when you filed

Page 397

L. Pai

1  the -- what the date of the complaint was?
2  A   No, I don't recall the exact date.  It
3  would have been after this February 4th E-mail.
4  MR. YI:  Steve, the original
5  complaint, it's Exhibit -- Ryu Exhibit 18.
6  MR. HARVEY:  Yeah.  It was March
7  the 19th.  Thank you, Michael.
8  Q   It was March the 19th of 2014;
9  right?
10  A   Okay.
11  Q   So by March 19th, you had
12  definitely reached that conclusion; right?
13  A   Yes.
14  MR. YI:  Objection to form.
15  Q   Now, had you reached that
16  conclusion -- by the conclusion -- when you
17  completed your interview of that meeting with Karen
18  that you told us about, had you reached that
19  conclusion by that point?
20  A   And that meeting was February --
21  Q   14th.
22  A   -- 14th.  So like I said, I don't recall
23  exactly when I said, oh, this is the time.
24  Q   Understood, but this is a different

41

L. Pai

question, which is as -- by the time that you concluded that interview with Karen on the 14th, had you decided by then that you believed her and that James was definitely involved, in your mind?

MR. YI: Objection to form. Asked and answered.

You can answer, if you recall.

A So I was closer to that conclusion than before. Each meeting and I had with employees or discussions with outside counsel, I got closer to that conclusion, I'm sure.

Q Okay. But -- so is it fair to say you don't remember whether you had reached that conclusion or not by the time that you had ended your interview with Karen on the 14th?

MR. YI: Objection.

Q Your mind might have still been open at that point, you just can't remember; do I understand correctly?

A That's right.

Q And the -- was any information, to the best of your knowledge, brought to your attention after the meeting with Karen on the 14th? You met with James on the 13th; you met with the



L. Pai

employees on 13th; you met with Karen on the 14th. Was there something that you learned after that date that had any bearing on this, in your mind?

A Well, it was an ongoing investigation. So each day would add additional information or additional documents or we've had -- would have discussed additional questions, so --

Q Well, that's the question. Between the 14th of February and the 19th of March, what, if anything, did you learn that added to your knowledge on this?

A Well, I can't recall exactly what I learned during that time period. That's very hard for me to recall.

Q Is it possible that you didn't learn any new additional information between the 14th and the -- February 19th of March?

MR. YI: Objection to form. Anything is possible.

A Yeah. When you ask is it possible, I don't --

MR. YI: I instruct the witness not to speculate. If you recall anything, you can testify.



L. Pai

A I just can't answer what we specifically learned between that -- that period -- during that period.

Q Yeah. Well, do you know for a fact that you learned anything after the 14th, before the 19th, in addition to what you'd already learned as of the 14th?

A I'd have to review some documents to refresh my recollection. I just answered that I can't recall, you know, what I learned exactly during any -- any specific periods unless it was a major event like her confession or meetings with James, meetings --

Q Okay.

A -- with Karen.

Q If you look again at this document, look at the entry for January 25th, second page of your body outline or the outline that you edited, and the second bullet makes reference to "James Ryu investment in Neew Millennium Bank is confirmed by the check copies." Do you see that?

A Yes.

Q What did that mean?

A Basically what it says, that James Ryu



L. Pai

appears to have made an investment in the new bank that he's forming. And so one was able to confirm that those checks were confirmed by copies of checks.

Q But what did that have to do with the investigation into the embezzlement?

A Well, because it goes to his financial status. He supposedly didn't have much money and had a lot of financial pressure and so everything that is relevant to his financial status was of interest to us. And if he had some money to invest in a new bank, that could go to show that he had some source of income other than from Bank Asiana. So that was a helpful fact.

Q Do you know when Neew Millennium Bank came into existence? Well, actually, the -- did you know that James Ryu and H.S. Hur worked on this Neew Millennium Bank starting sometime in the fall of 2013 but not before that?

MR. YI: Objection to form.

A Yeah. As to the date, I -- I'd have to refresh my recollection again, but during this investigation we did learn that both of them were involved in -- in Neew Millennium Bank.

Page 402

L. Pai

Q     Was that a source of concern for
Wilshire Bank?

A     What do you mean by was that -- that's a
broad question. I don't know what you mean.

Q     Well, was Wilshire Bank concerned
that James Ryu and H.S. Hur were working on this new
bank, this Neew Millennium Bank? Was the bank
concerned about that?

A     Yes. So there were several concerns. This
particular investment is -- it goes to show James's
financial status. And then the other concern we
about Neew Millennium is whether they were using
confidential information about Bank Asiana, VIP
customers and so on and so forth to -- if they were
going to use confidential information to form and/or
operate the new bank.

Q     The next entry here is for
January 26th, 2013. Do you see that on this Ryu 24?

A     Yes.

Q     And it says, "Internal auditor
Orest Hamersky arrived in New Jersey for onsite
investigation"; right?

A     Yes.

Q     Now, what was Mr. Hamersky's role

Page 403

L. Pai

in the investigation?

A     So his role was to work with Aleesha to
basically do a forensic accounting of the deposit --
the bank account transactions that Karen had
manipulated and create or summarize the specific
transactions, how -- to -- for us to understand how
she was able to avoid detection and how the money
flowed.

Q     So that was his -- that was his
focus in this investigation; right?

A     Yes.

Q     Was there a formal -- did the bank
open up a formal investigation for itself?

MR. YI: Objection to form.

Q     Let me withdraw the question.

All right. The bank clearly performed an
investigation; right?

A     Right.

Q     Yeah. And you just told us what
Mr. Hamersky's role. What other -- who else was
assigned to work on this investigation?

MR. YI: Objection. Asked and
answered.

A     So Orest and Aleesha were asked to look

Page 404

L. Pai

into the deposit transaction, CD transactions, and
we hired Clifton Larson Allen, LLP, to review
computer hard drive records, information, and we
retained an outside counsel to help us with the
investigation.

Q     And that was Mr. Yi?

A     Yes.

Q     Okay. So was that -- is that
everybody -- oh, and then in addition, what was your
role in the investigation?

A     So I -- my role was to work with outside
counsel in helping the investigation along.

Q     How old is Aleesha Lee
approximately?

A     Right now?

Q     Yeah.

A     Well, I don't really know, but I think
she's probably in her 40s.

Q     What's her background?

MR. YI: Be careful.

THE WITNESS: I'm sorry.

Q     What's her background?

A     Her background?

Q     Yeah. Is she a CPA?

Page 405

L. Pai

A     I don't know.

Q     Does she have an accounting
background?

A     I don't know.

Q     How long has she worked for --
well, how long had she worked for Wilshire Bank at
the time of this?

A     I don't know that either, but she was at
Wilshire when I started, which was about three years
before this, maybe two -- two years before this
incident.

Q     Does she have a background in
investigations? Does she have any expertise --
excuse me.

The question is: Does she have any
expertise in investigations?

MR. YI: Objection to form.

A     Her expertise is she had operations --
deposit operations background. She was the deposit
operations administrator, so she understood deposits
including CDs.

Q     Did anyone in the course of this
investigation interview the witnesses other than the
meeting with Karen on the 22nd and the 23rd, your

Page 406

L. Pai

1 meeting -- your meetings that you've testified about
2 with Bo Young and Irene and Karen and James with
3 Mr. Yi?  Were there any other -- were there any
4 other, you know, interviews of potential witnesses
5 to find out what happened other than those?
6     A    So I don't know who CLA,
7 CliftonLarsonAllen, met with or discussed, I don't
8 recall, but they could have spoken with Aleesha
9 and/or Orest and possibly Eun Moo.  Anyone else, I
10 can't think of any right now.
11        Q    But CliftonLarson, they were --
12 they were focused on the computers; right?
13     A    Sure.
14        Q    Now, at the bottom here it says,
15 "management discussed with CliftonLarsonAllen, LLP,
16 and recommended audit committee to engage the firm
17 based on the following reasons."  And then it gives
18 three possibilities and the last one is,
19 "considering detailed embezzlement plan with
20 corruption of multiple individuals, expert
21 investigation is warranted to discover illegal
22 activities."
23        Do you see that?
24     A    Yes.

Page 407

L. Pai

1        Q    What's that a reference -- what's
2 that referring to; do you know?
3     A    It seems to be referring to the
4 embezzlement plan -- the embezzlement happening in
5 kind of an elaborate fashion.  So not -- not a
6 simple, just take the money out of the teller
7 drawer, but it was set up pretty detailed.  It
8 was -- with a lot of details.  And then refers to
9 the fact that there were multiple individuals
10 involved.
11        So -- so this is saying that we need the
12 expert, referring to CliftonLarsonAllen, LLP, to be
13 involved.
14        MR. HARVEY:  Would you please mark
15 this as Ryu 25?
16        (Whereupon an E-mail chain is
17 marked as Exhibit Ryu 25 for identification.)
18        Q    Handing you what's been marked as
19 Ryu 25.  This is purely just to correct a mistake
20 that I have just made.  I gave you -- it's the same
21 thing as Ryu 24, but I neglected to give you the
22 second page of the E-mail.  So I just want to ask
23 you to take a look at this, what's been marked --
24        MR. HARVEY:  I don't have a copy

Page 408

L. Pai

1 for you, Michael, I apologize.
2        Q    If you can take a look at it, it's
3 exactly the same except I had neglected to include
4 the second page of the E-mail.
5     A    Which is on the back.
6        Q    Yes.  Just for the completeness of
7 the record.
8        MR. YI:  May I ask one request,
9 Steve?  And this -- obviously, you will need to do
10 this after this deposition is over, but if you could
11 provide the court reporter with the production
12 numbers for this particular exhibit.  I think this
13 is the only exhibit for which we don't have
14 production numbers.
15        MR. HARVEY:  I'll try to recall to
16 do that.
17        MR. YI:  Okay.
18     A    Okay.
19        Q    Does that -- that doesn't change
20 any of your testimony?  You see that there's an
21 E-mail there and it's -- who's it from?
22     A    It's from Dom to me.
23        Q    Who's Dom?
24     A    Dom Tallerico, he's the chief internal

Page 409

L. Pai

1 auditor.
2        Q    And in that he was suggesting that
3 you provide certain information to the FDIC;
4 correct?
5     A    That I review a document that was prepared
6 for the FDIC in response to the request.
7        Q    And what document was that?
8     A    The outline that we were just talking
9 about, timeline that we were just talking --
10        Q    And do you know if that was
11 provided to the FDIC?
12     A    I assume so.
13        MR. HARVEY:  Please mark that.
14        (Whereupon an E-mail dated February
15 4, 2014 is marked as Exhibit Ryu 26 for
16 identification.)
17        Q    I'm going to hand you what's been
18 marked as Ryu 26.  It doesn't have a Bates number
19 and I apologize, but it's an E-mail that was
20 produced to us and then it appears to be from Dom
21 Tallerico to you.  Please take a moment to look at
22 it at it.  My first question is going to be whether
23 you've ever seen it before.
24        (Whereupon the witness reviews the

L. Pai

1   document.)
2   A     Okay.
3   Q     Do you recognize -- have you seen
4   this before?
5   A     I don't have a specific recollection, but
6   it appears to be Dom's E-mail to me.
7   Q     Okay.  It says at the first
8   sentence of the second paragraph, "According to
9   Orest, you directed him to try to find a link
10  between one or more people and some of the key
11  participants"; do you see that?
12  A     Yes.
13  Q     Do you know what that's referring
14  to?
15  A     Must be referring to James and Karen and
16  possibly others.
17  Q     So you were asking Orest -- you
18  asked Orest to try to find a link between James and
19  the embezzlement; is that correct?
20  A     Yes, if any.
21  Q     And did Orest find any such link?
22  A     So Orest was -- basically I think what --
23  I'm referring to is that he confined in bank
24  records, because that's what he was looking at is
25

L. Pai

1   bank account records.  So because he found -- there
2   were because there were accounts in Karen's name, in
3   Karen's husband's accounts and also James had some
4   accounts and then there were a number of third
5   parties who appeared to have transactions with --
6   that went back and forth from theirs and Karen's
7   accounts.  So basically that's what I was referring
8   to from account to account, what kinds of links do
9   you -- can you find, and if so, highlight them.
10  That was the point.
11  Q     Did Orest find any such links?
12  A     I think he highlighted some large
13  transactions and -- which led to some of my
14  questions to Karen.  So he -- he pointed out some --
15  some possible -- or suspicious transactions, yes.
16  Q     Yes, but -- suspicious, but did he
17  point out any links between James Ryu and the
18  embezzlement?
19  A     Well, link is how Dom put it.  I don't know
20  that that's how I put it between -- to Orest.  These
21  are Dom's words.  So yes, he pointed out some
22  transactions that were suspicious.
23  Q     Okay.  So you didn't ask him to
24  find links, you just asked him to look for
25

L. Pai

1   suspicious transactions?
2   A     Well, that's how I would have put it, I
3   think, but again, I don't recall the specific E-mail
4   and it looks like Dom called it a link.  But it was
5   the same kind of -- it was -- it was consistent with
6   what I had asked Orest to look for and -- and this
7   E-mail, I think it's really talking about Orest's
8   time involvement, time commitment more than anything
9   else.
10  Q     Well, I think we already -- we
11  already covered it at your past deposition the last
12  time we were together, Orest's lack of conclusions,
13  so I'm not going to go there again.  But instead
14  I'll ask the court reporter to mark what's been
15  marked as -- this exhibit as the next exhibit.
16  (Whereupon an audit committee
17  report is marked as Exhibit Ryu 27 for
18  identification.)
19  MR. YI:  I don't know if that was a
20  question, but I will object if it was.
21  MR. HARVEY:  No, it is not a
22  question.
23  MR. YI:  Okay.
24  MR. HARVEY:  Well, I mean -- let me
25

L. Pai

1   just clarify.
2   Q     At the last deposition, just so
3   there's no confusion, I asked you what conclusions
4   Orest reached about James's involvement, and you
5   said it wasn't his job to reach any conclusions;
6   correct?  Do you remember that?
7   A     Yes, I remember that.
8   Q     So as a matter of fact, to the best
9   of your knowledge, he didn't reach any conclusions
10  about James's involvement; isn't that correct?
11  A     Right.  His job was to look for, you know,
12  facts and trans -- highlight transactions that we
13  should look into.
14  Q     Okay.
15  MR. YI:  This is Ryu 26?
16  MR. HARVEY:  27.
17  MR. YI:  27.
18  MR. HARVEY:  Off the record.
19  (Whereupon there is a discussion
20  held off the record.)
21  Q     Ms. Pai, the court reporter handed
22  you -- excuse me.  I just handed you what's been
23  marked as Ryu 27.  Please take a moment to look at
24  it.
25

## Page 414

L. Pai
2     (Whereupon the witness reviews the
3  document.)
4     A     I took a quick look. I don't know how much
5  you want me to review in detail.
6     Q     Well, I could ask you questions
7  about it. Have you ever seen it before?
8     A     I don't have a current recollection of it
9  specifically, but looking at the context, I may have
10  possibly seen it.
11     Q     Well, if you look at -- let's go to
12  the last page -- or last two pages. This is a
13  report from the audit committee of the bank; right?
14     A     Yes.
15     Q     And it was produced to us. I mean,
16  it's actually the last three pages, I guess, is the
17  audit report. Is this -- does this look like an
18  actual document the bank would have prepared, an
19  official bank document?
20     A     Yes.
21     Q     And then at the end there is a
22  bunch of cc's and it's J.W. Yu; right? That's Mr.
23  Yu, who was the -- was he the president of the bank?
24     A     Yes.
25     Q     And then there's you and then

## Page 415

L. Pai
2  there's Alex Ko who was the CFO; right?
3     A     Yes.
4     Q     Who was Peter Koh?
5     A     Peter Koh was the bank's chief credit
6  officer.
7     Q     How about Elaine Jiong, who was
8  she?
9     A     Elaine Jiong was the bank's chief
10  administrative officer.
11     Q     How about Thomas Ng?
12     A     Thomas Ng was the bank's chief risk
13  officer.
14     Q     And how about Jennie Han?
15     A     Jennie Han was the bank's H.R. manager.
16     Q     Was there a meeting at which this
17  was discussed?
18     A     I don't recall a meeting.
19     Q     There's a reference on the first
20  page to a loan initiator, former Bank Asiana
21  employee, Kenny Hong.
22     A     Fire page of the letter?
23     Q     The first page of the letter,
24  correct.
25     A     Where are you reading?

