1
IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

2
Case No.  2:14-cv-01770-JLL-JAD

3

4
Bank of Hope, as successor to
Wilshire Bank,

5
        Plaintiff,
        vs.

6
MIYE CHON, a/k/a Karen Chon,
SUK JOON RYU, a/k/a James S.

7
Ryu, TAE JONG KIM,
BERGENFIELD BAGEL & CAFE INC.,

8
d/b/a Cafe Clair,
MAYWOOD BAGEL INC., UB'S

9
PIZZA & BAGEL INC., UB'S
BAGEL & CAFE INC., and UBK

10
BAGELS CORP., d/b/a Franklin
Bagels & Cafe,

11
        Defendants.
        AND

12
SUK JOON RYU, a/k/a James S. Ryu,
        Counterclaim Plaintiff,

13
        vs.
BANK OF HOPE, a successor to

14
Wilshire Bank,
        Counterclaim Defendant.

15

16

17
        Oral Deposition of ALICIA LEE,

18
taken on behalf of the Defendants, at 316

19
West Second Street, Suite 200, Los Angeles,

20
California, on Friday, September 29, 2017,

21
at 9:55 a.m., before Maria Isabel DeLuna,

22
a Court Reporter and Notary Public

23
pursuant to notice.

24

```
 1    APPEARANCES:
 2    LEE ANAV CHUNG WHITE KIM RUGER & RICHTER LLP
 3    BY:  MICHAEL M. YI, ESQUIRE
 4    Michaelyi@lacwkrr.com
 5    156 Fifth Avenue, Suite 303
 6    New York, New York 10010
 7    212.271.0664
 8        FOR THE PLAINTIFF:
 9
10    (VIA TELEPHONE)
11    STEVE HARVEY LAW, LLC
12    BY:  DAVID V. DZARA, ESQUIRE
13    David@steveharveylaw.com
14    1880 John F. Kennedy Boulevard, Suite 1715
15    Philadelphia, Pennsylvania 19103
16    215.438.6600
17        FOR THE DEFENDANT:
18
19
20
21
22
23
24
```

Page: 3 (43)
ORAL DEPOSITION OF ALICIA LEE, 9/29/2017

```
 1                    EXAMINATION INDEX

 2    ALICIA LEE
           BY MR. DZARA DIRECT                       5
 3

 4                      EXHIBIT INDEX

 5                                                MARKED
      Exhibit 36   E-mail string, top dated         48
 6                 January 22, 2014

 7    Exhibit 37   E-mail, top dated                 80
                   January 23, 2014
 8
      Exhibit 38   E-mail string, top dated        105
 9                 January 24, 2014

10    Exhibit 39   E-mail dated                     107
                   January 24, 2014
11
      Exhibit 40   E-mail dated                     110
12                 January 25, 2014

13    Exhibit 41   E-mail dated                     111
                   January 25, 2014
14    Exhibit 42   E-mail string, top dated         114
                   January 27, 2014
15
      Exhibit 43   E-mail dated                     116
16                 January 30, 2014

17    Exhibit 44   E-mail string, top dated         120
                   January 31, 2014
18
      Exhibit 45   E-mail dated                     124
19                 February 11, 2014

20    Exhibit 46   E-mail dated                     128
                   February 11, 2014
21
      Exhibit 47   E-mail dated                     130
22                 February 11, 2014

23

24    EXHIBIT INDEX CONTINUED:
```

1    EXHIBIT INDEX CONTINUES:

2    Exhibit 48   E-mail dated                131
                 February 12, 2014
3
     Exhibit 49   E-mail dated                133
4                 February 18, 2014

5    Exhibit 50   E-mail dated                136
                 February 26, 2014
6
     Exhibit 51   E-mail string, top dated    143
7                 April 29, 2014

8

9              EXHIBITS PREVIOUSLY MARKED

10            EXHIBIT        PAGE

11               2            46

12               5            54

13              12           200

14              13           208

15              20           177

16              21           148

17              31           214

18

19

20

21

22

23

24

ORAL DEPOSITION OF ALICIA LEE, 9/29/2017

Page 5

1   THE REPORTER:  Pursuant to Federal
2   Rules of Civil Procedure, I am required to
3   state the following: My name is Isabel
4   DeLuna.  My business address is 14520 Sylvan
5   Street, Van Nuys, California 91411.
6        This is the deposition of Alicia
7   Lee in the matter of Bank of Hope,
8   et al., versus Miye Chon, et al., at 9:56
9   a.m. on September 29, 2017.
10       This deposition is taking place at
11  the offices of Personal Court Reporters at
12  316 West Second Street, Suite 200, Los
13  Angeles, California 90012.
14       Counsel, will you state your
15  appearances for the record.
16       MR. DZARA:  David Dzara for James
17  Ryu.
18       MR. YI:  Michael Yi for plaintiff
19  Bank of Hope and the two third-party
20  defendants.
21       ALICIA LEE, having been first
22  duly sworn by the reporter, was examined
23  and testified as follows:
24       EXAMINATION

Page 6

1   BY MR. DZARA:
2    Q   Good morning, Ms. Lee.  I'm going
3   to put the volume up because I'm having
4   some trouble hearing.
5    A   I'll try to speak up.
6    Q   Okay.  Good morning.  I am going
7   to introduce myself again.  My name is
8   David Dzara.  I represent James Ryu in
9   this matter, and I'll be taking your
10  deposition today.  So I'm going to go over
11  some ground rules first, and then we'll
12  start with some questions.
13       First, I'm going to -- well, in
14  the deposition, I'll ask you questions
15  pertaining to this lawsuit, and my
16  questions and your answers will be
17  recorded by the court reporter who has
18  placed you under oath.
19       Do you understand that?
20   A   Yes, I do.
21   Q   The court reporter is
22  transcribing everything that is said, so
23  it's important that you speak clearly.  She
24  won't be able to record a nod or a head

Page 7

1   shake, so you need to give your answers
2   orally and loud enough so that she can
3   hear you clearly.
4        Do you understand?
5    A   Yes, I do.
6    Q   Please let me finish asking my
7   question before you begin your answer.  If
8   Mr. Yi has an objection to my question,
9   wait until he's finished with his objection
10  before you start your answer; is that
11  okay?
12   A   Yes.
13   Q   If you don't understand one of my
14  questions, please let me know, and I'll
15  try to rephrase it.  Otherwise, I'll
16  presume that you understood the question
17  fully and answered it truthfully; is that
18  okay?
19   A   Yes.
20   Q   It's possible that you'll give an
21  answer as completely as you can and then
22  later on you'll remember additional
23  information and you may want to clarify or
24  add to an earlier response.  If that

Page 8

1   happens, just let me know that you would
2   like to supplement one of your earlier
3   answers and we can do that then while it's
4   on your mind; is that okay?
5    A   Yes.
6    Q   Also it's possible when you're
7   answering, you may think of some documents
8   that might help you remember the answer or
9   that might help you give a more accurate
10  answer.  If you do, please let me know
11  because I might have the documents here
12  and I'll be able to send them to you which
13  would hopefully help you answer the
14  question completely and accurately; is
15  that okay?
16   A   Yes.
17   Q   If you need to take a break at
18  any time for any reason, you should tell
19  me and we'll finish your answer if you're
20  in the middle of it and then we can take a
21  break; is that okay?
22   A   Yes.
23   Q   Are you taking any medication or
24  drugs, whether prescription or

**Page 9**

1  over-the-counter or otherwise, that might
2  make it difficult for you to understand
3  and answer my questions today?
4      A   No.
5      Q   Have you had any alcohol to drink
6  in the last 24 hours?
7      A   No.
8      Q   Are you sick today or under a
9  doctor's care for an illness?
10     A   Could you repeat that again?
11     Q   Are you sick today or under a
12  doctor's care for any illness?
13     A   No.
14     Q   Okay.  Is there any reason you
15  can think of why you will not be able to
16  answer my questions fully and truthfully
17  today?
18     A   No.
19     Q   Have you ever been involved in a
20  lawsuit before?
21     A   Have I been involved in a lawsuit
22  myself?  No.
23     Q   Okay.  Have you ever been deposed
24  before or given testimony?

**Page 10**

1      A   Yes.
2      Q   How many times?
3      A   Once.
4      Q   And was it a deposition, or did
5  you testify in court?
6      A   It was a deposition.
7      Q   Okay.  Were you just a witness?
8      A   Yes.
9      Q   And just, generally, what was the
10  matter -- why were you deposed?
11     A   It was a case from my old job.
12  It was at Hanmi Bank almost about ten
13  years ago.
14         MR. YI:  She's referring to Hanmi
15  Bank.  For the record, H-a-n-m-i.
16  BY MR. DZARA:
17     Q   And what -- why were you -- do
18  you know what the nature of the case was
19  about?
20     A   It was an injury case on our
21  property.
22     Q   Okay.  And you were a witness to
23  it?
24     A   Yes.

**Page 11**

1      Q   So you were deposed once before.
2  So you generally understand how the
3  deposition -- a deposition works?
4      A   Yes.
5      Q   Okay.  Great.  What did you do to
6  prepare for today's deposition?
7      A   I met briefly with Michael Yi to
8  go over the deposition.
9      Q   Okay.  When did you meet with Mr.
10  Yi?
11     A   I met Wednesday.
12     Q   Okay.  How long did you meet with
13  Mr. Yi?
14     A   I met with him for several hours.
15     Q   And did you review any documents
16  during the meeting?
17     A   Yes.
18     Q   And what documents -- do you
19  remember what documents you reviewed?
20     A   There were some e-mails that were
21  -- that I sent to my boss and --
22     Q   Who's your boss?
23     A   My boss, Elaine Jeon.
24     Q   And did you review any other

**Page 12**

1  documents other than e-mails that you sent
2  to Ms. Jeon?
3      A   Well, there were other documents
4  probably from our internal auditor, Mr.
5  Orest.
6      Q   Okay.
7          MR. YI:  Is that Mr. Hamersky?
8          THE WITNESS:  Yes, Mr. Orest
9  Hamersky.
10         MR. YI:  And just -- David, I'm
11  sorry to interrupt.  Do you have the
12  spelling for Elaine Jeon?
13         THE REPORTER:  No.
14         MR. YI:  J-e-o-n.  Elaine --
15         MR. DZARA:  Can we go off the
16  record for a minute?
17         (A discussion was held off the
18  record.)
19  BY MR. DZARA:
20     Q   So Ms. Lee, you said you looked
21  at documents -- audit documents that were,
22  I guess, maybe written or drafted by Mr.
23  Hamersky as part of your deposition prep;
24  is that correct?

## Page 13

1  A   Yes, uh-huh.
2  Q   Okay.  Do you remember what those
3 documents were?  Were they reports?  Were
4 they spreadsheets?
5  A   They were all spreadsheets.
6  Q   Did you review any audit reports
7 as part of your deposition preparation?
8  A   No.  Not all of the reports, no.
9  Q   Okay.  Did you review your -- the
10 FBI memo of their interview with you?
11  A   Well, I did not see the document.
12 It was read to me.
13  Q   It was read to you?
14  A   Yes.
15  Q   Okay.  You didn't actually read
16 it, but the contents were read to you by
17 Mr. Yi?
18  A   Yes.
19  Q   Did you do anything else other
20 than what you just testified about in
21 preparation for your deposition today?
22  A   No, I don't think I did anything
23 else.
24  Q   Did you talk to anybody -- I

## Page 14

1 don't want to know what you discussed with
2 Mr. Yi, but did you talk to anybody else,
3 any other Bank of Hope employees about
4 your deposition today?
5  A   No.
6  Q   Did you have to get permission
7 from Mr. Jeon to attend today's
8 deposition?
9  A   No.
10  Q   Did you talk to anybody outside
11 of Bank of Hope about your deposition
12 today?
13  A   Yes.
14  Q   Who did you talk to?
15  A   I talked to my current CEO.  Her
16 name is Joanne Kim from Commonwealth
17 Business Bank.  I had to take the day off,
18 so I had to let her know.
19  Q   Okay.  Where do you work right
20 now?
21  A   I work at Commonwealth Business
22 Bank.
23  Q   Oh, okay.  I'm sorry.  I thought
24 you were still with Bank of Hope.  When did

## Page 15

1 you leave Bank of Hope?
2  A   I left Bank of Hope February 2016.
3  Q   And you've been with Commonwealth
4 Business Bank since then?
5  A   I've been with Commonwealth
6 Business Bank since March 1st, 2016.
7  Q   And why did you leave -- I guess
8 it was still Wilshire Bank at the time.
9 Why did you leave Wilshire Bank?
10  A   I left Wilshire Bank because I
11 was offered a better position at
12 Commonwealth Business Bank.
13  Q   And what is your position there,
14 then?
15  A   The current SVP and chief
16 operations administrator.
17  Q   Is that equivalent to what Elaine
18 Jeon's position is at Bank of Hope?
19  A   Was, yes.
20  Q   Okay.  So you do -- just to
21 recap, you didn't talk to anybody at Bank
22 of Hope about your deposition today;
23 correct?
24  A   No.

## Page 16

1  Q   And the only -- you did talk to
2 your CEO at your current job about your
3 deposition today; correct?
4  A   Yes.
5  Q   And it was just that you needed a
6 day off because you were getting deposed?
7  A   Yes.
8  Q   Did you discuss your deposition
9 with anybody else --
10  A   No.
11  Q   -- anybody?
12     What is your date of birth?
13  A   My date of birth is May 16, 1969.
14  Q   And are you married?
15  A   Yes.
16  Q   And how long have you been
17 married?
18  A   Almost 20 years.
19  Q   Have you ever been divorced?
20  A   No.
21  Q   Do you have any children?
22  A   Yes, I have three.
23  Q   And how old are they?
24  A   They are 17, 15, and 4.

ORAL DEPOSITION OF ALICIA LEE, 9/29/2017

Page 17

1    Q   17, 15 and 4?
2    A   Yes.
3    Q   Wow.  Okay.  And where were you
4   born?
5    A   I was born in South Korea.
6    Q   Were you born -- what city?
7    A   I don't exactly recall the city,
8   but it's Seoul, Korea.
9    Q   Seoul?
10   A   Yeah.
11   Q   Okay.  I think everybody I've
12  asked in this case who is Korean, they all
13  say they were born in Seoul.
14       And when did you come to the
15  United States?
16   A   I came to the United States in
17  1986.
18   Q   So you were about 17 at that time?
19   A   Yes.
20   Q   And did you attend high school in
21  Korea -- South Korea?
22   A   No, I did not attend high school
23  in South Korea.
24   Q   Did you attend high school here

Page 18

1   in the United States?
2    A   I did attend high school in the
3   United States, yes.
4    Q   Okay.  And when you moved to the
5   United States, where did you move to?
6    A   I came to Los Angeles in --
7    Q   And you've been in --
8    A   I'm sorry.
9    Q   Sorry.  Keep going.
10   A   I've been in Los Angeles in
11  nearby Koreatown. I don't know the exact
12  address.
13   Q   Have you lived in the Los Angeles
14  area your whole time here in the United
15  States?
16   A   No.  I left Los Angeles two
17  months after I arrived.  I went to New
18  York, and I stayed about -- there for
19  about six months, and then I moved to
20  Colorado.  And from Colorado, I moved back
21  to Los Angeles.
22   Q   So where did you attend high
23  school?  What city?
24   A   I attended all three different

Page 19

1   state schools.
2    Q   Oh, okay.  So where were you when
3   you ended up graduating from high school?
4   Where were you living?
5    A   I was in California.  I graduated
6   from Glendale High School.
7    Q   And did you attend college?
8    A   Yes.
9    Q   Where did you attend?
10   A   I attended Glendale College, and
11  I transferred to Cal State Northridge, and
12  I completed my studies at the University
13  of Phoenix.
14   Q   University of Phoenix?
15   A   Yes, uh-huh.
16   Q   So do you have -- do you have a
17  bachelor's degree?
18   A   Yes, I do.
19   Q   And what is it in?
20   A   In business administration.
21   Q   And what year did you finally
22  receive your BA in business administration?
23   A   Oh, I received it after I had my
24  son, so it was -- I don't have the exact

Page 20

1   date, but it was in January after --
2    Q   What year approximately?
3    A   When was Joshua born?  2014.
4    Q   So you said you attended Glendale
5   College and then transferred to Cal State
6   Northridge --
7    A   Yes.
8    Q   -- but didn't complete your
9   degree then.
10       What year did you -- what year
11  did you stop your education at Cal State
12  Northridge?
13   A   I don't have the exact date, but
14  it was in the '90s.
15   Q   Okay.  So were you working at all
16  anywhere while you were going to Glendale
17  College or Cal State Northridge?
18   A   Yes.  I was working at Hanmi Bank.
19   Q   And what were you doing at Hanmi
20  Bank?
21   A   I started as a filing clerk, and
22  I worked my way up to operations officer.
23   Q   What year did you start at Hanmi
24  Bank?

## Page 21

1    A   I started in January of 1992.
2    Q   And was that your first job after
3 school -- or I guess, was that, like, your
4 first real job?
5    A   Well, if you say "real job," does
6 working for my dad counts as a real job?
7    Q   Okay.  I meant real like, you
8 know, you were -- how old were you in
9 1992?  You were 23?
10   A   Yes, uh-huh.
11   Q   So you were still -- were you in
12 college?
13       Were you still attending
14 Glendale or Cal State Northridge while you
15 started at Hanmi Bank?
16   A   Yes.  I was still attending
17 Glendale College when I started working
18 for Hanmi Bank.
19   Q   Okay.  Were you part time at
20 Hanmi, or were you full time when you
21 started?
22   A   I started as part time, and I was
23 full time later on.
24   Q   Okay.  Do you know approximately

## Page 22

1 when you started to be full time?
2    A   I think it was the same year that
3 I started.  It was towards the end, though.
4    Q   Okay.  So you started as a clerk.
5       And what other positions did you
6 hold while you were at Hanmi as you got
7 promoted?
8    A   Well, I was a teller -- merchant
9 teller, customer service representative,
10 new account representative, supervisor
11 officer, AVP, and I went up to vice
12 president operations officer.
13   Q   And do you know what year you
14 became the vice president operations
15 officer?
16   A   I don't have the exact date.
17 Sorry.
18   Q   Do you know what year,
19 approximately?
20   A   Approximately -- it's not exact
21 date -- probably around 2005 or 2004.
22   Q   Okay.  That's fine.  And what
23 were your duties?  Obviously, I know what a
24 clerk does and a teller, I think.  But as

## Page 23

1 you got into operations, what were your
2 duties as an operations employee?
3    A   You mean as an operations officer?
4    Q   Yes.  From when you got the
5 operations officer and became VP of
6 operations officer, what were your primary
7 duties?
8    A   Primary duty was to supervisor
9 tellers, new account representatives, and
10 customer service clerks and help them,
11 guide them throughout their day-to-day
12 daily operations.
13   Q   Okay.  Have you ever received any
14 accounting training?
15   A   What do you mean?  Accounting
16 training such as --
17   Q   Like, did you ever take any
18 classes in accounting?
19   A   Yes.
20   Q   You did?
21   A   Yes, I did.
22   Q   Okay.  Where was that?
23   A   I did take accounting classes at
24 University of Phoenix.

## Page 24

1    Q   Okay.  How about -- did you ever
2 have any investigation training?
3    A   No, not investigation training.
4 If you're talking about separate process,
5 no.
6    Q   Okay.  How about other than
7 classes, do you have any other -- did you
8 go to any other training for your job?
9 Any presentations or any extra educational
10 stuff?
11   A   Yeah.  We have a regular -- what
12 we call BCG seminars, bank compliance
13 group, trainings that we have. And there
14 are several in a year that I have to
15 attend, to.
16   Q   You said "we."  Who is we?
17   A   "We" as all the operations staff
18 that works at the bank.
19       They have their -- the bank
20 offer that kind of training for employees.
21 So I choose go to trainings that are
22 relevant to my job.
23   Q   And these are internal trainings
24 by the bank that you're working in?

## Page 25

1    A    No.  They are provided by lawyers.
2    Q    Okay.  So the lawyers come.
3        Were the trainings at the bank?
4    A    No.
5    Q    Like, lawyers came in from the
6  outside and did training at the bank?
7    A    No.  We go to the hotels, the
8  conference centers that they have the
9  trainings at.
10   Q    And you said you do that a couple
11 times a year?
12   A    Yes.
13   Q    So when did you -- did you leave
14 Hanmi Bank?
15   A    Yes, I left Hanmi Bank.
16   Q    What year?
17   A    I left in 2006.
18   Q    And where did you go?
19   A    I was trying to help my dad with
20 his business for a while, but it didn't
21 work out.
22   Q    So what was your next job after
23 trying to help your dad's business?
24   A    It was with Wilshire Bank.

## Page 26

1    Q    And when did you start at
2  Wilshire?
3    A    I started Wilshire on February
4  1st of 2007.
5    Q    You said February 1st, 2007?
6    A    Yes.
7    Q    What was your father's business
8  that you said you tried to help out?
9    A    My dad had a wholesale business
10 of luggage and bags.
11   Q    So why -- did you leave Hanmi
12 Bank to try to help your dad's business?
13 That's the reason why you left?
14   A    Yes.
15   Q    Okay.  What was your position
16 when you first started at Wilshire Bank?
17   A    I was VP and operations
18 administrator officer.
19   Q    Is that the title you held your
20 entire time at Wilshire Bank?
21   A    Was that the title that I held?
22 No.  I was promoted to FVP and ops admin
23 manager.
24   Q    So those are the two titles you

## Page 27

1  held at -- during your employment at
2  Wilshire Bank?
3    A    Well, before I became the
4  operation admin manager, I was FVP and ops
5  admin officer.  So it could be three
6  titles; right?
7    Q    I think we got two.
8        You said you started as VP
9  operations administrative officer, and
10 then you got promoted to FVP operations
11 administrative
12 manager.  Is that it?
13   A    Well, I got promoted when I left
14 Wilshire Bank. But between those, there's
15 one more title.  That is -- first vice
16 president and ops admin officer.  Sorry
17 about that.
18   Q    You said when you left Wilshire
19 Bank.  What do you mean when you left
20 Wilshire Bank?
21   A    To take my job on my current
22 position as --
23   Q    Okay.  I'm not talking about
24 that.  I'm just restricting -- we're just

## Page 28

1  going to talk about Wilshire Bank, your
2  job there.
3    A    Right.
4    Q    So you started at Wilshire Bank
5  in 2007 as VP operations administrative
6  officer; right?
7    A    Yes.
8    Q    And then were you promoted at
9  Wilshire Bank?
10   A    Yes.
11   Q    And you were promoted to what?
12   A    First vice president and
13 operations administrative officer.
14   Q    And those are the only two titles
15 you held at Wilshire Bank?
16   A    No.  There's another one which is
17 first vice president and ops admin manager.
18   Q    You held that title at Wilshire
19 Bank?
20   A    Yes.
21   Q    Got it.  Okay.  Were your duties
22 the same for all three positions, or were
23 they different?
24   A    They're a little bit different.

