# EXHIBIT
# 16

Page 1

```
 1
 2            UNITED STATES DISTRICT COURT
                DISTRICT OF NEW JERSEY
 3              No. 2:14-cv-01770-JLL-JAD
     BANK OF HOPE, as successor to )
 4   Wilshire Bank,                )
                   Plaintiff,      )
 5              vs.                )
     MIYE CHON, a/k/a Karen Chon;  )
 6   SUK JOON RYU, a/k/a James S.  )
     Ryu; TAE JONG KIM; BERGENFIELD)
 7   BAGEL & CAFÉ INC., d/b/a Café )
     Clair; MAYWOOD BAGEL INC.;    )
 8   UB'S PIZZA & BAGEL INC.; UB'S )
     BAGEL & CAFÉ INC.; and UBK    )
 9   BAGELS CORP., d/b/a Franklin  )
     Bagels & Café,                )
10                  Defendants.    )
     ------------------------------)
11   SUK JOON RYU, a/k/a James S.  )
     Ryu,                          )
12        Counterclaim-Plaintiff,  )
                   vs.             )
13   BANK OF HOPE, as successor to )
     Wilshire Bank,                )
14        Counterclaim-Defendant.  )
     ------------------------------)
15   SUK JOON RYU, a/k/a James S.  )
     Ryu,                          )
16        Third-Party Plaintiff,   )
                   vs.             )
17   KWON HO JUNG, JAE WHAN YOO,   )
     STEVEN S. KOH, and LISA PAI,  )
18        Third-Party Defendants.  )
     ------------------------------)  Start Time: 10:27 a.m.
19   SUK JOON RYU, a/k/a James S.  )  End Time: 5:01 p.m.
     Ryu,                          )
20        Cross-Claim Plaintiff,   )
                   vs.             )  Deposition of:
21   MIYE CHON, a/k/a Karen Chon;  )  Frank Gleeson
     TAE JONG KIM; BERGENFIELD     )
22   BAGEL & CAFÉ INC., d/b/a Café )  Wednesday,
     Clair; MAYWOOD BAGEL          )  December 20, 2017
23   INC.; UB'S PIZZA & BAGEL INC.;)
     UB'S BAGEL & CAFÉ INC.; and   )  Reported by:
24   UBK BAGELS CORP., d/b/a       )  Lisa M. Muraco
     Franklin Bagels & Café,       )  Job# 134438
25        Cross-Claim Defendants.  )
```

## Page 2

1
2       Deposition of FRANK GLEESON, held at the
3   offices of LEE ANAV CHUNG WHITE KIM RUGER &
4   RICHTER LLP, 156 Fifth Avenue, New York, New
5   York, at 10:27 a.m. before Lisa M. Muraco, a Notary
6   Public ofthe State of New York and New Jersey.
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

## Page 3

1
2   A P P E A R A N C E S :
3       LEE ANAV CHUNG WHITE KIM RUGER & RICHTER
4       Attorneys for Plaintiff-Counterclaim
5       Defendant, Bank of Hope, as successor to
6       Wilshire Bank, and
7       Third-Party Counterclaim Defendants,
8       Kwon Ho Jung and Lisa Pai
9           99 Madison Avenue
10          New York, New York 10016
11      BY:  MICHAEL YI, ESQ.
12          DOHEE KIM, ESQ.
13
14      STEVE HARVEY LAW
15      Attorneys for Defendant-Counterclaim
16      Plaintiff, Third-Party Counterclaim
17      Plaintiff, Cross-Claim Plaintiff
18      Suk Joon Ryu, a/k/a James S. Ryu
19          1880 John F. Kennedy Boulevard
20          Philadelphia, Pennsylvania 19103
21      BY:  DAVID DZARA, ESQ.
22
23
24
25

## Page 4

1
2       IT IS HEREBY STIPULATED AND AGREED
3   by and between the attorneys for the
4   respective parties herein, that filing and
5   sealing be and the same are hereby waived.
6       IT IS FURTHER STIPULATED AND AGREED
7   that all objections, except as to the form
8   of the question, shall be reserved to the
9   time of the trial.
10      IT IS FURTHER STIPULATED AND AGREED
11  that the within deposition may be sworn to
12  and signed before any officer authorized
13  to administer an oath, with the same
14  force and effect as if signed and sworn to
15  before the Court.
16
17
18
19          - oOo -
20
21
22
23
24
25

## Page 5

1       F. Gleeson
2   F R A N K   G L E E S O N,
3       called as a witness, having been duly sworn
4       by a Notary Public, was examined and
5       testified as follows:
6   EXAMINATION BY
7   MR. YI:
8       Q.   State your name for the record,
9   please.
10      A.   Frank J. Gleeson.
11      Q.   Good morning, Mr. Gleeson.
12      A.   Good morning.
13      Q.   Does your middle initial J stand for
14  a name?
15      A.   Joseph.
16      Q.   Just a few preliminary items, I just
17  want to make sure that you are able testify at
18  your deposition today and that nothing would
19  impair your ability to do that.
20      A.   Okay.
21      Q.   Have you consumed anything, such as
22  medication or any kind of alcoholic beverage,
23  that would affect your ability to testify
24  accurately and truthfully today?
25      A.   No.

Page 6

| | |
|---|---|
| 1 | F. Gleeson |
| 2 | Q.   Is there anything else that you |
| 3 | believe may affect your ability to testify |
| 4 | accurately and truthfully today? |
| 5 | A.   No. |
| 6 | Q.   Okay.  You understand that, even |
| 7 | though we are in a law office and not in a |
| 8 | court of law, this is a sworn testimony and |
| 9 | that you are testifying under oath as if you |
| 10 | were in court before either a judge or a jury? |
| 11 | A.   I understand. |
| 12 | MR. YI:  I would like to have this |
| 13 | marked as Exhibit 1 at this time. |
| 14 | (Gleeson Exhibit 1, subpoena, marked |
| 15 | for identification.) |
| 16 | BY MR. YI: |
| 17 | Q.   I'm showing you what's been marked |
| 18 | as Exhibit 1 to your deposition and I will |
| 19 | represent to you that this is a copy of a |
| 20 | document called Subpoena to Testify in a |
| 21 | Deposition in a Civil Action and the date of |
| 22 | this subpoena is September 27, 2017. |
| 23 | Is this a copy of the subpoena that |
| 24 | you received sometime prior to today? |
| 25 | A.   Yes. |

Page 7

| | |
|---|---|
| 1 | F. Gleeson |
| 2 | Q.   Just for the record, this deposition |
| 3 | is being taken pursuant to this notice -- |
| 4 | pursuant to this subpoena dated |
| 5 | September 27, 2017.  Thank you. |
| 6 | MR. YI:  Can I have this marked as |
| 7 | Exhibit 2? |
| 8 | (Gleeson Exhibit 2, subpoena to |
| 9 | produce documents, marked for |
| 10 | identification.) |
| 11 | BY MR. YI: |
| 12 | Q.   Before we get to Exhibit 2, are you |
| 13 | represented by counsel today in connection with |
| 14 | your deposition? |
| 15 | A.   No. |
| 16 | Q.   Okay.  I know that Mr. Dzara is |
| 17 | sitting to your left; he represents the |
| 18 | defendant in this case, also a counter-claim |
| 19 | plaintiff, Mr. Ryu, R-y-u. |
| 20 | He's not representing you in |
| 21 | connection with this deposition? |
| 22 | A.   Correct. |
| 23 | Q.   All right.  I would like you to take |
| 24 | a look at what's been marked Exhibit 2 to your |
| 25 | deposition, which is a copy of a document |

Page 8

| | |
|---|---|
| 1 | F. Gleeson |
| 2 | called Subpoena to Produce Documents, |
| 3 | Information or Objects or to Permit Inspection |
| 4 | of Premises in a Civil Action and this subpoena |
| 5 | is dated October 10, 2017. |
| 6 | Is this a copy of the subpoena that |
| 7 | you received sometime prior to today? |
| 8 | (Witness complies.) |
| 9 | A.   Okay. |
| 10 | Q.   I'm going to ask you to turn to |
| 11 | page 3 of this document.  It has a heading |
| 12 | Document Request. |
| 13 | MR. DZARA:  Page 3 of the schedule. |
| 14 | A.   Got it. |
| 15 | Q.   Is it fair to say that prior to |
| 16 | today or even this morning, you have not |
| 17 | produced any documents to us in response to |
| 18 | this subpoena? |
| 19 | A.   Yes, that's correct. |
| 20 | Q.   So I would like to just go through |
| 21 | each one, if that's okay. |
| 22 | Number one, all documents that |
| 23 | reflect or concern any efforts or assistance by |
| 24 | you to obtain any loans for Ryu, Ryu being the |
| 25 | defendant in this case. |

Page 9

| | |
|---|---|
| 1 | F. Gleeson |
| 2 | Well, let's refer to him as |
| 3 | James Ryu and I'll represent to you that his |
| 4 | full legal name is Suk Joon Ryu. |
| 5 | Is it your testimony that you do not |
| 6 | have any documents that are responsive to this |
| 7 | request? |
| 8 | A.   Correct. |
| 9 | Q.   Number two, all documents that |
| 10 | reflect or concern communications between you |
| 11 | and James Ryu concerning any efforts or |
| 12 | assistance by you to obtain any loans for Ryu. |
| 13 | Is it your testimony that you do not |
| 14 | have any documents that are responsive to this |
| 15 | request? |
| 16 | A.   Yes. |
| 17 | Q.   Three, all documents that reflect or |
| 18 | concern communications between you and any |
| 19 | other person or persons concerning any efforts |
| 20 | or assistance by you to obtain any loans for |
| 21 | Ryu. |
| 22 | Is it your testimony that you do not |
| 23 | have any documents that are responsive to this |
| 24 | request? |
| 25 | A.   Yes. |

---

Page 10

F. Gleeson

1

2     Q.   Four, all documents that reflect or
3  concern any loans made between you and
4  James Ryu.
5        Is it your testimony that you do not
6  have any documents that are responsive to this
7  request?
8     A.   Yes.
9     Q.   Five, all documents that reflect or
10  concern communications between you and
11  James Ryu concerning any loans made between you
12  and James Ryu.
13        Is it your testimony that you do not
14  have any documents that are responsive to this
15  request?
16     A.   Yes.
17     Q.   Six, all documents that reflect or
18  concern communications between you and any
19  other person concerning any loans made between
20  you and James Ryu.
21        Is it your testimony that you do not
22  have any documents that are responsive to this
23  request?
24     A.   Yes.
25     Q.   Seven, all documents that reflect or

---

Page 11

F. Gleeson

1

2  concern any loans made by James Ryu by any
3  other person or entity including, but not
4  limited to, Mike Kim, Kore Consulting LLC, Kore
5  LLC, Soyu Architecture, SilkRoad, Inc.,
6  BankAsiana -- one word -- Chon, which stands
7  for Karen Chon or Miye Chon who is also a
8  defendant in this case, Irene Lee, and/or
9  Hong Sik Hur.
10        Is it your testimony that you do not
11  have any documents that are responsive to this
12  request?
13     A.   Yes.
14     Q.   Eight, all documents that reflect or
15  concern communications between you and
16  James Ryu concerning any loans made to
17  James Ryu by any other person or entity,
18  including but not limited to, Michael Kim, Kore
19  Consulting LLC, Kore LLC, Soyu Architecture,
20  SilkRoad, Inc., BankAsiana, Karen Chon,
21  Irene Lee, and/or Hong Sik Hur.
22        Is it your testimony that you do not
23  have any documents responsive to this request?
24     A.   Yes.
25     Q.   Number nine, all documents that

---

Page 12

F. Gleeson

1

2  reflect or concern communications between you
3  and any other person concerning any loans made
4  by James Ryu by any other person or entity,
5  including but not limited to, Michael Kim, Kore
6  Consulting LLC, Kore LLC, Soyu Architecture,
7  SilkRoad, Inc., BankAsiana, Karen Chon,
8  Irene Lee, and/or Hung Sik Hur.
9        Is it your testimony that you do not
10  have any documents responsive to this request?
11     A.   Yes.
12     Q.   Number ten, all documents that
13  reflect or concern Seleste, S-e-l-e-s-t-e, aka
14  Kudo Beans, K-u-d-o, a cafe located at 1550
15  Lemoine Avenue, Fort Lee, New Jersey.
16        Is it your testimony that you do not
17  have any documents responsive to this request?
18     A.   Yes.
19     Q.   Eleven, all documents that reflect
20  or concern communications between you and
21  James Ryu concerning Seleste.
22        Is it your testimony that you do not
23  have any documents responsive to this request?
24     A.   Yes.
25     Q.   Twelve, all documents that reflect

---

Page 13

F. Gleeson

1

2  or concern communications between you and any
3  other person concerning Seleste.
4        Is it your testimony that you do not
5  have any documents responsive to this request?
6     A.   Yes.
7     Q.   Thirteen, all documents that reflect
8  or concern Luz, L-u-z, a hair salon located at
9  725 River Road, Edgewater, New Jersey.
10        Is it your testimony that you do not
11  have any documents responsive to this request?
12     A.   Yes.
13     Q.   Fourteen, all documents that reflect
14  or concern communications between you and
15  James Ryu concerning Luz or Luz.
16        Is it your testimony that you do not
17  have any documents responsive to this request?
18     A.   Yes.
19     Q.   Fifteen, all documents that reflect
20  or concern communications between you and any
21  other person concerning Luz or Luz.
22        Is it your testimony that you do not
23  have any documents responsive to this request?
24     A.   Yes.
25     Q.   Sixteen, all documents that reflect

---

## Page 14

F. Gleeson

or concern Eunhee Christine Pak.  Eunhee is spelled E-u-n-h-e-e, Christine, Pak is spelled P-a-k.

Q.   Is it your testimony is that you do not have any documents responsive to this request?

A.   Yes.

Q.   Seventeen, all documents that reflect or concern communications between you and James Ryu concerning Eunhee Christine Pak.

Is it your testimony that you don't have any documents responsive to this request?

A.   Yes.

Q.   Eighteen, all documents that reflect or concern communications between you and any other person concerning Eunhee Christine Pak.

Is it your testimony that you do not have any documents responsive to this request?

A.   Yes.

Q.   Nineteen, all documents that reflect or concern F One Communications -- and I represent to you that that's a defined term, F One Communications, which stands for the company F One Communication, Inc.

## Page 15

F. Gleeson

Is it your testimony that you do not have any documents responsive to this request?

A.   Yes.

Q.   Twenty, all documents that reflect or concern communications between you and James Ryu concerning F One Communications.

Is it your testimony that you do not have any documents responsive to this request?

A.   Yes.

Q.   Twenty-one, all documents that reflect or concern communications between you and any other persons concerning F One Communications.

Is it your testimony that you do not have any documents responsive to this request?

A.   Yes.

Q.   Twenty-two, all documents that reflect or concern James Ryu's duties and responsibilities at BankAsiana.

Is it your testimony that you do not have any documents responsive to this request?

A.   Yes.

Q.   All documents that reflect or concern James Ryu's assets.

## Page 16

F. Gleeson

Is it your testimony that you do not have any documents responsive to this request?

A.   Yes.

Q.   Twenty-four, all documents that reflect or concern James Ryu's liabilities.

Is it your testimony that you do not have any documents responsive to this request?

A.   Yes.

Q.   Twenty-five, all documents that reflect or concern James Ryu's personal financial statement.

Is it your testimony you do not have any documents responsive to this request?

A.   Yes.

Q.   Twenty-six, all documents that reflect or concern communications between you and James Ryu concerning James Ryu's personal financial statement.

Is it your testimony that you do not have any documents responsive to this request?

A.   Yes.

Q.   Twenty-seven, all documents that reflect or concern communications between you and any other person or persons concerning

## Page 17

F. Gleeson

James Ryu's personal financial statement.

Is it your testimony that you do not have any documents responsive to this request?

A.   Yes.

Q.   Twenty-eight, all documents that reflect or concern Karen Chon's embezzlement of money from BankAsiana.

Is it your testimony that you do not have any documents responsive to this request?

A.   Yes.

Q.   Twenty-nine, all documents that reflect or concern communications between you and James Ryu concerning Karen Chon's embezzlement of money from BankAsiana.

Is it your testimony that you do not have any documents responsive to this request?

A.   Yes.

Q.   Thirty, all documents that reflect or concern communications between you and any other persons concerning Karen Chon's embezzlement of money from BankAsiana.

Is it your testimony that you do not have any documents responsive to this request?

A.   Yes.

Page 18

F. Gleeson

Q.   Now, we've gone through all of our 30 documents requests.

And when I say that you do not have these documents that are responsive, it's your testimony that not only do you not have them, but that -- well, let me withdraw that.

Can you tell us what, if anything, you did in response to this subpoena which has document requests as a schedule?

A.   Anything I did?

Q.   Yes.  Did you do anything?

A.   As far as trying to answer these questions you mean?

Q.   Is it fair to say that after you received them that you reviewed the subpoena --

A.   Yes.

Q.   -- and the schedule?

A.   Yes.

Q.   And did you make a search of your files or records or your e-mails to determine whether you had any documents that may be responsive to the document requests, the 30 document requests that we just went over?

A.   Yes, I did.

Page 19

F. Gleeson

Q.   And is it your testimony that you were not able to find any documents that were responsive to any of the requests?

A.   Yes.

Q.   And you understand that, even if you don't have these documents, if you have access to them that you have an obligation to make an effort to try to retrieve those documents --

MR. DZARA:  Objection.

BY MR. YI:

Q.   -- if you have access to them?

MR. DZARA:  Objection.

BY MR. YI:

Q.   I'll represent to you that you have that obligation.

Did you make any attempt to retrieve any documents from other individuals or entities that may have had responsive documents?

MR. DZARA:  Objection.

BY MR. YI:

Q.   You can answer.

A.   No, I didn't ask anybody else for the documents.

Page 20

F. Gleeson

Q.   Are you aware of any other person or entity that may have maybe possession of documents that are responsive to these requests?

A.   No.

Q.   What is your home address?

A.   30 Highland Avenue in Warwick, New York.

Q.   And is the ZIP Code 10990?

A.   Yes.

Q.   How long have you lived there?

A.   Twelve years.

Q.   Do you own the home that you live in?

A.   Yes.

Q.   Are you married?

A.   Yes.

Q.   What is the name of your wife?

A.   Michelle Gleeson.

Q.   How long have you been married?

A.   Twenty years in May, this coming May.

Q.   Twenty-one years?

A.   It'll be 20 years in May.

Page 21

F. Gleeson

Q.   Do you have any children?

A.   Yes.

Q.   How many?

A.   We have one son together and I have two stepchildren, two stepsons, and I have an older son from my first marriage.  So four boys all together.

Q.   How old are they?

A.   Our youngest is 17 and the next two are 27 and 32.  And my oldest is 41.

Q.   Have you ever been deposed prior to today?

A.   In this matter?

Q.   In any matter.

A.   Yes.

Q.   How many times?

A.   Maybe twice.

Q.   Have you ever testified at any legal proceedings such as a hearing or a trial?

A.   No.

Q.   When was the last time you were deposed?

A.   I want to say 30 years ago.

Q.   Thirty years ago?

Page 22

F. Gleeson

2    A.   Mh-hm.
3    Q.   Are you involved in any lawsuits
4  currently?
5    A.   No.
6    Q.   Did you meet with any attorneys
7  concerning this deposition prior to today?
8    A.   No.
9    Q.   Did you meet with any of the parties
10  in this case prior to -- concerning the
11  deposition prior to today?
12    A.   Concerning the deposition, no.  But
13  I have met with James Ryu.
14    Q.   When did you meet with Mr. Ryu?
15    A.   Last time I saw James was about
16  seven months ago.  We had lunch.
17    Q.   And did you discuss -- at the lunch,
18  did you discuss with him about this case?
19    A.   He gave me some indication of what
20  was going on.
21    Q.   Okay.  Can you tell us what he said and
22  what you said?
23    A.   He explained to me that he had
24  been -- what was his term -- I guess found
25  exonerated or found not responsible for the

Page 23

F. Gleeson

2  embezzlement and that -- he gave me some
3  indication of how difficult his life has been
4  in the past three or four years since all this
5  began and that he's been out of work for all of
6  that time.  And we talked a little bit about,
7  you know, how difficult that's been on his
8  family.  His mother was very sick and has since
9  passed away and lot of that resulted from the
10  stress that was brought on by all of this.
11       We talked about his families, his
12  kids, his wife.  And, you know, he gave --
13  just -- it's been a tough time for him so he
14  kind of filled me in on that.  And a little bit
15  about the case but, you know, not so much
16  because I guess it's too involved to get into
17  it, but he did indicate that he was suing, I
18  guess, Bank of Hope now -- that's formally
19  known as Wilshire Bank, is that true?
20       So he did say that he was suing Bank
21  of Hope, I guess for damages of some sort
22  resulting from his being accused of embezzling
23  funds from BankAsiana.  That was the gist of
24  our conversation.
25    Q.   Do you remember anything else he may

Page 24

F. Gleeson

2  have told you?
3    A.   Not specifically, no.
4    Q.   That's all you remember?
5    A.   Yeah.
6    Q.   Do you remember what you said to
7  him?
8    A.   Well, you know, I was certainly sad
9  to hear about how his life had turned.  I
10  hadn't seen him for quite some time after I
11  left BankAsiana.  I want to say I didn't see
12  him for most of those three years or so.  So I
13  really didn't know what was going on in his
14  life.  And, you know, I just told him I felt
15  bad for him, is there anything I could do to
16  help in any way.  You know, just offer some
17  help as a friend.
18    Q.   And did he take you up on your
19  offer?
20    A.   No, not really.  No, we just, you
21  know, talk from time-to-time on the phone just
22  to catch up.  I think the last time I talked to
23  him was when his mom died and he was flying out
24  to California for the funeral. So I expressed
25  my condolences and anything I could do to help.

Page 25

F. Gleeson

2  But, no, he hasn't asked for any help of any
3  kind.
4    Q.   So the last time you spoke to him
5  was when you had lunch with him approximately
6  seven month ago?
7    A.   I have spoken to him on the phone
8  since then.
9    Q.   How often do you speak to him?
10    A.   Let's see, when was the last time I
11  talked to him?  I talked to him when his mom
12  died.  That was maybe three or four months ago.
13  And -- oh, he called me to tell me that I would
14  be receiving a subpoena.  So he called me about
15  a week or day or two before I received the
16  subpoena.  So that was sometime in October.  So
17  I think that was the last time I talked to him.
18    Q.   So the last time you spoke to him on
19  the phone was when he called to let you know
20  you'd be receiving a subpoena --
21    A.   Yes.
22    Q.   -- related to this case?
23    A.   Yes.
24    Q.   And did you speak to him about the
25  subpoena?

## Page 26

F. Gleeson

1
2    A.   A little bit because I read through
3 the document requests and, you know, expressed
4 to him that I didn't have any of these items.
5 He just, you know, acknowledged that I said
6 that and he said If you don't have any, there's
7 nothing you can do.  So...
8    Q.   Did you speak to him about the
9 deposition?
10    A.   When I postponed it last time I
11 e-mailed him, but I didn't speak to him.
12    Q.   And what did you indicate in your
13 e-mail to him about the deposition?
14    A.   That I was unable to attend because
15 I was -- had injured my leg.  He said he was
16 sorry to hear that, you know, hope that you'll
17 be able to reschedule.
18    Q.   Anything else?
19    A.   I don't recall anything else.
20    Q.   Have you talked to any other -- any
21 other person about your deposition in this
22 case?
23    A.   My wife.
24    Q.   Anybody else?
25    A.   No.

## Page 27

F. Gleeson

1
2    Q.   I would like to just briefly go over
3 your educational background and then your
4 professional employment history.
5    A.   Sure.
6    Q.   So let's start with your education,
7 let's start with high school.
8    A.   I went to Saint Joseph High School
9 in Toms River, New Jersey.
10    Q.   Did you graduate?
11    A.   Yes.
12    Q.   And did you attend college?
13    A.   Yes.
14    Q.   After high school?
15    A.   Yes.
16    Q.   Where?
17    A.   I attended -- immediately after high
18 school I attended Ocean County College, also in
19 Toms River.
20    And then I transferred -- after I
21 graduated from there, I transferred to Monmouth
22 University in New Jersey.  I graduated from
23 there with my bachelor's degree and also my
24 MBA.
25    Q.   Was that a BA?

## Page 28

F. Gleeson

1
2    A.   Yes.
3    Q.   Do you remember what year you
4 graduated with a BA from Monmouth University?
5    A.   BS in 1984.
6    Q.   I'm sorry, BS, 1984.
7    And the MBA?
8    A.   1989.
9    Q.   Do you have any other education?
10    A.   Professional education through work.
11 You know, seminars and workshops, that sort of
12 thing.
13    Q.   Do you have any other degrees?
14    A.   No.
15    Q.   Do you currently hold any licenses
16 or certifications?
17    A.   No.
18    Q.   Before we move on to your employment
19 history, have I covered your educational
20 background completely?
21    A.   Yes.
22    Q.   Okay.  And you mentioned you don't
23 hold any licenses or certifications?
24    A.   Correct.
25    Q.   Did you previously hold any licenses

## Page 29

F. Gleeson

1
2 or certifications of any kind?
3    A.   No.
4    Q.   Okay.  Let's start with your
5 employment history.
6    Did you have any significant
7 employment while you were in college or
8 graduate school?
9    A.   Yeah, I worked full-time and went to
10 school at the same time.
11    Q.   Where did you work?
12    A.   I worked for several institutions.
13 I worked for the New Jersey Department of
14 Banking and I worked for Anchor Savings.
15    Q.   Anchor Savings Bank?
16    A.   Savings and loan.  Let's see, where
17 else did I work?  I think I graduated when I
18 was working at Anchor, so that's where I worked
19 during that time.
20    Q.   Did you work for the New Jersey
21 Department of Banking when you were in college?
22    A.   I was going to college, yes, at that
23 time.
24    Q.   Is that department called something
25 else now?

## Page 30

F. Gleeson

1
2    A.   They changed it to New Jersey
3  Department of Banking and Insurance.  They
4  combined the two.
5    Q.   At the time that you were working
6  there, it was called New Jersey Department of
7  Banking?
8    A.   Mh-hm.
9    Q.   Do you remember what your position
10 was?
11   A.   Senior examiner.
12   Q.   And how long did you work there?
13   A.   Five years.
14   Q.   And how long did you work at Anchor
15 Savings?
16   A.   I want to say eight years.
17   Q.   And what was your position?
18   A.   CFO.
19   Q.   And was Anchor -- did you work at
20 Anchor Savings after college but while you were
21 attending graduate school for your MBA?
22   A.   While I was attending graduate
23 school, yes.  I graduated from Monmouth with my
24 BS when I was at the New Jersey Department of
25 Banking and then I went to Anchor Savings and

## Page 31

F. Gleeson

1
2  continued my education and I got my MBA when I
3  was working at Anchor Savings.
4    Q.   Is it fair to say that after you
5  received your MBA and graduated in 1989 from
6  Monmouth University, you continued to work at
7  Anchor Savings?
8    A.   Yeah, until 1992, I think.  1991 or
9  1992.
10   Q.   So approximately 1989 to 1992?
11   A.   Yeah.
12   Q.   I'm sorry, 1984 to 1992.
13   A.   I was at Anchor, actually, from '85
14 to '92.
15   Q.   So let's pick up there.
16        After Anchor Savings, where were you
17 employed?
18   A.   I went to work for Ocean City Home
19 Savings.
20   Q.   By the way, just quickly going back
21 to New Jersey Department of Banking, were you
22 always senior examiner during the five years?
23   A.   When I first started, I was just
24 examiner and then was -- received a promotion
25 somewhere during that time.

