# EXHIBIT 17

1              UNITED STATES DISTRICT COURT

2            FOR THE DISTRICT OF NEW JERSEY

3

4   Bank of Hope, as successor to )
    Wilshire Bank,                 )
5                                  )
                  Plaintiff,       )
6                                  )
              vs.                  )  Case No. 2:14-CV-01770-
7                                  )          JLL-JAD
    Miye Chon, a/k/a  Karen Chon, )
8   et al.,                        )
                                   )
9                  Defendants.     )
    _____ )

10

11

12           DEPOSITION OF OREST HAMERSKY

13

14

15        TAKEN AT:   555 West Fifth Street, 32nd Floor
                      Los Angeles, CA  90013
16
          DATE/TIME:  Thursday, February 15, 2018
17                    10:10 a.m. - 4:20 p.m.

18        REPORTER:   Sharon A. Golding
                      CSR No. 5934
19

20

21

22

23

24

25

Orest Hamersky

Page 2

1  APPEARANCES:
2  For Plaintiff BANK OF HOPE and the Witness:
3      LEE ANAV CHUNG WHITE KIM RUGER & RICHTER LLP
       BY:  MICHAEL M. YI, ESQ.
4      99 Madison Avenue, 8th Floor
       New York, NY  10016
5      (213) 271-0664
6  For Defendant JAMES RYU:
7      STEVE HARVEY LAW LLC
       BY:  DAVID V. DZARA, ESQ.
8      1880 John F. Kennedy Boulevard, Suite 1715
       Philadelphia, PA  19103
9      (215) 438-6600
       (Via teleconference)
10
   Also Present:
11
       Cory Tyler
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 3

1              I N D E X
2  Witness              Examination
3  Orest Hamersky
4     By Mr. Dzara              4
5
6
7
8            E X H I B I T S
9  Identification              Page
10  78 - E-mail string              76
11  79 - February 26, 2014 e-mails              131
12  80 - E-mail dated February 26, 2014              133
13  81 - E-mail dated February 27, 2014              152
14  82 - E-mail string              174
15
16
17
18        INFORMATION REQUESTED
19            (None)
20
21
22
23  QUESTIONS WITNESS INSTRUCTED NOT TO ANSWER
24        Page   Line
25         88     20

Page 4

1     Los Angeles, California; Thursday, February 15, 2018
2            10:10 a.m.
3            * * *
4
5            OREST HAMERSKY,
6  having been first duly sworn, was examined and testified
7            as follows:
8
9            EXAMINATION
10  BY MR. DZARA:
11     Q   Good morning again, Mr. Hamersky.  I am in
12  Philadelphia, so it's afternoon here.  And we're here to
13  take your deposition.
14     A   Good morning.  You can call me Orest.  You can
15  just call me Orest.
16     Q   Okay.  Thank you, Orest.
17        As you know, I think I told you when we spoke
18  before that I represent James Ryu in this action, and
19  we're here to take your deposition today.  I'm going to
20  go through a couple ground rules first before we get
21  into the meat of the deposition.
22        In the deposition, I will ask you questions
23  pertaining to this lawsuit, and my questions and your
24  answers will be recorded by the court reporter, who has
25  placed you under oath.

Page 5

1        Do you understand that?
2     A   I do.
3     Q   The court reporter is transcribing everything
4  that is said, so it's important that you speak clearly.
5  She won't be able to record a nod or a head shake, so
6  you need to give your answers orally and loud enough so
7  she can hear you clearly.
8        Do you understand that?
9     A   I do.
10     Q   Please let me finish asking my question before
11  you begin your answer.  If Mr. Yi has an objection to my
12  question, wait until he's finished with his objection
13  before you start your answer.
14        Is that understood?
15     A   Yes.
16     Q   If you don't answer one of my questions --
17  excuse me.
18        If you don't understand one of my questions,
19  please let me know, and I'll try to rephrase it.
20  Otherwise, I'll presume that you understood the question
21  fully and answered it truthfully.
22        Is that okay?
23     A   Yes.
24     Q   It's possible that you'll give an answer as
25  completely as you can and then later you'll remember

Orest Hamersky

Page 6

1  additional information you may want to clarify or add to
2  an earlier response.  If that happens, just let me know
3  that you would like to supplement one of your earlier
4  answers, and we can do that while it's on your mind.
5        Is that okay?
6     A   That is okay.
7     Q   Also, it's important that when you're
8  answering, you may think of documents that may help you
9  remember the answer or that might help you give a more
10  accurate answer.  If you do, please let me know because
11  I might have those documents here or we might be able to
12  get them to help you answer completely and accurately.
13        Is that okay?
14     A   Yes.
15     Q   If you need to take a break at any time for any
16  reason, you should tell me, and we will finish your
17  answer if you're in the middle of it, and then we can
18  take a break.
19        Is that okay?
20     A   Yes.
21     Q   Are you taking any medication or drugs, whether
22  prescription or otherwise, that might make it difficult
23  for you to understand and answer my questions today?
24     A   No.
25     Q   Have you had any alcohol to drink within the

Page 7

1  last eight hours?
2     A   No.
3     Q   Are you sick today or under a doctor's care for
4  an illness?
5     A   No.
6     Q   Is there any reason you can think of why you
7  will not be able to answer my questions fully and
8  truthfully today?
9     A   No.
10     Q   Have you ever been involved in a lawsuit
11  before?
12     A   No.
13     Q   "No"?
14     A   No.
15     Q   Have you ever been deposed before?
16     A   No.
17     Q   And what did you do to prepare for today's
18  deposition?
19     A   I looked over the subpoena that you had sent
20  me.
21     Q   Okay.  Anything else?
22     A   I tried to recall the events from four years
23  ago, to the best of my ability.
24     Q   Did you review any documents in preparation
25  other than the subpoena?

Page 8

1     A   I'm trying to recall what I did.  There's a
2  narrative that I had prepared when I was doing the
3  investigation.  I had a copy of that in my possession.
4  So I just read over the events as they occurred
5  four years ago.
6     Q   Did you bring that copy with you today?
7     A   I did not.
8     Q   Do you remember that there were several
9  versions of that narrative?  We're actually going to
10  look at them today as exhibits.  But do you remember --
11  and they had different dates, I believe, right at the
12  top, like the first page.
13        Do you remember the date of the version that
14  you reviewed in preparation for your deposition?
15     A   I don't remember, but I believe it was one
16  dated in March.
17     Q   Okay.  Thank you.
18        Did you speak to Mr. Yi in advance of your
19  deposition?
20     A   I met with him this morning.
21     Q   I don't want to know what you discussed.
22        Well, let me ask another question.
23        Is it your understanding that Mr. Yi is
24  representing you today at your deposition?
25     A   Yes.

Page 9

1     Q   So I don't want to know anything that you and
2  Mr. Yi discussed, but what I do want to know is how long
3  you met with him.
4     A   An hour and 45 minutes.
5     Q   Okay.  And before meeting with Mr. Yi this
6  morning, did you discuss with him prior to this morning
7  your deposition in preparation for it?
8     A   No.
9     MR. YI:  David, just for the record, I did e-mail
10  with him to make arrangements to meet with him this
11  morning.
12     MR. DZARA:  Okay.  Thank you, Michael.
13     Q   Okay.  Other than what you just testified
14  about, do you recall doing anything else to prepare for
15  today's deposition?
16     A   No.  I don't recall doing anything else.
17     Q   Sorry.  One other question I just thought of.
18        Did Mr. Yi show you any documents this morning
19  during your meeting?
20     A   Yes.
21     Q   What documents did he show you?
22     A   They were a stack of e-mails with attachments.
23     Q   E-mails you sent and received?
24     A   Sent, received, cc'd.
25     Q   Okay.  Did any of those e-mails when you

Orest Hamersky

1 reviewed them, did they -- well, let me guess.
2      What was the nature of the e-mail about?
3    A   It appears they're all the e-mails I did when I
4 performed the investigation.
5      (Mr. Tyler left the deposition room at
6 10:17 a.m.)
7    Q   BY MR. DZARA:  Were they in, like, the January
8 to March 2014 time frame?
9    A   That is correct.
10   Q   You previously testified before that you worked
11 on a narrative of your investigation, and you kept a
12 copy of it.
13     Did you see drafts of that same narrative in
14 the documents you reviewed this morning?
15   A   Yes.
16   Q   In reviewing those documents as attachments,
17 did they help you or did they refresh your recollection
18 of the embezzlement investigation that you were part of
19 in January to March of 2014?
20   A   Yes.
21   Q   Okay.  So in addition to reviewing those
22 documents this morning and everything else you testified
23 to, do you recall anything else in preparation for your
24 deposition?
25   A   I don't recall doing anything else.

1    Q   What is your date of birth?
2    A   ████58.
3    Q   And are you married?
4    A   I am.
5    Q   And do you have children?
6    A   I do.
7    Q   How many?
8    A   Two.
9    Q   Have you been divorced?
10   A   No.
11   Q   So educationwise, did you graduate from
12 college?
13   A   I did.
14   Q   Okay.  From where?
15   A   California State University, Northridge.
16   Q   What year did you graduate?
17   A   1979.
18   Q   What was your degree?
19   A   B.S. -- bachelor of science in business
20 administration with an option in finance.
21   Q   Did you go to graduate school?
22   A   I did.
23   Q   Where did you go?
24   A   California State University, Northridge.
25   Q   And did you obtain a degree?

1    A   I did.
2    Q   What was it?
3    A   Master of science in business administration
4 with an option in finance.
5    Q   Do you remember what year you received that
6 degree?
7    A   1981.
8    Q   Did you attend any other post-graduate
9 schooling?
10   A   No.
11   Q   Do you have any training in accounting?
12   A   I took accounting courses in college.
13   Q   How about do you have any training in
14 investigation work?
15   A   I've performed numerous investigations in my
16 career.
17   Q   And generally what types of investigations?
18   A   Embezzlements by employees.
19   Q   How many of those embezzlement investigations
20 have you conducted?
21   A   I can recall at least three more besides this
22 one.  There may be more.
23   Q   I'm sorry.  I didn't mean to cut you off.
24   A   There may be more, but I can recall
25 specifically three.

1    Q   Three total or four total?
2    A   Four, including this one.
3    Q   Okay.  Thank you.
4      Did you take any training classes on how to
5 conduct an investigation of possible embezzlement by
6 employees?
7    A   I've taken training classes throughout my
8 career that deal with fraud, embezzlement.
9    Q   And who were those trainings offered through?
10 Was it an association?
11   A   They were usually through the bank I worked
12 for.
13   Q   So internal training by the bank you worked
14 for?
15   A   Yes.  And perhaps there might have been a few
16 that were external, but I don't recall.
17   Q   So when you conducted at least the four
18 embezzlement investigations that you recall, what was
19 your purpose in conducting the investigation?  What were
20 you trying to find out?
21   A   First and foremost, whether a crime did occur.
22 In other words, were funds misappropriated.  Secondly,
23 who the culprit was.  Thirdly, what was the loss to the
24 bank.  And fourthly, my responsibility was to create a
25 detailed trail of how the funds moved out of the bank or

Page 14

1  into an employee's account for instances like this
2  today.
3      Q   Okay.  We're going to talk a lot about the
4  embezzlement that's at issue in this matter, but one
5  question I have before we get into all the details is
6  those four things you just testified about:  Determining
7  whether a crime occurred, no. 1; who the culprits were,
8  no. 2; the loss to the bank, no. 3; and no. 4, to create
9  a detailed trail of how the funds left the bank or got
10  into the culprit's account.
11      Is that an accurate summary of your testimony?
12      A   That is correct.
13      Q   Did you in your investigation of the
14  embezzlement at issue in this matter, did you try to
15  figure those four things out?
16      A   Yes.
17      Q   Right.
18      Do you remember -- no. 1, do you remember
19  whether there was a crime committed?
20      A   Yes, there was.
21      (Mr. Tyler entered the deposition room
22  at 10:24 a.m.)
23      Q   BY MR. DZARA:  And what was the crime and who
24  committed it?
25      A   Misappropriation of all cash by an individual

Page 15

1  named Karen Chon.
2      Q   Was Ms. Chon the culprit?
3      A   Yes.
4      Q   Were there any other culprits that you
5  discovered?
6      A   She was the only one who the records indicate
7  processed the transactions.
8      Q   Okay.  Was she the only culprit?
9      MR. YI:  Objection to form.
10      THE WITNESS:  Based on the --
11      MR. DZARA:  Let me take a step back.
12      Q   When Mr. Yi objects, unless he instructs you
13  not to answer the question, you may answer the question.
14      A   Based on the evidence, she was the individual
15  that I could tie for the misappropriation of the funds.
16      Q   Okay.  Did you determine the loss to the bank?
17      A   I did.
18      Q   Do you remember how much it was?
19      A   I don't recall the exact amount.
20      Q   How about the fourth action you do is to create
21  a detail of the trail of the funds moving.
22      Did you do that?
23      A   Yes, I did.
24      Q   And that's in the narrative that you talked
25  about before.  That was your detailed -- your

Page 16

1  document --
2      A   Yes.
3      Q   -- explaining the detail?
4      A   There's a spreadsheet attached to the back of
5  that that indicates the loss.
6      Q   Got it.
7      So it was a narrative and the spreadsheet
8  altogether, that was part of your job in creating the
9  detailed trail of the money; is that correct?
10      A   That is correct.
11      Q   Going back to your education, other than the
12  education you already testified about, did you have any
13  further education?
14      A   I have a license.
15      Q   What's your license in?
16      A   I'm a certified internal auditor.
17      Q   Who is that license through?
18      A   The Institute of Internal Auditors.
19      Q   And do you have to take continuing education
20  classes to maintain your license yearly?
21      A   Oh, yeah.
22      Q   Okay.  How many hours each year do you have to
23  take?
24      A   Forty hours.
25      Q   Really?  Wow.  We only have 12 to maintain our

Page 17

1  law license.  I guess that's why there's so many bad
2  lawyers.
3      A   It's a moneymaker.
4      MR. DZARA:  The record will now reflect that the
5  witness and Mr. Yi both laughed at my bad joke.
6      Q   So you're licensed as an internal auditor.
7      Do you have any other licenses?
8      A   I do not.
9      Q   Right.
10      Any other education or training or licenses
11  that you can remember, other than what you testified
12  about?
13      A   Yeah, I just forgot.  When I got my bachelor's,
14  I got a minor in economics too.
15      Q   So for your work history, obviously, we're
16  going to talk about your position at Wilshire Bank, but
17  how about your work history before Wilshire Bank.
18      Can you briefly detail who you worked for and
19  what your position was.
20      A   How far do you want me to go back?
21      Q   I mean, how many jobs have you had?  You can
22  start after college and let me know.  I'll stop you if
23  we're getting into details we don't need to get into.
24      A   Okay.  I graduated college in '79.  I worked
25  for Texaco Oil in Los Angeles as an accountant for a

Page 18

1  year and a half.
2      Then I worked for Great Western Bank from
3  19- -- okay. I'm sorry.
4      I left Texaco in 1981.
5      Then I worked for Great Western Bank from 1982
6  to 1985 starting as a senior auditor.
7      And then in 1985, I worked for Investment
8  Savings as a sole auditor for that savings and loan.
9  That was through 1990.
10     That association was taken over by the
11 government, so I moved on over to Coast Federal Bank
12 1990. I was a financial audit supervisor.
13     (Mr. Tyler left the deposition room at
14  10:29 a.m.)
15  THE WITNESS: I worked there through 1994, I
16 believe.
17     And then I worked for California Federal Bank
18 from 1996 through early 1999 as a senior auditor.
19     From 1999 through 2012, I was self-employed.
20 My company was Expense Recovery Services. I was a
21 bounty hunter. I didn't chase people; I chased money.
22 I was a contingency auditor.
23     And then from 2012 to 2013, I worked for
24 China Trust as an internal auditor.
25     And then 2013, I was hired by Wilshire Bank as

Page 19

1  an internal audit manager.
2      Q   BY MR. DZARA: And at Wilshire Bank, do you
3  remember who you interviewed with to get the job as
4  internal auditor?
5      A   The chief auditor.
6      Q   And was that Dom Tallerico?
7      A   That is correct.
8      Q   Is Dom the only one you interviewed with?
9      A   I believe I interviewed with his other audit
10 manager, Surrinder Masih.
11     Q   What were your duties as an audit manager at
12 Wilshire Bank?
13     A   I supervised a staff of two to four auditors
14 performing financial operation and compliance audits.
15     Q   And was your direct supervisor Dom Tallerico?
16     A   Yes.
17     Q   Did you report to anybody else?
18     A   No.
19     Q   And when did you leave Wilshire Bank?
20     A   On July 27, 2016, I was laid off in the merger
21 of Wilshire Bank with BBCN Bank.
22     Q   And what was your employment after leaving
23 Wilshire Bank?
24     A   I was unemployed for eight months, and I worked
25 for CIT Bank starting in March of 2017.

Page 20

1      Q   And you're still with CIT Bank now?
2      A   I am not.
3      Q   When did you leave CIT Bank?
4      A   On December 22nd or 23rd of 2017.
5      Q   Why did you leave CIT?
6      A   I was driving 800 miles a week. I wanted to
7  find a job closer to home.
8      Q   Okay. And are you currently employed?
9      A   I am.
10     Q   Okay. Where?
11     A   Golden State Farm Credit.
12     Q   Golden State Farm Credit?
13     A   That's correct.
14     Q   And when did you start there?
15     A   January 2nd of 2018.
16     Q   And what is your position there?
17     A   I am the internal auditor of that organization.
18     Q   It's closer to your home?
19     A   It's closer, but I still drive 700 miles a
20 week.
21     Q   You shaved off a hundred miles.
22     A   But at least I come home on the weekends --
23 every night instead of coming home on the weekends.
24     Q   Gotcha.
25         While you were at Wilshire Bank, was your title

Page 21

1  the whole time internal auditor?
2      A   It was internal audit manager. My current
3  position is internal auditor.
4      Q   Okay. You were internal audit manager the
5  entire time at Wilshire?
6      A   Yes.
7      Q   Did you receive any promotion while you were
8  there or is that the only position you held?
9      A   That's the only position I held.
10     Q   And that was the position you held in January
11 to March 2014?
12     A   Yes.
13     Q   And in your -- let me step back.
14         You said you conducted, you recall, four
15 internal investigations for embezzlement of employees;
16 correct?
17     A   At least four.
18     Q   At least four.
19         How many were with Wilshire Bank?
20     A   This was my second one.
21     Q   Do you recall the first one?
22     A   Yes, but it was -- monetarily, it was very
23 small. I believe -- I don't recall exactly, but 20,000,
24 something to that nature.
25         (Mr. Tyler entered the deposition room

Page 22

1      at 10:35 a.m.)
2      Q    BY MR. DZARA:  Did it involve any of the people
3   involved in this embezzlement?
4      A    No.
5      Q    I should say "persons involved in this
6   embezzlement."
7          Okay.  James Ryu, he is my client.
8          Do you know who he is?
9      A    I have not met him.
10     Q    Okay.  What do you know about him?
11     A    If I recall, he was chief operations officer at
12  BankAsiana.
13     Q    And you are aware that BankAsiana was acquired
14  by Wilshire Bank?
15     A    Yes.
16     Q    If I told you the acquisition was effective
17  October 2013, does that sound right?
18     A    That sounds right.
19     Q    Were you involved in any of the due diligence
20  or work done in preparation or during the acquisition
21  process of BankAsiana by Wilshire Bank?
22     A    No.
23     Q    So what you recall of James is he was the COO
24  of BankAsiana; right?
25     A    That is correct.

Page 23

1      Q    Did you know or recall a gentleman named
2   H.S. Hur, H-U-R?
3      A    Hong Sik Hur, yes.
4      Q    What do you recall about him?
5      A    He was the president.
6      Q    President of BankAsiana?
7      A    That is correct.
8      Q    Was he the CEO too?
9      A    I don't know.  I don't know if they had a CEO
10  president.  I think he was just president.
11     Q    Okay.  So going back to James, you said you've
12  never met him?
13     A    No.
14     Q    You've never spoken to him?
15     A    No.
16     Q    How about H.S. Hur?  Have you ever met or
17  spoken to him?
18     A    I have not.
19     Q    How about Karen Chon?  Do you know her?
20     A    I do not.
21     Q    What do you know about her?
22     A    She was the -- I forgot her exact title.  It's
23  probably in my paperwork.  But in all -- in essence, she
24  was the vault custodian at the East Fort Lee bank in
25  New Jersey.

Page 24

1      Q    The East Fort Lee branch at BankAsiana.
2      A    That is correct.
3      Q    Did you ever speak to or communicate with her?
4      A    I did not.
5      Q    Do you know if she was criminally charged for
6   the embezzlement?
7      A    Yes, she was.
8      Q    Okay.  Do you know anything about her
9   whereabouts right now?
10     A    Yes.  You can go on Google and see it.
11     Q    Okay.  Have you Googled her?
12     A    I did the other day.
13     Q    Okay.  Well, this is going back to
14  preparation -- for what you did in preparation for your
15  deposition.  That would be prep.
16     MR. YI:  Wait.
17     MR. DZARA:  Yeah, Michael?
18     MR. YI:  I just have an objection to that.  If you
19  want to follow up, go ahead.  I don't know that he
20  indicated that it was in preparation for this
21  deposition.
22     THE WITNESS:  I did, but --
23     Q    BY MR. DZARA:  Okay.  Well, let's go back.  I'm
24  not being critical --
25     A    Yeah, I should have told you that.  I Googled

Page 25

1   it.
2      Q    And what was your reasoning for Googling her?
3      A    Just to see what the latest on the case was.
4      Q    Okay.  And what did you find out?
5      A    Well, there were newspaper articles in papers,
6   and I think -- I forgot the paper, and it basically said
7   she's in the correctional institute in Danbury,
8   Connecticut.
9      Q    Okay.  Do you recall anything else that you
10  read about in those articles about her or this case?
11     A    Well, it talked about pretty much the events
12  that I've described in my narrative, so there wasn't --
13     Q    It's nothing you didn't know already?
14     A    Yeah, nothing that I didn't know already.
15     Q    Okay.  Did any of these articles mention my
16  client, James Ryu?
17     A    I believe they did.
18     Q    Do you recall what you read about him?
19     A    If I recollect correctly, she mentioned that --
20  I guess they quoted Karen, and she mentioned that --
21  there was a direct quote from her saying that she
22  couldn't have done it all on her own or something to
23  that point.
24     Q    Okay.  Do you know if my client has been
25  charged with any crimes relating to the embezzlement?

Page 26

1    A   I don't know whether he has or not.
2    Q   Do you know anything about his whereabouts
3 right now?
4    A   No, I don't.
5    Q   Okay. What do you know about this litigation?
6 What it's about, what the claims are.
7    A   It's a civil case.
8    Q   Okay. Do you know anything else about it?
9    A   I believe the plaintiff is the bank, and your
10 client is the -- whatever -- the second party, whatever
11 you call them.
12   Q   Defendant?
13   A   Defendant.
14   Q   Okay. Do you know what the claims are that the
15 bank has brought against Mr. Ryu?
16   A   No, I don't.
17   Q   Do you know if there's any other defendants?
18   A   I don't know of any other defendants.
19   Q   Did any of the articles that you read discuss
20 the civil litigation?
21   A   No, they didn't.
22   Q   I think I asked you this question already about
23 BankAsiana being acquired by Wilshire Bank, and I think
24 you testified that you weren't involved in that
25 acquisition process at all; correct?

Page 27

1    A   That is correct.
2    Q   Are you aware or were you aware then that
3 certain BankAsiana employees were laid off following the
4 acquisition?
5    A   I didn't know that until I started my
6 investigation.
7    Q   What do you recall learning about the issue
8 during your investigation?
9    A   Well, I interviewed the human resource manager
10 at Wilshire Bank and just asked her if anybody was laid
11 off.
12   Q   Was that Jennie Han?
13   A   That is correct.
14   Q   And do you remember what Ms. Han told you?
15   A   At a minimum, Karen was laid off. There might
16 have been more, but I don't recall if there were more.
17   Q   Do you know if James was laid off?
18   A   Yes, I believe so. I believe he and Mr. Hur
19 got packages. That's very typical for a merger of that
20 sort.
21   MR. DZARA:  Let's off the record for one second.
22       (Discussion held off the record.)
23   MR. DZARA:  Back on the record.
24   Q   All right. We're going to spend the remainder
25 of our time here really getting into as much as you

Page 28

1 remember with me showing you some documents as exhibits,
2 likely a lot of the ones you already reviewed this
3 morning regarding the embezzlement. And I will try to
4 be as quick as I can and not, you know, keep you,
5 obviously, here all day.
6       I should have mentioned that at the beginning.
7 My goal is not to waste time and keep you here. My goal
8 is to get information from you that you know, and then
9 we'll conclude as fast as we can.
10       So you've already talked a lot about the
11 embezzlement. And we're calling it -- we haven't really
12 defined the term "embezzlement."
13       What I'm referring to is the embezzlement
14 committed by Karen Chon that you were investigating.
15       So are you on the same page with me if we say
16 "embezzlement," that's what we mean?
17   A   Yes.
18   Q   And you've already testified a lot about what
19 you remember about the embezzlement and what your role
20 was. I'm sure there are some other facts we're going to
21 get into.
22       But the first question here at this stage of
23 the deposition is, do you remember when is the first
24 time you learned about the embezzlement?
25   A   I sure do.

