EXHIBIT

20

Page 1

```
 1
 2              UNITED STATES DISTRICT COURT
                  DISTRICT OF NEW JERSEY
 3                No. 2:14-cv-01770-JLL-JAD
    BANK OF HOPE, as successor to )
 4  Wilshire Bank,                )
                 Plaintiff,       )
 5               vs.              )
    MIYE CHON, a/k/a Karen Chon;  )
 6  SUK JOON RYU, a/k/a James S.  )
    Ryu; TAE JONG KIM; BERGENFIELD)
 7  BAGEL & CAFÉ INC., d/b/a Café )
    Clair; MAYWOOD BAGEL INC.;    )
 8  UB'S PIZZA & BAGEL INC.; UB'S )
    BAGEL & CAFÉ INC.; and UBK    )
 9  BAGELS CORP., d/b/a Franklin  )
    Bagels & Café,                )
10               Defendants.      )
    -----------------------------)
11  SUK JOON RYU, a/k/a James S.  )
    Ryu,                          )
12       Counterclaim-Plaintiff, )
                 vs.              )
13  BANK OF HOPE, as successor to )
    Wilshire Bank,                )
14       Counterclaim-Defendant.  )
    -----------------------------)
15  SUK JOON RYU, a/k/a James S.  )
    Ryu,                          )
16       Third-Party Plaintiff,  )
                 vs.              )
17  KWON HO JUNG, JAE WHAN YOO,   )
    STEVEN S. KOH, and LISA PAI,  )
18       Third-Party Defendants.)
    -----------------------------)
19  SUK JOON RYU, a/k/a James S.  )
    Ryu,                          ) Deposition of:
20       Cross-Claim Plaintiff,  ) SUK JOON RYU
                 vs.              )
21  MIYE CHON, a/k/a Karen Chon;  )
    TAE JONG KIM; BERGENFIELD     )
22  BAGEL & CAFÉ INC., d/b/a Café )
    Clair; MAYWOOD BAGEL          )
23  INC.; UB'S PIZZA & BAGEL INC.;) Reported by:
    UB'S BAGEL & CAFÉ INC.; and   ) Lisa M. Muraco
24  UBK BAGELS CORP., d/b/a       ) Job# 143521
    Franklin Bagels & Café,       )
25       Cross-Claim Defendants.) June 14,2018
```

Page 2

1
2      Deposition of SUK JOON RYU, held at the
3  offices of LEE ANAV CHUNG WHITE KIM RUGER &
4  RICHTER, LLP, 99 Madison Avenue, New York, New
5  York, before Lisa M. Muraco, a Notary Public of
6  the State of New York.
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24  Reported by:
    Lisa M. Muraco
25  JOB NO. 143521

Page 3

1
2  A P P E A R A N C E S:
3     Lee Anav Chung White Kim Ruger & Richter
4     Attorneys for Plaintiff-Counterclaim
5     Defendant, Bank of Hope, as successor to
6     Wilshire Bank
7        99 Madison Avenue
8        New York, NY 10016
9     BY:  MICHAEL YI, ESQ.
10
11
12     STEVE HARVEY LAW
13     Attorneys for Defendant-Counterclaim
14     Plaintiff, Third-Party Counterclaim
15     Plaintiff, Cross-Claim Plaintiff
16     Suk Joon Ryu, a/k/a James S. Ryu
17        1880 John F. Kennedy Boulevard
18        Philadelphia, Pennsylvania 19013
19     BY:  DAVID DZARA, ESQ.
20
21
22  Also Present:
23        Kate Romick
24
25

Page 4

1
2        IT IS HEREBY STIPULATED AND AGREED
3  by and between the attorneys for the
4  respective parties herein, that filing and
5  sealing be and the same are hereby waived.
6        IT IS FURTHER STIPULATED AND AGREED
7  that all objections, except as to the form
8  of the question, shall be reserved to the
9  time of the trial.
10        IT IS FURTHER STIPULATED AND AGREED
11  that the within deposition may be sworn to
12  and signed before any officer authorized
13  to administer an oath, with the same
14  force and effect as if signed and sworn to
15  before the Court.
16
17
18
19        - oOo -
20
21
22
23
24
25

Page 5

1                    S. Ryu
2  S U K  J O O N  R Y U,  called as a  witness,
3     having been duly sworn by a Notary Public,
4     was examined and testified as follows:
5  EXAMINATION BY
6  MR. YI:
7     Q.   State your name for the record,
8  please.
9     A.   Yeah.  James.  Legal name, S-U-K
10  J-O-O-N.  Last name R-Y-U.
11     Q.   Good morning, Mr. Ryu.  You just
12  stated your full legal name, I believe, Suk
13  Joon Ryu.  For the record, you also mentioned
14  you go by James Ryu.
15          Have you used any other names?
16     A.   No.
17     Q.   Do you have -- do you use a middle
18  initial when you use the name James Ryu?
19     A.   S.
20     Q.   Have you consumed anything either
21  today or last night, such as alcoholic
22  beverages or any medications that would affect
23  your ability to testify at this deposition
24  today?
25     A.   No.

Page 6

S. Ryu

1
2    Q.   You understand that you are
3  testifying under oath and that you must answer
4  each question truthfully?
5    A.   Yes.
6    Q.   Is there anything that would prevent
7  you from testifying truthfully today?
8    A.   No.
9    Q.   What is your home address?
10   A.   630 Rita, R-I-T-A, Drive River Vale,
11 New Jersey 07675.
12   Q.   Are you married?
13   A.   Yes.
14   Q.   What is your wife's name?
15   A.   Her name is Duhe, D-U-H-E.
16   Q.   And her last name is --
17   A.   R-Y-U.
18   Q.   -- the same.
19      Do you have any children?
20   A.   Yes.
21   Q.   How old are they?
22   A.   One is 19.  One just turned 15.
23   Q.   What is the name of the 19-year-old?
24   A.   Jamie (phonetic).
25   Q.   Son or daughter?

Page 7

S. Ryu

1
2    A.   A daughter.
3    Q.   Same last name?
4    A.   Sure.
5    Q.   And the 15-year-old?
6    A.   James.
7    Q.   Have you ever been deposed prior to
8  today?
9    A.   No.
10   Q.   Have you ever testified at any legal
11 proceedings prior to today?
12   A.   No.
13   Q.   Other than this litigation, are you
14 involved in any other litigation -- well, I
15 should say other than this action and the
16 related action pending in Federal Court in New
17 York, are you involved in any other litigation?
18      MR. DZARA:  Current or past?
19 BY MR. YI:
20   Q.   Currently.
21   A.   Currently, the mortgage company has
22 initiated a complaint for foreclosing.
23   Q.   When you say "mortgage company," are
24 you referring to --
25   A.   My own.

Page 8

S. Ryu

1
2    Q.   -- a particular lender?
3    A.   Yeah.
4    Q.   Who was that?
5    A.   It's called Mr. Cooper.
6    Q.   It's a mortgage company?
7    A.   Yeah.
8    Q.   So that's the company that made a
9  mortgage loan to you and your wife?
10   A.   I believe that's a company which is
11 handling the processes for lenders, but I'm not
12 sure who -- what happened to the loan.  It was
13 originally Bank of America loan, but it got
14 changed and sold and stuff like that.  And loan
15 is only underlining.
16      MR. DZARA:  Mr. Cooper might be the
17 servicer.
18      THE WITNESS:  Yeah, probably.
19      MR. DZARA:  I think we produced the
20 complaint in our most recent production and
21 the most recent initiation claim, so that's
22 -- whoever is the plaintiff that's in there
23 is likely the one who initiated the
24 lawsuit.
25 BY MR. YI:

Page 9

S. Ryu

1
2    Q.   So is it fair to say that you're
3  indicating to us that there's currently a
4  mortgage -- a residential mortgage foreclosure
5  action that was commenced by the plaintiff in a
6  mortgage foreclosure action against you?
7    A.   Yes.
8    Q.   Do you recall when that action
9  commenced?
10   A.   May -- mid May of this year.
11   Q.   And do you know what the status of
12 that action is?
13   A.   We -- well, my attorney for that
14 particular matter is preparing answer to the
15 complaint.
16   Q.   And is that Mr. Dzara?
17   A.   No.
18   Q.   Another attorney?
19   A.   Another one.
20   Q.   Are you currently involved in any
21 other litigation?
22   A.   No.
23   Q.   Have you been involved in any other
24 litigation in the past?
25   A.   No -- well, two years ago, 2016,

Page 10

S. Ryu

1
2  foreclosure action.
3      Q.   And that was also a residential
4  mortgage foreclosure action --
5      A.   Yes.
6      Q.   -- that was commenced against you?
7      A.   Right.
8      Q.   Was it only you, or you and your
9  wife?
10     A.   The loan is under my name, so...
11     MR. DZARA:  I think it was initially
12  against his wife, but she got dismissed
13  because the loan was only under his name.
14  She might have been named initially, but it
15  got -- whatever happened that got --
16     MR. YI:  Okay.
17     MR. DZARA:  -- resolved.
18  BY MR. YI:
19     Q.   Just to be clear, the mortgage
20  foreclosure action, the more recent one that
21  was commenced in -- sometime in May of this
22  year, that action concerns the mortgage on your
23  current home, 630 Rita Drive, correct?
24     A.   Yes.
25     Q.   And the residential mortgage

Page 11

S. Ryu

1
2  foreclosure action from 2016, approximately two
3  years ago, that also concerned a mortgage on
4  your current home, 630 Rita Drive, correct?
5      A.   Yes.
6      Q.   And is it fair to say that that
7  prior mortgage foreclosure action was resolved
8  by way of a loan modification agreement?
9      A.   Yes.
10     MR. DZARA:  I thought it was 2015.
11     MR. YI:  2015?
12     MR. DZARA:  Yes.
13  BY MR. YI:
14     Q.   So your counsel is indicating that
15  that was in 2015.  Does that sound right?
16     A.   Yeah, sounds about right.
17     Q.   Did you meet with your attorneys in
18  preparation for this deposition?
19     A.   It was about a month ago I met with
20  David and Steve.
21     Q.   Was it one day?
22     A.   It was actually only a couple of
23  hours.
24     Q.   Was anybody else present?
25     A.   No.

Page 12

S. Ryu

1
2      Q.   Did you review any documents?
3      A.   I reviewed my attorney's list of
4  possible --
5      MR. DZARA:  Wait.
6      THE WITNESS:  Oh, okay.
7      MR. DZARA:  Any documents.  Not
8  documents created by us.
9      THE WITNESS:  Okay.
10     A.   I don't think so.
11     Q.   You didn't review any documents
12  during the meeting?
13     A.   No.
14     Q.   Did you communicate with anyone else
15  -- not your attorneys, did you communicate with
16  anybody else concerning this deposition prior
17  to today?
18     A.   My wife and my kids.
19     Q.   Anybody else?
20     A.   No.
21     Q.   Is your daughter in college?
22     A.   Yes.
23     Q.   Where does she go to college?
24     A.   NYU.
25     Q.   And your son James, is he in high

Page 13

S. Ryu

1
2  school?
3      A.   Yes.
4      Q.   What year is he?
5      A.   He's a sophomore.
6      Q.   Where does he go to high school?
7      A.   Pascack Valley.
8      Q.   Is that a public or private?
9      A.   Public.
10     Q.   Other than your wife and your two
11  children, did you communicate with anybody else
12  concerning this deposition?
13     A.   No.
14     Q.   You worked at BankAsiana from in or
15  about April 2006 until October 2013, correct?
16     A.   Yes.
17     Q.   Where were you employed prior to
18  BankAsiana?
19     A.   Center Bank.
20     Q.   In Los Angeles?
21     A.   In Los Angeles.
22     Q.   From when to when?
23     A.   1998 until 2006.
24     Q.   Was there any gap between the time
25  you worked at Center Bank and BankAsiana?

S. Ryu

1
2     A.   No.
3     Q.   Did you ever work as a financial
4  consultant --
5     A.   Financial --
6     Q.   -- prior to -- immediately prior to
7  working at BankAsiana?
8     A.   No.
9     Q.   Okay.
10       MR. YI:  I will have this marked as
11  Plaintiff's Ryu Deposition 1, Exhibit 1.
12       (Plaintiff's Exhibit 1, Notice,
13  marked for identification.)
14       MR. DZARA:  Off the record.
15       (Discussion held off the record.)
16  BY MR. YI:
17     Q.   Sir, I'm asking you to take a look
18  at what's been marked as Plaintiff's Ryu
19  Deposition Exhibit 1.  And I represent to you
20  that it is a copy of a Notice of Deposition of
21  your deposition.  It was dated some time ago.
22  But just for the record, this deposition is
23  being taken pursuant to that notice.
24     A.   Okay.
25     Q.   Thank you.

S. Ryu

1
2       MR. YI:  This will be Exhibit 2.
3       (Plaintiff's Exhibit 2, e-mail,
4  marked for identification.)
5  BY MR. YI:
6     Q.   So I'd like to direct your attention
7  to in or about August 2007.  Did there come a
8  time around that time period when you met with
9  Karen Chon, whose legal name is Miye Chon?
10     A.   Yeah.  Yes.
11     Q.   And could you just briefly tell us
12  the circumstances in which you met with her in
13  or about August 2007.
14     A.   At that time the CEO, Mr. Hur, made
15  a decision to hire Ms. Chon, and I believe this
16  particular letter of -- offer of employment was
17  e-mailed to her.  And since I do the process of
18  sending out letters such as this (indicating),
19  I sent the letter out.  And I don't recall
20  exactly, but I must have met her briefly as an
21  introduction at the time.
22     Q.   In August of 2007, did BankAsiana
23  have an HR department?
24     A.   No.
25     Q.   Was there a particular officer or

S. Ryu

1
2  employee who was in charge of HR at BankAsiana
3  at that time?
4     A.   There was Bo Young Lee, was handling
5  employee papers and things like that.  And I
6  believe I oversaw that activity.
7     Q.   Okay.  Who was in charge of HR at
8  BankAsiana in August of 2007?
9     A.   August of 2007 -- let me see.  In
10  August of 2007, BankAsiana was not open for
11  business yet.  So while we had maybe a dozen or
12  so employees working to open up the business,
13  there wasn't exactly designation as to what
14  department and whatnot.  But along with the
15  CEO, I oversaw the HR activities.
16       So, you know, that would be my
17  answer.  Who it was in charge, I guess, it's
18  always the CEO and designated COO of the
19  company.
20     Q.   So it -- is it your testimony that
21  the president and CEO of BankAsiana, Mr. Hur,
22  made the decision to hire Karen Chon?
23     A.   Yes.
24     Q.   And that you then -- you believe you
25  met with her at some point after that decision

S. Ryu

1
2  was made?
3     A.   Yes.
4     Q.   And is it your testimony then
5  sometime after that decision was made by
6  Mr. Hur, that you sent her this offer of
7  employment letter by e-mail?
8     A.   Yes.
9     Q.   And what was the position for which
10  she was hired in August of 2007?
11     A.   I believe she was hired for customer
12  service representative.  Otherwise, also can be
13  called as a teller.
14     Q.   Before you met her in or about
15  August 2007 and sent her this offer of
16  employment letter, did you know her?
17     A.   No.
18     Q.   When you met with her in
19  August 2007, was that the first time you met
20  her?
21     A.   Yes.
22     Q.   And before you met her, had you
23  heard anything about her?
24     A.   No.
25     Q.   Specifically, had you heard anything

Page 18

```
 1              S. Ryu
 2   about her prior employment at Liberty Bank of
 3   New York?
 4        A.  Nope.
 5        Q.  Had you heard anything about her
 6   prior employment at Wilshire Bank, which I
 7   represent to you at some point acquired Liberty
 8   Bank of New York?
 9        A.  I must have seen her resume.  And if
10   that is a mean of my knowing the fact that she
11   was at Wilshire Bank, I suppose that would be
12   the case.  But other than just processing this
13   person with a resume, I didn't know anything
14   about her at all.
15        Q.  Did you -- do you recall whether she
16   submitted a list of references?
17        A.  I don't recall.  I'm sorry.
18        Q.  Do you recall making any calls to
19   anybody at Liberty Bank of New York or Wilshire
20   Bank to find out a little bit about her
21   before --
22        A.  No.
23        Q.  -- you sent this offer of employment
24   --
25        A.  No, no.
```

Page 19

```
 1              S. Ryu
 2        MR. DZARA:  One thing.  Let him
 3   finish the question before you answer.
 4   It's tough for witnesses to do that.
 5        THE WITNESS:  Okay.
 6        A.  Oh.  I was saying, all of the hiring
 7   decision was made by the CEO 100 percent.  And
 8   any reference check that may have been done was
 9   done by Mr. Hur.  I personally, myself, I don't
10   think I've ever done any type of reference
11   check by myself.  I may have indicated to my
12   subordinates to make some inquiries.  But other
13   than that, personally, for me, I did not
14   perform any references.
15        Q.  So is it your testimony that during
16   your entire tenure at BankAsiana, it was
17   Mr. Hur, the president and CEO of the bank, who
18   made all of the hiring decisions?
19        A.  Yes.
20        Q.  And is it your testimony that you --
21   well, I don't want to put words in your mouth,
22   but I'm just asking:  Is it your testimony that
23   you didn't have any role in hiring of employees
24   or officers of the bank?
25        A.  Oh, I have roles.
```

Page 20

```
 1              S. Ryu
 2        Q.  Okay.
 3        A.  But he made the decisions.
 4        Q.  He made the ultimate decisions?
 5        A.  Yes.
 6        Q.  And did you interview people,
 7   candidates for positions at the bank, and then
 8   did you make a recommendation to Mr. Hur?
 9        A.  Yes.
10        Q.  Okay.  So for purposes of today's
11   deposition, I'm going to use the word
12   "embezzlement."  And when I say "embezzlement,"
13   I'm really -- it's a defined term that we have
14   been using throughout this litigation.  The
15   attorneys have used it, I've used it, and it's
16   in our amended complaint.
17        Is it fair to -- you understand when
18   I say "embezzlement," you understand what I'm
19   talking about?
20        MR. DZARA:  Before he answers, let
21   me object.  You define embezzlement
22   differently than we define embezzlement.
23        MR. YI:  Okay.
24        MR. DZARA:  You define embezzlement
25   as two people participating, and we define
```

Page 21

```
 1              S. Ryu
 2   embezzlement as one person participating.
 3        So if the understanding is the
 4   embezzlement was the taking of the money
 5   from Wilshire Bank, I'm fine with that.
 6        MR. YI:  Okay.
 7        MR. DZARA:  Without attributing it.
 8   If you're going to attribute it, we have
 9   different opinions on who it was attributed
10   to.  But for that purposes, I'm fine.  I'm
11   not going to agree to your definition of
12   embezzlement in the amended complaint, nor
13   would you probably agree to ours in our
14   answers to you amended complaint.
15        MR. YI:  Okay.
16        MR. DZARA:  So with that
17   understanding, I'm fine with it.
18        MR. YI:  Okay.
19   BY MR. YI:
20        Q.  Okay.  You accept your counsel's
21   statements concerning our use of the word
22   "embezzlement"?
23        A.  Yes.
24        Q.  Thank you.
25        When did you first learn that Karen
```

Page 22

S. Ryu

2  Chon had implicated you in the embezzlement?
3      A.   It was January 30th of 2014.
4      Q.   How did you find out?
5      A.   Karen called me to have a meeting in
6  person.
7      Q.   When did she call you?
8      A.   The same day.
9      Q.   And what did she say when she called
10  you, in substance?
11      A.   She has done a terrible thing.  And
12  that she stole money from BankAsiana.  And then
13  she lied and implicated me being part of the
14  theft.
15      Q.   Do you recall anything else?
16      A.   Sure.  I recall a lot of different
17  things, but...
18      Q.   Tell us whatever else you remember.
19          MR. DZARA:  About what, the call or
20      the meeting?
21  BY MR. YI:
22      Q.   The call.
23      A.   The call?
24      Q.   Yeah?
25      A.   Oh, if you're just talking about the

Page 23

S. Ryu

2  call, she did not say on the call what I just
3  said about, you know, she has taken the money
4  from that.  That was during the meeting.
5      Q.   Okay.  So let's go back to the call.
6      A.   All right.  The call.
7      Q.   What do you remember her telling you
8  during the call?
9      A.   On the phone, yeah.  She called and
10  she wanted to meet me in person as soon as
11  possible.  I replied and said, "Couldn't we
12  have this conversation on the phone?  Why would
13  I need to meet you?"
14          And she said it was very important
15  that we -- you know, "If you could meet me,
16  it'll be great."  You know.
17          So since I was heading to Englewood,
18  and I told her -- and I needed to fix my car,
19  so I told her that it was going to take some
20  time to fix the car, so might as well -- then
21  if you show up to -- there was a diner right
22  next to, you know, auto repair shop, if you
23  could come to that place, you know, perhaps we
24  can meet.  And she said, "Yes."
25          And that was it as far as the phone

Page 24

S. Ryu

2  call is concerned.
3      Q.   Do you remember anything else she
4  said to you?
5      A.   I don't think she said anything
6  else.
7      Q.   Okay.  And is it fair to say she
8  didn't tell you during that call why she wanted
9  to meet with you, other than telling you that
10  it was important, something important?
11      A.   Right.  No.
12      Q.   So this is January 30, 2014.  By
13  this time, both of you were no longer with
14  BankAsiana, and you were no longer with
15  Wilshire Bank.
16          Is it fair to say after the merger
17  between Wilshire Bancorp and BankAsiana, that
18  you -- were you an employee of Wilshire Bank
19  briefly?
20      A.   Yes.
21      Q.   Okay.  And do you recall whether
22  Karen Chon was also a briefly an employee of
23  Wilshire Bank before she was let go?
24      A.   I think so.
25      Q.   But by January 30, 2014, both of you

Page 25

S. Ryu

2  have left Wilshire Bank following the merger.
3          MR. DZARA:  Is that a question?
4  BY MR. YI:
5      Q.   Is that correct?
6      A.   Yes.  We were both terminated.
7      Q.   And between the time you and she
8  left Wilshire Bank, and January 30th, had you
9  had any communications with her?
10      A.   I did right the day before on the
11  29th.  It was because my debit card Wilshire
12  Bank, BankAsiana, started not work.  Maybe
13  sometime, you know, around somewhere in 22nd,
14  23rd, 24th, somewhere there and then.  And I
15  really -- who was at the bank, I made a call to
16  check out what's wrong with my debit card.  And
17  she told me that she'll get right back to me.
18          But I couldn't reach her for a few
19  days, and I thought it was strange.  And I knew
20  that Irene was pretty good friends with Karen,
21  and from my previous conversation with Irene
22  Lee, that I knew she was hired by another bank
23  as a branch manager or something like that.
24          And while my -- driving back from
25  New Millennium Bank, which is located in New

S. Ryu

1
2  Brunswick, to, you know, Bergen County, so --
3  and I couldn't use my card or use my money.  So
4  I made a call on that 29th, particular call to
5  Irene Lee a few times.  And also made a call to
6  branch manager downstairs.
7          And she could not see, you know,
8  what the hell was going on, what's going on --
9  excuse me.  So at that meeting, I did reach out
10  to Karen and see, you know, what's happening
11  with Karen -- I mean, not Karen, Irene.  And
12  knowing that she was hired as branch manager, I
13  wanted to congratulate her, you know.
14          So that was the very first time when
15  I reach out to Karen just because I needed to
16  find out what's going on.
17          And she told me on 29th and said,
18  "Oh, Irene is available.  You want me to give
19  her a call?"
20          So I said, "That's okay."  It was
21  very brief call.  I said, "Oh, congratulations.
22  You became a branch manager."
23      Q.   Which bank -- I'm sorry.  Which bank
24  was Karen Chon branch manager?
25      A.   I believe it was Ohana Bank.

S. Ryu

1
2          And she said, "Oh, no, I quit."
3          I said, "Oh, that's too bad."  And
4  ask her, "Is Irene okay?"
5          She said, "Yeah, sure.  You want me
6  to reach her?"
7          I said, "No, it's okay."  And that
8  was it.  It was a very short conversation.
9          And I believe that led to her
10  calling me on the 30th.
11      Q.   What do you mean that phone call on
12  the 29th, that you made to her, led her to call
13  you the following day?
14          What do you mean by that?
15      A.   Well, what I mean by that, is that I
16  would think that it was easier for her to give
17  me a call.  And ultimately, I'll say this, that
18  she told me to truth, that she lied and stole
19  the money and all of that stuff the next day.
20          I think my call prompted her to
21  think straight and tell the truth.  And that's
22  what I mean.
23      Q.   So let's go back to -- after the
24  call, did you meet with her at the diner?
25      A.   Yes.

S. Ryu

1
2      Q.   And was there anybody other than the
3  two of you?
4      A.   No.  Well, there were a lot of
5  customers.
6      Q.   Yeah, okay.  But it was just the two
7  of you?
8      A.   Mh-hm.
9          MR. DZARA:  You have to say "yes" or
10  "no."
11      A.   Yes.
12      Q.   And could you tell us what she said
13  to you when you met with her at the diner on
14  January 30, 2014.
15      A.   She said she done a really terrible
16  thing, and she stole money from BankAsiana.
17  And that she told Wilshire Bank that I was
18  involved with taking the money at BankAsiana.
19  In essence, that's what she said.
20          And she said, "I'm very sorry."  And
21  she said, "I don't know why I did that."
22          That's what she told me.  And of
23  course, I told her in reply many different
24  things.
25      Q.   All right.  Could you tell us what

S. Ryu

1
2  you told her in response -- actually, before
3  you get to that --
4      A.   Sure.
5      Q.   -- do you remember anything else she
6  said to you at the diner?
7          Did she tell you, for instance, how
8  much she stole from BankAsiana?
9      A.   Yes, she did.
10      Q.   What did she tell you?
11      A.   She said it was over $1 million.
12  And she told me that she can't believe it's
13  over $1 million, but Wilshire Bank or
14  BankAsiana employees, Wilshire Bank had told
15  her that it was over $1 million.
16      Q.   And when you say that she told
17  Wilshire Bank that she had stolen money from
18  BankAsiana, did she tell you to whom?
19      A.   She mentioned Irene Lee and Bo Young
20  Lee.
21      Q.   Do you remember her mentioning
22  Alicia Lee?
23      A.   I don't think so.
24      Q.   Do you remember anything else she
25  told you?

S. Ryu

1
2    A.   Oh, yeah, she told me she will go
3  back to Wilshire Bank and tell the truth, that
4  I was not involved in what -- this theft in
5  whatsoever manner.  And that's how the meeting
6  ended.
7    Q.   Okay.  Let's go back.  I think I
8  sort of --
9        MR. DZARA:  I think this was a
10  conversation.  So she said this, you said
11  that.
12        MR. YI:  Right.
13  BY MR. YI:
14    Q.   Have we covered, as far as what she
15  told you at that meeting on January 30th, have
16  we covered what you remember?
17    A.   Yeah, pretty much.
18    Q.   Okay.  Can you tell us what you told
19  her at that meeting?
20    A.   Oh, when she told me that she'd done
21  a terrible thing, I said, "What?"  And -- well,
22  I'll just stick to the question.
23        And when she said she stole money
24  from BankAsiana, I was dumbfounded.
25        And I asked, "How much?"

S. Ryu

1
2        And she told me that it was over $1
3  million.  She can't believe it's that much, but
4  Wilshire has told her it was over $1 million.
5        So I -- so, "You met with Wilshire
6  people?"
7        And she sort of indicated, you know,
8  Irene had met with them.
9    Q.   Did she describe to you or did she
10  tell you how she stole the money?
11    A.   No, not at all.
12    Q.   Did you ask her?
13    A.   No.  And then -- well, actually
14  there was another thing she said.
15        "I've done a terrible thing to you,"
16  meaning, me.
17        And I said, "What?"
18        And she just kind of hung there and
19  cried for a while.
20        So I'm thinking, "Well, what is the
21  terrible thing?  She already did the terrible
22  by stealing the money."
23        And then she told me that, "I have
24  you" -- "I told Wilshire Bank that you were
25  implicated in the theft."

S. Ryu

1
2        And I said, "You got to be kidding
3  me."
4    Q.   By the way --
5    A.   So --
6    Q.   -- this entire conversation, by the
7  way, is in Korean, correct?
8    A.   Yes.
9    Q.   Go ahead.
10    A.   And I told her, "Why did you do
11  that?"  You know, "What was the reason?"
12        She wouldn't say for a while.  After
13  I asked her a few times, she said, "I don't
14  know."
15        And I asked her continually, "Why
16  did you do that?"  You know.
17        And she cried and cried and said, "I
18  don't know.  I don't know why."
19        So I told her, "Go back to Wilshire
20  Bank right away and clear this matter up, that
21  you have lied and I'm not involved in any
22  taking of the money from the bank."
23        And she said she will do that.
24  "Yes, I will do that right away."
25        I said, "Go now and do it."

S. Ryu

1
2        And that was about how the meeting
3  ended.  In retrospect, a couple of things:
4  First, I should have taken her to the police.
5  I should have called the police right there and
6  then, you know.
7        Second, I should have had her and go
8  to Wilshire Bank alongside me, you know, with
9  her, to whoever it may be in charge at the time
10  of this inquiry or investigation or, you know,
11  whatnot, and dealt with it right there and
12  then.
13        Instead, she said she would go right
14  away and tell the truth and clear this matter,
15  the whole thing up.  It was rather naive of me
16  that I believed that she would do that.
17        But apparently, you know, now, we
18  know -- now, I know, of course, not only now,
19  but for the past four and half years, I know
20  that's not the case.
21    Q.   Do you remember anything else you
22  told her at that meeting, you said to her?
23    A.   Huh?
24    Q.   Anything else that you remember
25  saying -- telling her?

Page 34

S. Ryu

1
2      A.   That's about the entire
3  conversation, right there and then.
4      Q.   So going back to her call, when she
5  called you to arrange this meeting with you on
6  January 30, 2014, did she call you on your
7  cellphone?
8      A.   Yes.
9      Q.   And is that cellphone number
10  213-700-2828?
11      A.   Yes.
12      Q.   And is that cellphone account under
13  your wife's name?
14      A.   I think it's under my name.  It
15  could have been.
16      Q.   And so, is it fair to say that Karen
17  Chon, on January 30, 2014, she had your
18  cellphone number?
19      A.   Yes.
20      Q.   Did you have her cellphone number?
21      A.   Yeah.  Yes, I had numbers of many
22  different employees.
23      Q.   Okay.  Do you remember Karen Chon at
24  that meeting on January 30th, asking you for
25  help in raising money to pay back Wilshire

Page 35

S. Ryu

1
2  Bank?
3      A.   Now that you mentioned it, not
4  helping her to raise the money, but she said
5  she'll pay back Wilshire Bank.  She did say
6  that, right.
7      Q.   Did she tell you how much she had to
8  pay back Wilshire Bank, or how much she
9  intended to pay back?
10      A.   I am not sure.
11      Q.   Do you recall her asking you for
12  your help in raising money to pay back the
13  bank?
14      A.   Not at that time.
15      Q.   Did she tell you -- do you remember
16  her telling you that she was going to be
17  interviewed by the FBI?
18      A.   She didn't say anything about that
19  at all.
20      Q.   Do you remember anything about -- do
21  you remember anything she said about the FBI at
22  that meeting?
23      A.   No.
24      Q.   After January 30, 2014, did there
25  come a time when you found out that Karen Chon

Page 36

S. Ryu

1
2  was going to be interviewed by the FBI?
3      A.   Could you repeat the question.
4      (Question was read back as follows:
5      "QUESTION:  After January 30, 2014,
6      did there come a time when you found out
7      that Karen Chon was going to be
8      interviewed by the FBI?")
9      A.   Well, I knew, by my knowledge, if
10  you thieve a bank, you will face federal
11  government and FBI.  So, my mind, I knew that
12  she will undertake the process.  As to actually
13  when she met with FBI, I did not know that for
14  years, until when I think through my counsel
15  that I saw the interview memorandums and
16  investigative reports or whatnot from FBI
17  itself.
18      Q.   After your meeting on January 30,
19  2014, did Karen Chon ever tell you that she had
20  been interviewed by the FBI?
21      A.   No.
22      Q.   Were you interviewed by the FBI at
23  any time concerning the embezzlement?
24      A.   Well, at our request, at my
25  counsel's, I guess, request to FBI, I and Steve

Page 37

S. Ryu

1
2  Harvey met with FBI and district attorneys.
3      Q.   Okay.  And when you first said
4  counsel, you were referring to Steve Harvey?
5      A.   Yes.
6      Q.   And do you remember when that was?
7      A.   I believe that was perhaps June or
8  July of 2015.
9      Q.   Do you remember who you and Steve
10  Harvey met with?
11      A.   I don't recall their names.
12      Q.   Do you remember how many FBI agents?
13      A.   I think there's just one.  One
14  agent.
15      Q.   Was his last name Decahua
16  (phonetic)?
17      A.   I'm unsure.
18      Q.   You mentioned, I believe, the U.S.
19  Attorney's Office or prosecutors?
20      A.   Yes.
21      Q.   Are you referring to Assistant U.S.
22  Attorneys, federal prosecutors?
23      A.   I think so.
24      Q.   And do you remember how many?
25      A.   Could have been two.

Page 38

S. Ryu

1
2   Q.   Do you remember their names?
3   A.   I don't.
4   Q.   And where was the meeting?
5   A.   In Newark.
6   Q.   And was it at the U.S. Attorney's
7   Office?
8   A.   I'm not sure whether it was U.S.
9   Attorney's Office, but it was some sort of
10  federal building.
11  Q.   Do you remember how long the meeting
12  was?
13  A.   Approximately an hour.
14  Q.   And I believe you stated that the
15  meeting was at your and Steve Harvey's request
16  to them?
17  A.   Yes.
18  Q.   And have you seen any reports
19  generated by either the FBI or the U.S.
20  Attorney's Office concerning that meeting?
21  A.   No.
22  Q.   Are you aware of the existence of
23  such a report?
24  A.   No.
25       MR. YI:  Go off the record.