## Page 416

L. Pai
2     Q     Second paragraph, end of the
3  first --
4     A     Okay. I see it.
5     Q     Who's Kenny Hong?
6     MR. YI: If you know.
7     A     I remember hearing a reference to his name,
8  but I don't have a -- I can't recall exactly what
9  his title was.
10     Q     On the second page, there's a
11  paragraph number -- it's at the top, there's two
12  paragraphs number 5. I'm referring to the one at
13  the top of the page; do you see that?
14     A     That starts at the top, third line?
15     Q     Yes. "On July 7, 2006."
16     A     Yes.
17     Q     Please read that to yourself.
18     (Whereupon the witness reviews the
19  document.)
20     A     Yes.
21     Q     It's pretty clear in your mind that
22  Karen embezzled money in 2006 when she previously
23  worked for Wilshire Bank; isn't that true?
24     MR. YI: Objection to form. Asked
25  and answered.

## Page 417

L. Pai
2     A     I don't have a specific recollection of
3  this, so I think they're referring to some warnings
4  she received.
5     Q     So the answer to that, it's not
6  clear in your mind?
7     A     That what?
8     Q     As of the date of this memo, which
9  was March 31, 2014, I'm asking, it was clear in your
10  mind that Karen had been an embezzler on a prior
11  occasion?
12     MR. YI: Objection to the form.
13     Q     True or false?
14     MR. YI: Asked and answered.
15     A     I think it's referring to some findings
16  that raised, you know, suspicions at the bank, but
17  suspicions that were not enough to result in a
18  termination.
19     Q     Right. But no, I'm -- yeah, that
20  was back in 2006, but I'm asking in 2014 when you
21  got this, you would have read that and said, oh,
22  Karen definitely embezzled on a prior occasion;
23  right?
24     MR. YI: Objection to form.
25     A     I don't -- I don't know if that's what I

Page 418

L. Pai

1  assumed at the time I read this memo.
2      Q    I'm asking you now, sitting here
3  reading that, wouldn't you look at that and say, oh,
4  this is serious evidence that this woman embezzled
5  on a prior occasion?
6      A    Sure.
7          MR. YI:  Steve, I need to make a
8  call.  I have an attorney who's trying to get ahold
9  of me.  Can we just take a real quick break?
10         MR. HARVEY:  Off the record.
11         (Whereupon there is a discussion
12  held off the record.)
13         (Whereupon a chain of E-mails is
14  marked as Exhibit Ryu 28 for identification.)
15         (Whereupon a chain of E-mails is
16  marked as Exhibit Ryu 29 for identification.)
17         (Whereupon a letter dated September
18  11, 2015, from Steve Harvey is marked as Exhibit Ryu
19  30 for identification.)
20         (Whereupon a chain of E-mails is
21  marked as Ryu Exhibit 31 for identification.)
22         (Whereupon a chain of E-mails is
23  marked as Ryu Exhibit 32 for identification.)
24         MR. YI:  Steve, I see this exhibit

Page 419

L. Pai

1  contains what appears to be a suspicious activity
2  report.  I'm going to have to check and see whether
3  this was produced inadvertently by our office.  So I
4  would ask that if you're going to ask Miss Pai
5  questions concerning this document, that you do that
6  subject to my having to review whether this was
7  intended to be produced to you or to the parties in
8  this case or whether it was produced inadvertently
9  and unintentionally.
10         MR. HARVEY:  I understand, and I --
11     Q    Okay.  I'm going to hand you what's
12  been marked as Ryu Exhibit 28.
13     A    Okay.
14         MR. YI:  And I'll just add for the
15  record, if we determine it was produced
16  unintentionally, I'll write you a letter to that
17  effect.
18         MR. HARVEY:  Thank you.
19     Q    This is -- this Exhibit 28, it's an
20  E-mail and then attached to it is a suspicion
21  activity report, which is 13 pages long.  Have you
22  ever seen this before?
23     A    I have.
24         Q    And you saw it at around the time

Page 420

L. Pai

1  it was filed?
2      A    Yes.  But like Michael said, we are not
3  allowed to produce copies of suspicious activity
4  reports to third parties without FDIC's specific
5  authorization and normally they don't give that
6  authorization.
7      Q    Okay.  Well, I -- if you just hand
8  that back to me for a second.  I note that this was
9  actually copied incorrectly as well because it only
10  has every other page.  So we're going to have to
11  come back to that.
12         And then instead, I'd like you to look at
13  what's been marked as Ryu Exhibit 29.
14     A    Okay.
15     Q    Okay.  Have you had a chance to
16  review this?
17     A    Yes.
18     Q    It's an E-mail that you sent to
19  James Ryu with a copy to Michael Yi on February 10th
20  of 2014; right?
21     A    Yes.
22     Q    And then attached to that is a
23  letter from Michael Yi.
24     A    Yes.

Page 421

L. Pai

1      Q    And James Ryu at this point
2  contacted you by phone?
3      A    Yes, I believe so.
4      Q    Tell me what you can recall about
5  that conversation.
6      A    I think he agreed to return the computers
7  to the bank.
8      Q    Okay.  So after this, Karen had
9  implicated James, you, of course, reached out to
10  James to interview him; didn't you?
11     A    Yes.
12     Q    And when did you do that?
13     A    I don't recall a specific date.
14     Q    Okay.  Now, this is referring to
15  his call to you; right?
16     A    Yes.
17     Q    Yeah.  He called you on this
18  occasion; right?
19     A    That's what it says, yes.
20     Q    And he called you up to ask you,
21  you know, when you were going to talk to him about
22  this allegation that had been made against him;
23  right?
24         MR. YI:  Objection to form.

Page 422

```
 1            L. Pai
 2    A    I don't recall the specifics of that call
 3  other than what's stated here.
 4        Q    Well, do you recall -- I mean, he
 5  didn't call you up to ask about computer; did he?
 6  That was a subject you raised with him?
 7    A    Well, what I'm trying to say is I don't
 8  know what his motivation was for calling me or him
 9  saying this is why I'm calling you.  So since you're
10  referring to why he called me, I just note, that,
11  yes, it was a call that he made to me as opposed to
12  me calling him.
13        Q    And you don't recall what he said
14  on the call or what you said on the call; right?
15    A    Not specifically.  I do recall a phone
16  conversation with him about returning the computers,
17  yes.
18        Q    And -- but you don't recall what
19  else was discussed on that call; do you?
20    A    Not specifically, no.
21        Q    Do you remember generally what else
22  was discussed on that call?
23    A    Yeah.  Generally we talked about the
24  computer being returned and probably talked about
25  the day when that would occur.
```

Page 423

```
 1            L. Pai
 2        Q    Did you talk about the allegation
 3  that Karen had made against him?
 4    A    I don't recall if we had that conversation
 5  during that phone call or just at the -- the
 6  meeting.
 7        Q    Do you recall any other
 8  conversations with him by phone other than the call
 9  that's reflected in this E-mail?
10    A    If there were any other calls with him?
11        Q    Yes.  Do you recall any other calls
12  with him?
13    A    Not that I recall right now.  There may
14  have been.
15        Q    Okay.  Now, attached to this E-mail
16  is a letter from Michael Yi to James Ryu; right?
17    A    Yes.
18        Q    And it's requesting the return of
19  some computers?
20    A    Yes.
21        Q    And it's also -- and it
22  also demands return of a severance payment?
23    A    Yes.
24        Q    And did he ever return that?
25    A    No.
```

Page 424

```
 1            L. Pai
 2        Q    Do you think he had -- do you think
 3  the bank had the right to have that money back?
 4    A    Since he was in -- since he breached the
 5  terms of the severance release agreement, we
 6  demanded it because we believed that he breached it
 7  and, therefore, had to refund the money to the bank.
 8        Q    How did he breach it?
 9    A    By taking confidential bank information
10  when he was not allowed to do so.
11        Q    And was the bank damaged in the
12  amount of $64,000 -- harmed in the amount of $64,000
13  by that?
14    A    Well, damage to the bank could have been up
15  to 1.6 million.
16        Q    Right.  Okay.  So you -- you
17  think -- so you were -- the bank was asking him for
18  the $64,000 back because in its mind he had engaged
19  in this illegal conduct with Karen Chon?
20        MR. YI:  Objection to form.
21    A    Well, that was definitely a possibility.
22        Q    Right.  But you're asking for
23  the -- the bank is asking for the $64,000 back
24  because he breached the severance agreement; right?
25    A    Right.
```

Page 425

```
 1            L. Pai
 2        Q    And what was the breach of the
 3  severance agreement at this point that the bank had
 4  in mind?
 5    A    That he took bank computers, bank assets,
 6  and information contained in that.
 7        Q    Okay.  The bank wasn't making an
 8  accusation against him at this point that he was
 9  complicit in the embezzlement; was it?
10    A    Well, we thought there was a connection
11  between the two.  The reason he took information
12  about the bank may have been related to the
13  embezzlement, his involvement in the embezzlement
14  that he might be trying to cover up.
15        Q    Right.  But the bank wasn't making
16  that -- so the bank had that question in its mind,
17  but the bank wasn't making that claim against James
18  Ryu as of the date of this letter, was it,
19  February 7th?
20        MR. YI:  I think his question is
21  about this particular letter.
22    A    I mean, the letter says what it says.
23        Q    I understand.  I --
24    A    I don't recall exactly what damages we were
25  thinking of at this time, but at this time, we knew
```

Page 426

L. Pai

1
2 that he was being implicated in a major
3 embezzlement.
4        Q     Yes. But was the bank taking the
5 position as of this date that he had to give back
6 the $64,000 because he had participated in an
7 embezzlement?
8 A     Well, it doesn't specifically refer to an
9 embezzlement, but we were focusing in on taking bank
10 information and bank computers.
11       Q     Right. So as of this time, which
12 was February the 7th, the bank hadn't made up its
13 mind whether or not James was involved in the
14 embezzlement; correct?
15 A     That, I don't have a specific recollection.
16       Q     Well, would it -- in any event, the
17 bank certainly wasn't making that -- wasn't making
18 that claim to him at this point; correct?
19 A     Not in this letter, right.
20       Q     And then it goes on to say, "but
21 the" -- but -- withdraw that.
22       So the question is this: The demand for
23 the $64,000 was because he had used or taken the
24 bank's computers and information as you contend, and
25 the question was, was the bank harmed in the amount

Page 427

L. Pai

1
2 of $64,000 by that?
3        MR. YI: Objection to form.
4 A     Well, we -- we were concerned about his
5 potential use of information. So I think at the
6 time, we thought we would have ben harmed at least
7 64,000, if not more.
8        Q     Correct. As a matter of fact, the
9 bank wasn't harmed at all by James's taking the
10 computer; correct?
11 A     Well, we don't know that yet.
12       Q     All right. So you have no evidence
13 that the bank was harmed by James taking the
14 computer; right?
15       MR. YI: Objection to form.
16 A     Well, we don't know exactly how much the
17 damages is other than thinking that it was at least
18 64,000 severance.
19       Q     I'm asking as of right now. You
20 have no evidence of any harm to the bank from James
21 taking the computer; isn't that true?
22       MR. YI: Objection to form.
23 A     Well, we know either James or Mr. Hur used
24 some VIP customer information.
25       MR. YI: Could we go off the record

Page 428

L. Pai

1
2 for a second?
3        (Whereupon there is a discussion
4 held off the record.)
5 MR. HARVEY: Let's go back on the
6 record.
7        Q     All right. Sitting here today,
8 you're not aware that James Ryu used any
9 confidential information that was on that computer
10 in any way; are you?
11       MR. YI: Objection to form.
12 A     But he may have. We haven't deposed him
13 yet. We don't know exactly which information he
14 used.
15       Q     My question was: Sitting here
16 today, you have no evidence that he used it, any
17 confidential information or other information or
18 bank information on that computer after he left the
19 bank; isn't that true?
20 A     Well, I don't know that I can say that.
21       Q     Well, okay. Then -- all right. So
22 then why can't you -- I'm asking you if you have any
23 evidence. That's a yes-or-no question, you either
24 have the evidence or you don't have the evidence, or
25 you don't know maybe. Do you not know?

Page 429

L. Pai

1
2 A     Well, there's a lot of evidence that we
3 gathered through, you know, discovery,
4 Interrogatories, and his deposition has not yet
5 taken place. So when you -- it sounds like you want
6 me to say there's no evidence at all and I'm saying
7 I cannot say that at this point.
8        Q     I didn't say that, actually. You
9 have to listen to the questions.
10       I asked for the evidence in the bank's
11 possession right -- as of right this minute. As of
12 right now, you're unaware of any evidence, you and
13 the bank have no evidence that James Ryu used the
14 information on the computer, the bank information
15 for any purpose; isn't that true?
16       MR. YI: Objection to form.
17 A     Like I said, I don't think that's true.
18       Q     So you have some evidence that he
19 used it?
20 A     Well --
21       Q     So the evidence that James used
22 information is what?
23 A     Like I said --
24       Q     Let's make a list. Number 1 --
25 A     We are --

Page 430

L. Pai

Q    -- evidence that James used the information. Point Number 1, what is it?