**Page 29**

1   Q   Okay.  Tell me -- let's say the
2   first one, the VP of operations
3   administrative officer, what were your
4   duties in that position?
5       A   That position, I was mainly going
6   around branches finding out whether their
7   daily procedure was followed and reviewing
8   their daily procedures and making
9   corrections if they needed to.  And I
10  would write reports to my boss in regards
11  to, you know, how the review went with all
12  the branches.
13      Q   And were all the branches in
14  Southern California?
15      A   No.  We had branches at Texas,
16  New York, and New Jersey.
17      Q   And you had to travel to all of
18  them?
19      A   Yeah, I would travel a couple of
20  times a year.
21      Q   And who was your boss at that
22  time in that position?
23      A   At that time in that position, my
24  boss -- my direct boss was Sora Park, and

**Page 30**

1   above that was David Kim.
2       Q   Okay.
3       A   He's the chief.
4       Q   What year -- you said your next
5   position was FVP, operations
6   administrative officer.
7       A   Yes.
8       Q   Do you remember what year you
9   were promoted to that?
10      A   I don't recall the exact dates
11  when I was promoted.  I'm sorry.
12      Q   That's fine.  No need to
13  apologize.
14          What were your duties in that
15  position?
16      A   Well, it was pretty much the
17  same.  It's just that I was also involved
18  in adjusting our day-to-day procedures for
19  our branch operations and providing
20  guidance of their day-to-day operations as
21  well.
22      Q   Okay.  And the third position,
23  FVP operations administrative manager, do
24  you remember when you got promoted to that

**Page 31**

1   position?
2       A   I would say around -- during 2010
3   or '11.
4       Q   Okay.  And what were your duties
5   in that position?
6       A   I was to manage my direct reports
7   who were in charge of all the duties that
8   I was doing before.
9       Q   Keep going.
10      A   Yeah.  I had -- I had a group of
11  people that were taking over some of the
12  duties that I had been performing before,
13  and I had to manage those operations
14  administrative officers as well.
15      Q   Okay.  And did you -- you left
16  Wilshire Bank before it merged with Bank
17  of Hope --
18      A   Yes.
19      Q   -- or merged and became Bank of
20  Hope?
21      A   Yes.
22      Q   Where was your office while you
23  worked at Wilshire Bank?
24      A   My office was at 3200 Wilshire

**Page 32**

1   Boulevard, seventh floor, Los Angeles 90010.
2       Q   Was that Wilshire's headquarters?
3       A   Yes, sir, uh-huh.
4       Q   So you were there the whole time?
5       A   Yes.
6       Q   That was your office the entire
7   time?
8       A   Yes.
9       Q   Other than, obviously, you were
10  traveling for part of that time --
11      A   Yes.
12      Q   -- that was your primary office?
13      A   Yes.
14      Q   And when did Elaine Jeon become
15  your boss? What position did you have when
16  Elaine became your boss?
17      A   I was the first vice president of
18  operations administrative officer, and I
19  believe she took -- she became my boss
20  around 2010.
21      Q   And you said your reason for
22  leaving Wilshire Bank was because you were
23  offered a better position at Commonwealth
24  Business Bank; correct?

## Page 33

1  A  Right.
2  Q  And is Commonwealth Business Bank
3 a Korean American bank too?
4  A  Yes.
5  Q  Okay.  Is it much smaller than
6 Wilshire Bank?
7  A  Yes.
8  Q  Okay.  Seems like what I've been
9 reading or learned from this case is that
10 there's a lot of banks buying each other
11 up?
12  A  Right.
13  Q  I guess -- I mean, the Korean
14 American bank industry, it seems like
15 that's, you know, similar in the nonKorean
16 American banking and the regular American
17 banking too.  Just an observation, not a
18 question.
19      When you were hired at Wilshire
20 Bank, who was -- who did you interview with,
21 if you remember?
22  A  I interviewed with David Kim.
23  Q  And what was his position at the
24 time?

## Page 34

1  A  He was the chief operation
2 administrator.
3  Q  Anybody else?
4  A  And the CEO.
5  Q  And who was that at the time?
6  A  Mr. Soo Bong Min.
7  Q  Okay.  In your position now with
8 Commonwealth Business Bank -- I forget if
9 I asked you before, but what are your job
10 responsibilities?
11  A  My job responsibility is to
12 provide guidance for our branch operations
13 and branch operations officers and also
14 supervise my manager -- our ops admin
15 department manager and ensure that the
16 day-to-day operation is smooth.
17  Q  And how many branches does
18 Commonwealth have?
19  A  We currently have eight.
20  Q  Are they all in Los Angeles?
21  A  No.  We have two in Texas and the
22 rest in California.
23  Q  And where is your office now?
24  A  My office is at 3445 Wilshire

## Page 35

1 Boulevard, seventh floor, Los Angeles,
2 California 90010.
3  Q  Is that right down the street
4 from your old office?
5  A  Yeah, couple of blocks down.
6  Q  Okay.  Do you know my client,
7 James Ryu?
8  A  No, I don't.  Never met him.
9  Q  Okay.  That was my next question.
10 Did you ever meet him?
11  A  No, I never met him.
12  Q  Did you ever talk to him on the
13 phone or --
14  A  No.
15  Q  Did you ever talk to him on the
16 phone?
17  A  No.
18  Q  Did you ever exchange e-mails
19 with him?
20  A  No.
21  Q  How about Karen Chon?  Do you
22 know her?
23  A  I met her when I was at New York
24 for the interview, but I had never met her

## Page 36

1 before.
2  Q  Okay.  We'll talk about the
3 interview of her. That was in New Jersey,
4 though, wasn't it?
5  A  Yeah, in New Jersey.
6  Q  So you only met her once, that
7 one time?
8  A  Once.
9  Q  You never talked to her before on
10 the phone or after?
11  A  Never.
12  Q  No e-mails with her ever?
13  A  No e-mails.
14  Q  Okay.  You're aware that
15 BankAsiana and Wilshire Bank merged in
16 October of 2013; right?
17  A  Yes, I do.
18  Q  Were you involved, at all, in
19 that merger process?
20  A  No.  Actually, I was on maternity
21 leave at the time.
22  Q  Oh, your four-year-old?
23  A  Yes.
24  Q  Didn't do the math.

Page 37

1    A   Yeah.
2    Q   If you weren't on maternity
3  leave, would you have been involved, at
4  all, in the merger process?
5    A   Yes.
6        MR. YI:  Objection to form.
7  BY MR. DZARA:
8    Q   Okay.  Have you ever been
9  involved -- when you were at Wilshire
10 Bank, were you involved in any other
11 mergers?
12   A   An acquisition, yes.
13   Q   Okay.  And what -- what was your
14 role in the acquisition process?  What was
15 your role?
16   A   I was involved in transferring,
17 ensuring that all the data for our deposit
18 side were correct.  And that if we were to
19 convert all the data from the previous --
20 banks that we were acquiring to be
21 correctly encoded in our system.
22   Q   Okay.  Do you know who was
23 responsible for that function in the
24 BankAsiana acquisition?

Page 38

1    A   Could you repeat that question?
2  I didn't catch.
3    Q   Sure.  You just described your
4  role in a prior acquisition when you are
5  at Wilshire Bank.
6    A   Right.
7    Q   But you testified you weren't
8  involved in the acquisition of BankAsiana;
9  correct?
10   A   Correct.
11   Q   So who was -- who handled for
12 Wilshire Bank the functioning that you
13 just described that you handled in the
14 prior acquisition for Wilshire Bank?
15   A   At that time, was my colleague,
16 Julie Ki.
17   Q   Julie Ki, K-i?
18   A   K-i.
19   Q   What was her position back then,
20 do you know?  Her title?
21   A   She was first vice president and
22 ops admin officer.
23   Q   So was she a step below you?
24   A   Yes.

Page 39

1    Q   Do you know if she was involved
2  in the BankAsiana acquisition?
3    A   I wouldn't know that.  I don't
4  know the answer to that, no.
5    Q   Okay.  Are you aware that certain
6  BankAsiana employees were laid off
7  following the merger?
8    A   Yeah.  I was told later, yes.
9    Q   You were aware of that?
10   A   Yes, uh-huh.
11   Q   Okay.  Do you know that James was
12 one of the employees laid off?
13   A   Yes.
14   Q   Okay.  And do you know that Karen
15 was also one of the employees that was
16 laid off?
17   A   Yes.
18   Q   And do you know how you learned
19 about that -- how you learned that they
20 were both laid off?
21   A   I learned after the merger and
22 acquisition was completed and when I came
23 back to work.
24   Q   Okay.  When did you come back to

Page 40

1  work following maternity leave?
2    A   I came back to work sometime in
3  November.
4    Q   Of 2013?
5    A   Yes.
6    Q   So after you returned to work,
7  you learned, I guess, about the merger and
8  part of what you learned is that James and
9  Karen were two of the BankAsiana employees
10 that were laid off?
11   A   Yes, uh-huh.
12   Q   Okay.  We're going to spend,
13 really, the rest of the deposition talking
14 about the embezzlement and Wilshire bank's
15 investigation and your role in that.
16       So when did you first learn about
17 Karen's embezzlement from BankAsiana?
18       MR. YI:  Objection to form.
19 BY MR. DZARA:
20   Q   You can answer.
21   A   I believe I learned when Elaine
22 Jeon forwarded me an e-mail from Bo Young
23 saying that there was some discrepancies
24 that they found.  And I don't exactly know

## Page 41

1  that's when I learned about the incident.
2      Q    Okay.  So you learned about --
3  you received -- Ms. Jeon forwarded an
4  e-mail from, you think, Bo Young that
5  talked about the discrepancies?
6      A    Yes, uh-huh.
7      Q    And did you -- after receiving
8  that e-mail, did you talk to anybody about
9  it?
10     A    After receiving that, no.  Only
11 to my boss, Elaine Jeon.
12     Q    Only to Ms. Jeon?
13     A    Yes, uh-huh.
14     Q    And what did you guys discuss?
15     A    She wanted me to go to New York
16 and find out what's going on and get a
17 report.
18     Q    Anything else --
19     A    I think that was --
20     Q    -- that you remember?
21     A    I think that's all that I can
22 remember right now.
23     Q    Okay.  Did you talk to Bo Young
24 before you left?

## Page 42

1      A    I don't know.  I don't remember.
2  I might have.
3      Q    Okay.  Well, I don't want you to
4  guess.  Whatever you remember is what you
5  remember.
6      A    I don't remember.
7      Q    You know, I'm not -- I prefer
8  that you not -- yeah, you can -- I don't
9  want to speculate or guess.  If you
10 remember something --
11     A    Of course.
12     Q    -- that's all I'm going to ask.
13 If you don't recall or you don't remember,
14 it's perfectly fine to say "I don't
15 recall," "I don't remember."  I'm not
16 trying to trick you here.  I'm sure
17 Michael told you I was a great guy, and
18 I'm not trying to be mean or trick you into
19 saying something that you don't believe or
20 you don't remember.
21         So you remember talking to Ms.
22 Jeon after receiving that e-mail, and you
23 remember her telling you she wanted you to
24 go to New Jersey and figure out what's

## Page 43

1  going on?
2      A    Yes.
3      Q    When did you leave for New
4  Jersey, that night or the next morning?
5      A    I think I arranged a flight, and
6  I don't know exact time, but I packed at
7  night, I remember.
8      Q    Did you take a red eye?
9      A    I think -- I believe I took the
10 red eye.
11     Q    Got it.  And you still had your
12 newborn at home; right?
13     A    Yes, uh-huh.
14     Q    Okay.  Bad time -- bad timing?
15     A    Yeah.
16     Q    Okay.  So you think you took a
17 red eye that night.
18         When you -- all you knew -- what
19 did you know at the time you took the
20 flight to New Jersey?
21         What did you know about the
22 embezzlement, specifically?
23     A    I knew that there was some
24 discrepancy that was discussed by a

## Page 44

1  customer, and the branch staff was
2  contacted about that.  And while the
3  branch staff was looking into the system,
4  they found something unusual.  So Bo
5  Young started digging into the account
6  history, and she believed that there were
7  some transactions that she felt was
8  unusual because it was funds transferred
9  from one CD to another CD which had no
10 relation to each other.
11     Q    So how did you learn all that?
12         Do you remember how you learned
13 all that?
14     A    It was provided on the
15 spreadsheet that was attached to the
16 e-mail that was sent to Elaine Jeon.
17     Q    Were you aware of any meeting
18 between Bo Young, Irene Lee, and Karen
19 prior to you leaving to go, to fly to New
20 Jersey?
21     A    No, I wasn't aware.  I had no
22 knowledge of that meeting.
23     Q    Okay.  Did you later become aware
24 that there was a meeting the day before

Page 45

1  you got to New Jersey between Karen, Bo
2  Young, and Irene?
3      A   I wasn't aware there was a
4  meeting, but I could tell they did talk
5  about.  I don't know whether they had met
6  in person or were over the phone.  I don't
7  know that.
8      Q   Okay.  Just tell me anything that
9  you remember about a possible meeting or a
10  discussion between Karen, Irene, and Bo
11  Young prior to you arriving.
12      A   Prior to my arrival, I wasn't
13  aware of it, that they had a meeting.
14      Q   Did you learn after the fact --
15  after you arrived?
16      A   After I arrived during the
17  meeting, there were some mentions that
18  they had talked, but I wasn't sure whether
19  they met in person or not.  That's all I
20  can remember.
21      Q   Okay.  Do you have the exhibits
22  there in front of you guys?  Can you take
23  the top one.  All right.  The first
24  document here -- the first exhibit I'm

Page 46

1  going to show you should be marked Ryu 2
2  in the bottom right-hand corner.
3      A   Yes.
4      Q   And it's Bates-numbered WB 1532.
5  I forget if it was marked at Bo Young's or
6  Irene's deposition.  But first, I want you
7  to take a look at the e-mail and see if
8  you recognize it.
9      A   It seems to be an e-mail from Bo
10  Young to Elaine Jeon and Seung Ho Park in
11  regards --
12      Q   Copied to Irene Lee?
13      A   Yes, copied to Irene Lee.
14      Q   And who's -- Seung Ho Park, who
15  was that?
16      A   He was the regional director at
17  the time.
18      Q   He was the regional director?
19      A   Yes.
20      Q   For the east region, New Jersey
21  region?
22      A   Yes, for Wilshire Bank.
23      Q   Okay.  Does anything in this e-
24  mail look familiar to you?  Do you

Page 47

1  remember seeing it?
2      A   I don't remember seeing this.
3          MR. DZARA:  Okay.  How about --
4  let's take a look at the next one that's
5  in the stack, Michael.
6          MR. YI:  Okay.
7          MR. DZARA:  It's not marked.
8  BY MR. DZARA:
9      Q   Okay.  Ms. Lee, it's Bates-
10  numbered WB 1578, and correct me if I'm
11  wrong, but if --
12          MR. YI:  Hold on.  David, if you
13  allow a moment, I'm just telling the
14  witness that she doesn't have to pay
15  attention to the production number which is
16  on a yellow Post-it.
17          MR. DZARA:  Got it.
18  BY MR. DZARA:
19      Q   So my first question to you, have
20  you seen this e-mail before?  Do you
21  recognize it?
22      A   It appears to be the memo that I
23  sent to Elaine Jeon on January 23rd.
24          MR. DZARA:  Okay.  These things

Page 48

1  might be out of order, Michael.  This
2  isn't the e-mail from Elaine Jeon to
3  Alicia dated Wednesday January 22nd?
4          MR. YI:  Which one did you want
5  to do next? Which document?
6          MR. DZARA:  This one should be in
7  the order I attached them in the e-mail
8  that I sent to the court reporter.  The
9  second one should be an e-mail from Elaine
10  Jeon to Alicia dated January 22nd, 2014, at
11  7:23 p.m.
12          MR. YI:  Okay.  Got it.
13          MR. DZARA:  Off the record for a
14  second.
15          (A discussion was held off the
16  record.)
17          (Exhibit 36 was marked for
18  identification and is attached hereto.)
19  BY MR. DZARA:
20      Q   Okay.  Ms. Lee, so now you should
21  have in front of you, hopefully, what's
22  now going to be marked Ryu 36,
23  Bates-numbered WB 1578.  And it should be
24  an e-mail from Elaine Jeon to you dated

Page 49

1 Wednesday, January 22nd, 2014, at 7:23 p.m.
2      Is that the document you have in
3 front of you?
4    A   Yes, I do.
5    Q   Okay.  Take a look at it.  My
6 first question is:  Have you seen this
7 before?
8    A   Yes.
9    Q   Okay.  So you testified before
10 that you received an e-mail from Elaine
11 that was your first -- was the first time
12 you learned about the embezzlement.
13      Is this the e-mail that you were
14 referring to before?
15    A   Yes.
16    Q   Okay.  So if you're looking at
17 the prior exhibit that I showed you, which
18 is Ryu 2, the one I showed you before --
19    A   Yes.
20    Q   -- this appears to be -- Elaine
21 seemed to have just forwarded the e-mail
22 that she received from Bo Young; is that
23 right?
24    A   It seems to be.

Page 50

1    Q   Okay.  So looking at Ryu 36, the
2 e-mail that Elaine forwarded to you,
3 you'll see the bottom -- the last
4 paragraph on the first page --
5    A   Yes.
6    Q   -- it talks about Irene Lee and
7 Bo Young meeting with Karen Chon this
8 morning at Karen's request.
9      Do you see that?
10    A   Yes, I see that.
11    Q   Okay.  So does that help -- you
12 said you didn't remember if there was a
13 meeting or when it was between Karen and
14 Irene and Bo Young.
15      Does this help you remember that
16 it was -- it was a meeting between the
17 three of them, and it was on January 22nd,
18 2014?
19    A   Yes, uh-huh.
20    Q   Okay.  So in this paragraph, Bo
21 Young goes on to state that, in the second
22 sentence, that Karen had been stealing
23 money from the bank for the last few years.
24    A   Yes, uh-huh.

Page 51

1    Q   And it goes on to kind of
2 describe what Karen told them -- "them"
3 being Irene and Bo Young -- about how
4 Karen -- how she was able to do the
5 stealing; is that right?
6    A   Yes, uh-huh.
7    Q   Okay.  And then you'll see in the
8 next couple pages, there seem to be
9 printouts and spreadsheets of the affected
10 customers.
11    A   Yes.
12    Q   Does that look right?
13    A   Yes.
14    Q   Okay.  So in anywhere on this e-
15 mail that Bo Young sent, do you see any
16 mention of James?
17    A   No, I don't see any mention of
18 James.
19    Q   Okay.  Are you aware of -- you're
20 aware that Karen -- I'm going to use first
21 names for Karen and James just to make it
22 easier.  Do you know -- you're obviously
23 aware that Karen implicated James in the
24 embezzlement?

Page 52

1    A   Yes.
2    Q   Okay.  Do you know if she
3 implicated James in the embezzlement
4 during this January 22nd, 2014, meeting
5 that she had with Irene and Bo Young?
6    A   I don't.
7    Q   You don't know?
8    A   Could you repeat that?
9    Q   Sure.  Are you aware if Karen
10 implicated James during her meeting with
11 Irene and Bo Young on January 22nd, 2014?
12    A   It appears to be that there's no
13 mention of James during that meeting --
14    Q   Okay.
15    A   -- according to this e-mail.
16    Q   Other than this document, what
17 you're looking at, do you have any
18 independent recollection -- do you know --
19    A   No.
20    Q   -- for sure, one way or the
21 other, if Karen implicated James during
22 this January 22nd meeting?
23    A   I don't have any knowledge of
24 that.  I can't recall.

**Page 53**

Q   Okay.  You can set these two exhibits aside.  Thank you.

So regarding this January 22nd meeting, do you think -- have you told me everything you remember about it?

A   22nd meeting with Elaine Jeon?

Q   Yeah.

A   Yes.

Q   Now, this January 22nd meeting between Bo Young and Irene and Karen, have you told me everything that you remember learning about that meeting?

A   Yes.

Q   And if you remember something else later, you're free to bring it up.

A   Yes.

Q   "I just remembered this."

A   Yes, of course.

Q   Thank you.  So you arrive likely in the early morning hours.  You arrive to New Jersey in the early morning hours of January 23rd, 2014?

A   Yes.

Q   Okay.  What did you do?  When you

**Page 54**

got in -- when you flew in -- did you fly into Newark?

A   Yes, I think I flew to Newark Airport.

Q   Okay.  Do you remember what you did when you got in?

Where did you go?

A   Well, I took the taxi and went to the headquarters of the BankAsiana -- the former BankAsiana which was on Broad Avenue where Bo Young was -- Bo Young Lee.

Q   Is that Palisades Park?

A   Yes, uh-huh.

Q   And what did you do when you got there?

A   When I got there, I met with Bo Young and we were getting ready to go and meet Karen.

MR. DZARA:  Let's go back a second.  Michael, could you pull that next exhibit?  I missed it for a second.  It should be marked Ryu 5.

MR. YI:  Which one is it?