## Page 32

F. Gleeson

1
2    Q.   And when you were at Anchor Savings
3  for approximately eight years, were you always
4  CFO?
5    A.   Well, I was controller when I first
6  went there and I think after I was there about
7  a year, I moved up to CFO.
8    Q.   And were you CFO when you left?
9    A.   Yes.
10   Q.   What was the reason for leaving New
11 Jersey Department of Banking?  Was that just
12 employment during school, during the college?
13   A.   No, I had an opportunity.  As an
14 examiner, I had met the CEO of Anchor Savings
15 and he offered me a job.  So when I graduated I
16 went to work for him.
17   Q.   What was the reason for leaving
18 Anchor Savings in 1992?
19   A.   The bank was acquired by another
20 bank.  I can't recall the name of it though.
21 It was taken over by another bank.
22   Q.   And were you laid off?
23   A.   No, I wasn't laid off, I just chose
24 to leave.
25   Q.   And you went over to Ocean City Home

## Page 33

F. Gleeson

1
2  Savings?
3    A.   Yes.
4    Q.   From when to when did you work
5  there?
6    A.   '92 to 2001.
7    Q.   And what was your position?
8    A.   CFO.
9    Q.   Were you CFO during that entire
10 time?
11   A.   I was.
12   Q.   After Ocean City Home Savings, where
13 were you employed?
14   A.   I was self-employed.  I had a
15 consulting business for about two years and I
16 also did some teaching at Stockton University.
17   Q.   Where is Stockton University?
18   A.   Right outside of Atlantic City, New
19 Jersey.
20   Q.   What were the circumstances in which
21 you left Ocean City Home Savings in
22 approximately 2001?
23   A.   My wife was very ill.  We had our
24 youngest child during that time and I almost
25 lost them both.  And it was a personal matter,

Page 34

F. Gleeson

1  I needed to be at home and I needed to spend
2  time with my wife and newborn son. So I left
3  Ocean City and started my own business and did
4  some teaching so I could be close to them.
5      Q. All right. After you were
6  self-employed and did consulting and teaching
7  for approximately two years, were you again
8  employed?
9      A. Yeah.
10     Q. Where?
11     A. I went to work for the FAA Credit
12 Union, which was in Northfield, New Jersey, as
13 a chief operating officer.
14     Q. And FAA stands for Federal Aviation
15 Administration?
16     A. Yes.
17     Q. From when to when did you work
18 there?
19     A. Let's see, sometime in 2002, I
20 guess, to 2005. I don't remember which months
21 but...
22     Q. And during that time were you were
23 you always COO?
24     A. Yeah.

Page 35

F. Gleeson

1      Q. Okay. After FAA Credit Union, where
2  were you employed next?
3      A. I had an opportunity in Mariner's
4  Bank in Northern Jersey. Edgewater, actually.
5  And I was the CFO and I worked there for two
6  years.
7      Q. From when to when?
8      A. 2005, 2007.
9      Q. What were the circumstances in which
10 you left FAA Credit Union in 2005?
11     A. An opportunity at Mariners.
12     Q. And were you CFO during the entire
13 time that you were with Mariner's Bank?
14     A. Yes, yes.
15     Q. After Mariner's Bank, where were you
16 employed?
17     A. BankAsiana, 2007 to 2013.
18     Q. Who hired you?
19     A. Hong Sik Hur.
20     Q. What were the circumstances in which
21 you became employed by BankAsiana?
22     A. Let's see, I was contacted by a
23 gentleman by the name of HB Kim, who was the
24 chief lending officer at BankAsiana.

Page 36

F. Gleeson

1      BankAsiana, at the time, was an
2  organization. It hadn't opened yet. It hadn't
3  received its approvals from the regulators to
4  open. So they were looking for a CFO to help
5  them get open and so he contacted me, asked --
6  he had gotten my name from somebody, I don't
7  recall who, and he contacted me, asked if I
8  would be interested and I said I would be. And
9  then I had an interview with Hong Sik Hur and
10 James Ryu.
11     Q. And during your employment with
12 BankAsiana, were you always CFO?
13     A. Yes.
14     Q. Could you describe to us your duties
15 and responsibility -- by the way, did you have
16 a corporate title of senior vice president?
17     A. I did.
18     Q. What were your duties and
19 responsibilities as a senior vice president and
20 CFO of BankAsiana?
21     A. I was responsible for the accounting
22 department, financial reporting, budgeting,
23 taxes, asset liability management. I worked
24 closely with examinations from the regulators,

Page 37

F. Gleeson

1  as well as audits from our independent
2  accountants. I supervised the accounting
3  department. That's pretty much what I did.
4      Q. Anything else?
5      A. Responsible to report to the board
6  on the financial condition of the bank, put
7  together annual reports, you know, lots of
8  financial reporting. You know, I was a big
9  part of -- I was one of the original hires at
10 BankAsiana. I think there were maybe eight or
11 ten people; I was one of those original
12 employees. I was responsible for getting the
13 bank open in the first part, getting all the
14 approvals from the regulators and so on.
15 Capital raising. That's pretty much it.
16     Q. During your employment with
17 BankAsiana -- withdrawn.
18     Is it fair to say that you worked
19 with James Ryu during your employment with
20 BankAsiana?
21     A. I did, yes.
22     Q. And is it fair to say that James Ryu
23 was senior vice president and COO, chief
24 operating officer, of BankAsiana?

Page 38

F. Gleeson

1
2      A.   Yes.
3      Q.   And that was during your entire
4  tenure or employment with BankAsiana?
5      A.   Yes.
6      Q.   Was James Ryu also the bank's BSA
7  officer?
8      A.   He was, yes.
9      Q.   Was James Ryu also the chief
10 compliance officer of the bank?
11     A.   Yes, he was.
12     Q.   When you left BankAsiana in 2013,
13 how many branches did BankAsiana have?
14     A.   Three, I believe.
15     Q.   Do you remember where they were?
16     A.   The main branch was Palisades Park,
17 New Jersey, we had a branch in Fort Lee, New
18 Jersey, and a branch in Flushing, New York.
19     Q.   And the branch in Fort Lee, New
20 Jersey, was that referred to as East Fort Lee,
21 New Jersey branch?
22     A.   Not that I know of.  I think it was
23 always -- I always called it Fort Lee so...
24     Q.   Okay.  In 2013, do you remember who
25 was in charge of the East Fort Lee branch for

Page 39

F. Gleeson

1
2  BankAsiana?
3      A.   I think it was TK Suh.  I don't know
4  what the TK stood for, but TK Suh, S-u-h.  I
5  believe he was --
6      Q.   Was he the branch manager?
7      A.   Yes, I believe he was.
8      Q.   Do you remember who the branch
9  manager was prior to TK Suh?
10     A.   There was a woman manager.  I can't
11 recall her name, but there was someone from TK.
12     Q.   Do you remember a woman named
13 Jessica Kim?
14     A.   I do, but that's not who I'm
15 thinking of.  There was another woman who was
16 branch manager.  I think she was hired when the
17 branch was opened and she was there for, you
18 know, some time, a couple of years or a few
19 years.  She left the bank and I can't recall
20 her name.
21     Q.   Okay.  Do you remember who the
22 number-two person, for lack of a better term,
23 would have been at the Fort Lee branch?
24     A.   Karen Chon was the operations
25 manager, I believe, at Fort Lee.  She would be

Page 40

F. Gleeson

1
2  the number-two person.
3      Q.   Prior to TK Suh becoming branch
4  manager of the Fort Lee branch -- and I'll
5  represent to you that it was referred to by
6  BankAsiana internally as East Fort Lee branch.
7      A.   Okay.
8      Q.   Prior to TK Suh becoming the branch
9  manager of the East Fort Lee branch of the
10 bank, do you recall if he had any experience in
11 operations?
12         MR. DZARA:  Objection to Fort Lee.
13     You can answer.  If I object, you have to
14     answer.
15         THE WITNESS:  Okay.
16     A.   When he was with the bank, he was a
17 marketing -- I think he was hired as a
18 marketing officer.  But he had -- my
19 recollection is he had a number of years
20 experience in banking prior to that.  Whether
21 he had any operations experience in those, you
22 know, years, I don't know.  So I really can't
23 answer that question.
24     Q.   Do you recall who made the decision
25 to make him branch manager of the East Fort Lee

Page 41

F. Gleeson

1
2  branch?
3         MR. DZARA:  Objection.
4      A.   I would think that was Hong Sik Hur,
5  but I don't know that for a fact.
6      Q.   Did BankAsiana -- during your
7  employment with BankAsiana, did the bank have
8  an internal audit department?
9      A.   No.
10     Q.   Is it fair to say that the functions
11 of an internal audit department of a bank were
12 performed by a company outside the bank?
13     A.   Yes, that's true.
14     Q.   Do you recall who that was?
15     A.   Withum, Smith, and Brown.
16         MR. YI:  Off the record.
17 BY MR. YI:
18     Q.   Anyone else?
19     A.   As far as auditors?
20     Q.   Yes.
21     A.   We had Crowe Horwath, who was our
22 external audit firm.  They audited the
23 financial statements and then Withum, Smith,
24 and Brown was the internal audit firm.
25     Q.   During your employment with

Page 42

F. Gleeson

1
2  BankAsiana, did the bank have an internal IT
3  department?
4      A.   Near the end of my tenure there,
5  yes, we hired an IT person, but not the entire
6  time.
7      Q.   Do you remember a company called F
8  One Communication, Inc.?
9      A.   Yes.
10     Q.   And do you recall what their role
11  was with respect to BankAsiana?
12     A.   They were essentially the outsourced
13  IT firm that helped manage the IT
14  infrastructure of the bank.
15     Q.   Do you remember any particular
16  individuals at that company?
17     A.   Paul Eom, I think, was the
18  principal.
19     Q.   Do you remember how he spelled his
20  last name?  Is it E-u-m?
21     A.   E-u-m or E-o-m, I don't know.
22     Q.   E-o-m?
23          Do you remember anyone else?
24     A.   When the bank first started, he had
25  a partner because he helped set up the bank's

Page 43

F. Gleeson

1
2  IT infrastructure at the beginning.  I don't
3  recall his name though, but he had someone in
4  business with him.  I don't remember his name.
5      Q.   Do you remember whether the company
6  had any employees?
7      A.   I never worked with anybody other
8  than Paul Eom, so I never met any other
9  employees.
10          (Gleeson Exhibit 3, copy of an
11  e-mail from James Ryu to Mr. Gleeson from
12  April 20, 2010, 9:55 a.m., marked for
13  identification.)
14          MR. YI:  Can we take a quick break?
15          MR. DZARA:  Sure.
16          (Recess is taken.)
17  BY MR. YI:
18     Q.   I'm showing you what's been marked
19  as Exhibit 3 to your deposition.
20          Is this a copy of an e-mail from
21  James Ryu to you from April 20, 2010,
22  9:55 a.m.?
23     A.   That's what it appears to be, yeah.
24     Q.   Okay.  If you could take a look at
25  the second page of this exhibit, which has the

Page 44

F. Gleeson

1
2  heading "James S. Ryu personal financial
3  statement as March 31, 2010."
4          Do you see that?
5      A.   Yes.
6      Q.   Is that a personal financial
7  statement of James Ryu as of March 31, 2010,
8  that you prepared for him?
9      A.   I helped him compile it.
10     Q.   When you say you "helped him compile
11  it," who actually prepared this document,
12  second page of this exhibit?
13     A.   Right.  He gave me the figures and I
14  put them on a page.
15     Q.   Just going back to the first page of
16  this exhibit, do you see the subject "Financial
17  statement for Luz," L-u-z?
18     A.   Mh-hm.
19     Q.   Do you see the attachment being
20  "Financial statement for Luz"?
21     A.   Yes.
22     Q.   Does that refresh your
23  recollection -- withdrawn.
24          Do you remember the purpose of this
25  financial -- personal financial statement?

Page 45

F. Gleeson

1
2      A.   I believe he was trying to acquire
3  this business at the time.  I don't know the
4  dates exactly, to be perfectly honest, but I
5  believe he was trying to acquire the business.
6      Q.   Do you remember what type of
7  business Luz was?
8      A.   I think that was the hair salon,
9  beauty salon.  So he was acquiring the business
10  and I think he had to put together a financial
11  statement for the people he was buying the
12  business from.
13     Q.   And do you recall whether he
14  actually did purchase the business?
15     A.   I don't know whether he actually
16  purchased it or if he just operated it.  I
17  never -- I never knew how that transaction
18  ended up, but I know he operated it for some
19  time.  Whether he owned it or not, I don't
20  know.
21     Q.   When you say he came to operate it
22  at some point, what do you mean by
23  operate"?
24     A.   Run the business on a day-to-day
25  basis.

---

Page 46

F. Gleeson

1

2    Q.   Did he do that while he was still
3    employed by BankAsiana?
4    A.   Yes.
5    Q.   When you left BankAsiana in 2013,
6    was James Ryu still operating this business,
7    Luz, the hair salon?
8    I don't think so.  I don't think so.
9    Q.   Do you recall approximately how long
10   he operated this hair salon?
11   A.   No, I would say less than two years.
12   That's a bit of a guess, but it wasn't that
13   long.
14        MR. DZARA:  Do you want him to
15   guess, Michael?
16        MR. YI:  No.
17   BY MR. YI:
18   Q.   You don't have to guess to any of my
19   questions.
20   A.   Okay.  Yeah, I really don't know how
21   long.
22   Q.   But your best recollection is
23   approximately two years?
24   A.   Yeah.
25   Q.   Is that your testimony?

---

Page 47

F. Gleeson

1

2    A.   Yeah, I would say that.
3    Q.   When you prepared this second page,
4    the personal financial statement of James Ryu
5    as of March 31, 2010, you indicated earlier
6    that these numbers were based on numbers that
7    James Ryu had provided to you.  Do you recall
8    whether he provided to you any source
9    documents?
10   A.   No.
11        MR. DZARA:  You don't remember?
12   BY MR. YI:
13   Q.   You don't recall or he didn't?
14   A.   He didn't.
15   Q.   Did you ask him for source
16   documents?
17   A.   No.
18   Q.   Do you know what James -- and I'll
19   just refer to him as James, if that's okay.
20   A.   Sure.
21   Q.   Do you know what James did with this
22   personal financial statement?
23   A.   No, I don't.
24   Q.   Do you recall him telling you what
25   he was going to use it for?

---

Page 48

F. Gleeson

1

2    A.   It was my understanding he was
3    trying to acquire the business and he needed to
4    prepare a financial statement.
5    Q.   And you don't recall whether there
6    were any other purposes for this personal
7    financial statement?
8    A.   No, I don't recall.
9    Q.   Do you remember anything else about
10   this personal financial statement that you
11   prepared for James Ryu in April of 2010?
12        MR. DZARA:  Objection to form.
13   A.   No, I don't remember anything else.
14        (Gleeson Exhibit 4, e-mail to James
15   from October 3, 2011, 1:03 p.m., subject is
16   "Seleste," attachment is also "Seleste",
17   marked for identification.)
18   BY MR. YI:
19   Q.   I'm showing you what's been marked
20   as Exhibit 4 to your deposition.
21        Is this a copy of your e-mail to
22   James from October 3, 2011, 1:03 p.m., subject
23   is "Seleste," attachment is also "Seleste"?
24   A.   Yup.  It appears to be that, yes.
25   Q.   On the second page of this exhibit,

---

Page 49

F. Gleeson

1

2    the heading is "Seleste LLC income statement."
3        Do you see that?
4    A.   Yes.
5    Q.   Do you recall the company, Seleste
6    LLC?
7    A.   Yes.
8    Q.   Okay.  What type of business?
9    A.   I believe that was the -- the
10   corporation that owned the hair salon, Luz, as
11   well as the cafe, which I believe was called --
12   was it called Seleste or -- the cafe may have
13   had a different name.
14   Q.   Does the name Kudo Beans --
15   A.   Yes, that was it, Kudo Beans.  So
16   Seleste was the limited liability corporation
17   that owned those two businesses.
18   Q.   So is it your testimony that Seleste
19   LLC is or was a limited liability company that
20   owned both the hair salon business, which was
21   called Luz, and a cafe, which was called Kudo
22   Beans?
23   A.   Yeah, that's the way I recall it,
24   yeah.
25   Q.   And the second page of this exhibit,

---

Page 50

F. Gleeson

1   F. Gleeson
2   is that a Seleste LLC income statement that you
3   prepared?
4       A.   I put the numbers of the page after
5   being given those numbers by James Ryu to
6   prepare the statement.
7       Q.   Okay.  And is it fair to say that
8   you prepared or you put together this income
9   statement at James's request?
10      A.   Yes.
11      Q.   And do you recall what the purpose
12  of this income statement was?
13      A.   No, I don't.
14      Q.   And other than James giving you
15  these figures or numbers, do you recall what --
16  did he give you, if you recall, any source
17  documents for these numbers that are indicated
18  in the income statement?
19      A.   No.
20      Q.   Did you ask him for source
21  documents?
22      A.   No.
23      Q.   And in your e-mail you state,
24  "James, let me know what changes you want to
25  make."

Page 51

1   F. Gleeson
2       Do you recall whether he asked you
3   to make any changes?
4       A.   I don't recall, no.  Was there a
5   later e-mail that followed up to this or...
6       Q.   Do you recall?
7       A.   No.
8       Q.   Okay.  And is it fair to say that,
9   as of October 3rd, 2011, you were the CFO of
10  BankAsiana?
11      A.   Yes.
12      Q.   And as of October 3rd, 2011, James
13  was the COO of the bank?
14      A.   Yes.
15      Q.   Were you ever compensated in any way
16  by James for preparing the -- his personal
17  financial statement dated as of March 31, 2010?
18      A.   No.
19          MR. DZARA:  Objection to form.
20  BY MR. YI:
21      Q.   Were you ever compensated by James
22  for preparing Seleste LLC's income statement --
23          MR. DZARA:  Objection to form.
24  BY MR. YI:
25      Q.   -- in or about October 2011?

Page 52

1   F. Gleeson
2       A.   No.
3           (Gleeson Exhibit 5, e-mail to James
4       from October 3rd, 2011, 2:45 p.m., with
5       subject "Seleste," and attachment
6       "Seleste", marked for identification.)
7   BY MR. YI:
8       Q.   I'm showing you what's been marked
9   as Exhibit 5 to your deposition.
10          Is this a copy of your e-mail to
11  James from October 3rd, 2011, 2:45 p.m., with
12  subject "Seleste," and attachment "Seleste"?
13      A.   It appears to be that, yes.
14      Q.   Why don't we take a look at 4 and 5,
15  the second pages of 4 and 5 together.
16          And I will represent to you that --
17  withdrawn.
18          The second page of Exhibit 5, is
19  that a copy of Business Income Statement
20  January 2010 to July 2010 that you either
21  compiled or prepared at James's request?
22      A.   Yes.
23      Q.   Just looking at the second page of
24  Exhibit 4 and the second page of Exhibit 5, can
25  you explain to us the difference, just in

Page 53

1   F. Gleeson
2   general?
3       A.   Well, he had given changes to
4   Exhibit 4, which resulted in Exhibit 5.
5       Q.   So Exhibit 5, the second page, it is
6   still Seleste LLC's income statement?
7       A.   Right.  Right.
8       Q.   Just some of the numbers were
9   changed?
10      A.   Yeah.
11      Q.   And those numbers were provided to
12  you by James, correct?
13      A.   Correct.
14      Q.   And you made those changes?
15      A.   Correct.
16      Q.   Again, same question, James -- is it
17  fair to say James didn't provide you with any
18  source documents for the new numbers?
19      A.   Correct.
20      Q.   And is it fair to say you didn't ask
21  him for the source documents?
22      A.   Yes.
23      Q.   And do you remember -- I'm sorry if
24  I asked this earlier, do you remember what the
25  purpose of this income statement was?

---

Page 54

F. Gleeson

1
2      A.   I don't remember what he was doing
3   with this document.
4      Q.   Did you ever ask him what he was
5   going to do with this income statement for
6   Seleste LLC?
7      A.   I don't.  I don't remember if I
8   asked him that question.
9      Q.   Do you remember anything else about
10  either the e-mail or the income statements
11  which is part of Exhibit 5?
12     A.   No, I don't remember anything else.
13     Q.   Were you ever employed by Seleste
14  LLC?
15     A.   No.
16     Q.   Were you ever compensated -- did you
17  ever receive compensation from Seleste LLC?
18     A.   No.
19     Q.   In this e-mail, Exhibit 5, you say
20  to James, "Here you go."
21          Is it fair to say that he had asked
22  you -- he had provided you with some new
23  numbers for the income statement and you put in
24  those numbers and you sent it to him?
25     A.   Correct.

---

Page 55

F. Gleeson

1
2          (Gleeson Exhibit 6, chain of e-mail
3      with James's e-mail from October 3rd, 2011,
4      2:52 p.m., subject "Seleste", marked for
5      identification.)
6   BY MR. YI:
7      Q.   Before we get to the next exhibit,
8   as of October 2011, was anyone else at the bank
9   aware that you were helping or assisting James
10  compile income statement for Seleste LLC?
11     A.   I don't remember if anybody else was
12  aware.
13     Q.   Did you ask anyone that you
14  considered to be -- withdrawn.
15          Did you ever ask Mr. Hur or anybody
16  on the board of the bank for permission to
17  either assist or help James compile or prepare
18  the income statement?
19     A.   I don't remember.
20     Q.   What about the personal financial
21  statement of James Ryu that we looked at
22  earlier, I believe it was as of March 31st of
23  2010.  Did you ever ask Mr. Hur or anybody on
24  the board of the bank for permission to help
25  James either compile or prepare his personal

---

Page 56

F. Gleeson

1
2   financial statement?
3      A.   I don't remember.
4      Q.   You have in front of you what's been
5   marked as Exhibit 6.
6      A.   Yes.
7      Q.   Okay.  And I'll represent to you
8   that the e-mail that's on the second page of
9   this exhibit was an e-mail that we had
10  previously looked at, your e-mail to James from
11  October 3, 2011, in which you said,
12  "Here you go."  And then I'm going to ask you
13  questions about two subsequent e-mails.
14          On the bottom of the first page of
15  this exhibit, is that a copy of James's e-mail
16  to you from October 3rd, 2011, 2:52 p.m.,
17  subject "Seleste"?
18     A.   It appears to be that, yes.
19     Q.   And in that e-mail James says to
20  you, "Thanks, Frank."
21          Do you see that?
22     A.   Yes.
23     Q.   Is it fair to say that he was
24  thanking you for sending to him the revised
25  income statement for Seleste LLC?

---

Page 57

F. Gleeson

1
2      A.   Yes.
3      Q.   And take a look at the e-mail at the
4   top of the first page, is that a copy of your
5   e-mail to James, same day, 2:57 p.m., with the
6   subject "Seleste"?
7      A.   Yes.
8      Q.   And in that e-mail you said to
9   James, "Anytime.  Let me know when you are
10  ready on the other thing."
11          Do you see that?
12     A.   Yes.
13     Q.   Do you remember what "the other
14  thing" was?
15     A.   I do not.  I do not remember.
16     Q.   And when you said "when you are
17  ready," you're saying "when you are," when
18  James Ryu are ready, right?
19     A.   Yes.
20     Q.   Do you remember anything else about
21  this particular e-mail?
22     A.   No.
23     Q.   Okay.  Just to be sure, you don't
24  remember what the other thing was that you were
25  referencing in that e-mail?

---

Page 58

F. Gleeson

1
2     A.   No, I don't.
3          (Gleeson Exhibit 7, e-mail to James
4     from October 5th, 2011, 11:49 a.m., with
5     the subject "Seleste," and attachment
6     "Seleste", marked for identification.)
7     BY MR. YI:
8     Q.   I'm showing you what's been marked
9     as Exhibit 7 to your deposition.
10         Is this a copy of your e-mail to
11    James from October 5th, 2011, 11:49 a.m., with
12    the subject "Seleste," and attachment
13    "Seleste"?
14    A.   Yes, it appears to be that.
15    Q.   Okay.  And let's go back to
16    Exhibit 5.  I'll ask you to turn to the second
17    page of this Exhibit 7 and compare it to the
18    second page of Exhibit 5.  Did you have a
19    conversation or a communication with James
20    prior to this e-mail where James provided to
21    you with numbers for utilities?
22    A.   Yes, he gave me some adjustments to
23    the numbers in Exhibit 5.
24    Q.   Okay.
25    A.   So we produced Exhibit 7.

Page 59

F. Gleeson

1
2     Q.   So the previous income statement
3     from -- which is second page of Exhibit 5, did
4     not have a line expense item for utilities --
5     A.   Correct.
6     Q.   -- and Exhibit 7, the second page,
7     the income statement, appears to be an updated
8     income statement which now has a line item
9     for utilities for both the hair salon and the
10    cafe with a combined total figure; is that
11    correct?
12    A.   That's correct.  Some of the other
13    numbers changed as well.
14    Q.   Right.  So the total expenses also
15    changed for both the hair salon and the cafe
16    and the combined total?
17    A.   Yes.
18    Q.   Including, I guess, the net income
19    also changed?
20    A.   Yes.
21    Q.   And those utilities numbers for the
22    hair salon and the cafe, those numbers were
23    provided to you by James?
24    A.   Yes.
25    Q.   And, again, he didn't provide you

Page 60

F. Gleeson

1
2     with any source documents for those figures,
3     right?
4     A.   Correct.
5     Q.   And you didn't ask for them?
6     A.   Correct.
7     Q.   And does this now refresh your
8     recollection as to what James told you about
9     what he was going to do with this income
10    statement?
11    A.   I do not recall what he was doing
12    with this particular statement, no.
13    Q.   Do you remember -- is there anything
14    else that you remember about this e-mail or
15    this income statement that's the second page to
16    this exhibit?
17    A.   No.
18         (Gleeson Exhibit 8, James's e-mail
19    from October 14, 2011, 10:50 a.m., with the
20    subject "Income and expense," and
21    attachment called "Income and expense",
22    marked for identification.)
23    BY MR. YI:
24    Q.   I'm showing you what's been marked
25    as Exhibit 8.

Page 61

F. Gleeson

1
2         Is this a copy of James's e-mail to
3     you from October 14, 2011, 10:50 a.m., with the
4     subject "Income and expense," and attachment
5     called "Income and expense"?
6     A.   It appears to be that, yes.
7     Q.   And I'm going to ask you to turn to
8     the second page of this exhibit.
9         Is that an income and expense
10    statement that you prepared or compiled for
11    James at his request?
12         (Witness complies.)
13    A.   These numbers appear to be
14    BankAsiana numbers.  So those are the assets,
15    loans, deposits, capital, net income before and
16    after tax for BankAsiana.
17    MR. YI:  Let's take a quick break.
18         (Recess is taken.)
19    BY MR. YI:
20    Q.   I'm showing you what's been marked
21    as Exhibit 8 and I was referring you to the
22    second page of this Exhibit 8, which appears to
23    be -- is that a copy -- is that an income and
24    expense statement that you either prepared or
25    compiled for James at his request?

Page 62

F. Gleeson

1
2      A.   Yes.
3      Q.   Okay.  And is it fair to say that
4  these are numbers that James had provided to
5  you so that you could prepare this statement?
6      A.   Yes.
7      Q.   And is it fair to say that he did
8  not provide you with any source documents or
9  back-up documents for these numbers?
10     A.   Yes.
11     Q.   And is it fair to say you didn't ask
12  him for such documents?
13     A.   Yes.
14     Q.   As you sit here today, do you know
15  whether any of these numbers are accurate as of
16  October 14, 2011?
17     A.   Accurate to the extent that he gave
18  them to me.  Outside of that, I don't know
19  these numbers are accurate beyond that.
20     Q.   Okay.  And is it fair to say that --
21  well, withdrawn.
22          The income and expenses that are
23  reflected in this statement, which is the same
24  page of this statement, is it fair to say that
25  this is James's personal income and expenses?