Page 29

1    Q   Okay. Tell me when and what you remember.
2    A   I got an e-mail from Dom Tallerico at 5:05. It
3 was a Wednesday. I believe it might have been
4 January 24th. And he indicated in that e-mail, "Don't
5 go anywhere."
6    Q   Okay. Is that all he said, "Don't go
7 anywhere," or was there more to it?
8    A   That was all to that e-mail.
9    Q   Okay. What happened after that?
10   A   He came from some meeting with senior
11 management and said, "There's some sort of defalcation
12 going on at one of the branches of BankAsiana."
13   Q   Do you recall him telling you anything else?
14   A   He said, "Be ready to get on an airplane."
15   Q   Okay. What happened next?
16   A   This a Wednesday, and he provided an e-mail
17 to me with some preliminary information that was being
18 researched by a couple of employees at BankAsiana. So I
19 just reviewed those e-mails.
20   Q   Do you remember who those employees were?
21   A   Irene Lee and Bo-Young Lee.
22   Q   Okay. So you reviewed them.
23       What happened next?
24   A   It was decided that I need to fly out there.
25 So I made arrangements to fly out Sunday -- that Sunday,

Orest Hamersky

Page 30

1  I believe it was -- I might be getting my dates wrong,
2  but those were all the last week of January.
3      Q   I think you're exactly right.  Your memory is
4  great.
5          So you remember flying out there that weekend.
6          Was Alicia Lee already there; do you remember?
7      A   She was.  She had left the prior week.
8      Q   Do you recall what Alicia Lee's role was?
9      A   She was the operations administration manager
10 at Wilshire Bank.
11     Q   Do you know what her role was in the
12 embezzlement?
13     A   Similar to mine.  She is a specialist on the
14 deposit side, so she went first to try to understand
15 what was going on.
16     Q   Tell me when you got out there, what happened
17 after you flew out there?
18     A   I met with her that Sunday night, and just we
19 made arrangements to go to the East Fort Lee branch the
20 very next day.
21     Q   Do you remember what Alicia Lee told you when
22 she met with you that Sunday night?
23     A   She had some of the same documents that Dom had
24 sent to me, and we just kind of discussed some
25 withdrawals from customers' CD accounts.

Page 31

1      Q   Okay.  Did she tell you at all about any
2  meetings that bank employees or her had with Karen Chon
3  prior to your arrival?
4      A   Yes.  I believe there were two meetings.  She
5  was involved in the second meeting with Karen Chon.
6      Q   Let's step back.  Let's take baby steps.
7          The first meeting, what do you recall about the
8  first meeting?
9      A   Again, this was what Alicia told me.  Irene was
10 investigating some customer accounts, and she called up
11 Karen over the phone and said, basically, "What's going
12 on here?"
13         And then the next day, Karen came in and talked
14 to Bo-Young and Irene and admitted that she had been
15 taking funds out of customers' CD accounts.
16     Q   What else do you remember about that meeting
17 that Alicia told you?
18     A   That's all that I remember about that meeting.
19     Q   Do you know if it was recorded?
20     A   I do not believe it was recorded.
21     Q   Do you ever recall seeing any notes of the
22 meeting by any attendees?
23     A   No, I don't recall seeing any notes.
24     Q   Do you recall Karen mentioned James during that
25 meeting?

Page 32

1      A   Not in that first meeting.
2      Q   Do you recall how that meeting ended?  Like,
3  scheduled a meeting to meet with Karen?
4      A   I don't know what ended, but they met again
5  when Alicia came.
6      Q   Was that the next day?
7      A   I believe it was.
8      Q   I believe that was January 23rd.
9      A   That's correct.  That's correct.
10     Q   Okay.  What do you recall about this second
11 meeting?
12     A   In the second meeting, Karen basically admitted
13 taking the funds, but in this meeting, she indicated
14 that James was involved.
15     Q   Okay.  Do you recall anything else about that
16 meeting?
17     A   I don't because I wasn't there, obviously.
18 This is what I recall she told me.
19     Q   I completely understand.
20     A   Yeah.
21     Q   When I ask you what do you recall --
22     A   Okay.
23     Q   -- do you remember what Alicia told you?
24         I got you.  I completely understand that's how
25 you got this information.

Page 33

1          Do you know if this meeting was recorded, the
2  second meeting?
3      A   I believe Alicia recorded it on her phone.
4      Q   Okay.  Did you ever listen to the recording?
5      A   I did not.
6      Q   Do you recall any of the attendees taking any
7  notes of the meeting?
8      A   I don't recall.
9      Q   Do you recall or remember seeing a summary of
10 the meeting?  A written summary.
11     A   No.
12     Q   Okay.  So you recall those two meetings that
13 you just testified about.
14         You recall Alicia telling you about them when
15 you arrived in New Jersey on or about January 29?
16     A   Yes.
17     MR. YI:  Objection to form.
18     THE WITNESS:  I don't think it was that late.  I
19 think it was, like -- wasn't I there on the 26th,
20 something like that?
21     MR. DZARA:  I'm not sure.  I asked the question
22 poorly.
23     Q   My point is that you didn't learn about any of
24 that information about the two meetings before you left
25 California, did you?

Orest Hamersky

Page 34

1   A   No, I didn't.
2   Q   You learned about it when you got to
3   New Jersey.
4   A   As far as I recall.  I didn't talk to Alicia
5   before I got out there.
6   Q   I understand.
7        Before you left California to fly to
8   New Jersey, the only person you spoke to about this
9   matter was Dom; is that correct?
10  A   I'm trying to recall -- no, I think I spoke to
11  somebody in I.T.  Maybe an Anthony Chung.  I was trying
12  to have some reports run, something to that effect.
13  Q   Okay.  Do you remember helping Lisa Pai before
14  you left California?
15  A   You know, I don't recall, but most likely I
16  did.
17  Q   Who did the investigation?  Was there a point
18  person or somebody in charge of it at the bank?
19  A   I don't believe anybody was in charge.  I kind
20  of took it over because I started documenting
21  everything.
22  Q   Okay.  And who were you reporting to during
23  your investigation?
24  A   To Dom.
25  Q   Okay.  Did you ever report or speak to a

Page 35

1   Lisa Pai during the investigation?
2   A   Yes, many times.
3   Q   And do you recall the nature of your
4   discussions with Ms. Pai?
5   A   Yes.  We -- I would give her a status of what
6   was going on, and sometimes she wanted more details, so
7   I would give her as much as I knew.
8   Q   So stepping back a second to confirm your
9   testimony, you considered yourself the point person for
10  the investigation?
11  A   Pretty much by default because --
12  Q   Nobody told you, "You're the point person" --
13  A   Right.  I just took it and went with it.
14  Q   But in terms of bank senior management, do you
15  know was there somebody in bank senior management kind
16  of controlling who was doing what and controlling this
17  investigation from a senior level?
18  A   Yes.
19  MR. YI:  Objection to form.
20  Q   BY MR. DZARA:  Okay.  Who?
21  A   I would say Lisa was pretty much coordinating
22  in conjunction with Dom.
23  Q   Okay.  So of senior management, Lisa and Dom
24  were the ones who seemed to be coordinating everything?
25  A   Yes.  And they were keeping the board informed

Page 36

1   too.
2   Q   I understand.
3        I just mean there was nobody on the board who
4   was running the day-to-day stuff or getting updates each
5   day.
6   A   Correct.
7   Q   Now, we talked about, I guess, in the beginning
8   of your testimony the four things:  Whether a crime was
9   committed, a culprit, loss to the bank, creating a
10  detailed trail of what you were finding out.
11       That was your four goals of this investigation?
12  A   Yes.
13  Q   And in writing this narrative, who was the
14  audience?  Who were you writing the narrative for?
15  A   It was primarily directed to Dom and Lisa.
16  Others may have also seen it, but it was pretty much
17  directed to them.
18  Q   Okay.  Was there any other investigation -- let
19  me restate the question a little better.
20       Was your investigation the only investigation
21  being done by the bank of the embezzlement?
22  A   No.
23  Q   What other investigations were there?
24  A   There was a company called CliftonLarsonAllen.
25  They're forensic auditors.

Page 37

1   Q   And what was their role or what was their
2   investigation?
3   A   They were hired by the board, and I believe
4   their goal was similar to mine.  But I wasn't involved
5   in their investigation, so I can't really speak to what
6   they were doing.
7   Q   So their goal was the same thing, the four
8   things we talked about?
9   A   I would imagine, you know.  They would look at
10  hard drives for data, so they approached it a little bit
11  differently than I did because of their expertise.
12  Q   But you think that part of their investigation
13  was also to figure out those four items:  Whether a
14  crime was committed, a culprit, loss and to create a
15  detailed summary?
16  A   I'm not exactly sure if they approached it from
17  that way because I was not privy to that information.
18  MR. YI:  David, if I may, I'm just going to instruct
19  the witness not to speculate.
20       If you know, then you can talk about that.  But
21  if you don't, just indicate that.
22  Q   BY MR. DZARA:  During your investigation of the
23  embezzlement, did you coordinate with anybody at
24  CliftonLarsonAllen?
25  A   I did not.  They would supply me some

Orest Hamersky

Page 38

1 information occasionally.
2   Q   And where were they getting their information
3 from?
4   A   I don't know.
5   Q   Okay.  Do you know if CliftonLarsonAllen ever
6 created a report summarizing their investigation?
7   A   I don't know.
8   Q   All right.  Other than the CliftonLarsonAllen
9 investigation, were there any other investigations?
10   A   I'm trying to think if there was any, and I
11 don't recall.  I mean, Lisa was there talking with
12 people too, but I would consider that all as our
13 investigation.
14   Q   Okay.  As far as you know, there was one bank
15 investigation.  You were kind of the point person, as
16 you testified, and then you know that Lisa was doing
17 some part of the investigation as well, but you would
18 coordinate with her?
19   A   Yes.
20   MR. YI:  Objection to form.
21   Q   BY MR. DZARA:  And Alicia Lee was involved as
22 well, but she was coordinating with you; correct?
23   A   We were working together.
24   Q   Okay.  And Irene Lee, Bo-Young Lee, they were
25 involved as well?

Page 39

1   A   Yes.
2   Q   Were there IT people involved, too, helping
3 out?
4   A   There was a gentleman named Eunmoo Choi who
5 assisted.
6   Q   Assisted you for your part of the
7 investigation?
8   A   Yes.  I don't know if he was doing any other
9 for anybody else.
10   Q   Okay.  So as far as you know, the written
11 summary you were working on, the narrative, there were
12 no other written summaries or narratives being drafted
13 by anybody else at the bank regarding the embezzlement
14 investigation; is that right?
15   A   Not that I'm aware of.
16   Q   You don't remember reviewing any summaries
17 written by anybody else at the bank?  Anybody else at
18 the bank.
19   A   I believe Alicia wrote a one-page summary right
20 in the very beginning.  That's the only other one that I
21 can recall.
22   Q   Was that of the second meeting with Karen?
23   A   I don't recall the contents of it.  I could
24 just picture that page.  I think I got it through an
25 e-mail.

Page 40

1   Q   All right.  Other than that one-page summary
2 prepared by Alicia Lee, do you remember any other
3 written summaries prepared by any other bank employee?
4   A   I don't recall any others.
5   Q   Thank you.
6   All right.  So we've covered a lot so far.  We
7 got up to -- in the timeline, we got up to you arrived
8 in New Jersey and you met with Alicia Lee, and the first
9 place you went to was the Fort Lee branch; is that
10 right?
11   A   That is correct.
12   Q   And you had already received some documents,
13 but now you're boots on the ground.  You're there.
14   What do you remember doing?
15   Well, how long were you there and what do you
16 remember doing?
17   A   I was at that branch, I believe, the first
18 two days, and then I moved to their operation center,
19 which was the South Palisades branch.  They had an
20 administrative office -- actually, their old corporate
21 office was on the -- on a higher floor in that building.
22   Q   And both of these branches were now
23 Wilshire Bank branches; right?
24   A   That is correct.
25   Q   But the administrative operations were still on

Page 41

1 the second floor of the Palisades Park branch?
2   A   Yes, just for the time being.
3   Q   Got it.
4   So how long in total were you in New Jersey
5 during this trip?
6   A   That one week.
7   Q   So you went to Fort Lee first, and then you
8 went to Palisades Park.
9   Just tell me kind of in as much detail as you
10 remember what you were doing, what you were looking at,
11 who you were talking to.
12   A   At East Fort Lee, I was going through the
13 documents that I had received by e-mail at the beginning
14 of the investigation and looking at signature cards,
15 looking at cashed checks, just a whole host of detailed
16 information.
17   When we moved to the South Palisades office, I
18 started talking to people who were involved in the
19 initial investigation, which would be Irene Lee and
20 Bo-Young.  And also talking with Eunmoo Choi.
21   Q   Okay.  And, now, what's your goal?  What are
22 you trying to accomplish now these first couple of days?
23   A   Again, my objective was to determine who the
24 culprit was; okay?  So I've been thrown into a
25 situation.  You basically don't trust anybody, so you're

Orest Hamersky

Page 42

1  trying to understand how the process works and talk to
2  as many people as possible and get the records. Just
3  getting a feel for the transactions.
4      Q    Okay. What else do you recall what you did
5  that week? Did you prepare a first draft of the
6  narrative?
7      A    No. I prepared the first draft of the
8  narrative on the plane trip going back.
9          But to answer your initial question, Lisa had
10 asked me to look at some invoices for a company out
11 there who provided data processing services for the
12 former BankAsiana. So I spent some time reviewing
13 invoices as well.
14     Q    Was that F-One Communications?
15     A    That is correct.
16     Q    They were the supplier of IT computer equipment
17 and BankAsiana's vendor that you recall?
18     A    Yes.
19     Q    Do you recall what Lisa asked you to look at in
20 regard to F-One Communications?
21     A    Just see if the disbursements were supported by
22 invoices and something of that nature.
23     Q    Do you recall what you discovered?
24     A    Yes. There were quite a few that were not
25 supported by invoices, and the control of the IT

Page 43

1  function was inadequate.
2      Q    Okay. Do you recall anybody -- I'm using the
3  word "culprit" again. I don't know if it's right in
4  this situation.
5          But do you recall any culprits at BankAsiana
6  that were the reason for what you discovered?
7      A    Could you rephrase that, please.
8      Q    Sure.
9          Was there anybody -- you said you found some
10 deficiencies regarding with BankAsiana and F-One
11 Communications: Unsupported invoices and the other
12 things that you testified about.
13         Was there anybody at BankAsiana that you
14 determined was to blame for these issues?
15     A    No. Just poor oversight of that whole function
16 from a senior management's perspective.
17     Q    Did Lisa ask you who at BankAsiana was the
18 cause of this --
19     A    No.
20 MR. YI: Let him finish his question.
21 THE WITNESS: Sorry.
22         But no. She said, "Just take a look at that
23 vendor and some of the invoices."
24     Q    BY MR. DZARA: Regarding the embezzlement, in
25 the first week, do you remember what you had concluded?

Page 44

1  MR. YI: Objection to form.
2  THE WITNESS: I concluded that vast quantities of
3  money were withdrawn from older customers' CD accounts
4  that were unauthorized.
5      Q    BY MR. DZARA: And who was the one who was
6  doing those unauthorized transactions?
7      A    Karen Chon.
8      Q    Okay. Did you at this point see anybody else
9  at the bank, based on what you reviewed at BankAsiana,
10 that was involved in these unauthorized withdrawals?
11 MR. YI: Objection to form.
12 THE WITNESS: In the first week, no.
13     Q    BY MR. DZARA: Okay.
14 MR. YI: David, when you get a chance, can we take a
15 quick break? I'd like to get some water for -- I forgot
16 to get some water for the witness.
17 MR. DZARA: Sure. Let me ask just a couple
18 questions, and we can take a break.
19     Q    So did what you discovered that first week sort
20 of match up with what Karen said she did when she
21 confessed to embezzling the money?
22     A    Yes, it matched up.
23     Q    Okay. During this first week, did you
24 determine how much was the loss? How much she stole?
25     A    Initial amount, but that fluctuated several

Page 45

1  times during the investigation.
2      Q    So did you conclude during this first week
3  whether or not a crime had, in fact, occurred?
4      A    Yes.
5      Q    So it sounds like of the four things you said
6  the goal of this investigation were -- I'm not going to
7  repeat them again. We've already repeated them a couple
8  of times.
9          It sounds like you figured out, at least
10 initially, the first one, whether a crime was committed,
11 the culprit and at least an initial loss amount, and you
12 said you started to draft the narrative on your flight
13 home; is that right?
14     A    Correct.
15 MR. DZARA: Okay. All right. Now is a good time to
16 take a break.
17 MR. YI: Objection to form on the last question.
18         (A recess was taken.)
19 MR. DZARA: Back on.
20         What was the last question and answer?
21         (The record was read.)
22     Q    BY MR. DZARA: There are a couple initial
23 points I forgot to ask you in the beginning of the
24 deposition.
25         Just to clarify, you are a former employee of

Page 46

1 Wilshire Bank; correct?
2    A    Correct.
3    Q    And it's your understanding Mr. Yi is
4 representing you as your lawyer at this deposition;
5 correct?
6    A    Yes.
7    Q    And are you being paid by Wilshire Bank for
8 your time spent for preparing and attending the
9 deposition?
10   A    I believe somebody is going to pay me for my
11 time in the deposition.
12   Q    Somebody like Bank of Hope?
13   A    Either Bank of Hope or Michael.  I don't know.
14   MR. YI:  I can state for the record it will be the
15 bank.
16   Q    BY MR. DZARA:  So Bank of Hope is paying you
17 for your time preparing, traveling and attending the
18 deposition?
19   A    Not for preparing.
20   Q    Not preparing?
21   A    No.
22   Q    Okay.  So for what?  Just traveling and
23 attending?
24   A    I believe I'm going to be paid for my drive
25 time and my deposition time.  That's it.

Page 47

1    Q    Okay.  How much -- is it an hourly fee?
2    A    I believe so.
3    Q    Okay.  How much?
4    A    I believe it's 75 bucks an hour.
5    Q    And that's all the questions I have on that.
6 Thank you.
7    MR. YI:  David, just for the record, it's my
8 intention to ask him -- to the extent that I met with
9 him this morning in preparation for this deposition, I
10 expect that he will bill us for that time as well.  I
11 think he mentioned one hour and 45 minutes.
12   MR. DZARA:  If I ask him any questions about your
13 conversation with him this morning, I assume you would
14 object as to attorney-client privilege?
15   MR. YI:  Yes.
16   Q    BY MR. DZARA:  Okay.  Orest, we got through you
17 being in New Jersey for a week and now flying back to
18 Los Angeles and you preparing an initial draft of your
19 narrative.
20        Could I say that the narrative was summarizing
21 your investigation?  Is that an accurate way to put it?
22   A    That is correct.
23   Q    All right.  And so when you got back to
24 Los Angeles, what do you remember then happening?
25   A    One of the things -- one of the four points was

Page 48

1 that I needed to create an audit trail of all the
2 transactions.  So my focus was on preparing a detailed
3 flow of events and dollar transactions in anticipation
4 of an event like this today.
5    Q    So were you drafting that in anticipation of
6 potential litigation?
7    A    Just for evidence that -- from my past history,
8 somebody is asking for evidence as to what happened in a
9 certain circumstance.
10   Q    So you were creating this audit trail.
11        And who were you talking to during this time?
12   A    Well, Mr. Seo -- Jake -- he's the IT manager at
13 Wilshire Bank.  He was able to get access for me for
14 their computer records off of Jack Henry.
15        So by doing that, I was able to do the
16 remaining part of the investigation back in Los Angeles
17 rather than spending the time in New Jersey.
18   Q    And two follow-up questions on that:
19 Jack Henry -- what was Jack Henry?  The banking system
20 used by BankAsiana?
21   A    That was their loan, deposit and general ledger
22 system where they recorded their transactions.
23   Q    And you said you were able to finish this audit
24 part of the investigation from Los Angeles and did not
25 have to go back to New Jersey; correct?

Page 49

1    A    Yes, I did not need to go back to finish the
2 investigation.
3    Q    So during this time in February, that's what
4 you were working on.  You were creating an audit
5 spreadsheet of all the transactions?
6    A    Yes.
7    Q    And that's the fourth part of your four items
8 that you said was the purpose of your investigation.
9        Were you already done the first three:  How
10 much was the loss, who was the culprit and whether a
11 crime was committed?  Were those done at this point?
12   A    No, it wasn't done at this point.
13   Q    What remained open for any of those three
14 issues?
15   A    Well, as an auditor, you have to look beyond
16 the box, and you have to look at other employees also.
17 And the way you do that is look through their accounts
18 just to make sure somebody else may not have been
19 involved -- were or may not have been involved.
20   Q    Okay.  Did you do that here?
21   A    I did that in Los Angeles.
22   Q    Here for this embezzlement.
23   A    Yes.  Sorry.
24   Q    Tell me what you did.  What did you look at?
25   A    I looked at accounts maintained by

Page 50

1    ████████.  I looked at accounts maintained by
2   James Ryu.  I looked at accounts -- a lady named Jenna
3   and Lee, I believe it was.  I looked at a variety of
4   different deposit accounts, and I also looked at some
5   loans as well.
6       Q    Okay.  So for James Ryu's accounts, what do you
7   remember -- what were your conclusions?  What did you
8   do?
9       A    I went through his accounts, and I saw some
10  cash flowing through there, but not extraordinarily --
11  they weren't extraordinarily large for a person in his
12  position.  I did see some funds going to Wells Fargo
13  Bank.  So I just did the same thing with Mr. Hur and
14  also with Karen and the fourth person I mentioned,
15  Jenna Lee.
16      Q    Going back to James, did anything you reviewed
17  lead you to conclude that any of it was evidence that he
18  was involved in the embezzlement?
19      A    I did not see direct postings to his account.
20  I did look at a whole host of transactions that I found
21  interesting.
22      Q    Okay.  Which transactions do you recall being
23  interesting?
24      A    He had a couple of loans.  He had an employee
25  loan.  He had a 401(k) loan.  I saw transactions of that

Page 51

1   sort that indicated that he was borrowing money from
2   people.
3       Q    Did you see any transactions paying back those
4   loans?
5       A    It appeared that he paid some of the
6   transactions -- I believe in my narrative, I mentioned
7   that the employee loan was paid off and perhaps the
8   401(k) loan was also paid off.  I believe that's
9   somewhere in my narrative.
10      Q    Okay.  So did anything you reviewed of
11  Mr. Ryu's transactions, did you believe any of it was
12  evidence that he was involved in the embezzlement?
13      A    I did not see direct evidence, but I saw an
14  individual that was -- appeared to have financial --
15  dire financial conditions.
16      Q    Why would you think that they were dire?  Can
17  you explain that.
18      A    Yes.  I saw through some other loans that he
19  had a loan with another gentleman, an outside party,
20  that was charging him very high rates of interest.
21      Q    Okay.  So that led you to the opinion that his
22  financial condition must be dire?
23      A    Well, if you're paying 22 percent, it sounds
24  like the other individual could have been a hard-money
25  lender.