Page 39

S. Ryu

1
2   (Discussion held off the record.)
3   BY MR. YI:
4   Q.   Other than Mr. Harvey, was there
5   another attorney representing you at that
6   meeting?
7   A.   Yes, David.
8   Q.   And can you tell us what you told
9   the FBI agents and the Assistant U.S.
10  Attorneys?
11  A.   Well, they asked some questions
12  about my background and things like that.  And,
13  you know, what I -- they asked questions as to
14  what I knew about the embezzlement related to
15  Karen Chon.
16       And I told them pretty much what
17  I've stated this morning as to her calls and,
18  you know, meeting with her the day of 30
19  January 2014, and beyond, because I had another
20  meeting with Karen Chon February 13th of 2014,
21  you know, prior to my meeting with you and Lisa
22  Pai on that same day.
23       So details of that particular
24  meeting on February 13th, I told them what she
25  said and whatnot.  And beyond that, there

Page 40

S. Ryu

1
2   wasn't anything else to tell.
3   Q.   And was that the only time you met
4   with FBI agents and attorneys from the U.S.
5   Attorney's Office?
6   A.   Yes.
7   Q.   And that was sometime in June or
8   July of 2015?
9   A.   Yes.
10  Q.   Okay.  Let's go back to your
11  February 13, 2014, meeting with Karen Chon.
12       Could you tell us how that meeting
13  came about?
14  A.   Well, I was scheduled to meet with
15  Lisa Pai and the outside counsel on
16  February 13th of 2014.  And I believe that was
17  about 3 o'clock in the afternoon, the meeting
18  with Lisa Pai and the outside counsel.
19       And around noon or so, Karen Chon
20  called me and said, "Can we meet?"
21       So by February of -- February 13th,
22  yeah, after a couple of weeks have gone by, you
23  know, my thinking was that right after the
24  meeting on the 30th with Karen, she would go
25  back and tell the truth, which I suppose was --

Page 41

S. Ryu

1
2   did not happen.  And by then I was -- I was
3   communicating with the corporate counsel for
4   New Millennium Bank, Bob Schwartz, and he had
5   told me --
6       MR. DZARA:  No --
7       THE WITNESS:  Okay.
8       MR. DZARA:  Don't tell him anything
9   you and Bob talked about.
10  A.   All right.  But I understood that I
11  shouldn't call her or do anything with
12  whatever.  But I was very glad that Karen
13  called me, because at this time, you know,
14  "Okay.  I'm going to bring a tape recorder and
15  record the conversation."  You know.
16       Because between the 30th and the
17  13th, it seemed like a lot of different things
18  had happened.  First, clearly my money was
19  frozen, which was completely illegal.
20       Second, I began to hear a lot from
21  the people who were involved in New Millennium
22  Bank project, including the CEO, Mr. Hur,
23  indicating to me that there's a rumor that some
24  sort of action is being taken against me
25  personally by Wilshire Bank.

Page 42

S. Ryu

And obviously, because of the frozen
-- freezing of the money, which is completely
illegal, I understood that something was
happening there. And that's why I think maybe
10th or 11th of February -- could have been 9th
-- I called Lisa Pai up to ask her, "What's
up?" You know, "What's going on?" You know.
        And not going into detail as to what
I was speaking with, with Lisa Pai, she want to
meet with me on 13th, as she said she will be
in New York. So I agreed to meet with her.
        And on that very same day, Karen
called me and she wanted to meet. So, oh, I
thought it was great. "Now, I can bring a tape
recorder and record the conversation, and
that'll be the end of that," I figured.
        So that's how the whole sort of
process in my mind, thought process, and what
happened with her phone call.
    Q.   Okay. So on February 13, 2014, you
said around noon she had called you, and she
called you on your cellphone?
    A.   Yes.
    Q.   Okay. And then what did she say?

Page 43

S. Ryu

    A.   She wanted to meet with me.
    Q.   Did she say why?
    A.   Well, she said it was important that
I, you know, meet. And I don't recall, you
know, what else she said. But she wanted to
meet, and I was -- I was glad that she wanted
to meet.
    Q.   Okay. And where did you meet with
her?
    A.   A diner in Englewood -- oh, no, it
wasn't at a diner. It was -- what do you call
it? Some lunch and drink place. I forget the
name of it, but it was in Englewood Cliff.
    Q.   It was not the same diner at which
you met with her January 30th?
    A.   No.
    Q.   It was a different place?
    A.   Yes.
    Q.   You don't remember the name?
    A.   No.
    Q.   Was it a restaurant?
    A.   Yeah. We call it a restaurant, yes.
        MR. DZARA: Was it a lounge?
        THE WITNESS: Yeah, we call it a

Page 44

S. Ryu

lounge.
        MR. DZARA: Whatever a lounge is.
BY MR. YI:
    Q.   And for how long did you meet with
her approximately?
    A.   Well, you know, she actually -- I
had told her there's a place, you know -- you
know, between here and there, and she mistook
my instruction as to where exactly, so she went
to the wrong place. So I don't know whether
she called me or whatnot, and she was half an
hour late.
        For the meeting, I believe that was
arranged for 1 o'clock, so we ended up meeting
at, like, 1:30 or something, if I recall
correctly.
    Q.   Okay. And what did she tell you at
that meeting? What did she say to you?
    A.   Well, I don't -- you know, maybe it
would be easier if we take this as what I told
her and what she told me is that -- can that be
done? Because that's easier that way. Because
obviously, I'm very upset at that point, "Why
is this still going on?" You know, so -- I

Page 45

S. Ryu

mean, is that okay, or do you want me to stick
to what she told me?
    Q.   Well, I'm asking you for your
recollection of what you remember her saying to
you at that second meeting.
        MR. DZARA: I think he is asking,
can you recite the conversation.
        THE WITNESS: Yes. Is that all
right?
        MR. YI: Why don't we take a quick
break and then we'll come back and do that.
        (Recess is taken.)
BY MR. YI:
    Q.   Can you tell us what Karen Chon said
to you when you met with her on February 13,
2014.
    A.   Can we -- can I tell the --
    Q.   Tell us --
    A.   -- conversation?
    Q.   -- the substance of the conversation
you had with her, yes.
    A.   Well, I told her, "Have you gone
back and told the truth?"
        And she said, "Not yet."

Page 46

S. Ryu

1
2     I said, "Why not, not yet?"
3         And she said she will clear things
4  up, and I'm not involved with taking money from
5  BankAsiana and whatnot.
6         And at this point, you know, want
7  her to tell whoever it is that she's telling
8  the lies, to tell the truth.  That was my main
9  focus.
10        And she was telling me that if she
11 could borrow some money from me to pay back
12 Wilshire Bank.
13        So I said, "How much?"
14        And I believe she was talking about
15 -- called in -- and some she wanted to pay back
16 to Wilshire Bank some $800,000 or something.
17        I told her I certainly do not have
18 anywhere the money that you're talking about
19 whatsoever.  And essentially, I said, "Are you
20 kidding?  No."  You know.
21        And she then said, "Can Mr. Hur help
22 her pay back to the money to Wilshire Bank?"
23        And I said, "I would not think so."
24        And she kept on saying about how she
25 is planning to pay back Wilshire Bank in lump

Page 47

S. Ryu

1
2  sum of, you know, like I said, some 800,000 or
3  whatnot, and she said she was going to work
4  through the rest of it or something like that.
5         And my objective during that meeting
6  first was to record the conversation so that I
7  have some tangible proof that she's lying, that
8  I'm not involved with embezzlement.  And the
9  second motive was for her -- I mean, my intent,
10 you know, my aim was to get her to go tell the
11 truth so that my name is cleared up over this
12 crime.
13        So, you know, while she was rambling
14 on about how she was going to get the money to
15 pay the -- the bank back and whatnot and, you
16 know, my point was for her, to listen to her
17 and tell her to go tell the truth.  In fact, I
18 think I even said, you know, "You must go back
19 and tell the truth, then maybe I could even
20 help you so that, you know -- you know, talk
21 with Wilshire Bank so that they are not so
22 harsh to you about, you know, your -- your
23 crime."
24        You know, "Maybe there may be
25 something that I can do to, you know, perhaps

Page 48

S. Ryu

1
2  calm Wilshire Bank down so that you are able to
3  pay them back, you know, whatnot."
4         But she just kept on, you know,
5  rambling on how she was going to pay back.
6  "Can I borrow money from you?"
7         "Of course not."  I don't have the
8  money."
9         In fact, since the recording was
10 done, and I think there is not -- I think there
11 is a transcript of that recording.  So, you
12 know, I think you already have it.  So the
13 conversation of that day, I think, is available
14 for your review.
15        But since she was late to the
16 meeting, and I had a meeting with Lisa Pai and
17 you at 3:00 or so, it wasn't really a lengthy
18 meeting.  Maybe probably less than an hour.
19 And that's a sense of what she was telling me
20 on that day.
21        And again, she said she'll tell the
22 truth.  She will, you know, clear my name and
23 so on and so forth.
24    Q.   Okay.  So I want to make sure I get
25 this straight.  So the second meeting on

Page 49

S. Ryu

1
2  February -- I'm sorry, February 13, 2014, by
3  the way, was that lounge or cafe, was that
4  called Central Kitchen?
5     A.   Oh, I think so.
6     Q.   Okay.  And during your conversation
7  with her at that meeting, she asked you for
8  help to raise money to pay back the bank?
9         MR. DZARA:  Objection.  She didn't
10     say -- he didn't say that.  Keep going.
11 BY MR. YI:
12     Q.   But in any event, she asked for help
13 in her efforts to pay back to the bank; is that
14 correct?
15     A.   Yes.
16     Q.   And is it your testimony that you
17 said essentially, no?
18     A.   Clearly, no.  Because the amount in
19 which I think she wanted to borrow from me was,
20 you know, outrageous.  Did not have it.
21     Q.   Did you tell her or did you indicate
22 in any way at that meeting that you would think
23 about it?
24     A.   I may have said that I would think
25 about it, just because I want her to go back

Page 50

S. Ryu

1   and tell the truth, so that is -- you know, I
2   didn't want to be very harsh to her in that
3   way. But, you know, in essence I said, "It's
4   not possible."
5          And it was not possible because,
6   obviously, I didn't have the money.
7       Q.   Okay. So when she asked you for
8   help in paying back the bank, is your best
9   recollection that you said, no? You declined?
10      A.   Sure.
11      Q.   Okay. Your cellphone number,
12  213-700-2828, was that your cellphone number
13  during the period of 2010 Through 2014?
14      A.   Yes.
15      Q.   And is that still your cellphone
16  number?
17      A.   Yes. I think I had that number from
18  2001.
19      Q.   2001?
20      A.   Yeah.
21      Q.   To the present?
22      A.   Yes.
23          MR. YI: Mark this as Exhibit 3.
24          (Plaintiff's Exhibit 3, documents

Page 51

S. Ryu

1   received from Verizon Wireless, marked for
2   identification.)
3   BY MR. YI:
4       Q.   I'm showing you what's been marked
5   as Exhibit 3 to your deposition, and ask you if
6   you recognize it.
7          By the way, I'll represent to you
8   that these are documents that we received from
9   Verizon Wireless pursuant to a subpoena duces
10  tecum that we issued to that company.
11      A.   Yes.
12      Q.   Okay. Are these copies of monthly
13  sort of statements that you received from
14  Verizon Wireless during the time periods that
15  are indicated in these documents?
16          MR. DZARA: Objection to form.
17      A.   I see my wife's name, so...
18      Q.   And you see your cellphone number --
19      A.   Sure.
20      Q.   -- 213-700-2828?
21      A.   Sure.
22      Q.   Thank you.
23          When did you move to New Jersey from
24  California?

Page 52

S. Ryu

1       A.   In 2006.
2       Q.   Do you remember when exactly around?
3       A.   I think end of March.
4       Q.   Why did you move -- why did you and
5   your wife move from California to New Jersey?
6       A.   To establish a bank.
7       Q.   BankAsiana?
8       A.   Yes.
9       Q.   With Mr. Hur?
10      A.   Yes.
11      Q.   Any other reason?
12      A.   No.
13      Q.   In November 2009, did you take a
14  loan against your 401k savings?
15      A.   I believe so, yes.
16      Q.   Have you produced copies of
17  documents relating to that 401k?
18      A.   I don't think so. Because I have
19  not.
20      Q.   And that 401k was with BankAsiana,
21  right?
22      A.   Yes.
23      Q.   Do you remember which company or
24  firm was administering that 401k plan?

Page 53

S. Ryu

1       A.   No, I don't.
2       Q.   Do you remember how much the loan
3   was?
4       A.   I think it was 30,000. Somewhere
5   around there.
6       Q.   When you moved from California to
7   New Jersey in 2006, just prior to your move,
8   were you employed by Center Bank?
9       A.   Yes.
10      Q.   So is it fair to say you left Center
11  Bank, moved to New Jersey, and then started
12  with Mr. Hur to start BankAsiana?
13      A.   Yes. There was absolutely no gap in
14  between.
15      Q.   Why did you take a loan against your
16  401k of approximately 30,000 in 2009?
17      A.   Well, first, because I could, and
18  second, at that time in 2008, '09, due to, you
19  know, financial crisis in -- in this country
20  and globally, things were pretty tough, and I
21  had a property out in Los Angeles. I did not
22  sell the property when I left Los Angeles to
23  New Jersey. And the renters were there, making
24  good payments until, I think, maybe end of 2008

Page 54

S. Ryu

1
2  or something, then they started defaulting.
3          You know, so I had to pay, like,
4  double the mortgage on those.  You know,
5  burdensome financially.  So...
6      Q.   When you say "property," are you
7  referring to --
8      A.   House.
9      Q.   -- a residential, like, a
10  single-family house?
11      A.   Yes.
12      Q.   In Los Angeles?
13      A.   Yes.
14      Q.   Any other reason?
15      A.   No.
16      Q.   So no particular reason that you can
17  think of?
18      A.   Well, like I said, I mean, because
19  of the renters were not paying rent.  And, you
20  know, if you think about a salary person who's
21  already paying one person and double that, and
22  that's -- just was making some things difficult
23  for us at the time.
24      Q.   When you -- when you took out the
25  loan against your 401k savings in your account,

Page 55

S. Ryu

1
2  were you receiving a salary from BankAsiana?
3      A.   Yes.
4      Q.   And in 2009, do you recall
5  approximately what your annual salary was?
6      A.   Probably 130, 140,000.
7          MR. YI:  Mark this as 4.
8          (Plaintiff's Exhibit 4, federal
9  income tax return for tax year 2009, marked
10  for identification.)
11          MR. DZARA:  Off the record.
12          (Discussion held off the record.)
13  BY MR. YI:
14      Q.   So I'm showing you what's been
15  marked as Exhibit 4 to your deposition.
16          Is that a copy of your federal tax
17  -- federal income tax return for tax year of
18  2009?
19      A.   Yes.
20      Q.   And it's a joint return by you and
21  your wife?
22      A.   Yes.
23      Q.   And if you look at line 7, wages,
24  salaries, tips, et cetera, there's an amount of
25  121,305.  Do you see that?

Page 56

S. Ryu

1
2      A.   Yes.
3      Q.   Is it fair to say that that reflects
4  your W-2 income from BankAsiana?
5      A.   Yes.
6      Q.   And if you look at line 12, there's
7  business income or loss, and there's a loss of
8  $16,785.  Do you see that?
9      A.   Yes.
10      Q.   And do you know -- can you tell us
11  what that relates to?
12      A.   Offhand, I do not know.
13      Q.   Was your wife working in the tax
14  year 2009?
15      A.   No.
16      Q.   Did you have -- other than your
17  employment with BankAsiana, were you operating
18  a business?
19      A.   I was about to start a business, but
20  I'm not sure whether I operated during 2009 or
21  not.
22      Q.   Okay.  May I ask you to turn to --
23  there's a Form 4562, Depreciation and
24  Amortization.  It's several pages into
25  Exhibit 4.

Page 57

S. Ryu

1
2          Do you see the second line below
3  your name and your wife's name, there's a line
4  that says "business or activity to which this
5  form relates," and it says "restaurant and
6  cafe"?
7          Do you see that?
8      A.   Yes.
9      Q.   Were you operating a restaurant and
10  cafe in 2009?
11      A.   2009, I may have been.  You know, it
12  started in 2009, the construction and some of
13  the stuff, so yeah, 2009, 2010, that's when I
14  was operating the restaurant and cafe.  But I
15  never had the ownership at the end.  So I would
16  think that would be referring to that, yes.
17      Q.   Okay.  Let me see if I can clarify.
18          As I look at your joint income tax
19  return for 2009, I'm seeing that on this page
20  Form 4562, you indicated that you had a
21  business or activity, restaurant and cafe, and
22  it appears that you were taking certain
23  depreciation.
24          Are you indicating that you didn't
25  actually own the restaurant and cafe business?

S. Ryu

1
2     A.   I never owned it.  I operated it,
3  but I never owned it.
4     Q.   And do you remember the name of the
5  restaurant and cafe?
6     A.   Well, it was originally called Kudo
7  Cafe, I believe, and then later I wanted to
8  make it to Seleste, but we never put out any --
9  it was a failure, so...
10        And as to the specifics of this,
11 when I do my tax, I use a CPA and I tell him,
12 you know, the activities that were being
13 undertaken.  He prepares it.  So as to the
14 details of this, in a very truthful, honest
15 way, I don't really know the details.
16    Q.   Is it your understanding that you
17 and your wife did take a depreciation for a
18 business described here as restaurant and cafe,
19 even though you and she did not have any
20 ownership interest?
21        MR. DZARA:  Objection to form.  He's
22 not a CPA.
23 BY MR. YI:
24    Q.   I'm asking for your understanding.
25    A.   I do not know.  I don't think...

S. Ryu

1
2     Q.   Okay.  Let's turn to Form 8582,
3  which is a couple of pages after that, which is
4  Passive Activity Loss Limitations.
5        Do you see that?
6     A.   Mh-hm.
7     Q.   And correct me if I'm wrong, but I
8  see a loss of $3,730, from what appears to be
9  from a rental property.
10        Is that the single-family house in
11 Los Angeles and the renters you had?
12    A.   It could be.
13    Q.   And is it fair to say that for tax
14 year 2009, that you reported a loss of $33,730
15 from that rental property?
16    A.   It could be, but I'm not sure.
17    Q.   Okay.  So going back to the first
18 page of Form 1040, your joint income tax return
19 for 2009, again, line 7 is indicating your W-2
20 income from BankAsiana of $121,305, correct?
21    A.   Yes.
22    Q.   And line 12 is indicating a business
23 income or loss, and in this case there was a
24 loss of indicated of $16,785, correct?
25    A.   Yes.

S. Ryu

1
2     Q.   And as far as you know, that is
3  indicating a business loss from the restaurant
4  and cafe business?
5     A.   I am not sure, but if you're
6  assuming that -- but I am not sure.
7     Q.   Okay.  Did you have any other -- did
8  you own or operate --
9     A.   No.
10    Q.   -- any other businesses?
11    A.   No.
12    Q.   Okay.  Line 17 is indicating rental
13 real estate, royalties, partnerships, et
14 cetera, and it's indicating a loss of -- net
15 loss of $22,740.
16        That relates to your rental property
17 in Los Angeles, correct?
18    A.   I would believe, so but again, I'm
19 not sure.
20    Q.   Okay.  So your adjusted gross income
21 for 2009 was $81,780, correct?
22    A.   It shows that.
23    Q.   Are you familiar with a company
24 named Seleste LLC?
25    A.   Yeah.  That was the company that was

S. Ryu

1
2  related to the cafe.  And in order to get the
3  bank account and pay employee salary related to
4  cafe.  Yes, I'm aware of that.
5     Q.   Is that a limited liability company
6  that you formed in January 2010?
7     A.   I believe so.
8     Q.   Did you form that company with
9  another person?
10    A.   I think it was just me.
11        (Plaintiff's Exhibit 5, Certificate
12     of Formation of Seleste LLC, marked for
13     identification.)
14 BY MR. YI:
15    Q.   I'm showing you what's been marked
16 Exhibit 5 to your deposition.
17        Do you recognize that document?
18    A.   I don't know whether I've seen this
19 before, but now I have it, I do recognize it.
20        MR. YI:  Give a moment, please.
21        (Recess is taken.)
22 BY MR. YI:
23    Q.   Is this a copy of the Certificate of
24 Formation of Seleste LLC, which appears to have
25 been filed with the New Jersey State Treasurer

## Page 62

S. Ryu

1
2 on January 7, 2010?
3      A.    Yes.
4      Q.    And according to this document, the
5 names and addresses of the members are -- and
6 then it has your name and your current home
7 address --
8      A.    Sorry.
9      Q.    -- and it has Christine Eunhee Park.
10      A.    Yes.
11      Q.    Do you see that?
12      A.    Yeah.
13      Q.    And 39 Grove Street, Tenafly, New
14 Jersey, was that Ms. Park or Pak's address at
15 that time?
16      A.    Yes.
17      Q.    By the way, the spelling of her last
18 name, should that be P-A-K?
19      A.    Yeah, I think so.
20      Q.    That's a typo?
21      A.    I guess, yeah.  Clearly.
22      Q.    And was this prepared by an attorney
23 by the name of Robert Yu?
24      A.    I think so, yes.
25      Q.    Was Robert Yu your attorney at that

## Page 63

S. Ryu

1
2 time?
3      A.    Yeah, Robert is a friend of mine,
4 and he looked after a few things.
5      Q.    So he was your personal attorney?
6      A.    I don't know whether you call it a
7 personal attorney, but he helped out on things
8 such as, I believe, this.
9      Q.    And was he also the attorney for
10 this company, Seleste LLC?
11      A.    This company didn't really need an
12 attorney.  There was one occasion that he
13 helped out other than this.  But if you want to
14 call it, is this the attorney for the company,
15 I guess you could.
16      Q.    So is it fair to say that the two
17 members of this LLC were yourself and Ms. Pak?
18      A.    Yes.
19      Q.    What was your relationship with
20 Ms. Pak at the time?
21      A.    She joined BankAsiana, and she
22 became a very good friend of mine.
23      Q.    When did she -- when did she start
24 at BankAsiana?
25      A.    July of 2009.

## Page 64

S. Ryu

1
2      Q.    And did you interview her before she
3 was hired?
4      A.    Yes.
5      Q.    And did you recommend to Mr. Hur
6 that she be hired?
7      A.    Actually, she had interview with
8 Mr. Hur as well.
9      Q.    Okay.  But did you recommend to
10 Mr. Hur that she be hired?
11      A.    I don't know whether I recommended.
12 He said, "Go ahead and hire her."  So I didn't
13 even really need to make any recommendations.
14      Q.    And what was she -- for what
15 position was she hired?
16      A.    Customer service representative.
17      Q.    A teller?
18      A.    A teller position.
19      Q.    And is it fair to say that she left
20 the bank in or about February 2010?
21      A.    Yes.
22      Q.    And during her entire tenure at
23 BankAsiana, was she a customer service
24 representative?
25      A.    No.

## Page 65

S. Ryu

1
2      Q.    Did her position change at some
3 point?
4      A.    Yes.
5      Q.    And what was the new position?
6      A.    She was actually assistant to me,
7 but she was working on other stuff as well.
8      Q.    When did she become your assistant?
9      A.    I think in October or so, perhaps.
10      Q.    October 2009?
11      A.    Yes.
12      Q.    And when she left in February of
13 2010 -- so from October 2009 to February 2010,
14 she was your assistant?
15      A.    Yes.
16      Q.    Did you have an affair with Ms. Pak?
17      A.    Yes.
18      Q.    And when did the affair begin?
19      A.    Maybe the end of December.
20      Q.    And when did it end?
21           MR. DZARA:  December of what year?
22           THE WITNESS:  December 2009.
23           When did it end?  September -- no.
24 August of 2010.
25      Q.    What type of business did Seleste

Page 66

S. Ryu

1  LLC conduct?
2  
3      A.   I believe Seleste, under Seleste LLC
4  was just a cafe, you know.  But I don't know
5  whether -- there was another business, which
6  was a hair salon.  I don't know whether that
7  was part of Seleste or not.
8          But either case, neither one of
9  them, the cafe or the hair salon ever became
10  under my legal control.  Never had ownership of
11  those.
12         I guess the -- the Seleste LLC
13  between myself -- and, you know, I guess had
14  the -- if you want to call it ownership -- we
15  did.  Other than that, under Seleste --
16  actually, let me clarify.
17         Under Seleste there wasn't any
18  really business that was under this company
19  because none of those things ever materialized,
20  you know, the hair salon and cafe.  The lease
21  was never transformed to this company.  You
22  know, we attempt to do so, just didn't happen.
23         And, you know, it began somewhere
24  perhaps around December of 2009, but it all
25  ended in July of 2010.  So it was essentially

Page 67

S. Ryu

1  about seven-month operation.
2  
3      Q.   So when you formed Seleste LLC with
4  Ms. Pak, your intention was for this company to
5  own and operate two businesses; one was a
6  restaurant/cafe -- I believe you said it was
7  called Kudo previously; and a hair salon, I
8  believe which was called Luz, L-U-Z?
9      A.   Yes.
10     Q.   That was the intention, that was the
11  plan?
12         MR. DZARA:  You need to say "yes."
13     A.   Yes.
14  BY MR. YI:
15     Q.   And did you actually enter into any
16  contracts in order to receive ownership
17  interest in either of those two businesses?
18     A.   I may have signed a, like, an MOU
19  type of thing.
20     Q.   Memorandum of understanding?
21     A.   For the cafe, but never -- other
22  than that, no.
23     Q.   Do you remember who owned and
24  operated the restaurant/cafe?
25     A.   The cafe was -- the cafe failed

Page 68

S. Ryu

1  sometime in 2009.  And it was for, you know,
2  what would you call it?  Bank sale.  And person
3  that I know, H.K. Lee, who did advertising --
4  he was owner of advertising company.  He
5  purchased it, and he wasn't doing anything with
6  it.
7          And, yeah, that's who I made the MOU
8  -- the memorandum of understanding to.
9      Q.   Okay.  So you were planning to
10  purchase the restaurant/cafe from Mr. H.K. Lee?
11     A.   Yes.
12     Q.   And you entered into an MOU in order
13  to do that?
14     A.   Right.
15     Q.   And it's your testimony that
16  ultimately, there was formal agreement pursuant
17  to which you or -- and/or Ms. Pak acquired the
18  ownership rights to that restaurant?
19     A.   Yes.
20     Q.   Did you ever tell anybody that you
21  owned and operated that restaurant?
22         MR. DZARA:  Objection to form.
23     A.   I don't think I -- I don't know.
24  That's a good question, whether I owned and

Page 69

S. Ryu

1  operated those things.  But maybe I said I
2  operated those things, because for a time being
3  I was operating it, yes.
4      Q.   Did Mr. Lee ever own and operate the
5  restaurant?
6      A.   Well, he was the owner.  And after I
7  withdrew from, you know, both the hair salon
8  and cafe, Mr. Lee may have operated the cafe
9  for a short duration.
10     Q.   And was the cafe or restaurant --
11  when it was operated, was it called Kudo Beans?
12     A.   I'm not sure what he called it at
13  that time, but...
14     Q.   When you were operating it for
15  whatever period of time --
16     A.   Right.
17     Q.   -- what was it called?
18     A.   Well, I wanted to call it Seleste,
19  but, you know, the landlord would not let us --
20  the lease rights and therefore, we could not
21  put any signages up, so there was no sign.  So
22  you know...
23     Q.   There was no sign --
24     A.   No sign.

S. Ryu

1
2    Q.   -- when you were operating it?
3    A.   No.
4         MR. DZARA:  Michael, you said for
5    the period of time that he operated it.  He
6    already testified the period of the time he
7    operated it.
8    BY MR. YI:
9    Q.   And the period of time that you were
10   operating that restaurant, you were employed at
11   BankAsiana as the chief operating officer?
12   A.   Yes.
13   Q.   And senior vice president?
14   A.   Yes.
15   Q.   And chief compliance officer?
16   A.   Yes.
17   Q.   And BSA officer?
18   A.   Yes.
19   Q.   Did Ms. Pak also assist in the
20   operation of that restaurant business during
21   the time you were?
22   A.   Yes.
23   Q.   Did Mr. H.K. Lee have any
24   relationship -- was there any relationship with
25   him and Ms. Pak?

S. Ryu

1
2    A.   No.
3    Q.   Did Mr. -- did Ms. Pak's husband
4    have anything to do with this restaurant/cafe
5    business?
6    A.   Yeah.  He worked in some measures,
7    yes.
8    Q.   When?
9    A.   On and off.  He -- maybe until May,
10   May of 2010.
11   Q.   When did he start working there?
12   A.   At the cafe?
13   Q.   Yeah.
14   A.   Maybe January or February.
15   Q.   Do you know who hired him?
16   A.   Well, you know, it wasn't really --
17   I don't know if you call it hiring.  But it was
18   sort of like a partnership between, you know,
19   me, Eunhee, and her husband.
20   Q.   Are you saying that the three of you
21   operated this restaurant/cafe even though none
22   of you had any ownership interest at any time
23   in --
24   A.   Yes.
25   Q.   -- in this business?

S. Ryu

1
2    A.   Yes.
3    Q.   And is it your testimony that
4    Mr. Lee sort of permitted you or allowed you to
5    operate the restaurant --
6    A.   Yes.
7    Q.   -- while he was still the owner?
8    A.   Yes.
9    Q.   And did you have any kind of
10   agreement with him, Mr. Lee?
11   A.   As I indicated there was -- I
12   believe there was an MOU signed.
13   Q.   And what was -- what did the MOU --
14   what did you agree to, in substance, with
15   Mr. Lee?
16   A.   When -- I guess in order to have the
17   business interest under, you know,
18   corporation's name or your name, you're going
19   to have the lease rights of the premises.  So
20   when that happens, I was to purchase the
21   business.  But I never got the lease right.
22       And you have to remember that the
23   operating period was, you know, only seven,
24   eight months or so.  Nothing ever happened.
25   Q.   All right.  So are you saying that

S. Ryu

1
2    you attempted to obtain a -- essentially a
3    lease estimate --
4    A.   Sure.
5    Q.   -- from either Mr. Lee or --
6    A.   Mr. Lee had no rights.
7    Q.   Who the leasehold rights?
8    A.   The owner of the building.  I don't
9    know his name.
10   Q.   I see.
11       Is it -- are you saying that you
12   were trying to obtain a --essentially a lease
13   to operate the restaurant?
14   A.   It has to be transferred, you know,
15   a lease agreement.  I was trying to do that.
16   But the building owner refused to do so.  So...
17   Q.   Okay.  I'm sorry if I'm not
18   understanding.
19       The building owner I presume leased
20   the space to a party?
21   A.   Mr. Lee.
22   Q.   Mr. Lee?
23   A.   Yes.
24   Q.   And Mr. Lee was trying to assign his
25   leasehold rights under the lease to you?

Page 74

S. Ryu

1
2   A.   Yes.
3   Q.   And it's your testimony that the
4   landlord, essentially, the building owner did
5   not approve that assignment?
6   A.   Yeah.  He refused to do it.
7   Q.   Did you invest -- did you pay any
8   money to Mr. Lee in connection with the
9   attempted assignment of the lease and
10  essentially takeover of the restaurant?
11  A.   Yeah.  I believe I paid him $10,000
12  under MOU, from the money that I got from the
13  4011 loan.
14  Q.   Okay.  What about the --
15  A.   It was a deposit, by the way.  It
16  wasn't, you know -- for the hair salon?  Paid
17  nothing.
18  Q.   Who was --
19  A.   Hair salon was owned by Eunhee's
20  husband's -- you know, husband and his brother.
21  Q.   And was the plan for to you purchase
22  that business from Ms. Pak's husband and
23  brother?
24  A.   Well, the hair salon business was
25  not making any money, losing money, so they're

Page 75

S. Ryu

1
2   about to close down and take a significant
3   loss.  So it was our attempt to somehow try to,
4   you know, revive the business.  But ultimately,
5   it failed.
6   Q.   When you say "our attempt," who are
7   you referring to?
8   A.   Myself and Eunhee.
9   Q.   Just to be clear, and you Ms. Pak
10  planned to purchase the hair salon business
11  from her husband and her husband's brother, but
12  in fact, you did not?
13  A.   Yeah, I guess you could put it that
14  way.
15  Q.   Did you enter into any written
16  agreements with Ms. Pak's husband and her
17  husband's brother in connection with the
18  planned purchase?
19  A.   No.
20  Q.   Did you make any deposit or give
21  them any money in connection with the proposed
22  purchase?
23  A.   No.
24  Q.   Did you derive any income from
25  either the restaurant/cafe business or the hair

Page 76

S. Ryu

1
2   salon?
3   A.   No.
4   Q.   I believe you testified earlier that
5   Ms. Pak left BankAsiana's employ in
6   February 2010.
7   A.   Yes.
8   Q.   Do you know why she left?
9   A.   She left in order to focus more on
10  the operating of the businesses.
11  Q.   When you say "operating of the
12  businesses," which businesses are you referring
13  to?
14  A.   Both the cafe and hair salon.
15  Q.   I'm sorry.  I'm a little bit
16  confused.
17        Ms. Pak was working full-time at
18  BankAsiana, correct?
19  A.   Part-time.
20  Q.   She was working part-time as your
21  assistant --
22  A.   Mh-hm.
23  Q.   -- among other duties?
24  A.   Mh-hm.
25  Q.   During the time that she was

Page 77

S. Ryu

1
2   employed at BankAsiana, was she helping to
3   operate both businesses, the restaurant and the
4   hair salon?
5   A.   After hours, I believe so, a little
6   bit.
7   Q.   Do you know, did there come a time
8   when Ms. Pak moved from New Jersey and moved to
9   California?
10  A.   In August of 2010, she had to go
11  back to Korea.  Business had failed and, you
12  know, she had to leave to Korea.  And I believe
13  she -- on her way to Korea, she and her mother
14  and kids stayed in California probably for a
15  week or something.
16        (Plaintiff's Exhibit 6, income tax
17  returns for tax year 2010, marked for
18  identification.)
19        MR. DZARA:  Off the record.
20        (Discussion held off the record.)
21  BY MR. YI:
22  Q.   Sir, I'm showing you what's been
23  marked as Exhibit 6 to your deposition.
24        Do you recognize it?
25  A.   Yes.