A    Well, we are still -- we haven't completed the discovery, so I think investigation's still pending.

Q    So you don't have any evidence as of right now; is that correct?

A    My recollection on every piece of evidence, I don't have a clear reflect -- recollection of every piece of evidence we have.

Q    Understood, but which --

A    We use our outside counsel to gather a lot of information, and I -- I can't tell you every piece right now.

Q    Okay. You understand that you're the corporate --

MR. YI: If we could just go off the record.

MR. HARVEY: No, we can't go off the record. We're not going off the record.

Q    You understand you're the corporate designee representative for the bank; don't you?

A    Sure.

Q    Ok. What does it mean to be a

Page 431

L. Pai

corporate representative designee; do you know?

A    Well, that I represent the bank to answer your questions.

Q    Right. That you have to provide to me that you've been designated as the person by the bank under Rule 30(b)(6) of the Federal Rules of Civil Procedure as the person most knowledgeable about this, and one of the topics in our notice of deposition is the computers that you claim James took from the bank.

And I'm just trying to understand -- if you don't have any evidence or you're not aware of any, you can just simply say I'm not aware of any -- I'm just trying to understand what information the bank has as of right now that James Ryu used any confidential information or any other information of the bank's.

A    Okay. Then, I'm not aware or recall any at this time.

Q    Good. Now, if -- at the bottom of this letter there's a reference to the bank's deposit account agreement; right?

A    Yes.

Q    Now, the bank placed an

Page 432

L. Pai

administrative hold on James's account?

A    That's right.

Q    And do you know how much money was in there?

A    I forget. Was it around 50,000?

Q    Correct. Now, why did the bank place a hold on James's account?

A    Well, because he was suspected of participating in a major embezzlement against the bank.

Q    Right. Now, did the bank think that the $54,000 was money from the embezzlement?

A    We -- yes, it could have been.

Q    Okay. It turned out not to have been; correct?

A    Well, I -- by the time -- well, I mean, I guess. It's hard to trace funds, because it's not just the -- the money that we can see from transactions in that account. Money can be layered to go through multiple accounts. So it's really hard to determine the exact source of the original funds. So based on what we could see from his accounts at Bank Asiana, we couldn't tie it directly to the embezzlement.

Page 433

L. Pai

Q    And as a matter of fact, I'm going to show you what's been marked as Ryu Exhibit 30. Please take a moment to look at that and tell me whether you've ever seen it before.

(Whereupon the witness reviews the document.)

A    Okay. Yes.

Q    Did you know that I made this request to the bank?

A    Yes.

Q    And the bank actually complied with this request and returned the money?

MR. YI: Objection to form.

A    Okay.

Q    Is that true?

A    Yes.

Q    Why did the bank return the money?

A    I think at this point --

MR. YI: Objection. Asked and answered.

A    Yeah. At this point, like I said, with the limitation of not being able to know the ultimate source of funds and the amount at stake, I think we -- based on discussions with outside counsel, we

L. Pai

1
2  decided that it made sense to return the money at
3  this time.
4           MR. YI:  I'm going to instruct the
5  witness not to go into discussions with counsel.
6           Q     I'm not asking you information with
7  counsel.
8           So -- but is there any -- any other reason
9  other than based on discussions with counsel that
10 the bank decided to return the money at this point?
11         A     No, no other.  Just based on discussions
12 with counsel.
13         Q     Okay.  Now, so after you sent James
14 this E-mail on February 10th, right, the one we
15 looked at just a couple of minutes ago was Ryu 29.
16         A     Okay.
17         Q     Four days later you had your
18 meeting with -- no, three days later you had your
19 meeting with James; right?
20         A     Yes.
21         Q     Where did that meeting take place?
22         A     It was at the hotel where I was staying
23 in -- in New Jersey.
24         Q     And was Mr. Yi present with you?
25         A     Yes.

L. Pai

1
2           Q     And was -- was it -- was the
3  meeting transcribed in any way?
4           A     I don't believe so.
5           Q     It wasn't recorded, in other words;
6  right?
7           A     It was not.
8           Q     And were notes taken of the
9  conversation?
10          A     I think our outside counsel took notes.
11          Q     And have you reviewed those --
12                THE WITNESS:  Did you?
13          A     I don't know.  I'm sorry.
14          Q     So you don't know.  So you don't
15 know.
16          A     I don't recall.
17          Q     Okay.  And did Mr. Ryu bring the
18 laptop and the computer to the meeting?
19          A     Yes.  He had it in his car and he handed it
20 over to me.
21          Q     Okay.  And what did you do with it?
22          A     I took it back to Bank Asiana and handed it
23 over to Eun Mo Choi, and I correct myself, instead
24 of Bank Asiana, it was Wilshire Bank at that time
25 because the merger had closed.

L. Pai

1
2           Q     So he complied with your request to
3  provide the computers; right?
4           A     Yes.
5           Q     What was it?  It was a laptop and a
6  hard drive?  What was it; do you remember?
7           A     I think it was both a desktop and a laptop.
8           Q     Okay.  Do you remember what they
9  looked like?
10          A     Vaguely, yes.  Laptop and a desktop.
11          Q     Well, you didn't fly back to
12 California with a desktop; did you?
13          A     No, no.  Like I said, I gave it -- handed
14 it over to Eun Mo Choi.
15          Q     Okay.  And what did Mr. -- what
16 conversation did you have with Mr. Ryu about the
17 computers when you met with him on January the 13th?
18          A     I think I asked him if he deleted any
19 contents, and he answered that he did not -- he had
20 not.  And then I think he mentioned he was concerned
21 about personal information and I think that was
22 about it.
23          Q     Did he tell you that H.S. Hur had
24 given him permission to take the computers?
25          A     I don't remember if he said that at the

L. Pai

1
2  meeting or during the telephone conversation or
3  subsequently, but I do remember hearing that
4  explanation.
5           Q     And did -- and did he tell you that
6  he was turning them over to you in good faith, even
7  though he thought he had a right to take them?
8                MR. YI:  Objection to form.
9           A     I don't remember him saying it that way,
10 that he had a right to take it.  I -- I do recall
11 some reference to CEO, Mr. Hur, giving it to him.
12 And I think my response to him was, well, he didn't
13 have authority to give it to either --
14          Q     Right.
15          A     -- himself or to James Ryu.
16          Q     Right.  And he told you there was
17 personal information of his on there?
18          A     I think he made a reference to that, yes.
19          Q     Did he tell you what personal
20 information was on there?
21          A     I don't think he described it.
22          Q     Did he -- but he asked for his
23 personal information back; didn't he?
24                MR. YI:  Objection to form.
25          A     Yes, I believe so.

Page 438

L. Pai

1
2    Q      And did you give that to him back?
3    A      I think we eventually produced copies of
4    the computer contents back to him.
5    Q      Right.  So -- but at the meeting,
6    you promised him that you would give him back his
7    personal information; isn't that true?
8         MR. YI:  Objection to form.
9    A      Well, if it's not relevant to our
10   investigation.
11   Q      So you promised him that you'd give
12   him back the -- his personal information?
13        MR. YI:  Objection to form.
14   A      Well, it says in -- in this E-mail we will
15   delete or return your personal information.  Yes.
16   Q      Right.  And you discussed that at
17   the meeting with him, February the 13th of 2014;
18   right?
19   A      I don't know that we discussed it.  I mean,
20   I think he said he had some personal information and
21   that he would like to get it back.  And I said,
22   well, if it's not relevant to our -- you know, this
23   case, then we would do so.
24   Q      And did you do that?
25   A      Eventually through discovery we returned

Page 439

L. Pai

1
2    that --
3    Q      We had to request it in discovery
4    before we got that back; right?
5    A      But the personal information we found were
6    relevant to our investigation.  It went to show that
7    he had improper relationships at the bank with
8    employees and that he had financial pressure or
9    problems.
10   Q      And pictures of his family, was
11   that relevant to your investigation?
12   A      I actually don't recall seeing any pictures
13   of his family, but if they were in there, then I
14   guess, no, that would not be relevant to our
15   investigation.
16   Q      And so what was relevant was you
17   read some E-mails where he had an affair with a
18   woman?
19   A      A former employee at the bank, yes.
20   Q      Okay.  And that was relevant to
21   your investigation; right?
22   A      Relevant to show what -- how he conducted
23   himself at the bank in his position of power and
24   authority.
25   Q      And so the fact that he had had an

Page 440

L. Pai

1
2    affair with a woman, that's one of -- that was a
3    factor that led you to be more suspicious of him;
4    right?
5         MR. YI:  Objection to form.
6    A      I think it corroborated accounts about his
7    behavior at the bank that I heard from other
8    employees.
9    Q      And that -- but that was -- that
10   corroborated your suspicion that he had engaged in
11   the embezzlement with Karen; right?
12   A      That he --
13        MR. YI:  Objection to form.
14   A      That he really seemed to do whatever he
15   wanted at the bank, whether it was proper or
16   improper.
17   Q      You were offended by that?
18   A      Not offended personally.  I thought it was
19   inappropriate for a senior executive of the bank to
20   have affairs with a married woman who was an
21   employee, low-level employee, and to participate in
22   embezzlement of large sums of money to the -- to get
23   a personal loan from a bank borrower and to allow
24   various NSF checks to be processed for that same
25   borrower who lent him -- gave him a personal loan,

Page 441

L. Pai

1
2    so on and so forth.  So it all went to show how he
3    conducted himself in the bank.
4    Q      Any of the senior executives at
5    Wilshire Bank, to your knowledge, have any affairs
6    with other bank employees?
7    A      Not that I know of.
8    Q      Okay.  So at your meeting with him,
9    you discussed the computers.  What else was
10   discussed at that meeting?
11   A      So he told us about the meeting that he had
12   with Karen.  He said that he did not participate in
13   the embezzlement; that she was lying.  So that was
14   the general topic.
15   Q      Did you ask him about the NSF funds
16   that you just made reference to?
17   A      At that meeting, no, I don't think so.
18   Q      You had a separate -- a separate --
19   you asked for a later meeting to discuss that
20   subject matter?
21   A      No.  I think that was part of a -- no, I
22   don't recall asking him for a meeting to talk about
23   the SBA loan.
24   Q      Did you ask for -- after that
25   meeting, did you ask for a subsequent meeting to

Page 442

L. Pai

1
2 explain anything else that -- any other questions
3 that you had?
4 A     My understanding was that we would have a
5 chance to depose him in this case.
6     Q     In other words, after you would
7 accuse him formally in a lawsuit, you would have a
8 chance to ask him some questions, but you didn't --
9 you passed on the opportunity to ask him more
10 questions at that point prior to filing a lawsuit;
11 isn't that true?
12     MR. YI:  Objection to form.
13 A     I think the SBA loan was something else
14 that we -- I, you know, wanted to look into, but at
15 the time, we were focused more on the embezzlement.
16     Q     Right.  But you could have had a
17 meeting with him after this meeting and asked him
18 any other questions you had; isn't that true?
19     MR. YI:  Objection to form.  Calls
20 for speculation.
21 A     I guess I could have asked him for another
22 meeting, sure.
23     Q     And did you?
24 A     No, I didn't.  I don't recall.
25     Q     Did your counsel ask him to have

Page 443

L. Pai

1
2 another meeting with him?
3 A     Well, what I discuss with a counselor would
4 be protected information; no?
5     Q     I'm just asking you if you know
6 whether your counsel asked to have a meeting with
7 James following your meeting?
8     MR. YI:  If you recall.
9 A     Yeah, I don't -- I don't recall.
10     Q     So he told you that he had just
11 come from a meeting with Karen; right?
12 A     Yes.
13     Q     And he had a -- he had a -- made a
14 tape of that, a recording of that meeting; right?
15 A     Yes.
16     Q     Did he offer you that recording
17 right then?
18 A     He did.
19     Q     And did you take it?
20 A     I think he sent it to me afterwards.
21     Q     Did you listen to it?
22 A     Yes.  I remember listening to it.
23     Q     Did you have it transcribed?
24 A     I think we did get it transcribed.
25     Q     And he told you -- we've already

Page 444

L. Pai

1
2 talked about this.  He told you in that -- that she
3 had -- that there was a conversation about him
4 helping her by providing money to her to help her
5 get out of this and that that was recorded on the
6 tape; right?
7 A     Right.
8     Q     Okay.  So he wasn't hiding that;
9 right?
10 A     No, he wasn't hiding it.  I mean, it was --
11 it appeared to me that he recorded a small segment
12 of their conversation and that it could very easily
13 have been taken either out of context or he set it
14 up so that she would say what he wanted her to say
15 and then record it.
16     Q     Do you think that's what he did?
17 A     Yes, I believe that's what he did.
18     Q     There was actually a second --
19 there was actually another recording of that
20 meeting, did you know that?
21 A     Not that I recall.
22     Q     You didn't know that Karen was
23 wearing a wire for the F.B.I. at that meeting?
24 A     Oh, now I recall.  Yes, I found that out
25 subsequently.