MR. DZARA:  The next one.  It

**Page 55**

should be the next one in the stack.  It's marked Ryu 5.

BY MR. DZARA:

Q   Okay.  Ms. Lee, take a look at the exhibit that's been previously marked Ryu 5.

A   Yes.

MR. YI:  Go ahead, David.

BY MR. DZARA:

Q   Okay.  So this is kind of a repeat, the earlier e-mails in the string of the e-mails that we already looked at.  The new e-mail in the string is the middle e-mail on the first page.  It's an e-mail from Elaine Jeon to Bo Young and Irene copying Seung Ho Park.

And in her e-mail -- it's dated January 22nd, 2014.  And in the e-mail -- in the middle of the e-mail, she says that you are flying out there.  You're going to be out there tomorrow morning to help out.

Do you see that?

A   Yes.

Q   And she says -- the last line in

**Page 56**

the e-mail, "Let's focus to investigate thoroughly and do the follow-up procedure timely"; right?

A   Yes.

Q   Okay.  Ms. Jeon asked you to fly out there to help investigate to figure out what's going on.  That was the purpose of you going?

A   Yes.

Q   Was there any other instructions Ms. Jeon gave you other than that?

A   Well, I was instructed that I was supposed to meet with Karen and get as much information that we can from the interview and see -- find out which accounts and what was the reason, the motive and all that of the embezzlement.

Q   Okay.  So you were supposed meet with Karen.

Did you know if a meeting was set up with Karen the next day?

A   Yes.

Q   Okay.  Who told you that there was a meeting already set up to meet with

Page 57

1  her again?
2      A    I don't recall exactly who told
3  me, but I was aware that I was supposed to
4  meet with Karen the next day.
5      Q    Okay. So when you flew there and
6  got there, you knew that day that you were
7  going to meet with Karen, and you were
8  instructed by Ms. Jeon to get information
9  from Karen to figure out what she did and
10  who the customers were and get as much
11  details that you could about what she did;
12  right?
13      A    Correct.
14          MR. YI:  Objection to form.
15  BY MR. DZARA:
16      Q    At that time, was there any
17  mention of James?
18      A    No, there was no mention of James.
19      Q    Okay. Did you talk -- before you
20  left -- other than talking to Ms. Jeon,
21  did you talk to anybody else at Wilshire
22  Bank that you were going out there, you
23  were flying out to New Jersey to do this
24  investigation?

Page 58

1      A    Yes. I did talk to Jake Seo and
2  Julie Ki. The reason I talked to Jake Seo
3  was for him to provide me a list of the
4  transactions for anything that Karen may
5  have done during that period so that it
6  could help me in the investigation.
7      Q    Okay.
8      A    And I talked to Julie because she
9  was my subordinate, and she needed to take
10  over while I was gone.
11      Q    Okay. So did you have -- do you
12  remember how you communicated with Jake
13  and Julie? Was it by e-mail or by phone?
14      A    No. They are right -- we're on
15  the same floor, so I just walked over to,
16  you know, his cubicle office and talked to
17  him.
18      Q    Okay. So it was in-person
19  meeting?
20      A    Yes. It was in person.
21      Q    In-person communication?
22      A    Yeah.
23      Q    Okay. And why were you -- why
24  did Elaine Jeon ask you to go to New

Page 59

1  Jersey to do -- to start this
2  investigation?
3      A    Because I was her direct report
4  and because my operations background, to
5  know the type of transaction -- to
6  identify certain transactions, I believe.
7      Q    Okay. So it was because of your
8  background. It wasn't because of any
9  speciality in investigation work that you
10  have? It was just solely due to your
11  operations background?
12      A    Yes.
13      Q    Was anybody else other than you
14  considered to go and handle this
15  investigation?
16      A    At my department by Ms. Jeon, or
17  are you talking about -- because I believe
18  Orest Hamersky was also put into the
19  investigation process.
20      Q    Yeah. He came afterwards. But
21  I'm talking about this January 22nd e-mail
22  when everybody found out, when Bo Young
23  sent this e-mail to Elaine Jeon, was
24  anybody else considered to be sent other

Page 60

1  than you?
2      A    No.
3      Q    Okay. You can set that aside.
4  Thank you.
5          So you knew about -- when you
6  arrived on January 23rd, you went to
7  Palisades Park, and you knew that you
8  were going to be meeting with Karen, and
9  you your objective was to interview her
10  and get as much information as you could
11  about what she did; is that right?
12      A    That's correct.
13      Q    Did you -- did you know anybody
14  else who would be attending this meeting
15  with Karen with you?
16      A    No.
17      Q    Like, I know Irene and Bo Young
18  were there.
19      A    Yes.
20      Q    They were there?
21      A    Yes, uh-huh.
22      Q    Was anybody else there?
23      A    No, there was no one else there.
24      Q    Do you know why Irene and Bo

## Page 61

1   Young were there? Did you ask them to be
2   there?
3       A   No, I didn't ask them to be
4   there. But I believe they were there
5   because I had never met Karen, and I
6   couldn't have done the meeting by myself
7   because I wouldn't recognize her.
8       Q   And where did you meet?
9       A   It was in a coffee shop nearby
10  the office.
11      Q   Was it in the same building as
12  the office, or was it somewhere --
13      A   No. No. I remember driving a
14  short distance by car.
15      Q   And did you drive to the coffee
16  shop by yourself, or was Bo Young and
17  Irene with you?
18      A   No. Bo Young drove her car, and
19  I was -- I mean, in the car with her and
20  Irene Lee was also.
21      Q   Okay. So you three went in.
22          Was Karen waiting for you, or did
23  you guys have to wait for her to show up?
24      A   I don't remember that, but I'm

## Page 62

1   sure we met.
2       Q   Okay. And did you record the
3   conversation with Karen?
4       A   Yes, I did.
5       Q   And you recorded it on your cell
6   phone?
7       A   Yes, uh-huh.
8       Q   Did you tell everybody that you
9   were going to be recording?
10      A   No, I didn't.
11      Q   Did anybody else know besides
12  you --
13      A   No.
14      Q   -- that you were recording?
15          Did Elaine Jeon ask you to record
16  the conversation?
17      A   No, she didn't.
18      Q   So you decided to do it on your
19  own?
20      A   Yes, to make better notes.
21      Q   And did you use the recording to
22  take better notes after the meeting was
23  done?
24      A   No, I didn't.

## Page 63

1       Q   How long -- do you remember how
2   long the meeting was?
3       A   I don't recall exactly. It could
4   have been a little more than an hour or so.
5       Q   Okay. Tell me, did anybody else
6   from Wilshire Bank attend the meeting
7   besides you, Irene, and Bo Young?
8       A   No one attended the meeting
9   besides us.
10      Q   And tell me what you remember
11  about what was discussed -- what was said
12  by Karen?
13      A   Well, to summarize, Karen
14  confessed to all these unauthorized
15  withdrawals of cash from the customers'
16  accounts. And during the confession, she
17  did mention Mr. James Ryu being involved
18  in it, and he was part -- he benefitted
19  from that. The funds -- the cash was
20  delivered to Mr. Ryu, and that's how she
21  had to deliver them, directly to him in an
22  interoffice envelope. And I think that's
23  pretty much what we discussed.
24          And I was concentrating in which

## Page 64

1   accounts were those funds distributed or
2   if there were anyone else besides those
3   customers that were identified by Bo Young
4   and try to get confirmation about, you
5   know, the actual cash being withdrawn from
6   the vault.
7       Q   Okay. So did you ask a lot of
8   questions about who were the CD customers
9   she took money from? Were you asking a
10  lot of questions --
11      A   Yes.
12      Q   -- about the customers to try to
13  figure out which accounts were affected?
14      A   Yes.
15      Q   Okay. Was that your -- your
16  primary focus was to figure out the
17  customers and what accounts were affected?
18          Was that your primary goal of
19  the interview?
20      A   Yeah, that was my primary goal of
21  the interview. But during the interview,
22  also there was information that someone
23  higher above was involved, and I was
24  trying to determine whether she was acting

ORAL DEPOSITION OF ALICIA LEE, 9/29/2017

Page 65

1  on her own or whether she was instructed
2  to do it, so I was asking a lot of
3  questions in regards to that.
4     Q   Okay.  And did she say -- do you
5  remember what she said about -- did she
6  start doing these unauthorized withdrawals
7  herself?
8        Did James tell her to do it?
9        Do you remember what she said
10 about that?
11    A   I don't exactly remember what
12 said.  But what I could recollect from the
13 interview was that she was approached not
14 only by James Ryu but also by Mr. Hong --
15 Hur -- Hong Sik Hur to lend him some money
16 or to facilitate some money to James Ryu.
17 And that's why we started asking all these
18 other questions, you know, was Mr. Hong
19 asking directly, or was it Mr. Ryu giving
20 you instructions on how to do it.  And
21 later on, she said that she came out with
22 the method, but then she provided the cash
23 to Mr. James Ryu.
24    Q   Okay.  What you were talking

Page 66

1  about with Mr. Hur, was that, like, an
2  employee loan?  Was that what she was
3  talking about?
4     A   Yes.  I believe from my
5  recollection is that the loan was
6  mentioned by Irene Lee.  I know that Mr.
7  Hur had asked Irene Lee to take a personal
8  loan and -- under her name -- under
9  Irene's name and lend the money to Mr.
10 Ryu, and she refused to do that.  You know,
11 she said she had to think about it.  She
12 would discuss it with her husband, and she
13 thought that wasn't right. And then after
14 that, she refused it.
15        And I don't know whether she told
16 directly or Mr. James Ryu found out about
17 it, but from my recollection was that
18 Mr. Ryu was saying that he was kind of
19 embarrassed that Mr. Hong would ask her to
20 do such a thing.
21        That he had asked for a personal
22 loan to Mr. Hur himself directly and not to
23 do certain transactions such as that and,
24 you know, have Irene involved in such a

Page 67

1  situation.
2     Q   And all this was discussed at
3  this January 23rd meeting?
4     A   Yes.
5     Q   And was Irene telling you this
6  story or Karen, about the employee loan
7  and Irene saying no and James being
8  embarrassed?
9        Was that Irene telling that
10 part of the story, or was it Irene and
11 Karen?
12    A   Yes, that was Irene.
13        And I think -- yeah, Karen was
14 aware of it.  I think that was my
15 impression.
16    Q   And so that whole story about
17 what Irene was telling you, what did that
18 have to do with Karen's embezzlement, do
19 you know?
20        MR. YI:  Objection to form.
21        THE WITNESS:  Well, my
22 understanding was that there were -- I
23 don't recall the exact flow of the
24 conversation, the interview was.  But

Page 68

1  there were some mentioning why everyone at
2  BankAsiana knew that James was in a
3  financial difficulty, and that he was going
4  around borrowing money from everyone else
5  that he knew.  So I think Irene also
6  mentioned that because Karen would mention
7  that he was in a financial debt and that he
8  needed the money and she wanted to help by
9  giving the cash.
10 BY MR. DZARA:
11    Q   Karen wanted to help James with
12 his financial difficulties, that's why she
13 gave him the cash that she was embezzling?
14    A   Yes.  Because James had asked her
15 if there was a way anyone -- if she knew a
16 way she could facilitate some cash for him
17 so maybe, you know -- that she could
18 figure out a way to do it.  So that's when
19 she decided to withdraw cash.
20    Q   And was Karen already doing,
21 like, the embezzling process when James
22 approached her, or did she start -- she
23 figured out how to do it after James
24 approached her?

Page 69

1    MR. YI:  Objection to form.
2    THE WITNESS:  I didn't get -- I
3 didn't get that full information.  I
4 wouldn't know to say whether she started
5 the embezzlement first and then give the
6 money to James, or did she start the
7 embezzlement after James asked.  That, I
8 couldn't -- I wouldn't be able to tell you
9 that for sure.
10 BY MR. DZARA:
11   Q   Okay.  Did she say she gave all
12 the money she embezzled to James, she
13 didn't keep any of it herself?
14   A   Well, during the interview, we
15 could tell that she did use some of the
16 funds for her own use, the cash.  That she
17 had to put some -- deposit some of the cash
18 into the business account that her husband
19 owned.
20   Q   So she said that, or you guys
21 figured -- like, she told you that during
22 the interview?
23   A   Yes, she told us that.
24   Q   Do you remember how much she said

Page 70

1 she -- the total amount she stole?
2    A   She -- I remember her saying it
3 was approximately about a million or
4 something, but --
5    Q   Did she say how much she kept?
6    A   She didn't give us an exact
7 figure, how much.  She was going to maybe,
8 like, 20 -- 255 or 300.  She didn't say
9 exactly.  She couldn't recall at that time
10 how much she got for herself.
11   Q   So she gave you a ballpark figure
12 of what she thought she kept?  She guessed
13 about -- she gave a guess about how much
14 she thought she kept?  Is that what you
15 remember?
16   A   Yeah.  I believe she kind of
17 guessed a very low amount compared to the
18 total amount, yes.
19   Q   And did she say the rest she gave
20 to James?
21   A   Yes.
22   Q   Did she say -- did she give you
23 the years of how long -- when she was
24 doing this, the time frame?

Page 71

1    A   I don't have the exact years, the
2 time frame.  But I think it kind of
3 correlated to -- it kind of matched to the
4 report Bo Young had provided.
5    Q   So the time frame she told you --
6 she did give you a time frame during this
7 meeting?
8    A   I don't recall.  But maybe one of
9 my memos, I would have mentioned some of
10 that.  I don't know.
11   Q   Okay.  We'll get to that.  I'm
12 just trying to get your understanding of
13 what you remember about that meeting
14 before I show you the documents.
15 Did you -- what was your impression of
16 Karen during meeting?
17   A   What do you mean by my impression
18 of Karen? Could you be more specific?
19   Q   Well, did you -- did you find her
20 believable, what she was saying?
21   A   Yeah, I would find her generally
22 credible, believable because, I mean, she
23 confessed to her crimes, and she was
24 very -- she was very concerned about her

Page 72

1 husband, her kids, and also, you know, she
2 was very remorseful about what she did.
3 And then she wanted to be able to help to
4 resolve this case as soon as possible.
5    Q   So she said she wanted to help
6 resolve it.
7    Did she say how she wanted to
8 help resolve it?
9    A   Well, she didn't say how she
10 wanted to help us to get all this, and I
11 don't know -- from the interview, I think
12 she mentioned that if -- when she
13 approached James, you know, about the
14 money that they needed to make up the cash
15 withdrawals from the customers' accounts,
16 that he was very -- like, he was denying
17 it.
18    And then she thought maybe she
19 was the one who should have been covering
20 the funds.  But at that time, it wasn't
21 something that she could handle.
22   Q   What did she say she did with the
23 money that she kept?
24   A   The only thing that I recall was

ORAL DEPOSITION OF ALICIA LEE, 9/29/2017

Page 73

1 that she was depositing to her husband's
2 business account.
3    Q   Okay. So she said she wanted to
4 help, and the way she was going to help
5 was to tell you everything she did and
6 help you guys figure out who the affected
7 customers were?
8    A   Yes.
9       MR. YI: Objection to form.
10       THE WITNESS: Yes.
11 BY MR. DZARA:
12    Q   So that was her help? Her help
13 was not paying the money back that she
14 stole?
15    A   We did mention if -- I mean, if
16 she was willing -- I mean, if she had a
17 way of paying it back. But she mentioned
18 that she could pay back, but she couldn't
19 pay back the whole amount because she
20 wasn't -- she didn't have that kind of
21 money. I think that's what I recall. It
22 could be, you know, a little bit different
23 wording, but that's what she said.
24    Q   Did she -- do you know if she

Page 74

1 paid any of the money back to the bank?
2    A   I have no knowledge of that.
3    Q   Okay. Was part of your job in
4 interviewing Karen at this meeting to
5 figure out if there was anybody else
6 involved?
7    A   Yes.
8    Q   That was part of your job?
9    A   Anybody -- anybody else involved,
10 that was why I asked those questions if
11 there were anyone else involved, yes, with
12 Karen.
13       MR. YI: David, sorry to
14 interrupt. Just can we take a break when
15 you get a chance?
16       MR. DZARA: Yes. Let me get a
17 couple more questions, and then we'll take
18 a break. I promise.
19       MR. YI: Yeah.
20 BY MR. DZARA:
21    Q   Okay. When you left that
22 meeting, did you believe that James had
23 been involved with the embezzlement?
24    A   With the information that I

Page 75

1 received, yes.
2    Q   Okay. So you were just taking
3 Karen for her word when she said James was
4 involved, and you believed that he was
5 involved?
6    A   Well, with the information that
7 we had, I had no reason why not.
8    Q   Well, somebody who just admitted
9 she committed a crime and confessed and
10 is now saying that somebody else was
11 involved -- and you had not met with James,
12 had you?
13    A   No. I had not met with James, no.
14    Q   So you believed someone who
15 committed a crime, you were believing her
16 word?
17       MR. YI: Objection to form.
18       THE WITNESS: Well, like I said,
19 she confessed to the crime, and she was
20 very credible at the time, and she was
21 mentioning that the reason why she did it
22 was because someone had asked her to do
23 it, and that's James Ryu.
24 BY MR. DZARA:

Page 76

1    Q   So you found her credible at the
2 time, yes?
3    A   Yes.
4    Q   Did you ever, at a later point in
5 time, rethink her credibility?
6    A   No.
7    Q   Nothing you learned later on made
8 you think she wasn't lying?
9    A   Oh, I -- I don't know what you're
10 talking about, what I learned. What I
11 learned was everything on the report, on
12 the interview, and whatever investigation
13 results that I had received. That's all I
14 have.
15    Q   Okay. Did you learn anything
16 about that interview of Karen to rethink
17 that she was telling the truth about
18 James's involvement?
19    A   No. I did not get the question.
20 I'm sorry. Could you repeat that?
21       MR. DZARA: Isabel, can you read
22 it back?
23       (Record read.)
24       THE WITNESS: No.

**Page 77**

BY MR. DZARA:
Q   Did you learn anything after the interview to rethink that she was telling the truth about James being involved?
        MR. YI:  Objection.  Asked and answered.
        THE WITNESS:  I did get some information in regards to Mr. Ryu's involvement in the New Millennium Bank setup or purchase or something.  So maybe I had my suspicions.  Maybe he were using the funds for that.  I don't know.  That's what I thought.
BY MR. DZARA:
Q   Okay.  Have you told me everything that you remember about the January 23rd interview of Karen?
A   I believe that I've told you everything that I remember at this time from that meeting.
Q   Okay.
A   Yes.
Q   How did the meeting end?
A   The meeting ended because I was

**Page 78**

getting a lot of calls that I needed to attend, and I told her -- well, I think it was kind of late, and I told her, "Whatever you remember, if you remember anything else that you need to tell us," you know, "you can contact me on my cell phone" or she could contact Irene Lee.  And that's how we ended the meeting.
Q   Did you give her your contact information?
A   Yeah, I did give her my personal cell phone number.  I didn't bring my business card, so I think I jot it down on somebody's or a napkin or something.  I gave it to her.
Q   Was the meeting in the morning or in the afternoon?
        Do you remember?
A   Well, I think I met -- it was in the afternoon, past noon.
Q   Okay.
A   Yes.
Q   And last question is about this.  Did you take notes during the meeting?

**Page 79**

A   No, I didn't take any notes.  I just recorded it.
Q   Okay.  And was the meeting in Korean or in English?
A   It was in Korean.
        MR. DZARA:  Okay.  Michael, let's take a break.
        MR. YI:  All right.  Thanks.
        (Record read.)
BY MR. DZARA:
Q   Tell me what you did after the January 23rd meeting.  What did you do?
        That day after you left the meeting, did you call anybody?
A   I have no recollection of calling anybody.  If I did -- I might have, but I don't know exactly who I called.  It was three and a half years ago.
        MR. DZARA:  Okay.  Can you -- Michael, can you show me the next exhibit?
        It's not marked.  It is an e-mail from Ms. Lee to Ms. Jeon dated January 23rd, 2014.  There's nothing on the e-mail, just forwarding a memo or attaching a memo.

**Page 80**

        MR. YI:  Got it.
        MR. DZARA:  Okay.  This one needs to be marked.  I think we're up to Ryu 37.
        (Exhibit 37 was marked for identification and is attached hereto.)
BY MR. DZARA:
Q   Okay.  Ms. Lee, take a look at that, and let me know once you've reviewed it.
A   Yeah, I recognize this.  It's a memo that I sent to Ms. Elaine Jeon after the meeting.
Q   Okay.  Let me step back for one second.
        You said you didn't take any notes.  Do you know if Irene or Bo Young took any notes of the interview of Karen on the 23rd?
A   I don't have no recollection of that, whether they took a note or not.
Q   Okay.  Let's look at this exhibit Ryu 37.  It's Bates-numbered WB 1579, and it's an e-mail from you to Ms. Jeon on January 23rd, 2014, at 9:28 p.m.