---

Page 63

F. Gleeson

1
2      A.   Yes.
3      Q.   Do you remember why he asked you to
4  prepare this for him?
5      A.   He was going through a modification
6  of his mortgage loan on his home and I think he
7  had to put together an income expense statement
8  for that modification request.  And I believe
9  that's the purpose of this, what this was.
10     Q.   Okay.  And when you say "his home,"
11  are you referring to his home in New Jersey --
12     A.   Yeah.
13     Q.   -- or his home elsewhere?
14     A.   His home in New Jersey.
15     Q.   And do you remember who the lender
16  was?
17     A.   I think it was Bank of America.
18     Q.   Let me just direct your attention to
19  the first two lines there, it says "Mortgage
20  LA" and then "Mortgage NJ."
21          Do you see that?
22     A.   Yes.
23     Q.   Okay.  It's your recollection that
24  he was attempting to modify the mortgage loan
25  for his home in New Jersey?

---

Page 64

F. Gleeson

1
2      A.   Yes, that's my recollection.
3      Q.   With Bank of America?
4      A.   Yes.
5      Q.   Do you remember anything else about
6  this e-mail or the income and expense statement
7  that you prepared for him?
8      A.   No, I don't remember.
9          (Gleeson Exhibit 9, e-mail to James
10  from November 8, 2011, marked for
11  identification.)
12  BY MR. YI:
13     Q.   I'm showing you what's been marked
14  as Exhibit 9.
15          Is this a copy of your e-mail to
16  James from November 8, 2011?
17     A.   It appears to be, yes.
18     Q.   At 9:22 a.m., with the subject
19  "Planning CO," and an attachment called
20  "Planning CO"?
21     A.   Yes.
22     Q.   And the attachment that's the second
23  page of this exhibit, do you remember what that
24  is?
25     A.   These are BankAsiana numbers for

---

Page 65

F. Gleeson

1
2  assets, loans, deposits, capital, and then
3  income before and after tax.  Actual numbers,
4  budgeted numbers, and projected numbers for the
5  following year.
6      Q.   Do these numbers reflect the
7  calendar year 2011?
8      A.   I believe so, yeah.
9      Q.   And did you prepare this actual and
10  budget document at James's request?
11     A.   Yes.
12     Q.   And do you remember what the purpose
13  of this document was?
14     A.   I seem to recall we had a planning
15  committee scheduled for November 11th of 2011
16  and this was some numbers that needed to be
17  discussed at that committee meeting.
18     Q.   And are the numbers indicated here,
19  are they in the thousands?
20     A.   Yes.  I believe James was putting
21  together a PowerPoint presentation for the
22  committee and he needed these numbers for that
23  purpose.
24     Q.   And when you say "planning
25  committee," is that the planning committee of

Page 66

```
 1              F. Gleeson
 2  the board of directors of the bank?
 3      A.   Correct.
 4          (Gleeson Exhibit 10, e-mail from
 5      James to Mr. Gleeson from February 15,
 6      2012, 9:22 a.m., with the subject "Schedule
 7      J, current expenditures", marked for
 8      identification.)
 9  BY MR. YI:
10      Q.   I'm showing you what's been marked
11  as Exhibit 10.
12          Have you had a chance to look
13  through this exhibit?
14      A.   Briefly, yeah.
15      Q.   I'm directing your attention to the
16  top of the first page of this exhibit.
17          Is that a copy of an e-mail from
18  James to you from February 15, 2012, 9:22 a.m.,
19  with the subject "Schedule J, current
20  expenditures," and an attachment, a PDF
21  attachment, with the numbers indicated there?
22      A.   It appears to be, yes.
23      Q.   Do you know why James was sending
24  this attachment to you?
25          (Witness complies.)
```

Page 67

```
 1              F. Gleeson
 2      A.   I'm trying to recall.  He was
 3  working with an attorney by the name of
 4  Robert Yu and Robert was working on -- I'm not
 5  sure if it was a bankruptcy application or -- I
 6  don't remember the purpose of the document.
 7  I'm trying to remember, but I don't remember.
 8      Q.   Okay.
 9      A.   But I know he was working with
10  Robert Yu on...
11      Q.   Let me direct your attention to the
12  attachment at the top, it indicates Inray and
13  has the name, last name, Ryu, R-y-u.  First
14  name, D-U.  Middle initial appears to be H.
15          Do you remember James's wife name?
16      A.   I believe that was his wife's name,
17  yeah.
18      Q.   And do you remember his wife filing
19  for bankruptcy sometime in 2012?
20      A.   You know, until this moment I
21  don't -- I did not remember that, but the
22  paperwork would indicate that to me.  But I
23  don't recall if she filed for bankruptcy.
24      Q.   These documents don't refresh your
25  recollection as to what, if any, involvement
```

Page 68

```
 1              F. Gleeson
 2  you may have had in connection with James's
 3  wife bankruptcy filing, if any, in or about
 4  2012?
 5          MR. DZARA:  Objection to form.
 6      A.   I'm trying to remember, but I don't.
 7      Q.   We can come back to it.
 8      A.   Yeah, there may be something else
 9  you show me that may help me to remember that,
10  but I don't remember that right now.
11      Q.   You mentioned earlier that James was
12  working with an attorney by the name of
13  Robert Yu?
14      A.   Mh-hm.
15      Q.   Was Robert Yu -- as of
16  February 2012, was Robert Yu the attorney
17  representing BankAsiana or James Ryu?
18          MR. DZARA:  Objection to form.
19      A.   I think he may have represented the
20  bank also, in certain matters.
21      Q.   And is it your testimony that
22  Robert Yu was also representing James Ryu?
23      A.   Yes.
24      Q.   In connection with James's personal
25  matters?
```

Page 69

```
 1              F. Gleeson
 2      A.   Yes.
 3      Q.   And perhaps -- do you know whether
 4  Robert Yu was representing James's wife in
 5  connection with personal matters as well?
 6      A.   From this document, it appears that
 7  way, but I didn't recall that, as I said before
 8  you handed this to me.  But it certainly would
 9  appear that way.
10      Q.   Do you recall having any discussions
11  with Robert Yu concerning any bankruptcy
12  proceeding relating to James's wife?
13      A.   No, I don't recall.
14      Q.   Okay.  I'm going to ask you to turn
15  to page 3 of this exhibit and direct your
16  attention to the bottom of this page.
17      Q.   Okay.
18      Q.   And I'll represent to you that this
19  is a copy of Irene Lee's e-mail to James from
20  February 14, 2012.
21          Do you know why Irene Lee would have
22  e-mailed to James on February 14, 2012, a copy
23  of this attachment?
24          MR. DZARA:  Objection.
25      A.   No, I don't know why she would have
```

Page 70

1        F. Gleeson
2    sent this.
3        MR. DZARA:  Foundation.  There's no
4    evidence that's the attachment that Irene
5    is e-mailing to James -- (inaudible) --
6    BY MR. YI:
7        Q.   I'll represent to you that --
8        MR. DZARA:  Unless you have that
9    e-mail.
10       MR. YI:  I'll represent to you that
11   this attachment was attached to the
12   e-mail --
13       MR. DZARA:  Well, I'll object to
14   that being -- because I don't see by
15   reading it it being sent to James.  So I
16   object to your representation.
17   BY MR. YI:
18       Q.   Do you know why Irene Lee would have
19   e-mailed to James on that day a copy of this
20   attachment?
21       MR. DZARA:  Objection.  Asked and
22   answered.
23       A.   No, I don't.
24       Q.   And Irene Lee was employed by
25   BankAsiana at the time, correct?

Page 71

1        F. Gleeson
2        A.   Yes.
3        Q.   And do you remember what her
4    position was at the bank?
5        A.   She worked in the operations
6    department of the bank.  She worked for James.
7        Q.   During the time you were employed by
8    BankAsiana, do you recall James Ryu asking
9    other employees at the bank to assist him in
10   connection with his or his wife's personal
11   matters?
12       A.   No, I do not.
13       Q.   Before we go on to the next exhibit,
14   is there anything else that you recall about
15   Exhibit 10?
16       MR. DZARA:  Objection to form.
17       A.   No, I don't recall anything else.
18       Q.   Okay.  I'll move on, but if you
19   remember something just let us know.
20       (Gleeson Exhibit 11, e-mail from
21   Robert Yu to James from February 15, 2012,
22   2:55 p.m., CC'd to Mr. Gleeson with a
23   subject "Schedule J," and attachment called
24   "Schedule J revised", marked for
25   identification.)

Page 72

1        F. Gleeson
2    BY MR. YI:
3        Q.   I'm showing you what's been marked
4    as Exhibit 11.
5        Let me start at the top of the first
6    page, is that an e-mail from Robert Yu to James
7    from February 15, 2012, 2:55 p.m., CC'd to you
8    with a subject "Schedule J," and attachment
9    called "Schedule J revised"?
10       A.   Yes.
11       Q.   And below that, is that a copy of
12   James's e-mail to Robert Yu from
13   February 15, 2012, 1:41 p.m., with -- CCed to
14   you with a subject "Schedule J"?
15       A.   Yes.
16       Q.   Okay.  In that e-mail, James says to
17   Robert Yu, "Robert, when you send the new
18   schedule, also CC Frank."
19       Do you see that?
20       A.   Yes.
21       Q.   Do you know why James made that
22   request to Robert?
23       A.   This is what -- I'm thinking this is
24   related back to -- it was the modification on
25   Exhibit 8, where it lists -- we list income and

Page 73

1        F. Gleeson
2    expenses.  In compiling the list of income and
3    expenses, I think they're somewhat related.  In
4    other words, the numbers that Robert Yu was
5    working with and the income and expense on
6    Exhibit 8, although they don't match exactly,
7    they were comparable numbers.  He was trying to
8    modify his mortgage here (indicating) while at
9    the same time this other action was going on
10   with Robert Yu and the numbers needed to be
11   relatively the same.  So I believe they are all
12   kind of -- I think, that's why they are carbon
13   copying me.  So I could incorporate the same
14   numbers from Robert Yu's document into the
15   income and expense document, related to the
16   modification.  I believe that's why it was
17   copied to me for.
18       Q.   Okay.  The e-mail above from
19   Robert Yu to James that you were CCed on, in it
20   Robert says, "Mr. James Ryu, please see the
21   advised Schedule J.  I tweaked the numbers so
22   that the disposable income is 1,495."
23       Do you see that?
24       A.   Mh-hm, yes.
25       Q.   Okay.  Do you know what he's talking

Page 74

F. Gleeson

1          F. Gleeson
2  about there?
3     A.  Well, he's saying he adjusted
4  numbers.  He's using the word "tweaked."  But I
5  don't know why, what the relevance of the 1495
6  is.  I don't know why.
7     Q.  Were you involved in any way in the
8  preparation of this attachment, Schedule J?
9     A.  Like I said, they were somewhat
10  related with the modification that he was
11  trying obtain on his home.  So I was trying to
12  help James with the income expense numbers.  So
13  in this filing here, if you look at the
14  numbers, they are not the same, but they are
15  same, close.  But I think they're trying to
16  align the two.  Schedule J with the income and
17  expense numbers they were using for the
18  modification.
19     Q.  Do you remember why the numbers had
20  to be aligned?
21     A.  Well, they needed to be accurate.
22  He had to report the same numbers to those --
23  both entities.  If this -- I'm not sure if this
24  is a bankruptcy filing or not.  Maybe you would
25  know, but I don't know.

Page 75

F. Gleeson

1          F. Gleeson
2     Q.  Do you remember why the numbers were
3  different, that they needed to be aligned?
4     A.  Well, they needed to be accurate.
5  So they should pretty close.  Anything that he
6  is reporting to on this Schedule J would need
7  to be pretty accurate to any numbers that he's
8  reporting to Bank of America on the
9  modification application so...
10     Q.  But is it fair to say that you
11  didn't have any source documents for any of the
12  numbers in Exhibit 8 or Exhibit 11, correct?
13     A.  Right.  I didn't have any source
14  documents, no.
15     Q.  So is it fair to say you would not
16  have not been able to determine the accuracy of
17  these numbers?
18        MR. DZARA:  Objection to the form.
19  Asked and answered.
20     A.  Yeah, I wouldn't -- I didn't have
21  any source documents to confirm the numbers.
22  They were just given to me by James.
23        MR. DZARA:  Off the record.
24     (Discussion held off the record.)
25     (Gleeson Exhibit 12, chain of

Page 76

F. Gleeson

1          F. Gleeson
2  e-mails with an e-mail to James from March
3  8, 2013, 4:46 p.m., with the subject "BOA",
4  marked for identification.)
5  BY MR. YI:
6     Q.  I'm showing you what's been marked
7  as Exhibit 12 to your deposition.  First I'll
8  ask you about the e-mail on the bottom of
9  page 1 of this exhibit.
10     Is that a copy of your e-mail to
11  James from March 8, 2013, 4:46 p.m., with the
12  subject "BOA"?
13     A.  Yes.
14     Q.  And subject "BOA" stands for Bank of
15  America, correct?
16     A.  Correct.
17     Q.  And in that e-mail you say, "James,
18  I spoke to BOA.  The appraisal was completed.
19  They are waiting for a workout specialist to
20  review.  You should hear something from them by
21  next Friday, 3/15.  Everything else is in
22  order."
23     Do you see that?
24     A.  Yes.
25     Q.  Does this refresh your recollection

Page 77

F. Gleeson

1          F. Gleeson
2  as to what you were doing for James in or about
3  March 2013?
4     A.  Yeah, I was helping him with his
5  modification with Bank of America on his
6  mortgage on his New Jersey home.
7     Q.  Do you know who owned -- when you
8  say James's New Jersey home, do you know who
9  owned that home?
10     A.  I mean, I understood that James and
11  his wife owned it, but I never saw anything to
12  tell me that.  But I understood that.
13     Q.  Okay.  And were you communicating
14  with a representative of Bank of America
15  concerning the modification?
16     A.  Yes.
17     Q.  Do you recall whether you signed any
18  document submitted to the Bank of America
19  indicating that you were acting on behalf of
20  James and/or his wife?
21     A.  No, I don't recall that.
22     Q.  Do you recall whether Bank of
23  America ever asked you to submit an
24  authorization letter of some kind to make sure
25  that you were authorized to act on behalf of

1             F. Gleeson
2   James and/or his wife?
3      A.  No.
4      Q.  Okay.  I'm directing your attention
5   to the e-mail above that.
6         Is that copy of James's reply e-mail
7   to you from the same day at 5:10 p.m., with the
8   subject "BOA"?
9      MR. DZARA:  Objection to form.
10      A.  It appears to be, but in the e-mail
11   it says, "Thanks, James."  But I don't
12   understand why he's saying "Thanks, James" when
13   he's writing the e-mail.
14      Q.  Okay.  Is it fair to say he was
15   thanking you for the information that you were
16   relaying to him in your e-mail?
17      MR. DZARA:  Objection to form.
18      A.  I don't know.  I honestly don't
19   know.  I don't know why it says "Thanks, James"
20   when he's replying to me.  I don't understand.
21      Q.  Do you remember anything else about
22   this e-mail correspondence?
23      A.  No.
24         (Gleeson Exhibit 13, string of
25        e-mails, marked for identification.)

1             F. Gleeson
2   BY MR. YI:
3      Q.  Okay.  Before we go onto the next
4   exhibit, do you remember whether James and/or
5   his wife ever entered into an agreement to
6   modify their mortgage loan with Bank of America
7   in or about 2013?
8      A.  I'm sorry, I was reading.  Could you
9   repeat that?
10        (Question was read back as follows:
11      "QUESTION:  Before we go onto the
12      next exhibit, do you remember whether James
13      and/or his wife ever entered into an
14      agreement to modify their mortgage loan
15      with Bank of America in or about 2013?")
16      A.  My understanding was that they were
17   denied the modification at that time, but then
18   sometime subsequent, more recently, the
19   modification was granted.  So more recently
20   being within the last year.
21      Q.  And when you say "the modification
22   was granted," are you referring to the
23   modification agreement with Bank of America?
24      A.  Yeah, yes.
25      Q.  And do you remember why the request

1             F. Gleeson
2   for modification in 2013 was denied?
3      A.  No, I don't, no.
4      Q.  Do you recall any communications
5   with anybody at Bank of America concerning the
6   denial?
7      A.  I seem to recall him getting a
8   letter and showing me a letter saying he was
9   denied.  But I don't remember who that was
10   from.
11      Q.  Okay.  The e-mails in Exhibit 12
12   seem to indicate that you were the one
13   communicating with Bank of America in
14   connection with the request for modification.
15      A.  Mh-hm.
16      Q.  At least in 2013.
17        Were you the person who was
18   communicating with Bank of America?
19      A.  I was up until sometime in 2013.
20   But then I left the bank in 2013 and I was no
21   longer involved with the process.
22      Q.  Do you remember why James asked you
23   to communicate with Bank of America?
24      A.  James was not -- I guess I just
25   wasn't comfortable in putting together the

1             F. Gleeson
2   financial statements, the numbers, the income,
3   the expenses.  He didn't have that -- it wasn't
4   his background or knowledge or understanding.
5        So he had asked me to help him
6   because I, you know, am a financial person.  So
7   I have the knowledge on how to put documents
8   like those together.  So that's why he asked me
9   to help him with that.  So that would be why,
10   you know, he didn't.  He just wasn't
11   comfortable doing it.
12      Q.  Are you aware of any other reason
13   why he asked you?
14      A.  No.
15      Q.  Did James ever tell you why he
16   needed to modify the mortgage loan on his home
17   in New Jersey?
18      A.  He couldn't afford it.  If you look
19   at his income and expense statement, he
20   didn't -- you know, he was upside down.  The
21   income was either more -- less than the
22   expenses or it was very close to the expenses
23   and he was trying to modify the loan so he can
24   lower his payment, his mortgage.
25      Q.  Is that based on what he told you or

Page 82

F. Gleeson

1
2 is that based on what documents that you
3 reviewed provided by James and/or his wife?
4     A.   I would say that that's what he told
5 me.
6         (Gleeson Exhibit 14, multiple
7     e-mails, marked for identification.)
8     A.   Do you have any questions on
9 Exhibit 13?
10     Q.   Sorry.  I forgot I gave you 13,
11 sorry.  Yeah, I do.  My apologies.  I gave you
12 14, but you can set that aside for now.
13         I'm showing you what's been marked
14 as Exhibit 13.  I'm going to represent to you
15 that there are two e-mails reflected in this
16 exhibit.  Let me start with the one on the
17 bottom the first page.
18         Is that a copy of an e-mail from
19 Eric Kalender to James with CC to you and
20 Karen Whelan from May 28, 2010, 3:33 p.m., with
21 the subject "Kudo Beans"?
22     A.   Yes.
23     Q.   Can you tell us what you remember
24 about what's discussed in this e-mail?
25     A.   Yeah, James is trying to obtain

Page 83

F. Gleeson

1
2 financing for Kudo Beans from Mariner's Bank
3 and I had introduced him to Eric Kalender, who
4 I knew indirectly through Karen Whelan, because
5 I used to work for Mariner's Bank.  So that was
6 what this was related to.  We actually had a
7 meeting with Eric to discuss that and this is
8 an e-mail exchange that James had with Eric.
9     Q.   Okay.  So is it fair to say that you
10 were copied on these e-mails because you made
11 the introduction?
12     A.   Yes.
13     Q.   And earlier you testified that a
14 company called Seleste LLC owned both Kudo
15 Beans, which was a cafe, and a hair salon
16 called Luz?
17     A.   Yes.
18     Q.   Was James trying to get financing
19 from Mariner's Bank for only Kudo Beans, the
20 cafe, or both Kudo Beans and the hair salon?
21     A.   I don't remember.  Well -- I'm
22 thinking -- I'm guessing, I'm not sure.
23     Q.   Just tell us what you remember.  I'm
24 not asking you to guess.
25     A.   I think he was trying to get

Page 84

F. Gleeson

1
2 financing for the entity, not just Kudo Beans.
3 But I believe we met -- we met them at Kudo
4 Beans and actually sat down and had lunch with
5 them at Kudo Beans.  So that's why.
6     Q.   In this e-mail, Eric refers to Kudo
7 Beans as a restaurant.  Do you see that?  It
8 says, "The restaurant is absolutely gorgeous."
9     A.   Yes.
10     Q.   Was it a cafe or restaurant?
11     A.   Well, it was a restaurant.  You can
12 go there and sit down and order food, yeah.
13     Q.   Okay.
14         (Recess is taken.)
15     MR. YI:  Can you just remind me
16 where we left off?
17         (Question was read back as follows:
18     "QUESTION:  In this e-mail, Eric
19 refers to Kudo Beans as a restaurant.  Do
20 you see that?  It says, "The restaurant is
21 absolutely gorgeous.")
22         (Answer was read back as follows:
23     "ANSWER:  Yes.")
24         (Question was read back as follows:
25     "QUESTION:  Was it a cafe or

Page 85

F. Gleeson

1
2 restaurant?")
3         (Answer was read back as follows:
4     "ANSWER:  Well, it was a restaurant.
5     You can go there and sit down and order
6     food, yeah.")
7 BY MR. YI:
8     Q.   Before we move on to the next
9 exhibit, is there anything else you remember
10 about what was discussed in the e-mails as
11 reflected in Exhibit 13?
12     A.   No.
13     Q.   I'm showing you what's been marked
14 as Exhibit 14.
15         And I'll represent to you that this
16 exhibit consists of multiple e-mails.  The
17 first two e-mails were part of the previous
18 exhibit, 13, and we've already gone over those
19 two e-mails.  So let's pick up the next e-mail,
20 which starts on the bottom of the first page.
21         Is that a copy of an e-mail from
22 Eric Kalender of Mariner's Bank to James, with
23 CC to you, Karen Whelan, and Donald Estes
24 (phonetic), with the subject "Kudo Beans"?
25     A.   Yes.

Page 86

F. Gleeson
1
2    Q.   By the way, who was Karen Whelan?
3    A.   She was an employee of Mariner's
4  Bank.
5    Q.   And what about Donald Estes?
6    A.   Also.
7    Q.   Can you tell us what you remember
8  about what was discussed in this e-mail?
9    A.   James had made an application to
10 Mariner's Bank for this line of credit for the
11 business and they -- they declined the request.
12   Q.   Okay.  In this e-mail, Eric states,
13 "We are currently not providing unsecured
14 commercial lines of credit on businesses with
15 an operating tenure of less than three years."
16       Do you see that?
17   A.   Yes.
18   Q.   And do you recall that as the reason
19 why the application for the loan was denied?
20   A.   Yes.
21   Q.   Do you recall whether there were any
22 other reasons?
23   A.   No.
24   Q.   Do you remember anything else?
25   A.   No.

Page 87

F. Gleeson
1
2    Q.   Eric Kalender also says in this
3  e-mail, "Based upon your personal financial
4  statement that you submitted, this does not
5  appear feasible.  The only way possible for us
6  to provide a business line of credit would
7  require cash collateralization.  Please advise
8  if this might be an option."
9        Do you see that?
10   A.   Yes.
11   Q.   Do you remember whether -- do you
12 remember anything about whether James was able
13 to provide the cash collateralization that Eric
14 was requesting or Mariner's Bank was
15 requesting?
16   A.   No, I don't believe he did.
17   Q.   Do you recall James or Seleste LLC
18 ever obtained a loan from Mariner's Bank?
19   A.   No, I don't believe they did, no.
20   Q.   Do you remember why James was
21 seeking a loan from Mariner's Bank for Kudo
22 Beans or Seleste LLC?
23       MR. DZARA:  Objection to form.
24   A.   I believe he was still in the
25 process of trying to acquire the business.  And

Page 88

F. Gleeson
1
2  then -- at that -- he was just running -- as I
3  said earlier, he was just operating those
4  businesses.  At least the hair salon.  And he
5  was still trying to put financing together to
6  acquire them and that's what this was all
7  about.
8    Q.   Do you remember whether he ever
9  acquired either the hair salon or the Kudo
10 Beans restaurant?
11       MR. DZARA:  Objection to form.
12   A.   I don't remember whether he had or
13 did acquire it.
14   Q.   Do you remember who the owners of
15 those businesses were in 2010?
16   A.   No, I never knew who the owners were
17 of those businesses.
18   Q.   Do you remember James ever telling
19 you anything about the owners of the hair salon
20 and the restaurant?
21   A.   There was someone he was working
22 with who worked there.  I don't know if they
23 were the owners though.  I can't remember their
24 names.  It was a husband and wife that were
25 involved in both businesses, or least the hair

Page 89

F. Gleeson
1
2  salon.  Whether they were the owners or not, I
3  don't remember.
4    Q.   During the time that you were
5  employed at BankAsiana, did you ever become --
6  withdrawn -- did you ever meet someone by the
7  name of Eunhee Pak, P-a-k?
8    A.   Yes.
9    Q.   Was she an employee of BankAsiana
10 during your --
11   A.   She was.
12   Q.   -- while you were employed with the
13 bank?
14   A.   Yes.
15   Q.   Do you remember what her position
16 was?
17   A.   She worked in the operations
18 department.
19   Q.   Did she work out of Palisades
20 Parkway, the main office of BankAsiana?
21   A.   Yes.
22   Q.   And do you recall whether James told
23 you that she was -- she owned the hair salon
24 and Kudo Beans restaurant with her husband?
25   A.   That's what I was referring to.  I

F. Gleeson

1  don't -- I did not know she was the owner of
2  those businesses, but that's who I was trying
3  to recall the name of earlier.  It was her and
4  her husband.
5     Q.   Okay.  And are you telling us that
6  based on what James told you?
7     A.   Well, I was in Kudo Beans and saw
8  her working there.  So I knew she worked there.
9     Q.   Did you ever have any communications
10  with Ms. Pak concerning Kudo Beans?
11     A.   No.
12     Q.   Did you have any communications with
13  her about the hair salon?
14     A.   No.
15     Q.   Did you ever speak to Ms. Pak's
16  husband concerning either the restaurant, Kudo
17  Beans, or the hair salon?
18     A.   No.
19     Q.   Is it fair to say that the only
20  person you spoke to about the restaurant and
21  the hair salon was James?
22     A.   Yes.
23     Q.   And just to be clear, what do you
24  remember James telling you about the ownership

F. Gleeson

1  of the restaurant and the hair salon?
2        MR. DZARA:  Objection to form.
3     Asked and answered.
4     A.   I don't know that he ever told me
5  anything about the ownership.  Alls I knew was
6  that Ms. Pak and her husband worked there.
7  Whether they were the owners or not, I never
8  knew that.  I don't recall him telling me that.
9     Q.   And is it fair to say that he told
10  you that he was trying to acquire those two
11  businesses?
12     A.   Yes, that is fair to say.
13        (Gleeson Exhibit 15, multiple
14     e-mails with an e-mail from Eric Kalender
15     to James from June 3rd, 2010, 9:14 a.m.,
16     subject "Kudo Beans", marked for
17     identification.)
18        (Discussion held off the record.)
19  BY MR. YI:
20     Q.   I'm showing you what's been marked
21  as Exhibit 15.  And I'll represent to you that
22  this exhibit consists of multiple e-mails.
23  We've already gone over some of them.
24        So this exhibit has two new e-mails

F. Gleeson

1  which I'll go over with you.  So let me go
2  over -- take a look at the first two e-mails.
3  Those are the new e-mails I would like to go
4  over with you.
5     A.   Okay.
6     Q.   On the bottom of the first page, is
7  that an e-mail from -- a copy of an e-mail from
8  Eric Kalender to James from June 3rd, 2010,
9  9:14 a.m., with a CC to you, Karen Whelan, and
10  Donald Estes, subject "Kudo Beans"?
11     A.   Yes.
12     Q.   And at the top, is that a copy of
13  James's reply e-mail to Eric Kalender from
14  June 3rd, 2010, 9:26 a.m., with CC to you and
15  Karen Whelan and Donald Estes, subject "Kudo
16  Beans"?
17     A.   Yes.
18     Q.   Can you tell us what you remember
19  about these two e-mails?
20     A.   James had provided some information
21  to Mariner's Bank in relation to applying for
22  the loan and James had asked for them back.  So
23  it's Eric saying that he will send those back
24  to James.  And James is just -- replied, you

F. Gleeson

1  know, there was no rush to do that.  So that's
2  it.
3     Q.   Okay.  And do you remember whether
4  the documents that were submitted to Mariner's
5  Bank in connection with this loan application
6  included James's personal financial statement?
7     A.   Yeah, I believe it did.
8     Q.   Okay.  Just going back to Exhibit 3
9  to your deposition.
10     A.   Yup.
11     Q.   James Ryu's personal financial
12  statement as of March 31, 2010, was that one of
13  the documents that was submitted to Mariner's
14  Bank?
15     A.   I believe so.
16     Q.   Okay.  And do you recall who
17  submitted the documentation in support of the
18  application to Mariner's Bank, was it you or
19  James?
20     A.   I don't -- I don't remember.
21     Q.   In the e-mail at the top of the
22  first page, James says to Eric Kalender, "Eric,
23  no rush.  Let's get together soon for some
24  potential joint initiatives."