Page 52

1       Q    Okay.  All right.  So you testified you didn't
2   find any direct evidence linking James to the
3   embezzlement; correct?
4       A    That is correct.
5       Q    And did you find any indirect evidence or
6   anything that would lead you to believe that he was
7   involved in the embezzlement?
8       A    Like I stated, there were instances where he
9   was borrowing considerable amounts of money that
10  suggested that he was having difficult financial
11  circumstances.
12      Q    Okay.  So for that indirect evidence, did that
13  lead you to believe that he was the culprit in the
14  embezzlement?
15      A    The records show that Karen posted the
16  transaction on her teller I.D.  So the evidence shows
17  that she directly posted the transactions.
18           I'm not speculating here as to his involvement,
19  but it does appear that this whole incident did not
20  happen in a vacuum for the number and the dollar amounts
21  of transactions that were flowing out of that bank.
22      Q    It didn't happen in a vacuum.  What do you mean
23  by that?
24      A    James was also the BSA officer, which is bank
25  secrecy officer, for the bank.  And that individual is

Page 53

1   supposed to be monitoring cash flows in and out of the
2   bank.  And there's government reporting and stuff like
3   that.
4           And as an auditor, I have a hard time believing
5   that such a large amount of cash could flow out of such
6   a small bank and nobody noticed.  And that's the BSA
7   officer's responsibility.
8       Q    So just to quickly summarize, you didn't find
9   any direct evidence that James was involved in the
10  embezzlement; correct?
11      A    Correct.
12      MR. YI:  Objection.  Asked and answered.
13      Q    BY MR. DZARA:  Did you tell anybody else at
14  Wilshire Bank that you didn't -- let's step back a
15  second.
16           Did you find any evidence that H.S. Hur was
17  involved in the embezzlement?
18      A    No, I did not see any evidence, but I went
19  through his accounts as well.  But I did see some other
20  interesting facts about some of his transactions that
21  were not -- were pretty suspicious.
22      Q    What do you remember about the suspicious
23  transactions?
24      A    Well, he was part of a team that was involved
25  somehow with a competitor, Millennium Bank.  And there

Page 54

1 were some transactions there, payments through attorneys
2 that I would consider a conflict of interest.
3    Q   Okay.  So did any of those transactions with
4 the competitor bank -- involving the competitor bank,
5 did they lead you to believe that he was possibly
6 involved in the embezzlement?
7    A   I didn't see any evidence he was involved in
8 the embezzlement.
9    Q   Okay.  There was no direct evidence in these
10 transactions and his accounts that he was involved --
11 H.S. was involved in the embezzlement; correct?
12    A   Correct.
13    Q   You just talked about these other interesting,
14 suspicious transactions.
15        Do you believe that those were indirect
16 evidence he may have been involved in the embezzlement
17 or benefit from the embezzlement?
18    A   Hong Sik Hur?
19    Q   Yes.
20    A   I don't -- I didn't see any evidence that he
21 was involved, but like I mentioned earlier, with that
22 kind of money flowing out of that bank, he should have
23 overseen those operations better.  And I have a hard
24 time believing he did not understand that there were
25 large amounts of money flowing out of that bank.

Page 55

1    Q   Okay.  How about you said -- was it Jenny or
2 Jenna Lee?
3    A   Jenna Lee.
4        Karen posted every single transaction that I
5 could find except for one transaction, and Jenna posted
6 it.  And it went into -- I believe it was into Karen's
7 account.  So there's a possibility that she assisted
8 Karen in some aspect.
9    Q   Okay.  Did you ever get to the bottom of that
10 or figure out if Jenna was, in fact, involved in the
11 embezzlement?
12    A   No, I could not find any evidence that she was
13 involved.
14    Q   So let's summarize this part of your testimony.
15        For H.S. Hur, you didn't find any direct
16 evidence in reviewing his accounts that he was involved
17 or benefited from the embezzlement, but you believe that
18 in his role as president of the bank, he should have
19 known or discovered this.
20    A   Yes.
21    Q   Okay.  Now, for James Ryu, you didn't find any
22 direct evidence that he benefited or was involved in the
23 embezzlement, but you found some transactions evidencing
24 to you that he was having financial problems, and that
25 in his role as COO and BSA officer of BankAsiana, he

Page 56

1 should have discovered these transactions by Karen; is
2 that correct?
3    MR. YI:  Objection to form.
4    THE WITNESS:  Yes.  He should have caught those
5 transactions.
6    Q   BY MR. DZARA:  Because of his position at the
7 bank.
8    A   Absolutely.
9    Q   Okay.  All right.  Is that for James in his
10 possible role or involvement and H.S.'s possible role or
11 involvement, is that everything you discovered?
12    A   I reviewed some loans as well.
13    Q   Okay.  What loans?
14    A   There were some SBA loans.  I believe they were
15 called CLEO Riverside and CLEO Park Avenue.  And at
16 least one of those loans was a fraudulent loan in which
17 the bank took over a $1 million loss on that.
18    Q   Okay.  And this loan, what does that have to do
19 with the embezzlement?
20    A   Karen posted the majority of the transaction on
21 the loan, and even more than the cash transactions, both
22 Hong Sik Hur and James Ryu undoubtedly were involved in
23 the approval -- in the whole process of those loans.
24    Q   Okay.  So how was that loan or loans related to
25 Karen's embezzlement?

Page 57

1    A   They don't relate to the deposit side.  And the
2 deposit side was over a million dollar loss.  But they
3 relate to the fact that there's another loss that the
4 bank took on the loan side, and she posted most of the
5 transactions to book that loan.
6    Q   Okay.  So your testimony is this just happened
7 to be another loss, but it's not related to the
8 embezzlement directly.
9    A   That is correct.
10    Q   Okay.  So your conclusions you just talked
11 about regarding James, did you tell anybody about it?
12 Did you tell anybody, "There was no direct evidence but
13 I found this other stuff"?
14    A   Everything that I told is in that narrative;
15 okay?  And the narrative basically concluded that Karen
16 had posted those transactions.
17    Q   I'm not talking about the CLEO loans.  I'm
18 talking about the embezzlement; right?
19    A   Right.  That's correct.
20    Q   So everything you just testified about you're
21 saying was in the narrative, and it was disclosed to
22 anybody who read the narrative.
23    A   Correct.
24    Q   So Dom Tallerico, to your knowledge, reviewed
25 the narrative?

Page 58

1    A   Yes.
2    MR. YI:  Objection to form of the question.
3        David, did we clarify what you mean by the
4   narrative?  Because there are, I think, at least --
5    MR. DZARA:  I'll step back, Michael.
6    Q   As far as you just testified that the evidence
7   we talked about or the indirect or direct evidence
8   regarding Mr. Ryu and H.S. Hur and Jenna Lee -- I'm not
9   going to repeat your testimony, but the stuff we just
10  talked about after our break until now, you said all the
11  stuff you discovered in reviewing their account and
12  everything was put in your narrative; right?
13   A   Correct.
14   MR. DZARA:  Okay.  So that's what I'm talking about
15  the narrative, Michael.
16   Q   I know there are different versions of it, but
17  in the end, this stuff you just testified about your
18  conclusions and what you saw was in that narrative, and
19  you provided that narrative to Dom Tallerico; correct?
20   A   Yes.  And others too.
21   MR. YI:  David, can we go off the record for one
22  second?
23   MR. DZARA:  Yes, Michael.
24       (Discussion held off the record.)
25   Q   BY MS. DZARA:  Just circling back for a second,

Page 59

1   the conclusions that you reached in terms of direct
2   evidence and other things related to your review of the
3   accounts, the BankAsiana account and I guess their
4   Wilshire Bank accounts once the merger happened with
5   BankAsiana belonging to James and H.S. Hur and
6   Jenna Lee, you put your conclusions in writing; correct?
7    A   Yes.
8    Q   And they were in a narrative -- what we're
9   calling your narrative; right?
10   A   Yes.  A series of them.  And like Michael said,
11  they all updated as I got more information.
12   Q   Michael said that off the record.
13       So you had multiple versions of the narrative.
14  We're going to look at them.  I understand that.
15       My only question is that you put it in the
16  narrative -- in one of these versions of the narrative
17  these conclusions.
18       And to your recollection, did you provide that
19  narrative, these conclusions that were in the narrative,
20  to anybody at the bank?
21   A   Yes.
22   Q   Okay.  Who?
23   A   I don't remember exactly, but I would say at a
24  minimum, Dom, Lisa, and there's a person I forgot,
25  Elaine Jeon.  She was Alicia's boss.  And I imagine

Page 60

1   Alicia got a copy of it and maybe even Jake did.  I
2   mean, it's in the e-mails who I cc'd it to so --
3    Q   I understand.
4        Do you remember talking to anybody at the bank
5   regarding during the time when you were creating
6   these -- when you got back to L.A. and you're working on
7   this narrative, and there are multiple drafts of it?
8        Other than e-mail, were you talking to other
9   banking employees about what you were finding and what
10  you concluded?
11   A   Yes.  There was a gentleman in their special
12  assets department named Dennis, and I forgot his last
13  name.  But it's in the narrative.  And he and I talked
14  about the fraudulent SBA loans.
15   Q   Okay.  So regarding your conclusion regarding
16  the embezzlement, did you ever meet with Dom and tell
17  him your conclusions?
18   A   I don't recall, but it's very possible that I
19  spoke with him about it.
20   Q   I'm just asking if you recall.  It's okay if
21  you don't.
22   A   Yeah, it's four years ago.
23   Q   How about Lisa Pai?  Did you ever meet with her
24  and discuss with her about your conclusions?
25   A   I met with her numerous times, and I imagine

Page 61

1   that I gave her conclusions, but I don't specifically
2   remember a certain point of time.  The whole idea of the
3   narrative was to provide as much information in paper in
4   writing.
5    Q   I understand.
6        All right, Michael.  Can we grab some of those
7   exhibits?
8    MR. YI:  Yeah.
9    Q   BY MR. DZARA:  Let me backtrack one second.
10       Now, you were writing multiple drafts of this
11  narrative that we're going to look at, Orest.
12       What else do you remember about this
13  February-March time period regarding the embezzlement
14  investigation or any other related investigation?
15   A   I just recall I was working on it full-time
16  gathering all the evidence that I felt was necessary to
17  complete my investigation.
18   Q   Do you recall drafting any -- other than these
19  multiple versions of the narrative, do you recall
20  drafting any other reports?
21   MR. YI:  Objection to form.
22   THE WITNESS:  Yes.  A report was prepared at the end
23  of March, which I believe went to the board of directors
24  kind of giving a summary as well.
25   Q   BY MR. DZARA:  Did you prepare that?

Page 62

1    A   I did prepare it.
2    Q   Did anybody else review it before it was
3  submitted to the board?
4    A   Yes. Dom reviewed it and edited it and
5  submitted to the board.
6    Q   Any other reports other than that one that you
7  prepared as part of your work on this investigation?
8    A   I don't recall any other besides the narratives
9  and that last report. There was another report that our
10 BSA officer had to file. It's called a suspicious
11 activity report --
12   MR. YI: Let's not get into that.
13   THE WITNESS: All right.
14   MS. DZARA: We don't need to get into that. We're
15 aware of that, but we don't need to get into that.
16   Q   Other than that, any other reports --
17   MR. YI: David, if I may, would it be okay if we
18 just strike that portion of his response from the
19 record?
20   MS. DZARA: Well, it's a established fact that we
21 saw the report, but we don't need to talk about what was
22 in it. I don't think you can strike it from deposition
23 but we're not going to use it for anything.
24   MR. YI: All right.
25   Q   BY MS. DZARA: So any other reports that you

Page 63

1  worked on regarding your investigation?
2    A   I don't recall any other reports.
3    Q   So I sort of just glossed over -- well, did the
4  investigation conclude -- do you remember when it
5  concluded?
6    A   I don't remember, but it went on for months.
7    Q   Okay. Because the latest thing we saw, at
8  least in the e-mails that were produced by Bank of Hope,
9  went kind of to the end of March when it was all kind of
10 wrapped up.
11       And it's your testimony that there were still
12 things going on beyond the end of March 2014?
13   A   Just follow-up if I needed additional
14 information or -- I don't recall -- I mean, the bank has
15 the records on when my hours were spent on the
16 investigation, so -- I just recall that I was still
17 working on beyond March for whatever reason,
18 inquiries by senior management or -- I had to fly out to
19 New Jersey in preparation for a possible trial. So it
20 just didn't end on March 31st.
21   Q   Okay. Well, you just kind of summarized what
22 happened after March 31st.
23       Specifically, what do you recall doing?
24   MR. YI: Objection to form.
25   THE WITNESS: I just recall that criminal charges

Page 64

1  had been filed and --
2    Q   BY MR. DZARA: Against who?
3    A   Karen.
4    Q   Okay. Keep going.
5    A   And then I met with the U.S. Attorney's office
6  there in -- I don't think it was East Fort -- it was in
7  Newark, New Jersey. And just they wanted -- they were
8  going to prosecute a case, so they wanted to understand
9  the whole process. So I spent a couple days there
10 explaining to them.
11   Q   Do you remember when that was?
12   A   I think it was in March. I don't know. Maybe
13 2015.
14   Q   Okay.
15   A   Or maybe even '16. One of those. I don't
16 remember.
17   Q   But the point is you met with the U.S. Attorney
18 handling the criminal matter?
19   A   Yes.
20   Q   Did you meet with anybody from the F.B.I.?
21   A   There was a gentleman there from the F.B.I.
22   Q   And the point of you going was to discuss your
23 investigation and what you discovered and explain to
24 them what happened?
25   A   Yes. I believe they were going to use me as a

Page 65

1  witness.
2    Q   Who else was there in the meeting?
3    A   Michael was there. I was there. I think the
4  attorney's name was Cohen, and there was a lady there.
5  She was also an attorney with a -- I believe an Indian
6  surname, and then there was a F.B.I. agent. I think his
7  name was Tylenda or something like that.
8    Q   You have a very good memory. You're right.
9        Okay. So the point was, like you just said or
10 what I said for you and you agreed, you explained to
11 them what happened, I guess, and they prepared you to be
12 a witness in the criminal trial of Karen; is that
13 correct?
14   A   Correct.
15   MR. YI: Objection to form.
16   Q   BY MS. DZARA: Anything else you recall you
17 were doing after March of 2014 other than what you just
18 testified about regarding the criminal investigation?
19   A   Yes. There was a gentleman -- one of the
20 victims. His name was ███████████. And actually, he
21 was the one who tipped us off to this embezzlement. And
22 we -- he had started inquiring about the account, and I
23 went back, and we determined that he was owed some money
24 that we at first initially thought that he had been
25 reimbursed by another withdrawal from another CD

Page 66

1  account.  The bottom line is, we ended up disbursing
2  funds to him because the money was rightly due him.
3  Q    Anything else you recall happening after March
4  of 2014 regarding the embezzlement investigation?
5  A    I'm just trying to think.  I mean, that was one
6  of the key items we were doing.  We were subpoenaed for
7  records, but I believe that was before March.
8  Q    By the government?  The subpoena was from the
9  government?
10  A    Yes.  And -- I mean, there may be more.  I
11  remember this thing just kind of dragging on.  Not
12  full-time, but there was inquiries being made and --
13  Q    Regarding inquiries being made, do you remember
14  who was making the inquiries to you from the bank?
15  A    Senior management and perhaps Michael.  I don't
16  remember for sure.  But it just dragged on.
17  Q    You said you were keeping time records of your
18  work on this matter?
19  A    Yes.
20  Q    Do you keep time records every day for all of
21  your work?
22  A    Every day.
23  Q    Okay.  So for all matters every day -- yes?
24  A    Yes.
25  Q    -- you keep time records?

Page 67

1  A    Yes.
2  Q    Did you ever meet with -- you talked about
3  being with the F.B.I. and the U.S. Attorney at some
4  point, you said, after March of 2014.  You don't
5  remember which year.
6      But before that, while you were in New Jersey
7  in the January-February time period, did you meet with
8  the F.B.I. then?
9  A    I did.
10  Q    What do you remember about that meeting?
11  A    Alicia and I met with Special Agent
12  Joel DeCapua and a second agent named Carl.  And we met
13  at the DoubleTree Hotel in East Fort Lee or Fort Lee.
14  And for an hour and a half, we just discussed what we
15  found during the first week that we were out there.  It
16  occurred late in the week like Thursday night --
17  probably Thursday night or Friday.  I think it was
18  Thursday.
19  Q    So did you explain to them at this meeting
20  everything that you discovered today, you and Alicia?
21  A    Right, because the bank was required to report
22  this instance to the F.B.I., and they contacted Alicia,
23  and then we sat down and discussed the evidence that we
24  had found to date.
25  Q    Did you and Alicia both do all the talking or

Page 68

1  did one of you do more?
2  A    We both did it.
3  Q    Do you know if the F.B.I. drafted a report
4  summarizing that meeting with you and Alicia?
5  A    I don't know.
6  Q    Do you remember any other meetings -- did you
7  have any other meetings with the F.B.I. other than the
8  one you just testified about and the one you testified
9  about earlier?
10  A    No.
11  Q    Okay.  Before I start showing you some
12  exhibits, are there any things -- I know it's an
13  open-ended question -- is there anything that I missed
14  that you want to talk about now regarding the
15  investigation?
16  MR. YI:  Objection to form.
17  THE WITNESS:  I don't recall any other things.
18  MR. DZARA:  Okay.  Michael, show him the first one,
19  Ryu 52, and the next one, Ryu 153.  They kind of go
20  together, please.
21      And do these have the sticker already on them
22  with the exhibit number on them?
23  MR. YI:  It looks like 52 may but not 53.
24  MR. DZARA:  All right.  Let's go off the record for
25  a second.

Page 69

1      (Discussion held off the record.)
2  Q    BY MR. DZARA:  There should be two exhibits in
3  front of you.  The first is marked Ryu 52.  The second
4  one is marked Ryu 53.  I see you're looking at them as
5  we were off the record.
6      Let me know when you've had a chance to skim
7  them over.
8  A    I've skimmed them over.
9  Q    Okay.  So why I gave you two is if you look at
10  Ryu 52, if you look at the bottom e-mail on the first
11  page --
12  A    Yes.
13  Q    -- this is an e-mail from Bo-Young Lee to
14  Elaine Jeon and Seung Ho Park and Irene Lee.  That
15  e-mail is then forwarded from Elaine Jeon at the top of
16  this Ryu 52 to J.W. Yoo, Alex Ko, Lisa Pai and
17  Dom Tallerico.
18      And if you look at Ryu 53, that e-mail has been
19  forwarded from Dom to you; is that right?
20  A    Yes.
21  Q    Okay.  So going back to Ryu 52, the bottom
22  e-mail, from Bo-Young Lee, I think you testified before
23  you remember seeing an e-mail that kind of summarized
24  the initial discovery and confession by Karen to
25  Bo-Young and Irene.

Orest Hamersky

1       Is this the e-mail you were referencing before?

2    A   Yes.

3    Q   Okay.  So in Ryu 53, Dom forwarded this to you.

4       Anything else you remember?  I know you

5    testified before about receiving an e-mail from Dom and

6    him telling you to hold tight, something is going on at

7    Fort Lee.

8       Anything else that you remember now reviewing

9    this e-mail about that issue?

10    MR. YI:  Objection to form.

11    THE WITNESS:  No, I don't remember anything else.

12    Q   BY MR. DZARA:  Now, if you look at Ryu 52, do

13    you recognize these?

14    A   Could you repeat that question, please.

15    Q   Look at Exhibit 52.

16       Do you recognize them?

17    A   Oh, yeah.

18    Q   Briefly tell me what they are.

19    A   These are screen prints from the Jack Henry

20    system -- deposit system, and it's showing large

21    withdrawals from CD accounts of the customers' accounts

22    named on the very top left-hand corner.

23    Q   And do you believe these would be the affected

24    CD account holders in the embezzlement?

25    A   These are the account holders.

1    Q   These are the account holders who had the money

2    stolen from them by Karen?

3    A   Correct.

4    Q   All right.  You can set them aside.

5    MR. YI:  By the way, just for the record, I think

6    you said "exhibits," but you meant "attachments."

7    MR. DZARA:  Right.  We looked at attachments to

8    Ryu 52.

9    Q   All right.  Can you get the next exhibit,

10    Ryu 56, please.

11    A   Yes.

12    Q   Take a look at that, and let me know when

13    you're done looking at it.

14    A   I'm done.

15    Q   Okay.  Do you recognize this e-mail?

16    A   Yes.

17    Q   Okay.  What is it?

18    A   If you recall, I mentioned that I thought I saw

19    a one-page e-mail -- no, a one-page summary by Alicia.

20    I think that's what was attached to this e-mail.

21    Q   So the attachment to Ryu 56 is the one-page

22    memo from Alicia that you recall -- that you testified

23    about before --

24    A   Yes, I believe that's what this was.

25    Q   Now, if you look at that memorandum -- did you

1    take a look at the memorandum and see the attachment?

2    A   Yes, but it's not attached right now.  Oh, it's

3    on the back.  Okay.

4    Q   Everything should be double-sided, I hope.

5    A   Yeah, yeah, yeah.  Go ahead with your

6    questioning.

7    Q   Take a look at that memo, and just let me know

8    if this is what you recall seeing before.

9    A   Yes, I recall seeing this before.

10    Q   Now, is this memo, is it a summary of Alicia's

11    meeting with Karen on January 23rd, 2014?

12    MR. YI:  Objection to form.

13    THE WITNESS:  I believe this is a summary of what

14    she was able to determine since she flew out there.  Not

15    just the meeting.

16    Q   BY MR. DZARA:  So you recall seeing it at the

17    time?

18    A   Yes.

19    Q   And do you recall discussing this information

20    provided in the memo with Alicia Lee when you arrived in

21    New Jersey?

22    A   I don't recall specifically discussing it with

23    her, but most likely I discussed it with her.

24    Q   Okay.  So you didn't write this memo.  I

25    understand that.

1    A   No.

2    Q   But could you just read it to yourself, and

3    just let me know if anything in here is incorrect --

4    that you believe is incorrect.

5    MR. YI:  Objection to form.

6    THE WITNESS:  The only -- okay.

7    MR. YI:  David, let me just state for the record

8    that this witness was not at the meeting, so I don't

9    know how he can testify as to whether something

10    describing the meeting and what was discussed at the

11    meeting is either accurate or not accurate.

12       But go ahead.

13    THE WITNESS:  The only thing --

14    MR. DZARA:  Orest, step back one second.  Let me

15    respond to Michael.

16       Orest testified that he was the main person

17    doing the investigation, so this memo, he didn't write.

18    I understand that.  But it concerns potential facts or

19    findings by someone else at Wilshire Bank involved in

20    the investigation that likely Orest could testify he

21    reviews.

22       So my only question is, if he reviews it, he

23    lets me know or testifies as to whether or not as part

24    of his investigation he believes that any of these

25    statements are false or true.

Page 74

1    And my question is if any of them are false
2 based on his investigation.
3    MR. YI:  Go ahead.
4    THE WITNESS:  Okay.  I see some inaccuracies, but
5 this is very preliminary.  At the very last line, she
6 says that the loss could be 1.9 million.  It turned out
7 it wasn't that high, but she did -- she provided this
8 with the best evidence she had based on the CD report
9 that Jake provided.  So it's inaccurate, but she was
10 giving the worst-case scenario.
11    Q   BY MR. DZARA:  She said "we were suspecting,"
12 but she's not stating a conclusion.  I understand those
13 are her preliminary results to date as of January 23rd.
14 I understand that.
15    And that's your understanding as well?
16    A   Yes.
17    Q   Can you grab the next exhibit, please.  It
18 should be Ryu 57.
19    MR. YI:  Just make sure he finishes the question.
20    THE WITNESS:  I know.  It's hard for her.
21    MR. YI:  For Sharon, yes.
22    THE WITNESS:  Yes, I'm ready.
23    Q   BY MR. DZARA:  I know this is not an e-mail
24 probably that you've seen before because it's solely
25 between Dom and Lisa; correct?

Page 75

1    A   Correct.
2    Q   But my question is -- I kind of touched on this
3 before -- do you know did Lisa ask Dom to get the audit
4 team involved?  Is that your understanding?
5    A   I don't know.  I don't know who asked who.
6    Q   Okay.  But Dom reached out to you and said,
7 "You've got to go to Fort Lee"; is that correct?
8    A   Yes.
9    Q   But you don't recall who asked Dom -- who
10 contacted Dom to get him involved --
11    A   No, I don't know.
12    Q   So in this e-mail, Dom states in the second
13 sentence:
14    "I'm sending Orest there this weekend
15 to help Alicia Lee, and could use some legal
16 guidance on a couple of approaches I would
17 like Internal Audit take in this matter."
18    Do you see that?
19    A   Yes.
20    Q   Do you remember Dom ever telling you around
21 this time any guidance that he got from Lisa when you
22 approached this matter?
23    A   No.
24    Q   You can set that aside.  Thank you.
25    Can you get the next one, Michael.