Page 78

S. Ryu

1
2    Q.   Is this a copy of your income tax
3  returns for tax year 2010?
4        A.   Yes.
5        Q.   Again, it's a joint income tax
6  return with you and your wife?
7        A.   Yes.
8        Q.   And if you take a look at line 7 on
9  the first page, or the second page I should
10  say, there's wages, salaries, tips, et cetera,
11  in the amount of $135,840.
12        Do you see that?
13        A.   Yes.
14        Q.   Does that reflect your W-2 income
15  from BankAsiana for that year, 2010?
16        A.   Yes.
17        Q.   And if you go down to line 12,
18  business income or loss, for that line there's
19  a business loss reported of $153,966.
20        Do you see that?
21        A.   Yes.
22        Q.   Do you know what that relates to?
23        A.   I believe that loss incurred for
24  operating the hair salon and cafe for eight
25  months or so.

Page 79

S. Ryu

1
2        Q.   Okay.  I'm going to ask you to turn
3  to Schedule C which is, I believe, three pages
4  later.
5        And Schedule C, profit or loss from
6  business, has your name, your wife's name.
7  Line A says "hair salon" and line C says "Luz
8  Hair Boutique."
9        Was that the name of the hair salon?
10        A.   Yes.
11        Q.   And for the tax year 2010, did you
12  have any ownership in that business?
13        A.   No.
14        Q.   And do you see gross receipts or
15  sales line 1, $235,119.
16        Do you see that?
17        A.   Mh-hm.  Yes.
18        Q.   And then do you see at the bottom,
19  net loss of $80,185?
20        A.   Yes.
21        Q.   I'm going to ask you to turn to
22  another Schedule C, which is a couple of pages
23  later.  Again, profit or loss from business.
24  Has your name, your wife's name.
25        And for line A, it indicates

Page 80

S. Ryu

1
2  "principal business or profession" states
3  "restaurant and cafe."
4        And then C says "Seleste Cafe."
5        Do you see that?
6        A.   Yes.
7        Q.   And was that name of the restaurant
8  and cafe?
9        A.   Yes.  Never had any sign up, but
10  yes.
11        Q.   Okay.  And line 1, gross receipts or
12  sales, the amount of $75,325.
13        A.   Yes.
14        Q.   And on the bottom, line 31, net
15  profit or loss, you reported a loss of $73,781.
16        Do you see that?
17        A.   Yes.
18        Q.   And it -- was that correct, to the
19  best of your recollection?
20        A.   Yes, yes.
21        Q.   Okay.  And again, your understanding
22  was that -- well, withdrawn.
23        Calendar or tax year 2010, it's your
24  testimony that neither you, nor your wife had
25  any ownership interest in this restaurant and

Page 81

S. Ryu

1
2  cafe business called Seleste Cafe?
3        A.   No.
4        Q.   If you turn to Form 8582, which is a
5  few pages later, "passive activity loss
6  limitations."
7        If you look at line 4, it's
8  indicating a loss of $27,363.
9        Does that relate to the house that
10  you were renting out in Los Angeles?
11        A.   I am unsure.
12        Q.   Did you still own the house in Los
13  Angeles in 2010?
14        A.   I think so, yeah.  Well, next page
15  indicates that, yes.
16        Q.   Okay.  So I'll ask you again:  Does
17  this Form 8582, indicating a loss of $27,363,
18  relate to your house that you were renting out
19  in Los Angeles?
20        A.   Yes.
21        Q.   You didn't have any other investment
22  properties?
23        A.   No.
24        Q.   There was an address in Northridge,
25  California.

Page 82

1      S. Ryu
2      A.   Mh-hm.
3      Q.   Did you own any properties in
4  Northridge, California?
5      A.   Well, this Oakhurst Way, this is in
6  Northridge.
7      Q.   Is it in Northridge, or is it in Los
8  Angeles?
9      A.   Northridge, right.
10     Q.   Is Northridge a town or a
11  municipality or...
12     A.   Well, you know, I'm not even sure,
13  but --
14     Q.   Is it fair to say you can refer to
15  it as Los Angeles, this address, as well as
16  Northridge?
17     A.   Yeah.  Somehow it kind of works out
18  there that way.  It's very different from here.
19     Q.   It's like Queens, New York.
20     A.   I suppose.
21     Q.   There are towns in Queens that you
22  refer to, for instance, Flushing, Queens.
23     A.   Right.  Yeah.  Regular Los Angeles
24  area is huge, you know.
25     Q.   Okay.  Just to be clear --

Page 83

1      S. Ryu
2      A.   Yeah.
3      Q.   -- the only rental property or
4  investment property that you had in 2009 and
5  2010 was the house whose address is indicated
6  here, 11763 Oakhurst Way?
7      A.   Yes.
8      Q.   In either Los Angeles or Northridge,
9  California?
10     A.   Yes.
11     Q.   So for tax year 2010, your adjusted
12  gross income for that year -- and when I say
13  yours, I'm talking about you and your wife
14  combined -- was negative $101,525?
15     A.   Yes.
16     Q.   And you received a refund of $5 for
17  that tax year?
18     A.   I'm not sure.
19     Q.   If you look at page 2 of Form 1040,
20  which is really page 3 of this exhibit, it says
21  there's a column or line called "refund 73."
22          It says $5.
23     A.   I guess that's -- that is it.
24          (Plaintiff's Exhibit 7, income tax
25  returns for tax year 2011, marked for

Page 84

1      S. Ryu
2  identification.)
3  BY MR. YI:
4      Q.   I'm showing you what's been marked
5  as Exhibit 7 to your deposition.
6          Do you recognize it?
7      A.   Yes.
8      Q.   Is this a copy of your income tax
9  returns for tax year 2011?
10     A.   Yes.
11     Q.   Again, it's a joint income tax
12  return by you and your wife.
13          And if you look at line 7, wages,
14  salaries, tips, et cetera, there's an amount of
15  $151,250.
16          Does that reflect your W-2 income
17  from BankAsiana?
18     A.   Yes.
19     Q.   And if you go down to line 12,
20  business income or loss, there's a loss,
21  business loss of $47,538.
22          Do you know what that relates to?
23     A.   I'm not sure.
24     Q.   I'm going to ask you to turn to
25  Schedule C, which is a few pages --

Page 85

1      S. Ryu
2          MR. DZARA:  He's at it.
3  BY MR. YI:
4      Q.   Schedule C, profit or loss from
5  business, sole proprietorship, has your name.
6  And line A, principal business or profession
7  says consulting.
8      A.   Yes.
9      Q.   And it's showing a net loss on line
10  31 of $47,538.
11     A.   Yes.
12     Q.   Can you tell us what the nature of
13  that consulting business was?
14     A.   Well, after tremendous loss, you
15  know, I was trying at that time, aside from
16  banking, and the corporation is aware about,
17  you know, the restaurant operation, the hair
18  salon operation, this type of a consulting
19  attempt and things like that.
20          There's a company called Reliance in
21  -- headquartered in Mumbai, India.  And the
22  Reliance USA owns huge, huge cinema chains and
23  nearly 50 percent of ownership of Dreamworks
24  with Steven Spielberg.  And it's an India
25  company -- it's -- probably it's Global 100, if

S. Ryu

1  not better.
2          But at that time we were trying to
3  introduce business to Reliance USA because they
4  own and operate huge postproduction shops in
5  Burbank, California -- Hollywood, essentially.
6  And I was trying to link various different
7  companies to refer them for business and things
8  like that.
9          And it never worked out. So, in
10 essence, this is what that is.
11     Q.  Okay. So you were providing
12 consulting services to certain clients in
13 calendar year 2011, in addition to your
14 full-time job at BankAsiana?
15     A.  Yes.
16     Q.  And who were the clients for whom
17 you provided consulting services?
18     A.  Reliance USA.
19     Q.  Reliance USA?
20     A.  Yeah.
21     Q.  Any other clients?
22     A.  Not that I recall. Reliance was the
23 company.
24     Q.  And I'm sorry if I didn't quite

S. Ryu

1  understand.
2          What was the nature of the
3  consulting services?
4      A.  Well, it was linking businesses to
5  -- referral business to a huge film production
6  company based in -- well, they have offices
7  here in New York, too. But mostly based in
8  Burbank, California.
9          It still exists, Reliance USA. If
10 you see some of the movies, you will see
11 Reliance involved in many of them.
12     Q.  For the tax year -- I'm sorry.
13     A.  Go ahead.
14     Q.  For tax year 2011, I'm referring to
15 line 37, the first page of form 1040. Your
16 adjusted gross income, your joint adjusted
17 gross income for tax year 2011 was $103 and
18 $712, correct?
19     A.  Yes.
20         MR. DZARA: Objection.
21 BY MR. YI:
22     Q.  I'm sorry. $103,712.
23     A.  Yes.
24         (Plaintiff's Exhibit 8, e-mail to a

S. Ryu

1  person by the name Mi Hyung Kim, marked for
2  identification.)
3  BY MR. YI:
4      Q.  I'm showing you what's been marked
5  as Exhibit 8 to your deposition.
6          Do you recognize this?
7      A.  Now that I see it, yes.
8      Q.  Is it a copy of your e-mail to a
9  person by the name Mi Hyung Kim, M-I,
10 H-Y-U-N-G, last name Kim, K-I-M?
11     A.  Yes.
12     Q.  From March 4, 2010, 11:42 a.m.
13 Eastern Standard Time?
14     A.  Yes.
15     Q.  By the way, Mi Hyung Kim was someone
16 who previously worked at BankAsiana?
17     A.  Yes.
18     Q.  When I say "previously," I mean
19 prior to March 2010.
20     A.  Yes.
21     Q.  And second page is her e-mail to you
22 from February 9, 2010, correct?
23     A.  Yes.
24     Q.  Okay. So she e-mailed you on

S. Ryu

1  February 9, 2010, then you responded to her
2  e-mail on March 4, 2010?
3      A.  Yes.
4      Q.  And I would like to direct your
5  attention to -- all right. Let me just read it
6  to you and then I'll ask you some questions.
7          In this e-mail, you say, "Mi Hyung,
8  I trust that you are doing well. Thank you for
9  your call on my birthday. You were right.
10 That was my birthday."
11         When is your birthday?
12     A.  February 18th.
13     Q.  "There are some interesting
14 endeavors that I am engaged in. First, I have
15 rebuilt and currently beginning to operate Kudo
16 Beans Cafe. It is a longer story,
17 nevertheless, I am on this."
18         Do you see that?
19     A.  Yes.
20     Q.  And is that statement accurate?
21     A.  Yeah. Yes.
22     Q.  Next you say, "Second, I have
23 acquired a huge hair/styling salon in
24 Edgewater, called Luz. You may know this

Page 90

S. Ryu

1
2   place."
3          Do you see that?
4       A.   Yes.
5       Q.   Was that an accurate statement?
6       A.   Well, inaccurate.  I acquired the
7   operation of Luz.  But it sounds like I'm
8   saying I own it, which is untrue.  So that
9   statement is incorrect.  It's misleading.
10      Q.   "So the above two are being operated
11  by acquaintances and my wife.  They are not as
12  tactful, so it can be challenging, but I know
13  the businesses are going to be fine.  I
14  acquired both for basically no money.  So far I
15  spent perhaps 35,000 for both.  The hair salon
16  alone was built with $1.1 million.  And you
17  know Kudo Beans, right?"
18          So let me take this in parts.
19      A.   Sure.
20      Q.   You indicate that the two businesses
21  are being operated by acquaintances and your
22  wife.
23          Was that a correct statement?
24      A.   Yes.
25      Q.   Who are the acquaintances?

Page 91

S. Ryu

1
2       A.   Eunhee and her husband.
3       Q.   You say, "I acquired both for
4   basically no money.  So far I have spent
5   perhaps 35,000 for both."
6          Was that a correct statement?
7       A.   Well, the word "acquired" seems to
8   be that I legally own it, so that's not
9   correct.  As far as spending about 35,000 at
10  that point, that's probably true.
11      Q.   You mentioned a $10,000 deposit when
12  you signed the MOU --
13      A.   Yes.
14      Q.   -- with Mr. J.H. Lee.
15          What other monies did you -- when
16  you say "35,000 for both," what were you
17  referring to, other than the 10,000 deposit we
18  talked about?
19      A.   The remodeling of the cafe took
20  quite a bit of money, and also some
21  readjustment to hair salon took money as well.
22      Q.   So the renovation of the hair salon,
23  did you pay for the renovation?
24      A.   Yeah.
25      Q.   Did you yourself alone?

Page 92

S. Ryu

1
2       A.   Yes.  That's why there is some
3   $150,000 loss for operating these things for,
4   you know, six, seven months because there was
5   -- actually, for cafe, there was extensive
6   renovation.  It didn't cost very much, but it
7   was pretty, you know, extensive cosmetically,
8   so that took quite a bit.  You know.
9       Q.   And it says "The hair salon alone
10  was built with $1.1 million."
11          Is that money that you spent?
12      A.   No.  That was money spent by
13  Eunhee's husband and husband's brother.
14      Q.   And then you go on to say, "Third, I
15  almost acquired Sports Soul aka Sports Chosun."
16  C-H-O-S-U-N.  "Nevertheless, I decided to hold
17  off for now."
18          Do you see that?
19      A.   Yes.
20      Q.   Why did you decide to hold off?
21      A.   Oh, because it was losing money.
22          MR. DZARA:  Objection.  Form.
23  BY MR. YI:
24      Q.   You then go on to say, "Fourth, last
25  October" --

Page 93

S. Ryu

1
2       A.   Yeah.
3       Q.   -- "I went to Costa Rica, Central
4   American country.  I am involved with
5   infrastructure project there."
6          And you go on to talk about that
7   infrastructure project.
8          Do you see that?
9       A.   Yes.
10      Q.   And those statements in that
11  paragraph, the fourth paragraph, are those
12  statements correct?
13      A.   Yes.
14      Q.   And that was during the time you
15  were working full-time at BankAsiana?
16      A.   Yes.  As a matter of fact, I met
17  with number of cabinet leaders and the vice
18  president of the country during that trip.  And
19  it was very interesting opportunity.  Nothing
20  ever materialized, but you know...
21          I went there, as a matter of fact,
22  with my ex-boss from Center Bank, Mr. Kim and
23  his wife and -- you know, Mr. Kim introduced me
24  and other guys who were involved in this
25  project to --

S. Ryu

1
2    Q.   Sir, if I may just -- my question
3    simply was, and did you --
4        A.   Yes.
5        Q.   -- get involved in this
6    infrastructure project in Costa Rica during the
7    time --
8        A.   Yes.
9        Q.   -- you were working full-time at
10   BankAsiana?
11       A.   Yes, yes.
12       Q.   Thank you.
13           (Plaintiff's Exhibit 9, financial
14       statement as of March 31, 2010, marked for
15       identification.)
16   BY MR. YI:
17       Q.   I'm showing you what's been marked
18   as Exhibit 9 to your deposition.
19           Do you recognize this document?
20       A.   Yes.
21       Q.   Is this your personal financial
22   statement as of March 31, 2010?
23       A.   Yes.
24       Q.   Who prepared this?
25       A.   I think I did.  Or maybe someone

S. Ryu

1
2    else helped me.
3        Q.   Did Frank Gleeson help you prepare
4    this document?
5        A.   He may have.
6        Q.   And let's go through this.  Under
7    assets column, cash in the bank, 35,000.
8            To the best of your recollection,
9    was that approximately what you had in your
10   bank account?
11       A.   Maybe.  Perhaps.
12       Q.   And readily marketable securities of
13   350,000.  Is that what you had as of March 31,
14   2010?
15       A.   I'm not sure.  But see, this
16   statement I believe was utilized to send it to
17   the landlord of hair salon as a part of the
18   application for signing of the lease, which it
19   was denied, so -- but I think this was part of
20   that.
21           So I hate to say, but some of these
22   things are blown up a little bit.
23       Q.   All right.
24       A.   So I don't know the accuracy of it.
25   But I mean, you know, things that are -- such

S. Ryu

1
2    as life insurance, real estate, you know,
3    things like that -- yeah, that's -- some things
4    are there.
5        Q.   And as of March 31, 2010, did you
6    actually have any readily marketable securities
7    of 350,000?
8        A.   I may have some, but I don't think I
9    did.
10       Q.   How much -- approximately how much
11   do you think you had?
12       A.   I'm not sure.
13       Q.   Accounts receivable of 45,000, what
14   is that indicating?
15       A.   That's probably from an account
16   receivable from the businesses, perhaps.  But
17   again, I'm not really sure.  Like I said, these
18   things are exaggerated for the purpose of
19   submitting application to private landlord,
20   so...
21       Q.   But the accounts receivable you
22   believe was indicating or relating to the two
23   businesses that we talked about?
24       A.   I would have to think so.
25       Q.   And net surrender value of life

S. Ryu

1
2    insurance, 50,000.
3            I imagine you have whole life
4    insurance and that's the net surrender of cash
5    value?
6        A.   I'm not sure.  There was some cash
7    value which later I cashed in.  But, you know,
8    again, this is nearly ten years ago for, you
9    know, attempt to get a signed lease.  So if you
10   are asking me specifics, whether I recall that
11   I had or not, as I already indicated, these are
12   exaggerated numbers.
13           As to what I have and whatnot, I
14   could explain it to you.  But as to the exact
15   numbers, probably not right.
16       Q.   Did you have whole life insurance
17   policy in March of 2010?
18       A.   I did have life insurance policy,
19   but I don't know the difference between the
20   whole life and half-life, you know, whatever
21   you call it, so...
22       Q.   Well, it's whole versus term.
23       A.   I don't really know.
24       Q.   All right.  Residential real estate,
25   700,000.

S. Ryu

1  
2   Is that indicating your home --
3   A.   Yes.
4   Q.   -- in New Jersey?
5   A.   Yeah.
6   Q.   Did you have a mortgage?
7   A.   Yeah.
8   Q.   And that's 350,000, which is on the
9  liabilities column on the right?
10   A.   I suppose so, yes.
11   MR. DZARA:  Objection.
12   A.   600 and something.
13   Q.   650,000?
14   A.   Yes.
15   Q.   That's relating to the residential
16  real estate of 700,000?
17   A.   Yes.
18   Q.   Real estate investments, 850,000.
19   What does that indicate?
20   A.   I would think that's a residence in
21  California.
22   Q.   So it's one, one property?
23   A.   Right.
24   Q.   And did you have a mortgage on that?
25   A.   Yes.

S. Ryu

1  
2   Q.   So the mortgages payable on the
3  liabilities column on the right of 650,000, is
4  that just for the New Jersey house, or is that
5  combining both the mortgage on New Jersey house
6  and the mortgage on the rental property in
7  California?
8   A.   Perhaps a combination.  But as I
9  said, then that would be not exaggerated.  That
10  would be a shrinkage.  I mean, like I said,
11  this is just really attempt to submit some sort
12  of picture of my financial condition just to
13  get a signed lease.
14   Q.   Partnership/business investments of
15  150,000.
16   What does that relate to?  What is
17  that indicating?
18   A.   It's probably indicating maybe the
19  cafe, since this was for the purpose of the
20  hair salon.
21   Q.   The cafe and the hair salon?
22   A.   I'm not sure.
23   Q.   Invested retirement accounts of
24  250,000?
25   A.   That's probably indicating my 401k,

S. Ryu

1  
2  but I never had that much.  Again, this is
3  exaggerated.
4   Q.   Automobile collection of 250,000?
5   A.   I may have up to 100,000 -- no,
6  actually, more than that in terms of automobile
7  collection.  Not 250,000.
8   Q.   As of March 31 2010, could you just
9  tell us what your collection consisted of?
10   A.   As of 2010, let me see.  I may have
11  had, like, six different cars.
12   Q.   Tell us what they were.
13   A.   Lotus Esprit, Porsche 911, Audi A8.
14   Q.   A8 or an A8 L?
15   A.   A8 L.  Land Rover Discovery.  Toyota
16  FJ 6.  And a Volkswagen van.
17   Q.   Those are the six?
18   A.   I think so, yeah.
19   Q.   Do you still have all of those cars
20  or automobiles?
21   A.   Except for the van, they are all
22  gone.
23   Q.   Sold?
24   A.   Some sold.  Some, you know, crashed.
25  You know.  Some basically stolen, but...

S. Ryu

1  
2   Q.   Let's go to the liabilities column.
3   Notes payable of 35,000, what is
4  that indicating?
5   A.   I'm not sure.  But maybe that's
6  401k.  I'm not sure.
7   Q.   Consumer credit payable of $40,000,
8  what is that indicating?
9   A.   That's probably my creditor debt.
10  But, in fact, my creditor debt was much larger
11  than that.
12   Q.   Approximately how much do you think
13  it was?
14   A.   Probably nearly 100,000.
15   Q.   Taxes payable of 17,000, what does
16  that indicate to you?
17   A.   I'm not sure.  Yeah, just taxes that
18  I suppose I have to pay.
19   Q.   Did you have any other liabilities
20  that are not listed here as of March 31, 2010?
21   A.   Not sure.  There may be.
22   MR. YI:  Do you want to take a quick
23  break, or do you want to keep going?  We'll
24  go to 1 o'clock.
25   We're going to go into the

Page 102

S. Ryu

1
2  afternoon.  Do you want to take a lunch
3  break at 1 o'clock?
4        MR. DZARA:  Sure.
5        MR. YI:  It's now about 12:34.  So
6  we'll stop at 1:00 for a break.
7  BY MR. YI:
8     Q.   Do you know a person by the name of
9  Michael Kim?
10    A.   Yes.
11    Q.   Did he die sometime last year?
12    A.   It may have been a couple of years
13  ago.
14    Q.   Couple years ago.
15         And are you familiar with a company
16  called KORE Consulting?
17    A.   Yes.
18    Q.   K-O-R-E Consulting?
19         And was that Michael Kim's company?
20    A.   I believe so.
21    Q.   Is it fair to say the nature of that
22  company's business was lending?
23    A.   I think that's one of the business
24  -- one of the businesses KORE Consulting was
25  doing.  I think it was a referral business

Page 103

S. Ryu

1
2  facility of loans from banks to clients and
3  such.
4     Q.   By the way, when Robert Yu was
5  either representing you or helping you in
6  connection with the formation of Seleste LLC,
7  and you mentioned that he helped you with
8  another related matter, was he also serving as
9  outside counsel to BankAsiana?
10    A.   I'm not sure as outside counsel, but
11  on certain, I believe loan transactions, many
12  different attorneys did, you know, oversee the
13  loans, or assist the loan processing process.
14  And I believe Robert Yu did some of that stuff,
15  too.
16    Q.   Okay.  So are you indicating that he
17  did perform legal services or render legal
18  services as an attorney for BankAsiana during
19  your tenure at the bank?
20    A.   Yes.
21    Q.   And he was one of the closing
22  attorneys --
23    A.   Yes.
24    Q.   -- loan closing attorneys for the
25  bank?

Page 104

S. Ryu

1
2     A.   Yes.
3     Q.   With respect to services rendered by
4  Robert Yu for you --
5     A.   Yes.
6     Q.   -- and/or Ms. Pak and your company
7  Seleste LLC, did you ever pay him?
8     A.   Some.  It wasn't very much.  It was
9  just being a friend, you know.
10    Q.   Okay.  Did you ever receive a
11  personal -- did you ever receive a loan from
12  either Michael Kim or his company, KORE
13  Consulting?
14    A.   Yes.
15    Q.   And was in or about April 2010?
16    A.   Yes.
17    Q.   Do you remember how much?
18    A.   50,000.
19    Q.   And was it from Michael Kim himself,
20  or was it from his company, KORE Consulting?
21    A.   Unsure, but I think it was from his
22  company.
23    Q.   And that was during the time you
24  were senior vice president and chief operating
25  officer of BankAsiana?

Page 105

S. Ryu

1
2     A.   Yes.
3     Q.   And during that time, April 2010,
4  was Michael Kim -- did he -- was he a customer
5  of BankAsiana?
6     A.   Yeah.  Yes.
7     Q.   And was his company KORE Consulting
8  also BankAsiana's customer?
9     A.   I think so.
10    Q.   Did Michael Kim in 2010 have any
11  other companies or businesses?
12    A.   I think he did.
13    Q.   Do you remember the names of any
14  other companies or businesses?
15    A.   I know he had something, but I do
16  not recall the name.
17    Q.   Was he referring borrowers to
18  BankAsiana --
19    A.   I believe he was.
20    Q.   -- during your tenure at the bank?
21    A.   I believe he was.
22    Q.   And for those referrals, did he
23  receive a fee or some type of payment from
24  BankAsiana?
25    A.   I believe so.

S. Ryu

1
2     Q.   What was the arrangement, as far as
3  you can recall?
4     A.   I was not -- I was never involved in
5  any lending operation of banking business, so
6  I'm unclear as to the exact nature of the terms
7  and conditions for his referrals and whatnot.
8         But I know that it referred to loan
9  clients to BankAsiana, and I think he was paid
10 in certain percentage.
11        Sorry.  (Cellphone ring.)
12        (Answer was read back as follows:
13        "ANSWER:  I was not -- I was never
14     involved in any lending operation of
15     banking business, so I'm unclear as to the
16     exact nature of the terms and conditions
17     for his referrals and whatnot.  But I know
18     that it referred to loan clients to
19     BankAsiana, and I think he was paid in
20     certain percentage.)
21 BY MR. YI:
22     Q.   So if Michael Kim or his company
23 referred a potential borrower to the bank,
24 BankAsiana, and that person or company ended up
25 closing a loan and getting a loan from the

S. Ryu

1
2  bank, then Michael Kim or his company would
3  receive a percentage of that loan amount, yes?
4     A.   Yes.
5     Q.   Why did you borrow 50,000 from
6  either Michael Kim or his company KORE
7  Consulting in April of 2010?
8     A.   Because of -- mainly because of the
9  hair salon, and to help operations of the cafe
10 and hair salon.
11    Q.   Did you complete the repayment of
12 that loan?
13    A.   Yes.
14    Q.   When approximately?
15    A.   Maybe -- it's either the end of 2010
16 or end of 2011.  I'm not sure.
17    Q.   And what were the -- what was the
18 source of funds with which you made those loan
19 repayments?
20    A.   For beginning, the $10,000 deposit
21 that I made to operate the cafe, I got that
22 back.  Oh, and I took out an employee loan, I
23 think for $25,000.  And Mr. Hur arranged this
24 personal loan from Youngsam Yu, who was the --
25 who was an architect called SOYU ARCHitecture,

S. Ryu

1
2  and he -- I think he let me borrow 15,000.  I
3  think that makes exactly 50,000.
4         And in which for Youngsam Yu and
5  SOYU ARCHitecture, I paid him back, like,
6  $1,500 per month for the next ten months or
7  whatnot.  So I think I did pay him back in
8  December of 2010, not 2011.
9         (Plaintiff's Exhibit 10, account
10     overdrawn advice notifications from then
11     Royal Asian Bank, marked for
12     identification.)
13 BY MR. YI:
14    Q.   I'm showing you what's been marked
15 as Exhibit 10 to your deposition.
16        Do you recognize that?
17    A.   Yes.
18    Q.   And I'll represent to you that these
19 are documents that we received from Noah Bank,
20 formerly known as Royal Asian Bank, in response
21 to our subpoena duces tecum, and the --
22        Do you recall receiving these
23 account overdrawn advice notifications from
24 then Royal Asian Bank?
25    A.   Do I recall?  No, I don't.

S. Ryu

1
2     Q.   Have you had a chance to take a look
3  at this?
4     A.   Yeah, I just skimmed through it
5  right now.
6     Q.   Okay.  And is this accurate -- does
7  this refresh your recollection as to that --
8  this Seleste LLC account at then Royal Asian
9  Bank had a negative -- essentially, an account
10 overdrawn status?
11        MR. DZARA:  Objection to form.
12 BY MR. YI:
13    Q.   During the time indicated in these
14 documents, July 2010, September 2010,
15 August 2011?
16    A.   Yeah, it does indicate that.
17    Q.   Okay.  Do you know why this account
18 was overdrawn during that time period?
19    A.   I have no idea.
20    Q.   What was money that -- why did you
21 open up this account?
22    A.   Because of the cafe and hair salon.
23    Q.   And do you recall how much you
24 deposited into this account when you opened it?
25    A.   No, I don't recall.

Page 110

S. Ryu

1
2   Q.   Is it fair to say it was fairly
3   minimal?
4       A.   Yeah, it was.
5       Q.   And is it fair to say that during
6   the entire time -- during the entire account
7   history of this account --
8       A.   Yes.
9       Q.   -- that it was either overdrawn or
10  it had minimal amounts?
11      A.   I would think -- I would guess.
12      Q.   Okay.
13          (Plaintiff's Exhibit 11, e-mail
14      string, marked for identification.)
15  BY MR. YI:
16      Q.   I'm showing you what's been marked
17  as Exhibit 11 to your deposition.
18          Do you recognize the e-mails that
19  are in this exhibit?
20      A.   Yes.
21      Q.   Okay.  Let me first ask you to turn
22  to page 3.
23      A.   Yes.
24      Q.   On the bottom of page 3, is that a
25  copy Ms. Pak's e-mail to Robert Yu, and you

Page 111

S. Ryu

1
2   were copied on that from January 14, 2010,
3   4:15 p.m.?
4       A.   Yeah, it looks that way.
5       Q.   And there's a reference to
6   Mrs. Cherie Ryu.
7       A.   Yes.
8       Q.   Cherie is C-H-E-R-I-E, Ryu, Kudo
9   Beans former owner.  And then it has a
10  cellphone number.
11          Do you know who that person is?
12      A.   Yeah, that's the previous owner of
13  Kudo Beans before Mr. Lee purchased from bank
14  sale.
15      Q.   Any relation?
16      A.   No, no relation.
17      Q.   And if you turn to page 1, on the
18  bottom there's a -- that's an e-mail from
19  Robert Yu to you, with a CC to Pak.
20          And in that e-mail there's a
21  reference to a 50,000 --
22          MR. DZARA:  Can we go off the
23      record.
24          (Discussion held off the record.)
25          MR. YI:  Sir, I think the privilege

Page 112

S. Ryu

1
2   belongs to you.  Are you asserting the
3   privilege?
4       MR. DZARA:  For the record, as the
5   conversation we had off the record, Robert
6   Yu -- Mr. Ryu already testified that Robert
7   Yu was the attorney for Seleste LLC.  The
8   two members of Seleste LLC are James Ryu
9   and Eunhee Pak, which have already been
10  established by testimony today by Mr. Ryu.
11          These communications that you're
12  showing, as Plaintiff Ryu alleged, are all
13  communications between Ms. Pak, Mr. James
14  Ryu, and Mr. Yu.  So therefore, it's my
15  opinion I never produced these documents.
16  Wilshire Bank did, because they were using
17  James -- they were from James e-mail
18  account at Bank Asiana, which I never had
19  access to.  Only Wilshire Bank did and
20  Mr. Yi and his colleagues.
21          So it is my opinion that all of
22  those e-mails are privileged communications
23  between the attorney and client, and I'm
24  instructing Mr. Ryu not to answer any
25  questions about these, and I'm also asking

Page 113

S. Ryu

1
2   Mr. Yi to turn over all communications that
3   he has that have or have not produced that
4   are communications between Mr. Ryu and --
5   Mr. James Ryu and Ms. Pak.  So I think we
6   could put this e-mail aside.
7       MR. YI:  Okay.
8       MR. DZARA:  He doesn't need to
9   confirm them.  I'm asserting the objection
10  and I'm instructing him not to answer.  So
11  he's not going to answer.
12      MR. YI:  All right.
13      MR. DZARA:  Off the record.
14      (Discussion held off the record.)
15      MR. YI:  Well, I don't think there's
16  any material or any information here that
17  is in any way sensitive.  I think this
18  relates to the $50,000 loan that we've
19  already discussed.  So I don't see any
20  reason to assert the privilege.
21      MR. DZARA:  It's a privileged
22  communication between a lawyer and two
23  representative members of the LLC.
24      MR. YI:  That's fine.
25      MR. DZARA:  You should never have

S. Ryu

1
2  been able to look at them, number one.
3      So move on to your next question and
4  your next exhibit, please.
5      (Plaintiff's Exhibit 12, MOU, marked
6  for identification.)
7      MR. DZARA:  And we're going to have
8  to circle back at the end, figure out what
9  to do with these e-mails because they can't
10  be used for any purpose.  Next question.
11  BY MR. YI:
12     Q.   So I'm showing you what's been
13  marked as Exhibit 12 to your deposition.
14     Do you recognize this?
15     A.   Yes.
16     Q.   Is this the MOU that you were
17  referring to or is this a different MOU?
18     A.   I think this is the MOU that I was
19  referring to.
20     Q.   Earlier you testified that you had
21  contemplated acquiring the ownership interest
22  of Sports Chosun from a Mr. Lee, and that you
23  ultimately decided to hold off and you didn't
24  actually go through with it.
25     Is this an MOU relating to Sports

S. Ryu

1
2  Chosun?
3      A.   Yes.  So going back, this is not --
4  this MOU is not related to the cafe.
5      Q.   Okay.  The businesses that we
6  discussed previously, Kudo Beans and the hair
7  salon, did there come a time when those
8  businesses stopped operating, closed down?
9      A.   Oh.  You mean, closing down as to --
10     Q.   No longer in operation.
11     A.   By me or...
12     Q.   By anybody.
13     A.   I'm not sure when.
14     Q.   By you?  By you --
15     A.   Both in July of 2010.
16     Q.   What happened to the two businesses
17  after you stop operating and closed it down?
18     A.   I think Mr. Lee operated the cafe
19  for -- I don't know how long, you know, using
20  someone, I believe.  The hair salon, I have no
21  idea.
22     Q.   So as of July 2010, neither you nor
23  Ms. Pak were operating those businesses?
24     A.   Yes, correct.
25     Q.   And Ms. Pak's husband and the

S. Ryu

1
2  husband's brother were also no longer operating
3  the hair salon?
4      A.   Right.
5      Q.   With respect to the proposed
6  assignment of the lease for the cafe, did the
7  landlord ever tell you why the proposed lease
8  assignment was not approved?
9      A.   No.  He just said, "This lease was
10  for Mr. Lee."  That's all he had to say.
11     Q.   But he made the decision not to
12  approve the proposed lease assignment after you
13  submitted your personal financial statement,
14  correct?
15     A.   I never submitted any financials to
16  the building owner of the cafe.  That
17  particular financial statement, that was for
18  lease for the hair salon.
19     Q.   Lease for the hair salon?
20     A.   Right.
21     Q.   And was the lease obtained after the
22  financials were submitted?
23     A.   No.
24     Q.   It was not approved?
25     A.   I think I indicated before that

S. Ryu

1
2  neither one of those businesses, the leases
3  ever were converted to -- under the company or
4  my name.
5      Q.   Okay.
6      MR. YI:  I think we're going to take
7  a break now.
8      (Recess is taken.)
9  BY MR. YI:
10     Q.   Okay.  Sir, before we go back to
11  some of the exhibit documents, I'd like to go
12  over some bank accounts that you have and
13  credit cards that you have.
14     Do you currently have a bank account
15  or accounts at Noah Bank?
16     A.   No.
17     Q.   Do you currently have any bank
18  accounts with JPMorgan Chase?
19     A.   No.
20     Q.   Do you currently have any bank
21  accounts at TD Bank?
22     A.   Yes.
23     Q.   New Millennium Bank?
24     A.   Yes.
25     Q.   The account at New Millennium Bank

Page 118

S. Ryu

1
2    -- by the way, is it one account --
3        A.    Yes.
4        Q.    -- New Millennium Bank?
5        A.    Yeah.
6        Q.    And is it a joint account with your
7    wife?
8        A.    Yes.
9        Q.    Center Bank?
10       A.    No.
11       Q.    You did have an account at
12   BankAsiana and Wilshire Bank that's been
13   closed?
14       A.    Yes.
15       Q.    So currently, you have bank accounts
16   at TD Bank and New Millennium Bank?
17       A.    Yes.
18       Q.    The account at TD Bank, is it your
19   name only, or is it a joint account?
20       A.    My name only.
21       Q.    Does your wife have any bank
22   accounts in her name only?
23       A.    No.
24       Q.    Okay.  Let's go back to 2009, the
25   time period of 2009 to 2014.