Page 445

L. Pai

1
2     Q     And did you look at that
3 transcript?
4 A     Transcript of her interview with the
5 F.B.I. --
6     Q     Yes.
7 A     -- second interview?
8     Q     Yes.  No, the transcript of the
9 conversation that James had with her on February 13,
10 the same one that he recorded and he gave to you.
11 A     Oh, I don't actually specifically recall
12 that.
13     Q     You didn't know that James's
14 recording was actually much longer and more detailed
15 than the recording from the F.B.I.?
16     MR. YI:  Objection to form.
17 Steve, I don't recall getting a recording,
18 the F.B.I. recording.
19     MR. HARVEY:  I believe you produced
20 it to us.
21     MR. YI:  I did?
22     MR. HARVEY:  I have it.  I thought
23 I got it from you.  I don't know.  I wouldn't have
24 got it from the F.B.I.
25     MR. YI:  I don't have a

L. Pai

1
2  recollection of that at all.
3       If you know.
4       Q    So you don't know.  You haven't
5  listened to the F.B.I.'s transcript, have you, or
6  looked at it?
7       A    I don't -- I don't have a recollection of
8  that either.
9       Q    But you think that -- you're pretty
10 confident that James only recorded a portion of the
11 meeting to create a misleading impression; is that
12 what you're suggesting?
13      A    Yes.  Based on my discussion with Karen the
14 next day, again, it was what he said versus what she
15 said.
16      Q    What else do you recall about the
17 meeting with James on February the 13th of 2013?
18      A    Well, we talked earlier --
19           MR. YI:  '13 or '14?
20           MR. HARVEY:  '14.  Sorry.
21      Q    February 13th, 2014.
22      A    We talked earlier about the body language.
23      Q    Yes.
24      A    That's what I recall.
25      Q    Did you ask James about the affair

L. Pai

1
2  that he had with this bank employee?
3       A    No, I don't think we went into that at that
4  meeting.
5       Q    Did you ask -- who did the
6  questioning?  Did you do the questioning or did
7  Mr. Yi do the questioning?
8       A    I think Michael did the questioning.  I may
9  have interjected with my own questions.  I'm sorry.
10 I don't recall those kinds of specifics.
11      Q    So what happened -- so you
12 completed the conversation, meaning with James;
13 right?  Have you told us everything you can recall
14 about that conversation?
15      A    Right.
16      Q    And then -- how long did that
17 meeting last, by the way?
18      A    I don't recall.  Maybe a few hours.
19      Q    Okay.  Now, Karen had to leave;
20 right?  Did James have to leave, or was he willing
21 to stay and answer all your questions?
22           MR. YI:  Objection to form.
23      Q    Well, let me break it down.  We
24 already talked about Karen -- Karen only gave you a
25 certain amount of time and then she had to go;

L. Pai

1
2  right?
3       A    Right.
4       Q    Just under an hour; right?
5           MR. YI:  Objection to form.
6       Q    Well, that's what you testified
7  earlier; right?
8       A    Right.
9       Q    Okay.  James you interviewed for
10 several hours; right?
11      A    Yes.
12      Q    And did James cut it short?  Did he
13 say "I have to go"?
14      A    I don't recall him saying that or having to
15 leave early, but it may have been my last day.  I --
16 I'm trying to recall, but I -- again, I don't have a
17 specific recollection.
18      Q    But you don't recall him putting
19 any time limit on the meeting; right?
20      A    I don't recall.  Yeah, that's right.  I
21 don't recall him putting any specific time limit.
22      Q    So you filed the lawsuit on March
23 19th, which was just a little over a month, about
24 35 days after your meeting with -- 36 days or so --
25 approximately that number of days in February, about

L. Pai

1
2  35 days later.  Why -- what was the rush to file a
3  federal civil lawsuit against James and Karen?
4       A    Why the rush?  I don't know that it was --
5           MR. YI:  Objection to form.
6       A    I don't know that it was rushed.  I think
7  at that point it was clear that he was going to deny
8  everything and that we -- and we concluded that she
9  was more believable than he was and that we
10 understood enough about what probably happened to
11 support a complaint.
12           MR. YI:  I'm just going to instruct
13 the witness not to go into any discussions with
14 counsel.
15      Q    I'm going to hand you what's been
16 marked as Ryu 31.
17      A    Yes.
18      Q    Do you recall this exchange of
19 E-mails with James Ryu?
20      A    I don't have a specific recollection, but I
21 see that I E-mailed James on February 25th, 2014.
22      Q    And do you recall ever discussing
23 this with him again?
24      A    No, I don't have a recollection of any
25 subsequent discussions.

Page 450

L. Pai

1
2     Q     Did you tell him at the meeting
3   that you were going to accuse him of -- that you --
4   that you understood that -- what he had said, but
5   that you were -- you didn't believe him?
6     A     At -- at our meeting with James?
7     Q     Yeah.
8     A     No.  I think the meeting was mostly to hear
9   what he had to say.
10     Q     So you didn't tell him that you
11   were going to -- at any time prior to suing him, did
12   you let him know that we don't believe you, we're
13   going to sue you?
14     A     Well, I think our questioning about what
15   Karen had said and why would you help her if she's
16   telling a lie and implicating you improperly, I
17   think the context of our questions would have made
18   him realize that we didn't believe his side of the
19   story.
20          MR. YI:  I'm going to instruct the
21   witness not to speculate as to what Mr. Ryu may have
22   been thinking.
23          THE WITNESS:  Right.  Sorry.  I'm
24   speculating.
25     Q     Right.  But -- but at that point

Page 451

L. Pai

1
2   you had already come to a conclusion that he was not
3   telling the truth; right?
4          MR. YI:  Objection.
5     Q     That's what you just told us?
6     A     Well, we didn't -- I didn't tell him, oh,
7   yes, I completely believe your side of the story at
8   that meeting.
9     Q     Right.  But you were already highly
10   suspicious; right?
11          MR. YI:  Objection to form.
12     A     Well, like I said before, his explanation
13   made me more suspicious, actually, after that
14   meeting.
15     Q     And then you met with Karen and you
16   believed her completely; right?
17          MR. YI:  Objection to form.
18     A     Well, I -- after my meeting with Karen, I
19   believed her more than I believed James.
20     Q     Well, you already told us you
21   believed everything she told you; right?
22          MR. YI:  Objection to form.
23     A     Well, I don't know everything, but
24   generally implication of James's involvement, I
25   believe her more than I believe him.

Page 452

L. Pai

1
2     Q     What parts of her story did you not
3   believe, if any?
4     A     Not -- it's not that I didn't believe her.
5   I think she -- we didn't really have a chance to go
6   over the specific transactions, things like that,
7   and I just don't want to make up a statement that
8   encompasses everything she may have said.
9     Q     Well, you told me everything that
10   you could recall that what she -- we did that
11   earlier in the deposition.  You told me everything
12   that you can recall that she told you; right?
13     A     Well, but there were some inconsistencies
14   that we talked about, right, in her story to the
15   F.B.I., and so that's why I don't want to say I
16   believe everything she said because she did make
17   some inconsistent statements, but I understood why.
18     Q     Right.  I gotcha.
19          But when you met with her, she told you a
20   series -- she made a series of statements to you
21   when you met with her on the 14th; right?  We talked
22   about that at the beginning of the deposition --
23     A     Yes.
24     Q     -- today; right?
25     A     Yes.

Page 453

L. Pai

1
2     Q     And every single one of those
3   things you believed that -- that day, I'm not
4   talking about right now, but when you heard them
5   that day, you believed them; right?
6     A     Yes.  I believed her account of what
7   conversation took place between her and James.
8     Q     Right.  But more than that, you
9   believed everything she told you that day?  Should
10   we go back and -- you want to go back and --
11     A     Yeah, everything that was critical to the
12   embezzlement.
13     Q     Well, was there any part that you
14   didn't believe?
15     A     Well, no.  I mean -- yes, I believed her.
16     Q     Okay.  You believed her in
17   entirety, is what I'm trying to get at?
18          MR. YI:  Objection to form.
19     A     Yes.  From that meeting, yes.
20     Q     Correct.  And it was based on that
21   that you filed a lawsuit on March the 19th against
22   James Ryu, right?
23     A     Sure.  Based in part of that, yes.
24     Q     And you continue to believe
25   everything she told you.  You continue to believe

Page 454

L. Pai

1  that it was all true, what she told you that day?
2  
3         MR. YI:  Objection to form.
4  A      Yes, I continue to believe that James was
5  involved; that she was not able to conduct -- she
6  was not able to embezzle the sum -- the total amount
7  by herself.
8         Q      Right.  And since then -- you said
9  at your first deposition that events since then have
10  proved, have corroborated it.  Remember giving that
11  testimony when we were together last?
12  A      Well, it strengthened my belief, yes.
13         Q      And what were the things since the
14  filing of the lawsuit that have strengthened your
15  belief?
16         MR. YI:  Objection, form.  Asked
17  and answered.
18         If you know.
19         MR. HARVEY:  I don't believe I did
20  ask this question before, Michael.
21         MR. YI:  Go ahead.
22  A      I think there were additional details about
23  the SBA loan and other improprieties by James that
24  strengthens my belief that he must have been
25  involved.

Page 455

L. Pai

1  
2         Q      What were the other improprieties
3  that you learned of after the filing of the lawsuit?
4  A      More details about the NSF; more details
5  about Karen processing various loan payments and
6  transactions by Michael Kim, the broker, at the
7  request of James.  And I just am drawing a blank,
8  I'm sorry, about what if -- but basically everything
9  we talked about during my depositions.
10         Q      Okay.  But -- so the things after
11  the filing of the lawsuit that have further -- there
12  was some information about some NSF transactions
13  involving Karen and Michael Kim; right?  And then
14  the SBA -- some additional information you learned
15  about the SBA loan.  You mentioned those two.
16         Anything else since the filing of the
17  lawsuit that you've learned to further confirm that
18  you were right that Karen was telling the entire
19  truth?
20         MR. YI:  Objection to form.  Asked
21  and answered.
22  A      I'm sorry.  What was your question?
23         Q      Yeah.  So you said at your last
24  deposition when we were together, that since the
25  filing of the lawsuit you've learned -- the things

Page 456

L. Pai

1  
2  you've learned have been confirmed even more that
3  you were right to accept Karen's testimony in its --
4  what she told you in its entirety; right?  And I
5  asked you what those things were, and you said,
6  well, there's something about an SBA loan, some
7  additional information about an SBA loan, and
8  additional information about some NSF transactions
9  involving Michael Kim; right, you just told me.
10         Anything else other than those two things
11  since the filing of the lawsuit that confirmed your
12  belief that Karen was telling you the entire truth
13  when you met with her that day on February 14th o
14  2014?
15         MR. YI:  Objection to form.  Asked
16  and answered.
17  A      Yeah.  So what I -- what else I recall are
18  some phone records that show that there were
19  multiple calls between Karen and James at odd hours
20  of the day or odd days of the week and odd hours;
21  things that point to more than just a working
22  relationship between Karen and James.
23         Q      And other than those phone records,
24  what were they?  These things that pointed to --
25  what were these things?

Page 457

L. Pai

1  
2         MR. YI:  If you recall.
3  A      So -- yeah, I mean, I just don't have any
4  specific recollections of anything else at this
5  time.
6         Q      But you just said there were some
7  other things and now you're saying you don't recall
8  those other things.  Is it possible there weren't
9  any other things?
10  A      Well, no, it's -- I'm referring to a period
11  of over, I don't know, two years, three years, so
12  it's hard for me to make a list of everything that
13  you think supports our claim.
14         Q      Sure.  But you -- but you think
15  it's there, you just can't recall what it is; right?
16  There are additional details that you're aware of
17  that support your claim that you've learned of since
18  the filing of the lawsuit, and other than the things
19  you mentioned, which was the ABA -- the SBA loan,
20  NSF -- something about some NSF transactions and
21  some phone calls between James and Karen, there is
22  some additional information, but you can't recall
23  what it is; is that correct?
24  A      Sure.
25         Q      Okay.  And let me just give you --

L. Pai

so you know that -- you've learned since then that Karen flat out lied to the F.B.I. on February 7th 2014; right?

MR. YI: Objecting to form.

A At James's coaching, yes.

Q Okay. And that doesn't change that -- that -- that has -- is that one of those things that has strengthened your belief in, you know, having learned that she lied at his coaching?

A Well, I understand what James was trying to do to get her to change her story so that he can attack her credibility.

Q This coaching that occurred, this is the coaching that you can't remember when this took place; right? This is the coaching that might have occurred on the 13th, the day that he -- the day that he met with you, the day that he talked about, that was the coaching on the 13th; right?

A Either the --

MR. YI: Objection to form.

A Either the 13th or the 30th.

Q You have no evidence of any coaching on the 30th; isn't that true?

MR. YI: Objection to the form.



L. Pai

A Well, I think Karen told the F.B.I. that she had a meeting with James on the 30th.

Q Oh, she definitely had a meeting with him on the 30th, but there's no evidence that he coached her on that day. He hasn't said that; she hasn't said that. There's not evidence of that; is there?

MR. YI: Objection to form. Counsel, if you want to testify, go ahead, but I think this is her deposition.

MR. HARVEY: It is her deposition, and she's clearly mistaken about this at best. And I think --

MR. YI: Well, you can make the case to the jury or before the Court at the appropriate time.

MR. HARVEY: No, I'll make it --

MR. YI: This is not the time for that.

MR. HARVEY: Listen --

MR. YI: I apologize for the speaking objection.

Go ahead.

Q So you have no evidence that he did



L. Pai

that on the 30th; do you?

A What --

MR. YI: Objection to form. Argumentative. Asked and answered.

A What I'm referring to is her telling the bank that she thinks she can come up with the money and pleading the bank to not pursue charges against her. I think James was basically making her think that he could help her, that he would consider it so that she would change her story.

Q Correct. But you're a very intelligent woman, so let's stop playing games here.

You have no evidence that that took place on the 30th of January. You keep going and pretending you're mistaken about the dates. You say that he said that and he admitted he said that to you, but that happened on the 13th. You don't have any evidence of any such communication between James and Karen other than the one that took place on the 13th that he told you about; isn't that true?

MR. YI: Objection to form. Argumentative.

Q It is argumentative; I agree, but I have to ask it. Go ahead, answer the question,



L. Pai

please?

A Well, what Karen told the F.B.I., are you saying that that's not evidence in our case?

Q What Karen -- what did Karen -- what are you referring to that Karen told the F.B.I.?

A About the meetings.

Q On the 30th, right?

A Yes.

Q But there's no evidence that -- Karen never told the F.B.I. that on the 30th, James talked to her about helping her repay the money back; right?

A Well, I remember hearing references to the fact that she thought she could raise the money with James's help.

Q And when did she have a communication with James on that subject?

MR. YI: If you know.

A I -- I don't know.

Q Well, if she didn't have that -- that conversation with him prior to her meeting with the F.B.I., then -- then he couldn't have planted that idea with her; isn't that true?

Page 462

L. Pai

1
2    A     Well, but we know that she had a meeting
3    with him on January 30th.
4          Q     But there's no evidence that he
5    said that to her on January 30th; correct?
6    A     And we also have phone records of them
7    exchanging phone calls on January 30th.
8          Q     And you think -- so -- but there's
9    no evidence that he said that to her on January
10   30th; is there?
11         MR. YI:  Objection to form.  Asked
12   and answered.
13   A     Clearly he's going to deny it, but she got
14   the idea that he was going to help her financially
15   to repay the bank.
16         Q     Okay.  All right.  So did -- so did
17   she tell you that that's what they discussed on
18   January the 30th?
19   A     I didn't have a chance to ask her
20   specifically about the January 30th meeting.
21         Q     Well, you actually did have a
22   chance, but you just chose not to; correct?
23   A     No.
24         MR. YI:  Objection to form of the
25   question.  Argumentative.