Pages 24 (81 - 84)
ORAL DEPOSITION OF ALICIA LEE, 9/29/2017

Page 81

1    So this -- the second page is the
2 attachment.  It's a memorandum from you to
3 Elaine Yeon.  The subject is "BA
4 unauthorized CD withdrawal incident."
5    Is this the memo you drafted the
6 same day after your interview with
7 Ms. Jeon?
8    A   Yes, it appears to be.
9    Q   Do you remember drafting this?
10   A   Yes.
11   Q   When you drafted it, did you
12 draft it from your memory, or did you
13 listen to the recording?
14   A   I drafted it from my memory.
15   Q   And do you remember -- this may
16 be a tough question to remember, but did
17 you draft this right away, right after the
18 meeting, or was there some time in-between?
19   A   There was some time in-between.
20   Q   Okay.  So did you get a chance to
21 read the memo?
22   A   Yes.
23   Q   Okay.  My question is:  Is
24 everything in here, you believe, true or

Page 82

1 at least what Karen told you during the
2 meeting?
3    A   Yes.
4    Q   Okay.  So the second paragraph,
5 it states, the first sentence, "The
6 details of the interview will be submitted
7 separately."
8    Do you see that?
9    A   Yes.
10   Q   Did you ever draft any other
11 summary of your January 23rd meeting with
12 Karen other than this memo?
13   A   No, I didn't.
14   Q   So what did you mean by "the
15 details of the interview will be submitted
16 separately"?  Do you remember what you
17 meant by that?
18   A   Well, I was going to submit
19 details of the interview and the
20 investigations separately, but I learned
21 after that that our internal auditor, Orest
22 Hamersky, was coming, so I left the
23 reporting to be his.
24   Q   So you left it up to him to

Page 83

1 draft --
2    A   Yes, uh-huh.
3    Q   -- the report?
4    A   Yes.
5    Q   Okay.  Did you ever talk to Orest
6 about your interview of Karen on January
7 23rd?
8    A   I may have discussed it with him,
9 yes.
10   Q   But to your recollection, you
11 never drafted any other document about
12 that January 23rd meeting other than this
13 memorandum; is that right?
14   A   I have no recollection of
15 drafting any other thing.
16   Q   Okay.  Sticking with the second
17 paragraph, as you just said, it starts
18 with "The details of the interview will be
19 submitted separately, but to summarize
20 today's interview, Karen Chon confessed
21 that the unauthorized transactions were
22 her wrongdoing and that the funds were
23 delivered to James Ryu."
24   Do you see that?

Page 84

1    A   Yes.
2    Q   So does that mean that she said
3 she transferred all the funds that she
4 took -- she stole to James?
5    A   I mean, are you asking me whether
6 I meant to say that?
7    Q   Yeah.  Because there's no mention
8 here, I don't think, of how much she kept
9 or how much she gave to him. I know you
10 testified before you remember her kind of
11 giving a guess about how much she took and
12 said the rest she gave to James?
13   A   Right.
14   Q   That's not in this memo.
15   A   Yeah, that's not in this memo.
16   Q   Okay.
17   A   But my intention was to
18 communicate that there were funds -- cash
19 delivered to James Ryu.  I didn't mean to
20 say that all -- that she delivered
21 everything to James Ryu.
22   Q   Okay.  It doesn't say "all," but
23 it seems -- in my reading, it seems to
24 imply that it was all.  But you didn't

Page 85

1  intend to say all was given to James; is
2  that correct?
3      A    That's correct.
4      Q    Midway down, there's a sentence.
5  "As per Karen's statement, Mr. Ryu
6  mentioned to her that he would compensate
7  her for her help."
8          Do you see that?
9      A    Yes.
10      Q    What do you remember about what
11  Karen told you about that sentence?
12      A    Well, she mentioned that because
13  of -- in the beginning, she did start
14  giving him some cash whenever he needed
15  it.  And when they were meeting for lunch
16  and all of that, you know, he would always
17  say that, "I know" -- that, "I will
18  compensate you for your help" in
19  facilitating that cash to him.
20      Q    Did she say what she thought
21  "compensate" meant?
22      A    No.
23      Q    Did Karen say anything that -- I
24  know we might have covered this a little

Page 86

1  bit before, but I just want to clarify
2  your testimony.
3          Did Karen say that James helped
4  her to come up with the scheme of how to
5  do the embezzling, or was it all Karen's
6  idea?
7          MR. YI:  Objection to form.
8  Asked and answered.
9          Go ahead.
10          THE WITNESS:  I don't have an
11  exact recollection, but I believe at first
12  she had said that James had helped.  And
13  then after that, she did mention that was
14  her coming up for the -- in how to make all
15  these transactions go and get the funds
16  out of the customers' account.
17  BY MR. DZARA:
18      Q    So you said "James helped."  What
19  do you mean by "James helped"?
20      A    Well, James giving her idea on
21  how to do it.  But later on, we learned
22  that it wasn't James who give her
23  instruction on how to do it.  She's the
24  one who come up with her own method.

Page 87

1      Q    Okay.  Let's discuss what you
2  just said.
3          You recollect Karen saying at the
4  meeting that James helped or gave her ideas
5  on how to do the embezzlement; right?
6      A    Yes.
7      Q    And later you learned that no, it
8  was all Karen's doing.  She came up with
9  everything; right?
10          MR. YI:  Objection to form.
11          THE WITNESS:  I had the idea that
12  James had given the idea to come up with
13  the process, and that wasn't in Karen's
14  exact words, that she -- she didn't say
15  that.  I heard that from Bo Young saying
16  that, "Well, you're saying that yesterday
17  when you were talking that James give you
18  the instruction on how to do it."  And
19  then she retracted saying that no, that it
20  was her who came up with the idea.
21  BY MR. DZARA:
22      Q    Okay.  So during the January 23rd
23  meeting, Bo Young said to Karen, "Oh, you
24  told us yesterday at the January 22nd

Page 88

1  meeting that James," you know, "helped you
2  come up with the idea."  And then Karen
3  responded, "No.  No.  No.  It was all my
4  idea"?
5      A    Yeah, uh-huh.
6          MR. YI:  Objection to form.
7          THE WITNESS:  Yes, that was my
8  understanding.
9  BY MR. DZARA:
10      Q    Okay.  All right.  So at the time
11  you sent this memo, what was the status of
12  the investigation?
13      A    The status was still ongoing.  It
14  wasn't closed.  I mean, we had to find out
15  the exact amount, the clients that were
16  involved who needed to replenish their
17  cash too, and if we had to correct any of
18  the 1099 reporting, all that.  That was
19  something I needed to find out.
20      Q    Okay.  So what did you -- what
21  did you do?  After you sent this memo, what
22  did you do?
23      A    Well, after I sent this memo, I
24  went to bed.

Page 89

1  Q   Okay.  All right.  That's
2  understandable.
3  A   The next day, I went to the
4  branch, and I went with -- to help Irene
5  and Bo Young and research, try to find out
6  any documentation that could support any
7  of the saying, that could assist in the
8  investigation and help compile the reports
9  for the internal auditor.
10  Q   Do you remember -- after you sent
11  this memo to Elaine Yeon, did you have
12  anymore communications with her around
13  that time about what you were doing, what
14  your thoughts were, what your
15  investigation results were?
16  A   I might have, but I have no
17  recollection and what type of
18  communication I had with her.
19  Q   Okay.  Who was -- was there
20  someone in charge of the investigation --
21  somebody overseeing the whole thing at
22  Wilshire Bank?
23  A   Oh, I believe on the operational
24  side was my boss Elaine Yeon and also Mr.

Page 90

1  Dom Tallerico, our chief internal auditor,
2  would be in charge because the internal
3  auditor was also involved in the
4  investigation.
5  Q   Okay.  Was Lisa Pai involved in
6  the investigation?
7  A   I believe Lisa Pai was informed
8  about the incident, and she might have
9  been involved in the investigation, but I
10  have no knowledge of how much or was she
11  in charge.  I don't know.
12  Q   Who -- what was your -- now we're
13  post January 23rd.  Now we're onto January
14  24.
15  A   Yes.
16  Q   How long were you in New Jersey?
17  How long did you stay there?
18  A   I don't have the exact
19  recollection, but I stayed -- was it 24?  I
20  think I stayed over -- past the weekend,
21  so I don't know the exact day.  Maybe I
22  could have stayed for over five, six,
23  seven days.  I don't know.
24  Q   Okay.  And what were you doing

Page 91

1  during that time?  What specifically were
2  you doing?  What was your role?  What were
3  you asked to do?
4  A   Well, my role was to support
5  all these transactions, find out the
6  supporting documentation, trying to
7  find evidence that Karen had withdrawn
8  those funds, and that -- make the
9  determination -- the exact amount of the
10  loss that the bank would have incurred
11  because of this incident.
12  Q   So your primary role was to
13  figure out how much money she actually
14  took and who were the affected customers?
15  A   Yes.
16  Q   Did you have any other -- did you
17  have any other responsibilities in this
18  investigation other than that?
19  A   No.
20  Q   Okay.  Were you asked to help
21  out -- to find out -- research if James was
22  involved or any connection to James?
23  A   No.
24  Q   Were you asked to look at any of

Page 92

1  James's bank accounts to see if he had any
2  deposits that the bank considered
3  suspicious?
4  A   Well, I took the job onto my
5  myself.  I had no instruction from them.
6  But because his name was mentioned in the
7  investigation, I did look into his account
8  and to see if there were any suspicious
9  transactions that could help in evidence
10  or that could support the statement made
11  by Karen.
12  Q   And what did you -- what were the
13  results of that part of your investigation?
14  A   During the investigation, I kind
15  of find it odd that he would receive some
16  payment from a law office -- some checks
17  that were from a law office that was
18  deposited into his account.  And it was
19  not only him, but also Mr. Hur that got
20  payment from a law office in regards to --
21  I think it was involved with New
22  Millennium Bank.
23  Q   Okay.  Other than those
24  transactions and those deposits that you

Page 93

1  just mentioned, did you -- did you think
2  those transactions had something to do
3  with the embezzlement?
4      A   What -- I couldn't make that
5  determination myself.  I was just
6  investigating and trying to find out any
7  evidence that could show that -- support
8  Karen's statement.
9      Q   Okay.  Did you find -- what
10 else -- did you find any other
11 transactions in James's account that you
12 found suspicious in addition to the ones
13 that you just mentioned?
14     A   No.  I haven't find anything at
15 that time, no.
16     Q   Okay.  Did you find -- did you --
17 did you find any evidence looking at
18 James's transactions in his bank accounts
19 that supported Karen's statement that he
20 was involved in the embezzlement?
21         MR. YI:  Objection to form.
22         THE WITNESS:  I did not find --
23 I couldn't determine whether those were
24 something that could support.  But I did

Page 94

1  find it kind of unusual that he would get
2  that kind of payment from the law office.
3  BY MR. DZARA:
4      Q   Okay.  You found it odd, but was
5  that -- did you or anybody else later
6  decide that those payments were evidence
7  that he was involved in the embezzlement?
8      A   No.
9      Q   "No," you never concluded that?
10     A   I never concluded that.
11     Q   Okay.  So you took it upon
12 yourself to look at James's transaction
13 history to look for any evidence to
14 support Karen's statement that he was
15 involved?
16     A   Right.
17     Q   Did you find any evidence to
18 support her statement?
19         MR. YI:  Objection to form.
20 Asked and answered.
21         THE WITNESS:  No.
22 BY MR. DZARA:
23     Q   No?  Okay.
24         Did you later find out what those

Page 95

1  transactions were, those deposits from the
2  law office and New Millennium Bank?
3          MR. YI:  Objection to form.
4          THE WITNESS:  I believe someone
5  mentioned that that was because he was
6  trying to join -- I mean, as the
7  management team to the New Millennium
8  Bank, and he was getting investors and
9  being paid for it.  That's all I have.
10 BY MR. DZARA:
11     Q   Okay.  Who did you learn that
12 from?
13     A   I have no recollection who told
14 me that.  I'm sorry.
15     Q   You don't have to apologize.
16 Don't apologize for not remembering.
17 That's perfectly appropriate.
18         Do you remember when you learned
19 that information about James's role with
20 New Millennium Bank?
21         MR. YI:  Objection to form.
22         THE WITNESS:  I don't have
23 recollection.  It was probably after I
24 left New Jersey.

Page 96

1  BY MR. DZARA:
2      Q   Okay.  Was it close in time to
3  this investigation, like -- we're in
4  January of 2014.  Was it close in time to
5  January 2014, couple of weeks after, a
6  month?  Do you remember?
7      A   I don't remember.
8      Q   Okay.  Okay.  So to your
9  knowledge, you didn't discover any
10 evidence from James's bank accounts
11 corroborating Karen's statement that he
12 was involved; right?
13     A   Correct.
14         MR. YI:  Objection to form.
15         THE WITNESS:  Yes.
16 BY MR. DZARA:
17     Q   Thank you.  Who were you reporting
18 to during this investigation while you were
19 in New Jersey?
20         I'm talking about the time you're
21 still in New Jersey.  Who were you reporting
22 to about what you were doing?
23     A   I was reporting to Elaine Jeon.
24     Q   Okay.  And you said Orest came to

Page 97

1   New Jersey too?
2      A   Yes, he came to New Jersey, I
3   think, the week after.
4      Q   Were you still there?
5      A   Yes.
6      Q   Okay.  And what was Orest -- what
7   was his role in the investigation?
8      A   His role in the investigation --
9   as an internal auditor, he would have to
10  determine the loss and provide a report.
11     Q   So when he showed up, were you,
12  like, assisting him?  Were you assisting
13  his investigation?
14     A   Yes.  I would provide all the
15  printouts of the reports and screenshots
16  so that Mr. Hamersky could compile his
17  report.
18     Q   And were you, like -- were you
19  giving your opinion about things, like, "I
20  think it's this account. I think it's that
21  account"?
22         Were you actually helping him
23  make the decisions to figure out what
24  happened or were you just giving him the

Page 98

1   source documents?
2      A   Well, I was giving him mainly the
3   source documents, and he wanted to figure
4   out what type of transaction it was.  I
5   would explain that type of transaction to
6   him.
7      Q   Okay.  Who else was assisting you
8   and Orest in New Jersey in the
9   investigation?
10     A   Mainly Irene Lee.
11     Q   And was Bo Young helping too?
12     A   Bo Young was at the corporate
13  office, and I was investigating at the
14  East Fort Lee branch where the actual
15  transactions and embezzlement had occurred.
16     Q   Okay.  So when you were in New
17  Jersey, you were spending all of your time
18  at the Fort Lee branch?
19     A   Yes.
20     Q   And Orest, when he showed up, he
21  was at that branch with you?
22     A   Yes.
23     Q   And Irene Lee was there too?
24     A   Yes.

Page 99

1      Q   And Bo Young was back at the
2   Palisades Park headquarters?
3      A   Yes.
4      Q   Was there anybody else assisting
5   you guys while you were there during the
6   investigation -- any other Wilshire Bank
7   employees in New Jersey, not in L.A.?
8      A   In New Jersey, I did ask the IT
9   personnel if they had any of the old
10  computers that were used by either
11  Irene -- I'm sorry -- by Karen or James
12  Ryu, if there were anything left that we
13  could take for the forensic.
14     Q   Was that -- was his name Eunmoo
15  Choi?
16     A   Yes.  I believe that's his name,
17  yeah.
18     Q   Do you know if they were able to
19  locate the computers or whatever happened
20  to the computers?
21     A   I was told that some of the
22  computers that Mr. James Ryu was working
23  on were taken by him.  There were two
24  computers that were taken by him, and one

Page 100

1   was a personal desktop computer and one
2   was a laptop.
3      Q   And who did you learn that from?
4      A   I believe I learned it from Mr.
5   Choi, Eunmoo Choi.  He said that those
6   computers are no longer there.
7      Q   And do you remember anything else
8   about the computers?
9      A   No, I don't.
10     Q   Were you talking to anybody else?
11  Other than Ms. Jeon, were you talking to
12  anybody else at Wilshire Bank headquarters
13  about the investigation and what you were
14  doing?
15     A   What do you mean, "anybody else
16  during" --
17     Q   Well, you were reporting to Ms.
18  Jeon?
19     A   Yes.
20     Q   Were you talking to Dom Tallerico
21  or anybody -- Lisa Pai or anybody else at
22  Wilshire Bank about the investigation, or
23  were you just giving Ms. Jeon updates?
24     A   I was giving mostly the updates

## Page 101

1  to Ms. Jeon, and I might have talked to
2  Lisa Pai for some questions, but I don't
3  remember what I discussed with her.
4      Q    Did Lisa Pai ever interview you
5  about the investigation -- your role in
6  the investigation?
7      A    No, she didn't.
8      Q    If you were -- you remember being
9  interviewed by the FBI; correct?
10     A    Yes.
11     Q    Were you ever interviewed by
12 anyone else about your role in the
13 investigation and what you discovered
14 during the investigation?
15     A    No, I wasn't.
16     Q    Did you draft any documents or
17 any reports about your role and what you
18 were doing and what you were finding in
19 the investigation?
20     A    No.
21     Q    Why -- you said you were in the
22 Fort Lee branch.  You were there about a
23 week, approximately?
24     A    I don't remember the exact dates,

## Page 102

1  but it was several days, yes.
2      Q    Okay.  What -- why did you --
3  what was the decision for you to go back
4  to L.A.?
5          Why did you fly back?
6      A    Because -- my decision to fly
7  back to L.A. -- first of all, I had to go
8  back to my baby, and second was that I
9  gathered sufficient evidence to back up the
10 statement from Karen saying that certain
11 funds that were withdrawn from the
12 accounts were matching.  Yes, uh-huh.
13     Q    So when you went back to L.A.,
14 was your role done in the investigation?
15 Did you do anything else?
16     A    In the investigation, yeah, my
17 role was pretty much done on the
18 investigation.  I had to go and do some
19 corrections to the 1099 reportings because
20 they were a mess.  So that was my next
21 step -- my next job.
22     Q    Okay.  But other than correcting
23 stuff on the back end like the restitution
24 stuff and 1099s, did you do anything else

## Page 103

1  in terms of investigating what happened,
2  who was involved, anything else on those
3  subjects?
4      A    No.
5      Q    Do you know if the investigation
6  was still ongoing after you were done?  Do
7  you know if there was still an
8  investigation being done by Wilshire Bank
9  about the embezzlement?
10     A    I don't have an exact
11 recollection whether they were continuing
12 to.  But again, I'm imagining that there
13 were still some investigate done.
14     Q    Okay.  But you don't know for
15 sure?
16     A    No.
17     Q    And your -- the results of your
18 part of the investigation -- so you said
19 you gave everything you found to Orest to
20 support which accounts were affected,
21 which customers, and how much money it was
22 that was taken; is that right?
23     A    Yes.  Correct.
24     Q    And do you remember the

## Page 104

1  overall -- the amount that was -- Wilshire
2  Bank concluded was taken by Karen?
3      A    I don't have that recollection,
4  the exact amount, but it was approximately
5  over a million.
6      Q    Okay.  Did you see any
7  investigation or audit reports
8  summarizing -- you said you -- let me
9  strike that.
10         You said you knew Orest was
11 working on a report; right?
12     A    Yes.
13     Q    Did you ever see the report Orest
14 drafted?
15     A    I did not see any report that
16 Orest drafted. There was a communication
17 from Orest -- from Orest asking --
18 actually, mentioning that the original
19 amount that we came out to be may not be
20 correct, that he wanted to take a look
21 again.
22     Q    Okay.  But you don't remember
23 seeing like an actual report written --
24     A    No.

## Page 105

1  Q    -- documenting everything that
2  was done?
3  A    No.
4        MR. DZARA:  Okay.  Can you -- the
5  next exhibit, hopefully, at the top of the
6  stack, Michael, should be an e-mail from
7  Bo Young to Elaine Yeon dated January
8  24th, 2014, at 4:11 p.m.  It's not marked.
9  I think we're going to mark this one
10 number Ryu 38, please.
11       (Exhibit 38 was marked for
12 identification and is attached hereto.)
13 BY MR. DZARA:
14  Q    Okay.  Ms. Lee, would you take a
15 look at this document and let me know when
16 you're ready.  Really, just look at the
17 first page.  I think all the other pages
18 are repeats of what we looked at before.
19  A    Yes.
20  Q    So this is e-mail from Bo Young
21 to Elaine Yeon and copying you and Irene
22 Lee dated January 24, 2014. It's
23 Bates-numbered WB 1580.
24       So I know we covered some of the

## Page 106

1  investigation.  These are just some e-mails
2  during the time, I believe, you were in
3  Fort Lee doing the investigation.  And this
4  is an e-mail from Bo Young to Elaine about
5  possibly wanting to see the accounts that
6  were affected.
7        Does that look right to you?
8  A    Yes.
9  Q    Okay.  And Bo Young was directly
10 communicating with Ms. Jeon.
11       Do you know, like, while you were
12 doing your investigation you were there -- I
13 mean, you were talking to Ms. Jeon, but do
14 you know, were Bo Young and Irene talking to
15 Ms. Jeon too?
16  A    Well, according to the e-mail,
17 yes, they were talking.
18  Q    Okay.  But you don't remember
19 that?
20  A    No, I don't remember that.
21       MR. DZARA:  Okay.  All right.
22 You can set that aside.
23       Next one, hopefully, Michael, is an
24 e-mail from Orest to Alicia dated January

## Page 107

1  24th.  It's not marked.  All right.  This one
2  needs to be marked as Ryu 39, please.
3        (Exhibit 39 was marked for
4  identification and is attached hereto.)
5        THE WITNESS:  Yes.  Ready.
6  BY MR. DZARA:
7   Q    Okay.  Have you seen this
8  document before?
9   A    Yes.  It appears to be an e-mail
10 that Orest sent to me on Friday letting me
11 know that he'll be flying in Sunday.
12  Q    Okay.  Do you remember receiving
13 this e-mail?
14  A    Yes.
15  Q    Okay.  Did you -- do you remember
16 reviewing it as part of your deposition
17 preparation?
18  A    Yes.
19  Q    Okay.  So in his second
20 paragraph, third sentence, he says, "My
21 role is to help you in any way you
22 determine necessary and to determine the
23 amount of the loss."
24       Do you see that?