Page 94

F. Gleeson

1
2    Do you see that?
3    A.  Yes.
4    Q.   Do you recall whether you and James
5    ever got together with Eric or anybody at
6    Mariner's Bank for any potential joint
7    initiatives?
8    A.   I don't believe we did.
9    Q.   Is there anything else you remember
10   about what was discussed in these e-mails?
11   A.   No, I don't recall anything else.
12            (Gleeson Exhibit 16, multiple
13       e-mails, marked for identification.)
14   BY MR. YI:
15   Q.   Before we go onto the next exhibit,
16   16, do you recall whether BankAsiana had an
17   employee loan program?
18   A.   An employee loan program?  I seem to
19   think that they did, yeah.
20   Q.   Okay.  And do you remember -- could
21   you just briefly describe that loan program for
22   us that you remember?
23   A.   I believe the bank offered a lower
24   interest rate for employees.  A mortgage loan
25   or personal loan of some sort.  Sorry.  I said

Page 95

F. Gleeson

1
2    I believe the bank offered a lower interest
3    rate on loans to employees, mortgage loans or
4    consumer loans of some sort.
5    Q.   And was that a loan program in place
6    at BankAsiana during the entire time you were
7    employed there?
8    A.   I don't know about the entire time.
9    That might have been a benefit that was added
10   later.
11   Q.   And did you take advantage of that
12   program?
13   A.   I don't believe so, no.  I don't
14   think I ever had a loan from BankAsiana.
15   Q.   Did you receive or obtain any loans
16   of any kind or nature from BankAsiana during
17   your employment?
18   A.   When I first went to work there, I
19   was given an advance.  It wasn't really a loan.
20   It was an advance before the bank actually
21   opened.  So it wasn't a loan.  It was an
22   advance.
23   Q.   Do you remember how much that was?
24   A.   I'm going to guess $5,000.
25   Q.   Did you ever -- when you say

Page 96

F. Gleeson

1
2    "advance," you are talking about an advance on
3    your salary?
4    A.   Yes.
5    Q.   Did you ever pay that back?
6    A.   No.
7    Q.   Why not?
8    A.   I was told I didn't have to.
9    Q.   Who told you that?
10   A.   James and Hong Sik Hur.
11   Q.   The advance that you just mentioned,
12   that would have been around the time you became
13   employed by BankAsiana?
14   A.   Yes.
15   Q.   Before they actually received a
16   charter from the regulators?
17   A.   Yeah, it was actually before that.
18   Q.   So that would have been some time in
19   2007?
20   A.   Yes.
21   Q.   Do you remember both James and
22   Mr. Hur both telling you, in essence, Don't
23   worry about the advance, you don't have to pay
24   it back?
25   A.   James told me that he had discussed

Page 97

F. Gleeson

1
2    it with Mr. Hur and that I didn't have to pay
3    it back.  I didn't discuss it with Mr. Hur.
4    Q.   Do you know whether James had a
5    personal relationship of any nature with
6    Ms. Pak, P-a-k?
7    A.   I believe they were friends.
8    Q.   Do you know if their relationship --
9    during the time you were at the bank, do you
10   know whether their relationship was more than
11   friends?
12   A.   Well, James indicated to me that he
13   cared for her deeply.
14   Q.   Do you recall -- are those, in
15   substance, the words that he used or what do
16   you remember him telling you?
17   A.   That he cared for her.  She was
18   somebody special in his life.
19   Q.   At the time he told you this, James
20   was married, right?
21   A.   Yes.
22   Q.   And Ms. Pak was also married?
23   A.   I believe so, yes.
24   Q.   Did James ever tell you that he had
25   an -- he was having an affair with her?

Page 98

F. Gleeson

1
2    A.   No, he never used that terminology.
3    Q.   Did he ever tell you, in substance,
4  that he was having a romantic relationship?
5        MR. DZARA:  Objection.  Asked and
6  answered.
7    A.   Alls I know is that they were good
8  friends, they were very close, they spent a lot
9  of time together, and he cared for her.  I
10  don't know, you know, what else to say about
11  that.
12    Q.   Okay.  Thank you.
13    A.   You're welcome.
14    Q.   When you were employed by
15  BankAsiana, did you have any -- did you own or
16  operate any businesses of your own?
17    A.   No.
18    Q.   To your knowledge, did any other
19  bank officers own or operate any businesses of
20  their own while they were employed by
21  BankAsiana?
22    A.   No, I don't recall that anyone did.
23    Q.   Is it fair to say that you were
24  employed on a full-time basis with BankAsiana?
25    A.   Yes.

Page 99

F. Gleeson

1
2    Q.   And is it fair to say that James was
3  employed by BankAsiana on a full-time basis as
4  well?
5    A.   Correct.
6    Q.   Do you recall any policies and
7  procedures of BankAsiana that permitted bank
8  officers or employees from owning and/or
9  operating businesses of their own during their
10  employment with the bank?
11    A.   I believe there was a code of ethics
12  that they had to disclose any other employment
13  that they had other than BankAsiana or any
14  other business relationship.  In fact, it had
15  to be, you know, senior-level people,
16  especially, would have to disclose that
17  information on an annual basis.  That they, you
18  know, worked somewhere else or they owned a
19  business or they had some other interest
20  outside of BankAsiana.
21    Q.   And when you say "code of ethics,"
22  were they written code of ethics?
23    A.   Yeah, I believe so.  It may have
24  called code of conduct or something.  It was
25  essentially a code of ethics.

Page 100

F. Gleeson

1
2    Q.   I'm showing you what's been marked
3  as Exhibit 16.
4    A.   Okay.
5    Q.   And I'll represent to you that this
6  exhibit contains multiple e-mails and some of
7  them, I believe, have your name.  So I wanted
8  to go over those.
9        Have you had a chance to go through
10  these?
11    A.   No.
12    Q.   Okay.
13       (Witness complies.)
14    A.   Half of them are in Korean, so --
15    Q.   I won't be asking you about anything
16  that is in Korean.
17    A.   -- I can't read that.
18    Q.   Why don't we start with this:  Do
19  you see the name Eunmoo Choi in this e-mails?
20    A.   Yeah.
21    Q.   Was Eunmoo Choi -- withdrawn.
22       Do you know who Eunmoo Choi is?
23    A.   He was the IT manager at the bank,
24  I'm going to say, in late 2012 or early 2013.
25    Q.   And do you know -- do you see the

Page 101

F. Gleeson

1
2  name Paul Y. Eom, E-o-m; do you see that?
3    A.   Yes.
4    Q.   And is that the Mr. Eom that -- of F
5  One Communication, Inc., that we discussed
6  earlier?
7    A.   Yes.
8    Q.   Okay.  So I'm going to ask you to
9  turn to page 3 of this exhibit, which I believe
10  has the first e-mail with your name.  I'm
11  directing your attention to the middle of that
12  page 3.
13       Is that a copy of Mr. Eom's e-mail
14  to you from June 23rd, 2013, 9:26 p.m., with CC
15  to Eunmoo Choi, with the subject "Update,
16  unfinished project"?
17    A.   Yes.
18    Q.   And can you tell us what you
19  remember about that e-mail or what's discussed
20  in that e-mail?
21    A.   Sure.  Let me read it.
22       (Witness complies.)
23    A.   All right.  Yes, Eunmoo Choi had
24  taken an inventory of some equipment and was
25  missing some equipment.  Since Paul Eom had

Page 102

F. Gleeson

1  been the IT manager before that, although he
2  was an outsourced IT manager, Eunmoo's only
3  source to find out about that equipment was
4  through Paul Eom.
5      So Eunmoo had asked Paul Eom about
6  some equipment that he couldn't locate and Paul
7  is replying back saying, you know, he had to
8  check -- check that out and try to find out
9  what equipment he was referring to and so on.
10 So that's what that's about.
11     Q.   So do you recall Eunmoo Choi
12 reporting to you that he was missing some
13 equipment when he checked the inventory, the
14 bags of computer equipment inventory?
15     A.   I do, yeah.
16     Q.   And do you recall having
17 communications thereafter with Paul Eom about
18 that?
19     A.   Yes.
20     Q.   And do you recall whether you
21 ever -- whether you were ever able to determine
22 what had happened to the missing equipment?
23     A.   No, it was still an ongoing process
24 when I left the bank.  So I never knew what --

Page 103

F. Gleeson

1  the final outcome of that.
2      Q.   And did Eunmoo Choi ever report to
3  you, in addition to missing equipment, computer
4  equipment, did he ever tell you any other
5  problems or issues relating to F One
6  Communication?
7      A.   Yeah, I think he didn't feel as
8  though -- this is my opinion of what Eunmoo
9  told me, is he didn't feel as though Paul Eom
10 or F One Communications completed the work that
11 they were expected to have completed.
12     So he was looking into that deeper
13 and then with that process couldn't locate
14 certain pieces of equipment that the bank
15 apparently had paid for.  And so he was digging
16 into that with Paul Eom to try and understand
17 what happened.  And that was still ongoing when
18 I left the bank.
19     Q.   Okay.  So Eunmoo Choi reported to
20 you that there were equipment that the bank
21 purchased from F One Communication that they
22 never received --
23     A.   Well, that he couldn't locate.
24     Q.   -- or that he couldn't locate?

Page 104

F. Gleeson

1      A.   Right.
2      Q.   And that there was certain work or
3  services that should have been performed by F
4  One Communication that were not performed?
5      A.   Yes, that was -- that was his
6  impression, that those things weren't done the
7  way they should have been done.
8      Q.   And did he tell you whether the bank
9  had already paid for those services or work
10 that should have been performed?
11     A.   Yes, and I believe we did a little
12 bit of research at the time to try and match up
13 the two, as far as what had been paid for and
14 what we had received, and Eunmoo was working on
15 that, trying to reconcile the two.  And his
16 initial result was that there was
17 discrepancies, that the bank had paid for
18 things that hadn't been completed or equipment
19 that hadn't been received that was paid for.
20     Q.   Okay.  I'll represent to you that
21 below that e-mail are some statements that --
22 comments provided by Mr. Choi concerning this F
23 One Communication matter.
24     He states, "I reported it to Frank

Page 105

F. Gleeson

1  on July 9, 2013, again, but he left company at
2  July 12, 2013.  So I had to deal with Paul."
3      Do you see that?
4      A.   Yes.
5      Q.   The date July 12, 2013, is that the
6  date that you left BankAsiana?
7      A.   I believe so.
8      Q.   On or about?
9      A.   Yeah, on or about, yes.
10     Q.   Okay.  And he indicates in these
11 comments here that he reported this matter to
12 you on July 9, 2013, does that appear to be
13 about the timeframe?
14     A.   Yeah, I believe that's the correct
15 timeframe.
16     Q.   And he says "again," which suggested
17 he reported this matter to you prior to
18 July 9, 2013, do you remember that?
19     A.   Yeah, I believe those discussions
20 started before July 9th, yeah.
21     Q.   Okay.  And your testimony -- and I
22 just want to make sure, your testimony is,
23 because you left the bank in July 2013, you
24 don't know what the ultimate outcome was?

Page 106

F. Gleeson

1
2    A.   Correct.  And I had those -- I had
3    discussions regarding Eunmoo's concern with
4    James and Mr. Hur around this time.
5    Q.   Okay.
6    A.   But, like I said, I left the bank
7    shortly thereafter so I never knew the outcome
8    of it.
9    Q.   So the discrepancies relating to F
10   One Communications that you just talked about,
11   were those discrepancies based on information
12   that Mr. Choi provided to you?
13   A.   It was based on his research, yeah.
14   Q.   Did you, yourself, personally do any
15   research or review any invoices or inventory
16   list to make a determination about the
17   discrepancies?
18   A.   I reviewed the material that he
19   provided me, yeah.
20   Q.   And did you -- in or about
21   June 2013, did you come to any conclusion
22   yourself about what Mr. Choi was reporting to
23   you?
24   A.   No, I did not reach a conclusion,
25   although, I agreed, on the surface, with his

Page 107

F. Gleeson

1
2    initial reaction that there was something
3    missing when you compared the two.  But I
4    didn't continue to do any additional research
5    because I left the company.
6    Q.   Do you know who hired F One
7    Communication, Inc. -- withdraw that.
8    Do you know who referred F One
9    Communication and/or Paul Eom to the bank?
10   A.   No, I don't because when I started
11   with the bank in -- before the bank opened, he
12   was already there.  So his firm was already
13   installing equipment at that time.  So I don't
14   know where he was referred from.
15   Q.   Okay.  Let me refer you to page 2 of
16   this exhibit.
17   Is that a copy of Mr. Eom's e-mail
18   to you from June 3, 2013, 9:55 a.m., with the
19   subject "Contract"?
20   A.   Yes.
21   Q.   Can you tell us what you remember
22   about what was discussed in this e-mail by
23   Mr. Eom?
24   A.   Yeah, what Paul Eom was saying was
25   that he was closing his business, F One

Page 108

F. Gleeson

1
2    Communications.  And he was trying to establish
3    a business in Los Angeles.  And I believe, at
4    the time of this writing, he was in Los
5    Angeles.  And he was saying that he had not
6    completed certain things related to servers
7    with the bank and then he listed out what those
8    things were.  And then he also says that he
9    couldn't continue his contract with the bank so
10   he was going to refund the fee he had gotten
11   and he was essentially closing his business.
12   Q.   Having reviewed this e-mail, do you
13   remember whether Paul Eom or his company F One
14   Communication, Inc., as he says, broke the
15   contract with BankAsiana or ended the contract
16   with BankAsiana?
17   A.   I believe, yeah, he did at that
18   point in time.  So what was -- just a little
19   background on Paul Eom and Eunmoo is Paul Eom
20   was essentially the outsourced -- well, was the
21   outsourced IT member for the bank and had been
22   for six years.  And Eunmoo Choi was hired to be
23   the internal IT manager of the bank for the
24   ultimate purpose of canceling the relationship
25   with F One Communications.  And that was a

Page 109

F. Gleeson

1
2    decision made within the bank to do that.
3    So when Eunmoo came in, he was
4    trying to get as much information out of Paul
5    as far as where things stood, what projects
6    were in place, what equipment was coming or
7    going or where it was installed, and all of
8    that.  And in Eunmoo's process of doing that,
9    he, you know, he was coming up with these
10   discrepancies.  So he was trying to work with
11   Paul and Paul had one foot out of the door --
12   well, Paul was in California at the end here
13   and, you know, Paul, you know, was, I guess,
14   trying to do whatever he could do, but
15   apparently his company was closing down and he
16   wasn't able to provide Eunmoo or the bank with
17   the equipment or the servers or the, in this
18   case, they're talking about a printer.  It
19   wasn't -- he hadn't completed it.  So that was
20   kind of like -- it was all -- this is all
21   happening at the time that I was leaving the
22   bank.  So Paul was trying to tell me what he
23   was doing here in this e-mail, I mean, closing
24   his business, and this is where some of these
25   matters stood that Eunmoo had questioned.  And

Page 110

F. Gleeson

1   that was the end of his -- going to be the end
2   of his relationship with BankAsiana.
3      Q.   Okay.  Aside from the discrepancies
4   concerning the equipment and certain work that
5   was to be done by F One Communication, if you
6   look at number five, time-based contract, Paul
7   say in this e-mail to you, "I think bank used
8   around 15 hours or so, but I'm about to refund
9   full amount because I'm asking you to break the
10  contract."
11     Do you recall whether Paul or F One
12  Communication fully refunded that amount to the
13  bank?
14     A.   I don't recall whether they did or
15  not.  If they did, I'm thinking it would have
16  happened after I left.  But I don't recall if
17  they did.
18     Q.   Okay.  I'm going to ask you to turn
19  to the first page, bottom of the first page.
20     Is that a copy of an e-mail from
21  Eunmoo Choi to you from April 17, 2013,
22  4:48 p.m., with the subject "BankAsiana IT
23  inventory research result"?
24     A.   Yes.

Page 111

F. Gleeson

1      Q.   Okay.  And in this e-mail Mr. Choi
2   states to you, "I found out some problems with
3   F One during inventory research"?
4      A.   Yes.
5      Q.   We discussed that already, right?
6      A.   Say that again.
7      Q.   The problems that he mentions with F
8   One Communications during his inventory
9   research, we already discussed that?
10     A.   Actually, this is different.
11     Q.   Do you know what he was referring to
12  there?
13     A.   Yeah, what he's saying is he did an
14  analysis of all of these servers as far as
15  their capacity and how they were operating and
16  functioning.  And came up with some problems
17  with the servers.  And for instance he says,
18  "Exchange server, space shortage; Domain
19  server, space shortage; Need file server,
20  current file server is running on domain server
21  and has space shortage."
22     So he was coming up with performance
23  issues, performance problems, in a variety of
24  servers within the bank.

Page 112

F. Gleeson

1   This isn't necessarily what he was
2   referring to in the equipment that was missing.
3   This is just problems he's seeing within the
4   existing --
5      Q.   Right.  As I read this e-mail, it
6   appears that Mr. Choi is raising two issues
7   with you in that e-mail.
8      The first is problems with F One
9   Communication that he found during his
10  inventory research.
11     A.   Okay.
12     Q.   And I believe -- my question to you
13  is:  Is he referring to the fact that there was
14  certain equipment that he could not find during
15  in his inventory research?
16     A.   Oh, I follow.  I follow.
17     Q.   And we already discussed that?
18     A.   Yeah.
19     Q.   And then he says, "Also, I think we
20  have some urgent case with IT for our bank."
21     And he goes on to discuss the
22  various servers and PCs; do you see that?
23     A.   Yes.
24     Q.   Okay.

Page 113

F. Gleeson

1      A.   Yup.
2      Q.   So is it fair to say that in his
3   e-mail he's communicating to you two different
4   sets of problems; one is he did an inventory
5   search or research and discovered that there
6   were equipment that should be on -- it's on the
7   inventory list, but it's not there at the bank
8   where it should be, correct?
9      A.   It would seem that way, yeah.  But
10  he doesn't give any details.  So, yeah.
11     Q.   Right.  And second problem was that
12  there were issues with the bank's servers and
13  some computers?
14     A.   Correct.
15     Q.   Do you remember anything else?
16     (Witness complies.)
17     A.   I think the last e-mail, at the top
18  there, he's referring to -- we had a company we
19  were doing business with called United Computer
20  and he was communicating with them to -- United
21  Computer was going to come in and to try help
22  resolve some of these issues we were having
23  with the server.  I think that was what that
24  was referring to, but other than that I don't

Page 114

F. Gleeson

1   have anything else.
2   Q.   Were you still at the bank when
3   United Computer was asked to come in and help
4   address some of these IT-related issues?
5   A.   Yeah, we had worked with United
6   Computer in some other capacity while F One
7   Communications was there also.  We were looking
8   to upgrade servers and do a whole system
9   upgrade at that time, so United Computer was
10  involved in trying to get that ball rolling and
11  Eunmoo was working with them to get that going.
12  So that's -- United Computer had been around
13  for some time.
14  Q.   Okay.  Before we go on, do you
15  remember anything else about F One
16  Communications and any issues related to F One
17  Communication?
18  A.   I don't think so, no.
19  MR. YI:  It's now 1:31.  I'm not
20  sure if you were in the room at the time,
21  but I had suggested we take a short break
22  for lunch because I anticipate that I, you
23  know, have a couple more hours at least to
24  go.  I estimated that I could wrap up

Page 115

F. Gleeson

1   around by around 3:00, 3:30 based on where
2   I am in my outline and documents we have
3   left.  I think we have 14 documents left to
4   cover.
5   THE WITNESS:  Okay.
6   MR. YI:  And Mr. Dzara will have
7   some questions after I'm done.
8   (Recess is taken.)
9   (Question was read back as follows:
10  "QUESTION:  Before we go on, do you
11  remember anything else about F One
12  Communications and any issues related to F
13  One Communication?")
14  BY MR. YI:
15  Q.   Mr. Gleeson, before we move on to
16  the next exhibit, which I believe will be 17, I
17  just want to go back to your employment
18  history.
19  We covered your employment with
20  BankAsiana from 2007 to 2013.  After you left
21  BankAsiana, where were you employed?
22  A.   Noah Bank.  Like Noah's Ark, Noah
23  Bank.
24  Q.   From when to when?

Page 116

F. Gleeson

1   A.   From July of 2013 to October 2014.
2   Q.   And is that the Noah Bank in New
3   Jersey?
4   A.   Yeah.
5   Q.   What was your position?
6   A.   I had several positions.  I went
7   there as senior VP of finance, and then became
8   the chief financial officer, and when I left
9   there I was chief accounting officer.
10  Q.   So you were hired as senior vice
11  president of finance and then you became CFO
12  and then you became chief accounting officer?
13  A.   Right.
14  Q.   Okay.  And what were the
15  circumstances of you leaving the bank?
16  A.   I had an opportunity at Carver
17  Federal Savings.
18  Q.   Is that C-a-r-v-e-r?
19  A.   Right, in Manhattan.  So I left
20  there and went to Carver and I was the
21  controller at Carver.
22  Q.   From when to when?
23  A.   I was there from October '14 until
24  October '16.  And they, unfortunately, had a

Page 117

F. Gleeson

1   restructuring of the finance department there
2   and several of us were let go.  So I left there
3   in October of '16.  And I was actually
4   unemployed for about four or five months.  And
5   then, in February of '17, I went to my current
6   employer which is Empire State Bank in
7   Newburgh, New York.
8   Q.   That's N-e-w-b-u-r-g-h?
9   A.   Yes.  And I'm chief financial
10  officer there.
11  Q.   When you were employed by Carver
12  Federal Savings Bank, was your position
13  controller at all times?
14  A.   Yes.
15  Q.   Now, at Empire State Bank, has your
16  position always been CFO?
17  A.   Yes.
18  Q.   And are you are currently employed
19  there?
20  A.   Yes.
21  Q.   So have we covered your employment
22  history?
23  A.   Yeah, I should have just given you
24  my resume.

## Page 118

F. Gleeson

1    Q.   Okay.
2         (Gleeson Exhibit 17, e-mail to James
3    from January 29, 2010, 3:20 p.m., with a
4    subject "NJDOBI examination exit meeting,",
5    marked for identification.)
6    BY MR. YI:
7    Q.   I'm showing you what's been marked
8    as Exhibit 17 to your deposition and directing
9    your attention to the first page of this
10   exhibit.
11        Is that a copy of your e-mail to
12   James from January 29, 2010, 3:20 p.m., with a
13   subject "NJDOBI examination exit meeting," and
14   an attachment called the same thing, "NJDOBI
15   examination exit meeting"?
16   A.   Yes.
17   Q.   And what does the NJDOBI stand for?
18   A.   That's the New Jersey Department of
19   Banking and Insurance.
20   Q.   The attachment, which starts on the
21   second page of this exhibit, is that a document
22   that you prepared?
23   A.   Yes.
24   Q.   Could you describe the document for

## Page 119

F. Gleeson

1    us?
2    A.   It looks like minutes to the exit
3    conference at the close of the examination by
4    the New Jersey Department of Banking and
5    Insurance examination of the bank and it was
6    held on January 7th of 2010.  It goes through
7    the discussion of results of the examination of
8    the banks, the ratings.
9    Q.   Okay.  What would you describe --
10   how would you describe this document, is it --
11   A.   What do you mean?
12   Q.   What would you refer to it as?
13   A.   Minutes to the meeting.  The
14   examining people from the New Jersey Department
15   of Banking were there and management from
16   BankAsiana and the examiners went through all
17   the ratings, how they rate banks.  They call
18   them CAMEL ratings, C-A-M-E-L, it's an acronym
19   that stands for capital, asset quality
20   management, earnings, and liquidity.  And they
21   gave a rating on each one of those areas and
22   then an overall composite rating.  And the
23   rating's on a scale 1 to 5, 1 being the best, 5
24   being the worst.  And the bank was given an

## Page 120

F. Gleeson

1    overall deposit rating of two, which is
2    satisfactory.  And then it goes into all of the
3    details of each rating, the capital, the asset
4    quality, so forth.
5    Q.   Okay.  Let's look at the top of
6    page 2, which appears to list the officers of
7    BankAsiana who were present at this examination
8    exit conference --
9    A.   Right.
10   Q.   -- on January 7, 2010.
11   A.   Mh-hm.
12   Q.   There's Mr. Hur, the CEO --
13   president and CEO.  There's James Ryu, senior
14   vice president and COO.  Then there's
15   Heung Bae Kim, senior vice president and CLO.
16   Heung is spelled H-e-u-n-g.  Bae is spelled
17   B-a-e.
18        Do you see that?
19   A.   Yes.
20   Q.   What is CLO?
21   A.   Chief lending officer.
22   Q.   And was Mr. Kim the chief lending of
23   BankAsiana during your tenure at the bank?
24   A.   He was until 2012 maybe.  I don't

## Page 121

F. Gleeson

1    know, maybe 2011 he left the bank.
2    Q.   When you were first employed by
3    BankAsiana, was Mr. Kim at the bank?
4    A.   Yes.
5    Q.   So is it fair to say he was one of
6    the officers, one of the initial group of
7    officers who began BankAsiana?
8    A.   He was.
9    Q.   And then there's you?
10   A.   Right.
11   Q.   During this examination, the exit
12   conference of which was held in January 2010,
13   did the examiners from the New Jersey
14   Department of Banking and Insurance, did
15   they -- do you recall them pointing out any
16   particular issues or problems with the bank?
17   A.   I don't recall anything offhand.
18   I'm just looking at some of the discussion
19   here.  Capital of the bank was considered well
20   capitalized, so that's fine.  The asset quality
21   was given strong ratings so that's good.
22   Management was given a good rating.  There was
23   one violation of the New Jersey statute
24   requiring that all board of directors minutes

Page 122

F. Gleeson

1    be presented at the full board.  And I think
2    there was some issues with the board
3    attendance.  So there was some issue there.
4        Q.   What do you mean by that?
5        A.   New Jersey had a rule, I think they
6    still do, that says board members have to
7    attend at least 75 percent of the meetings
8    held.  And I believe there was a -- maybe one
9    board member who hadn't.  Maybe they attended
10   only 60 percent or so.  So they brought that as
11   a violation.
12       Then they talk about internal
13   controls, employees had to take a minimum of
14   ten consecutive days and not everybody had done
15   that.  That's not a rule, that's a guideline,
16   and they commented on that.
17       And they talk about the earnings of
18   the bank; they had improved.  Overall it was a
19   good examination.  A composite rating of two
20   is, you know, considered a good rating so...
21       Q.   Okay.  Other than what you just
22   testified to, you don't remember any particular
23   problems or issues raised by the examiners in
24   January 2010?