Page 76

1    MR. YI:  Yeah.
2    MR. DZARA:  This one is not marked.  It's a new one.
3 It should be an e-mail from Jennie Han to Orest.  This
4 will be Ryu 78.
5    (Whereupon, the document referred to
6 was marked for identification as Ryu
7 Exhibit 78.)
8    MR. YI:  Do you have the production numbers?
9    MR. DZARA:  I do.  WB 1906.
10    MR. YI:  1906.
11    This exhibit consists of two pages, but the
12 production number is just 1906?
13    MR. DZARA:  Yes, correct.
14    Q   All right.  Orest, take a look at this exhibit,
15 and let me know when you're done reviewing it.
16    A   I'm ready.
17    Q   Okay.  Have you seen this e-mail string before?
18    A   Yes.
19    Q   Okay.  What do you recall about it?
20    A   I sent it out before I ever left for
21 New Jersey.  And I was trying to get some information
22 about names of individuals that I saw in prior
23 documents.
24    Q   Well, the first e-mail on page 2, the e-mail
25 from you to Jennie Han on January 24, you're asking for

Page 77

1 the hire and termination dates for James and Karen.
2    Do you see that?
3    A   Yes.
4    Q   Why did you need that information?
5    A   I don't recall why I was asking him.  I have to
6 think a little bit.
7    Q   Okay.  If you remember, you remember.  If you
8 don't, you don't.  It's fine.
9    So what do you remember today why you asked for
10 this?
11    A   I don't remember why I asked for this.
12    Q   So in the first page about midway down, there's
13 an e-mail from you to Jennie Han again on January 24th,
14 4:23 p.m.  You are asking for Karen's start and
15 termination date with Wilshire State Bank before she
16 left Wilshire State Bank for BankAsiana.
17    Do you see that?
18    A   Yes.
19    Q   And I think this is Jennie's response to you.
20 It's highlighted or looks like it's highlighted, the
21 next paragraph.  And she's telling you that Karen was
22 originally at Liberty Bank.
23    A   Yes.
24    Q   Do you remember why you were asking Jennie for
25 Karen's start and termination date when Karen worked for

Page 78

1  Wilshire State Bank?
2      A   I went and I talked to Jennie because she was
3  the human resources manager and just to understand the
4  role of these employees at the bank.  And evidently
5  Karen had earlier worked at Wilshire Bank through a
6  merger with Liberty Bank, and there was a loss there
7  that I found interesting.
8      Q   There was a what there?
9      A   A loss.
10     Q   Okay.  What do you recall about that loss?
11     A   There was a $10,000 vault cash shortage.
12     Q   While Karen was an employee at Liberty Bank or
13  Wilshire State Bank?
14     A   I think the loss -- okay.  She worked for
15  Liberty Bank.  Wilshire Bank acquired Liberty Bank, and
16  I believe -- and it's probably in my narrative -- I
17  believe the loss occurred while she was now at
18  Wilshire Bank.
19     Q   It is in your narrative.  We're going to look
20  at it later.
21         But before we look at the narrative, what do
22  you recall about this loss other than $10,000 was short
23  from the vault?
24     A   Karen was the vault custodian.
25     Q   Was Karen suspected of being involved; do you

Page 79

1  recall?
2      A   They did an investigation, and they said it was
3  inconclusive.
4      Q   Who is "they"?  Wilshire Bank did an
5  investigation?
6      A   Yes.  It doesn't say who.  In the personnel
7  file, it never said who did the investigation.
8      Q   So there was a notation about this in Karen's
9  personnel file that Jennie Han had?
10     A   Yes.
11     Q   And you recall reviewing Karen's personnel file
12  and seeing this?
13     A   I did.
14     Q   Do you remember discussing that issue, that
15  prior loss, with Karen at Wilshire State Bank?  Do you
16  recall discussing that with anybody at Wilshire Bank?
17     A   With Jennie.  With Jennie.
18     Q   With Jennie.
19         Okay.  Anybody else?
20     A   I don't recall, but I believe it's in the
21  narrative.
22     Q   Other than writing the narrative, you don't
23  recall specifically having a conversation with anybody
24  else --
25     A   No.

Page 80

1      Q   -- at Wilshire Bank about it.
2          Okay.  That's all the questions I have for this
3  exhibit.
4          Can you get the next one, Michael, please.
5  It's previously marked Ryu 39.  I don't know if yours
6  has a sticker on it.
7      MR. YI:  It does.
8      MR. DZARA:  And it's WB 1582.
9      THE WITNESS:  I'm ready.
10     Q   BY MR. DZARA:  Okay.  I will state that I did
11  not attach the attachments as referenced in the e-mail.
12         Do you recall sending this e-mail to
13  Alicia Lee?
14     A   Yes.
15     Q   Okay.  Other than what's stated in the e-mail,
16  what do you recall was the purpose of sending it?
17     A   To let her know that I was coming.  I don't
18  think she knew I was on my way.
19     Q   Okay.  When you arrived, did she ever say to
20  you, "I didn't know you were coming until you sent that
21  e-mail"?
22     A   No.  I'm sure she probably assumed that
23  somebody would be coming out somewhere down the road,
24  but I was just giving her a head's-up that I was on my
25  way, and I could help her in any way she saw fit.

Page 81

1      Q   Okay.  You can set that aside.
2          Can we get the next one, please.
3      MR. YI:  59?
4      MR. DZARA:  Yes, it should be Ryu 59.  Yes, it's one
5  of the redacted ones, Michael, that you produced,
6  WB 1741-001.
7      MR. YI:  Okay.
8      Q   BY MR. DZARA:  Okay.  Mr. -- Orest, I keep
9  wanting to call you Mr. Hamersky.  I'm sorry.
10         Can you take a look at this e-mail and let me
11  know when you're done.
12     A   Yeah.  I, unfortunately, left my glasses in my
13  car.  So I'll try.
14     Q   I have a lot of documents to show you.
15     A   This is only the small one.  This is better.
16     Q   This is the only one that I think that's small.
17     A   Okay.  Go ahead.
18     Q   So my questions really are only -- well, my
19  first question is, do you recall this e-mail string?
20     A   Yes.
21     Q   Did you review it as part of your preparation
22  this morning?
23     A   No, I don't remember seeing this one.
24     Q   Okay.  My only concern is really the first
25  e-mail at the top from you to Dom.  You referenced

Page 82

1  camera footage.
2       Do you remember ever seeing any camera footage?
3  A   No.  They don't keep it that long.
4  Q   Regarding no. 1 in your initial comments to
5  Dom, it says:
6       "Karen Chon confessed but she may
7  change her tune later on."
8       Do you remember that she changed her tune later
9  on?
10  A   I believe she pleaded not guilty initially.
11  Q   Okay.  Do you remember -- so let's step back.
12  This is a good spot to kind of summarize some things.
13       You testified before that at the first meeting
14  that Karen confessed to Irene Lee and Bo-Young Lee.  I
15  think that was January 22nd, 2014.  I believe you
16  testified before that you don't recall -- or that she
17  didn't mention James at that first meeting; is that
18  correct?
19  A   That is correct.
20  Q   Okay.  And then the first time she mentioned
21  James was that next meeting when Alicia Lee was there
22  with Irene Lee and Bo-Young Lee; correct?
23  A   Yes.
24  Q   Do you remember if Karen -- I believe Lisa Pai
25  interviewed Karen.

Page 83

1       Do you remember that?
2  A   Yes.  After I left.
3  Q   Do you recall anything about that interview?  I
4  know you weren't there.  Do you recall learning anything
5  about the meeting?
6  A   Sorry again.  It's in the narrative, and I
7  believe she met with Karen, and I think maybe Michael
8  was there too.  And she basically admitted to them as
9  well.
10  Q   Okay.  Do you remember if she mentioned
11  anything about James at that meeting with --
12  A   I believe she did mention about James.
13  Q   Do you recall if Lisa Pai met with James and
14  interviewed him?
15  A   Oh, I believe she did, and now -- now, if I'm
16  correct, maybe Michael met with her and James instead
17  of -- initially how I explained it.
18  Q   Okay.  Do you remember what James said?
19  A   He denied any involvement.
20  Q   Are you aware if Karen was interviewed by the
21  F.B.I.?
22  A   My understanding is that she was.
23  Q   What do you know of that or do you recall
24  anything about that?
25  A   I don't know anything, but I had heard that she

Page 84

1  was interviewed.
2  Q   All right.  So you asked was the confession
3  obtained in writing.
4       Do you know if Karen ever gave a confession in
5  writing?
6  A   I know of no confession in writing.
7  Q   And then 5:
8       "For the transactions occurring prior
9  to 2013, who was preparing/altering the
10  1099s?"
11       Did you ever figure that out?
12  A   No, I never was able to figure that out --
13  Q   Your --
14  MR. YI:  David, I'm sorry.  I don't think the
15  witness finished his answer.
16  THE WITNESS:  Okay.  I don't think the issue was an
17  altering.  I think the issue was one was missing.  But I
18  did not know that at the time when I wrote this e-mail.
19       Does that make sense what I just said to you?
20  Q   BY MR. DZARA:  Yeah.  Well, sort of.
21       But I guess what this is getting at -- and I
22  think I remember seeing it in another document -- that
23  Karen was moving the money around; right?  From CD
24  accounts to the vault cash.
25       And I thought this was getting at when a 1099

Page 85

1  is issued for that CD account that she was moving money
2  in and out of, what did that 1099 say when it was issued
3  to the customer?  Because if it showed all these
4  transactions, what the customer found out in 2010 what
5  she was doing that, "Hey, what's all these transactions
6  on my 1099?"
7       So that's a long way of saying I thought this
8  was getting at who was the one who was altering the 1099
9  to hide that there was transactions being made in and
10  out of these CDs?
11  MR. YI:  Objection to form.
12  THE WITNESS:  A 1099 only shows your balance as of
13  12/31.  It's not going to show you all the movement in
14  and out; okay?
15       So I'm trying to understand why I was asking
16  this question.  Just give me a moment and let me read it
17  one more time.
18       I'm back.
19       I wanted to know who was preparing the 1099s.
20  The altering was not an issue in this case.  The issue
21  was one 1099 was missing.  But when I wrote this e-mail,
22  I had not even been out there.  I didn't know the full
23  story at that time.  So I asked a question that really
24  wasn't a valid question.
25  Q   BY MR. DZARA:  Okay.  You can set that aside,

Orest Hamersky

Page 86

1 and we'll move on to the next one, the next exhibit. It
2 should be marked Ryu 60.
3 MR. YI: Do you have the production number, David?
4 MR. DZARA: WB 1736-001.
5 MR. YI: Thank you.
6 MR. DZARA: You have a copy that has a redaction on
7 it; correct?
8 MR. YI: Yes.
9 Q BY MR. DZARA: Orest, please look at this
10 e-mail string, and let me know when you're done
11 reviewing it.
12 A I'm done reviewing it.
13 Q Okay. Do you recall seeing this e-mail string
14 before?
15 A Obviously, my name is on it, but they redacted
16 what I asked Thomas. So I'm having a difficult time --
17 I see an answer, but what is my question?
18 MR. YI: David, could we go off the record for a
19 second?
20 MR. DZARA: Sure.
21 (Discussion held off the record.)
22 (A recess was taken.)
23 MR. DZARA: Back on.
24 Q Orest, we were looking at Exhibit Ryu 60.
25 My question is, Thomas, last name spelled N-G,

Page 87

1 who is Thomas?
2 A He was the chief compliance officer of Bank --
3 Wilshire Bank.
4 Q How about Alix Nam, who is she?
5 A She was the BSA officer of Wilshire Bank.
6 Q And were they involved with your part of the
7 investigation? Were they helping you out for your part
8 of the investigation?
9 A No.
10 Q You can set that aside.
11 Let's look at the next one, Ryu 61.
12 MR. YI: David, before 61, there is one-page e-mail.
13 It's from you to scheduling.
14 Oh, okay. All right.
15 MR. DZARA: That's a cover e-mail. I sent them in
16 about four different e-mails. You can just trash that.
17 MR. YI: Okay. Never mind.
18 MR. DZARA: There might be more of them because I
19 sent four e-mails.
20 MR. YI: I'll just put those aside.
21 Q BY MR. DZARA: Let me know when you're ready,
22 Orest.
23 A Oh, I'm sorry.
24 Yes, I'm ready now.
25 Q Okay. Do you recognize this e-mail string?

Page 88

1 A Yes.
2 Q My only questions are, the second e-mail in the
3 string, it's from Lisa Pai to a bunch of people,
4 including Dom and he forwarded it to you. That e-mail
5 from Lisa, she states that there will be -- the
6 embezzlement matter is going to be reported to the local
7 New Jersey police.
8 I know you testified before about meeting with
9 the F.B.I. and U.S. Attorney's office in New Jersey.
10 Did you ever talk to any local police,
11 New Jersey police?
12 A No.
13 Q And you said you met with Michael Yi. He was
14 at that meeting.
15 And sometime after March of 2014, the meeting
16 with the U.S. Attorney's office and the F.B.I. agent,
17 did you ever talk to Michael at any other point during
18 the embezzlement investigation?
19 A Yes.
20 Q And I can't ask you about privileged
21 communications with Michael, but were any of your
22 discussions with Michael regarding interviews or facts
23 about the investigation?
24 MR. YI: Objection. I'm going to direct the witness
25 not to answer.

Page 89

1 MR. DZARA: Michael, you're a fact witness in this
2 case. You were involved in James' interview with Lisa.
3 So I think I can ask him about whether or not you
4 discussed with him your interview with Lisa and James.
5 MR. YI: I'm going to object and direct the witness
6 not to answer.
7 MR. DZARA: But you are a fact witness; right?
8 MR. YI: If you want to take that up with Magistrate
9 Judge Dixon, we can do that.
10 Q BY MR. DZARA: Orest, were you at the meeting
11 with Michael and Lisa when they interviewed James Ryu?
12 A No.
13 Q Did you learn about -- it's in the narrative
14 that you said that James denied being involved in the
15 embezzlement; correct?
16 A Correct.
17 Q Do you recall anything else that you learned
18 about that interview of James by Lisa and Michael?
19 A I don't recall anything else. I mean, it's in
20 my narrative if there was anything else.
21 Q I'm asking you right now, without looking at
22 your narrative, do you recall anything else about that
23 interview?
24 A No, I don't.
25 Q Okay. You can set this aside, and we can move

Orest Hamersky

Page 90

1  on to the next one.  It should be premarked Ryu 44.
2      Take a look at this exhibit, and let me know
3  when you're done, Orest.
4  A  Yes, I'm done.
5  Q  Do you recall seeing this e-mail string before?
6  A  Yes.
7  Q  Okay.  What do you recall about it?
8  A  Alicia had sent me an e-mail saying that she
9  saw some accounts --
10  MR. YI:  Lisa or Alicia?
11  THE WITNESS:  Alicia.  I'm sorry.
12      -- that were made by some attorneys on the back
13  in relation to New Millennium Bank.
14  Q  BY MR. DZARA:  Okay.  So is it your
15  understanding that James was receiving payments from a
16  03 firm related to New Millennium Bank?
17  A  Correct.
18  Q  Why was there interest in those statements?
19  A  He was a senior officer as well as Hong Sik Hur
20  was, and typically when senior officers are let go or
21  laid off, they sign a document that does not allow them
22  to be involved in a conflict of interest with their
23  current employer.
24  Q  So are you referring to, like, a noncompete?
25  A  Yes, but I believe they were getting severance

Page 91

1  payments.  So if you're getting severance payments, you
2  shouldn't be getting money from your new employer or --
3  I didn't see any agreement.  I'm not sure there was an
4  agreement.  It's just it looked like there may have been
5  a conflict of interest.
6  Q  And is that speculation, though, by you?
7  A  Yes.
8  Q  Okay.  So you just testified you're not aware
9  of any -- you didn't look at any of the documents
10  regarding or that laid out the terms of James Ryu's
11  departure from Wilshire Bank; correct?
12  A  Correct.
13  Q  Okay.  What do you know about -- sitting here
14  today, what do you know about James Ryu's involvement
15  with New Millennium Bank?
16  A  I don't know any involvement.
17  Q  How about H.S. Hur?  Do you know about any
18  involvement he had with New Millennium Bank, sitting
19  here today?
20  A  I don't know anything of today, but back then
21  it seemed like he was going to join them or be involved
22  with them somehow.  But I don't have any information on
23  that.
24  Q  Is that speculation on your part?
25  MR. YI:  Objection to form.

Page 92

1      THE WITNESS:  I had some reason to believe that.  I
2  don't recall why, so yes.
3  Q  BY MR. DZARA:  Okay.  You can set that one
4  aside.
5      Let's look at the next one, please.  It should
6  be premarked Ryu 62.
7  A  I'm ready.
8  Q  Okay.  I believe this is the -- it looks like
9  the initial draft of your narrative; correct?
10  A  Based on the date, it appears to be.
11  Q  And this is Bates-numbered -- I'm not sure if
12  your copy has it -- WB 11928.
13  A  Yes.
14  Q  Okay.  So you testified before that you
15  prepared this initial draft of the narrative, what you
16  recall, on your flight back from New Jersey to
17  Los Angeles; right?
18  A  Yes.
19  Q  Okay.  I guess this is Monday, February 3rd
20  when you sent it.
21      Did you kind of work on it when you got back to
22  the office that morning and then sent it to Dom?
23  A  Yes.
24  Q  So all the information that's provided in this
25  narrative, this was all information you specifically

Page 93

1  were aware of; correct?
2  A  After one week of investigating this incident.
3  Q  Okay.  I understand.
4      So some of this information you discovered, and
5  some of this information you learned from other people.
6  A  Correct.
7  Q  Other people who were involved in the
8  investigation, obviously.
9  A  Yes.
10  Q  Now, for the information that's in this
11  narrative that you didn't learn specifically yourself --
12  like, you didn't review the document or talk to the
13  person.  I'm talking about the information you learned
14  from someone else -- did you do any vetting or checking
15  to make sure that information that you learned from
16  somebody else was correct?
17  A  I believe I quoted individuals that I got
18  information from.  I verified the accuracy to all the
19  records that I had.  I'm not sure where you're going
20  with this.
21  Q  Let me ask you specific questions.
22      My general question before we get specific is,
23  everything you put in this report, you believed at the
24  time was correct.
25  A  Yes.

Page 94

1    Q   My point is, you wouldn't put anything that you
2  knew was not correct in the report.
3    A   That is correct.
4    Q   And did you ever draft a report -- a
5  narrative -- what do you want to call it?  A narrative
6  or a report?
7    A   Narrative.
8    Q   Okay.  Did you ever draft a narrative like this
9  before?
10   A   Before the January 31st one?
11   Q   Yes.  Not for this case.
12       I'm talking about this narrative was for
13  this -- obviously, this specific embezzlement you were
14  investigating.
15       Did you ever draft a narrative -- did you ever
16  draft a narrative for another embezzlement investigation
17  prior to this one?
18   A   I did, for that 20,000 one I mentioned earlier.
19   Q   And when you write these narratives, do you
20  follow the same general format in your head when you
21  draft it or are they all unique?
22   A   They're about the same.  It explains the facts
23  and a final conclusion.
24   Q   That was a bad question, but you answered it
25  accurately.  I apologize for the poor questioning.

Page 95

1       So again, you testified before that the
2  audience for this narrative was -- I believe you
3  testified was senior management; is that right?  Of the
4  bank.
5    A   Correct.
6    Q   And it was simply to, obviously, apprise them
7  of what happened to give them a written explanation of
8  your investigation and conclusions; right?
9    A   Correct.
10   Q   And I think I asked you before, but I forget.
11       Did Dom ask you to specifically write this
12  narrative or you just know that this is your job and you
13  were going to do it, no matter what?
14   A   He asked me to write it.
15   Q   Okay.  Let's look at the second page of the
16  narrative.  And in the second paragraph or I guess it's
17  the first full paragraph beginning "With the assistance
18  of Jake..."
19       Do you see that?
20   A   Yes.
21   MR. YI:  Can we just refer to it by exhibit number?
22   MR. DZARA:  What do you mean?  We're on Exhibit 62.
23   MR. YI:  Because they were subsequently updated, and
24  I think -- I imagine we're going to be looking at
25  subsequent updated drafts of narratives.

Page 96

1    MR. DZARA:  Okay.  We're looking at, we believe and
2  I think Orest testified, that this is the initial draft
3  of the narrative attached as Ryu 52.
4    Q   So page 2, first full paragraph, the sentence
5  when you look is about 60 percent down, it says
6  "Discussion with Jennie Han..."  It begins with that.
7       Do you see that?
8    A   Yes.
9    Q   Okay.  So it says:
10       "Discussion with Jennie Han, Human
11  Resource Manager, revealed that Karen was a
12  former WB employee, acquired in the
13  Liberty Bank of New York merger in 2006.  At
14  that time Karen left the Bank through
15  maternity leave under a cloud of suspicion
16  since she and/or her employees allegedly had
17  several cash shortages, of which $10,000 was
18  the largest."
19       Do you see that?
20   A   Yes.
21   Q   Now, I think you said before you learned about
22  it from Jennie Han; right?
23   A   Yes.
24   Q   And at this point had you reviewed Karen's
25  personnel file that discussed this Liberty Bank-Wilshire

Page 97

1  State Bank prior possible embezzlement or was this --
2  when you wrote this, was this solely based on what
3  Jennie had told you?
4    A   I reviewed the employee file.
5    Q   Okay.  So this states that there were several
6  cash shortages of which 10,000 was the largest.
7       What do you remember about the other cash
8  shortages?  How many were there and what denominations
9  or amounts were at issue?
10   A   I don't know because what I saw in the H.R.
11  file, it didn't specify how many; it didn't specify
12  amount.  But it did specify there were several, but they
13  did mention the 10,000 one.
14   Q   Okay.  So you were basically repeating what you
15  saw in the personnel file.
16   A   Yes.
17   Q   The next sentence:
18       "The investigation hopes to determine
19  whether this was the efforts of a bad apple,
20  rotten the second time, or whether it was a
21  well-conceived plot to steal BankAsiana
22  money to finance a bank acquisition."
23       Do you see that?
24   A   I see that.
25   Q   I want to understand what you meant by that

Orest Hamersky

Page 98

1  sentence.
2      For the first part, "determine whether this was
3  the efforts of a bad apple, rotten the second time," is
4  that whether or not Karen did this by herself and it was
5  the second time because of the prior Liberty Bank?
6      A   That's correct.
7      Q   And the second part, "or whether it was a
8  well-conceived plot to steal BankAsiana's money to
9  finance a bank acquisition."
10     Is that referring to, I guess, other people
11  being involved and payments regarding New Millennium
12  that you found?
13     A   That's correct.
14     Q   Anything else -- I don't want to put words in
15  your mouth, but anything else in that second part about
16  what you meant by that?
17     A   No, that's primarily what I meant.
18     Q   Okay.  And whether or not it was a
19  well-conceived plan, that's inferring other people were
20  involved, and you were thinking of James and H.S.?
21     A   That is correct.
22     Q   And the "finance a bank acquisition," we saw
23  the checks that were attached to that one e-mail a
24  couple of exhibits ago -- actually, it might have been
25  the last exhibit -- from a law firm to James regarding

Page 99

1  New Millennium.
2      I think you found similar checks for H.S. Hur;
3  is that correct?
4      A   That is correct.
5      Q   And that's what this is referring to,
6  basically, those checks?
7      A   Yes.
8      Q   The same page, the bottom of page 2, do you see
9  the last portion of that paragraph, it's talking all
10  about that F-One Communication issue.
11     A   Yes.
12     Q   I know you testified about it before, but I
13  think the one question I forgot to ask about this issue
14  was, did you ever conclude that James was involved in
15  any issues relating to F-One that you had investigated?
16     A   No.
17     Q   Did you ever conclude as part of that
18  F-One Communication investigation whether any employee
19  of BankAsiana did anything illegal?
20     A   Regarding the F-One Communication?
21     Q   Yes.
22     A   I didn't conclude, but it was -- there were no
23  controls over that function.  No purchase requisition,
24  no purchase orders, no packing slips.
25     MR. YI:  Off the record.

Page 100

1      (Discussion held off the record.)
2      (The record was read.)
3      Q   BY MR. DZARA:  So I guess, based on that
4  answer, Orest, you didn't conclude anybody -- did you
5  ever tell anybody, "Hey, I think somebody at BankAsiana
6  did something illegal?"
7      A   I basically indicated in the narrative
8  indicated there were no controls.  I did not specify
9  that it was illegal.
10     Q   Okay.  Thank you.
11     Let's look at page -- sorry.  Yeah, let's look
12  on page 3, please.
13     A   Okay.
14     Q   In the first full paragraph beginning with "On
15  January 29th," that's the summary that you met with the
16  F.B.I.; correct?
17     A   Yes.
18     Q   And you said you don't remember seeing any
19  written summary of your meeting with the F.B.I.?
20     A   No.
21     Q   The next paragraph begins -- it's the first
22  sentence:
23     "In conclusion, the embezzlement was a
24     well-conceived plan to defraud the bank,
25     regardless of whether James was involved."