Page 119

S. Ryu

1
2        During that time period, did you
3    have any bank accounts at Noah Bank?
4        A.    Yes.
5        Q.    Or formerly known as Royal Asian
6    Bank?
7        A.    Yes.
8        Q.    How many accounts?
9        A.    I think one.
10       Q.    Was it in your name only?
11       A.    One was in Seleste, I believe.  I
12   don't know that I had a personal account there
13   or not.  I'm not sure.
14       Q.    Okay.  I think we have some
15   documents showing Seleste LLC's account.
16       A.    Right.
17       Q.    And I think the name of the bank at
18   the time was Royal Asian Bank.  We'll go over
19   that.
20       A.    Right.
21           MR. DZARA:  We've already looked at
22   those.
23   BY MR. YI:
24       Q.    You don't -- you didn't have any
25   other accounts?

Page 120

S. Ryu

1
2        A.    I don't think so.  For Royal Asian,
3    I think Seleste may have been only account.
4        Q.    Okay.  During the same time period,
5    did you have any bank accounts at JPMorgan
6    Chase?
7        A.    Yes.
8        Q.    How many?
9        A.    Just one.
10       Q.    In your name only?
11       A.    Yes.
12       Q.    And was that a checking?  Savings?
13       A.    Checking.
14       Q.    Checking?
15       A.    It might have been checking and
16   savings.  I don't know.
17       Q.    And approximately when did you close
18   that account at Chase?
19       A.    Maybe 2015.
20       Q.    During that time period, did you --
21   did your son or your daughter have any bank
22   accounts?
23       A.    From 2014, I don't think so, no.
24   But they do have a -- they do have accounts at
25   TD now.

Page 121

S. Ryu

1
2        Q.    Okay.  Have we covered all of the
3    bank accounts that you had during the time
4    period of 2009 to 2014?
5        A.    Yeah, I think so.
6        Q.    Whether, you know, held only in your
7    name or jointly with others?
8        A.    Yes.
9        Q.    So you didn't have any joint
10   accounts, bank accounts where the account
11   holder was you and someone else, other than
12   your wife, like your son, your daughter, your
13   father --
14       A.    I don't think so.
15       Q.    -- your brother?
16       A.    No.
17       Q.    Okay.  Credit cards.
18           First, I'm going to ask you about
19   the credit cards you currently have.
20           What are the credit cards -- let me
21   just list them for you, and you can tell me.
22       A.    Sure.
23       Q.    Chase Slate?
24       A.    Yeah, that account may or may not be
25   open anymore.  I'm just completely late, all

S. Ryu

1 the payments.  So I think it's safe to even
2 assume that they're all closed, all Chase
3 accounts.
4     All the -- I have no credit card as
5 of current because I think they have -- what do
6 you call it?  Charged off the whole credit
7 card, you know, business with me all together,
8 as of today.
9     Q.   Okay.  So is it fair to say that
10 with respect to Chase Slate, you are not
11 currently using that card?
12     A.   Oh, not at all.  I have not used
13 that card for a long time.
14     Q.   And you believe the account has been
15 closed?
16     A.   I think so.
17     Q.   Chase Freedom credit card?
18     A.   Same story.
19     Q.   Chase, Inc. --
20     A.   Same.
21     Q.   -- which appears to be a business
22 credit card?
23     A.   Same story.
24     Q.   What is the -- who's the account

S. Ryu

1 holder --
2     A.   Me.
3     Q.   -- for Chase, Inc.?
4     A.   Myself.
5     Q.   It's you?
6     A.   Yes.
7     Q.   And same sorry?
8     A.   Yup.
9     Q.   Discover?
10     A.   Yes.  Same story.
11     Q.   Same story?
12     Capital One?
13     A.   Same story.
14     Q.   And Synchrony Bank?
15     A.   Same story.
16     Q.   R Us credit card, I think it's
17 called?
18     A.   Right, right.
19     Q.   Same story?
20     A.   Yes.
21     Q.   So is it fair to say that you
22 currently do not have or use any credit cards?
23     A.   Correct.
24     Q.   Do you have any charge cards?

S. Ryu

1     A.   Charge cards?  I have debit card.
2 That's the only card that I have.
3     Q.   And with whom do you have a debit
4 card?
5     A.   TD Bank.
6     Q.   Okay.  Now, going back to 2009-2014
7 time period.
8     Chase Slate?
9     A.   I think I have it, yeah.
10     Q.   Chase Freedom?
11     A.   Yes.
12     Q.   Chase, Inc.?
13     A.   Yes.
14     Q.   Discover?
15     A.   I think so, yes.
16     Q.   Capital One?
17     A.   May not have had, but maybe.
18     Q.   Synchrony Bank?
19     A.   Same thing, maybe I had it, you
20 know.
21     Q.   So is it fair to say that, to the
22 best of your recollection, during the period of
23 2009-2014, during that time period, you did
24 have and use the credit cards that we just went

S. Ryu

1 over?
2     A.   Yes, Yes.
3     Q.   Any other credit cards that we
4 didn't discuss?
5     A.   I don't think so.
6     Q.   And the debit card at -- the TD Bank
7 debit card, that's tied to your TD Bank
8 account?
9     A.   Yes.
10     Q.   In your name only?
11     A.   Yes.
12     Q.   For the joint account at New
13 Millennium Bank, do you also have a --
14     A.   Debit card.
15     Q.   -- debit card?
16     A.   Yes.
17     Q.   You have one -- you and your wife
18 both have a debit card?
19     A.   Yes.
20     Q.   Now, just want to go over the list
21 of your wife's credit cards.
22     I have Citibank credit card.
23     A.   The list that you probably have
24 there of -- all of our credit cards are closed.

Page 126

S. Ryu
Currently, she has no credit cards.
Q. Okay. And when we went over your list of your credit cards and you said "same story," would that apply to your wife's credit cards, same story meaning that --
A. Yeah, it was -- sorry.
Q. Same story meaning that those credit cards are no longer being used, and to the best of your knowledge, those account, credit card accounts have been closed?
A. Yes.
Q. And that's the Citibank, American Express, Capital One, HSBC, Discover?
A. Yes.
Q. Did your wife at one time have any other credit cards?
A. I don't think so.
Q. And from the time period of 2009 to 2014, to the best of your knowledge, did your wife have a credit card with those following credit cards: Citibank, American Express, Capital One, HSBC, Discover?
A. Yes.
Q. During the time period of 2009 to

Page 127

S. Ryu
2014, did either your son or your daughter have any credit cards?
A. No.
(Plaintiff's Exhibit 13, Advantage money market account, account number ending 6775, marked for identification.)
BY MR. YI:
Q. Sir, I'm showing you what's been marked as Exhibit 13 to your deposition.
Do you recognize this document?
MR. DZARA: Which pages?
BY MR. YI:
Q. Let's just look at the first page for now.
And I'll represent to you that these documents were produced to us by Noah Bank in response to our subpoena duces tecum.
And on the top, it says "BankAsiana, Inc." And then in the middle of the first page, it says "Advantage money market account."
A. Yes.
Q. Account number ending 6775.
A. Yes.
Q. Can you tell us what this is?

Page 128

S. Ryu
A. Yeah. This is the balance that was left over while BankAsiana was being incorporated back in 2006, 2007 --
Q. Time period?
A. -- and whatnot, yeah. And the investors' money were deposited into Royal Asian Bank, so that the -- we would be able to spend our operating expenses from Royal Asian Bank to build BankAsiana.
Q. So these monies belong to -- is it fair to say that these monies belong to the investors of BankAsiana?
A. Or BankAsiana the organization, you would call. But, you know, once investors put out their risk money, that's -- you know, that goes into the organization.
Q. So put another way, the monies belong to the shareholders of BankAsiana, Inc.?
A. Yes, yes.
Q. Were you a shareholder?
A. No.
Q. Was any member of your family a shareholder of BankAsiana, Inc.?
A. Not at that time. After BankAsiana

Page 129

S. Ryu
got regulatory approval and everything so that we would be able to sell stocks of BankAsiana to public, then my brother and my father owned portion of stock at BankAsiana.
Q. And how much did they invest to get stock?
A. I think $100,000.
Q. Each?
A. I think both combined.
Q. And did any of that money come from you?
A. No.
Q. Their own money?
A. Yeah.
Q. Do you have -- did you have any rights or interest to any of the money that's reflected on this exhibit?
A. No.
(Plaintiff's Exhibit 14, document signed for business account Seleste LLC at Royal Asian Bank, marked for identification.)
BY MR. YI:
Q. I'm showing you what's been marked

Page 130

```
 1              S. Ryu
 2  as Exhibit 14 to your deposition.
 3          Do you recognize this document?
 4      A.   Yes.
 5      Q.   Is this a document that you
 6  completed and signed in order to open the
 7  business account for Seleste LLC at Royal Asian
 8  Bank?  And I believe the time period is
 9  January 2010 or March -- I'm sorry, March 2010.
10      A.   Yeah, yeah.  March 2010.
11      Q.   All right.  I'm sorry.  Can you go
12  back to this exhibit.
13          In this one, two, three -- fourth
14  box on the left, it says "Date opened,
15  March 22, 2010, by Soyeng Im."  That's
16  S-O-Y-E-N-G.  Last name I-M.
17          Do you know who that is?
18      A.   That's the bank person.
19      Q.   I see.  Okay.  Thank you.
20          (Plaintiff's Exhibit 15, bank
21          statements that relate to the bank accounts
22          of Seleste LLC, marked for identification.)
23  BY MR. YI:
24      Q.   I'm showing you what's been marked
25  as Exhibit 15 to your deposition.
```

Page 131

```
 1              S. Ryu
 2          Do you recognize these documents?
 3      A.   Yes.
 4      Q.   Okay.  And I'll represent to you
 5  that we received these documents from Noah Bank
 6  in response to our subpoena duces tecum.
 7          Are these copies of the bank
 8  statements that relate to the bank accounts of
 9  Seleste LLC, which was opened at Royal Asian
10  Bank, and the bank is now known as Noah Bank,
11  for the time periods that are indicated in
12  these documents?
13      A.   Yeah, it looks that way.
14      Q.   Okay.  I've gone through this and it
15  appears that the balance for the most part was
16  less than $50; is that correct?
17      A.   Probably.
18      Q.   Is that consistent with your
19  recollection?
20      A.   Yeah.
21          (Plaintiff's Exhibit 16, Young Lee's
22          e-mail to Irene Lee, from October 30,2013,
23          7:02 p.m., marked for identification.)
24          MR. YI:  I think there was a
25  document that I intended to go over
```

Page 132

```
 1              S. Ryu
 2  previously, so we'll just mark it now.  So
 3  we're going a little bit out of the order.
 4          MR. DZARA:  I don't have a copy.
 5          MR. YI:  You don't have a copy?
 6          MR. DZARA:  You don't have a copy
 7  for me?
 8          (Discussion held off the record.)
 9  BY MR. YI:
10      Q.   I'm showing you what's been marked
11  as Exhibit 16 to your deposition.
12          And I'll represent to you that this
13  is a copy of Bo Young Lee's e-mail to Irene
14  Lee, from October 30,2013, 7:02 p.m.
15          And the subject is "401k loan
16  payment due James Ryu."
17          And the e-mail indicates "410k loan
18  payment due for James" -- and then it says
19  B-A-H-J-N, which I believe refers to sort of
20  your honorary position, a Korean honorary
21  position at the bank.
22          And it has $274.61 times two.  And
23  then he says $549.22 per month.
24          Do you see that?
25      A.   Yes.
```

Page 133

```
 1              S. Ryu
 2      Q.   Was that -- were you making a
 3  monthly repayment of your 401k loan, and is
 4  that consistent with your recollection that it
 5  was $549.22 per month?
 6      A.   Yes.  I don't know whether it was
 7  540-something or 270-something.  But, you know,
 8  it was monthly payment going towards 401k.
 9  Looking at the time of October 30th, that's
10  after I left the bank.
11          So must mean that Bo Young Lee
12  wanted have Irene contact me to pay this.  But
13  soon here after, I pay back the loan.  But
14  anyhow...
15      Q.   So is it fair to say that after you
16  took out the 401k loan in 2010, while you were
17  employed by the bank, you were repaying that
18  loan on a monthly basis?
19      A.   Yes.
20      Q.   And during your tenure at the bank,
21  after you took out the 401k loan, were you
22  making the payment yourself?
23      A.   Well, I was ultimately paying it.
24  But as to making the payments, somebody else
25  could have it done for me.
```

S. Ryu

1
2     Q.   Who would have done it for you?
3     A.   Irene perhaps.  I mean, you know,
4  she would write the check, and I would sign it.
5  Then she deposits it, or something like that.
6     Q.   Did you have an assistant after
7  Ms. Pak left the bank --
8     A.   Yes.
9     Q.   -- August of 2010?
10     A.   Yes.
11     Q.   Who was that?
12     A.   Irene.
13     Q.   Irene Lee?
14     A.   Yeah.
15     Q.   And as your assistant, was one of
16  her -- one of the things that she did for you
17  was to make this monthly payment towards the
18  401k loan?
19     A.   I think so.
20     Q.   In or about May -- I'm sorry, in or
21  about April of 2010, did you apply to Royal
22  Asian Bank for a loan for your company Seleste
23  LLC?
24     A.   Yes, I did.  I think I remember,
25  yes.

S. Ryu

1
2     Q.   What was the amount of the loan that
3  you applied for?
4     A.   I'm not sure.  Maybe 150,000.
5     Q.   Did Royal Asian Bank make the loan
6  to you?
7     A.   No.
8     Q.   Or to Seleste LLC?
9     A.   No.
10     Q.   What was the -- what were you going
11  to use the proceeds of the loan for, if the
12  loan had been approved?
13     A.   Operations and maybe paying the rent
14  money.  You know, running the business.
15     Q.   When you say "running the business,"
16  are you referring to both the cafe and the hair
17  salon?
18     A.   Yes.
19          (Plaintiff's Exhibit 17, two
20  e-mails, marked for identification.)
21  BY MR. YI:
22     Q.   I'm showing you what's been marked
23  as Exhibit 17 to your deposition.
24          Do you recognize the two e-mails
25  that are contained in this exhibit?

S. Ryu

1
2     A.   Oh, yeah.  Yes.
3     Q.   Okay.  On the bottom of the first
4  page, starting from actually the top of the
5  second page on to the bottom of the first page,
6  is that a copy of Marie Lee's e-mail to you,
7  May 17, 2010, 1:37 p.m., subject is "Seleste
8  LLC"?
9     A.   Yes.
10     Q.   And Marie Lee at the time was with
11  Royal Asian Bank, now called Noah Bank.
12          And in that e-mail, did she notify
13  you that the loan that you had applied for had
14  been declined?
15     A.   Yes.
16     Q.   And she lists the three reasons why
17  the loan had been declined?
18     A.   Yes.
19          (Plaintiff's Exhibit 18, e-mail from
20  Jeanne Kim, at Woori America Bank, marked
21  for identification.)
22  BY MR. YI:
23     Q.   I'm showing you what's been marked
24  as Exhibit 18 to your deposition.
25          Do you recognize this -- these two

S. Ryu

1
2  e-mails?
3     A.   Now that I look at it, yes.
4     Q.   On the bottom of this page, or this
5  exhibit, is that a copy of an e-mail from -- I
6  believe the person's English name is Jeanne
7  Kim, at Woori America Bank, to you, from April
8  30, 2010, 9:16 a.m.  Subject is "Benex Corp"?
9     A.   Yes.
10     Q.   And is it fair to say that in that
11  e-mail Ms. Kim of Woori America Bank is
12  informing you that Woori America Bank is
13  exercising its right in accelerating the loan
14  made to Benex Corp. because of event of
15  default --
16     A.   Yes.
17     Q.   -- payment default, I believe?
18     A.   Yes.
19     Q.   Are you familiar with Benex Corp.?
20     A.   Yes.
21     Q.   What is that company?
22     A.   That is a company formed by Eunhee's
23  husband and his brother.  The loan they
24  obtained from Woori America to make the hair
25  salon.

Page 138

S. Ryu

1
2     Q.   And Benex Corp. was the company that
3  was -- that owned and operated the hair salon?
4     A.   Yes.
5     Q.   And was that prior to you getting
6  involved with the operation?
7     A.   Yes.
8     Q.   And the top of this exhibit, you
9  took that e-mail and you forwarded it to
10 Ms. Pak, correct?
11    A.   Yes.
12    Q.   What happened with this loan to
13 Benex Corp., if you know?
14    A.   I'm not -- I'm unsure, but my guess
15 is, it would -- the whole thing was charged
16 off, probably.
17    Q.   When you say, "the whole thing was
18 charged off," you mean the loan was in some off
19 in some respect by Woori America Bank?
20    A.   Yeah.
21    Q.   Do you know whether there was ever a
22 legal action taken by Woori American Bank
23 against Benex Corp. or any of their guarantors
24 on the loan?
25    A.   I don't have any idea.

Page 139

S. Ryu

1
2     Q.   Why was Woori America Bank sending
3  you this e-mail?
4     A.   Because -- let's see.  Oh, I wanted
5  to see if Woori Bank would transfer loan to me
6  or, you know, Seleste or whatnot.  And I went
7  to meet them and it never materialized.  But
8  for my information purposes, Woori America send
9  this e-mail to me.
10    Q.   Is it fair to say that you had
11 offered to assume all of the obligations of the
12 loan --
13    A.   Yes.
14    Q.   -- on behalf of Benex Corp.?
15    A.   Yes.
16    Q.   And is it fair to say that Woori
17 America Bank did not approve the proposed
18 assumption of the loan?
19    A.   Yes.  I'm very glad that they
20 didn't.
21        MR. YI:  Off the record.
22        (Discussion held off the record.)
23        (Plaintiff's Exhibit 19, e-mail
24     string with an e-mail from Jon Schwitzer,
25     marked for identification.)

Page 140

S. Ryu

1
2  BY MR. YI:
3     Q.   Sir, I'm showing you what's been
4  marked as Exhibit 19 to your deposition, and
5  I'm only going to ask you questions about the
6  very first e-mail that is shown in this exhibit
7  on the second page, the bottom of the second
8  page.
9     A.   Yes.
10    Q.   Is that a copy of an e-mail from Jon
11 Schwitzer -- J-O-N, Schwitzer,
12 S-C-H-W-I-T-Z-E-R, to you, with copies to your
13 attorney and someone named Joseph Rotolo
14 (phonetic) from June 3, 2010, 10:49 a.m.?
15    A.   Yes.
16    Q.   And in that e-mail Mr. Schwitzer
17 states:  "Gentlemen, I'm writing because of the
18 fact that we have not yet received a check for
19 the June rent."
20        And then he goes on, indicating that
21 "You would continue to pay regular monthly
22 reoccurring charges in the amount of $16,965.80
23 per month on or before the first day of each
24 month."  And he goes on, "Until the assignment
25 agreement is concluded."

Page 141

S. Ryu

1
2        Do you see that?
3     A.   Yes.
4     Q.   And then it also references 8
5  percent late fee stipulated in the lease in the
6  next paragraph.
7        Do you see that?
8     A.   Yes.
9     Q.   So is it fair to say while that you
10 were waiting for approval of the proposed lease
11 assignment for the hair salon, you had agreed
12 to assume the monthly rent payments --
13    A.   Yes.
14    Q.   -- for the hair salon?
15    A.   Yes.
16    Q.   And that was 16,000 -- a little less
17 than 17,000 a month?
18    A.   Yes.
19    Q.   And did you in fact make those
20 payments?
21    A.   I made actually two payments from
22 the money that I borrowed from Michael Kim.
23    Q.   And why did you stop making the rent
24 payments after the two months you mentioned?
25    A.   Because it was just complete loss.

Page 142

```
1            S. Ryu
2       And, you know, it would throwing $17,000 to,
3   you know, river.  So as you could see, this is
4   in June 30th, a day after, or two after I said,
5   you know, finished to the businesses.
6       Q.   This e-mail is dated June 3, 2010?
7       A.   June 3rd, is it?
8       Q.   June 3, 2010.
9       A.   Oh, yeah.  So maybe some 30 days
10  later, I said.  Oh, okay.
11           (Plaintiff's Exhibit 20, e-mail and
12           the attachment, marked for identification.)
13  BY MR. YI:
14       Q.   I'm showing you what's been marked
15  as Exhibit 20 to your deposition.
16           Do you recognize this e-mail and the
17  attachment?
18       A.   Oh.  The -- now, I remember.  There
19  was a person --
20       Q.   Do you recognize the exhibit?
21       A.   Yes.
22       Q.   The e-mail and attachment?
23       A.   Yes.
24       Q.   Can you tell us who Mr. Gong is?
25       A.   Initially, I did not remember what
```

Page 143

```
1            S. Ryu
2   this was at all.  But now that I look at the --
3   now that I look at it carefully, Mr. Gong is
4   somebody that I really don't know well, but who
5   was very interested in purchasing the hair
6   salon.
7            So he -- and I'm not sure what was
8   his inability, but he wanted to help him get
9   lease assigned to him, you know, from the
10  landlord of hair salon.
11           He wanted me to --
12       Q.   If I may, do you remember the name
13  of Mr. Gong (phonetic)?
14       A.   No, I don't.
15           MR. DZARA:  You mean the first name?
16           MR. YI:  Yes, the full name.
17  BY MR. YI:
18       Q.   The full name?
19       A.   I don't.
20       Q.   His e-mail address is
21  KGS918@hotmail.com.
22           Does that refresh your recollection?
23       A.   Not all.
24       Q.   Did Mr. Gong ever execute this
25  agreement?
```

Page 144

```
1            S. Ryu
2       A.   No.
3       Q.   As of July 14, 2010, you were
4   employed by BankAsiana as senior vice president
5   and chief operating officer, correct?
6       A.   Yes.
7       Q.   And that was your work e-mail,
8   correct, JamesRyu@BankAsiana.com?
9       A.   Yes.
10      Q.   Did you have any dealings with
11  Mr. Gong after this?
12      A.   No.
13           (Plaintiff's Exhibit 21, e-mail and
14           attachment, marked for identification.)
15  BY MR. YI:
16      Q.   Before we get to that exhibit, the
17  next exhibit, in April or May of 2010, did you
18  apply for a loan from Mariner's Bank for the
19  cafe business?
20      A.   I may have, yes.
21      Q.   Seleste LLC?
22      A.   Yes.
23      Q.   And do you recall what the amount of
24  the loan that you were seeking was?
25      A.   No, I don't.  No.
```

Page 145

```
1            S. Ryu
2       Q.   Not at all?
3       A.   Not at all.
4       Q.   Was --
5       A.   Probably, you know, the more the
6   better type of, you know...
7       Q.   Do you have any recollection as to
8   just kind of an approximate range that you had
9   applied for?
10      A.   No.  I don't think I ever applied
11  formally to Mariner's Bank.
12      Q.   Did you make an inquiry as to
13  whether you can obtain a loan from Mariner's
14  Bank either for yourself or for Seleste LCC?
15      A.   It was for cafe, I believe.  And
16  Frank used to be CFO of Mariner's, so I think
17  either he offered to see whether I could get a
18  loan or whatnot.  But beyond that, I don't
19  really recall the details.
20      Q.   And did Mariner's Bank ever approve
21  a loan either to you or Seleste LLC?
22      A.   No.
23      Q.   I'm showing what's been marked as
24  Exhibit 21 to your deposition.
25           Do you recognize the e-mail and the
```

Page 146

S. Ryu

1
2   attachment?
3       A.   Yes.
4       Q.   And is the e-mail a copy of an
5   e-mail from Frank Gleeson to you, from October
6   5, 2011, 11:49 a.m.?
7            The subject is "Seleste."
8       A.   Yes.
9       Q.   And second page of this exhibit is a
10  document called "Business Income Statement,
11  January 2010 to July 2010."
12      A.   Yes.
13      Q.   So is it fair to say that Seleste
14  LLC was the company that you had planned on
15  acquiring both the hair salon and the cafe?
16      A.   Yes.
17      Q.   And by "acquire," I mean ownership
18  interest?
19      A.   Yes.
20      Q.   And the second page of this exhibit
21  is showing both the revenue and expenses for
22  the two business?
23      A.   Yes.
24      Q.   And then the third column "Combined"
25  is for the combined number?

Page 147

S. Ryu

1
2       A.   Yes.
3       Q.   And do you know who prepared that
4   business income statement?
5       A.   I think Frank did.
6       Q.   And did Frank prepare that statement
7   at your request?
8       A.   I am not sure.  It must have been.
9       Q.   And the business income statement
10  shows net income is actually net loss for the
11  hair salon of 103,000 and change.  Cafe, it's
12  just under 90,000.  Again, it's a net loss.
13           Do you see that?
14      A.   Yes.
15      Q.   So it's a combined loss of just
16  under 200,000 for the two businesses?
17      A.   Yes.
18      Q.   Is that consistent with your
19  recollection?
20      A.   I would think so.  You know,
21  anywhere from 150- to 200,000 was a total loss
22  for that, you know, period, for trying to
23  operate the businesses, ultimately, yes.
24      Q.   Okay.  At the time that Mr. Gleeson
25  sent this e-mail to you on October 5, 2011, at

Page 148

S. Ryu

1
2   11:49 a.m., Frank Gleeson was senior vice
3   president and the chief financial offer of
4   BankAsiana?
5       A.   Yes.
6       Q.   And you were at the time senior vice
7   president and COO?
8       A.   Yes.
9            (Plaintiff's Exhibit 22, e-mail to
10           Mr. Henry Chi, marked for identification.)
11  BY MR. YI:
12      Q.   Sir, I'm showing you what's been
13  marked as Exhibit 22 to your deposition.
14           Do you recognize the e-mail and the
15  attachment?
16      A.   Yes.
17      Q.   First e-mail, is that a copy of your
18  e-mail to Mr. Henry Chi, C-H-I, from
19  October 12, 2012, 10:17 a.m.?
20      A.   Yes.
21      Q.   And is the attachment -- withdrawn.
22           You stated in that e-mail it is the
23  loss details of Seleste Consulting for 2011.
24           Do you see that?
25      A.   Yes.

Page 149

S. Ryu

1
2       Q.   And I believe we reviewed earlier
3   your joint income tax return for tax year 2011,
4   which had certain business loss.
5       A.   Yes.
6       Q.   And is this second page of this
7   Exhibit a document that you prepared concerning
8   that loss?
9       A.   Yes.
10      Q.   And you e-mailed it to Mr. Chi.
11           Is Mr. Chi your accountant?
12      A.   Yes.
13      Q.   So looking at the second page of
14  this exhibit, for the year 2011 you had
15  revenue, which is described as professional
16  fees of 3,500, and you have total expenses of
17  just under 50,000; is that correct?
18      A.   Yes.
19      Q.   The 3,500 professional fees, from
20  whom did you receive those fees?
21      A.   I think I got it from Reliance, or
22  one of their subsidiary businesses.
23           As I indicated before to you, it's
24  -- Reliance USA operates many film-related
25  businesses here in the USA.  But again, this is

Page 150

S. Ryu

1   nearly ten years ago -- or six years ago, yeah.
2   My memory serves me correctly, I think that's
3   what it was.
4       Q.   Under "expenses," you have legal of
5   $5,355.
6           Was that payment you made to Robert
7   Yu?
8       A.   I may presume so, but I'm not sure.
9       Q.   Was Robert Yu representing you in
10  connection with your consulting -- Seleste
11  Consulting business?
12      A.   Well, you know, Robert Yu and I had,
13  you know, ongoing good friendship for years.
14  So, yeah, I would assume that may have been the
15  case.
16      Q.   Seleste Consulting, was that a
17  company that was formally formed or
18  incorporated?
19      A.   No.
20      Q.   It was a sole proprietorship?
21      A.   Yes.
22      Q.   You testified earlier that you took
23  out an employee loan in the amount of $25,000
24  from BankAsiana.

Page 151

S. Ryu

1       Q.   Was that in October 2010?
2       A.   It sounds about right.
3       Q.   And did the employee loan program at
4   BankAsiana begin in or about September 2010?
5       A.   Sounds about right.
6       Q.   And did you complete repayment of
7   that loan to BankAsiana?
8       A.   Yes.
9       Q.   When was that?
10      A.   I think it was October of 2013.
11      Q.   Was that around the time that the
12  merger was completed?
13      A.   After merger was completed.  Or
14  exactly when I was terminated, I paid that
15  back.
16      Q.   You mentioned earlier that you had
17  taken a $50,000 loan from either Michael Kim or
18  his company, KORE Consulting.
19          Did you receive any additional loans
20  from either Michael Kim or KORE Consulting?
21      A.   No.
22      Q.   You mentioned a loan from SOYU
23  ARCHitecture that was arranged by Mr. Hur, and
24  you said it was $15,000; is that correct?

Page 152

S. Ryu

1       A.   Yes.
2       Q.   When did you take that loan?
3       A.   Maybe October, November of 2010.
4       Q.   Did you take any additional loans
5   from SOYU ARCHitecture?
6       A.   No.
7       Q.   At the time that you took a loan of
8   $50,000 from SOYU ARCHitecture --
9           MR. DZARA:  Objection.
10  BY MR. YI:
11      Q.   -- was that company --
12          MR. DZARA:  Michael, he said 15,000.
13  BY MR. YI:
14      Q.   I'm sorry, 15,000.  I apologize.
15          Was that company or firm a vendor of
16  BankAsiana?
17      A.   Not at that current time.  But we
18  used them before for architectural works, yes.
19  Mr. Hur, good friend of the guy.  So...
20      Q.   So the SOYU ARCHitecture was the
21  company that renovated the headquarters of
22  BankAsiana, correct, in Palisades Park?
23      A.   I think so.  I think they did that.
24      Q.   During your employment at

Page 153

S. Ryu

1   BankAsiana, did you ever ask any officers or
2   employees of the bank or a loan?
3       A.   Yeah.  Yes.
4       Q.   To whom did you ask for a loan?
5       A.   Well, a few persons.
6       Q.   From whom?  I'm sorry.
7       A.   Bo Young Lee is one.  Jessica --
8       Q.   Kim?
9       A.   Jessica Kim.
10          And this was the period of running,
11  of operating the businesses.  And Chanlai Park,
12  C-H-A-N-L-A-I, Park.  And Mr. Hur.
13      Q.   Bo Young Lee, Jessica Kim, Chanlai
14  Park.  And that's C-H-A-N-L-E-I?
15      A.   L-A-I.
16      Q.   L-A-I.  Park.
17          And Hong Sik Hur?
18      A.   Yes.
19      Q.   Did any of them lend you money?
20      A.   Mr. Hur and Chanlai Park did.
21      Q.   How much did Mr. Park -- oh, I'm
22  sorry, Ms. Park?
23      A.   Oh, 2,500, 3,000, or something like
24  that.