Page 463

L. Pai

1
2          Q     Well, you met with her --
3          MR. YI:  Asked and answered.
4          Q     You met with her on February the
5    14th, and you could have asked her about that if you
6    wanted to; right?
7    A     I could have, but I didn't know she had
8    a meeting with James Ryu before my meeting with her.
9          Q     Did you ask her about that?
10   A     If I had time to ask her, I would have, but
11   we were pressed for time and I didn't have a chance
12   to find out about --
13         Q     Okay.
14   A     -- her meeting with James.
15         Q     I think we finally got something.
16   So on the 14th -- now I understand.  On the 14th,
17   you didn't know that she had met with James on the
18   30th; right?
19         MR. YI:  Objection to form.
20   A     I -- you know, James -- on the 14th is when
21   we met with James.  He --
22         Q     No, you met with James on the 13th.
23   You met with Karen on the 14th.
24   A     I'm sorry.  I'm sorry.  Yeah.  He made some
25   references to meetings that -- meeting or meetings

Page 464

L. Pai

1
2    he had with Karen, but when I met with Karen, we
3    really didn't have time to focus in on what exactly
4    was said by James exactly when.
5          Q     Got you.  Because she was rushed?
6    A     She was rushed, yes.
7          Q     Right.  And -- so a minute ago you
8    said you weren't aware when you met with Karen on
9    the 14th that she had spoken to James on the 30th.
10   Do you remember giving that testimony just a minute
11   ago?
12   A     And I meant the exact date.  But I -- I
13   know based on -- and I'm getting mixed up now, but
14   based on what James had told me, I know they met
15   before my meeting with Karen.
16         Q     And you knew -- but you just didn't
17   have the exact date?
18   A     Right.  I didn't have the exact date.
19         Q     James -- James may have told you
20   that, the exact date, you just don't recall it;
21   right?
22   A     I don't recall it.
23         Q     So you could have asked Karen about
24   the meeting -- or his -- her earlier meeting with
25   James if you wanted to when you met with her on the

Page 465

L. Pai

1
2    14th, but you chose not to; right?
3          MR. YI:  Object to the form.
4    A     There was a lot to cover and we had very
5    little time, so I don't recall specifically honing
6    in on the dates.
7          Q     Right.  It was horribly reckless of
8    you to bring this accusation against James Ryu;
9    true?
10         MR. YI:  Objection, form.
11   Argumentative.
12         MR. HARVEY:  It's a factual
13   statement.  I'm asking.
14         Q     Do you agree that it was horribly
15   reckless of you to bring this accusation against
16   James Ryu?
17   A     No, I don't believe so.
18         MR. YI:  Objection to form.
19         Q     Now, did you learn about what
20   happened at Karen's sentencing?
21   A     Yeah.
22         MR. YI:  Objection.  Asked and
23   answered.
24   A     What do you mean by that?
25         Q     You know Karen was sentence; right?

Page 466

L. Pai

1
2     A     Yes.
3         Q      And did you know what happened at
4     the sentencing?
5     A     I don't know what you're referring to at
6     the sentencing.
7         Q      Well, do you know that her
8     attorney, Mr. Jeon, Mr. Yi's former colleague, got
9     up and made a statement that James Ryu had forced
10    her to do this and then the United States attorney
11    got up and said that's the first time that's ever
12    been said to the F.B.I. or to the government?  Did
13    you know that?
14        MR. YI:  Objection to form.
15    A     I think I remember seeing that.
16        Q      And that doesn't in any way shape
17    your conclusion that Karen is telling you the entire
18    truth when you met her on February the 14th of 2014?
19        MR. YI:  Objection to form.
20    A     No, because I think that's really
21    inaccurate.  She did tell me about the blackmail
22    incident, and I don't know why her counsel would not
23    have made that clear to her before.
24        MR. YI:  Let me just say for the
25    record, if the questions are based on it transcript

Page 467

L. Pai

1
2     have the sentencing of Ms. Chon in the criminal
3     case, then I feel a little bit uncomfortable you're
4     asking her questions without referring to particular
5     portions of the transcript, and I will note that
6     this witness was not present at that sentencing.
7         MR. HARVEY:  I just asked her if
8     she was aware of it.
9         MR. YI:  The transcript has been
10    marked as an exhibit, I believe.
11        Q      Sure.  I have it right in front of
12    me.  Take a look it at it, please.  It's been marked
13    as Ryu Exhibit 23.  I'm looking for the page number.
14    A     I'm sorry.  What did you say about the page
15    number?
16        Q      I'm going to find it for you.
17    A     Oh.
18        Q      Read from page 15, line 12 to the
19    last page 17, line 1.
20        (Whereupon the witness reviews the
21    document.)
22    A     Okay.
23        Q      So you've had a chance to read
24    that.  Had you read that before?
25    A     I don't have a recollection, but I'm -- I'm

Page 468

L. Pai

1
2     generally familiar, so I must have read it.
3         Q      Did you know that she admitted that
4     she lied to the bank's auditors?
5         MR. YI:  Objection to form.
6         Q      The government -- I mean, I'm
7     just -- you don't know whether -- do you know
8     whether she lied to the bank's auditors or not?
9     A     I don't believe so.
10        Q      You think she told the truth to the
11    bank's auditors?
12    A     Yes.  I think that was the true account of
13    what happened and then she changed her story to the
14    F.B.I.
15        Q      Who were the bank's auditors?
16    A     I think she's referring to Orest.
17        MR. YI:  I instruct the witness not
18    to speculate.
19    A     Yes, I don't know who she was --
20        Q      She never met with Orest; right?
21    A     So then -- well, I don't know what she
22    meaning by the bank's auditors.
23        Q      Well, the government also says,
24    "What we know is that $535,000 of the proceeds can
25    be traced directly into her bank account."

Page 469

L. Pai

1
2     Were you aware of that fact?
3     A     So that's consistent with what she had told
4     me, that she thought she took about $500,000 and
5     gave the rest to James.
6         Q      And so -- and you know that no
7     other funds have been found; right?
8     A     Right.
9         MR. YI:  Objection to form.
10        Q      This is one of the great issues in
11    the case.  Approximately $1.6 million was embezzled;
12    right?
13    A     Right.
14        Q      She clearly took every dime of
15    that; right?  She was responsible for bringing that
16    out of the vault; right?
17    A     That's right.
18        Q      Now, of that $1.6 million that she
19    embezzled, she can account for approximately
20    $535,000 of it; right?
21    A     Right.
22        Q      And so it's your belief that the
23    remainder, that's almost -- that's over a million
24    dollars, actually went to James Ryu?
25        MR. YI:  Objection to form.

L. Pai

1
2    A   Yes. That's what she told me, but when she
3 told me that, she -- she thought that the total
4 amount she had taken was about 1.2 million and so
5 she thought that our bank's accounting of how much
6 was taken was probably inflated.
7    Q   Right. So the -- the amount
8 that -- you don't think she took any money other
9 than the amount that can be accounted for by going
10 into accounts -- I mean, that went to her
11 personally. Every last bit of it she gave to James
12 except for the amount -- part that can be directly
13 accounted for by the bank; right?
14       MR. YI: Objection to form.
15    A   That's generally what she told me. She
16 told me the rest of it, being about 700,000, she
17 gave to James in -- in cash and that was put into
18 envelopes.
19    Q   And you believe that?
20    A   Yes.
21    Q   Now, let's go back and look at the
22 corporate designee deposition notice.
23       MR. YI: Can we take a bathroom
24 break?
25       MR. HARVEY: Sure. Go ahead.

L. Pai

1
2 That's a perfectly fine time.
3       (Whereupon a short recess was held.)
4    Q   I'm going to hand you what's been
5 marked as Exhibit 32, Ryu 32. I've handed you
6 what's been marked as Ryu 32. Have you ever seen
7 this before, any part of this?
8    A   Actually, I don't have a recollection.
9    Q   Well, who is Sung Ho Park, the
10 sender of this E-mail? It's on page -- the first
11 page, which I should point out this is WB 1745, and
12 it's the attachment to WB -- which didn't have Bates
13 numbers on it, which is a check that has Bates --
14 check number 171, check 101, and check 00120.
15    A   Mr. Park was the regional director.
16    Q   For?
17    A   For the eastern region that covers New York
18 and New Jersey area.
19    Q   And Elaine Jeon, as you told us
20 earlier, was the head of administration for the
21 bank?
22    A   Deposit administration, yes.
23    Q   And then he is forwarding her
24 something from Mia Ja Tong (phonetic); correct?
25    A   Yes.

L. Pai

1
2    Q   Can you see what that is that's
3 being referenced partially there in Korean?
4    A   Yes. Information about Neew Millennium
5 Bank related -- I guess checks payable to an escort
6 agent.
7    Q   I see. So the first one for the
8 first check is a check from -- if you turn to the
9 first attachment, it's an attachment -- it's a check
10 from ████ and his spouse to escrow agent for
11 Neew Millennium Bank for $330,000; right?
12    A   Yes.
13    Q   And then the next one is a check
14 from somebody named Young K. Kim and to same escrow
15 agent for $75,000; right?
16    A   $750,000.
17    Q   Who was Young K. Kim; do you know?
18    A   I don't know.
19    Q   And the third one was an escrow
20 payment for $500,000 from somebody named Dong Jwan
21 Kim, right?
22    A   That's right.
23    Q   And you've never seen these before?
24    A   I don't have a recollection of seeing these
25 things.

L. Pai

1
2    Q   Was it -- when you met with James
3 Ryu on February the 13th of 2014, did you ask him
4 whether he was an investor in Neew Millennium Bank?
5    A   I don't recall that question.
6    Q   You asked him a lot of questions
7 about his finances, though; right?
8       MR. YI: Objection to form.
9    A   I -- I probably asked him questions about
10 his financial condition and -- yes, condition
11 possibly.
12    Q   And did you ask him about that
13 failed business investment that he had made several
14 years earlier?
15    A   I think I did.
16    Q   Did you ask him -- you or
17 Mr. Kim -- Mr. Yi, excuse me. Did you ask him about
18 where he got the money to pay that back?
19       MR. YI: I'm just going to instruct
20 the witness not to speculate. If she remembers.
21    A   Yeah. I don't recall specific questions.
22 I know we talked about his involvement in the
23 embezzlement.
24    Q   Right. Didn't you ask him
25 questions about -- the investigation report that

Page 474

L. Pai

1  L. Pai
2  Mr. Hamersky's put together contains a lot of
3  information about his -- Mr. Ryu's financial
4  problems and then -- right?  You remember that;
5  don't you?
6  A     Yes.
7       Q     And the fact that he was -- as you
8  said, he was desperate for money, I think was your
9  testimony on it; right?
10 A     Yes.
11      Q     Did you ask him questions about
12 that subject?
13 A     I don't recall specific questions at that
14 meeting.
15      Q     But did you recall discussing that
16 subject with him, putting aside specific questions?
17 A     I think generally we talked about his
18 financial.
19      Q     Were there any questions he refused
20 to answer?
21 A     I don't recall specific questions or
22 answers.  I just recall general topic of what we
23 discussed.
24      Q     Okay.  But do you recall one way or
25 another whether he said, "I won't answer that

Page 475

L. Pai

1  question" to anything?
2  A     If you're referring to the fact that he was
3  cooperative?  Yes, he was cooperative.  He had his
4  own side of the story to tell, and he told it to us
5  that he was not involved in -- involved with -- or
6  involved in Karen's embezzlement.
7       Q     Did you ever think to ask him, for
8  example, about the -- well, you didn't know about
9  the phone calls, the phone records; did you?
10 A     Not at that time, no.
11      Q     But specifically, did he -- was
12 there any question that he refused to answer for you
13 or Mr. -- refused to answer for you or Mr. Yi?
14 A     No.  Like I said, he had his own version of
15 the story and it was very clear to us that it was
16 very different from Karen's version.
17      Q     Correct.  But I'm -- I just want to
18 make sure that you understood and answered the
19 question.  You can't recall any question that you
20 asked him that he refused to answer; isn't that
21 true?
22            MR. YI:  Objection, asked and
23 answered.
24 A     Yes, I don't recall any specific questions

Page 476

L. Pai

1  or specific answers.
2       Q     Okay.  So broadly speaking, you
3  don't recall any specific -- maybe I misunderstood
4  you.  From the beginning of the meeting to the end
5  of the meeting, you don't recall any specific
6  answers or questions; right?
7  A     Right.  It was a long time ago.
8       Q     How is it that you remember Karen's
9  account so well from the same amount of time ago,
10 but you don't remember specific questions and
11 answers from James?
12 A     I think Karen's you showed me my notes, so
13 that really refreshed my recollection.
14      Q     Please take a look at what's been
15 marked as Ryu Exhibit 15.  It's the corporate
16 designee notice of deposition.
17 A     Okay.
18      Q     Okay.  Have you had a chance to
19 review this before?
20 A     Yes.
21      Q     Did you do anything -- I know at
22 your last deposition I asked you what you had done
23 to prepare for your deposition.  I believe you said
24 you met with counsel; right?

Page 477

L. Pai

1  A     Yes.
2       Q     And did you -- I could go back and
3  look, but I can't recall.  Did you say you had
4  reviewed documents to prepare for the deposition?
5  A     Some, yes.
6       Q     Do you remember which ones you
7  reviewed?
8  A     No, I don't remember which ones I reviewed.
9       Q     Okay.
10           MR. YI:  I think there was
11 testimony about the documents that she did review.
12 A     Yeah.
13           MR. HARVEY:  I'm sure there was.
14 A     I mean, I'm getting mixed up in my brain
15 about all this --
16           MR. HARVEY:  I'm sure there was.
17 A     -- exhibits that you showed me.
18           MR. YI:  I'll represent to you,
19 Steve, just to move things along, this is one of the
20 documents I did review with her, at both meetings
21 with her to prepare for the deposition.
22      Q     Okay.  I'm going to ask you a
23 question about Number 2, "All statements Chon made
24 to Wilshire Bank employees, agents or attorneys

Page 478

L. Pai

1  about the embezzlement."
2  Now, you've told us about a number of
3  statements that Chon made. Are you aware of any
4  others other than the ones you've told us about?
5  A     No, I think I talked about all of those
6  statements.
7  Q     Question Number 4 --
8  MR. YI:  Just to clarify, Steve,
9  does this include statements she made to the F.B.I.
10 agents that we went over?
11 MR. HARVEY:  No, this is statements
12 made to Wilshire Bank employees, agents or
13 attorneys.
14 MR. YI:  Okay.
15 Q     Number 4, "All evidence in support
16 of Bank of Hope's claim" -- and I won't read the
17 rest of it, you can read that; right?
18 A     Okay.
19 Q     Are you aware of any evidence other
20 than the evidence that we have discussed at this
21 deposition or the prior deposition encompassed by
22 Number 4 that you haven't told us about?
23 A     I think we've talked about all evidence
24 that I can recall.