## Page 108

1   A    Yes, uh-huh.
2   Q    So he -- I know -- I'm not trying
3  to pick a fight or anything with you, but
4  it looks like he's saying here he's
5  supporting you, but you remember that
6  you're really supporting him?
7   A    Right.
8   Q    So once he got there, did it turn
9  out that he took the lead, and you were
10 supporting him?
11  A    Yes.
12  Q    Okay.  And it mentions Anthony
13 Chung in the second-to-last paragraph.
14       Do you know who Anthony Chung is?
15  A    Yes.  He is our, at that time, IT
16 manager.
17  Q    Okay.  And then the last
18 sentence, he mentions Dom.
19       Is that Dom Tallerico?
20  A    Yes.  That's his boss.  That's
21 the chief internal auditor.
22  Q    Okay.  Other than -- who was in
23 the audit department?
24       Was there a lot of employees

Page 109

1 other than Dom and Orest?
2    A    Yes.
3    Q    And Orest was just one of the
4 audit managers? Were there more than one
5 audit managers?
6    A    Yes.
7    Q    Okay. Had you worked with Orest
8 before in any way prior to this
9 investigation?
10    A    Worked with him?
11    Q    Yeah.
12    A    I was audited by Orest.
13    Q    You were audited by Orest?
14    A    Yes. Because Orest does auditing
15 of all the departments in our bank, so.
16       MR. DZARA:  Got it. Okay. You
17 can set that aside.
18       Next one, Michael, should be,
19 hopefully, an e-mail from Alicia to Elaine
20 Yeon dated Saturday, January 25th, and the
21 subject is New Millennium Bank.
22       MR. YI:  David, just one thing
23 for the record. I notice that in one of
24 the exhibits that we recently looked at,

Page 110

1 names of City account holders were --
2 appeared.  There were two names that
3 appeared.  I'm going to have to go back
4 and figure out whether we need to redact
5 those or not.  And if we determine it may
6 be necessary to redact those names, I'll
7 confer with you.
8       MR. DZARA:  Okay.
9       (Exhibit 40 was marked for
10 identification and is attached hereto.)
11 BY MR. DZARA:
12    Q    All right.  The document that,
13 Ms. Lee, you have in front of you, we're
14 going to mark it Ryu 40.
15    A    Yes.
16    Q    And it's Bates-numbered WB 1584.
17 It is an e-mail from you to Ms. Jeon dated
18 January 25th, 2014.  I believe you already
19 testified about this before, but these are
20 the New Millennium Bank-related checks that
21 you discovered that were paid or deposited
22 into James's account; is that right?
23    A    Correct.
24    Q    Okay.  And these are the ones you

Page 111

1 testified before you thought were, you
2 know, kind of suspicious?
3    A    Yes.
4    Q    Okay.  And you later found out,
5 though, that James was doing work with New
6 Millennium Bank, and these were payment
7 for his work?
8       MR. YI:  Objection to form.
9       THE WITNESS:  Yes.
10 BY MR. DZARA:
11    Q    And one question.  How did you
12 discover these checks?  Did you have
13 access to his Wilshire Bank account?
14    A    Yes.
15    Q    All right.  So you were able to
16 see all deposits, transactions?  You were
17 able to see everything in the account?
18    A    Yes.
19       MR. DZARA:  Next one, Michael,
20 should be, hopefully, an e-mail from
21 Alicia to Irene Lee dated Saturday,
22 January 25th.  It's going to be Ryu 41.
23       (Exhibit 41 was marked for
24 identification and is attached hereto.)

Page 112

1 BY MR. DZARA:
2    Q    All right.  There's an attachment
3 with this e-mail, but I didn't provide it
4 because it was a long Excel spreadsheet.
5 This is Bates-numbered WB 1585. It's an
6 e-mail from you to Irene Lee dated January
7 25th, and I believe the transaction -- the
8 Excel spreadsheet, if I remember
9 correctly, was a copy of all certificate
10 of deposit transactions since 2009 from
11 BankAsiana.
12       My question is not if you agree
13 with me or not. My question is what was --
14 I know you kind of testified before about
15 Irene's role.
16       What was Irene's role during the
17 time -- at the Fort Lee branch during the
18 investigation?
19    A    Because she -- we acquired
20 BankAsiana, and BankAsiana was under a
21 totally different system than Wilshire
22 Bank at the time.  And she was a better
23 expert in accessing that system to
24 retrieve all the data.  I needed her help.

## Page 113

1   Q   Okay.  Do you remember that Irene
2  Lee left shortly after this embezzlement
3  came to light?
4   A   Yes, I do remember.
5   Q   Okay.  What do you remember about
6  the circumstances of her departure from
7  Wilshire Bank?
8   A   Well, she had found a new
9  position at a different bank and that she
10 was leaving us.  That's all I remember.
11   Q   Okay.  You don't remember
12 anything about the stress of this
13 investigation was a reason for her
14 leaving?
15   A   She didn't mention that to us.
16   MR. DZARA:  Okay.  All right.
17 Next one is an e-mail not marked -- an
18 e-mail from Ms. Lee to Alex Ko and some
19 other people dated January 27, 2014, one
20 page.
21   MR. YI:  Okay.  Just give me one
22 second, please.  Okay.  David, can you
23 repeat what you just said?
24   MR. DZARA:  Sure.  It's an e-mail

## Page 114

1  to Alex Ko and a couple other people dated
2  January 27, 2014.  It's one page, two
3  e-mails.
4   MR. YI:  WB 1594?
5   MR. DZARA:  1586.
6   MR. YI:  Oh.
7   MR. DZARA:  You know, Michael,
8  let's go off the record.  I've got, like,
9  seven in a row here.  Let's go off the
10 record and get them in order, and that
11 will save some time, I think.
12   MR. YI:  Yeah.
13   MR. DZARA:  Okay.  Off the
14 record, Isabel.
15   (RECESS)
16   (Exhibit 42 was marked for
17 identification and is attached hereto.)
18 BY MR. DZARA:
19   Q   The next exhibit we're on,
20 hopefully, in front of you, Ms. Lee, is
21 Ryu 42.  Take a look at it, and let me
22 know when you're done.
23   A   Yes, I'm ready.
24   Q   Okay.  Have you ever seen this

## Page 115

1  document before?
2   A   Yes.
3   Q   Okay.  Did you review it as part
4  of your deposition preparation?
5   A   Yes.
6   Q   Okay.  Do you remember it other
7  than reviewing it during your deposition
8  preparation?  Do you remember it
9  independently of that?
10   A   Yes.
11   Q   Okay.  So this is Bates-numbered
12 WB 1586.  The first e-mail or the e-mail
13 at the bottom of the page, bottom half, is
14 from Alex Ko who was CFO of Wilshire Bank
15 at that time, on January 27, 2014, to
16 Elaine Yeon, you, and Bo Young.
17   And he's asking for the balance of
18 James and Karen's account -- the current
19 balance of their accounts with Wilshire
20 Bank; is that right?
21   A   Correct.
22   Q   And the next e-mail on top of the
23 page, you respond, and you provide the
24 balance of the two accounts; correct?

## Page 116

1   A   Yes.
2   Q   Okay.  Do you know why Mr. Ko was
3  asking for this information at that time?
4   A   No, I don't.
5   Q   Do you know why you responded
6  instead of Elaine or Bo Young?
7   A   Elaine asked me to.
8   Q   Oh, so you remember that?
9   A   Yes.
10   Q   But you don't know why he was
11 asking for this information, then?
12   A   No.
13   Q   Okay.  Next one should be the e-
14 mail from Alex Ko on January 30, 2014.
15 We're going to mark it Ryu 43.
16 And take a look at it, and let me know when
17 you're done, Ms. Lee.  You don't need to
18 read the whole article or the attachment.
19   A   Okay.
20   (Exhibit 43 was marked for
21 identification and is attached hereto.)
22 BY MR. DZARA:
23   Q   All right.  So this is a document
24 we marked Ryu 43.  It's Bates-numbered WB

## Page 117

1576. It's an e-mail from Alex Ko to a bunch of people, including you, on January 30, 2014. And he's attaching an article -- a news article from SNL that concerns New Millennium Bank.

And he says -- Mr. Ko says in this e-mail, "I highlighted in yellow related to Hur, Mr. Ryu, and Injin Choi involvements in New Millennium Bank."

Do you see that?

A   Yes.

Q   Okay. Do you remember receiving this e-mail?

A   Yes.

Q   Okay. Do you know who Injin Choi is?

A   No, I don't know.

Q   Okay. So you testified before that you later learned -- well, you testified when we saw the checks -- the check from a law firm regarding New Millennium Bank to James, you've already testified about that, and you looked at them; right?

## Page 118

A   Yes.

Q   And then you testified that you later found out that James was doing work for New Millennium, and that it was your understanding that those checks were payment for his work; right?

A   Correct.

Q   Okay. So this article here is talking about New Millennium Bank and James's involvement.

Is this when you learned about James's work with New Millennium Bank?

A   I don't recall whether this was the time I learned or it was before. I have no recollection, the timing.

Q   Okay. Let me just say, the e-mail that you had sending the checks, the copies of the New Millennium Bank checks, was Ryu 40, and it's -- that e-mail was dated January 25th. Now, this is just five days later.

So you don't remember if this, you know, five days later is when you were told or learned that James was actually

## Page 119

doing work for New Millennium Bank?

A   No, I don't remember because of --

Q   Okay. You can complete your answer. I didn't mean to cut you off.

A   The checks did mention -- on the check, it did say New Millennium Banking in acronyms, NMB or something. So maybe that's when I learned that he was doing something. But this could have been, you know -- could have completed my -- what is it? Suspicious or knowledge that Mr. Ryu was working for the New Millennium Bank.

Q   Okay. Do you know why Alex Ko was sharing this article with all these people in this e-mail?

A   Oh, I don't know why. But the people in the e-mail seems to be our CEO, our board of directors, and persons that were involved in the investigation.

Q   Okay. So higher-up, executive-level people --

A   Yes.

Q   -- employees of Wilshire Bank?

## Page 120

A   Yes.

Q   Do you know, was Wilshire Bank concerned about New Millennium Bank for any reason at this time?

A   I wouldn't know what to say. I have no knowledge of that to...

Q   Okay. So you think you -- I know this may -- I don't want you to guess, but do you think you received that e-mail because you were involved in the investigation at that time?

A   Yes, I believe that's the reason why I got this e-mail.

Q   Okay. You can put this aside.

Move on to the next one. It should be an e-mail from you to Orest dated January 31st. We're going to mark it Ryu 44. Take a look at it, and let me know when you're done.

A   Yes, I'm ready.

(Exhibit 44 was marked for identification and is attached hereto.)

BY MR. DZARA:

Q   Okay. So this e-mail is marked

## Page 121

Ryu 44. It's Bates-numbered WB 1589, and
it is an e-mail from you to Orest dated
January 31st, 2014. And you are -- looks
like you're forwarding the previous e-mail
we looked at that had the law firm checks
to Mr. Ryu that he had deposited in his
Wilshire Bank account associated with his
work for New Millennium Bank; is that
right?

A   Yes.

Q   Do you know why you forwarded
these to Orest?

A   After receiving the e-mail, I
might have been asked by Orest that if I
had anything to support -- that could help
of involvement of Mr. Ryu with New
Millennium Bank. And I remembered the
e-mail that I sent to Elaine, so I
forwarded that to him.

Q   Was Orest investigating as to
whether or not James was involved in
the -- in Karen's embezzlement? Was that
part of his investigation?

A   I don't have that information, no.

## Page 122

Q   One thing is, looking at the
checks, flip the page to the attachment.
Do you see the two checks right in the
middle of the first page, on the memo
line, it says "Salary expenses NMB"?

A   Yes.

Q   Do you see that? Okay.
So you testified before when you
saw these checks, you found these
suspicious?

A   Yes.

Q   And I guess -- did you testify
before that you didn't know what NMB meant?

A   No. I knew that NMB meant New
Millennium Bank.

Q   Okay. So despite -- so these
checks, you're saying -- in the memo line
"Salary expenses for New Millennium Bank,"
and they were being paid, you know, by a
trust account from a law firm.

A   Right.

Q   And you said you thought these
were suspicious at the time?

A   Yes. Yes.

## Page 123

Q   Okay. I guess I never asked you
the question before why you thought they
were suspicious based on what they said.
What about them was suspicious?

A   At that time, I wasn't aware that
trust accounts were able to pay for the
payrolls. I didn't know whether it was a
legitimate transaction from the trust
account. That's what I thought.

Q   Okay. So the suspicion was you
didn't know a trust account could make
payments like this?

A   Yes, payroll payments.

Q   Okay. But we're looking at this
check, it says "salary." I guess you may
not believe that the check was for salary.
Obviously, I'm not asking you that.

A   Yes.

Q   But your testimony is what gave
you suspicion about these checks was the
fact that it was being paid out of a trust
account; right?

A   Yes.

Q   Okay. Thank you.

## Page 124

Next one should be an e-mail from
you to Elaine Yeon February 11, 2014, at
4:09 p.m. We're going to mark it Ryu 45.
Okay. Take a look at it, and let me know
when you're ready.

A   Yes, ready.
(Exhibit 45 was marked for
identification and is attached hereto.)

BY MR. DZARA:

Q   Okay. So this is a document
marked Ryu 45, and it is Bates-numbered WB
1590. It's an e-mail from you to Elaine
Jeon dated February 11, 2014. And it
attaches -- you say in your e-mail "Please
review memo and let me know if you need
anything else to be addressed." And the
attached memo is a -- appears to be a
restitution memo for Alex Ko to review and
sign; right?

A   Correct.

Q   Okay. Looking at the memo --
well, first of all, tell me, why did you
draft this memo?

A   Why did I draft this memo? Well,

Page 125

I needed to restitute the funds that were
embezzled by Karen Chon to the accounts
because the accounts were coming due to
maturity, and we needed to restitute that.
    Q    Okay.  Why was approval needed by
Alex Ko?
    A    Because he was our CFO, and we
needed to debit it from our suspense G/L.
    Q    Okay.  Does he always have to
approve these types of restitution
payments, or is it when they're above a
certain amount?
    A    It's -- above certain amount, yes.
    Q    Okay.  Do you remember what the
certain amount was?  What the threshold was?
    A    I don't remember.
    Q    Did Elaine Jeon tell you to draft
this, or did you do this on your own
because you knew you had to do it?
    A    No.  Elaine Yeon told me to draft
it.
    Q    Okay.  So if you read this memo,
it says that Karen embezzled the money;
right?

Page 126

    A    Yes.
    Q    Okay.  There's no mention of
James --
    A    Yes.
    Q    -- in this memo; correct?
    A    Yes.
    Q    There's no mention of him?
    A    No mention of James in this memo.
    Q    Okay.  At this time, did you
think -- so this time of February 11,
2014 -- did you believe that James was
involved in the embezzlement?
    A    Yes.
    Q    Okay.  So if you believed he was
involved in the embezzlement, why isn't he
mentioned in this?
    A    I didn't have any evidence at the
time, just Karen's statement.
    Q    Okay.  So is that the reason why
you didn't mention it, because you didn't
have any other evidence?
    A    Yes.
    Q    Did anybody say "Hey," you know,
"you should put James in here."  Wasn't he

Page 127

involved?"  Did anybody tell you that?
    A    No, no one did.
    Q    Okay.  Did you discuss -- we're
around this time in this investigation,
late January or early February 2014.  Did
you discuss with anybody at Wilshire Bank
your belief at that time that you thought
James was involved?
    A    I might have, but I don't recall
discussing it with anyone at this time.
    Q    Okay.  Did anybody ask your
opinion, around this time, if you thought
James was involved?
    A    No, no one asked for my opinion.
    Q    And do you remember offering your
opinion to anybody at Wilshire Bank, at
this time, about your opinion that he was
involved?
    A    I don't recall offering my
opinion at any time during this time, no.
    Q    Okay.  So at this time, you only
link between -- that you knew of, the only
link between James and Karen and the
embezzlement was Karen's statement; right?

Page 128

    A    Correct.
    Q    Okay.  You can set that aside.
        So the next one should be Alicia
to Elaine February 11, 2014, 5:21 p.m.
We're going to mark this one Ryu 46,
please.  Take a look at it,
Ms. Lee, and let me know when you're ready.
    A    Ready.
        (Exhibit 46 was marked for
identification and is attached hereto.)
BY MR. DZARA:
    Q    Okay.  This document has been
marked Ryu 46, and it's Bates-numbered
WB1591.  And it is an e-mail from you to
Elaine Jeon dated February 11, 2014, at
5:21 p.m., and it looks like -- it looks
like you're sending a revised -- although
it doesn't say in the cover e-mail, I
think you send a revised restitution memo.
        And if you look at the last
exhibit compared to this one, I think the
only change you made is in the second
paragraph, you added in from March 2010 to
October 2014.  You just added in the time

## Page 129

period of when you think Karen was
embezzling?

A   Yes.

Q   Okay.  And it looks like the last
sentence -- or the third paragraph, you
added in the last five words saying "by
debiting the suspense liability G/L."

A   Yes.

Q   Do you remember why you made
these revisions?  Did anybody ask you to do
it?

A   Yes.

Q   Who did?

A   It was Elaine.

Q   Okay.  I think there's one more
addition.  The last sentence in the second
paragraph, I believe, was added in too.

And again, this memo makes no
mention of James in it; right?

A   No.

Q   Okay.  All right.

Next one should be -- we're going
to mark it Ryu 47.

MR. YI:  You're doing okay?

## Page 130

THE WITNESS:  Yeah.

(Exhibit 47 was marked for
identification and is attached hereto.)

BY MR. DZARA:

Q   Okay.  Ready?

A   Yes.

Q   All right.  So Ryu 47, Bates-
numbered WB 1594, it's an e-mail from you
to Alex Ko dated February 11, 2014, 9:39
p.m. and it looks like you're sending him a
copy of the restitution memo that we just
looked at in the prior exhibit.

Is that your understanding?

A   Yes.

Q   Okay.  You have "Dear JMN."  What
does JMN stand for?

A   It's an honorific name for our
executive vice president of the company,
and it's Jeon Mu Nim.

Q   Okay.  Is it, like, a Korean
acronym?

A   Yes.

Q   Okay.  I saw a lot of e-mails
that had that.  I just wanted to know.  I

## Page 131

think somebody else explained that in a
prior deposition, that that's what -- kind
of what these acronyms are.

Okay.  And again, this memo
doesn't mention James as well?

A   No.

Q   Do you know if anybody at
Wilshire Bank, at this time -- I know you
said -- you testified that you thought
James was involved based solely on Karen's
statement and no other evidence.  But did
anybody else at Wilshire Bank think James
was involved, do you know?

MR. YI:  Objection to form.

Go ahead.

THE WITNESS:  I wouldn't have an
answer for that.

(Exhibit 48 was marked for
identification and is attached hereto.)

BY MR. DZARA:

Q   Okay.  Okay.  Next one we're
going to mark Ryu 48.  It is an e-mail
from you to Alex Ko.

A   Yes.

## Page 132

Q   All right.  So it's an e-mail to
Alex Ko.  It's Bates-numbered WB 1592, and
it's dated Wednesday, February 12, 2014,
and it looks like it's a restitution memo
again, and there was a typo that was fixed.

A   Right.

Q   October 2014 was changed to
October 2013; is that right?

A   Correct.

Q   Okay.  Who is -- you're copying
Alvin Ha.

Who is Alvin Ha?

A   Alvin Ha is the controller of
Wilshire Bank.

Q   Okay.  Now, I never saw a signed
copy.  Well, going back to this memo,
attached to this e-mail -- again, James is
not mentioned in this e-mail; correct?

A   He's not.

Q   Okay.  I never saw a signed copy,
but I assume that Mr. Ko ended up signing
this?

A   Yes.

Q   And it's your understanding that

Pages 37 (133 - 136)
ORAL DEPOSITION OF ALICIA LEE, 9/29/2017

---

**Page 133**

all of the affected customers had their
money put back in their accounts?
   A   Yes.
   Q   Okay.  You can set that aside.
      Let's go to the next one.  It'll
be Ryu 49 -- or we're going to mark it Ryu
49.
   A   Ready.
      (Exhibit 49 was marked for
identification and is attached hereto.)
BY MR. DZARA:
   Q   Okay.  This document that's been
marked as Ryu 49 is Bates-numbered WB
1595.  It is an e-mail from Orest to you
dated February 18, 2014.  And in the e-mail
Orest is -- well, tell me if you remember
seeing this e-mail.
   A   Yes, I remember seeing this
e-mail.
   Q   Okay.  So tell me -- rather than
me tell you what it is, you tell me, what
is this?  Tell me what you're talking
about in this e-mail with Orest.
   A   Well, Orest was trying to

---

**Page 134**

communicate to me saying that maybe the
amount we first came out to be the total
amount of loss was incorrect, so he was
trying to discuss this with me.
   Q   Okay.  So the second paragraph,
it's one sentence.  It says "I took the
following out of your spreadsheet. "
      Do you see that?
   A   Yes.
   Q   Do you remember drafting -- what
spreadsheet is he referring to?
   A   It's the memo that I attached
to -- not the memo.  There was a
spreadsheet that I presented to one of the
memos.  I don't know if it was addressed
to Elaine Jeon or not, which was later
forwarded to Orest. But I think that's
what he's talking about.
   Q   So the spreadsheet you drafted
was what you thought the total loss was,
or the transactions that added up to the
total loss?
   A   Yes.
   Q   Okay.  So he reviewed it.  He's

---

**Page 135**

saying he took out these five?
   A   Right.
   Q   Okay.  So now, this is February
18th.  You're, you know, I guess you've
been back -- you're back in L.A. at this
time.
      So you testified before that
you thought your work was pretty much done
on this investigation when you got back to
L.A.  This appears to be a few weeks after
that.  Is there still some, you know,
little things going on?
      Does that help you remember
that?
   A   Yes.  He wanted --
   Q   So you remember?
   A   Yes.  He wanted to confirm
certain transactions with me.  Although my
investigation was done when I came back
Los Angeles, there were some
communications between Orest and myself in
regards to getting the all these
transactions clarified.
   Q   Okay.  Was he asking you to sign

---

**Page 136**

off on this or agree on this, or was he
providing this to you like an FYI?
   A   It's like an FY -- I can't even
say it.
      MR. DZARA:  Okay.  You can set
this aside.
      MR. YI:  If you need to take a
break, just let us know if you're getting
tired.
BY MR. DZARA:
   Q   Yeah, if you want to take a
break, let me know. Let's go on.  There's
only two -- do you need a break?
   A   No.  Go ahead.  I'm okay.  Let's
just get through this.
   Q   Okay.  So there's just two more
e-mails in this line of questioning.  Can
you get the next one?  E-mail from Lisa
Pai to Elaine Jeon and you and a couple
others dated February 26.  We're going to
mark it Ryu 50.
   A   Yes.
      (Exhibit 50 was marked for
identification and is attached hereto.)