Page 123

F. Gleeson

1        A.   I don't.
2        Q.   Okay.
3        (Gleeson Exhibit 18, e-mail from
4    Vivek Agarwal to Joseph Choi at BankAsiana
5    and Jessica Kim with CC to Ray Broek, Frank
6    Gleeson, and James Ryu, with the subject
7    "Draft branch audit report, Fort Lee
8    branch,", marked for identification.)
9    BY MR. YI:
10       Q.   I'm showing you what's been marked
11   as Exhibit 18 to your deposition.
12       And directing your attention to the
13   first page of this exhibit, is this a copy of
14   an e-mail from Vivek Agarwal to Joseph Choi at
15   BankAsiana and Jessica Kim with CC to
16   Ray Broek, you, Frank Gleeson, and James Ryu,
17   with the subject "Draft branch audit report,
18   Fort Lee branch," with the attachment
19   "BankAsiana Fort Lee branch audit report
20   February 2010"?
21       A.   Yes.
22       Q.   Can you tell us what you remember
23   about what's discussed in this e-mail?
24       A.   Well, this is a Withum, Smith, and

Page 124

F. Gleeson

1    Brown, whom Vivek Agarwal worked for, he was
2    the auditor and he had performed an audit of
3    the Fort Lee branch.  And he's presenting a
4    draft report to Joseph Choi.  Joseph Choi may
5    have been the branch manager at that time in
6    Fort Lee.
7        Q.   Okay.  When we talked earlier about
8    who the branch manager of the East Fort Lee
9    branch of the bank was and I had asked you who
10   was the gentleman or who was the person who was
11   branch manager prior to him, you believe it was
12   Joseph Choi?
13       A.   Yes, there was -- I mentioned there
14   was a woman at one point in time whose name I
15   can't remember, but I think Joseph Choi was,
16   for a period of time, the branch manager.
17       Q.   At least in February 2010?
18       A.   Yes.
19       Q.   Okay.  And do you remember what
20   Jessica Kim's was position was as of
21   February 2010?
22       A.   She was vice president of
23   operations.
24       Q.   Okay.  And what about Ray Broek?

Page 125

F. Gleeson

1        A.   Ray Broek was the partner with
2    Withum, Smith, and Brown.  Vivek reported to
3    him.
4        Let's see.  So then they go, on the
5    next page, giving, I guess, a summary of the
6    work that they performed.  And that's a rating
7    of satisfactory was given in the next to last
8    paragraph there.
9        And then the next page is a summary
10   of all the procedures that they performed in
11   the audit.  And appendix B of page 3 lists out
12   the recommendations that Withum, Smith, and
13   Brown are giving the bank and there was 1, 2,
14   3, 4, it looks like five.
15       Q.   Okay.  So I would like to go over
16   the recommendations.
17       A.   Okay.
18       Q.   By the way, Vivek was working, at
19   the time, for the internal auditor of
20   BankAsiana which was Withum, Smith, and Brown
21   Global Assurance, right?
22       A.   Yes.
23       Q.   Let's just refer to it as WSB from
24   now on.

Page 126

F. Gleeson

1
2    A.    Okay.
3    Q.    So Vivek, in this e-mail, is
4  distributing to you and others a draft of the
5  audit report concerning the Fort Lee branch
6  operations of BankAsiana?
7    A.    Yes.
8    Q.    And in appendix -- appendix A has a
9  list or summary of the audit procedures that
10  they performed concerning the branch
11  operations, correct?
12    A.    Yes.
13    Q.    And appendix B is a summary of the
14  observations and recommendations of the branch
15  operations at the Fort Lee branch, correct?
16    A.    Yes.
17    Q.    Okay.  And so I would like to, at
18  this time, go over those recommendations.
19          Number one, the first recommendation
20  on page -- it's three pages -- the bottom, it
21  says page 3 of 3?
22    A.    Yes.
23    Q.    Okay.  It says, "Recommendation: It
24  is recommended that the CFO review reports from
25  Shinhan Bank on a quarterly basis to ensure

Page 127

F. Gleeson

1
2  that Shinhan Bank is adequately capitalized and
3  the limit of 50 percent is applicable."
4          Do you see that?
5    A.    Yes.
6    Q.    To your knowledge and recollection,
7  did you, as BankAsiana CFO, follow that
8  recommendation?
9    A.    Yes, I did.
10    Q.    Okay.  Number two, "Recommendation:
11  It is recommended that management should ensure
12  that each branch stays within their daily cash
13  limits."
14          Do you see that?
15    A.    Yes.
16    Q.    What does that mean?
17    A.    Each branch was given a level of
18  cash vault, vault cash, to maintain and not to
19  exceed.
20    Q.    And do you remember what that cash
21  limit was at that time?
22    A.    No.  Let's see.  Next to number two
23  there, just above that, it says, "Management
24  will establish daily cash limits of branches as
25  follows:  300,000 for Palisades Park; 150,000

Page 128

F. Gleeson

1
2  for Fort Lee."
3    Q.    Does that sound right?
4    A.    Yeah, it does.  And it says that the
5  branch, Fort Lee, exceeded that level for three
6  days in November of 2009 and seven days in
7  January of 2010.
8    Q.    Who was -- who at the bank was
9  responsible for the cash that went into the
10  cash vault at the bank's branches?
11    A.    The manager would be ultimately
12  responsible.
13    Q.    The branch manager?
14    A.    Right.  The branch manager.
15    Q.    So for either the Fort Lee -- the
16  Fort Lee branch, the branch manager at the Fort
17  Lee branch would have been responsible for how
18  much was maintained in the cash vault?
19    A.    Yes.
20    Q.    Did you have anything to do with
21  that?
22    A.    No.
23    Q.    Do you recall why the Fort Lee
24  branch had exceeded the daily cash limit on
25  those days indicated in November 2009 and

Page 129

F. Gleeson

1
2  January 2010?
3    A.    No, I don't recall.
4    Q.    "Any excess cash should immediately
5  be shipped out.  Alternatively, the policy may
6  be amended to provide for an average cash limit
7  instead of a daily cash limit since the cash
8  shipments are usually done once a week on a
9  fixed day by the branches."
10          Do you recall whether these
11  recommendations were adopted?
12    A.    I do seem to recall that the cash
13  limit was increased because it just -- it was
14  considered too low.  150,000 in cash to carry a
15  branch, you know, was too low.
16    Q.    And it was increased to how much?
17  From 150,000 to what?
18    A.    That I don't know.  I don't remember
19  what it was increased to.
20    Q.    Do you know who made that decision?
21    A.    To increase it?
22    Q.    Yes.
23    A.    Well, it was a policy.  So it would
24  have had to have been approved by the board,
25  ultimately.  But it may have been recommended

Page 130

F. Gleeson

by James or perhaps Jessica to increase it to a
certain level.  But I would think, as it was a
policy, it would have had to have gone to the
board.

Q.   Do you recall who made the
recommendation to the board to increase the
daily cash limit at the Fort Lee branch?

A.   No, I don't.  I don't recall that
specifically, no.

Q.   But it's just testimony that it
would have been either James or Jessica Kim?

A.   Yes.

Q.   James because he's the chief
operating officer?

A.   Yes.

Q.   And Jessica Kim because she was...

A.   VP of operations.

Q.   Vice president of operations?

A.   Yes.

Q.   Do you recall whether there was any
written document such as a memo that was
submitted to the board recommending the
increase of the daily cash limit at the Fort
Lee branch?

Page 131

F. Gleeson

A.   I would think what would have been
submitted would have been a revised policy,
written policy.  Perhaps the company buy a
memo, but the policy would have been delivered
to the board.

Q.   Do you recall seeing such a
document?

A.   Not anything specifically, no.  That
would be the way I would think it would be
handled.

Q.   Would the chief financial officer of
the bank be copied on any submission to the
board?

A.   Yeah.  I would have seen that, yeah.

Q.   And do you -- as you sit here today,
do you recall seeing some type of written
submission to the board recommending the
increase of the daily cash limit for the Fort
Lee branch?

MR. DZARA:  Objection to form.

A.   I don't specifically recall that
document, but I'm just saying how I believe it
would have been handled.

Q.   Okay.  And it says here, "Exceptions

Page 132

F. Gleeson

were also noted at Palisades Park branch in
November 2009 and January 2010."

So it appears to be around the same
period of time; do you recall that?

A.   Where does it say that?

Q.   Page 3 of 3, paragraph 2, right
above --

A.   "Exceptions were also noted" -- oh,
okay.

(Witness complies.)

A.   I do seem to recall that, yes, I do.

Q.   And do you recall whether the daily
cash limit for Palisades Park branch was
increased subsequent to this -- these
recommendations?

A.   I don't recall that it was, no.  I
mean, it's not uncommon for that cash limit to
be exceeded on a day, you know, here or there.
But when it exceeds it for several days, that's
when, you know, it's an issue.  But I don't
recall it being increased in Palisades Park.
That doesn't mean it wasn't, I just don't
recall.

Q.   Let's go to the next page, the top

Page 133

F. Gleeson

of the last page, 3, "Recommendation:  It is
recommended that someone independent of the
branch, e.g., BSA officer or designee, perform
the surprise cash count at the branch on a
monthly basis."

Do you see that?

A.   Yes.

Q.   First of all, do you know why
they -- why WSB made that recommendation?

A.   Well, it's typical procedure to
perform cash counts, unannounced cash counts in
branches.  It's just general operating
procedure.  So that's why they would make that
recommendation.  It's saying that it's
performed by one of the two tellers.  Since the
teller's performing the cash count, there's no
element of surprise in the cash count.  So I
think there were maybe two tellers in the
branch, plus the branch manager, so I guess
it's saying it defeated the element of
surprise.

Q.   So is it fair to say that there were
surprise cash counts that were performed at
each branch from time to time?

Page 134

F. Gleeson

1   A.   Yes.
2   Q.   And WSB, in particular Vivek
3  Agarwal, is indicating in this document that
4  the surprise cash counts were being performed
5  by one of the two tellers at the branch?
6   A.   Right.
7        MR. DZARA:  Objection.  It doesn't
8  say that.  It says tellers can't perform
9  the surprise cash count because they are
10  the tellers.
11       MR. YI:  All right.  Let me just
12  rephrase my question by reading this.
13  BY MR. YI:
14  Q.   "Three, surprise cash counts are
15  performed by the Fort Lee branch on a monthly
16  basis.  This cash count is performed by one of
17  the two tellers that the branch has.
18       Since the teller is performing the
19  cash count, there is no element of surprise or
20  independence and it defeats the purpose of a
21  surprise cash count.  It was noted, however,
22  that the assistant BSA officer, on a quarterly
23  basis, also performs a surprise cash count."
24       Do you see that?

Page 135

F. Gleeson

1   A.   Yeah.
2   Q.   So let me ask you first:  The
3  surprise cash count, does that include cash in
4  the vault at the branch?
5   A.   It could.  Not always, but it could.
6   Q.   Okay.  And there's reference to two
7  tellers at the branch, Fort Lee branch.  As of
8  February 2010, do you remember who they were?
9   A.   Karen Chon was one of them.  She was
10  the operations manager, but she also was a
11  teller.
12  Q.   Okay.
13  A.   And I don't know who the other one
14  was honestly.
15  Q.   Okay.  Do you remember who the
16  assistant BSA officer was?
17  A.   Jessica Kim.
18  Q.   The recommendation -- and I'll read
19  to you and then I'll ask you the question.
20       "It is recommended that someone
21  independent of the branch, e.g., assistant BSA
22  officer or designee, perform the surprise cash
23  count at the branch on a monthly basis."
24       Do you know whether that

Page 136

F. Gleeson

1  recommendation was followed?
2   A.   I don't know if it was done on a
3  monthly basis.  I know -- I know that Jessica
4  was doing, as it says above, quarterly cash
5  counts, but I don't know if it was then
6  increased to monthly.  I'm not sure.
7   Q.   Do you remember whether, after this
8  recommendation, the bank stopped having either
9  Karen Chon or the other teller perform the
10  so-called surprise cash counts?
11  A.   I don't know.
12  Q.   You don't know?
13  A.   No.  Do we have -- not to interrupt,
14  but do we have management's response to this?
15  Q.   Not in any document that I've seen.
16  A.   Okay.  Because that would help.  You
17  know, because there would've -- this is a
18  draft.  So there would have been a final with
19  management's response.
20  Q.   Right.  I represent to you that I
21  have not seen a document that has the
22  management's response.
23  A.   Okay.
24  Q.   I'm just asking you what you

Page 137

F. Gleeson

1  remember, you know, what your knowledge --
2   A.   Right.
3   Q.   -- and recollection is.
4   A.   Yeah.
5   Q.   Do you know whether management of
6  the bank accepted this recommendation?
7   A.   I would say yes.
8        MR. DZARA:  Are you guessing?
9        THE WITNESS:  Well, I --
10       MR. DZARA:  Because we don't need a
11  guess.
12       THE WITNESS:  I don't -- that's why
13  I'm asking for management's response.  If I
14  were responding to this, I would say that
15  we would follow that recommendation, but,
16  you know, I don't know.
17  BY MR. YI:
18  Q.   Just tell us your best recollection.
19  That's all we are asking for.
20  A.   I would think that it would have
21  been followed, but without seeing management --
22  Q.   Can you think of anything that leads
23  you to believe it was not followed?
24  A.   No, no.

Page 138

F. Gleeson

Q.   All right.  Let us go to the next
one, "Four, it was noted that Integrated
Compliance Solutions, ICS, has not performed
any regulatory compliance testing for branch
operations for Fort Lee branch since its
opening.  The last branch operations audit
performed by ICS was in February 2nd, 2008, for
the Palisades Park branch."

Do you see that?

A.   Yes.

Q.   Okay.  So do you -- do you remember
anything about this?

A.   Yes, the Integrated Compliance
Solutions did -- they did not perform financial
audits, they did compliance audits.  So
compliance was consumer rules and regulations,
that sort of thing.  Not things like, you know,
cash counts or internal controls or anything
like that.  So apparently they had not been
doing them on the Fort Lee branch since it
opened.  I think it opened at the end of 2008.
So the recommendation here is that the
compliance testing be done for the Fort Lee
branch as it had been for the Palisades Park

Page 139

F. Gleeson

branch.

Q.   Do you know why ICS -- why the bank
did not cause ICS to perform a compliance audit
for Fort Lee branch?

A.   No, I don't know why.

Q.   Do you remember having any
discussions with anyone at the bank about this?

A.   About why it wasn't being done?

Q.   Yeah.

A.   No, I don't.

Q.   Who at the bank made the decision to
have ICS perform compliance audits at the
bank's branches?

A.   Well, it was a compliance function.
So James Ryu is the compliance officer who
would've been working with ICS to do those.

Q.   Okay.  Let's go to the
recommendation under four.  "It is recommended
that ICS perform the regulatory compliance
testing for branch operations for Fort Lee
branch as soon as possible."

Do you see that?

A.   Mh-hm.

Q.   And to your knowledge, did the

Page 140

F. Gleeson

bank's management accept and follow that
recommendation?

A.   Yes, I believe so.  I believe I
recall that.

Q.   Number five, "It was noted that
combinations to open the safe at the Fort Lee
branch have not been changed since branch
opening."

Do you see that?

A.   Yeah.

Q.   The word "safe," is that the same as
the vault?

A.   Yes.

Q.   So that would be what we refer to as
cash vault?  It's where the cash is kept?

A.   Yes.

Q.   "This is important as the branch
manager prior to Joseph Choi is no longer
working with the bank and is aware of the
combinations.  Currently the safe requires two
combinations; one is with the branch manager
and the other is with the teller to open."

Do you see that?

A.   Yes.

Page 141

F. Gleeson

Q.   What do you remember about the issue
relating to the safe or the vault at the Fort
Lee branch?

A.   Well, I do remember that, after
that, the combinations were changed.  I do
remember that.  As to why it hadn't been done
up to that point, I don't -- I don't have any
knowledge.

Q.   Okay.  And here there's reference to
Joseph Choi.  So the branch manager prior to
Joseph Choi was no longer working for the bank
as of February 2010, you don't remember who
that was, right?

A.   I think that's the woman I was
mentioning earlier, but I don't remember her
name.

Q.   And it says that the safe requires
two combinations?

A.   Mh-hm.

Q.   Can you explain that to us?  What
does that mean?

A.   Yeah, what they normally do is the
combo -- they'll split the combination into
halves, like there might be four numbers in a

Page 142

F. Gleeson

1  combination. It's a dial combination. So one
2  person has the first two numbers and one person
3  has the second two numbers. So not any one
4  person can open the safe without somebody else.
5      Q.  Do you remember anything else about
6  the issue relating to the safe at the Fort Lee
7  branch and the combinations?
8      A.  No, I don't.
9      Q.  Okay. Let's go to the
10  recommendation. "It is recommended that safe
11  combinations be immediately changed by
12  management and on a periodic basis thereafter
13  or whenever an employee knowing the combination
14  leaves the bank."
15      Do you see that?
16      A.  Yes.
17      Q.  First, do you know whether the
18  bank's management accepted and followed that
19  recommendation that the combinations be
20  immediately changed?
21      A.  Yes, I believe that they did.
22      Q.  Okay. What about the second part?
23  It says that it be changed on a periodic basis
24  thereafter.
25

Page 143

F. Gleeson

1      A.  Well, that's why I'm asking for the
2  management's response.
3      Q.  I'm just asking what you recall.
4      A.  Yeah, that I don't recall, that it
5  was changed on a periodic basis going forward.
6  That I don't recall because I didn't have any
7  direct knowledge of that.
8      Q.  Do you have any reasons to believe
9  that the bank's management would not have
10  accepted and followed any part of this
11  recommendation?
12      A.  No, I do not.
13      Q.  Are you aware that Karen Chon was
14  prosecuted and convicted and is in prison in
15  connection with an embezzlement at BankAsiana?
16      A.  Yes.
17      Q.  And that embezzlement occurred
18  during the time you were employed with
19  BankAsiana?
20      A.  Yes.
21      Q.  And are you aware that she had sole
22  access to the cash vault at the Fort Lee
23  branch?
24      A.  That, no, I wasn't aware of that.
25

Page 144

F. Gleeson

1      Q.  Would that surprise you?
2      A.  Yes.
3      Q.  During the time you were employed at
4  BankAsiana, would you have known who had the
5  combinations, the two combinations, to the cash
6  vault at the Fort Lee branch?
7      A.  Well, I think the branch manager
8  would have half and most likely Karen would
9  have had the other half.
10      Q.  And do you know -- when you say
11  "half," do you have any idea whether they were
12  numbers or -- I mean, how many digit numbers --
13  you mentioned four before, two and two?
14      A.  Well, I don't know the particular
15  safe, but some are only three digits. So
16  somebody might have the first digit and
17  somebody else has the second two digits or vice
18  versa.
19      Q.  Okay.
20      A.  But there were some safes that have
21  four, and some five digits, depending upon the,
22  you know, the type of safe. So in that case
23  it's a little easier to split it up, you know.
24      Q.  But you were not familiar with the
25

Page 145

F. Gleeson

1  combinations of -- the cash vault combinations
2  to the safe or cash vault at the Fort Lee
3  branch during the time you were employed by the
4  bank?
5      A.  Well, we did -- we did have --
6  there's -- I do have some direct knowledge of
7  that. We had to work one Saturday a month at
8  one or the other branch. So there was times
9  when I worked in Fort Lee on a Saturday. And I
10  had half of that combination, was given half of
11  that combination by the branch manager to open
12  the safe on a Saturday.
13      So there were times when I did help
14  do that and it was split, you know, I had
15  whatever it was, one or two digits of that
16  number to open up the safe.
17      Q.  Okay. But you don't remember how
18  many digits the combination was?
19      A.  I don't, no.
20      Q.  And you mentioned that the branch
21  manager gave you one combination?
22      A.  Yeah, their half, right.
23      Q.  Okay. When you accessed the cash
24  vault at the Fort Lee branch during the time
25

Page 146

F. Gleeson

1
2  that you mentioned, was there always a second
3  person who provided the balance of the
4  combination?
5      A.   Yes.
6      Q.   And do you recall who that person
7  was or persons were?
8      A.   Generally, Karen.  Karen Chon.
9      Q.   When you say generally Karen Chon,
10  were there instances when it was someone other
11  than Karen?
12      A.   I would say, yes, yeah.
13      Q.   One other person?
14      A.   One of the other -- the other
15  teller, yeah.
16      Q.   Is it fair to say it would have been
17  Karen or the other teller?
18      A.   Yeah, yes.
19      Q.   During the time you were with the
20  bank, did you ever learn that Karen Chon had
21  both combinations?
22      A.   No.
23      Q.   Did you ever learn that anybody at
24  the bank had both combinations to the cash
25  vault at the Fort Lee branch during the time

Page 147

F. Gleeson

1
2  you were employed at the bank?
3      A.   No, I did not.
4           (Gleeson Exhibit 19, e-mail and
5       attachment, marked for identification.)
6  BY MR. YI:
7      Q.   I'm showing you what's been marked
8  as Exhibit 19.
9           Is this a copy of -- withdrawn.
10           Have you ever seen this e-mail and
11  attachment that's been marked as Exhibit 19 to
12  your deposition?
13      A.   Have I ever seen it?
14      Q.   Yes.
15      A.   I don't recall seeing it.
16      Q.   Okay.  So let me just refer you to
17  the e-mail portion of this exhibit.
18           It has the name Jessica Kim,
19  assistant BSA officer operations administrator.
20           We have previously talked about
21  Jessica Kim?
22      A.   Mh-hm.
23      Q.   So as of 2010, or during your tenure
24  at the bank, is that Jessica Kim -- was that
25  Jessica Kim's position or title?

Page 148

F. Gleeson

1
2      A.   As assistant BSA officer, yes.
3      Q.   And also operations administrator?
4      A.   Yes.
5      Q.   And she worked out of the Palisades
6  Park branch or the main office of the bank?
7      A.   Yes, she did.
8      Q.   So was the Palisades Park branch
9  location both a Palisades Park branch and also
10  the main office of the bank?
11      A.   Yes.
12      Q.   So the branch was on the ground
13  floor and then, what, was the main office of
14  the bank on the second floor?
15      A.   It was actually the third floor.
16      Q.   Third floor?
17      A.   Yeah.
18      Q.   Was there something on the second
19  floor?
20      A.   Yeah, we leased the space.  So there
21  was something else on that second floor.
22      Q.   And so you worked out of the third
23  floor of 7 Broad Avenue?
24      A.   Right.
25      Q.   And Mr. Hur as well?

Page 149

F. Gleeson

1
2      A.   Yes.
3      Q.   And Mr. Kim, the chief lending
4  officer?
5      A.   He was actually on the first floor.
6  He was -- he had an office in the branch.
7      Q.   Let me just direct your attention to
8  this document starting on the second page of
9  the exhibit that's titled "BSA/AML report
10  May 13, 2010"?
11      A.   Yup.
12      Q.   Do you recognize this document or
13  this report?
14      A.   It looks like the same as the other
15  report we just looked at, as far as the
16  findings or the recommendations.  Only this one
17  has the management responses that I was talking
18  about.
19      Q.   Oh, okay.  Well, so I --
20      A.   It's laid --
21      Q.   -- stand corrected.
22      A.   It's laid out differently but...
23      Q.   Okay.  Do you know who the author of
24  this report is?
25      A.   Just from the cover of the e-mail, I

Page 150

```
 1              F. Gleeson
 2   would suspect it would be Jessica Kim.
 3      Q.   Okay.
 4      A.   Yeah, so these are the responses to
 5   these questions.
 6      Q.   All right.  So why don't we quickly
 7   go through this.
 8         Okay.  So the WSB's recommendation
 9   that the CFO review reports from Shinhan Bank
10   on a quarterly basis -- the CFO being you --
11      A.   Mh-hm.
12      Q.   -- Management's response is "Shinhan
13   Bank's financials have been reviewed and will
14   continue to be monitored on a quarterly basis.
15   The CFO will maintain documentation to support
16   this review."
17         Do you see that?
18      A.   Yes.
19      Q.   And is that consistent with what you
20   remember?
21      A.   Yes.
22      Q.   The next one, I'll just go to the
23   management's response if that's okay.
24         "The policy has been amended to
25   provide for average cash levels to accommodate
```

Page 151

```
 1              F. Gleeson
 2   the frequency of cash shipments."
 3         Do you see that?
 4      A.   Yes, I do.
 5      Q.   Can you explain that to us?
 6      A.   Well, the recommendation from WSB
 7   was that cash shipments be more frequent,
 8   right?
 9      Q.   But previously we talked about the
10   fact that you believe that, based on the
11   recommendation of WSB concerning the cash
12   maintained at Fort Lee branch, that the cash,
13   daily cash limit, was increased?
14      A.   Yeah, I seem to recall that, but it
15   doesn't say that here.
16      Q.   Okay.  But that's still your
17   recollection?
18      A.   I believe it was.  At some point or
19   another, I believe they increased the cash
20   level there for this very reason, but I could
21   be wrong.  But that's what I seem to recall.
22      Q.   Okay.  Let's go to the next one,
23   management response to the next recommendation,
24   "The operations administration department will
25   perform surprise cash counts at the branch on a
```

Page 152

```
 1              F. Gleeson
 2   monthly basis."
 3         Is that consistent with your
 4   recollection?
 5      A.   Yes.
 6      Q.   And by "operations administration
 7   department," is it your recollection that it
 8   was Jessica Kim, the operation administrator --
 9      A.   Yes.
10      Q.   -- who performed the surprise cash
11   count?
12      A.   Yes.
13      Q.   And that was done on a monthly
14   basis?
15      A.   Yes.
16      Q.   Next one is management's response,
17   "ICS will be contacted to perform regulatory
18   compliance testing for each branch office."
19         Do you see that?
20      A.   Yes.
21      Q.   And that's consistent with your
22   recollection?
23      A.   Yes.
24      Q.   And do you know whether ICS
25   performed regulatory compliance testing at the
```

Page 153

```
 1              F. Gleeson
 2   Fort Lee branch?
 3      A.   I do recall that they did, yes.
 4      Q.   Was that done annually, by the way,
 5   if you recall?
 6      A.   I don't recall.  It should have
 7   been, but I don't recall if it was.
 8      Q.   Okay.  The next management response
 9   is "Combinations have been changed in the Fort
10   Lee branch"?
11      A.   Mh-hm.
12         MR. DZARA:  You have to say yes or
13   no.
14      A.   Yes.
15      Q.   Do you know whether -- in addition
16   to changing the combinations immediately,
17   whether the bank's management also changed the
18   combinations periodically as recommended?
19      A.   That I don't know.
20      Q.   What does AML stand for?
21      A.   Anti money laundering.
22      Q.   During your tenure at the bank, who
23   was responsible for filing suspicious activity
24   reports?
25      A.   James.
```

Page 154

F. Gleeson

1
2      (Gleeson Exhibit 20, e-mail to James
3   and Jessica Kim from May 20, 2010,
4   11:18 a.m., marked for identification.)
5   BY MR. YI:
6      Q.   I'm showing you what's been marked
7   as Exhibit 20.
8         First, let me direct your attention
9   to the bottom.  Is that a copy of your e-mail
10  to James and Jessica Kim from May 20, 2010,
11  11:18 a.m. --
12     A.   Yup.
13     Q.   -- subject "Fort Lee audit
14  response"?
15     A.   Yes.
16     Q.   Is it fair to say that in this
17  e-mail you were making some suggested revisions
18  to the management's response to one of the
19  recommendations made by WSB?
20     A.   Yes.
21     Q.   Okay.  And the management's response
22  that you were suggesting was, "It should be
23  noted that surprise cash had been completed by
24  the operations administration department on
25  five separate occasions throughout 2009.

Page 155

F. Gleeson

1
2   Further, it has been the practice for the
3   branch to perform internal surprise cash counts
4   on a monthly basis.  Management feels that this
5   practice is sufficient to provide for monthly
6   internal surprise cash counts and at least
7   quarterly cash counts from the operations
8   administration department."
9         Do you see that?
10     A.   Yes.
11     Q.   Do you recall whether your suggested
12  revision or revised response was adopted in the
13  final version?
14     A.   Well, I'm just looking at the
15  document, Exhibit 19, where it says, "The
16  operations administration department will
17  perform surprise cash counts at a branch on a
18  monthly basis."  And that's dated May 13th.  So
19  I don't know that they changed their response
20  to mine or not because they are a little bit
21  different.
22     Q.   Right.  But is it fair to say that
23  in your e-mail you are suggesting revised
24  responses -- or response to this recommendation
25  after this May 13, 2010, document?