Page 101

1      Do you see that sentence?
2      A   Yes.
3      Q   At this point you didn't conclude whether or
4  not James was involved in the embezzlement; correct?
5      A   That is correct.
6      Q   I know we talked -- you testified before about
7  James' involvement and what evidence you saw.
8      Did you ever make a specific -- we'll look at
9  it in the other versions of the narrative.
10     But did you ever make a specific conclusion in
11  the narrative whether or not James was involved?
12     A   I don't believe I concluded.
13     Q   Okay.  The bottom of that same paragraph, the
14  third-to-last sentence states:
15     "With the exception of the
16     New Millennium Checks which Orest has not
17     seen yet and the missing hard drives, there
18     is no documentary evidence at this time that
19     James and Hong are linked to the crime."
20     Do you see that sentence?
21     A   Yes.
22     Q   Did you ever locate any documentary evidence
23  linking James or H.S. Hur to the embezzlement?
24     A   No.
25     Q   Okay.  That's it for this exhibit.  You can set

Orest Hamersky

Page 102

1 it aside.
2      Can you grab the next one, please, Michael.  It
3 should be premarked Ryu 21.
4      Before you read it, Orest, this is a memo or
5 written report from the F.B.I. purportedly summarizing
6 their meeting with you and Alicia.  So that's the
7 backdrop for this.  I know you said you weren't aware of
8 a written summary.  This is a written summary.  So I
9 imagine --
10      Well, my first question is, did you review this
11 in preparation of your deposition?
12 MR. YI:  Objection to form.
13 THE WITNESS:  I've never seen this document.
14 Q   BY MR. DZARA:  Okay.  Well, I want you to read
15 it, and I want you to read the whole thing because I'm
16 going to ask you questions about it.
17      So can you take a couple minutes and read this.
18 A   Sure.
19 Q   And then I'll ask my questions.  Thank you.
20      I'm going to step out while you're reading it.
21      (Discussion held off the record.)
22 MR. YI:  While you stepped out, I indicated to the
23 witness that the reference to Chon-Kim in the document I
24 believed was Karen Chon.
25 MR. DZARA:  Okay.

Page 103

1 THE WITNESS:  All right.  I'm ready, David.
2 Q   BY MR. DZARA:  All right.  Thank you.
3      So although this report is just what Alicia Lee
4 told the F.B.I., but in reading this, do you remember
5 some of the information summarized in this report was
6 from you too?
7 MR. YI:  Objection to form.
8 THE WITNESS:  Yeah, I imagine they -- yeah, I was
9 there, so I imagine they took it from both of us.
10 Q   BY MR. DZARA:  Okay.  In reading this report,
11 do you remember you specifically telling them some of
12 the information that's summarized?
13 A   Yes.
14 Q   Okay.  When you read this just now, did
15 anything in it appear inaccurate to you?
16 A   Yeah, there were some minor things.  Like, it
17 says that we are both auditors.  Alicia wasn't an
18 auditor.
19 Q   Okay.  Anything else?
20 A   Some of the events mentioned here, I don't
21 recall.  Like, they talk about a romantic relationship.
22 I don't recall that being discussed.  But it very well
23 may have, but --
24 Q   Those are the things I'm going to get to,
25 specific questions.

Page 104

1      So let's go back -- let's go to page 2.
2 A   All right.
3 Q   Do you see the second-to-the-last paragraph, it
4 begins with, "Chon-Kim says she personally spent only
5 200,000"?
6 A   Yes.
7 Q   I'll read the whole sentence.
8      "Chon-Kim says she personally spent
9      only 200,000 of the $1.6 million of stolen
10     client money.  The rest she gave to
11     James Ryu, the bank's Chief
12     Operations/Compliant Officer."
13     Do you see that?
14 A   I see it.
15 Q   Do you recall that being discussed at the
16 meeting with the F.B.I.?
17 A   Yeah, but I thought it was a lot higher than --
18 I thought that the amount that Karen spent was half a
19 million and the rest went to James.  That dollar figure
20 I don't recall.
21 Q   Who do you recall learning that information
22 from?
23 A   The statement that I just said?
24 Q   Yes.
25 A   I would think it was -- hopefully I mentioned

Page 105

1 it in my narrative, but I don't recall where that
2 information came from.
3 Q   Okay.  Let's look at the next page, page 3.
4 The top of the first paragraph -- I mean, the bottom of
5 the first paragraph, the sentence:
6      "Chon-Kim said that Ryu never
7      communicated with her via e-mail, but would
8      call her and use codes to tell her when to
9      meet with cash."
10     Do you see that?
11 A   Yes.
12 Q   Okay.  Do you remember or recall this
13 information being discussed with the F.B.I.?
14 A   I remember all of it except the word "codes."
15 Q   Okay.  That's my question.
16     Do you know what the "codes" is referring to?
17 A   I don't.
18 Q   The third full paragraph on that page, it
19 begins with:
20     "Chon-Kim was employed as a teller at
21     Liberty Bank."
22     Do you see that paragraph?
23 A   I see it.
24 Q   So we've already discussed all that in your
25 deposition, but this is as of -- and I believe you were

Orest Hamersky

Page 106

1  interviewed by the F.B.I. on January 29, 2014.
2      Do you recall was it you or Alicia who
3  disclosed this information to the F.B.I. at this
4  meeting?
5    A  I don't recall who disclosed it.
6    Q  Were you aware of this information at the time?
7    A  Yeah.
8    Q  You had reviewed the personnel records?
9    A  Yeah, because I believe I reviewed the
10  personnel records before I even went out there.
11    Q  Okay.  Thank you.  I was unclear about the
12  timeline.
13      The one paragraph -- the two paragraphs down,
14  it's about the rumors about a romantic relationship
15  between James and Karen.
16      Are you aware of any of those rumors?
17    A  I was not aware of a romantic relationship.
18    Q  The next sentence talks about Karen spent a lot
19  of time gambling.
20      Do you recall any information about that?
21    A  Yes.
22    Q  What do you recall?
23    A  Okay.  In the personnel file -- and it's also
24  in the narrative -- some employees had gone through her
25  purse and found $4,000 in cash and some gambling

Page 107

1  receipts.
2    Q  So this is what that's in reference to?
3    A  I would imagine.
4    MR. YI:  David, just for the record, I believe you
5  had mentioned that this meeting -- interview may have
6  taken place January 29th, 2014.
7      I just want to point out that this document
8  says "Interview of Alicia Lee," and then it has a date
9  of January 28, 2014.  I mean, I don't know.  I'm just
10  pointing it out.
11    Q  BY MR. DZARA:  The next paragraph discusses --
12  it says Alicia "found that Chon-Kim's husband's business
13  account had suspicious cash deposits during the time of
14  Chon-Kim's fraud."
15      Do you see that?
16    A  Yes.
17    Q  I don't think you testified today about the
18  relationship between -- anything about the relationship
19  between Karen and her husband and her husband's
20  businesses.
21      So my question is, do you recall anything
22  regarding this issue, that sentence I just read?
23    A  Yes.  In fact, Karen's first account that she
24  was taking money out was her husband's business account
25  partner, Eunchul Paek, E-U-N-C-H-U-L P-A-E-K.

Page 108

1    Q  And that was her husband's business partner?
2    A  Yes.  As far as we could tell.
3    Q  Okay.  This is referring to her husband's
4  business accounts.  So --
5    A  Oh.
6    Q  Tell me what you recall about any relationship
7  between her husband and his business account and the
8  embezzlement.
9    A  There were several bagel business accounts
10  under her husband's name.  And it appeared that she
11  was -- she wasn't a signer on those accounts, and she
12  was writing checks, forging checks to that effect on
13  those accounts.
14    Q  Was she depositing large cash deposits into
15  those?
16    A  No, not large ones.  The large ones didn't come
17  until later.
18    Q  And where were the large ones being deposited?
19    A  No.  When I say -- when I meant deposited, the
20  large transactions were coming out of other customers'
21  accounts.  I saw smaller transactions coming out of the
22  business account -- the husband's business account.
23    Q  Coming out or going in?
24    A  Coming out.  But at the very end right before
25  she left the bank, she replenished the account to the

Page 109

1  tune of $200,000.  So even though there were a lot of
2  small transactions coming out, they were replenished by
3  taking from another customer's CD account.
4    Q  So she was taking small deposits out of her
5  husband's business account --
6    A  No, would --
7    Q  -- or his business partner's account?
8    A  I'm sorry.
9    MR. YI:  Let him finish.
10    THE WITNESS:  She wasn't taking deposits.  She was
11  taking withdrawals out of the husband's business
12  account, and some were in cash; some were going to other
13  accounts.
14    Q  BY MR. DZARA:  So to you it appeared that she
15  was stealing from her husband's business?
16    A  Yes, because she's not an authorized signer on
17  that account.
18    Q  The last sentence of this paragraph says:
19      "Lee has not found similar deposits in
20      Ryu's account."
21      And I believe you testified about before you
22  didn't find any, I guess, suspicious cash deposits in
23  Ryu's account linking him to the embezzlement?
24    A  There were cash deposits but not to the extent
25  that you would expect for -- I mean, they were common to

Orest Hamersky

Page 110

1  somebody holding that office.
2      Q    So is this sentence accurate, the one I just
3  read?
4      A    Yes.
5      Q    The next paragraph, it's referring to an
6  employee loan that H.S. Hur asked Irene Lee to take and
7  give the money to James.
8          Do you see that?
9      A    Uh-huh, yes.
10     Q    Do you recall anything about that issue?
11     A    I knew there was an employee loan, but I don't
12 know if the former CEO was involved like it states.
13     Q    Okay.  What do you know about it?  What do you
14 know about an employee loan?
15     A    Well, he had an employee loan and he had a
16 401(k) loan, and it was eventually paid off.  And the
17 point I made earlier is he had several loans out there
18 that suggest that he may have been in financial stress.
19     Q    Okay.  So this is referring to an employee loan
20 Irene Lee would take out and give the proceeds of the
21 loan to James.
22         Do you recall anything about that other than
23 what's written here; do you recall?
24     A    It says:
25         "Lee" -- so that's going to be

Page 111

1      Alicia -- "stated that Irene Lee was asked
2      by the former CEO to take out a $25,000
3      employee loan from the bank and to lend the
4      money to Ryu."
5          I don't know who the loan was to based on this
6  statement.
7      Q    Okay.  I believe the statement is saying that
8  H.S. Hur, the former CEO of BankAsiana, asked Irene Lee
9  to take out -- to have Irene Lee take out an employee
10 loan for herself and give the proceeds of that loan --
11 to lend the proceeds of that money to James.  That's
12 what I believe this sentence is saying.
13         Do you know anything about that?
14     A    No.
15     Q    The next sentence talks about James and H.S.
16 taking their work computers with them when they left
17 Wilshire Bank.
18         Do you see that?
19     A    Yes.
20     Q    And I believe that's discussed in your
21 narrative too, some versions of it.
22         What do you recall about that?
23     A    What I recall is Hong Sik Hur's desktop was
24 missing, James Ryu's laptop was missing and James Ryu's
25 desktop was missing.

Page 112

1      Q    Do you recall anything else about that?
2      A    I recall later in the narrative that all of
3  these devices were subsequently returned, and I believe
4  Michael sent a demand letter to one of the individuals
5  or maybe both requesting the devices back.
6      Q    Anything else on that issue that you recall?
7      A    That's all that I recall on that.
8      Q    Okay.  Those are all the questions I have on
9  this memo or exhibit.
10         Let's go off the record for a second.
11         (Discussion held off the record.)
12 MR. DZARA:  Back on the record.
13     Q    Let's look at the next exhibit.  It should be
14 premarked Ryu 63.
15     A    Yes.  I'm ready to discuss.
16     Q    Okay.  Do you recall this e-mail?
17     A    Yes.
18     Q    Did you review this in preparation for this
19 deposition this morning?
20     A    I don't remember seeing this one.
21     Q    So on the first e-mail or the older e-mail in
22 this string, it's an e-mail from you to Dom, and you're
23 referencing a meeting you had with Lisa.
24         Do you see that?
25     A    Yeah, I'm looking at the one on 11:30 -- let's

Page 113

1  say, at 8:01 a.m.?
2      Q    Correct.
3      A    Yes, go ahead.
4      Q    So it references a meeting you had with Lisa.
5          Do you recall that meeting?
6      A    No, I don't recall it.  But there's no doubt we
7  met because I said I did.
8      Q    Got it.
9          So you state in your e-mail that you met with
10 her yesterday to discuss the investigation, and your
11 next sentence:
12         "It appears that the F.B.I. will
13     perform a surprise visit with Karen very
14     soon."
15         Based on the sentence structure, is it correct
16 to assume that you learned that from Lisa during that
17 meeting?
18     A    I don't recall where I learned about that.
19     Q    Okay.  So you remember that the F.B.I. was
20 going to perform a surprise visit on Karen?
21     A    Somehow I knew that.  I don't recall how I knew
22 it.
23     Q    Okay.  Did you ever learn about if the F.B.I.
24 did meet with Karen?
25     A    I heard that they did meet with her.

Page 114

1    Q   I don't recall if any of that was in any of the
2  versions of the narrative, so that's why I'm asking.
3    A   Yeah, I don't --
4    Q   So do you recall what happened at any meeting
5  between her and the F.B.I.?  "Her" being Karen.
6    A   Yeah.  No, I'm sorry.  I don't remember what
7  they discussed or what she said.
8    Q   You do not need to apologize.  Whatever you
9  remember is what you remember.  That's all we're trying
10  to figure out today.
11    MR. YI:  David, do you have a production number for
12  this exhibit?
13    MR. DZARA:  I don't think it had one, actually.
14  There were a number of e-mails I used in Dom's
15  deposition -- and now we're using them again -- that
16  were a group of e-mails attached to another e-mail --
17    MR. YI:  Okay.
18    MR. DZARA:  -- that you produced.  So those e-mails
19  that were attached had no Bates numbers on them.
20    MR. YI:  Okay.
21    Q   BY MR. DZARA:  The last sentence in the first
22  paragraph says:
23       "Hopefully, she will provide evidence
24  to implicate others, if others were
25  involved."

Page 115

1       So do you see that?
2    A   Yes, I do.
3    Q   So apparently at this time period,
4  February 4th -- we kind of talked about it before --
5  there's no conclusion -- you have not reached a
6  conclusion at this stage as to whether anyone else is
7  involved; correct?
8    A   Correct.
9    Q   And I think I know the answer to this, but do
10  you know if Karen ever provided any evidence to the
11  F.B.I. about if anybody else was involved?
12    A   I don't know if she did provide any evidence.
13    Q   So Dom responds to your e-mail and says:
14       "Let's discuss when I get to the
15  office.  I will need far more details on how
16  all this came about and what is actually
17  needed."
18       Do you see that?
19    A   I see it.
20    Q   Do you remember meeting with Dom in response to
21  these e-mails?
22    A   Not specifically, but undoubtedly I did meet
23  with him.
24    Q   Going back to the e-mail you sent to Dom, the
25  last paragraph, you state that you're proposing that

Page 116

1  Carol and perhaps Kathy drop everything and work on this
2  investigation until it's complete.
3    A   Yes.
4    Q   Who are Carol and Kathy?
5    A   They were two of my staff auditors.
6    Q   Did they ever assist you in this investigation?
7    A   Carol assisted me quite a bit.
8    Q   Is Carol's last name Shin, S-H-I-N?
9    A   Yes.
10    Q   Did Kathy assist?
11    A   If she did, it was very minimal.
12    Q   Okay.  Let's go to the next one.  It should be
13  marked Ryu 26.
14       I apologize, Michael.  I don't have the Bates
15  number on this.
16    MR. YI:  Let him know when you're ready.
17    THE WITNESS:  Okay.  Yeah, I'll let him know.
18       Okay.  Go ahead.
19    Q   BY MR. DZARA:  You were not a sender or
20  receiver on this e-mail, so I assume you don't recall
21  seeing this e-mail before.
22    A   I never saw it.
23    Q   Okay.  The second paragraph in this e-mail from
24  Dom to Lisa, it states:
25       "According to Orest, you directed him

Page 117

1  to try to find a link between one or more
2  people and some of the key participants."
3       Do you see that?
4    A   I see it.
5    Q   Do you remember Lisa ever telling you to find a
6  link between people and the key participants in the
7  embezzlement?
8    A   She had given me some information specifically
9  on those SBA loans, CLEO Riverside and CLEO Park Avenue,
10  and she said, "There may be some relation to this
11  investigation.  You should look in that direction too."
12    Q   Okay.  And I know you talked about -- you
13  testified about the CLEO loans --
14    A   Yes.
15    Q   -- SBA loans before.
16       Let me finish.
17       And you testified before, I believe -- and
18  correct me if I'm wrong -- that you didn't find the link
19  between the CLEO SBA loan and the embezzlement; right?
20    MR. YI:  Objection to form.
21    THE WITNESS:  Correct.
22    MR. DZARA:  Okay.  That's the only question I have
23  on this.
24    Q   Look at the next one, Ryu 64.  It should be
25  premarked.

Page 118

1    Orest, I don't want you to read this. Just
2 take a look at it and get acquainted with it.
3    A   All right.
4    Q   Do you recall seeing this e-mail and attachment
5 before?
6    A   Yeah, it looks familiar.
7    Q   Okay. Do you recall if you reviewed this this
8 morning in prep for the deposition?
9    A   I don't recall. I looked through a lot of
10 documents, but I didn't look very detailed.
11    Q   Okay. I believe that we looked at Ryu 62,
12 which was the initial draft of this narrative. I
13 believe this is Dom's response to the edit of that
14 draft.
15    Does that sound right?
16    A   Let me look at 62. Just give me a moment.
17    I don't think so. 62 was dated January 31st,
18 and it was e-mailed on 2/3. This e-mail is on 2/4. So
19 it seems like 62 went out before this was edited.
20    Q   My question is Ryu 62 is the initial draft, and
21 then Ryu 64 now is Dom's edit to that draft.
22    A   It's possible. Oh, I see. Yeah, it's probable
23 because I'm looking at the date on it.
24    But go ahead.
25    Q   In the edited version of this narrative, can

Page 119

1 you see the draft changes in them?
2    And those were Dom's edits?
3    A   All the crossed-out were -- would have been his
4 edits.
5    Q   Did you ever meet with him or discuss with him
6 why he made these changes?
7    A   No. I just made the changes.
8    Q   So he writes in his cover e-mail:
9    "My goal was to take out opinion and
10 flowery prose."
11    Do you see that?
12    A   I see that.
13    Q   I know you're not Dom. I'm asking if it's your
14 understanding or do you have any other information
15 regarding whether or not the edits Dom made were purely
16 to take out opinion and flowery prose or was there any
17 other reason that Dom explained to you?
18    A   I think he was just trying to take out opinion
19 and flowery prose.
20    Q   And it was your understanding you made these
21 changes and moved on.
22    A   Yes.
23    Q   Okay. You can set it aside.
24    The next one should be marked Ryu 25.
25    MR. YI: Yeah. I should just point out, David, that

Page 120

1 Ryu 64 that we just looked at appears to have Ryu 25
2 attached to it. I don't know if you intended that or
3 not.
4    MR. DZARA: I did not.
5    MR. YI: Okay.
6    MR. DZARA: They were separate PDFs when I e-mailed
7 them, so I guess it was just a collating issue.
8    MR. YI: Well, they're not the same. The copy
9 that's attached to Ryu 64 does not have the actual
10 deposition exhibit. It's just written Ryu 25.
11    But in any event, I just wanted to let you know
12 that it has a couple of attachments, Ryu 64.
13    MR. DZARA: Ryu 64 should just have one attachment,
14 the narrative.
15    Let's go off the record for a second.
16    (Discussion held off the record.)
17    Q   BY MR. DZARA: So Orest, you have in front of
18 you Ryu 25. It has one attachment to it. Just take a
19 quick look at the e-mail and the attachment, and I'm
20 going to direct you to specific parts of the e-mail.
21    A   All right.
22    Q   Okay. Do you remember seeing this e-mail and
23 the attachment before?
24    A   Vaguely, but I'm sure I prepared it because my
25 name is on it.

Page 121

1    Q   Well, let's look at --
2    Okay. So you were a recipient of this e-mail
3 from Dom. You were copied on it.
4    A   Yeah, copied on it.
5    Q   So the e-mail from Dom to Lisa, the second
6 sentence says:
7    "The first is your edited version of
8    Alex Ko's timeline and the second is my
9    edited version (via Track Changes) of
10    Orest's summary."
11    Do you see that?
12    A   Yes.
13    Q   Okay. So the first is referring to the first
14 attachment to the e-mail. And based on Dom's e-mail, it
15 appears that this is a timeline drafted by Alex Ko that
16 was then edited by Lisa Pai.
17    Is that your understanding or interpretation of
18 the e-mail too?
19    A   Give me a moment. It sounds from this e-mail
20 that Alex Ko did the timeline.
21    Is that what you're asking?
22    Q   Correct. That's what I'm asking. Yup.
23    A   Okay. Go ahead.
24    Q   So do you remember reviewing this timeline
25 before sitting here today?

Page 122

1  A  Well, I would imagine I reviewed it back on
2  February 4th, but I don't recall reviewing it since.
3  Q  Okay.  Who was Alex Ko?
4  A  The chief financial officer of Wilshire Bank.
5  Q  And was he involved in any of this embezzlement
6  investigation?
7  A  I was not aware that he was involved.
8  Q  Okay.  Well, these e-mails are saying Alex Ko
9  drafted the timeline, and if you look at the timeline,
10  the timeline is all about the embezzlement.
11  So does that change your understanding of
12  whether or not Alex Ko was involved?
13  A  Well, if he prepared this document, then he
14  knew -- he might have gotten some of the information
15  from my narrative.
16  Q  Okay.  That's my question.
17  The information in this timeline, do you know
18  where it came from?
19  A  No, I don't.
20  Q  Let's look at the second page of the timeline
21  under January 24th.
22  A  Yes.
23  Q  The first bullet point references an insurance
24  claim made by the bank.
25  A  Yes.

Page 123

1  Q  Do you know anything about or recall anything
2  about any insurance claim made for the embezzlement by
3  the bank?
4  A  I'm not familiar with this insurance claim
5  mentioned here.
6  Q  Okay.  That's my only question, if you're aware
7  or know or recall any information about any insurance
8  claim.
9  And your answer is "no"; correct?
10  A  Yeah, I'm not -- I'm not familiar with this
11  Rampart Group or that we made an insurance claim.  I
12  knew they talked about insurance claims, but I didn't
13  know any of the details.
14  Q  Flip the page to the section regarding
15  January 25th.
16  A  Okay.
17  Q  The second bullet states:
18  "James Ryu's investment in
19  New Millennium Bank is confirmed by the
20  check copies."
21  Do you see that?
22  A  Yes.
23  Q  Is it your understanding that James was an
24  investor in New Millennium Bank?
25  A  I don't know if he was.  All I did was see

Page 124

1  checks from some attorney, and I believe they referenced
2  New Millennium on the memo line or somehow -- there was
3  some documentation that referenced New Millennium.
4  Q  And we looked at those checks already.  Maybe
5  not all of them, but we looked at an exhibit that had
6  some of them.
7  So my question, then, is, do you know where
8  Alex Ko got that information from to draft this bullet
9  point?
10  A  I don't know.
11  Q  The next section, January 26, if you look at --
12  I guess it's the second-to-last bullet point in that
13  section.  It states:
14  "Regulator's separate investigation is
15  expected, where professional/independent
16  investigation report will be more relied by
17  regulator and earn higher credit."
18  Do you see that?
19  A  I see that.
20  Q  Do you recall any separate investigation by any
21  bank regulators regarding the embezzlement?
22  A  All I recall about bank regulators is they came
23  in the week before I flew out there, and we apprised
24  them of a potential loss to the bank.  I don't know
25  anything else if they did any investigation.