Page 154

S. Ryu

1
2      Q.   Did she lend you anything other than
3  3,000?
4      A.   No.
5      Q.   Just 3,000 approximately?
6      A.   Yes.
7      Q.   Mr. Hur?
8      A.   Maybe 3,500.
9      Q.   Just one loan?
10     A.   Yes.
11     Q.   Bo Young Lee?
12     A.   No.
13     Q.   Jessica Kim?
14     A.   No.
15     Q.   Any other officers or employees?
16     A.   No.
17     Q.   Did you repay Ms. Park?
18     A.   Yes.
19     Q.   Did you repay Mr. Hur?
20     A.   Yes.
21     Q.   When did you -- approximately when
22  did you take a loan from Ms. Park?
23     A.   Maybe March of 2010.
24     Q.   And Mr. Hur?
25     A.   Probably at the same time.

Page 155

S. Ryu

1
2      Q.   What were the loans for?  What did
3  you use the proceeds for?
4      A.   To pay employees for working at
5  cafe.
6      Q.   Anything else?
7      A.   No.
8          (Plaintiff's Exhibit 23, e-mail to
9  Mr. Kumar, marked for identification.)
10  BY MR. YI:
11     Q.   Sir, I'm showing you what's been
12  marked as Exhibit 23 to your deposition.
13         Do you recognize this e-mail and the
14  attachment?
15     A.   Yes.
16     Q.   And is the e-mail a copy of your
17  e-mail to Mr. Kumar, K-U-M-A-R, first name
18  Uday, U-D-A-Y, from June 13, 2012, 3:30 p.m.,
19  subject is "RSK/Seleste presentation"?
20     A.   Yes.
21     Q.   And the attachment is described as
22  "Selet Korea-" -- S-E-L-E-T -- "Korea-animation
23  venture"?
24     A.   Yes.
25     Q.   Have we talked about this project?

Page 156

S. Ryu

1
2      A.   Yes.
3      Q.   Is this the one where -- does this
4  relate to --
5      A.   Reliance.
6      Q.   Reliance?
7      A.   Yes.
8      Q.   And Mr. Kumar is a representative of
9  Reliance?
10     A.   I think he still is the CEO of
11  Reliance USA.
12     Q.   Reliance USA.
13         And this attachment, the
14  presentation material, do you know who prepared
15  this?
16     A.   I did.
17     Q.   Before we move on to the next
18  exhibit, I want to come back to this exhibit.
19  And I'm going to ask you to take a look at --
20  there's no page number, but it's a page that
21  has a heading "Consideration on Details-
22  Principals."
23     A.   Yes.
24     Q.   Strategic alliance.  Then it has two
25  arrows down there.  It says "Rainbow Salad

Page 157

S. Ryu

1
2  Korea/Seleste, CEO James S. Ryu will facilitate
3  this alliance."
4          Do you see that?
5      A.   Yes.
6      Q.   What is Rainbow Salad Korea/Seleste?
7      A.   Rainbow Salad Korea I believe is
8  name of a company out in Korea that facilitates
9  moviemaking.  And this /Seleste means nothing.
10  That's that, and this is this.
11     Q.   When you say "CEO James S. Ryu," CEO
12  of which entity are you referring to?
13     A.   Seleste.
14     Q.   That would be Seleste LLC?
15     A.   Sure.  I'm just using the name.
16  That's all.
17         MR. DZARA:  LLC don't have officers.
18  There could no CEO in an LLC.
19     A.   This is printed in a really weird
20  way.  I don't know why it printed this way.
21     Q.   As of June 2012, were you -- did you
22  hold a title of CEO at any company?
23     A.   No.  This is a proposal.
24     Q.   Okay.  So you were proposing that
25  you would be the -- if this proposal was

Page 158

S. Ryu

1
2   accepted and executed, you would have expected
3   to be CEO of what entity?
4           MR. DZARA: Objection. There's zero
5   foundation in that question.
6           Answer if you can.
7       A.  I guess, my own company. Seleste, I
8   suppose. Yes, Seleste. I don't know what this
9   -- I hardly recall this Rainbow Salad thing.
10  But I mean, if you were curious, this M Venture
11  (phonetic), you could research. It's a huge
12  company that invests a lot of money in movies.
13          (Plaintiff's Exhibit 24, notice from
14      GE Capital Retail Bank, marked for
15      identification.)
16  BY MR. YI:
17      Q.  I'm showing you what's been marked
18  as Exhibit 24 to your deposition.
19          Do you recognize this document?
20          And I'll represent to you that this
21  exhibit is a document that we received from
22  Synchrony Bank in response to our subpoena
23  duces tecum.
24      A.  Now, when I look at it, yeah, I
25  recall.

Page 159

S. Ryu

1
2       Q.  Okay. As far as you know, did you
3   receive a copy of this notice on or about
4   October 29, 2012, from GE Capital Retail Bank?
5       A.  Well, Synchrony Bank I think bought
6   off GE Capital, so I did not immediately
7   recognize this documentation. But yeah, it
8   looks like I did receive it. But in context
9   what they're saying is that they're cutting my
10  limit because my credit level is too high or
11  whatnot. So...
12      Q.  Right.
13          So in this -- in this letter to you,
14  dated October 29, 2012, notice letter, GE
15  Capital Retail Bank is stating it has decided
16  to lower the credit limit on your R Us
17  Mastercard account to $3,810, correct?
18      A.  Yes.
19      Q.  And they cite the reasons for the
20  down as to why they made that decision.
21      A.  Yes. It was a bummer, you know.
22          (Plaintiff's Exhibit 25, e-mail from
23      Bo Young Lee, marked for identification.)
24  BY MR. YI:
25      Q.  I'm showing you what's been marked

Page 160

S. Ryu

1
2   as Exhibit 25 to your deposition.
3           Do you recognize this document?
4       A.  Yes.
5       Q.  Is this a copy of an e-mail from Bo
6   Young Lee to a number of then-employees of
7   BankAsiana, and the subject of this e-mail is a
8   sort of a farewell party or gathering for
9   Ms. Pak --
10      A.  Yes.
11      Q.  -- at Kudo Beans after the staff
12  meeting the following the day of this e-mail?
13      A.  Yes.
14      Q.  And did you attend that farewell
15  gathering?
16      A.  Yes.
17          (Plaintiff's Exhibit 26, checks
18      issued to KORE, marked for identification.)
19  BY MR. YI:
20      Q.  I'm showing you what's been marked
21  as Deposition Exhibit 26 to your deposition.
22          Do you recognize these documents?
23      A.  Yes.
24      Q.  Are these copies of checks that you
25  signed and that you issued to KORE or KORE

Page 161

S. Ryu

1
2   Consulting?
3       A.  Yes.
4       Q.  And the dates of the checks are
5   indicated.
6           Those are your handwriting, right?
7       A.  Yes.
8       Q.  That's your signatures on those
9   checks?
10      A.  Yes.
11      Q.  And is it fair to say that these
12  checks represent loan repayment to KORE
13  Consulting?
14      A.  Yes.
15      Q.  The $50,000 loan that we talked
16  about earlier?
17      A.  Yes.
18      Q.  So -- so -- excuse me.
19      A.  Excuse. Let me make this remark.
20          It must be that I paid the loan off
21  not in 2010, but maybe end of 2011 or a little
22  bit beyond that.
23      Q.  Right. I see, if you look at the
24  last page, it says January 13, 2012, check.
25      A.  Yes.

S. Ryu

1
2     Q.   And if you take a look at the check
3  dated December 29, 2011, it's for 25,000.
4     A.   Yes.
5     Q.   And there's a memo there.  It says
6  -- can you tell me what that says?
7        I see a number of 18,500.
8     A.   Yes.
9     Q.   What is the letter -- that's just a
10 dollar sign?
11    A.   Yes.
12    Q.   And is that indicating the balance
13 of the loan?
14    A.   Yes.
15    Q.   Okay.  And the 25,000, is that from
16 the employee loan from BankAsiana?
17    A.   I don't think so.  Because if you
18 have research and it said that I borrowed
19 $25,000 in 2010 --
20    Q.   It was October 2010.
21    A.   Yeah.  Then I don't think that's
22 what it was.
23        This is from my bonus.
24    Q.   Your bonus for 2011 was 25,000?
25    A.   Yes.  Something like that.  It was

S. Ryu

1
2  consistently about that much.
3        (Plaintiff's Exhibit 27, e-mail from
4      Soomi Kim, marked for identification.)
5  BY MR. YI:
6     Q.   I'm showing you what's been marked
7  as Exhibit 27 to your deposition.
8        Do you recognize this?
9     A.   Yes.
10    Q.   Is this a copy of an e-mail from
11 Soomi, S-O-O-M-I, last name Kim, K-I-M, to
12 Maureen Hemhauser, with a copy to you and Irene
13 Lee, from July 16, 2013, 3:40 p.m., subject
14 "employee loans list"?
15    A.   Yes.
16    Q.   Okay.  And under one, there's an
17 indication of your name, loan number, original
18 loan amount of 25,000, and the then-current
19 balance of 11,755.70.
20       Do you see that?
21    A.   Yes.
22    Q.   Is that consistent with your
23 recollection?
24    A.   Sure.
25    Q.   Were you aware that Karen Chon also

S. Ryu

1
2  had an employee loan?
3     A.   Yes.
4     Q.   For the same amount, 25,000?
5     A.   Yes, maximum amount.
6        (Plaintiff's Exhibit 28, checks
7      issued to SOYU ARCHitecture, marked for
8      identification.)
9  BY MR. YI:
10    Q.   I'm showing you what's been marked
11 as Exhibit 28 to your deposition.
12       Do you recognize these documents?
13    A.   Yes.
14    Q.   Are these copies of checks that you
15 signed and issued to SOYU ARCHitecture?
16    A.   Yes.
17    Q.   Do these checks represent your loan
18 repayment to SOYU ARCHitecture?
19    A.   Yes.  It must be that he lend me
20 $18,000.
21    Q.   So the memo on each check is
22 indicating the remaining balance on the right
23 side?
24    A.   Yes.
25    Q.   So the first page of this exhibit,

S. Ryu

1
2  when it says 16,500, that's the remaining
3  balance of the loan?
4     A.   Yes.
5     Q.   So based on those notations, you now
6  recall that the amount of the loan was 18,000?
7     A.   Yes.  I thought it was 15, but...
8        (Plaintiff's Exhibit 29, letter that
9      was sent to Mr. Ryu's wife from IndyMac
10     Mortgage Services, marked for
11     identification.)
12 BY MR. YI:
13    Q.   I'm showing you what's been marked
14 as Exhibit 29 to your deposition.
15       Do you recognize this document?
16    A.   Now that I look at it, yes.
17    Q.   Have you seen this document before?
18    A.   I think so.
19    Q.   Okay.  Let's turn to the third page
20 of this exhibit.
21    A.   Yes.
22    Q.   Was this -- I just want to make sure
23 that this third page was an enclosure or
24 attachment to the letter, May 23, 2011, letter
25 from IndyMac Mortgage Services?

Page 166

```
1              S. Ryu
2       A.   I don't think so.
3       Q.   They're two separate documents?
4       A.   I would think so.  It has to be.
5       Q.   Okay.  So let's separate them.
6  Okay.
7            Is it fair to say Exhibit 29 is a
8  copy of a letter that was sent to your wife
9  from IndyMac Mortgage Services?
10      A.   Yes.
11      Q.   And you remember seeing this letter?
12      A.   I think so.
13      Q.   You remember discussing this with
14 your wife?
15      A.   No.
16      Q.   And when it says "You have fallen
17 behind your mortgage payments," are they
18 referring to the mortgage payments on the New
19 Jersey house or the property in California?
20      A.   Property in California.
21      Q.   And is it fair to say that IndyMac
22 Mortgage Services was the loan servicing
23 company?
24      A.   Yes.
25      Q.   Do you remember -- it says "A
```

Page 167

```
1              S. Ryu
2  division of OneWest Bank, FSB, Federal Savings
3  Bank," I believe.
4            And is it fair to say that as of
5  May 2011 -- well, withdrawn.
6            Why was this letter sent to your
7  wife, not you?
8       A.   Because the house is -- was under
9  her name only.
10      Q.   I see.
11           And the mortgage loan was also in
12 her name only?
13      A.   Yes.
14           (Plaintiff's Exhibit 30, home equity
15      line of credit statement issued by
16      Citibank, marked for identification.)
17 BY MR. YI:
18      Q.   Did you and your wife purchase the
19 house in California while you were married,
20 during your marriage?
21      A.   Yes.
22      Q.   Okay.  I'm showing you Exhibit 30 to
23 your deposition.
24           Do you recognize this exhibit?
25      A.   Now that I look at it, yes.
```

Page 168

```
1              S. Ryu
2       Q.   Is this a copy of home equity line
3  of credit statement issued by Citibank to -- or
4  sent by Citibank to your wife?
5       A.   Yes.
6       Q.   And do you recall that there was a
7  home equity line of credit in addition to the
8  first mortgage on the California house, that
9  was a home equity line of credit?
10      A.   Yes.
11      Q.   And do you remember what the
12 original line of credit amount was?
13      A.   I think it was 12,500, as indicated
14 in the third box in the middle.
15      Q.   Okay.
16           (Plaintiff's Exhibit 31, notice
17      letter from Meridian Foreclosure Service,
18      marked for identification.)
19 BY MR. YI:
20      Q.   I'm showing you what's been marked
21 as Exhibit 31 to your deposition.
22           Do you recognize this document?
23      A.   Yes.
24      Q.   Is this a copy of a notice letter
25 from Meridian Foreclosure Service that was sent
```

Page 169

```
1              S. Ryu
2  to your wife on September 29, 2011?
3       A.   Yes.
4       Q.   And was this essentially a notice of
5  default and election to foreclose on the deed
6  of trust which had secured -- which was secured
7  on the house in California?
8       A.   Yes.
9       Q.   And if you turn to the second page,
10 it says amount of debt, 576,000.
11           Is that consistent with your
12 recollection?
13      A.   Yes.
14      Q.   Okay.
15           (Plaintiff's Exhibit 32, notice of
16      trustee sale, marked for identification.)
17      A.   And certainly, the house was
18 foreclosed forcibly.  The laws are a little bit
19 different in California.
20      Q.   I'm showing you what's been marked
21 as Exhibit 32 to your deposition.
22           Do you recognize this document?
23      A.   Yes.
24      Q.   Is this a copy of a notice of
25 trustee sale that was sent by Meridian
```

S. Ryu

1
2  Foreclosure Service to your wife?
3      A.   Yes.
4      Q.   And the date here on the notice is
5  December 23, 2011?
6      A.   Yes.
7      Q.   And the amount of unpaid balance and
8  other charges, total amount is indicated to be
9  $614,735.75.
10         Is that consistent with your
11 recollection?
12     A.   Yes.
13         (Recess is taken.)
14 BY MR. YI:
15     Q.   We've looked at documents relating
16 to the property owned in the name of your wife,
17 in Northridge, California, also known as Los
18 Angeles, California, and we looked at exhibits
19 including the notice of trustee sale, dated
20 December 23, 2011.
21         Did a trustee sale of that property
22 take place?
23     A.   Yes.
24     Q.   And did that take place in August of
25 2012?

S. Ryu

1
2      A.   I'm not sure exactly when, but if
3  that's what you know, that must be true.
4      Q.   According to our records or review,
5  that trustee sale occurred on August 7, 2012.
6      A.   Sounds right.
7      Q.   You don't have any reason to believe
8  that that's incorrect?
9      A.   No, no.
10     Q.   Okay.  And prior to that trustee
11 sale in August of 2012, do you recall whether
12 your wife filed for personal bankruptcy?
13     A.   Yes.
14     Q.   And do you recall when she filed --
15 and was that Chapter 13?
16     A.   I'm not sure what chapter, but...
17     Q.   It was a personal bankruptcy filing?
18     A.   Yeah.
19     Q.   In her name only?
20     A.   Yes.
21     Q.   And did she make that filing through
22 her counsel with a U.S. Bankruptcy Court for
23 the District of New Jersey?
24     A.   I think so.
25     Q.   And was she represented -- do you

S. Ryu

1
2  know who represented her?
3      A.   I think it was Robert Yu.
4          MR. DZARA:  Michael, for the record,
5      the document request that you sent to us
6      only concerned loans to James.  You never
7      asked for loans for his wife, which I
8      probably would have objected to.  But we
9      didn't produce any documents for that
10     basis, any documents related to any loans
11     to Mrs. Ryu.  Basically, you didn't ask for
12     any.
13 BY MR. YI:
14     Q.   Do you know why she filed for
15 bankruptcy?  And I'm sorry.  Withdrawn.
16         And do you know when she filed for
17 bankruptcy?  Was it in 2012?
18     A.   I think so.
19     Q.   Was it prior to the trustee sale,
20 which I think I told you was August 2012?
21     A.   On or around then, I believe.  But
22 as to exact when, I don't know.
23     Q.   And was the purpose of her
24 bankruptcy filing, to your knowledge, was it to
25 sort of stop or delay the trustee sale?

S. Ryu

1
2      A.   Perhaps.  I don't recall exactly.
3      Q.   Were you communicating with Robert
4  Yu in connection with the trustee sale that was
5  scheduled and your wife's personal bankruptcy
6  filing?
7      A.   I think so.
8      Q.   And based on those -- and you don't
9  have to tell me what you discussed with him --
10 but based on your discussions with your wife
11 and with Robert Yu, was it your understanding
12 that she had filed for personal bankruptcy in
13 order to either stop or delay the trustee sale?
14     A.   I am not sure.
15     Q.   Okay.  And you didn't join in that
16 personal bankruptcy filing in 2012 because the
17 property that was being foreclosed on in
18 California was only in her name and not your
19 name -- you were not on that deed --
20     A.   No.
21     Q.   -- deed of trust?
22     A.   No.
23     Q.   That was the reason?
24     A.   I don't know if that was the reason,
25 but maybe -- not certain.  But it was an

Page 174

S. Ryu

1  option, I believe, that the counselor
2  presented, and you know, I think we took his
3  advice and...
4      Q.   Why did she -- I'm sorry if we went
5  over this.  I just want to make it clear that I
6  understand.
7      What were the reasons as far as, you
8  know, for her personal bankruptcy filing in
9  2012?
10     A.   Too much debt.
11     Q.   In her name only?
12         MR. DZARA:  Objection.
13     A.   The house --
14         MR. DZARA:  Sorry.  Keep going.
15  Ignore me.
16     A.   Yeah, the house and whatever the
17  obligation under her name, I suppose, was the
18  reason why.
19     Q.   Okay.  So she had -- she had
20  defaulted on the loan payments on the house in
21  California by 2011.
22      Did she also have credit card debt?
23     A.   Yes.
24     Q.   Any other types of debts?

Page 175

S. Ryu

1      A.   No.
2      Q.   Were you in any way obligated on
3  those debts of hers?
4      A.   No.
5      Q.   Did you have any -- did you have any
6  -- did she have any credit cards where you are
7  also obligated as either a joint account
8  holder?
9      A.   No.
10     Q.   So when she filed for bankruptcy and
11  at some point she had to submit a list of all
12  of the debts or creditors, to the -- as far as
13  you know, you were not obligated to make any
14  payments to any of those creditors?
15     A.   No, I don't think so.
16     Q.   And that bankruptcy proceeding, has
17  that concluded?
18     A.   I'm not sure whether it went through
19  all the way or not.
20     Q.   Did she get a discharge at the end?
21     A.   I'm not sure.
22     Q.   You don't know?
23     A.   Seriously.
24     Q.   I just want to -- before we go back

Page 176

S. Ryu

1  to the documents, I just want to go over your
2  current assets briefly.
3      The house that you are living in in
4  New Jersey, you own that house?
5      A.   Yes.
6      Q.   You own it with your wife?
7      A.   No.
8      Q.   Just you?
9      A.   Just me.
10     Q.   Do you own any other real estate or
11  real properties either by yourself with
12  somebody else?
13     A.   When you say "real property" --
14         MR. DZARA:  Real estate.
15     A.   No.
16     Q.   Just a house in New Jersey?
17     A.   Just a house in New Jersey.
18     Q.   And the car collections that we
19  talked about, you mentioned six cars and you
20  said five you no longer own.
21      You only now own the van?
22     A.   Yeah.  Actually, I own an Audi A8
23  which is broken, so it's not operating.  So
24  it's a junk.

Page 177

S. Ryu

1      Q.   And the van was a VW van?
2      A.   Yes.
3      Q.   And what year is that van?
4      A.   2009.
5      Q.   And the Audi?
6      A.   2004.
7      Q.   Those are the only two cars you
8  currently have?
9      A.   No, I do actually have a Bentley,
10  which I bought in December of 2013.
11     Q.   What model is it?
12     A.   It's Arnage, A-R-N-A-G-E.  Year
13  2000.  It was involved in an accident, so it's
14  now sitting in repair shop for the last two
15  years.
16     Q.   Don't you have to pay a storage fee?
17     A.   Well, you know, I'm going to have to
18  eventually fix it, so the owner of the shop is
19  giving me a break.
20     Q.   Any other cars?
21     A.   Oh.  MINI Cooper.
22     Q.   What year?
23     A.   2007.
24     Q.   What --

S. Ryu

1
2     A.    MINI Cooper.
3     Q.    Okay.  And is that operating?
4     A.    Yeah.  Yes.
5     Q.    And is that what you're currently
6  driving?
7     A.    Yes.
8     Q.    Any other cars?
9     A.    No.
10    Q.    Do you have any savings?
11    A.    Savings account, yes, I have.
12    Q.    Do you have any savings money in
13 that account?
14    A.    Yes.
15    Q.    How much?
16    A.    About $8,000.
17    Q.    Any other savings?
18    A.    No.
19    Q.    Do you have any retirement savings?
20 401k?
21    A.    No.
22    Q.    Do you have any other assets
23 currently?
24    A.    Some musical instrument, but...
25    Q.    Are you currently employed?

S. Ryu

1
2     A.    No.
3     Q.    When was the last time you were
4  employed?
5     A.    About two years ago briefly as a
6  consultant by New Millennium Bank.
7     Q.    So you left Wilshire Bank in
8  October 2013?
9     A.    Yes.
10    Q.    And so, between October 2013, I'm
11 sorry, to the present, the only employment or
12 work you've done is as a consultant to New
13 Millennium Bank?
14    A.    And prior to this underlying
15 litigation, there was a period, I think
16 December 2013 until March 2014, yeah, by New
17 Millennium Bank Investment Group, I was
18 employed.
19    Q.    December 2013 to --
20    A.    March of 2014.
21    Q.    Were you an actual employee of the
22 bank?
23    A.    Well, it wasn't -- the change of
24 control did not take place.  Nevertheless --
25 actually, you know, the project itself was

S. Ryu

1
2  legitimate through government agencies and
3  whatnot, so I guess you can call it an actual
4  employee of the project, yes.
5     Q.    Employee of the project, not
6  employee of New Millennium Bank?
7     A.    No.
8     Q.    And do you remember the entity that
9  actually paid you during that time?
10    A.    It came from an attorney trust
11 account that was holding the investors' money.
12    Q.    Right.
13          So, for example, when we looked at
14 BankAsiana, when Bank Asiana was being formed,
15 there was an entity called BankAsiana Inc.,
16 that had money in with Royal Asian Bank.
17    A.    Right.
18    Q.    And that was the entity, I presume,
19 that covered expenses of forming, founding the
20 bank, BankAsiana.
21          Similarly, with New Millennium Bank,
22 I understand it was an existing bank, but prior
23 to the actual change in control, was there an
24 entity that was set up, to your knowledge, that
25 kind of paid Mr. Hur and paid you and others?

S. Ryu

1
2     A.    There was no actual entity.  Because
3  the time consideration of undertaking the
4  project until finishing -- essentially, when I
5  was fired in March, the project was complete.
6  As you can see, it was only four-month duration
7  in which the project materialized.
8          So there was no need to create
9  separate entity to handle the payroll and
10 whatnot.  Therefore, we decided to use attorney
11 trust account in lieu of forming any type of an
12 entity.
13    Q.    Okay.
14    A.    It was a matter of practicality.
15    Q.    Okay.  During the time period of
16 2009 to 2014, was your wife working?
17    A.    No.
18    Q.    She was not employed?
19    A.    No.
20    Q.    She didn't have any income?
21    A.    No.
22    Q.    From 2014 -- let's say October 2013,
23 I'm sorry, to the present, has your wife
24 worked?
25    A.    No.

Page 182

S. Ryu

1
2   Q.   No employment?
3   A.   No.
4   Q.   No income?
5   A.   Nope.
6   Q.   From October 2014 to the present,
7   other than the income from New Millennium Bank,
8   prior to the change in control and about three
9   years ago when you worked as a consultant,
10  other than income from that, did you have any
11  other income from anywhere?
12      A.   Well, I had income from doing a
13  little slight translation work earlier this
14  year that made, I don't know, $500.
15      Q.   Any other income?
16      A.   No.
17      Q.   No other sources of income?
18      A.   Oh, loans from my father.
19      MR. DZARA:  Income is different than
20  loans.
21      Do you want source of money or just
22  -- you're talking about jobs?
23      MR. YI:  I'm talking about income.
24      MR. DZARA:  From jobs.
25      A.   No.

Page 183

S. Ryu

1
2   Q.   No other source of income?
3   A.   No.
4   Q.   So let's talk about loans.
5       I want to make sure that I have it
6   all.
7       So there's $50,000 loan that you
8   took from Mike -- KORE Consulting.
9       And is it correct, now that we've
10  look at the copies of the checks, the loan
11  repayment checks, it looked like you were
12  making the payments to KORE Consulting.
13      So based on those checks, is it fair
14  to say that the loan was made by KORE
15  Consulting?
16      A.   Yes.
17      Q.   50,000 from them.
18      Then employee loan of 25,000.
19      Then you had personal loans from
20  Mr. Hur and Ms. Park, I believe.  Ms. Park gave
21  you approximately 3,000.  Mr. Hur gave you
22  approximately 3,500.
23      Were there any other loans?
24      A.   Forgot the 401k loan.
25      Q.   401k loan, what was the amount?

Page 184

S. Ryu

1
2   A.   I'm not sure whether it was 30,000.
3   I think it was 30,000.
4   Q.   Okay.  And then -- oh, I'm sorry.
5       There was an $18,000 from SOYU
6   ARCHitecture?
7   A.   Right.
8   Q.   Were there any other loans that you
9   took?
10      MR. DZARA:  During what time period?
11  BY MR. YI:
12      Q.   Let's say from 2009 to the present.
13      A.   Oh, to present.  There's loan from
14  my father and my brother.
15      Q.   Okay.  First, let's talk about loans
16  from your father.
17      How many loans?
18      A.   In total, he let me borrow $50,000.
19      Q.   So he's made a number of personal
20  loans to you and they total 50,000?
21      A.   Yes.
22      Q.   And your brother -- by the way, what
23  is your father's name?
24      A.   Spelling, H-O-S-A-N-G.
25      Q.   Okay.  And your brother?

Page 185

S. Ryu

1
2   A.   Alan.
3   Q.   A-L-A-N?
4   A.   Mh-hm.
5   Q.   Does he have a middle initial or
6   middle name?
7   A.   I think he just goes by Alan.
8   Q.   Alan, okay.
9       And did your brother also make a
10  number of personal loans to you?
11      A.   Right.  Maybe about 2,200 -- I mean,
12  22,000.
13      Q.   And what is the approximate time
14  period of these loans?
15      A.   From 2016 to today.
16      Q.   In the past two or three years?
17      A.   2016 till today.  So -- yeah.
18      Q.   So over the course of 2016, 2,017,
19  2018?
20      A.   Yes.
21      Q.   So approximately past three years?
22      A.   Two and a half or, you know, or more
23  than.
24      Q.   Any other loans?
25      A.   Actually, my wife's friend lend

## Page 186

S. Ryu

1  
2  $3,000. And that was in end of 2016. And
3  Chanlai Park, who, you know, that lend me years
4  ago, just gave me a thousand dollars.
5      Q.   That's not a loan. That's just a
6  gift?
7      A.   I don't know. She said, "Go ahead
8  and use it. Repay that whatever you can."
9          So I guess you call it a loan. But
10 that was in, like, maybe January of 2017.
11     Q.   Any other loans or gifts?
12     A.   Nope.
13     Q.   So for the time period of 2009 to
14 the present, have we covered all the loans that
15 you've taken between that time period?
16     A.   Yes.
17     Q.   What about your wife, we covered all
18 the loans your wife received?
19     A.   Yes.
20     Q.   How is your -- is it your daughter
21 who goes to NYU?
22     A.   Yes.
23     Q.   How is she paying for --
24     A.   Grants and loans.
25     Q.   Grants and loans.

## Page 187

S. Ryu

1  
2      Are you or your wife financially
3  helping your daughter in any way?
4      A.   No. I mean, we signed for a Parents
5  PLUS loan or something, which our credit is --
6  the scoring is so low, my father had to cosign.
7      Q.   I'm sorry. What is called?
8      A.   I think it's called Parents PLUS
9  loan.
10     Q.   Parents PLUS loan.
11     A.   I think. I could wrong.
12     Q.   What was the amount of the loan?
13     A.   I think it was 30,000.
14     Q.   Who's obligated to repay that loan?
15     A.   I am.
16     Q.   You? Your wife?
17     A.   Yeah.
18     Q.   Your father, as the co-guarantor?
19     A.   Sure, sure.
20     Q.   And your daughter?
21     A.   I don't know. Probably.
22     Q.   Any other loans taken out by your
23 daughter or in connection with her tuition at
24 NYU?
25     A.   I think she might -- there might be

## Page 188

S. Ryu

1  
2  a student loan in a few thousand, in tune. But
3  other than that, no.
4      Q.   Okay. Let's go back to the
5  documents for a while and then I'll come back.
6          (Plaintiff's Exhibit 33, document,
7  marked for identification.)
8  BY MR. YI:
9      Q.   I'm showing you what's been marked
10 as Exhibit 33 to your deposition.
11         Do you recognize this document?
12     A.   Not sure. But, you know, when I
13 look at it now, yeah, I recognize it.
14     Q.   Okay. So we talked earlier by your
15 wife's personal bankruptcy filing in 2012. And
16 you mentioned that in addition to the, I guess,
17 the outstanding obligations on the mortgage
18 loan on the property in California, she had
19 other debts.
20         And I believe I asked you whether
21 other debts included credit card debts.
22     A.   Yes.
23     Q.   And it appears from this exhibit,
24 and I'll represent to you that this is a copy
25 of a summons and what appears to be a complaint

## Page 189

S. Ryu

1  
2  that was filed against your wife by Citibank
3  NA. And it looks like it's dated January 2012.
4          And according to the complaint, she
5  owed Citibank over $8,000 in credit card debt.
6          Do you remember that?
7      A.   I don't remember it, but I know it
8  now, as I look at it.
9      Q.   Okay. And do you know what happened
10 to this case?
11     A.   I have no idea.
12     Q.   Okay. And I believe you said that
13 you don't know whether she ultimately received
14 a bankruptcy discharge at the conclusion of
15 that proceeding?
16     A.   I do not know.
17         (Plaintiff's Exhibit 34, adjustable
18 rate note, marked for identification.)
19 BY MR. YI:
20     Q.   I'm showing you what's been marked
21 as Exhibit 34 to your deposition.
22         Do you recognize this document?
23     A.   As I look at it.
24     Q.   Is this a copy of the adjustable
25 rate note that you executed in connection with

S. Ryu

1
2 either the purchase or refinancing of your
3 house in River Vale, New Jersey?
4     A.  Yes.
5     (Plaintiff's Exhibit 35, foreclosure
6     complaint, marked for identification.)
7 BY MR. YI:
8     Q.  I'm showing you what's been marked
9 as Exhibit 35 to your deposition.
10     Do you recognize this document?
11     A.  Yes.
12     Q.  Is this a copy of the foreclosure
13 complaint that was filed against you by U.S.
14 Bank National Association as trustee for Bank
15 of America Funding Corporation, Mortgage Past
16 Due Certificates, Series 2006-J?
17     A.  Yes.
18     (Plaintiff's Exhibit 36, Answer and
19     Affirmative Defenses to Plaintiff's
20     Complaint and Cross-Claim, marked for
21     identification.)
22 BY MR. YI:
23     Q.  I'm showing you what's been marked
24 as Exhibit 36 to your deposition.
25     Do you recognize this document?