Page 479

L. Pai

1  Q     Why don't you take a look at Number
2  8.
3  MR. YI:  I think that was the one
4  she said she couldn't testify about, right, and
5  we're going to have Mr. Jung (phonetic) testify?
6  MR. HARVEY:  I'm going to ask her
7  about that.
8  Q     So this is the one that you said
9  that you couldn't testify about; right?
10 A     That's right.
11 Q     You're the bank's designee on every
12 single topic on this notice except this one;
13 correct?
14 A     That's right.
15 Q     Number 9 asks for "all evidence in
16 support of Bank of Hope's claim that Ryu did not
17 have permission or authority to take within his
18 desktop computer and laptop computer"; right?
19 A     Yes.
20 Q     You testified about that at this
21 deposition on the prior day we were together. Is
22 there any other evidence other than what you told us
23 about that would support Bank of Hope's claim as
24 referenced here?

Page 480

L. Pai

1  A     No, I think we talked about all that I
2  could recall.
3  Q     And Number 10, "The damages Bank of
4  Hope suffered as a result of not having the
5  computers." Bank of Hope suffer any damages as a
6  result of not having the computers?
7  A     I think we also talked about that.
8  MR. YI:  Object to the question
9  based on my earlier comments.
10 Go ahead. If you can answer.
11 A     Yeah. My answer was I think we talked
12 about that already.
13 Q     Right. But I'm -- and I think the
14 answer was you weren't aware of any, but I just want
15 to make clear. This is the damages from not having
16 the computers between the date he took them on
17 September 28th, 2013, and when he returned them on
18 February -- it says the 12th, but I believe that was
19 the 13th.
20 A     That was a question?
21 Q     Yeah. Was there any -- the bank
22 didn't have those computers from the date he took
23 them to the date he returned them. Did the bank
24 suffer any harm from not having those computers

Page 481

L. Pai

1  during that time?
2  A     Well, and I think I responded that if -- it
3  was hard for me to determine the damages from any
4  information that he may have used, but as of now,
5  I -- I told you whatever I could recall.
6  Q     Right, which I think was that you
7  weren't aware of any; right?
8  A     Right.
9  MR. YI:  Wait. Let's just clarify.
10 Are you talking about damages from our allegation
11 that -- of conversion of bank assets, or are you
12 talking about -- are you talking about the earlier
13 allegations which we dismissed having to do with use
14 of confidential information?
15 MR. HARVEY:  Well, actually, I was
16 talking about Number 10.
17 Q     I'm just making the point, the bank
18 didn't -- he had the computers, the bank didn't have
19 the computers. Irrespective of what he used them
20 for, the bank wasn't harmed by not having those
21 computers during that time frame; right?
22 MR. YI:  Objection to form.
23 A     Uhm, harmed by not having the physical
24 computers? I mean, I -- I think we could say that

1          L. Pai
2    the physical computers was one thing, but the
3    information that he may have used from the contents
4    is another, so...
5          Q.    Yeah.  So I'm just trying to just
6    establish here from -- the bank didn't suffer any
7    harm from not having the computers as opposed to the
8    content in the computers; right?
9    A.    Right.
10         Q.    Now, as to the content of the
11   computers, you originally -- the bank brought a
12   claim for trade secretes and misappropriation;
13   didn't it?
14   A.    Yes.
15         Q.    And then it dropped that claim?
16   A.    Yes.
17         Q.    All right.  Now, the factual basis
18   for each of Bank of Hope's affirmative defenses.  So
19   now we're going to need to mark two documents.
20         MR. HARVEY:  This is the first one,
21   Michael.
22         (Whereupon a Jury Trial Demand is
23   marked as Ryu Exhibit 33 for identification.)
24         (Whereupon Plaintiff Counterclaim,
25   Defendant Bank of Hope and Third-Party Defendant's

1          L. Pai
2    Answer to Counts 3, 4 and 5 Claims is marked as
3    Exhibit Ryu 35 for identification.)
4          MR. HARVEY:  Back on the record.
5          Q.    Can I ask, why did the bank bring
6    the lawsuit?  What did it -- against James and
7    Karen -- what did it -- and the other defendants,
8    what did it hope to achieve?
9    A.    To ultimately get recovery of the money
10   that was embezzled.
11         Q.    Okay.  So the bank thinks -- so why
12   didn't the bank sue Karen then; right?  Karen
13   doesn't have money.  James has the money; right?
14         MR. YI:  Objection to form.
15   A.    Well, Karen had her -- her husband had
16   businesses I think that they were operating, so to
17   the extent we can get a civil judgment, I think we
18   originally thought we would recover from his
19   businesses.
20         Q.    Right.  So the money -- Karen's
21   money went all into her husband's businesses; right?
22   A.    Right.  And he was still operating a
23   business.
24         Q.    So --
25         MR. YI:  Objection to form.

1          L. Pai
2          Q.    So why sue Karen?  Did the bank
3    think that she had some money?
4    A.    Well, we sued her and her husband.
5          Q.    Why didn't the bank just ask her to
6    give the money back?
7    A.    Well, we did.  She said she didn't have any
8    money that she could pay back right away, but then
9    she said that she would try to raise the money.
10         Q.    So why didn't the bank just enter
11   into an agreement with her to get a judgment against
12   her for that money that she owed?
13   A.    We -- I think that's what we're trying to
14   do.
15         MR. YI:  Off the record.
16         (Whereupon there is a discussion
17   held off the record.)
18         (Whereupon an Answer and
19   Counterclaim is marked as Exhibit Ryu 34 for
20   identification.)
21         Q.    Okay.  Now, did you review James's
22   counterclaim, you know, prior to today?
23   A.    Yes.
24         Q.    Okay.  You've reviewed it paragraph
25   by paragraph?

1          L. Pai
2    A.    Yes, but it's been -- it's been a while.
3          Q.    Okay.  So you recognize that's
4    what's been marked as Exhibit Ryu 34, the answer and
5    the counterclaim; correct?
6    A.    33 and 34?  Yes.
7          Q.    I'm sorry.  The -- I believe -- I
8    apologize.  I didn't give it to you.  Do you have --
9    do you have -- the counterclaim itself is Exhibit 34
10   and the bank's answer to the counterclaim is
11   Exhibit 35.
12   A.    Oh.  So 34 and 35.
13         MR. YI:  You can look at these.
14         Q.    Correct.
15   A.    Is that the same thing?  The numbering is
16   different.
17         Q.    Well, no, I want to make sure we're
18   looking at the same one.  I would ask that you -- I
19   don't have the -- this is the official one with the
20   stickers on it.  Ryu 34 says on the first cover, it
21   says "Jury trial demand" on the right-hand side;
22   right?"
23   A.    Right, right.
24         Q.    And at the top of -- it's Document
25   111 at the top, page 1 of 56; right?  Do you see

Page 486

L. Pai
2  that?
3  A    Yes.
4       Q    Okay.  So that's Ryu 34.  Then Ryu
5  35 is the bank's answer to that counterclaim and
6  that's -- at the top -- it says Ryu 35 and at the
7  top it says Document 139, page 1 of 24.
8  A    Yes.
9       Q    Okay.  Now, I'm going to ask you
10 first about the affirmative defenses that have been
11 asserted by the bank.  You know what an affirmative
12 defense is; right?
13 A    Yes.
14      MR. YI:  I'm just going to help the
15 witness get to the affirmative defenses.
16      Q    Do you have that in front of you?
17 A    Yes.
18      Q    Okay.  It says, "The first" -- on
19 the second affirmative defense is the one I want to
20 focus on.  It says, "Counts 3, 4 and 5 should be
21 dismissed because Wilshire Bank, Kwan Ho Jong and
22 Lisa Pai had just cause for their actions."
23      I'm just asking now about Wilshire Bank.
24 Well, I think I can ask about Lisa Pai, too,
25 obviously.  You're Lisa Pai; right?  So Count 3 was

Page 487

L. Pai
2  for illegal seizure of funds on deposit.  Count 4
3  was with -- was for tortious interference with
4  contract.  And Count 5 is for conversion.
5  A    Okay.
6       Q    Okay.  Tell me, what was the just
7  cause for the illegal -- for what's been -- for
8  Count 5, which is ceasing the money that -- placing
9  the administrative hold on James's Ryu's $50,000
10 approximately?
11      MR. YI:  Objection to form.  Asked
12 and answered.
13      Go ahead.
14 A    Yeah.  I mean, I -- I think we were basing
15 it on account deposit agreement with him and the
16 provisions in the disclosure agreement that provided
17 the bank with the right to cease the funds pending
18 investigation.
19      Q    So if we go back and we just take a
20 look at that just to make sure I understand you.
21 This is Ryu 29.  It's one of these documents here.
22 It's Ryu 29, and if you turn to the third page of
23 that, it's actually the second -- a second page of
24 Michael Yi's letter of February 7th, 2014.
25 A    Yes.

Page 488

L. Pai
2       Q    You're referring to the language
3  that says, "If we are uncertain regarding the
4  legality of any transaction, we may freeze the
5  amount in question while we investigate the matter."
6  A    Right.
7       Q    That's the contract language you're
8  referring to there?
9  A    Yes, I believe so.
10      Q    And what was -- so the bank was
11 uncertain regarding the legality of a transaction?
12 A    Is that a question?
13      Q    Yes.  Was the bank uncertain
14 regarding the legality of a transaction?
15 A    Yes.
16      Q    What was the transaction that the
17 bank was uncertain of regarding the legality?
18 A    Basically the source of funds that were on
19 deposit.
20      Q    And ultimately, did the bank -- and
21 then -- so -- so -- okay.  So then the bank froze
22 that amount while it investigated the matter; right?
23 A    Yes.
24      Q    And the -- did the bank reach a
25 conclusion that the funds on deposit were not

Page 489

L. Pai
2  attributable to embezzlement?
3  A    I think that was discussed earlier.  You
4  had asked about it.
5       Q    And I'm asking it in a slightly
6  different context now.  Did the bank make a
7  determination that there was no illegality regarding
8  those funds on deposit, those approximately $50,000?
9       MR. YI:  Objection to form.
10 A    I think I had answered before that really
11 it's hard to get to the ultimate source of the
12 funds.  We don't know how money was moved around, so
13 ultimately we decided to return the money to James
14 Ryu rather than spend more time.
15      Q    So the bank concluded that it
16 couldn't prove that those funds were based upon
17 any -- anything illegal; right?
18 A    Well, I mean, that was a discussion that I
19 had with our outside consultant, whether it was
20 worth trying to prove it.
21      Q    Well, could the bank -- did the
22 bank have any evidence that those funds were the
23 fruit of any illegal conduct?
24 A    Well, to come up with concrete evidence, we
25 would have had to continue with our discovery.  We

L. Pai

1  felt that it was unproductive and --
2
3      Q    So you believed that the bank would
4  be able to do that, but you just decided not to; do
5  I understand that correctly?
6      A    Well, I don't know that I had enough to say
7  that we would be able to, but it -- it was not worth
8  further investigation.
9      Q    You knew that Mr. Ryu's counsel had
10 threatened to bring a preliminary injunction action
11 to get that money back so that Mr. Ryu would have
12 some money for him and his family, you knew that;
13 right?
14     MR. YI:  Objection to form.
15     A    Sure.  I knew about the demand and
16 pressure.  Sure.
17     Q    And so I'm just trying to
18 understand.  Did you make a determination that you
19 couldn't prove that those were illegal, or you just
20 decided it wasn't worth the further effort to try to
21 prove that?
22     A    I think it was more the latter.
23     Q    Okay.  And how would the bank have
24 proven that if it had wanted to take the time to try
25 to prove that?

L. Pai

1
2      A    Well, he had multiple accounts at other
3  institutions, and like I said, money gets moved
4  around.  He had -- you know, he has -- he knew a lot
5  about various ways people launder money, so -- so if
6  we were to continue to investigate, we would be
7  looking for patterns like that.
8      Q    So you think that Mr. Ryu took this
9  approximately $1 million and might have put it into
10 an account and that with time you would have been
11 able to figure out what account it went into and
12 find it; was that your thinking?
13     MR. YI:  Objection to form.
14     A    We were interested in how he would hide all
15 that cash.
16     Q    Right, but --
17     A    Or how he used all that cash.
18     Q    You're suggesting that given time,
19 you would have been able to -- time and money, you
20 would have been able to figure that question out as
21 to where that million dollars went into some bank
22 account; is that what your -- is that your
23 testimony?
24     MR. YI:  Objection to form.
25     Instruct the witness not to speculate.

L. Pai

1
2      A    Yeah.  I mean, I don't know what you're
3  asking.
4      Q    Well, you told me that you decided
5  that it wasn't worth the trouble of trying to trace
6  that 54 -- 50 -- I think it was 54,000 --
7  approximately $50,000 to try and tie that to the
8  embezzlement; right, that was your testimony?
9      A    That's right.
10     MR. YI:  Objection to form.
11     Q    And I'm just trying to understand,
12 does that mean that you believe that you would be
13 able to find some bank accounts where that money
14 actually is and prove that the $54,000 that was in
15 that account was actually the fruit of this
16 embezzlement somehow in some indirect way by
17 reference to some other accounts?  Is that what
18 you're suggesting?
19     MR. YI:  Objection to the form.
20     A    Well --
21     MR. YI:  Asked and answered.
22     A    I mean, that's one of the possibilities,
23 but because James was so smart, I don't think we
24 would have -- he would have made it that easy for us
25 to discover it.  So it wasn't worth spending more

L. Pai

1
2  time.
3      Q    Okay.  So the bank thinks that --
4  the bank is -- thinks that James somehow had that
5  million dollars, either had or has -- had or has the
6  million dollars approximately that Karen gave him;
7  right?
8      MR. YI:  Objection to form.  I
9  don't think there's been testimony about a million
10 dollars.
11     Q    Well, okay.  Let me be clear about
12 this.  Karen embezzled approximately 1.6 million;
13 right?
14     A    That was the number the bank came up with,
15 yes.
16     Q    And that -- it's more than the
17 number the bank came up with.  That's approximately
18 the correct number; right, about $1.6 million?
19     A    Well, I did tell you before that she's --
20 she thought it was more like 1.2, so there's some
21 difference in the amount.  And she told me she
22 thought that she gave about $700,000 to James, so I
23 guess what James took was 700,000 up to $1 million.
24     Q    Well, does the bank know how much
25 Karen embezzled from its own records?