Page 137

BY MR. DZARA:
Q   Okay.  Take a look at it, and let me know when you're ready.
A   Ready.
Q   Okay.  So this document has been marked Ryu 50, and it's Bates-numbered WB 11930.
Do you recognize this document?
A   Yes, I do.
Q   Okay.  Do you remember seeing it?
A   Yes, I remember seeing it.
Q   At your deposition prep or when it was sent?
A   When it was sent.
Q   Okay.  So this is an e-mail from Lisa to you and Elaine Jeon and Alex Ko and Thomas, last name is Ng.  Who is Thomas?
A   Thomas Ng is our chief risk officer.
Q   Okay.  And it's copying Orest and Dom Tallerico and somebody from Crowe Horwath.
Do you know Crowe Horwath?
A   I believe this is one of our

Page 138

accounting auditors that we contract.
Q   That Wilshire Bank contracted with?
A   Yes.
Q   Okay.  So Lisa is telling everybody, as an FYI, that this is an updated loss summary and the detailed backup spreadsheet from Orest that's confirming a total loss amount of $1,575,754.10; right?
A   Correct.
Q   All right.  So this is a determination of what the amount was that Karen embezzled; correct?
A   Yes.
Q   And she says in her second paragraph "While this amount could still change in the future after more detailed interviews with Karen or litigation discovery or depositions, the bank has concluded our internal investigation of the loss amount with this report."
Do you see that?
A   Yes.

Page 139

Q   Okay.  She's mentioning interviews with Karen.
Other than your interview with Karen, do you know of any other interviews with Karen by anyone at Wilshire Bank?
A   No, I don't.
Q   It's mentioning litigation discovery or depositions.
Were you aware of any litigation at that time concerning the embezzlement?
A   No, I wasn't.
Q   Okay.  You're aware of this case right now -- right? -- the case between Wilshire Bank and -- well, really, Bank of Hope and Karen Chon and Mr. Ryu?
A   Yes, I am.
Q   Okay.  What do you know about this case?
A   This case?  I think this is a civil case, and you are attorney for Mr. James Ryu.  That's all I know.
Q   Okay.  Do you know any of the claims that Wilshire Bank has against Mr.

Page 140

Ryu?
A   No, I don't.
Q   Do you know any of the claims that Mr. Ryu has against Bank of Hope?
A   No, I don't.
Q   Okay.  Do you know when this litigation was started?
A   No, I don't.
Q   Were you involved, at all, in deciding to initiate this litigation against Mr. Ryu or Ms. Chon?
A   No, I wasn't.
MR. YI:  David, with respect to this exhibit document, Ryu 50, I'm going to have go back and determine whether this should have been produced or should have been put on the privileged log.  If we decide it should have been on our log, it should not have been produced, then I will confer with you.
MR. DZARA:  Okay.
BY MR. DZARA:
Q   Ms. Lee, do you -- are you aware of the criminal charges brought against

Page 141

1  Karen?
2     A   Yes.  I was informed of that.
3     Q   Okay.  What do you know about
4  them?
5     A   What do you mean, that the
6  criminal --
7     Q   What do you know about Karen's
8  criminal situation regarding this
9  embezzlement?
10        MR. YI:  Objection to form.
11        THE WITNESS:  Well, I know that
12  Karen had her criminal case done first,
13  and I think it's over.  And that's pretty
14  much what I know about that.
15  BY MR. DZARA:
16     Q   Do you know anything about -- do
17  you know where Karen is right now?
18     A   I believe she is in federal
19  prison.
20     Q   Okay.  So are you aware that she
21  pled guilty to certain criminal charges?
22     A   I would assume since she's in
23  federal prison.
24     Q   Okay.  Do you know if any

Page 142

1  criminal charges were brought against
2  James for the embezzlement?
3     A   I don't know.  I'm not aware.
4     Q   You're not aware one way or the
5  other?
6     A   No.
7     Q   So here -- and looking back at
8  Ryu 50, the last sentence says "The bank
9  has concluded our internal investigation
10  of the loss amount with this report";
11  right?
12     A   Yes.
13     Q   Was the bank investigating
14  anything else?
15        Are you aware if the bank was
16  investigating anything else at this time
17  time other than the lawsuit regarding the
18  embezzlement?
19     A   I wasn't aware of it.
20     Q   Okay.  You weren't involved in
21  any other aspects of the investigation?
22     A   No, I wasn't.
23     Q   Okay.  You can set that aside.
24        All right.  The next one is an

Page 143

1  e-mail from Bo Young to Alicia, April 29,
2  2014 -- dated.  We're going to mark this
3  one Ryu 51.
4        Can you just take a look at the
5  first e-mail?  You don't need to look at
6  all the attachments.
7     A   Yes.
8        (Exhibit 51 was marked for
9  identification and is attached hereto.)
10  BY MR. DZARA:
11     Q   And let me know when you're ready.
12     A   Okay.  Ready.
13     Q   Okay.  So this document is marked
14  Ryu 51.  It is Bates-numbered WB 1596, and
15  it's a one-page e-mail string between you
16  and Bo Young.  So the initial e-mail in
17  this string is from you to Bo Young on
18  April 28, 2014.
19        And what do you -- just tell me
20  what you're asking from Bo Young in this
21  e-mail.
22     A   I'm asking her to provide the
23  offset items for all these transactions
24  that occurred in 2011.  Since I had no

Page 144

1  access to the old BankAsiana computer
2  system, she was providing me that.
3     Q   Does that have anything to do
4  with the embezzlement investigation, or is
5  this concerning something else?
6     A   Oh, I believe this was because
7  they wanted to confirm the discrepancy on
8  the amount that I first provided, the
9  1.68-something and the final amount.
10     Q   Okay.  So did this concern the
11  embezzlement investigation?
12     A   Yes.
13     Q   So looking back at the last e-
14  mail from Lisa, it's dated February 26th,
15  and it's saying that, you know, the bank
16  concluded its internal investigation with
17  the loss amount with this report.  Now,
18  this is over two months later, and it
19  looks like you're still asking questions
20  or trying to get more confirmation from Bo
21  Young about certain of the transactions
22  that were at issue in the embezzlement.
23        So was the investigation still
24  ongoing about the loss amount into April

## Page 145

1  2014?
2      A   No.  I think that was because
3  there was an amount set aside on the
4  liability G/L, and our controller wanted
5  me to clear some of the discrepancy
6  because the amount did not match.  That's
7  why, that's all I know.
8      Q   That's all you recall?
9      A   Yeah.
10     Q   So do you remember who -- did
11 somebody ask you to send this e-mail to Bo
12 Young?
13     A   Oh, no.  I did it on my own to
14 find out -- to determine the exact amount
15 of the loss because at that time, I wasn't
16 quite sure whether I should confirm on the
17 1.5 or 1.6.  That's why.
18     Q   And do you believe you received
19 the information you asked for from Bo Young?
20     A   Well, yes.  This is the
21 information that I asked from Bo Young.
22     Q   Do you remember resolving the
23 discrepancy on the G/L liability side that
24 you just testified about?

## Page 146

1      A   I remember telling that my belief
2  was that 1.6 was correct to Orest.
3      Q   That your number was correct, not
4  the number that Orest came up with?
5      A   Uh-huh.
6      MR. YI:  David, if I may?  I'm
7  just going to remind the witness to try to
8  say "yes" and not "uh-huh" because that
9  may not reflect accurately.
10     THE WITNESS:  Right.
11     MR. YI:  Sorry.  Go ahead.
12     MR. DZARA:  Thank you, Michael.
13 BY MR. DZARA:
14     Q   So there was the discrepancy.
15     Do you remember if that
16 discrepancy was ever resolved?
17     A   I have no knowledge of that.
18     Q   Okay.  So you say you remember
19 being interviewed by the FBI; correct?
20     A   Yes.
21     Q   And do you know where the
22 interview took place?
23     A   I believe it took place in the
24 lobby of the hotel that I was at in New

## Page 147

1  Jersey.
2      Q   In Fort Lee?
3      A   Yes.
4      Q   And it was -- was it during the
5  time while you were at Fort Lee during
6  that week of your investigation?
7      A   Yes, I believe so.
8      Q   And how did you -- how did the
9  interview get set up?
10     Do you remember?
11     A   I don't remember exactly.  I
12 believe either Lisa Pai had contacted the
13 FBI to meet with me -- but they were there
14 when we met at the hotel lobby.
15     Q   Was anybody with you?
16     A   Orest Hamersky was with me.
17     Q   Okay.  Did they interview Orest
18 while they interviewed you, or was it just
19 you?
20     A   They interviewed both of us.
21     Q   They interviewed both of you?
22     A   Yes.
23     Q   Do you remember what you told the
24 FBI?

## Page 148

1      A   Yes.
2      Q   Okay.  What did you tell them?
3  What do you remember telling them?
4      A   Oh, okay.  That was a question?
5      Q   That was the question.
6      A   Well, I remember telling about
7  the Karen interview, and that we were
8  suspecting a large amount of cash being
9  embezzled by Karen, and also that there may
10 have been someone else involved in the case.
11     Q   Okay.  Did you tell them who the
12 other one was that you thought was
13 involved in the case?
14     A   I don't recall if I mentioned
15 their name or not.
16     MR. DZARA:  Okay.  Michael, can
17 you pull out -- the FBI memo should be
18 there of her interview.  Should be marked
19 Ryu 21 already.
20     MR. YI:  It's actually, I
21 believe -- yeah, Ryu 21.  Correct.
22 BY MR. DZARA:
23     Q   Okay.  Ms. Lee, I want you to
24 read this, not skim it, read it.  Well,

## Page 149

1 first of all, have you ever seen this
2 before?
3     A   No, I haven't.
4     Q   Okay.  Oh, this -- okay.  Correct
5 me.  You testified before that the FBI
6 memo was read to you by Mr. Yi but you
7 never saw it?
8         MR. YI:  Objection to form.
9         THE WITNESS:  I never saw it.
10 BY MR. DZARA:
11    Q   You never saw it, but you were --
12 correct -- was that your testimony before,
13 that you said Mr. Yi read this to you?
14    A   Could you repeat the question
15 again?
16    Q   I think I asked you before about
17 this FBI memo a couple of hours ago.  And
18 you said you didn't see it, but it was
19 read to you by Mr. Yi; is that correct?
20    A   What I meant was I did not read
21 it myself.  It was read to me.
22    Q   Yeah, I understand.
23        MR. YI:  Just to clarify.  I'll
24 represent that I did read it to her.

## Page 150

1         MR. DZARA:  All right.  Why did
2 you let me ask the question three times,
3 Michael?  Come on.  All right.
4         Well, now I want you to read
5 this.  And my question is going -- I want
6 you to spend five minutes or however long
7 it takes you to read this.
8         And my question is going to be if
9 anything in here is, you believe, not
10 correct.  But take your time.  And I'm
11 going to ask you some specific questions
12 about it too.
13        Okay.  And while you do that, I'm
14 going to run out and use the bathroom, so
15 we can go off the record while she's
16 reading that, okay?
17        MR. YI:  Okay.
18        (RECESS)
19 BY MR. DZARA:
20    Q   First paragraph -- well, for the
21 record, this is an exhibit, Ryu 21.  It
22 was marked at -- during Lisa Pai's
23 deposition.  The Bates numbers on here are
24 from, I believe, Karen Chon's attorney.

## Page 151

1 And it's a weird Bates numbering, so I'm
2 not going to put it on the record.  But it
3 was produced by Karen Chon.
4         The -- it looks like at the
5 bottom of the page, it says "Investigation
6 on January 28, 2014."
7         Does that sound like the date
8 you were interviewed?
9     A   Yes, it sounds like about the
10 date that I was interviewed.
11    Q   Okay.  And it says it took
12 place -- the first paragraph says it took
13 place at the Doubletree Hotel in Fort Lee;
14 correct?
15    A   Correct.
16    Q   It states that Orest was with you
17 during the interview?
18    A   Yes.
19    Q   Okay.  So the next paragraph --
20 anything incorrect in the next paragraph
21 that starts with "BankAsiana is a Fort
22 Lee, New Jersey-based bank"?
23    A   No.
24    Q   Okay.  Do you remember telling the

## Page 152

1 investigators that?
2     A   Yes.
3     Q   Next paragraph, anything
4 incorrect in that paragraph?
5     A   No.
6     Q   Okay.  Do you remember telling
7 them this?
8     A   Yes.
9     Q   Next paragraph, it says -- well,
10 anything incorrect with that paragraph?
11    A   Well, at that time, we were
12 Wilshire Bank, not Wilshire State Bank.  So
13 if you're talking about this -- and also
14 the first paragraph has the banks wrong.
15    Q   Okay.  I'm more concerned about,
16 like, you know, you seeing something and
17 saying "I definitely did not say that."
18 That's what I'm concerned about.
19        We can go paragraph by
20 paragraph, but for you to say -- I want you
21 to testify if you remember saying that and
22 if there's anything incorrect, like, you
23 know, big corrections, not, you know,
24 Wilshire Bank -- Wilshire's name is wrong.

## Page 153

1  MR. YI: Objection to the form.
2 BY MR. DZARA:
3  Q  So we're looking at that
4 paragraph. Is there anything incorrect
5 with that paragraph?
6  A  No.
7  Q  All right. It does say here --
8 it qualifies you and Orest as internal
9 auditors.        Did you consider
10 yourself an internal auditor?
11  A  That would be a wrong statement.
12 I'm not an auditor.
13  Q  Okay. Next paragraph that begins
14 with "Lee and Hamersky found," anything
15 incorrect in that paragraph?
16  A  I believe not, no.
17  Q  Okay. And you remember saying
18 this to them?
19  A  Yes.
20  Q  All right. On top of page 2, the
21 first paragraph, anything incorrect in
22 that paragraph?
23  A  No.
24  Q  No?

## Page 154

1  A  No.
2  Q  And you remember saying this?
3  MR. YI: Objection to form.
4  THE WITNESS: I don't know
5 whether I said it or if Mr. Hamersky said
6 it, but I believe we did discuss this in
7 the interview.
8 BY MR. DZARA:
9  Q  Okay. So either you or Orest
10 said this in the first paragraph?
11  A  Yes.
12  MR. YI: Objection to form.
13 BY MR. DZARA:
14  Q  Okay. I'm going to represent
15 that there is no interview memo for Orest.
16 The only interview memo of this meeting
17 was this. So nowhere in here does it say
18 that Orest said any of this. But I'm just
19 telling you I'm representing that, and Mr.
20 Yi can object or disagree. That's fine.
21  But this -- if you read these
22 paragraphs and you say it was a
23 combination of you and Orest, let me know,
24 okay?

## Page 155

1  A  All right.
2  Q  Okay. So you're saying this
3 first paragraph of page 2 is correct, and
4 you think it's both you and Orest that
5 said this to the FBI agents; right?
6  A  Yes.
7  MR. YI: Objection to form.
8  THE WITNESS: Yes.
9 BY MR. DZARA:
10  Q  Okay. Next paragraph.
11  MR. YI: David, can we just
12 clarify one thing for the record? Are you
13 asking whether these were her actual
14 statements or a summary of the discussions
15 at the interview?
16  MR. DZARA: Well, I mean, the
17 basis of my -- the questions are is this
18 what she said? Is this what she remembers
19 saying? Is it correct? Correct as in not
20 is it true factually, but, is it what she
21 remembers saying? Like, is this a correct
22 summary of what she told the FBI agents.
23 That's what I want to know.
24  MR. YI: Okay.

## Page 156

1  MR. DZARA: I'm not asking if
2 these are true, you know, because
3 personally, I believe some of these
4 statements are not true. We're not
5 discussing that. We're not debating that.
6 This isn't the place for it. But I want to
7 know if this an accurate summary of what
8 she told the FBI agents if she remembers.
9 She may not remember. That's fine. But
10 that's what I want to know, if that makes
11 sense.
12  MR. YI: Yeah, it's just a
13 clarification as to a summary of the
14 information she provided during the
15 interview versus what she literally told
16 them.
17  MR. DZARA: Yeah, no. It's a
18 summary of what -- if this an accurate --
19 in her memory of what she recalls, is this
20 an accurate summary of what she told the
21 FBI agents.
22  MR. YI: Okay. Thanks.
23 BY MR. DZARA:
24  Q  Do you understand that, Ms. Lee?

## Page 157

1  A   Yes.  I believe what I said was
2  October 1st, not November 4, 2013, which
3  was Karen Chon's last day of employment at
4  the bank.
5  Q   So October 1st, 2013?
6  A   Yes.
7  Q   Okay.  And that's the first
8  paragraph of page 2; right?
9  A   Correct.
10  Q   Okay.  All right.  How about the
11  second paragraph on page 2, is this an
12  accurate summary of what you told the FBI
13  agents?
14  A   Yes.
15  Q   Okay.  Who did you -- now, this
16  second paragraph concerns the meeting
17  with -- the meeting between Karen, Bo
18  Young, and Irene on January 22nd.
19      Who told you this information?
20  A   That was -- that was after I had
21  the meeting with Karen on the 23rd, I
22  believe.
23  Q   Okay.
24  A   And that's when I found out that

## Page 158

1  they had a meeting -- a telephone
2  conversation prior to her meeting with me.
3  Q   Okay.  So after your meeting with
4  Karen on the 23rd -- January 23rd, 2014,
5  you learned that Karen had a meeting with
6  Bo Young and Irene on January 22nd;
7  correct?
8  A   Yes.
9  Q   And at that time, you learned
10  about what they discussed at that meeting?
11  A   Yes.
12  Q   And this second paragraph on page
13  2 is a summary of what you learned from
14  the January 22 meeting from Bo Young and
15  Irene?
16  A   Yes.
17  Q   Okay.  So this information that
18  you're providing to the FBI, or at least
19  this is a summary of what the FBI claims
20  that you told them during this
21  interview -- this information you received
22  from Bo Young and Irene?
23  A   Yes.
24  Q   Okay.  So the last couple of

## Page 159

1  sentences here in this second paragraph,
2  it talks about -- you know that Chon-Kim
3  is referring to Karen; correct?
4  A   Yes, I do.
5  Q   Okay.  So the last sentence says
6  "Chon-Kim said that she was giving the
7  cash to another person, but that she was
8  afraid of that person and did not want to
9  reveal his name."
10      Do you see that?
11  A   Yes.  That's the information that
12  I got from Bo Young and Irene.
13  Q   Okay.  So it's your understanding
14  that Karen never mentioned James at that
15  January 22nd meeting with Bo Young and
16  Irene; right?
17  A   Right.
18  Q   Okay.
19      MR. YI:  David, can we just
20  clarify one thing?  I thought Ms. Lee had
21  testified earlier that Karen Chon was laid
22  off in October 2013 --
23      MR. DZARA:  Yes.
24      MR. YI:  -- not November?

## Page 160

1      MR. DZARA:  She just clarified
2  that five minutes ago.
3      THE WITNESS:  Yeah, there's two
4  dates.  Here and here.
5      MR. YI:  So she was indicating
6  October -- okay.
7  BY MR. DZARA:
8  Q   Okay.  Next paragraph, the third
9  paragraph of page 2, can you take a look
10  at that, and let me know if that's an
11  accurate summary of what you told the FBI.
12  A   There is a typo.  It should be
13  2013, not 2012 on January 23rd.
14  Q   Got you.
15  A   Yes.
16  Q   Okay.  How about the next
17  paragraph, which would be the fourth
18  paragraph on page 2?
19  A   Yes.
20  Q   Okay.  How about the next
21  paragraph which is the fifth paragraph on
22  page 2 that carries over to page 3?
23  A   Correct.  Yes.
24  Q   Okay.  You'll see that in this

Page 161

1  paragraph, the last sentence on page 2
2  that carries over to page 3, it says
3  "Chon-Kim had already begun her scheme,
4  and she shared her method with Ryu."
5      Do you see that?
6      A   Yes.
7      Q   So you testified before that you
8  weren't sure if Karen had come up with the
9  scheme and started it or that James had,
10  you know, helped her come up with the
11  scheme.
12      So does this help you remember
13  which one it was?
14      MR. YI:  Objection to form.
15      THE WITNESS:  Oh, yes, uh-huh.
16  BY MR. DZARA:
17      Q   Okay.  So what is your testimony
18  now?  Did Karen come up with the scheme
19  first?
20      A   Yes.  She did mention in the
21  interview, and I think I did say that --
22  that she -- during the interview, that she
23  was the one who came up with the method
24  and shared with James.

Page 162

1      Q   So it wasn't James's idea?
2      A   No.
3      Q   And the last sentence, it says
4  "Chon-Kim said that Ryu never communicated
5  with her via e-mail, but would call her
6  and use codes to tell her when to meet
7  with cash."
8      Do you see that?
9      A   Yes.
10      Q   Do you know what the codes -- do
11  you know anything about these codes?
12      A   Well, from my understanding, it
13  was that if he needed $20,000, he would
14  say, "20" --
15      Q   Okay.
16      A   -- "Monday," things like that.
17  "I need $20,000 by Monday," he said, "20,
18  Monday."  That was my -- my understanding
19  at the interview.
20      Q   Got it.  Okay.  How about the
21  next paragraph which is the first full
22  paragraph on page 3?  Is that an accurate
23  summary of what you told the FBI?
24      A   You mean that "Chon-Kim stated"?