Page 156

F. Gleeson

1
2      A.   Yeah, that's what it looks like.
3      Q.   And my question is:  Do you recall
4   whether what you had suggested as the
5   management's response concerning the surprise
6   cash count at the Fort Lee branch was
7   ultimately adopted?
8      A.   I don't.  I don't recall.  That's
9   why I'm saying, if we had the final report with
10  management's response, then we would know.
11  Because I was having discussions -- I'm just
12  looking at what was written here -- with WSB.
13     Q.   Let me ask you:  You said, "Further,
14  it has been the practice for the branch to
15  perform internal surprise cash counts on a
16  monthly basis."
17         And we talked earlier about the fact
18  that the branch had the practice of having one
19  of two tellers at the branch --
20     A.   Right.
21     Q.   -- perform these surprise cash
22  counts and we talked about, well, that couldn't
23  really be a surprise cash count then.
24     A.   Right.
25     Q.   Yet, you are saying here, "Further,

Page 157

F. Gleeson

1
2   it has been the practice for the branch to
3   perform internal surprise cash counts on a
4   monthly basis.  Management feels that this
5   practice is sufficient."
6         Do you see that?
7      A.   Yeah.
8      Q.   Do you remember why you suggested
9   this revision?
10     A.   Normally the branch manager is part
11  of that process, not the tellers.  So the
12  branch manager should be performing the
13  surprise cash count, not the tellers.  So
14  that's what Withum, Smith, and Brown was
15  bringing out, was that the tellers were doing
16  it.  And what I'm saying here is that the
17  surprise cash count should be done and that
18  should of included the branch manager.
19     Q.   But that's not exactly what it says?
20     A.   It's not exactly what it says.
21     Q.   But that's what you meant to say?
22     A.   Yes.  It needs to be an independent
23  party as part of that process.  And when it's
24  not an independent party then, you know, it can
25  be an issue.

Page 158

F. Gleeson

1
2    Q.   Right.  But your understanding of
3   WSB's recommendation was that it should be
4   someone external, meaning somebody who doesn't
5   work at the branch, perform the surprise cash
6   counts?
7       A.   Well, not necessarily somebody that
8   doesn't work in the branch, somebody who
9   doesn't handle the cash.  So the branch manager
10  wouldn't be one to handle the cash so they
11  could be a likely alternative to a surprise
12  cash count.  I have been a branch manager in my
13  day so I know.  I have done it.  So I would
14  perform surprise cash counts.
15      Q.   Right.  But I represent to you, as
16  we went through Exhibit 18, that WSB's
17  recommendation was that the surprise cash count
18  should be done by somebody outside the branch.
19      A.   Outside the branch.
20          MR. DZARA:  It's says -- that's
21      wrong.  It says "assistant BSA management
22      or their designee."  I don't know if I
23      believe that this is completely relevant
24      fully to this case, but I do want to
25      correct the record.  That's not what it

Page 159

F. Gleeson

1
2   says and we should move on because this
3   deposition is taking a long time.
4          (Document review.)
5       A.   Yeah, assistant BSA officer.
6       Q.   Right.  It says, "It is recommended
7   someone independent of the branch perform the
8   surprise cash count."
9          Right?
10      A.   That's what it says, yeah.  So do
11  you have the final report that has the final
12  management response?
13      Q.   Well, I can only give you -- show
14  you what I have and I couldn't tell you.  I'm
15  not here to testify.
16      A.   Well, that would be helpful.
17      Q.   Okay.  But I just want to make sure
18  that I understand.  Your testimony is that
19  after WSB's recommendation concerning the
20  surprise cash count, your recollection is that
21  it was Jessica Kim, the operations
22  administrator of the bank, who performed the
23  surprise cash counts going forward?
24      A.   Or perhaps, as David said, her
25  designee.  She might have had somebody else --

Page 160

F. Gleeson

1
2          MR. DZARA:  I can't testify either.
3       A.   -- from the operation's department.
4       Q.   Okay.  So it would have been either
5   Jessica Kim or her designee --
6       A.   Right.
7       Q.   -- from operations administration?
8       A.   From operations, which would be
9   independent of the branch.
10      Q.   Okay.
11          (Gleeson Exhibit 21, e-mail from
12      Vivek Agarwal of WSB to Mr. Gleeson and
13      James from August 20, 2010, 3:36 p.m., with
14      the subject "Audit reports", marked for
15      identification.)
16          (Document review.)
17  BY MR. YI:
18      Q.   Okay.  I'm showing you what's been
19  marked as Exhibit 21.
20          I would like to direct your
21  attention to the bottom of the first page.  Is
22  that a copy of an e-mail from Vivek Agarwal of
23  WSB to you and James from August 20, 2010,
24  3:36 p.m., with the subject "Audit reports"?
25      A.   Yes.

Page 161

F. Gleeson

1
2       Q.   And even though the e-mail doesn't
3   seem to indicate an attachment in his e-mail,
4   Mr. Agarwal states, "Please find attached the
5   draft risk assessment report."
6          And then I'll represent to you that
7   the attachment follows.
8          Do you recall seeing this
9   attachment?
10      A.   Yeah, they -- WSB presented an
11  audit, this document to the audit committee of
12  the board every year.  So yeah, I do recall
13  seeing these reports.
14      Q.   Okay.  So this is essentially WSB
15  performing an internal audit of the bank and
16  then submitting its internal audit report to
17  the audit committee of the board of directors
18  of BankAsiana?
19      A.   No.  This is -- annually, WSB would
20  do a risk assessment of the bank to determine
21  where the risks were and they would rank all of
22  those risks high, medium or low.  And from that
23  ranking determine what areas they were going to
24  audit in that coming year.
25      Q.   Okay.  So was the risk assessment

Page 162

F. Gleeson

1  concerning -- were they indicating -- what year
2  were they indicating they would audit?
3      A.   Well, they're doing a risk
4  assessment for 2010 and 2011.  So I would think
5  that their audit plan would then be for 2011.
6      Q.   What was the bank's fiscal year?
7      A.   The calendar year.
8      Q.   The calendar year?
9      A.   Yeah.  But I'm trying to remember, I
10 think their audit year -- sometimes the audit
11 year differs.  I think their audit year was
12 like July to June.  You know what I mean, they
13 did their audit plan based on a July-to-June
14 year, not fiscal.
15     Q.   So based on the fact that this
16 e-mail was sent on August 20, 2010, are they
17 indicating that they are going to do an
18 internal audit which would include a certain
19 risk assessment, evaluations, and reviews for
20 the audit year of July 2010 to June 2011?
21     A.   I would think so, but I've got to
22 kind of read it and see.
23     Q.   Okay.
24          (Witness complies.)

Page 163

F. Gleeson

1      A.   Yeah, I believe it's from July 2010
2  to June of 2011.
3      Q.   Okay.
4      A.   Yeah.
5      Q.   And just to be clear, WSB was the
6  only entity which was responsible for
7  performing internal audit of BankAsiana during
8  your tenure at the bank?
9      A.   Yes.
10     Q.   There was no other person or entity
11 responsible for that function?
12     A.   Right.
13     Q.   And ICS Compliance, ICS or
14 Integrated Compliance Solutions, was the sole
15 entity that was responsible for compliance
16 auditing for BankAsiana during your tenure?
17     A.   Yes, yup.
18          (Gleeson Exhibit 22, e-mail from
19          Jessica Kim to Mr. Gleeson from September
20          13, 2010, 10:32 a.m., marked for
21          identification.)
22 BY MR. YI:
23     Q.   I'm showing you what's been marked
24 as Exhibit 22.

Page 164

F. Gleeson

1          Is this a copy of an e-mail from
2  Jessica Kim to you from September 13, 2010,
3  10:32 a.m., with CC to James with a subject
4  "Suggestion of installment saving account
5  restriction"?
6      A.   Yes.
7      Q.   Can you tell us what you remember
8  about this?
9      A.   Give me a minute here.
10          (Witness complies.)
11     A.   The bank had a product called
12 installment savings.  They also sometimes
13 referred to it as club savings.  And it was
14 like a saving plan for people, the customers,
15 if they wanted to save -- if you look at
16 page 2 -- if they wanted to save $20,000, which
17 is the far-right column, and they wanted to do
18 that in 12 months, it tells them how much they
19 would need to put in the bank each month, you
20 know, to do that.
21          Do you see what I'm saying?  So if
22 you wanted to save $20,000 in 12 months, you'd
23 have to put $1,644.31 a month in the bank at
24 the rate of 2.53 percent to get to your goal.

Page 165

F. Gleeson

1          So it was a recommendation on
2  offering this account.
3      Q.   The attachment to this e-mail --
4  first of all, do you see the reference to
5  Wilshire State Bank at the bottom of this
6  e-mail?
7      A.   Yeah, okay.  I see that.
8      Q.   Okay.  The rainbow saving plan
9  that's described, starting on the second page
10 of this exhibit, was that from Wilshire State
11 Bank?
12     A.   Yeah, I believe what she was doing
13 is showing other bank's products.  Making a
14 recommendation that we offer something like
15 this to, you know, to compete.  So she shows
16 Wilshire State Bank's product was called a
17 rainbow savings.  Narrow Bank's was called
18 piggy bank savings account.  And New Bank was
19 called something.
20     Q.   Okay.  Just to summarize, is this an
21 e-mail in which Jessica Kim is recommending
22 that BankAsiana begin an installment saving
23 account program?
24     A.   That's what I recollect.

Page 166

```
 1              F. Gleeson
 2       Q.   And she's showing you the type of
 3   program that's available from other
 4   Korean-American banks?
 5       A.   Right.
 6       Q.   That's all that is?
 7       A.   That's all -- yeah, that's all it
 8   was.
 9            (Gleeson Exhibit 23, multiple
10   e-mails, marked for identification.)
11            MR. YI:  Off the record.
12            (Discussion held off the record.)
13   BY MR. YI:
14       Q.   I'm showing you what's been marked
15   as Exhibit 23.
16            And I represent to you that this
17   exhibit consists of multiple e-mails and it
18   appears that you were copied on the e-mail --
19       A.   Mh-hm.
20       Q.   -- e-mails they show here.
21            Can you tell us what was discussed
22   in this e-mail correspondence?
23       A.   You want me to start from the front
24   or the back?
25       Q.   Why don't we start at the back, the
```

Page 167

```
 1              F. Gleeson
 2   very first e-mail appears to be an e-mail
 3   from --
 4       A.   Maureen Hemhauser.
 5       Q.   At ICS Compliance?
 6       A.   Right.  That was the compliance
 7   firm.  She's talking here about scheduling a
 8   compliance committee meeting.  The e-mail was
 9   sent to Jessica, James, and myself and that
10   she's having somebody else do the performance
11   compliance monitoring the following week and
12   what they were going to be doing, the red flags
13   and possible signage review.  And then another
14   e-mail, but it looks, to me, like they are just
15   trying to schedule compliance reviews.
16       Q.   She was trying to schedule ICS's
17   compliance audit of the Fort Lee branch as
18   recommended by WSB?
19       A.   Well, where does it say Fort Lee
20   branch?
21       Q.   No, I'm just asking.
22       A.   Oh, I don't see that anywhere.  They
23   are talking about scheduling a compliance
24   committee meeting and then somebody from ICS
25   was going to come in and do the red flags
```

Page 168

```
 1              F. Gleeson
 2   review which is a completely different -- it's
 3   not necessarily related to Fort Lee.
 4       Q.   Okay.
 5       A.   And the branch signage review, that
 6   might involve Fort Lee, where they go out and
 7   check to make sure the proper signs are posted
 8   by the compliance rules.
 9       Q.   Okay.
10       A.   And it just looks like they are
11   trying to schedule.
12       Q.   Okay.  Thank you.
13            (Gleeson Exhibit 24, e-mail from
14   Jessica Kim to various individuals at
15   BankAsiana, marked for identification.)
16            (Witness complies.)
17   BY MR. YI:
18       Q.   I'm showing you what's been marked
19   as Exhibit 24.
20            Is this a copy of an e-mail from
21   Jessica Kim to various individuals at
22   BankAsiana, with CC to you and others, with a
23   subject "Operations officer meeting," with the
24   attachment "Officer meeting 5/25/2011"?
25       A.   Yes.
```

Page 169

```
 1              F. Gleeson
 2            MR. YI:  Off the record.
 3            (Discussion held off the record.)
 4   BY MR. YI:
 5       Q.   Is there anything here that's
 6   pertinent to the Fort Lee branch operations?
 7       A.   Yes.
 8       Q.   Can you tell us which?
 9       A.   I would say all of them.  It is
10   related to branch -- it's branch operations
11   related.
12       Q.   Okay.
13       A.   Affecting dormant inactive accounts,
14   the daily procedures, monthly procedures for
15   dormant accounts.  So there's certain
16   procedures that she's directing the branch
17   operations staff to conduct when handling
18   dormant and inactive accounts.
19       Q.   Okay.  These -- this internal
20   memorandum has nothing to do with certificates
21   of deposit accounts at BankAsiana?
22       A.   No, it wouldn't.  Certificates of
23   deposit don't normally go dormant.
24       Q.   Right.  So they are just talking
25   about checking or savings?
```

Page 170

F. Gleeson

1
2    A.   Checking or savings, yeah.
3         (Gleeson Exhibit 25, e-mail from
4    Jessica Kim to individuals who were
5    employed at BankAsiana with a CC to Mr.
6    Gleeson and others from June 16, 2011,
7    11:32 a.m., marked for identification.)
8  BY MR. YI:
9    Q.   I'm showing you what's been marked
10   as Exhibit 25.
11        Is this a copy of -- is the first
12   page indicating an e-mail -- withdrawn.
13        Is Exhibit 25 a copy of an e-mail
14   from Jessica Kim to individuals who were
15   employed at BankAsiana at the time with a CC to
16   you and others from June 16, 2011, 11:32 a.m.,
17   with a subject "Operation officer meeting
18   6/16/2011," and with an attachment starting
19   with "Officer meeting 6/16/2011"?
20   A.   Yes.
21   Q.   "CIP risk rating and account opening
22   procedures April 2011.  Branch self-assessment
23   for 2011"?
24   A.   Yes.
25   Q.   Okay.  And if you could just turn to

Page 171

F. Gleeson

1
2    the -- starting the second page of this
3    exhibit, the internal memorandum, which is the
4    attachment to this e-mail.
5    A.   Mh-hm.
6    Q.   Can you just point out to us what in
7    this internal memorandum relates to the branch
8    operations at the Fort Lee branch, if any?
9    A.   Well, yeah, again, it would all
10   relate to any branch.  They are giving wire
11   instructions and particular SWIFT instructions,
12   SWIFT wires.
13   Q.   So this internal memorandum has to
14   do with wire transfer transactions?
15   A.   Wire transfers and also CIP risk
16   ratings.  CIP risk ratings have to do with BSA,
17   where you have to risk rate customers.
18   Customer information profile I think is what
19   CIP stands for.
20   Q.   I'm sorry, what does CIP stand for?
21   A.   I think it's customer information
22   profile.  Let me see.  I could be wrong on
23   that.  Yeah, customer -- yeah, customer
24   information profile.  So it's all the
25   procedures to follow when opening new accounts

Page 172

F. Gleeson

1
2    and how to determine that the customer is who
3    they say they are and all the documentation
4    that has to be completed for BSA purposes.
5    Q.   Okay.  I'm going to ask you to turn
6    to page 4 of the internal memorandum and
7    there's what appears to be a little bit of a
8    schedule, a table, and there is a product and
9    services column indicating checking, savings,
10   money markets, CD -- CD is certificate of
11   deposit, right?
12   A.   Yes.
13   Q.   Certificate of deposit accounts.
14        And it has these ratings of low for
15   corporate under the liability company
16   partnerships?
17   A.   Mh-hm.
18   Q.   Do you see that?
19   A.   Yeah.
20   Q.   What is that indicating?
21   A.   When you are opening up a new
22   account for a new customer, these products all
23   have different risk ratings depending upon
24   activity in the account.  So they are given,
25   you know, for instance, a main deposit account

Page 173

F. Gleeson

1
2    or checking account would have a higher risk
3    because there's more activity going on in that
4    account.  So it's given a higher rating.
5         Whereas a CD has very low activity,
6    so it wouldn't be given as high as a rating
7    from a customer information profile
8    perspective.  It's purely for BSA purposes.
9    Q.   So the higher the frequency of
10   transactions, bank transactions, relating to
11   these accounts, the higher the risk assessment
12   would be?
13   A.   Right.
14   Q.   The fewer the transactions, the risk
15   assessment rating would be lower?
16   A.   Right.
17   Q.   So a CD account, if it's a one-year
18   CD, three-year CD, five-year CD, because it has
19   such few transactions, you would have a low
20   risk assessment rate?
21   A.   Right, from a customer information
22   perspective.  Not necessarily from an internal
23   control perspective, but from a customer --
24   know-your-customer kind of perspective.
25   Q.   Whether the transaction is

1          F. Gleeson
2    authorized?
3         A.   Or no, knowing whether the customer
4    is who they say they are and that they are not
5    going to have a likelihood to perform, you
6    know, fraudulent transactions with the account
7    for BSA purposes.  It's really -- it's a risk
8    rating for BSA specifically.
9         Q.   "Know your customer" meaning verify
10   the identification of the customer --
11        A.   Right.
12        Q.   -- check the driver's license,
13   passport, whatever type of ID --
14        A.   Right.  All the documentation.
15        Q.   -- and if there's a power of
16   attorney, make sure it's the proper power of
17   attorney?
18        A.   Right, yeah.
19        Q.   Okay.
20             (Gleeson Exhibit 26, Karen Chon's
21        e-mail to Mr. Gleeson, James Ryu, and
22        others at BankAsiana from September 16,
23        2001, 12:43 p.m., marked for
24        identification.)
25   BY MR. YI:

1          F. Gleeson
2         Q.   I'm showing you Exhibit 26.
3              Is this a copy of Karen Chon's
4    e-mail to you, James Ryu, and others at
5    BankAsiana from September 16, 2001, 12:43 p.m.,
6    with CC to Mr. Hur and Mr. Taikyo Suh -- that's
7    T-a-i-k-y-o, last name S-u-h -- with the
8    subject "Daily report 9/15/11," and the
9    attachment "Daily balance sheet"?
10        A.   Yes.
11        Q.   Who is Taikyo Suh?
12        A.   He was the branch manager, TK Suh,
13   who I mentioned earlier.  I think he was the
14   branch manager at, you know...
15        Q.   Fort Lee branch?
16        A.   At the -- the last branch manager,
17   let's put it that way.
18        Q.   Thank you.
19             Was Mr. Kim, who received this
20   e-mail, is that the chief lending officer?
21        A.   Yes.
22        Q.   And who is Mr. Chan Mai Park?
23        A.   She was a branch manager in
24   Palisades Park.
25        Q.   So is it fair to say that Karen Chon

1          F. Gleeson
2    is sending to all of you indicated here,
3    including the CC to Mr. Hur and Mr. Suh, her
4    daily report for the transactions that occurred
5    on October 20, 2017, at the Fort Lee branch?
6         A.   The top half of the report is the
7    breakdown of all the different deposit products
8    in the branch and what the balances were.  So,
9    for instance, a personal free checking balance
10   at 820,000 on 12/31/2010.
11             And then she gives last month's
12   balance, last week's balance, yesterday's
13   balance, you know, and each product is rated
14   the same way.  And then the bottom section
15   under Remark, is the activity for that
16   particular day.  So they are opened two, looks
17   like, I don't know what type of accounts,
18   checking, free checking accounts.  They opened
19   some business accounts, you know, so that's
20   like daily activity in the branch.
21        Q.   Okay.  So is it -- do you
22   remember -- I ask, because the subject of this
23   e-mail was "Daily report."
24        A.   Yeah.
25        Q.   And it's 9/15/2011.

1          F. Gleeson
2         A.   Right.
3         Q.   But the attachment appears to be
4    October 20, 2017.
5         A.   I don't know why it's...
6         Q.   I'll have to check that.
7              But here's my question, though.  My
8    question is:  During your tenure at the bank,
9    do you remember did Karen Chon, as the
10   operations manager at the Fort Lee branch, did
11   she distribute a daily report to certain
12   officers at the bank, including you?
13        A.   Yes, she did.  I don't recall if it
14   was every day or if it was -- she says "daily
15   reports" so I would assume it was daily.  But,
16   yeah, it was a report that she generated.
17        Q.   And would it have been in this form,
18   which is attached to the e-mail, and I'm not
19   representing to you that this is the correct
20   attachment to this e-mail --
21        A.   Yeah, right.
22        Q.   -- but does this form -- are you
23   familiar with this form?
24        A.   I recall seeing it, yeah.
25        Q.   And so when you received the daily

Page 178

1  F. Gleeson
2  report from Karen Chon, was it in --
3  substantially in this form?
4     A.  Yes.  Yeah.
5     Q.  Okay.  So the top half would sort of
6  show you -- it would be more of a balance
7  sheet?
8     A.  Right.
9     Q.  And the bottom half would be the
10 actual transactions for that day?
11    A.  Some of them, yes.  It may not be
12 all the transactions, but it looks like it was
13 like some of the major transactions of that
14 particular day.  I would think there would be a
15 lot more than ten transactions in the branch
16 for the day so...
17    Q.  To your knowledge, was Karen
18 supposed to include all of the transactions for
19 the day in her daily report?
20    A.  No, she was tracking -- and I think
21 the other branches did the same thing -- any
22 significant fluctuations in certain accounts.
23    Q.  But not necessarily every single
24 transaction?
25    A.  Correct.

Page 179

1  F. Gleeson
2     Q.  Okay.  If you -- let me direct your
3  attention to the second page, bottom half of
4  the -- what's called the Daily Worksheet,
5  there's a name, Soyu Architecture, in line 4,
6  next to the column for balance fluctuation; do
7  you see that?
8     A.  Yes.
9     Q.  By the way, the amounts that are
10 indicated here, are thousands, right?
11    A.  Right.
12    Q.  Okay.  Soyu Architecture, are you
13 familiar with that company?
14    A.  Yeah, I believe they did some
15 architecture work for the bank.
16    Q.  And do you remember the principal or
17 owner of Soyu Architecture?
18    A.  I think it was Sam Kim, I think.  I
19 think it was Sam.
20    Q.  And is it your testimony that Soyu
21 Architecture was one of the vendors of
22 BankAsiana?
23    A.  Yes.
24    Q.  They provided architectural
25 services?

Page 180

1  F. Gleeson
2     A.  Yes.
3     Q.  Do you recognize anybody else on
4  this worksheet?
5     A.  No, I don't.
6     Q.  Okay.
7     (Gleeson Exhibit 27, Mr. Agarwal's
8  e-mail to Jessica Kim from November 7,
9  2011, 11:45 a.m., marked for
10 identification.)
11 BY MR. YI:
12    Q.  I'm showing you what's been marked
13 as Exhibit 27.
14    Is this -- directing your attention
15 to the top of the first page, is that a copy of
16 Mr. Agarwal's e-mail to Jessica Kim from
17 November 7, 2011, 11:45 a.m., with a copy to
18 you and James with a subject "BSA audit
19 report," with an attachment called "BankAsiana
20 BSA audit report October 2011"?
21    A.  Yes.
22    Q.  So earlier in Exhibit 18, that
23 was -- the time frame was February of 2010, WSB
24 had sent a draft audit report for the Fort Lee
25 branch operations.  This, in November 2011, is

Page 181

1  F. Gleeson
2  a BSA audit report?
3     A.  Yes.
4     Q.  Okay.  And is the BSA audit report
5  for the entire bank?
6     A.  Yes.
7     Q.  Let's just go to the recommendations
8  which appear on page 4 of 5.
9     So this also has appendix A, which
10 is a summary of what they did, and then
11 appendix B, which is a summary of their
12 observations and recommendations.
13    A.  Right.
14    Q.  If you could just quickly go through
15 these recommendations.
16    Again, this appears to be a draft
17 that does not have the management's response.
18    A.  Mh-hm.
19    (Witness complies.)
20 BY MR. YI:
21    Q.  And just to save time a little bit,
22 I'm just going to ask you to read the
23 recommendation starting on page 3 of 5.  It's
24 the first page of appendix B.
25    A.  Okay.

Page 182

F. Gleeson

1
2      Q.   And they are two recommendations it
3  appears, A and B?
4      A.   Mh-hm.
5          (Witness complies.)
6      Q.   And to your knowledge or
7  recollection, did the bank's management accept
8  and follow that recommendation?
9      A.   This is tough for me because I was
10 not involved in BSA so much.
11     Q.   Whatever you remember.
12     A.   Yeah.
13     Q.   Do you recall whether the bank's
14 management accepted and followed this
15 recommendation, 1A and B?
16     A.   Honestly, I don't recall.
17     Q.   Okay.  Let's go to Section 2
18 concerning wire transfers.
19         (Witness complies.)
20     A.   Okay.  I don't -- I don't know.
21     Q.   Okay.  Let's go to Section 3.
22         (Witness complies.)
23     Q.   There are four separate
24 recommendations it appears -- A, B, C, D -- for
25 Section 3 concerning remote deposit capturing.

Page 183

F. Gleeson

1
2      Q.   Do you recall whether the management
3  of the bank accepted and followed
4  recommendations?
5      A.   I do not.
6      Q.   Okay.  Go to Section 4, trade
7  finance activities.
8          (Witness complies.)
9      A.   I do have some recollection of this
10 and I do believe we did add trade finance to
11 the BSA policy of procedures.
12     Q.   Thank you.
13         (Gleeson Exhibit 28, e-mail to
14 Warren Mackey from April 12, 2013,
15 2:51 p.m., marked for identification.)
16 BY MR. YI:
17     Q.   I'm showing you Exhibit 28 and let's
18 start on the second page of this exhibit.
19         Is that a copy of your e-mail to
20 Warren Mackey (phonetic) from April 12, 2013,
21 2:51 p.m., subject "BankAsiana BSA audit report
22 March 2013"?
23     A.   Yes.
24     Q.   And Warren Mackey, at the time, was
25 BankAsiana's member of the board of directors?

Page 184

F. Gleeson

1
2      A.   Yes.
3      Q.   Was he chair of the audit committee?
4      A.   I think at one time he was, yes.  So
5  at this time he likely was.
6      Q.   Let me read this e-mail to you.  You
7  told him in this e-mail, "Warren, attached is
8  the draft BSA report as we discussed."
9          Is that the draft BSA report from
10 WSB that we just reviewed in Exhibit 27 -- no,
11 it's not, it's from 2013.
12     A.   Yeah.
13     Q.   But it would have been a draft BSA
14 audit report that WSB would have prepared for
15 the bank?
16     A.   Yes.
17     Q.   "I spoke with James after you and I
18 talk and he clarified with me that prior to
19 2012, a normal level of SAR activity was around
20 12 per year.  2013 is more likely to be around
21 25.  So it has doubled in the last year or so.
22 This will continue to grow as we do.  Please
23 let me know if you have any more questions.  I
24 will forward the ID audit when I receive it.
25 Thank you, Warren, have a good weekend."

Page 185

F. Gleeson

1
2          Do you see that?
3      A.   Yes.
4      Q.   You mentioned earlier, in looking at
5  Exhibit 27, that you weren't really involved
6  with BSA audits?
7      A.   I said I wasn't involved with BSA,
8  but I was certainly in any audits that took
9  place.
10     Q.   Okay.  I'm sorry.
11     A.   Right.
12     Q.   I may have misunderstood your
13 statement.
14         This e-mail suggests that you may
15 have been the bank officer responsible for
16 submitting BSA audit reports from WSB to the
17 audit committee of the board?
18     A.   Yeah, the draft reports would come
19 to me of any audit.
20     Q.   And then you would review the draft
21 report and then submit it to the chair of the
22 audit committee?
23     A.   Correct.
24     Q.   Let's go to the next e-mail, which
25 appears on the bottom of the first page.