Page 125

1  Q  When did they come in to --
2  A  If I recall correctly, they come in annually or
3  18 months, and they just -- the FDIC does their annual
4  audit, and they had just come in maybe a week before I
5  had gone out or maybe a week after.  But it was all in
6  the time frame where management felt they needed to let
7  the regulators know that there's an embezzlement out
8  there.
9  Q  Okay.  Do you recall any separate investigation
10  completed by the regulators into the embezzlement?
11  A  I don't recall any.  I had one examiner came
12  and just asked me some -- like, a summary about what had
13  happened.  But whether they did an investigation, I
14  don't recall.  I don't know.
15  Q  Do you recall ever seeing a report generated by
16  regulators of any investigation?
17  A  No.
18  Q  Okay.  You can set that one aside.  Let's go to
19  the next one, Ryu 65.
20  You don't have to review this.  Let me just ask
21  you one question.  And I think you testified to this
22  before.
23  Did you review any audit reports prepared for
24  BankAsiana or by BankAsiana or any external auditors of
25  BankAsiana in the merger process with Wilshire Bank?

Orest Hamersky

Page 126

1  A  No.
2  Q  I believe Dom did.
3     Do you remember -- well, let me ask the
4  question differently.
5     Do you recall talking to Dom about his review
6  of any external or internal audit records of BankAsiana
7  prior to the merger?
8  A  No.
9  Q  All right.  You can set that aside.
10    Let's go to Ryu 66.  It should be the next one.
11 A  Okay.  Go ahead.
12 Q  This might be duplicative of some of the issues
13 we talked about.
14    Let me ask you the first question.  Sorry.
15    Do you recall seeing this e-mail string before?
16 A  I didn't see it this morning, but my name is on
17 it so I'm sure I wrote this.
18 Q  Well, this e-mail string talks about H.S. Hur
19 and finding checks linking him to New Millennium Bank
20 and the same thing for James' checks regarding linking
21 him to New Millennium Bank; right?
22 MR. YI:  Objection to form.
23 THE WITNESS:  Yeah, that's what it's saying.
24 Q  BY MR. DZARA:  So we've looked at some of these
25 checks before.

Page 127

1     Now, these might be duplicates of ones we
2  looked at before for James.  I think this is the first
3  time we're looking at ones for H.S. Hur.
4     And again, they were just concerned about
5  their -- remind me again what your concern was about
6  New Millennium Bank at this time, February 7, 2014, why
7  you were concerned about these checks involving
8  New Millennium Bank.
9  A  Well, I believe Hong Sik Hur wasn't let go
10 initially, and so he's getting a package -- a financial
11 package from Wilshire Bank -- basically, a salary -- and
12 now he's getting money from another bank.  That's
13 conflict of interest.
14 Q  Okay.  Regarding James, what was your concern
15 at the time?
16 A  Similar.
17    But back to Hong Sik Hur, I think there --
18 wasn't there a larger check, like, for 300,000 in my
19 narrative?  I don't see it here unless I'm not seeing
20 it.  I thought there was --
21 Q  There's no check there.
22 A  Okay.  But in my narrative, didn't I mention a
23 larger check than these?
24 Q  I'm not sure.
25    It doesn't really matter.  I'm only concerned

Page 128

1  about James and just what your concern was again
2  regarding James and New Millennium Bank at this time,
3  February 7, 2014.
4  A  Again, I don't recall right off the hand when
5  he was let go, but if he's getting a severance package
6  from Wilshire Bank and at the same time he's getting
7  paid a salary from a competitor, that concerns me.
8  Q  Okay.  And we talked before you speculated --
9  you never saw any severance documents regarding James or
10 Wilshire Bank, so some of this conflict of interest
11 concerns was kind of speculation; right?
12 MR. YI:  Objection to form.
13 THE WITNESS:  Yes.  But all top executives aren't
14 leaving empty-handed.
15 Q  BY MR. DZARA:  You're speculating he didn't
16 leave empty-handed.
17 MR. YI:  Objection to form.
18 MR. DZARA:  Michael, you don't want him to
19 speculate.  I'm just trying to confirm that he
20 doesn't -- he's speculating.
21 THE WITNESS:  I'm telling you the real world.
22 That's what it is.
23 Q  BY MR. DZARA:  But in terms of James, it's
24 speculation; correct?
25 A  If you insist.

Page 129

1  Q  Well, I'm asking --
2  MR. YI:  Do you have an understanding?
3  Q  BY MR. DZARA:  If you didn't see the severance
4  documents, everything else is speculation.
5  MR. YI:  If you know.
6  Q  BY MR. DZARA:  I'm not trying to pick a fight
7  with you.  I'm just trying to get your understanding.
8     Okay.  I think now is good time to take a break
9  because I'm clearly not going to get done by 5:00.
10    (Whereupon, the deposition was recessed
11    for lunch at 1:57 p.m.)
12              *  *  *
13
14
15
16
17
18
19
20
21
22
23
24
25

Orest Hamersky

Page 130

1  Los Angeles, California; Thursday, February 15, 2018
2              2:30 p.m.
3              * * *
4
5        EXAMINATION (CONTINUED)
6  BY MR. DZARA:
7    Q   Okay.  Let's move on to the next exhibit, which
8  should be premarked Ryu Exhibit 67.
9        Just take a look.  There's two attachments.  I
10 didn't attach the third, which was a gigantic Excel
11 spreadsheet.  Just take a peek at it.
12   A   Yes, I'm familiar with this.
13   Q   This is Bates no. WB 11927.
14       And do you recall seeing this e-mail and the
15 two attachments before?
16   A   Yes.
17   Q   Just tell me what you recall about this e-mail
18 and the attachments.
19   A   Well, as you can tell, there was a subpoena,
20 and we had to produce documents.  So this was the net
21 result after I had produced all the documents for the
22 subpoena.
23   Q   And the subpoena was from the U.S. Attorney's
24 office?
25   A   I believe so.  I don't recall right off the

Page 131

1  bat.
2    Q   Was it related to the criminal matter?
3    A   Yes.
4    Q   Okay.  That's it for this.  You can set that
5  aside.
6        The next one is not marked.  It's a one-page
7  e-mail, Michael, from Orest from Jennie Han.
8        What number --
9  MR. DZARA:  This is Ryu 79.
10       (Whereupon, the document referred to
11 was marked for identification as Ryu
12 Exhibit 79.)
13 MR. DZARA:  So it's Bates no. WB 1937.
14 MR. YI:  I'm sorry.  Can you give that to me again.
15 MR. DZARA:  WB 1937.
16 MR. YI:  Thank you.
17   Q   BY MR. DZARA:  Let me know when you're ready,
18 Orest.
19   A   I'm ready.
20   Q   Okay.  Do you recall this e-mail string?
21   A   I don't recall it, but my name's on it so --
22   Q   Okay.  It looks like an e-mail between you and
23 Jennie Han dated February 26, 2014, and it concerns you
24 reviewing personnel files for Karen Chon, Jenna Lee,
25 James Ryu and H.S. Hur; is that right?

Page 132

1    A   I see only Karen Chon and Jenna Lee.  I don't
2  see the last two people you're talking about.
3    Q   The last sentence of the e-mail, "Do you have
4  personnel files for James Ryu..."
5    A   Okay.  I'm sorry.  I see that.
6    Q   My question is, did I accurately state what
7  this e-mail says?
8    A   Yes.
9        MR. YI:  Objection to form.
10   Q   BY MR. DZARA:  And you testified before about
11 reviewing personnel files, but I think your testimony
12 before concerned -- you say you might have reviewed
13 them before you left for New Jersey.  That would have
14 been late January.  These e-mails are late February.
15       Is this a rereview of the personnel files or is
16 this the first time you're reviewing them?
17   A   Well, the first time I looked at Karen's, and I
18 believe that's all I looked at.  This time I'm looking
19 at Jenna, James and Hong Sik Hur's.  And Karen as well.
20   Q   So this is a repeat review of Karen's.  The
21 first time you believe you were reviewing the other
22 three?
23   A   I believe so.
24   Q   And do you remember reviewing all four of these
25 people's personnel files?

Page 133

1    A   Yes, I remember reviewing them.
2    Q   Right around this time, late February --
3    A   I don't recall when I did it, but I recall
4  reviewing all affiliated parties -- concerned parties.
5    Q   Well, before Karen, Jenna, James and H.S.?
6    A   Yeah, there was another one, but they didn't
7  have the file on them so --
8    Q   Who was the other one?
9    A   Kenny Hong.
10   Q   All right.  You can set that aside and move on
11 to the next one.
12       It's one page -- excuse me -- one-page e-mail
13 with a one-page attachment, Michael.
14 MR. YI:  There's an attachment?  Ah, it's on the
15 back.
16       Will this be Ryu 80?
17 MR. DZARA:  Let me talk.
18       It should be an e-mail from Carol Shin to
19 Janet Lee; is that right?
20 MR. YI:  Yes.  And the attachment is on the back.
21 MR. DZARA:  Okay.  And this has not been marked.  We
22 will mark it Ryu 80.
23       (Whereupon, the document referred to
24 was marked for identification as Ryu
25 Exhibit 80.)

Orest Hamersky

Page 134

1    MR. YI:  Do you have the production number?
2    MR. DZARA:  WB 1941.
3    MR. YI:  Thank you.
4    Q    Let me know when you're ready, Orest.
5    A    I'm ready.
6    Q    Okay.  So this is an e-mail from Carol Shin.
7        I believe you said she was one of the internal
8    auditors that assisted you; right?
9    A    Yes.
10   Q    And she's e-mailing Janet Lee, and she copied
11   you.
12       Who is Janet Lee?
13   A    I don't know, but I'm guessing they're in the
14   wire department.
15   Q    Okay.  And this e-mail concerns Carol asking
16   Janet for information for a $40,000 and change wire into
17   James' Wilshire Bank account; is that correct?
18   A    That is correct.
19   Q    And this wire was made on February 3rd, 2014,
20   is the date of the wire; correct?
21   A    Correct.
22   Q    And the second page here, it's an attachment to
23   this e-mail, and it looks like it's a screenshot or
24   printout of James' Wilshire Bank account; correct?
25   A    Correct.

Page 135

1    Q    What was your interest in this wire and what do
2    you recall about it?
3    A    As you recall, I was looking at Hong Sik Hur's
4    account, James' account, Jenna's account, everybody's
5    account looking for suspicious activity.  And I saw this
6    large wire for 40,000, so I wanted to see what it was.
7    Q    And this wire was on February 3rd, 2014.  So
8    that's way past --
9    A    Right.
10   Q    -- the embezzlement time period; right?
11   A    Right.  But I'm still investigating, so I just
12   want to see -- I'm looking for any clues that I can find
13   on all the parties.
14   Q    And do you recall what your resolution was or
15   investigation was into this wire payment?
16   A    It's stated in the narrative, but I didn't make
17   any comments, so I didn't conclude whether it was, you
18   know, suspicious or not.  So my recollection is it was
19   just a large wire, and I had no comment on it.
20   Q    Okay.  You can set that aside.
21       Let's look at the next one.  The next exhibit
22   is premarked Ryu 50.  And it has a Bates number of
23   WB 11930.
24   MR. YI:  Can you give that to me again.
25   MR. DZARA:  11930.

Page 136

1    MR. YI:  Thanks.
2    Q    BY MR. DZARA:  This is a one-page e-mail from
3    Lisa Pai to a bunch of bank employees, including you and
4    also somebody from Crowe Horwath.
5        Do you recall Crowe Horwath's involvement in
6    this matter?
7    A    They were the external auditor, and they were
8    always interested in knowing what the total loss to the
9    bank would be.  That was their -- they certified the
10   financial statements for Wilshire Bank.  So by
11   certifying the financial statement, if there's something
12   really material that they should report, they want to
13   know about it.
14   Q    And they were not BankAsiana's external
15   auditor.
16   A    I do not know who BankAsiana's was.
17       Can you hear me?
18   Q    Yeah.  I'm sorry.
19       The attachment is -- was that prepared by you?
20   A    Yes, this was.
21   MR. YI:  And the attachment is on the back.
22   MR. DZARA:  Correct.
23   Q    And if you go back to Lisa's e-mail, she says
24   that this one-page summary is backed up by a spreadsheet
25   from you.  I imagine -- I think that's the second

Page 137

1    attachment.  I didn't provide it because I think it's
2    that big, long legal-sized Excel spreadsheet that you
3    prepared.
4    A    That's correct.
5    Q    Does that sound right?
6    A    Yes.
7    Q    Okay.  So the loss amount is at this point
8    about approximately 1.6 million; right?
9    A    That is correct.
10   Q    And Lisa states in her second paragraph of her
11   e-mail that the amount could still change in the future
12   based on learning additional information.  But at this
13   point the bank had "concluded our external investigation
14   of the loss amount with this report."
15   A    As of that date.
16   Q    As of that date, yeah.
17       Is that correct?
18   A    That is correct.
19   Q    So this is just concluding the loss amount.
20   This wasn't concluding -- you were still doing your
21   other parts of the investigation, still working on the
22   narrative; right?
23   A    Yes, because this is dated February 26, and I
24   was still -- my last narrative, I believe, was the end
25   of March.

Orest Hamersky

Page 138

1  Q   So any other significance to this e-mail other
2  than Lisa telling some people that this is the loss
3  amount right now but it could change because the rest of
4  the investigation is still going on?
5  A   Yeah, there's nothing else of importance.
6  Q   Let's go to the next one, the next exhibit,
7  premarked Ryu -- previously marked Ryu 68.
8      And Michael, the Bates number is WB 11923.
9  MR. YI:  Okay.  Thanks.
10  Q   BY MR. DZARA:  Orest, I don't need you to read
11  the whole attachment, which I believe is an updated
12  narrative.
13      Let me know when you're ready.
14  A   I'm ready.
15  Q   The first question is, have you seen this
16  document before?
17  A   I'm sure I've seen it, yeah.
18  Q   It appears to be an updated narrative from you
19  to Dom for his review.
20  A   Right.
21  Q   And you state in your cover e-mail, the top
22  e-mail:
23      "I have highlighted the new portion in
24  red."
25      I believe the copy you have probably in front

Page 139

1  of you is probably not in color.  It's probably all in
2  black and white; right?
3  A   That is correct.
4  Q   I will represent to you that I have a color
5  copy, and I will tell you if it's important if I read
6  something to you if it was in red or it was in black;
7  okay?
8  A   Okay.
9  Q   So you say in your cover e-mail to Dom, the
10  second paragraph, that Lisa supplied much of the
11  information.
12      Correct me if I'm wrong:  That's much of the
13  new information is what were referring to she
14  supplied you?
15  A   I would imagine that is correct.
16  Q   So the new information is in red, and you're
17  saying here Lisa supplied much of that.
18  A   Correct.
19  Q   So looking at page 3 of this narrative, the
20  second paragraph, that paragraph I'll represent in the
21  record is all in red, the paragraph beginning, "On
22  February 4, Wilshire Bank and Wilshire Bancorp were
23  served a subpoena..."
24  A   Yes.
25  Q   According to your cover e-mail, that's new.

Page 140

1  This talks about the -- this paragraph talks about the
2  Liberty Bank stuff, Liberty Bank shortages from Karen.
3      Do you recall that?
4  A   Yes.
5  Q   Okay.  And you already testified about that
6  before, and you said that you learned about that from
7  reviewing her personnel file; right?
8  A   Yeah.  But I believe the statement about
9  "searched her purse and found 4,000 in cash," I believe
10  Alicia mentioned that at the meeting as opposed to I
11  finding it in the personnel file.
12  Q   Okay.  Alicia mentioned that to you at what
13  meeting?
14  A   Well, on February 4th, there was a meeting.
15  No, I'm sorry.  I take it back.
16      On February 5th, it lists all the people who
17  were in the meeting, and in that meeting, I believe
18  Alicia mentioned the $4,000 was found in cash in her
19  purse as opposed to me seeing it in the personnel file.
20  Q   Okay.  So that information is part of the
21  narrative.  You learned that from Alicia.  You didn't
22  learn that --
23  A   Yeah, in that meeting.  Sorry.
24  Q   Do you know where Alicia learned that
25  information?

Page 141

1  A   No.
2  Q   The next sentence:
3      "She was not terminated and arrested
4  for the cash shortage due to lack of
5  sufficient evidence."
6      Was that learned from Alicia at this meeting or
7  did you review that in the personnel file?
8  A   I learned that in the personnel file.
9  Q   And the next sentence:
10      "That is akin to police chasing a bank
11  robber who robbed a bank for $20,000 in cash
12  and capturing him a few hours later with
13  only $10,000 in cash and not arresting him
14  for bank robbery."
15      This is just your opinion?
16  A   Yes.  I was being very critical.
17  Q   Okay.  And your criticalness is you find it --
18  your criticalness is you find it hard to believe that
19  she wasn't fired when they found the money?
20  A   Absolutely.
21  Q   And the next sentence:
22      "Had she been terminated and charged
23  for theft at that time, she would not have
24  been employed later on by BankAsiana."
25  A   I see that.

Orest Hamersky

---

Page 142

1   Q   What did you mean by that?

2   A   Okay.  This is the Korean culture.  Everybody

3 knows each other in the Korean culture, especially on

4 the banking side.  And if an employee is fired at one

5 bank, everybody else knows about it.

6      Had she been fired the first time, she wouldn't

7 have gotten another job in banking in the Korean

8 community again just because they talk.  So had they

9 done their job right the first time, we wouldn't be

10 involved in this today.

11   Q   And they not doing their job right, that would

12 have been -- you're referring to Wilshire Bank; right?

13   A   Yeah.  Whoever investigated it.

14   Q   Okay.  But when she allegedly stole this money,

15 the Liberty Bank thing, at the time it was Liberty Bank,

16 not Wilshire Bank; right?

17   A   You know, I'm trying to remember, was it

18 Liberty or was it Wilshire?  And I still think it's

19 Wilshire, but I'm not positive about it.

20   Q   Okay.  Well, the middle of that paragraph, it

21 says:

22      "It was also learned that when Karen

23   was a former WB employee through the Liberty

24   Bank of New York merger..."

25      So that sentence I just read, does that help

---

Page 143

1 you remember whether or not she was a Wilshire Bank

2 employee or Liberty Bank employee at the time of these

3 cash shortages?

4   A   Yes.  That makes her a Wilshire Bank employee.

5 WB --

6   Q   So WB stands for Wilshire Bank; right?

7   A   Yes.

8   Q   So it's your opinion -- and I know this is just

9 your opinion -- that if Wilshire Bank had fired her when

10 they found these cash shortages, she never would have

11 been hired by BankAsiana, and therefore, never would

12 have embezzled money from BankAsiana; right?

13   A   That is correct.

14   Q   I will represent that the next paragraph is all

15 in red, and then the bottom paragraph on page 3 is all

16 in red, too, indicating it was new.  The paragraph

17 beginning with "Amid much snow..."

18   A   Yeah.  The flowery prose.

19   Q   Yeah.  I got it.

20      So this is what we talked about before, your

21 summary of -- I guess what you learned from Lisa about

22 her interviewing James; correct?

23   A   Yes.

24   Q   It states:

25      "James denied any involvement in the

---

Page 144

1 embezzlement."

2      You learned that from Lisa.  That's what she

3 told you?

4   A   Yes.

5   Q   Other than what's in this paragraph regarding

6 that meeting that Lisa had with James and Michael Yi was

7 there as well as you testified about, do you recall

8 anything else about that meeting other than what's

9 written in this narrative?

10   A   I don't recall anything else.

11   Q   Okay.  Page 5.

12   A   Okay.

13   Q   The middle of the paragraph, the sentence

14 beginning:

15      "Internal Audit is currently reviewing

16   the activity..."

17      Do you see that?

18   A   Yes.

19   Q   Okay.  That sentence begins in red, and all the

20 rest of it in that paragraph is in red.

21   A   I understand.

22   Q   The last sentence says:

23      "If JPMorgan Chase's information proves

24   fruitless, WB will have to rely on CLA to

25   produce evidence, if any, of James' and/or

---

Page 145

1 Hong's involvement in the crime."

2      Do you see that?

3   A   Yes.

4   Q   And we talked before of CLA stands for

5 CliftonLarsonAllen.

6   A   Yes.

7   Q   You testified before they were conducting an

8 investigation as well, like a forensic investigation.

9   A   Yes.

10   Q   Do you remember anything about -- well, the

11 first part of the sentence refers to JPMorgan Chase's

12 information.

13      Do you recall that information being helpful or

14 fruitless as part of your investigation?

15   A   Well, money -- I saw money going to

16 JPMorgan Chase, but we don't have access to their

17 records, so I don't know.  I could only review our own

18 records because you need --

19   Q   Do you remember reviewing any records from

20 JPMorgan Chase?

21   A   I did not.

22   Q   And the sentences above is referring to this is

23 Karen's account at JPMorgan Chase; right?

24   A   Actually, there were several people who had

25 accounts there.  James had an account there, and I

---

Orest Hamersky

Page 146

1 thought there was somebody else too.  It was more than
2 just Karen.
3    Q    Okay.  Well, there's a one sentence:
4        "Upon receipt and review of this
5    information from JPMorgan Chase, Internal
6    Audit's role in the relationship will end."
7        And your testimony is you don't remember
8 receiving any information from JPMorgan Chase?
9    A    No, because we never subpoenaed it.  To get the
10 information, you have to subpoena it.
11    Q    Okay.  A couple sentences above, it looks like
12 you're referring to a section of the BSA and saying that
13 Alix could use that specific section of the BSA to get
14 information from JPMorgan Chase.
15        Is it your testimony that never happened?
16    A    We later determined that by using that portion
17 of the BSA regulation, you can get very little.  So we
18 abandoned that idea.
19    Q    Going back to that last sentence of the
20 paragraph:
21        "WB will have to rely on CLA to produce
22    evidence, if any, of James' and/or Hong's
23    involvement in the crime."
24        Do you remember if CLA produced any evidence in
25 locating James' or H.S.'s embezzlement?

Page 147

1    A    I don't know what their results were.
2    Q    You can set that aside.
3        Let's go to the next one.  It should be
4 previously marked Ryu 69.
5        And Michael, it's Bates no. WB 11924.
6    MR. YI:  Okay.  Thanks.
7    Q    BY MR. DZARA:  Orest, just take a quick look at
8 it.  I only have one or two questions.
9    A    I've already looked at it.
10    Q    Okay.  Do you recall seeing this document
11 before?
12    A    Yeah.  It sounds familiar.
13    Q    It appears to be -- and correct me if I'm
14 wrong -- Dom's edits to the most recent narrative, which
15 we just looked at the previous exhibit.
16        Does that sound right?
17    A    Yes.
18    Q    And I believe that it appears to be in his
19 cover e-mail a removal of your personal -- what he
20 viewed as your personal opinion and flowery prose in the
21 latest version of the narrative; is that right?
22    A    That is correct.
23    Q    And did you in this exhibit -- excuse me.
24        In this attachment, there are track changes,
25 and your understanding is that those are Dom's changes

Page 148

1 to your narrative; right?  Those are his revisions?
2    A    Yes.
3    Q    Do you remember ever talking to him about these
4 revisions or did you just make them and move on?
5    A    I made them and moved on.
6    Q    One question here I have is on the last page of
7 this narrative.  The Bank Secrecy Act software that
8 BankAsiana had -- I believe it was called Yellow Hammer;
9 is that right?
10    A    Yes.
11    Q    I think you concluded that it wouldn't have
12 detected these transactions from the vault cash
13 because -- well, it's not designed to detect
14 discrepancies from the vault cash, and that's why it
15 didn't detect any of these transactions; is that what
16 you remember?
17    A    Yes, that's correct.
18    Q    Can you just explain that, why it doesn't --
19 what your understanding is of why it doesn't apply to
20 vault cash disbursements?
21    A    Okay.  The regulation says that any cash
22 greater than 10,000 withdrawal, deposit, cash, check
23 must be reported to the government under a certain
24 document that we're all aware of.
25        But a transfer from the vault is not a direct

Page 149

1 transfer to, like, a customer.
2        Typically -- typically a vault will sell its
3 cash to a teller, and then the teller will give it to
4 the customer.  So the software is not designed to look
5 for internal transfers.  It's only looking for external
6 transfers when cash leaves the bank or cash comes back
7 into the bank.
8    Q    I didn't mean to cut you off.  Keep going.
9    A    Well, Karen stole the funds out of the vaults,
10 so it's not being deposited or given to a customer.
11 It's a theft.  And the software systems aren't looking
12 for transfers between a vault cash to a teller.  They're
13 looking from a teller out to the customer.
14    Q    So when Karen transferred the money, she was
15 transferring it from the CD account into the vault cash
16 account.  I think it was called the cash and coin
17 account.  And she was walking in the vault and taking
18 the money out that she just transferred from the CD
19 account; is that correct?
20    A    That's correct.
21    Q    When she was walking and taking the cash out of
22 the vault, she was never transferring that same amount
23 of cash anywhere.  She was just walking in and taking it
24 out?
25    A    She was walking out of the branch with the

Orest Hamersky

Page 150

1  cash.  So that --
2    Q   No, I'm saying when she -- let me finish.
3        When she went into the vault -- after she
4  transferred an amount from a CD account to the vault,
5  she went into the vault.  She went into the vault and
6  took out that same amount of cash; correct?
7    A   Correct.
8    Q   But she never transferred -- when she was
9  taking the cash out of the vault, there's no transfer --
10 electronic transfer from the vault cash account to
11 anywhere?  It doesn't transfer electronically in the
12 system somewhere?
13   A   Well, the way it works is you debit the
14 customer's account and then you credit cash.  So she had
15 to post -- okay.  When she took the money out of the
16 vault, if you just do one transaction, you're going to
17 be out of balance.  So to balance that transaction,
18 she's got to offset it against something else, so she
19 offset it against the customer's account.  Now, at the
20 end of the day, her -- the branch balance is in their
21 cash drawers and the cash vault.
22   Q   Got it.
23       Was there an account that was keeping track of
24 the cash in the cash vault to know that money just came
25 out in cash?