S. Ryu

1
2     A.  Yes.
3     Q.  Is this a copy of your Answer and
4 Affirmative Defenses to Plaintiff's Complaint
5 and Cross-Claim that was filed in the mortgage
6 foreclosure action relating to your house in
7 New Jersey?
8     A.  I believe so.
9     (Plaintiff's Exhibit 37, e-mail and
10     an attached document or letter, marked for
11     identification.)
12 BY MR. YI:
13     Q.  Just going back to the last exhibit,
14 did you review that document before it was
15 filed?
16     A.  I think so.
17     Q.  Okay.  I'm showing you what's been
18 marked as Exhibit 37 to your deposition.
19     Do you recognize this document?
20     And I'll represent to you that this
21 document consists of an e-mail and an attached
22 document or letter.
23     A.  Yeah, I recognize it.
24     Q.  And it appears, based on this
25 exhibit, that in or about 2015 you have may

S. Ryu

1
2 have entered into a loan modification agreement
3 with the plaintiff in the mortgage foreclosure
4 action, your mortgage lender; is that correct?
5     A.  I think so.  I'm not sure as to when
6 exactly.
7     Q.  Okay.  Is it fair to say that it was
8 sometime in 2015?
9     A.  I would think so, yes.
10     MR. DZARA:  It wasn't.  But --
11     THE WITNESS:  It wasn't?
12     MR. DZARA:  No.
13 BY MR. YI:
14     Q.  Okay.  Did there come a time
15 following this e-mail of November 23, 2015,
16 that your mortgage loan was reinstated pursuant
17 to a loan modification agreement?
18     A.  Yes.
19     (Plaintiff's Exhibit 38, Home
20     Affordable Modification Agreement, dated
21     January 30, 2017, marked for
22     identification.)
23 BY MR. YI:
24     Q.  I'm showing you what's been marked
25 as Exhibit 38 to your deposition.

S. Ryu

1
2     Do you recognize this document?
3     A.  Yes.
4     Q.  Is this a recorded copy of a
5 document called "Home Affordable Modification
6 Agreement," dated January 30, 2017, which you
7 executed?
8     A.  Yes.
9     Q.  And is it fair to say that pursuant
10 to this agreement, your mortgage loan on your
11 house in New Jersey was reinstated?
12     A.  Yes.
13     MR. DZARA:  Objection.  "Reinstated"
14 is the wrong term.
15 BY MR. YI:
16     Q.  Let me try to see if I can clear the
17 record.
18     So is it fair to say that in
19 connection with this Home Affordable
20 Modification Agreement, at some point your loan
21 was reinstated and the terms of your mortgage
22 loan were modified?
23     A.  Yes.
24     (Plaintiff's Exhibit 39, document
25     related to Mr. Cooper, marked for

S. Ryu

1  identification.)
2
3  BY MR. YI:
4      Q.   I'm showing you what's been marked
5  as Exhibit 39 to your deposition.
6          Do you recognize this document?
7      A.   Yes.
8      Q.   Earlier you mentioned a company
9  called Mr. Cooper.
10     A.   Yes.
11     Q.   And that you -- I believe you said,
12 and correct me if I'm wrong -- I believe you
13 said that you had received a notice from a
14 company called Mr. Cooper, indicating that
15 there was going to be a foreclosure of your
16 house in New Jersey?
17     A.   Yeah, there was a complaint filed by
18 Mr. Cooper.
19     Q.   And is it your understanding that
20 Mr. Cooper is the loan servicer?
21     A.   I think so.
22     Q.   And I believe you said that a
23 complaint, foreclosure complaint was filed by
24 either Mr. Cooper or the lender, and that you
25 are having your attorneys prepare an answer or

S. Ryu

1  response to that complaint?
2      A.   Yes.
3      Q.   And that's the current status?
4      A.   Yes.
5      Q.   And do you know what the outstanding
6  loan amount is?
7      A.   It's 550,000 all together.
8      Q.   Approximately?
9      A.   Yes.
10     Q.   And do you know -- do you happen to
11 know what the approximate reinstatement amount
12 is?  How much would you have to pay the lender
13 to get the loan reinstated?
14     A.   Maybe 23,000.
15         (Plaintiff's Exhibit 40, bank
16     statement from New Millennium Bank, marked
17     for identification.)
18 BY MR. YI:
19     Q.   Are you planning to reinstate the
20 mortgage loan?
21     A.   I hope so.
22     Q.   I'm showing you what's been marked
23 as Exhibit 40 to your deposition.
24         Do you recognize this document?
25

S. Ryu

1      A.   Yes.
2      Q.   Is this a copy of the bank statement
3  that you received from New Millennium Bank for
4  the period indicated here?
5          This says July 15, 2016.
6      A.   Yes.
7      Q.   And that's your account number --
8  it's a joint account held by you and your wife?
9      A.   Yes.
10     Q.   And account number ending 0455?
11     A.   Yes.
12     Q.   And when we talked earlier about
13 your joint account at New Millennium Bank,
14 that's the account?
15     A.   Yes.
16         (Plaintiff's Exhibit 41, check dated
17     November 23, 2016, paid to Nationstar,
18     marked for identification.)
19 BY MR. YI:
20     Q.   I'm showing you what's been marked
21 as Exhibit 41 to your deposition.
22         Do you recognize this?
23     A.   Yes.
24     Q.   I'd like to bring your attention to

S. Ryu

1  the copy of the front of the check on the
2  bottom.
3          Do you see a copy of the check dated
4  November 23, 2016, paid to Nationstar?
5      A.   Yes.
6      Q.   And it has a loan number on the
7  memo.
8      A.   Yes.
9      Q.   And the amount is $2,802.92?
10     A.   Yes.
11     Q.   Do you know -- can you tell us what
12 that is?
13     A.   It's a mortgage payment.
14     Q.   So is that your -- that the lender,
15 the mortgagee lender for your house in New
16 Jersey?
17     A.   Yes.
18         MR. DZARA:  It's the servicer.
19 BY MR. YI:
20     Q.   It's the servicer?
21     A.   Yes.
22     Q.   But it's your -- it's the mortgage
23 payment, monthly mortgage payment for your
24 house in New Jersey?
25

S. Ryu

1
2 MR. DZARA:  The modified mortgage.
3 A.   Yes.
4 Q.   Do you remember when you -- when the
5 default began, the payment default began?
6 A.   Must have been sometime in 2015.
7 I'm not sure exactly.
8 Q.   Well, we just looked at a copy of a
9 check that was dated November 23, 2016.
10 A.   Right.
11 Q.   The monthly mortgage payment as
12 modified.
13 MR. DZARA:  I believe that was
14 modify --
15 MR. YI:  It was prior to the
16 modification.
17 MR. DZARA:  They were trial payments
18 he was required to make before they agreed
19 to modification.
20 MR. YI:  I see.
21 MR. DZARA:  It was a trial.  He made
22 multiple trial payments that are reflected
23 in the checks from his account.
24 BY MR. YI:
25 Q.   We talked earlier about the fact

S. Ryu

1
2 that the lender has commenced foreclosure,
3 filed a complaint, and your attorney is in the
4 processing of a preparing an answer or a
5 response to that complaint.
6 When did the payment default begin,
7 to the best of your recollection?
8 A.   Right.  December of 2017.
9 Q.   Was there any particular event in or
10 about December 2017 that caused you to --
11 A.   Yes.  I could not any longer pay the
12 mortgages and creditors and to live.
13 Q.   And prior to that, were you using
14 loans from your father and brother to make
15 those mortgage payments?
16 A.   Yes.
17 (Plaintiff's Exhibit 42, e-mail and
18 check, marked for identification.)
19 BY MR. YI:
20 Q.   I'm showing you what's been marked
21 as Exhibit 42 to your deposition.
22 Before I ask you questions, I'm
23 going to go off the record for -- just briefly.
24 (Discussion held off the record.)
25 BY MR. YI:

S. Ryu

1
2 Q.   Sir, is this a copy of -- well, have
3 you seen this document before?
4 A.   I don't know --
5 Q.   Let me withdraw.
6 Have you seen -- this exhibit
7 consists of two documents.  There's an e-mail
8 on the first page and there's a copy of a check
9 on the second page.
10 Have you seen either document?
11 A.   I've seen the check.
12 Q.   Can you tell us what that is?
13 A.   That's for the consulting work that
14 I did for New Millennium Bank back in 2016.
15 Q.   Okay.  And is it fair to say that
16 that was a 1099 payment?
17 A.   Yes.
18 Q.   And do you know what I mean when I
19 say 1099?
20 A.   Yes.
21 Q.   It wasn't a W-2 payment?
22 A.   No.
23 Q.   Do you see in the e-mail, Rachel
24 Gallegos (phonetic) indicates that it was your
25 first paycheck from New Millennium Bank.

S. Ryu

1
2 It wasn't a -- it wasn't your first
3 paycheck at New Millennium Bank, correct?
4 A.   You mean, paycheck as -- are you
5 referring to W-2 versus 1099?
6 Q.   My understanding is when you say
7 "paycheck," you're talking about a W-2 payroll
8 check that an employee receives.
9 I'm just trying to clarify that this
10 is not a paycheck that you received from New
11 Millennium Bank.  You were not an employee of
12 New Millennium Bank --
13 A.   No.
14 Q.   -- you were working as a consultant.
15 You were being paid for your
16 consulting services?
17 A.   Yes.
18 MR. DZARA:  Off the record.
19 (Discussion held off the record.)
20 BY MR. YI:
21 Q.   The reason why I ask you that is
22 because I'm just trying to make sure that you
23 were never at any time an employee of New
24 Millennium Bank.  We talked about the fact that
25 you rendered services as a consultant in 2016.

Page 202

S. Ryu
1
2     You were paid for those services on
3 a 1099 basis, I believe.
4        And then prior to the change and
5 control taking place, you were being paid by
6 the law firm representing the group of
7 individuals that was planning to take over
8 control of the New Millennium Bank.
9     A.   Yes.
10    Q.   I'll just quickly go through this
11 one, too.
12        (Plaintiff's Exhibit 43, copy of a
13    check dated July 21, 2016, marked for
14    identification.)
15 BY MR. YI:
16    Q.   I'm showing you what's been marked
17 as Exhibit 43 to your deposition.  And I'll
18 just ask you to turn to the page that's showing
19 a copy of the check.
20    A.   Yes.
21    Q.   Or checks.
22        Let's see, there's one -- so if you
23 look at the last page, there appears to be a
24 copy of a check dated July 21, 2016.  It's
25 payable to you from New Millennium Bank for

Page 203

S. Ryu
1
2 $5,000?
3    A.   Yes.
4    Q.   You've seen that document?
5    A.   Yes.
6    Q.   And that's a copy of the check you
7 received from New Millennium Bank that was
8 payment for your services as a consultant to
9 the bank?
10    A.   Yes.
11    Q.   In 2016?
12    A.   Yes.
13    Q.   And then if you turn to the
14 second-to-last page, there's a copy of another
15 check, this one dated August 4, 2016, also in
16 the amount of 5,000.
17        And that was also -- this is a copy
18 of a check issued by New Millennium Bank to you
19 for consulting services?
20    A.   Yes.
21    Q.   So the 10,000 we saw before, it
22 looks like there's two checks each for 5,000.
23 That totals 20,000.
24        Is that consistent with your
25 recollection?

Page 204

S. Ryu
1
2    A.   Yes.
3    Q.   By the way, those six cars that we
4 talked about earlier today, did you have any
5 loans on those cars?
6    A.   I had loan for VW.
7    Q.   The van?
8    A.   Yeah.  And I had loan for Audi A8,
9 but they're all paid off.
10    Q.   Let me see if I can make it easier
11 this way.
12        During the time period of 2009 to
13 October 2013, were you making any car
14 payments --
15    A.   Yes.
16    Q.   -- on any of the six cars?
17    A.   Yes.
18    Q.   Which ones?
19    A.   VW and Audi.
20    Q.   And do you remember approximately
21 what the payments were?
22        Were you paying them on a monthly
23 basis?
24    A.   Yes.  About $500 each.
25    Q.   Okay.  Do you currently have any car

Page 205

S. Ryu
1
2 loans --
3    A.   No.
4    Q.   -- on the two cars?
5    A.   No.  Three cars.
6    Q.   Oh, three cars.  Sorry.
7    A.   No, actually --
8    Q.   MINI Cooper, Bentley, and the VW
9 van?
10    A.   Right.  Because Audi is not
11 operational, so no.  No loans.
12        (Plaintiff's Exhibit 44, certificate
13    of title to MINI Cooper and the second page
14    is certificate of title to 2000 Bentley,
15    marked for identification.)
16 BY MR. YI:
17    Q.   I'm showing you what's been marked
18 as Exhibit 44 to your deposition.
19        Do you recognize these documents?
20    A.   Yes.
21    Q.   So the first page is certificate of
22 title to your MINI Cooper?
23    A.   Yes.
24    Q.   And second page is certificate of
25 title to your 2000 Bentley?

Page 206

S. Ryu

1
2    A.    Yes.
3    Q.    And the third page is a certificate
4  of title -- these are copies of certificate of
5  title to your 2009 Volkswagen van?
6    A.    Yes.
7    Q.    And the fourth page is a copy of the
8  certificate of title for your Audi A8 L 2004?
9    A.    Yes.
10    Q.    That's the one you said is
11  inoperable?
12    A.    Right.
13    Q.    And you currently do not have any
14  loans on any of them?
15    A.    No.
16        (Plaintiff's Exhibit 45, TD Bank
17        statements, marked for identification.)
18  BY MR. YI:
19    Q.    I'm just going to try to go through
20  without a break, try to go through these
21  documents.  If you need a break, just let me
22  know and we'll take a short break.
23        Sir, I'm showing you what's been
24  marked as Exhibit 45 to your deposition.
25        Do you recognize this exhibit or

Page 207

S. Ryu

1
2  these documents?
3    A.    Yes.
4    Q.    Are these copies of your TD Bank
5  statements for the statement period indicated
6  in the exhibit, which appears to be January 14,
7  2017, to February 13, 2017?
8    A.    Yes.
9    Q.    And also November 14, 2017, to
10  November 24, 2017?
11    A.    Yes.
12    Q.    Also October 1, 2016, to
13  December 31, 2016?
14    A.    Yes.
15    Q.    And I represent to you that these
16  are documents that were produced by you through
17  your attorneys.
18        I'm going to direct your attention,
19  sir, to the first page of this exhibit.  If you
20  go down towards the bottom there is a wire
21  transfer incoming, Lotus WNY Inc.
22        Do you see that?
23    A.    Yes.
24    Q.    In the amount of 24,500?
25    A.    Yes.

Page 208

S. Ryu

1
2    Q.    Do you know what that was?
3    A.    Sale of my car.
4    Q.    Which car?
5    A.    Lotus Esprit, which I explained --
6    Q.    I see.
7    A.    -- to you before.
8    Q.    So we talked earlier about your
9  account at TD Bank, and you said it was in your
10  name only.
11        This exhibit reflects that account?
12    A.    Yes.
13    Q.    Let's see, the account number ending
14  1646?
15    A.    Yes.
16        (Plaintiff's Exhibit 46, three
17        promissory notes, marked for
18        identification.)
19        MR. DZARA:  Off the record.
20        (Discussion held off the record.)
21  BY MR. YI:
22    Q.    Why don't we clarify that.
23        Earlier, we talked about sources of
24  income for you, and we talked about your wife,
25  we talked about you.  And you indicated that

Page 209

S. Ryu

1
2  there were no sources of income other than
3  payments from New Millennium Bank.
4        We then talked about the loans from
5  your father, your brother, and we'll get into
6  the loans from your father.
7        MR. DZARA:  He also said he made, I
8  think, 500-something from translation
9  services, something.
10    A.    Yeah.
11    Q.    Right.
12        Aside from that, have you had any
13  monies that you have received from any
14  disposition of assets or otherwise?
15    A.    On two occasions.  I had to sell my
16  car Lotus back in January, February 2017.  As
17  you saw a wire coming in.  And I think it was
18  November of 2016, I sold a motorcycle which was
19  never registered or anything.  It was kind of
20  an antique thing, for, I think, 13,000.  And
21  that's pretty much it.
22    Q.    Who did you sell the motorcycle to?
23    A.    I forget the guy's name.
24    Q.    Not someone you knew?
25    A.    No.

S. Ryu

1
2     Q.   And who did you sell the Lotus to?
3     A.   Lotus whatever it --
4     Q.   WNY Inc.?
5     A.   Yes.
6     Q.   Is that a, like, an auto dealer?
7     A.   I am not sure.  I thought I would
8  sell it to a person, but it was -- the wire
9  came from, you know.
10     Q.   Not someone you knew?
11     A.   No.
12     Q.   Okay.  Have we covered everything
13  now?
14     A.   I think so -- no, there's more?
15         MR. DZARA:  Off the record.
16         (Discussion held off the record.)
17     A.   There was a McIntosh amp and
18  preamplifier, which combined I sold for about
19  $3,000.
20     Q.   Anything else?
21     A.   I don't think so.
22     Q.   Okay.  I'm showing you what's been
23  marked as Exhibit 46 to your deposition.
24         Have you seen these documents
25  before?

S. Ryu

1
2     A.   Yes.
3     Q.   Are these copies of three promissory
4  notes that you executed in favor of your
5  father?
6     A.   Yes.
7     Q.   And the first one was a promissory
8  note for 30,000, the second one for 10,000, and
9  the third one for 10,000?
10     A.   Yes.
11     Q.   Totaling 50,000?
12     A.   Yes.
13     Q.   And those were the loans that we
14  were talking about earlier?
15     A.   Yes.
16         (Plaintiff's Exhibit 47, check for
17     20,000, marked for identification.)
18  BY MR. YI:
19     Q.   I'm showing you what's been marked
20  as Exhibit 47 to your deposition.
21         Do you recognize these documents?
22     A.   Yes.
23     Q.   So let's take one at a time.
24         The first page, Alan Ryu (phonetic),
25  is that your brother?

S. Ryu

1
2     A.   Yes.
3     Q.   And I see a copy of a check for
4  20,000.  Is that a $20,000 loan from your
5  brother to you?
6     A.   Yes.
7     Q.   And the check is dated December 8,
8  2016?
9     A.   Yes.
10     Q.   So is it fair to say that the first
11  page of this exhibit reflects your brother's
12  $20,000 personal loan to you --
13     A.   Yes.
14     Q.   -- made December 2016?
15     A.   Yes.
16     Q.   And the second page, there's a copy
17  of the check.  This time it's -- the first
18  check that we looked at on the first page looks
19  like his account with Hanmi Bank, correct?
20     A.   Yes.
21     Q.   And the second page looks like your
22  brother has a joint account with his -- is that
23  his wife?
24     A.   Yes.
25     Q.   And it's a check in the amount of

S. Ryu

1
2  $820.  That was also a personal loan from your
3  brother to you?
4     A.   Yes.  As I indicated before, the
5  total that he lent me, I said, was about
6  22,000, which reflects all of these.
7     Q.   And the third page also appears to
8  be a copy of a Bank of America account check
9  from your brother to you for $1,550.
10         That's also a loan--
11     A.   Yes.
12     Q.   -- made by your brother to you?
13     A.   Yes.
14     Q.   Those are the three amounts?
15     A.   Yes.
16         (Plaintiff's Exhibit 48, advancement
17     of salary agreement, marked for
18     identification.)
19  BY MR. YI:
20     Q.   I'm showing you what's been marked
21  as Exhibit 48 to your deposition.
22         Do you recognize this document?
23     A.   Yes.
24     Q.   Can you tell us what this is?
25     A.   At the time of Frank Gleeson

S. Ryu

1
2  obtaining approval to join as CFO for
3  BankAsiana, he owed some financial institutions
4  money that he did not have.  He asked the
5  BankAsiana organization if we could borrow some
6  money to take care of that so that he could be
7  approved.  And this was advancement of salary
8  agreement, which was drafted 11 years ago.
9      Q.   So this document reflects the fact
10 that Frank Gleeson was given an advance against
11 his salary in the amount of $5,354?
12     A.   Yes.
13     Q.   And was this advance given to him at
14 the commencement of his employment with either
15 BankAsiana or BankAsiana in organization?
16     A.   Yeah, I think so.
17     Q.   Can you tell us what BankAsiana in
18 organization was?  Was it an actual legal
19 entity, or was it just a name that was being
20 used?
21     A.   It was just a name.  In terms of
22 legality, for example, the -- for the -- use it
23 for opening bank accounts and stuff like that,
24 as you saw previously from Royal Asian Bank was
25 BankAsiana Inc. or something.

S. Ryu

1
2      Q.   Right.
3      A.   So this is just name that was used.
4  And you know, new banks, the noble banks, when
5  they're opening prior to their formalized
6  opening, it is common that, you know, new bank
7  information is called something "in
8  organization."
9      Q.   So this was at the outset of Frank
10 Gleeson's employment with BankAsiana or
11 BankAsiana in organization?
12     A.   Yes.
13     Q.   It's your testimony that he had
14 certain debts that he had to take care of?
15     A.   He understand that he promised to
16 pay.
17     Q.   Well, the reason why he was asking
18 for an advance against his salary was because
19 you testified that he didn't have the money to
20 pay his debts, so he asked for an advance
21 against his salary so he can pay off those
22 debts?
23     A.   Correct.
24     Q.   And was this approved, this
25 advancement against his salary, was it approved

S. Ryu

1
2  by you?
3      A.   No.  Actually, it was approved by
4  the board.
5      Q.   Okay.  And do you remember signing
6  off on this?  It has your signature.
7      A.   I think so.
8      Q.   I mean, it has your signature line.
9      A.   Yeah, I think I signed it off.
10     Q.   Okay.  Did Frank Gleeson ever ask,
11 subsequently ask for an advance against his
12 salary?
13     A.   What do you mean?
14     Q.   Subsequent to August 2007, during
15 his tenure with BankAsiana as a CFO, did Frank
16 Gleeson ever ask you or anybody else at the
17 bank for an advance against his salary?
18         MR. DZARA:  You mean, a second
19     advance?
20 BY MR. YI:
21     Q.   Yeah, a second or subsequent
22 advances.
23     A.   I don't think so.  But -- I don't
24 think so.
25     Q.   Did he ever pay this back?

S. Ryu

1
2      A.   I am not sure.
3      Q.   Do you recall whether you told him
4  he didn't have to pay it back?
5      A.   I'm not really sure.
6          (Plaintiff's Exhibit 49, e-mail to
7      Frank Gleeson from April 20, 2010, marked
8      for identification.)
9  BY MR. YI:
10     Q.   I'm showing you what's been marked
11 as Exhibit 49 to your deposition.
12         And I'll represent to you that we
13 earlier looked at the second page of this
14 exhibit, and I'm asking you to take a look at
15 the first page of this exhibit.
16         Is that a copy of your e-mail to
17 Frank Gleeson from April 20, 2010, 9:55 a.m.,
18 with the subject "Financial statement for Luz,"
19 L-U-Z?
20     A.   Yes.
21     Q.   And at the time that -- is it fair
22 to say that you sent this to Frank Gleeson --
23 withdrawn.
24         Who prepared this personal financial
25 statement?

Page 218

S. Ryu

1
2  And I'm sorry if I asked you
3  previously.
4      A.   I am not sure whether it was me or
5  Frank.
6      Q.   But it would have been either you or
7  Frank?
8      A.   I would think so.
9      Q.   And I believe you indicated earlier
10 that the purpose of this personal financial
11 statement, as of March 31, 2010, was to submit
12 it to the landlord --
13     A.   Yes.
14     Q.   -- for the approval of the lease
15 assignment?
16     A.   Yes.
17         MR. DZARA:  For Luz, I believe.
18         THE WITNESS:  Yes.
19 BY MR. YI:
20     Q.   The hair salon?
21     A.   This was in the e-mail somewhere.
22         (Plaintiff's Exhibit 50, e-mail and
23     the second page is a document called
24     "Seleste LLC Income Statement", marked for
25     identification.)

Page 219

S. Ryu

1
2  BY MR. YI:
3      Q.   I'm showing you what's been marked
4  as Exhibit 50 to your deposition.
5          Do you recognize these two
6  documents?
7      A.   Yes.
8      Q.   First page is the e-mail.  The
9  second page is a document called "Seleste LLC
10 Income Statement."
11     A.   Yes.
12     Q.   And I'll represent to you that we
13 went over the second page of this exhibit.
14         The first page, is that a copy of
15 Frank Gleeson's e-mail to you, from October 3,
16 2111, 1:03 p.m., subject "Seleste"?
17     A.   Yes.
18     Q.   And in this e-mail, Frank says,
19 "James, let me know what changes you want to
20 make, Frank."
21     A.   Yes.
22     Q.   Does that refresh your recollection
23 that it was Frank Gleeson who prepared -- well,
24 withdrawn.
25         Does that indicate to you that Frank

Page 220

S. Ryu

1
2  prepared this Seleste LLC Income Statement and
3  was asking you to review it and make any
4  changes?
5      A.   It looks like that way.
6      Q.   Is that consistent with your
7  recollection?
8      A.   I don't really recall, but it looks
9  that way.
10         (Plaintiff's Exhibit 51, e-mail,
11     marked for identification.)
12 BY MR. YI:
13     Q.   I'm showing you what's been marked
14 as Exhibit 51 to your deposition.
15     A.   Yes.
16     Q.   Do you recognize these two
17 documents?
18         And I'll represent to you we already
19 went over the second page of this exhibit.
20     A.   Yes.
21     Q.   The first page, is that a copy of
22 Frank Gleeson's e-mail to you, from October 3,
23 2011, 2:45 p.m., with a subject "Seleste"?
24     A.   Yes.
25     Q.   And in this e-mail, Frank says,

Page 221

S. Ryu

1
2  "Here you go."
3          So is it -- does that indicate that
4  you asked him to make some changes and he made
5  the changes and he sent them back to you?
6      A.   It looks that way.
7      Q.   Okay.
8          (Plaintiff's Exhibit 52, e-mail
9     string, marked for identification.)
10 BY MR. YI:
11     Q.   I'm showing you what's been marked
12 as Exhibit 52 to your deposition.
13         Do you recognize these e-mails?
14     A.   Yes.
15     Q.   So I think we already went over the
16 first one, where Frank Gleeson says to you,
17 October 3, 2011, "Here you go."
18         Then you say, "Thanks, Frank."  Same
19 day 2:52 p.m.
20         Then Frank responds, "Any time.  Let
21 me know when your ready on the other thing."
22         And "you're" is spelled Y-O-U-R.
23         What is the other thing that Frank
24 was referring to?
25     A.   I have no idea.

Page 222

S. Ryu

1
2    Q.   Did Seleste LLC or the business
3  income statement of the hair salon or the cafe
4  have anything to do with BankAsiana business?
5    A.   No.   It only relates that I was in
6  business with these things and I was, you know,
7  one of the chief of the bank.
8         (Plaintiff's Exhibit 53, e-mail and
9         attachment, marked for identification.)
10  BY MR. YI:
11    Q.   I'm showing you what's been marked
12  as Exhibit 53 to your deposition.
13         Do you recognize the e-mail and the
14  attachment?
15         The attachment we've already gone
16  over.
17         Do you recognize the e-mail?
18    A.   Yes.
19    Q.   Is that a copy of Frank Gleeson's
20  e-mail to you, from October 5, 2011,
21  11:49 a.m., with the subject "Seleste"?
22    A.   Yes.
23         (Plaintiff's Exhibit 54, e-mail and
24         attachment, marked for identification.)
25  BY MR. YI:

Page 223

S. Ryu

1
2    Q.   I'm showing you what's been marked
3  as Exhibit 54 to your deposition.
4         Do you recognize these two
5  documents, e-mail and attachment?
6    A.   Now, when I look at it, yeah, I do.
7    Q.   The first page of the exhibit, is
8  that a copy of your e-mail to Frank Gleeson,
9  from October 14, 2011, 10:50 a.m., subject
10  "income and expense"?
11    A.   Yes.
12    Q.   And is the second page your list of
13  your personal expenses?
14    A.   Yes.
15    Q.   And to the best of your knowledge,
16  the list of your personal expenses on the
17  second page, was that accurate as of
18  October 2011?
19    A.   It looks pretty accurate.
20    Q.   And is it, to the best of your
21  knowledge, as of October 2011, was that a
22  complete list of your personal expenses?
23    A.   I'm not sure.
24    Q.   It says "mortgage LA."  So that's
25  the LA property we discussed earlier.

Page 224

S. Ryu

1
2         "Mortgage NJ," that would be the
3  mortgage payment on your house, monthly
4  mortgage payment on your house in New Jersey?
5    A.   Yes.
6    Q.   And there's "property tax LA,"
7  "property NJ," "income tax," "insurance LA."
8         I presume that's homeowners
9  insurance for the California property?
10    A.   Must be.
11    Q.   "Insurance NJ," and that would be
12  homeowners insurance for your property in New
13  Jersey?
14    A.   Yes.
15    Q.   And it says "home association LA."
16         Is that a home association fee for
17  the property in California?
18    A.   It looks that way.
19    Q.   And then it has "credit card
20  payments, 2,500."
21         Is that just for you, or is that
22  combined for you and your wife?
23    A.   Credit card payments?
24    Q.   Yes.
25    A.   I'm not sure, depending on when this

Page 225

S. Ryu

1
2  was.
3    Q.   This is October 2011.
4    A.   I'm not sure.
5    Q.   And then it has "automobiles,
6  $1,020."
7    A.   Yes.
8    Q.   These all appear to be monthly
9  expenses.
10         Are those car payments?
11    A.   Yes.
12    Q.   Then it says "insurance auto, $350."
13    A.   Yes.
14    Q.   Is that a combined total amount for
15  the month?
16    A.   It must be.
17    Q.   And as of October 2011, how many
18  cars did you have?  Six?
19    A.   Yes.
20    Q.   And then it says "various utilities,
21  $750."
22    A.   Yes.
23    Q.   And it says "others, lawn and
24  repairs, $300."
25         And then below that is "401k loan,

S. Ryu

1  
2  $549."
3      And then it says "bank loan, $452."
4  What is that referring to?
5      A.   The employee loan.
6      Q.   Okay.  So then it has -- on the
7  income column, it has your payroll, $9,244.
8      That's your W-2 income from
9  BankAsiana?
10      A.   Yes.
11      Q.   "Expense reimbursement" says $1,080.
12      Did you have an expense account at
13  BankAsiana?
14      A.   Yes.
15      Q.   And was it about 1,000 a month?
16      A.   Yes.
17      Q.   Or was it $1,080?
18      A.   I don't know.  On or around.
19      Q.   Approximately 1,000?
20      A.   I think 1,080 probably was the exact
21  amount.
22      Q.   Okay.  And then it says "rent
23  income."
24      That's the rental income from the
25  California property?

S. Ryu

1  
2      A.   Yeah.
3      Q.   So you had a total income, monthly
4  income as of October 2011, 13,064,
5  approximately?
6      A.   Yes.
7      Q.   And you had expenses of $14,575,
8  approximately?
9      A.   Yes.
10      Q.   So is it fair to say that, according
11  to this statement, this income and expense
12  statement, your expenses exceeded your income?
13      A.   Yes.  I think this is one of the
14  reasons why my wife decided to file bankruptcy
15  shortly hereafter or sometime thereon.
16      Q.   Okay.
17      (Plaintiff's Exhibit 55, Frank
18  Gleeson's e-mail from November 8, 2011,
19  marked for identification.)
20  BY MR. YI:
21      Q.   I'm showing you what's been marked
22  as Exhibit 55 to your deposition.
23      Do you recognize these documents?
24      A.   Yes.
25      Q.   Okay.  First page, is that a copy of

S. Ryu

1  
2  Frank Gleeson's e-mail to you, from November 8,
3  2011, 9:22 a.m., with a subject "planning CO,"
4  which I believe stands for "planning company"?
5      A.   No, planning committee.
6      Q.   Planning committee, okay.  Thank
7  you.
8      Turn to the second page of the
9  exhibit, please.  Can you tell us what those
10  numbers are indicating?
11      A.   This bank's numbers.
12      Q.   Which bank's numbers?
13      A.   BankAsiana.  It's his preparation
14  for BankAsiana business to be sent to planning
15  committee of the bank.  And that's in
16  thousands, so assets --
17      Q.   Right.
18      A.   -- at that time, you know, actual,
19  we had in 2011, as of November, or as of
20  October, we had 179 or 180 million actual in
21  budget.  Our target was 181.  Pretty close.
22  Loans and deposit there and so forth.
23      And 2012 projection was in 240
24  million for total assets, loans, and, so...
25      Q.   Thank you.