Page 494

L. Pai

1
2  A      Well, we did our best to trace the
3  transactions.  We still need to sit down with her
4  and confirm each of the transactions, and so far we
5  have 1.6.
6      Q      Okay.  So the bank thinks she stole
7  $1.6 million; right?
8  A      Yes.
9      Q      All right.  Now, you saw that the
10  United States --
11          MR. YI:  Can we just agree that's
12  an approximate amount?
13          MR. HARVEY:  Yes, yes.  It's
14  approximate.  It's within 100,000 of that, right?  I
15  believe.  Right?
16      Q      So that's your understanding;
17  right?  It's 1.6 million, that's an approximate
18  amount.  It's maybe $100,000 give or take; right?
19  A      Yes.
20      Q      Okay.  Now, you know that the
21  United States attorney has concluded that $535,000
22  of that can be traced to her payment of accounts for
23  her husband; right?
24  A      Yes.
25      Q      And actually, the bank's records

Page 495

L. Pai

1
2  reflect that, too?
3  A      Yes.
4      Q      All right.  So that means that
5  there's approximately 100 million -- approximately
6  $1 million is unaccounted for --
7  A      That's right.
8      Q      -- right?  And it's the bank's
9  belief that James Ryu either had -- either had or
10  still has access to all of that money because she
11  gave all of that to him.  That's the bank's belief;
12  right?
13          MR. YI:  Objection to form.
14  A      Yes.
15      Q      Right.  And it's also the bank's
16  belief that she didn't take -- you know, in addition
17  to what she paid for her husband, she didn't take
18  one penny beyond the things that she used for her
19  husband; right, Just the money she used to pay for
20  her husband?  She didn't buy any clothes or take any
21  trips or go to any casinos or nothing.  The only --
22  the only money that she kept was the money that's --
23  the approximately 535,000 that was used to pay for
24  her husband's accounts; right?
25          MR. YI:  Objection to form.

Page 496

L. Pai

1
2  A      You mean that's my --
3          MR. YI:  I instruct the witness not
4  to speculate.
5  A      My general belief is based on things --
6  transaction review and her testimony or what she
7  told us, and it's an approximate amount of 500,000.
8  So I -- I don't know.  I mean, you're putting a lot
9  of things in there that she absolutely didn't use
10  for any other purpose.  I didn't have that
11  discussion with her.
12      Q      Well, you know that from the United
13  States attorney that they've been able to identify
14  $535,000 and there's no other information about what
15  happened to the rest; right?
16  A      Right.  I didn't ask her, "Did you use a
17  penny more in anything else other than your
18  husband's business?"  I really didn't ask her like
19  that, so I can't really answer your question based
20  on my knowledge.
21      Q      Well, do you think that -- does the
22  bank or you think that she took anything -- I mean,
23  other than the $535,000 that the record show went to
24  her bank's business, do you think she took any other
25  part of that?  She told you she took about 500,000;

Page 497

L. Pai

1
2  right, for herself?
3  A      Yes, but that was not when she was looking
4  at specific summary of transactions.  It was her
5  rough recollection of -- her recollection of an
6  estimated amount that she took for herself including
7  her husband.
8      Q      Right.  And that so happens to be
9  pretty close to the amount that the bank's records
10  show she used to pay debts for her husband's
11  businesses; right?
12  A      That's right.
13      Q      So do you think that she took -- in
14  addition to the 535,000 that can be accounted for,
15  do you think that Karen kept or used some additional
16  money beyond, you know, as -- in other words, James
17  Ryu didn't get all the rest of it.  She used some of
18  it for some other purposes.  Does the bank have any
19  information on that?
20  A      No.
21          MR. YI:  Objection to form.
22  A      No.  I don't know.
23      Q      And if it's her testimony that she
24  didn't -- that all the rest of it she gave to James
25  Ryu, you believe her; right?

Page 498

L. Pai

1         A     Yes.

2         Q     Okay.  So then if that's correct,

3 then there's approximately $1 million that James Ryu

4 either had or has; right?

5         MR. YI:  Objection.  Asked and

6 answered.

7         A     Right, unless our accounting is off by a

8 little bit.

9         Q     Okay.  And does the bank have any

10 information or evidence about where he's -- what

11 he's done with that money?

12         A     Well, I think part of it was used to payoff

13 some debts that he had because that was why he was

14 in such desperate need of money.  Apparently, he had

15 a lot of debts.

16         Q     Okay.  So some of it was used to

17 pay some debts, the bank -- is the bank's view.

18 What about the rest?  Does the bank have any view

19 of -- was it $1 million in debt?

20         MR. YI:  Again, I'm going to

21 instruct the witness not to speculate.

22         A     Yeah, I don't --

23         MR. YI:  If you have actual

24 knowledge, you can testify.

---

Page 499

L. Pai

1         A     Yeah.  I don't know what other debts he

2 had.

3         Q     Do you know how much money he owed

4 in connection with these failed businesses?

5         A     No, I don't have a recollection.  I -- I

6 think there were some accounting, financial

7 information that former CFO had prepared for James,

8 but I don't recall exactly how much in debt he was.

9         Q     But in any event, that wouldn't

10 account for -- according to the bank, believes that

11 in addition to whatever was used to pay his debts,

12 he must have taken at least several hundred thousand

13 dollars on top of that; correct?

14         MR. YI:  Objection to form.

15         A     Yes, I guess.

16         Q     And does the bank have any

17 information --

18         MR. YI:  Wait.  He's not asking you

19 to guess or speculate.  So your answer should not be

20 "I guess so."  If you have to guess, then you -- you

21 need to testify based on information or knowledge

22 that you actually have.  He's not asking you to

23 guess or speculate.

24         THE WITNESS:  Okay.

---

Page 500

L. Pai

1         Q     But if something is logical, you

2 can admitted that it's logical, but -- so -- so it's

3 the bank's belief that in addition to whatever he

4 used to pay whatever debts he owed for these failed

5 businesses, there was a considerable sum of money on

6 top of that that he took; right, and may still have;

7 right?

8         A     That's our belief, yes.

9         Q     And does the bank have any evidence

10 of that?

11         MR. YI:  Objection to form.

12         Q     Other than Karen's testimony.

13         MR. YI:  Asked and answered.

14         A     Well, Karen's testimony is a big part of

15 that, yes.

16         Q     I mean, the bank doesn't have any,

17 for example, records to show that he had some money

18 that he hasn't disclosed or that he's got it hidden

19 in his backyard or somebody else's backyard; does

20 it?

21         A     No, we didn't find anything buried in his

22 backyard.

23         Q     But you didn't find it any other

24 places.  I mean, you didn't find evidence that he

---

Page 501

L. Pai

1 had transferred money to a Swiss bank account or,

2 you know, bought, you know, diamonds or anyplace

3 else that anybody could take money and essentially,

4 you know, hide it; did you?  Or does the bank --

5         MR. YI:  Objection to form.

6         A     I mean, other than some car collections he

7 supposedly has, I don't know.  I think he has a

8 couple of houses.  But discovery is still, you know,

9 not yet completed on his -- where he may have hidden

10 any assets.

11         Q     So you think he might have hidden

12 it by buying a house; is that your --

13         A     No, I think he already had a couple of

14 houses.

15         Q     What about the cars?  Do you think

16 he hid it, or did he already own those cars?

17         A     I don't know.

18         MR. YI:  I instruct the witness not

19 to speculate.

20         A     I don't know.

21         Q     So the bank doesn't have -- you,

22 the bank, doesn't have any information on what he

23 might have supposedly done with any money other than

24 the money he used to payoff his debts back in the --

Page 502

```
 1              L. Pai
 2    from the failed businesses that you testified;
 3    right?
 4    A      Right.
 5         Q      Okay.  So then we were looking at
 6    your -- okay.  So I think that answered the
 7    question.
 8         So the just cause for Count 3, which was
 9    the freezing of the assets, which was what we just
10    talked about.  What was the just cause for Count 4
11    regarding tortious interference of a contractual
12    relationship?
13              MR. YI:  And here, to the extent
14    that I think I -- I'm just anticipating to the extent
15    that it's going to be discussed about SAR -- any
16    discussion about SAR, I think, in this deposition, I
17    would like that to be marked for potential ruling.
18    But it's our position that my -- in my understanding
19    that we are -- the bank is not to disclose even the
20    existence of an SAR and, therefore, to the extent
21    that the response to this question requires
22    reference to SAR, I would ask that it be marked
23    confidential.
24         Q      Do you understand the question?
25    A      Well, no.  Can you repeat the question?
```

Page 503

```
 1              L. Pai
 2         Q      Yeah.  The -- you know, for its --
 3    in its -- in the second affirmative defenses, it
 4    says that "Wilshire Bank, Kwan Ho Jong and Lisa Pai
 5    had just cause for their actions with respect to
 6    these counts."  One of these counts is Count 4,
 7    which was tortious interference with contract.  And
 8    I would like to know what was the bank's reference
 9    to just cause with respect to Count 4?
10    A      I don't think the bank did anything to --
11    to interfere with James Ryu's contracts in any way.
12         Q      Well, did -- it's paragraph 173 of
13    the complaint, it says that "Young and Wilshire Bank
14    interfered with the contract by informing the Neew
15    Millennium Bank investors of Chon's false accusation
16    about Ryu's role in her embezzlement."
17         And the bank says, "Deny the allegation in
18    paragraph 173."
19    A      Yeah.  So that's the part that's referring
20    to Kwan Ho Jong and not to me.
21         Q      Well, actually, he was being --
22    A      I'm not aware of any facts or discussions.
23         Q      Have you ever discussed that with
24    Kwan Ho Jong?
25    A      I think when we got served with it in -- he
```

Page 504

```
 1              L. Pai
 2    denied it.
 3         Q      He denied that he had made a
 4    statement to the Neew Millennium Bank investors; is
 5    that right?
 6    A      That's my vague recollection.  I don't
 7    recall specifically what he said.
 8         Q      Okay.  So when you said that you
 9    had just cause with respect to that count, which was
10    Count 4, the fact is is that to the best of your
11    knowledge, the bank denies doing anything; right?
12    A      Right.
13         Q      Okay.  And then Count 5, it says
14    "just cause," and this is the claim against you for
15    converting the computers, which belonged to James
16    Ryu.  What was your just cause for doing that?
17    A      Right.  And it's our bank's position that
18    those did not belong to James Ryu, that they were
19    bank properties.
20         Q      Okay.  The third affirmative
21    defense, you say that "Counts 3, 4 and 5 are barred
22    because Defendant Ryu has failed to take reasonable
23    steps to mitigate damages alleged that have been
24    sustained."
25         How did he fail to mitigate damages?
```

Page 505

```
 1              L. Pai
 2              MR. YI:  Steven, I think that
 3    really -- those two are attorney-client privileged
 4    work product.
 5         But the witness can answer if she can.
 6              MR. HARVEY:  The bank has to have
 7    some facts to support its claim.  So if the --
 8    A      Well, I already said that we didn't
 9    interfere with this contract, so that's one.
10         And Counts 3 and 4 were what?  One was --
11    one was conversion.  One was tortious interference.
12         Q      Well, let's talk about Count 3,
13    which is for illegal seizure of funds on deposit.
14    Ryu's claiming that you took his money, you wouldn't
15    give it to him for 18 months and that this caused
16    him harm.  The bank says for an affirmative defense
17    is that he failed to take reasonable steps to
18    mitigate damages.
19         How did he fail to mitigate damages?
20              MR. YI:  If you know.
21    A      Yeah, I don't recall what discussions,
22    and -- and it would have been based on my
23    discussions with outside counsel.  I don't recall.
24         Q      So the bank has no evidence that he
25    failed to mitigate damages, no evidence that it can
```

L. Pai

1 tell without -- that -- that's -- other than what's
2 attorney-client privileged, which means basically
3 essentially none; right?
4     MR. YI:  Objection to form.
5   A     That's not exactly what I said, but, yeah,
6 I think we discussed it with outside counsel.  I
7 don't recall the specifics.
8   Q     Okay.  Count -- the fourth
9 affirmative defense, we've already discussed that
10 one.  Okay.  I don't have any further questions
11 about the affirmative defenses, but I do have a
12 question about some of the denials in the complaint.
13     MR. YI:  He's going to be referring
14 to Exhibit 34.
15     THE WITNESS:  Oh, 34.  This one?
16     MR. YI:  And he's going to --
17     THE WITNESS:  This is 35?
18     MR. YI:  Oh.  Wait a minute.
19     THE WITNESS:  Your numbering is
20 switched around.
21     MR. YI:  Could I just clarify
22 exhibit number, please.  I have, Steve, your answer
23 and counterclaims as Ryu 33.
24     THE WITNESS:  Yeah, and he changed

L. Pai

1 it to 34.
2     MR. HARVEY:  I think you're
3 mistaken, Michael.
4     MR. YI:  Okay.
5     THE WITNESS:  Changed that to 34.
6     MR. HARVEY:  Let's just go off the
7 record for a second.
8     (Whereupon there is a discussion
9 held off the record.)
10     MR. HARVEY:  I inadvertently
11 skipped 33, so we went right from 32 to 34.  I might
12 have another document to mark before we're done, so
13 we might eventually use that 33, but as of right now
14 there is no 33; is that clear?
15     MR. YI:  Yes.  Thank you.
16   Q     So now I'd like to ask you -- I'm
17 going to ask you about the bank's denials of some of
18 these paragraphs.  Let's start with paragraph 28.
19     MR. YI:  You're going to have to
20 refer to 28 in the other document.
21     THE WITNESS:  In the counterclaims?
22     MR. YI:  Answer and counterclaims.
23     THE WITNESS:  All right.
24   Q     So paragraph -- let's start with

L. Pai

1 paragraph 28.
2   A     Okay.
3   Q     Is there -- is there any part of
4 paragraph 28 that the bank denies?
5     MR. YI:  Paragraph 28 of the
6 counterclaims.
7     THE WITNESS:  Oh, I'm looking at
8 the wrong counterclaim.  I thought this was the
9 counterclaim.
10   A     Does it say -- does the counterclaim 28
11 say, "On March 21, 2016, Chon pled guilty."
12   Q     Yes.  That's it.
13   A     So we admitted that she pled guilty and
14 agreed to make full restitution.
15   Q     Yes.  So is there any part of
16 paragraph 28 -- I'm going to ask this over and over
17 because I'm just trying to get the record clear.
18     Is there any part of paragraph 28 that the
19 bank denies?
20     MR. YI:  Yeah.  If I may, Steve, I
21 think it's clear from our -- where it says "except
22 admit that."
23     MR. HARVEY:  And we're going to do
24 this a lot and if you want to -- but I'm just trying

L. Pai

1 to understand if there's any part of paragraph 28
2 that's being denied.
3     MR. YI:  Yes.  If I may?
4     MR. HARVEY:  You may.
5     MR. YI:  I think, first, the date
6 is March 22, 2016, and the second is the amount.
7     THE WITNESS:  It's slightly
8 different.
9   Q     So just the -- the only thing
10 that's being denied is the date and the amount;
11 right?
12     MR. YI:  Yeah.  And also we're just
13 clarifying the allegation that she also agreed to
14 pay back that amount.  I think I was trying to point
15 out that as part of the sentence, she was ordered to
16 make full restitution in that amount.
17     MR. HARVEY:  Okay.
18   Q     Paragraph 29, any part of paragraph
19 29 that's being denied?
20   A     So I think you're referring to the fact
21 that not all of them -- it does say "primarily."
22 And some of the accounts were not C.D. accounts.
23 There was at least one that was a demand deposit
24 checking account, her husband's partner's account.