Page 163

1  Is that the paragraph that you're
2  referring to?
3      Q   Yes.  Yes.
4      A   Yes, that's true.
5      Q   Okay.  It's what you told -- it's
6  an accurate summary of what you told the
7  FBI?
8      A   Yes.
9      Q   Okay.  How about the next
10  paragraph which is the second paragraph on
11  page 3?
12      A   Yes.  This is also a summary of
13  what I said to the FBI agent.
14      Q   Okay.  Next paragraph, just
15  paragraph 3 on page 3.
16      A   Yes.  Yes.
17      Q   This is an accurate summary of
18  what you told the FBI?
19      A   Yes.
20      Q   Okay.  This paragraph discusses
21  Karen's prior employment with Liberty Bank
22  between 2005 and 2006; correct?
23      A   Yes.
24      Q   And then Liberty Bank was

Page 164

1  acquired by Wilshire Bank; right?
2      A   Yes.
3      Q   And in here, it talks about
4  you -- it appears you told the FBI about a
5  prior incident where Karen -- $10,000 was
6  missing from Karen's cash drawer while she
7  was at Liberty Bank; right?
8      A   Yes.
9      Q   And the sentence before says
10  "Karen's personnel records show that she
11  was consistently short on her cash drawer"?
12      A   Yes.
13      Q   And that Liberty Bank fired her
14  even though it had no evidence of fraud;
15  right?
16      A   Yes.
17      Q   And who did you learn this
18  information from?
19      A   I had learned from one of my
20  staff who was at the site of the merger
21  with Liberty Bank.
22      Q   Who from your staff?
23      A   Might have been from Julie Ki.
24      Q   So Julie Ki learned this and told

## Page 165

you about it?

A   Yes.  Julie Ki was at the site in New York when Wilshire Bank was merging with Liberty Bank, and she was also aware of the operational transaction and all that, and that was information given to me.  I might have learned it from her.

Q   So Julie Ki was working for Wilshire Bank in New York at the time Wilshire Bank acquired Liberty Bank?

A   Well, Julie Ki was working for Wilshire Bank in California, and she went to New York to complete the operation side of the merge.

Q   When they purchased Liberty Bank?

A   Yes.

Q   And you think when the merger happened between Liberty Bank and Wilshire Bank, there was -- it was disclosed, this information that you state in this paragraph about Karen?

A   I believe that was their understanding.

Q   It was Liberty Bank disclosed it

## Page 166

to Wilshire Bank during that merger process?

A   I don't -- I wouldn't be able to tell you whether it was disclosed at that time or not.  But it was information given.

Q   Given by Liberty Bank to Wilshire Bank?

A   No.  No.  It was information given to me by Julie.

Q   Okay.  And -- okay.  I got that part.

A   Yes.

Q   My question is:  How did Julie find out about this?

A   Oh, I wouldn't know -- I don't know how she found out.  But I believe because she was involved in the merger, she had information.  And since she was in operations before Karen leaving the bank, I believe she would have information in regards to what was, you know -- how this incident happened or whether she was fired or not.

Q   Why do you think Julie told you this information?

## Page 167

A   Julie told me because of the name that she recognized when I told her that I was investigating a case and that she needed to be in charge and that person involved Karen Chon.

Q   Okay.  So you told her you were investigating something involving Karen Chon?

A   Yes.

Q   And she said -- she responded at some point soon thereafter with this information about Karen's incident at Liberty Bank?

MR. YI:  Objection to form.

THE WITNESS:  She might have, yes.

BY MR. DZARA:

Q   And you don't know if she just remembered this information or if she went and looked for documents, do you?

A   It was something that she remembered.

Q   So she remembered that Karen's personnel records at Liberty Bank showed

## Page 168

that she was consistently short on her cash drawer?

A   Yes.

Q   Julie, specifically, remembered that?

A   Julie told me there was an incident at Liberty Bank when Wilshire Bank merged -- acquired Liberty Bank, and that they were investigating that case.  Although they didn't have hard evidence, that they were suspecting Karen to be the embezzler or -- so she remembers everything.

Q   That's the second half of this paragraph.  I'm talking about the sentence that says "Karen's personnel records show that she was consistently short on her cash drawer."

Your testimony is that -- hold on.  Your testimony is that you think Julie remembered that and told you that?

A   Yes.

Q   That's quite a memory.

A   Well, you would remember things that are like shortage and anyone, you

Page 169

1 know, that are not properly behaving in a
2 banking environment.
3    Q   Okay.  Did you -- when you
4 learned this information from Julie, did
5 you tell anybody about Karen's past
6 employment with Liberty Bank and these
7 incidents?
8    A   With the exception of the federal
9 agent, I might not have said this
10 information to anyone else.
11    Q   So you told the FBI about this,
12 but you don't remember telling anybody at
13 Wilshire Bank?
14    A   At Wilshire Bank, no.  Well, I
15 would have told Orest since he was at the
16 interview with me.
17    Q   Okay.  So Orest was there.  He
18 learned it?
19    A   Yes.
20    Q   But you don't remember telling
21 anybody else about it -- at Wilshire Bank
22 about it?
23    A   No.
24    Q   You didn't tell Elaine Jeon?

Page 170

1    A   Oh, I might have told Elaine
2 Jeon, yes.
3    Q   Okay.  Anybody else?  Maybe Lisa
4 Pai?
5    A   I don't recall telling it to Lisa
6 Pai.  I might have.
7    Q   Do you think -- I mean --
8        MR. YI:  Can you we just instruct
9 the witness not to speculate?
10        THE WITNESS:  Sorry.
11 BY MR. DZARA:
12    Q   No.  Okay.  You said you may have
13 told Elaine Jeon, and you don't remember
14 telling anybody else; right?
15    A   Right.
16    Q   Do you know if Orest told anybody
17 else at Wilshire Bank?
18    A   I don't know.
19    Q   Okay.  So Karen admitted to
20 embezzling money from BankAsiana; right?
21    A   No.  She -- yes, BankAsiana.  I'm
22 sorry about that.
23    Q   Okay.  Then as you're in this
24 investigation, you find out from Julie

Page 171

1 that Karen has a past incident of possibly
2 taking money from Liberty Bank; right?
3    A   Yes.
4    Q   Okay.  Did you -- I mean, what
5 did you think about learning that she may
6 have a past incident at Liberty Bank of
7 taking money?  Did it cause you to think
8 anything -- think about her differently
9 during your investigation?
10        MR. YI:  Objection to form.
11        THE WITNESS:  I don't understand,
12 think differently about her?  I mean --
13 BY MR. DZARA:
14    Q   Yeah.  What was your reaction to
15 learning that she may have stolen money
16 from Liberty Bank too?
17    A   My reaction would be -- was that
18 -- oh, I mean, she -- she has a prior --
19 prior incident, and now she has become a
20 bigger -- what is it?
21    Q   Steal?
22    A   Thief.
23    Q   And that's it?
24    A   Yeah, that's all I thought.  I

Page 172

1 don't know what else I would think.
2    Q   Did you think that was something
3 really important that you should tell
4 Elaine or somebody else at Wilshire Bank?
5 Did you think "This is" -- "she's had a
6 past incident of maybe stealing.  I've got
7 to tell somebody"?
8    A   No.  It was just a regular
9 communication -- I mean, information that
10 I heard, might be of no interest or help
11 to the investigation.
12    Q   Okay.  Okay.  Next paragraph, can
13 you look?  It's the fourth full paragraph
14 on page 3.
15    A   Yes.
16    Q   Is that an accurate summary of
17 what you told the FBI?
18    A   Yes.
19    Q   Okay.  How about the next
20 paragraph?  It starts with "Lee said that
21 in her discussions with"?
22    A   Yes.
23    Q   Is that accurate, what you told
24 the FBI?

## Page 173

1    A    Yes.
2    Q    Okay.  This paragraph says that
3  you found that there was potentially a
4  romantic relationship between James and
5  Karen based on your discussions with
6  employees at BankAsiana that worked with
7  them; right?
8    A    Correct.
9    Q    Who told you -- what BankAsiana
10 employees told you that there was
11 potentially a romantic relationship
12 between James and Karen?
13   A    I don't recall who told me,
14 specifically, who had relationship with
15 him -- or with her.
16   Q    You don't remember who told you,
17 specifically?
18   A    No, I don't remember.
19   Q    Did you think this was important
20 in your investigation, a possible romantic
21 relationship between James and Karen?
22   A    Yeah, at that time, I thought it
23 could be important for them to look at it.
24   Q    For who to look into it?

## Page 174

1    A    For the FBI agent to investigate.
2    Q    Did you ever find out one way or
3  another or conclude one way or another if
4  there was a romantic relationship between
5  James and Karen?
6    A    No.  I never found out whether
7  they were ever romantic.
8    Q    Okay.  How about the last
9  sentence here?  You say that "There's
10 rumors that Karen spent a lot of time
11 gambling."
12        Who did you -- how did you learn
13 that?
14   A    This was also told -- something
15 that was told to me by employees from
16 either BankAsiana or anyone that worked
17 with her before.
18   Q    Okay.  Do you remember who,
19 specifically?
20   A    No, I don't.
21   Q    Do you know -- did you ever find
22 out if Karen -- if this was true, if Karen
23 spent a lot of time gambling?
24   A    I don't have that information.  I

## Page 175

1  never found out.
2    Q    How about the next paragraph?
3  Take a look and let me know if this is an
4  accurate summary of what you told the FBI.
5    A    Yes, this is accurate.
6    Q    Okay.  The last sentence is that
7  you did not find suspicious cash deposits
8  in James's account; correct?
9    A    Yes.
10   Q    Okay.  Did you ever find any
11 suspicious cash deposits in James's
12 account during your part of the
13 investigation?
14   A    Not during my investigation, no.
15   Q    At any other time, did you find
16 out?
17   A    No.  I didn't investigate after
18 that.
19   Q    Okay.  How about the next
20 paragraph which is the second-to-last
21 paragraph on page 3?
22   A    Yes, that's correct.
23   Q    Okay.  And then we talked about
24 these two issues before, the employee

## Page 176

1  loan.  You testified -- your testimony
2  before is everything you know about the
3  employee loan?
4    A    Can you repeat that question?
5  Did I testify what?
6    Q    You previously testified about
7  this employee loan; right?
8    A    Yes.
9    Q    And I don't want to ask anymore
10 questions about it.  I just want to know
11 is the testimony that you gave before
12 everything you knew about the employee loan
13 issue?
14   A    Yes.
15   Q    Okay.  And the computers -- you
16 testified before that you were aware that
17 James and Mr. Hur took their computers?
18   A    Yes.
19   Q    Okay.  And you testified before
20 that -- I'm not going to characterize or
21 repeat your testimony from before about
22 the computers.  But my question is:  The
23 testimony you gave before about the
24 computers is everything you know about the

Page 177

1 computers; correct?
2    A   Yes, uh-huh.
3    Q   Okay.  How about the last
4 sentence that's at the bottom of page 3,
5 carries over to page 4?
6    A   Yes, it's correct.
7       MR. DZARA:  Okay.  Now, I want to
8 show you one more document, and we can
9 talk about taking a lunch break for you
10 guys because I don't want to starve you,
11 but I don't think I have a lot more.
12       Michael, can you pull out the FBI
13 memo marked Ryu 20?
14 BY MR. DZARA:
15    Q   Take a look at it for a couple
16 seconds, Ms. Lee, and tell me when you're
17 ready.  I'll direct you to -- I don't want
18 you to read the whole thing.  I'll direct
19 you where I want you to read.
20    A   I'm ready.
21    Q   This is an exhibit marked Ryu 20.
22 It was previously marked at Lisa Pai's
23 deposition and was produced by Karen Chon.
24 This is the FBI memo of its interview of

Page 178

1 Karen Chon on February 4th.
2       Do you see at the bottom left
3 corner, it says "Investigation on February
4 4, 2014"?
5    A   Yes, I do.
6    Q   So flip, please, to page
7 4.  Okay.  Now, midway down the page --
8 well, my question is:  Have you ever seen
9 this document before?
10    A   No, I haven't.
11    Q   Did you review it as part of your
12 deposition preparation?
13    A   No, I didn't.
14    Q   Did you know that Karen Chon was
15 investigated by the -- or was interviewed
16 by the FBI?
17    A   No, I didn't.
18    Q   Okay.  Midway down the page, a
19 paragraph begins "James Ryu was not
20 involved."
21       Do you see that?
22    A   Okay.  Yes.
23    Q   Okay.  So this is -- this memo
24 is -- has been represented by the FBI as an

Page 179

1 accurate summary of what Ms. Chon told
2 them on February 4, 2014, and I'm going to
3 read you these three paragraphs, and you
4 can read along with me.  But I'm going to
5 read them into the record.
6       "James Ryu was not involved in
7 the scheme to steal money from the CD
8 accounts.  Chon last met with James Ryu on
9 or about Thursday, January 30, 2014.  Chon
10 and Ryu met at the Englewood Diner.  Chon
11 apologized to James Ryu for all the
12 trouble he was experiencing with Wilshire
13 Bank.  Chon admitted to Ryu that Chon had
14 lied to bank auditors about Ryu being
15 involved in the scheme to take money from
16 the CD accounts.  Chon told Ryu that Chon
17 was going to tell the truth and clear Ryu
18 of wrongdoing.
19       "Ryu did not threaten Chon in any
20 way.  During this meeting, Ryu laughed at
21 the situation in disbelief. Ryu appeared to
22 be shocked.
23       "Chon lied about James Ryu's
24 involvement because the bank auditor

Page 180

1 suggested to Chon that Ryu was involved.
2 The auditors seemed to suspect Ryu from the
3 beginning.  They did not believe that Chon
4 accomplished the scheme by herself.  Chon
5 agreed with the auditors that James Ryu
6 was involved."
7       Did I read that correctly?  Did I
8 read that correctly?
9    A   Yes.
10    Q   Okay.  So this is the first time
11 you heard this.
12       What's your reaction to what I've
13 just read and what's provided in this
14 report?
15    A   My reaction to the report -- I
16 mean, to what you just said?
17    Q   Yeah.  This has been represented
18 as to -- an accurate summary of what Karen
19 Chon told the FBI on February 4th.
20 Now, you interviewed with them on January
21 28 -- right? -- 2014?
22    A   Yes.
23    Q   So now, this is a couple days
24 later, and you're reading this.

## Page 181

1  A   Yes.
2  Q   This is completely opposite of
3  what she told you at your January 23rd
4  meeting; right?
5  A   Yes.
6  MR. YI:  Objection to form.
7  BY MR. DZARA:
8  Q   So what's your reaction right now
9  to reading this, that this is completely
10 opposite of what she told you?  She's
11 saying that she lied to you.  What's your
12 reaction?
13 MR. YI:  Objection to form.
14 THE WITNESS:  I mean, if this
15 statement is true, then she had us leading
16 for something that was totally not true.
17 BY MR. DZARA:
18 Q   Okay.  Were you -- your testimony
19 is you weren't aware she testified to the
20 FBI -- that she gave this statement to the
21 FBI?
22 A   No, I wasn't aware.
23 Q   Okay.  So you're saying if this
24 is true, then she -- you just testified if

## Page 182

1  this is true, then she lied to you during
2  the January 23rd meeting; right?
3  A   Right.
4  Q   Okay.  What do you think is true?
5  This statement, this summary of what she
6  told the FBI or what she told you on
7  January 23rd?
8  MR. YI:  Objection to form.
9  BY MR. DZARA:
10 Q   It's a tough question to answer;
11 right?
12 A   Yeah.
13 MR. YI:  Objection to form.
14 THE WITNESS:  Well, I mean, I'm
15 just reading this report.  To my
16 knowledge, what she has told me at that
17 time and at the interview seems to be the
18 truth that she was telling me.
19 BY MR. DZARA:
20 Q   Okay.  So you believe -- you
21 believe that she told the truth to you and
22 that this is a lie?  "Yes" or "No"?
23 A   Yes.
24 Q   So you think this statement to

## Page 183

1  the FBI -- you think she lied to the FBI
2  in what I just read to you?
3  A   Yeah, I think she lied to the FBI
4  after meeting with James Ryu.
5  Q   What's your basis for that?  What
6  do you mean by "after meeting with James
7  Ryu"?
8  A   Well, maybe I don't -- the thing
9  is --
10 Q   I don't want you to guess.
11 Remember, I don't want you to guess.
12 A   Yes.
13 Q   But you just said --
14 MR. YI:  Well, let her answer,
15 please.
16 THE WITNESS:  When I met with
17 Karen, she was very, very remorseful for
18 what she did.  And I don't believe at that
19 time, she would involve someone -- that
20 she would try to incriminate somebody that
21 was totally not involved in this situation
22 because she wanted to get away.  That
23 would be my belief.  I mean, you don't
24 incriminate someone just because you felt

## Page 184

1  like it at that time.
2  BY MR. DZARA:
3  Q   Well, let me stop you there.
4  A   I believe there should be some
5  truth in the statement that she was
6  giving.  And also she was very
7  cooperative, and she did admit to the
8  crimes.  I mean, she said she's the one
9  who stole the money.  But she also
10 commented that she did not take possession
11 of the money to herself, that some of them
12 was given to Mr. James Ryu.
13 Q   Do you know if they ever -- if
14 anybody ever concluded that James had any
15 of the money?
16 A   No, I don't have any evidence.
17 Q   You don't know if any of the
18 money was ever found with James Ryu; right?
19 A   I don't -- I don't have any
20 evidence of whether, you know, the money
21 was found with James Ryu or not.
22 Q   Okay.  So your reason why --
23 let's take this in pieces.  Your reason
24 why you think this is a lie, what I just

Page 185

1 read to you and why she was telling you
2 the truth on January 23rd, is that she was
3 remorseful. That's what you said; right?
4   A   Yes.
5   Q   And then you said why would she
6 implicate somebody else if they weren't
7 involved?
8   A   Correct.
9   Q   And she said, "I didn't keep all
10 the money. I gave it to James"?
11   A   Yes.
12      MR. YI: Objection to form.
13 BY MR. DZARA:
14   Q   Okay. And now you just testified
15 that you know of no evidence that has
16 proven that James has any of the money;
17 right?
18      MR. YI: Objection to form.
19      THE WITNESS: Yes.
20 BY MR. DZARA:
21   Q   Okay. So that's number three of
22 what you testified. The third reason why
23 you believed her.
24      And the second reason was why

Page 186

1 would she implicate somebody if they
2 weren't involved.
3      You, Alicia Lee -- you wouldn't
4 implicate somebody if they weren't
5 involved; right?
6      If you stole money, you
7 personally wouldn't implicate somebody;
8 right?
9   A   Yes.
10      MR. YI: Objection to form. I
11 don't know where this is going.
12      MR. DZARA: Doesn't matter,
13 Michael. Just object to form. That's it.
14 BY MR. DZARA:
15   Q   So if you stole money, you
16 wouldn't implicate somebody if they
17 weren't involved; right?
18   A   Right.
19      MR. YI: Objection to form.
20 BY MR. DZARA:
21   Q   Okay. Karen -- you're saying --
22 so your opinion is because you wouldn't
23 implicate somebody if they weren't
24 involved if you stole money, she wouldn't

Page 187

1 either. Is that your testimony?
2      MR. YI: Objection to form.
3 That's not what she said.      Go ahead.
4      THE WITNESS: That's not what I
5 said.
6 BY MR. DZARA:
7   Q   Okay. What's the basis -- I'm
8 trying to understand why you believe her
9 if -- you're saying she wouldn't -- why
10 would she implicate James if he wasn't
11 involved; right? That doesn't make sense
12 to you; right?
13   A   Doesn't make sense to me.
14      MR. YI: Objection to form.
15 BY MR. DZARA:
16   Q   Okay. Doesn't make sense to you;
17 right?
18   A   Correct.
19   Q   But you can't -- you've got Karen
20 here who admits to stealing money, says it
21 was her scheme. It's previously --
22 there's suspicion that she stole money
23 from Liberty Bank. You've got no evidence
24 linking James. You've testified you know

Page 188

1 of no other evidence linking James to this
2 embezzlement other than her word. Yet you
3 still believe her that he was involved?
4      MR. YI: Objection to form.
5 Asked and answered. You're being
6 argumentative. Let's move on.
7      MR. DZARA: Michael. Answer the
8 question. Stop objection.
9      MR. YI: All right. You want to
10 get on a call with Judge -- Magistrate
11 Judge Dixon? I'm ready.
12      MR. DZARA: Michael, I'm asking
13 her a question. She's allowed to answer it.
14      MR. YI: I've let you ask it a
15 number of times. You're being
16 argumentative now. You're not asking for
17 information. You're trying to now cross-
18 examine this witness. This is not a
19 trial. This is a deposition. You're being
20 argumentative.
21      MR. DZARA: Isabel, can you read
22 back the question, please, and have the
23 witness answer?
24      (Record read.)

Page 189

BY MR. DZARA:
Q   And I'll say this in a nonargumentative tone.
Your testimony today and the fact -- well, let me strike.  Let me start over.  Karen admitted to embezzling from BankAsiana; correct?
A   Yes.
Q   Karen was suspected of stealing money from Liberty Bank; correct?
A   Yes.
Q   Karen -- the only evidence that you know of -- not Wilshire Bank.  I'm talking about you.  The only evidence linking James to the embezzlement was Karen's statement to you on January 23rd, 2014; correct?
A   Yes.
Q   Karen gave this statement to the FBI that we just reviewed in Ryu 20 that is completely opposite of what she told you on January 23rd; correct?
A   Yes.
MR. YI:  Objection to form.