Page 186

F. Gleeson

1
2          Is that -- I don't know if you were
3   copied on this.  Let's see -- well...
4          A.   It doesn't look like it.
5          Q.   Do you -- do you remember after you
6   submitted the draft BSA audit report to Warren
7   Mackey, do you remember discussing with him
8   about a BSA problem?
9          A.   No, I don't.  I mean, the issue that
10  was raised in the memorandum on page 2 here is
11  that the SAR activity had doubled.
12         Q.   Okay.
13         A.   So whether that was interpreted by
14  him as a BSA problem, I don't know.  I don't
15  recall a particular BSA problem.  I'm trying to
16  remember when we acquired -- we opened a third
17  branch in Flushing in 2000- -- maybe '12.  I'm
18  not sure.  So there was volume, you know, so...
19         Q.   Do you recall having either an
20  in-person meeting or telephone call with
21  Warren Mackey about a BSA problem in March or
22  April of 2013?  It would have been of
23  April 2013.
24         A.   Yeah -- honestly, I don't recall
25  offhand.  Do we have that audit report?

Page 187

F. Gleeson

1
2          Q.   Well, I guess we will have to see.
3          Looking at the earlier e-mail, you
4   were talking about the fact that the level of
5   SAR activity and were you referring to the fact
6   that -- were you referring to the number of SAR
7   filings?
8          A.   Yes.
9          Q.   So the number of filings had
10  increased, that's what you were telling him in
11  that e-mail?
12         A.   Right.
13         Q.   Okay.
14         A.   And that they -- just from reading
15  this, it sounds like that issue was raised in
16  the audit.  So maybe he interpreted that as a
17  problem, I don't know.
18         MR. DZARA:  We don't want to you
19  guess.  Only if you have direct knowledge.
20         A.   Yeah, I really don't know.
21         Q.   Okay.  And then if you look at the
22  top of the first page of this exhibit, James
23  then -- looks like he's sending this e-mail
24  thread to your attention and is that a copy of
25  James's e-mail to you from April 15, 2013,

Page 188

F. Gleeson

1
2   9:51 a.m.?
3          A.   It -- yes, it appears to be that.
4          Q.   And I don't see any message in that
5   e-mail.  Do you recall why he sent that e-mail
6   to you with the rest of the e-mail thread?
7          A.   I'm thinking because I wasn't copied
8   on this.
9          Q.   He wanted you to know?
10         A.   Yeah.
11         Q.   And does that refresh your
12  recollection --
13         MR. DZARA:  Objection.
14  BY MR. YI:
15         Q.   Other than the fact that the SAR
16  filings had increased, do you remember any
17  other aspect of the BSA problem that Mr. Mackey
18  was referring to?
19         MR. DZARA:  Objection to form.
20         A.   No, I'm not aware of what.
21         Q.   Okay.
22         A.   I don't recall what the problem was
23  that he's referring to.
24         (Gleeson Exhibit 29, James's e-mail
25  to Mr. Gleeson from May 28, 2013,

Page 189

F. Gleeson

1
2   11:11 a.m., with the subject "BSA audit
3   report,", marked for identification.)
4   BY MR. YI:
5          Q.   I'm showing you what's been marked
6   as Exhibit 29.
7          Let's just start at the top.  Is
8   that a copy of James's e-mail to you from
9   May 28, 2013, 11:11 a.m., with the subject "BSA
10  audit report," with the attachment "BankAsiana
11  BSA audit report March 2013, 5/2/13"?
12         A.   Yes.
13         Q.   Okay.  And do you recall why James
14  sent you that e-mail with that attachment and
15  that subject?
16         A.   I don't recall, but I'm assuming
17  that the original report was not sent to my
18  attention so he was just forwarding me a copy
19  of it.
20         Q.   Okay.
21         A.   I don't know for sure.
22         Q.   Now, if you follow this e-mail
23  thread onto the second page, there's an e-mail
24  from Maureen Hemhauser.  It appears that she,
25  at the time, was compliance manager, research

F. Gleeson

1
2     and development at FIS; do you see that?
3         A.   Yes.
4         Q.   Is that the same person who was
5     previously at ICS Compliance?
6         A.   Yeah.  FIS acquired ICS, the
7     company.
8         Q.   Okay.  So is it fair to say after
9     FIS acquired Integrated Compliance Solutions,
10    that FIS, and in particular Maureen Hemhauser,
11    was essentially doing the same function for
12    BankAsiana that she had previously at ICS?
13        A.   Yes.
14        Q.   In connection with compliance audits
15    for the bank?
16        A.   Yes.
17        Q.   So she sends an e-mail to Vivek and
18    she seems to indicate that she's asking for
19    Vivek to provide to her his report so that she
20    could then issue her management responses.
21        So when WSB issued their BSA audit
22    report, was the management responses prepared
23    by Maureen Hemhauser at FIS and previously at
24    ICS Compliance?
25        A.   Previously, I don't believe so.  But

F. Gleeson

1
2     I think at this point in time, this is shortly
3     before the bank was sold to Wilshire Bank.
4         Q.   Okay.
5         A.   So I think Maureen Hemhauser had
6     been -- or I should say FIS, Maureen Hemhauser
7     was the person -- had been retained to assist
8     with some of the BSA compliance matters at the
9     bank.
10        So I think she was involved in the
11    audit report and helping to draft responses to
12    the audit report.
13        Q.   Okay.
14        A.   For the bank.
15        Q.   So before May 2013 when Maureen got
16    involved with drafting or preparing the
17    management responses to the BSA audit report
18    prepared by WSB, who at the bank was
19    responsible for either drafting or preparing
20    the management's responses?
21        A.   James.
22        Q.   James?
23        A.   Yeah.  I may have assisted.  Jessica
24    certainly may have assisted.
25        Q.   But James was primarily responsible?

F. Gleeson

1
2         A.   Yeah.
3         Q.   And is it fair to say that sometime
4     in May 2013 that responsibility had been --
5     James had given that responsibility over to
6     Maureen?
7         A.   Yeah, he had retained -- the bank
8     had retained, I guess at James's request, ICS
9     or FIS to assist with the process, yeah.
10        Q.   What is your recollection about
11    that?  Why did the bank or James make that
12    decision to shift the responsibility from him,
13    his primary responsibility, to Maureen
14    Hemhauser at FIS?
15        A.   I seem to recall that Jessica Kim,
16    who was the BSA -- assistant BSA officer, had
17    left the bank.  So James was -- needed some
18    assistance in maybe providing prepared
19    responses to BSA.
20        Q.   So I'd like to just quickly go
21    through just the recommendations.  If you would
22    just turn to appendix B again, summary of
23    observations and recommendations.
24        And just to save time again, I would
25    just ask you to turn to page 3 of 8 which

F. Gleeson

1
2     starts Section 1 and then it appears that there
3     are three separate recommendations or a
4     three-part recommendation:  A, B, C.
5         (Witness complies.)
6         A.   Again, I wasn't involved in the BSA
7     process as far as what was done to answer these
8     recommendations.
9         Q.   Okay.  I'll just go through them and
10    ask you if you remember anything --
11        A.   Right.
12        Q.   -- about these recommendations.
13        Do you recall anything about the
14    recommendation under Section 1?
15        A.   No.
16        Q.   Section 2?  Again, it also has the
17    three-part recommendation:  A, B, C, and it's
18    on page 4 of 8.
19        A.   The one that starts with "check
20    system reports"?
21        Q.   Yes.
22        A.   I don't know.  I don't know what
23    these things were.  As I said before, it's very
24    difficult without management's response to know
25    what was done.  So I'm not being --

Page 194

F. Gleeson
1
2      Q.   I understand and I apologize for not
3  having a draft that has the response.  I can
4  only give you what I have.
5      A.   No, I understand.
6      Q.   Let me ask you this way:  With
7  respect to the recommendation for both
8  Section 1 and 2, what is your best
9  recollection, did the bank's management accept
10  and follow the recommendations?
11          MR. DZARA:  Objection to form.  He
12  already answered the question.
13  BY MR. YI:
14      Q.   If you recall.
15      A.   I really don't recall.
16      Q.   Okay.  Let's go to Section 3.
17      A.   I don't know.  I don't know if that
18  was followed.
19      Q.   You don't recall?
20      A.   No.
21      Q.   Let's go to Section 4, Customer Due
22  Diligence.
23      A.   I don't -- I don't know if that was
24  done.
25      Q.   Okay.  Do you see under Section 4,

Page 195

F. Gleeson
1
2  Customer Due Diligence, 4B, do you see where it
3  says, "It was noted that the listing of
4  high-risk customers from Jack Henry 2020 was
5  not maintained during the audit period."
6          Do you see that?
7      A.   I do see that.
8      Q.   Jack Henry 2020, was that the
9  computer software system used by BankAsiana?
10      A.   Yes.
11      Q.   And was that system used by
12  BankAsiana, at the time, for customer accounts?
13      A.   Yes.
14      Q.   And did that include certificate of
15  deposit customers?
16      A.   Yes.
17      Q.   Do you remember anything about this
18  statement, "It was noted that the listing of
19  high-risk customers from Jack Henry 2020 was
20  not maintained during the audit period"?
21      A.   No, I don't know.
22      Q.   What does that mean?
23      A.   In BSA, you have to maintain a list
24  of high-risk customers.  So certain types of
25  customers are concerned high risk.  And that's

Page 196

F. Gleeson
1
2  somewhat dictated by the BSA rules.  For
3  instance, a perfect example is a money service
4  business.  It's a high-risk customer regardless
5  of what they are.  So that's just one example,
6  but -- oddly enough, lawyers are considered
7  high-risk customers.  You know there's a lot of
8  different types of high-risk customers.
9      Q.   I don't know why you find that odd.
10      A.   So any way what I'm saying is that
11  the system didn't maintain a list of high-risk
12  customers.
13      Q.   What about a hard money lender?
14      A.   Yeah, that would be in high risk,
15  sure.  Payday lenders.
16      Q.   Who would have been responsible for
17  maintaining a list of high-risk customers from
18  Jack Henry 2020?
19      A.   The BSA officer.
20      Q.   That would have been James?
21      A.   Yeah.
22      Q.   Okay.  And then below that are the,
23  again, three-part recommendation, A, B, C.  You
24  don't remember whether the bank management
25  accepted and followed those recommendations?

Page 197

F. Gleeson
1
2      A.   I don't.  Sorry, but I don't.
3      Q.   Okay.  Section 5, suspicious
4  activity report.
5      A.   I don't know.  I wasn't involved in
6  SAR filings at all.
7      Q.   Okay.  Is it fair to say that this
8  BSA audit by WSB indicated some inaccuracies in
9  the filing of SARs by the bank?
10      A.   Yeah, two out of five looked at,
11  yes.  So, yeah, sure.
12      Q.   And then there are recommendations,
13  a two-part recommendation, A, B; do you see
14  that?
15      A.   Yes.
16      Q.   And do you remember whether the
17  bank's accepted and followed that
18  recommendation?
19      A.   I don't remember.
20      Q.   Okay.
21      A.   SARs are a very secretive process
22  within the bank.  Nobody knows who files -- who
23  we filed SARs on other than the BSA officer.
24  Even the board of directors doesn't know.
25      Q.   Okay.

Page 198

F. Gleeson
1
2        A.   So I don't know.
3        Q.   Let's go to six.  Six doesn't have
4    a -- doesn't appear to have a section heading.
5            But it -- let me just read it to you
6    just to expedite.
7            "It was noted during our analysis of
8    customer cash transactions that there was an
9    uptick in customer cash transaction activity
10   during the audit period, which was
11   January 1, 2012, to January 31, 2013, as
12   compared to prior years.  We analyzed the cash
13   transaction activity for suspicious activity
14   and selected 25 sample customer accounts based
15   on the following criteria."
16           And then it says, "We inquired with
17   management the rationale for not filing a SAR
18   during the audit period.  Management concluded
19   the following."
20           Do you see that?
21       A.   Yes.
22       Q.   Do you remember anything about that?
23       A.   I do remember the increase in cash
24   transaction activity and this timeframe
25   included the timeframe when we acquired

Page 199

F. Gleeson
1
2    Flushing branch, which was a very different
3    market than Fort Lee or Palisades Park.  So
4    we -- what we did see from that was that the
5    cash -- number of cash transactions coming out
6    of the Flushing branch were much higher than
7    they had previously been anywhere else.  And
8    that's what this was, you know, telling us.
9    And there was a lot more high-risk customers
10   coming out of that branch and that's, I think,
11   where most of this was emanating from.
12       Q.   Let's go to recommendation section.
13   This has a four-part recommendation -- A, B, C,
14   D -- and, again, just to expedite, let me read
15   it to you and ask you.
16           "The process of monitoring for
17   suspicious activity and the subsequent filing
18   of SARs needs to be strengthened.  Based on the
19   above findings, it appears that the monthly
20   activity review, as documented in the monthly
21   SAR binder and the quarter EDD review, are not
22   sufficient to make a determination on
23   suspicious activity.  Management should analyze
24   at least six months to a whole year worth of
25   data to be able to make a determination if a

Page 200

F. Gleeson
1
2    suspicious activity exists, such as CTR
3    structuring" -- CTR, by the way, stands for
4    cash transaction?
5        A.   Currency transaction report.
6        Q.   Currency transaction report.
7            "Structuring or excessive cash
8    non-commensurate to business profile."
9            Do you see that?
10       A.   Yes.
11       Q.   Okay.  Then B is "SARs for the
12   identified nine customers should be filed
13   immediately."
14           Do you see that?
15       A.   Yes.
16       Q.   Okay.  C, "Rationale for not filing
17   a SAR should be clearly documented.  The bank
18   should consider using the EDD forms to document
19   its rational."
20           What is -- what are the EDD reviews?
21       A.   The EDD is an enhanced due
22   diligence.  So on high-risk customers, when you
23   identify somebody as a high-risk customer, you
24   have to increase the amount of diligence you do
25   on that account monitoring.

Page 201

F. Gleeson
1
2        Q.   So CTR structuring refers to a
3    situation where you have to report any cash
4    transaction that's 10,000 or more, right?
5        A.   More than 10,000.
6        Q.   So I would take out, let's say as a
7    customer, instead of taking out $10,000 or
8    more, I take out 5,000; 2,000; 3,000.
9            That's what we are talking about,
10   right?
11       A.   Yeah, structuring.  When you just
12   come short of the $10,000 mark.  You do it in
13   multiple transactions, yeah.
14       Q.   Multiple cash transactions that are
15   less than $10,000, but that look suspicious
16   because it looks like you are trying to get
17   around that $10,000 threshold?
18       A.   Right, right.
19       Q.   D is "SARs should be filed for
20   suspicious activity, irrespective of whether
21   CTRs are being filed or not."
22           Do you see that?
23       A.   Mh-hm.
24       Q.   With respect to all four of those
25   recommendations or that four-part

Page 202

F. Gleeson

recommendation, do you recall whether the
bank's management accepted and followed those
recommendations?

A.   I do not.  As I mentioned, SARs are
a very secretive process in the bank.  So I
would have no way of knowing.

Q.   Right.  And the right person for me
to ask would be James?

A.   Yes.

Q.   Section 7, access to wire transfer
system.  Anything you recall there?

A.   Okay.  Let's see.  No, I suppose I
should recall because my name is listed, but I
don't have an immediate recollection as far as
what we did.  But I would think that what we
would have done is added somebody else to the
list so we had backup in the event somebody
wasn't available for wire transfer.

Q.   Okay.  Section eight, monetary
instrument sales.  Anything you remember?

A.   No, I don't.  I mean, I know what
they are talking about, but I don't recall that
instance and what was done.

Q.   Okay.  So for both Sections 7 and 8,

Page 203

F. Gleeson

do you recall whether the bank's management
accepted and followed the recommendations?

MR. DZARA:  Objection to form.
Asked and answered.

A.   Seven, I would say yes.  Eight, I'm
not -- I don't know.

Q.   Okay.  I have two more and I'll try
to go quickly.

(Gleeson Exhibit 30, copy of
BankAsiana's BSA/AML report March 11, 2010,
marked for identification.)

(Discussion held off the record.)

BY MR. YI:

Q.   I'm showing you Exhibit 30 to your
deposition and I'm going to ask you to also
refer, at the same time, to the attachment to
exhibit -- previous exhibit, 19.  And I would
like you to take a look at both of those
documents.

(Witness complies.)

Q.   So it appears that Exhibit 30 is a
copy of BankAsiana's BSA/AML report
March 11, 2010.

We had previously looked at

Page 204

F. Gleeson

Exhibit 19, the attachment to the e-mail was
"BSA/AML report dated May 13, 2010."

My question to you is:  Looking at
this now, can you tell us why there was a
BSA/AML report from March 11, 2010, and then
another one May 13, 2010?

Let me ask you this way:  Was there
a quarterly report, BSA/AML report, or was
there a monthly report?

A.   I believe it was a monthly report
that went to the board.

Q.   Okay.

A.   And that's what I believe this is.

Q.   When you say "the board," would it
have gone to the entire board or the audit
committee only?

A.   The entire board.

Q.   The entire board, okay.

And I apologize if we covered this
previously, if you look at Exhibit 19, the
BSA/AML report dated May 13, 2010, came from
Jessica Kim and she sent it to James.

A.   Okay.

Q.   Do you recall whether, as of

Page 205

F. Gleeson

May 2010, it was Jessica Kim who was primarily
responsible for preparing BSA/AML reports?

A.   Yeah, I believe Jessica repaired the
reports, submitted it to James, he, you know,
reviewed it, made changes or whatever he needed
to do, and then he then presented it to the
board.

Q.   Okay.  So Jessica assisted him in
preparation for the report, but the person
primarily responsible for submitting the report
to the board was James?

A.   Correct.

Q.   Did you have any involvement in the
preparation of the BSA report or the submission
to the board?

A.   Generally not.  In this case, it
looks like some of the audit's comments were
included.  And there was that one audit comment
that I did submit, the recommended response.

Q.   Okay.  Are you referring to
Exhibit 30 or Exhibit 19?

A.   Well, if you recall, in Exhibit 19,
the -- all the bullets in here with management
responses matched up to the bullets in the

Page 206

F. Gleeson

1
2    WSB...
3       Q.   Audit report?
4       A.   Audit report.  So there's clearly
5    some overlap here between the audit report and
6    the BSA/AML report and there was one exhibit
7    where I provided, recommended or suggested a
8    response.  So I had -- to answer your question,
9    I think I had some involvement, but I didn't
10   prepare the BSA/AML report for the board.
11          Does that make any sense?
12      Q.   Yes, thank you.
13          (Gleeson Exhibit 31, internal audit
14   report submitted by WSB to Warren Mackey,
15   marked for identification.)
16   BY MR. YI:
17      Q.   I'm showing you what's been marked
18   as Exhibit 31.
19          Do you recognize this document?
20      A.   Yes.
21      Q.   Is this a copy of -- well, let me be
22   accurate about it.
23          Is this a copy of an internal audit
24   report submitted by WSB to Warren Mackey, who
25   was then BankAsiana's audit committee chair?

Page 207

F. Gleeson

1
2       A.   Yes.
3       Q.   Dated June 12, 2012?
4       A.   Yes.
5       Q.   And the audit period was as of
6    February 29, 2012?
7       A.   Yes.
8       Q.   Okay.  And you recall getting a copy
9    of this in or about June 2012?
10      A.   Yes.
11      Q.   Okay.  Let me turn to appendix B in
12   particular -- all right, let me first go to
13   page 4 of 7, middle of the page, 4 of 7.
14          Again, appendix B has a summary of
15   the observations and recommendations and it
16   lists the observations and recommendations and
17   I'm referring to the third section.
18          And it says, "Page 1 of 4 of
19   operations procedures lists the cash limits
20   established for each branch.  The cash limit
21   for the Palisades Park branch is a monthly
22   average balance of 350,000, while that at the
23   Fort Lee branch is 250,000."
24          Do you see that?
25      A.   Yes.

Page 208

F. Gleeson

1
2       Q.   So does this refresh your
3    recollection?  I think we talked about earlier
4    how your recollection was that, at some point,
5    the cash, the cash limit, had been increased
6    from 150,000 to a higher amount you didn't
7    recall.  And this document indicates it was --
8    as of this report, it was 250,000.
9       A.   Okay.
10      Q.   Is that consistent with your
11   recollection?
12      A.   Yeah; like I said earlier, I seemed
13   to recall it was increased, but I didn't know
14   to what.
15      Q.   Okay.  And then it also looks like
16   BankAsiana changed from a daily cash limit to
17   an average balance?
18      A.   Right.
19      Q.   Do you know what I mean by that?
20      A.   Yeah, I do.
21      Q.   Okay.  Let's go back to 1 on page 3
22   of 7.
23          Do you see the recommendations under
24   one?
25      A.   Mh-hm.

Page 209

F. Gleeson

1
2       Q.   It's a two-part recommendation, A
3    and B.
4          (Document review.)
5       Q.   Is there anything that you remember
6    about that?
7          (Witness complies.)
8       A.   Yeah, I recall the overage shortage
9    report coming to myself and to Jessica Kim; I
10   do recall that.  And we expanded the report to
11   give us a little bit more information.  Prior
12   to that, there really wasn't -- we weren't
13   tracking overage and shortages by individuals.
14   It was just tracked by the branch as a whole.
15   So we were breaking it down now by individual
16   teller.  So I recall that.
17      Q.   Do you remember when we were talking
18   about the Fort Lee branch and access to the
19   cash vault and you mentioned there were two
20   combinations?
21      A.   Yeah.
22      Q.   And the bank was to ensure that the
23   combinations would have to be changed from time
24   to time?
25      A.   Yup.

F. Gleeson

Q. And also two individuals had to have part combinations?

A. Yup.

Q. It was two combinations, one officer should have had one and the second officer should have a second so that no one person could have access to the cash vault, right?

A. Correct.

Q. This Section 1 here seems to talk about supervision of cash shipments out of the bank?

A. Right.

Q. Out of the branch, I should say?

A. Yes.

Q. And WSB, looks like during their audit, discovered that there was no supervisory, there was no supervision of the two tellers.

Is that a reference to Fort Lee branch?

A. Yeah.

Q. Because I see at the top it says Fort Lee branch.

A. Right, it's Fort Lee.

F. Gleeson

Q. So it was specific to Fort Lee branch, there were two tellers, Karen Chon and one other teller, and there was no supervision over the cash shipments out of the branch?

A. Is that what it's saying?

Q. That's what I'm asking you.

(Witness complies.)

A. Well, what it's saying is that two people should check the cash before it's shipped out. So I believe what was happening here -- well, I'm trying to remember.

Q. If I may, let me ask it this way.

A. Yeah.

Q. Recommendation 1A says, "Although two tellers are involved while making cash shipments from the Fort Lee branch, it is recommended that a supervisor-level employee, not from the teller department" --

A. Right.

Q. -- "should perform a spot check of the cash before it is being shipped."

A. Right. That would be the -- in that particular instance, the branch manager.

Q. Right. So is it fair to say that as

F. Gleeson

of June 2012, WSB, during their internal audit, discovered that there was no supervisory-level employee, not from the teller department, that was performing a spot check of the cash before it was being shipped out of the branch?

A. That's what it's saying, yeah, is that there was no -- it was just the two tellers who were shipping the cash.

Q. Okay. And to your knowledge, and to your recollection, did the bank's management, including James as the COO of the bank, accept and follow this particular recommendation?

A. Well, it says in the management response, "Consideration is being given to adding additional staff to allow for the spot checking of cash."

So at that point in time, there was only the two tellers and the branch manager. And if the two tellers were there and the branch manager wasn't, and the cash had to be shipped out, then they were the only two people that could do it. So, at the very least, there's dual control, but, you know, if we should have a -- you should have a supervisory

F. Gleeson

person looking at that, but the staffing of the branch didn't allow for that. There was only three people in the office and one of them was the manager, who may or may not have been there. So at that point in time, I believe it was TK Suh. So was he there, I don't know.

Q. Okay. When you -- during your tenure at the bank, did you communicate on a regular basis with James?

A. Yes.

Q. And how did you communicate with him?

A. How? What do you mean?

Q. By telephone, by e-mail?

A. All the above, you know.

Q. Okay. So by telephone, did you have a work phone in your office?

A. Yeah.

Q. And did James have one?

A. Yes.

Q. And did you -- when you were both at work and you had to speak with each other by telephone, did you call each other on the office telephone?

Page 214

F. Gleeson

1    A.   Yeah, but generally -- our offices
2  were right next to each other so we'd --
3  generally, we'd get up and walk into the
4  other's office and speak face to face.  But
5  yeah, there was times when we would talk on the
6  phone, sure.
7    Q.   Did you also communicate by e-mail
8  on a regular basis?
9    A.   Yeah.
10   Q.   Even when you were in the office?
11   A.   Sure.
12   Q.   What about text?
13   A.   Text?  No.
14   Q.   Okay.  Did the bank have any kind of
15 internal electronic communication, like an
16 instant messaging type?
17   A.   No, we had just e-mail.
18   Q.   Did you ever communicate with James
19 cellphone to cellphone?
20   A.   Yes.
21   Q.   And on what occasions?  When you
22 were both out of the office?
23   A.   Yeah, I would say so, yeah.  Or if
24 one of us was out of the office and one was in

Page 215

F. Gleeson

1  the office, it might be cellphone to office
2  phone.
3    Q.   Did the bank provide a cellphone in
4  addition to an office-type, like a landline
5  telephone?
6    A.   The bank didn't provide a phone, the
7  bank reimbursed a portion of the cost of a
8  phone.
9    Q.   You mentioned that you had been
10 communicating with James from time to time and
11 talking to him from time to time.  And those
12 communications, is it by telephone?
13       MR. DZARA:  Objection.  When?
14       MR. YI:  I'm sorry?
15       MR. DZARA:  When?  You didn't give a
16 timeframe.
17 BY MR. YI:
18   Q.   After you left BankAsiana, you
19 testified, I believe at the outset of this
20 deposition, that you have communicated with him
21 from time to time.  You also mentioned the last
22 time you saw him was that you had lunch with
23 him, I believe it was, approximately six months
24 ago, I think you said?

Page 216

F. Gleeson

1    A.   Yeah.
2    Q.   So on those occasions when you had
3  these occasional, from time-to-time
4  communications, was it by telephone?
5    A.   It could have been, yeah.
6    Q.   Was it also by e-mail?
7    A.   May have been, yeah.  We may have
8  e-mailed here and there.
9    Q.   Any other way?  No texting?
10   A.   No, he's not a texter.
11   Q.   And you are not a texter either?
12   A.   Well, I am, but he's not so...
13   Q.   Okay.  And I'm sorry if I covered
14 this, but I want to get it right before we
15 finish up here today.
16   A.   Okay.
17   Q.   Did you make any loan, personal
18 loans, to James?
19   A.   No.
20   Q.   At any time?
21   A.   No.
22   Q.   Did James ever make any personal
23 loans to you at any time?
24   A.   No.

Page 217

F. Gleeson

1    Q.   We talked about Soyu Architecture
2  earlier, which provided architectural services
3  to BankAsiana, do you know whether James ever
4  received a loan from Soyu Architecture?
5    A.   No, I don't, no.
6    Q.   Do you know who Michael Kim was?
7    A.   Yes.
8    Q.   Okay.  Tell me how you knew him.
9    A.   He was a customer of the bank.  I
10 believe he was a shareholder.  He was in the
11 bank fairly frequently.
12   Q.   When you say "shareholder," what do
13 you mean?  Shareholder of what?
14   A.   Stockholder of the bank.
15   Q.   Of BankAsiana?
16   A.   Yeah, I believe that he was.
17   Q.   Okay.  And does the -- do you know a
18 company or a -- company called KORE consulting,
19 K-o-r-e?
20   A.   Yeah, I believe that's his company.
21   Q.   Was Michael Kim the principal of
22 that company?
23   A.   I believe so, yes.
24   Q.   What about Kore LLC, K-o-r-e?