Page 151

1    A   If you looked at the history of the account,
2  you would see it.
3    Q   The cash coin account.
4    A   Right.
5    Q   So the cash coin account would show that money
6  coming out, but it doesn't show where it went.
7    A   It won't show where it went, but you're
8  unbalanced because you took it out of the customer's
9  account.  For every debit, you need a credit.  So she
10 was always in balance because she got the money from a
11 customer, and the offsetting was the vault cash.
12   Q   But the Yellow Hammer BSA software wasn't
13 detecting cash coming out of the cash and coin account.
14   A   That is correct.  And none of the softwares do.
15   Q   Maybe that's a hole they should fix.
16   A   No, not necessarily because, remember, you can
17 transfer cash -- you can do transfers within the bank
18 all day long.  It's when physical cash moves out of your
19 branch or comes into your branch, only those
20 transactions are reportable to the government.  They
21 don't care what your internal transactions are.  They
22 only care where the money -- if large quantities of cash
23 are coming in or going out.
24   MR. DZARA:  Let's move to the next one, Michael.  It
25 is not marked previously as an exhibit, but it is a

Page 152

1  one-page e-mail with a one-page attachment from
2  Carol Shin to Orest.  81.
3       (Whereupon, the document referred to
4  was marked for identification as Ryu
5  Exhibit 82.)
6    MR. YI:  Do you have the production number?
7    MR. DZARA:  Yes.  WB 1945.
8    THE WITNESS:  Yeah, I'm ready.
9    Q   BY MR. DZARA:  Okay.  Do you recall this e-mail
10 and attachment?
11   A   I don't specifically recall the e-mail, but,
12 you know, I remember the attachment very well.  So it
13 looks like --
14   Q   What was the point of it?
15   A   I had Carol research transactions on customer
16 accounts that I wanted -- that were of interest, which
17 included James, Hong, Karen.  And it looks like I asked
18 her give me all cash transactions over $100, both
19 deposits and withdrawals.
20   Q   Okay.  Did these deposits and withdrawals that
21 are represented in the attachment, do they lead you to
22 any conclusion that James was involved or not involved
23 in the embezzlement?
24   A   It did not leave any direct evidence, but if
25 you look on the right-hand side of the attachment,

Page 153

1  you're seeing Soyu Architecture and payments for 1500.
2       It looks like James was borrowing money and
3  paying Soyu Architecture, which gave -- which indicated
4  to me that, you know, he was in financial distress
5  because here's just one more loan that was out there.
6    Q   Okay.  So regarding the financial distress, do
7  all the deposits match up with all the withdrawals?  I
8  mean, he had money in his account to pay back these
9  loans; right?
10   A   He did have money in the account.  As to -- I
11 don't -- I don't see that the deposits and the
12 withdrawals necessarily correspond.
13   Q   That doesn't seem the point.
14       This looks like it's purely, as you said,
15 deposits by check of checks or cash of greater than $100
16 and then checks, I guess, greater than $100 -- or maybe
17 not.  But checks -- withdrawals that are in writing,
18 checks, banks are the first to say, "Money out."
19       So you weren't attempting to balance out the
20 deposits and withdrawals.  But I'm asking a general
21 question.
22       You keep talking about he had financial stress
23 because he had loans.
24       Well, I'll tell you, I have loans.  I have a
25 mortgage.  I financed right now, you know, a car and my

Page 154

1 wife's car and appliances from Best Buy, and I don't
2 think I'm in financial distress.
3      So my question to you is, do you know if he had
4 enough money in his deposits to cover all these
5 payments?
6      MR. YI:  Objection to form.
7      THE WITNESS:  That's true.  You may have debt, and
8 we all have debt, but you aren't paying 22 percent
9 interest on loans either.
10     Q   BY MR. DZARA:  How do you know it was
11 22 percent interest?  Where did you see that?
12     A   When I talked to this gentleman named Dennis in
13 special assets, he pulled documents that showed notes to
14 Michael Kim that James owed him, and they were 20,
15 22 percent interest loans.
16     Q   Okay.  Let's step back for a second.
17         The bank -- who is Dennis again?
18     A   He's mentioned in the narrative somewhere.
19         When I started investigating the fraudulent SBA
20 loans, he's a loan specialist with the bank, and I
21 needed to get some documents from him.  And so we went
22 over the documents, and he showed me these notes that he
23 was investigating on his -- as part of his special
24 assets portfolio.  So that's when I was -- learned of
25 those notes.

Page 155

1      Q   So Dennis was a BankAsiana employee that was a
2 holdover to the Wilshire Bank?
3      A   No, he was never a BankAsiana employee.  He was
4 always a Wilshire Bank employee.
5      Q   Okay.  My question is, how did he have copies
6 of notes of loans from James to Kore Consulting?
7      A   I don't know.
8      Q   Michael Kim.
9      A   I don't know.  But he was also investigating
10 that SBA loan, and it just happened to be that we
11 converged our efforts, and he provided me those
12 documents.
13     Q   Okay.  My question is -- and you may not know
14 the answer to this -- why did Dennis have copies of
15 notes of loans between James and Michael Kim or
16 Kore Consulting?
17     A   Somehow it was in that loan file on that
18 fraudulent loan.  It was in the documents for some
19 reason.  I don't know why they were in there, but they
20 were.
21     Q   Okay.  Let's put that aside.
22         Let's say you didn't know about the loan
23 documents, the notes, and you just saw these
24 transactions.
25         Is your only concern or your only basis of your

Page 156

1 opinion that James was in financial distress not because
2 he had debt, it's because some of the debt was on a
3 22 percent loan?
4      MR. YI:  Objection to form.
5      THE WITNESS:  Well, he had debt, but typically you
6 aren't borrowing from your 401(k).  That's, like, a last
7 resort.  So that was -- that doesn't suggest a very
8 healthy environment.
9          And in looking at some of these transactions
10 here, on the memo part of the check -- you know, on the
11 bottom left-hand corner -- it looked like he was keeping
12 track of how much money he owed to his creditors because
13 I would see 30,000, and then it went down by the next
14 payment.
15         Well, one of the transactions on the memo was
16 $900,000.  I mean, that's an immense loan.  So you put
17 all of these together -- large loans, high interest rate
18 loans, 401(k) loan -- it suggested that this was not
19 somebody who was doing very well financially.
20     Q   BY MR. DZARA:  Did you ever figure out if he
21 had a $900,000 loan?
22     A   No, I could not figure that out.
23     Q   So you're just speculating in reviewing the
24 checks that he had a $900,000 loan?
25     MR. YI:  Objection to form.

Page 157

1      THE WITNESS:  I am, but based on smaller loans where
2 I saw the balance go down after each payment, there's
3 reasonable -- there's reason to believe that this was a
4 way of keeping track of your debts.
5      Q   BY MR. DZARA:  Do you remember telling anybody
6 about your opinion on James' financial health?
7      A   The only person who knew would be what was
8 disclosed in the narrative, and I believe I mentioned
9 that about --
10     Q   You mentioned he had a $900,000 loan?
11     A   I believe somewhere in there I mentioned that
12 he was keeping track of his loans on the memo line, and
13 I might have mentioned 918 -- it's somewhere there.  I
14 can look for it later, if you would like.
15     Q   Okay.  Well, other than it being in your
16 narrative, do you remember talking to anybody -- Dom or
17 Lisa -- and saying, "Hey, look at this.  He's in serious
18 financial issue.  You guys need to look into it"?
19     A   I didn't mention it, but it's very clear in the
20 narrative -- I made it very clear that he was in severe
21 financial condition.
22     Q   Let's go back to the last exhibit, Ryu 69.
23         Show me where you wrote in here that he had
24 severe financial condition because I don't see it.
25     A   Do you have it in Word?  You can do a control F

Page 158

1  and do "James." It's somewhere here.
2    Q   I don't know if I have it in Word, but I may.
3       But you said it's in the thing -- in the
4  narrative. So we're looking at the one you sent to Dom
5  on February 25th -- dated February 25th.
6    A   Well, it might have been in the latest one,
7  which was March. It's somewhere in there.
8    Q   Okay. Did you ever tell Lisa, "Hey, did you
9  meet with James? You need to ask him about these
10 transactions and find out what's going on with his
11 finances"?
12   A   No, because I did that part of the
13 investigation after she already met with him.
14   Q   All right. Did you just look through that?
15 Did you see anything?
16   A   No, I didn't. But, David, it's in there,
17 David. I know for sure. It's somewhere -- I would like
18 to see the March 28 one because that was the last one
19 that I know of before --
20   Q   Okay. We're going to get to that one. So
21 we'll put that aside.
22   A   All right.
23   Q   So we're looking at Ryu 81 and the spreadsheet
24 attached to it. And I think we've kicked the tires
25 enough on that one, so let's move on to the next one.

Page 159

1       It was previously marked Ryu 70. And I only
2  have a couple questions on this, so I'll be brief.
3       When you're ready.
4    A   Yes, I'm ready.
5    MR. DZARA: Okay. This is Bates numbered, Michael,
6  WB 11925.
7    MR. YI: Thank you.
8    Q   BY MR. DZARA: And this looks like it's an
9  e-mail from you to Dom with attached updated narrative,
10 and it appears you may have changed, as he suggested in
11 the last version, and added one sentence, which you say
12 is bolded.
13      Is that accurate?
14   A   Yes.
15   Q   And if you look, the one sentence, I believe,
16 is on page 5. And I don't know if you can see the
17 bolding in black and white, but I can see it on my copy
18 in red. And it's the sentence kind of right in the
19 middle of the paragraph.
20      It says:
21      "The loss was calculated by the sum
22   of..."
23   A   Yes.
24   Q   So this is simply a revised version with that
25 one change; right?

Page 160

1    A   That appears to be true.
2    Q   Okay. Set that side. We'll move on to the
3  next one.
4       Previously marked Ryu 71.
5       Michael, Bates no. WB 11926.
6       And I'll be brief when you're ready, Orest.
7    A   I'm ready.
8    Q   Okay. I think this is the same version that we
9  just looked at, but the one sentence you added that was
10 bolded is not bolded anymore. Other than that, it
11 doesn't seem like there's anything new.
12      Let me know if you think I'm right or wrong.
13   A   Yeah, I don't know. I must have made some
14 change, but -- all I see is this is the latest version.
15   Q   And I'm looking, and all the lines match up
16 except the one version that is bolded.
17      Other than that, it looks like the same thing
18 as before?
19   A   It may very well be.
20   Q   Great.
21      You can set that aside and look at the next
22 one. It is previously marked Ryu 72. It is Bates
23 no. WB 11922.
24   A   Yeah, I'm ready.
25   Q   Okay. This looks like a further revised

Page 161

1  version. This version of the narrative has a date of
2  March 11th, 2014, on the first page; correct?
3    A   Correct.
4    Q   And this is you sending it to Dom for his
5  review; correct?
6    A   Yes.
7    Q   And you mentioned the area highlighted in red
8  are the additions. I know your copy is not red. I do
9  have red on mine, and there is significant red on here
10 beginning on page 5.
11      So let me direct you to the questions that I
12 want to ask you about. Page 5, the fourth paragraph.
13   A   Okay.
14   Q   First sentence -- this paragraph is all in red,
15 I'll tell you for the record.
16      It says:
17      "Based on the review of accounts, there
18   is no evidence that the funds stolen by
19   Karen, which was mostly cash, was deposited
20   into James' and Hong's
21   BankAsiana/Wilshire Bank accounts."
22      Is that an accurate reading?
23   A   Yes.
24   Q   And is that accurate? That's what you found?
25   A   That's what I found.

Orest Hamersky

Page 162

1    Q   Did you have any other evidence that James
2  deposited cash to any other account?
3    A   You mean outside the bank?
4    Q   Yes.
5    A   No evidence that cash, but maybe some checks.
6    Q   So you said before you didn't review any
7  JPMorgan Chase accounts.
8        Did you end up reviewing any accounts other
9  than Wilshire Bank/BankAsiana accounts belonging to
10  James that he had with other financial institutions?
11    A   I couldn't do it.  I didn't have a subpoena.
12    Q   Okay.  So therefore, you had no evidence that
13  he was depositing large sums of cash or checks into any
14  other accounts he owned at other institutions because
15  you didn't have those records; right?
16    MR. YI:  Objection to form.
17    THE WITNESS:  I did not see the other bank's
18  records, but there was evidence that there was some
19  money going to Wells Fargo.
20    Q   BY MR. DZARA:  What evidence is that?  Did I
21  miss it in one of these exhibits?
22    A   I had this long spreadsheet, and I remember --
23  I remember that I would put the destination of the
24  monies, and I saw Wells Fargo -- not only James but
25  Karen and -- some money was going to Wells Fargo on

Page 163

1  several of these officers, and I don't recall where I
2  have this noted right now.  But it's conclusive money
3  went there.  How much, I don't have the details here.
4    Q   Okay.  So he was transferring money between his
5  BankAsiana account to his Wells Fargo account.
6        You saw evidence of that; right?
7    MR. YI:  Objection to form.
8    THE WITNESS:  Yes, I saw it somewhere.
9    Q   BY MR. DZARA:  You don't have to go back and
10  look at it.
11        My question is, how is that relevant?  He's
12  transferring money between accounts; right?
13    A   Well, the question was -- the question was
14  asked, did I see evidence of money going into his
15  accounts in BankAsiana, and the answer was I didn't see
16  anything suspicious, but if you -- but you can transfer
17  monies to other accounts if money is stolen too.  It
18  doesn't have to be the same bank.  In fact, it would be
19  stupid to put it into your own bank because you leave an
20  audit trail.
21        So I'm just saying if people are taking money,
22  it will be wise for them to get it out of the bank
23  altogether and put it into another institution, or the
24  best thing is just take cash where there is no trail.
25    Q   Okay.  Let's clarify some things because I'm a

Page 164

1  little bit confused.
2        You said before you saw transactions from
3  BankAsiana to Wells Fargo from James; right?
4    A   Yes, I thought I saw some going to Wells Fargo.
5    Q   Okay.  And you just said somebody who is
6  stealing money is not going to deposit it in their
7  BankAsiana account; right?
8    A   That's correct.
9    Q   So the fact that he's transferring money from
10  his BankAsiana account to Wells Fargo, when somebody
11  who's stolen money would never deposit it into his
12  BankAsiana account, why are the transactions from
13  BankAsiana to Wells Fargo relevant at all or suspicious
14  at all?
15    A   Okay.  What that developed -- the fact that I
16  knew he had money going to Wells Fargo, had I had
17  records to Wells Fargo, I could see whether there were
18  some cash deposits going there because Karen alleges
19  that she gave most of the money away in cash.  If I had
20  access to Wells Fargo, I could determine whether there
21  was some accuracy to Karen's statements.  If there's
22  tons of cash going to his account in Wells Fargo, then
23  that's very suspicious.
24        Do you understand what I'm saying?  The
25  checks --

Page 165

1    Q   Let me clarify.  Let me clarify for you.
2        It's not the fact that there were transfers
3  from BankAsiana to Wells Fargo.  There were actual
4  transfers that gave you concern.  It's the fact that he
5  had this proof that he had the Wells Fargo account, and
6  now we need to go look at that Wells Fargo account to
7  see if he's making cash deposits in it.
8    A   That is correct.  It just gave me another venue
9  to look.  But since I didn't have access, I could not
10  look.
11    Q   Okay.  So the fact that there were deposits
12  transferred from BankAsiana to Wells Fargo, those actual
13  transfers aren't suspicious or relevant at all.
14    MR. YI:  Objection to form.
15    THE WITNESS:  They -- they are of concern, not
16  necessarily suspicious.
17    Q   BY MR. DZARA:  He's transferring money from his
18  BankAsiana account to his Wells Fargo account.  I just
19  want to know --
20        I know you said these transactions from
21  BankAsiana to Wells Fargo gave you concern because now
22  it showed he has a Wells Fargo account.
23        Putting that aside, I want to know the fact --
24  the actual individual transactions between money leaving
25  BankAsiana and going to Wells Fargo, why are those

Orest Hamersky

Page 166

1  actual transactions of any concern to anything that you
2  were investigating?
3      A   Those individual transactions are not
4  suspicious, but the fact that he is transferring money
5  to an outside bank gives me concern whether he may have
6  been depositing cash that Karen allegedly gave him also
7  into that bank.
8      Q   "That bank" being Wells Fargo.
9      A   That is correct.
10     Q   So circling back, it's really a lot simpler to
11 say these transactions show that he had a Wells Fargo
12 account.  You were concerned that he had another
13 account.
14     A   Not necessarily another account.  I knew he had
15 one account.  I was very curious to see what other type
16 of transactions were going into the account, especially
17 if they were cash.
18     Q   Yeah.  Okay.  I get that.  I'm just not really
19 understanding -- and I don't think you fully explained
20 it.  I'm not picking on you.  I'm just not
21 understanding.
22     I transfer money from banks -- I have a CIT
23 savings account that I just opened, and I transfer money
24 from my Bank of America account to my CIT account.
25     So the fact that he was transferring money from

Page 167

1  BankAsiana to Wells Fargo, those actual transfers from
2  BankAsiana to Wells Fargo, whatever amount, whatever
3  denomination, why did the fact that he had -- what about
4  those actual transactions -- other than to show that he
5  had a Wells Fargo account, what about those actual
6  transactions gave you any -- why were they of any
7  concern to you?
8      MR. YI:  Objection to form; asked and answered;
9  argumentative.
10     You can go ahead.
11     MR. DZARA:  It's not argumentative.  Just say,
12 "Object to form."
13     THE WITNESS:  An allegation was made that Karen gave
14 a lot of money to James.  I'm an impartial witness here.
15 I'm just trying to figure out whether the allegation is
16 true or correct.
17     If I were to see a lot of large cash
18 transactions going into the Wells Fargo account, then it
19 would -- it could confirm the allegations.  I'm just
20 trying to figure out who all was involved, and this was
21 just another trail that I was checking out because you
22 want to see where funds flow in and out.
23     Q   BY MR. DZARA:  Okay.  So none of the deposits
24 into the BankAsiana account that you reviewed caused you
25 to come to a conclusion that he was involved in the

Page 168

1  embezzlement; right?
2      MR. YI:  Objection to form.
3      THE WITNESS:  There wasn't sufficient evidence to
4  conclude that he was involved in --
5      Q   BY MR. DZARA:  Based on the review of his
6  BankAsiana --
7      A   BankAsiana accounts alone.
8      Q   But the fact that he may have transferred money
9  out of his BankAsiana account, that gives you concern
10 that maybe he was involved; is that your testimony?
11     MR. YI:  Objection to form.  That's not what he
12 said.
13     Go ahead.
14     THE WITNESS:  No, that's not it.  I'm just -- when
15 there's fire -- when there's smoke, there's fire
16 somewhere.  So I'm just trying to -- trying to look at
17 all the leads and see if there's any evidence.  If
18 there's not evidence, there's not evidence.  If there's
19 evidence, you continue on.
20     Q   BY MR. DZARA:  You found no evidence involving
21 James; correct?
22     MR. YI:  Objection to form.
23     THE WITNESS:  I found no evidence because I did not
24 look at Wells Fargo Bank.
25     Q   BY MR. DZARA:  I'm saying you found no evidence

Page 169

1  in your review of the BankAsiana account.
2      A   That is correct.
3      Q   Okay.  Put that aside.  Look at the next one,
4  Ryu 73.  Previously marked Ryu 73.
5      Take a quick look at this.  I'll be quick on
6  this, I hope.
7      MR. YI:  Are you sure?
8      MR. DZARA:  Michael, Bates no. WB 11921.
9      MR. YI:  Thanks.
10     THE WITNESS:  Yes, I'm ready.
11     Q   BY MR. DZARA:  This appears to be Dom's edit to
12 the latest draft of the narrative; right?
13     A   Yes.
14     Q   And is it similar to how he was making his
15 edits previously --
16     A   Yes.
17     Q   -- consistent with that method?
18     So in the cover e-mail, Dom references a
19 meeting that just concluded on the BankAsiana
20 embezzlement issue.
21     A   Okay.
22     Q   Do you remember -- and he says he'll be
23 discussing with you issues stemming from that meeting.
24     Do you recall him discussing with you that
25 meeting at or about this time period, March 13, 2014?

Page 170

1    A   I don't recall.
2    Q   Okay.  That's all I have for this one.
3        Go to the next one previously marked Ryu 74.
4    MR. YI:  David, I'm just checking to see whether we
5  need to take a break sometime soon.
6    MR. DZARA:  Let's just get through this one.
7    THE WITNESS:  I'm ready.
8    Q   BY MR. DZARA:  Okay.  This appears to be
9  another revised version of the narrative; correct?
10   A   That is correct.
11   Q   Okay.  And your first sentence in the cover
12 e-mail says:
13       "I have completed the investigation."
14       So at this point, March 20, 2014, you believe
15 you completed everything of your part of -- your
16 investigation of the issue?
17   A   At that time I did.
18   Q   The second attachment is titled "CLEO
19 Riverside."  It begins -- hopefully it should be
20 attached.
21   A   It is.
22   Q   And this is a summary of the CLEO Riverside SBA
23 loan we discussed; right?
24   A   Yes.
25   Q   And this is the first time we're seeing this,

Page 171

1  to my knowledge, on any of the exhibits we looked at.
2        And does this summary accurately summarize what
3  you learned in your investigation into the CLEO SBA loan
4  issue?
5    A   It does.
6    Q   And again, you didn't find any links between
7  that SBA investigation and the embezzlement allegation;
8  is that correct?
9    MR. YI:  Objection to form.
10   THE WITNESS:  Well, I know -- I mentioned in here
11 somewhere that Karen posted most of those transactions,
12 so you can call that a connection.
13   Q   BY MR. DZARA:  Okay.  Other than that, there's
14 no other connection?
15   MR. YI:  Objection to form.
16   THE WITNESS:  The other connection was Michael Kim,
17 who we discussed earlier, being a hard-money lender to
18 James is also mentioned in here as the recipient of that
19 loan.
20   Q   BY MR. DZARA:  Okay.  Anything else?
21   A   That's about it.
22   Q   Let's go to the next one, a quick one.
23 Previously marked Ryu 75.
24       Let me know when you're ready, Orest.
25   A   I'm ready.

Page 172

1    Q   Okay.  This appears to be Dom's edits to the
2  latest version of the narrative; correct?
3    A   That is correct.
4    Q   It looks like this time he made track changes
5  again, but this time he made some comments -- how you
6  can make comments in the margin on Word; right?
7    A   Right.
8    Q   Looking at Dom's cover e-mail, he talks
9  about -- the last paragraph:
10       "No audit report is necessary, but an
11       investigation report will be needed."
12       And he asks you to basically draft that report
13 in one page; right?
14   A   Yes.
15   Q   Okay.  You said no audit report is necessary.
16       What is the difference between an audit report
17 and these narratives that you prepared?
18   A   The narrative is just a summary of what I am
19 doing on the project.
20       An audit report is you go into a department,
21 you evaluate their controls and determine if there are
22 any weaknesses.  There was no reason to do an audit here
23 because BankAsiana was no more in existence.
24   Q   How about this investigation report he's asking
25 you to draft?  What's the difference between that and

Page 173

1  the narrative you wrote?
2    A   The investigation report is that two-page memo
3  that came after this that went to the board.
4    Q   Okay.  I understand that that's physically the
5  difference between them.
6        But the purpose of this -- what's the purpose
7  of the investigation report versus the difference
8  between that and the purpose of the narrative?
9    A   The board is not going to read the whole
10 narrative.  So basically, the investigation report was a
11 two-page summary of the whole narrative.
12   Q   Okay.  You can set this aside.
13       Let's look at the next one, Michael, please.
14       Michael, is it an e-mail from Orest to
15 Philip An?
16   MR. YI:  This is Ryu 76.
17   MR. DZARA:  I'm sorry.  You're right.
18   Q   Let me know when you're ready, Orest.
19   A   I'm ready.
20   Q   Okay.  This appears to be the latest version of
21 the narrative, and you were responding to Dom's comments
22 in the margins; right?
23   A   Yes.
24   Q   Do you remember discussing these with Dom other
25 than these e-mails?