S. Ryu

1  
2      Now, during your tenure at
3  BankAsiana from April 2006, to October 2013,
4  you were the bank's chief operating officer and
5  you were also chief compliance officer and you
6  were also BSA officer, correct?
7      A.   Yes.
8      Q.   Are you aware of any other bank
9  employee or officer who has served in all three
10  of those capacities, other than yourself?
11      MR. DZARA:  Objection to form.
12  Calls for speculation.
13      You can answer, if you can.
14      A.   Well, in terms of titles, Frank was
15  CFO, but he was also IT manager.  And he was
16  also bank's security officer.
17      Q.   If I may, my question is --
18      A.   Yes.
19      Q.   -- do you know anyone else who has
20  served as --
21      A.   Oh.
22      Q.   -- any bank's COO, chief compliance
23  officer, and BSA officer?
24      A.   Anyone else who served COO,
25  compliance officer, and BS officer at

Page 230

```
1              S. Ryu
2  BankAsiana?  Is that your question?
3      Q.   At any bank.
4      A.   Oh, at any bank.
5      Q.   Have you come across anyone?
6      A.   Oh, anyone who served under that
7  many titles and things like that, or those
8  different titles at other banks?
9      Q.   Let me see if I can rephrase the
10  question to make it clear to you.
11      A.   Sure.
12      Q.   In your career in banking, have you
13  come across any individuals who have served as
14  the bank's chief operating officer, chief
15  compliance officer, and BSA officer all at the
16  same time?
17      A.   Perhaps not in those exact title,
18  but I've seen individuals with multiple
19  responsibilities and titles.
20      Q.   Okay.  As chief compliance officer,
21  could you just tell us briefly your duties and
22  responsibilities at BankAsiana.
23      A.   Oversee the laws and regulations
24  related to banking, for the bank.
25      Q.   So when you say "oversee laws and
```

Page 231

```
1              S. Ryu
2  regulations," are you referring to sort of
3  overseeing the bank's compliance with those
4  laws and regulations?
5      A.   Yes.
6      Q.   Let me see if I can make it easier
7  for you.
8          Can you give me, like, the top three
9  duties and responsibilities?  Is that okay?
10          MR. DZARA:  I think he just answered
11      the question, but you can ask him to be
12      more specific.
13      A.   Top three.
14      Q.   As chief compliance officer.
15      A.   Okay.  Make certain that the bank is
16  in satisfied standing with federal compliance
17  examination.  Make sure the bank is in
18  satisfactory standing with Community
19  Reinvestment Act of 1978.  And make certain
20  that the bank has satisfactory compliance
21  program in place.
22      Q.   And could you give us a few sort of
23  the top duties and responsibilities or key
24  duties and responsibilities of when you served
25  as chief operating officer of BankAsiana?
```

Page 232

```
1              S. Ryu
2      A.   Well, coordinate the board and
3  management activities.  Prepare board reports
4  and regulatory -- oversee preparing of
5  board-related reportings.  Oversee the
6  regulatory reportings of the bank to the
7  regulatory agencies.  Promote successful
8  operations of the bank, among other things.
9      Q.   Who was responsible for filing --
10  overseeing the filing of SARS at BankAsiana?
11      A.   Who was responsible for filing of
12  Suspicious Activity Reports?
13      Q.   Who was responsible for supervising
14  or overseeing the filing of SARs?
15      A.   Me.
16      Q.   And did that fall under chief
17  compliance officer?
18      A.   BSA.
19      Q.   BSA.
20          And was part of the duties and
21  responsibilities of COO overseeing the
22  operations of the bank's branches?
23      A.   Operations in terms of money
24  exchange or accounting, or what do you mean?
25          There's a specific operations -- you
```

Page 233

```
1              S. Ryu
2  know, as a COO, I was responsible for -- and,
3  you know, if that operation, if you want to
4  address it as the accuracy of numbers or, you
5  know, safety of lending or money exchange, that
6  falls into different categories.
7      Q.   Did you, as -- were you given a
8  daily report from a branch manager as to the
9  daily activities or business activities of each
10  branch?
11      A.   No.
12      Q.   Were you given any periodic reports
13  from branch managers, "Hey, here's how we're
14  doing"?
15      A.   No.
16      Q.   On a monthly basis?  Quarterly
17  basis?  Daily basis?
18      A.   They were not submitting their
19  performance reporting to me.  There was one
20  thing that was sort of missing.  We could have
21  added that, the periodic proactive submitment
22  from the branch level to corporate
23  headquarters, but oftentimes poses hindrance to
24  the branch people, so I think we opted not to
25  do that.  Rather, we try to figure out the
```

S. Ryu

1
2  financial people, like Bo Young Lee and Frank
3  and Jessica Kim, try to figure themselves out
4  as to what the numbers are in terms of branch.
5       My chief duty as chief operating
6  officer was to facilitate elements of banking
7  operations so that the bank would operate
8  properly in terms of providing resources,
9  providing facility, providing individuals,
10 overseeing people.  You know, making salary
11 recommendation and things like that.
12      Never really -- you know, there's a
13 difference between -- you know, it used to be a
14 lot more simple, that when you didn't have, you
15 know, chief compliance officer, chief
16 operations officers, and things like that.  But
17 now, they're having chief performance officers
18 and all of this stuff.
19      So it's lot more segregated and it's
20 now hard to pinpoint -- or maybe it is easier
21 to pinpoint.  Had we a chief operations officer
22 related to deposit operations, that person
23 would be responsible for all of the branch
24 operations deposit.
25      I believe Bank of Hope and other

S. Ryu

1
2  larger institutions have that type of functions
3  nowadays.  But as a small bank, my role, as you
4  asked, as chief operating officer, was not
5  really looking into the numbers or loans or
6  deposit activities and things like that.  It
7  was just more so facilitating necessary
8  categories and items and resources so that it
9  can operate.
10      Q.   But is it fair to say that as the
11 chief operating officer, that you were
12 ultimately the chief officer of the bank
13 overseeing the operations of the bank?
14      A.   No.
15      Q.   No?  Who was --
16      A.   That would be CEO.
17      Q.   CEO?
18      A.   Of course.
19      Q.   Okay.  What would you say your
20 duties and responsibilities were as a BSA
21 officer of BankAsiana?
22      I think you mentioned overseeing the
23 filing of SARs as being one of those.
24      A.   Yes.  Let me rephrase that.
25      I never filed any SARs myself or,

S. Ryu

1
2  you know, whatnot.  I am responsible for
3  someone else filing the SAR and that falls onto
4  my responsibility ultimately.
5       But I never file SARs.  I did sign
6  SARs because I was bank's designated BSA
7  officer.  But --
8       Q.   So before the filing of the SAR, you
9  would review it and then you would sign it?
10      A.   Yeah.  I would take a look at it,
11 definitely.
12      Q.   And in addition to reviewing the
13 SAR, is it fair to say you would speak to the
14 bank employee who is filing the SAR?
15      A.   Briefly, yes.
16      Q.   Any other duties and
17 responsibilities as BSA officer of BankAsiana?
18      A.   Reporting to the board, coordinating
19 state and federal examination related to that
20 type of scrutiny and examination and whatnot,
21 you know.  Facilitating the board education,
22 employee education through third parties and
23 whatnot.
24      And that would include implementing
25 any punishment if there is any violation

S. Ryu

1
2  internally, if the laws and regulations are
3  being violated by employees.
4       Q.   Could you just briefly describe the
5  -- withdrawn.
6       Are you familiar with surprise cash
7  counts that took place at BankAsiana?
8       A.   Yes.
9       Q.   And do you know who performed that
10 duty during your tenure?
11      A.   Jessica Kim.
12      Q.   And could you just tell us what her
13 position or title was?
14      A.   She was vice president and
15 operations administrator.
16      Q.   And is it fair to say that you were
17 her direct boss?
18      A.   Partly.  Not entirely, but mostly,
19 yes.
20      Q.   And is it fair to -- did -- when
21 Jessica Kim -- withdrawn.
22      Did she conduct surprise cash counts
23 every day?
24      A.   Not every day.
25      Q.   From time to time?

Page 238

S. Ryu

1  A.   From time to time.
2
3  Q.   Weekly basis?  Monthly basis?
4  A.   Wish it was weekly basis.  But my
5  opinion, she was a little bit on a lazy side
6  and I think, you know, CEO prompted her quite a
7  bit more than me to perform surprise cash
8  checks and whatnot.  So I'd say perhaps each
9  branch got monthly hit on, you know, with the
10 cash counts.
11 Q.   When Jessica Kim was going to
12 conduct a surprise cash count, did she tell you
13 in advance that she was going to conduct such a
14 cash count?
15 A.   Yes.
16 Q.   Okay.  And was that -- is it fair to
17 say that that was her sort of procedural
18 practice?
19 A.   Yes.
20 Q.   During your tenure at BankAsiana,
21 did you ever learn at any time that the
22 surprise cash counts were being performed not
23 by Jessica Kim, but by two tellers at the Fort
24 Lee branch, Karen Chon and one other teller?
25 A.   No.

Page 239

S. Ryu

1
2  Q.   You have no recollection of learning
3  at some point that the cash -- the surprise
4  cash counts were being performed by Karen Chon
5  and one other teller at the Fort Lee branch?
6  A.   I really don't think so.  I mean, if
7  they are performing their own cash counts, what
8  is the surprise and what is the purpose?  That
9  doesn't make any sense to me.
10 Q.   So during the -- your entire tenure
11 at BankAsiana, as far as you know, the surprise
12 cash counts were being performed by Jessica
13 Kim?
14 A.   Yeah, yeah.  Or somebody who would
15 have the function of audit.
16 Q.   Now, Jessica Kim left BankAsiana at
17 some point?
18 A.   Yes.
19 Q.   You were still at the bank?
20 A.   Yes.
21 Q.   Who took over the duties and
22 responsibilities of Jessica Kim?
23 A.   Irene.
24 Q.   Irene Lee?
25 A.   Yes.

Page 240

S. Ryu

1
2  Q.   And is it fair to say it was Irene
3  Lee who then took over also the performance of
4  the surprise cash counts?
5  A.   Yes.
6  Q.   Now, each branch of BankAsiana had a
7  daily cash limit, correct?
8  A.   I think so.
9  Q.   And do you recall you approving
10 increase of a daily cash limit at the Fort Lee
11 branch from 150,000 to 250,000, during your
12 tenure at BankAsiana?
13 A.   I'm not sure whether I personally
14 approved that or not.  So answer is, I'm not
15 sure.
16 Q.   Do you ever recall being asked to
17 increase the daily cash limit at Fort Lee
18 branch -- at the Fort Lee branch, from 150,000
19 to 250,000?
20 A.   No.
21 Q.   Now, we talked earlier about Michael
22 Kim and KORE Consulting.
23 During your tenure at the bank, did
24 any bank employees bring to your attention the
25 fact that either Michael Kim or his company,

Page 241

S. Ryu

1
2  KORE Consulting had issued nonsufficient funds
3  checks?
4  Do you know what I mean when I say
5  nonsufficient funds checks?
6  A.   Yes.  I don't know whether it was
7  intentional for the company or principal to
8  write a check knowing that there was no money.
9  I don't know.  And it sounds like, when you say
10 it, when you put it that way -- I forget how
11 you put it -- but it sounds like it was a --
12 writing, like, a check that in the account,
13 there was no money.  I'm not sure whether that
14 was the case.  And somehow that was approved or
15 whatnot.
16 But I know that -- and Michael Kim
17 had other businesses, too.  I don't know what
18 exactly.  I can't recall.  If you have
19 something, I may be able to recall.
20 But I know he had over -- overdrawn
21 his money from his accounts a number of times
22 and, you know, at times he would call me and
23 ask me, "Oh, could you call Fort Lee and see,
24 you know, talk to the manager if he will give
25 me time until tomorrow and I will make up the

Page 242

S. Ryu

1 difference?"  And whatever.
2        And I said, "Oh, sure.  I'll try."
3        So I will call, you know, the
4 manager and tell them this is the case, "Do
5 whatever you want."  Because I can't tell him
6 what to do.  But, you know, I remember that.
7        But as you put it -- can you put
8 your question once again for me.  Let me hear
9 that exactly.
10    Q.   Did you ever -- during your tenure
11 at BankAsiana, did you ever instruct any bank
12 employees to honor nonsufficient funds checks
13 issued by Michael Kim?
14    A.   So that term is incorrect at all.
15    Q.   Let me --
16    A.   The answer is no.
17    Q.   All right.  Do you have any
18 recollection of any bank employee contacting
19 you and telling you that Michael Kim or his
20 company had issued a check, that there was not
21 enough funds in that account to cover that
22 check, and that Michael Kim was asking that the
23 bank honor the check nonetheless?
24    A.   Employee contacting me?

Page 243

S. Ryu

1    Q.   Yes.
2    A.   Michael -- I remember Michael Kim
3 contacting me to see, you know, whether the
4 bank will hold off the -- or honor what you
5 call a -- what you call -- I forgot the term.
6 It's a credit, you know.
7        And it's a common banking practice
8 that the branch managers would give, you know,
9 their discretionary credit to certain
10 customers, you know, if they're everyday,
11 coming in customers that somehow check got
12 returned or something.  It was still honored.
13 It was like an advance.  They call it immediate
14 advance or something like that.
15    Q.   And did Michael Kim ever ask you to
16 approve what you refer to as an immediate
17 advance?
18    A.   Right.  Immediate credit.
19    Q.   Immediate credit?
20    A.   Approve -- I have no authority to
21 approve anything, because immediate credit is
22 credit.  I'm not a credit officer, nor was I
23 the deposit officer.
24        So I would ask -- for example, I

Page 244

S. Ryu

1 would ask T.K. Suh at Fort Lee branch -- he was
2 the manager -- "You know, Michael Kim just
3 asked me to do -- you know, ask you, that
4 situation is this.  You know, go and do
5 whatever you want."
6        And I don't know what his
7 relationship, Michael Kim's relationship was
8 with T.K.  But Michael Kim asked me, you know,
9 sort of ask them.  But there is no way that I
10 could dictate them or, you know, approve these
11 things.  It's not in my realm whatsoever.
12    Q.   Okay.
13    A.   So the answer is no.
14    Q.   Just to clarify, so it's your
15 testimony that Michael Kim, on certain
16 occasions, called you and asked you for
17 immediate credit?
18    A.   No.
19        MR. DZARA:  Objection.
20    A.   He did not ask me.  He asked me to
21 call.
22    Q.   He asked you to make a call to
23 Mr. Suh?
24    A.   Make a call to Fort Lee branch, you

Page 245

S. Ryu

1 know, and to see whether they would do that.
2 That's the only thing I did.  So, you know --
3 so he was an acquaintance of mine and, you
4 know, he asked me, so I simply called and
5 asked.
6    Q.   And was it on more than one occasion
7 did he ask?
8    A.   Oh, yeah.  I think so.  I could
9 recall maybe -- not more than dozen times.  But
10 you know, one and four times.
11    Q.   And did they include times when you
12 had outstanding loan from --
13    A.   Yes.
14    Q.   -- from Michael Kim's company?
15    A.   Yes.
16    Q.   Now, we talked about the loans that
17 you received from Michael Kim's company, KORE
18 Consulting, 50,000.  We talked about SOYU
19 ARCHitecture loan, 18,000.
20        Do you ever receive a loan from Silk
21 Road Inc.?
22    A.   No.
23    Q.   Was Silk Road Inc. Bank Asiana's
24 marketing vendor during your tenure at the

Page 246

S. Ryu

1
2  bank?
3      A.  Yeah, I would say so.
4      Q.  And it's your testimony that you
5  never received a loan from Silk Road Inc.?
6      A.  No.
7      Q.  Did you ever receive a prior
8  approval, written approval from either the
9  BankAsiana's board of directors or the
10 president and CEO to pursue the two businesses
11 that we've spent some time talking about, the
12 cafe and hair salon, while you were employed on
13 a full-time basis as an officer of BankAsiana?
14     A.  You mean, I obtained a written
15 approval?
16     Q.  Yeah.  Did you receive anything in
17 writing that said it's okay for you to pursue
18 or to operate these businesses while you were
19 working full-time for the bank?
20     A.  First, before I answer that in form
21 of "yes" or "no," first the bank policies did
22 not require that the additional activities of
23 the bank employees be approved by anyone.  And
24 then there are some banks who require that.
25         And number two, the board of

Page 247

S. Ryu

1
2  directors and the CEO, they were fully aware of
3  what I was doing.  In fact, I told them in
4  advance my full engagement of those businesses
5  to the board.
6         So not only the board members came
7  to, you know, the cafe -- and I don't know
8  whether they did to the hair salons, but
9  certainly, you know, board members came by.
10 You know, they have coffees and whatnot.  So
11 they were fully aware.
12         As to the written approval, no,
13 because there was none required for me to do
14 so.
15     Q.  Okay.
16         (Recess is taken.)
17 BY MR. YI:
18     Q.  Before we go back to the remaining
19 exhibit documents, I just want to -- I just
20 want to make sure that I have a clear
21 understanding of your annual salary when you
22 were at BankAsiana.
23     A.  Yes.
24     Q.  So I'm happy to mark these.  I have
25 some e-mails that I can mark as exhibits, and

Page 248

S. Ryu

1
2  I'll represent to you that these are e-mails in
3  which you are either the sender or the
4  recipient.
5         But I think that if you could just
6  refer to them -- so let me try to do it this
7  way.  I'm just going to ask you to take a look
8  at this right here.
9         This is 2010 payroll, 121,900.
10     A.  Yes.
11     Q.  Okay.  So, sir, for calendar year
12 2010, was your annual salary at BankAsiana
13 $121,900?
14     A.  What year was that again?
15     Q.  2010.
16     A.  I don't think that's right.
17     Q.  Okay.  I'm just going to ask you to
18 take a look at this.  I'm happy to mark it as
19 an exhibit if I need to, but why don't you take
20 a look.
21         MR. DZARA:  Off the record.
22         (Discussion held off the record.)
23     A.  2010, 125,500.  Is that what you're
24 talking about?
25     Q.  I see.  Okay.

Page 249

S. Ryu

1
2         So for calendar year 2009, your
3  annual salary at Bank Asiana was $121,900, and
4  for calendar year 2010, your annual salary was
5  125,500; is that correct?
6      A.  Yes.
7      Q.  So if you look at 2011 and 2012 --
8      A.  Yes.
9      Q.  -- it looks like it was 129,300.
10 And then there was no change for the following
11 year 2012.  It remained the same, 129,300.
12     A.  I think this is indicator of -- see,
13 the -- none of the increase percentage were
14 applied to this particular sheet, so of course
15 there is no change.
16         But there was change in 2012.  I
17 don't know what percentage.
18     Q.  Off the record.
19         (Discussion held off the record.)
20 BY MR. YI:
21     Q.  Sir, we just looked at some
22 documents that were in front of us, and I want
23 to just make sure that I'm correct.
24         For calender year 2011, your annual
25 salary at BankAsiana was 129,300, correct?

Page 250

S. Ryu

1
2   A.   That sounds right.
3   Q.   Okay.  And for calendar year 2012,
4   your annual salary was $140,000?
5   A.   Right.
6   Q.   Yes?
7   A.   Yes.
8   Q.   And for calendar year 2011, you
9   received a bonus of $14,000?
10  A.   Sounds right.
11  Q.   And for calendar year 2012, you
12  received a bonus of $20,000?
13  A.   Sounds right.  If it's indicated in
14  there, then yeah.
15       MR. DZARA:  Can I have a Bates
16  number of the document you were looking at,
17  Michael?
18       MR. YI:  We were referring to
19  documents numbered WB 10229 and WB 10529.
20  BY MR. YI:
21  Q.   Okay.
22       MR. YI:  Off the record.
23       (Discussion held off the record.)
24  BY MR. YI:
25  Q.   Sir, for calendar year 2013, your

Page 251

S. Ryu

1
2   annual salary at BankAsiana was 160,000?
3   A.   Yes.
4   Q.   And you received a bonus of 20,000?
5   A.   Yes.
6   Q.   Thank you.
7       MR. YI:  And for the record, the
8   document that we were referring to off the
9   record was WB 11666.
10  BY MR. YI:
11  Q.   Are you aware of any small business
12  loan made by BankAsiana to an entity called
13  Cleo Riverside?
14  A.   Now you mention it, yes.
15  Q.   Can you tell us what you remember?
16  A.   I just -- I'm aware that that is a
17  loan which BankAsiana made to that entity,
18  Cleo, and I know Cleo is somehow related to
19  Michael Kim.
20  Q.   So did you have anything to do with
21  the making of this loan, origination of this
22  loan by BankAsiana to Cleo Riverside?
23  A.   No.
24  Q.   Did you have any discussions with
25  Michael Kim about this loan?

Page 252

S. Ryu

1
2   A.   Not at all.
3   Q.   Did you have any discussions with
4   anybody at BankAsiana about this loan?
5   A.   I may have discussed some aspects of
6   loans somehow.  But I'm not a lender.  I never
7   served as a lender, so I was never part of any
8   approval or recommendation or, you know,
9   whatnot of any lending activities.
10  Q.   Do you have any recollection of any
11  internal discussions you had with anybody at
12  BankAsiana either before the loan was
13  originated or after?
14  A.   I may have some discussions at
15  certain point with somebody, but I don't have
16  any recollections of any particular.  Unless
17  you have something that indicates that then, I
18  may be able to recognize it.
19  Q.   Did you ever learn that this SBA
20  loan was a fraudulent loan and that the SBA
21  declined to provided the guarantee?
22  A.   No.
23  Q.   For the guarantee portion of the
24  loan, I should say.
25  A.   No.

Page 253

S. Ryu

1
2   Is it fraud?
3       MR. DZARA:  You can't ask him
4   questions.
5       THE WITNESS:  Oh, okay.
6   A.   I have no idea.
7   Q.   Do you recall who referred the Cleo
8   Riverside entity or the principal of that
9   entity to BankAsiana?
10  A.   I'm not sure.  But since Michael Kim
11  that -- I am aware that he was involved with
12  the loan, maybe he did.
13  Q.   But you don't know who actually
14  referred Cleo Riverside to BankAsiana --
15  A.   No.
16  Q.   -- if there was a referral?
17  A.   Right.  No.
18       (Plaintiff's Exhibit 56, e-mail from
19  Donald Kong, marked for identification.)
20  BY MR. YI:
21  Q.   I'm showing you what's been marked
22  as Exhibit 56 to your deposition.
23       Do you recognize this document?
24  A.   I recognize as I read it, yes.
25  Q.   Is this a copy of an e-mail from

Page 254

S. Ryu

1   Donald Kong (phonetic), who at the time was an
2   employee at BankAsiana, to you, from March 10,
3   2011, 5:37 p.m., Eastern Standard Time?
4       A.   Yes.
5       Q.   Okay.  And does this refresh your
6   recollection as to discussions you may have had
7   with either Donald Kong or anybody else at the
8   bank?
9       A.   No.
10      Q.   Okay.
11      A.   It appears to me that he's asking
12  whether this is a conflict or interest or not.
13  And I don't recall what I replied to him or,
14  you know, told him whether it was or not.
15      Q.   Do you have any recollection of your
16  communication with Mr. Kong following this
17  e-mail?
18      A.   No.
19      Q.   Do you have any recollection of
20  telling Mr. Kong that you were concerned to
21  learn this fact, and that the loan department
22  of the bank ought not to make the loan?
23          MR. DZARA:  Objection to form.
24      A.   I don't know what happened with this
25

Page 255

S. Ryu

1   loan.  I don't...
2       Q.   If I may, my question is:  Do you
3   have any recollection of telling Mr. Kong,
4   "Well, if these facts are correct, then we
5   should not originate this loan"?
6           MR. DZARA:  Objection to form.
7   BY MR. YI:
8       Q.   Do you have any recollection of
9   saying something in substance to that effect?
10          MR. DZARA:  Objection to form.
11      A.   I have no recollection of it.
12      Q.   Do you have any recollection of
13  speaking to Michael Kim about this --
14      A.   Michael Kim?
15      Q.   -- after you received this e-mail?
16      A.   No.
17      Q.   Let's put it aside for the time
18  being.
19          MR. DZARA:  Note for the record the
20          top line says "Cleo Gramercy loan
21          disbursement and control."  I assume that's
22          the subject line of the e-mail that somehow
23          got -- that got put up there.
24          But you were talking about a Cleo
25

Page 256

S. Ryu

1   Riverside loan, and this says Cleo Gramercy
2   loan.
3           So I guess just note my objection
4   for the record.
5           MR. YI:  I think we can clarify on
6           the next exhibit.
7           (Plaintiff's Exhibit 57, e-mail
8           string, marked for identification.)
9   BY MR. YI:
10      Q.   I'm showing you what's been marked
11  as Exhibit 57 to your deposition.
12          Have you seen this before?
13          Do you recognize these e-mails?
14      A.   Now that I see, I recognize it.
15      Q.   At the top, is that a copy of your
16  e-mail to Michael Kim, from May 13, 2011, 10:55
17  a.m.?
18      A.   Yes.
19      Q.   And the subject is "Cleo Park
20  Avenue"?
21      A.   Yes.
22      Q.   And if you look down -- so it
23  appears that the original e-mail was from
24  Joseph Kim to Mr. Hur, and then Mr. Hur
25

Page 257

S. Ryu

1   forwarded the e-mail to you, and then you in
2   turn forwarded the e-mail to Michael Kim.
3       A.   Yes.
4       Q.   Okay.  And do you see, under Joseph
5   Kim's e-mail, do you see under "Borrower," Cleo
6   Riverside; loan type, SBA; loan amount,
7   $1,340,000 is the current balance indicated
8   with the date maturity, and you see guarantors,
9   and do you see Michael Kim's name?
10      A.   Yes.
11      Q.   And seeing this exhibit, including
12  your forwarding e-mail to Michael Kim, does
13  that refresh your recollection of
14  communications you may have had with Michael
15  Kim about these loans?
16      A.   No.
17      Q.   Including Cleo Riverside loan?
18      A.   No.
19      Q.   You have no recollection?
20      A.   No.
21          You know, if I may explain, I have
22  no recollection about this whatsoever.  But it
23  looks to me that Joseph Kim had indicated to
24  the CEO and H.B. Kim, that the loan are
25

S. Ryu

1
2 related, the four loans are somehow related so
3 that the management loan committee level loan
4 decision cannot be made.  I guess that's
5 indicated that it's over the limit of
6 management loan committee's decision.
7          So I would assume that Cleo -- or
8 somehow requested inquiries in amount, and I
9 guess Joseph Kim is indicating that cannot be
10 done.
11          So I don't know why Mr. Hur
12 forwarded this to e-mail to me.  I don't know
13 whether he instruct me to since forward this to
14 Michael Kim or not.  But you know, this is sort
15 of a denial of some sort that I ended up
16 somehow sending it to Michael Kim, saying that,
17 no.
18          And that's -- I'm just driving from
19 the context of the e-mail.  As far as the
20 recollection of mine is concerned, I do not
21 recall any of this.
22      Q.   So is it your testimony that you do
23 not recall why you forwarded the e-mail to
24 Michael Kim on May 13, 2011?
25      A.   Yes.

S. Ryu

1
2      Q.   And is it your testimony that you
3 did not know why Michael Kim, who was one of
4 the guarantors for the Cleo Riverside SBA loan,
5 also received a loan referral fee of $5,000?
6          MR. DZARA:  I'm going to object.
7      You're trying to link these two e-mails.  I
8      don't know if they can be linked.
9          But he can answer, if he understands
10      the questions.
11 BY MR. YI:
12      Q.   I'll withdraw and I'll rephrase.
13      A.   Okay.
14      Q.   In the previous exhibit, Mr. Kong is
15 indicating to you that -- he was referencing
16 Cleo Gramercy -- G-A-R-M-E-R-S-Y -- which
17 appears to be a typographical error.  He said
18 the above SBA loan was originated and referred
19 by Michael Kim, and that Mr. Kim got a referral
20 fee of $5,000.
21          Is it your testimony that you do not
22 recall having -- having any discussions with
23 Mr. Kong about this?
24      A.   No.
25      Q.   And is it your testimony that you

S. Ryu

1
2 have no recollection as to whether you
3 subsequently discussed this matter with Michael
4 Kim?
5      A.   Yes.  I don't remember anything
6 about either one of these.  But I don't know.
7 If you ask me to make my judgment call on this
8 as to whether --
9      Q.   I'm not asking you for a judgment
10 call --
11      A.   Okay.
12      Q.   -- I'm just asking whether you
13 remember anything.
14      A.   No, I don't remember anything.
15      Q.   So is there anything you remember
16 about the subject matter reflected in these
17 e-mails.
18          MR. DZARA:  Objection to form.
19      Asked and answered.
20          You can answer.
21      A.   No, I don't remember.
22      Q.   Are you in communication with
23 Ms. Eunhee Pak?
24      A.   No.
25      Q.   When was the last time you

S. Ryu

1
2 communicated with her?
3      A.   Maybe November of 2010.
4      Q.   Are you able to provide her last
5 known address in Korea?
6      A.   I don't know.
7      Q.   I believe earlier you said that she
8 moved to Korea in or about August 2010.
9      A.   Yes.
10      Q.   After she moved, did you learn her
11 address in Korea?
12      A.   No.
13      Q.   Did she ever provide that to you?
14      A.   No.
15      Q.   Did you ever ask for it?
16      A.   No, I don't think so.
17          (Plaintiff's Exhibit 58, number of
18 checks, marked for identification.)
19          MR. DZARA:  Off the record.
20          (Discussion held off the record.)
21 BY MR. YI:
22      Q.   I'm showing you what's been marked
23 as Exhibit 58 to your deposition.
24          Do you recognize this documents?
25      A.   Yes.

Page 262

S. Ryu

1
2  Q.   Is this exhibit showing copies of a
3  number of checks that you issued from your
4  joint account with your wife, which was held at
5  Center Bank?
6  A.   Yes.
7  Q.   And these are checks that you issued
8  to Ms. Pak?
9  A.   Yes.
10  Q.   What were these payments for?
11  A.   Salary.
12  Q.   What do you mean by salary?
13  A.   For working at the cafe and hair
14  salon.
15  Q.   Did you ever issue a 1099 to her?
16  A.   I don't think so.
17  Q.   I'm a little bit confused.
18      Earlier, you said that you didn't
19  have any ownership interest in either the cafe
20  or the hair salon, as I recall.
21  A.   Yes.
22  Q.   And you also said that Ms. Pak was
23  sort of working part-time or helping out at the
24  cafe and the hair salon.
25  A.   Yes.

Page 263

S. Ryu

1
2  Q.   Why were you making salary payments
3  to Ms. Pak when you had no ownership interest
4  in either the cafe or the hair salon?
5  A.   Ownership interest has nothing to do
6  with -- you are obligated to pay somebody who
7  is working for you.
8  Q.   You weren't deriving any income from
9  either the cafe or the hair salon, right?
10  A.   I was making some revenues, but
11  ultimately, there was no positive income.
12      But, you know, she was working so,
13  you know, it's only fair that I would
14  compensate her something.
15  Q.   The revenues from the cafe and the
16  hair salon, were you depositing it into your
17  joint account at Center Bank?
18  A.   I don't think so.  I think it was
19  being deposited into Royal Asian Bank.
20  Q.   Seleste LLC account at Royal Asian
21  Bank?
22  A.   I think so.
23  Q.   So why were the salary payments
24  being made from your personal account at Center
25  Bank?