Page 510

L. Pai

So that may have been one of the facts that we're
not -- yeah.

MR. YI:  Yeah, I think we were just
trying to -- trying to just -- trying to be as
accurate as -- as factually accurate as possible.

MR. HARVEY:  Anything else?

MR. YI:  No, I think it was really
more about the specific language.  We were just
trying to stick to the language that we thought were
as factually accurate as possible.

MR. HARVEY:  So other than the fact
that it was --

MR. YI:  You know, words like
"preying," "unsuspecting," we really can't -- you
know, we thought that we would just try to stick to
the facts as we knew them.

A     So whatever we said, except -- after
"except admit that," that's what we are willing to
stipulate or --

Q     So I'm just asking you -- I'm
asking the question:  What part of 29 do you not --
does the bank not admit, and I guess does the bank
not admit that she preyed on unsuspecting
accountholders?

Page 511

L. Pai

MR. YI:  No.  I guess what I'm
trying to -- and if I -- if you would allow me, I'm
just trying top explain that we didn't want to
necessarily adopt the language that was being
contained in the paragraph 29 of the answer.  We
were just trying to be as factually accurate as we
could be.

So, you know, that they -- that she was
preying on unsuspecting accountholders, we can't
really speak to that.  What we can say is that she
made unauthorized withdrawals from certain
customers.  So we were just trying not to
necessarily admit to language like preying on -- on
unsuspecting accountholders.

Q     Well, I'm asking you to admit that
it actually came out of a bank document.

A     Okay.

Q     That language came out of your
attorney.

MR. YI:  I think --

Q     But I do believe that language is
used by the bank.

A     Well, that may have been used by Orest, but
it probably shouldn't have been used by him.  He --

Page 512

L. Pai

we need to stick to the facts and not what his
interpretation was.

Q     Okay.  So you deny that she preyed
on unsuspecting C.D. accountholders; is that
correct?  It's either an admit or deny or don't
know.  Those are your choices?

A     It says, "Admit that Defendant Chon made
unauthorized withdrawals."

Q     So the bank denies that she preyed
on C.D. accountholders?

MR. YI:  No, we're not denying
that.  No, we're not denying -- necessarily denying
that.  I think what we're doing here -- and if you
would allow me, this is just my style of just trying
to be as factually accurate.  So I think the focus
should be on what we are, in fact, admitting and we
are admitting that Defendant Chon made unauthorized
withdrawals from certain customer accounts and that
some of those accounts were held -- some of those
customers were elderly.

MR. HARVEY:  I appreciate that's
the way you've answered this, but I think I'm
entitled to ask the questions the way I'm asking,
which is, you know, determine if the -- you know, if

Page 513

L. Pai

you admit -- even -- you can admit or deny
characterizations.  If you want to deny a
characterization, you can deny it.  That's totally
up to the bank.  But I'm entitled to know which
parts of these you do not agree with, and that's all
I'm trying to get at by asking the questions the way
I'm asking.

So I'm going to take you through these.  If
you want to break for a couple of minutes and talk
so it will go smoother -- between yourselves, I
mean -- I have no problem with that, but that's what
I intend to do.  I intend to take you through these
and find out where the bank doesn't agree with what
we've said here.

MR. YI:  Ok.  And I think maybe
just cut through this.  I'm happy to just -- you
know, if you want to just address it with Judge
Dixon, that's fine, and if he gives us particular
direction, that's fine.  I mean, I think this is
really a pleading style more than anything else and
it's coming from me more than the witness.

So if you have any issues with the way we
have pled our -- our response to counterclaims, I
think we can take it up with Judge Dixon.  If he

L. Pai

1 instructs me to, you know, amend our answer, I'll do
2 that.
3         MR. HARVEY: Well, I don't think
4 it's necessary to take it up with Judge Dixon. I
5 think I'm -- this is a deposition, a corporate
6 designee. We said we were going to ask about the
7 denials of the -- we specifically said we were going
8 to ask about the denials of the allegations of the
9 complaint, and that's what I intend to do.
10        MR. YI: I think it's a matter of
11 style of the pleading.
12        MR. HARVEY: Well, I think I'm
13 entitled to admit -- I was entitled to an admission
14 when I asked it in the complaint, didn't get an
15 answer and now I'm entitled to take it up with the
16 witness. If you don't want to do that, then --
17        MR. YI: Let me just say this,
18 Steve, if you make an allegation that Karen Chon was
19 preying on unsuspecting accountholders, that
20 suggests something versus our position that she was
21 blackmailed and coerced into making certain
22 unauthorized withdrawals at the specific instruction
23 of your client. Those are two different things.
24        So we don't want to admit to anything that

L. Pai

1 suggests that she was on her own, completely of her
2 own volition, preying on unsuspecting
3 accountholders. So, you know, I'm happy to explain
4 that to Judge Dixon as to the basis for our denial.
5 But we are admitting, at the same time, that she
6 did, in fact, make unauthorized withdrawals from
7 certain customers' C.D. accounts and that some of
8 those accounts -- accountholders were elderly.
9        MR. HARVEY: I don't think we need
10 to chew up more of this transcript, and this
11 Court --
12        MR. YI: I apologize for going into
13 to this. But again, I would offer just to cut
14 through this so we can try to finish this
15 deposition, I'm happy to -- I'm offering that, you
16 know, we can -- we will be appearing before
17 Judge Dixon, so I'm happy to take this up with him.
18        MR. HARVEY: Well, I don't think
19 it's necessary for us to take this up with Judge
20 Dixon. I think I'm entitled to ask my questions.
21 I'm entitled to questions and get answers from the
22 witness. So I don't agree that this is something
23 that needs to be taken up with Judge Dixon. I think
24 it's a very straightforward matter.

L. Pai

1        If you wanted to try to find someway to
2 obviate -- if you want to stipulate that these all
3 should have been admitted or tell me -- if you want
4 to go through that. I don't want to waste anybody's
5 time here, but I don't think it's necessary to raise
6 it with Judge Dixon.
7        I think I'm entitled to know the factual
8 basis whether you admit or deny these allegations,
9 and if you don't admit them, why. Paragraph by
10 paragraph, I think I'm entitled to that.
11        MR. YI: I think that what I'm
12 indicating is a lot of this comes from me and I
13 think it goes into attorney-work privilege and
14 attorney-client work product. If you insist on
15 asking the questions, I mean, I can't stop you.
16        MR. HARVEY: Okay. Well, I'll tell
17 you what, I'm going to ask you to take a look at all
18 of these questions as to which -- paragraphs 31 to
19 41, and I'm going to ask you to -- not right now,
20 but to tell me separately, if you can, whether you
21 admit those or not, and if you admit them, you can
22 just tell me that. If you deny them, I'm going to
23 ask the witness to come back and explain to me why
24 they're denied or maybe you can do that. But are

L. Pai

1 you willing to do that so I can cut right through 31
2 to 41 because it's the same issue for every single
3 one.
4        MR. YI: We're not in a position to
5 admit to these allegations in those paragraphs. I
6 believe you said 31 through 41. I think you're
7 referring to her -- correct me if I'm wrong -- I
8 think in these allegations, you're referring to her
9 statements at her deposition. We have the
10 transcript of her deposition, so to the extent that
11 these allegations are trying to somehow summarize
12 her testimony, I don't think it's appropriate. I
13 mean, I think we have the record.
14        And, you know, she'll testify and if she's
15 not available to testify, I'm sure there's a ruling
16 as to whether you can admit the transcript for
17 certain purposes. But again, I think to the extent
18 that you're trying to summarize it, and I don't
19 think it's appropriate and we cannot admit to the
20 allegations.
21        MR. HARVEY: There's no need to
22 argue about this. I'm quite certain that what I
23 have done here is entirely proper. I made a factual
24 statements, you have to admit them or deny them.

Page 518

L. Pai

1   You can refer to the transcript if you want
2   to, but they're subjects that it's either true or
3   it's not true. I'm entitled to know whether you
4   agree with my reading of the transcript or not and
5   that's why, in general, the objection that the
6   document speaks for itself is a bogus objection.
7   I'm entitled to know whether or not my
8   characterization of the document is correct or not
9   according to your answer.
10      So do you want to --
11              MR. YI:  And what I'm telling you
12  is I have reviewed the allegations and they're not
13  fully accurate of her testimony, her sworn
14  testimony, and therefore, we can not admit to them
15  and that's why what we have done is to say that
16  we're referring the Court to the transcript and that
17  we're denying any allegations or characterizations
18  that are contrary to her testimony.
19      For instance -- I mean, I can -- we can sit
20  here and go through it, but again, in the sage of
21  time, I'm happy to address this with Judge Dixon.
22  If he directs us to do something like amend our
23  answer, I'm happy to do that. But I'm happy to take
24  it up with the judge.

Page 519

L. Pai

1              MR. HARVEY:  Well, I'm --
2              MR. YI:  But I think that we have
3   done --
4              MR. HARVEY:  Are you instructing
5   the witness not to answer as to 31 to 41?
6              MR. YI:  No, I don't think I -- I
7   don't think it's improper for me to instruct the
8   witness not to answer.
9              MR. HARVEY:  Okay. Then I'll take
10  them one at a time.
11      Q      Paragraph 31, that's true; isn't
12  it?
13      A      No. All of our responses are based on, you
14  know, attorney-client privileged discussion about
15  how it should be responded to. So that's going to
16  be the same answer for all the -- all the questions.
17      Q      So 31 is -- do you deny 31,
18  paragraph 31?
19      A      Right. As stated in this paragraph.
20      Q      What's wrong with it?
21      A      Well, we're referring to the transcript of
22  her deposition and we deny that the way you
23  characterized it is correct.
24      Q      And in what sense is it incorrect?

Page 520

L. Pai

1   A      Well, 31.
2              MR. YI:  Well, let me -- if I may,
3   Steve, let me give you an example. This allegation
4   says, "According to Chon, she committed the
5   embezzlement by stealing cash from the bank vault
6   and entering phoney entries."
7       So that's not completely accurate. What
8   she testified to and what she told both the bank
9   employees and the F.B.I. is that she first made
10  certain entries in the bank's system. There --
11  there's several different ways that she did this,
12  but the removal of the cash from the bank vault
13  follows after she makes certain entries.
14              MR. HARVEY:  I'm not willing to
15  have any more further objections on the record here.
16  It's just wasting time. I offered to work out 31 to
17  41 with you if you'd like to try to work it out
18  after the fact. I have the right to have the
19  witness back, if necessary, if we can't work it out.
20  That's what I offered to you. I don't want to argue
21  about it anymore. I think I'm entitled to answer to
22  this.
23      So you either accept my offer to work it
24  out after the fact, which I'm happy to do. And I'm

Page 521

L. Pai

1   not going to go to Judge Dixon because I don't think
2   it's necessary to bother the judge with something
3   like this.
4              MR. YI:  No, we can confer and we
5   can work it out and obviously if we can't work it
6   out, then I'm -- you know, I'm open to taking it up
7   with the judge.
8              MR. HARVEY:  And I'm open to -- I'm
9   not willing to do that unless you're willing to tell
10  me -- give me the witness again if we can't work it
11  out. So that's my offer to you and, otherwise, I'm
12  going to take her through these right now.
13              MR. YI:  Fine. Let me discuss with
14  the client.
15              MR. HARVEY:  Off the record.
16      (Whereupon there is a discussion
17  held off the record.)
18              MR. HARVEY:  Okay. Let's go back
19  on the record. Okay. We've spent a long day here.
20  It's now 11 minutes to 6:00 and in consideration of
21  the fact that it's been a long day and that I don't
22  have too much more to go, I need to complete my
23  questioning about the corporate designee notice,
24  which would include the complaint and the answer.

Page 522

```
 1              L. Pai
 2         Mr. Yi and I have had some discussions
 3   about that and we agree we will confer further on
 4   that.  But in any event, we're going to break this
 5   deposition.  We're going to complete it by
 6   videotape, which we'll set up sometime in the next
 7   few weeks, hopefully.  And there should be, at best,
 8   an hour approximately or less of questioning to
 9   finish out this deposition and that will save
10   everyone.
11         And then if we can confer in the meantime
12   and obviate the need for further discussion and
13   disagreement, that will be to everyone's benefit.
14         Are we agreed?
15         MR. YI:  Yes.
16         MR. HARVEY:  Thank you.  Have a
17   nice weekend.  Thank you, Court Reporter.  Put that
18   on the record.
19         (Whereupon the deposition was
20   adjourned at 5:48 p.m. for the day.)
21
22
23
24
25
```

Page 523

```
 1              L. Pai
 2         C E R T I F I C A T E
 3
 4         I, PATRICIA A. MOHYLA-KLEIN, a Notary
 5   Public and Certified Court Reporter of the State of
 6   New Jersey, do hereby certify that prior to the
 7   commencement of the examination LISA PAI, was duly
 8   sworn by me to testify the truth, the whole truth
 9   and nothing but the truth.
10         I DO FURTHER CERTIFY that the foregoing is
11   a true and accurate transcript of the testimony as
12   taken by and before me at the time, place and on the
13   date hereinbefore set forth.
14         I DO FURTHER CERTIFY that I am neither a
15   relative nor employee nor attorney nor counsel of
16   any of the parties to this action and that I am
17   neither a relative nor employee of such attorney or
18   counsel, and that I am not financially interested in
19   the action.
20
21
22         _____
23         Notary Public of the State of New Jersey
24         License Number XI 00998
25
     Dated:  August 31, 2017
```

Page 524

```
 1         ERRATA SHEET
 2   Case Name:
 3   Deposition Date:
 4   Deponent:
 5   Pg. No. Now Reads    Should Read  Reason
 6   ___ ___ _____   _____  _____
 7   ___ ___ _____   _____  _____
 8   ___ ___ _____   _____  _____
 9   ___ ___ _____   _____  _____
10   ___ ___ _____   _____  _____
11   ___ ___ _____   _____  _____
12   ___ ___ _____   _____  _____
13   ___ ___ _____   _____  _____
14   ___ ___ _____   _____  _____
15   ___ ___ _____   _____  _____
16   ___ ___ _____   _____  _____
17   ___ ___ _____   _____  _____
18   ___ ___ _____   _____  _____
19   ___ ___ _____   _____  _____
20
21         _____
         Signature of Deponent
22
     SUBSCRIBED AND SWORN BEFORE ME
23   THIS ____ DAY OF _____, 2017.
24   _____
25   (Notary Public)  MY COMMISSION EXPIRES:_____
```