Page 190

BY MR. DZARA:
Q   So Karen is in jail -- right? -- for her crimes?
A   Yes.
Q   Okay.  Taking all that into account right now today, do you still believe Karen's statement that James was involved in the embezzlement?
A   Yes, I do.
Q   Okay.  What's the basis of you still believing that based on everything that I just said?
MR. YI:  Objection to form.  Asked and answered.
Go ahead.
THE WITNESS:  During the interview with Karen, it wasn't only Karen who had given me information about James Ryu's financial difficulty, how he was approaching other employees to borrow money, and that he had other borrowing relationships with clients and brokers around the area, and that everyone at BankAsiana knew about it. And even with

Page 191

the CEO of the bank, Mr. Hur, had approached Irene Lee to take a loan from the bank to give it to Mr. Ryu which is unethical.
BY MR. DZARA:
Q   Okay.  Do you know if Mr. Ryu asked Mr. Hur to do that?
A   I'm sorry.  Could you repeat the question?
Q   You said Mr. Hur asked Irene for an employee loan to give money to James.
Do you know if James asked Mr. Hur to do that?
A   During the statement -- during the interview, Irene was asked by Mr. Hur.  And after that when Mr. Ryu found out, according to Irene, he was embarrassed because he had asked for the money to Mr. Hur directly, not to ask Irene to take a loan.
Q   Okay.  So you're saying that James never asked Mr. Hur to ask Irene for an employee loan; right?
A   Yes.  That's according to Irene

Page 192

Lee's statement, yes.
Q   Okay.  So now you just gave all that testimony in response to my question of why do you still believe Karen that James was involved.  And you just gave all this testimony about James needing money; right?       So you're giving -- are you trying to say that there was motive for James to be involved?
A   Yes.
Q   Okay.  But you're just speculating; is that right?
MR. YI:  Objection to form.
THE WITNESS:  That's my belief.
BY MR. DZARA:
Q   That's your belief?
A   Yes.
Q   Okay.  You reviewed James's finances.
Did you see any financial problems in his finances?
MR. YI:  Objection to form.  Assuming facts not in evidence.
THE WITNESS:  I did not review --

## Page 193

1    MR. DZARA:  She reviewed his
2  account.
3  BY MR. DZARA:
4    Q   Let's start back.  Did you review
5  James's bank accounts at Wilshire Bank?
6    A   I did review Mr. James's accounts,
7  only a few. I did not review all his
8  accounts which could not tell me what his
9  finances were.
10    Q   Okay.  So you didn't review any
11  of his financial accounts to support all
12  this stuff you were hearing about James's
13  financial difficulty?
14    MR. YI:  Objection to form.
15    THE WITNESS:  No, I did not find
16  any evidence during my review of the
17  accounts that were at BankAsiana and later
18  on at Wilshire Bank, no.
19  BY MR. DZARA:
20    Q   Okay.  I'm saying you didn't
21  review any other accounts besides Wilshire
22  Bank and BankAsiana -- right? -- of James?
23    A   No, I did not.
24    Q   So you didn't -- did you find any

## Page 194

1  evidence -- any financial records, banking
2  records to support what you heard from
3  Eileen and Bo Young or whoever about
4  James's financial problems?
5    MR. YI:  Objection to form.
6    THE WITNESS:  No, I did not find
7  any evidence at BankAsiana.
8  BY MR. DZARA:
9    Q   Okay.  So you were just believing
10  what they said out of hand?  You just
11  believed them?
12    MR. YI:  Objection to form.
13  Starting to be argumentative, again.  I'm
14  not sure that's the purpose here.
15  But go ahead if you can answer.
16    THE WITNESS:  Yes.
17    MR. DZARA:  Michael, let's go off
18  the record.
19    (A discussion was held off the
20  record.)
21  BY MR. DZARA:
22    Q   So Ms. Lee, I just asked the
23  questions regarding the basis of your
24  belief or the basis of your believing Ms.

## Page 195

1  Lee -- or Irene Lee and Bo Young when they
2  talked about James's financial problems.
3    And you testified that you didn't
4  review any financial records to support
5  what they were saying about James's
6  financial condition; is that correct?
7    MR. YI:  Objection to form.
8    THE WITNESS:  Yes.
9  BY MR. DZARA:
10    Q   Okay.  Thank you.  Okay.  So you
11  believed everything Irene and Bo Young
12  said about James's financial condition;
13  right?
14    MR. YI:  Objection to form.
15    THE WITNESS:  Yes.
16  BY MR. DZARA:
17    Q   And you believed what Karen said
18  about James being involved; right?
19    A   Yes.
20    Q   Okay.  And nothing that we've
21  looked at today and that we've discussed
22  changes your opinion about believing
23  Ms. Chon's statement about James being
24  involved and Ms. -- Bo Young and Irene

## Page 196

1  saying James had financial problems; is
2  that correct?
3    A   Yes.
4    Q   Okay.  And it's your testimony
5  that in this FBI statement here -- or FBI
6  memo marked Ryu 20, which has been
7  represented as an accurate summary of what
8  Karen told the FBI, the section I read,
9  you believe she's lying; correct?
10    A   Yes.
11    Q   Okay.  And I believe I asked the
12  question the basis of why you think she
13  was lying, and you went into your
14  testimony about Irene and Bo Young talking
15  about James's financial problems; right?
16    MR. YI:  Objection to form.
17  Asked and answered.
18    MR. DZARA:  No.  I'm confirming
19  that's what she said.
20    THE WITNESS:  Yes.
21  BY MR. DZARA:
22    Q   Okay.  So the reason -- I asked
23  you why do you think she's lying here, and
24  you said, "Well, there was other stuff

## Page 197

1 going on like the financial information Bo
2 Young and Irene said at the January 23rd
3 meeting."
4     Is there anything else, any other
5 reasons why you think -- that support and
6 form the basis of why you believe Karen was
7 lying to the FBI in this memo?
8     MR. YI:  Objection to form.
9     THE WITNESS:  I don't have any
10 other.
11 BY MR. DZARA:
12    Q   Nothing else?
13    A   No.
14    Q   Okay.  Thank you.  So one
15 specific question here.  It says, the last
16 paragraph I read, that "Chon lied about
17 James Ryu's involvement because the bank
18 auditor suggested to Chon that Ryu was
19 involved."
20     MR. YI:  I'm sorry to interrupt.
21 You said you were going to give us a
22 break.  Just let us know when you're ready
23 to give us a break.
24     MR. DZARA:  Yeah, I just have a

## Page 198

1 couple of questions about this, and then
2 we're done with this exhibit.
3     MR. YI:  Okay.
4     MR. DZARA:  Thank you.
5 BY MR. DZARA:
6    Q   So this sentence, "Chon lied
7 about James Ryu's involvement because the
8 bank auditor suggested to Chon that Ryu
9 was involved."     Do you see that?
10    A   Yes, I see that.
11    Q   Okay.  Do you know what bank
12 auditors -- who were the bank auditors
13 that she met with?
14    A   I have no idea because she had
15 met with me, but she never met with Orest.
16 So that statement alone itself is a lie to
17 me.
18    Q   Can you repeat that?  I didn't
19 understand the last part.
20    A   I'm not an auditor, and she never
21 met with Orest.  And if she gives a
22 statement saying that the bank auditor
23 suggested that James Ryu was involved,
24 that's a false statement.

## Page 199

1    Q   So that's a lie?  Okay.
2    A   Yes.
3    Q   So you're aware -- you said you
4 know that Karen met with Bo Young and
5 Irene on June 22nd, and then she met with
6 you, Bo Young, and Irene on -- or January
7 22nd and she met with you, Bo Young, and
8 Irene on January 23rd; right?
9    A   Yes.
10    Q   And I think you testified you're
11 not aware of her meeting with anybody else
12 affiliated with Wilshire Bank --
13    A   Yes.
14    Q   -- as part of the investigation?
15     She didn't meet with anybody else
16 at Wilshire Bank as part of the
17 investigation; right?
18    A   The knowledge that I have, no, as
19 far as I know.
20    Q   All right.  So I guess -- I'm
21 not asking you to guess here.  But she's
22 got to be referring to you in this
23 statement -- right? -- this sentence?
24     MR. YI:  I'm going to instruct

## Page 200

1 the witness not to speculate.
2     If she knows.
3     THE WITNESS:  I have no idea
4 whether she's referring to me or not
5 because I'm not an internal auditor.
6     MR. DZARA:  Okay.  That's all the
7 questions I have for this, Michael.  Off
8 the record.
9     (Record read.)
10 BY MR. DZARA:
11    Q   You were just handed an exhibit
12 previously marked Ryu 12, and it's
13 Bates-numbered WB 795 through 808.
14 My first question is:  Upon looking at it,
15 have you ever seen it before?
16    A   No, I haven't.
17    Q   Okay.  Well, this was an
18 initial -- there's two investigation audit
19 reports that were produced by Wilshire
20 Bank here in this case, and it's my
21 understanding that Orest drafted them.
22 Now, I haven't deposed Orest, but based on
23 what I know about this case, I think he's
24 the one that drafted them.

## Page 201

1  But you're specifically mentioned
2 a lot in this report because I think some
3 of the information Orest learned came from
4 you. So I want to direct you to -- it's
5 page 2 of the report, WB 798.
6  MR. YI: David, may I make a
7 suggestion?
8  MR. DZARA: Sure.
9  MR. YI: Do you want show her
10 both -- both reports, the one from --
11  MR. DZARA: No. I'm just going
12 to do one at a time. That's all.
13  MR. YI: All right.
14  MR. DZARA: I'm not sure if I
15 have any questions about the second one,
16 Michael.
17  MR. YI: All right. Go ahead.
18  MR. DZARA: Thank you.
19 BY MR. DZARA:
20  Q  Okay. So are you at page 2, WB
21 798?
22  A  Yes.
23  Q  Okay. Towards the, you know --
24 maybe one-third of the way down, there is

## Page 202

1 sentence that begins with "Discussion with
2 Jennie Han human resource manager."
3  Do you see that?
4  MR. YI: I'm just going to point
5 if that's okay?
6  MR. DZARA: Okay.
7  THE WITNESS: Okay. Yes.
8 BY MR. DZARA:
9  Q  Okay. So that sentence says --
10 I'm going to read it. "Discussion with
11 Jennie Han human resource manager revealed
12 that Karen was a former WB employee
13 acquired in the Liberty Bank of New York
14 merger in 2006. At that time, Karen left
15 the bank through maternity leave under a
16 cloud of suspicion since she and/or her
17 employees allegedly had several cash
18 shortages of which $10,000 was the
19 largest."
20  Did I read that correctly?
21  A  Yes.
22  Q  Okay. This is similar to what we
23 looked at before -- what you told the FBI
24 about Karen's prior suspicion at Liberty

## Page 203

1 Bank, and you testified that you learned
2 about that from Julie Ki; right?
3  A  Yes.
4  Q  Okay. So this is saying that
5 discussion was with Jennie Han.
6  Do you know -- who is Jennie
7 Han? Do you know her?
8  A  Jennie Han is our HR manager.
9  Q  Okay. Were you aware that
10 someone, Orest or somebody else, at W --
11 at Wilshire Bank talked to Jennie Han
12 about this suspected -- Karen-suspected,
13 you know, situation with Liberty Bank?
14  A  I'm not aware.
15  Q  Okay. Because this is -- you
16 said you learned from Julie Ki. This
17 apparently seems to be -- is stating that
18 Jennie Han was the source of this
19 investigation; right?
20  MR. YI: Objection to form.
21  THE WITNESS: So you're asking me
22 if my source was just Julie Ki, or was it
23 Jennie Han?
24 BY MR. DZARA:

## Page 204

1  Q  Yeah. Your source was Julie
2 Ki -- right? -- for the Liberty Bank
3 information?
4  A  At the time when I was at --
5 before I left California to go to New
6 Jersey, that was my source. This could
7 have been added to the statement afterwards.
8  Q  Okay. So you're not aware of any
9 discussion? You never talked to Jennie Han
10 about the Liberty Bank and Karen incident?
11  A  I might have discussed it
12 afterwards, yes.
13  Q  Okay. So one clarification
14 question. When did Julie Ki tell you
15 about Karen and Liberty Bank? Was it
16 before you left for New Jersey or while
17 you were in New Jersey?
18  A  I don't know the exact date, but
19 it was before I came back from New Jersey.
20  Q  I'm saying, she didn't tell you
21 before you flew out to New Jersey, did she?
22  A  I don't know whether she told me
23 before or she told me after, but it was
24 before I got back from New Jersey. That's

ORAL DEPOSITION OF ALICIA LEE, 9/29/2017

Page 205

1  for sure.
2     Q    Okay.  Can you flip the page?
3     A    Sure.
4     Q    So page 3 the top -- the
5  beginning of the last full paragraph on
6  the page begins with "Lisa flew to New
7  Jersey the week of February 9th."
8     A    Yes.
9     Q    Okay.  Did you know that Lisa
10 flew to New Jersey the week of February
11 9th, 2014, to interview people about the
12 investigation and embezzlement?
13    A    I don't know the exact date, but
14 I was under the impression that she was
15 flying to New Jersey for the investigation
16 of the case.
17    Q    Okay.  Do you remember how you
18 learned about that?
19    A    I don't know how I learned.
20 Maybe I -- I really don't know.  I don't
21 recall.
22    Q    Okay.  Do you know that she met
23 with James while she was in New Jersey
24 that week?

Page 206

1     A    I don't know.
2     Q    You didn't know that?
3     A    No.
4     Q    Do you know that James denied any
5  involvement in the embezzlement when he
6  met with Lisa?
7     A    Since I didn't know whether they
8  met or not, I don't know what was the
9  outcome of the interview.
10    Q    Okay.  Do you know -- sitting
11 here today, do you know that James has
12 denied any involvement in the embezzlement?
13    A    Well, you just said it.
14    Q    Other than me -- no.  I'm saying
15 right now aside from this document.
16 Sitting here today right now, are you
17 aware that James has denied any
18 involvement in the embezzlement?
19    A    No, I'm not aware.
20    Q    Other than me saying that, you're
21 not aware of it?
22    A    Yeah, uh-huh.
23    Q    Okay.  Thank you.  And we talked
24 about the computers before briefly.

Page 207

1        Do you know if James returned the
2  computers to Wilshire Bank?
3     A    I don't know.
4     Q    Okay.  You understand that it's
5  the bank's position -- now Bank of Hope,
6  formerly Wilshire Bank.  It's their
7  position and their belief that James was
8  involved in the embezzlement; correct?
9     A    Yes.
10       MR. DZARA:  Okay.  All right.
11 Let me look at the next one and see if I
12 have anymore questions on the next report,
13 Michael.
14       MR. YI:  Okay.
15       MR. DZARA:  Give me 20 seconds.
16 Okay.  I just have a couple,
17 Michael.  I'm sorry.
18       So can you show her -- hand her
19 a copy.
20       MR. YI:  I already did.  She
21 started reviewing it already.
22       MR. DZARA:  Okay.  Thank you.
23 BY MR. DZARA:
24    Q    All right.  So this next exhibit

Page 208

1  that Michael just you handed to you
2  graciously is previously marked Ryu 13.
3  It's Bates-numbered WB 810 through 817.
4     A    No.  This is Ryu 12.  It's not 13.
5        MR. YI:  Sorry.
6        THE WITNESS:  Uh-huh.  Okay.
7        MR. YI:  She now has 13.
8        MR. DZARA:  Great.  Thank you.
9  BY MR. DZARA:
10    Q    Just take a look for a couple
11 seconds.  My first question is going to be
12 have you ever seen this before?
13    A    No.
14    Q    Okay.  I'm going to direct you
15 to -- well, I'm going to direct you to page
16 3.  The second paragraph, it begins with
17 "On February 4th."
18       MR. YI:  Which page?
19       MR. DZARA:  Are you there,
20 Michael?
21       THE WITNESS:  Page 3.
22       MR. DZARA:  Page 3.
23       MR. YI:  Sorry.  Go ahead.
24 BY MR. DZARA:

Page 209

1   Q   So the paragraph that begins "On
2   February 4th," the second-to-last sentence
3   begins "It was also learned when Karen was
4   a former WB employee through the Liberty
5   Bank of New York merger and experienced a
6   $10,000 cash shortage that branch
7   employees searched her purse and found
8   $4,000 in cash."
9        Do you see that?
10  A   So you're reading in the middle
11  of the paragraph; right?
12  Q   Yeah, second-to-last sentence.
13  A   Yes.
14  Q   Okay.  So again, this is
15  discussing the Karen, Liberty Bank cash
16  shortage issue.  The new part of this that
17  wasn't in your FBI -- what you said to the
18  FBI and in the last exhibit that we looked
19  at has here that branch employees searched
20  Karen's purse and found $4,000 in cash.
21       Do you have any information about
22  that or know anything about that?
23  A   No, I don't.
24  Q   Okay.  This is the first time --

Page 210

1   is this the first time you're learning
2   about it, reading it here?
3   A   Yes.  Reading it here, yes.
4   Q   Okay.
5   A   I have no recollection.
6   Q   All right.  Can we go to the last
7   page, page 8, please?  The last sentence
8   of this report begins with "By virtue of
9   the $30,000 check."
10       Do you see that sentence?
11  A   Yes.
12  Q   Okay.  This is talking about Gae,
13  G-a-e.  Can you just tell me what is a
14  Gae -- Korean Gae?
15  A   How would I explain Gae?  It's a
16  group of people that facilities funds on
17  terms of paying interest, something like
18  that.
19  Q   Okay.  And it's a -- for lack of
20  a better term, it's a Korean thing; right?
21  A   Yes.
22  Q   Okay.  So this sentence ends with
23  "The Gae's involvement in this
24  embezzlement cannot be ruled out."

Page 211

1        Do you -- were you -- did you
2   investigate any Gae that Karen was part of
3   to see if it was involved in the
4   embezzlement?
5   A   No, I didn't.
6   Q   Okay.  Were you aware that
7   Wilshire Bank was investigating that?
8   A   No, I wasn't.
9   Q   Okay.  Okay.  Were you aware that
10  Wilshire Bank seized the bank account
11  James had with Wilshire Bank when the
12  embezzlement came to light?
13  A   Yes, I was aware.
14  Q   How did you learn about that?
15  A   I don't know whether I was the
16  one who put the seize on it or it was one
17  of my colleagues, but I was instructed to
18  do it.
19  Q   Okay.  Who instructed you to do
20  it?
21  A   Was upper management, probably my
22  boss.
23  Q   Do you think Elaine Jeon
24  instructed you to do it?

Page 212

1   A   Either Elaine or Lisa.  I don't
2   have exact recollection, but it would have
3   been any one of those two.
4   Q   And do you know why they decided
5   to freeze or put the hold on the James's
6   account?
7   A   No, I don't know why they had.  I
8   was just following instructions.
9   Q   Okay.  But you weren't involved
10  in the decision-making.  You were just
11  told to do it?
12  A   No, I wasn't involved in the
13  decision-making.  I was just told to do it.
14  Q   We talked about New Millennium
15  Bank before.
16       What's your understanding of -- or
17  do you know New Millennium Bank?
18  A   It was mentioned while I was at
19  New Jersey, and also I learned about it
20  after with the communication and
21  information that I got in researching Mr.
22  Ryu's account.
23  Q   Okay.  Is that your only
24  knowledge of anything having to do with

Page 213

1  New Millennium Bank?
2      A    No.
3      Q    But that's your only knowledge of
4  them?  You don't know anything else about
5  them?
6      A    Yes, that's my only knowledge.
7  I'm sorry.
8      Q    Are you aware of any
9  communications between anyone from
10  Wilshire Bank with anyone at New
11  Millennium Bank about James in or around
12  January, February, March 2014?
13      A    No, I'm not aware of any of that.
14         MR. DZARA:  Okay.  Michael, can
15  you show her the last exhibit, the
16  litigation hold?
17         MR. YI:  David, just for the
18  record, Exhibit 13 and 14 were clipped
19  together by one of the folks that works
20  here.  You didn't want to ask her about
21  Exhibit 14; right?
22         MR. DZARA:  Let me go back and
23  see what Exhibit 14 was.  What is 14,
24  Michael?

Page 214

1         MR. YI:  They're handwritten
2  notes of Lisa Pai's meeting with Karen
3  Chon.
4         MR. DZARA:  Oh, no.  That may
5  have -- no.  That may have accidently been
6  in the PDF.
7         MR. YI:  Okay.
8         MR. DZARA:  Someone might have
9  merged these together on my end when we
10  scanned the exhibits.  So no, I did not.
11  You can trash them or shred it.  You know,
12  take it away with you.
13         MR. YI:  Okay.  I just wanted to
14  make sure.
15         MR. DZARA:  Yeah, thank you.
16  That's completely accidental.
17  BY MR. DZARA:
18      Q    Okay.  You should have in front
19  of you an exhibit that's been previously
20  marked Ryu 31, WB 939?
21      A    Yes.
22      Q    My first question is going to be:
23  Have you ever seen this document before?
24      A    No.

Page 215

1      Q    Okay.  Do you remember receiving
2  it from Lisa Pai?
3      A    I don't recollect receiving it
4  from Lisa Pai, no.
5      Q    Okay.  That's fine.  All right.
6  I think I don't have anymore questions
7  other than -- do you -- we talked a lot
8  about the embezzlement, a lot about your
9  role in the investigation.
10         Do you think that you told me
11  everything that you recall about the
12  investigation into Karen's
13  embezzlement?
14      A    What I recall?  Yeah, I believe I
15  told you everything that I recall at this
16  time.
17         MR. DZARA:  Okay.  Great.  Thank
18  you.  That's all the questions I have.
19  Thank you so much for your time today.  I
20  really appreciate it.
21         THE WITNESS:  You're welcome.
22         (The deposition proceedings were
23  concluded at 2:24 p.m.)
24

```
 1              WITNESS CERTIFICATION
 2
 3         I hereby certify that I
 4    have read the foregoing transcript of
 5    my deposition testimony, and that my
 6    answers to the questions propounded,
 7    with the attached corrections or
 8    changes, if any, are true and
 9    correct.
10
11
12
13
14    _____
      DATE      ALICIA LEE
15
16
17
18    _____
      PRINTED NAME
19
20    FILE #13270
21    Bank of Hope, ET AL
22    vs.
23    Miye Chon, ET AL
24
```

```
 1                          CERTIFICATE

 2

 3          I, MARIA ISABEL DELUNA, a Certified

 4   Shorthand Reporter in and for the State of

 5   California, do hereby certify:

 6          That the foregoing witness by me

 7   was duly sworn; that the deposition was then

 8   taken before me at the time and place herein

 9   set forth; that the testimony and proceedings

10   were reported stenographically by me and

11   later transcribed into typewriting under my

12   direction; that the foregoing is a true

13   record of the testimony and proceedings taken

14   at that time.

15          IN WITNESS WHEREOF, I have

16   subscribed my name on this date:

17

18

19

20

21

22

23   _____
     MARIA ISABEL DELUNA,
24   CSR NO. 13986
```