F. Gleeson

2  A.   Was it the same company or no?  What
3  was the other one, didn't you say Kore?
4  Q.   Kore Consulting?
5  A.   Oh.  I just remember we called it
6  Kore.  So I don't recall consulting or the
7  other.
8  Q.   Do you remember what type of
9  business Kore or Kore Consulting was?
10  A.   No, I don't.
11  Q.   Do you remember what type of
12  business Michael Kim was engaged in?
13  A.   I don't remember, no.
14  Q.   Was he a hard money lender?
15  A.   I don't know.  I don't know.
16  Q.   To your knowledge, did Michael Kim
17  or any of his companies or any of the companies
18  in which he was either the principal or
19  shareholder or an officer, make any loans to
20  James?
21  A.   James told me that he did borrow
22  money from Michael Kim.
23  Q.   Did he ever tell you when he did?
24  A.   I don't recall.
25  Q.   During the time you were employed by

F. Gleeson

2  the bank?
3  A.   Yeah, yeah, when I was there.
4  Q.   Did he tell how much?
5  A.   No, I don't remember the amount.  He
6  may have told me, but I don't recall the
7  amount.
8  Q.   Is an officer of a bank permitted to
9  receive a loan from -- a personal loan from a
10  customer of a bank -- of the bank?
11  MR. DZARA:  Objection to form.
12  A.   Permitted by who?
13  Q.   Okay.  Let me rephrase the question.
14  Is it your understanding that an
15  officer of a bank -- that it's appropriate or
16  proper for an officer of a bank to receive a
17  personal loan from a customer of that bank?
18  MR. DZARA:  Objection to form.
19  A.   My understanding is under full
20  disclosure, it could occur.  I don't believe
21  there's anything wrong with it under full
22  disclosure.
23  Q.   Are you aware of any bank
24  regulations, banking laws or regulations that
25  would prohibit an officer of a bank, a

F. Gleeson

2  regulated bank, to obtain a personal loan from
3  a customer of the bank at which that officer is
4  employed?
5  MR. DZARA:  Objection to form.
6  A.   I'm not aware of any regulation.
7  Q.   Okay.  Did BankAsiana have any
8  policies and procedures that prohibited
9  employees or officers of the bank from
10  obtaining loans from the bank's customers?
11  A.   Again, full disclosure.  If it were
12  to happen, it would have had to have been
13  disclosed in writing or should have been
14  disclosed in writing to the company as part of
15  code of ethics or...
16  Q.   And you testified that -- that
17  you -- withdrawn.
18  So James told you that he had
19  received a loan from Michael Kim.  To your
20  knowledge, did James make, as you say, full
21  disclosure to either the bank or the board of
22  directors of the bank that he had done so?
23  A.   My understanding is that he
24  disclosed it to HS Hur.
25  Q.   That's Hong Sik Hur?

F. Gleeson

2  A.   Yes.
3  Q.   Do you know whether James made that
4  disclosure to the bank's board of directors?
5  A.   That I don't know.
6  Q.   Did you ever speak with Mr. Hur to
7  determine whether James had, in fact, made that
8  disclosure to Mr. Hur?
9  A.   I don't recall whether we ever spoke
10  about it or not.
11  Q.   So as you sit here today, your
12  testimony is that James told you that he made
13  full disclosure to Mr. Hur?
14  A.   Yes.
15  Q.   But you don't know that for a fact?
16  A.   No, I wasn't --
17  MR. DZARA:  Objection to form.
18  A.   Yeah, I wasn't there when it
19  happened.
20  Q.   Okay.  Did you, yourself, receive or
21  obtain any personal loans from either
22  Michael Kim or any other bank's customers?
23  A.   No.
24  Q.   Okay.  Did you ever observe James
25  ask other employees at the bank for a personal

F. Gleeson

1                    F. Gleeson
2  loan?
3      A.   No.
4      Q.   Did James ever tell you that he had
5  asked other employees for a loan?
6      A.   No.
7      Q.   I'm almost there.  I appreciate it.
8        Did you hear from anybody at the
9  bank, while you were working there, that
10  Mr. Hur, the president and CEO of BankAsiana,
11  had asked Irene Lee to take out an employee
12  loan and lend the proceeds of that employee
13  loan to James?
14      MR. DZARA:  Objection to form.
15      A.   No, I don't know that.
16      Q.   We talked about the employee loan
17  program.  Did James ever tell you that he took
18  out an employee loan?
19      MR. DZARA:  Objection to the form.
20  Asked and answered.
21      A.   No, I don't recall that.
22      Q.   Okay.  And do you remember the
23  maximum amount or the cap of that employee
24  loan?
25      A.   No, I really don't.  I've never

1                    F. Gleeson
2  gotten involved with it so.
3      Q.   Does 25,000 ring a bell?
4      MR. DZARA:  Objection to form.
5      A.   No.
6      Q.   During your tenure at the bank, did
7  anyone at the bank tell you that James was
8  instructing the bank's employees to honor
9  non-sufficient funds checks for Michael Kim?
10      MR. DZARA:  Objection to form.
11      A.   No.
12      Q.   Did James tell you that he obtained
13  a loan from -- other than Michael Kim, did he
14  tell you that he received any other loans from
15  any other bank customers?
16      A.   No.
17      MR. DZARA:  Objection to form.
18  BY MR. YI:
19      Q.   Are you aware of a SBA loan
20  exceeding -- loan amount exceeding $1 million
21  that was made by BankAsiana to an entity called
22  Cleo Riverside?
23      A.   No.
24      Q.   During your tenure at the bank, did
25  you ever observe James steal any properties

1                    F. Gleeson
2  belonging to BankAsiana?
3      A.   No.
4      Q.   During your tenure at the bank, did
5  Jessica Kim ever tell you anything about
6  Karen Chon's past employment history?
7      A.   I don't know if it was Jessica Kim.
8  It could have been, but I believe there was
9  some -- some issue with her former employer
10  before she came to BankAsiana.  I'm trying to
11  remember who it was.
12      Q.   Does the name Liberty Bank of New
13  York ring a bell?
14      A.   Yeah, yeah, that's right because
15  Jessica worked at Liberty Bank.
16      Q.   Can you tell us what you remember?
17      A.   I think there was some money
18  missing.  That's really all I remember.
19      Q.   Was that information based on what
20  somebody else told you?
21      A.   Yes.
22      Q.   What -- do you remember who?
23      A.   Most likely Jessica because she had
24  worked at Liberty Bank.
25      Q.   Just, to the best of your

1                    F. Gleeson
2  recollection, could you tell us what you
3  remember her telling you?
4      MR. DZARA:  Objection to form.
5  Asked and answered.
6      A.   Just that she had -- you know, there
7  was some money missing at the bank and I don't
8  know, that's why she didn't work there anymore.
9      Q.   "She" being Karen Chon?
10      A.   Yes.
11      Q.   Do you remember anything else?
12      MR. DZARA:  Objection to form.
13      A.   No, I don't.
14      Q.   Do you remember discussing that with
15  James?
16      A.   No, I don't remember discussing that
17  with James.
18      Q.   Do you remember discussing that with
19  Mr. Hur, the president and CEO on the bank?
20      MR. YI:  Thank you.  I have no more
21  questions at this time.
22      (Recess is taken.)
23  EXAMINATION BY
24  MR. DZARA:
25      Q.   Hi, Mr. Gleeson.  My name, again, is

Page 226

F. Gleeson

1    David Dzara and I represent James Ryu in this
2    matter.  I have a few questions for you.
3          You previously testified about
4    issues raised by Eunmoo Choi concerning F One
5    Communications.  And I believe some of those
6    issues concerned services or hardware that F
7    One billed BankAsiana and BankAsiana paid for,
8    but F One either didn't provide the hardware or
9    didn't provide the services.
10         Is that accurate from what you
11   remember?
12       A.  Yes.
13       Q.  Were you -- who was the one at
14   BankAsiana that approved payments to F One?
15       A.  Me.
16       Q.  Were you involved in any illegal
17   practice of approving F One's invoices knowing
18   that you -- that BankAsiana did not receive the
19   products and service that F One billed for?
20       A.  No.
21       Q.  Do you know if anybody else at
22   BankAsiana was involved in some type of illegal
23   arrangement regarding payments to F One for
24   services or products not received to

Page 227

F. Gleeson

1    BankAsiana?
2        A.  No.
3        Q.  Was James involved in any such
4    illegal activity?
5        A.  Not that I know of, no.
6        Q.  At her deposition, Lisa Pai -- let
7    me step back.
8          Do you know who Lisa Pai is?
9        A.  From Wilshire Bank, I believe she's
10   general counsel there.
11       Q.  Yes.  Correct.  She was general
12   counsel general at Wilshire Bank.  She is now
13   general counsel at Bank of Hope.
14       A.  Oh, okay.
15       Q.  Do you know that Bank of Hope and --
16   became -- Wilshire Bank merged with the bank
17   and became Bank of Hope; you're aware of that?
18       A.  Yes.
19       Q.  Okay.  At her deposition in this
20   matter, Lisa Pai testified about your receipt
21   of the $5,000 advance in your pay when you
22   started at BankAsiana.
23         You testified about that today as
24   well, correct?

Page 228

F. Gleeson

1        A.  Yes.
2        Q.  And Ms. Pai testified that James was
3    the one who told you not to pay it back.
4          Your testimony today was indeed that
5    James was the one who told you didn't have
6    to pay the $5,000 advance back, correct?
7        A.  Yes.
8        Q.  Who made the decision that you
9    didn't have to pay that advance back, do you
10   know?
11       A.  I was told that it was a joint
12   decision between James and Mr. Hur.
13       Q.  Okay.  So both James and Mr. Hur
14   made that decision, to your knowledge?
15       A.  Yes.
16       MR. YI:  Objection to form.
17   BY MR. DZARA:
18       Q.  Who told you that?
19       A.  James.
20       Q.  I believe Ms. Pai also testified
21   that she interviewed you after -- let me step
22   back.
23         The embezzlement that this case
24   concerns, and Mr. Yi did ask you certain

Page 229

F. Gleeson

1    questions repeating some sort of background
2    about the embezzlement.
3          What do you know about the
4    embezzlement that's the core issue of this
5    case?
6        A.  What do I know?
7        Q.  Mh-hm.
8        A.  Is that Karen Chon had been
9    siphoning money out of customer's accounts over
10   a period of time and, I guess, replacing it
11   when she needed to to cover up what she was
12   doing.  And eventually walked out the door with
13   1.6 million I had heard.  That's really all I
14   know.  Then of course it was -- well, I don't
15   know how it was all uncovered, but I understand
16   through an audit that Wilshire conducted
17   post-acquisition it was brought to light and
18   investigated and she was ultimately tried and
19   found guilty of embezzlement.
20       Q.  And all the testimony that you just
21   gave about the embezzlement, where did you
22   learn that?
23       A.  Some of it I read in the paper.
24   Some of it people told me.  I worked for Noah

F. Gleeson

Bank for a period of time after I left BankAsiana, that was a Korean bank, and they were very in tune with it. I had people reading to me out of the Korean newspapers what was in Korean newspapers. And of course, I couldn't understand. So basically what I heard from other people and what I read in the paper.

Q. What paper do you remember reading about the embezzlement in?

A. I think it was the Bergen Record.

Q. Do you know if James was criminally charged with the embezzlement?

A. I don't know that he was or wasn't, no.

Q. Do you know that Karen Chon implicated James in the embezzlement?

A. Yes, actually, James told me that.

Q. Did you learn about that from anybody else besides James telling you?

A. That may have been -- one of my coworkers may have said something about that, yeah.

Q. I believe Lisa Pai testified at her deposition that she interviewed you after the



F. Gleeson

embezzlement came to light to Wilshire Bank.

Did Lisa Pai interview you?

A. By telephone, yes.

Q. Lisa Pai did call you?

A. Mh-hm.

Q. Do you remember when that was?

A. Well, when did this all come up, the early part of 2014, I guess.

Q. I think Mr. Yi will stipulate that it was early 2014 that it came to light.

A. So probably that timeframe, maybe spring of 2014.

Q. And you said she called you?

A. She called me.

Q. Do you remember what she asked you?

A. She asked me about the advance, the $5,000 advance. She asked me about a laptop computer that I had, that I was told I could keep when I left BankAsiana. And she asked me about F One Communications, if I knew about them. I don't know that we really talked about any of the embezzlement matter. I don't think we did.

Q. Did she mention the embezzlement to



F. Gleeson

you?

A. She may have. She may have.

Q. So first thing you mentioned she said was she talked about the advance. Do you remember what you told her?

A. That I was given an advance shortly after I started with BankAsiana before the bank opened and that I had not paid that back and when I left the bank in 2013, I was told by James, as I mentioned earlier, that I did not have to pay it back.

Q. Did you mention to her that Mr. Hur was involved in that decision?

A. I don't know that I did. I might not have known that at that time, that Mr. Hur was involved in that decision.

Q. But your testimony today is he was involved?

A. Well, because James told me that, yes.

Q. You said you also -- Ms. Pai asked you about a laptop computer you took with you after you left BankAsiana, correct?

A. Yeah.



F. Gleeson

Q. What does -- tell me about the laptop. What did you do? What happened with that?

A. I had a laptop computer that belonged to the bank and when I left James had said I was free to take it with me. So I did.

Q. Do you know if James was the sole decisionmaker in that decision?

A. I don't know.

Q. And what did Ms. Pai ask you about regarding the laptop?

A. Just that. Who told you you could take the laptop computer and I told her what I just told you and then I also told her that she can have it back if she wants it. I mean, it's not a big deal.

Q. What was her response?

A. She, you know, kind of shrugged that off.

Q. Did she ever ask you for it later?

A. No.

Q. And you said the third thing she raised in the interview was F One Communication?

Page 234

F. Gleeson

1  
2      A.   She did.
3      Q.   And do you remember what she asked
4  you about with F One Communications?
5      A.   She asked a little bit about what
6  Eunmoo Choi's concerns were and there was some
7  concern that there had been some services or
8  hardware that the bank paid for that was never
9  received or it disappeared and what did I know
10  about that.  And all I really knew about that
11  was Eunmoo Choi kind of came across that in his
12  research and brought it to my attention and
13  that it was being researched at the time when I
14  left the bank.  And that I didn't know anything
15  further beyond that.
16      Q.   Have you told me everything you
17  remember about your conversation with Lisa?
18      A.   Yeah, I think so.
19      Q.   Mr. Yi asked you questions about an
20  SBA loan by Michael Kim or Cleo Riverside for
21  approximately $1 million.
22          Do you remember those questions?
23      A.   I do remember the questions.
24          MR. YI:  In excess of.
25  BY MR. DZARA:

Page 235

F. Gleeson

1  
2      Q.   In excess of $1 million.
3          I believe your testimony was you
4  didn't know anything about that, correct?
5      A.   Right.
6      Q.   There has been testimony and I
7  believe reports generated by Wilshire Bank as
8  part of the investigation in this case that
9  state that both you and Karen posted some of
10  the loan payments for this SBA loan.
11          Do you remember posting any loan
12  payments for this SBA loan?
13      A.   No.
14      Q.   Was posting loan payments part of
15  your job responsibilities?
16      A.   No.
17      Q.   Do you remember ever posting loan
18  payments on any loan during your time at
19  BankAsiana?
20      A.   No.
21      Q.   Do you know anything about James
22  taking his BankAsiana computers with him
23  following the merger with Wilshire Bank?
24      A.   Yeah, he told me that, that he did.
25      Q.   What did he tell you?

Page 236

F. Gleeson

1  
2      A.   That he took the computer when he
3  left.
4      Q.   When did he tell you that?
5      A.   Well, when did he leave there?  Do
6  you know?
7      Q.   Well, he -- the merger -- do you
8  know when the merger or the acquisition with
9  Wilshire Bank closed?
10      A.   It was fall of '13, like October.
11          So he was there for a little while
12  past that, I guess, right?  Or no?
13      Q.   You can't ask me questions.
14      A.   I'm sorry.
15      Q.   I mean, I think Mr. Yi would
16  stipulate that James was laid off as part of
17  the acquisition and that his last day was in
18  early October of 2013.
19      A.   Okay.
20          MR. DZARA:  Mr. Yi, would you agree
21  with that?
22          MR. YI:  You know, without having
23  documents in front of me, I mean, I
24  don't --
25          MR. DZARA:  We've had like 15

Page 237

F. Gleeson

1  
2  depositions in this case, his -- it's
3  not -- the date of his termination came up
4  in almost every single one.  If you're not
5  going to stipulate, that's fine.  But I
6  will state for the record that his last
7  day --
8          MR. YI:  You can represent to us.
9          MR. DZARA:  Okay.  I believe his
10  last day was October 23rd or October 24,
11  2013.
12      A.   Okay.
13      Q.   When did you learn that -- when did
14  James tell you that he took his BankAsiana
15  computer?
16      A.   The first time I saw James after I
17  left the bank was in February of 2014.  We had
18  lunch and that would have been when he had told
19  me.
20      Q.   Do you remember anything else that
21  he talked to you about during that lunch in
22  February 2014?
23      A.   No, it was just a friendly lunch.
24  It was not...
25      Q.   Do you know if the embezzlement came

Page 238

1          F. Gleeson
2    up?
3        A.   No, it was right after that that I
4    learned about the embezzlement.  Right after
5    that.
6        Q.   But not from him?
7        A.   Not from him.
8        Q.   Did James say he had permission to
9    take the computers from BankAsiana?
10       A.   He didn't say.
11       Q.   How did that even come up that he
12   said he took the computers?  It seems like a
13   weird thing to bring up in a conversation.
14       A.   We might have been talking about me
15   taking the laptop and he took the computers,
16   his computer.  Or something.  I don't know.
17       Q.   Do you know where James worked after
18   BankAsiana?
19       A.   I know he worked for New Millennium
20   Bank for a period of time.
21       Q.   What do you know about that?
22       A.   That he was part of the group that
23   acquired New Millennium Bank from its former
24   shareholders, I guess.  He and HS Hur and that
25   he was working there for awhile until all --

Page 239

1          F. Gleeson
2    all of this happened.
3        Q.   The embezzlement happened?
4        A.   Yes.
5        Q.   And then what?
6        A.   My understanding is that they let
7    him go and he hasn't worked since.
8        Q.   Karen Chon, did you interact with
9    her during your time at BankAsiana?
10       A.   A little bit, yeah.
11       Q.   What were your -- what did your
12   interactions concern, generally?
13       A.   What was my what?
14       Q.   Your interactions with her, what did
15   they concern?
16       A.   A question about a customer.  I
17   mean, sometimes we would have customers come in
18   and negotiate rates on CDs.  And she might call
19   me and see if we could negotiate a rate a
20   little higher.  As I mentioned earlier, I
21   worked there on Saturdays periodically, so she
22   would be there.
23       Q.   Did you have any type of social
24   relationship outside of work with Karen?
25       A.   No.

Page 240

1          F. Gleeson
2        Q.   Did you talk to Karen -- have you
3    ever spoken to Karen after you left BankAsiana?
4        A.   No.
5        Q.   Going back to that interview with
6    Lisa of you, I think you said possibly spring
7    of 2014, do you remember how long -- you said
8    it was by phone, correct?
9        A.   Mh-hm.
10       Q.   Do you know how long the phone
11   conversation lasted?
12       A.   Maybe 20 minutes.
13       Q.   Do you remember how it ended?  Did
14   she say she'd call you back or...
15       A.   I think something to the effect that
16   if she had any other questions she would call
17   me back.
18       Q.   Has anybody from Wilshire Bank or
19   Bank of Hope ever followed up with you
20   following Lisa's conversation with you about
21   your -- anything having to do with the
22   embezzlement or your time at BankAsiana?
23       A.   No.
24       Q.   Are you aware that Wilshire Bank
25   froze James's checking account following the

Page 241

1          F. Gleeson
2    embezzlement coming to light?
3        A.   James told me that.
4            MR. YI:  Objection to form.
5    BY MR. DZARA:
6        Q.   What did James tell you?
7        A.   That he had 50-something thousand
8    dollars in his account and they froze it.
9        Q.   Remember anything else he talked
10   about with that issue?
11       A.   That he thought that that was
12   illegal, shouldn't have been done.  There's no
13   reason to do it is what he said.
14       Q.   Do you know anything about when a
15   bank has a right to freeze a customer's
16   account?
17       A.   My understanding is if there's some
18   sort of court order or a levy, or a regulatory
19   order.  Other than that, I don't think you can
20   do that, outside of the normal hold policies,
21   you know.
22       Q.   So I think I mentioned before that
23   Karen implicated James in her embezzlement.  Do
24   you have any opinion of whether or not you
25   believe James was involved in Karen's

## Page 242

F. Gleeson

1
2  embezzlement?
3      MR. YI:  Objection.
4      A.   Yeah, I have no reason to believe
5  that her implications are true.
6      Q.   What's your basis of your opinion?
7      A.   I never had any inkling that James
8  was taking any money from the bank.
9      Q.   You testified your office was next
10  to James's office, correct?
11      A.   Yes.
12      Q.   While you were at BankAsiana?
13      A.   Mh-hm.
14      Q.   During your time at BankAsiana, did
15  you ever see Karen and James interacting
16  together?
17      A.   No, never.
18      Q.   Did you ever see her hand him any
19  inner-office envelopes?
20      A.   No.
21      Q.   Do you remember them talking a lot?
22      A.   No.  I can't say I ever saw them
23  together.
24      MR. DZARA:  Okay.  I have no further
25  questions.

## Page 243

F. Gleeson

1
2  MR. YI:  Nothing further.
3  (Time Noted:  5:01 p.m.  )
4
5
6       ---------------------
7      FRANK GLEESON
8
9  Subscribed and sworn to before me
10  this      day of            2018.
11
12  --------------------------------------
13
14
15
16
17
18
19
20
21
22
23
24
25

## Page 244

1
2      C E R T I F I C A T E
3
4  STATE OF NEW YORK  )
5            ) ss.:
6  COUNTY OF NEW YORK  )
7
8      I, LISA M. MURACO, a Notary Public
9  within and for the State of New York, do
10  hereby certify:
11      That FRANK GLEESON, the witness whose
12  deposition is hereinbefore set forth, was
13  duly sworn by me and that such deposition
14  is a true record of the testimony given by
15  such witness.
16      I further certify that I am not
17  related to any of the parties to this
18  action by blood or marriage; and that I am
19  in no way interested in the outcome of this
20  matter.
21      IN WITNESS WHEREOF, I have hereunto
22  set my hand this 3rd day of January,
23  2018.
24      ------------------------
25      LISA M. MURACO

## Page 245

1
2      I N D E X
3
4  WITNESS                    PAGE
5  FRANK GLEESON
6  MR. YI                        5
7  MR. DZARA               225
8
9      E X H I B I T S
10  DESCRIPTION               PAGE
11  Gleeson Exhibit 1, subpoena        6
12  Gleeson Exhibit 2, subpoena to produce    7
   documents
13
   Gleeson Exhibit 3, copy of an e-mail    43
14  from James Ryu to Mr. Gleeson from
   April 20, 2010, 9:55 a.m.
15
   Gleeson Exhibit 4, e-mail to James from    48
16  October 3, 2011, 1:03 p.m., subject is
   "Seleste," attachment is also "Seleste"
17
   Gleeson Exhibit 5, e-mail to James from    52
18  October 3rd, 2011, 2:45 p.m., with
   subject "Seleste," and attachment
19  "Seleste"
20  Gleeson Exhibit 6, chain of e-mail with    55
   James's e-mail from October 3rd, 2011,
21  2:52 p.m., subject "Seleste"
22  gleeson Exhibit 7, e-mail to James from    58
   October 5th, 2011, 11:49 a.m., with the
23  subject "Seleste," and attachment
   "Seleste"
24
25

Page 246

I N D E X   O F   E X H I B I T S(Cont'd.)
DESCRIPTION                                          PAGE
Gleeson Exhibit 8, James's e-mail from        60
October 14, 2011, 10:50 a.m., with the
subject "Income and expense," and
attachment called "Income and expense"

Gleeson Exhibit 9, e-mail to James from       64
November 8, 2011
Gleeson Exhibit 10, e-mail from James         66
to Mr. Gleeson from February 15, 2012,
9:22 a.m., with the subject "Schedule
J, current expenditures"

Gleeson Exhibit 11, e-mail from Robert        71
Yu to James from February 15, 2012,
    p.m., CC'd to Mr. Gleeson with a
subject "Schedule J," and attachment
called "Schedule J revised"

Gleeson Exhibit 12, chain of e-mails          75
with an e-mail to James from March 8,
2013, 4:46 p.m., with the subject "BOA"

Gleeson Exhibit 13, string of e-mails         78

Gleeson Exhibit 14, multiple e-mails          82

Gleeson Exhibit 15, multiple e-mails          91
with an e-mail from Eric Kalender to
James from June 3rd, 2010, 9:14 a.m.,
subject "Kudo Beans"
Gleeson Exhibit 16, multiple e-mails          94
Gleeson Exhibit 17, e-mail to James          118
from January 29, 2010, 3:20 p.m., with
a subject "NJDOBI examination exit
meeting"

Page 247

I N D E X   O F   E X H I B I T S(Cont'd.)
DESCRIPTION                                          PAGE

Gleeson Exhibit 18, e-mail from Vivek         123
Agarwal to Joseph Choi at BankAsiana
and Jessica Kim with CC to Ray Broek,
Frank Gleeson, and James Ryu, with the
subject "Draft branch audit report,
Fort Lee branch"
Gleeson Exhibit 19, e-mail and                147
attachment

Gleeson Exhibit 20, e-mail to James and       154
Jessica Kim from May 20, 2010,
a.m.

Gleeson Exhibit 21, e-mail from Vivek         160
Agarwal of WSB to Mr. Gleeson and James
from August 20, 2010, 3:36 p.m., with
the subject "Audit reports"
Gleeson Exhibit 22, e-mail from Jessica       163
Kim to Mr. Gleeson from September 13,
2010, 10:32 a.m.
Gleeson Exhibit 23, multiple e-mails          166
Gleeson Exhibit 24, e-mail from Jessica       168
Kim to various individuals at
BankAsiana
Gleeson Exhibit 25, e-mail from Jessica       170
Kim to individuals who were employed at
BankAsiana with a CC to Mr. Gleeson and
others from June 16, 2011, 11:32 a.m.

Gleeson Exhibit 26, Karen Chon's e-mail       174
to Mr. Gleeson, James Ryu, and others
at BankAsiana from September 16, 2001,
12:43 p.m.
Gleeson Exhibit 27, Mr. Agarwal's             180
e-mail to Jessica Kim from November 7,
2011, 11:45 a.m.

Page 248

I N D E X   O F   E X H I B I T S(Cont'd.)
DESCRIPTION                                          PAGE
Gleeson Exhibit 28, e-mail to Warren          183
Mackey from April 12, 2013, 2:51 p.m.

Gleeson Exhibit 29, James's e-mail to         188
Mr. Gleeson from May 28, 2013,
    a.m., with the subject "BSA audit
report,"
Gleeson Exhibit 30, copy of                   203
BankAsiana's BSA/AML report March 11,
2010
Gleeson Exhibit 31, internal audit            206
report submitted by WSB to Warren
Mackey

Page 249

ERRATA SHEET FOR THE TRANSCRIPT OF:

CASE NAME:

DATE:

DEPONENT:

Pg. Ln.  Now Reads   Should Read   Reason

___ ___  _____   _____   _____

___ ___  _____   _____   _____

___ ___  _____   _____   _____

___ ___  _____   _____   _____

___ ___  _____   _____   _____

___ ___  _____   _____   _____

___ ___  _____   _____   _____

___ ___  _____   _____   _____

___ ___  _____   _____   _____

___ ___  _____   _____   _____


_____

                FRANK GLEESON

SUBSCRIBED AND SWORN BEFORE ME

THIS____DAY OF_____ 2018.

_____

(Notary Public)

MY COMMISSION EXPIRES:_____