Page 174

1    A   No, I did most discussions with him through
2  e-mails.
3    Q   And in your cover e-mail, you're referring to
4  "Philip."
5      Do you know who Philip is?
6    A   The controller of the bank.
7    Q   All right.  Set that aside, please.
8      The next one, you've got that.  It needs to be
9  marked?
10   MR. YI:  Do you have the production number, David?
11   MR. DZARA:  Yes.  It is 11496.  Yeah, it's 82.
12     (Whereupon, the document referred to
13   was marked for identification as Ryu
14   Exhibit 82.)
15   THE WITNESS:  Yes, I'm ready.
16   Q   BY MR. DZARA:  This is an e-mail from you to
17  Philip, who is the controller at the bank; right?
18   A   Correct.
19   Q   Do you remember why you're providing this
20  information to him?
21   A   Because the e-mail that Dom had sent to Philip
22  wasn't the most accurate and current, so I wanted to
23  make sure he had it.  He -- his relation here is
24  basically filing a claim to the insurance company, so he
25  needed to have the most current, accurate information.

Page 175

1    Q   Okay.  So Philip's role in all this is he needs
2  this information for the insurance claim.
3    A   Correct.
4    Q   I think you testified before you're unsure of
5  what the results were of that insurance claim.
6    A   Correct.
7    Q   Did you ever see whatever it was that Philip
8  drafted from all this information?
9    A   No, I did not.
10   Q   Okay.  Set that aside.
11     Let's look at the next one, Michael.  It's been
12  previously marked as Ryu 27.  And it's Bates
13  no. WB 11917.
14   A   I'm ready.
15   Q   This is the one-page -- well, two-page
16  investigation report that Dom asked you to draft;
17  correct?
18   A   Correct.
19   Q   Let's look at the recommendation on page 2.
20   A   Okay.
21   Q   No. 3:
22     "Had Human Resources not known of
23     Karen's previous cash shortages, the Bank
24     would have retained her as an employee and
25     the embezzlement would have continued

Page 176

1  because she would have personally handled
2  Mr. ▮▮▮▮▮ complaint."
3      Can you explain what you were referring to
4  there?
5    A   When Wilshire Bank acquired BankAsiana, they
6  kept most all of the employees.  They did not keep
7  Hong Sik Hur or James Ryu because you never keep the top
8  dogs.  But Karen would have normally been retained.  Had
9  they retained her, she could have kept her lapping
10  scheme going.
11   Q   So that's what this is referring to?
12   A   Yes.
13   MR. DZARA:  Okay.  You can set that aside.
14     There are only a couple more and we're done.  I
15  promise.
16     Michael, the next two were previously marked
17  Ryu 12 and Ryu 13.
18   Q   One thing, Orest, if you go back two
19  exhibits -- I'm sorry to do this to you.  Ryu 82.  Can
20  you go back to Ryu 82.
21   A   Yes.
22   Q   If you look at the second page of that, your
23  e-mail to Philip on March 19 that are numbered in that
24  e-mail, look at no. 6.
25     It says:

Page 177

1      "I have prepared a narrative on this
2      embezzlement since joining the investigation
3      on January 26.  To date, three versions have
4      been distributed.  I expect to complete a
5      fourth and final version by the end of the
6      week."
7      Do you see that?
8    A   I see that.
9    Q   So we looked at a bunch of versions of the
10  narrative.  That's probably what you're referring to.  I
11  guess --
12     Well, let me ask you:  After you submitted a
13  version with changes and Dom made his changes, and then
14  you accepted those red-line changes, did you consider
15  that, "Okay.  That's now version no. 1"?
16     And then you went through the process again,
17  and that's version no. 2 after you accept Dom's
18  revisions.
19     Is that what you're referring to, these are the
20  three or four versions you did?  Is that the process
21  that captures that?
22   MR. YI:  Objection to form.
23   THE WITNESS:  No, my versions were the versions that
24  I distributed to Dom.  And then if he made any changes,
25  I considered that one and the same version.

Orest Hamersky

Page 178

1    Does that make sense?
2    Q   BY MR. DZARA:  Yes.  That makes sense.  Thank
3  you.
4    So we might have looked at four, I guess, but
5  I'm not going to go back and count.
6    These are what -- Ryu 12 and Ryu 13 were -- we
7  viewed these as the final narrative in many of the other
8  depositions in this case.  And I think we were -- "we"
9  meaning me and my colleague Steve -- were under the
10  impression that these were the two final versions.
11    Now, based on reviewing your e-mails and the
12  versions of the narratives we reviewed in this
13  deposition, I'm not sure if our understanding is
14  correct.  I think you're right.
15    I think what you just testified was that when
16  you completed a version, you submitted it to Dom, and
17  Dom made his changes.  That was a version.  If he made
18  changes again, that was the next version.
19    So that's not a question.  I'm just going to
20  give you the background of why I'm showing you these two
21  exhibits now.
22    You can see they have redactions in them, and
23  the prior version that we were looking at to your
24  attached e-mail did not have redactions.
25    The redactions, if you look at them, clearly

Page 179

1  are removing and identifying information of the
2  customers involved.  I don't know why Wilshire Bank
3  produced these with redactions and where these were sent
4  and why -- you know, if these are any different than the
5  versions we looked at so far in this deposition.  I
6  don't think they are other than the redactions.
7    So my question to you is, looking at these two,
8  is there any conclusion in these two versions of the
9  narrative that James was involved in Karen's
10  embezzlement?
11    MR. YI:  Objection to form.
12    David, are you asking the witness to look at
13  Ryu 12 and 13 at the same time?
14    MR. DZARA:  Yes.  I'm asking him to look at them.
15  Probably we already looked at them because I think
16  they're duplicates, just with redactions of prior
17  versions we looked at.  But because these have been
18  represented as the final versions at prior
19  depositions -- and I believe by your office, Michael --
20  I don't know if that's right, but I'm going to go with
21  that representation.
22    Q   My question to Orest is, are there any
23  conclusions in these versions that we're looking at
24  marked Ryu 12 and 13, is there any conclusion that James
25  was involved in the embezzlement?

Page 180

1    MR. YI:  Okay.  I'm going to object to the form of
2  the question.
3    Can you answer?
4    THE WITNESS:  I believe the conclusions in both are
5  the same.
6    Q   BY MR. DZARA:  Okay.  My question is, is your
7  conclusion that James was involved in the embezzlement?
8    A   There was no direct evidence, but there is
9  suspicious transactions that would suggest that he at
10  the very minimum knew what was going on.  He knew what
11  transpired during the course of these transactions.
12    Q   Okay.  Where in these -- show me -- take as
13  much time as you need to look at these two reports and
14  tell me where that's written.
15    MR. YI:  I just need to look at something.
16    MR. DZARA:  Michael, he can read them on his own.  I
17  don't think you need to help him.
18    MR. YI:  No, no.  Ryu 13 has attached to it Ryu 14.
19  I'm going to remove Ryu 14.
20    MR. DZARA:  Thank you, Michael.  I'm not sure how
21  that happened.
22    MR. YI:  Okay.  I'm going to remove it from my copy
23  too.
24    MR. DZARA:  Thank you, Michael.
25    Q   So my two questions are -- so we're all on the

Page 181

1  same page, Orest -- where in these two versions of the
2  narrative is the conclusion that James was involved, if
3  there is such a conclusion?
4    A   Well, I did not make a -- I did not make a
5  conclusion that James was involved.
6    Q   Okay.  So then my next question is what we just
7  talked about.
8    You said you knew he had to have known about
9  it.
10    Where in these narratives is a statement that
11  says James had to have known about it?  He may not have
12  been involved but he had to have known about it.
13    MR. YI:  Objection to form.
14    MR. DZARA:  That's what he said, Michael.  I'm
15  asking where is it.
16    MR. YI:  Objection to form.
17    THE WITNESS:  David, I don't know if I ever stated
18  that in this document.
19    Q   BY MR. DZARA:  Okay.  That's fine.  That was my
20  question.
21    You said there was suspicion and he had to have
22  known of these transactions, so you're allowed to say
23  that.  I'm not saying you can't say that.
24    I'm saying this narrative is a summary of your
25  investigation, so if that's what you believe or you

Page 182

1 conclude that, where is that in your narrative or is it?
2 MR. YI: Objection to form.
3    David, when we're done with this, I would
4 suggest taking a quick break and then we can finish up.
5 MR. DZARA: Got it.
6 THE WITNESS: David, I don't see where I mentioned
7 that, but I would like to just read one sentence to you
8 on page 7, if that's okay.
9 Q   BY MR. DZARA: Of course.
10 A   The last line says:
11    "Information from JPMorgan Chase should
12 be interesting since the following parties
13 deposited and/or wrote signature checks
14 drawn on that bank: ████ James, ████
15 ████ and ████
16    You had asked me earlier about -- I'm sorry. I
17 kept on saying Wells Fargo. It should have been
18 JPMorgan Chase. But I'm just making this point to
19 clarify my earlier points; okay?
20 Q   Okay.
21 A   That's all I have to say.
22 Q   So James is one of the people who deposited
23 and/or wrote significant checks drawn on JPMorgan Chase;
24 right?
25 A   It says:

Page 183

1    "Information from JPMorgan Chase should be
2 interesting since the following parties" -- which I
3 listed -- "deposited and/or wrote significant" --
4    Okay. It went both ways.
5 Q   So you're saying you saw checks --
6 A   Coming from Wells and going to Wells.
7 Q   You can clarify.
8 A   What I'm saying is I saw checks being deposited
9 into JPMorgan Chase and also coming from JPMorgan Chase
10 for those four individuals -- five individuals mentioned
11 below. That was to answer your earlier question about
12 why I was so concerned about those outside accounts.
13 Q   Yeah. I understand that.
14    And circling back to that, before we were only
15 talking about money leaving BankAsiana and going to
16 JPMorgan Chase. You weren't testifying, then, about
17 money from JPMorgan Chase going to BankAsiana.
18 A   Well, I'm concerned both ways.
19 Q   Okay. I can understand the concern for
20 JPMorgan Chase transaction money leaving JPMorgan Chase
21 and going to James' BankAsiana account because you don't
22 know the source of the JPMorgan Chase money; right?
23 A   Correct.
24 Q   But my question that I was asking before -- and
25 why I was maybe being argumentative, and I apologize if

Page 184

1 I was -- was I didn't understand why the transaction of
2 money leaving BankAsiana and going to JPMorgan Chase had
3 any significance whatsoever other than it alerted you to
4 that he had a JPMorgan Chase account. The actual money
5 leaving BankAsiana, you saw the source of that money.
6 A   Well, if Karen is correct and she said that she
7 gave half of the money to him in cash, and I'm seeing
8 half of the money in cash being deposited to
9 JPMorgan Chase, I am concerned.
10 Q   That's not my question.
11    This is the problem we were having, Orest. My
12 question and my confusion --
13 MR. YI: Do we need to go back to that?
14 Q   BY MR. DZARA: -- you saw the source of the
15 money in the BankAsiana account. You saw the deposits.
16    So the fact that there was money leaving from
17 BankAsiana and going to JPMorgan Chase, you knew where
18 the money in the BankAsiana account came from.
19 A   No, no.
20 Q   If somebody steals money, they're not going to
21 deposit it in their BankAsiana account because that's
22 the bank they're stealing from. So that's my confusion.
23    My confusion is, I don't understand where you
24 see the source of the money with the BankAsiana account
25 and you see transactions, you see money leaving

Page 185

1 BankAsiana and going anywhere else, wherever it was
2 going, why that would give you any concern or be
3 suspicious at all?
4 A   Karen said she gave all the money to him in
5 cash. If I'm seeing a lot of huge deposits at
6 JPMorgan Chase into James' account in cash, I'm
7 concerned. That's the point --
8 Q   -- cash deposits leaving BankAsiana and going
9 to JPMorgan Chase.
10 A   It doesn't have to be a cash withdrawal; okay?
11 It can be the cash that she took out of the vault, and
12 she gave to him, and he walked it over to
13 JPMorgan Chase.
14 Q   Orest, I get it. I understand that you can't
15 see the deposits to JPMorgan Chase, so you would be
16 concerned about what they are. I get it.
17    Let's put aside JPMorgan Chase. My
18 confusion -- and I'll say it for the fiftieth time, and
19 I'm not sure why we're not on the same page on this.
20 It's probably my fault, and I apologize.
21    But you testified before -- and you testified
22 multiple times, I think -- that somehow you got
23 concerned when there was money leaving BankAsiana and
24 going to JPMorgan Chase.
25    Was that your testimony? Am I accurate? You

Page 186

1  were concerned seeing transactions from BankAsiana to
2  JPMorgan Chase.
3      A   I wasn't concerned about the specific
4  transactions.  I was concerned that there were accounts
5  outside of BankAsiana where large deposits might be
6  made.
7      Q   Perfect.
8          So you weren't concerned about the actual money
9  that was leaving BankAsiana and going to JPMorgan Chase;
10 correct?
11     A   That is correct.
12     Q   Perfect.  Thank you.
13     MR. YI:  Can we take a quick break?
14     MR. DZARA:  Yes, we can.
15         (A recess was taken.)
16     MR. DZARA:  Back on the record.
17     Q   So Orest, you testified before that you know
18 that Karen said James was involved in the embezzlement.
19     A   Yes.
20     Q   You're aware she said that?
21     A   Well, according to my -- the documentation and
22 the conversations that I had with Alicia.  I, obviously,
23 wasn't in any of these meetings so --
24     Q   I understand that.
25         You're aware -- my only question -- I know she

Page 187

1  didn't say it to you, but you're aware that she told
2  other Wilshire Bank employees that James was involved;
3  right?
4      A   Yes.
5      Q   Your role was to find evidence to find out what
6  happened here, to investigate what happened, and part of
7  it was to find the culprit.  Identify the culprit.
8          I know you testified already that you didn't
9  find any direct evidence that James was involved, but
10 you found some other stuff that gave you concern.
11         Is that accurate?
12     MR. YI:  Objection to form.
13     THE WITNESS:  Correct.
14     Q   BY MR. DZARA:  What is your personal opinion
15 about whether you believe James was involved in the
16 embezzlement or not?
17     A   My personal opinion is that he may very well
18 have been involved.  There's several interesting facts
19 that I've learned during the investigation.
20     Q   And those are the facts that you testified
21 about, and they were the financial distress; right?
22     A   That is correct.  But in my narrative, he also
23 walked off with the company laptop and company desktop.
24 That's not a normal thing for an employee to do.
25     Q   Okay.  And you testified he returned them;

Page 188

1  right?  You knew he returned them.
2      A   That is correct.  But by then you can alter
3  anything.
4      Q   Okay.  You're just speculating there that he
5  could have altered the computers; right?
6      MR. YI:  Objection to form.
7      THE WITNESS:  It's common sense.
8      Q   BY MR. DZARA:  Okay.  Common sense.
9  Speculation.
10     A   If you please.
11     Q   Okay.  And you said CLA was involved in
12 reviewing the computers; right?
13     A   That is correct.
14     Q   But you're not aware of what CLA, what their
15 investigation in the computers resulted in.  You're not
16 aware of any of that?
17     A   No, I wasn't aware.
18     Q   Let's look -- well, did Karen -- it seems like
19 you're not really taking into account Karen saying that
20 James was involved in your opinion of whether or not you
21 believe James was involved.
22         Are you taking into account Karen's word into
23 your opinion?
24     A   I'm trying to be an impartial person.  I'm
25 trying to look at the facts.  I did hear the allegation,

Page 189

1  so I have to research them out.
2      Q   Okay.  Well, regarding that researching them
3  out, let's look at the next exhibit, previously marked
4  Ryu 20.
5          Now, before you look at this, Orest, this is
6  a -- Karen did meet with the F.B.I., and this is a
7  summary of their meeting with her.  And you don't have
8  to read it.  I'm going to direct you to what I want to
9  discuss with you.
10         But look at page 4 of this memo.  Fourth full
11 paragraph on page 4 begins with:
12         "James Ryu was not involved in the
13 scheme to steal money."
14     A   Yes, I see that.
15     Q   I'm going to read that, and you can read along
16 with me to yourself:
17         "James Ryu was not involved in the
18 scheme to steal money from the CD account.
19 Chon met with James Ryu on or about
20 Thursday, January 30th, 2014.  Chon and Ryu
21 met at the Englewood Diner.  Chon apologized
22 to James Ryu for all the trouble he was
23 experiencing with Wilshire Bank.  Chon
24 admitted to Ryu that Chon had lied to bank
25 auditors about Ryu being involved in the

Page 190

1  scheme to take money from the CD accounts.
2  Chon told Ryu that Chon was going to tell
3  the truth and clear Ryu of any wrongdoing.
4      "Ryu did not threaten Chon in any way.
5  During this meeting, Ryu laughed at the
6  situation in disbelief.  Ryu appeared to be
7  shocked.
8      "Chon lied about James Ryu's
9  involvement because the bank auditors
10 suggested to Chon that Ryu was involved.
11 The auditors seemed to suspect Ryu from the
12 beginning.  They did not believe that Chon
13 accomplished this scheme by herself.  Chon
14 agreed with the auditors that James Ryu was
15 involved.
16     "Chon was not friends with James Ryu.
17 Their relationship was strictly
18 professional.  As the Chief Operations
19 Officer (COO), Ryu was Chon's boss.  Chon
20 did not see Ryu on a daily basis because Ryu
21 worked from the Palisades Park location
22 while Chon worked at the Fort Lee branch."
23     So this is what the F.B.I. recorded as what
24 Chon told them Karen told them.
25     Now, were you aware of it?

Page 191

1  A  No.
2  Q  You were never told by anybody about this?
3  A  No.
4  Q  Does this have any influence, sitting here
5  today, about whether or not your personal opinion or
6  everything you looked at still suggests James was
7  involved?
8  A  I see inconsistencies of what we described
9  earlier.  It doesn't still influence my opinion.
10 Q  What inconsistencies do you see in what I just
11 read and what we discussed earlier?
12 A  Well, when she -- when she met with Alicia and
13 Bo-Young and Irene on the 22nd, she told them that Ryu
14 was involved.  When she met with Lisa Pai, she said Ryu
15 was involved.  This is saying just the opposite.
16 Q  This is saying she told them he was involved
17 because they told her he was involved; right?
18 A  Well, it talks about "bank auditors."  Who in
19 the world are the bank auditors?  I'm the only bank
20 auditor that was involved in this thing.  So I don't
21 understand this comment "bank auditors" here.  I never
22 even met her.
23 Q  So the inconsistency is -- basically, you're
24 saying, putting aside the bank auditors, the
25 inconsistency is what she's saying here is exactly

Page 192

1  opposite of what she told Irene and Bo-Young and Alicia;
2  right?
3  A  Right.  But she's talking about lying to the
4  bank auditors.  She didn't talk to the bank auditors, so
5  who is lying here?
6  Q  Okay.  That's my question.
7      Was she lying here to the F.B.I. and she didn't
8  lie to the Wilshire Bank employees or did she lie to the
9  Wilshire Bank employees and told the truth to the
10 F.B.I.?
11 A  That's a good question.
12 Q  That was my only question.  I know you didn't
13 see this before, and I'm going to read it to you now.
14 Obviously, it directly contradicts everything she said
15 to the Wilshire Bank employees, right, about James?
16 A  Yes.  What she's saying about James here is not
17 what she told the bank auditors, and I don't know what
18 this reference to "bank auditors" is all about.
19 Q  All right.  So clearly this is the exact
20 opposite of what she told the Wilshire Bank employees.
21 She was lying either to the F.B.I. or she was lying to
22 the Wilshire Bank employees; right?  It can't be both.
23 MR. YI:  Objection to form.
24 THE WITNESS:  These are inconsistent testimony.
25 Q  BY MR. DZARA:  It's not testimony.

Page 193

1  A  Whatever.
2  Q  She wasn't under oath either time, but my only
3  question and my only point -- I'm not trying to beat a
4  dead horse here, but what she said here to the F.B.I.
5  was the exact opposite of what she told the
6  Wilshire Bank employees.  So she was lying on one of the
7  occasions.  That's the only logical conclusion; right?
8  MR. YI:  Objection to form.
9  Q  BY MR. DZARA:  What was your answer?
10 A  That appears logical.
11 Q  Do you know that Wilshire Bank froze James'
12 accounts he had with Wilshire Bank, the one you were
13 reviewing?
14 A  I believe I heard that.
15 Q  Who did you hear that from?
16 A  Oh, I don't recall.  Probably somebody in the
17 management team.  I'm only speculating as to --
18 MR. YI:  I'll instruct the witness not to speculate.
19     If you know.
20 THE WITNESS:  I don't know.
21 Q  BY MR. DZARA:  Okay.  So you were told, but you
22 don't remember who told you.
23 A  That is correct.
24 Q  And do you know why the bank froze his account?
25 A  No, I don't.

Orest Hamersky

Page 194

```
 1     Q   And do you remember receiving a litigation hold
 2  notice for Lisa Pai to preserve any documents you have
 3  concerning the embezzlement?
 4     A   I kind of recall that, but she didn't have to
 5  tell me that.  I've been auditing long enough to know
 6  you don't destroy anything.
 7     Q   And to your knowledge, you didn't destroy
 8  anything.  All the documents that you created as part of
 9  your investigation were preserved, as far as you know?
10     A   Yes.
11     MR. DZARA:  All right.  That's all the questions I
12  have.
13         Michael, any questions?
14     MR. YI:  No.
15     Q   BY MR. DZARA:  Let's go back.  One thing.
16  Sorry.  Last question, Orest.
17         Anything else that -- is there anything else
18  that you remember that you want to say now before we
19  conclude?
20     A   I can't think --
21     MR. YI:  Objection to form.
22     THE WITNESS:  I can't think of anything else --
23     MR. DZARA:  Okay.
24     THE WITNESS:  -- to talk about.
25     MR. DZARA:  Great.  Thank you so much for your time.
```

Page 195

```
 1  We're done.
 2     MR. YI:  I have no more questions at this time.
 3         (Whereupon, the deposition was
 4     concluded at 4:20 p.m.)
 5
 6
 7         I declare under penalty of perjury under the
 8  laws of the State of California that the foregoing is
 9  true and correct.  Executed this _____ day of _____,
10  2_____, at _____, California.
11
12         _____
13                Witness Signature
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 196

```
 1  STATE OF CALIFORNIA    )
                          )
 2  COUNTY OF LOS ANGELES  )
 3
 4         Reporter's Certificate
 5
 6         I, Sharon Amy Golding, Certified Shorthand
 7  Reporter No. 5934, do hereby certify:
 8         That prior to being examined, the witness named
 9  in the foregoing deposition, to wit, Orest Hamersky, was
10  by me duly sworn to testify to the truth, the whole
11  truth and nothing but the truth;
12         That said deposition was taken down by me in
13  shorthand at the time and place therein named and
14  thereafter reduced to print by means of computer-aided
15  transcription under my direction, and the same is a
16  true, correct and complete transcript of said
17  proceedings;
18         Pursuant to Federal Rule 30(e), transcript
19  review was not requested.
20         I further certify that I am not interested in
21  the event of the action.
22         Witness my hand this 4th day of March, 2018.
23
24         _____
25           Sharon Amy Golding, CSR No. 5934
```

Page 197

```
 1         - - - - - -
 2          E R R A T A
 2         - - - - - -
 3  PAGE  LINE  CHANGE
 4  ____ ____ _____
 5     REASON: _____
 6  ____ ____ _____
 7     REASON: _____
 8  ____ ____ _____
 9     REASON: _____
10  ____ ____ _____
11     REASON: _____
12  ____ ____ _____
13     REASON: _____
14  ____ ____ _____
15     REASON: _____
16  ____ ____ _____
17     REASON: _____
18  ____ ____ _____
19     REASON: _____
20  ____ ____ _____
21     REASON: _____
22  ____ ____ _____
23     REASON: _____
24  ____ ____ _____
25     REASON: _____
```