Page 264

S. Ryu

1
2  A.   It was my choice.  You know, money
3  from this account or that account did not
4  matter to me.  So...
5  Q.   And these salary payments to Ms. Pak
6  from 2010, did you reflect this on your income
7  tax return for 2010?
8  A.   Reflect how?
9  Q.   I mean, did you claim it as a
10  business deduction?
11  A.   I'm not sure whether I did or not.
12  Q.   Did you ever consultant with your
13  accountant about these payments?
14  A.   No.
15      (Plaintiff's Exhibit 59, two checks
16      issued from Mr. Ryu's personal joint
17      account, marked for identification.)
18  BY MR. YI:
19  Q.   I'm showing you what's been marked
20  as Exhibit 59 to your deposition.
21      Do you recognize these documents?
22  A.   Yes.
23  Q.   Are these copies of two checks that
24  you issued from your personal joint account
25  with your wife to Ms. Pak --

Page 265

S. Ryu

1
2  A.   Yes.
3  Q.   -- in 2010?
4  A.   Yes.
5  Q.   And can you tell us what these
6  payments are for?
7  A.   I'm not certain, but it must be part
8  of her salary.
9  Q.   What was her salary?
10  A.   Maybe 2,500 or beyond.  You know,
11  maybe more than that, or -- I don't clearly
12  remember.  But, you know, these are payments
13  made to her in relation for her work at either
14  cafe or hair salon.
15  Q.   And is it fair to say that during
16  this time, all the revenue from the cafe and
17  hair salon, you deposited into the Seleste LLC
18  account at Royal Asian Bank?
19  A.   I would think so, but I'm not 100
20  percent certain.
21  Q.   Can you think of any other bank
22  accounts where those revenues could have been
23  deposited into?
24  A.   It could have been deposited into
25  BankAsiana or, you know -- apparently, I was

Page 266

```
 1              S. Ryu
 2   wrong about not having a Center Bank account
 3   here in 2010.  But maybe it was deposited
 4   there.
 5          Technically, practically speaking,
 6   depositing any money to Center Bank is
 7   impossible because there was no Center Bank
 8   available here in East Coast at that time.
 9          And, you know, Royal Asian was
10   right, ten meters from -- it was in the same
11   building as the cafe.  So I would assume that
12   the money was deposited into the Royal Asian
13   Bank.
14          And it's the -- the reason -- one of
15   the reasons why I don't recall the money, where
16   I deposit or why not, because I never make my
17   own deposits.  You know, I don't like to going
18   to banks to deposit stuff.  So I think it was
19   either my wife or Eunhee that deposited money,
20   so...
21      Q.   These two checks, unlike the other
22   checks that we were looking at, which were
23   Center Bank checks, these are Royal Bank -- I'm
24   sorry, Royal Asian Bank checks.
25          So are you -- I'm just trying to
```

Page 267

```
 1              S. Ryu
 2   make sure that I understood.
 3          You're saying that you believe that
 4   the revenues during this time from the cafe and
 5   the hair salon would have been deposited into
 6   the Seleste LLC account at Royal Asian Bank,
 7   and that it's also possible that you may have
 8   deposited some of that revenue into your
 9   personal joint account with your wife at Royal
10   Asian Bank?
11      A.   You know, that may have been
12   possible, but the banks are pretty strict about
13   if the income is coming from, you know, the
14   cars and whatnot.  I mean, it would have to be
15   deposited into business account.
16          But these things being deposited
17   into personal account, I'm not sure because I
18   wasn't making the deposits myself.
19      Q.   And the revenues that were being
20   deposited, did it include cash?
21      A.   Oh, I'm sure.
22      Q.   So if we were to review your bank
23   statements from both accounts, the personal
24   account and the Seleste LLC business account at
25   Royal Asian Bank, we would see deposits of the
```

Page 268

```
 1              S. Ryu
 2   revenue from the cafe and the hair salon during
 3   this time period of 2010?
 4      A.   I don't understand the question.
 5   Repeat.
 6          (Question was read back as follows:
 7          "QUESTION:  So if we were to review
 8          your bank statements from both accounts,
 9          the personal account and the Seleste LLC
10          business account at Royal Asian Bank, we
11          would see deposits of the revenue from the
12          cafe and the hair salon during this time
13          period of 2010?")
14      A.   Maybe.  But as I indicated just now,
15   I don't know.  I don't remember because I'm not
16   -- I probably not even once made any deposit to
17   Royal Asian Bank myself.  So -- just beyond my
18   knowledge.  But you may see just -- it's
19   possible.
20          (Plaintiff's Exhibit 60, e-mail
21          string with Ms. Pak, marked for
22          identification.)
23   BY MR. YI:
24      Q.   Sir, I'm showing you what's been
25   marked as Exhibit 60 to your deposition.  And
```

Page 269

```
 1              S. Ryu
 2   if it's okay with you, I'd like to just go over
 3   each document at a time.
 4          On the first page, is that a copy of
 5   your e-mail to Ms. Pak, from July 30, 2010,
 6   9:06 a.m., Eastern Daylight Savings Time?
 7      A.   Yes.
 8      Q.   The second page, is that a copy of
 9   your e-mail to Ms. Pak, from August 4, 2010,
10   5:20 p.m., Eastern Daylight Savings Time?
11      A.   Yes.
12      Q.   Third page and I -- is the bottom of
13   the third page a copy Ms. Pak's e-mail to you,
14   from August 5, 2010?  And there's a time of
15   2:55.  It's not clear whether it's a.m. or p.m.
16      A.   Yes.
17      Q.   And above that, is that a copy of
18   your e-mail, your reply e-mail to her August --
19   from August 5, 2010, 10:03 a.m., Eastern
20   Daylight Savings Time?
21      A.   Yes.
22      Q.   The next page --
23          MR. DZARA:  Stop.  Off the record.
24          (Discussion held off the record.)
25   BY MR. YI:
```

Page 270

S. Ryu

1
2     Q.   Sir --
3          Discussion held off the record.)
4          MR. YI:  David, I appreciate your
5     offer and I'll take you up on it.
6     BY MR. YI:
7     Q.   Could you just go through the rest
8     of these e-mails and just confirm for us that
9     these are copies of your e-mail -- your e-mails
10    to Ms. Pak.  And I believe there are -- a few
11    of these e-mails are her e-mails to you.
12    A.   Sure.
13         MR. DZARA:  There are multiple --
14    they're different e-mail addresses, and you
15    did confirm.  You can stipulate they're
16    e-mail addresses you sent, but there are
17    different e-mails addresses.
18         THE WITNESS:  Yeah, I see that.
19    A.   Yes.
20    Q.   Okay.  And the e-mail that you were
21    using, e-mail address or addresses that you
22    were using, mostly you were using what appears
23    to be your work e-mail at Bank Asiana?
24    A.   Yes.
25    Q.   And then on occasion you were also

Page 271

S. Ryu

1
2     using your personal e-mail address?
3     A.   Yes.
4     Q.   And that was JamesSJRyu@msn.com?
5     A.   Yes.
6     Q.   And Ms. Pak, her e-mail address was
7     omirimom@naver.com, correct?
8     A.   Yes.
9     Q.   And I think there was one more that
10    she used...
11         MR. DZARA:  Look on the first page.
12    BY MR. YI:
13    Q.   She had a Hotmail e-mail address
14    that was ChrisEHPak@Hotmail.com?
15    A.   Yes.
16    Q.   Okay.  And I think, in addition to
17    the e-mails, there's one document that appears
18    to be -- that was an attachment to one of the
19    e-mails.
20         Your e-mail to Ms. Pak, from
21    February 2, 2011, 1:54 p.m., Eastern Standard
22    Time.  It appears to be a copy of Ms. Pak's
23    W-2, which was issued by BankAsiana?
24    A.   Yes.
25    Q.   So this exhibit reflects e-mail

Page 272

S. Ryu

1
2     correspondence, e-mails that you sent to
3     Ms. Pak, and on occasion Ms. Pak responding to
4     your e-mails?
5     A.   Yes.
6          (Plaintiff's Exhibit 61, journal,
7     letters to Eunhee, marked for
8     identification.)
9     BY MR. YI:
10    Q.   I'm showing you what's been marked
11    as Exhibit 61 to your deposition.
12         Do you recognize this documents?
13    A.   Yes.
14    Q.   Can you tell us what they are?
15    A.   It's sort of my journal, letters to
16    Eunhee.
17    Q.   And were these generated -- were
18    these Word documents?
19    A.   Yes.
20    Q.   And did you send -- did you actually
21    send these to Ms. Pak?
22    A.   No.
23    Q.   Did you send any of them to her?
24    A.   No.
25    Q.   Now, we looked at the previous

Page 273

S. Ryu

1
2     exhibit, which is a series of e-mails that you
3     sent to her, and on occasion she responded to
4     your e-mails.  And it's from 2010, July 2010
5     through February 2012.
6          So earlier, I think when I asked you
7     about your communications with her, I think I
8     believe you said that the last time you
9     communicated with her was November 2010?
10    A.   Yes.
11         MR. DZARA:  Objection.  You asked
12    him the last time he talked to her.
13         You said communicate.
14    BY MR. YI:
15    Q.   Regardless, let me say:  When's the
16    last time you communicated with her?
17         MR. DZARA:  Objection to form.
18    A.   I would need to refresh my
19    recollection.
20    Q.   Go ahead.
21    A.   I guess February 2, 2011.
22    Q.   And referring to this -- these
23    collection of e-mails, does that refresh your
24    recollection as to when you composed these --
25    A.   Oh, I think I did.

Page 274

S. Ryu

1
2     Q.   What would you call this, by the
3  way?
4     A.   This is, like, a journal of letters,
5  you know, for me to -- just for me to digest
6  loss of good friend.
7     Q.   Right.  So these are sort of, you're
8  drafting a letter to her?
9     A.   Yes.  So -- but --
10     Q.   But you never sent it?
11     A.   Never sent it.
12     Q.   And do you recall the time period
13  that they were drafted?
14     A.   Oh, I don't know.  It might have
15  been over a period of one year.  I don't know.
16  More or less.
17         (Plaintiff's Exhibit 62, three
18     e-mails, marked for identification.)
19  BY MR. YI:
20     Q.   I'm showing you what's been marked
21  as Exhibit 62 to your deposition.  And I'll
22  represent to you that this exhibit consists of
23  three -- copies of three e-mails.
24         Do you recognize this document?
25     A.   Yes.

Page 275

S. Ryu

1
2     Q.   And starting on the second page, is
3  that a copy of Lisa Pai's e-mail to you, with a
4  copy to me, from Monday, February 10, 2014?
5     A.   Yes.
6     Q.   And turning to the bottom of the
7  first page, is that a copy of your e-mail to
8  Lisa Pai, from February 20, 2014, 2:02 p.m.?
9     A.   Yes.
10     Q.   And top of the first page, is that a
11  copy of Lisa Pai's reply e-mail to you, from
12  February 25, 2014, 8:46 p.m.?
13     A.   Yes.
14     Q.   Okay.  Now, these e-mails concern a
15  Dell personal computer and a Sony laptop, Sony
16  VAIO laptop, correct?
17     A.   Yes.
18     Q.   Now, my understanding is that your
19  position is that you may have purchased one or
20  both of these computers; is that correct?
21         MR. DZARA:  Objection.
22     A.   Purchased?
23     Q.   You personally, out of your own
24  personal funds, may have purchased one or more
25  of these computers.

Page 276

S. Ryu

1
2     A.   One more of these -- which
3  computers?
4     Q.   Well, let's take the Dell personal
5  computer first.
6         Is it your position that you
7  yourself, personally, out of your personal
8  funds, purchased that computer?
9     A.   You mean --
10     Q.   When you were at the bank?
11     A.   No, I did not.
12     Q.   What about the Sony laptop?
13     A.   No.
14     Q.   So you didn't personally pay, out of
15  your own personal funds, for either of those
16  computers?
17     A.   No.
18     Q.   Now, these were two computers that
19  you were using when you were working at
20  BankAsiana?
21     A.   Yes.
22     Q.   And when you left Wilshire Bank, I
23  believe October 4th --
24     A.   Yes.
25     Q.   -- 2013 --

Page 277

S. Ryu

1
2     A.   Yes.
3     Q.   -- did you take these computers with
4  you?
5     A.   Yes.
6     Q.   Did you speak to anyone about the
7  fact that you were taking them --
8     A.   Yes.
9     Q.   -- before you took them?
10     A.   Yes.
11     Q.   Who did you speak with?
12     A.   I spoke with the CEO, Mr. Hur.
13     Q.   Was Mr. Hur CEO at the time?
14     A.   Yes, when I asked.
15     Q.   When did you ask?
16     A.   Oh, maybe a week or even prior with
17  -- longer than a week of my departure from
18  BankAsiana, Wilshire Bank.  It was certainly
19  prior to the summation of merger agreement on
20  October 1, 2013.
21         I told them, "I'm taking those
22  computers."
23         And he said, "Sure.  Go ahead."
24         And I did ask him a few times,
25  confirmed it as I was walking out the door with

Page 278

S. Ryu

1  the computers. "I'm taking the computers."
2  He said, "Sure."
3  Q.   Was that conversation before or
4  after the merger of --
5  A.   Before --
6  Q.   Wilshire --
7  A.   I'm sorry.
8  Q.   Between Wilshire Bancorp and
9  BankAsiana?
10  A.   You mean, was it completed?
11  Q.   Yes.
12  A.   Yes, it was before.
13  Q.   It was before the effective date of
14  the merger?
15  A.   Yes.
16  Q.   And at the time, Mr. Hur was CEO?
17  A.   Yes.
18  Q.   It was not after the merger?
19  A.   No.
20  Q.   But you took the computers after the
21  merger?
22  A.   I don't know exactly what they --
23  when I took the computers, but...
24  Q.   I'll represent to you that my

Page 279

S. Ryu

1  knowledge is that you took them after the
2  merger.
3  MR. DZARA:  That's wrong.  He took
4  them before.
5  MR. YI:  He did, okay.
6  THE WITNESS:  Yeah, before.
7  MR. DZARA:  There's e-mails from --
8  there's e-mails from them.
9  BY MR. YI:
10  Q.   Now, you worked on the merger,
11  right?
12  A.   Yes.
13  Q.   As a representative of Bank Asiana?
14  A.   Yes.
15  Q.   And is it fair to say that in
16  connection with the merger, that was due
17  diligence that was performed by Wilshire
18  Bancorp?
19  A.   Yes.
20  Q.   And as part of that due diligence,
21  BankAsiana provided a list of inventory?
22  A.   I believe so.
23  Q.   Okay.  And is it fair to say that
24  the list of inventory would have included

Page 280

S. Ryu

1  computer equipment that -- BankAsiana's
2  computer equipment?
3  A.   I would think so.
4  Q.   Okay.  And before you took these two
5  computers, did you check to see whether the
6  list of inventory of BankAsiana equipment had
7  been provided to Wilshire Bancorp in connection
8  with the merger, whether it was on that
9  inventory list?
10  A.   No.
11  Q.   When you left BankAsiana, were you
12  given certain documents to execute in
13  connection with your departure?
14  A.   Yes.
15  Q.   Okay.  And was there a severance
16  agreement?
17  A.   Yes.
18  Q.   Were there any other documents that
19  you recall executing?
20  A.   There were a few different
21  documents, but I don't know as to exactly what.
22  I'm sure Bank of Hope has them.  I'm
23  sure you have them.  I know you have them.  You
24  know, but I don't know exactly what they are.

Page 281

S. Ryu

1  Q.   Okay.  Did you have an
2  identification?
3  A.   I.D.?
4  Q.   Did Wilshire Bank issue to you an
5  identification card?
6  A.   No.
7  Q.   There was no I.D.?
8  A.   No.
9  Q.   You didn't an employee I.D. or --
10  A.   Wilshire Bank?
11  Q.   Wilshire Bank.
12  A.   No.
13  Q.   Did you have any keys that were
14  issued to you by Wilshire Bank?
15  A.   Wilshire Bank?  No.
16  Q.   Was there any property of any kind
17  that was issued to you by Wilshire Bank?
18  MR. DZARA:  Objection to form.
19  You can answer, if you understand.
20  BY MR. YI:
21  Q.   Such as building I.D. or security
22  I.D. or anything like that?
23  A.   Not by BankAsiana, Wilshire Bank?
24  Q.   Wilshire Bank.

Page 282

S. Ryu

```
 1              S. Ryu
 2       A.   No.
 3       Q.   Do you have any from BankAsiana?
 4       A.   Yes.
 5       Q.   What did you have?
 6       A.   Keys.
 7       Q.   What type of keys?
 8       A.   Just key to the door of --
 9       Q.   Your office?
10       A.   -- third floor.  Yeah.  And the
11  office, yes.
12       Q.   What else?
13       A.   That's it.
14       Q.   No I.D.?
15       A.   No I.D.
16       Q.   Did you turn in the keys when you
17  left Wilshire Bank?
18       A.   I think so.
19       Q.   Did you turn in anything else?
20       A.   No.
21       Q.   So I want to just make sure I have
22  this correct in light of your counsel's
23  statements.
24            He indicated that you took the two
25  computers prior to the merger, prior to the
```

Page 283

S. Ryu

```
 1              S. Ryu
 2  effective date of the merger; is that right?
 3            MR. DZARA:  Objection.  I didn't
 4  make any representation of my opinion.  I'm
 5  simply reciting what I remember.
 6  Mr. Choi's deposition testimony, as well
 7  as, I believe e-mails Mr. Choi sent to Ms.
 8  Pai that have been marked as exhibits.
 9            I may be remembering it wrong, but
10  my memory is that it said after.
11            THE WITNESS:  I -- before.
12            MR. DZARA:  My memory is that it was
13  before the merger was complete or effective
14  on October 1st.  But...
15  BY MR. YI:
16       Q.   You can ignore what we said.  You
17  can ignore what we said.
18       A.   Right.
19       Q.   Tell us what you remember.
20       A.   I think it was before the effective
21  date of the completion of the merger, which was
22  October 1st, that I was given the computers by
23  the bank, by the CEO.  And I obviously packed
24  them and I believe -- I don't know what Choi
25  has said, but I think he loaded onto the carts
```

Page 284

S. Ryu

```
 1              S. Ryu
 2  and brought it down to my car.  And, you know,
 3  he loaded those things into my car, and I drove
 4  off.  And there were, you know, all employees
 5  saw that was being moved by Mr. Hur approved
 6  it, so...
 7       Q.   When you worked at Center Bank with
 8  Mr. Hur, I believe, and when you left Center
 9  Bank, did you ask to -- did you take any
10  computer -- bank computers home with you?
11       A.   No.
12       Q.   Did you work at another bank prior
13  to Center Bank?
14       A.   Wilshire Bank, a long time ago, back
15  in '89.
16       Q.   And when you left Wilshire Bank, did
17  you take any bank computers with you?
18       A.   No.  I -- if I may add, I never
19  asked them what I could take.  At Center Bank,
20  I didn't ask.  But the CEO provided me with
21  Omega watch and other stuff, a lot of gifts
22  when I departed.  So I mean...
23       Q.   Prior to BankAsiana --
24       A.   Yes.
25       Q.   -- when you worked at other banks --
```

Page 285

S. Ryu

```
 1              S. Ryu
 2       A.   Right.
 3       Q.   -- and when you left those banks --
 4       A.   Right.
 5       Q.   -- did you take any properties
 6  belonging to the bank?
 7       A.   No.
 8            MR. DZARA:  Objection to the form of
 9  that question.
10  BY MR. YI:
11       Q.   Did you ever ask anybody at those
12  prior banks, when you were leaving, whether you
13  could take any properties of the bank?
14            MR. DZARA:  Objection to form.
15       A.   No.
16            MR. DZARA:  You're assuming a legal
17  conclusion to that question.
18  BY MR. YI:
19       Q.   You can answer.
20       A.   No.
21       Q.   Now, let me go back to your meeting
22  with -- your second meeting with Karen Chon,
23  February 13, 2014.
24            I believe you said that at some
25  point, she asked you to help her repay Wilshire
```

Page 286

S. Ryu
1
2 Bank.
3        And correct me if I'm wrong, but I
4 believe your testimony was that you said, "no,"
5 you declined?
6     A.   I believe she asked me whether she
7 could borrow money from me to pay back Wilshire
8 Bank.  In my mind I was, like, "Are you kidding
9 me?"
10        But what I actually told her
11 ultimately was "no."  But in very nice way, "I
12 may consider but, you know, I just don't have
13 the money."  So I don't know whether you would
14 say in a word that I said "no."
15        But I didn't want to be nasty to her
16 because I still needed to propel this person to
17 get up and tell the truth.  So I wasn't being
18 very harsh.  In retrospect, I should have been,
19 you know?  I should have called the cops.  I
20 should have dragged her out of there, you know,
21 and whatever.  But I didn't do that.  It was
22 kind of dumb of me.
23     Q.   Okay.  And I think I asked you a
24 follow-up question, which was: Do you recall
25 ever telling her whether you would think about

Page 287

S. Ryu
1
2 it.
3        And I believe you said "no."
4        Is that right; you didn't tell her
5 that?  You never said to her, "I'll think about
6 it"?
7     A.   I may have.  I mean, I may have said
8 that -- I never said I would think about it
9 during the earlier time when you asked me that
10 question.
11        But now, I think I may have said,
12 "Well, I'll think, but I just don't have the
13 money."  So whether that would constitute
14 outright saying that, "Oh, I'll think about
15 it," you know, or not -- but that may have been
16 the case.
17        I know my motive there was to then
18 to have her tell the truth to the authorities
19 and to the Wilshire Bank so that I no longer
20 have to deal with this nonsense of being some
21 part of conspiracy to steal money from bank.
22        You know, so -- but then I didn't --
23 it wasn't really -- it is not everyday
24 occurrence, where you are meeting with a
25 mastermind and then somebody is putting you in

Page 288

S. Ryu
1
2 a very bad position to -- you know, getting
3 your life being ruined.  Which at the time, I
4 did not realize how far things will move along
5 to make this really, really horrible process.
6        But, you know, I mean, put it this
7 way.  Had I known then what it would be today,
8 on the first meeting, I would have called the
9 cops.  I would have had her be questioned by
10 authorities.  I would call the FBI myself on
11 her.  You know.  I should have done that.  And
12 it was very stupid of me not to do so.
13        At least I should have called, you
14 know, Lisa Pai or whatever was in charge of the
15 this ridiculous claim.  You know, as to my
16 being part of this theft, you know.
17        And if I could do it over again,
18 even at the second meeting, which you are
19 asking me now, you know, I would've called, you
20 know, authorities and cops.
21        Instead, sometime later, she was
22 doing some sort of sting job for FBI herself on
23 that particular meeting, which is very ironic.
24        You know, it's just outrageous, is
25 what I have to say about that.

Page 289

S. Ryu
1
2        But you may continue with your
3 question on second meeting with this character.
4     Q.   When you were working at BankAsiana,
5 did there come a time when Jessica Kim was
6 hired?
7     A.   Yes.
8     Q.   And do you remember around when she
9 was hired?
10     A.   I don't know.  Maybe sometime in
11 2008.
12     Q.   And after she was hired in or about
13 2008, did she ever come to you and Mr. Hur and
14 talk to the two of you about Karen Chon?
15     A.   About what?
16     Q.   Anything about Karen Chon.
17     A.   No.
18     Q.   Do you recall Jessica Kim telling
19 you about Karen Chon's prior employment at
20 Liberty Bank of New York?
21     A.   No.
22     Q.   Do you remember Jessica Kim telling
23 about Karen Chon's employment, prior employment
24 at Wilshire Bank, which had acquired Liberty
25 Bank of New York?

Page 290

S. Ryu

1  
2     A.  No.
3     Q.  Did Jessica Kim ever tell you that
4  when she and Karen Chon were both working at
5  Liberty Bank of New York, which had -- either
6  Liberty Bank of New York or Wilshire Bank,
7  after Wilshire Bank acquired Liberty Bank of
8  New York, that Karen Chon was suspected of
9  having embezzled from the bank?
10    A.  Did she ever tell me?
11    Q.  Yes, did Jessica Kim ever tell you
12 that?
13    A.  No.  Here are the facts with -- I
14 think you're trying to ask me whether I had a
15 prior acknowledge of Karen having her -- now I
16 know, the record of stealing money from her
17 previous employment.
18       Here is the clearest indication of
19 that, the fact that she stole money from either
20 Wilshire Bank before, you know, at Liberty Bank
21 or whatnot, was from Lisa Pai in about two
22 weeks prior to my departure from BankAsiana and
23 Wilshire Bank, that she was discussing the list
24 of employee -- terminating employee list.
25       And she said she went one-by-one.

Page 291

S. Ryu

1  
2  She indicated that, "I'm sorry to tell you,
3  but, you know, you, you know, will be
4  terminated effective October 4th, you know,
5  2013."
6        So I said, "I thought I had a bit
7  more time and whatnot."
8        But she said, "Sorry.  That's the
9  date set.  Along with you, we are considering
10 decisionmaking with respect to" -- I think
11 there were additional 12 or 13 different
12 employees that the bank was contemplating on
13 discharging.
14       And it included branch manager, some
15 marketeers, some, you know, ethnic market
16 specialist, and things like that.  And, in
17 fact, it included Karen, too.
18       So during that conversation, when
19 Lisa was, you know, communicating with me as
20 to, "Oh, we're thinking of terminating, let's
21 say, the branch manager of Palisades Park" --
22 and this happens to be the case.
23       "We are thinking of letting go Miye
24 Tong."  T-O-N-G, she spells it.
25       And I said, "Well, you know, she is

Page 292

S. Ryu

1  
2  pretty good at what she does, and would you not
3  reconsider this?
4        And so, out of 12 or 13 or 15 people
5  that she was making decision to terminate, we
6  had pretty good conversation as to who is
7  going, or should go and who, you know, she may
8  reconsider up on the advice of me.
9        And, in fact, what had happened was
10 initially they had planned to let go of, say,
11 somewhere around 15 people, which may include
12 me, and it ended up being, like, 11 or 12
13 termination at the end.
14       So I did "save" a few persons.
15       But when it came to Karen Chon, I
16 said to her, "It seems like, you know, she's
17 pretty good employee.  You know, why" -- and
18 she was -- now, I recall, she was pregnant and
19 about to give labor and stuff like that.  And I
20 thought it was cruel to fire her for some
21 reason.
22       So I said, "Why do you -- you know,
23 why don't you make a reconsideration on Karen?"
24       And she said -- Lisa Pai said,
25 "Absolutely not."

Page 293

S. Ryu

1  
2  I said, "Why?"
3        And she said, "Don't you know about
4  Karen?"
5        I said, "I don't know.  What are you
6  talking about?"
7        You know.  And she said -- you know,
8  she had some acknowledge that -- that Karen,
9  based off on that, should be fired.
10       Now, I don't know what -- and that
11 was really the first time that there was
12 perhaps, you know, something strong against
13 Karen through Lisa Pai, and that was really the
14 first time that I truly got the sense of the
15 severeness of her past behavior.
16       Prior to that, I believe there was
17 hearsay of some sort.  And, you know, I don't
18 even recall it, but at one point, I believe,
19 H.S., the CEO came to me and he said he heard
20 from somebody that Karen may have been, you
21 know, involved in something, you know, so, you
22 know, you should be aware.
23       And I don't even remember when or
24 how or what means, from whom he heard the
25 details.  But rather than on Jessica, as you

S. Ryu

1
2  recite and ask me question as to whether she
3  came to me and asked those questions, you know,
4  you should be aware, or statements that Karen
5  is something, I think Mr. Hur and I may have
6  been present at the time, asked Jessica to the
7  fact that, "Do you have knowledge of this
8  person doing something wacky, because you guys
9  were at the same place previously?"
10        You know, from my understanding,
11  Jessica was Liberty Bank, too, and maybe at
12  Wilshire as well.
13        And I remember this: She was, like,
14  laughing at Mr. Hur and saying, no, she
15  wouldn't do that or something like that.
16        You know, so it seems to me it's --
17  and, you know, now, you know, going through
18  this whole process -- and it's nonsensical for
19  me that I'll pay anything to the past of Karen
20  Chon character. But, you know, now we go
21  through this exercise, "Did you know?" Did I
22  not know?
23        You know, the truth is that Karen
24  and Jessica, I believe they were pretty close
25  in terms of relationship, and you know, if

S. Ryu

1
2  anything, we -- I think Mr. Hur asked --
3  questioned integrity of Karen Chon to Jessica
4  Kim, not the other way around.
5        Hope that clarifies something.
6        But, you know, the first time that I
7  really learned there's really got to be
8  something that was that, you know, when Lisa Pai
9  said definitively, there's no -- absolutely
10  question, she's got to go. And she didn't tell
11  me why exactly.
12    Q.   Okay. Have you told us everything
13  that you remember about that?
14    A.   Yes.
15    Q.   All right.
16        MR. YI: It is now 6:12, and we can
17  be on the record.
18        So, David, I think you and I have an
19  understanding. We have subpoenaed certain
20  banks and we're still waiting to receive
21  documents from which banks?
22        MR. DZARA: Doesn't matter. We have
23  to be on the record. Everybody but
24  Synchrony. You want to produce Synchrony,
25  so I assume everybody else but Synchrony.

S. Ryu

1
2        MR. YI: Okay. In addition, I'm
3  going to be writing to you about some -- we
4  did receive some bank statements from you
5  and credit card statements. But we believe
6  there may be some missing pages or missing
7  parts. So I'll follow up with you by
8  letter on that.
9        And you graciously, I believe it was
10  last week, when we discussed this
11  deposition, that you would be agreeable to
12  letting us reserve our right to possibly
13  continuing this deposition upon receipt of
14  the subpoena documents.
15        MR. DZARA: I said I would consider
16  it. I didn't promise. I said I would
17  consider it.
18        MR. YI: Well, let me just for the
19  record specifically state that we hereby
20  reserve our right to continue this
21  deposition if we determine that it's
22  necessary after we receive the subpoenaed
23  documents and after we follow up with you
24  about documents that we believe are missing
25  in the later production.

S. Ryu

1
2        MR. DZARA: That's fine. You can
3  reserve your right. And I can object if I
4  don't deem it necessary to have a second
5  dep. And we can deal it with it then.
6  We'll not have that fight now.
7        (Time Noted: 6:13 p.m.)
8
9
10        ---------------------
11        SUK JOON RYU
12  Subscribed and sworn to before me
13  this      day of          2018.
14  --------------------------------------
15  --------------------------------------
16
17
18
19
20
21
22
23
24
25

Page 298

1
2                 C E R T I F I C A T E
3
4      STATE OF NEW YORK  )
5                         ) ss.:
6      COUNTY OF NEW YORK )
7
8          I, Lisa M. Muraco, a Notary Public
9      within and for the State of New York, do
10     hereby certify:
11         That SUK JOON RYU, the witness whose
12     deposition is hereinbefore set forth, was
13     duly sworn by me and that such deposition
14     is a true record of the testimony given by
15     such witness.
16         I further certify that I am not
17     related to any of the parties to this
18     action by blood or marriage; and that I am
19     in no way interested in the outcome of this
20     matter.
21         IN WITNESS WHEREOF, I have hereunto
22     set my hand this 26th day of June, 2018.
23         ------------------------
24              LISA M. MURACO
25

Page 299

1
2                  I N D E X
3
4    WITNESS                    PAGE
5    SUK JOON RYU
6    MR. YI                       5
7
8         E X H I B I T S
9    DESCRIPTION                 PAGE
10   Plaintiff's Exhibit 1, Notice        14
11   Plaintiff's Exhibit 2, e-mail        15
12   Plaintiff's Exhibit 3, documents     50
     received from Verizon Wireless
13
14   Plaintiff's Exhibit 4, federal income  55
     tax return for tax year 2009
15   Plaintiff's Exhibit 5, certificate of  61
     Formation of Seleste LLC
16
17   Plaintiff's Exhibit 6, income tax      77
     returns for tax year 2010
18   Plaintiff's Exhibit 7, income tax      83
     returns for tax year 2011
19
20   Plaintiff's Exhibit 8, e-mail to a     87
     person by the name Mi Hyung Kim
21   Plaintiff's Exhibit 9, financial       94
     statement as of March 31, 2010
22
23   Plaintiff's Exhibit 10, account        108
     overdrawn advice notifications from
     then Royal Asian Bank
24
25   Plaintiff's Exhibit 11, e-mail string   110

Page 300

1
2      I N D E X   O F   E X H I B I T S(Cont'd.)
3    DESCRIPTION             PAGE
4    Plaintiff's Exhibit 12, MOU        114
5    Plaintiff's Exhibit 13, Advantage money   127
     market account, account number ending
6    6775
7    Plaintiff's Exhibit 14, document signed   129
     for business account Seleste LLC at
8    Royal Asian Bank
9    Plaintiff's Exhibit 15, bank statements   130
     that relate to the bank accounts of
10   Seleste LLC
11   Plaintiff's Exhibit 16, Young Lee's       131
     e-mail to Irene Lee, from October
12   30,2013, 7:02 p.m.
13   Plaintiff's Exhibit 17, two e-mails       135
14   Plaintiff's Exhibit 18, e-mail from       136
     Jeanne Kim, at Woori America Bank
15
     Plaintiff's Exhibit 19, e-mail string     139
16   with an e-mail from Jon Schwitzer
17   Plaintiff's Exhibit 20, e-mail and the    142
     attachment
18
     Plaintiff's Exhibit 21, e-mail and        144
19   attachment
20   Plaintiff's Exhibit 22, e-mail to         148
     Mr. Henry Chi
21
     Plaintiff's Exhibit 23, e-mail to         155
22   Mr. Kumar
23   Plaintiff's Exhibit 24, notice from GE    158
     Capital Retail Bank
24
     Plaintiff's Exhibit 25, e-mail from Bo    159
25   Young Lee

Page 301

1
2      I N D E X   O F   E X H I B I T S(Cont'd.)
3
     DESCRIPTION               PAGE
4
     Plaintiff's Exhibit 26, checks issued     160
5    to KORE
6    Plaintiff's Exhibit 27, e-mail from       163
     Soomi Kim
7
     Plaintiff's Exhibit 28, checks issued     164
8    to SOYU ARCHItecture
9    Plaintiff's Exhibit 29, letter that was   165
     sent to Mr. Ryu's wife from IndyMac
10   Mortgage Services
11   Plaintiff's Exhibit 30, home equity       167
     line of credit statement issued by
12   Citibank
13   Plaintiff's Exhibit 31, notice letter     168
     from Meridian Foreclosure Service
14
     Plaintiff's Exhibit 32, notice of         169
15   trustee sale
16   Plaintiff's Exhibit 33, document          188
17   Plaintiff's Exhibit 34, adjustable rate   189
     note
18
     Plaintiff's Exhibit 35, foreclosure       190
19   complaint
20   Plaintiff's Exhibit 36, Answer and        190
     Affirmative Defenses to Plaintiff's
21   Complaint and Cross-Claim
22   Plaintiff's Exhibit 37, e-mail and an     191
     attached document or letter
23
     Plaintiff's Exhibit 38, Home Affordable   192
24   Modification Agreement, dated
     January 30, 2017
25

Page 302

I N D E X   O F   E X H I B I T S (Cont'd.)

DESCRIPTION                                    PAGE

Plaintiff's Exhibit 39, document          193
related to Mr. Cooper

Plaintiff's Exhibit 40, bank statement    195
from New Millennium Bank

Plaintiff's Exhibit 41, check dated       196
November 23, 2016, paid to Nationstar

Plaintiff's Exhibit 42, e-mail and        199
check

Plaintiff's Exhibit 43, copy of a check   202
dated July 21, 2016

Plaintiff's Exhibit 44, certificate of    205
title to MINI Cooper and the second
page is certificate of title to 2000
Bentley

Plaintiff's Exhibit 45, TD Bank           206
statements

Plaintiff's Exhibit 46, three             208
promissory notes

Plaintiff's Exhibit 47, check for         211
20,000

Plaintiff's Exhibit 48, advancement of    213
salary agreement

Plaintiff's Exhibit 49, e-mail to Frank   217
Gleeson from April 20, 2010

Plaintiff's Exhibit 50, e-mail and the    218
second page is a document called
"Seleste LLC Income Statement"

Plaintiff's Exhibit 51, e-mail            220

Plaintiff's Exhibit 52, e-mail string     221

Page 303

I N D E X   O F   E X H I B I T S (Cont'd.)

DESCRIPTION                                    PAGE

Plaintiff's Exhibit 53, e-mail and        222
attachment

Plaintiff's Exhibit 54, e-mail and        222
attachment

Plaintiff's Exhibit 55, Frank Gleeson's   227
e-mail from November 8, 2011

Plaintiff's Exhibit 56, e-mail from       253
Donald Kong

Plaintiff's Exhibit 57, e-mail string     256

Plaintiff's Exhibit 58, number of         261
checks

Plaintiff's Exhibit 59, two checks        264
issued from Mr. Ryu's personal joint
account

Plaintiff's Exhibit 60, e-mail string     268
with Ms. Pak

Plaintiff's Exhibit 61, journal,          272
letters to Eunhee

Plaintiff's Exhibit 62, three e-mails     274

Page 304

ERRATA SHEET FOR THE TRANSCRIPT OF:

Case Name:     BANK OF HOPE v MIYE CHON

Dep. Date:     THURSDAY, JUNE 14, 2018

Deponent:     SUK JOON RYU

CORRECTIONS:

Pg. Ln.  Now Reads     Should Read     Reason

___ ___  _____  _____  _____
___ ___  _____  _____  _____
___ ___  _____  _____  _____
___ ___  _____  _____  _____
___ ___  _____  _____  _____
___ ___  _____  _____  _____
___ ___  _____  _____  _____
___ ___  _____  _____  _____
___ ___  _____  _____  _____
___ ___  _____  _____  _____

_____
Signature of Deponent

SUBSCRIBED AND SWORN BEFORE ME

THIS_____DAY OF_____, 2018.

_____

(Notary Public)  MY COMMISSION EXPIRES:_____